**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| **LUCAS WALL,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **SOUTHWEST AIRLINES,** | : | |
| **ALASKA AIRLINES,** | : | Case No. 6:21-cv-_____ |
| **ALLEGIANT AIR,** | : | |
| **DELTA AIR LINES,** | : | |
| **FRONTIER AIRLINES,** | : | |
| **JETBLUE AIRWAYS, and** | : | |
| **SPIRIT AIRLINES,** | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

## I. STATEMENT OF THE CASE

Plaintiff Lucas Wall brings this suit to permanently enjoin the seven airline defendants

from: A) discriminating against travelers with disabilities who seek exemptions from the

Federal Transportation Mask Mandate ("FTMM")[1] in violation of the Air Carrier Access

Act ("ACAA") (49 USC § 41705); B) enforcing any mask requirement on their passengers

– once the FTMM is struck down or repealed –who are not known to have a communica-

ble disease, also in violation of the ACAA; and C) endangering the health and safety of

their passengers by mandating masks that cause harm to human health in violation of the

---

[1] The Federal Transportation Mask Mandate consists of: 1) Executive Order 13998, 86 Fed. Reg. 7205 (Jan. 26, 2021); 2) Department of Homeland Security Determination 21-130 (Jan. 27, 2021); 3) Centers for Disease Control & Prevention Order "Requirement for Persons To Wear Masks While on Conveyances & at Transportation Hubs," 86 Fed. Reg. 8,025 (Feb. 3, 2021); 4) Transportation Security Administration Security Directives 1542-21-01A, 1544-21-02A, and 1582/84-21-01A (May 12, 2021); and 5) TSA Emergency Amendment 1546-21-01A (May 12, 2021).

terms of their operator certificate issued by the Federal Aviation Administration ("FAA") under 49 USC § 44702(b)(1)(a).

This case does not turn on the facts. The evidence is indisputable that all seven defendants for the past year or so during the COVID-19 pandemic have illegally discriminated against potentially millions of flyers with disabilities in refusing to grant any mask exemptions and/or requiring such an onerous exemption process that travelers such as myself with a medical condition that makes it impossible for them to cover their face are essentially banned from using the nation's commercial aviation system.

Rather, this case appears to present three questions of law that appear to be of first impression in the nation:

1. Although the ACAA doesn't explicitly provide for a private right for disabled travelers to sue an airline for discrimination, does congressional intent show that a private right of action is nevertheless created when the federal agency responsible for enforcing the act – the U.S. Department of Transportation ("DOT") – abrogates its legal duty to protect the rights of disabled flyers by failing for about nine months to enforce the ACAA and then issuing an enforcement directive to the airlines it regulates that clearly violates the statute?

2. May an airline require passengers who are not known to be infected with a communicable disease wear a face mask when such a requirement violates the ACAA?

3. Do airlines holding air-carrier operating certificates from the FAA violate their legal duty to provide service with the highest possible degree of health and safety in the public interest violate that obligation by requiring passengers wear masks, which are known to cause dozens of harms to human health and have created chaos in the skies with thousands of altercations?

Surprisingly, this lawsuit appears to be the first in the nation to challenge the horrendous discriminatory practices of the airline industry when it comes to enforcing the FTMM as well as their own internal policies dictating that flyers cover their faces – all in violation of the ACAA.

I filed June 7, 2021, a separate lawsuit in this district seeking to strike down all aspects of the FTMM. *Wall v. Centers for Disease Control & Prevention*, Case No. 6:21-cv-975-PGB-DCI. In that matter, I filed June 10 an Emergency Motion for Temporary Restraining Order to halt enforcement of the FTMM until the Court can consider further briefing and oral argument on an upcoming Motion for Preliminary Injunction. I am awaiting a ruling on the emergency motion.

The facts underlying both cases are similar, but the questions of law presented are different. The airline defendants' goal of easing the impact of COVID-19 is laudable but grossly misguided. In mandating masks for all passengers, the defendants have unacceptably violated the ACAA – especially when it comes to illegally discriminating against passengers with disabilities who can't medically tolerate wearing a face covering with arduous exemption requirements that aren't supported by law.

Making this matter worse is the fact that the airlines' regulatory agency, DOT, has given them guidance that actually supports their illegal behavior. Therefore, I bring this suit to enforce the ACAA since the administrative agency has neglected its statutory duty to do so. Because the agency charged by Congress to enforce the rights of passengers with disabilities has failed to protect me and millions of others similarly situated, my only recourse is a private suit in this Court to ensure the defendants cease and desist their unlawful conduct.

The airlines have acted without statutory or regulatory authority to demand that every passenger – even those with disabilities as well as those who are fully vaccinated and/or with natural immunity – obstruct their breathing by wearing a mask that covers their nose and mouth. Defendants have illegally required face coverings for the past year or so not only on board their property (aircraft) but also in public areas of airports they do not own or control. The Court must stop them from continuing to discriminate against flyers with disabilities and force them to follow the ACAA because DOT has refused to do its job.

The Court should declare the defendants' mask-exemption policies illegally discriminate against flyers with disabilities who can't tolerate face coverings and issue a permanent injunction against the airlines prohibiting them from such discriminatory conduct. Once the FTMM is struck down or repealed, the Court must also then declare the airlines' policies of requiring all passengers wear a face mask violate the ACAA's provisions concerning treatment of passengers who are not known to have a communicable disease. A permanent injunction should then issue barring defendants from ever requiring any passenger not known to have a communicable disease from being forced to muzzle themselves.

The Court should also award me – and/or issue civil fines – $35,188  in damages per violation of the ACAA, the maximum amount permitted by law. For Southwest Airlines, Delta Air Lines, and Alaska Airlines, that's $70,376 each since I have or will have been discriminated against twice. For the other four defendants, it's $35,188 each for one violation. Total damages and/or fines demanded are $351,880.

"For purposes of section 46301, a separate violation occurs under this section for each individual act of discrimination prohibited by subsection (a)." 49 USC § 41705(b). "A general civil penalty of not more than $35,188 ... applies to violations of statutory provisions and rules or orders issued under those provisions ..." 14 CFR § 383.2(a).

## II. PARTIES

Plaintiff Lucas Wall resides at 435 10th St., NE, Washington, DC 20002. I am a frequent traveler, having flown more than 1.5 million miles and visited 134 nations as well as all 56 U.S. states and territories. I am currently stranded at my mother's house in The Villages, Florida, (located in this judicial district) because Defendant Southwest Airlines refused to let me board a flight June 2, 2021, out of Orlando (MCO) to Fort Lauderdale (FLL) for not wearing a mask even though I have a qualifying disability and submitted an exemption form the same day I booked my flight.

Defendant Southwest Airlines is a common carrier subject to the ACAA. Its corporate headquarters is at 2702 Love Field Dr., Dallas, TX, 75235. Its registered agent in Florida is Prentice-Hall Corporation System, 1201 Hays St., Tallahassee, FL 32301.

Defendant Alaska Airlines is a common carrier subject to the ACAA. Its corporate headquarters is at 19300 International Blvd., Seattle, WA 98188. Its registered agent in Florida is Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.

Defendant Allegiant Air is a common carrier subject to the ACAA. Its corporate headquarters is at 1201 N. Town Center Dr., Las Vegas, NV 89144. Its registered agent in Florida is Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.

Defendant Delta Air Lines is a common carrier subject to the ACAA. Its corporate headquarters is at 1030 Delta Blvd., Atlanta, GA 30354. Its registered agent in Florida is Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.

Defendant Frontier Airlines is a common carrier subject to the ACAA. Its corporate headquarters is at 4545 Airport Way, Denver, CO 80239. Its registered agent in Florida is Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.

Defendant JetBlue Airways is a common carrier subject to the ACAA. Its corporate headquarters is at 27-01 Queens Plaza N., Long Island City, NY 11101. Its registered agent in Florida is Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.

Defendant Spirit Airlines is a common carrier subject to the ACAA. Its corporate headquarters is at 2800 Executive Way, Miramar, FL 33025. Its registered agent is Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.

### III. BASIS FOR JURISDICTION, VENUE, & STANDING

This Court has jurisdiction over this case under 28 U.S.C. § 1331: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." My claims arise under the ACAA (49 USC § 41705) and aviation safety law (49 USC § 44702).

This Court has the authority to grant declaratory and injunctive relief under the Declaratory Judgment Act and this Court's inherent equitable powers. 28 U.S.C. §§ 2201, 2202.

Venue is proper in this judicial district because a substantial part of the events giving rise to this lawsuit occurred in Orlando, Florida. "A civil action may be brought in … a

judicial district in which a substantial part of the events or omissions giving rise to the claim occurred …" 28 U.S.C. § 1391(b)(2).

I have standing to sue Defendant Southwest Airlines because it illegally discriminated against me by denying me boarding of a flight I paid for from Orlando (MCO) to Fort Lauderdale (FLL) on June 2, 2021. I have standing to sue the other six airline defendants because I have purchased tickets for flights they offer, but their burdensome mask-exemption requirements that violate the ACAA will prevent me from using these tickets.

A court order declaring unlawful and enjoining all seven defendants' illegal discrimination would redress my injuries because I would then be able to use the tickets I have bought.

## IV. STATEMENT OF FACTS

1. **MY PURCHASE OF AIRLINE TICKETS FOR SUMMER 2021 TRAVEL:** I've been taking care of my mother in The Villages, Florida – located in this judicial district – during the last several months of the COVID-19 pandemic.

2. May 31, 2021: Now that my mom and I are both fully vaccinated, I booked eight airline tickets for summer travel to see friends and family as well as visit several National Park Service units. My airline tickets are:

3. June 2, 2021: Southwest Airlines Flight 2204 from Orlando (MCO) to Fort Lauderdale (FLL). Pl. Ex. 1.

4. June 16, 2021: JetBlue Airways Flight 2319 from Fort Lauderdale (FLL) to Salt Lake City (SLC). Pl. Ex. 2.

5. June 18, 2021: Frontier Airlines Flight 2943 from Salt Lake City (SLC) to Phoenix (PHX). Pl. Ex. 3.

6. June 20, 2021: Allegiant Air Flight 543 from Mesa, Arizona, (IWA) to Houston (HOU). Pl. Ex. 4.

7. June 22, 2021: Southwest Airlines Flight 32 from Houston (HOU) to Dallas (DAL). Pl. Ex. 5.

8. June 24-25, 2021: Delta Airlines Flight 1776 from Dallas (DFW) to Atlanta (ATL), then Delta Airlines Flight 14 from Atlanta (ATL) to Frankfurt, Germany (FRA). June 30, 2021: Delta Airlines Flight 15 from Frankfurt (FRA) to Atlanta (ATL), then Delta Connection Flight 5412 from Atlanta (ATL) to Myrtle Beach, South Carolina (MYR). Pl. Ex. 6.

9. July 3, 2021: Spirit Airlines Flight 454 from Myrtle Beach (MYR) home to Baltimore/Washington (BWI). Pl. Ex. 7.

10. July 10, 2021: Alaska Airlines Flight 1032 from Washington (IAD) to Seattle (SEA). July 15, 2021: Alaska Airlines Flight 1078 from Seattle (SEA) home to Washington (IAD). Pl. Ex. 8.

11. **SUBMISSION OF MASK-EXEMPTION FORMS TO SOUTHWEST:** Immediately after booking my two tickets May 31 on Southwest, I submitted the company's "Passenger Application for Exemption to Federal Mask Requirement" for both my June 2 MCO-FLL flight and my June 22 HOU-DAL flight. Pl. Ex. 9.

12. I noted at the bottom of each form: "It is illegal pursuant to 14 CFR Part 382 to require advance notice of disability accommodation. I object to having to submit this form." *Id.*

13. I attached to each of the two forms a printout of the "Exemption to Federal Mask Requirement on Southwest Airlines" webpage. On this printout, I noted the numerous

provisions that are illegal under the ACAA (49 USC § 41705) and its accompanying regulations (14 CFR Part 382). *Id.*

14. Southwest requires disabled passengers who can't wear masks to submit the exemption form using its website's "Comment/Question – Disability – Future Travel Assistance" form. *Id.*

15. I wrote in the text box of that form: "Please note it is illegal under the Air Carrier Access Act regulations (14 CFR § 382) for you to require: 1. a disability accommodation request be submitted in advance; 2. a signed letter from my medical physician attesting to my disability that precludes me from wearing a face mask; 3. me to undergo a private medical screening with a third-party medical provider; and 4. me to provide evidence of a qualifying COVID negative viral test taken within three calendar days preceding my scheduled date of travel." *Id.*

16. I also wrote: "Your face-mask-exemption policy constitutes illegal discrimination against passengers with disabilities pursuant to the Air Carrier Access Act (49 USC § 41705). The U.S. Code and Code of Federal Regulations provisions are attached for your reference. I refuse to abide by your requests for a physician letter, private medical screening, and negative COVID test since these are illegal. Also, I am fully vaccinated and don't pose a threat to anyone." *Id.*

17. In addition to my mask-exemption form, I also attached to my submission copies of the ACAA and its accompanying regulations. *Id.*

18. After submitting my forms, I received two automatic e-mail replies from Southwest stating: "You indicated that your reason for contacting us is regarding a disability-

related service. Depending on the nature of your correspondence and regulatory re-quirements, ***it may take up to 30 days before you receive a response***." *Id.* (emphasis added).

19. Prior to my June 2 blocked flight from MCO to FLL, I did not receive any further re-sponse from Southwest.

20. As of today (June 14) – two weeks after submitting the form – I have still not received a response from Southwest concerning my mask-exemption request for my June 22 flight from HOU to DAL.

21. **I AM FULLY VACCINATED:** I received my first COVID-19 Moderna vaccine shot March 29, 2021. I received my second and final Moderna vaccine jab April 26, 2021. Pl. Ex. 10. According to CDC guidelines that a person becomes "fully vaccinated" two weeks after the final inoculation, I have been fully vaccinated since May 10, 2021.

22. **I CAN'T TOLERATE WEARING A FACE MASK:** I have suffered from General-ized Anxiety Disorder ("GAD") for many years. Pl. Exs. 11-15.

23. I am currently on medication for GAD. Pl. Ex. 16. While this helps reduce my panic attacks, the medicine does not totally eliminate them. Any time I've tried to put a mask on my face, I have experienced feelings of panic, shortness of breath, and hyperventi-lating.

24. Due to my GAD, I have never covered my face during the COVID-19 pandemic. I tried a mask a couple times for brief periods last year, but had to remove it after five or so minutes because it caused me to instigate a feeling of a panic attack, including hyper-ventilating and other breathing trouble. I carry cards in my wallet to hand to anybody who asks me to wear a mask. Pl. Ex. 17.

25. I also strongly oppose any mask mandate on numerous grounds including that it's a violation of my civil liberties to be ordered to block my nose and mouth, my only two sources of oxygen; face masks have proven to be totally ineffective in reducing COVID-19 infections and deaths; and researchers have identified dozens of health problems that occur among maskwearers.

26. "For many individuals with different types of disabilities the effects of wearing a mask are far more severe than being slightly uncomfortable. Wearing a face mask can have a significant impact on their health, wellbeing, and ability to function. … ***People with anxiety disorders and post-traumatic stress disorder (PTSD) may develop severe anxiety when wearing a face mask***." Pl. Ex. 18 (emphasis added).

27. **SOUTHWEST REFUSED TO LET ME BOARD MY FLIGHT EVEN THOUGH I'M FULLY VACCINATED & SUBMITTED An EXEMPTION FORM:** Defendant Southwest, in conjunction with the Transportation Security Administration ("TSA"), refused to let me board Flight 2204 from MCO to FLL the morning of June 2, 2021. Watch my video posted to YouTube at https://bit.ly/LucasFTMM1.

28. I reach the TSA checkpoint for Gates 70-129. TSA officer immediately hands me back my vaccination card. "Hold that, I don't need that. You need to put your mask on," he said. *Id.*

29. The TSA officer was about to hand me a mask. No, I won't wear a mask that's why I have my vaccination card. "To get in you need a mask," he told me. *Id.*

30. "Just wait on the side for me" the agent said, then he calls for a supervisor. *Id.*

31. A TSA uniformed supervisor approaches me. "You can't go through here without a mask," he tells me. Watch my video posted to YouTube at https://bit.ly/LucasFTMM2.

32. I refuse to comply with that. I can't wear a mask because of my anxiety.  The supervisor asks me to stand by. *Id.*

33. "As a rule people with disabilities do not carry documentation of disability or a doctor's note." Pl. Ex. 18.

34. "In the nonemployment context (i.e., a customer relationship), a business generally cannot demand documentation confirming that an individual is disabled or needs a particular accommodation, so businesses may run the risk of alienating customers with disabilities, or even draw a bona fide complaint to the DOJ or a lawsuit, by requiring a showing of such proof." *Id.*

35. Next blue-shirt and plain-clothes TSA supervisors approach. I'm fully vaccinated and I suffer from anxiety so I can't wear a face mask. "Do you have that on your boarding pass?" I'm asked. No I don't think so. I sent Southwest a form when I booked my ticket two days ago. "We checked with them and they don't have anything on record for you," I'm told. I have the form. Watch my video posted to YouTube at https://bit.ly/LucasFTMM2.

36. "That's something you have to take up with Southwest, but the federal mandate requires you to wear a mask in the airport," I'm told by TSA agents. Defendant Southwest has to recognize disabilities that prevent wearing a face mask under the ACAA. *Id.*

37. I tell TSA supervisors here I've got the passenger exemption to federal face mask requirement on Southwest form that I filed out when I booked my ticket two days ago. Watch my video posted to YouTube at https://bit.ly/LucasFTMM3.

38. They're saying even though I sent in the passenger application for exemption to mask mandate requirement on Southwest Airlines form that the airline hasn't placed anything special on my boarding pass to clear me through security. *Id.*

39. The situation definitely does make me anxious being put through all this just to board my flight I paid for. Just patiently waiting see if they are going to bring someone from Southwest to speak with me. I submitted the form to Southwest two days ago and got an automatic notification that my form had been received but there was no other communication indicating that my exemption had been denied or anything like that. *Id.*

40. This is taking quite a long time. Definitely aggravating to have to go through this though. A year ago this would be a nonissue. All you had to do is say "I have a medical exemption" and you'd be waived straight through. *Id.*

41. I'm now counting 12 people who seem to be assembled for this conversation about my refusal/inability to wear a mask through the TSA security checkpoint. Watch my video posted to YouTube at https://bit.ly/LucasFTMM4.

42. TSA enforces the FTMM but it's up to the airlines' discretion on whether to grant you the mask exemption, which kind of puts law enforcement into the hands of private companies, which is certainly something I object to. *Id.*

43. Southwest Airlines agents and a manager approach me. I tell them I have my boarding pass, my card showing I'm fully vaccinated, and the form I submitted to Southwest when I booked my ticket two days ago. I'm asked if I got a reply back. Nope, I did not. "Let's look in your reservation to see if it's been updated," a Southwest agent tells me. *Id.*

44. "We'll see if [your mask exemption] has been noted. Can I see the medical exemption request?" a Southwest agent asks. She tells me, "You're supposed to submit this 72

hours before your flight." But my flight was just boked two days ago, so how am I sup-
posed to submit a form 72 hours in advance? "That's our requirement" she replied.
Well that's illegal under the ACAA. *Id.*

45. "We're going to see if it's in there. If it's not in there, you'll have to be required to wear
your mask," she says. Well I will not wear a mask because of my anxiety. It gives me
panic attacks. I'm already starting to have one just based on the adversarial confronta-
tation here. All I'm trying to do is board my flight. This makes me very upset. "We're
going to check and see if it's in there," the Southwest agent replies. *Id.*

46. I told her if you call your legal department, tell them to look at 14 CFR Part [382].
Airlines are not allowed to request an exemption in advance for any accommodation
related to a disability. That is the federal regulation. I've done a lot of research on this.
"I have to adhere to the policy of Southwest Airlines," she says. *Id.*

47. "Right now you have to wear a mask in the airport. You have to get past the TSA and
you're not wearing a mask, and you don't have the medical exemption in [your reser-
vation]" she says. Just be aware if you deny me boarding, I will see you in federal court.
*Id.*

48. Southwest supervisor Tom Starr comes over and I'm told SW is going check about my
request for mask exemption I submitted two days ago after booking my ticket. Watch
my video posted to YouTube at  https://bit.ly/LucasFTMM5.

49. Mr. Kappel (sp?) from the Greater Orlando Aviation Authority, the agency that oper-
ates MCO, approaches me. He says he's been in touch with GOAA's lawyer, Mr. Ger-
ber. Mr. Kappel (sp?) asked if I have something showing that I am medically exempt
from not wearing a mask. I told him I submitted the Southwest medical exemption
form and I have the card that I normally carry. *Id.*

50. "As long as you have that, you're good to go in the terminal and all the public spaces," Mr. Kappel (sp?) says. "If we can help you, let us know. We have no problem with you because you have a medical exemption." *Id.*

51. GOAA is taking the position they are going to accept my medical exemption without requiring any other documentation. That should be the policy of TSA and the airlines as well, but that is what I am going to challenge in court. *Id.*

52. A female TSA supervisor in a flowery red-and-pink blouse just came over to talk to me and see my medical exemption form. She said her boss has shown up, so I assume that's the woman in the navy suit. There are now four TSA managers who are huddling over the situation. Meanwhile we are waiting for someone from Southwest Airlines to come back over here. Watch my video posted to YouTube at https://bit.ly/Lu-casFTMM6.

53. 9:21 a.m.: My flight boards in nine minutes and there has been a lengthy disappearance of the Southwest agents. Earlier they told me I had to submit my medical exemption form three days in advance but I booked my ticket two days ago. She didn't answer the question as to how someone is supposed to submit a form three days in advance when the ticket is purchased two days prior to the flight. *Id.*

54. A male agent with Southwest just came over to tell me "what we are trying to do, we are trying to expedite the approval but it has to go through our Customer Relations Department. I think they quoted you three days but it's actually a seven-day process." I booked my flight two days ago so I was asking your colleague how I'm supposed to submit a form seven days in advance when I book a ticket two days beforehand. *Id.*

55. "That's just part of the process," the Southwest agent says. "We're trying to get it expedited it but it has to go through an approval process. It's not something we can just

come out and say 'he's approved.' The good thing is you have your COVID vaccination card so we did share that with them. You don't happen to have a negative test that you took three days ago?" No, I reply, there's no reason for me to take a test because I'm fully vaccinated. *Id.*

56. This is creating so much anxiety for me right now to be denied the ability to just go board my flight because of my disability. *Id.*

57. 9:39 a.m.: After waiting here at the TSA checkpoint for exactly one hour, here comes the people from Southwest Airlines. "Unfortunately I tried to see if I could push this through, because you didn't meet the requirements, and unfortunately our company is saying now you have to wear a mask if you go through" the TSA checkpoint, an agent tells me. "Also I did want to give this [mask-exemption policy] to you because if you fly on Southwest a lot, that's the exemption…" she says. Pl. Ex. 19 and watch my video at https://bit.ly/LucasFTMM7.

58. That's unreasonable and not possible. "I'm sorry. We did try sir," she says. *Id.*

59. "You must not take any adverse action against an individual (e.g., refusing to provide transportation) because the individual asserts, on his or her own behalf or through or on behalf of others, rights protected by this part or the Air Carrier Access Act." 14 CFR § 382.11 (a)(4).

60. "In providing air transportation, an air carrier … may not discriminate against an otherwise qualified individual on the following grounds: (1) the individual has a physical or mental impairment that substantially limits one or more major life activities …" 49 USC § 41705(a).

61. "Major life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, ***breathing***, learning, and working." 14 CFR § 382.3 (emphasis added).

62. Three of the Southwest agents I dealt with gave me their business cards: Carolos Dunn, manager customer service; Lisa Tibbs, assistant station manager; and Anita Norris, supervisor. Pl. Ex. 20.

63. 9:48 a.m.: I'm at the Southwest ticket counter waiting for Mr. Dunn to get me the names and contact information of the people at the corporate office who denied me boarding. The employees at Southwest and TSA have been cooperative but it is outrageous to be denied boarding. Watch my video posted to YouTube at https://bit.ly/LucasFTMM8.

64. This is the sign at the Southwest check-in area indicating that "We are requiring face coverings for Customers and Employees." Southwest doesn't mention anything on the sign about exemptions for people with disabilities who can't tolerate wearing a face mask. Right now I'm waiting for a final contact for the person at Southwest headquarters in Dallas who refused to let me board my fight without a mask (her name is Melissa Dalton at the office of ground operations standards). *Id.*

65. I found many signs at airline check-in counters June 2 at MCO telling passengers they have to wear masks without mentioning mandatory exemptions for passengers for disabilities, and without noting that such a requirement only legally applies to travelers with known communicable disease. Pl. Ex. 114.

66. It wasn't until the next day (June 3) that I received another reply from Southwest regarding the two mask-exemption forms I had submitted May 31. These e-mails state,

"Due to the nature of your issue, we are forwarding your email to our Customer Relations Department for further review. ***You should expect a response to your concern within 30 days*** ..." Pl. Ex. 21 (emphasis added).

67. **AIRLINE MASK-EXEMPTION POLICIES THAT VIOLATE THE ACAA:** All seven defendants have mask-emption policies that break the law.

68. **SOUTHWEST POLICIES:** "Customers with disabilities are not required to provide advance notice of the need for assistance..." Defendant Southwest correctly states on one of its webpages. Pl. Ex. 115.

69. However, Southwest then illegally makes passengers needing a mask exemption to complete a "Passenger Application for Exemption to Federal Mask Requirement on Southwest Airlines" form and submit it at least seven days in advance. *Id.*

70. Southwest's form requires passengers to acknowledge an illegal policy that "Southwest Airlines may change my travel dates and/or flights should one or more of my originally scheduled flights have a capacity of 75% or more, or another Passenger approved for a mask exemption booked on such flight." *Id.*

71. "As a carrier, you must not limit the number of passengers with a disability who travel on a flight." 14 CFR § 382.17.

72. Southwest's policy that it may change the travel dates of a passenger with a disability, including if a flight is more than 75% booked, is clearly illegal. "You must not discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air transportation..." 14 CFR § 382.11(a)(1). *See also* 49 USC § 41705.

73. Southwest admits that prior to March 14, 2021, it did not "consider applications for exemptions from this mask requirement from Passengers with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability." Pl. Ex. 115.

74. "Per guidance from the U.S. Department of Transportation, airlines are permitted to impose certain requirements or conditions on a person requesting an exemption from the mask requirement. These requirements/conditions are described below." *Id.* As noted, DOT's guidance is illegal and thus gives me this private right of action to enforce the ACAA since DOT has failed to do so.

75. "As a mitigation measure, DOT allows airlines to schedule the passenger (not wearing a mask) on a less crowded flight." This is actually forbidden. 49 USC § 41705 and 14 CFR § 382.11(a)(1).

76. "Southwest requires that a Passenger obtaining a mask exemption travel on a flight with less than 75% capacity at the time of the flight's departure, and with no other Passengers on board approved for a mask exemption. If the passenger's preferred flight ends up being more than 50% full on the day of travel, Southwest Airlines will work to reaccommodate Passengers who obtain a mask exemption. Please note that Passengers may be required to travel on a different date than their scheduled itinerary." Pl. Ex. 115. This is all illegal. 49 USC § 41705 and 14 CFR § 382.11(a)(1).

77. "At least seven (7) days prior to the Passenger's planned date of travel, a Passenger requesting a mask exemption for travel on Southwest Airlines must complete and submit [the form]..." Pl. Ex. 115. This is illegal. 14 CFR § 382.25.

78. "A signed letter [is required] from the requesting Passenger's Medical Physician on the Physician's letterhead stating that the Passenger with a disability has a recognized medical condition precluding the wearing or safe wearing of a mask because of their disability." Pl. Ex. 115. This is illegal. 14 CFR § 382.23.

79. "Once Southwest Airlines receives a mask exemption application in line with the above criteria, at Southwest's request to Passenger, Passenger may undergo a private medical screening (over the phone) with a third-party medical provider…" Pl. Ex. 115. This is illegal. 14 CFR § 382.23(d).

80. "No later than 24 hours prior to the Passenger's scheduled departure(s), Passenger must provide evidence of Passenger's qualifying COVID negative viral test result." Pl. Ex. 115. This is illegal as it sets different requirements for passengers without and with disabilities to fly; i.e. those who can mask don't need a test, those who can't mask (even if fully vaccinated and/or naturally immune), must get an expensive test ***for each segment of their journey***. 49 USC § 41705 and 14 CFR § 382.11(a)(1).

81. "Roundtrip travel will require an additional qualifying COVID negative viral test result taken within three (3) calendar days preceding the Passenger's scheduled date of return travel and submitted no later than 24 hours prior to the Passenger's scheduled departure…" Pl. Ex. 115.

82. No provision of federal law or regulations permit an airline to require that any person be tested for a disease as a condition of carriage.

83. The most outrageous and discriminatory policy of Southwest is that "if the Passenger's originally scheduled date of travel is changed as a result of the flight having a capacity of 75% or more or another Passenger approved for a mask exemption, then you will be required to obtain a qualifying COVID negative viral test result within three (3) calendar days preceding the Passenger's new scheduled date of departure or return travel, as applicable and at your own expense." Pl. Ex. 115. So in other words, Southwest is going to violate the law by refusing to carry a disabled person because the flight is pretty full and/or because there's another disabled person on board, and then it is

going to violate the law AGAIN by mandating you get ANOTHER negative COVID-19 test when nondisabled passengers are not subject to the testing requirement. 49 USC § 41705; 14 CFR § 382.11(a)(1); 14 CFR § 382.17.

84. "Southwest Airlines will introduce tough new face mask rules that will make it even more difficult for passengers with a legitimate medical exemption to fly with the airline..." Pl. Ex. 124.

85. "Once a passenger has jumped through those hoops, Southwest Airlines will still refuse to board them if the flight is booked to 50% capacity or more. Even on a near-empty flight, an exempt passenger may still be refused boarding if there is more than one exempt passenger booked on the same flight." *Id.*

86. Before the FTMM, "Southwest Airlines barred anyone over the age of two years old from flying with them if they claimed to have a medical condition that prevented them wearing a face mask. Instead, Southwest told passengers to either delay travel indefinitely or find another airline to fly with." *Id.*

87. The other six defendants maintain similar illegal mask-exemption policies, which I will summarize briefly below, without repeating citations to the laws and regulations that prohibit their conduct.

88. **ALASKA POLICIES:** "If you have a disability and are unable to wear a mask, please call our dedicated accessible services line at 1-800-503-0101 ... to request an exemption from the mask requirement." Pl. Ex. 116.

89. "Exemptions will require: • Documentation from a licensed health care provider as to your inability to wear a mask due to your disability; and • Proof of a negative test result from an FDA approved molecular NAAT or PCR Covid-19 test taken within 72 hours of your scheduled flight departure." *Id.*

90. "Documentation from your health care provider must be submitted to Alaska Airlines at least 72 hours before your flight. We recommend that you contact us at least one week before departure to start the exemption process." *Id.*

91. **ALLEGIANT POLICIES:** Defendant Allegiant falsely represents that "federal law requires every person to wear a face covering that covers the nose and mouth at all times while traveling." Pl. Ex. 117. Of course, the FTMM is not a "law" enacted by Congress; it is a series of orders and directives illegally and unconstitutionally issued by the Executive Branch. Also, the FTMM explicitly requires transportation providers to exempt customers with disabilities who can't wear a mask.

92. Allegiant further misrepresents the FTMM by informing customers "Those with limited mobility who are unable to remove a face covering without assistance are exempt from the requirement." *Id.* But there are many other categories of exemptions under the FTMM.

93. "To request face mask exemptions. please email our Disabilities Team at ACAA@allegiantair.com at least 10 days prior to the departure of the first flight on your itinerary. Please note, if your exemption is approved. a negative COVID test will be required within 3 days of each flight segment." *Id.*

94. Allegiant makes it difficult for customers with disabilities to (illegally) request in advance a mask exemption when booking their ticket. When I booked my flight May 31, a "Special Assistance" form came up. But there is no box to check for mask exemption; I had to write the words in a box under "Other Services Information." It's been two weeks but nobody from Allegiant has responded to my Special Assistance request.

95. **DELTA POLICIES:** Defendant Delta discriminates against those who can't wear masks by flat-out telling them they "***are strongly encouraged to reconsider***

*travel* or should be prepared to complete a 'Clearance-to-Fly' process prior to departure at the airport. If you are a customer with a disability who requires this exemption, please arrive early to complete the process during check-in to avoid missing your flight. This process can take over one hour." Pl. Ex. 118 (emphasis added).

96. "Delta CEO Ed Bastian said Monday that the airline has now banned roughly 950 flyers who violated the airline's requirement that flyers wear masks onboard. ... Bans of passengers who violated mask rules are expected to last until mask requirements fade." Pl. Ex. 125.

97. **FRONTIER POLICIES:** Defendant Frontier also illegally requires advance notice and a medical certificate, among other discriminatory rules: "At least 10 days prior to departure: Submit documentation from a licensed medical provider on professional letterhead stating the customer is a person with a disability who cannot wear a mask, or cannot safely wear a mask..." Pl. Ex. 119. This means a Frontier frequent flier would have to see his/her doctor before *every trip* on the airline. In other words, Frontier, like other airlines, refuses to grant passengers who have proven their disability a permanent mask emption – meaning Frontier discriminates against disabled passengers on every single trip they take.

98. "Failure to provide 10 days' notice will result in denial of the request." *Id.*

99. "Present evidence that the customer requesting a mask exemption does not have COVID-19 by providing a negative result from a SARS-CoV-2 viral test; the specimen for the test must have been collected no more than 3 days before the applicable flight." Not only is this policy illegal discrimination, it does not logically exempt flyers who are fully vaccinated and/or naturally immune from COVID-19, presenting what's been widely described as insane "pandemic theater."

23

100.    Flyers with disabilities must endure this torment on each segment of their journey. "These testing requirements apply to return travel." *Id.*

101.    Like Defendant Allegiant, Frontier makes it difficult for passengers to seek mask exemptions. While booking my flight May 31, a screen came up for me to select if I need any "Special Services" – but there's no box to check for mask exemption. *Id.*

102.    **JETBLUE POLICIES:** Defendant JetBlue, like Defendant Delta, blatantly discriminates against passengers with disabilities by telling them: "Customers with conditions that prevent them from wearing a mask should consider postponing travel." Pl. Ex. 120.

103.    "Exemptions will be limited on board each flight and will require specific documentation." *Id.*

104.    I received an e-mail from JetBlue on June 13 regarding my upcoming June 16 flight from FLL to SLC. The airline explains the mask mandate, but fails to advise customers with disabilities that by law they may ask for an accommodation at the airport. *Id.*

105.    **SPIRIT POLICIES:** Defendant Spirit informs passengers it will view mask-exemption requests unfavorably and require illegal actions: "we allow limited exceptions for Guests who cannot wear or safely wear an appropriate face covering due to a disability recognized by the Americans with Disabilities Act (ADA) who meet certain criteria. ***The ADA exemption is narrowly interpreted and will be vetted through a strict approval process***." Pl. Ex. 121.

106.    "Contact us through our Chat feature here or via WhatsApp at 855-728-3555 with the words 'ADA face mask exemption' 48 hours prior to scheduled departure to let us know you will be asking for an exemption on the day of your flight." *Id.* Not only is requiring advance notice illegal discrimination, but Spirits also discriminates against

passengers who don't use the app "WhatsApp" or have access to a computer for an online chat.

107.    "Arrive at the airport 3 hours prior to your flight's scheduled departure since you may be screened by our medical experts." *Id.*

108.    "Have your medical doctor or medical professional complete the Spirit ADA Face Covering Exemption Form or provide a letter from your medical doctor that must meet all of the following requirements:" *Id.* Each requirement listed by Spirit violates the ACAA's regulatory provisions concerning when medical certificates may be demanded.

109.    "Present a negative COVID-19 PCR or Antigen test result, taken within 24 hours prior to scheduled departure ..." *Id.* This appears to be the most onerous illegal testing requirement of any of the defendants. Many Americans simply do not have access to rapid coronavirus testing, thus Spirit's policy intends to totally ban all passengers with disabilities from flying.

110.    "Guests who have received the COVID-19 vaccine or tested positive for antibodies must still provide a negative viral test result as described above." *Id.* Spirit has not explained the logic behind this absurd statement.

111.    "Spirit agents may contact our third-party medical professionals to determine if you're fit to fly without a mask." *Id.*

112.    "We may place you on a flight that has a lower number of Guests. You may be moved to the back of the aircraft." *Id.*

113.    As with some of its codefendants, Spirit displayed a "Special Services" form when I booked my ticket May 31, but the form lacks any box to check for a mask exemption. *Id.*

114.  **CONGRESS HAS DECLINED NUMEROUS TIMES TO AMEND THE ACAA DURING THE PANDEMIC:** Much of this case will turn on a novel question of law: When DOT fails its duty to enforce an act of Congress (the ACAA), does that create a private right of action in district court to seek airlines' compliance with the act and its regulations?

115.  In considering congressional intent, this Court has to review actions Congress has taken during the COVID-19 pandemic. Airline mask policies – and especially their discriminatory refusal to follow the law in granting exemptions to those with disabilities – without any doubt goes against the express wishes of Congress. The Legislative Branch has explicitly failed to mandate masks in any setting. This shows clear, unambiguous congressional intent.

116.  The federal legislative response to coronavirus has been enormous with 20 bills related to the COVID-19 pandemic enacted into law, eight bills having passed one chamber, and another 452 bills have been introduced. https://coronavirus.skoposlabs.com (visited May 19, 2021). *See also* Pl. Ex. 113.

117.  But none of these new laws have waived the defendants' requirement to not discriminate against passengers with disabilities, not does any provision change ACAA regulations that permit airlines to force only ***those passengers known to have a communicable disease*** from wearing a mask.

118.  None of these new laws authorize DOT to stop its obligation under the law to enforce the ACAA, however DOT has done so anyway.

119.  **FTMM, PRESIDENTIAL ACTION:** The day after taking office (Jan. 21, 2021), Defendant Biden issued "Executive Order Promoting COVID-19 Safety in Domestic &

International Travel." E.O. 13998, 86 Fed. Reg. 7205 (Jan. 26, 2021). This executive

order set in motion the FTMM issued by CDC, HHS, TSA, DHS, and DOT.

120.    **FTMM, DHS ACTION:** To carry out E.O. 13998, the Department of Homeland

Security issued Determination 21-130 on Jan. 27, 2021: "Determination of a National

Emergency Requiring Actions to Protect the Safety of Americans Using & Employed

by the Transportation System." Pl. Ex. 22.

121.    **FTMM, CDC ACTION:** Without providing public notice or soliciting comment,

Defendant CDC – an agency within HHS – issued an Order "Requirement for Persons

To Wear Masks While on Conveyances & at Transportation Hubs" on Feb. 1, 2020,

effective immediately. 86 Fed. Reg. 8,025 (Feb. 3, 2021).

122.    "This Order exempts the following categories of persons: ... ***A person with a***

***disability who cannot wear a mask, or cannot safely wear a mask***, be-

cause of the disability as defined by the Americans with Disabilities Act ..." *Id.* (em-

phasis added).

123.    The CDC Order illegally states: "Operators of conveyances or transportation hubs

may impose requirements, or conditions for carriage, on persons requesting an ex-

emption from the requirement to wear a mask, including medical consultation by a

third party, medical  documentation by a licensed medical provider, and/or other in-

formation as determined by the operator, as well as require evidence that the person

does not have COVID–19 such as a negative result from a SARS–CoV–2 viral test or

documentation of recovery from COVID–19. ... Operators may further require that

persons seeking exemption from the requirement to wear a mask ***request an ac-***

***commodation in advance***." *Id.* (emphasis added).

124.   CDC's FTMM Order is in direct conflict with the ACAA (49 USC § 41705) and the regulations promulgated thereunder. For example, "May a carrier require a passenger with a disability to provide advance notice that he or she is traveling on a flight? As a carrier, ***you must not require a passenger with a disability to provide advance notice of the fact that he or she is traveling on a flight***." 14 CFR § 382.25 (emphasis added).

125.   CDC's FTMM Order is also in gross noncompliance with numerous other regulations promulgated by Defendant DOT, who has thus far neglected its duty to enforce the ACAA. *See* 14 CFR Part 382 for an extensive list of ACAA requirements.

126.    On its website, Defendant CDC falsely claims that "Most people, including those with disabilities, can tolerate and safely wear a mask ..." Pl. Ex. 23.

127.   **FTMM, TSA ACTION:** Based on CDC's questionable delegation of its authority, TSA issued three security directives and one emergency amendment Feb. 1, 2021, to transportation operators requiring them to vigorously enforce CDC's FTMM. These four orders were effective until May 11, 2021.

128.   When TSA's FTMM security directives and emergency amendment expired, the administration extended their effective date from May 12 to Sept. 13, 2021. These are the SD's and EA currently in effect.[2]

129.   "Aircraft operators may impose requirements, or conditions of carriage, on persons requesting an exemption from the requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed medical pro-

---

[2] SD 1542-21-01A, SD 1544-21-02A, EA 1546-21-01A, and SD 1582/84-21-01A.

vider, and/or other information as determined by the air craft operator, as well as re-
quire evidence that the person does not have COVID-19 such as a negative result from
a SAR-Co V-2 viral test or documentation of recovery from COVID-19." TSA SD 1544-
21-02A, Pl. Ex. 24. These requirements violate the ACAA.

130.    "Aircraft operators may also impose additional protective measures that improve
the ability of a person eligible for exemption to maintain social distance (separation
from others by 6 feet), such as scheduling travel at less crowded times or on less
crowded conveyances, or seating or otherwise situating the individual in a less
crowded section of the conveyance or airport. ***Aircraft operators may further
require that persons seeking exemption from the requirement to wear a
mask request an accommodation in advance.***" *Id.* (emphasis added).

131.    TSA's FTMM constitutes an illegal divergence from the ACAA (49 USC § 41705)
and the regulations promulgated thereunder. For example, "May a carrier require a
passenger with a disability to provide advance notice that he or she is traveling on a
flight? As a carrier, ***you must not require a passenger with a disability to
provide advance notice of the fact that he or she is traveling on a flight***."
14 CFR § 382.25 (emphasis added).

132.    TSA's FTMM violates numerous other regulations promulgated by Defendant
DOT, who has thus far neglected its duty to enforce the ACAA during the pandemic.

133.    **FTMM, DOT ACTIONS:** DOT issued a lengthy "Frequently Asked Questions"
bulletin about the FTMM. Pl. Ex. 25.

134.    "Additional requirements or conditions may be imposed that provide greater pub-
lic health protection and are more restrictive than the requirements of the CDC Order,

including requirements for persons requesting an exemption from the mask require-
ment, including medical consultation by a third party, medical documentation by a
licensed medical provider, and/or other information as determined by the operator."
*Id.*

135.   DOT's FTMM FAQ's lack legal foundation under the ACAA (49 USC § 41705) and
the regulations promulgated thereunder.

136.   **DOT HAS FAILED TO ENFORCE THE ACAA  & ITS OWN REGULA-
TIONS:** The Office of Aviation Consumer Protection ("OACP"), a unit within the Of-
fice of the General Counsel of Defendant DOT, issued a Notice of Enforcement Policy
Feb. 5, 2021, "Accommodation by Carriers of Persons with Disabilities Who Are Una-
ble to Wear or Safely Wear Masks While on Commercial Aircraft" "to remind U.S. and
foreign air carriers of their legal obligation to accommodate the needs of passengers
with disabilities when developing procedures to implement the Federal mandate on
the use of masks to mitigate the public health risks associated with the Coronavirus
Disease 2019 (COVID-19)." Pl. Ex. 26.

137.   "OACP will exercise its prosecutorial discretion and provide airlines 45 days from
the date of this notice to be in compliance with their obligation under the Air Carrier
Access Act ("ACAA") and the Department's implementing regulation in 14 CFR Part
382 ("Part 382") to provide reasonable accommodations to persons with disabilities
who are unable to wear or safely wear masks, so long as the airlines demonstrate that
they began the process of compliance as soon as this notice was issued." *Id.*

138.   The 45-day deadline was March 22, 2021. But there is no evidence DOT has taken
any enforcement action against the seven airline defendants for violating the ACAA as
these airlines continue to enforce their illegal discriminatory policies requiring, for

example, that passengers with a disability that prevents them from wearing a mask must submit a request in advance in violation of 14 CFR § 382.25.

139.    "[T]he ACAA and Part 382, which are enforced by OACP, require airlines to make reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear or safely wear a mask due to their disability." *Id.*

140.    "To ensure that only qualified persons under the exemptions would be able to travel without a mask, the CDC Order permits operators of transportation conveyances, such as airlines, to impose requirements, or conditions for carriage, on persons requesting an exemption, including ***requiring a person seeking an exemption to request an accommodation in advance***, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the operator. The CDC Order also permits operators to require protective measures, such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19 or seating or otherwise." *Id.* (emphasis added).

141.    OACP's Notice of Enforcement Policy did not advise airlines that the CDC's Order allowing carriers to impose additional requirements is illegal (such as requesting a mask exemption in advance, submitting to a third-party medical consultation, submitting a medical certificate, and requiring a negative COVID-19 test). *Id.*

142.    "As a carrier, you must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability, except as specifically permitted by this part." 14 CFR § 382.19(a).

143. "Except as provided in this section, ***you must not require a passenger with a disability to have a medical certificate as a condition for being provided transportation***." 14 CFR § 382.23(a) (emphasis added).

144. "You may also require a medical certificate for a passenger ***if he or she has a communicable disease or condition that could pose a direct threat to the health or safety of others on the flight***." 14 CFR § 382.23(c)(1) (emphasis added). This requirement does not include ***speculation*** that a person ***might*** have a communicable disease such as COVID-19; evidence is required that the passenger ***has*** a communicable disease, i.e. has tested positive for the coronavirus.

145. Since airlines may not require a medical certificate for a passenger unless he/she has a communicable disease, they may also not require a third-party medical consultation. "As a carrier, you may require that a passenger ***with a medical certificate*** undergo additional medical review by you ***if there is a legitimate medical reason for believing that there has been a significant adverse change in the passenger's condition*** since the issuance of the medical certificate ..." 14 CFR § 382.23(d) (emphasis added).

146. No provision of the ACAA or its accompanying regulations promulgated by DOT permits airlines to require passengers submit a negative test for any communicable disease.

147. In its Feb. 5 Notice of Enforcement Policy, OACP admitted it had failed to enforce the ACAA and its regulations in 2020 when many airlines banned all passengers with disabilities who could not wear a face covering: "Some carriers have adopted policies that expressly allow 'no exceptions' to the mask requirement other than for children under the age of two. OACP has received complaints from persons who assert they

have a disability that precludes their wearing a mask, and who contend that they were denied transport by an airline under a 'no exceptions allowed' mask policy." Pl. Ex. 26.

148.   "The CDC and other medical authorities recognize that individuals with certain medical conditions may have trouble breathing or other difficulties such as being unable to remove the mask without assistance if required to wear a mask that fits closely over the nose and mouth." *Id.*

149.   "It would be a violation of the ACAA to have an exemption for children under 2 on the basis that children that age cannot wear or safely wear a mask and not to have an exemption for … individuals with disabilities who similarly cannot wear or safely wear a mask when there is no evidence that these individuals with disabilities would pose a greater health risk to others." *Id.*

150.   "The ACAA prohibits U.S. and foreign air carriers from denying air transportation to or otherwise discriminating in the provision of air transportation against a person with a disability by reason of the disability. When a policy or practice adopted by a carrier has the effect of denying service to or otherwise discriminating against passengers because of their disabilities, the Department's disability regulations in Part 382 require the airline to modify the policy or practice as necessary to provide nondiscriminatory service to the passengers with disabilities …" *Id.*

151.   "Part 382 allows an airline to refuse to provide air transportation to an individual whom the airline determines presents a disability-related safety risk, provided that the airline can demonstrate that the individual would pose a 'direct threat' to the health or safety of others onboard the aircraft, and that a less restrictive option is not feasible." *Id.*

152.    OACP illegally advised airlines that "In accordance with the CDC Order, as convey-
ance operators, airlines are required to implement face mask policies that ***treat pas-
sengers presumptively as potential carriers of the SARS-CoV-2 virus*** and,
therefore, as presenting a potential threat to the health and safety of other passengers
and the crew." *Id.* This advice violates 14 CFR § 382.23(c)(1), which provides that an
airline must have evidence that the passenger ***"has"*** a communicable disease, i.e. has
tested positive for the coronavirus. A "presumptive" determination that every single
airline passenger – even those who are fully vaccinated and/or naturally immune – is
infected with COVID-19 is not only scientifically impossible, it goes against the plain
language of 14 CFR § 382.23(c)(1).

153.    OACP wrongly informed airlines Feb. 5 that "both the CDC Order and Part 382
permit airlines to require passengers to consult with the airline's medical expert
and/or to provide medical evaluation documentation from the passenger's doctor suf-
ficient to satisfy the airline that the passenger does, indeed, have a recognized medical
condition precluding the wearing or safe wearing of a mask." Pl. Ex. 26. *See* 14 CFR §
382.23(a).

154.    OACP wrongly informed airlines that "Part 382, like the CDC Order, permits air-
lines to require passengers with disabilities who are unable to wear masks to request
an accommodation in advance." *See* 14 CFR § 382.25.

155.    OACP wrongly informed airlines that they "may impose protective measures to re-
duce or prevent the risk to other passengers. For example, airlines may require pro-
tective measures, such as a negative result from a SARS-CoV-2 test, taken at the pas-
senger's own expense, during the days immediately prior to the scheduled flight." Pl.

Ex. 26. As noted above, there is no provision of the ACAA or 14 CFR Part 382 that allows airlines to require a negative test to board a plane.

156.   "Airlines are expected to review their face mask policies immediately and to revise them as necessary to comply with the ACAA and Department's disability regulation in Part 382." *Id.* However, DOT has failed its duty to enforce the ACAA and its regulations, as evidenced by the seven defendants' continuance of policies that violate Part 382 more than four months after the DOT issued its faulty notice.

157.   Information provided to passengers by DOT contradicts OACP's Feb. 5 Notice of Enforcement Policy. In a document "New Horizons: Information for the Air Traveler with a Disability," DOT informs flyers that "***Airlines may not require passengers with disabilities to provide advance notice of their intent to travel or of their disability*** ..." Pl. Ex. 27 (emphasis added).

158.   "A medical certificate is a written statement from the passenger's physician saying that the passenger is capable of completing the flight safely without requiring extraordinary medical care. A disability is not sufficient grounds for a carrier to request a medical certificate. ***Carriers shall not require passengers to present a medical certificate unless the person: ... Has a communicable disease or infection that has been determined by federal public health authorities to be generally transmittable during flight***." *Id.* (emphasis added).

159.   "If a person who seeks passage ***has an infection or disease*** that would be transmittable during the normal course of a flight, and ***that has been deemed so by a federal public health authority knowledgeable about the disease or in-***

*fection, then the carrier may: ... Impose on the person a condition or requirement not imposed on other passengers (e.g., wearing a mask)*." *Id.* (emphasis added).

160.   DOT publishes a 190-page handbook "What Airline Employees, Airline Contractors, & Air Travelers with Disabilities Need to Know About Access to Air Travel for Persons with Disabilities: A Guide to the Air Carrier Access Act (ACAA) and its implementing regulations, 14 CFR Part 382 (Part 382)." Relevant excerpts of this handbook are attached as Pl. Ex. 28.

161.   "In 1986, Congress passed the ACAA, which prohibits discrimination by U.S. air carriers against qualified individuals with disabilities. 49 U.S.C. 41705. In 1990, the Department of Transportation (DOT) issued part 382, the regulations defining the rights of passengers with disabilities and the obligations of U.S. air carriers under the ACAA." *Id.*

162.   "In 2000, Congress required DOT to create a technical assistance manual to provide guidance to individuals and entities with rights or responsibilities under the ACAA. This manual responds to that mandate." *Id.*

163.   "May I ask an individual what his or her disability is? Only to determine if a passenger is entitled to a particular seating accommodation pursuant to section 382.38. *Generally, you may not make inquiries about an individual's disability or the nature or severity of the disability*." *Id.*

164.   "*You must not refuse transportation to a passenger solely on the basis of a disability*. [Sec. 382.31(a)]." *Id.* (emphasis added).

165.    "***You shall not require a passenger with a disability*** to travel with an attendant or ***to present a medical certificate***, except in very limited circumstances. [Secs. 382.35(a) and 382.53(a)]" *Id.* (emphasis added).

166.    "***You cannot require passengers with disabilities to provide advance notice of their intention to travel or of their disability*** except as provided below. [Sec. 382.33(a)]." *Id.* (emphasis added).

167.    "If you are faced with particular circumstances where you are required to make a determination as to whether a passenger with a communicable disease or infection poses a direct threat to the health or safety of others, ***you must make an individualized assessment*** based on a reasonable judgment, relying on current medical knowledge or the best available objective evidence." No presumptive judgment that every single person has a communicable disease or infection is permitted. *Id.* (emphasis added).

168.    "If, in your estimation, a passenger ***with a communicable disease or infection*** poses a direct threat to the health or safety of other passengers, you may … (iii) impose on that passenger a special condition or restriction ***(e.g., wearing a mask)***." … [Sec. 382.51(b)(4)]." *Id.* (emphasis added).

169.    "Except under the circumstances described below, ***you must not require medical certification of a passenger with a disability as a condition for providing transportation***. You may require a medical certificate only if the passenger with a disability is an individual who is traveling on a stretcher or in an incubator (where such service is offered); needs medical oxygen during the flight (where

such service is offered); or has a medical condition that causes the carrier to have reasonable doubt that the passenger can complete the flight safely without requiring extraordinary medical assistance during the flight. [Sec. 382.53 (a) and (b)]." *Id.*

170.   "In addition, if you determine that a passenger ***with a communicable disease or infection*** poses a direct threat to the health or safety risk of others, you may require a medical certificate from the passenger. [Sec. 382.53(c)(1)]." *Id.* (emphasis added).

171.   "Generally, you must not refuse travel to, require a medical certificate from, or impose special conditions on a passenger with a communicable disease or infection." *Id.*

172.   "Some Examples of Mental or Psychological Impairments [Sec. 382.5(a)(2)]: Mental retardation; Depression; ***Anxiety disorders*** ..." *Id.* (emphasis added).

173.   "Discrimination is Prohibited: Management of carriers are required to ensure that the carrier ... does not discriminate against qualified individuals with a disability by reason of such disability. [Sec. 382.7(a)(1)]." *Id.*

174.   "***Carriers must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability unless it is expressly permitted*** by the ACAA and part 382. [Sec. 382.31(a)]." *Id.* (emphasis added).

175.   **CDC MASK GUIDELINES:** After 14 months of conflicting and confusing advice on face coverings, CDC updated its guidance May 13, 2021: "vaccinated people don't need masks in most places: ... ***people who are fully vaccinated can stop wearing masks*** ...." Pl. Ex. 29. (emphasis added).

176.   Defendant CDC finally admitted "The science is clear***: If you are fully vaccinated, you are protected, and you can start doing the things that you stopped doing because of the pandemic*** ..." *Id.* (emphasis added).

177.    CDC's May 13 "Interim Public Health Recommendations for Fully Vaccinated Peo-
ple" states: "***Fully vaccinated people can: Resume activities without wear-
ing masks*** or physically distancing ... Resume domestic travel and ***refrain from
testing before or after travel*** or self-quarantine after travel..." *Id.* (emphasis
added).

178.    CDC issued a color-coded chart showing that the fully vaccinated should not wear
a mask in any listed situation. Pl. Ex. 30.

179.    "Currently authorized vaccines in the United States are highly effective at protect-
ing vaccinated people against symptomatic and severe COVID-19. Additionally, a
growing body of evidence suggests that fully vaccinated people are less likely to have
asymptomatic infection or transmit SARS-CoV-2 to others." Pl. Ex. 29.

180.    Airlines are continuing to enforce mask requirements not only in violation of the
ACAA but in ignorance of the science showing that masks are totally ineffective
measures when it comes to reducing COVID-19 infections and fatalities. The mask
policies of the defendants also undermine public confidence in vaccines, as seen by a
rapidly decreasing number of daily vaccine doses administered across the nation.

181.    "Guiding Principles for Fully Vaccinated People: Indoor and outdoor activities
pose minimal risk to fully vaccinated people. Fully vaccinated people have a reduced
risk of transmitting SARS-CoV-2 to unvaccinated people. ... ***Risk of SARS-CoV-2
infection is minimal for fully vaccinated people. The risk of SARS-CoV-2
transmission from fully vaccinated people to unvaccinated people is also
reduced. Therefore, fully vaccinated people can resume activities with-
out wearing a mask*** ... Fully vaccinated travelers are less likely to get and spread

SARS-CoV-2 and can now travel at low risk to themselves ..." Pl. Ex. 29 (emphasis added).

182. Despite all these strong statements that the vaccines are effective and the fully inoculated don't need to cover their faces, the airlines have given no rational explanation for their failure to get rid of their stringent mask rules that breach the ACAA.

183. CDC "said additional data in the past few weeks has shown the effectiveness of the vaccines in the real world, the vaccines work against variants, and vaccinated people are unlikely to transmit the virus." Pl. Ex. 31.

184. **DEFENDANTS IGNORED BETTER OPTIONS THAN IMPOSING UNLAWFUL MASK MANDATES:** The airlines have more effective tools at combatting COVID-19 spread than requiring their passengers be muzzled (and refusing to grant medical exemptions). However, for the most part, the defendants have not worked to implement these better procedures to reduce infections in the transportation sector – especially as they effect the fully vaccinated and/or those who recovered from coronavirus and now have natural immunity. These passengers such as myself – more than half of Americans – pose no threat to others. Yet there's no evidence that the airlines have sought the government's cooperation in using existing federal procedures that actually target the sick.

185. For example, in June 2007, HHS, CDC, and DHS developed a public-health Do Not Board ("DNB") list, enabling domestic and international health officials to request that individuals with communicable diseases who meet specific criteria, including having a communicable disease that poses a public health threat to the traveling public, be restricted from boarding commercial aircraft arriving into, departing from, or traveling within the United States. CDC published a Notice six years ago concerning the

"Criteria for Requesting Federal Travel Restrictions for Public Health Purposes…" 18 Fed. Reg. 16,400 (March 27, 2015). Pl. Ex. 32.

186.   There also exists a complimentary Public Health Border Lookout Record ("Lookout") for individuals with communicable diseases that pose a public-health threat to travelers to restrict them from boarding commercial aircraft arriving into, departing from, or traveling within the United States. *Id.*

187.   Once an individual is placed on the DNB list, airlines are instructed not to issue a boarding pass to the individual for any flight. Individuals included on the DNB list are assigned a Lookout record that assists in ensuring that an individual placed on the DNB list is detected if he or she attempts to enter or depart the United States. *Id.*

188.   "Currently, HHS/CDC considers whether: (1) The individual is known or reasonably believed to be infectious or reasonably believed to have been exposed to a communicable disease and may become infectious with a communicable disease that would be a public health threat should the individual be permitted to board a commercial aircraft or travel in a manner that would expose the public …" *Id.*

189.   TSA "has the authority to accept the services of, or otherwise cooperate with, other federal agencies including implementing the DNB list.  … In administering the DNB list, TSA relies on CDC to make public health findings as the basis for its request." *Id.*

190.   I have found no evidence that the airline defendants have worked in conjunction with the federal government to use the DNB list and Lookout system to stop people who have tested positive for COVID-19 from traveling during the time they are a danger to spread the virus to others (typically considered to be two weeks).

191.    "Disease is just a flight away. To protect America's health, CDC partners with the Department of Homeland Security to prevent the spread of serious contagious diseases during travel. CDC uses a Do Not Board list to prevent travelers from boarding commercial airplanes if they are known or suspected to have a contagious disease that poses a threat to the public's health. Sick travelers are also placed on a Lookout list so they will be detected if they attempt to enter the United States by land or sea. These tools can be used for anyone who poses a threat to the public's health." Pl. Ex. 33.

192.    If the defendants truly cared about preventing COVID-19 transmission on their planes, they would have worked with CDC, HHS, DHS, TSA, and other federal partners to use the DNB and Lookout systems. Instead, they illegally treat every single passenger as having the coronavirus and mandating they wear masks in defiance of the science that face coverings do nothing to prevent COVID-19 infections and deaths.

193.    "The criteria for adding people to the Do Not Board and Lookout lists are 1. Known or believed to be infectious with, or at risk for, a serious contagious disease that poses a public health threat to others during travel; and any of the following three: 1. not aware of diagnosis or not following public health recommendations, or 2. Likely to travel on a commercial flight involving the United States or travel internationally by any means; or 3. Need to issue travel restriction to respond to a public health outbreak or to help enforce a public health order." *Id.*

194.    "Once public health authorities confirm a person is no longer contagious, the person is removed from the lists (typically within 24 hours). Also, CDC reviews the records of all persons on the lists every two weeks to determine whether they are eligible for removal." *Id.*

195.    Also, it appears Defendant Frontier is the only airline using a simple mitigation strategy that doesn't discriminate against anyone who isn't actually ill: "Frontier is the first U.S. airline to take passengers' temperatures with a touchless thermometer before boarding, and will block anyone with a temperature of 100.4 F or higher from flights." Pl. Ex. 128.

196.    It's a mystery why the other defendants don't appear to be utilizing this simple measure to check for fevers (a key symptom of COVID-19) before check in or boarding.

197.    **STATES WITHOUT MASK MANDATES SUFFERED FEWER DEATHS:** Defendants' reliance on mask mandates ignores the reality that the 10 states that never implemented a statewide mask mandate have 157 deaths attributed to COVID-19 per 100,000 residents compared with the national average of 165. Whereas the 40 states that had a statewide mask requirement at some point during the pandemic have a death rate of 167. Pl. Ex. 34.

198.    **DEFENDANTS' MASK POLICIES HAVE CREATED CHAOS IN THE SKIES, ENDANGERING AVIATION SAFETY:** In addition to the tens of millions of Americans who can't safely obstruct their breathing because of a medical condition, tens of millions more Americans vehemently object to anyone ordering them to wear face masks. This is evidenced by the at least 2,500 incidents of unruly behavior aboard airplanes reported to FAA during the pandemic.

199.    Airlines continue to mandate masks in violation of the ACAA despite the fact they know such rules put airline passengers and flight crews in danger as some people violently stand up for their right not to wear a mask. This is at odds with their legal "duty … to provide service with the highest possible degree of safety in the public interest …" to maintain their operating certificates. 49 USC § 44702(b)(1)(a).

200.   "Since Jan. 1, the Federal Aviation Administration has received about 2,500 re-ports of unruly behavior by passengers, including about 1,900 reports of passengers refusing to comply with a federal mandate that they wear masks on planes. The agency said that in the past it did not track reports of unruly passengers because the numbers had been fairly consistent over the years, but that it began receiving reports of a 'significant increase' in disruptive behavior starting in late 2020." Pl. Ex. 35.

201.   "We have just never seen anything like this," Sara Nelson, the international president of the Association of Flight Attendants, said during an online meeting with federal aviation officials. "We've never seen it so bad." *Id.*

202.   As a former commercial airline captain, FAA Administrator Steve Dickson said he knows that disruptive passengers can pose a safety risk. *Id.*

203.   All of the "unruly" behavior seen aboard airplanes when airlines try to enforce their illegal mask policies is explained by science: "Wearing masks, thus, entails a feeling of deprivation of freedom and loss of autonomy and self-determination, which can lead to suppressed anger and subconscious constant distraction, especially as the wearing of masks is mostly dictated and ordered by others. These perceived interferences of integrity, self-determination and autonomy, coupled with discomfort, often contribute to substantial distraction and may ultimately be combined with the physiologically mask-related decline in psychomotoric abilities, reduced responsiveness, and an overall impaired cognitive performance," according to a study recently published in the International Journal of Environmental Research & Public Health. Pl. Ex. 36.

204.   Being forced to cover a person's only two sources of oxygen – breathing is of course essential to maintaining life – "leads to misjudging situations as well as delayed, incorrect, and inappropriate behavior and a decline in the effectiveness of the mask wearer." *Id.*

205.   "The use of masks for several hours often causes further detectable adverse effects such as headaches, local acne, mask-associated skin irritation, itching, sensations of heat and dampness, impairments, and discomfort predominantly affecting the head and face. However, the head and face are significant for well-being due to their large representation in the sensitive cerebral cortex (homunculus)." *Id.*

206.   The defendants are negligently risking the health and welfare of their passengers and employees by continuing to require masks 15 months into the pandemic as U.S. infections, hospitalizations, and deaths plummet.

207.   The defendants' conduct violates federal law requiring that airlines have a "duty … to provide service with the highest possible degree of safety in the public interest …" to maintain their operating certificates. 49 U.S. Code § 44702(b)(1)(a).

208.    "It is no secret that the threats flight attendants face each day have dramatically increased," said a letter to union members from Julie Hedrick, president of the Association of Professional Flight Attendants. "Every day, we are subjected to verbal and sometimes physical altercations, mainly centered around mask compliance." Pl. Ex. 37.

209.   "Airlines and federal officials have noted an uptick in passenger misbehavior. Flight attendant union leaders have attributed much of the uptick in passengers refusing to wear masks …" *Id.*

210.    "President Joe Biden made a federal face mask rule on planes one of his first executive orders after he took office. But passenger misbehavior has continued throughout the year despite numerous fines against passengers proposed by the FAA." *Id.*

211.    May 28, 2021: "Incidents of unruly behavior from airplane passengers has risen to an unprecedented level this year, union leader Sara Nelson told CNBC on Friday, the start of the Memorial Day holiday weekend. 'This is an environment that we just haven't seen before, and we can't wait for it to be over,' the president of the Association of Flight Attendants-CWA said ... She noted the role masks are playing in the surge..." Pl. Ex. 38.

212.    "[P]assengers have verbally abused and taunted flight attendants trying to enforce airline mask requirements ... The displays of rule-bucking intransigence are described in more than 150 aviation safety reports filed with the federal government since the start of the pandemic ..." Pl. Ex. 39.

213.    "A flight attendant reported being so busy seeking mask compliance that the employee couldn't safely reach a seat in time for landing. One airline captain, distracted by mask concerns, descended to the wrong altitude. The repeated talk of problem passengers in Row 12 led the captain to mistakenly head toward 12,000 feet, not a higher altitude given by air traffic control to keep planes safely apart." *Id.*

214.    But passengers are allowed by defendants to drop their masks to eat and sip beverages, negating all possible positive impacts of required muzzling. "When you start opening it up to eating, the whole thing kind of weakens," Slovic said. *Id.*

215.    Carrying out mask rules also worsens the already strained position of flight attendants, who are frontline enforcers even as they keep their usual safety responsibilities,

experts said. "Flight attendants are dealing with mask compliance issues on every single flight they work right now," said Taylor Garland, spokeswoman for the Association of Flight Attendants-CWA, noting that those efforts range from friendly reminders to facing passengers "actively challenging the flight attendants' authority." *Id.*

216. **SAFETY INCIDENTS ABOARD SOUTHWEST:** "Two major airlines, American and Southwest, have postponed plans to resume serving alcohol on flights in an effort to stop a surge of unruly and sometimes violent behavior by passengers who have shoved, struck, and yelled at flight attendants. Both airlines announced the policies this week after the latest assault was captured on a widely watched video that showed a woman punching a flight attendant in the face on a Southwest Airlines flight from Sacramento to San Diego," The New York Times reported May 29, 2021. Pl. Ex. 35.

217. "A Southwest Airlines flight attendant who lost two teeth after she was physically assaulted by a passenger on Sunday is among the more egregious examples of an unsettling increase in unruly and dangerous behavior on the part of air travelers. There were 477 passenger misconduct incidents on Southwest flights between April 8 and May 15 ..." Pl. Ex. 47.

218. "The Southwest Airlines flight attendant who got two of her teeth knocked out by a passenger was 'very unprofessional' and provoked the wild altercation, another flier said. The shocking incident unfolded just after a flight from Sacramento landed in San Diego on Sunday. It began when the unnamed flight attendant confronted passenger Vyvianna Quinonez, 28, and her other family members about putting their face masks back on ..." Pl. Ex. 48.

219.   "Southwest Airlines issued a statement on Friday citing the 'recent uptick indus-trywide of incidents in-flight involving disruptive passengers' as it announced that it had paused plans to resume serving alcohol on flights. ... American Airlines an-nounced a similar policy on Saturday. It said that alcohol sales, which had been sus-pended in the main cabin since late March 2020, would remain suspended through Sept. 13, when a federal mandate requiring passengers to wear masks on airplanes, buses, and trains is set to expire." Pl. Ex. 35.

220.   A "male passenger aboard a Southwest Airlines flight from Chicago to Sacramento on Jan. 26 refused to comply with a flight attendant's instructions to wear a mask over his nose and mouth. The man became combative and used offensive language when a second flight attendant told him he was required to wear a mask, according to the FAA, which said that the passenger hit one of the flight attendants with his bags when he was ordered to leave the plane." Pl. Ex. 41.

221.   "This unprecedented number of incidents has reached an intolerable level, with passenger non-compliance events also becoming more aggressive in nature." Pl. Ex. 47.

222.   **SAFETY INCIDENTS ABOARD ALASKA:** A Colorado man is now facing fed-eral charges over an alleged mask dispute while taking a flight from Seattle to Denver this week. "According to the facts contained in the complaint, on March 9, 2021, Grier was a passenger onboard Alaska Airlines flight 1474 traveling from Seattle to Denver," a release from the Department of Justice reads. "During the flight, Grier was asked eight to ten times to put on a face mask, as required by airline policy. Grier initially ignored the flight attendant, but then struck her arm." Pl. Ex. 40.

223.   A "flier on an Alaska Airlines plane preparing to fly from Bozeman, Mont., to Seattle who ignored repeated reminders to wear a mask, causing the plane to return to the gate, according to the FAA. The incidents of passengers being unruly — ignoring crew members' instructions, fighting and refusing to wear a mask — have been surging, according to the FAA, even while the number of Americans flying on commercial planes remains about 40% below pre-pandemic levels." Pl. Ex. 49.

224.   FAA "is warning air travelers about what it describes as a dramatic increase in unruly or dangerous behavior aboard passenger airplanes. ... In Fort Lauderdale, Florida, for example, a fistfight broke out amid a dispute over mask-wearing. In Washington, D.C., a passenger was escorted off a flight after arguing with flight attendants over the mask rule. ... In recent days, Alaska Airlines banned an Alaska state senator for refusing to comply with mask requirements..." Pl. Ex. 42.

225.   Angela Hagedorn, a former flight attendant with Alaska, tweeted that she recently resigned.  "It has been an exhausting time for all the employees who are just trying to do their job according to their company's policies," she said. "The constant arguing and pushback from guests, it's ridiculous." *Id.*

226.   "What we have seen on our planes is flight attendants being physically assaulted, pushed, choked," Nelson said. "These are some of the things that we have been dealing with," she said, adding that the physical and verbal abuse that flight attendants have experienced this year has been "way off the charts" compared to the last 20 years. *Id.*

227.   "In January, a passenger on Alaska Airlines shoved a flight attendant who was walking down the aisle and documenting which passengers were wearing masks ..." Pl. Ex. 35.

228. **SAFETY INCIDENTS ABOARD ALLEGIANT:** "On an Allegiant Air flight in August, a passenger hit a flight attendant, yelled obscenities at him, and grabbed his phone as he described a mask-related dispute to the captain…" *Id.*

229. "A man was removed from an Allegiant Air flight Monday morning to Punta Gorda, Florida, after allegedly asking a flight attendant to put a face mask on…" Pl. Ex. 41.

230. "A woman is facing a $9,000 fine for continually refusing to wear a mask properly and cursing at flight attendants on a February 15 Allegiant Air flight from Ft. Lauderdale, Florida, to Knoxville, Tennessee." *Id.*

231. "The unprecedented number of incidents has reached an intolerable level, with passenger noncompliance events also becoming more aggressive in nature." *Id.*

232. **SAFETY INCIDENTS ABOARD DELTA:** "A Delta Air Lines passenger is facing a $27,500 fine for allegedly striking a flight attendant in the face in October. The Federal Aviation Administration on Friday announced the proposed civil penalty for an unnamed passenger traveling on a flight from Miami to Atlanta on Oct. 19. The FAA says the passenger, who has 30 days to respond, was traveling with another passenger who refused to wear a mask, fasten his seat belt, or put up the tray table. As a result, the flight returned to the gate, and the passengers were asked to get off the plane. The passenger facing the fine ignored the flight attendant's instructions to leave the plane, began swearing at the flight attendant, and then struck her under her left eye, the agency says." *Id.*

233. "The FAA adopted a stricter policy on unruly passenger behavior in January due to incidents involving Capitol riot participants and a steady stream of passengers refusing to comply with airline mask policies. Passengers will no longer get any warnings. At the time, the FAA said it had seen a 'disturbing increase' in incidents in which

passengers have disrupted flights with violent behavior or threats of violent behavior." *Id.*

234.   "Four people are facing nearly $70,000 in civil fines for clashing with airline crews over mask requirements and other safety instructions on recent flights ... The latest round of proposed fines, which passengers have 30 days to contest, came just days after the FAA said that it had received more than 1,300 unruly passenger reports from airlines since February." Pl. Ex. 41.

235.   "The number of passengers who have been banned from the nation's airlines continues to rise. Delta Air Lines appears to lead all U.S. carriers by putting on its internal no-fly list about 1,200 passengers who refused to wear a mask or became unruly on a plane. It is followed by Frontier Airlines with more than 830, United Airlines with about 750, and Alaska Airlines with 542. American Airlines and Southwest Airlines declined to disclose how many passengers they have banned." Pl. Ex. 49.

236.   **SAFETY INCIDENTS ABOARD JETBLUE:** "One of the passengers, a woman who was traveling from the Dominican Republic on a JetBlue flight bound for New York on Feb. 7, refused to comply with instructions to wear a mask aboard the plane, hurled an empty liquor bottle that almost hit another passenger, and threw food and shouted obscenities at flight attendants, according to the FAA. The woman grabbed the arm of a flight attendant and hurt her arm, and she struck the arm of another flight attendant twice and scratched that crew member's hand, causing the flight to return to the Dominican Republic..." Pl. Ex. 41.

237.   "What's causing these incidents?" she asked. "Overwhelmingly, it's passengers who refuse to wear masks." *Id.* Pl. Ex. 41.

238.   A "female passenger failed multiple times to comply with flight attendants' instructions to wear a face mask and remain seated with her seatbelt fastened on a JetBlue Airlines flight from Boston to Puerto Rico on Dec. 27. 'The passenger shoved a flight attendant multiple times in her chest/shoulder area, shouted obscenities at the flight attendant, and threatened to have her fired. As a result of the passenger's behavior, the captain diverted the flight back to Boston,' the FAA wrote. She faces a fine of $20,000." Pl. Ex. 41.

239.   "Then, just days later on another JetBlue Airlines flight from New York to the Dominican Republic, a male passenger failed multiple times to comply with flight attendants' instructions to wear his facemask … 'After flight attendants issued the passenger a 'Notice to Cease Objectionable Behavior' card, he shouted profanities at them, slammed overhead bins and became more and more uncooperative and agitated,' the FAA wrote." *Id.*

240.   "Meanwhile, airlines have recently reported more than 500 cases involving unruly passengers since late December – most of which started with passengers refusing to wear a face mask." *Id.*

241.   "The incident took place onboard a JetBlue aircraft as it flew holidaymakers to Cancun, Mexico, when it was forced to divert to Florida. … The aircraft was diverted to Florida because the passenger repeatedly removed his mask. … The flight attendants and the pilot made two announcements about the passenger saying that if he didn't keep his mask on then they would have to make an emergency landing and get him off. … Passengers onboard the flight said they were on the ground in Florida for 90 minutes." Pl. Ex. 50.

242.   "This past week a Family with 6 children were removed by JetBlue. A Brooklyn mother traveling with six children from Orlando to New York was kicked off a JetBlue flight on Wednesday because her 2-year-old would not wear a face mask…" Pl. Ex. 127.

243.   **SAFETY INCIDENTS ABOARD SPIRIT:** "A family was asked to leave a Spirit Airlines flight before takeoff from Orlando International Airport to Atlantic City, N.J., after their 2-year-old child didn't have a mask on while eating, according to videos of the confrontation. The videos, which started making the rounds on social media Monday afternoon, showed the young girl on her mother's lap eating when a flight attendant, relaying a message from the pilot, said the girl had to have a mask on. The mother told the flight attendant the girl had just turned 2. Much like other airlines, Spirit requires passengers 2 and older wear masks except while eating, which the girl is doing. … All the passengers had to deplane and then re-board the plane with a new flight attendant crew …" Pl. Ex. 43.

244.   "Spirit Airlines said it removed a family of four from a flight because they refused to wear masks. Video of the incident shows the masked parents being told to leave as their maskless child eats … The Monday fight from Orlando, Florida, to Atlantic City, New Jersey, was ultimately delayed more than two hours after passengers were deplaned and the family was allowed to reboard the flight." Pl. Ex. 44.

245.   FAA issued a press release Jan. 13, 2021: "FAA Administrator Steve Dickson today signed an order directing a stricter legal enforcement policy against unruly airline passengers in the wake of recent, troubling incidents. The FAA has seen a disturbing increase in incidents where airline passengers have disrupted flights with threatening or violent behavior. These incidents have stemmed both from passengers' refusals to

wear masks … This dangerous behavior can distract, disrupt, and threaten crewmembers' safety functions." Pl. Ex. 45.

246.   "On a Spirit Airlines flight on Monday from Orlando to New York, a family was kicked off when their two year old, who was eating yogurt, removed their mask. The mother of the two year old girl is seven months' pregnant, and their other child – traveling with them – is special needs." Pl. Ex. 46.

247.   "Numerous two year olds have been kicked off of flights when they had difficulty maintaining their masks. … we've even seen one airline remove an 18 month old over failure to wear a mask even though it's not required (nor advisable, according to the CDC) and eating is considered a justifiable reason to temporarily remove a mask …" *Id.*

248.   **DEFENDANTS HAVE UNLAWFULLY DISCRIMINATED AGAINST TENS OF THOUSANDS OF TRAVELERS WITH DISABILITIES:** The defendants have a long track record during the pandemic of illegally banning passengers with disabilities who request face-mask exemptions, including children as young as three, in violation of the ACAA (49 USC § 41705) and its accompanying regulations (14 CFR § 382). There are thousands of media reports of ACAA violations by the defendants. I will highlight several of these below.

249.   "The Centers for Disease Control and Prevention (CDC) states that a person who has trouble breathing or is unconscious, incapacitated, or otherwise unable to remove the face mask without assistance should not wear a face mask … Additionally, people with post-traumatic stress disorder, ***severe anxiety***, claustrophobia, autism, or cerebral palsy may have difficulty wearing a face mask." Pl. Ex. 52 (emphasis added).

250.   Defendants Southwest and Spirit, based on media reports, appear to be the worst offenders.

251.   **DISCRIMINATION BY SOUTHWEST:** "[A]merican Airlines and Southwest Airlines, two of the largest U.S. carriers, have announced that even medical exemptions won't fly. On Wednesday, they unveiled new policies that require everyone over the age of 2 to don a mask or be denied boarding." Pl. Ex. 126.

252.   "View from the Wing notes an internal Southwest Airlines document making this policy explicit: 'Due to the Safety risk posed by someone not wearing a mask, we are not able to allow any other exemptions at this time, including those for disabilities or medical conditions. *If a Customer cannot travel safely while wearing a mask, the Customer will be refused transportation*.'" Pl. Ex. 129 (emphasis added).

253.   "If you determine that the passenger does pose a *direct threat*, you must select the least restrictive response from the point of view of the passenger ... For example, *you must not refuse transportation to the passenger* if you can protect the health and safety of others by means short of a refusal." 14 CFR § 382.19(c)(2) (emphasis added).

254.   "Southwest stated that it would 'temporarily refuse to transport any passenger who is unable to wear a mask even if the Customer has a verifiable medical condition that prevents them from wearing a mask.' That's 7 of the 10 largest U.S. airlines which have told disabled people with autism, asthma, cerebral palsy, claustrophobia, COPD, PTSD, *severe anxiety*, and other conditions that they are not welcome onboard an aircraft. *It is the largest ban on disabled air travel since the Air Carrier Access Act became law in 1986*." Pl. Ex. 127 (emphasis added).

255.   "The harshest Child and Toddler enforcement policies appear to be at Southwest and Jet Blue." *Id.*

256.   "Southwest will temporarily refuse to transport any passenger who is unable to wear a mask even if the Customer has a verifiable medical condition that prevents them from wearing a mask." *Id.*

257.   "That's right. Effective July 27, 2020, on Southwest and July 29, 2020, on American, all passengers aged two and older will be required to wear a mask. No exceptions." Pl. Ex. 131.

258.   "A family boarding a San Jose-bound flight says they were forced to remove their special needs daughter from the airplane because she wasn't wearing a mask. 15-year-old Mya was told she had to get off the Southwest Airlines plane before it departed Portland if she didn't put on her mask." Pl. Ex. 58.

259.   "'She was really upset, crying, she was so excited for the ride and for the trip,' said Tim Cleary. Her mother says they firmly believe in masks, and even though Mya will put it on, after a few minutes it feels constraining in a way most people can't understand." *Id.*

260.   "Passenger Jennifer Clymer of Turlock saw it all. She was seated two rows ahead on the Southwest flight. 'We were all very unhappy and thought it was very unfair that the family couldn't take a trip just because an autistic child didn't understand why she had to wear a mask,' said Clymer. Mya and her mom had to get off the flight." *Id.*

261.   "A Georgia family heading to New York said they were kicked off a Southwest Airlines flight because their 2-year-old son with autism wouldn't wear a mask. ... The couple said they've flown with their son, Elias, before but have never encountered this problem. The family of five was leaving Atlanta for a trip to New York." Pl. Ex. 110.

262. "According to an advocacy group called Autism Speaks, it can be difficult for some on the autism spectrum to wear a mask. CDC guidelines state exemptions can be made for those with disabilities." *Id.*

263. "'I forced it on him, fighting with him to put the mask over him, he ripped it right off and threw it on the floor,' he said. The family was eventually asked to get off the plane, but Edwin Rios said he told them he would only do so if the family was able to get their checked bags back." *Id.*

264. "An Iowa family says they were prohibited from boarding a Southwest Airlines flight because their autistic son could not wear his face mask. Instead, the family said they were forced to rent a car and drive home to Des Moines from St. Louis. The family – parents Cody and Paige Petek and their two children – were waiting on a connecting flight in St. Louis after arriving from Florida, where they had been on vacation." Pl. Ex. 60.

265. "But their 5-year old non-verbal son has autism and a sensory processing disorder, making it difficult for him to wear a face mask. A fellow passenger on the flight, Dr. Vince Hassel, said other customers were lobbying to get the boy on board when the Southwest Airlines crew refused. 'They weren't going to let the kid on the plane if he didn't put his mask on,' Hassel said. 'He just wasn't having it and throwing a fit. Just to watch this play out was absolutely horrible.'" As this unfolded, the family said their son had a seizure. *Id.*

266. "TSA policy calls for people with disabilities who cannot wear a mask because of the disability are exempt from having to wear a mask. The Peteks' lawyer said he thinks Southwest Airlines violated the Americans with Disabilities Act." *Id.*

267.   "[O]n Aug. 10, the airline confirms, Southwest removed a family from one of its flights when a 3-year-old was unable to wear his mask on a flight from Midland, Tex., to Houston. The child has autism and doesn't like his face covered, the mother told Houston's KPRC-TV, and she had a doctor's note confirming as much. 'He was screaming. He was throwing a fit. He was screaming 'No, no, no!' she told the news station. 'I think there needs to be something in place for children or even adults with disabilities who can't wear a mask. They should have some kind of exemption.'" Pl. Ex. 61.

268.   In addition to Southwest, "Alaska, American, Frontier, JetBlue, United, and Spirit airlines all have similar policies in place, requiring face coverings for travelers over the age of 2 without mention of any exceptions for medical conditions or disabilities." *Id.*

269.   **DISCRIMINATION BY ALASKA:** "Alaska Airlines banned medical exemptions in August [2020]." Pl. Ex. 130.

270.   "If you are unable to wear a mask throughout the airport and for the duration of your flight for any reason, you will not be able to fly with us." Pl. Ex. 132.

271.   **DISCRIMINATION BY ALLEGIANT:** "Only children under the age of 2 are exempt from wearing a face covering. Customers who are not able to wear a face covering will not be permitted to travel." *Id.*

272.   **DISCRIMINATION BY FRONTIER:** "We require both passengers and employees to wear a face-covering over nose and mouth throughout the Frontier travel experience including ticket counters, gate areas, baggage claim, and onboard all flights. The only exception is for children under the age of 2." *Id.*

273.    **DISCRIMINATION BY JETBLUE:** "Customers with conditions that prevent them from wearing a face covering should postpone travel until this temporary requirement is no longer in place." Pl. Ex. 127.

274.    "This leaves the ADA Disabled customers who are traveling for medical treatments or surgeries to out of state specialized medical procedures at a great disadvantage. The numbers of Cancer Deaths has skyrocketed globally since these new rules went into place. This is mainly attributed to these patients not having access to their Cancer Screenings and Cancer Treatments." *Id.*

275.    **DISCRIMINATION BY SPIRIT:** "Any other Guest who is unable to wear an appropriate face covering for any reason, including medical, will not be permitted to travel with us at this time." Pl. Ex. 132.

276.    "A 4-year-old boy with nonverbal autism has been kicked off a flight for not wearing a face mask. Callie Kimball and her husband said that they and their son, Carter, were removed from a Spirit Airlines flight from Las Vegas to their home city of Little Rock on Monday morning, despite showing  staff a doctor's note stating that he's exempt from wearing a face-covering." Pl. Ex. 56.

277.    "A Chicago family says their 3-year-old boy with autism has been banned from an airline since he would not wear a mask. The family says Spirit Airlines kicked them off the flight … It all started over her autistic son not being able to keep a mask on for the 4-hour flight." Pl. Ex. 57.

278.    "Zana, her son, and two other family members took the 1,700 mile trek to visit family when it was time to return on Spirit. 'On the way back, she stopped us. She said if he doesn't wear a mask he can't get on the plane. I'm like well he's autistic and we didn't have this problem coming up here,' Zana said." *Id.*

279.   "Spirit released a statement, saying they require face covering during the entire flight. The only exceptions are children under 2. ***Travelers unable to wear them for any reason, including medical, won't be able to fly Spirit***." *Id.* (emphasis added).

280.   "Days later, letters arrived in the mail, one to Zana's sister and another addressed to 3-year-old Cebastian, banning the toddler from flying Spirit for non-compliance of the airline's face covering policy. In 2 years, he can write a letter explaining why the carrier should reconsider." *Id.*

281.   "A family of Spirit Airlines flyers are accusing the airline of discrimination, after a flight attendant asked the group to leave when a child was not wearing a face covering prior to departure" from Orlando (MCO) to Atlantic City (ACY). "In fact, the child was not wearing a face mask, as she was eating when the attendant approached. Other flyers said they were not uncomfortable with the context... The entire flight was deplaned, and a supervisor in Orlando made the decision to allow the family to continue on the flight." Pl. Ex. 123.

282.   "This incident is the second time in less than 30 days that the Florida-based ultra-low-cost-carrier stood accused of unfairly removing a child from a flight. In March 2021, another family said they were asked to leave a Spirit flight because their non-verbal Autistic son could not wear a face mask, despite having a doctor's note confirming the condition." *Id.*

283.   "An Arkansas family is crying foul after their four-year-old son, who's non-verbal with autism, was removed from a Spirit Airlines flight because he wasn't wearing a

mask … Callie Kimball claims that Carter 'had a medical note from his physician stating that he's exempt from wearing masks because whenever he wears a mask he holds his breath or he starts freaking out and he will harm himself.'" Pl. Ex. 53.

284.   Spirit admitted it violated the ACAA: "Our existing policy does not provide for medical exemptions, regardless of diagnosis." *Id.*

285.   **DOT HASN'T SANCTIONED THESE CARRIERS FOR THEIR ILLEGAL DISCRIMINATION:** I've found no evidence that DOT has penalized these air carriers for violating the ACAA by discriminating against so many Americans with disabilities. As a result of DOT's refusal to obey its statutory duty to enforce the ACAA, tens of millions of Americans have been barred from flying.

286.   DOT has told the defendant airlines they must accommodate passengers who are unable to tolerate wearing a face mask, however there is no evidence that DOT has actually initiated any civil enforcement proceedings against any air carrier.

287.   "Masks or Cloth Face Covering: Recommendation: Everyone should correctly wear a mask or cloth face covering over their nose and mouth at all times in the passenger air transportation system (***excluding*** children under age 2, or ***anyone who has a medical condition that causes trouble breathing*** …," according to a July 2020 report issued by DOT, DHS, and HHS. Pl. Ex. 54 (emphasis added).

288.   "Reasonable accommodations should be made for persons with disabilities or ailments who cannot wear masks … Accommodations for persons with disabilities or ailments who cannot wear cloth face coverings should be considered on a case-by-case basis." *Id.*

289.   Many airlines, including several of the defendants, starting in Summer 2020, banned all passengers who could not wear a face covering for any reason, in clear violation of the ACAA. DOT issued updated guidance in December 2020, stressing a key point: "Mask Use***, specifically the need to accommodate those who cannot wear masks***." Pl. Ex. 55. But again, there is no evidence I have located that DOT's OACP has fined any airline who banned customers with disabilities from flying, showing how DOT has failed its statutory duty to enforce the ACAA.

290.   "Masks Recommendation: Everyone should wear a mask per CDC guidance, over their nose and mouth, at all times in the passenger air transportation system (excluding children under age 2, ***or anyone who has a medical condition for which wearing a mask is contraindicated … Reasonable accommodations should be made for persons with disabilities or ailments who cannot wear masks***." *Id*. (emphasis added).

291.   "Under the Air Carrier Access Act, ***U.S. and foreign air carriers have legal obligations to accommodate the needs of passengers with disabilities when the airlines develop and implement policies requiring the use of masks*** to mitigate the public health risks associated with COVID-19." *Id*. (emphasis added).

292.   "The Air Carrier  Access Act and its implementing regulations in 14 CFR Part 382 require airlines to ensure that their mask policies provide for reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear a face covering for medical reasons. The Office of Aviation Consumer Protection within the Department of Transportation and the Office of Civil Rights in

the Federal Aviation Administration enforce aspects of these requirements within their jurisdiction." *Id*

293.   "People who are deaf or hard of hearing – or those who care for or interact with a person who is hearing impaired – may be unable to wear cloth face coverings if they rely on lipreading to communicate. Some people, such as people with intellectual and developmental disabilities, mental health conditions, or other sensory sensitivities, may have challenges wearing a cloth face covering." Pl. Ex. 62.

294.   "Individuals with asthma, chronic obstructive pulmonary disease (COPD), or other respiratory disabilities may not be able to wear a face mask because of difficulty in or impaired breathing. People with respiratory disabilities should consult their own medical professional for advice about using face masks." *Id*.

295.   "Some people with autism are sensitive to touch and texture. Covering the nose and mouth with fabric can cause sensory overload, feelings of panic, and extreme anxiety." *Id*.

296.   **DEFENDANTS IGNORE THE MASSIVE EVIDENCE SHOWING MASKS HAVE PROVEN TO BE TOTALLY INEFFECTIVE IN REDUCING COVID-19 SPREAD:** Despite what the defendants and federal government tell us, numerous scientific and medical studies document how masks are totally ineffective in reducing COVID-19 infections, hospitalizations, and deaths. Ignoring the science means the defendants have harmed their passengers in violation of their legal "duty ... to provide service with the highest possible degree of safety in the public interest ..." to maintain their operating certificates. 49 USC § 44702(b)(1)(a).

297.   A study released May 25, 2021, by the University of Louisville found mask mandates didn't help slow COVID-19 transmission: "Randomized control trials have not

clearly demonstrated mask efficacy against respiratory viruses, and observational studies conflict on whether mask use predicts lower infection rates. ... Case growth was not significantly different between mandate and non-mandate states at low or high transmission rates, and surges were equivocal." Pl. Ex. 63.

298.  "In summary, ***mask mandates and use were poor predictors of COVID-19 spread in US states***. Case growth was independent of mandates at low and high rates of community spread, and mask use did not predict case growth during the Summer or Fall-Winter waves." ... The research suggests that mandating mask usage didn't turn out to be the magic bullet that many hoped it might be. *Id.* (emphasis added)

299.  Mask manufacturers themselves admit their products are ineffective in preventing COVID-19 infection. Just read the fine print on the boxes of masks you can purchase at Costco this month.

300.  Two of the mask boxes contain this disclaimer: "Not for medical use. Intended for single use only – discard after use. This general use mask cannot eliminate the risk of contracting an infectious disease." Pl. Ex. 64.

301.  Another brand's box contains this disclaimer: "These masks are not personal protective equipment and are not intended as replacements or substitutes for personal protective equipment. ***These products are not intended*** for medical use or ***to prevent any disease or illness***. Each mask is intended for single use only – discard immediately after use." Pl. Ex. 65 (emphasis added).

302.  "Cloth masks, while comforting to some, should not be implied to provide anything but marginal (at best) protection to this 'epidemic.' When referring to virus particles that can spread via droplets it is fairly apparent that cloth masks do little to nothing for protection (except [peace] of mind). Ex. 66.

303.   "Wearing a cloth mask may not shield the user from coronavirus because too many infected droplets can slip through … Scientists at New Mexico State University … studied five types of face coverings including cloth masks and surgical grade N95 masks. … Some think the masks may also help to 'train' people not to touch their faces, while others argue that the unfamiliar garment will just make people do it more, actually raising infection risks." Pl. Ex. 67.

304.   Masks can't be worn while transportation passengers are eating and drinking, thereby eliminating any claimed effectiveness they might have in reducing virus transmission from infected travelers.

305.   "Masks are not an effective way of protection from the new coronavirus, only N95 are, and masks have disclaimers saying they cannot prevent someone from acquiring the new coronavirus," according to an article published in Medical News Today. Pl. Ex. 68.

306.   "The study found that cloth mask wearers had higher rates of infection than even the standard practice control group of health workers, and the filtration provided by cloth masks was poor compared to surgical masks. At the time of the study, there had been very little work done in this space, and so little thought into how to improve the protective value of the cloth masks. Until now, most guidelines on PPE did not even mention cloth masks…" Pl. Ex. 69.

307.   One of the first studies in the world to conclude that face masks don't reduce COVID-19 infections was published in November 2020 by Danish scientists in Annals of Internal Medicine. The study divided thousands of Danish into groups of maskwearers and nonmaskwearers. "4,862 completed the study. Infection with SARS-CoV-2 occurred in 42 participants [wearing] masks (1.8%) and 53 control participants

[who did not cover their faces] (2.1%). The between-group difference was 0.3 percentage point … … ***the difference observed was not statistically significant*** …" Pl. Ex. 70 (emphasis added).

308.    "When it comes to masks, it appears there is still little good evidence they prevent the spread of airborne diseases. … overall, ***there is a troubling lack of robust evidence on face masks and Covid-19***." Pl. Ex. 71.

309.    "[N]ow that we have properly rigorous scientific research we can rely on, ***the evidence shows that wearing masks in the community does not significantly reduce the rates of infection***." *Id.* (emphasis added).

310.    A study in South Korea determined: "Whether face masks worn by patients with coronavirus disease 2019 (COVID-19) prevent contamination of the environment is uncertain." Pl. Ex. 72.

311.    "In conclusion, ***both surgical and cotton masks seem to be ineffective in preventing the dissemination of SARS–CoV-2 from the coughs of patients with COVID-19*** to the environment and external mask surface." *Id.* (emphasis added).

312.    "Upon our critical review of the available literature, we found only weak evidence for wearing a face mask as an efficient hygienic tool to prevent the spread of a viral infection," according to a study published in the European Journal of Medical Research. Pl. Ex. 73.

313.    "In controlled laboratory situations, face masks appear to do a good job of reducing the spread of coronavirus (at least in hamsters) and other respiratory viruses. However, evidence shows maskwearing policies seem to have had much less impact on the community spread of COVID-19. Why this gap between the effectiveness in the

lab and the effectiveness seen in the community? The real world is more complex than a controlled laboratory situation." Pl. Ex. 74.

314.    "CDC has admitted face masks do little to prevent the spread of COVID-19 amid mounting pressure to lift mask mandates across the U.S. In a new study, the CDC found face masks had a negligible impact on coronavirus numbers that didn't exceed statistical margins of error." Pl. Ex. 75.

315.    "It is not clear however, what the scientific and clinical basis for wearing face-masks as protective strategy, given the fact that facemasks restrict breathing, causing hypoxemia and hypercapnia, and increase the risk for respiratory complications, self-contamination, and exacerbation of existing chronic conditions," according to a paper published by the National Institutes of Health ("NIH"), a part of HHS. Pl. Ex. 76. NIH describes itself as "the nation's medical research agency – making important discoveries that improve health and save lives."

316.    "***Where others say the science is settled, our analysis shows that is not the case***. We break down the most widely referenced studies on masking policies so you can see for yourself what the data really says. We should also point out that ***it is unscientific to claim that the science is settled***. Science is always a work-in-progress and we should never make the false claim that a scientific theory is settled as fact." Pl. Ex. 77 (emphasis added).

317.    "In France, homemade masks and some shop-bought cloth masks have now been banned … French health minister Olivier Veran announced on 22 January that people in France should no longer wear homemade masks or certain industrially made fabric masks…," according to an article published in the British Medical Journal ("BMJ"), a

weekly published by the British Medical Association. Pl. Ex. 78. The BMJ is one of the world's oldest medical journals.

318.   "COVID-19 is as politically-charged as it is infectious. Early in the COVID-19 pandemic, the WHO, the CDC, and NIH's Dr. Anthony Fauci discouraged wearing masks as not useful for non-health care workers. Now they recommend wearing cloth face coverings in public settings where other social distancing measures are hard to do (e.g., grocery stores and pharmacies). ***The recommendation was published without a single scientific paper or other information provided to support that cloth masks actually provide any respiratory protection***," according to the Association of American Physicians & Surgeons. Pl. Ex. 79 (emphasis added).

319.   "Conclusion: ***Wearing masks (other than N95) will not be effective at preventing SARS-CoV-2 transmission***, whether worn as source control or as PPE." *Id.* (emphasis added).

320.   "In a recent report in Emerging Infectious Diseases, the U.S. Centers for Disease Control & Prevention (CDC) suggests what experts have stated all along: There is no conclusive evidence that cloth masks protects users from coronavirus, especially since most people do not use them correctly and do not keep them clean." Pl. Ex. 80.

321.   "To our knowledge, only 1 randomized controlled trial has been conducted to examine the efficacy of cloth masks in healthcare settings, and the results do not favor use of cloth masks. … ***There is increasing evidence that cloth masks not only may be ineffective against stopping coronavirus transmission, but that they may actually increase the spread of the virus, as well as worsening other health conditions***." *Id.* (emphasis added).

322.   The American College of Physicians published an examination of COVID-19 transmission in a cohort study of 3,410 close contacts of 391 index cases of COVID-19 in Guangzhou, China. Pl. Ex. 81.

323.   "***Secondary infections acquired while using public transportation were rare***; in contrast, 1 in 10 household contacts was found to be infected. … In addition, we found that the ***risk for transmission via public transportation or health care settings was low***." *Id.*

324.   "[T]here does not appear to be much current (i.e. from 2019-2020) medical evidence that supports the effectiveness of face masks specifically vs Covid-19. … Key Point: 'To our knowledge, only 1 randomized controlled trial has been conducted to examine the efficacy of cloth masks in healthcare settings, and ***the results do NOT favor use of cloth masks***.'" Pl. Ex. 82 (emphasis added).

325.   "Although there is a dearth of medical evidence that supports the use of face masks specifically vs Coronavirus***, there IS a growing body of scientific data that indicates face masks do NOT work to stop the spread of Covid-19***." *Id.* (emphasis added).

326.   "Multiple medical authorities, including the World Health Organization, the CDC, and the New England Journal of Medicine have all acknowledged that there is no scientific justification for normal, healthy people to be wearing masks. ***Prolonged mask wearing actually increases the risk of disease to the wearer***." *Id.* (emphasis added).

327.   "The question on whether to wear a face mask or not during the Covid-19 pandemic remains emotional and contentious. … Importantly, ***the evidence just is and was not there to support mask use for asymptomatic people to stop viral***

*spread during a pandemic*. While the evidence may seem conflicted, the evidence (including the peer-reviewed evidence) actually does not support its use and *leans heavily toward masks having no significant impact in stopping spread of the COVID virus*. In fact, it is not unreasonable at this time to conclude that surgical and cloth masks, used as they currently are, have absolutely no impact on controlling the transmission of Covid-19 virus, and *current evidence implies that face masks can be actually harmful*." Pl. Ex. 83 (emphasis added).

328.   "[M]asking is truly an ineffectual way to manage pandemic-related spread of viral disease. As Kolstoe stated, *it has become less about the science and more about politics and a symbol of solidarity. Our view is that masks as they are worn now, and the masks that are in use, offer zero protection*." *Id.* (emphasis added).

329.   "Masking drives fear in the population and a perennial sense of 'illness' that is crippling. As stated eloquently by Weiss, '*Our universal use of unscientific face coverings is therefore closer to medieval superstition than it is to science*, but many powerful institutions have too much political capital invested in the mask narrative at this point, so the dogma is perpetuated.'" *Id.* (emphasis added).

330.   "[T]he data supporting the effectiveness of a cloth mask or face covering are very limited. We do, however, have data from laboratory studies that indicate cloth masks or face coverings offer very low filter collection efficiency for the smaller inhalable particles we believe are largely responsible for transmission, particularly from pre- or asymptomatic individuals who are not coughing or sneezing." Pl. Ex. 84.

331.   "During the influenza pandemic of 1918, officials often advised Americans to wear face masks in public," The Washington Post reported. However, that flu "killed at least

675,000 Americans. … The masks worn by millions were useless as designed and could not prevent influenza …" Pl. Ex. 133.

332. "The history of modern times shows that already in the influenza pandemics of 1918-1919, 1957-58, 1968, 2002, in SARS 2004–2005, as well as with the influenza in 2009, *masks in everyday use could not achieve the hoped-for success in the fight against viral infection scenarios*." Pl. Ex. 36 (emphasis added).

333. Defendant CDC admitted in its Emerging Infectious Diseases May 2020 publication that "Although mechanistic studies support the potential effect of hand hygiene or face masks, evidence from 14 randomized controlled trials of these measures did not support a substantial effect on transmission of laboratory-confirmed influenza. … The effect of hand hygiene combined with face masks on laboratory-confirmed influenza was not statistically significant…" Pl. Ex. 86.

334. "Overall, the available evidence is inconclusive about the degree to which home-made fabric masks may suppress the spread of infection from the wearer to others," according to an article published in The National Academies Press. Pl. Ex. 86.

335. "Moisture saturation is inevitable with fabrics available in most homes. Moreover*, moisture can trap the virus and become a potential contamination source for others after a mask is removed*." *Id.* (emphasis added).

336. "No RCT study with verified outcome shows a benefit for HCW [healthcare workers] or community members in households to wearing a mask or respirator. There is no such study. There are no exceptions. Likewise, no study exists that shows a benefit from a broad policy to wear masks in public …" Pl. Ex. 87.

337. "[I]f anything gets through (and it always does, irrespective of the mask), then you are going to be infected. Masks cannot possibly work. It is not surprising, therefore,

that ***no bias-free study has ever found a benefit from wearing a mask*** …"
*Id.* (emphasis added).

338.   The University of Colorado School of Medicine published an article in the January/February  2021 edition of Annals of Family Medicine concluding: "Cloth masks lack evidence for adequate protection of health care clinicians against respiratory viral infections. The CDC notes that cloth masks are not considered PPE [personal protective equipment] and that their capability to protect health care clinicians is not currently known. The CDC does not offer information regarding the degree of protection a cloth mask might provide compared to a medical mask. In addition, there is no recommendation for what the best design of a cloth mask might be in the face of a shortage of PPE." Pl. Ex. 88.

339.   "Does the CDC really think that masks prevent the wearer from getting COVID, or from spreading it to others? The CDC admits that the scientific evidence is mixed, as their most recent report glosses over many unanswered scientific questions. But even if it were clear – or clear enough – as a scientific matter that masks properly used could reduce transmission, ***it is a leap to conclude that a governmental mandate to wear masks will do more good than harm***, even as a strictly biological or epidemiological matter." Pl. Ex. 89 (emphasis added).

340.   "We think that inclusion of such evidence on the failures of masks mandates globally and states within the US would have made for more balanced, comprehensive, and fully-informed reporting. … ***mask mandates have a poor track record insofar as fighting this pandemic***." *Id.* (emphasis added).

341.   "Transmission of COVID-19 in 282 clusters in Catalonia, Spain: a Cohort Study," published Feb. 2, 2021, in Lancet Infectious Diseases, "***observed no association***

***of risk of transmission with reported mask usage by contacts*** ...” Pl. Ex. 90. (emphasis added).

342.    “Very little good quality research exists on the use of cloth masks, especially in non-medical settings,” according to a study published in BMJ. “One randomized controlled clinical trial of cloth masks, published in BMJ Open in 2015, compared their effectiveness with that of medical masks worn by hospital healthcare workers. The study, involving the industry partner 3M (which makes medical masks), reported that healthcare workers ‘should not use cloth masks as protection against respiratory infection. Cloth masks resulted in significantly higher rates of infection than medical masks, and also performed worse than the control arm.’” Pl. Ex. 91.

343.    “***The evidence is not sufficiently strong to support widespread use of facemasks as a protective measure against covid-19***.” *Id.* (emphasis added).

344.    “At the very end of 2020, the WHO updated their guidelines, noting that any kind of mask was ineffective if the wearer come into close contact with someone for 15 minutes or more. ... A mask alone, even when it is used correctly, is insufficient to provide adequate protection or source control.” Pl. Ex. 92.

345.    “In September of 2020, the ***CDC reported that 85% of COVID-19 cases in July were people who often or always wear masks***.” *Id.*

346.    “Anders Tegnell, chief epidemiologist at Sweden’s Public Health Agency, stated that evidence about the effectiveness of face mask use was ‘astonishingly weak.’” Pl. Ex. 93.

347.    “The World Health Organization admits there is no scientific medical reason for any healthy person to wear a mask outside of a hospital. ... If you do not have any respiratory symptoms, such as fever, cough, or runny nose, you do not need to wear a

medical mask. When used alone, masks can give you a false feeling of protection and can even be a source of infection when not used correctly." Pl. Ex. 94.

348.   "***The science***, contrary to the ignorant platitudes we are bombarded with, ***has NOT proven that universal masking is effective for viral containment, and has instead provided substantial grounds for skepticism of such a policy***." *Id.* (emphasis added).

349.   Many arguments "have been advanced against mask requirements during the coronavirus (COVID-19) pandemic. These arguments come from a variety of sources, including public officials, journalists, think tanks, economists, scientists, and other stakeholders." Pl. Ex. 95.

350.   "Claims that low mask compliance is responsible for rising case counts are also not supported by Gallup data, which show that the percentage of Americans reporting wearing masks has been high and relatively stable since June***. Health officials and political leaders have assigned mask mandates a gravity unsupported by empirical research***." *Id.* (emphasis added).

351.   "[T]he justification for mask-wearing is based on a nonsense narrative with little to no scientific basis. To illustrate [the doctor's] point, she showed a video of a man installing drywall while wearing a surgical mask with ear loops, similar to the mask that health authorities encourage people to wear to prevent infection. However, when the man removed his mask, he still had flecks of drywall stuck around his nose and mouth. The mask failed to filter out drywall dust, which is about 10 micrometers (um) in size. Yet health authorities have been claiming that such surgical masks can protect against SARS-CoV-2, which measures about 0.125 um." Pl. Ex. 96.

352.   "For people at no realistic risk to others to be forced or even guilted into wearing masks to mollify the ideological sensibilities of those unwilling to accept the CDC's (belated but nevertheless unambiguous) guidance inflicts real costs on parties simply acting at the direction of public health authorities." Pl. Ex. 97.

353.   "'Evidence that masking as a source control results in any material reduction in transmission was scant, anecdotal, and, in the overall, lacking … [and ***mandatory masking] is the exact opposite of being reasonable***,' ruled a hospital arbitrator in a dispute between the Ontario Nurses' Association and the Toronto Academic Health Science Network," according to an article published Jan. 23, 2021, in Canada's Global Research. Pl. Ex. 98 (emphasis added).

354.   ***Masks "were made mandatory 'not because of scientific evidence, but because of political pressure and public opinion."*** *Id*. (emphasis added).

355.   **DEFENDANTS' MASK MANDATES POSE SERIOUS HEALTH RISKS TO PASSENGERS:** In addition to the science showing that masks have proven totally ineffective in reducing coronavirus transmission, we must now turn to the serious health risks to human beings of forced muzzling. Dozens of scientific and medical studies illustrate the frightening number of negative health consequences of covering your face. A table succinctly summarizes the numerous "Physiological & Psychological Effects of Wearing Facemasks & Their Potential Health Consequences." Pl. Ex. 99.

356.   Ignoring the dangers of masks to passengers' health means the defendants have disobeyed their legal "duty … to provide service with the highest possible degree of safety in the public interest …" to maintain their operating certificates. 49 USC § 44702(b)(1)(a).

357.    The leading authority on this subject is a 42-page paper published April 20, 2021, by eight German doctors and scientists in the International Journal of Environmental Research & Public Health. They found: "Up until now, there has been no comprehensive investigation as to the adverse health effects masks can cause." The doctors reviewed 65 scientific papers on masks – and determined dozens of adverse health effects of covering your nose and mouth. Pl. Ex. 36.

358.    "Extended mask-wearing by the general population could lead to relevant effects and consequences in many medical fields." *Id*.

359.    "The mask-induced adverse changes are relatively minor at first glance, but repeated exposure over longer periods in accordance with the above-mentioned pathogenetic principle is relevant**. Long-term disease-relevant consequences of masks are to be expected**." *Id*. (emphasis added).

360.    "According to a questionnaire survey, ***masks also frequently cause anxiety and psychovegetative stress reactions in children – as well as in adults – with an increase in psychosomatic and stress-related illnesses and depressive self-experience***, reduced participation, social withdrawal, and lowered health-related self-care. Over 50% of the mask wearers studied had at least mild depressive feelings." *Id*. (emphasis added).

361.    "***[C]hanges that lead to hypercapnia are known to trigger panic attacks***. This makes the significantly measurable increase in CO2 caused by wearing a mask clinically relevant. ... The activation of the locus coeruleus by CO2 is used to generate panic reactions via respiratory gases." *Id*. (emphasis added).

362.    "From the physiological, neurological, and psychological side effects and dangers described above (Sections 3.1, 3.3, and 3.4), ***additional problems can be derived***

76

*for the use of masks in psychiatric cases*. People undergoing treatment for dementia, paranoid schizophrenia, *personality disorders with anxiety and panic attacks*, but also panic disorders with claustrophobic components, *are difficult to reconcile with a mask requirement, because even small increases in CO2 can cause and intensify panic attacks*." *Id.* (emphasis added).

363.    "Since masks are constantly penetrated by germ-containing breath and the pathogen reproduction rate is higher outside mucous membranes, potential infectious pathogens accumulate excessively on the outside and inside of masks. *On and in the masks, there are quite serious, potentially disease-causing bacteria and fungi* such as E. coli (54% of all germs detected), Staphylococcus aureus (25% of all germs detected), Candida (6%), Klebsiella (5%), Enterococci (4%), Pseudomonads (3%), Enterobacter (2%), and Micrococcus (1%) even detectable in large quantities." *Id.* (emphasis added).

364.    "Germany pointed out that *wearers of certain types of masks such as the common fabric masks (community masks) cannot rely on them to protect them or others from transmission of SARS-CoV-2*. … A Swiss textile lab test of various masks available on the market to the general public recently confirmed that most mask types filter aerosols insufficiently." *Id.* (emphasis added).

365.    "[M]asks are even considered a general risk for infection in the general population, which does not come close to imitating the strict hygiene rules of hospitals and doctors' offices: *the supposed safety, thus, becomes a safety risk itself*." *Id.* (emphasis added).

366.    "*Since masks impede the wearer's breathing and accelerate it, they work completely against the principles of health-promoting breathing*

used in holistic medicine and yoga. According to recent research, ***undisturbed breathing is essential for happiness and healthy drive, but masks work against this***. The result of significant changes in blood gases in the direction of hypoxia (drop in oxygen saturation) and hypercapnia (increase in carbon dioxide concentration) through masks, thus, has the potential to have a clinically relevant influence on the human organism...” *Id.*

367.   “The study concluded that ‘***the advocacy of an extended mask requirement remains predominantly theoretical ... On the other hand, the side effects of masks are clinically relevant***.’” *Id.* (emphasis added).

368.   The defendants have failed to take notice of numerous other medical and scientific studies that warn us of the dangers of wearing face masks: “A recent study in the journal Cancer Discovery found that inhalation of harmful microbes can contribute to advanced stage lung cancer in adults***. Long-term use of face masks may help breed these dangerous pathogens***. Microbiologists agree that frequent mask wearing creates a moist environment in which microbes are allowed to grow and proliferate before entering the lungs.” Pl. Ex. 100 (emphasis added).

369.   “Dentists have also been warning about a phenomenon known as ‘mask mouth’ in which patients are arriving back to the dental office with an increase in gingivitis and tooth decay as high as 50% in a period of just a few months since mask mandates began. ***This discovery sheds light on the growing evidence of harm caused by long-term mask wearing***.” *Id.* (emphasis added).

370.   "*Although scientific evidence supporting facemasks' efficacy is lacking, adverse physiological, psychological, and health effects are established*. Is has been hypothesized that facemasks have compromised safety and efficacy profile and should be avoided from use." Pl. Ex. 73 (emphasis added).

371.   "*Breathing is one of the most important physiological functions to sustain life and health.* Human body requires a continuous and adequate oxygen (O2) supply to all organs and cells for normal function and survival. ... chronic mild or moderate hypoxemia and hypercapnia such as from wearing facemasks resulting in shifting to higher contribution of anaerobic energy metabolism, decrease in pH levels, and increase in cells and blood acidity, toxicity, oxidative stress, chronic inflammation, immunosuppression, and health deterioration. ...*Long-term practice of wearing facemasks has strong potential for devastating health consequences*." Pl. Ex. 76 (emphasis added).

372.   "*Long-term consequences of wearing facemask can cause health deterioration*, developing and progression of chronic diseases and premature death." *Id*. (emphasis added).

373.   "Wearing a mask reduces the oxygen we breathe in and increases the CO2 intake**.** *Masks are muzzling suffocation devices that science says are causing great harm*." Pl. Ex. 101 (emphasis added).

374.   Wearing masks "creates more cases of dry eye. The Center for Ocular Research & Education (CORE) at the University of Waterloo, Ontario, Canada, is advising eye care professionals on how to recognize and mitigate mask-associated dry eye." Pl. Ex. 102.

375.   "There is no biological history of mass masking until the current era. ... if even a small portion of mask fibers is detachable by inspiratory airflow, or if there is debris

in mask manufacture or packaging or handling, then there is the possibility of not only entry of foreign material to the airways, but also entry to deep lung tissue, and potential pathological consequences of foreign bodies in the lungs." Pl. Ex. 103.

376.    "***Prior research has overwhelmingly shown that there is no significant evidence of benefits of masks, particularly regarding transmission of viral infections, and that there are well-established risks***." *Id.* (emphasis added).

377.    "***If widespread masking continues, then the potential for inhaling mask fibers and environmental and biological debris continues on a daily basis for hundreds of millions of people***. This should be alarming for physicians and epidemiologists knowledgeable in occupational hazards." *Id.* (emphasis added).

378.    "More support for health concerns with wearing masks has been uncovered. ... This study confirms our reporting from yesterday that masks aren't just a nuisance but can cause serious health problems. The article recently uncovered was published by the CDC and it states in black and white the side-effects of wearing a mask, specifically related to the masks trapping carbon dioxide or CO2." Pl. Ex. 104.

379.    "When bacteria from your mouth enter your lungs, it's linked to advanced-stage lung cancer and tumor progression, a finding that raises serious questions about the long-term use of face masks, which could potentially accelerate this process." Pl. Ex. 105.

380.    "Scientists have found evidence that some face masks which are on sale and being used by members of the general public are laced with toxic chemicals. Preliminary tests have revealed traces of a variety of compounds which are heavily restricted for

both health and environmental reasons. This includes formaldehyde, a chemical known to cause watery eyes; a burning sensations in the eyes, nose, and throat; coughing; wheezing; and nausea. Experts are concerned that the presence of these chemicals in masks which are being worn for prolonged periods of time could cause unintended health issues." Pl. Ex. 106.

381.    In a 2015 study of healthcare workers in Vietnam, "Adverse events associated with facemask use were reported in 40.4% (227/562) of [healthcare workers] in the medical mask arm and 42.6% (242/568) in the cloth mask arm." Pl. Ex. 107.

382.    "The health risks of incorrectly wearing a facemask represent an important argument against the use of face masks as a public health measure," according to research published Jan. 13, 2021, by European scientists in the journal Frontiers & Public Health. Pl. Ex. 108.

383.    **MANY EXPERTS CONSIDER FORCING KIDS TO WEAR MASKS CHILD ABUSE:** Defendants are maltreating young passengers in particular by requiring face coverings: "***They have become a cruel device on young children everywhere***, kindergarten students covered by masks and isolated by Plexiglas, struggling to understand the social expressions of their peers." Pl. Ex. 100 (emphasis added).

384.    "A first-of-its-kind study, involving over 25,000 children, reveals that masks are harming schoolchildren in many physical and psychological ways and have a negative effect on their behavior, focus, and interest in learning." Pl. Ex. 109.

385.    By abusing children, the defendants are betraying their legal "duty ... to provide service with the highest possible degree of safety in the public interest ..." to maintain their operating certificates. 49 USC § 44702(b)(1)(a).

386.  "Universal mask wearing is destroying the health of children, making their immune system more susceptible to disease." Pl. Ex. 109.

387.  "[M]asks block the foundation of human communication and the exchange of emotions and not only hinder learning but deprive children of the positive effects of smiling, laughing, and emotional mimicry. ***The effectiveness of masks in children as a viral protection is controversial, and there is a lack of evidence for their widespread use in children*** ..." Pl. Ex. 36.

388.  The large German study of kids wearing masks described "the results of 17,854 parent submitted reports on health complaints or impairments experienced as a result of wearing masks by their 25,930 children." Pl. Ex. 110.

389.  The German research "reveals that major negative impacts on the physical, psychological, and behavioral health of children may be far more widespread than reported in the media and by government officials – affecting approximately 68% and contributing to 24 distinct health complaints, according to parent submitted observations." *Id.*

390.  "***Requiring children wear masks does more harm than good***, Dr. Jay Bhattacharya told The Epoch Times. Bhattacharya advised Florida Gov. Ron DeSantis not to make children don face coverings. Bhattacharya is a professor of medicine at Stanford University. ... 'In the case of masks, the evidence [of how] children spread the disease even without a mask is that they're much less efficient spreaders.'" Pl. Ex. 111 (emphasis added).

391.  "[T]here are serious repercussions to child development when they and others around them are wearing masks," Dr. Bhattacharya said. "Children have developmental needs that require them to see other people's faces. Learning to speak, for instance,

requires seeing lips move. For slightly older children, they need to see people, the body, they learn body language, how to interact socially, by watching people. And when you ask them to wear a mask, you sort of cut that out. So you have harms on one side, and very little benefit on the other." *Id.*

392.   "The information that is accumulating involves mask wearers within a Covid-19 environment and raises many concerns especially regarding psychological damage and especially to infants and children, ***with potential catastrophic impacts on the cognitive development of children***." *Id.* (emphasis added).

393.   **AIRPLANE CABINS POSE LITTLE RISK FOR CORONAVIRUS SPREAD:** Ample evidence for the lack of a need for mask mandates comes from the aviation industry itself. U.S. air carriers commissioned a lengthy report "Assessment of Risks of SARS-CoV-2 Transmission During Air Travel & Non-Pharmaceutical Interventions to Reduce Risk" by the Harvard T.H. Chan School of Public Health as part of the Aviation Public Health Initiative ("APHI"). Pl. Ex. 112.

394.   "Ventilation Systems on Aircraft: These sophisticated systems deliver high amounts of clean air to the cabin that rapidly disperses exhaled air, with displacement in the downward direction, reducing the risk of passenger-to-passenger spread of respiratory pathogens. Aircraft ventilation offers enhanced protection for diluting and removing airborne contagions in comparison to other indoor spaces with conventional mechanical ventilation and is substantially better than residential situations. This level of ventilation effectively counters the proximity travelers will be subject to during flights. The level of ventilation provided onboard aircraft would substantially reduce the opportunity for person-to-person transmission of infectious particles ..." *Id.*

395.   "***Particular emphasis is placed on the effectiveness of aircraft ventila-tion systems, which are able to filter 99.97% of SARS-CoV-2 particles out of air found on aircraft***." *Id.* (emphasis added).

396.   The study confirms what the airlines themselves have been promoting to custom-ers: There is little-to-no risk of contracting COVID-19 aboard an aircraft. "After de-tailed analysis of these reports***, it is the view of APHI that there have been a very low number of infections that could be attributed to exposure on aircraft during travel***." *Id.* (emphasis added).

397.   CDC itself has admitted "***the risk of getting a contagious disease on an airplane is low."*** *Id.* (emphasis added).

398.   "Based on the available scientific evidence, it is the view of APHI that ***there have been a very low number of infections that could be attributed to exposure on aircraft during travel***." *Id.* (emphasis added).

399.   "Given the volume of commercial flights daily, carrying millions of passengers and crew worldwide***, the number of documented incidents of infectious disease transmission occurring on board an aircraft remains infrequent***." *Id.* (emphasis added).

400.   "The airlines' disinfection processes have changed significantly in order to reduce any contaminated surfaces or fomites inside the cabin. All airlines have added addi-tional cleaning, prioritizing between flights highly touched areas, and adding addi-tional disinfection overnight or when there is enough time between flights or 'turns.' Between turns, most disinfection activities require wiping down the high touch areas, lavatories, and galleys. Deeper cleaning is done mostly overnight and often includes use of electrostatic spraying." *Id.*

401.   "An aircraft cabin has inherently a high airflow volume and high-quality air filtra-

tion during cruising, which are managed through the environmental control system

(ECS) that also controls the temperature and cabin pressurization. All nine airlines

mentioned having high air exchange rates of approximately every 2 to 3 minutes (20

to 30 ACH) while cruising, a rate that is similar to, or even higher than the recom-

mended air exchange rates for an operating room in a hospital." *Id.*

402.   "Air recirculation happens mostly when cruising, where about 40% to 50% of the

cabin air is recirculated and filtered through a high-efficiency particulate air filter, also

known as a HEPA filter. All the airlines interviewed have aircraft that are equipped

with HEPA filters, and one of the airlines has increased the replacement frequency of

their HEPA filters." *Id.*

403.   "One of the airlines noted that the ground pre-conditioned air is not recirculated,

so it is 100% fresh air from outside the aircraft that comes into the cabin." *Id.*

404.   "Specific industry guidance, Federal Aviation Regulations, and international regu-

lations are in place to help ensure acceptable conditions of cabin safety, air quality,

and thermal comfort are always maintained inside the aircraft. This includes the need

to provide adequate control of potential airborne transmission of infectious diseases,

including SARS-CoV-2 virus within the aircraft environment." *Id.*

405.   "With these regulations and standards, the cabin is supplied with outside air and

highly filtered 'clean air' providing air exchange rates significantly in excess to those

found in well-ventilated offices and retail spaces (see Table 4.2). The high air exchange

rates utilized in aircraft ventilation systems mean that any contaminant introduced

into the cabin should be flushed out much faster than would occur in other types of

spaces, i.e., in the order of two to five minutes. The HEPA filters remove, at a minimum, 99.97% of the particulate matter from the return air. This high level of filtration ensures that the air supplied to the cabin is virtually free of particulate matter, including bacteria and viruses." *Id.*

406.    "Aircraft meeting current ventilation standards with 50% recirculation HEPA-filtered air will supply passengers with a clean air delivery rate of 19 cfm/person, which is essentially free of any virus particles." *Id.*

407.    "This analysis shows that aircraft will have a significantly lower age of air, resulting in a very short residence time for particles, and possibility of exposure to infectious particles than any other commonly encountered environment, which will help offset the counteracting effect of being in a smaller volume and in closer proximity to other passengers. For episodic releases, such as from a cough or a sneeze, the very high air exchange rates in aircraft cabins assume that contaminants released in such events are fully flushed from the cabin in as little as two to five minutes, as opposed to some six hours in a commercial or retail space complying with current codes and standards where these particles will be mixed into the large volume of the space." *Id.*

408.    "***[T]he risk of SARS-CoV-2 transmission onboard aircraft will be below that found in other routine activities during the pandemic, such as grocery shopping or eating out***." *Id.* (emphasis added).

409.    "[T]he aircraft's environmental control systems effectively diluting and removing pathogens significantly reduce the risk of passengers and crewmembers from acquiring COVID-19 during the cruise segment of their journey." *Id.*

410.    Many of the defendants tout all the steps they've taken to greatly reduce the risk of COVID-19 on planes. For example, *see* Frontier's detailed list of enhanced cleaning,

air filtration, temperature checks, health assessments, and other measures at Pl. Ex. 119. The effectiveness of these measures, unlike mask wearing, actually are backed by scientific research.

411.    Airlines for America, the trade group representing most major U.S. carriers, touts how safe airplanes are: "Airlines have implemented a robust, multi-layered strategy which can effectively reduce the risk of exposure to COVID-19 during air travel – this strategy is aligned with the findings from researchers at Harvard University." Pl. Ex. 122.

412.    "[T]he multiple layers of protection against COVID-19 make being on an airplane as safe if not safer than other routine activities, such as grocery shopping or going to a restaurant." *Id.*

## V. CAUSES OF ACTION

**Count 1: Violation of the Air Carrier Access Act: illegal discrimination against flyers with disabilities in refusing to provide mask exemptions.**

413.    For this and all other causes of action, I reallege and incorporate by reference the allegations and facts contained in all of the preceding paragraphs as though set forth fully herein.

414.    All seven defendants are charged with illegally discriminating against passengers (including myself) with medical conditions who seek exemptions from mask requirements in violation of the ACAA (49 USC § 41705) and its underlying regulations (14 CFR Part 382).

415.    The defendants have violated the ACAA and its regulations by requiring advance notice by customers with disabilities seeking a mask exemption and imposing unauthorized requirements including obtaining mandatory COVID-19 testing (even for

fully vaccinated and/or naturally immune travelers), medical certificates, and third-party medical consultations, among others.

416.   The defendants have violated the ACAA and its underlying regulations by discriminating against passengers with mask exemptions by making them take a later flight because their ticketed flight is too full and/or has other mask-exemption customers on board.

417.   The defendants have violated the ACAA and its underlying regulations by having a policy permitting moving a mask-exempt passenger to the back of the aircraft.

## Count 2: Violation of the Air Carrier Access Act: Requiring passengers not known to have a communicable disease to wear a face covering.

418.   All seven defendants are charged with illegally requiring passengers who are not known to have a communicable disease to require a face mask.

419.   The ACAA, 49 USC § 41705, and its accompanying regulations, 14 CFR Part 382, spell out specific procedures for dealing with airline passengers who are known to have a communicable disease. The defendants' mask policies violate these regulations by assuming that every passenger has a communicable disease.

420.   Airlines are prohibited from requiring that a passenger wear a face covering or refuse him/her transportation unless they determine that the passenger "has" a communicable disease and poses a "direct threat" to other passengers and the flight crew. 14 CFR § 382.21.

421.   The defendants' rules illegally assume every single traveler is infected with COVID-19, even those who are fully vaccinated and/or have natural immunity. This violates the regulation that "In determining whether an individual poses a direct threat, you must make an individualized assessment." 14 CFR § 382.19(c)(1).

422.   The defendants' mask policies don't provide for making an "individualized assessment" of whether someone is known to have COVID-19 or another communicable disease. They instead impose a blanket policy that every single traveler must wear a face covering, even those passengers for whom it is ***impossible*** to be infected due to vaccination and/or natural immunity.

## Count 3: Violation of the common-carrier duty to ensure the health and safety of passengers.

423.   All seven defendants are charged with endangering the health and safety of their passengers by illegally mandating masks that cause harm to human health in violation of the terms of their operator certificate issued by the FAA under 49 USC § 44702.

424.   The defendants' mask policies endanger the health and safety of their passengers by causing thousands of incidents of customers and flight crews battling over mask enforcement to the detriment of flight safety and security in violation of the terms of their operator certificate issued by the FAA under 49 USC § 44702.

## VI. PRAYER FOR RELIEF

WHEREFORE, I request this Court grant the following relief:

A.   Declare that DOT has failed its statutory obligation to enforce the ACAA, thereby creating a private right of action in this Court for me to enforce the anti-discrimination law as Congress intended.

B.   Declare that the defendants have violated the ACAA and its underlying regulations by requiring advance notice by customers with disabilities seeking a mask exemption and imposing unauthorized requirements including obtaining mandatory

COVID-19 testing (even for fully vaccinated and/or naturally immune travelers), medical certificates, and third-party medical consultations, among others.

C. Issue a permanent injunction prohibiting all defendants from requiring advance notice, medical certificates, third-party medical consultations, COVID-19 testing, and other illegal actions from any passenger asserting a mask exemption because of a medical condition unless that person is known to have a communicable disease such as COVID-19 by information showing the person has tested positive for the coronavirus in the last two weeks or the person presents with a fever of more than 100.4°F.

D. Declare that the defendants have violated the ACAA and its underlying regulations by discriminating against passengers with mask exemptions by making them take a later flight because their ticketed flight is too full and/or has other mask-exemption customers on board.

E. Issue a permanent injunction prohibiting all defendants from forcing mask-exempt passengers to take a later flight because their ticketed flight is above a certain percentage full and/or has other mask-exempt customers on board.

F. Declare that the defendants have violated the ACAA and its underlying regulations by permitting their employees to move a mask-exempt passenger to the back of the aircraft.

G. Issue a permanent injunction prohibiting all defendants from forcing any mask-exempt passenger from sitting in any seat other than the one that person selected in advance or was assigned at check-in.

H. Award me as damages, and/or direct the defendants to pay as civil fines to the government, for violation of the ACAA: $35,188 per violation against me, the maximum amount permitted by law. For Southwest, Delta, and Alaska, that's $70,376 each since I have or will have been discriminated against twice. For the other four defendants, it's $35,188 each for one violation. Total damages demanded are $351,880.

I. Once the FTMM is struck down or repealed, declare that the defendants have violated the ACAA and its underlying regulations by requiring customers not known to be infected with a communicable disease wear a face mask.

J. Issue a permanent injunction prohibiting all defendants from forcing any passenger not known to be infected with a communicable disease to cover their face.

K. Declare that the defendants' mask mandates have damaged passengers' health and caused thousands of dangerous in-flight incidents, putting passengers' safety at risk in violation of their legal "duty … to provide service with the highest possible degree of safety in the public interest…" 49 USC § 44702(b)(1)(a).

L. Issue a writ of mandamus to the FAA administrator to revoke each defendants' air-carrier operator certificate for a minimum of one month for their total disregard for passengers' health and safety during the pandemic by requiring masks that harm human health and have caused thousands of dangerous in-flight incidents while trying to enforce their illegal mask rules.

M. Issue a permanent injunction prohibiting all defendants from creating and enforcing any future rules putting in place any requirement that any passenger cover his/her face unless the person is known to be infected with a communicable disease

as alerted by the government's Do Not Board and Lookout systems or other public-health authority.

N.  Award me all costs and attorneys' fees (if I later hire an attorney to represent me in this lawsuit) pursuant to any applicable statute or authority; or, if I elect to continue proceeding *pro se*, an award of all costs and fees to me in lieu of an attorney for the time I have spent litigating this matter.

O.  Grant other declaratory and injunctive relief as may be necessary to ensure that all defendants comply with the Air Carrier Access Act and their legal duty to ensure the health and safety of their passengers.

P.  Grant such other and further relief as the Court may deem just and proper under the circumstances.

**Certification:** Under F.R.Civ.P. 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully submitted this 14th day of June 2021.

*Lucas Wall*

Lucas Wall, plaintiff
435 10th St., NE
Washington, DC 20002
Telephone: 202-351-1735
E-Mail: Lucas.Wall@yahoo.com

## CERTIFICATE OF SERVICE

Because this is a new case, formal service of the Complaint has not yet been completed on any defendant and no defense counsel have entered an appearance with the Court. However, I have corresponded prior to filing this lawsuit with attorneys for six of the defendants. I've also e-mailed numerous times counsel for and officers of Defendant Spirit Airlines, who have failed to respond to my multiple requests to provide me with the name and contact information for the lawyer who will be handling this case.

Therefore I hereby certify that on June 14, 2021, I e-mailed this Complaint as well as all exhibits and other attachments to the attorneys for six defendants as well as the people I have attempted to contact at Defendant Spirit:

Angela Mayeux
Counsel for Southwest Airlines
Angela.Mayeux@wnco.com

Kyle Levine
Counsel for Alaska Airlines
Kyle.Levine@alaskaair.com

Laura Overton
Counsel for Allegiant Air
Laura.Overton@allegiantair.com

Komal Patel
Counsel for Delta Air Lines
Komal.A.Patel@delta.com

Brian Maye
Counsel for Frontier Airlines
Adler, Murphy, & McQuillen LLP
bmaye@amm-law.com

Michael Carbone
Counsel for JetBlue Airways
Michael.Carbone@jetblue.com

Thomas Canfield
Senior Vice President, General Counsel, & Secretary
Spirit Airlines
Thomas.Canfield@spirit.com

Meisha Coulter or Meisha Smith (last name uncertain)
Senior Director & Legal Counsel
Spirit Airlines
Meisha.Coulter@spirit.com
Meisha.Smith@spirit.com

Yasaman Moazami-Goudarzi
Attorney
Spirit Airlines
Yasaman.Moazami-Goudarzi@spirit.com

Joan McField-Mortimer
Guest Relations Manager
Spirit Airlines
Joan.McField-Mortimer@spirit.com

*Lucas Wall*

Lucas Wall, plaintiff