Plaintiff's Exhibit 21

# Southwest Airlines Response to your Inquiry (Case #24103856)

From:  Southwest Airlines (no-reply@southwest-communications.com)

To:    lewnwdc77-airlines@yahoo.com

Date:  Thursday, June 3, 2021, 9:26 AM EDT



Thank you for contacting us. Due to the nature of your issue, we are forwarding your email to our Customer Relations Department for further review. You should expect a response to your concern within 30 days, and we'll do our best to get back to you as soon as possible. We certainly appreciate your patience.

 **Reward seats only on days ending in "y."** That's Trans**fare**ncy®.

**Connect with us**
   

**Mobile app**

Southwest.com® | Privacy | Contact Us

Cualquier información publicitaria, promocional o de mercadotecnia contenida en este correo electrónico sólo será efectiva y únicamente será aplicable en los Estados Unidos de América.

This is a post-only mailing from Southwest Airlines®. Please do not attempt to respond to this message.

Southwest Airlines
2702 Love Field Drive
Dallas, TX 75235
1-800-I-FLY-SWA (1-800-435-9792)

© Copyright 2021 Southwest Airlines Co. All Rights Reserved.

# Southwest Airlines Response to your Inquiry (Case #24107771)

From:  Southwest Airlines (no-reply@southwest-communications.com)

To:    lewnwdc77-airlines@yahoo.com

Date:  Thursday, June 3, 2021, 9:26 AM EDT



Thank you for contacting us. Due to the nature of your issue, we are forwarding your email to our Customer Relations Department for further review. You should expect a response to your concern within 30 days, and we'll do our best to get back to you as soon as possible. We certainly appreciate your patience.

**Reward seats only on days ending in "y."**
That's Trans**fare**ncy®.

**Connect with us**
   

**Mobile app**


Southwest.com® | Privacy | Contact Us

Cualquier información publicitaria, promocional o de mercadotecnia contenida en este correo electrónico sólo será efectiva y únicamente será aplicable en los Estados Unidos de América.

This is a post-only mailing from Southwest Airlines®. Please do not attempt to respond to this message.

Southwest Airlines
2702 Love Field Drive
Dallas, TX 75235
1-800-I-FLY-SWA (1-800-435-9792)

© Copyright 2021 Southwest Airlines Co. All Rights Reserved.

Plaintiff's Exhibit 22

**Determination of a National Emergency Requiring Actions to Protect the Safety of Americans Using and Employed by the Transportation System**

As reflected in numerous determinations by the Executive Branch, including the President's March 13, 2020 determination that the outbreak of Coronavirus Disease 2019 (COVID-19) constitutes a "national emergency" under the National Emergencies Act and the nationwide public health emergency declared by the Secretary of Health and Human Services on January 31, 2020, the COVID-19 pandemic continues to pose a threat to our health and security. On January 15, 2021, the Centers for Disease Control and Prevention (CDC) updated their information to account for several new strains of COVID-19, including variant B.1.1.7 from the United Kingdom, variant B.1.351 from South Africa, and variant B.1.1.28.1 from Brazil.  As of January 20, 2021, the United States has experienced more than 24 million confirmed COVID-19 cases and more than 400,000 COVID-19 deaths. The CDC, the Surgeon General, and the National Institutes of Health have concluded that mask-wearing, physical distancing, appropriate ventilation, and timely testing can mitigate the risk of travelers spreading COVID-19.  On January 21, 2021, the President issued the *Executive Order on Promoting COVID-19 Safety in Domestic and International Travel.*  The purpose of this Executive Order is to save lives and allow all Americans, including the millions of people employed in the transportation industry, to travel and work safely.  Further, on January 25, 2021 the President issued a *Proclamation on the Suspension of Entry as Immigrants and Non-Immigrants of Certain Additional Persons Who Pose a Risk of Transmitting Coronavirus Disease* whereby he reinstituted travel restriction for individuals traveling to the United States from the United Kingdom, Ireland, the Schengen Area, and instituted restrictions for South Africa.

In the light of these circumstances and direction from the President, and after consultation with public health officials, I, David P. Pekoske, Acting Secretary of Homeland Security, pursuant to the authority vested in me under section 101 of the Aviation and Transportation Security Act (ATSA), as codified at section 114(g) of title 49, United States Code (U.S.C.) do hereby determine that a national emergency exists and am directing the Transportation Security Administration to take actions consistent with the authorities in ATSA as codified at 49 U.S.C. sections 106(m) and 114(f), (g), (l), and (m) to implement the Executive Order to promote safety in and secure the transportation system.  This includes supporting the CDC in the enforcement of any orders or other requirements necessary to protect the transportation system, including

passengers and employees, from COVID-19 and to mitigate the spread of COVID-19 through the transportation system, to the extent appropriate and consistent with applicable law.  I specifically direct the Transportation Security Administration to use its authority to accept the services of, provide services to, or otherwise cooperate with other federal agencies, including through the implementation of countermeasures with appropriate departments, agencies, and instrumentalities of the United States in order to address a threat to transportation, recognizing that such threat may involve passenger and employee safety.

1/27/2021

David P. Pekoske

Acting Secretary

Department of Homeland Security

 **Centers for Disease Control and Prevention**

`Plaintiff's Exhibit 23`

# Order: Wearing of face masks while on conveyances and at transportation hubs

The Centers for Disease Control and Prevention (CDC) issued an Order ▣ [PDF – 11 pages] on January 29, 2021 requiring the wearing of masks by travelers to prevent spread of the virus that causes COVID-19. Conveyance operators must also require all persons onboard to wear masks when boarding, disembarking, and for the duration of travel. Operators of transportation hubs must require all persons to wear a mask when entering or on the premises of a transportation hub.

This Order must be followed by all passengers on public conveyances (e.g., airplanes, ships, ferries, trains, subways, buses, taxis, ride-shares) traveling into, within, or out of the United States as well as conveyance operators (e.g., crew, drivers, conductors, and other workers involved in the operation of conveyances) and operators of transportation hubs ( e.g., airports, bus or ferry terminals, train or subway stations, seaports, ports of entry) or any other area that provides transportation in the United States.

People must wear masks that cover both the mouth and nose when awaiting, boarding, traveling on, or disembarking public conveyances. People must also wear masks when entering or on the premises of a transportation hub in the United States.

This Order ▣ [PDF – 11 pages] is effective as of February 2, 2021 and was published in the Federal Register ⬓ on February 3, 2021.

For frequently asked questions, visit the FAQs.

The following are attributes of masks needed to fulfill the requirements of the Order. CDC will update this guidance as needed.

- A properly worn mask completely covers the nose and mouth.
- Cloth masks should be made with two or more layers of a breathable fabric that is tightly woven (i.e., fabrics that do not let light pass through when held up to a light source).
- Mask should be secured to the head with ties, ear loops, or elastic bands that go behind the head. If gaiters are worn, they should have two layers of fabric or be folded to make two layers.
- Mask should fit snugly but comfortably against the side of the face.
- Mask should be a solid piece of material without slits, exhalation valves, or punctures.

The following attributes are additionally acceptable as long as masks meet the requirements above.

- Masks can be either manufactured or homemade.
- Masks can be reusable or disposable.
- Masks can have inner filter pockets.
- Clear masks or cloth masks with a clear plastic panel may be used to facilitate communication with people who are hearing impaired or others who need to see a speaker's mouth to understand speech.
- Medical masks and N-95 respirators fulfill the requirements of the Order.

The following do not fulfill the requirements of the Order.

- Masks worn in a way that does not cover both the mouth and nose
- Face shields or goggles (face shields or goggles may be worn to supplement a mask that meets above required attributes)
- Scarves, ski masks, balaclavas, or bandannas
- Shirt or sweater collars (e.g., turtleneck collars) pulled up over the mouth and nose.
- Masks made from loosely woven fabric or that are knitted, i.e., fabrics that let light pass through
- Masks made from materials that are hard to breathe through (such as vinyl, plastic or leather)
- Masks containing slits, exhalation valves, or punctures
- Masks that do not fit properly (large gaps, too loose or too tight)

Additional guidance on the use of masks to slow the spread of COVID-19 is available on CDC's website.

# Disability Exemptions of the Order

Who is covered by the exemption for "a person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act ☐ (ADA, 42 U.S.C. 12101 *et seq.*)"?

Most people, including those with disabilities, can tolerate and safely wear a mask and are required to wear one as per CDC's Order. However, certain people with disabilities who, because of their disability, cannot wear a mask, or cannot safely wear a mask, are exempted from CDC's mask-wearing requirement.

The exemption is not meant to cover people with disabilities for whom wearing a mask might only be difficult or whose disability does not prevent them from wearing a mask or wearing a mask safely.

The following narrow subset of persons with disabilities are exempt from CDC's requirement to wear a mask:

- A person with a disability who, for reasons related to the disability, would be physically unable to remove a mask without assistance if breathing becomes obstructed. Examples might include a person with impaired motor skills, quadriplegia, or limb restrictions
- A person with an intellectual, developmental, cognitive, or psychiatric disability that affects the person's ability to understand the need to remove a mask if breathing becomes obstructed

The following persons with disabilities might be exempt from CDC's requirement to wear a mask based on factors specific to the person:

- A person with a disability who cannot wear a mask because it would cause the person to be unable to breathe or have respiratory distress if a mask were worn over the mouth and nose. A person with a condition that causes intermittent respiratory distress, such as asthma, likely does not qualify for this exemption because people with asthma, or other similar conditions, can generally wear a mask safely.
- A person with a disability requiring the use of an assistive device, such as for mobility or communication, that prevents the person from wearing a mask and wearing or using the assistive device at the same time. If use of the device is intermittent and the person can remove the mask independently to use the device, then a mask must be worn during periods when the person is not using the device.
- A person with a severe sensory disability or a severe mental health disability who would pose an imminent threat of harm to themselves or others if required to wear a mask. Persons who experience discomfort or anxiety while wearing a mask without imminent threat of harm would not qualify for this exemption.

**How can operators facilitate safer transportation where a passenger is a person with a disability who is exempt from the requirement to wear a mask?**

Operators of conveyances or transportation hubs should consider providing options for additional protective measures that improve the ability of the people who are subject to the exemption to maintain social distance (separation from others by at least 6 feet/2 meters [about 2 arm lengths]). Examples include—

- If travel is pre-scheduled, schedule travel for people who are exempt at less crowded times or on less crowded conveyances.
- Seat or otherwise situate the person in a less crowded section of the conveyance or transportation hub.
- Inform people with disabilities who cannot wear a mask safely that these additional measures might be taken to facilitate safer transportation.

All people should consider the necessity of using public transportation, especially those with disabilities or underlying conditions that may place them at increased risk for severe illness from COVID-19. Disability alone may not be related to higher risk for getting COVID-19 or having severe illness. Most people with disabilities are not inherently at higher risk for becoming infected with or having severe illness from COVID-19. However, some people with disabilities might be at a higher risk of infection or severe illness, at least in part because of their underlying medical conditions.

People with disabilities should talk with their healthcare providers if they have questions about their health or how their health conditions are being managed.

While this guidance uses the ADA's definition of disability, it does not address other ADA provisions that may be pertinent to issues involving the use of masks.

Page last reviewed: March 23, 2021

Plaintiff's Exhibit 24



**Transportation
Security
Administration**

U.S. Department of Homeland Security
Transportation Security Administration
6595 Springfield Center Drive
Springfield, Virginia 20598

## SECURITY DIRECTIVE

| | |
|---|---|
| NUMBER | SD 1544-21-02A |
| SUBJECT | Security Measures – Mask Requirements |
| EFFECTIVE DATE | May 12, 2021 |
| EXPIRATION DATE | September 13, 2021 |
| CANCELS AND SUPERSEDES | SD 1544-21-02 |
| APPLICABILITY | Aircraft operators regulated under 49 CFR 1544.101 |
| AUTHORITY | 49 U.S.C. 114, 44902, and 44903; 49 CFR 1544.305 |
| LOCATION(S) | All Locations |

PURPOSE AND GENERAL INFORMATION

Due to the ongoing COVID-19 pandemic and to reduce the spread of the virus, the President issued an Executive Order, *Promoting COVID-19 Safety in Domestic and International Travel*, on January 21, 2021, requiring masks to be worn in **and on** airports, on commercial aircraft, and in various modes of surface transportation.[1] On January 27, 2021, the Acting Secretary of Homeland Security determined a national emergency existed[2] requiring the Transportation Security Administration (TSA) to issue this Security Directive (SD) to implement the Executive Order and enforce the related Order[3] issued by the Centers for Disease Control and Prevention (CDC), pursuant to the authority of 49 U.S.C. sections 114, 44902, and 44903. Consistent with these mandates and TSA's authority, TSA is issuing this SD requiring masks to be worn to mitigate the spread of COVID-19 during air travel. The requirements in this SD must be applied

---

[1] 86 FR 7205 (published Jan. 26, 2021).

[2] Acting Secretary David P. Pekoske, Determination of a National Emergency Requiring Actions to Protect the Safety of Americans Using and Employed by the Transportation System (Jan. 27, 2021), *available at* https://www.dhs.gov/publication/determination-national-emergency-requiring-actions-protect-safety-americans-using-and (accessed Feb. 22, 2021). The Acting Secretary's determination directs TSA to take actions consistent with its statutory authorities "to implement the Executive Order to promote safety in and secure the transportation system." In particular, the determination directs TSA to support "the CDC in the enforcement of any orders or other requirements necessary to protect the transportation system, including passengers and employees, from COVID-19 and to mitigate the spread of COVID-19 through the transportation system."

[3] *See* Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations (CFR) §§ 70.2, 71.31(B), 71.32(B); Requirement for Persons to Wear Masks While on Conveyances and at Stations, Ports, or Similar Transportation Hubs (January 29, 2021)

to all persons onboard a commercial aircraft operated by a U.S. aircraft operator, including passengers and crewmembers, **including those already vaccinated.** TSA developed these requirements in consultation with the Federal Aviation Administration and CDC.

DEFINITIONS

For the purposes of this SD, the following definitions apply:

*Conveyance* has the same definition as under 42 CFR 70.1, meaning "an aircraft, train, road vehicle, vessel…or other means of transport, including military."

*Mask* means a material covering the nose and mouth of the wearer, excluding face shields.[4]

ACTIONS REQUIRED

A. The aircraft operator must provide passengers with prominent and adequate notice of the mask requirements to facilitate awareness and compliance.[5] At a minimum, this notice must inform passengers, at or before check-in and as a pre-flight announcement, of the following:

  1. Federal law requires each person to wear a mask at all times throughout the flight, including during boarding and deplaning.

  2. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties under federal law.

  3. If wearing oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation, masks should be removed to accommodate oxygen masks.

B. The aircraft operator must not board any person who is not wearing a mask, except as described in Sections D., E., and F.

C. The aircraft operator must ensure that direct employees and authorized representatives wear a mask at all times while on an aircraft or in an airport location under the control of the aircraft operator, except as described in Sections D., E., and F.

D. The requirement to wear a mask does not apply under the following circumstances:

  1. When necessary to temporarily remove the mask for identity verification purposes.

---

[4] A properly worn mask completely covers the nose and mouth of the wearer. A mask should be secured to the head, including with ties or ear loops. A mask should fit snugly but comfortably against the side of the face. Masks do not include face shields. Masks can be either manufactured or homemade and should be a solid piece of material without slits, exhalation valves, or punctures. Medical masks and N-95 respirators fulfill the requirements of this SD. CDC guidance for attributes of acceptable masks in the context of this SD is available at https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html.

[5] Notice may include, if feasible, advance notifications on digital platforms, such as on apps, websites, or email; posted signage in multiple languages with illustrations; printing the requirement on boarding passes; or other methods as appropriate.

2. While eating, drinking, or taking oral medications for brief periods.[6] Prolonged periods of mask removal are not permitted for eating or drinking; the mask must be worn between bites and sips.

3. While communicating with a person who is deaf or hard of hearing, when the ability to see the mouth is essential for communication.

4. If wearing oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation.

5. If unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to remove the mask without assistance, or otherwise unable to remove the mask without assistance.[7]

E. The following conveyances are exempted from this SD:

1. Persons in private conveyances operated solely for personal, non-commercial use.

2. A driver, when operating a commercial motor vehicle as this term is defined in 49 CFR 390.5, if the driver is the sole occupant of the vehicle.

F. This SD exempts the following categories of persons from wearing masks:[8]

1. Children under the age of 2.

2. People with disabilities who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.).[9]

---

[6] The CDC has stated that brief periods of close contact without a face mask should not exceed 15 minutes. *See* https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html

[7] Persons who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask. Persons who are vomiting should remove the mask until vomiting ceases. Persons with acute illness may remove the mask if it interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask.

[8] Aircraft operators may impose requirements, or conditions of carriage, on persons requesting an exemption from the requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the aircraft operator, as well as require evidence that the person does not have COVID-19 such as a negative result from a SAR-CoV-2 viral test or documentation of recovery from COVID-19. CDC definitions for SAR-CoV-2 viral test and documentation of recovery are available in Frequently Asked Questions at: https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html. Aircraft operators may also impose additional protective measures that improve the ability of a person eligible for exemption to maintain social distance (separation from others by 6 feet), such as scheduling travel at less crowded times or on less crowded conveyances, or seating or otherwise situating the individual in a less crowded section of the conveyance or airport. Aircraft operators may further require that persons seeking exemption from the requirement to wear a mask request an accommodation in advance.

[9] This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability; who, e.g., do not understand how to remove their mask due to cognitive impairment, cannot remove a mask on their own due to dexterity/mobility impairments, or cannot communicate promptly to ask someone else to

Security Directive                                                    SD 1544-21-02A

---

3.  People for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

G.  If a passenger refuses to comply with an instruction given by a crew member with respect to wearing a mask, the aircraft operator must:

1.  Make best efforts to disembark the person who refuses to comply as soon as practicable; and

2.  Follow incident reporting procedures in accordance with its TSA-approved standard security program and provide the following information, if available:

    a. Date and flight number;

    b. Passenger's full name and contact information;

    c. Passenger's seat number on the flight;

    d. Name and contact information for any crew members involved in the incident; and

    e. The circumstances related to the refusal to comply.

PREEMPTION

The requirements in this SD do not preempt any State, local, Tribal, or territorial rule, regulation, order, or standard necessary to eliminate or reduce a local safety hazard, which includes public health measures that are the same or more protective of public health than those required in this SD, if that provision is not incompatible with this SD.

ACKNOWLEDGMENT OF RECEIPT

The aircraft operator must immediately provide written confirmation of receipt of this SD to its Principal Security Inspector (PSI) or International Industry Representative (IIR), as appropriate.

DISSEMINATION REQUIRED

The aircraft operator must immediately pass the information and measures set forth in this SD to any personnel having responsibilities in implementing the provisions of this directive. The aircraft operator may share this SD with anyone subject to the provisions of this directive to include but not limited to:  federal, state, and local government personnel; authorized representatives; catering personnel; vendors; airline club staff; contractors; etc.

---

remove their mask due to speech impairments or language disorders, or cannot wear a mask because doing so would impede the function of assistive devises/technology.  It is not meant to cover persons for whom mask-wearing may only be difficult.  **The CDC issued additional guidance on disability exemptions on March 23, 2021, which is available at https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html.**

APPROVAL OF ALTERNATIVE MEASURES

In accordance with 49 CFR 1544.305(d), the aircraft operator must immediately notify its PSI or IIR, as appropriate, if unable to implement any of the measures in this SD, or in any TSA-approved alternative measure.  The aircraft operator may submit proposed alternative measures and the basis for submitting those measures to its PSI or IIR.


Darby LaJoye
Senior Official Performing the Duties of the Administrator

An official website of the United States government Here's how you know ∨

The latest general information on the Coronavirus Disease 2019 (COVID-19) is available on Coronavirus.gov. For USDOT specific COVID-19 resources, please visit our page.

Home \ Priorities

# Frequently Asked Questions

## Wearing of Face Masks While on Conveyances and at Transportation Hubs

The Centers for Disease Control and Prevention (CDC) issued an Order on January 29, 2021, requiring the wearing of masks by travelers to prevent spread of the virus that causes COVID-19.  Conveyance operators must also require that all persons wear masks when boarding, disembarking, and for the duration of travel, with certain exemptions as described in the Questions below. The Order defines "conveyance" as including "aircraft, train, road vehicle (including rideshares), vessel…or other means of transport, including military transport." (42 CFR §§ 70.1, 71.1).  Operators of transportation hubs must require all persons we a mask when entering or on the premises of a transportation hub. A "transportation hub" means any airport, bus terminal, marina, seaport, or other port, subway station, terminal, train station, U.S. port of entry, or any other location that provides transportation". More information about this order can be found on the CDC's website, including CDC's FAQ's for this mask requirement, here.

The Transportation Security Administration (TSA) has issued an emergency amendment and three security directives in suppor of the CDC Order. They can be found here. SD 1582/84-21-01 pertains directly to owners and operators of ground transport. The other three pertain to the aviation industry. For more information about the TSA's COVID-19 prevention efforts visit their COVID-19 hub, or their COVID-19 FAQs.

To assist ground transportation operators in the implementation of the Order and the Directive, the U.S. Department of Transportation (USDOT) compiled a list of questions and answers, and will continue to update them  as additional information becomes available.

The USDOT will also continue to engage stakeholders in conjunction with the CDC and other Federal agencies.

For air transportation operators, please see FAA's Fly Healthy web page for more information.

General

Federal Aviation Administration (FAA)

Federal Transit Administration (FTA)

Federal Railroad Administration (FRA)

Federal Motor Carrier Safety Administration (FMCSA)



## General

### What is the CDC's Order and who does it apply to?

The Centers for Disease Control and Prevention (CDC) issued an Order on January 29, 2021, requiring the wearing of masks

by travelers to prevent spread of the virus that causes COVID-19. Conveyance operators must require all persons to wear masks when boarding, disembarking, and for the duration of travel. Operators of transportation hubs must require all persons to wear a mask when entering or on the premises of a transportation hub.

This Order must be followed by all passengers on public conveyances (e.g., airplanes, ships, ferries, trains, subways, buses, taxis, rideshares) traveling into, within, or out of the United States as well as conveyance operators (e.g., crew, drivers, conductors, and other workers involved in the operation of conveyances) and operators of transportation hubs (e.g., airports, bus or ferry terminals, train or subway stations, seaports, ports of entry) or any other area that provides transportation in the United States.

People must wear masks that cover both the mouth and nose when awaiting, boarding, traveling on, or disembarking public conveyances. People must also wear masks when entering or on the premises of a transportation hub in the United States.

## What does the CDC Order require?                                                         ︿

The CDC Order requires conveyance operators to use their best efforts to ensure that persons wear masks while boarding and disembarking a conveyance, for the duration of a trip, and within a transportation hub. Best efforts may include:

- Boarding and allowing entry to only those persons who wear masks;
- Instructing persons that Federal law requires wearing a mask on the conveyance and in the transportation hub and failure to comply constitutes a violation of Federal law;
- Monitoring persons onboard conveyances and in facilities for anyone who is not wearing a mask and seeking compliance from such persons;
- At the earliest opportunity, disembarking any person who refuses to comply; and
- Providing persons with prominent and adequate notice to facilitate awareness and compliance of the requirement to wear a mask, with best practices including, if feasible, advance notifications on digital platforms, such as on apps, websites, or email; posted signage in multiple languages with illustrations; printing the requirement on tickets; and other methods as appropriate.

Best efforts should take into consideration the safety of conveyance operators when identifying roles and responsibilities for implementing the CDC Order.

## What if we have a local mask mandate already in place?                                    ︿

The CDC Order does not apply within any state, locality, territory, or area under the jurisdiction of a tribe that: (1) requires a person to wear a mask on conveyances; (2) requires a person to wear a mask at transportation hubs; and (3) requires conveyances to transport only a person wearing a mask. Such state, local, territorial, or tribal requirements must provide the same level of public health protection as—or greater protection than—the requirements of the CDC Order. In addition, the CDC Order does not preclude operators from imposing additional requirements or conditions that provide greater public health protection and are more restrictive than the requirements of the CDC Order.

## How does CDC define mask?                                                                 ︿

*Mask* means a material covering the nose and mouth of the wearer, excluding face shields. CDC guidance for acceptable masks in the context of this Order is available here.

Are there any exemptions to the CDC Order?                                              ⌃

The CDC Order exempts the following categories of persons:

- A child under the age of 2 years;
- A person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq.*); and
- A person for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

The exemption for a person with a disability is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability. CDC will issue additional guidance regarding persons who cannot wear a mask under this exemption here.

The CDC Order also states that the requirement to wear a mask shall not apply under the following circumstances:

- While eating, drinking, or taking medication, for brief periods;
- While communicating with a person who is hearing impaired when the ability to see the mouth is essential for communication;
- If unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to remove the mask without assistance; or
- When necessary to temporarily remove the mask to verify one's identity, such as when asked to do so by a ticket or gate agent or any law enforcement official.

In addition, persons who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask. Persons who are vomiting should remove the mask until vomiting ceases. Persons with acute illness may remove the mask if it interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask.

Are conveyance operators permitted to impose additional requirements or conditions regarding masks?   ⌃

Yes. The CDC Order does not preclude operators from imposing additional requirements or conditions that provide greater public health protection and are more restrictive than the requirements of the CDC Order. The Order also encourages, State, local, territorial, and tribal governmental entities that operate conveyances to implement additional measures to enforce the Order regarding persons utilizing their system. Additional requirements or conditions may be imposed that provide greater public health protection and are more restrictive than the requirements of the CDC Order, including requirements for persons requesting an exemption from the mask requirement, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the operator.

How long is the CDC Order in effect?                                                    ⌃

The effective date of the CDC Order is February 1, 2021, at 11:59 p.m. The Order will remain in effect for the duration of the COVID-19 public health emergency, and as determined by the CDC.

## Federal Aviation Administration (FAA)

For air transportation operators, please see FAA's Fly Healthy web page for more information.

## Federal Transit Administration (FTA)

## Are transit operators considered a public conveyance?

Yes.

## Is Federal funding available to support implementation of the CDC Order?

Yes. FTA recipients may use the $39 billion in Coronavirus Aid, Relief, and Economic Security Act (CARES Act) and Coronavirus Response and Relief Supplemental Appropriations Act, 2021 (CRRSAA) funds to implement the CDC Order. Operating expenses incurred beginning on January 20, 2020, for all rural, and small and large urban recipients, also are eligible to draw from FTA urbanized area and rural formula funds, including operating expenses to purchase and provide face masks to employees or passengers, install additional cameras in transit vehicles, hire additional transit security personnel, and/or enter into additional contracts for security services to implement the CDC Order. Federal Emergency Management Agency funding also may be available.

## Who should I contact if I have questions about the face mask requirement for transit?

Please submit your questions about the implementation of the CDC Order for public transit to TransitMaskUp@dot.gov.

## What technical assistance will FTA provide to support implementation of the CDC Order?

In coordination with Federal partners, FTA will support transit's implementation of the CDC Order, with a focus on leveraging its existing technical assistance and stakeholder engagement platforms, including the following:

- Coordinating and publishing FAQs with Federal partners to provide the transit industry with guidance on implementing requirements of E.O. 13998, the CDC Order, the TSA Security Directive, and applicable Federal guidance.

  FTA will post responses to Frequently Asked Questions (FAQs) on the DOT FAQ page. Please submit your questions about the implementation of the CDC Order for public transit to TransitMaskUp@dot.gov.

  Additionally, in accordance with Executive Order 13166, FTA will ensure that FAQs will be made available in languages other than English, to ensure access for individuals with limited English proficiency.

- Hosting industry-wide stakeholder calls, weekly during February and as needed, to deliver key messages on the mask requirement to a broad transit audience.
- Hosting listening sessions with transit stakeholders to provide an opportunity for transit agencies across the United States to share their experiences and lessons learned as they implement a mask requirement and respond to the COVID-19 public health emergency.
  When necessary, FTA will ensure these sessions are accessible in languages other than English.
- Encouraging transit industry engagement in the FTA-sponsored COVID-19 Recovery Discussion Forum to facilitate peer-to-peer exchanges on ideas, practices, and other information related to implementation of a mask requirement.
- Continuing to work with the American Public Transportation Association and the Community Transportation Association of America to produce a COVID-19 Recovery Vendor List for Transit, which documents over 350 vendors providing critical materials for transit's COVID-19 recovery efforts.
- Publishing updates to the COVID-19 Recovery Practices in Transit resource, which provides web links to practices implemented by transit systems across the globe to respond to the COVID-19 public health emergency. In providing this resource, FTA also will remind transit agencies to ensure that publicly available information related to COVID-19

recommendations on transit-related topics. This tool includes information from CDC on face masks.

## Does the mask requirement apply to Section 5310 operators? ^

The CDC Order applies to all recipients and subrecipients of Federal funding under 49 U.S.C. Chapter 53 that own, operate, or maintain a public transportation system, including an entity that receives Federal financial assistance only under the formula grants for Enhanced Mobility of Seniors and Individuals with Disabilities (49 U.S.C. §5310).

## Does FTA have training on de-escalation for transit operators? ^

Yes. FTA works with the National Transit Institute at Rutgers University to deliver a 3-hour training on Assault Awareness and Prevention for Transit Operators, which addresses de-escalation techniques. Virtual offerings of this training became available beginning in February 2021. The goal of the course is to give vehicle operators in the transit industry – with an emphasis on bus operators—the knowledge and skills needed to reduce the likelihood of assault incidents from occurring. Prevention methods covered include discussing the types of incidents that could be considered assault and recognizing key vulnerability factors. Prevention strategies focus on communication and response skills, and the value of reporting incidents.

## What Federal resources will be available to support enforcement of mask usage on transit systems and to reduce the risk of assault to employees who might enforce the CDC Order? ^

The primary goal of the CDC Order is compliance, not enforcement. The CDC Order requires transit operators to use their best efforts to ensure that persons wear masks while boarding and alighting a transit vehicle, for the duration of a trip, and within a transit facility. Best efforts should take into consideration the safety of transit employees when identifying roles and responsibilities for implementing the CDC Order.

FTA recipients may use the $39 billion in Coronavirus Aid, Relief, and Economic Security Act (CARES Act) and Coronavirus Response and Relief Supplemental Appropriations Act, 2021 (CRRSAA) funds to implement the CDC Order. Operating expenses incurred beginning on January 20, 2020, for all rural, and small and large urban recipients, also are eligible to draw from FTA urbanized area and rural formula funds, including operating expenses to purchase and provide face masks to employees or passengers, install additional cameras in transit vehicles, hire additional transit security personnel, and/or enter into additional contracts for security services to implement the CDC Order. Federal Emergency Management Agency funding also may be available.

## Do transit employees who work behind plexiglass barriers or shields on public transportation conveyances or in transportation hubs still need to wear a face mask? ^

Yes. A transit employee is required to wear a mask unless covered under an exemption, even if the employee is separated from passengers or other employees by plexiglass or another protective barrier. While protective barriers help limit transmission, respiratory droplets that can spread the virus that causes COVID-19 still can enter shielded areas. Masks provide an additional and necessary layer of protection against transmission.

## Does the mask requirement apply in administrative facilities? ^

include, for example, executive offices, training facilities, and construction field offices. Transit employees must wear masks while on public transportation conveyances, and on the premises of a transportation hub unless they are the only person in the work area, such as in a private office.

As applied to transit, public transportation conveyances are transit vehicles being used in revenue service. A transportation hub is any location where people gather to await, board, or disembark public transportation, such as bus and ferry terminals, train and subway stations, and ride-share pick-up locations. It also includes any facility directly involved in the provision of transit service, such as ticket sales offices, vehicle maintenance facilities, vehicle cleaning facilities, operations control centers, electric vehicle charging facilities, operator break areas, and fueling facilities.

Per the CDC Order, persons for whom a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or Federal regulations are not required to wear a mask. A narrow subset of employees with disabilities also are exempt from the mask requirement under CDC Order because it would be unsafe for them to wear a mask due to their disability. The CDC states it will issue additional guidance regarding persons who cannot wear a mask under this exemption.

## Does the mask requirement apply to employees in transit maintenance and operations facilities? ^

Yes. Transit employees must wear masks while on public transportation conveyances and at transportation hubs. The starting point is that everyone should be wearing a mask and employees are broadly required to wear masks by the CDC Order. As applied to transit, public transportation conveyances are transit vehicles being used in revenue service. A transportation hub is any location where people gather to await, board, or disembark public transportation, such as bus and ferry terminals, train and subway stations, and ride-share pick-up locations. It also includes any facility directly involved in the provision of transit service, such as ticket sales offices, vehicle maintenance facilities, vehicle cleaning facilities, operations control centers, electric vehicle charging facilities, operator break areas, and fueling facilities. An employee is not required to wear a mask if he/she is the only person in the work area, such as in a private office.

The CDC Order broadly requires persons to wear masks whenever possible, particularly in any transit facility or location where persons are not alone. Employees must wear a mask while on the premises of a transportation hub unless they are the only person in the work area, such as in private offices.

The CDC Order exempts from the mask requirement persons for whom a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or Federal regulations; such persons are not required to wear a mask. A narrow subset of employees with disabilities are also exempted from the mask requirement under CDC's Order because it would be unsafe for them to wear a mask due to their disability. The CDC states it will issue additional guidance regarding persons who cannot wear a mask under this exemption.

FTA encourages transit agencies to implement mask polices in all areas of their organizations, including those areas where masks are not required to be worn under the CDC Order. The CDC has developed specific guides for rail and bus transit employers to protect transit workers in the workplace. In addition, the Occupational Safety and Health Administration (OSHA) issued guidance, _Protecting Workers: Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace_ (dated January 29, 2021), to help identify risks of being exposed to COVID-19 in workplace settings and to determine any appropriate control measures to implement, which could be informative to the use of masks in transit offices and facilities.

## How will FTA enforce the CDC Order? ^

FTA has amended the Master Agreement to incorporate the requirements of the CDC Order. Pursuant to the terms and conditions of FTA Master Agreement FTA MA(28), FTA may take enforcement action against a recipient or subrecipient that fails to comply with this Order, including, but not limited to, actions authorized by 49 U.S.C. § 5329(g) and 2 CFR §§ 200.339-.340 when a recipient does not comply with Federal law with respect to the safety of its public transportation system.

### Are riders with disabilities exempt from mask requirements?

The CDC Order exempts people with disabilities who cannot wear a mask, or cannot safely wear a mask, because of their disability, as defined by the Americans with Disabilities Act (42 U.S.C. § 12101, *et seq.*). This is a narrow exemption to be applied in very limited circumstances. It is not meant to cover persons for whom mask-wearing may only be difficult. The TSA Security Directive gives examples of persons unable to wear a mask due to safety reasons who would be exempt, including those who do not understand how to wear or remove the mask due to cognitive impairment, *or* cannot wear or remove a mask on their own due to dexterity/mobility impairments. The CDC issued supplemental guidance on the disability exemption that gives examples of persons with disabilities who are exempt from the mask-wearing requirement and those individuals who might be exempt. See Disability Exemptions of the Order.

### May a transit agency require requests for exemptions from mask requirements to be made in advance of travel?

Yes. The TSA Security Directive states, "Operators may further require that persons seeking exemption from the requirement to wear a mask request an accommodation in advance. Operators may impose requirements, or conditions of carriage, on persons requesting an exemption from the requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the owner/operator."

The exemption process is likely easier to implement in systems that require riders to make trip reservations in advance, and especially in Americans with Disabilities Act (ADA) complementary paratransit service, where the agency has already confirmed the eligible rider's disability status and functional limitations, and where the submittal of medical and other information is routine. For fixed-route bus and rail systems, which do not require rider reservations, granting exemptions and ensuring only individuals qualified for an exemption ride without wearing a mask may be more challenging. Consistent with the CDC Order and TSA Security Directive, fixed-route transit providers may require individuals to request an exemption in advance of being allowed to travel and could issue riders a card or other document noting the exemption to present to transit personnel on future trips.

### Is a transit agency required to adopt a specific process for handling exemption requests, such as through its already required Americans with Disabilities Act (ADA) reasonable modification of policy procedures?

Generally, no. The TSA Security Directive does not dictate a specific process. Most individuals, including those with disabilities, can tolerate and safely wear a mask. However, a narrow subset of individuals with disabilities may not be able to wear a mask or cannot safely wear a mask. Those who cannot safely wear a mask – for example, a person with a disability who, for reasons related to the disability, would be physically unable to remove a mask without assistance if breathing becomes obstructed – should not be required to wear one. The current exemption for people with disabilities who cannot wear masks safely is in a TSA Security Directive, and is not a reasonable modification under the ADA. Agencies have discretion in how they process such exemption requests; however, any process adopted should provide a prompt response to the person requesting the exemption. The process also must be sufficiently advertised so that people know how to make the request. 49 CFR § 37.167(f). Public information explaining the process also should be provided in languages other than English consistent with the agency's Title VI program.

### Does a transit agency need to ensure frontline workers and other personnel understand the exemption process for people with disabilities?

Yes. Regardless of the exemption process an agency adopts, training and providing information to personnel on the process

Americans with Disabilities Act (ADA) regulations at 49 CFR § 37.173 require personnel to be prepared to "properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities."

## COVID-19 Employer Information for Transit Maintenance Workers – CDC Guidance ∧

CDC Guidance for Transit Maintenance Workers

## What Rail Transit Operators Need to Know about COVID-19 – CDC Guidance ∧

CDC Guidance for Rail Transit Operators

## Are direct recipients, such as State Departments of Transportation (DOTs) and local governmental authorities, responsible for ensuring subrecipients implement the mask requirement? ∧

Yes. State DOTs and other direct recipients have the responsibility to ensure that subrecipients are implementing a mask requirement as a term of their grant agreements. On February 9, 2021, FTA issued an amendment to its Master Agreement to incorporate the requirements of the CDC Order into the standard terms and conditions for all of its grants, cooperative agreements, and loans authorized by Federal public transportation law or administered by FTA.

## Are State DOTs required to report non-compliant passengers to TSA's Transportation Security Operations Center (TSOC)? ∧

It depends. Under TSA's Security Directive, owners/operators must report to the TSOC at 1-866-615-5150 or 1-703-563-3240 if an individual's refusal to comply with the mask requirement constitutes a significant security concern. State DOTs must report non-compliant passengers to the TSOC only if they are the owners/operators of the transportation conveyances or hubs where the incidents occurred.

## Can local law enforcement enforce the mask requirement? ∧

The CDC Order requires conveyance operators to use best efforts to ensure that any person, unless otherwise exempted, on the conveyance wears a mask when boarding, disembarking, and for the duration of travel; and operators of transportation hubs must use best efforts to ensure that any person entering or on the premises of the transportation hub wears a mask, unless otherwise exempted.  The TSA Security Directive requires that owner/operators establish procedures to manage situations with persons who refuse to comply with the mask requirement.  At a minimum, these procedures must ensure that if an individual refuses to comply with an instruction given by the owner/operator with respect to wearing a mask, the owner/operator must deny boarding, make best efforts to disembark the individual as soon as practicable, or make best efforts to remove the individual from the transportation hub/facility. Satisfying the mask requirement could include obtaining support from cooperating local law enforcement to assist transit agencies with implementation and minimize confrontations between transit operators and passengers.

**Can transit agencies choose not to deny boarding or remove passengers who refuse to wear a mask if local law enforcement does not assist, or if doing so would impact service or put operators in harm's way?** ⌃

Transit agencies must use best efforts to deny boarding to passengers who refuse to wear a mask, unless otherwise exempted, and make best efforts to disembark a passenger who removes a mask as soon as practicable unless the person is otherwise exempted. As defined by the CDC Order, what actions constitute "best efforts" include:

- Boarding only those persons who wear masks, unless persons not wearing masks are exempt from the CDC Order;
- Instructing persons that Federal law requires wearing a mask and failure to comply constitutes a violation of Federal law;
- Monitoring persons onboard for anyone who is not wearing a mask and, unless such persons are exempt from the CDC Order, seeking compliance from such persons; and
- At the earliest opportunity, disembarking any person who refuses to comply.

TSA also clarifies that "best efforts" should take into consideration the safety of transit vehicle operators when identifying roles and responsibilities for implementing the CDC Order. If an individual's refusal to comply with the mask requirement constitutes a significant security concern, the transit agency must report the incident to the Transportation Security Operations Center at 1-866-615-5150 or 1-703-563-3240 for tracking and consideration for possible penalties.

**How does the requirement apply to riders who use oxygen?** ⌃

Persons with acute illness may remove the mask if it interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask (see footnote 7 of the CDC Order).  Persons who use oxygen full time may be exempt from the mask requirement if a mask interferes with the ability to use an oxygen mask.

**CDC guidance on mask wearing seems to suggest people who have trouble breathing shouldn't wear masks, but what if these people don't qualify for an exemption under the CDC Order?** ⌃

The CDC Order clarifies that persons who are having trouble breathing or shortness of breath, or are feeling winded, may remove the mask temporarily until able to resume normal breathing with the mask (see footnote 7 of the CDC Order).

**What should transit agencies do when drivers with glasses report difficulty wearing masks because their glasses fog up?** ⌃

The CDC Order requires transit employees to wear masks while engaging with passengers and operating transportation conveyances. CDC recommends that individuals who wear glasses find a mask that fits closely over their nose or has a nose wire to help reduce fogging and consider using an antifogging spray.

Transit agencies should work with drivers on mask fit to reduce fogging. In certain circumstances, where this issue cannot be resolved, the CDC Order provides for exemptions to ensure workplace safety and safe operation of the transit vehicle.

**If transit agencies have mobile ticketing, are they required to provide notice of the requirement in the app?** ⌃

No. Transit agencies are not required to provide notice of the requirement on their app, though it is a good practice to do

notice of the mask requirement at the time the conveyance departs its location after boarding passengers. The notice must include the following statements:

- Federal law requires wearing a mask while on the conveyance and failure to comply may result in denial of boarding or removal; and
- Refusing to wear a mask is a violation of federal law; passengers may be subject to penalties under federal law.

The CDC Order requires conveyance operators and transportation hub operators to use their best efforts to ensure that persons wear masks while boarding and disembarking a conveyance, for the duration of a trip, and within a transportation hub. Best efforts could include advance notifications on digital platforms, such as on apps, websites, or email; posted signage in multiple languages with illustrations; printing the requirement on tickets; and other methods. Best efforts also should include advance notifications in languages other than English consistent with the transit agency's Title VI program, and in accessible formats for persons with disabilities.

## Are transit agencies required to notify passengers of penalties for non-compliance? If so, what information must transit agencies provide? ^

Yes. The TSA Security Directive states that, at a minimum, public notice must include the following statements:

- Federal law requires wearing a mask while on the conveyance and failure to comply may result in denial of boarding or removal; and
- Refusing to wear a mask is a violation of federal law; passengers may be subject to penalties under federal law.

## Does the exemption from the mask-wearing requirement for disability-related reasons apply to transit personnel? ^

Yes. The Centers for Disease Control and Prevention (CDC) Order exempts from the mask requirement people with disabilities who cannot wear a mask, or cannot safely wear a mask, because of their disability, as defined by the Americans with Disabilities Act (42 U.S.C. § 12101, et seq.).  This narrow exemption, to be granted in very limited circumstances, applies not only to transit passengers, but also to transit personnel and all other individuals while on a conveyance or at a transportation hub conducting transit operations.  As with exemption requests from the public, agencies "may impose requirements, or conditions of carriage, on persons requesting an exemption from the requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the owner/operator" per the TSA Security Directive.  Also, transit agencies may need to address requests from transit personnel for reasonable accommodation under the ADA.

FTA encourages transit agencies to review the CDC's guidance to Bus Transit Operators, Rail Transit Operators, and Transit Station Workers, as well as Guidance for Wearing Masks.

## Are transit operators required to wear masks when there are no passengers on the vehicle? ^

Yes, except for operators of transit vehicles that are commercial vehicles, as defined in 49 CFR § 390.5.  The Centers for Disease Control and Prevention (CDC) provides an exemption for such commercial motor vehicles, when the operator is the sole occupant of the vehicle.  For transit vehicles that meet this regulatory definition of a commercial motor vehicle (including that the vehicle is used on a highway in interstate commerce), the operator is not required to wear a mask when there are no passengers on the vehicle, but must put a mask on prior to any passenger boarding the vehicle.  For all other transit vehicles, the operator must wear a mask when there are no passengers on the vehicle.

Are bus stops without shelters or benches considered transportation hubs?                                    ^

Yes. The CDC Order defines a transportation hub as any location where people gather to await, board, or disembark public transportation.  This includes bus stops with or without shelters or benches.

## Federal Railroad Administration (FRA)

Are both passenger and freight train operators and rail employees covered by the mask mandates?

Yes, both passenger and freight train operators and rail employees are subject to Executive Order 13998 and the CDC's Order requiring masks during rail transportation.

Who should I contact if I have questions about the face mask requirement for railroads?

Please submit your questions about the implementation for railroads  to RailroadsMaskup@dot.gov.

Does the mandate require mask wearing by employees in railroad yard offices, rail facilities, rail maintenance facilities, vans hauling crews, or occupied engines?

The Order of the Centers for Disease Control and Prevention (CDC Order) broadly requires employees to wear masks in conveyances and transportation hubs. This applies to railroad terminals, yards, storage facilities, yard offices, crew rooms, maintenance shops, and other areas regularly occupied by railroad personnel. Masks are also required in vans hauling crews and occupied engines. The CDC Order broadly requires persons to wear masks in such settings and applies in both passenger and freight rail facilities. See CDC FAQs explaining that employees at transportation hubs must wear a mask while on the premises of a transportation hub unless they are the only person in the work area, such as in private offices, private hangars at airports, or in railroad yards (available at: https://www.cdc.gov/coronavirus/2019-ncov/travelers/face-masks-public-transportation.html).

Although wearing a mask is required as outlined above and critical to stop the spread of COVID-19, the CDC Order specifically exempts situations involving commercial truck drivers who are the sole occupants of the vehicle. 86 FR 8025, 8028 (Feb. 3, 2021).  Similarly, a railroad employee who is the sole occupant of a vehicle, locomotive cab, or hi-rail truck, would have flexibility through company policy or employee discretion to choose not to wear a mask.  Moreover, per the CDC Order, persons for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations are not required to wear a mask.

Additionally, note that the Occupational Safety and Health Administration issued guidance, *Protecting Workers: Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace* (dated January 29, 2021), to help identify risks of being exposed to COVID-19 in workplace settings and to determine any appropriate control measures to implement, which could be informative to the use of masks in rail offices and facilities.

Does the mandate require mask wearing by railroad employees at all times or only when such employees cannot maintain social distance?

The Order of the Centers for Disease Control and Prevention (CDC Order) broadly requires employees to wear masks in conveyances and transportation hubs.  This applies to railroad terminals, yards, storage facilities, yard offices, crew rooms, maintenance shops, and other areas regularly occupied by railroad personnel.  Masks are also required in vans hauling

while on the premises of a transportation hub unless they are the only person in the work area, such as in private offices, private hangars at airports, or in railroad yards (available at: *https://www.cdc.gov/coronavirus/2019-ncov/travelers/face-masks-public-transportation.html*). Masks are required at all times, aside from the limited exceptions as outlined in the CDC Order (e.g., while eating, drinking, or taking medication, for brief periods).

Although wearing a mask is required as outlined above and critical to stop the spread of COVID-19, the CDC Order specifically exempts situations involving commercial truck drivers who are the sole occupants of the vehicle. 86 FR 8025, 8028 (Feb. 3, 2021). Similarly, a railroad employee who is the sole occupant of a vehicle, locomotive cab, or hi-rail truck, or a railroad employee performing duties outdoors and not in proximity to any other persons (e.g., a railroad employee performing a train or track inspection outdoors and far from any other persons), would have flexibility through company policy or employee discretion to choose not to wear a mask. Moreover, per the CDC Order, persons for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations are not required to wear a mask.

Additionally, note that the Occupational Safety and Health Administration issued guidance, *Protecting Workers: Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace* (dated January 29, 2021), to help identify risks of being exposed to COVID-19 in workplace settings and to determine any appropriate control measures to implement, which could be informative to the use of masks in rail offices and facilities.

### I am a locomotive engineer at a major freight railroad. Does FRA's Emergency Order apply to me? ︿

Yes. FRA's Emergency Order applies to all railroad personnel in or on a freight train, locomotive, high-rail vehicle, or crew transportation vehicle, or in a railroad transportation facility, terminal, yard, storage facility, yard office, crew room, maintenance shop, and other areas regularly occupied by railroad personnel when engaged in railroad operations.

### If I am a crew member alone in a locomotive cab, does FRA's Emergency Order require me to wear a mask? ︿

No. If a crew member (or any other railroad personnel) is alone in an enclosed locomotive cab, FRA's Emergency Order does not require wearing a mask. Wearing a mask is required, however, if there is another person inside the cab (e.g., if a locomotive engineer and conductor are both in the cab). Railroad personnel alone in a locomotive cab should therefore have a mask available to put on when required.

### Do workers at transportation hubs need to wear masks at all times inside or only when they cannot socially distance? ︿

Per the January 29, 2021, Order of the Centers for Disease Control and Prevention (and the CDC's responses to Frequently Asked Questions), employees must wear a mask while on the premises of a transportation hub. However, CDC has posted guidance to their website that masks do not need to be worn if a worker is the only person in the work area, which might occur in private offices or in railroad yards and other outdoor spaces. If another person enters the work area, or the employee leaves the work area and enters another area where others might be located, the employee must wear a mask. If the nature of the work area is such that other persons are likely to be located there and are allowed to enter or leave unannounced, then a mask must be worn at all times.

Under CDC's Order, employees do not need to wear a mask if wearing one would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations. An employee is also exempted if the employee has a disability and cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*).

### Does FRA's Emergency Order cover personnel performing duties outdoors and not in proximity to any other persons?

No.  Railroad personnel performing duties outdoors and not in proximity to any other persons (e.g., a railroad employee performing a train or track inspection outdoors and far from any other persons) would have flexibility through company policy or employee discretion to choose not to wear a mask.

### Does FRA's Emergency Order cover railroad personnel in corporate office buildings, such as railroad headquarters?

No.  FRA's Emergency Order does not cover personnel in corporate office buildings, such as railroad headquarters.  However, mask orders from States, localities, or other jurisdictions may apply to these spaces.  Wearing a mask is encouraged even if the railroad personnel are not specifically covered by the Emergency Order.

### Does FRA's Emergency Order cover personnel in a railroad yard office? If so, are masks required for personnel inside a private office with a closed door?

Yes.  Personnel in a railroad yard office, such as a depot, would be covered by the Emergency Order.  If a person in a railroad yard office is alone in a private office with the door closed, a mask would not be required.  If another person enters the private office, or the person leaves the office and enters another area where others may be located, the individual must wear a mask.

### Do passengers or persons (including railroad personnel) in or on a passenger train or in public areas of passenger railroad transportation hubs or facilities have to wear a mask?

Yes. Per the Transportation Security Administration (TSA) Security Directive (SD) 1582/84-21-01, *Security Measures – Face Mask Requirements*, such passengers or persons (including railroad personnel) are required to wear a mask.

### Is a railroad carrier that fails to comply with FRA's Emergency Order subject to enforcement action?

Yes. Any violation of FRA's Emergency Order may subject the railroad carrier committing the violation to a civil penalty of up to $118,826 for each day the violation continues. 49 U.S.C. 21301 and 86 FR 1751 (Jan. 11, 2021).  FRA may, through the Attorney General, also seek injunctive relief to enforce the Emergency Order.  49 U.S.C. 20112.

For information about enforcement action for violations of TSA's Security Directives, please email TSA-Surface@tsa.dhs.gov.

### Can a railroad employee be subject to enforcement action personally for failure to comply with FRA's Emergency Order?

Yes. Any individual (railroad personnel) who willfully violates a provision stated in FRA's Emergency Order is subject to civil penalties under 49 U.S.C. 21301.  In addition, any individual (railroad personnel) whose violation of the Emergency Order

For information about enforcement action for violations of TSA's Security Directives, please email TSA-Surface@tsa.dhs.gov.

## For how long is FRA's Emergency Order in effect?

FRA's Emergency Order is in effect until: (1) the CDC Order is modified in relevant part or rescinded based on specific public health or other considerations; (2) the U.S. Secretary of Health and Human Services rescinds the determination that a public health emergency exists; or (3) it is rescinded by FRA.

## Does FRA's Emergency Order cover other individuals (other than passengers) who could be present on railroad property, but are not involved in railroad operations, such as invited guests, government officials, or customers?

No. FRA's Emergency Order does not specifically apply to persons who are not involved in railroad operations, such as invited guests, government officials, or customers. FRA also notes that while FRA's Emergency Order does not cover these persons, mask orders from States, localities, or other jurisdictions, including the CDC Order or TSA SD, may apply.

## Does FRA's Emergency Order cover other individuals (other than passengers) who could be present on railroad property, but are not involved in railroad operations, such as trespassers?

No. FRA's Emergency Order does not apply to trespassers, as they are not railroad personnel. However, while FRA's Emergency Order does not cover trespassers, mask orders from States, localities, or other jurisdictions, including the CDC Order or TSA SD, may apply.

## Is a railroad required to supply face masks to comply with FRA's Emergency Order?

No. However, it is recommended that the railroad provide railroad personnel with face masks to achieve compliance.

## By when must a railroad comply with the requirement to have written procedures fully implementing FRA's Emergency Order?

Although FRA's Emergency Order does not have a deadline for when a railroad must establish written procedures implementing the Order, FRA expects railroads to do so within a reasonable amount of time.

## Can a railroad and contractor agree that the contractor is responsible for ensuring that its employees comply with FRA's Emergency Order and the contractor's written procedures for implementing the order?

While a railroad and its contractor may agree that the contractor has primary responsibility for ensuring the contractor's employees comply with the Emergency Order (including the contractor's written procedures), a railroad retains responsibility for ensuring that contractor employees on the railroad's property comply with the Emergency Order.

<u>How does FRA plan to enforce the Emergency Order?</u>                                          ⌄

FRA will enforce the Emergency Order in the same manner it enforces all federal railroad safety requirements. For example, FRA inspectors will note observed instances of non-compliance during inspections, and FRA may take enforcement action (e.g., issue warnings or civil penalties) based on non-compliance.

<u>Does a railroad have to comply with FRA's Emergency Order if all of its personnel have received a COVID-19 vaccine and waited the appropriate time for the vaccine to be effective?</u>                ⌃

Yes. FRA's Emergency Order explains that, for reasons described in the <u>CDC Order</u>, it applies to railroad personnel, including those who have received a COVID-19 vaccine and/or who have recovered from COVID-19. *See* 86 FR 8029.

<u>Does FRA's Emergency Order apply to railroad personnel working with a customer on the customer's property?</u>                                                                     ⌃

Yes. Railroad carriers must require their personnel to wear a mask while engaged in railroad operations. Railroad personnel therefore would be required to comply with the Emergency Order to the same extent as when they are on railroad property, if they perform railroad operations while working with a customer on the customer's property.

<u>Does FRA's Emergency Order apply to railroads operating in States without a mask mandate?</u>        ⌃

Yes. FRA's Emergency Order applies to railroads and railroad operations under FRA's jurisdiction in every State; whether a State relaxes, revokes, or has no mask requirements, FRA's Emergency Order remains in effect.

<u>If an employee refuses to wear a mask as required by FRA's Emergency Order, what steps does a railroad need to (or should) take to address this with the employee?</u>                               ⌃

A railroad may:

- Educate the employee on the need to wear a mask (for example, the railroad may explain the public health benefit and that it is a Federal requirement).
- If the employee continues to refuse, remove the employee from service.
- Reinstate the employee into service as soon as the employee agrees to wear a mask in compliance with FRA's Emergency Order.

If an employee's refusal to wear a mask is related to a disability, temporarily remove the employee from service while the railroad determines if reasonable accommodation under the Americans with Disabilities Act is possible or an exemption is granted. See CDC guidance at https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html.

The purpose of removing an employee from service is to ensure compliance with the Emergency Order, not to take punitive action. FRA also expects almost all employees will agree to wear a mask without having to be removed from service. If a railroad employee willfully violates a provision stated in FRA's Emergency Order, the railroad employee is subject to civil penalties under 49 U.S.C. 21301. In addition, any individual (railroad personnel) whose violation of the Emergency Order demonstrates the individual's unfitness for safety-sensitive service may be removed from safety-sensitive service on the railroad under 49 U.S.C. 20111.

**Do the Centers for Disease Control and Prevention (CDC) Interim Public Health Recommendations for Fully Vaccinated People, issued on April 27, 2021, affect FRA's Emergency Order requiring face mask use in railroad operations?**                                                                                                                    ^

No.  On April 27, 2021, the CDC issued Interim Public Health Recommendations for Fully Vaccinated People, stating that fully vaccinated people no longer need to wear a mask outdoors, except in certain crowded settings and venues.  However, the CDC emphasized that fully vaccinated people should continue to take precautions in indoor public settings, including wearing a well-fitted mask, following guidance issued by individual employers, and following CDC and health department travel requirements and recommendations.  In addition, the CDC has not modified its Order requiring persons to wear masks while on conveyances and at transportation hubs, nor modified its related guidance on the Order. The CDC continues to state that masks are required on trains and other forms of public transportation traveling into, within, or out of the United States and in U.S. transportation hubs such as train stations.  Accordingly, there are no changes to FRA's Emergency Order requiring face mask use in railroad operations at this time.  FRA also notes that its Emergency Order provides flexibility to railroad personnel performing duties outdoors who are not in proximity to any other persons (e.g., a railroad employee performing a train or track inspection outdoors and far from any other persons).  Such railroad personnel have the option not to wear a mask, when consistent with company policy.


# Federal Motor Carrier Safety Administration (FMCSA)

**Do drivers still need a mask if they are behind plexiglass?**                                                                                        ^

A driver is required to wear a mask, even if a driver of a conveyance is segregated from passengers by plexiglass. Plexiglass shields and other fixed barriers on conveyances do not provide adequate protection to limit the spread of COVID-19.


**Do passengers need to wear a double mask?**                                                                                                   ^

No, two masks are not required under the CDC Order.  "Mask" means a material covering the nose and mouth of the wearer and secured to the head, including with ties or ear loops.  Masks do not include face shields.  CDC guidance for acceptable masks is available here.


**May passengers remove masks when they are in the restroom on a conveyance or at a transportation hub?**  ^

No, there is no exception for passengers who are in a restroom. A passenger is required to wear a mask the entire time while they are on the conveyance or at a transportation hub, other than those exceptions specified in the CDC Order.


**Are bus companies required to provide riders with masks?**                                                                            ^

No, it is the responsibility of the passenger to have a mask prior to attempting to board a conveyance.  Boarding or entry will be denied if a passenger is not wearing a mask. A bus company may provide masks for free, or for a charge.


**What if a passenger loses their mask, or the mask gets damaged after the passenger is already on board?**  ^

be to have a spare mask, and as specified above a bus company may have spare masks available, for free or for a charge, for such situations.

## Who should I contact if I have questions about the face mask requirement for motor carriers?   ^

Please submit your questions about implementation for motor carriers to FMCSAMaskUp@dot.gov.

## Are school bus operators and their passengers required to wear masks?   ^

Yes, school bus operators, including operations by public school districts, and their passengers are required to wear masks as defined by the Order issued by the Centers for Disease Control and Prevention (CDC). The CDC Order provides limited exemptions to the mask requirement for certain small categories of individuals, including: children under the age of 2; persons with disabilities who cannot wear a mask, or cannot safely wear a mask because of a disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.); and persons for whom wearing a mask would create a risk to workplace health, safety, or job duty.

In an FAQ concerning the CDC Order, the CDC states that passengers and drivers on school buses must wear a mask unless the driver is the only person on the bus. This requirement applies to all school buses whether publicly or privately owned.

Background

The President's Executive Order 13998, *Promoting COVID-19 Safety in Domestic and International Travel*, directs the CDC and the heads of Agencies to take action, to the extent appropriate and consistent with applicable law, to require masks to be worn in compliance with CDC requirements when traveling on or via various modes of transportation. The CDC subsequently issued an Order, *Order under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2, 71.31(b), 71.32(b)* (CDC Order), under its existing statutory and regulatory authority, requiring individuals to properly wear masks, unless otherwise exempted, when boarding, disembarking, and traveling on any conveyance, as defined in the CDC Order, to prevent the spread of the virus that causes COVID-19. Similarly, the Transportation Security Administration (TSA) issued Security Directive No. SD 1582/84-21-01 (TSA Security Directive), applicable to certain surface transportation modes, to implement Executive Order 13998 and enforce the CDC Order. Both the CDC Order and the TSA Security Directive became effective on February 1, 2021.

The CDC Order, consistent with the mandate in Executive Order 13998 to implement additional measures to protect public health in domestic travel, requires a mask to be worn by any operator or passenger traveling on a *conveyance* within the United States unless otherwise exempted. Conveyances include all road vehicles (subject to certain exceptions, e.g., for private conveyances operated solely for personal, non-commercial use), including school buses.[1]

[1] Executive Order 13998 directs the heads of Agencies to require masks, to the extent appropriate and consistent with applicable law, in or on all forms of public transportation as defined in 49 U.S.C. § 5302. School bus operations are specifically excepted from the statutory definition of public transportation. The TSA Security Directive, likewise, does not include school bus operations in its mask mandate. However, as explained above, the CDC Order applies to school buses.

## Are passengers required to wear masks if bus service is not for-hire, inter-city fixed-route (i.e., charter service, irregular route, private passenger carriers)?   ^

Yes, unless otherwise exempted, passengers are generally required to wear masks when traveling on any bus into or within the United States. There are limited exemptions to the mask mandate for specific categories of persons, such as a child under the age of 2 years, described in the CDC Order.

The President's Executive Order 13998, *Promoting COVID-19 Safety in Domestic and International Travel*, directs the CDC and the heads of Agencies to take action, to the extent appropriate and consistent with applicable law, to require masks to be worn in compliance with CDC requirements when traveling on intercity buses, or on any other modes of public transportation.

The CDC issued an Order (CDC Order) under its existing statutory and regulatory authority, requiring travelers to properly wear masks when traveling on any conveyance to prevent the spread of the virus that causes COVID-19. Similarly, the TSA issued Security Directive No. SD 1582/84-21-01 (TSA Security Directive) applicable to certain surface transportation modes to implement Executive Order 13998 and enforce the CDC Order. Both the CDC Order and the TSA Security Directive became effective on February 1, 2021.

The CDC Order, consistent with the mandate in Executive Order 13998 to implement additional measures to protect public health in domestic travel, requires a mask to be worn by any operator or passenger traveling on a *conveyance* within the United States, unless otherwise exempted. Conveyances include all road vehicles (subject to certain exceptions, e.g., for private conveyances operated solely for personal, non-commercial use), including charter buses, buses operating on irregular routes, and buses operated by private motor carriers of passengers.[2]

[2] Executive Order 13998 directs the heads of Agencies to require masks, to the extent appropriate and consistent with applicable law, in or on all forms of public transportation, as defined in 49 U.S.C. § 5302. Charter bus operations are specifically excepted from the statutory definition of public transportation. The TSA Security Directive, likewise, does not include charter bus operations in its mask mandate. However, as explained above, the CDC Order applies to charter bus operations.

## What should a bus driver do with a non-compliant passenger who refuses to wear a mask and proceeds to cause a disturbance?

Pursuant to the CDC Order, bus drivers should either refuse to board or seek to disembark as soon as safely possible any passenger who refuses to wear a mask, unless otherwise exempted from the mask requirement. If the passenger continues to cause a disturbance before the bus driver can safely disembark the individual(s), the Federal Motor Carrier Safety Administration (FMCSA) recommends following company policy related to de-escalation and coordination with law enforcement.

If a company does not have a policy for handling disruptive passengers, FMCSA recommends each company develop a policy and provide training to implement the policy. The training should include de-escalation techniques to reduce the disruption; when to call law enforcement for assistance; knowledge and skills needed to reduce the likelihood of assaults occurring; the definition and prevention of assault, including discussing the types of incidents that could be considered assault and recognizing key vulnerability factors; prevention strategies focusing on communication and response skills; effective communication with limited English proficient individuals; and the value of reporting incidents.

FMCSA re-emphasizes that bus companies should include the refusal of a passenger to wear a mask in existing company policies for handling disruptive passengers to provide clarity for drivers on how to handle these situations. Company policies should also include considerations regarding when to call law enforcement, which may ultimately be necessary to enforce the mask mandate. In addition, the TSA Security Directive, which applies to an over-the-road bus operating in fixed route service (among other types of transportation service), includes the following reporting requirement: "If an individual's refusal to comply with the mask requirement constitutes a significant security concern, the owner/operator must report the incident to the Transportation Security Operations Center (TSOC) at 1-866-615-5150 or 1-703-563-3240 in accordance with 49 CFR 1570.203." If there is an immediate threat, the first priority is to notify and work with first responders before contacting TSOC to provide information about the incident. Drivers should contact federal law enforcement or state and local law enforcement if assistance is required to enforce the mask mandate, regardless of company policy.

passengers are not exempted from the mandate in the CDC Order or TSA Directive?   ⌃

Drivers who believe their company is preventing them from enforcing the mask mandates may be covered by the whistleblower protection provisions in 49 U.S.C. § 31105. Drivers may refuse to operate a vehicle if required by their company to transport passengers without masks. Whistleblower protection prohibits the employer from retaliating against drivers who exercise their rights under the statute. Go to www.whistleblowers.gov for further information about how to file a complaint. If you choose to inform FMCSA, send an email to FMCSAMaskUp@dot.gov.

Does the CDC Order apply to team truck drivers while they are in the cab of the truck?   ⌃

Team drivers are not required to wear a mask in the cab of a commercial motor vehicle (CMV) if the vehicle occupants are individuals who all live in the same household and are the only persons in the vehicle. The CDC recently issued guidance expanding the exemption for solo drivers to include driving teams from the same household.

**U.S. DEPARTMENT OF TRANSPORTATION**
1200 New Jersey Avenue, SE
Washington, DC 20590
855-368-4200

͟   u   te   ͟er   ͟d   May 12, 2021

**WANT TO KNOW MORE?**
Receive email updates about the latest in Safety, Innovation, and Infrastructure.

   **SUBSCRIBE NOW**

**ABOUT DOT**

**Meet the Secretary**

**Mission**

**Newsroom**

**Medium Blog**

**Social Media**

**Leadership**

**Regulations**

**Transit Benefit Policy**

**Careers**

**Contact Us**

**OPERATING ADMINISTRATIONS**

**FAA**

**FHWA**

**FMCSA**

**FRA**

**FTA**

**GLS**

**MARAD**

**NHTSA**

**OIG**

**OST**

**PHMSA**

**RESEARCH AND TECHNOLOGY**

Plaintiff's Exhibit 26

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

---

**NOTICE OF ENFORCEMENT POLICY:**
**ACCOMMODATION BY CARRIERS OF PERSONS WITH DISABILITIES**
**WHO ARE UNABLE TO WEAR OR SAFELY WEAR MASKS WHILE ON**
**COMMERCIAL AIRCRAFT**

---

The Office of Aviation Consumer Protection (OACP), a unit within the Office of the General Counsel of the U.S. Department of Transportation (DOT or the Department), is issuing this Notice of Enforcement Policy to remind U.S. and foreign air carriers of their legal obligation to accommodate the needs of passengers with disabilities when developing procedures to implement the Federal mandate on the use of masks to mitigate the public health risks associated with the Coronavirus Disease 2019 (COVID-19). OACP will exercise its prosecutorial discretion and provide airlines 45 days from the date of this notice to be in compliance with their obligation under the Air Carrier Access Act (ACAA)[1] and the Department's implementing regulation in 14 CFR Part 382 (Part 382) to provide reasonable accommodations to persons with disabilities who are unable to wear or safely wear masks, so long as the airlines demonstrate that they began the process of compliance as soon as this notice was issued.

To carry out the Executive Order on Promoting COVID-19 Safety in Domestic and International Travel (Executive Order),[2] the Centers for Disease Control and Prevention (CDC) issued an order on January 29, 2021 (CDC Order)[3] that, among other things, requires U.S. and foreign air carriers to use their best efforts to ensure that persons on flights to, within, or from[4] the United States wear a mask for the duration of travel, including when boarding and disembarking aircraft. The CDC Order exempts certain categories of persons from the mask-wearing mandate, including a person with a disability who cannot wear a mask, or who cannot safely wear a mask

---

[1] The ACAA, signed into law in 1986, prohibits discrimination by airlines against individuals with disabilities in commercial air transportation. The Americans with Disabilities Act, signed into law after the ACAA in 1990, prohibits discrimination against individuals with disabilities in employment, state or local government, public accommodations, commercial facilities, telecommunications, and transportation other than by commercial airlines.

[2] Exec. Order No. 13998, 86 FR 7205 (Jan. 26, 2021).

[3] Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2, 71.31(b), 71.32(b): Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs (CDC Order), *available at* https://www.cdc.gov/quarantine/pdf/Mask-Order-CDC_GMTF_01-29-21-p.pdf.

[4] CDC Order specifies that "[c]onveyance operators must also require all persons to wear masks on board conveyances departing from the United States and for the duration of their travel until the conveyance arrives at the foreign destination if at any time any of the persons onboard (passengers or conveyance operators) will return to the United States while this Order remains in effect." CDC Order at 9.

because of the disability.[5] However, it allows airlines to impose requirements or conditions for carriage on the categories of persons exempted from the mask mandate, whether the person is a child under the age of two, a person for whom wearing a mask would create a risk to workplace safety, health, or job duty, or a person with a disability who is unable to wear or safely wear a mask because of the disability. Additionally, on January 31, 2021, the Transportation Security Administration (TSA) issued a Security Directive (SD) to aircraft operators on face mask requirements to implement the Executive Order and to support enforcement of the CDC Order mandating masks.[6] The Department supports actions by the airline industry to have procedures in place requiring passengers to wear masks in accordance with the CDC Order, CDC guidance, and TSA SD. At the same time, the ACAA and Part 382, which are enforced by OACP, require airlines to make reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear or safely wear a mask due to their disability. This Notice sets forth the enforcement policy that OACP will apply in determining, on a prospective basis, whether airlines are complying with the requirements of the ACAA and Part 382 when implementing procedures requiring mask-wearing by passengers.

<u>Background</u>

SARS-CoV-2, the virus that causes COVID-19, spreads most often when an infected person coughs, sneezes, or talks, and droplets from the infected individual's mouth or nose are spread through the air and come in contact with people nearby.[7] Persons with COVID-19 infection may have symptoms of fever, cough, or shortness of breath,[8] or they may be asymptomatic[9] or pre-symptomatic[10] but still able to spread the virus.[11] CDC has made clear that appropriately worn masks reduce the spread of COVID-19—particularly given the evidence of pre-symptomatic and asymptomatic transmission of COVID-19.[12]

---

[5] CDC Order at 4 and 5 (noting that this is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to disability).

[6] TSA Security Directive 1544-21-02: Security Measures – Face Mask Requirements (January 31, 2021).

[7] *See* Ctrs. for Disease Control & Prevention, *How COVID Spreads*, CDC.gov (last updated Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html; Ctrs. for Disease Control & Prevention, *Considerations for Wearing Masks*, CDC.gov (last updated Dec. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html.

[8] Ctrs. for Disease Control & Prevention, *Symptoms of Coronavirus*, CDC.gov (last updated Dec. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

[9] An asymptomatic case is an individual infected with SARS-CoV-2, who does not exhibit symptoms during the course of infection. Ctrs. for Disease Control & Prevention, *COVID-19 Pandemic Planning Scenarios*, CDC.gov (last updated Sept. 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html.

[10] A pre-symptomatic case of COVID-19 is an individual infected with SARS-CoV-2, who has not exhibited symptoms at the time of testing, but who later exhibits symptoms during the course of the infection. *COVID-19 Pandemic Planning Scenarios*, *supra* note 8.

[11] *See How COVID Spreads* and *Considerations for Wearing Masks*, *supra* note 6.

[12] CDC Order at 6.

As of January 27, 2021, there have been over 99 million confirmed cases of COVID-19 globally and over 25 million confirmed cases of COVID-19 in the United States, with over 2 million deaths globally and over 400,000 deaths in the United States due to the disease.[13]  To slow the spread of COVID-19, on January 21, 2021, President Biden issued Executive Order 13998, which directs the heads of certain Federal agencies to take immediate actions to require mask-wearing in domestic and international transportation.  The Executive Order further provides that the heads of agencies may make categorical or case-by-case exceptions to policies developed under the order, consistent with applicable law, to the extent that doing so is necessary or required by law.

Pursuant to the Executive Order, on January 29, 2021, CDC issued an order directing conveyance operators, which includes airlines, to use best efforts to ensure that any person on the conveyance, such as an aircraft, wears a mask when boarding, disembarking, and for the duration of travel.  Recognizing that there are specific instances when wearing a mask may not be feasible, the CDC Order exempts several categories of persons from the mask mandate, including "a person with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.)."  The Americans with Disabilities Act (ADA) defines a person with a disability to include a person who has a physical or mental impairment that substantially limits one or more major life activities.[14]  To ensure that only qualified persons under the exemptions would be able to travel without a mask, the CDC Order permits operators of transportation conveyances, such as airlines, to impose requirements, or conditions for carriage, on persons requesting an exemption, including requiring a person seeking an exemption to request an accommodation in advance, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the operator.  The CDC Order also permits operators to require protective measures, such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19 or seating or otherwise situating the individual in a less crowded section of the conveyance, e.g., aircraft.[15]

In response to COVID-19, U.S. and foreign air carriers generally have implemented policies requiring passengers to wear masks onboard aircraft even before the issuance of the Executive Order and the CDC Order.  Some carriers have adopted policies that expressly allow "no exceptions" to the mask requirement other than for children under the age of two.[16] OACP has

---

[13] *Id.* at 5.

[14] 42 U.S.C. 12102(4).  OACP notes that the definition of a person with a disability under the ADA is almost identical to the definition of a person with a disability under the Department's ACAA regulation.   See also CDC Order at 4 and 5.

[15] CDC Order at 4. CDC definitions for SARS-CoV-2 viral test and documentation of recovery are available in the Frequently Asked Questions at https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html.

[16] It would be a violation of the ACAA to have an exemption for children under 2 on the basis that children that age cannot wear or safely wear a mask and not to have an exemption for the limited number of individuals with disabilities who similarly cannot wear or safely wear a mask when there is no evidence that these individuals with disabilities would pose a greater health risk to others.  *See* Ctrs. for Disease Control & Prevention, *Information for Pediatric Healthcare Providers*, CDC.gov (last updated Dec. 30, 2020), https://www.cdc.gov/coronavirus/2019-

received complaints from persons who assert they have a disability that precludes their wearing a mask, and who contend that they were denied transport by an airline under a "no exceptions allowed" mask policy.

The CDC and other medical authorities recognize that individuals with certain medical conditions may have trouble breathing or other difficulties such as being unable to remove the mask without assistance if required to wear a mask that fits closely over the nose and mouth.[17] The CDC Order provides that a mask is not required in circumstances where an individual is "unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to wear the mask without assistance."[18]  The Order notes that individuals may remove masks "who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask"."[19]  Also, individuals with acute illness may remove the mask if it "interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask."[20]  CDC will issue additional guidance regarding persons who cannot wear a mask on the basis of disability.[21]  Individuals who have a physical or mental impairment that substantially limits one or more major life activities are individuals with a disability for purposes of the ACAA and Part 382.[22]

<u>Legal Authority</u>

The ACAA prohibits U.S. and foreign air carriers from denying air transportation to or otherwise discriminating in the provision of air transportation against a person with a disability by reason of the disability.[23]  When a policy or practice adopted by a carrier has the effect of denying service to or otherwise discriminating against passengers because of their disabilities, the Department's disability regulations in Part 382 require the airline to modify the policy or practice as necessary to provide nondiscriminatory service to the passengers with disabilities, provided that the modifications would not constitute an undue burden or fundamentally alter the airline's program.[24]

Part 382 allows an airline to refuse to provide air transportation to an individual whom the airline determines presents a disability-related safety risk, provided that the airline can demonstrate that

---

ncov/hcp/pediatric-hcp.html (stating that "[r]ecent evidence suggests that compared to adults, children likely have similar viral loads in their nasopharynx, similar secondary infections rates, and can spread the virus to others").

[17] Considerations for Wearing Masks, *supra* note 6.

[18] CDC Order at 4.

[19] CDC Order at 4 (footnote 7).

[20] CDC Order at 4 (footnote 7).

[21] CDC Order at 5 (footnote 9).

[22] 49 U.S.C. 41705(a); 14 CFR 382.3.

[23] 49 U.S.C. 41705(a); 14 CFR 382.11.

[24] 14 CFR 382.13.

the individual would pose a "direct threat" to the health or safety of others onboard the aircraft, and that a less restrictive option is not feasible.[25]  To support a determination that an individual poses such a direct threat, the airline must make "an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence," in order to ascertain "(i) [t]he nature, duration, and severity of the risk; (ii) [t]he probability that the potential harm to the health and safety of others will actually occur; and (iii) [w]hether reasonable modifications of policies, practices, or procedures will mitigate the risk."[26]  If the airline has adequately determined, based on such an individualized assessment, that the passenger does pose a direct threat to the health or safety of others because of a disability-related condition, the airline "must select the least restrictive response from the point of view of the passenger, consistent with protecting the health and safety of others," and must, for example, "not refuse transportation to the passenger if [the airline] can protect the health and safety of others by means short of a refusal" to provide transportation.[27]  Furthermore, the Department's regulations permit the airline to impose reasonable conditions, restrictions, or requirements on a passenger who has a "medical condition" that may cause the passenger to pose a risk to the health and safety of others.[28]

<u>Enforcement Policy</u>

The authority to pursue or not to pursue enforcement action against airlines with respect to air travel consumer protection and civil rights requirements, including compliance with the ACAA, lies with OACP.[29]

In accordance with the CDC Order, as conveyance operators, airlines are required to implement face mask policies that treat passengers presumptively as potential carriers of the SARS-CoV-2 virus and, therefore, as presenting a potential threat to the health and safety of other passengers and the crew.[30]  Notably, however, the CDC Order exempts from the mask mandate a person with a disability who cannot wear a mask, or who cannot safely wear a mask because of the

---

[25] 14 CFR 382.19(c)(1), (2).

[26] *Id.*

[27] 14 CFR 382.19(c)(2).

[28] 14 CFR 382.21(a)(3).  The rule recognizes that a passenger with a communicable disease or infection, such as infection with the SARS-CoV-2 virus or other "medical condition," may pose a direct threat to the health and safety of others onboard an aircraft, and the airline may be justified in refusing to transport the passenger or in requiring protective measures to mitigate the risk, consistent with the directives of public health authorities.  14 CFR 382.21(a)–(b).

[29] 49 U.S.C. 41705(c), 46301. The CDC Order requiring aircraft operators to mandate mask use will be enforced by the Transportation Security Administration under its statutory and regulatory authorities, including 49 U.S.C. 106, 114, 44902, 44903, and 46301; and 49 CFR 1542.303, 1544.305, and 1546.105.

[30] CDC Order at 5 ("The virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet)."); *id.* at 7 ("Traveling on public conveyances increases a person's risk of getting and spreading COVID-19 by bringing persons in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces.").

disability.  The Department also requires reasonable accommodations for persons with disabilities who are unable to wear masks or are unable to wear them safely.[31]

Airlines have expressed concerns to OACP that a significant number of passengers may claim medical exemption from the mask requirements without an apparent credible basis.  The CDC Order permits airlines to impose requirements or conditions for carriage on a person requesting an exemption, including requiring a person seeking an exemption to request an accommodation in advance, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the airline.[32] Similarly, under the Department's disability regulation in 14 CFR Part 382, airlines may impose conditions, restrictions, or requirements on a passenger asserting that a medical condition prevents the passenger from wearing a face mask, because the passenger may pose a direct threat to the health or safety of others, as any passenger is a potential carrier of the SARS-CoV-2 virus.[33]  In short, both the CDC Order and Part 382 permit airlines to require passengers to consult with the airline's medical expert and/or to provide medical evaluation documentation from the passenger's doctor sufficient to satisfy the airline that the passenger does, indeed, have a recognized medical condition precluding the wearing or safe wearing of a mask.

Airlines have also represented to OACP that, given the number of passengers making such claims, it is not practicable for airlines to make the required individualized assessment of appropriate mitigation measures at the airport on the day of the flight.  Under the Department's disability regulation in Part 382, airlines must conduct an individualized assessment of the potential ways to mitigate the risk to others of allowing passengers with disabilities to fly without a mask.[34]  However, Part 382, like the CDC Order, permits airlines to require passengers with disabilities who are unable to wear masks to request an accommodation in advance. Airlines may also require such passengers to check in early and to agree to undergo the required individualized assessment a reasonable period in advance of the scheduled flight, provided that the process is completed on the day of travel.

In addition, airlines may impose protective measures to reduce or prevent the risk to other passengers.  For example, airlines may require protective measures, such as a negative result from a SARS-CoV-2 test,[35] taken at the passenger's own expense, during the days immediately

---

[31] 14 CFR 382.13.

[32] *Id.*

[33] 14 CFR 382.21(a)(3).

[34] 14 CFR 382.19(c)(1).

[35] On January 12, 2021, CDC issued an order requiring any passenger flying into the United States from a foreign country to provide, before boarding the flight, proof of a negative pre-departure test result for SARS-CoV-2, the virus that causes COVID-19, or documentation of recovery from COVID-19 after a previous SARS-CoV-2 infection. This order became effective on January 26, 2021.  Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2, 71.31(b): Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for All Airlines or Other Aircraft Passengers Arriving into the United States from Any Foreign Country, *available at* https://www.cdc.gov/quarantine/pdf/global-airline-testing-order_2021-01-2_R3-signed-encrypted-p.pdf.

prior to the scheduled flight.[36]   Further, the airline may arrange for additional, appropriate mitigation measures, including arranging for the passenger to sit in a less crowded section of the plane, to take a flight at times when airports are less crowded, and/or scheduling the passenger on a less crowded flight.

To ensure travelers are aware of the face mask requirements, airlines should use their best efforts to make this information easily available.  The Department requires airlines provide information on request, to individuals with disabilities, about any service-related or other limitations on the airline's ability to accommodate passengers with a disability.[37]  Also, CDC and TSA require airlines to provide passengers with prominent and adequate notice to facilitate awareness and compliance with the requirement that masks must be worn, subject to certain limited exemptions, to mitigate the spread of COVID-19 during air travel.[38]  Airlines' obligation to provide information on the face mask requirements includes updating airlines' face mask policies on their websites to ensure accuracy and consistency with the ACAA, CDC Order and TSA SD.[39]

In recognition of the CDC Order, as well as airlines' efforts to minimize the potential for transmission of the virus onboard aircraft by implementing policies requiring passengers to wear masks onboard aircraft even before the issuance of the CDC Order, OACP  will exercise its prosecutorial discretion and provide airlines an opportunity to follow the steps described herein to become compliant before taking further action.[40]  Airlines are expected to review their face mask policies immediately and to revise them as necessary to comply with the ACAA and Department's disability regulation in Part 382.  OACP will refrain from taking enforcement action against an airline for a period of up to 45 days from the date of this notice, so long as the airline demonstrates that it began the process of compliance as soon as this notice was issued. This timeframe should provide airlines with adequate time to review and revise their mask procedures as needed to comply with the law.[41]

---

[36] A positive test result for SARS-CoV-2, the virus that causes COVID-19, is a valid reason for an airline to deny transport to any individual, including an individual with a disability.  CDC recommends isolation to separate people infected with SARS-CoV-2 from people who are not infected.  *See* Ctrs. for Disease Control & Prevention, *Isolate if You are Sick*, CDC.gov (last updated Jan. 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/isolation.html.

[37] 14 CFR 382.41.

[38] CDC Order at 1; TSA SD at 2.

[39] *See* 14 CFR 399.79 (b)(2) (defining an airline's practice as "deceptive" to consumers within the meaning of section 41712 if it is likely to mislead a consumer, acting reasonably under the circumstances, with respect to a material matter).

[40] Every day, we are learning more about how COVID-19 spreads and affects people and communities.  OACP will continue to follow the data and information provided by public health authorities, such as CDC, on actions necessary to limit the spread or impact of SARS-CoV-2 and will make changes to this notice as necessary to be consistent with current medical knowledge and the best available objective evidence.

[41] This document is a temporary notice of enforcement discretion.  Regulated entities may rely on this notice as a safeguard from Departmental enforcement as described herein. To the extent that this notice includes guidance on how regulated entities may comply with existing regulations, it does not have the force and effect of law and is not meant to bind the regulated entities in any way.

Questions regarding this Notice may be addressed to the Office of Aviation Consumer Protection (C-70), 1200 New Jersey Avenue, S.E., Washington, D.C. 20590.

By:

Blane A. Workie
***Assistant General Counsel for***
***Office of Aviation Consumer Protection***

Dated:  February 5, 2021


*An electronic version of this document is available at http://www.dot.gov/airconsumer*

Plaintiff's Exhibit 27

# *New Horizons*

 Information for the
Air Traveler with
a Disability





U.S. Department of Transportation

Rev. Feb. 2004

# *INTRODUCTION*

For years, access to the nation's air travel system for persons with disabilities was an area of substantial dissatisfaction, with both passengers and the airline industry recognizing the need for major improvement.  In 1986 Congress passed the Air Carrier Access Act, requiring the Department of Transportation (DOT) to develop new regulations which ensure that persons with disabilities will be treated without discrimination in a way consistent with the safe carriage of all passengers.  These regulations were published in March 1990 and have been amended several times since then.

The DOT regulations, referred to here as the Air Carrier Access rules, represent a major stride forward in improving air travel for persons with disabilities.  The rules clearly explain the responsibilities of the traveler, the carriers, the airport operators, and contractors, who collectively make up the system which moves over one million passengers per day.

The Air Carrier Access Act was amended effective April 5, 2000, to cover foreign air carriers.  The rules that implement the ACAA will be amended to reflect that change.

The Air Carrier Access rules are designed to minimize the special problems that travelers with disabilities face as they negotiate their way through the nation's complex air travel system from origin to destination.  This is achieved:

- By recognizing that the physical barriers encountered by passengers with disabilities can frequently be overcome by employing simple changes in layout and technology.

- By adopting the principle that many difficulties confronting passengers with hearing or vision impairments will be relieved if they are provided access to the same information that is available to all other passengers.

- Through training of all air travel personnel who come in day-to-day contact with persons with disabilities, to understand their needs and how they can be accommodated quickly, safely, and with dignity.

This guide is designed to offer travelers with disabilities a brief but authoritative source of information about the Air Carrier Access rules: the accommodations, facilities, and services that are now required to be available.  It also describes features required by other regulations designed to make air travel more accessible.

The guide is structured in much the same sequence as a passenger would plan for a trip: the circumstances he or she must consider prior to traveling, what will be encountered at the airport, and what to expect in the transitions from airport to airplane, on the plane, and then airplane to airport.

## ✈ *Planning Your Trip*

### The New Traveling Environment

THE AIR CARRIER ACCESS RULES SWEEP aside many restrictions that formerly discriminated against passengers with disabilities:

- A carrier may not refuse transportation to a passenger solely on the basis of a disability.

- Air carriers may not limit the number of individuals with disabilities on a particular flight.

- All trip information that is made available to other passengers also must be made available to passengers with disabilities.

- Carriers must provide passage to an individual who has a disability that may affect his or her appearance or involuntary behavior, even if this disability may offend, annoy, or be an inconvenience to crew-members or other passengers.

There are a few exceptions:

- The carrier may refuse transportation if the individual with a disability would endanger the health or safety of other passengers, or transporting the person would be a violation of FAA safety rules.

- The carrier may refuse transportation if there are no lifts, boarding chairs or other devices available which can be adapted to enplane the passenger. Airline personnel are not required to carry a mobility-impaired person on or off the aircraft by hand, i.e. to directly pick up the passenger's body in the arms of one or more airline staffers and carry the individual up or down stairs. Lifts or similar devices are currently required for nearly all flights on aircraft with 19 or more seats at airports with 10,000 or more annual enplanements.

- There are special rules about persons with certain disabilities or communicable diseases. These rules are covered in the chapter entitled "At the Airport."

- The carrier may refuse transportation if it is unable to seat the passenger without violating the FAA Exit Row Seating rules. See the chapter "On the Plane."

There are new procedures for resolving disputes:

- All carriers are now required to have a Complaints Resolution Official (CRO) immediately available (even if by phone) to resolve disagreements which may arise between the carrier and passengers with disabilities.

- Travelers who disagree with a carrier's actions toward them can pursue the issue with the carrier's CRO on the spot.

- A carrier that refuses transportation to any person based on a disability must provide a written statement to that person within 10 calendar days, stating the basis for the refusal. The statement must include, where applicable, the basis for the carrier's opinion that transporting the person could be harmful to the safety of the flight.

- If the passenger is still not satisfied, he or she may pursue DOT enforcement action.

### Getting Advance Information About the Aircraft

Travelers with disabilities must be provided information upon request concerning facilities and services available to them. When feasible this information will pertain to the specific aircraft scheduled for a specific flight. Such information includes:

- Any limitations concerning the ability of the aircraft to accommodate an individual with a disability (the carrier shall provide this information to any passenger who states that he or she uses a wheelchair for boarding,

even if the passenger does not explicitly request the information);

- The location of seats (if any) with movable aisle armrests and any seats which the carrier does not make available to an individual with a disability (e.g., exit rows);

- Any limitations on the availability of storage facilities in the cabin or in the cargo bay for mobility aids or other equipment commonly used by an individual with a disability;

- Whether the aircraft has an accessible lavatory.

Normally, advance information about the aircraft will be requested by phone. Any carrier that provides telephone service for the purpose of making reservations or offering general information must provide comparable services for hearing-impaired individuals, utilizing telecommunications devices for the deaf (TDDs), or text telephones (TTs). The TTs shall be available during the same hours that the general public has access to regular phone service. The response time to answer calls on the TT line shall also be equivalent to the response time available to the general public. Charges for the call, if any, shall be the same as charges made to the general public.

## When Advance Notice Can Be Required

Airlines may not require passengers with disabilities to provide advance notice of their intent to travel or of their disability except as provided below. Nonetheless, letting the airline know in advance how they can help you will generally result in a smoother trip.

Carriers may require up to 48 hours advance notice and one hour advance check-in from a person with a disability who wishes to receive any of the following services:

- Transportation for an electric wheelchair on an aircraft with fewer than 60 seats;

- Provision by the carrier of hazardous materials packaging for the battery of a wheelchair or other assistive device;

- Accommodations for 10 or more passengers with disabilities who travel as a group;

- Provision of an on-board wheelchair on an aircraft that does not have an accessible lavatory for persons who can use an inaccessible lavatory but need an on-board chair to do so.

An airline that uses a "block seating" approach to provide special seating for passengers with disabilities is free to require 24 hours advance notice for such accommodations. See the "Seating" section later in this booklet.

Carriers are not required to provide the following services or equipment, but should they choose to provide them, they may require 48 hours advance notice and a one hour advance check-in:

- Medical oxygen for use on board the aircraft;

- Carriage of an incubator;

- Hook-up for a respirator to the aircraft's electrical supply;

- Accommodations for a passenger who must travel on a stretcher.

Carriers may impose reasonable, non-discriminatory charges for these optional services.

Where a service is required by the rule, the airline must ensure that it is provided if appropriate notice has been given and the service requested is available on that particular flight. If a passenger does not meet advance notice or check-in requirements, carriers must make a reasonable effort to accommodate the requested service, providing this does not delay the flight.

If a passenger with a disability provides the required notice but is required to fly on another carrier (for example, if the flight is cancelled), the original carrier must, to the maximum extent feasible, provide assistance to the second carrier in furnishing the accommodation requested by the individual.

It must be recognized that even when a passenger has requested information in advance on the accessibility features of the scheduled aircraft,

carriers sometimes have to substitute a different aircraft at the last minute for safety, mechanical or other reasons.  The substitute aircraft may not be as fully accessible—a condition that may prevail until the retirement of the last of the aircraft that were in service before the implementation of the Air Carrier Access rules.

## When Attendants Can Be Required

Carriers may require the following individuals to be accompanied by an attendant:

- A person traveling on a stretcher or in an incubator (for flights where such service is offered);

- A person who, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from carrier personnel;

- A person with a mobility impairment so severe that the individual is unable to assist in his or her own evacuation from the aircraft;

- A person who has both severe hearing and severe vision impairments which prevent him or her from receiving and acting on necessary instructions from carrier personnel when evacuating the aircraft during an emergency.

The carrier and the passenger may disagree about the applicability of one of these criteria.  In such cases, the airline can require the passenger to travel with an attendant, contrary to the passenger's assurances that he or she can travel alone. However, the carrier cannot charge for the transportation of the attendant.

The airline can choose an attendant in a number of ways.  It could designate an off-duty employee who happened to be traveling on the same flight to act as the attendant.  The carrier or the passenger with a disability could seek a volunteer from among other passengers on the flight to act as the attendant.  The carrier could provide a free ticket to an attendant of the passenger's choice for that flight segment.  In the end, however, a carrier is not required to find or furnish an attendant.

The attendant would not be required to provide personal service to the passenger with a disability other than to provide assistance in the event of an emergency evacuation.  This is in contrast to the case of the passenger that usually travels accompanied by a personal attendant, who would provide the passenger whatever service he or she requests.

If there is not a seat available on the flight for an attendant, and as a result a person with a disability holding a confirmed reservation is denied travel on the flight, the passenger with a disability is eligible for denied boarding compensation.

For purposes of determining whether a seat is available for an attendant, the attendant shall be deemed to have checked in at the same time as the person with the disability.

# ✈ *At The Airport*

## Airport Accessibility

UNTIL A FEW YEARS AGO, ONLY THOSE AIRPORT facilities designed, constructed, or renovated by or for a recipient of federal funds had to comply with federal accessibility standards. Even at federally-assisted airports, not all facilities and activities were required to be accessible. Examples are privately-owned ground transportation and concessions selling goods or services to the public. As a result of the Air Carrier Access rules, and the Americans with Disabilities Act of 1990 (ADA) and implementing regulations, these privately-owned facilities must also be made accessible.

In general, airports under construction or being refurbished must comply with the ADA Accessibility Guidelines (ADAAG) and other regulations governing accessibility in accordance with a timetable established in the ADA. The ADAAGs can be found at http://www.access-board.gov/adaag/html/adaag.htm. Note in particular section 10.4, "Airports." Thus, while there are still many changes to be made, the accessibility of most airports is improving. With few exceptions, the following services should be available in all air carrier terminals within the next few years:

- Accessible parking near the terminal;

- Signs indicating accessible parking and the easiest access from those spaces to the terminal;

- Accessible medical aid facilities and travelers aid stations;

- Accessible restrooms;

- Accessible drinking fountains;

- Accessible ticketing systems at primary fare collection areas;

- Amplified telephones and text telephones (TTs) for use by persons with hearing and speech impairments (there must be at least one TT in each terminal in a clearly marked accessible location);

- Accessible baggage check-in and retrieval areas;

- Jet bridges and mobile lounges that are accessible (at airports that have such facilities);

- Level entry boarding ramps, lifts or other means of assisting an individual with a disability on and off an aircraft;

- Information systems using visual words, letters or symbols with lighting and color coding, and systems for providing information orally;

- Signs indicating the location of specific facilities and services.

## Moving Through the Airport

To make travel easier for an individual with a disability, major airports will be required to make the following services accessible under new rules being put into effect in the next several years:

- Shuttle vehicles, owned or operated by airports, transporting people between parking lots and terminal buildings;

- People movers and moving walkways within and between terminals and gates.

All carrier facilities must currently include one accessible route from an airport entrance to ticket counters, boarding locations and baggage handling areas. These routes must minimize any extra distance that wheelchair users must travel compared to other passengers to reach these facilities. Outbound and inbound baggage facilities must provide efficient baggage handling for individuals with a disability, and these facilities must be designed and operated so as to be accessible. There must be appropriate signs to indicate the location of accessible services.

Carriers cannot restrict the movements of persons with disabilities in terminals or require them to remain in a holding area or other location while awaiting transportation and other assistance.

Curbside baggage check-in (available only for domestic flights) may be helpful to passengers with a disability.

## Passenger Information

Carriers must ensure that individuals with disabilities, including those with vision and hearing impairments, have timely access to the same information provided to other passengers,including (but not limited to) information on:

- ticketing;

- scheduled departure times and gates;

- change of gate assignments;

- status of flight delays;

- schedule changes;

- flight check-in;

- checking and claiming of luggage.

This information must be made available upon request.  A crew member is not required to interrupt his or her immediate safety duties to supply such information.

A copy of the Air Carrier Access rules must be made available by carriers for inspection upon request at each airport.

As previously noted, any carrier that provides telephone service for the purpose of making reservations or offering general information shall also provide TT service.  This service for people with speech and hearing impairments must be available during the same hours that the general public has access to regular phone service, with equivalent response times and charges.

## Security Screening

An individual with a disability must undergo the same security screening as any other member of the traveling public.

If an individual with a disability is able to pass through the security system without activating it, the person shall not be subject to special screening procedures.  Security personnel are free to examine an assistive device that they believe is capable of concealing a weapon or other prohibited item.  If an individual with a disability is not able to pass through the system without activating it, the person will be subject to further screening in the same manner as any other passenger activating the system.

Security screening personnel at some airports may employ a hand-held device that will allow them to complete the screening without having to physically search the individual.  If this method is still unable to clear the individual and a physical search becomes necessary, then at the passenger's request, the search must be done in private.

If the passenger requests a private screening in a timely manner, the carrier must provide it in time for the passenger to board the aircraft.  Such private screenings will not be required, however, to a greater extent or for any different reason than for other passengers.  However, they may take more time.

## Medical Certificates

A medical certificate is a written statement from the passenger's physician saying that the passenger is capable of completing the flight safely without requiring extraordinary medical care.

A disability is not sufficient grounds for a carrier to request a medical certificate.  Carriers shall not require passengers to present a medical certificate unless the person:

- Is on a stretcher or in an incubator (where such service is offered);

- Needs medical oxygen during flight (where such service is offered);

- Has a medical condition which causes the carrier to have reasonable doubt that the individual can complete the flight safely, without requiring extraordinary medical assistance during the flight; or

- Has a communicable disease or infection that has been determined by federal public health authorities to be generally transmittable during flight.

If the medical certificate is necessitated by a communicable disease (see next section), it must say that the disease or infection will not be communicable to other persons during the normal course of flight, or it shall state any conditions or precautions that would have to be observed to prevent transmission of the disease or infection to others.

Carriers cannot mandate separate treatment for an individual with a disability except for reasons of safety or to prevent the spread of a communicable disease or infection.

## Communicable Diseases

As part of their responsibility to their passengers, air carriers try to prevent the spread of infection or a communicable disease on board an aircraft. If a person who seeks passage has an infection or disease that would be transmittable during the normal course of a flight, and that has been deemed so by a federal public health authority knowledgeable about the disease or infection, then the carrier may:

- Refuse to provide transportation to the person;

- Require the person to provide a medical certificate stating that the disease at its current stage would not be transmittable during the normal course of flight, or describing measures which would prevent transmission during flight;

- Impose on the person a condition or requirement not imposed on other passengers (e.g., wearing a mask).

If the individual has a contagious disease but presents a medical certificate describing conditions or precautions that would prevent the transmission of the disease during the flight, the carrier shall provide transportation unless it is not feasible to act upon the conditions set forth in the certificate to prevent transmission of the disease.

6

Plaintiff's Exhibit 28

# What Airline Employees, Airline Contractors, and Air Travelers with Disabilities Need to Know About Access to Air Travel for Persons with Disabilities

*A Guide to the Air Carrier Access Act (ACAA) and its implementing regulations, 14 CFR Part 382 (Part 382)*

# Chapter 1:  Understanding How to Use this Manual

**A.  Introduction**
**B.  Background**
**C.  Keyword Definitions**

## A.  Introduction

*Purpose of the Manual*

This manual is a guide to the Air Carrier Access Act (ACAA) and its implementing regulations, 14 CFR part 382 (part 382).  It is designed to serve as a brief but authoritative source of information about the services, facilities, and accommodations required by the ACAA and the provisions of part 382.  The manual does not expand air carriers' legal obligations or establish new requirements under the law.   It contains suggested practices and procedures for carriers to use on a voluntary basis to implement Part 382.

The primary purpose of the manual is to help you, employees/contractors of air carriers and employees/contractors of indirect air carriers that provide services or facilities to passengers with disabilities, to assist those passengers in accordance with the law. Knowing your legal responsibilities will help ensure consistent compliance with the law and protect the civil rights of air travelers with disabilities when providing services, facilities, and accommodations to them.

Throughout the manual, rather than talking about air carriers' or indirect air carriers' employees/contractors such as yourself in the third person, the word "you" is used.  In most instances, the word "you" refers to personnel who deal directly with the traveling

public.  Moreover, the obligations and responsibilities under the law as set forth in the manual must be read within the context of each specific employee's duties on the job.

A second purpose of this manual is to offer air travelers with disabilities information about their rights under the ACAA and the provisions of part 382.  Accordingly, in addition to the other useful information in this manual, Appendix I contains a list of "Tips for Air Travelers with Disabilities" to help ensure a smooth and comfortable trip.  In addition, Appendix III provides a list of "Frequently Asked Questions" and answers and Appendix IV contains a list of "Recent DOT Enforcement Orders Related to the ACAA." These DOT enforcement orders are useful because they provide examples in which DOT has interpreted some of the provisions of the ACAA and part 382 under particular circumstances.

**B.  Background**

_U.S. Air Carriers_

In 1986, Congress passed the ACAA, which prohibits discrimination by U.S. air carriers against qualified individuals with disabilities.  49 U.S.C. 41705.  In 1990, the Department of Transportation (DOT) issued part 382, the regulations defining the rights of passengers with disabilities and the obligations of U.S. air carriers under the ACAA.  Since then, these regulations have been amended a number of times.  DOT has also issued guidance to air carriers on the ACAA and part 382 in a variety of ways:  preambles to regulatory amendments, industry letters, correspondence with individual carriers or complainants, enforcement actions, website postings, and informal conversations with the public and air carriers.

*Foreign Air Carriers*

On April 5, 2000, the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21"; Pub. L. 106-181) amended the ACAA to cover foreign air carriers. Although a final rule modifying part 382 to cover foreign air carriers has not yet been issued, in May 2000 DOT's Office of the Assistant General Counsel for Aviation Enforcement and Proceedings (Enforcement Office) issued a notice informing the public of its intent to use the provisions of part 382 as guidance in investigating any complaints of non-compliance with the ACAA by foreign carriers. In addition, in July 2003 DOT amended part 382 by adding a new section, 382.70, that requires both U.S. carriers and foreign carriers to record and report to DOT on written disability-related complaints that they receive. At the present time, section 382.70 is the only provision of part 382 that specifically states that it applies to foreign carriers. Finally, a notice of proposed rulemaking (NPRM) proposing to extend the other provisions of part 382 to foreign carriers was published on November 4, 2004. Therefore, while the majority of this manual does not expressly apply to foreign carriers, they should look to this document and part 382 in satisfying their general nondiscrimination obligations under AIR-21 and DOT's May 2000 guidance.

*Development of Technical Assistance Manual*

In 2000, Congress required DOT to create a technical assistance manual to provide guidance to individuals and entities with rights or responsibilities under the ACAA. This manual responds to that mandate. In creating this manual, DOT held meetings with representatives from the disability community, air carriers, and organizations that contract with air carriers to provide disability-related services. Those who attended the

3

meetings made suggestions for this manual.  All of these suggestions have been thoroughly considered by DOT and incorporated where appropriate.

_ACCESS_

A step-by-step process for resolving issues involving passengers with disabilities appears later in this manual.  Whether the issue is a matter of law, customer service, or both, the ACCESS checklist will be useful in identifying the needs of passengers with disabilities and determining what accommodations the air carriers are required to provide as a matter of law.  _See_ Chapter 6, section B.

**_How to use this Manual_**

This manual is structured in the same sequence as the steps a passenger would encounter on a trip, _i.e._, requirements concerning

- planning a flight,

- the airport experience,

- enplaning, deplaning, and making connections,

- services during a flight, and

- responding to disability-related complaints.

This manual contains the following tools to assist you in quickly and easily finding the answer to your questions:

- A Table of Contents at the beginning of the manual;

- An Alphabetical Index at the back of the manual; and

- A part 382 Index listing the citations to part 382 at the back of the manual.

4

Also, the following appendices appear at the end of the manual:

- Appendix I:  "Tips for Air Travelers with Disabilities" as they relate to the most commonly-used accommodations, facilities, and services that carriers are required to make available to such passengers;

- Appendix II:  a list of concerns applicable mainly to air carrier management, as opposed to frontline customer service personnel;

- Appendix III:  a list of "Frequently Asked Questions" and answers;

- Appendix IV:  a list of "Recent DOT Enforcement Orders Related to the ACAA";

- Appendix V:  the full text of part 382; and

- Appendix VI:  the DOT document "Guidance Concerning Service Animals in Air Transportation."

***Themes of this Manual***

*Legal Requirements and Customer Service*

This manual highlights the difference between actions you must take according to the law as stated in part 382 and actions that you may choose to take in an effort to provide superior customer service to passengers with disabilities. Legal requirements are generally designated by the words, "must" or "shall" in the manual. Words such as "should" or "may" indicate accommodations that part 382 does not require but that DOT recommends and that you may decide to provide as a matter of good customer service.

*Safety*

5

**Indirect Air Carrier:**

A company not directly involved in the operation of an aircraft that sells air transportation services to the general public, such as tour and charter operators.  [Sec. 382.5]

**Individual with a Disability:**

Any individual who:

- has a physical or mental impairment that, on a permanent or temporary basis,

- substantially limits one or more major life activities,

- has a record of such an impairment, or

- is regarded as having such an impairment. [Sec. 382.5]

**Qualified Individual with a Disability:**

An individual with a disability who:

- accompanies or meets a traveler using airport facilities;

- seeks information about schedules, fares, or policies;

- attempts to use facilities or services offered to the general public by an air carrier;

- has a ticket, or makes a good faith attempt to buy a valid ticket for a flight;

- arrives with a valid ticket for the flight; and

- meets reasonable, nondiscriminatory requirements applicable to all passengers.

  [Sec. 382.5]

12

# Chapter 2:  Learning the Basics about the Law

# Protecting Air Travelers with Disabilities

- **What does the Air Carrier Access Act (ACAA) say?** The ACAA prohibits U.S. and foreign air carriers from discriminating against an air traveler with a disability on the basis of such disability (49 U.S.C. 41705).

- **What is 14 CFR Part 382 (part 382)?**  Part 382 is a detailed set of rules that define air carriers' responsibilities under the ACAA and ensures that individuals with disabilities will be treated without discrimination consistent with the safe carriage of all passengers.

- **Who has to follow part 382?**  The following organizations and individuals must comply with part 382: (1) air carriers and their employees (*e.g.*, ticket and gate agents, flight attendants, baggage handlers, pilots, etc.); (2) authorized agents of an air carrier (*e.g.*, travel agents); (3) organizations and their employees that have business arrangements with air carriers to provide disability-related services (*e.g.*, wheelchair service, baggage handling, etc.); and (4)  indirect air carriers and their employees (*e.g.*, tour operators) that provide facilities, services, or other accommodations to passengers with disabilities.

- **Who is protected by part 382?** Part 382 protects three categories of individuals with disabilities: (1) individuals who have a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities; (2) individuals who

15

have a record of such impairment; and (3) individuals who are regarded as having such an

impairment, whether they have the impairment or not.

- **What is a physical or mental impairment?**

  **Physical impairments** include (1) physiological disorders or conditions; (2) cosmetic

  disfigurements; or (3) anatomical loss affecting one or more of the following body systems:

  neurological, musculoskeletal, special sense organs, respiratory including speech organs,

  cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and

  endocrine.

  Examples of physical impairments include orthopedic, visual, speech, and hearing

  impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart

  disease, diabetes, HIV disease, drug addition, and alcoholism.

  **Mental impairments** include mental or psychological disorders, such as mental retardation,

  organic brain syndrome, emotional or mental illness, and specific learning disabilities.

  Physical characteristics such as the color of one's eyes, hair, or skin, baldness, and left-

  handedness do not constitute physical impairments.  Similarly, neither age nor obesity alone

  constitutes a physical impairment.  Disadvantages due to cultural or economic factors are not

  covered by part 382.  Moreover, the definition of "physical or mental impairment" does not

  include personality traits such as poor judgment or a quick temper, where these are not

  symptoms of a mental or psychological disorder.

16

- **What is a substantial limitation on major life activities?** To qualify as a "disability" under part 382 a condition or disease must substantially limit a major life activity.  Major life activities include, but are not limited to, activities such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

- **When does an impairment "substantially limit" a major life activity?**  There is no absolute standard for determining when an impairment is a substantial limitation.  Some impairments obviously limit the ability of an individual to engage in a major life activity.

  *Example 1*:  *A person who is deaf is substantially limited in the major life activity of hearing.*

  *Example 2*:  *A person with traumatic brain injury may be substantially limited in the major life activities of:  (a) caring for himself or herself; and (b) working, because of memory deficiency, confusion, contextual difficulties, and the inability to reason appropriately.*

  *Example 3*:  *An individual who is paraplegic may be substantially limited in the major life activity of walking.*

- **Are temporary mental or physical impairments covered by part 382?**  Yes.

  *Example*:  *While on a skiing trip, Jane breaks her leg and is placed in a cast that keeps her from bending her leg and walking without the use of crutches.  Jane will eventually recover the full use of her leg, but in the meantime she is substantially limited in the major life*

*__Example 2__: Karen, an individual born with a prominent facial disfigurement, has been refused transportation on the grounds that her presence has upset several passengers who have complained to gate agents about her appearance. Karen's physical disfigurement becomes substantially limiting only as a result of the attitudes of others and she is protected by the provisions of part 382. Refusing to provide transportation to Karen would violate section 382.31 because you must not refuse to provide transportation to a qualified individual with a disability, such as Karen, solely because her appearance may offend or annoy other passengers. As in the example above, and regardless whether the decision to refuse transportation was correct, you must provide Karen with a written explanation of the specific basis for the refusal within 10 calendar days of the incident.*

- **How do I determine whether a person is an individual with a disability?**

  Provide an opportunity for the passenger to self-identify by asking how you can best assist him or her.

- **How do I assist a passenger with a disability?** Ask the passenger how you can best assist him or her. A passenger with a disability has the most information about his or her abilities, limitations, level of familiarity with the airport and airline, and needs in connection with traveling by air.

- **May I ask an individual what his or her disability is?** Only to determine if a passenger is entitled to a particular seating accommodation pursuant to section 382.38. Generally, you may not make inquiries about an individual's disability or the nature or

20

severity of the disability.  However, you may ask questions about an individual's ability to perform specific air travel-related functions, such as enplaning, deplaning, walking through the airport, etc.

**_Example 1_**:  *You may not ask a person, "What is your disability?"  You may not ask, "Do you have diabetes?"*

**_Example 2_**:  *You may ask, "Can you walk from the gate area to your aircraft seat?"  You may ask, "Are you able to transfer from the aisle chair over a fixed aisle seat armrest?" You may ask, "Can you walk from this gate to your connecting gate?"  You may ask (by writing a note if necessary), "Do you need me to notify you if I make any announcements over the public address speaker?"*

**_Example 3_**:  *Susan asks for a bulkhead seat because the condition of her leg necessitates her need for greater legroom. You may ask, "Are you unable to bend your leg or is your leg fused or immobilized?"  [Sec. 382.38]*

- **What are some of the requirements of part 382 that you should be aware of?**  Following are some of the principal requirements of part 382.  It is important to note that the requirements of part 382 listed below are not meant to be exhaustive.  Rather, it is a list of requirements governing situations that you are likely to encounter on a regular basis.

- You must not discriminate against qualified individuals with a disability.  [Sec. 382.7(a)(1)]  You must not *require* a passenger with a disability to accept special services (including, but not limited to, pre-boarding) not requested by the passenger.  [Sec. 382.7(a)(2)]  Instead, you may *ask* a passenger with a disability if he or she would like a particular service, facility, or other accommodation.  In addition, you must not exclude a qualified individual with a disability from or deny the individual the benefit of any air transportation or related services that are available to other passengers.  [Sec. 382.7(a)(3)]  For example, if you choose to provide ground transportation and overnight accommodations to passengers because of a flight cancellation, you must ensure that the ground transportation to the hotel, and the hotel itself, are accessible to a passenger with a disability.

- You must not refuse transportation to a passenger solely on the basis of a disability.  [Sec. 382.31(a)]

- You must provide transportation to an individual with a disability who has an impairment that affects his or her appearance or results in involuntary behavior except under limited circumstances specified below.  You must provide transportation to such individuals with disabilities even if the disability may offend, annoy, or inconvenience crewmembers or other passengers.  [Sec. 382.31(b)]  However, if the person's disability results in involuntary behavior that would or might be inimical to the safety of the flight, then the person may properly be refused transportation.  [Sec. 382.31(d)]

- You shall not limit the number of individuals with disabilities on a particular flight.  [Sec. 382.31(c)]

- If transportation of a passenger with a disability would endanger the safety of the aircraft or the health or safety of its passengers or violate an FAA safety regulation, you may refuse transportation to the individual with a disability.  [Sec. 382.31(d)]

- You shall not require a passenger with a disability to travel with an attendant or to present a medical certificate, *except* in very limited circumstances.  [Secs. 382.35(a) and 382.53(a)]

- You shall not exclude a passenger with a disability from any seat in an exit or other row solely on the basis of his or her disability except to comply with FAA safety rules.  FAA safety rules establish criteria that must be met in order for a passenger to occupy a seat in the emergency exit rows.  [14 CFR 121.585]  If a passenger with a disability meets these FAA criteria, he or she must be allowed to sit in an emergency exit row.  As with any other passenger, you must look at the individual passenger with a disability and reasonably assess whether he or she meets FAA criteria for exit-row seating.  [Sec. 382.37(a)]

- You must provide timely enplaning, deplaning, and connecting assistance to passengers with disabilities requesting such assistance.  As part of this duty, you must provide equipment (*e.g.*, wheelchairs, electric carts, and aisle chairs) and personnel (*e.g.*, individuals to propel wheelchairs and aisle chairs and individuals to assist passengers with disabilities in carrying and stowing their baggage).  [Secs. 382.39(a)(1) and 382.39(b)(5)]

- You must allow a passenger with a disability to stow his or her cane or other assistive device inside the cabin of the aircraft close to his or her seat if it fits, consistent with FAA safety rules on carry-on items.  [Sec. 382.41(c)]

# Chapter 3:  Assisting Air Travelers with Disabilities

## Planning a Trip

    **A.  Advance Notice**
    **B.  Information about the Aircraft**
    **C.  Mobility Aids and Assistive Devices**
    **D.  Service Animals**
    **E.  Accommodations for Air Travelers  who are Deaf, Hard of Hearing, or Deaf-Blind**
    **F.  Communicable Diseases**
    **G.  Medical Certificates:  When are They Allowed?**
    **H.  Your Obligation to Provide Services and Equipment**
    **I.  Attendants**

## A.    Advance Notice

You cannot require passengers with disabilities to provide advance notice of their intention to travel or of their disability except as provided below.  [Sec. 382.33(a)]

*Advance Notice Only for Particular Services and Equipment*

You may require up to 48 hours' advance notice and one hour's advance check-in from a passenger with a disability who wishes to receive the following services:

- Transportation for a battery-powered wheelchair on an aircraft with fewer than 60 seats;

- Provision by the carrier of hazardous materials packaging for the battery of a wheelchair or other assistive device;

- Accommodations for 10 or more passengers with disabilities who travel as a group; and

- Provision of an on-board wheelchair on an aircraft that does not have an accessible lavatory for passengers with disabilities who can use an inaccessible lavatory but need an on-board chair to do so.  [Secs. 382.33(b)(5)-(8)]

**_Example_**:  *While making his reservation, a passenger with a disability gave the reservation agent 48 hours' advance notice that he would need an aisle chair to access the lavatory on his upcoming flight.  The flight is on an aircraft with more than 60 seats and it does not have an accessible lavatory.  During the call, the passenger is made aware of the fact that the lavatory is inaccessible, but explains that he can use an inaccessible lavatory as long as he has access to a carrier-provided aisle chair.  Because the passenger has complied with the advance notice requirement here, normally this information would have been entered into the passenger's reservation record (otherwise known as the passenger name record (PNR)) by the carrier and the request for an aisle chair would have been handled through that notification process.  You are a new gate agent for your carrier and when this passenger approaches you at the gate more than an hour before the scheduled departure time of the flight and asks about the aisle chair, you are not sure how to reply.  What should you do?*

*To begin, as a matter of good customer service, you should tell the passenger that you are not sure but you will find out for him.  You should ask a colleague and, if necessary, contact a CRO.  When you ask your colleague, you are told that all aircraft with more than 60 seats in your carrier's fleet maintain an in-cabin aisle chair.  Once you receive this information you should assure the passenger that an aisle chair is available so he can use the inaccessible lavatory on the aircraft.*

*Advance Notice for Optional Services and Equipment*

Although carriers are not required to provide the following services or equipment, if they choose to provide them, you may require 48 hours' advance notice and one hour's advance check-in for:

- Medical oxygen for use on board the aircraft;

- Carriage of an incubator;

- Hook-up for a respirator to the aircraft's electrical power supply; and

- Accommodation for a passenger who must travel on a stretcher.  [Secs. 382.33(b)(1)-(4)]

If appropriate advance notice has been given and the requested service is available on that particular flight, you must ensure that the service or equipment is provided.

*Make a Reasonable Effort to Accommodate, Even Without Advance Notice*

In addition, even if a passenger with a disability does *not* meet the advance notice or check-in requirement, you must make a reasonable effort to furnish the requested service or equipment, provided that making such accommodation would not delay the flight. [Secs. 382.33(c) and (e)]

**Example 1**: *Mr. Thomas uses a battery-powered wheelchair.  He travels frequently between Washington, DC, and New York for business.  One day, he finds out that he has an important business meeting in New York and must travel up to New York that afternoon.  He has no time to provide advance notice regarding the transportation of his battery-powered wheelchair and arrives at the gate 45 minutes before his flight is*

29

*scheduled to depart.  The aircraft for the flight has fewer than 60 passenger seats.  What should you do?*

*Carriers may require 48 hours' advance notice and one-hour advance check-in for transportation of a battery-powered wheelchair on a flight scheduled to be made on an aircraft with fewer than 60 seats.  Carriers may require the same advance notice for provision of hazardous materials packaging for a battery.  However, airline personnel are required to make reasonable efforts to accommodate a passenger who fails to provide the requisite notice to the extent it would not delay the flight.  Therefore, you must make a reasonable effort to accommodate Mr. Thomas as long as it would not delay the flight.*

*Mr. Thomas is a frequent traveler on this particular route and he knows that usually it is feasible to load, store, secure, and unload his battery-powered wheelchair and spillable battery in an upright position [Sec. 382.41(g)(2)] or detach, "box", and store the spillable battery [Sec. 382.41(g)(3)] within about 20-25 minutes.  If this is the case, you must accommodate Mr. Thomas, his battery-powered wheelchair, and the spillable battery even though Mr. Thomas did not provide advance notice, since doing so would not delay the flight.*

**Example 2***:  Ms. Webster must travel with medical oxygen and shows up at the airport without providing advance notice of her need for medical oxygen.  As a policy, your carrier does not provide medical oxygen on any flights.  What should you do?*

*To begin, you should confirm that your carrier does not provide the optional service of medical oxygen for use on board a flight. If no medical oxygen service is available on your carrier, you should explain this to Ms. Webster and tell her that the carrier cannot accommodate her.*

*As a matter of customer service, you may direct Ms. Webster to another carrier that does provide medical oxygen service in that market. The passenger should be aware, however, that the provision of medical oxygen involves coordination with the passenger's physician to determine the flow rate and the amount of oxygen needed and arranging for the delivery of the oxygen by the carrier to the point of origin of the passenger's trip. Therefore, normally, it is not possible to accommodate a passenger who needs medical oxygen on a flight unless the advance notice is provided because the accommodation cannot be made without delaying the flight.*

### *If Aircraft is Substituted, Make an Effort to Accommodate*

Even if a passenger with a disability provides advance notice, sometimes weather or mechanical problems require cancellation of the flight altogether or the substitution of another aircraft. Under these circumstances, you must, to the maximum extent feasible, assist in providing the accommodation originally requested by the passenger with a disability. [Sec. 382.33(f)]

## B.    Information about the Aircraft

You should be familiar with and be able to provide information about aircraft accessibility for passengers with a disability when they request this information. [Secs.

31

*Requests for Seat Assignments by a Passenger Accompanied by a Service Animal*

For a disabled passenger traveling with a service animal, you must provide, as the passenger with a disability requests, either a bulkhead seat or a seat other than a bulkhead seat.  [Sec. 382.38(a)(3)]

If carriers provide special information concerning the transportation of animals outside the continental United States to any passengers, you must provide such information to all passengers with a disability traveling with a service animal on the flights.  [Sec. 382.55(a)(3)]

**E.    Accommodations for Air Travelers who are Deaf, Hard of Hearing, or Deaf-Blind**

If your carrier makes available a telephone reservation and information service to the public, you must make available a text telephone (TTY) to permit individuals who are deaf or hard of hearing to make reservations and obtain information.  The TTY must be available during the same hours as the telephone service for the general public and the same wait time and surcharges must apply to the TTY as the telephone service for the general public.  [Secs. 382.47(a) and (b)]

**F.    Communicable Diseases**

*Passengers with a Communicable Disease Are Permitted on Flight*

Except as described below, you must not (i) refuse transportation to; (ii) require provision of a medical certificate from; or (iii) impose any condition, restriction, or requirement not

imposed on other passengers on, a passenger with a communicable disease or infection. [Sec. 382.51(a)]


*If Direct Threat to Health or Safety of Others, Limitations May be Imposed*

Only if a passenger with a communicable disease or infection poses a *direct threat* to the health or safety of others, can you take any of the actions listed above.  [Sec. 382.51(b)(1)]  A *direct threat* means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services.


If you are faced with particular circumstances where you are required to make a determination as to whether a passenger with a communicable disease or infection poses a direct threat to the health or safety of others, you must make an individualized assessment based on a reasonable judgment, ***relying on current medical knowledge or the best available objective evidence.***  If the presentation of a medical certificate would alleviate concerns over the passenger's condition, or reasonable modification of policies, practices, or procedures would lessen the risk to other passengers, then you should consider this in making such an individualized assessment.  You should also confer with appropriate medical personnel and a CRO when making this assessment.


*If the Passenger Poses a Direct Threat to the Health and Safety of Others*

If, in your estimation, a passenger with a communicable disease or infection poses a direct threat to the health or safety of other passengers, you may (i) refuse to provide transportation to that person; (ii) require that person to provide a medical certificate

38

stating that the disease at its current stage would not be transmittable during the normal course of a flight or, if applicable, describing measures that would prevent transmission during the flight [Sec. 382.53(c)]; or (iii) impose on that passenger a special condition or restriction (*e.g.*, wearing a mask).  You must ***choose the least restrictive*** of the three options set forth above that would accomplish the objective.  [Sec. 382.51(b)(4)]

At all times, as a matter of good customer service, you should treat the passenger with courtesy and respect.

## G.    Medical Certificates:  When are they Allowed?

A medical certificate is a written statement from the passenger's physician saying that the passenger is capable of completing the flight safely without requiring extraordinary medical assistance during the flight.  Except under the circumstances described below, you must not require medical certification of a passenger with a disability as a condition for providing transportation.

You may require a medical certificate only if the passenger with a disability is an individual who

- is traveling on a stretcher or in an incubator (where such service is offered);

- needs medical oxygen during the flight (where such service is offered); or

- has a medical condition that causes the carrier to have reasonable doubt that the passenger can complete the flight safely without requiring extraordinary medical assistance during the flight.  [Sec. 382.53 (a) and (b)]

*Medical Certificate and a Passenger with a Communicable Disease or Infection*

In addition, if you determine that a passenger with a communicable disease or infection poses a direct threat to the health or safety risk of others, you may require a medical certificate from the passenger.  [Sec. 382.53(c)(1)]  The medical certificate must be dated within 10 days of the flight date.  [Sec. 382.53(c)(2)]

In the event that you determine the need for a medical certificate, you should indicate to the passenger with a disability the reason for the request.  You should base your request on the reasons set forth under the law and outlined above.

At all times, you should treat the passenger from whom you are requesting a medical certificate with courtesy and respect.

**Example**:  *A passenger arrives at the gate with her six year old daughter.  The girl's face and arms are covered with red lesions, resembling chicken pox.  What should you do?*

*Generally, you must not refuse travel to, require a medical certificate from, or impose special conditions on a passenger with a communicable disease or infection.  However, if a passenger appears to have a communicable disease or infection that poses a direct threat to the health or safety of other passengers, you may be required to make a determination about the best course of action based on the seriousness of the health risk and the ease of disease transmittal.  For a communicable disease or infection to pose a direct threat, the condition must both be readily transmitted under conditions of flight and have serious health consequences (e.g., SARS).  Medical conditions that are easily*

40

*transmitted in aircraft cabins but have limited health consequences (e.g., a common cold) as well as conditions that are difficult to transmit in aircraft cabins but have serious health consequences (e.g., AIDS) do not pose a direct threat to the health or safety of passengers.*

*The first thing you should do is interview the passenger and her mother to obtain basic information about the girl's condition. This exchange should be done discreetly and in a courteous and respectful manner. If you still have a question about the nature of the child's condition that will impact decisions about transportation, you should contact a CRO and explain the situation.*

*Here, the mother tells you and the CRO that the child has chicken pox but is no longer contagious. The CRO would likely consult with appropriate medical personnel to verify whether the child could be contagious based on the mother's statement.*

*If there is a reasonable basis for believing that the passenger poses a direct threat to the health or safety of others, you must choose the least restrictive alternative among the following options: (i) refusing transportation to the individual; (ii) requiring a medical certificate; or (iii) imposing a special condition or limitation on the individual. If the medical support people indicate that there is a chance that the child is no longer contagious but only if a certain number of days have passed since the outbreak of the lesions, you could request a medical certificate before you permit the child to travel.*

*Having discussed the situation with the passenger and her mother and consulted the CRO and the medical support personnel, the request for a medical certificate appears to be reasonable under the circumstances and the least restrictive of the three options.*

*Keep in mind that section 382.53(c)(2) specifies that the medical certificate be from the child's physician and state that the child's chicken pox would not be communicable to other passengers on the flight.  The medical certificate must also include any conditions or precautions that would have to be observed to prevent the transmission of the chicken pox to other passengers and be dated within ten days of the date of the flight.  If the medical certificate is incomplete or if the passenger is attempting to travel before the date specified in the medical certificate or without implementing the conditions outlined to prevent transmission, the child would not be permitted to fly.*

## H.    Your Obligation to Provide Services and Equipment

When assistance getting on or off a plane, making flight connections, or receiving transportation between gates is requested by a passenger with a disability, or offered by carrier personnel and accepted by the passenger, you must provide it.  [Sec. 382.39(a)] More specifically, you must provide, as needed, the following:

- services personnel

- ground wheelchairs

- boarding wheelchairs

- ramps or mechanical lifts.  [Sec. 382.39(a)(1)]

Aircraft with more than 60 passenger seats having an accessible lavatory must be equipped with an operable on-board wheelchair.  [Sec. 382.21(a)(4)]  On-board

42

It may not be apparent whether a person is an individual with a disability. You should provide an opportunity for a passenger to self-identify as an individual with a disability by asking if the person needs assistance and, if so, how best you can assist with those needs. Keep in mind that you cannot require an individual with a disability to accept special services, including pre-boarding.

### *Some Examples of Physical Impairments [Sec. 382.5(a)(1)]:*

- Orthopedic impairment;

- Deafness (profound hearing loss);

- Hard of hearing (mild to profound hearing loss);

- Vision impairment and blindness;

- Speech disorder;

- Cerebral palsy;

- Epilepsy;

- Muscular dystrophy;

- Multiple sclerosis;

- Cancer;

- Heart disease; and

- Diabetes.

### *Some Examples of Mental or Psychological Impairments [Sec. 382.5(a)(2)]:*

- Mental retardation;

- Depression;

- Anxiety disorders;

- Specific learning disabilities; and

- Brain injury.

Below is a list of general tips to consider when interacting with people with disabilities followed by tips relating to interacting with individuals with one or more of the five basic types of disabilities. These tips are aimed at ensuring that services, facilities, and other accommodations are provided to passengers with disabilities in a respectful and helpful manner.

Some of the tips relate to specific legal requirements, but most of them set forth suggestions for interacting in a way that would constitute good customer service and demonstrate a sensitivity to the issues concerning passengers with disabilities. The following tips should be read and employed with the above qualification in mind.

# APPENDIX II

# Airline Management-Related Issues

# Airline Management-Related Issues

Appendix II highlights provisions of the ACAA and the accompanying regulations outlining specific responsibilities of management of carriers, *i.e.*, requirements to be implemented by management employees as opposed to personnel who deal with the traveling public, including passengers with a disability.  In places, these are overlapping responsibilities and cross-references will be made to specific sections of this manual.

## Discrimination is Prohibited

Management of carriers are required to ensure that the carrier (either directly or indirectly through its contractual, licensing, or other arrangements for provision of air transportation) does not discriminate against qualified individuals with a disability by reason of such disability.  [Sec. 382.7(a)(1)]  In addition, management of carriers should be aware that they are responsible for compliance with the ACAA and part 382 not only by their *own* employees, but also by employees of any company or entity performing functions on behalf of the carrier.

More specifically, carriers cannot require a passenger with a disability to accept special services, *e.g.*, pre-boarding, not requested by the passenger.  [Sec. 382.7(a)(2)]  Carriers cannot exclude a qualified individual with a disability from or deny that individual the benefit of air transportation or related services that are available to other individuals, even if there are separate or different services available for passengers with a disability, except as provided by the ACAA and part 382.  [Sec. 382.7(a)(3)]  Carriers cannot take actions adverse to passengers with a disability if they assert their rights under the ACAA and part 382.  [Sec. 382.7(a)(4)]

Carriers cannot limit the number of passengers with a disability on a given flight.  [Sec. 382.31(c)]   Carriers must modify policies, practices, and facilities as necessary to ensure nondiscrimination consistent with the standards of Section 504 of the Rehabilitation Act, as amended.  Carriers are not required to make modifications that would constitute an undue burden or would fundamentally alter their program.  [Sec. 382.7(c)]

### Refusal of Transportation

Carriers cannot refuse transportation to a qualified individual with a disability solely because the person's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience others.  [Sec. 382.31(b)]  Carriers must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability unless it is expressly permitted by the ACAA and part 382.  [Sec. 382.31(a)]

### Safety Considerations

The ACAA does not require air carriers to disregard applicable FAA safety regulations.  [Sec. 382.3(d)]

Carriers may refuse to provide transportation to *any* passenger on the basis of safety and if carriage would violate FAA regulations.  However, when carriers exercise this authority, they must not discriminate against a passenger with a disability on the basis of disability.  [Sec. 382.31(d)]

**Written Explanation for Refusal of Transportation**

When a carrier refuses to provide transportation to a passenger on a basis relating to disability, the carrier must specify in writing to the passenger the basis for the determination within 10 days of the refusal of transportation.  [Sec. 382.31(e)]  In the situation where refusal of transportation is based on safety concerns, the written notice must include the carrier's reasonable and specific basis for its opinion that transporting the passenger would be inimical to the safety of the flight.

**No Charge for Accommodating Passengers with a Disability**

Carriers cannot impose charges for providing facilities, equipment, or services that are required by the ACAA and its accompanying regulations for passengers with a disability.  [Sec. 382.57]

**Indirect Air Carriers**

If an indirect air carrier provides facilities or services for passengers that are covered for other carriers by sections 382.21 through 382.55, the indirect air carrier must do so in a manner consistent with those regulations.  [Sec. 382.7(b)]

**Contractors and Travel Agents**

Carriers must receive assurances from their contractors who provide services, including travel agents (except non-U.S. citizens providing services outside the U.S.), that they will not discriminate on the basis of disability when providing such services and include a clause with that assurance in their contracts.  [Sec. 382.9(a)]  Similarly, their contracts must contain a

# APPENDIX III

# Frequently Asked Questions

# Frequently Asked Questions

**QUESTION**:  What's the difference between the Air Carrier Access Act (ACAA) and the Americans with Disabilities Act (ADA)?

**ANSWER**:  The ACAA, signed into law by then-President Reagan in 1986, prohibits discrimination by *airlines* against individuals with disabilities in commercial air transportation. The ADA, signed into law after the ACAA in 1990 by then-President Bush, prohibits discrimination against individuals with disabilities in employment, public accommodations, commercial facilities, telecommunications, and *transportation other than by commercial airlines* (*e.g.*, subway and bus systems).  [Sec. 382.1]

**QUESTION**:  Do the ACAA and its implementing regulations (14 CFR part 382 or part 382) apply to both U.S. and foreign carriers?

**ANSWER**:  When initially passed in 1986, the ACAA and part 382 (subsequently issued in March 1990) applied only to U.S. carriers.  However, on April 5, 2000, Congress extended the applicability of the ACAA to cover foreign carriers.  At approximately the same time, DOT issued a notice to foreign carriers advising them that the Department intended to use the provisions of part 382, which by its terms does not impose requirements on foreign air carriers, as guidance in investigating any complaints it receives alleging noncompliance with the ACAA by foreign carriers.  The only provision of part 382 that currently applies to foreign air carriers is Section 382.70(b), which expressly requires foreign carriers to record, categorize, and report written disability-related complaints associated with any flight segment originating or

**Glossary**

***Direct Threat to the Health or Safety of Others***
A significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services.

***Fundamental Alteration***
A modification that substantially alters the basic nature or purpose of a program, service, product or activity.

***Individual with a Disability***
"Any individual who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment."  (Section 382.5).

***Qualified Individual with a Disability***
Any individual with a disability who:
(1) "takes those actions necessary to avail himself or herself of facilities or services offered by an air carrier to the general public with respect to accompanying or meeting a traveler, use of ground transportation, using terminal facilities, or obtaining information about schedules, fares or policies";
(2) "offers, or makes a good faith attempt to offer, to purchase or otherwise validly to obtain . . . a ticket" "for air transportation on an air carrier"; or
(3) "purchases or possesses a valid ticket for air transportation on an air carrier and presents himself or herself at the airport for the purpose of traveling on the flight for which the ticket has been purchased or obtained; and meets reasonable, nondiscriminatory contract of carriage requirements applicable to all passengers."  (Section 382.5).

***Service Animal***
Any animal that is individually trained or able to provide assistance to a qualified person with a disability; or any animal shown by documentation to be necessary for the emotional well being of a passenger.

**Sources**
*See:* 14 CFR 382.5**,** 14 CFR 382.37(a) and (c), 14 CFR 382.38 (a)(3), (b), (d) & (h)-(j), 14 CFR 382.55(a)(1)-(3), 14 CFR 382.57, "Guidance Concerning Service Animals in Air Transportation," (61 FR 56420-56422, (November 1, 1996)), "Commonly Asked Questions About Service Animals in Places of Business" (Department of Justice, July, 1996), and "ADA Business Brief: Service Animals" (Department of Justice, April 2002).
Questions regarding this notice may be addressed to the Office of Aviation Enforcement and Proceedings, C-70, 400 7th Street, SW, Washington, D.C. 20590.  A copy of this notice will be published in the Federal Register.
An electronic version of this document is available on the World Wide Web at
http://airconsumer.ost.dot.gov
Issued in Washington, DC on May 2, 2003.

Samuel Podberesky,

Assistant General Counsel for Aviation Enforcement and Proceedings

Plaintiff's Exhibit 29

cdc.gov

# COVID-19 Vaccination

10-12 minutes    Updated May 13, 2021

## Interim Public Health Recommendations for Fully Vaccinated People

Guidance for Fully Vaccinated People

### Summary of Recent Changes

- Update that fully vaccinated people no longer need to wear a mask or physically distance in any setting, except where required by federal, state, local, tribal, or territorial laws, rules, and regulations, including local business and workplace guidance

- Update that fully vaccinated people can refrain from testing following a known exposure unless they are residents or employees of a correctional or detention facility or a homeless shelter

## Choosing Safer Activities

Accessible link: https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/participate-in-activities.html

| | Unvaccinated People | Examples of Activities | Fully Vaccinated People |
|---|---|---|---|
| | | **Outdoor** | |
| Safest | | Walk, run, wheelchair roll, or bike outdoors with members of your household | |
| | | Attend a small, outdoor gathering with fully vaccinated family and friends | |
| | | Attend a small, outdoor gathering with fully vaccinated and unvaccinated people | |
| Less Safe | | Dine at an outdoor restaurant with friends from multiple households | |
| Least Safe | | Attend a crowded, outdoor event, like a live performance, parade, or sports event | |
| | | **Indoor** | |
| Less Safe | | Visit a barber or hair salon | Safest |
| | | Go to an uncrowded, indoor shopping center or museum | |
| | | Ride public transport with limited occupancy | |
| | | Attend a small, indoor gathering of fully vaccinated and unvaccinated people from multiple households | |
| Least Safe | | Go to an indoor movie theater | |
| | | Attend a full-capacity worship service | |
| | | Sing in an indoor chorus | |
| | | Eat at an indoor restaurant or bar | |
| | | Participate in an indoor, high intensity exercise class | |



**INFOGRAPHIC**

If you are fully vaccinated you can start doing many things that you had stopped doing because of the pandemic.

Text Version

## Key Points

The following recommendations apply to non-healthcare settings. For related information for healthcare settings, visit Updated Healthcare Infection Prevention and Control Recommendations in Response to COVID-19 Vaccination.

Fully vaccinated people can:

- Resume activities without wearing masks or physically distancing, except where required by federal, state, local, tribal, or territorial laws, rules and regulations, including local business and workplace guidance

- Resume domestic travel and refrain from testing before or after travel or self-quarantine after travel

- Refrain from testing before leaving the United States for international travel (unless required by the destination) and refrain from self-quarantine after arriving back in the United States

- Refrain from testing following a known exposure, if asymptomatic, with some exceptions for specific settings

- Refrain from quarantine following a known exposure if asymptomatic

- Refrain from routine screening testing if feasible

For now, fully vaccinated people should continue to:

- Get tested if experiencing COVID-19 symptoms

- Follow CDC and health department travel requirements and recommendations

- Overview

- Guiding Principles for Fully Vaccinated People

- Recommendations for Indoor and Outdoor Settings

- Recommendations for Travel

- Recommendations for Isolation, Quarantine and Testing

## Overview

Currently authorized vaccines in the United States are highly effective at protecting vaccinated people

against symptomatic and severe COVID-19. Additionally, a growing body of evidence suggests that fully vaccinated people are less likely to have asymptomatic infection or transmit SARS-CoV-2 to others. How long vaccine protection lasts and how much vaccines protect against emerging SARS-CoV-2 variants are still under investigation.

For the purposes of this guidance, people are considered fully vaccinated for COVID-19 ≥2 weeks after they have received the second dose in a 2-dose series (Pfizer-BioNTech or Moderna), or ≥2 weeks after they have received a single-dose vaccine (Johnson & Johnson [J&J]/Janssen)[±]; there is currently no post-vaccination time limit on fully vaccinated status. Unvaccinated people refers to individuals of all ages, including children, that have not completed a vaccination series or received a single-dose vaccine.

At this time, there are limited data on vaccine protection in people who are immunocompromised. People with immunocompromising conditions, including those taking immunosuppressive medications (for instance drugs, such as mycophenolate and rituximab, to suppress rejection of transplanted organs or to treat rheumatologic conditions), should discuss the need for personal protective measures with their healthcare provider after vaccination.

This guidance provides recommendations for fully vaccinated people, including:

- How fully vaccinated people can safely resume activities

- How fully vaccinated people should approach domestic and international travel

- How fully vaccinated people should approach isolation, quarantine, and testing

CDC will continue to evaluate and update public health recommendations for fully vaccinated people as more information, including on new variants, becomes available. Further information on evidence and considerations related to these recommendations is available in the Science Brief.

### Guiding Principles for Fully Vaccinated People

- Indoor and outdoor activities pose minimal risk to fully vaccinated people.

- Fully vaccinated people have a reduced risk of transmitting SARS-CoV-2 to unvaccinated people.

- Fully vaccinated people should still get tested if experiencing COVID-19 symptoms.

- Fully vaccinated people should not visit private or public settings if they have tested positive for COVID-19 in the prior 10 days or are experiencing COVID-19 symptoms.

- Fully vaccinated people should continue to follow any applicable federal, state, local, tribal, or territorial laws, rules, and regulations.

### Recommendations for Indoor and Outdoor Settings

Risk of SARS-CoV-2 infection is minimal for fully vaccinated people. The risk of SARS-CoV-2 transmission from fully vaccinated people to unvaccinated people is also reduced. Therefore, fully vaccinated people can resume activities without wearing a mask or physically distancing, except where required by federal, state, local, tribal, or territorial laws, rules, and regulations, including local business and workplace guidance. Fully vaccinated people should also continue to wear a well-fitted mask in correctional facilities and homeless shelters. Prevention measures are still recommended for unvaccinated people.

**Travel**

==Fully vaccinated travelers are less likely to get and spread SARS-CoV-2 and can now travel at low risk to themselves== within the United States. International travelers need to pay close attention to the situation at their international destinations before traveling due to the spread of new variants and because the burden of COVID-19 varies globally.

==CDC prevention measures continue to apply to all travelers, including those who are vaccinated. All travelers are required to wear a mask on all planes, buses, trains, and other forms of public transportation traveling into, within, or out of the United States and in U.S. transportation hubs such as airports and stations.==

**Domestic travel (within the United States or to a U.S. territory)**

- Fully vaccinated travelers do not need to get a SARS-CoV-2 viral test before or after domestic travel, unless testing is required by local, state, or territorial health authorities.

- Fully vaccinated travelers do not need to self-quarantine following domestic travel.

- For more information, see Domestic Travel During COVID-19.

**International travel**

- Fully vaccinated travelers do not need to get tested before leaving the United States unless required by their destination.

- ==Fully vaccinated air travelers coming to the United States from abroad, including U.S. citizens, are still required to have a negative SARS-CoV-2 viral test result or documentation of recovery from COVID-19 before they board a flight to the United States.==

- International travelers arriving in the United States are still recommended to get a SARS-CoV-2 viral test 3-5 days after travel regardless of vaccination status.

- Fully vaccinated travelers do not need to self-quarantine in the United States following international travel.

- For more information, see International Travel During COVID-19.

## Recommendations for Isolation, Quarantine and Testing

The following recommendations apply to non-healthcare settings. Guidance for residents and staff of healthcare settings can be found in the Updated Healthcare Infection Prevention Control Recommendations in Response to COVID-19 Vaccination.

**Fully vaccinated people with COVID-19 symptoms**

Although ==the risk that fully vaccinated people could become infected with COVID-19 is low,== any fully vaccinated person who experiences symptoms consistent with COVID-19 should isolate themselves from others, be clinically evaluated for COVID-19, and tested for SARS-CoV-2 if indicated. The symptomatic fully vaccinated person should inform their healthcare provider of their vaccination status at the time of presentation to care.

**Fully vaccinated people with no COVID-like symptoms following an exposure to someone with suspected or confirmed COVID-19**

Most fully vaccinated people with no COVID-like symptoms do not need to quarantine, be restricted from work, or be tested following an exposure to someone with suspected or confirmed COVID-19, as their risk of infection is low.

However, they should still monitor for symptoms of COVID-19 for 14 days following an exposure.

Exceptions where testing (but not quarantine) is still recommended following an exposure to someone with suspected or confirmed COVID-19 include:

- Fully vaccinated residents and employees of correctional and detention facilities and homeless shelters.

**Fully vaccinated people with no COVID-19-like symptoms and no known exposure to someone with suspected or confirmed COVID-19**

It is recommended that fully vaccinated people with no COVID-19-like symptoms and no known exposure should be exempted from routine screening testing programs, if feasible.


†This guidance applies to COVID-19 vaccines currently authorized for emergency use by the U.S. Food and Drug Administration: Pfizer-BioNTech, Moderna, and Johnson & Johnson (J&J)/Janssen COVID-19 vaccines. This guidance can also be applied to COVID-19 vaccines that have been authorized for emergency use by the World Health Organization (e.g. AstraZeneca/Oxford).

- Guiding principles for fully vaccinated people are now provided.

- Underscores that immunocompromised people need to consult their healthcare provider about these recommendations, even if fully vaccinated.

- Fully vaccinated people no longer need to wear a mask outdoors, except in certain crowded settings and venues.

- Clarification that fully vaccinated workers no longer need to be restricted from work following an exposure as long as they are asymptomatic.

- Fully vaccinated residents of non-healthcare congregate settings no longer need to quarantine following a known exposure.

- Fully vaccinated asymptomatic people without an exposure may be exempted from routine screening testing, if feasible.

# Choosing Safer Activities

Accessible link: https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/participate-in-activities.html

Plaintiff's Exhibit 30

| | Unvaccinated People | Examples of Activities | Fully Vaccinated People |
|---|---|---|---|
| | | **Outdoor** | |
| Safest | | Walk, run, wheelchair roll, or bike outdoors with members of your household | |
| Safest | | Attend a small, outdoor gathering with fully vaccinated family and friends | |
| Safest | | Attend a small, outdoor gathering with fully vaccinated and unvaccinated people | |
| Less Safe | | Dine at an outdoor restaurant with friends from multiple households | |
| Least Safe | | Attend a crowded, outdoor event, like a live performance, parade, or sports event | |
| | | **Indoor** | |
| Less Safe | | Visit a barber or hair salon | Safest |
| Less Safe | | Go to an uncrowded, indoor shopping center or museum | Safest |
| Less Safe | | Attend a small, indoor gathering of fully vaccinated and unvaccinated people from multiple households | Safest |
| Least Safe | | Go to an indoor movie theater | Safest |
| Least Safe | | Attend a full-capacity worship service | Safest |
| Least Safe | | Sing in an indoor chorus | Safest |
| Least Safe | | Eat at an indoor restaurant or bar | Safest |
| Least Safe | | Participate in an indoor, high intensity exercise class | Safest |

## Get a COVID-19 vaccine

**Prevention measures not needed**

 **Take prevention measures**
Wear a mask, stay 6 feet apart, and wash your hands.

- Safety levels assume the recommended prevention measures are followed, both by the individual and the venue (if applicable).
- CDC cannot provide the specific risk level for every activity in every community. It is important to consider your own personal situation and the risk to you, your family, and your community before venturing out.



**cdc.gov/coronavirus**

CS324153K

Plaintiff's Exhibit 31

thehill.com

# CDC says vaccinated people can take masks off indoors and outdoors | TheHill

*Nathaniel Weixel*

4-5 minutes

---

People who are fully vaccinated against COVID-19 can safely resume life without any restrictions, according to long-awaited federal guidance released Thursday.

The Centers for Disease Control and Prevention (CDC) says if you are fully vaccinated — two weeks past the last required COVID-19 vaccine dose — you don't need to wear masks indoors or outside, and you don't need to maintain physical distance.

The change is a monumental shift in how the agency has communicated about the risks of the coronavirus and the benefits of vaccines, and is a major step towards reopening America in time for the July 4th holiday.

Essentially, for vaccinated people, life can begin to return to normal.

"Anyone who is fully vaccinated, can participate in indoor and outdoor activities, large or small, without wearing a mask or physical distancing," CDC Director Rochelle WalenskyRochelle WalenskySchools face new pressures to reopen for in-person learning CDC clarifies mask guidance for schools Sunday shows - Cheney removal, CDC guidance reverberate MORE said during a White House briefing. "If you are fully vaccinated, you can start doing the things that you had stopped doing because of the pandemic. We have all longed for this moment, when we can get back to some sense of normalcy."

The new guidelines do not apply to health care settings, correctional facilities or homeless shelters, the agency said. People will also need to follow local business and workplace guidances, so masks are likely to continue to be required in private businesses.

In addition, CDC emphasized fully vaccinated people should still wear well-fitted

masks where required by laws, rules and regulations, including on airplanes, trains and public transportation.

It also urged those who are immune-compromised to speak with their doctors before giving up their masks.

==The update comes as the agency has been criticized for being too slow to react to changing science, overly cautious and even contradictory in its recommendations to the public.==

More than 117 million Americans are now fully vaccinated, which is about 35 percent of the population. New cases are down by a third over the last two weeks, and daily deaths have dropped to the lowest point since April 2020.

But the announcement puts even more pressure on businesses and local governments. There is no way to know who is vaccinated and who is not, and the idea of some kind of "vaccine passport" or digital identifier has become a partisan flashpoint vehemently opposed by Republicans.

States across the country have been easing restrictions and reopening businesses as local vaccination rates increase, despite the CDC and federal health officials who continued to urge caution.

Health experts said they feared the agency's overly conservative approach could result in fewer people getting shots, if they failed to show the benefits of being vaccinated.

The agency relaxed some of its rules for fully vaccinated people last month, but still advised wearing masks indoors in most public settings, and in many outdoor places.

That guidance included an elaborate color-coded chart for various activities that was widely mocked for being confusing and contradictory.

The agency's recent guidance on summer camps was also panned as being overly restrictive.

The CDC had said masks should be worn at all times, even outdoors, by everyone, including vaccinated adults and children as young as 2 years old.

Walensky denied that the changes were being made because of the criticism, or as an incentive to get more people vaccinated.

"We follow the science here," Walensky said. "While this may serve as an incentive

for some people to get vaccinated, that is not the purpose."

She said additional data in the past few weeks has shown the effectiveness of the vaccines in the real world, the vaccines work against variants, and vaccinated people are unlikely to transmit the virus.

But as recently as Wednesday evening, the message hadn't changed.

During an interview with CNBC's Shepard Smith, Walensky said that masks were still advised for people indoors, even if they were fully vaccinated, because the science wasn't clear if the vaccine worked against COVID-19 variants or whether vaccinated people could be asymptomatic carriers.

*—Updated at 3:15 p.m.*

*www.fitness.gov* when it has been finalized.

The meeting that is scheduled to be held on May 5, 2015, is open to the public. Every effort will be made to provide reasonable accommodations for persons with disabilities and/or special needs who wish to attend the meeting. Persons with disabilities and/or special needs should call (240) 276–9567 no later than close of business on April 21, 2015, to request accommodations. Members of the public who wish to attend the meeting are asked to pre-register by sending an email to *rsvp.fitness@hhs.gov* or by calling (240) 276–9567. Registration for public attendance must be completed before close of business on April 28, 2015.

Dated: March 20, 2015.

**Shellie Y. Pfohl,**

*Executive Director, Office of the President's Council on Fitness, Sports, and Nutrition, U.S. Department of Health and Human Services.*

[FR Doc. 2015–06999 Filed 3–26–15; 8:45 am]

**BILLING CODE 4150–35–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

**Criteria for Requesting Federal Travel Restrictions for Public Health Purposes, Including for Viral Hemorrhagic Fevers**

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice.

---

**SUMMARY:** The Centers for Disease Control and Prevention (CDC) in the Department of Health and Human Services (HHS) is publishing this Notice to inform the public of the criteria CDC considers for requesting federal travel restrictions for public health purposes, including for use of the Do Not Board (DNB) list and Public Health Border Lookout records. Individuals with communicable diseases that pose a public health threat to travelers can be placed on this list to restrict them from boarding commercial aircraft arriving into, departing from, or traveling within the United States. This notice further describes the factors that HHS/CDC will consider in evaluating whether to request that an individual who may have been exposed to a hemorrhagic fever virus be placed on the DNB list, which is administered by the Department of Homeland Security (DHS). It also contains information for

individuals who have been placed on this list to respond to this decision in writing, if they believe the decision was made in error. This notice is effective immediately.

**DATES:** This notice is effective on March 27, 2015.

**FOR FURTHER INFORMATION CONTACT:** For information regarding this Notice: Ashley A. Marrone, J.D., Division of Global Migration and Quarantine, Centers for Disease Control and Prevention, 1600 Clifton Road NE., MS–E03, Atlanta, GA 30329. For information regarding CDC operations related to this Notice: Travel Restrictions and Intervention Activity, ATTN.: Francisco Alvarado-Ramy, M.D., Division of Global Migration and Quarantine, Centers for Disease Control and Prevention, 1600 Clifton Road NE., MS–C–01, Atlanta, GA 30329. Either may also be reached by telephone 404–498–1600 or email *travelrestrictions@cdc.gov*.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

Individuals with communicable diseases who travel on commercial aircraft can pose a risk for infection to the traveling public. In June 2007, HHS/CDC and DHS developed a public health DNB list, enabling domestic and international public health officials to request that individuals with communicable diseases who meet specific criteria, including having a communicable disease that poses a public health threat to the traveling public, be restricted from boarding commercial aircraft arriving into, departing from, or traveling within the United States.[1] The public health DNB list, administered by DHS and based on HHS/CDC's requests, is intended to supplement state and/or local public health measures to prevent individuals who are infectious, or reasonably believed to have been exposed to a communicable disease and may become infectious, from boarding commercial aircraft. Use of the list is limited to those communicable diseases that would pose a public health threat to travelers should the infected individual be permitted to board a flight. Once an individual is placed on the DNB list, airlines are instructed not to issue a boarding pass to the individual for any commercial domestic flight or for any commercial international flight arriving in or departing from the United States.

An individual is typically removed from the DNB list upon receipt by HHS/CDC of the treating physician's or public health authority's statement (or other medical documentation) that the individual is no longer considered infectious, or lapse of the period that the individual is at risk of becoming infectious without development of symptoms.

Individuals included on the DNB list are assigned a Public Health Border Lookout ("Lookout") record that assists in ensuring that an individual placed on the DNB is detected if he or she attempts to enter or depart the United States through a port of entry. When this happens, officials from U.S. Customs and Border Protection (CBP), a component agency of DHS, notify HHS/CDC so that a thorough public health inquiry and evaluation can be conducted and appropriate public health action taken, as needed.

Requests for an individual to be placed on the public health DNB list with an associated Lookout record happen through a number of means, including: State or local public health officials contact the CDC Quarantine Station of jurisdiction, health-care providers make requests by contacting their state or local public health departments, and foreign and U.S. government agencies contact the CDC's Emergency Operations Center (EOC) in Atlanta. HHS/CDC may also request that DHS place an individual on the public health DNB and Lookout lists if HHS/CDC becomes independently aware of an individual who meets the placement criteria.[2]

HHS/CDC has refined the criteria that it initially considered, as published in the Morbidity and Mortality Weekly Report (MMWR) in 2008, and this notice describes the criteria CDC currently considers when making requests to DHS to include an individual on the DNB list and associated Lookout record. If an individual satisfies the first criteria and any of the three other criteria, then he/she may qualify to be placed on the list. Currently, HHS/CDC considers whether:

(1) The individual is known or reasonably believed to be infectious or reasonably believed to have been exposed to a communicable disease and may become infectious with a communicable disease that would be a public health threat should the individual be permitted to board a commercial aircraft or travel in a manner that would expose the public; and

---

[1] CDC. *Federal air travel restrictions for public health purposes—United States, June 2007–May 2008.* MMWR 2008; 57:1009–12. Available at *http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5737a1.htm*.

[2] CDC. *Federal air travel restrictions for public health purposes—United States, June 2007–May 2008.* MMWR 2008; 57:1009–12. Available at *http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5737a1.htm*.

(2) the individual is not aware of his or her diagnosis, has been advised regarding the diagnosis and is non-compliant with public health requests or has shown potential for non-compliance, or is unable to be located; or

(3) the individual is at risk of traveling on a commercial flight or of traveling internationally by any means; or

(4) the individual's placement on the DNB is necessary to effectively respond to outbreaks of communicable disease or other conditions of public health concern. For example, an individual's placement on the DNB may be considered when necessary to aid in the application of controlled movement[3] or in the execution of a federal, state, or local quarantine, isolation, or conditional release order.

## II. Authority

The DNB list and Lookout record are based on requests made by HHS/CDC regarding public health decisions and actions, and are administered by DHS. Under the Public Health Service Act, the Secretary of HHS is authorized to make and enforce regulations and take other actions necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the United States or between states.[4] Under its delegated authority, the HHS/CDC Division of Global Migration and Quarantine fulfills this responsibility through a variety of activities that may include operating quarantine stations at ports of entry, conducting routine public health screening, and administering quarantine regulations that govern the international and interstate movement of persons, animals, and cargo.[5]

### Authority of DHS

Federal law authorizes CBP, U.S. Immigration and Customs Enforcement (ICE), and U.S. Coast Guard (USCG) officers to assist HHS by enforcing quarantine rules and regulations.[6] In addition, other DHS Components such as the Transportation Security

Administration (TSA), relying on their existing authorities, may provide supportive roles to federal screening efforts designed to prevent the introduction and spread of communicable disease.

TSA has the authority to accept the services of, or otherwise cooperate with, other federal agencies including implementing the DNB list.[7] Further, TSA may "develop policies, strategies, and plans for dealing with the threats . . . including coordinating countermeasures with appropriate departments, agencies, and instrumentalities of the United States."[8] Consistent with this authority, TSA may assist another Federal agency in carrying out its authority in order to address a threat to transportation. These threats may involve passenger safety.[9] In administering the DNB list, TSA relies on CDC to make public health findings as the basis for its request. As the medical authority for DHS,[10] the Office of Health Affairs reviews and approves the medical appropriateness of HHS/CDC's request prior to DHS implementing HHS/CDC's request by placing the person on the DNB list.

## III. Operations

Because of the urgency involved in restricting individuals with serious communicable diseases from boarding commercial aircraft, individuals might not be notified prior to their inclusion on the DNB list and associated Lookout record. When an individual is placed on the DNB list with an associated Lookout record, HHS/CDC advises in writing that the individual is temporarily restricted from traveling by commercial air carrier and provides the reasons why HHS/CDC has reached this decision. HHS/CDC interprets "temporarily restricted" to mean that the individual will remain on the lists until no longer considered to be infectious or at risk of becoming infectious. HHS/CDC's notification to the individual also explains that, while the individual is on these lists, travel by commercial aircraft is forbidden and any attempt to enter the United States through any port of entry will be stopped by CBP officials and that the individual will be referred for public health evaluation. If an individual cannot be located, HHS/CDC works with state and local public health officials to contact the individual through family or other contacts. HHS/CDC and DHS take great care to ensure personal medical information is safeguarded.

As part of its notification process HHS/CDC also asks the appropriate state or local health department to notify the individual directly, state the reasons for the placement on the DNB list and associated Lookout record, and provide the medical or public health requirements that must be satisfied to be removed from the lists. The primary consideration for requesting removal from the DNB list and associated Lookout record is CDC's determination that the individual is no longer considered to be infectious or at risk of becoming infectious; however, other factors may be taken into consideration including the individual's return to treatment, if applicable, and following public health recommendations. Once HHS/CDC receives documentation that these medical and other stated requirements have been met, it sends a request to DHS to lift the travel restrictions (both the DNB list and the Lookout record).[11] Once an individual is removed from the DNB list and the associated Lookout record is removed, a second notification letter is sent by HHS/CDC to the individual informing him or her that the public health travel restrictions have been removed and providing further recommendations on an as-needed basis (e.g., advising that the individual continue treatment, if applicable).

HHS/CDC's letter informing individuals that they have been placed on the DNB list and associated Lookout records invites individuals who believe that HHS/CDC's public health decision was made in error to submit a written response to the Director of HHS/CDC's Division of Global Migration and Quarantine and provide any supporting facts or other evidence supporting their belief. These operations and procedures will not change as a result of this Notice.

## IV. Requesting Travel Restrictions for Viral Hemorrhagic Fevers

To date, the DNB list and associated Lookout records have been used primarily with respect to individuals with suspected or confirmed pulmonary tuberculosis (TB), including multidrug-resistant tuberculosis (MDR–TB), and a very small number with measles. However, travel restrictions are also applicable to other suspected or confirmed communicable diseases that could pose a public health threat during travel, including viral hemorrhagic fevers such as Ebola virus disease

---

[3] See http://www.cdc.gov/vhf/ebola/exposure/monitoring-and-movement-of-persons-with-exposure.html.

[4] 42 U.S.C. 264–265. The Secretary has promulgated implementing regulations at 42 CFR parts 70 and 71, administered by the CDC.

[5] See generally U.S. Department of Health and Human Services Centers for Disease Control and Prevention, Public Health Screening at U.S. Ports of Entry: A Guide for Federal Inspectors (July 2007) (describing port of entry health screening procedures); 42 CFR part 70 (interstate quarantine regulations); 42 CFR part 71 (foreign quarantine regulations).

[6] See 42 U.S.C. 97, 268(b).

[7] 49 U.S.C. 106(l), (m), 114(m).

[8] 49 U.S.C. 114(f)(3), (4).

[9] See, e.g., 49 U.S.C. 114(h)(3).

[10] 6 U.S.C. 321e(c)(1).

[11] In addition to contacting CDC, individuals seeking removal from the Public Health DNB may also seek assistance through the redress process established by DHS in 49 CFR 1560.205.

(Ebola). Ebola is a type of viral hemorrhagic fever that is often fatal in humans and nonhuman primates. Ebola can spread through human-to-human transmission, with infection resulting from direct contact (through broken skin or mucous membranes) with the blood, secretions, droplets, or other body fluids of infected people, and indirectly from contact with surfaces or items (such as needles) contaminated with such fluids.

With respect to viral hemorrhagic fevers, placement on the DNB list and associated Lookout record is requested for people known or suspected to have a viral hemorrhagic fever. Placement may also be requested for people without symptoms who have been exposed to a viral hemorrhagic fever, particularly if these individuals intend to travel against public health recommendations. Even though people without symptoms are not infectious, these restrictions are requested because of the possibility that symptoms could develop during travel, particularly long international flights. Exposure is determined through a CDC risk factor assessment using information available from a variety of public health, medical and other official sources. Examples of types of potential exposure to viral hemorrhagic fevers contained within the CDC risk factor assessment include the following. It should be noted that not all of these exposures may result in travel restrictions.

- Having been in a country with widespread Ebola virus transmission within the past 21 days and, although having had no known exposures, is showing symptoms
- Percutaneous (*e.g.,* needle stick) or mucous membrane exposure to blood or body fluids of a person with Ebola while the person was showing symptoms
- Exposure to the blood or body fluids (including but not limited to feces, saliva, sweat, urine, vomit, and semen) of a person with Ebola while the person was showing symptoms without appropriate personal protective equipment (PPE) (see *http://www.cdc.gov/vhf/ebola/hcp/procedures-for-ppe.html*)
- Laboratory processing of blood or body fluids of a person with Ebola while the person was showing symptoms without appropriate PPE or standard biosafety protections
- Direct contact with a dead body without appropriate PPE in a country with widespread Ebola virus transmission (see *http://www.cdc.gov/vhf/ebola/outbreaks/2014-west-africa/distribution-map.html*)
- Having lived in the immediate household and provided direct care to

a person with Ebola while the person was showing symptoms
- In countries with widespread Ebola virus transmission: Direct contact while using appropriate PPE with a person with Ebola while the person was showing symptoms, or with the person's body fluids, or any direct patient care in other healthcare settings
- Close contact in households, healthcare facilities, or community settings with a person with Ebola while the person was showing symptoms
○ Close contact is defined as not wearing appropriate PPE within approximately 3 feet (1 meter) of a person with Ebola while the person was showing symptoms
- Having brief direct contact (*e.g.,* shaking hands), while not wearing appropriate PPE, with a person with Ebola while the person was in the early stage of disease
- In countries without widespread Ebola virus transmission: Direct contact while using appropriate PPE with a person with Ebola while the person was showing symptoms
- Traveled on an aircraft with a person with Ebola while the person was showing symptoms

Exposure risk factors, such as those just described, will be considered by HHS/CDC in their totality when determining whether an individual meets the first criteria for placement on the DNB List, as described in Section I of this notice. HHS/CDC would also consider other facts and information it may have to make a decision with respect to the other criteria, as described in Section I of this notice. It should be noted that all facts are considered when applying the criteria. Again, with the exception of the first criteria, not all of the other criteria need to be present for HHS/CDC to make a request to DHS to have an individual placed on DNB and Lookout.

HHS/CDC would also consider these risk factors when assessing an individual who has been in a country where outbreaks of viral hemorrhagic fevers were occurring and refuses to comply with a public health assessment, and otherwise meets the travel restriction criteria. Refusing to comply with a public health risk assessment in this situation could include refusing to provide relevant information that would allow public health officials to assess the exposure risk.

**V. Provisions of This Notice**

HHS/CDC will make requests of DHS based on the criteria in this notice effective immediately. Individuals who have had their travel temporarily

restricted as a result of placement on the DNB list and associated Lookout records may submit a written response to the Director, Division of Global Migration and Quarantine, if they believe that HHS/CDC has erred in its public health request to DHS. The response should be addressed to: Director, Division of Global Migration and Quarantine, ATTN: Travel Restriction and Intervention Activity, Centers for Disease Control and Prevention, 1600 Clifton Road, MS E–03, Atlanta, GA 30329. Responses may also be faxed to CDC at (404) 718–2158 or emailed to *travelrestrictions@cdc.gov*.

As part of the response, individuals should include the reference number listed in the notification letter they received and any facts or other evidence indicating why they believe that HHS/CDC's public health request was made in error.

The policy and program operations described above will become effective on March 27, 2015.

Dated: March 24, 2015.

**Sylvia M. Burwell,**
*Secretary.*
[FR Doc. 2015–07118 Filed 3–26–15; 8:45 am]
**BILLING CODE 4163–18–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

[Docket No. FDA–2011–N–0908]

**Agency Information Collection Activities; Proposed Collection; Comment Request; Guidance for Clinical Trial Sponsors: Establishment and Operation of Clinical Trial Data Monitoring Committees**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

---

**SUMMARY:** The Food and Drug Administration (FDA) is announcing an opportunity for public comment on the proposed collection of certain information by the Agency. Under the Paperwork Reduction Act of 1995 (the PRA), Federal Agencies are required to publish notice in the **Federal Register** concerning each proposed collection of information, including each proposed extension of an existing collection of information and to allow 60 days for public comment in response to the notice. This notice solicits comments on the collection of information concerning the establishment and operation of clinical trial data monitoring committees.

Plaintiff's Exhibit 33

cdc.gov

# Travel Restrictions | CDC

3 minutes



*Credit: David Snyder*

Disease is just a flight away. To protect America's health, CDC partners with the Department of Homeland Security to prevent the spread of serious contagious diseases during travel. CDC uses a **Do Not Board list** to prevent travelers from boarding commercial airplanes if they are known or suspected to have a contagious disease that poses a threat to the public's health. Sick travelers are also placed on a **Lookout** list so they will be detected if they attempt to enter the United States by land or sea. **These tools can be used for anyone who poses a threat to the public's health.**

Local and state public health officials can request CDC's assistance if a person who poses a public health threat intends to travel. CDC helps ensure these people do not travel while contagious.

**Placing people on the lists**

The criteria for adding people to the **Do Not Board** and **Lookout** lists are

1. Known or believed to be infectious with, or at risk for, a serious contagious disease that poses a public health threat to others during travel; **and** any of the following three:

1. **not** aware of diagnosis or **not** following public health recommendations, **or**

2. Likely to travel on a commercial flight involving the United States or travel internationally by any means; **or**

3. Need to issue travel restriction to respond to a public health outbreak or to help enforce a public

health order.

Criteria number one plus one of the three subsets must be met for a person to be placed on the **Do Not Board** and **Lookout** lists.



*Credit: David Heaberlin*

Once a person is placed on these lists, airlines will not issue a boarding pass to the person for any commercial flight within, arriving to, or departing from the United States.

To date, the Do Not Board and Lookout lists have been used for people with suspected or confirmed infectious tuberculosis (TB), including multidrug-resistant tuberculosis (MDR-TB), and measles. However, travel restrictions can also be used for other suspected or confirmed contagious diseases that could pose a public health threat during travel, including viral hemorrhagic fevers such as Ebola.

Preventing people with contagious diseases from traveling also helps to make sure they get or continue medical treatment, such as for infectious tuberculosis.

**Taking people off the lists**

Once public health authorities confirm a person is no longer contagious, the person is removed from the lists (typically within 24 hours). Also, CDC reviews the records of all persons on the lists every two weeks to determine whether they are eligible for removal.

Plaintiff's Exhibit 34

**COVID-19 Deaths Reported by State per 100,000 Residents**
*Data updated through May 26, 2021*

| STATE | DEATHS | MASK MANDATE | REPEALED | NOTES |
|---|---|---|---|---|
| Hawaii | 35 | Yes | In Effect | |
| Vermont | 41 | Yes | In Effect | Applies only to unvaccinated; ends when 80% vaccinated |
| Alaska | 50 | No | N/A | |
| Maine | 61 | Yes | 5/24/2021 | |
| Oregon | 62 | Yes | In Effect | Applies only to unvaccinated |
| Utah | 71 | Yes | 4/10/2021 | Repealed by legislature |
| Washington | 75 | Yes | In Effect | Applies only to unvaccinated |
| New Hampshire | 99 | Yes | 4/16/2021 | |
| Colorado | 113 | Yes | 5/14/2021 | |
| Nebraska | 116 | No | N/A | |
| Idaho | 117 | No | N/A | |
| North Carolina | 124 | Yes | 5/14/2021 | |
| Wyoming | 124 | Yes | 3/16/2021 | |
| Virginia | 130 | Yes | 5/28/2021 | |
| Minnesota | 133 | Yes | 5/14/2021 | |
| Wisconsin | 133 | Yes | 3/31/2021 | Struck down by Wisconsin Supreme Court |
| Maryland | 149 | Yes | 5/15/2021 | |
| Montana | 150 | Yes | 2/12/2021 | |
| Kentucky | 151 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 6/11/21 |
| Missouri | 154 | No | N/A | |
| West Virginia | 155 | Yes | In Effect | Scheduled to end 6/20/21 |
| California | 159 | Yes | In Effect | Scheduled to end 6/15/21 |
| District of Columbia | 160 | Yes | In Effect | Now applies only to unvaccinated |
| Ohio | 169 | Yes | In Effect | Applies only to unvaccinated; scheduled to end 6/2/21 |
| Delaware | 170 | Yes | 5/21/2021 | |
| Florida | 170 | No | N/A | Local mandates prohibited by EO |
| Kansas | 174 | Yes | 4/1/2021 | Repealed by legislature; counties could opt out when in effect |
| Oklahoma | 175 | No | N/A | |
| Texas | 177 | Yes | 3/10/2021 | Local mandates prohibited by EO |
| Nevada | 181 | Yes | In Effect | Now applies only to unvaccinated |
| Tennessee | 182 | No | N/A | Local mandates prohibited by EO |
| South Carolina | 188 | No | N/A | Local mandates prohibited by EO |
| Iowa | 191 | Yes | 2/7/2021 | Local mandates prohibited by new law |
| Arkansas | 193 | Yes | 3/31/2021 | Local mandates prohibited by new law |
| Georgia | 195 | No | N/A | |
| Illinois | 198 | Yes | In Effect | Now applies only to unvaccinated |
| Indiana | 202 | Yes | 4/6/2021 | |
| New Mexico | 202 | Yes | In Effect | Applies only to unvaccinated |
| North Dakota | 202 | Yes | 1/18/2021 | |
| Michigan | 203 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 7/1/21 |
| Pennsylvania | 211 | Yes | In Effect | Applies only to unvaccinated; scheduled to end 6/28/21 |
| Alabama | 227 | Yes | 4/9/2021 | |
| Louisiana | 227 | Yes | 4/28/2021 | |
| South Dakota | 227 | No | N/A | |
| Connecticut | 231 | Yes | In Effect | Now applies only to unvaccinated |
| Arizona | 241 | Yes | 3/25/2021 | Local mandates prohibited by EO |
| Mississippi | 245 | Yes | 3/3/2021 | |
| Rhode Island | 256 | Yes | In Effect | Applies only to unvaccinated |
| Massachusetts | 259 | Yes | In Effect | Scheduled to end 5/29/21 |
| New York | 273 | Yes | In Effect | Applies only to unvaccinated |
| New Jersey | 294 | Yes | 5/28/2021 | |
| **NATIONAL AVERAGE** | **165** | | | |

| | |
|---|---|
| **States that never had a mask mandate** | **10** |
| **Mandate repealed before 5/13/21 CDC guidance** | **15** |
| **Mandate repealed after 5/13/21 CDC guidance** | **8** |
| **Mandate still in effect for unvaccinated only** | **14** |
| **Mandate still in effect for everyone** | **4** |

*Chart by Lucas Wall*
*Data Sources: www.statista.com/statistics/1109004/coronavirus-covid19-cases-rate-us-americans-by-state*
*www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-coronavirus.html*

**COVID-19 Deaths Reported by State per 100,000 Residents**
**Sorted by Whether State Had a Mask Mandate**
*Data updated through May 26, 2021*

| STATE | DEATHS | MASK MANDATE | REPEALED | NOTES |
|---|---|---|---|---|
| Alaska | 50 | No | N/A | |
| Nebraska | 116 | No | N/A | |
| Idaho | 117 | No | N/A | |
| Missouri | 154 | No | N/A | |
| Florida | 170 | No | N/A | Local mandates prohibited by EO |
| Oklahoma | 175 | No | N/A | |
| Tennessee | 182 | No | N/A | Local mandates prohibited by EO |
| South Carolina | 188 | No | N/A | Local mandates prohibited by EO |
| Georgia | 195 | No | N/A | |
| South Dakota | 227 | No | N/A | |
| **AVERAGE** | **157** | | | |
| | | | | |
| Hawaii | 35 | Yes | In Effect | |
| Vermont | 41 | Yes | In Effect | Applies only to unvaccinated; ends when 80% vaccinated |
| Maine | 61 | Yes | 5/24/2021 | |
| Oregon | 62 | Yes | In Effect | Applies only to unvaccinated |
| Utah | 71 | Yes | 4/10/2021 | Repealed by legislature |
| Washington | 75 | Yes | In Effect | Applies only to unvaccinated |
| New Hampshire | 99 | Yes | 4/16/2021 | |
| Colorado | 113 | Yes | 5/14/2021 | |
| North Carolina | 124 | Yes | 5/14/2021 | |
| Wyoming | 124 | Yes | 3/16/2021 | |
| Virginia | 130 | Yes | 5/28/2021 | |
| Minnesota | 133 | Yes | 5/14/2021 | |
| Wisconsin | 133 | Yes | 3/31/2021 | Struck down by Wisconsin Supreme Court |
| Maryland | 149 | Yes | 5/15/2021 | |
| Montana | 150 | Yes | 2/12/2021 | |
| Kentucky | 151 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 6/11/21 |
| West Virginia | 155 | Yes | In Effect | Scheduled to end 6/20/21 |
| California | 159 | Yes | In Effect | Scheduled to end 6/15/21 |
| District of Columbia | 160 | Yes | In Effect | Now applies only to unvaccinated |
| Ohio | 169 | Yes | In Effect | Applies only to unvaccinated; scheduled to end 6/2/21 |
| Delaware | 170 | Yes | 5/21/2021 | |
| Kansas | 174 | Yes | 4/1/2021 | Repealed by legislature; counties could opt out when in effect |
| Texas | 177 | Yes | 3/10/2021 | Local mandates prohibited by EO |
| Nevada | 181 | Yes | In Effect | Now applies only to unvaccinated |
| Iowa | 191 | Yes | 2/7/2021 | Local mandates prohibited by new law |
| Arkansas | 193 | Yes | 3/31/2021 | Local mandates prohibited by new law |
| Illinois | 198 | Yes | In Effect | Now applies only to unvaccinated |
| Indiana | 202 | Yes | 4/6/2021 | |
| New Mexico | 202 | Yes | In Effect | Applies only to unvaccinated |
| North Dakota | 202 | Yes | 1/18/2021 | |
| Michigan | 203 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 7/1/21 |
| Pennsylvania | 211 | Yes | In Effect | Applies only to unvaccinated; scheduled to end 6/28/21 |
| Alabama | 227 | Yes | 4/9/2021 | |
| Louisiana | 227 | Yes | 4/28/2021 | |
| Connecticut | 231 | Yes | In Effect | Now applies only to unvaccinated |
| Arizona | 241 | Yes | 3/25/2021 | Local mandates prohibited by EO |

| | | | | |
|---|---|---|---|---|
| Mississippi | 245 | Yes | 3/3/2021 | |
| Rhode Island | 256 | Yes | In Effect | Applies only to unvaccinated |
| Massachusetts | 259 | Yes | In Effect | Scheduled to end 5/29/21 |
| New York | 273 | Yes | In Effect | Applies only to unvaccinated |
| New Jersey | 294 | Yes | 5/28/2021 | |
| **AVERAGE** | **167** | | | |

| | |
|---|---|
| **No Mask Mandate** | **157** |
| **National Average** | **165** |
| **Statewide Mandate** | **167** |

**Deaths in states that never implemented a mask mandate are 6.0% lower than states that had a requirement**
**Deaths in states that never implemented a mask mandate are 4.9% lower than the national average**
**Deaths in states that required face coverings are 1.2% higher than the national average**
**The 7 worst states in per-capita deaths all have/had mask requirements**

*Chart by Lucas Wall*
*Data Sources: www.statista.com/statistics/1109004/coronavirus-covid19-cases-rate-us-americans-by-state*
*www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-coronavirus.html*

**COVID-19 Deaths Reported by State per 100,000 Residents**
**Sorted by When State Had a Mask Mandate**
*Data updated through May 26, 2021*

| STATE | DEATHS | MASK MANDATE | REPEALED | NOTES |
|---|---|---|---|---|
| Alaska | 50 | No | N/A | |
| Nebraska | 116 | No | N/A | |
| Idaho | 117 | No | N/A | |
| Missouri | 154 | No | N/A | |
| Florida | 170 | No | N/A | Local mandates prohibited by EO |
| Oklahoma | 175 | No | N/A | |
| Tennessee | 182 | No | N/A | Local mandates prohibited by EO |
| South Carolina | 188 | No | N/A | Local mandates prohibited by EO |
| Georgia | 195 | No | N/A | |
| South Dakota | 227 | No | N/A | |
| **AVERAGE** | **157** | **Never** | | |
| | | | | |
| Utah | 71 | Yes | 4/10/2021 | Repealed by legislature |
| New Hampshire | 99 | Yes | 4/16/2021 | |
| Wyoming | 124 | Yes | 3/16/2021 | |
| Wisconsin | 133 | Yes | 3/31/2021 | Struck down by Wisconsin Supreme Court |
| Montana | 150 | Yes | 2/12/2021 | |
| Kansas | 174 | Yes | 4/1/2021 | Repealed by legislature; counties could opt out when in effect |
| Texas | 177 | Yes | 3/10/2021 | Local mandates prohibited by EO |
| Iowa | 191 | Yes | 2/7/2021 | Local mandates prohibited by new law |
| Arkansas | 193 | Yes | 3/31/2021 | Local mandates prohibited by new law |
| North Dakota | 202 | Yes | 1/18/2021 | |
| Indiana | 202 | Yes | 4/6/2021 | |
| Alabama | 227 | Yes | 4/9/2021 | |
| Louisiana | 227 | Yes | 4/28/2021 | |
| Arizona | 241 | Yes | 3/25/2021 | Local mandates prohibited by EO |
| Mississippi | 245 | Yes | 3/3/2021 | |
| **AVERAGE** | **177** | **Repealed before 5/13/21 CDC guidance** | | |
| | | | | |
| Maine | 61 | Yes | 5/24/2021 | |
| Colorado | 113 | Yes | 5/14/2021 | |
| North Carolina | 124 | Yes | 5/14/2021 | |
| Virginia | 130 | Yes | 5/28/2021 | |
| Minnesota | 133 | Yes | 5/14/2021 | |
| Maryland | 149 | Yes | 5/15/2021 | |
| Delaware | 170 | Yes | 5/21/2021 | |
| New Jersey | 294 | Yes | 5/28/2021 | |
| **AVERAGE** | **167** | **Repealed after 5/13/21 CDC guidance** | | |
| | | | | |
| Hawaii | 35 | Yes | In Effect | |
| Vermont | 41 | Yes | In Effect | Now applies only to unvaccinated; ends when 80% vaccinated |
| Oregon | 62 | Yes | In Effect | Now applies only to unvaccinated |
| Washington | 75 | Yes | In Effect | Now applies only to unvaccinated |
| Kentucky | 151 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 6/11/21 |
| West Virginia | 155 | Yes | In Effect | Scheduled to end 6/20/21 |
| California | 159 | Yes | In Effect | Scheduled to end 6/15/21 |
| District of Columbia | 160 | Yes | In Effect | Now applies only to unvaccinated |
| Ohio | 169 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 6/2/21 |

| | | | | |
|---|---|---|---|---|
| Nevada | 181 | Yes | In Effect | Now applies only to unvaccinated |
| Illinois | 198 | Yes | In Effect | Now applies only to unvaccinated |
| New Mexico | 202 | Yes | In Effect | Now applies only to unvaccinated |
| Michigan | 203 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 7/1/21 |
| Pennsylvania | 211 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 6/28/21 |
| Connecticut | 231 | Yes | In Effect | Now applies only to unvaccinated |
| Rhode Island | 256 | Yes | In Effect | Now applies only to unvaccinated |
| Massachusetts | 259 | Yes | In Effect | Scheduled to end 5/29/21 |
| New York | 273 | Yes | In Effect | Now applies only to unvaccinated |
| **AVERAGE** | **168** | **Still in Effect** | | |

| | | |
|---|---|---|
| **No Mask Mandate** | **157** | **4.9% below national average** |
| ***National Average*** | ***165*** | |
| **Mandate repealed after 5/13/21 CDC guidance** | **167** | **6.4% higher than national average** |
| **Mandate still in effect** | **168** | **1.2% higher than national average** |
| **Mandate repealed before 5/13/21 CDC guidance** | **177** | **7.3% higher than national average** |

**Deaths in states that never implemented a mask mandate are 6.5% lower than states that still have a requirement**
**All 3 groups of states that adopted a mask mandate at some point fared worse than the 10 states that never did**

*Chart by Lucas Wall*

*Data Sources: www.statista.com/statistics/1109004/coronavirus-covid19-cases-rate-us-americans-by-state*
*www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-coronavirus.html*

Plaintiff's Exhibit 35

nytimes.com

# 2 Airlines Will Postpone Serving Alcohol Amid Surge of In-Flight Violence

*Maria Cramer, Michael Levenson*

5-7 minutes

American and Southwest announced the policies after the latest assault was captured on a widely watched video that showed a woman punching a flight attendant in the face.





Credit...Charlie Riedel/Associated Press

May 29, 2021

Two major airlines, American and Southwest, have postponed plans to resume serving alcohol on flights in an effort to stop a surge of unruly and sometimes violent behavior by passengers who have shoved, struck and yelled at flight attendants.

Both airlines announced the policies this week after the latest assault was captured on a widely watched video that showed a woman punching a flight attendant in the face on a Southwest Airlines flight from Sacramento to San Diego on Sunday.

The flight attendant lost two teeth in the assault, according to her union, and the passenger, who was identified by the police as Vyvianna Quinonez, 28, has been charged with battery causing serious bodily injury. She has also been barred for life from flying Southwest, the airline said.

It was not immediately clear if Ms. Quinonez had a lawyer, and she did not respond on Saturday to messages left at a number listed under her name.

Since Jan. 1, the Federal Aviation Administration has received about 2,500 reports of unruly behavior by passengers, including about 1,900 reports of passengers refusing to comply with a federal mandate that they wear masks on planes.

The agency said that in the past it did not track reports of unruly passengers because the numbers had been fairly consistent over the years, but that it began receiving reports of a "significant increase" in disruptive behavior starting in late 2020.

"We have just never seen anything like this," Sara Nelson, the international president of the Association of Flight Attendants, said during an online meeting with federal aviation officials on Wednesday. "We've never seen it so bad."

Southwest Airlines issued a statement on Friday citing the "recent uptick industrywide of incidents in-flight involving disruptive passengers" as it announced that it had paused plans to resume serving alcohol on flights.

"We realize this decision will be disappointing for some customers, but we feel it to be the right decision now in the interest of safety and comfort of all onboard," the statement said.

American Airlines announced a similar policy on Saturday.

It said that alcohol sales, which had been suspended in the main cabin since late March 2020, would remain suspended through Sept. 13, when a federal mandate requiring passengers to wear masks on airplanes, buses and trains is set to expire.

In a memo, American said it recognized that "alcohol can contribute to atypical behavior from customers onboard and we owe it to our crew not to potentially exacerbate what can already be a new and stressful situation for our customers."

"Over the past week we've seen some of these stressors create deeply disturbing situations on

board aircraft," said the memo, which was issued to American's flight attendants on Saturday. "Let me be clear: American Airlines will not tolerate assault or mistreatment of our crews."

American said that alcohol would continue to be served in first class and business class, but only during the flight and not before departure.

The changes came after Lyn Montgomery, the president of Transport Workers Union Local 556, which represents flight attendants on Southwest Airlines, urged the airline's chief executive, Gary Kelly, to stop the "abuse" employees have been facing.

"We ask that you take a strong stance to ensure that unruly passengers are not welcome to travel with us, period, full stop," she wrote in a letter to Mr. Kelly on Monday. "Flight crews must feel safe and supported when reporting to work."

The changes also came after the F.A.A. said on Monday that it had proposed fines of $9,000 to $15,000 for five passengers who had exhibited disruptive behavior on flights.

One of those passengers was in the main cabin of a JetBlue flight in February. She yelled obscenities and pushed a flight attendant who took away champagne and food that had been brought to her by a passenger in first class, the F.A.A. said.

Another passenger on a JetBlue flight in January ignored instructions to stop drinking alcohol and yelled at crew members after they told him to stop talking on his cellphone, the agency said.

In January, a passenger on Alaska Airlines shoved a flight attendant who was walking down the aisle and documenting which passengers were wearing masks, the F.A.A. said.

Steve Dickson, the F.A.A. administrator, said in a videotaped statement that the agency has a "zero-tolerance policy" for passengers who cause disturbances on flights or fail to obey instructions from the flight crew.

Passengers, regardless of their vaccination status, must wear masks on planes and in airports, he said.

"But this isn't just about face masks," Mr. Dickson said. "We've seen incidents related to alcohol, violence toward flight attendants and abusive behavior in general."

Those who violate the rules, he said, may be subject to fines and jail time. As a former commercial airline captain, Mr. Dickson said, he knows that disruptive passengers can pose a safety risk.

"Flying is the safest mode of transportation," he said, "and we intend to keep it that way."



Plaintiff's Exhibit 36



*Review*

# Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?

**Kai Kisielinski** [1], **Paul Giboni** [2], **Andreas Prescher** [3], **Bernd Klosterhalfen** [4], **David Graessel** [5], **Stefan Funken** [6], **Oliver Kempski** [7] and **Oliver Hirsch** [8,*]

[1] Private Practice, 40212 Düsseldorf, Germany; kaikisielinski@yahoo.de
[2] Private Practice, 22763 Hamburg, Germany; pgiboni@gmx.de
[3] Institute of Molecular and Cellular Anatomy (MOCA), Wendlingweg 2, 52074 Aachen, Germany; aprescher@ukaachen.de
[4] Institute of Pathology, Dueren Hospital, Roonstrasse 30, 52351 Dueren, Germany; bernd.klosterhalfen@web.de
[5] Institute of Neuroscience and Medicine, Forschungszentrum Jülich, 52425 Jülich, Germany; d.graessel@fz-juelich.de
[6] Private Practice, 47803 Krefeld, Germany; dr_funken@colita.net
[7] Institute of Neurosurgical Pathophysiology, University Medical Centre of the Johannes Gutenberg University of Mainz Langenbeckstr. 1, 55131 Mainz, Germany; oliver.kempski@unimedizin-mainz.de
[8] Department of Psychology, FOM University of Applied Sciences, 57078 Siegen, Germany
* Correspondence: oliver.hirsch@fom.de



**Citation:** Kisielinski, K.; Giboni, P.; Prescher, A.; Klosterhalfen, B.; Graessel, D.; Funken, S.; Kempski, O.; Hirsch, O. Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?. *Int. J. Environ. Res. Public Health* **2021**, *18*, 4344. https://doi.org/10.3390/ijerph18084344

Academic Editor: Paul B. Tchounwou

Received: 20 March 2021
Accepted: 16 April 2021
Published: 20 April 2021

**Publisher's Note:** MDPI stays neutral with regard to jurisdictional claims in published maps and institutional affiliations.



**Copyright:** © 2021 by the authors. Licensee MDPI, Basel, Switzerland. This article is an open access article distributed under the terms and conditions of the Creative Commons Attribution (CC BY) license (https://creativecommons.org/licenses/by/4.0/).

**Abstract:** Many countries introduced the requirement to wear masks in public spaces for containing SARS-CoV-2 making it commonplace in 2020. Up until now, there has been no comprehensive investigation as to the adverse health effects masks can cause. The aim was to find, test, evaluate and compile scientifically proven related side effects of wearing masks. For a quantitative evaluation, 44 mostly experimental studies were referenced, and for a substantive evaluation, 65 publications were found. The literature revealed relevant adverse effects of masks in numerous disciplines. In this paper, we refer to the psychological and physical deterioration as well as multiple symptoms described because of their consistent, recurrent and uniform presentation from different disciplines as a Mask-Induced Exhaustion Syndrome (MIES). We objectified evaluation evidenced changes in respiratory physiology of mask wearers with significant correlation of $O_2$ drop and fatigue ($p < 0.05$), a clustered co-occurrence of respiratory impairment and $O_2$ drop (67%), N95 mask and $CO_2$ rise (82%), N95 mask and $O_2$ drop (72%), N95 mask and headache (60%), respiratory impairment and temperature rise (88%), but also temperature rise and moisture (100%) under the masks. Extended mask-wearing by the general population could lead to relevant effects and consequences in many medical fields.

**Keywords:** personal protective equipment; masks; N95 face mask; surgical mask; risk; adverse effects; long-term adverse effects; contraindications; health risk assessment; hypercapnia; hypoxia; headache; dyspnea; physical exertion; MIES syndrome

## 1. Introduction

At the beginning of the spread of the novel pathogen SARS-CoV-2, it was necessary to make far-reaching decisions even without available explicit scientific data. The initial assumption was that the pandemic emergency measures were set in place to reduce the acute threat of the public health system effectively and swiftly.

In April 2020, the World Health Organization (WHO) recommended the use of masks only for symptomatic, ill individuals and health care workers and did not recommend its widespread use.

---

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

In June 2020, they changed this recommendation to endorse the general use of masks in, e.g., crowded places [1,2]. In a meta-analysis study commissioned by the WHO (evidence level Ia), no clear, scientifically graspable benefit of moderate or strong evidence was derived from wearing masks [3].

While maintaining a distance of at least one meter showed moderate evidence with regard to the spreading of SARS-CoV-2, only weak evidence at best could be found for masks alone in everyday use (non-medical setting) [3]. Another meta-analysis conducted in the same year confirmed the weak scientific evidence for masks [4].

Accordingly, the WHO did not recommend general or uncritical use of masks for the general population and expanded its risk and hazard list within just two months. While the April 2020 guideline highlighted the dangers of self-contamination, possible breathing difficulties and false sense of security, the June 2020 guideline found additional potential adverse effects such as headache, development of facial skin lesions, irritant dermatitis, acne or increased risk of contamination in public spaces due to improper mask disposal [1,2].

However, under pressure from increasing absolute numbers of positive SARS-CoV-2 tests, many prescribers further extended mask-wearing according to certain times and situations, always justified by the desire to limit the spread of the virus [5]. The media, numerous institutions and most of the population supported this approach.

Among the medical profession and scientists, the users and observers of medical devices, there have been simultaneous calls for a more nuanced approach [6–8]. While there has been a controversial scientific discussion worldwide about the benefits and risks of masks in public spaces, they became the new social appearance in everyday life in many countries at the same time.

Although there seems to be a consensus among the decision makers who have introduced mandatory masks that medical exemptions are warranted, it is ultimately the responsibility of individual clinicians to weigh up when to recommend exemption from mandatory masks. Physicians are in a conflict of interest concerning this matter. On the one hand, doctors have a leading role in supporting the authorities in the fight against a pandemic. On the other hand, doctors must, in accordance with the medical ethos, protect the interests, welfare and rights of their patient's third parties with the necessary care and in accordance with the recognized state of medical knowledge [9–11].

A careful risk–benefit analysis is becoming increasingly relevant for patients and their practitioners regarding the potential long-term effects of masks. The lack of knowledge of legal legitimacy on the one hand and of the medical scientific facts on the other is a reason for uncertainty among clinically active colleagues.

The aim of this paper is to provide a first, rapid, scientific presentation of the risks of general mandatory mask use by focusing on the possible adverse medical effects of masks, especially in certain diagnostic, patient and user groups.

## 2. Materials and Methods

The objective was to search for documented adverse effects and risks of different types of mouth–nose-covering masks. Of interest here were, on the one hand, readymade and self-manufactured fabric masks, including so-called community masks and, on the other hand medical, surgical and N95 masks (FFP2 masks).

Our approach of limiting the focus to negative effects seems surprising at first glance. However, such an approach helps to provide us with more information. This methodology is in line with the strategy of Villalonga-Olives and Kawachi, who also conducted a review exclusively on the negative effects [12].

For an analysis of the literature, we defined the risk of mouth–nose protection as the description of symptoms or the negative effects of masks. Reviews and expert presentations from which no measurable values could be extracted, but which clearly present the research situation and describe negative effects, also fulfill this criterion.

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

Additionally, we defined the quantifiable, negative effect of masks as the presentation of a measured, statistically significant change in a physiological parameter in a pathological direction ($p < 0.05$), a statistically significant detection of symptoms ($p < 0.05$) or the occurrence of symptoms in at least 50% of those examined in a sample ($n \geq 50\%$).

Up to and including 31 October 2020, we conducted a database search in PubMed/MEDLINE on scientific studies and publications on adverse effects and risks of different types of mouth–nose-covering masks according to the criteria mentioned above (see Figure 1: Review flowchart). Terms searched were "face masks", "surgical mask" and "N95" in combination with the terms "risk" and "adverse effects" as well as "side effects". The selection criteria of the papers were based on our above definition of risk and adverse effect of masks. Mainly English- and German-language publications of evidence levels I to III according to the recommendations of the Agency for Healthcare Research and Quality (AHQR) that were not older than 20 years at the time of the review were considered. The evaluation also excluded level IV evidence, such as case reports and irrelevant letters to the editor that exclusively reflect opinions without scientific evidence.



**Figure 1.** Scoping review flow diagram according to the PRISMA scheme.

After excluding 1113 papers that were irrelevant to the research question and did not meet the criteria mentioned (quantifiable, negative effects of masks, description of symptoms or the negative effects of masks), a total of 109 relevant publications were found for evaluation in the context of our scoping review (see Figure 1: Flow chart).

Sixty-five relevant publications concerning masks were considered being within the scope of the content-related evaluation. These included 14 reviews and 2 meta-analyses from the primary research. For the quantitative evaluation, 44 presentations of nega-

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

4 of 42

tive effects from the years 2004 to 2020 were eligible. Thirty-one of these studies were experimental (70%), and 13 studies were data collection studies in the sense of simple observational studies, especially in the dermatological field (30%). The observed study parameters and significant results from these 44 publications ($p < 0.05$ or $n \geq 50\%$) were compiled in an overall display (Figure 2). Based on this data, a correlation analysis of the observed mask effects was performed. This included a correlation calculation of the recorded symptoms and physiological changes (for nominally scaled, dichotomous variables according to Fisher using R, R Foundation for Statistical Computing, Vienna, Austria, version 4.0.2).



| significantly measured mask-induced changes in scientific studies 2004-2020: • = p<0.05 ■ = n≥50 % | Fabric Mask | Surgical Mask | N95-Mask | O₂↓ | CO₂↑ | Humidity↑ | Temperature↑ | Breathing Resistance↑ | Respiratory Rate↑ | Blood Pressure↑ | Cerebral Vasodilation | Heart Rate↑ | Respiratory impairment | Exhaustion & Fatigue | Drowsiness | Dizziness | Headache | Psycho-vegetative Effect | Decrease in Empathy | Itch | Skin Irritation | Acne | Rhinitis | Voice Disorder | False Sense of Security | Bacterial Contamination | Fungal Contamination | Viral Contamination |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beder 2008 | | X | | • | | | | | | | | • | | | | | | | | | | | | | | | | |
| Bharatendu 2020 | | | X | | • | | | | | | | • | | | | | • | | | | | | | | | | | |
| Butz 2005 | | X | | | • | | | | | | | | | | | | | | | | | | | | | | | |
| Chughtai 2019 | | X | | | | | | | | | | | | | | | | | | | | | | | | | | • |
| Epstein 2020 | | X | X | | • | | | | | | | | | | | | | | | | | | | | | | | |
| Fikenzer 2020 | | X | X | • | | • | • | | • | | | • | • | | | | | | | | • | | | | | | | |
| Foo 2006 | | X | | | | | | | | | | | | | | | | | | • | • | • | • | | | | | |
| Georgi 2020 | X | X | X | • | • | | | | | • | | • | • | | | | | | | | | | | | | | | |
| Goh 2019 | | X | X | | ■ | | | | | | | | | | | | | | | | | | | | | | | |
| Heider 2020 | | X | X | | | | | | | | | | | | | | | | | | | | | • | | | | |
| Hua 2020 | | X | X | | | • | | | | | | | | | | | | | | • | • | • | | | | | | |
| Jacobs 2009 | | X | | | | | | | | | | | | | | | • | | | | | | | | | | | |
| Jagim 2018 | X | | | | • | | | | | | | | | • | • | | | | | | | | | | | | | |
| Kao 2004 | | X | | • | | | | | | • | | | • | • | | | | | | | | | | | | | | |
| Klimek 2020 | | | | | | | | | | | | | | | | | | | | | | | • | | | | | |
| Kyung 2020 | | X | | • | • | | | | • | | | | • | • | | | | | | | • | • | | | | | | |
| Lan 2020 | | X | | | | | | | | | | | | | | | | | | | • | | | | | | | |
| Lee 2011 | | X | | | | | | • | | | | | | | | | | | | | | | | | | | | |
| Li 2005 | | X | X | | • | • | | • | | | • | | • | • | | | | | | | • | | | | | | | |
| Lim 2006 | | X | | | | | | | | | | | | | | | • | | | | | | | | | | | |
| Liu 2020 | X | X | X | • | | • | • | | | | | • | • | • | | • | | | | | | | | • | | | | |
| Luckman 2020 | X | X | X | | | | | | | | | | | | | | | | | | | | | | | • | | |
| Luksamijarulkul 2014 | X | | | | | | | | | | | | | | | | | | | | | | | | | • | • | • |
| Matusiak 2020 | X | X | X | | | • | • | | | | | | | • | | | | | | • | • | | • | | | | | |
| Mo 2020 | | X | | | • | | | | | | | | • | | | | | | | | | | | | | • | | |
| Monalisa 2017 | | X | | | | | | | | | | | | | | | | | | | | | | | | • | • | • |
| Ong 2020 | | | X | | | | | | | | | | | | | | • | | | | | | | | | | | |
| Person 2018 | | X | | | | | | | | | | | | • | | | | | | | | | | | | | | |
| Pifarre 2020 | | X | X | • | • | | | | | | | | | | | | | | | | | | | | | | | |
| Porcari 2016 | X | | | | • | | | | | | | | | | | | | | | | | | | | | | | |
| Prouse 2020 | X | X | X | | | | | | | | | | | | | | | • | | | | | | | | | | |
| Ramirez 2020 | | X | X | | | | | | | | | | | | | | • | | | | | | | | | | | |
| Rebmann 2013 | | X | X | • | | • | • | | | | | • | • | • | | | • | | | | | | | | | | | |
| Roberge 2012 | | X | | • | | • | • | | | | | | | | | | | | | | | | | | | | | |
| Roberge 2014 | | | X | | | • | • | | | | | | | | | | | | | | | | | | | | | |
| Rosner 2020 | | X | X | | | | | | | | | | | | | | • | | | | | | | | | • | • | |
| Scarano 2020 | | X | | | | • | • | | | | | | | • | | | | | | | | | | | | | | |
| Shenal 2012 | X | X | X | | | | | | | | | | | • | | | | | | | | | | | | | | |
| Smart 2020 | | X | X | | | | | • | | | | | | • | | | | | | | | | | | | | | |
| Szepietkowski 2020 | X | X | X | | | | | | | | | | | | | | | | | | | | | • | | | | |
| Techasatian 2020 | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | • | |
| Tong 2015 | | | X | • | • | • | | | | | | | | | | | | | | | | | | | | | | |
| Wong 2013 | | X | | | | | | | | | | | | | | | | | | | | | | • | | | | |
| Zhiqing 2018 | | X | | | | | | | | | | | | | | | | | | | | | | | | | • | |

**Figure 2.** Overview including all 44 considered studies with quantified, significant adverse effects of masks (black dots and black rectangles). Not all studies examined each mentioned parameter, as focused or subject-related questions were often in the foreground. Gray fields correspond to a lack of coverage in the primary studies, white fields represent measured effects. We found an often combination of significant chemical, physical, physiological parameters and complaints. Drowsiness summarizes the symptom for any qualitative neurological deficits described in the scientific literature examined.

In addition, another 64 publications with a neighboring range of topics were consulted in connection with the mask effects we found. These included declarations, guidelines

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

and legal principles. In order to expand the amount of data for the discussion, we proceeded according to the "snowball principle" by locating citations of selected papers in the bibliographies and including them where appropriate.

Since the findings from the topics presented for discussion were to an unexpected degree subject-related, we decided to divide the results according to the fields of medicine. Of course, there are overlaps between the respective fields, which we point out in detail.

## 3. Results

A total of 65 scientific papers on masks qualified for a purely content-based evaluation. These included 14 reviews and two meta-analyses.

Of the mathematically evaluable, groundbreaking 44 papers with significant negative mask effects ($p < 0.05$ or $n \geq 50\%$), 22 were published in 2020 (50%), and 22 were published before the COVID-19 pandemic. Of these 44 publications, 31 (70%) were of experimental nature, and the remainder were observational studies (30%). Most of the publications in question were English (98%). Thirty papers referred to surgical masks (68%), 30 publications related to N95 masks (68%), and only 10 studies pertained to fabric masks (23%).

Despite the differences between the primary studies, we were able to demonstrate a statistically significant correlation in the quantitative analysis between the negative side effects of blood-oxygen depletion and fatigue in mask wearers with $p = 0.0454$.

In addition, we found a mathematically grouped common appearance of statistically significant confirmed effects of masks in the primary studies ($p < 0.05$ and $n \geq 50\%$) as shown in Figure 2. In nine of the 11 scientific papers (82%), we found a combined onset of N95 respiratory protection and carbon dioxide rise when wearing a mask. We found a similar result for the decrease in oxygen saturation and respiratory impairment with synchronous evidence in six of the nine relevant studies (67%). N95 masks were associated with headaches in six of the 10 studies (60%). For oxygen deprivation under N95 respiratory protectors, we found a common occurrence in eight of 11 primary studies (72%). Skin temperature rise under masks was associated with fatigue in 50% (three out of six primary studies). The dual occurrence of the physical parameter temperature rise and respiratory impairment was found in seven of the eight studies (88%). A combined occurrence of the physical parameters temperature rise and humidity/moisture under the mask was found in 100% within six of six studies, with significant readings of these parameters (Figure 2).

The literature review confirms that relevant, undesired medical, organ and organ system-related phenomena accompanied by wearing masks occur in the fields of internal medicine (at least 11 publications, Section 3.2). The list covers neurology (seven publications, Section 3.3), psychology (more than 10 publications, Section 3.4), psychiatry (three publications, Section 3.5), gynecology (three publications, Section 3.6), dermatology (at least 10 publications, Section 3.7), ENT medicine (four publications, Section 3.8), dentistry (one publication, Section 3.8), sports medicine (four publications, Section 3.9), sociology (more than five publications, Section 3.10), occupational medicine (more than 14 publications, Section 3.11), microbiology (at least four publications, Section 3.12), epidemiology (more than 16 publications, Section 3.13), and pediatrics (four publications, Section 3.14) as well as environmental medicine (four publications, Section 3.15).

We will present the general physiological effects as a basis for all disciplines. This will be followed by a description of the results from the different medical fields of expertise and closing off with pediatrics the final paragraph.

### 3.1. General Physiological and Pathophysiological Effects for the Wearer

As early as 2005, an experimental dissertation (randomized crossover study) demonstrated that wearing surgical masks in healthy medical personnel (15 subjects, 18–40 years old) leads to measurable physical effects with elevated transcutaneous carbon dioxide values after 30 min [13]. The role of dead space volume and $CO_2$ retention as a cause of the significant change ($p < 0.05$) in blood gases on the way to hypercapnia, which was still

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

6 of 42

within the limits, was discussed in this article. Masks expand the natural dead space (nose, throat, trachea, bronchi) outwards and beyond the mouth and nose.

An experimental increase in the dead space volume during breathing increases carbon dioxide ($CO_2$) retention at rest and under exertion and correspondingly the carbon dioxide partial pressure $pCO_2$ in the blood ($p < 0.05$) [14].

As well as addressing the increased rebreathing of carbon dioxide ($CO_2$) due to the dead space, scientists also debate the influence of the increased breathing resistance when using masks [15–17].

According to the scientific data, mask wearers as a whole show a striking frequency of typical, measurable, physiological changes associated with masks.

In a recent intervention study conducted on eight subjects, measurements of the gas content for oxygen (measured in $O_2$ Vol%) and carbon dioxide (measured in $CO_2$ ppm) in the air under a mask showed a lower oxygen availability even at rest than without a mask. A Multi-Rae gas analyzer was used for the measurements (RaeSystems®) (Sunnyvale, California CA, United States). At the time of the study, the device was the most advanced portable multivariant real-time gas analyzer. It is also used in rescue medicine and operational emergencies. The absolute concentration of oxygen ($O_2$ Vol%) in the air under the masks was significantly lower (minus 12.4 Vol% $O_2$ in absolute terms, statistically significant with $p < 0.001$) at 18.3% compared to 20.9% room air concentration. Simultaneously, a health-critical value of carbon dioxide concentration ($CO_2$ Vol%) increased by a factor of 30 compared to normal room air was measured (ppm with mask versus 464 ppm without mask, statistically significant with $p < 0.001$) [18].

These phenomena are responsible for a statistically significant increase in carbon dioxide ($CO_2$) blood content in mask wearers [19,20], on the one hand, measured transcutaneously via an increased $PtcCO_2$ value [15,17,19,21,22], on the other hand, via end-expiratory partial pressure of carbon dioxide ($PETCO_2$) [23,24] or, respectively, the arterial partial pressure of carbon dioxide ($PaCO_2$) [25].

In addition to the increase in the wearer's blood carbon dioxide ($CO_2$) levels ($p < 0.05$) [13,15,17,19,21–28], another consequence of masks that has often been experimentally proven is a statistically significant drop in blood oxygen saturation ($SpO_2$) ($p < 0.05$) [18,19,21,23,29–34]. A drop in blood oxygen partial pressure ($PaO_2$) with the effect of an accompanying increase in heart rate ($p < 0.05$) [15,23,29,30,34] as well as an increase in respiratory rate ($p < 0.05$) [15,21,23,35,36] have been proven.

A statistically significant measurable increase in pulse rate ($p < 0.05$) and decrease in oxygen saturation $SpO_2$ after the first ($p < 0.01$) and second hour ($p < 0.0001$) under a disposable mask (surgical mask) were reported by researchers in a mask intervention study they conducted on 53 employed neurosurgeons [30].

In another experimental study (comparative study), surgical and N95 masks caused a significant increase in heart rate ($p < 0.01$) as well as a corresponding feeling of exhaustion ($p < 0.05$). These symptoms were accompanied by a sensation of heat ($p < 0.0001$) and itching ($p < 0.01$) due to moisture penetration of the masks ($p < 0.0001$) in 10 healthy volunteers of both sexes after only 90 min of physical activity [35]. Moisture penetration was determined via sensors by evaluating logs (SCXI-1461, National Instruments, Austin, TX, USA).

These phenomena were reproduced in another experiment on 20 healthy subjects wearing surgical masks. The masked subjects showed statistically significant increases in heart rate ($p < 0.001$) and respiratory rate ($p < 0.02$) accompanied by a significant measurable increase in transcutaneous carbon dioxide $PtcCO_2$ ($p < 0.0006$). They also complained of breathing difficulties during the exercise [15].

The increased rebreathing of carbon dioxide ($CO_2$) from the enlarged dead space volume in mask wearers can reflectively trigger increased respiratory activity with increased muscular work as well as the resulting additional oxygen demand and oxygen consumption [17]. This is a reaction to pathological changes in the sense of an adaptation effect. A mask-induced drop in blood oxygen saturation value ($SpO_2$) [30] or the blood

Case 6:21-cv-01008-PGB-DCI   Document 1-2   Filed 06/14/21   Page 111 of 155 PageID 270

oxygen partial pressure (PaO$_2$) [34] can in turn additionally intensify subjective chest complaints [25,34].

The documented mask-induced changes in blood gases towards hypercapnia (increased carbon dioxide/CO$_2$ blood levels) and hypoxia (decreased oxygen/O$_2$ blood levels) may result in additional nonphysical effects such as confusion, decreased thinking ability and disorientation [23,36–39], including overall impaired cognitive abilities and decrease in psychomotoric abilities [19,32,38–41]. This highlights the importance of changes in blood gas parameters (O$_2$ and CO$_2$) as a cause of clinically relevant psychological and neurological effects. The above parameters and effects (oxygen saturation, carbon dioxide content, cognitive abilities) were measured in a study on saturation sensors (Semi-Tec AG, Therwil, Switzerland), using a Borg Rating Scale, Frank Scale, Roberge Respirator Comfort Scale and Roberge Subjective Symptoms-during-Work Scale, as well as with a Likert scale [19]. In the other main study, conventional ECG, capnography and symptom questionnaires were used in measuring carbon dioxide levels, pulse and cognitive abilities [23]. Other physiological data collection was done with pulse oximeters (Allegiance, MCGaw, USA), subjective complaints were assessed with a 5-point Likert scale and motoric speed was recorded with linear-position transducers (Tendo-Fitrodyne, Sport Machins, Trencin, Slovakia) [32]. Some researchers used standardized, anonymized questionnaires to collect data on subjective complaints associated with masks [37].

In an experimental setting with different mask types (community, surgical, N95) a significant increase in heart rate ($p < 0.04$), a decrease in oxygen saturation SpO$_2$ ($p < 0.05$) with an increase in skin temperature under the mask (face) and difficulty of breathing ($p < 0.002$) were recorded in 12 healthy young subjects (students). In addition, the investigators observed dizziness ($p < 0.03$), listlessness ($p < 0.05$), impaired thinking ($p < 0.03$) and concentration problems ($p < 0.02$), which were also statistically significant when wearing masks [29].

According to other researchers and their publications, masks also interfere with temperature regulation, impair the field of vision and of non-verbal and verbal communication [15,17,19,36,37,42–45].

The above-mentioned measurable and qualitative physiological effects of masks can have implications in various areas of expertise in medicine.

It is known from pathology that not only supra-threshold stimuli exceeding normal limits have disease-relevant consequences. Subthreshold stimuli are also capable of causing pathological changes if the exposure time is long enough. Examples occur from the slightest air pollution by hydrogen sulfide resulting in respiratory problems (throat irritation, coughing, reduced absorption of oxygen) and neurological diseases (headaches, dizziness) [46]. Furthermore, subthreshold but prolonged exposure to nitrogen oxides and particulate matter is associated with an increased risk of asthma, hospitalization and higher overall mortality [47,48]. Low concentrations of pesticides are also associated with disease-relevant consequences for humans such as mutations, development of cancer and neurological disorders [49]. Likewise, the chronic subthreshold intake of arsenic is associated with an increased risk of cancer [50], subthreshold intake of cadmium with the promotion of heart failure [51], subthreshold intake of lead is associated with hypertension, renal metabolic disorders and cognitive impairment [52] or subthreshold intake of mercury with immune deficiency and neurological disorders [53]. Subliminal UV radiation exposure over long periods is also known to cause mutation-promoting carcinogenic effects (especially white skin cancer) [54].

The mask-induced adverse changes are relatively minor at first glance, but repeated exposure over longer periods in accordance with the above-mentioned pathogenetic principle is relevant. Long-term disease-relevant consequences of masks are to be expected. Insofar, the statistically significant results found in the studies with mathematically tangible differences between mask wearers and people without masks are clinically relevant. They give an indication that with correspondingly repeated and prolonged exposure to physical, chemical, biological, physiological and psychological conditions, some of which are

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

subliminal, but which are significantly shifted towards pathological areas, health-reducing changes and clinical pictures can develop such as high blood pressure and arteriosclerosis, including coronary heart disease (metabolic syndrome) as well as neurological diseases. For small increases in carbon dioxide in the inhaled air, this disease-promoting effect has been proven with the creation of headaches, irritation of the respiratory tract up to asthma as well as an increase in blood pressure and heart rate with vascular damage and, finally, neuropathological and cardiovascular consequences [38]. Even slightly but persistently increased heart rates encourage oxidative stress with endothelial dysfunction, via increased inflammatory messengers, and finally, the stimulation of arteriosclerosis of the blood vessels has been proven [55]. A similar effect with the stimulation of high blood pressure, cardiac dysfunction and damage to blood vessels supplying the brain is suggested for slightly increased breathing rates over long periods [56,57]. Masks are responsible for the aforementioned physiological changes with rises in inhaled carbon dioxide [18–28], small sustained increases in heart rate [15,23,29,30,35] and mild but sustained increases in respiratory rates [15,21,23,34,36].

For a better understanding of the side effects and dangers of masks presented in this literature review, it is possible to refer to well-known principles of respiratory physiology (Figure 3).

The average dead space volume during breathing in adults is approximately 150–180 mL and is significantly increased when wearing a mask covering the mouth and nose [58]. With an N95 mask, for example, the dead space volume of approximately 98–168 mL was determined in an experimental study [59]. This corresponds to a mask-related dead space increase of approximately 65 to 112% for adults and, thus, almost a doubling. At a respiratory rate of 12 per minute, the pendulum volume respiration with such a mask would, thus, be at least 2.9–3.8 L per minute. Therefore, the dead space amassed by the mask causes a relative reduction in the gas exchange volume available to the lungs per breath by 37% [60]. This largely explains the impairment of respiratory physiology reported in our work and the resulting side effects of all types of masks in everyday use in healthy and sick people (increase in respiratory rate, increase in heart rate, decrease in oxygen saturation, increase in carbon dioxide partial pressure, fatigue, headaches, dizziness, impaired thinking, etc.) [36,58].

In addition to the effect of increased dead space volume breathing, however, mask-related breathing resistance is also of exceptional importance (Figure 3) [23,36].

Experiments show an increase in airway resistance by a remarkable 126% on inhalation and 122% on exhalation with an N95 mask [60]. Experimental studies have also shown that moisturization of the mask (N95) increases the breathing resistance by a further 3% [61] and can, thus, increase the airway resistance up to 2.3 times the normal value.

This clearly shows the importance of the airway resistance of a mask. Here, the mask acts as a disturbance factor in breathing and makes the observed compensatory reactions with an increase in breathing frequency and simultaneous feeling of breathlessness plausible (increased work of the respiratory muscles). This extra strain due to the amplified work of breathing against bigger resistance caused by the masks also leads to intensified exhaustion with a rise in heart rate and increased $CO_2$ production. Fittingly, in our review of the studies on side effects of masks (Figure 2), we also found a percentage clustering of significant respiratory impairment and a significant drop in oxygen saturation (in about 75% of all study results).

In the evaluation of the primary papers, we also determined a statically significant correlation of the drop in oxygen saturation ($SpO_2$) and fatigue with a common occurrence in 58% of the mask use studies with significant results (Figure 2, $p < 0.05$).

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344



**Figure 3.** Pathophysiology of the mask (important physical and chemical effects): Illustration of the breathing resistance* and of the dead space volume of an N95 mask in an adult. When breathing, there is an overall significantly reduced possible gas exchange volume of the lungs of minus 37% caused by the mask (Lee 2011) [60] according to a decrease in breathing depth and volume due to the greater breathing resistance of plus128%* (exertion when inhaling greater than when exhaling) and due to the increased dead space volume of plus80%**, which does not participate directly in the gas exchange and is being only partially mixed with the environment. (* = averaged inspiration and expiration according to Lee 2011 [60] including moisture penetration according to Roberge 2010 [61], ** = averaged values according to Xu 2015 [59]).

### 3.2. Internistic Side Effects and Dangers

As early as 2012, an experiment showed that walking in the 20 masked subjects compared to the identical activity without masks significantly increased heart rates (average +9.4 beats per minute, $p < 0.001$) and breathing rates ($p < 0.02$). These physiological changes were accompanied by transcutaneous significantly measurable increased transcutaneous carbon dioxide (PtcCO$_2$) levels ($p < 0.0006$) as well as respiratory difficulties in the mask wearers compared to the control group [15].

In a recent experimental comparative study from 2020, 12 healthy volunteers under surgical masks as well as under N95 masks experienced measurable impairments in the measured lung function parameters as well as cardiopulmonary capacity (lower maximum blood lactate response) during moderate to heavy physical exertion compared to exertion without masks ($p < 0.001$) [31]. The mask-induced increased airway resistance led to increased respiratory work with increased oxygen consumption and demand, both of the respiratory muscles and the heart. Breathing was significantly impeded ($p < 0.001$) and participants reported mild pain. The scientists concluded from their results that the cardiac compensation of the pulmonary, mask-induced restrictions, which still functioned in healthy people, was probably no longer possible in patients with reduced cardiac output [31].

In another recent study, researchers tested fabric masks (community masks), surgical masks and FFP2/N95 masks in 26 healthy people during exercise on a cycle ergometer. All

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

masks also showed a measurable carbon dioxide ($CO_2$) retention ($PtcCO_2$) (statistically significant with $p < 0.001$) and, for N95 masks, a decrease in the oxygen saturation value $SpO_2$ (statistically significant at 75 and 100 W with $p < 0.02$ and $p < 0.005$, respectively). The clinical relevance of these changes was shown in an increase in breathing frequency with fabric masks ($p < 0.04$) as well as in the occurrence of the previously described mask-specific complaints such as a feeling of heat, shortness of breath and headaches. The stress perception was recorded on a Borg scale from 1 to 20. During physical exertion under an N95 mask, the group with masks showed a significant increase in the feeling of exhaustion compared to the group without with 14.6 versus 11.9 on the scale of 20. During the exposure, 14 of the 24 subjects wearing masks complained of shortness of breath (58%), four of headaches and two of a feeling of heat. Most of the complaints concerned FFP2 masks (72%) [21].

The aforementioned physiological and subjective physical effects of masks on healthy people at rest and under exertion [21,31] give an indication of the effect of masks on sick and elderly people even without exertion.

In an observational study of ten 20 to 50 year-old nurses wearing N95 masks during their shift work, side effects such as breathing difficulties ("I can't breathe"), feelings of exhaustion, headache ($p < 0.001$), drowsiness ($p < 0.001$) and a decrease in oxygen saturation $SpO_2$ ($p < 0.05$) as well as an increase in heart rate ($p < 0.001$) were statistically significant in association with an increase in obesity (BMI) [19]. The occurrence of symptoms under masks was also associated with older age (statistically significant correlation of fatigue and drowsiness with $p < 0.01$ each, nausea with $p < 0.05$, an increase in blood pressure with $p < 0.01$, headache with $p < 0.05$, breathing difficulties with $p < 0.001$) [19].

In an intervention study involving 97 patients with advanced chronic obstructive pulmonary disease (COPD) the respiratory rate, oxygen saturation and exhaled carbon dioxide equivalents (capnometry) changed unfavorably and significantly after the use of N95 masks (FFP2 equivalent) with an initial 10-minute rest and subsequent 6-minute walking. Seven patients discontinued the experiment due to serious complaints with a decrease in the oxygen saturation value $SpO_2$ and a pathological carbon dioxide ($CO_2$) retention as well as increased end-expiratory partial pressure of carbon dioxide ($PETCO_2$) [23]. In two patients, the $PETCO_2$ exceeded the normal limits and reached values of >50 mmHg. An FEV1 < 30% and a modified Medical Research Council (mMRC) Dyspnea Scale Score of ≥3, both indicators of advanced COPD, correlated with mask intolerance overall in this study. The most common symptom under mask was breathlessness at 86%. In the dropouts of the study, dizziness (57%) and headaches were also often recorded. In the mask-tolerant COPD patients, significant increases in heart rate, respiratory rate and end-expiratory carbon dioxide partial pressure $PETCO_2$ could be objectified even at rest, after only 10 min of mask-wearing ($p < 0.001$), accompanied by a decrease in oxygen saturation $SpO_2$ ($p < 0.001$) [23]. The results of this study with an evidence level IIa are indicative for COPD mask wearers.

In another retrospective comparative study on COPD and surgical masks, examiners were able to demonstrate statistically an increase in arterial partial pressure of carbon dioxide ($PaCO_2$) of approximately +8 mmHg ($p < 0.005$) and a concomitant mask-related increase in systolic blood pressure of +11 mmHg ($p < 0.02$) [25]. This increase is relevant in hypertensive patients, but also in healthy people with borderline blood pressure values as pathological value range triggered by mask-wearing can be induced.

In 39 hemodialysis patients with end-stage renal disease, a type N95 mask (FFP2 equivalent) caused a significant drop in blood oxygen partial pressure ($PaO_2$) in 70% of patients at rest (on hemodialysis) within only 4 h ($p = 0.006$). Despite a compensatory increased respiratory rate ($p < 0.001$), malaise with chest pain occurred ($p < 0.001$) and even resulted in hypoxemia (drop in oxygen below the normal limit) in 19% of the subjects [34]. The researchers concluded from their findings that elderly or patients with reduced cardiopulmonary function have a higher risk of developing a severe respiratory failure while wearing a mask [34].

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

11 of 42

In a review paper on the risks and benefits of masks worn during the COVID-19 crisis, other authors provide an equally critical assessment of mandatory mask use for patients with pneumonia, both with and without COVID-19 pneumonia disease [16].

### 3.3. Neurological Side Effects and Dangers

In a scientific evaluation of syncope in the operating theatre, 36 of 77 affected persons (47%) were associated with wearing a mask [62]. However, other factors could not be ruled out as contributory causes.

In their level III evidence review, neurologists from Israel, the UK and the USA state that a mask is unsuitable for epileptics because it can trigger hyperventilation [63]. The use of a mask significantly increases the respiratory rate by about plus 15 to 20% [15,21,23,34,64]. However, an increase in breathing frequency leading to hyperventilation is known to be used for provocation in the diagnosis of epilepsy and causes seizure-equivalent EEG changes in 80% of patients with generalized epilepsy and in up to 28% of focal epileptics [65].

Physicians from New York studied the effects of wearing masks of the surgical-type mask and N95 among medical personnel in a sample of 343 participants (surveyed using standardized, anonymized questionnaires). Wearing the masks caused detectable physical adverse effects such as impaired cognition (24% of wearers) and headaches in 71.4% of the participants. Of these, 28% persisted and required medication. Headache occurred in 15.2% under 1 h of wear, in 30.6% after 1 h of wear and in 29.7% after 3 h of wear. Thus, the effect intensified with increasing wearing time [37].

Confusion, disorientation and even drowsiness (Likert scale questionnaire) and reduced motoric abilities (measured with a linear position transducer) with reduced reactivity and overall impaired performance (measured with the Roberge Subjective Symptoms-during-Work Scale) as a result of mask use have also been documented in other studies [19,23,29,32,36,37].

The scientists explain these neurological impairments with a mask-induced latent drop in blood gas oxygen levels $O_2$ (towards hypoxia) or a latent increase in blood gas carbon dioxide levels $CO_2$ (towards hypercapnia) [36]. In view of the scientific data, this connection also appears to be indisputable [38–41].

In a mask experiment from 2020, significant impaired thinking ($p < 0.03$) and impaired concentration ($p < 0.02$) were found for all mask types used (fabric, surgical and N95 masks) after only 100 min of wearing the mask [29]. The thought disorders correlated significantly with a drop in oxygen saturation ($p < 0.001$) during mask use.

Initial headaches ($p < 0.05$) were experienced by up to 82% of 158, 21–35 year-old mask wearers in another study of N95 respiratory protection with one third (34%) experiencing headaches up to four times daily. Participants wore the mask for 18.3 days over a 30-day period with a mean of 5.9 h per day [66].

Significantly increased headache ($p < 0.05$) could be observed not only for N95 but also for surgical masks in participants of another observational study of health care workers [67].

In another study, the researchers classified 306 users with an average age of 43 years and wearing different types of masks, of whom 51% had an initial headache as a specific symptom related exclusively to increased surgical and N95 mask use (1 to 4 h, $p = 0.008$) [68].

Researchers from Singapore were able to demonstrate in a trial involving 154 healthy N95 health service mask wearers that a significant increase in mask-induced blood carbon dioxide levels (measured by end-expiratory partial pressure of carbon dioxide $PETCO_2$) and a measurably greater vasodilatation with an increase in cerebral artery flow in the cerebri media resulted. This was associated with headaches in the trial group ($p < 0.001$) [27].

According to the researchers, the aforementioned changes also contribute to headaches during the prolonged use of masks with a shift towards hypoxia and hypercapnia. Furthermore, stress and mechanical factors such as the irritation of cervical nerves in the neck and head area caused by the tight mask straps pressuring the nerve strands also contribute to headaches [66].

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

In the analysis of the primary studies, we were able to detect an association between the N95 mask and headaches. In six out of 10 studies, the significant headache appeared in conjunction with the N95 mask (60% of all studies, Figure 2).

### 3.4. Psychological Side Effects and Dangers

According to an experimental study, wearing surgical masks and N95 masks can also lead to a reduced quality of life owing to reduced cardiopulmonary capacity [31]. Masks, along with causing physiological changes and discomfort with progressive length of use, can also lead to significant discomfort ($p < 0.03$ to $p < 0.0001$) and a feeling of exhaustion ($p < 0.05$ to 0.0001) [69].

Besides the shift in blood gases towards hypercapnia (increase in $CO_2$) and hypoxia (decrease in $O_2$), detailed under general physiological effects (Section 3.1), masks also restrict the cognitive abilities of the individual (measured using a Likert scale survey) accompanied by a decline in psycho-motoric abilities and consequently a reduced responsiveness (measured using a linear position transducer) as well as an overall reduced performance capability (measured with the Roberge Subjective Symptoms-during-Work Scale) [29,32,38,39,41].

The mask also causes an impaired field of vision (especially affecting the ground and obstacles on the ground) and also presents an inhibition to habitual actions such as eating, drinking, touching, scratching and cleaning the otherwise uncovered part of the face, which is consciously and subconsciously perceived as a permanent disturbance, obstruction and restriction [36]. Wearing masks, thus, entails a feeling of deprivation of freedom and loss of autonomy and self-determination, which can lead to suppressed anger and subconscious constant distraction, especially as the wearing of masks is mostly dictated and ordered by others [70,71]. These perceived interferences of integrity, self-determination and autonomy, coupled with discomfort, often contribute to substantial distraction and may ultimately be combined with the physiologically mask-related decline in psycho-motoric abilities, reduced responsiveness and an overall impaired cognitive performance. It leads to misjudging situations as well as delayed, incorrect and inappropriate behavior and a decline in the effectiveness of the mask wearer [36,37,39–41].

The use of masks for several hours often causes further detectable adverse effects such as headaches, local acne, mask-associated skin irritation, itching, sensations of heat and dampness, impairments and discomfort predominantly affecting the head and face [19,29,35–37,71–73]. However, the head and face are significant for well-being due to their large representation in the sensitive cerebral cortex (homunculus) [36].

According to a questionnaire survey, masks also frequently cause anxiety and psycho-vegetative stress reactions in children—as well as in adults—with an increase in psycho-somatic and stress-related illnesses and depressive self-experience, reduced participation, social withdrawal and lowered health-related self-care [74]. Over 50% of the mask wearers studied had at least mild depressive feelings [74]. Additional fear-inducing and often exaggerated media coverage can further intensify this. A recent retrospective analysis of the general media in the context of the 2014 Ebola epidemic showed a scientific truth content of only 38% of all publicly published information [75]. Researchers classified a total of 28% of the information as provocative and polarizing and 42% as exaggerating risks. In addition, 72% of the media content aimed to stir up health-related negative feelings. The feeling of fear, combined with insecurity and the primal human need to belong [76], causes a social dynamic that seems partly unfounded from a medical and scientific point of view.

The mask, which originally served purely hygienic purpose, has been transformed into a symbol of conformity and pseudo-solidarity. The WHO, for example, lists the advantages of the use of masks by healthy people in public to include a potentially reduced stigmatization of mask wearers, a sense of contribution to preventing the spread of the virus and a reminder to comply with other measures [2].

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

### 3.5. Psychiatric Side Effects and Dangers

As explained earlier, masks can cause increased rebreathing with an accumulation of carbon dioxide in the wearer due to increased dead space volume [16–18,20] (Figure 3), with often statistically significant measurable elevated blood carbon dioxide (CO2) levels in sufferers [13,15,17,19–28] (Figure 2). However, changes that lead to hypercapnia are known to trigger panic attacks [77,78]. This makes the significantly measurable increase in $CO_2$ caused by wearing a mask clinically relevant.

Interestingly, breath provocation tests by inhaling $CO_2$ are used to differentiate anxiety states in panic disorders and premenstrual dysphoria from other psychiatric clinical pictures. Here, absolute concentrations of 5% $CO_2$ already suffice to trigger panic reactions within 15–16 min [77]. The normal exhaled air content of $CO_2$ is about 4%.

It is obvious from experimental studies on masked subjects that concentration changes in the respiratory gases in the above-mentioned range with values above 4% could occur during rebreathing with prolonged mask use [18,23].

The activation of the locus coeruleus by $CO_2$ is used to generate panic reactions via respiratory gases [78,79]. This is because the locus coeruleus is an important part of the system of vegetative noradrenergic neurons, a control center in the brainstem, which reacts to an appropriate stimulus and changes in the gas concentrations in the blood by releasing the stress hormone noradrenaline [78].

From the physiological, neurological and psychological side effects and dangers described above (Sections 3.1, 3.3 and 3.4), additional problems can be derived for the use of masks in psychiatric cases. People undergoing treatment for dementia, paranoid schizophrenia, personality disorders with anxiety and panic attacks, but also panic disorders with claustrophobic components, are difficult to reconcile with a mask requirement, because even small increases in $CO_2$ can cause and intensify panic attacks [44,77–79].

According to a psychiatric study, patients with moderate to severe dementia have no understanding of COVID-19 protection measures and have to be persuaded to wear masks constantly [80].

According to a comparative study, patients with schizophrenia have a lower acceptance of mask-wearing (54.9% agreement) than ordinary practice patients (61.6%) [81]. The extent to which mask-wearing can lead to an exacerbation of schizophrenia symptoms has not yet been researched in detail.

When wearing masks, confusion, impaired thinking, disorientation (standardized recording via special rating and Likert scales, $p < 0.05$) and in some cases a decrease in maximum speed and reaction time (measured with the linear-position transducer, $p < 0.05$) were observed [19,32,36,38–41]. Psychotropic drugs reduce psycho-motoric functions in psychiatric patients. This can become clinically relevant especially with regard to the further reduced ability to react and the additional increased susceptibility to accidents of such patients when wearing masks.

In order to avoid an unintentional $CO_2$-triggered anesthesia [39], fixed and medically sedated patients, without the possibility of continuous monitoring, should not be masked according to the criteria of the Centers for Disease Control and Prevention, USA (CDC). This is because of the possible $CO_2$ retention described above, as there is a risk of unconsciousness, aspiration and asphyxia [16,17,20,38,82,83].

### 3.6. Gynaecological Side Effects and Dangers

As a critical variable, a low blood carbon dioxide level in pregnant women is maintained via an increased respiratory minute volume, stimulated by progesterone [22]. For a pregnant woman and her unborn child, there is a metabolic need for a fetal–maternal carbon dioxide (CO2) gradient. The mother's blood carbon dioxide level should always be lower than that of the unborn child in order to ensure the diffusion of $CO_2$ from the fetal blood into the maternal circulation via the placenta.

Therefore, mask-related phenomena described above (Sections 3.1 and 3.2), such as the measurable changes in respiratory physiology with increased breathing resistance,

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

14 of 42

increased dead space volume (Figure 3) and the retention of exhaled carbon dioxide ($CO_2$) are of importance. If $CO_2$ is increasingly rebreathed under masks, this manifestation could, even with subliminal carbon dioxide increases, act as a disturbing variable of the fetal–maternal $CO_2$ gradient increasing over time of exposure and, thus, develop clinical relevance, also with regard to a reduced compensation reserve of the expectant mothers [20,22,28].

In a comparative study, 22 pregnant women wearing N95 masks during 20 min of exercise showed significantly higher percutaneous $CO_2$ values, with average $PtcCO_2$ values of 33.3 mmHg compared to 31.3 mmHg than in 22 pregnant women without masks ($p = 0.04$) [22]. The heat sensation of the expectant mothers was also significantly increased with masks, with $p < 0.001$ [22].

Accordingly, in another intervention study, researchers demonstrated that breathing through an N95 mask (FFP2 equivalent) impeded gas exchange in 20 pregnant women at rest and during exercise, causing additional stress on their metabolic system [28]. Thus, under an N95 mask, 20 pregnant women showed a decrease in oxygen uptake capacity $VO_2$ of about 14% (statistically significant, $p = 0.013$) and a decrease in carbon dioxide output capacity $VCO_2$ of about 18% (statistically significant, $p = 0.001$). Corresponding significant changes in exhaled oxygen and carbon dioxide equivalents were also documented with increases in exhaled carbon dioxide ($FeCO_2$) ($p < 0.001$) and decreases in exhaled oxygen ($FeO_2$) ($p < 0.001$), which were explained by an altered metabolism due to respiratory mask obstruction [28].

In experiments with predominantly short mask application times, neither the mothers nor the fetuses showed statistically significant increases in heart rates or changes in respiratory rates and oxygen saturation values. However, the exact effects of prolonged mask use in pregnant women remain unclear overall. Therefore, in pregnant women, extended use of surgical and N95 masks is viewed critically [20].

In addition, it is unclear whether the substances contained in industrially manufactured masks that can be inhaled over longer periods of time (e.g., formaldehyde as an ingredient of the textile and thiram as an ingredient of the ear bands) are teratogenic [20,84].

### 3.7. Dermatological Side Effects and Dangers

Unlike garments worn over closed skin, masks cover body areas close to the mouth and nose, i.e., body parts that are involved in respiration.

Inevitably, this leads not only to a measurable temperature rise [15,44,85], but also to a severe increase in humidity due to condensation of the exhaled air, which in turn changes the natural skin milieu considerably of perioral and perinasal areas [36,61,82]. It also increases the redness, pH-value, fluid loss through the skin epithelium, increased hydration and sebum production measurably [73]. Preexisting skin diseases are not only perpetuated by these changes, but also exacerbated. In general, the skin becomes more susceptible to infections and acne.

The authors of an experimental study were able to prove a disturbed barrier function of the skin after only 4 h of wearing a mask in 20 healthy volunteers, both for surgical masks and for N95 masks [73]. In addition, germs (bacteria, fungi and viruses) accumulate on the outside and inside of the masks due to the warm and moist environment [86–89]. They can cause clinically relevant fungal, bacterial or viral infections. The unusual increase in the detection of rhinoviruses in the sentinel studies of the German Robert Koch Institute (RKI) from 2020 [90] could be another indication of this phenomenon.

In addition, a region of the skin that is not evolutionarily adapted to such stimuli is subjected to increased mechanical stress. All in all, the above-mentioned facts cause the unfavorable dermatological effects with mask related adverse skin reactions like acne, rashes on the face and itch symptoms [91].

A Chinese research group reported skin irritation and itching when using N95 masks among 542 test participants and also a correlation between the skin damage that occurred and the time of exposure (68.9% at ≤6 h/day and 81.7% at >6 h/day) [92].

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

A New York study evaluated in a random sample of 343 participants the effects of frequent wearing of surgical mask type and N95 masks among healthcare workers during the COVID-19 pandemic. Wearing the masks caused headache in 71.4% of participants, in addition to drowsiness in 23.6%, detectable skin damage in 51% and acne in 53% of mask users [37].

On the one hand, direct mechanical skin lesions occur on the nose and cheekbones due to shear force, especially when masks are frequently put on and taken off [37,92].

On the other hand, masks create an unnaturally moist and warm local skin environment [29,36,82]. In fact, scientists were able to demonstrate a significant increase in humidity and temperature in the covered facial area in another study in which the test individuals wore masks for one hour [85]. The relative humidity under the masks was measured with a sensor (Atmo-Tube, San Francisco, CA, USA). The sensation of humidity and temperature in the facial area is more crucial for well-being than other body regions [36,44]. This can increase discomfort under the masks. In addition, the increase in temperature favors bacterial optimization.

The pressure of the masks also causes an obstruction of the flow physiology of lymph and blood vessels in the face, with the consequence of increased disturbance of skin function [73] and ultimately also contributing to acne in up to 53% of all wearers and other skin irritations in up to 51% of all wearers [36,37,82].

Other researchers examined 322 participants with N95 masks in an observational study and detected acne in up to 59.6% of them, itching in 51.4% and redness in 35.8% as side effects [72].

In up to 19.6% (273) of the 1393 wearers of different masks (community masks, surgical, N95 masks), itching could be objectified in one study, in 9% even severely. An atopic predisposition (allergy tendency) correlated with the risk of itching. The length of use was significantly related to the risk of itching ($p < 0.0001$) [93].

In another dermatological study from 2020, 96.9% of 876 users of all mask types (community masks, surgical masks, N95 masks) confirmed adverse problems with a significant increase in itching (7.7%), accompanied by fogging-up of glasses (21.3%), flushing (21.3%), slurred speech (12.3%) and difficulty breathing (35.9%) ($p < 0.01$) [71].

Apart from an increased incidence of acne [37,72,91] under masks, contact eczema and urticaria [94] are generally described in connection with hypersensitivities to ingredients of the industrially manufactured masks (surgical mask and N95) such as formaldehyde (ingredient of the textile) and thiram (ingredient of the ear bands) [73,84]. The hazardous substance thiram, originally a pesticide and corrosive, is used in the rubber industry as a optimization accelerator. Formaldehyde is a biocide and carcinogen and is used as a disinfectant in the industry.

Even isolated permanent hyperpigmentation as a result of post-inflammatory or pigmented contact dermatitis has been described by dermatologists after prolonged mask use [72,91].

### 3.8. ENT and Dental Side Effects and Dangers

There are reports from dental communities about negative effects of masks and are accordingly titled "mask mouth" [95]. Provocation of gingivitis (inflammation of the gums), halitosis (bad breath), candidiasis (fungal infestation of the mucous membranes with Candida albicans) and cheilitis (inflammation of the lips), especially of the corners of the mouth, and even plaque and caries are attributed to the excessive and improper use of masks. The main trigger of the oral diseases mentioned is an increased dry mouth due to a reduced saliva flow and increased breathing through the open mouth under the mask. Mouth breathing causes surface dehydration and reduced salivary flow rate (SFR) [95]. Dry mouth is scientifically proven due to mask wear [29]. The bad habit of breathing through the open mouth while wearing a mask seems plausible because such breathing pattern compensates for the increased breathing resistance, especially when inhaling through the masks [60,61]. In turn, the outer skin moisture [71,73,85] with altered

Case 6:21-cv-01008-PGB-DCI   Document 1-2   Filed 06/14/21   Page 120 of 155 PageID 279

skin flora, which has already been described under dermatological side effects (Section 3.7), is held responsible as an explanation for the inflammation of the lips and corners of the mouth (cheilitis) [95]. This clearly shows the disease-promoting reversal of the natural conditions caused by masks. The physiological internal moisture with external dryness in the oral cavity converts into internal dryness with external moisture.

ENT physicians recently discovered a new form of irritant rhinitis due to N95 mask use in 46 patients. They performed endoscopies and nasal irrigations on mask wearers, which were subsequently assessed pathologically. Clinical problems were recorded with standardized questionnaires. They found statistically significant evidence of mask-induced rhinitis and itching and swelling of the mucous membranes as well as increased sneezing ($p < 0.01$). Endoscopically, it showed an increased secretion and evidence of inhaled mask polypropylene fibers as the trigger of mucosal irritation [96].

In a study of 221 health care workers, ENT physicians objectified a voice disorder in 33% of mask users. The VHI-10 score of 1 to 10, which measures voice disorders, was on average 5.72 higher in these mask users (statistically significant with $p < 0.001$). The mask not only acted as an acoustic filter, provoking excessively loud speech, it also seems to trigger impaired vocal cord coordination because the mask compromises the pressure gradients required for undisturbed speech [43]. The researchers concluded from their findings that masks could pose a potential risk of triggering new voice disorders as well as exacerbating existing ones.

### 3.9. Sports Medicine Side Effects and Dangers

According to the literature, performance-enhancing effects of masks regarding cardiovascular optimization and improvement of oxygen uptake capacity cannot be proven.

For example, in an experimental reference study (12 subjects per group), the training mask that supposedly mimics altitude training (ETM: elevation training mask) only had training effects on the respiratory muscles. However, mask wearers showed significantly lower oxygen saturation values ($SpO_2\%$) during exercise ($SpO_2$ of 94% for mask wearers versus 96% for mask-less, $p < 0.05$) [33], which can be explained by an increased dead space volume and increased resistance during breathing. The measured oxygen saturation values were significantly lower than the normal values in the group of mask wearers, which indicates a clinical relevance.

The proven adaptation effect of the respiratory muscles in healthy athletes [33] clearly suggests that masks have a disruptive effect on respiratory physiology.

In another intervention study on mask use in weightlifters, researchers documented statistically significant effects of reduced attention (questionnaire recording, Likert scale) and a slowed maximum speed of movement detectable by means of sensors (both significant at $p < 0.001$), leading the researchers to conclude that mask use in sport is not without risks. As a secondary finding, they also detected a significant decrease in oxygen saturation $SpO_2$ when performing special weight-lifting exercises ("back squats") in the mask group after only 1 min of exercise compared to the mask-free group ($p < 0.001$) [32]. The proven tendency of the masks to shift the chemical parameter oxygen saturation $SpO_2$ in a pathological direction (lower limit value 95%) may well have clinical relevance in untrained or sick individuals.

Sports medicine confirmed an increase in carbon dioxide ($CO_2$) retention, with an elevation in $CO_2$ partial pressure in the blood with larger respiratory dead space volumes [14].

In fact, dead space-induced $CO_2$ retention while wearing a mask during exercise was also experimentally proven. The effects of a short aerobic exercise under N95 masks were tested on 16 healthy volunteers. A significantly increased end-expiratory partial pressure of carbon dioxide ($PETCO_2$) with plus 8 mmHg ($p < 0.001$) was found [24]. The increase in blood carbon dioxide ($CO_2$) in the mask wearers under maximum load was plus 14% $CO_2$ for surgical masks and plus 23% $CO_2$ for N95 masks, an effect that may well have clinical relevance in the pre-diseased, elderly and children, as these values strongly approached the pathological range [24].

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

In an interesting endurance study with eight middle-aged subjects (19–66), the gas content for $O_2$ and $CO_2$ under the masks was determined before and after exercise. Even at rest, the oxygen availability under the masks was 13% lower than without the masks and the carbon dioxide ($CO_2$) concentration was 30 times higher. Under stress (Ruffier test), the oxygen concentration (% $O_2$) below the mask dropped significantly by a further 3.7%, while the carbon dioxide concentration (% $CO_2$) increased significantly by a further 20% (statistically significant with $p < 0.001$). Correspondingly, the oxygen saturation of the blood ($SpO_2$) of the test persons also decreased significantly from 97.6 to 92.1% ($p < 0.02$) [18]. The drop in the oxygen saturation value ($SpO_2$) to 92%, clearly below the normal limit of 95%, is to be classified as clinically relevant and detrimental to health.

These facts are an indication that the use of masks also triggers the effects described above leading to hypoxia and hypercapnia in sports. Accordingly, the WHO and Centers for Disease Control and Prevention, GA, USA (CDC) advise against wearing masks during physical exercise [82,97].

### 3.10. Social and Sociological Side Effects and Dangers

The results of a Chilean study with health care workers show that masks act like an acoustic filter and provoke excessively loud speech. This causes a voice disorder [43]. The increased volume of speech also contributes to increased aerosol production by the mask wearer [98]. These experimental data measured with the Aerodynamic Particle Sizer (APS, TSI, model 332, TSI Incorporated, Minnesota, MI, USA) are highly relevant.

Moreover, mask wearers are prevented from interacting normally in everyday life due to impaired clarity of speech [45], which tempts them to get closer to each other.

This results in a distorted prioritization in the general public, which counteracts the recommended measures associated with the COVID-19 pandemic. The WHO prioritizes social distancing and hand hygiene with moderate evidence and recommends wearing a mask with weak evidence, especially in situations where individuals are unable to maintain a physical distance of at least 1 m [3].

The disruption of non-verbal communication due to the loss of facial expression recognition under the mask can increase feelings of insecurity, discouragement and numbness as well as isolation, which can be extremely stressful for the mentally and hearing-impaired [16].

Experts point out that masks disrupt the basics of human communication (verbal and nonverbal). The limited facial recognition caused by masks leads to a suppression of emotional signals. Masks, therefore, disrupt social interaction, erasing the positive effect of smiles and laughter but at the same time greatly increasing the likelihood of misunderstandings because negative emotions are also less evident under masks [42].

A decrease in empathy perception through mask use with disruption of the doctor–patient relationship has already been scientifically proven on the basis of a randomized study (statistically significant, with $p = 0.04$) [99]. In this study, the Consultation Empathy Care Measury, the Patient Enablement Instrument (PEI) Score and a Satisfaction Rating Scale were assessed in 1030 patients. The 516 doctors, who wore masks throughout, conveyed reduced empathy towards the patients and, thus, nullified the positive health-promoting effects of a dynamic relationship. These results demonstrate a disruption of interpersonal interaction and relationship dynamics caused by masks.

The WHO guidance on the use of masks in children in the community, published in August 2020, points out that the benefits of mask use in children must be weighed up against the potential harms, including social and communicational concerns [100].

Fears that widespread pandemic measures will lead to dysfunctional social life with degraded social, cultural and psychological interactions have also been expressed by other experts [6–8,42].

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

### 3.11. Social and Occupational Medicine Side Effects and Hazards

In addition to mask-specific complaints such as a feeling of heat, dampness, shortness of breath and headache, various physiological phenomena were documented, such as the significant increase in heart and respiratory rate, the impairment of lung function parameters, the decrease in cardiopulmonary capacity (e.g., lower maximum blood lactate response) [15,19,21,23,29–31], as well as the changes in oxygen and carbon dioxide both in the end-expiratory and the air under the mask that was measured in the blood of the individuals [13,15,18,19,21–25,27–34]. The significant changes were measurable after only a few minutes of wearing a mask and in some cases reached magnitudes of minus 13% reduced $O_2$ concentration and 30-fold increased $CO_2$ concentration of the inhaled air under masks ($p < 0.001$) [18]. The changes observed were not only statistically significant, but also clinically relevant; the subjects also showed pathological oxygen saturation after exposure to masks ($p < 0.02$) [18].

Shortness of breath during light exertion (6 min walking) under surgical masks has been recorded with statistical significance in 44 healthy subjects in a prospective experimental intervention study ($p < 0.001$) [101]. Here, the complaints were assessed using a subjective, visual analogue scale.

In another study from 2011, all tested masks caused a significantly measurable increase in discomfort and a feeling of exhaustion in the 27 subjects during prolonged usage ($p < 0.0001$) [69].

These symptoms lead to additional stress for the occupational mask wearer and, thus, in relation to the feeling of exhaustion, contribute to the self-perpetuating vicious circle caused by the vegetative sympathetic activation, which further increases the respiratory and heart rate, blood pressure and increased sense of exhaustion [16,20,35,83].

Other studies showed that the psychological and physical effects of the masks can lead to an additional reduction in work performance (measured with the Roberge Subjective Symptoms-during-Work Scale, a Likert scale of 1–5) via increased feelings of fatigue, dissatisfaction and anxiety [58,102,103].

Wearing masks over a longer period of time also led to physiological and psychological impairments in other studies and, thus, reduced work performance [19,36,58,69]. In experiments on respiratory-protective equipment, an increase in the dead space volume by 350 mL leads to a reduction in the possible performance time by approx. −19%, furthermore to a decrease in breathing comfort by −18% (measured via a subjective rating scale) [58]. In addition, the time spent working and the flow of work is interrupted and reduced by putting on and taking off the masks and changing them. The reduced work performance has been recorded in the literature found as described above (especially in Sections 3.1 and 3.2) but has not been quantified further in detail [36,58].

Surgical mask type and N95 protective equipment frequently caused adverse effects in medical personnel such as headaches, breathing difficulties, acne, skin irritation, itching, decreased alertness, decreased mental performance and feelings of dampness and heat [19,29,37,71,85]. Subjective, work performance-reducing, mask-related impairments in users, measured with special survey scores and Likert scales, have also been described in other studies [15,21,27,32,35,43,66–68,72,96,99].

In Section 3.7 on dermatology, we already mentioned a paper that demonstrated a significant temperature increase of 1.9 °C on average (to over 34.5 °C) in the mask-covered facial area ($p < 0.05$) [85]. Due to the relatively larger representation in the sensitive cerebral cortex (homunculus), the temperature sensation in the face is more decisive for the feeling of well-being than other body regions [36,44]. The perception of discomfort when wearing a mask can, thus, be intensified. Interestingly, in our analysis, we found a combined occurrence of the physical variable temperature rise under the mask and the symptom respiratory impairment in seven of eight studies concerned, with a mutual significantly measured occurrence in 88%. We also detected a combined occurrence of significantly measured temperature rise under the mask and significantly measured fatigue in 50% of the relevant primary studies (three of six papers, Figure 2). These clustered associations of

temperature rise with symptoms of respiratory impairment and fatigue suggest a clinical relevance of the detected temperature rise under masks. In the worst case scenario, the effects mentioned can reinforce each other and lead to decompensation, especially in the presence of COPD, heart failure and respiratory insufficiency.

The sum of the disturbances and discomforts that can be caused by a mask also contributes to distraction (see also psychological impairment). These, in conjunction with a decrease in psycho-motoric skills, reduced responsiveness and overall impaired cognitive performance (all of which are pathophysiological effects of wearing a mask) [19,29,32,39–41] can lead to a failure to recognize hazards and, thus, to accidents or avoidable errors at work [19,36,37]. Of particular note here are mask-induced listlessness ($p < 0.05$), impaired thinking ($p < 0.05$) and concentration problems ($p < 0.02$) as measured by a Likert scale (1–5) [29]. Accordingly, occupational health regulations take action against such scenarios. The German Industrial Accident Insurance (DGUV) has precise and extensive regulations for respiratory protective equipment where they document the limitation of wearing time, levels of work intensity and defined instruction obligation [104].

The standards and norms prescribed in many countries regarding different types of masks to protect their workers are also significant from an occupational health point of view [105]. In Germany, for example, there are very strict safety specifications for masks from other international countries. These specify the requirements for the protection of the wearer [106]. All these standards and the accompanying certification procedures were increasingly relaxed with the introduction of mandatory masks for the general public. This meant that non-certified masks such as community masks were also used on a large scale in the work and school sectors for longer periods during the pandemic measures [107]. Most recently, in October 2020, the German Social Accident Insurance (DGUV) recommended the same usage time limits for community masks as for filtering half masks, namely, a maximum of three shifts of 120 min per day with recovery breaks of 30 min in between. In Germany, FFP2 (N95) masks must be worn for 75 min, followed by a 30-minute break. An additional suitability examination by specialized physicians is also obligatory and stipulated for occupationally used respirators [104].

### *3.12. Microbiological Consequences for Wearer and Environment: Foreign/Self-Contamination*

Masks cause retention of moisture [61]. Poor filtration performance and incorrect use of surgical masks and community masks, as well as their frequent reuse, imply an increased risk of infection [108–110]. The warm and humid environment created by and in masks without the presence of protective mechanisms such as antibodies, the complement system, defense cells and pathogen-inhibiting and on a mucous membrane paves the way for unimpeded growth and, thus, an ideal growth and breeding ground for various pathogens such as bacteria and fungi [88] and also allows viruses to accumulate [87]. The warm and humid mask microclimate favors the accumulation of various germs on and underneath the masks [86], and the germ density is measurably proportional to the length of time the mask is worn. After only 2 h of wearing the mask, the pathogen density increases almost tenfold in experimental observation studies [87,89].

From a microbiological and epidemiological point of view, masks in everyday use pose a risk of contamination. This can occur as foreign contamination but also as self-contamination. On the one hand, germs are sucked in or attach themselves to the masks through convection currents. On the other hand, potential infectious agents from the nasopharynx accumulate excessively on both the outside and inside of the mask during breathing [5,88]. This is compounded by contact with contaminated hands. Since masks are constantly penetrated by germ-containing breath and the pathogen reproduction rate is higher outside mucous membranes, potential infectious pathogens accumulate excessively on the outside and inside of masks. On and in the masks, there are quite serious, potentially disease-causing bacteria and fungi such as *E. coli* (54% of all germs detected), Staphylococcus aureus (25% of all germs detected), Candida (6%), Klebsiella (5%), Enterococci (4%),

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

Pseudomonads (3%), Enterobacter (2%) and Micrococcus (1%) even detectable in large quantities [88].

In another microbiological study, the bacterium Staphylococcus aureus (57% of all bacteria detected) and the fungus Aspergillus (31% of all fungi detected) were found to be the dominant germs on 230 surgical masks examined [86].

After more than six hours of use, the following viruses were found in descending order on 148 masks worn by medical personnel: adenovirus, bocavirus, respiratory syncytial virus and influenza viruses [87].

From this aspect, it is also problematic that moisture distributes these potential pathogens in the form of tiny droplets via capillary action on and in the mask, whereby further proliferation in the sense of self- and foreign contamination by the aerosols can then occur internally and externally with every breath [35]. In this regard, it is also known from the literature that masks are responsible for a proportionally disproportionate production of fine particles in the environment and, surprisingly, much more so than in people without masks [98].

It was shown that all mask-wearing subjects released significantly more smaller particles of size 0.3–0.5 µm into the air than mask-less people, both when breathing, speaking and coughing (fabric, surgical, N95 masks, measured with the Aerodynamic Particle Sizer, APS, TS, model 3329) [98]. The increase in the detection of rhinoviruses in the sentinel studies of the German RKI from 2020 [90] could be a further indication of this phenomenon, as masks were consistently used by the general population in public spaces in that year.

### 3.13. Epidemiological Consequences

The possible side effects and dangers of masks described in this paper are based on studies of different types of masks. These include the professional masks of the surgical mask type and N95/KN95 (FFP2 equivalent) that are commonly used in everyday life, but also the community fabric masks that were initially used. In the case of N95, the N stands for National Institute for Occupational Safety and Health of the United States (NIOSH), and 95 indicates the 95 per cent filtering capacity for fine particles up to at least 0.3 µm [82].

A major risk of mask use in the general public is the creation of a false sense of security with regard to protection against viral infections, especially in the sense of a falsely assumed strong self-protection. Disregarding infection risks may not only neglect aspects of source control, but also result in other disadvantages. Although there are quite a few professional positive accounts of the widespread use of masks in the general populace [111], most of the serious and evident scientific reports conclude that the general obligation to wear masks conveys a false sense of security [4,5]. However, this leads to a neglect of those measures that, according to the WHO, have a higher level of effectiveness than mask-wearing: social distancing and hand hygiene [2,112]. Researchers were able to provide statistically significant evidence of a false sense of security and more risky behavior when wearing masks in an experimental setting [112].

Decision makers in many countries informed their citizens early on in the pandemic in March 2020 that people without symptoms should not use a medical mask, as this created a false sense of security [113]. The recommendation was ultimately changed in many countries. At least Germany pointed out that wearers of certain types of masks such as the common fabric masks (community masks) cannot rely on them to protect them or others from transmission of SARS-CoV-2 [114].

However, scientists not only complain about the lack of evidence for fabric masks in the scope of a pandemic [16,110], but also about the high permeability of fabric masks with particles and the potential risk of infection they pose [108,109]. Ordinary fabric masks with a 97% penetration for particle dimensions of ≥0.3 µm are in stark contrast to medical-type surgical masks with a 44% penetration. In contrast, the N95 mask has a penetration rate of less than 0.01% for particles ≥ 0.3 µm in the laboratory experiment [108,115].

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

21 of 42

For the clinical setting in hospitals and outpatient clinics, the WHO guidelines recommend only surgical masks for influenza viruses for the entire patient treatment except for the strongly aerosol-generating measures, for which finer filtering masks of the type N95 are suggested. However, the WHO's endorsement of specific mask types is not entirely evidence-based due to the lack of high-quality studies in the health sector [108,109,116,117].

In a laboratory experiment (evidence level IIa study), it was demonstrated that both surgical masks and N95 masks have deficits in protection against SARS-CoV-2 and influenza viruses using virus-free aerosols [118]. In this study, the FFP2-equivalent N95 mask performed significantly better in protection (8–12 times more effective) than the surgical mask, but neither mask type established reliable, hypothesis-generated protection against corona and influenza viruses. Both mask types could be penetrated unhindered by aerosol particles with a diameter of 0.08 to 0.2 μm. Both the SARS-CoV-2 pathogens with a size of 0.06 to 0.14 μm [119] and the influenza viruses with 0.08 to 0.12 μm are unfortunately well below the mask pore sizes [118].

The filtering capacity of the N95 mask up to 0.3 μm [82] is usually not achieved by surgical masks and community masks. However, aerosol droplets, which have a diameter of 0.09 to 3 μm in size, are supposed to serve as a transport medium for viruses. These also penetrate the medical masks by 40%. Often, there is also a poor fit between the face and the mask, which further impairs their function and safety [120]. The accumulation of aerosol droplets on the mask is problematic. Not only do they absorb nanoparticles such as viruses [6], but they also follow the airflow when inhaling and exhaling, causing them to be carried further. In addition, a physical decay process has been described for aerosol droplets at increasing temperatures, as also occurs under a mask [15,44,85]. This process can lead to a decrease in size of the fine water droplets up to the diameter of a virus [121,122]. The masks filter larger aerosol droplets but cannot retain viruses themselves and such smaller, potentially virus-containing aerosol droplets of less than 0.2 μm and hence cannot stop the spread of virus [123].

Similarly, in an in vivo comparative studies of N95 and surgical masks, there were no significant differences in influenza virus infection rates [124,125]. Although this contrasts with encouraging in vitro laboratory results with virus-free aerosols under non-natural conditions, even with fabric masks [126], it should be noted that under natural in-vivo conditions, the promising filtration functions of fabric masks based on electrostatic effects also rapidly diminish under increasing humidity [127]. A Swiss textile lab test of various masks available on the market to the general public recently confirmed that most mask types filter aerosols insufficiently. For all but one of the eight reusable fabric mask types tested, the filtration efficacy according to EN149 was always less than 70% for particles of 1 μm in size. For disposable masks, only half of all eight mask types tested were efficient enough at filtering to retain 70% of particles 1 μm in size [128].

A recent experimental study even demonstrated that all mask-wearing people (surgical, N95, fabric masks) release significantly and proportionately smaller particles of size 0.3 to 0.5 μm into the air than mask-less people, both when breathing, speaking and coughing [98]. According to this, the masks act like nebulizers and contribute to the production of very fine aerosols. Smaller particles, however, spread faster and further than large ones for physical reasons. Of particular interest in this experimental reference study was the finding that a test subject wearing a single-layer fabric mask was also able to release a total of 384% more particles (of various sizes) when breathing than a person without [98].

It is not only the aforementioned functional weaknesses of the masks themselves that lead to problems, but also their use. This increases the risk of a false sense of security. According to the literature, mistakes are made by both healthcare workers and lay people when using masks as hygienically correct mask use is by no means intuitive. Overall, 65% of healthcare professionals and as many as 78% of the general population, use masks incorrectly [116]. With both surgical masks and N95 masks, adherence to the rules of use is impaired and not adequately followed due to reduced wearability with heat discomfort and skin irritation [29,35,116,129]. This is exacerbated by the accumulation of carbon dioxide

due to the dead space (especially under the N95 masks) with the resulting headaches described [19,27,37,66–68,83]. Increased heart rate, itching and feelings of dampness [15,29,30,35,71] also lead to reduced safety and quality during use (see also social and occupational health side effects and hazards). For this reason, (everyday) masks are even considered a general risk for infection in the general population, which does not come close to imitating the strict hygiene rules of hospitals and doctors' offices: the supposed safety, thus, becomes a safety risk itself [5].

In a meta-analysis of evidence level Ia commissioned by the WHO, no effect of masks in the context of influenza virus pandemic prevention could be demonstrated [130]. In 14 randomized controlled trials, no reduction in the transmission of laboratory-confirmed influenza infections was shown. Due to the similar size and distribution pathways of the virus species (influenza and Corona, see above), the data can also be transferred to SARS-CoV-2 [118]. Nevertheless, a combination of occasional mask-wearing with adequate hand-washing caused a slight reduction in infections for influenza in one study [131]. However, since no separation of hand hygiene and masks was achieved in this study, the protective effect can rather be attributed to hand hygiene in view of the aforementioned data [131].

A recently published large prospective Danish comparative study comparing mask wearers and non-mask wearers in terms of their infection rates with SARS-CoV2 could not demonstrate any statistically significant differences between the groups [132].

### 3.14. Paediatric Side Effects and Hazards

Children are particularly vulnerable and may be more likely to receive inappropriate treatment or additional harm. It can be assumed that the potential adverse mask effects described for adults are all the more valid for children (see Section 3.1 to Section 3.13: physiological internal, neurological, psychological, psychiatric, dermatological, ENT, dental, sociological, occupational and social medical, microbiological and epidemiological impairments and also Figures 2 and 3).

Special attention must be paid to the respiration of children, which represents a critical and vulnerable physiological variable due to higher oxygen demand, increased hypoxia susceptibility of the CNS, lower respiratory reserve, smaller airways with a stronger increase in resistance when the lumen is narrowed. The diving reflex caused by stimulating the nose and upper lip can cause respiratory arrest to bradycardia in the event of oxygen deficiency.

The masks currently used for children are exclusively adult masks manufactured in smaller geometric dimensions and had neither been specially tested nor approved for this purpose [133].

In an experimental British research study, the masks frequently led to feelings of heat ($p < 0.0001$) and breathing problems ($p < 0.03$) in 100 school children between 8 and 11 years of age especially during physical exertion, which is why the protective equipment was taken off by 24% of the children during physical activity [133]. The exclusion criteria for this mask experiment were lung disease, cardiovascular impairment and claustrophobia [133].

Scientists from Singapore were able to demonstrate in their level Ib study published in the renowned journal "nature" that 106 children aged between 7 and 14 years who wore FFP2 masks for only 5 min showed an increase in the inspiratory and expiratory $CO_2$ levels, indicating disturbed respiratory physiology [26].

However, a disturbed respiratory physiology in children can have long-term disease-relevant consequences. Slightly elevated $CO_2$ levels are known to increase heart rate, blood pressure, headache, fatigue and concentration disorders [38].

Accordingly, the following conditions were listed as exclusion criteria for mask use [26]: any cardiopulmonary disease including but not limited to: asthma, bronchitis, cystic fibrosis, congenital heart disease, emphysema; any condition that may be aggravated by physical exertion, including but not limited to: exercise-induced asthma; lower respiratory tract infections (pneumonia, bronchitis within the last 2 weeks), anxiety disorders,

diabetes, hypertension or epilepsy/attack disorder; any physical disability due to medical, orthopedic or neuromuscular disease; any acute upper respiratory illness or symptomatic rhinitis (nasal obstruction, runny nose or sneezing); any condition with deformity that affects the fit of the mask (e.g., increased facial hair, craniofacial deformities, etc.).

It is also important to emphasize the possible effects of masks in neurological diseases, as described earlier (Section 3.3).

Both masks and face shields caused fear in 46% of children (37 out of 80) in a scientific study. If children are given the choice of whether the doctor examining them should wear a mask they reject this in 49% of the cases. Along with their parents, the children prefer the practitioner to wear a face visor (statistically significant with $p < 0.0001$) [134].

A recent observational study of tens of thousands of mask-wearing children in Germany helped the investigators objectify complaints of headaches (53%), difficulty concentrating (50%), joylessness (49%), learning difficulties (38%) and fatigue in 37% of the 25,930 children evaluated. Of the children observed, 25% had new onset anxiety and even nightmares [135]. In children, the threat scenarios generated by the environment are further maintained via masks, in some cases, even further intensified, and in this way, existing stress is intensified (presence of subconscious fears) [16,35,136,137].

This can in turn lead to an increase in psychosomatic and stress-related illnesses [74,75]. For example, according to an evaluation, 60% of mask wearers showed stress levels of the highest grade 10 on a scale of 1 to a maximum of 10. Less than 10% of the mask wearers surveyed had a stress level lower than 8 out of a possible 10 [74].

As children are considered a special group, the WHO also issued a separate guideline on the use of masks in children in the community in August 2020, explicitly advising policy makers and national authorities, given the limited evidence, that the benefits of mask use in children must be weighed up against the potential harms associated with mask use. This includes feasibility and discomfort, as well as social and communication concerns [100].

According to experts, masks block the foundation of human communication and the exchange of emotions and not only hinder learning but deprive children of the positive effects of smiling, laughing and emotional mimicry [42]. The effectiveness of masks in children as a viral protection is controversial, and there is a lack of evidence for their widespread use in children; this is also addressed in more detail by the scientists of the German University of Bremen in their thesis paper 2.0 and 3.0 [138].

### 3.15. Effects on the Environment

According to WHO estimates of a demand of 89 million masks per month, their global production will continue to increase under the Corona pandemic [139]. Due to the composition of, e.g., disposable surgical masks with polymers such as polypropylene, polyurethane, polyacrylonitrile, polystyrene, polycarbonate, polyethylene and polyester [140], an increasing global challenge, also from an environmental point of view, can be expected, especially outside Europe, in the absence of recycling and disposal strategies [139]. The aforementioned single use polymers have been identified as a significant source of plastic and plastic particles for the pollution of all water cycles up to the marine environment [141].

A significant health hazard factor is contributed by mask waste in the form of microplastics after decomposition into the food chain. Likewise, contaminated macroscopic disposable mask waste—especially before microscopic decay—represents a widespread medium for microbes (protozoa, bacteria, viruses, fungi) in terms of invasive pathogens [86–89,142]. Proper disposal of bio-contaminated everyday mask material is insufficiently regulated even in western countries.

## 4. Discussion

The potential drastic and undesirable effects found in multidisciplinary areas illustrate the general scope of global decisions on masks in general public in the light of combating the pandemic. According to the literature found, there are clear, scientifically recorded adverse effects for the mask wearer, both on a psychological and on a social and physical level.

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

Neither higher level institutions such as the WHO or the European Centre for Disease Prevention and Control (ECDC) nor national ones, such as the Centers for Disease Control and Prevention, GA, USA (CDC) or the German RKI, substantiate with sound scientific data a positive effect of masks in the public (in terms of a reduced rate of spread of COVID-19 in the population) [2,4,5].

Contrary to the scientifically established standard of evidence-based medicine, national and international health authorities have issued their theoretical assessments on the masks in public places, even though the compulsory wearing of masks gives a deceptive feeling of safety [5,112,143].

From an infection epidemiological point of view, masks in everyday use offer the risk of self-contamination by the wearer from both inside and outside, including via contaminated hands [5,16,88]. In addition, masks are soaked by exhaled air, which potentially accumulates infectious agents from the nasopharynx and also from the ambient air on the outside and inside of the mask. In particular, serious infection-causing bacteria and fungi should be mentioned here [86,88,89], but also viruses [87]. The unusual increase in the detection of rhinoviruses in the sentinel studies of the German RKI from 2020 [90] could be an indication of this phenomenon. Clarification through further investigations would therefore be desirable.

Masks, when used by the general public, are considered by scientists to pose a risk of infection because the standardized hygiene rules of hospitals cannot be followed by the general public [5]. On top of that, mask wearers (surgical, N95, fabric masks) exhale relatively smaller particles (size 0.3 to 0.5 μm) than mask-less people and the louder speech under masks further amplifies this increased fine aerosol production by the mask wearer (nebulizer effect) [98].

The history of modern times shows that already in the influenza pandemics of 1918–1919, 1957–58, 1968, 2002, in SARS 2004–2005 as well as with the influenza in 2009, masks in everyday use could not achieve the hoped-for success in the fight against viral infection scenarios [67,144]. The experiences led to scientific studies describing as early as 2009 that masks do not show any significant effect with regard to viruses in an everyday scenario [129,145]. Even later, scientists and institutions rated the masks as unsuitable to protect the user safely from viral respiratory infections [137,146,147]. Even in hospital use, surgical masks lack strong evidence of protection against viruses [67].

Originally born out of the useful knowledge of protecting wounds from surgeons' breath and predominantly bacterial droplet contamination [144,148,149], the mask has been visibly misused with largely incorrect popular everyday use, particularly in Asia in recent years [150]. Significantly, the sociologist Beck described the mask as a cosmetic of risk as early as 1992 [151]. Unfortunately, the mask is inherent in a vicious circle: strictly speaking, it only protects symbolically and at the same time represents the fear of infection. This phenomenon is reinforced by the collective fear mongering, which is constantly nurtured by main stream media [137].

Nowadays, the mask represents a kind of psychological support for the general population during the virus pandemic, promising them additional anxiety-reduced freedom of movement. The recommendation to use masks in the sense of "source control" not out of self-protection but out of "altruism" [152] is also very popular with the regulators as well as the population of many countries. The WHO's recommendation of the mask in the current pandemic is not only a purely infectiological approach, but is also clear on the possible advantages for healthy people in the general public. In particular, a reduced potential stigmatization of mask wearers, the feeling of a contribution made to preventing the spread of the virus, as well as the reminder to adhere to other measures are mentioned [2].

It should not go unmentioned that very recent data suggest that the detection of SARS-CoV-2 infection does not seem to be directly related to popular mask use. The groups examined in a retrospective comparative study (infected with SARS-CoV-2 and not infected) did not differ in their habit of using masks: approximately 70% of the subjects in both groups always wore masks and another 14.4% of them frequently [143].

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

In a Danish prospective study on mask-wearing carried out on about 6000 participants and published in 2020, scientists found no statistically significant difference in the rates of SARS-CoV-2 infection when comparing the group of 3030 mask wearers with the 2994 mask-less participants in the study ($p = 0.38$) [132].

Indeed, in the case of viral infections, masks appear to be not only less effective than expected, but also not free of undesirable biological, chemical, physical and psychological side effects [67]. Accordingly, some experts claim that well-intentioned unprofessionalism can be quite dangerous [6].

The dermatological colleagues were the first to describe common adverse effects of mask-wearing in larger collectives. Simple, direct physical, chemical and biological effects of the masks with increases in temperature, humidity and mechanical irritation caused acne in up to 60% of wearers [37,71–73,85]. Other significantly documented consequences were eczema, skin damage and overall impaired skin barrier function [37,72,73].

These direct effects of mask use are an important pointer to further detrimental effects affecting other organ systems.

In our work, we have identified scientifically validated and numerous statistically significant adverse effects of masks in various fields of medicine, especially with regard to a disruptive influence on the highly complex process of breathing and negative effects on the respiratory physiology and gas metabolism of the body (see Figures 2 and 3). The respiratory physiology and gas exchange play a key role in maintaining a health-sustaining balance in the human body [136,153]. According to the studies we found, a dead space volume that is almost doubled by wearing a mask and a more than doubled breathing resistance (Figure 3) [59–61] lead to a rebreathing of carbon dioxide with every breathing cycle [16–18,39,83] with—in healthy people mostly—a subthreshold but, in sick people, a partly pathological increase in the carbon dioxide partial pressure ($PaCO_2$) in the blood [25,34,58]. According to the primary studies found, these changes contribute reflexively to an increase in respiratory frequency and depth [21,23,34,36] with a corresponding increase in the work of the respiratory muscles via physiological feedback mechanisms [31,36]. Thus, it is not, as initially assumed, purely positive training through mask use. This often increases the subliminal drop in oxygen saturation $SpO_2$ in the blood [23,28–30,32], which is already reduced by increased dead space volume and increased breathing resistance [18,31].

The overall possible resulting measurable drop in oxygen saturation $O_2$ of the blood on the one hand [18,23,28–30,32] and the increase in carbon dioxide ($CO_2$) on the other [13,15,19,21–28] contribute to an increased noradrenergic stress response, with heart rate increase [29,30,35] and respiratory rate increase [15,21,23,34], in some cases also to a significant blood pressure increase [25,35].

In panic-prone individuals, stress-inducing noradrenergic sympathetic activation can be partly directly mediated via the carbon dioxide ($CO_2$) mechanism at the locus coeruleus in the brainstem [39,78,79,153], but also in the usual way via chemo-sensitive neurons of the nucleus solitarius in the medulla [136,154]. The nucleus solitarius [136] is located in the deepest part of the brainstem, a gateway to neuronal respiratory and circulatory control [154]. A decreased oxygen ($O_2$) blood level there causes the activation of the sympathetic axis via chemoreceptors in the carotids [155,156].

Even subthreshold changes in blood gases such as those provoked when wearing a mask cause reactions in these control centers in the central nervous system. Masks, therefore, trigger direct reactions in important control centers of the affected brain via the slightest changes in oxygen and carbon dioxide in the blood of the wearer [136,154,155].

A link between disturbed breathing and cardiorespiratory diseases such as hypertension, sleep apnea and metabolic syndrome has been scientifically proven [56,57]. Interestingly, decreased oxygen/$O_2$ blood levels and also increased carbon dioxide/$CO_2$ blood levels are considered the main triggers for the sympathetic stress response [38,136]. The aforementioned chemo-sensitive neurons of the nucleus solitarius in the medulla are considered to be the main responsible control centers [136,154,155]. Clinical effects of prolonged mask-wearing would, thus, be a conceivable intensification of chronic stress re-

actions and negative influences on the metabolism leading towards a metabolic syndrome. The mask studies we found show that such disease-relevant respiratory gas changes ($O_2$ and $CO_2$) [38,136] are already achieved by wearing a mask [13,15,18,19,21–34].

A connection between hypoxia, sympathetic reactions and leptin release is scientifically known [136].

Additionally important is the connection of breathing with the influence on other bodily functions [56,57], including the psyche with the generation of positive emotions and drive [153]. The latest findings from neuro-psychobiological research indicate that respiration is not only a function regulated by physical variables to control them (feedback mechanism), but rather independently influences higher-level brain centers and, thus, also helps to shape psychological and other bodily functions and reactions [153,157,158]. Since masks impede the wearer's breathing and accelerate it, they work completely against the principles of health-promoting breathing [56,57] used in holistic medicine and yoga. According to recent research, undisturbed breathing is essential for happiness and healthy drive [157,159], but masks work against this.

The result of significant changes in blood gases in the direction of hypoxia (drop in oxygen saturation) and hypercapnia (increase in carbon dioxide concentration) through masks, thus, has the potential to have a clinically relevant influence on the human organism even without exceeding normal limits.

According to the latest scientific findings, blood-gas shifts towards hypoxia and hypercapnia not only have an influence on the described immediate, psychological and physiological reactions on a macroscopic and microscopic level, but additionally on gene expression and metabolism on a molecular cellular level in many different body cells. Through this, the drastic disruptive intervention of masks in the physiology of the body also becomes clear down to the cellular level, e.g., in the activation of hypoxia-induced factor (HIF) through both hypercapnia and hypoxia-like effects [160]. HIF is a transcription factor that regulates cellular oxygen supply and activates signaling pathways relevant to adaptive responses. e.g., HIF inhibits stem cells, promotes tumor cell growth and inflammatory processes [160]. Based on the hypoxia- and hypercapnia-promoting effects of masks, which have been comprehensively described for the first time in our study, potential disruptive influences down to the intracellular level (HIF-a) can be assumed, especially through the prolonged and excessive use of masks. Thus, in addition to the vegetative chronic stress reaction in mask wearers, which is channeled via brain centers, there is also likely to be an adverse influence on metabolism at the cellular level. With the prospect of continued mask use in everyday life, this also opens up an interesting field of research for the future.

The fact that prolonged exposure to latently elevated $CO_2$ levels and unfavorable breathing air compositions has disease-promoting effects was recognized early on. As early as 1983, the WHO described "Sick Building Syndrome" (SBS) as a condition in which people living indoors experienced acute disease-relevant effects that increased with time of their stay, without specific causes or diseases [161,162]. The syndrome affects people who spend most of their time indoors, often with subliminally elevated $CO_2$ levels, and are prone to symptoms such as increased heart rate, rise in blood pressure, headaches, fatigue and difficulty concentrating [38,162]. Some of the complaints described in the mask studies we found (Figure 2) are surprisingly similar to those of Sick Building Syndrome [161]. Temperature, carbon dioxide content of the air, headaches, dizziness, drowsiness and itching also play a role in Sick Building Syndrome. On the one hand, masks could themselves be responsible for effects such as those described for Sick Building Syndrome when used for a longer period of time. On the other hand, they could additionally intensify these effects when worn in air-conditioned buildings, especially when masks are mandatory indoors. Nevertheless, there was a tendency towards higher systolic blood pressure values in mask wearers in some studies [21,31,34], but statistical significance was only found in two studies [25,35]. However, we found more relevant and significant evidence of heart

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

27 of 42

rate increase, headache, fatigue and concentration problems associated with mask wearers (Figure 2) indicating the clinical relevance of wearing masks.

According to the scientific results and findings, masks have measurably harmful effects not only on healthy people, but also on sick people and their relevance is likely to increase with the duration of use [69]. Further research is needed here to shed light on the long-term consequences of widespread mask use with subthreshold hypoxia and hypercapnia in the general population, also regarding possible exacerbating effects on cardiorespiratory lifestyle diseases such as hypertension, sleep apnea and metabolic syndrome. The already often elevated blood carbon dioxide ($CO_2$) levels in overweight people, sleep apnea patients and patients with overlap-COPD could possibly increase even further with everyday masks. Not only a high body mass index (BMI) but also sleep apnea are associated with hypercapnia during the day in these patients (even without masks) [19,163]. For such patients, hypercapnia means an increase in the risk of serious diseases with increased morbidity, which could then be further increased by excessive mask use [18,38].

The hypercapnia-induced effects of sympathetic stress activation are even cycle phase-dependent in women. Controlled by a progesterone mechanism, the sympathetic reaction, measured by increased blood pressure in the luteal phase, is considerably stronger [164]. This may also result in different sensitivities for healthy and sick women to undesirable effects masks have, which are related to an increase in carbon dioxide ($CO_2$).

In our review, negative physical and psychological changes caused by masks could be objectified even in younger and healthy individuals.

The physical and chemical parameters did not exceed the normal values in most cases but were statistically significantly measurable ($p < 0.05$) tending towards pathological ranges. They were accompanied by physical impairments (see Figure 2). It is well known that subthreshold stimuli are capable of causing pathological changes when exposed to them for a long time: not only a single high dose of a disturbance, but also a chronically persistent, subthreshold exposure to it often leads to illness [38,46–48,50–54]. The scientifically repeatedly measurable physical and chemical mask effects were often accompanied by typical subjective complaints and pathophysiological phenomena. The fact that these frequently occur simultaneously and together indicates a syndrome under masks.

Figure 2 sums up the significant mask-dependent physiological, psychological, somatic and general pathological changes and their frequent occurrence together is striking. Within the framework of the quantitative evaluation of the experimental studies, we were actually able to prove a statistically significant correlation of the observed side effects of fatigue and oxygen depletion under mask use with $p < 0.05$. In addition, we found a frequent, simultaneous and joint occurrence of further undesirable effects in the scientific studies (Figure 2). Statistically significant associations of such co-occurring, adverse effects have already been described in primary studies [21,29]. We detected a combined occurrence of the physical parameter temperature rise under the mask with the symptom respiratory impairment in seven of the nine studies concerned (88%). We found a similar result for the decrease in oxygen saturation under mask and the symptom respiratory impairment with a simultaneous detection in six of the eight studies concerned (67%). We detected a combined occurrence of carbon dioxide rise under N95 mask use in nine of the 11 scientific papers (82%). We found a similar result for oxygen drop under N95 mask use with simultaneous co-occurrence in eight of 11 primary papers (72%). The use of N95 masks was also associated with headache in six of the 10 primary studies concerned (60%). A combined occurrence of the physical parameters temperature rise and humidity under masks was even found 100% within six of the six studies with significant measurements of these parameters (Figure 2).

Since the symptoms were described in combination in mask wearers and were not observed in isolation in the majority of cases, we refer to them as general Mask-Induced Exhaustion Syndrome (MIES) because of the consistent presentation in numerous papers from different disciplines. These include the following, predominantly statistically significantly

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

($p < 0.05$) proven pathophysiological changes and subjective complaints, which often occur in combination as described above (see also Section 3.1 to Section 3.11, Figures 2–4):

- Increase in dead space volume [22,24,58,59] (Figure 3, Sections 3.1 and 3.2).
- Increase in breathing resistance [31,35,61,118] (Figure 3, Figure 2: Column 8).
- Increase in blood carbon dioxide [13,15,19,21–28] (Figure 2: Column 5).
- Decrease in blood oxygen saturation [18,19,21,23,28–34] (Figure 2: Column 4).
- Increase in heart rate [15,19,23,29,30,35] (Figure 2: Column 12).
- Decrease in cardiopulmonary capacity [31] (Section 3.2).
- Feeling of exhaustion [15,19,21,29,31–35,69] (Figure 2: Column 14).
- Increase in respiratory rate [15,21,23,34] (Figure 2: Column 9).
- Difficulty breathing and shortness of breath [15,19,21,23,25,29,31,34,35,71,85,101,133] (Figure 2: Column 13).
- Headache [19,27,37,66–68,83] (Figure 2: Column 17).
- Dizziness [23,29] (Figure 2: Column 16).
- Feeling of dampness and heat [15,16,22,29,31,35,85,133] (Figure 2: Column 7).
- Drowsiness (qualitative neurological deficits) [19,29,32,36,37] (Figure 2: Column 15).
- Decrease in empathy perception [99] (Figure 2: Column 19).
- Impaired skin barrier function with acne, itching and skin lesions [37,72,73] (Figure 2: Column 20–22).

It can be deduced from the results that the effects described in healthy people are all more pronounced in sick people, since their compensatory mechanisms, depending on the severity of the illness, are reduced or even exhausted. Some existing studies on and with patients with measurable pathological effects of the masks support this assumption [19,23,25,34]. In most scientific studies, the exposure time to masks in the context of the measurements/investigations was significantly less (in relation to the total wearing and duration of use) than is expected of the general public under the current pandemic regulations and ordinances.

The exposure time limits are little observed or knowingly disregarded in many areas today as already mentioned in Section 3.11 on occupational medicine. The above facts allow the conclusion that the described negative effects of masks, especially in some of our patients and the very elderly, may well be more severe and adverse with prolonged use than presented in some mask studies.

From a doctor's viewpoint, it may also be difficult to advise children and adults who, due to social pressure (to wear a mask) and the desire to feel they belong, suppress their own needs and concerns until the effects of masks have a noticeable negative impact on their health [76]. Nevertheless, the use of masks should be stopped immediately at the latest when shortness of breath, dizziness or vertigo occur [23,25]. From this aspect, it seems sensible for decision makers and authorities to provide information, to define instruction obligations and offer appropriate training for employers, teachers and other persons who have a supervisory or caregiving duty. Knowledge about first aid measures could also be refreshed and expanded accordingly in this regard.

Elderly, high-risk patients with lung disease, cardiac patients, pregnant women or stroke patients are advised to consult a physician to discuss the safety of an N95 mask as their lung volume or cardiopulmonary performance may be reduced [23]. A correlation between age and the occurrence of the aforementioned symptoms while wearing a mask has been statistically proven [19]. Patients with reduced cardiopulmonary function are at increased risk of developing serious respiratory failure with mask use according to the referenced literature [34]. Without the possibility of continuous medical monitoring, it can be concluded that they should not wear masks without close monitoring. The American Asthma and Allergy Society has already advised caution in the use of masks with regard to the COVID-19 pandemic for people with moderate and severe lung disease [165]. Since the severely overweight, sleep apnea patients and overlap-COPD sufferers are known to be prone to hypercapnia, they also represent a risk group for serious adverse health effects under extensive mask use [163]. This is because the potential of masks to produce additional

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

$CO_2$ retention may not only have a disruptive effect on the blood gases and respiratory physiology of sufferers, but may also lead to further serious adverse health effects in the long term. Interestingly, in an animal experiment an increase in $CO_2$ with hypercapnia leads to contraction of smooth airway muscles with constriction of bronchi [166]. This effect could explain the observed pulmonary decompensations of patients with lung disease under masks (Section 3.2) [23,34].



**Figure 4.** Unfavorable mask effects as components of Mask-Induced Exhaustion Syndrome (MIES). The chemical, physical and biological effects, as well as the organ system consequences mentioned, are all documented with statistically significant results in the scientific literature found (Figure 2). The term drowsiness is used here to summarize any qualitative neurological deficits described in the examined scientific literature.

Patients with renal insufficiency requiring dialysis are, according to the literature available, further candidates for a possible exemption from the mask requirement [34].

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

According to the criteria of the Centers for Disease Control and Prevention, GA, USA (CDC), sick and helpless people who cannot remove a mask on their own should be exempted from the mask requirement [82].

Since it can be assumed that children react even more sensitively to masks, the literature suggests that masks are a contraindication for children with epilepsies (hyperventilation as a trigger for seizures) [63]. In the field of pediatrics, special attention should also be paid to the mask symptoms described under psychological, psychiatric and sociological effects with possible triggering of panic attacks by $CO_2$ rebreathing in the case of predisposition and also reinforcement of claustrophobic fears [77–79,167]. The mask-related disturbance of verbal [43,45,71] and non-verbal communication and, thus, of social interaction is particularly serious for children. Masks restrict social interaction and block positive perceptions (smiling and laughing) and emotional mimicry [42]. The proven mask-induced mild to moderate cognitive impairment with impaired thinking, decreased attention and dizziness [19,23,29,32,36,37,39–41,69], as well as the psychological and neurological effects [135], should be additionally taken into account when masks are compulsory at school and in the vicinity of both public and non-public transport, also regarding the possibility of an increased risk of accidents (see also occupational health side effects and hazards) [19,29,32,36,37]. The exclusion criteria mentioned in pediatric studies on masks (see pediatric impairments, Section 3.14) [26,133] should also apply to an exclusion of these children from the general mask obligation in accordance with the scientific findings for the protection of the sick children concerned. The long-term sociological, psychological and educational consequences of a comprehensive masking requirement extended to schools are also unpredictable with regard to the psychological and physical development of healthy children [42,135]. Interestingly, according to the Corona Thesis Paper of the University of Bremen children "are infected less often, they become ill less often, the lethality is close to zero, and they also pass on the infection less often", according to the Thesis Paper 2.0 of the German University of Bremen on page 6 [138]. Studies conducted under real-life conditions with outcome endpoints showing hardly any infections, hardly any morbidity, hardly any mortality and only low contagiousness in children are clearly in the majority, according to Thesis Paper 3.0 of the German University of Bremen [138]. A recent German observational study (5600 reporting pediatricians) also showed a surprisingly low incidence of COVID-19 disease in children [168]. The infection of adults with SARS-CoV-2 by children has been considered in only one suspected case, but could not be proven with certainty, since the parents also had numerous contacts and exposure factors for viral infections due to their occupation. In this case, the circulating headlines in the public media that children contribute more to the incidence of infection are to be regarded as anecdotal.

In pregnant women, the use of masks during exertion or at rest over long periods of time is to be regarded as critical as little research has been done on this [20]. If there is clear scientific evidence of increased dead space ventilation with possible accumulation of $CO_2$ in the mother's blood, the use of masks by pregnant women for more than 1 h, as well as under physical stress, should be avoided in order to protect the unborn child [20,22]. The hypercapnia-promoting masks could act as a confounder of the fetal/maternal $CO_2$ gradient in this case (Section 3.6) [20,22,28].

According to the literature cited in the Section 3.5 on psychiatric side effects (personality disorders with anxiety and panic attacks, claustrophobia, dementia and schizophrenia), masking should only be done, if at all, with careful consideration of the advantages and disadvantages. Attention should be paid to possible provocation of the number and severity of panic attacks [77–79].

In patients with headaches, a worsening of symptoms can be expected with prolonged mask use (see also Section 3.3., neurological side effects) [27,66–68]. As a result of the increase in blood carbon dioxide ($CO_2$) when the mask is used, vasodilatation occurs in the central nervous system and the pulsation of the blood vessels decreases [27]. In this connection, it is also interesting to note radiological experiments that demonstrate an increase in brain volume under subthreshold, but still within normal limits of $CO_2$ increase

in the blood by means of structural MRI. The blood carbon dioxide increase was produced in seven subjects via rebreathing with resulting median carbon dioxide concentration of 42 mmHg and an interquartile range of 39.44 mmHg, corresponding to only a subthreshold increase given the normal values of 32–45 mmHg. In the experiment, there was a significant increase in brain parenchymal volume measurable under increased arterial $CO_2$ levels ($p < 0.02$), with a concomitant decrease in CSF spaces ($p < 0.04$), entirely in accordance with the Monroe–Kelly doctrine, according to which the total volume within the skull always remains the same. The authors interpreted the increase in brain volume as an expression of an increase in blood volume due to a $CO_2$ increase-induced dilation of the cerebral vessels [169]. The consequences of such equally subthreshold carbon dioxide ($CO_2$) increases even under masks [13,15,18,19,22,23,25] are unclear for people with pathological changes inside the skull (aneurysms, tumors, etc.) with associated vascular changes [27] and brain volume shifts [169] especially due to longer exposure while wearing a mask, but could be of great relevance due to the blood gas-related volume shifts that take place.

In view of the increased dead space volume, the long-term and increased accumulation and rebreathing of other respiratory air components apart from $CO_2$ is also unexplained, both in children and in old and sick people. Exhaled air contains over 250 substances, including irritant or toxic gases such as nitrogen oxides (NO), hydrogen sulfide (H2S), isoprene and acetone [170]. For nitrogen oxides [47] and hydrogen sulfide [46], pathological effects relevant to disease have been described in environmental medicine even at a low but chronic exposure [46–48]. Among the volatile organic compounds in exhaled air, acetone and isoprene dominate in terms of quantity, but allyl methyl sulfide, propionic acid and ethanol (some of bacterial origin) should also be mentioned [171]. Whether such substances also react chemically with each other underneath masks and in the dead space volume created by masks (Figure 3), and with the mask tissue itself, and in what quantities these and possible reaction products are rebreathed, has not yet been clarified. In addition to the blood gas changes described above ($O_2$ drop and $CO_2$ rise), these effects could also play a role with regard to undesirable mask effects. Further research is needed here and is of particular interest in the case of prolonged and ubiquitous use of masks.

The WHO sees the integration of individual companies and communities that produce their own fabric masks as a potential social and economic benefit. Due to the global shortage of surgical masks and personal protective equipment, it sees this as a source of income and points out that the reuse of fabric masks can reduce costs and waste and contribute to sustainability [2]. In addition to the question of certification procedures for such fabric masks, it should also be mentioned that due to the extensive mask obligation, textile (artificial) substances in the form of micro- and nanoparticles, some of which cannot be degraded in the body, are chronically absorbed into the body through inhalation to an unusual extent. In the case of medical masks, disposable polymers such as polypropylene, polyurethane, polyacrylonitrile, polystyrene, polycarbonate, polyethylene and polyester should be mentioned [140]. ENT physicians have already been able to detect such particles in the nasal mucosa of mask wearers with mucosal reactions in the sense of a foreign body reaction with rhinitis [96]. In the case of community masks, other substances from the textile industry are likely to be added to those mentioned above. The body will try to absorb these substances through macrophages and scavenger cells in the respiratory tract and alveoli as part of a foreign body reaction, whereby toxin release and corresponding local and generalized reactions may occur in an unsuccessful attempt to break them down [172]. Extensive respiratory protection in permanent long-term use (24/7), at least from a theoretical point of view, also potentially carries the risk of leading to a mask-related pulmonary [47] or even generalized disorder, as is already known from textile workers chronically exposed to organic dusts in the Third World (byssinosis) [172].

For the general public, from a scientific angle, it is necessary to draw on the long-standing knowledge of respiratory protection in occupational medicine in order to protect children in particular from harm caused by uncertified masks and improper use.

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

The universal undefined and extended mask requirement—without taking into account multiple predispositions and susceptibilities—contradicts the claim of an increasingly important individualized medicine with a focus on the unique characteristics of each individual [173].

A systematic review on the topic of masks is necessary according to the results of our scoping review. The primary studies often showed weaknesses in operationalization, especially in the evaluation of cognitive and neuropsychological parameters. Computerized test procedures will be useful here in the future. Mask research should also set itself the future goal of investigating and defining subgroups for whom respiratory protection use is particularly risky.

## 5. Limitations

Our approach with a focus on negative effects is in line with Villalonga-Olives and Kawachi [12]. With the help of such selective questioning in the sense of dialectics, new insights can be gained that might otherwise have remained hidden. Our literature search focused on adverse negative effects of masks, in particular to point out risks especially for certain patient groups. Therefore, publications presenting only positive effects of masks were not considered in this review.

For a compilation of studies with harmless results when using masks, reference must, therefore, be made to reviews with a different research objective, whereby attention must be paid to possible conflicts of interest there. Some of the studies excluded by us lacking negative effects have shown methodological weaknesses (small, non-uniform experimental groups, missing control group even without masks due to corona constraints, etc.) [174]. In other words, if no negative concomitant effects were described in publications, it does not necessarily mean that masks have exclusively positive effects. It is quite possible that negative effects were simply not mentioned in the literature and the number of negative effects may well be higher than our review suggests.

We only searched one database, so the number of papers on negative mask effects may be higher than we reported.

In order to be able to describe characteristic effects for each mask type even more extensively, we did not have enough scientific data on the respective special designs of the masks. There is still a great need for research in this area due to the current pandemic situation with extensive mandatory masking.

In addition, the experiments evaluated in this paper do not always have uniform measurement parameters and study variables and, depending on the study, take into account the effect of masks at rest or under stress with subjects having different health conditions. Figure 2, therefore, represents a compromise. The results of the primary studies on mask use partially showed no natural variation in parameters, but often showed such clear correlations between symptoms and physiological changes, so that a statistical correlation analysis was not always necessary. We found a statistically significant correlation of oxygen deprivation and fatigue in 58% of the studies ($p < 0.05$). A statistically significant correlation evidence for other parameters has been previously demonstrated in primary studies [21,29].

The most commonly used personal particulate matter protective equipment in the COVID-19 pandemic is the N95 mask [23]. Due to its characteristics (better filtering function, but greater airway resistance and more dead space volume than other masks), the N95 mask is able to highlight negative effects of such protective equipment more clearly than others (Figure 3). Therefore, a relatively frequent consideration and evaluation of N95 masks within the studies found (30 of the 44 quantitatively evaluated studies, 68%) is even advantageous within the framework of our research question. Nevertheless, it remains to be noted that the community masks sold on the market are increasingly similar to the protective equipment that has been better investigated in scientific studies, such as surgical masks and N95 masks, since numerous manufacturers and users of community masks are striving to approximate the professional standard (surgical mask, N95/FFP2). Recent

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

study results on community masks indicate similar effects for respiratory physiology as described for medical masks: in a recent publication, fabric masks (community masks) also provoked a measurable increase in carbon dioxide $PtcCO_2$ in wearers during exertion and came very close to surgical masks in this effect [21].

Most of the studies cited in our paper included only short observation and application periods (mask-wearing durations investigated ranged from 5 min [26] to 12 h [19]. In only one study, a maximum observation period of an estimated 2-month period was chosen [37]. Therefore, the actual negative effects of masks over a longer application period might be more pronounced than presented in our work.

## 6. Conclusions

On the one hand, the advocacy of an extended mask requirement remains predominantly theoretical and can only be sustained with individual case reports, plausibility arguments based on model calculations and promising in vitro laboratory tests. Moreover, recent studies on SARS-CoV-2 show both a significantly lower infectivity [175] and a significantly lower case mortality than previously assumed, as it could be calculated that the median corrected infection fatality rate (IFR) was 0.10% in locations with a lower than average global COVID-19 population mortality rate [176]. In early October 2020, the WHO also publicly announced that projections show COVID-19 to be fatal for approximately 0.14% of those who become ill—compared to 0.10% for endemic influenza—again a figure far lower than expected [177].

On the other hand, the side effects of masks are clinically relevant.

In our work, we focused exclusively on the undesirable and negative side effects that can be produced by masks. Valid significant evidence of combined mask-related changes were objectified ($p < 0.05$, $n \geq 50\%$), and we found a clustered and common occurrence of the different adverse effects within the respective studies with significantly measured effects (Figure 2). We were able to demonstrate a statistically significant correlation of the observed adverse effect of hypoxia and the symptom of fatigue with $p < 0.05$ in the quantitative evaluation of the primary studies. Our review of the literature shows that both healthy and sick people can experience Mask-Induced Exhaustion Syndrome (MIES), with typical changes and symptoms that are often observed in combination, such as an increase in breathing dead space volume [22,24,58,59], increase in breathing resistance [31,35,60,61], increase in blood carbon dioxide [13,15,17,19,21–30,35], decrease in blood oxygen saturation [18,19,21,23,28–34], increase in heart rate [23,29,30,35], increase in blood pressure [25,35], decrease in cardiopulmonary capacity [31], increase in respiratory rate [15,21,23,34,36], shortness of breath and difficulty breathing [15,17,19,21,23,25,29,31,34,35,60,71,85,101,133], headache [19,27,29,37,66–68,71,83], dizziness [23,29], feeling hot and clammy [17,22,29,31,35,44,71,85,133], decreased ability to concentrate [29], decreased ability to think [36,37], drowsiness [19,29,32,36,37], decrease in empathy perception [99], impaired skin barrier function [37,72,73] with itching [31,35,67,71–73,91–93], acne, skin lesions and irritation [37,72,73], overall perceived fatigue and exhaustion [15,19,21,29,31,32,34,35,69] (Figures 2–4).

Wearing masks does not consistently cause clinical deviations from the norm of physiological parameters, but according to the scientific literature, a long-term pathological consequence with clinical relevance is to be expected owing to a longer-lasting effect with a subliminal impact and significant shift in the pathological direction. For changes that do not exceed normal values, but are persistently recurring, such as an increase in blood carbon dioxide [38,160], an increase in heart rate [55] or an increase in respiratory rate [56,57], which have been documented while wearing a mask [13,15,17,19,21–30,34,35] (Figure 2), a long-term generation of high blood pressure [25,35], arteriosclerosis and coronary heart disease and of neurological diseases is scientifically obvious [38,55–57,160]. This pathogenetic damage principle with a chronic low-dose exposure with long-term effect, which leads to disease or disease-relevant conditions, has already been extensively studied and described in many areas of environmental medicine [38,46–54]. Extended

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

mask-wearing would have the potential, according to the facts and correlations we have found, to cause a chronic sympathetic stress response induced by blood gas modifications and controlled by brain centers. This in turn induces and triggers immune suppression and metabolic syndrome with cardiovascular and neurological diseases.

We not only found evidence in the reviewed mask literature of potential long-term effects, but also evidence of an increase in direct short-term effects with increased mask-wearing time in terms of cumulative effects for: carbon dioxide retention, drowsiness, headache, feeling of exhaustion, skin irritation (redness, itching) and microbiological contamination (germ colonization) [19,22,37,66,68,69,89,91,92].

Overall, the exact frequency of the described symptom constellation MIES in the mask-using populace remains unclear and cannot be estimated due to insufficient data.

Theoretically, the mask-induced effects of the drop in blood gas oxygen and increase in carbon dioxide extend to the cellular level with induction of the transcription factor HIF (hypoxia-induced factor) and increased inflammatory and cancer-promoting effects [160] and can, thus, also have a negative influence on pre-existing clinical pictures.

In any case, the MIES potentially triggered by masks (Figures 3 and 4) contrasts with the WHO definition of health: "health is a state of complete physical, mental and social well-being and not merely the absence of disease or infirmity." [178].

All the scientific facts found in our work expand the knowledge base for a differentiated view of the mask debate. This gain can be relevant for decision makers who have to deal with the issue of mandatory mask use during the pandemic under constant review of proportionality as well as for physicians who can advise their patients more appropriately on this basis. For certain diseases, taking into account the literature found in this study, it is also necessary for the attending physician to weigh up the benefits and risks with regard to a mask obligation. With an overall strictly scientific consideration, a recommendation for mask exemption can become justifiable within the framework of a medical appraisal (Figure 5).



**Figure 5.** Diseases/predispositions with significant risks, according to the literature found, when using masks. Indications for weighing up medical mask exemption certificates.

In addition to protecting the health of their patients, doctors should also base their actions on the guiding principle of the 1948 Geneva Declaration, as revised in 2017. According to this, every doctor vows to put the health and dignity of his patient first and, even under threat, not to use his medical knowledge to violate human rights and civil liberties [9]. Within the framework of these findings, we, therefore, propagate an explicitly medically judicious, legally compliant action in consideration of scientific factual reality [2,4,5,16,130,132,143,175–177] against a predominantly assumption-led claim to a general effectiveness of masks, always taking into account possible unwanted individual ef-

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

fects for the patient and mask wearer concerned, entirely in accordance with the principles of evidence-based medicine and the ethical guidelines of a physician.

The results of the present literature review could help to include mask-wearing in the differential diagnostic pathophysiological cause consideration of every physician when corresponding symptoms are present (MIES, Figure 4). In this way, the physician can draw on an initial complaints catalogue that may be associated with mask-wearing (Figure 2) and also exclude certain diseases from the general mask requirement (Figure 5).

For scientists, the prospect of continued mask use in everyday life suggests areas for further research. In our view, further research is particularly desirable in the gynecological (fetal and embryonic) and pediatric fields, as children are a vulnerable group that would face the longest and, thus, most profound consequences of a potentially risky mask use. Basic research at the cellular level regarding mask-induced triggering of the transcription factor HIF with potential promotion of immunosuppression and carcinogenicity also appears to be useful under this circumstance. Our scoping review shows the need for a systematic review.

The described mask-related changes in respiratory physiology can have an adverse effect on the wearer's blood gases sub-clinically and in some cases also clinically manifest and, therefore, have a negative effect on the basis of all aerobic life, external and internal respiration, with an influence on a wide variety of organ systems and metabolic processes with physical, psychological and social consequences for the individual human being.

**Author Contributions:** Conceptualization, K.K. and O.H.; methodology, K.K. and O.H.; software, O.H.; formal analysis, K.K., O.H., P.G., A.P., B.K., D.G., S.F. and O.K.; investigation, K.K., O.H., P.G., A.P., B.K., D.G., S.F. and O.K.; writing—original draft preparation, K.K., O.H., P.G., A.P., B.K., D.G., S.F. and O.K.; writing—review and editing K.K., O.H., P.G., A.P., B.K., D.G., S.F. and O.K. All authors have read and agreed to the published version of the manuscript.

**Funding:** This research received no external funding.

**Institutional Review Board Statement:** Not applicable.

**Informed Consent Statement:** Not applicable.

**Data Availability Statement:** Not applicable.

**Acknowledgments:** We thank Bonita Blankart, for translation of the manuscript. For support in their special field we wish to thank: Tanja Boehnke (Psychology), Nicola Fels (Pediatrics), Michael Grönke (Anesthesiology), Basile Marcos (Psychiatry), Bartholomeus Maris (Gynecology) and Markus Veit (Pharmacist).

**Conflicts of Interest:** The authors declare no conflict of interest.

## References

1. World Health Organization. *WHO-Advice on the Use of Masks in the Context of COVID-19: Interim Guidance, 6 April 2020*; World Health Organization: Geneva, Switzerland, 2020; Available online: https://apps.who.int/iris/handle/10665/331693 (accessed on 7 November 2020).
2. World Health Organization. *WHO-Advice on the Use of Masks in the Context of COVID-19: Interim Guidance, 5 June 2020*; World Health Organization: Geneva, Switzerland, 2020; Available online: https://apps.who.int/iris/handle/10665/332293 (accessed on 7 November 2020).
3. Chu, D.K.; Akl, E.A.; Duda, S.; Solo, K.; Yaacoub, S.; Schünemann, H.J.; Chu, D.K.; Akl, E.A.; El-harakeh, A.; Bognanni, A.; et al. Physical Distancing, Face Masks, and Eye Protection to Prevent Person-to-Person Transmission of SARS-CoV-2 and COVID-19: A Systematic Review and Meta-Analysis. *Lancet* **2020**, *395*, 1973–1987. [CrossRef]
4. Jefferson, T.; Jones, M.; Ansari, L.A.A.; Bawazeer, G.; Beller, E.; Clark, J.; Conly, J.; Mar, C.D.; Dooley, E.; Ferroni, E.; et al. Physical Interventions to Interrupt or Reduce the Spread of Respiratory Viruses. Part 1-Face Masks, Eye Protection and Person Distancing: Systematic Review and Meta-Analysis. *medRxiv* **2020**. [CrossRef]
5. Kappstein, I. Mund-Nasen-Schutz in der Öffentlichkeit: Keine Hinweise für eine Wirksamkeit. *Krankenh. Up2date* **2020**, *15*, 279–295. [CrossRef]
6. De Brouwer, C. Wearing a Mask, a Universal Solution against COVID-19 or an Additional Health Risk? 2020. Available online: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3676885 (accessed on 12 November 2020). [CrossRef]
7. Ewig, S.; Gatermann, S.; Lemmen, S. Die Maskierte Gesellschaft. *Pneumologie* **2020**, *74*, 405–408. [CrossRef] [PubMed]

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

8. Great Barrington Declaration Great Barrington Declaration and Petition. Available online: https://gbdeclaration.org/ (accessed on 9 November 2020).
9. WMA-The World Medical Association-WMA Declaration of Geneva. Available online: https://www.wma.net/policies-post/wma-declaration-of-geneva/ (accessed on 7 November 2020).
10. WMA-The World Medical Association-WMA Declaration of Helsinki–Ethical Principles for Medical Research Involving Human Subjects. Available online: https://www.wma.net/policies-post/wma-declaration-of-geneva/ (accessed on 7 November 2020).
11. WMA-The World Medical Association-WMA Declaration of Lisbon on the Rights of the Patient. Available online: https://www.wma.net/policies-post/wma-declaration-of-lisbon-on-the-rights-of-the-patient/ (accessed on 7 November 2020).
12. Villalonga-Olives, E.; Kawachi, I. The Dark Side of Social Capital: A Systematic Review of the Negative Health Effects of Social Capital. *Soc. Sci. Med.* **2017**, *194*, 105–127. [CrossRef]
13. Butz, U. Rückatmung von Kohlendioxid bei Verwendung von Operationsmasken als hygienischer Mundschutz an medizinischem Fachpersonal. Ph.D. Thesis, Fakultät für Medizin der Technischen Universität München, Munich, Germany, 2005.
14. Smolka, L.; Borkowski, J.; Zaton, M. The Effect of Additional Dead Space on Respiratory Exchange Ratio and Carbon Dioxide Production Due to Training. *J. Sports Med.* **2014**, *13*, 36–43. [PubMed]
15. Roberge, R.J.; Kim, J.-H.; Benson, S.M. Absence of Consequential Changes in Physiological, Thermal and Subjective Responses from Wearing a Surgical Mask. *Respir. Physiol. Neurobiol.* **2012**, *181*, 29–35. [CrossRef] [PubMed]
16. Matuschek, C.; Moll, F.; Fangerau, H.; Fischer, J.C.; Zänker, K.; van Griensven, M.; Schneider, M.; Kindgen-Milles, D.; Knoefel, W.T.; Lichtenberg, A.; et al. Face Masks: Benefits and Risks during the COVID-19 Crisis. *Eur. J. Med. Res.* **2020**, *25*, 32. [CrossRef]
17. Roberge, R.J.; Coca, A.; Williams, W.J.; Powell, J.B.; Palmiero, A.J. Physiological Impact of the N95 Filtering Facepiece Respirator on Healthcare Workers. *Respir. Care* **2010**, *55*, 569–577.
18. Pifarré, F.; Zabala, D.D.; Grazioli, G.; de Yzaguirre i Maura, I. COVID 19 and Mask in Sports. *Apunt. Sports Med.* **2020**. [CrossRef]
19. Rebmann, T.; Carrico, R.; Wang, J. Physiologic and Other Effects and Compliance with Long-Term Respirator Use among Medical Intensive Care Unit Nurses. *Am. J. Infect. Control* **2013**, *41*, 1218–1223. [CrossRef]
20. Roeckner, J.T.; Krstić, N.; Sipe, B.H.; Običan, S.G. N95 Filtering Facepiece Respirator Use during Pregnancy: A Systematic Review. *Am. J. Perinatol.* **2020**, *37*, 995–1001. [CrossRef]
21. Georgi, C.; Haase-Fielitz, A.; Meretz, D.; Gäsert, L.; Butter, C. Einfluss gängiger Gesichtsmasken auf physiologische Parameter und Belastungsempfinden unter arbeitstypischer körperlicher Anstrengung. *Deutsches Ärzteblatt* **2020**, 674–675. [CrossRef]
22. Roberge, R.J.; Kim, J.-H.; Powell, J.B. N95 Respirator Use during Advanced Pregnancy. *Am. J. Infect. Control* **2014**, *42*, 1097–1100. [CrossRef]
23. Kyung, S.Y.; Kim, Y.; Hwang, H.; Park, J.-W.; Jeong, S.H. Risks of N95 Face Mask Use in Subjects with COPD. *Respir. Care* **2020**, *65*, 658–664. [CrossRef]
24. Epstein, D.; Korytny, A.; Isenberg, Y.; Marcusohn, E.; Zukermann, R.; Bishop, B.; Minha, S.; Raz, A.; Miller, A. Return to Training in the COVID-19 Era: The Physiological Effects of Face Masks during Exercise. *Scand. J. Med. Sci. Sports* **2020**. [CrossRef]
25. Mo, Y.; Wei, D.; Mai, Q.; Chen, C.; Yu, H.; Jiang, C.; Tan, X. Risk and Impact of Using Mask on COPD Patients with Acute Exacerbation during the COVID-19 Outbreak: A Retrospective Study. *Res. Sq.* **2020**. [CrossRef]
26. Goh, D.Y.T.; Mun, M.W.; Lee, W.L.J.; Teoh, O.H.; Rajgor, D.D. A Randomised Clinical Trial to Evaluate the Safety, Fit, Comfort of a Novel N95 Mask in Children. *Sci. Rep.* **2019**, *9*, 18952. [CrossRef]
27. Bharatendu, C.; Ong, J.J.Y.; Goh, Y.; Tan, B.Y.Q.; Chan, A.C.Y.; Tang, J.Z.Y.; Leow, A.S.; Chin, A.; Sooi, K.W.X.; Tan, Y.L.; et al. Powered Air Purifying Respirator (PAPR) Restores the N95 Face Mask Induced Cerebral Hemodynamic Alterations among Healthcare Workers during COVID-19 Outbreak. *J. Neurol. Sci.* **2020**, *417*, 117078. [CrossRef]
28. Tong, P.S.Y.; Kale, A.S.; Ng, K.; Loke, A.P.; Choolani, M.A.; Lim, C.L.; Chan, Y.H.; Chong, Y.S.; Tambyah, P.A.; Yong, E.-L. Respiratory Consequences of N95-Type Mask Usage in Pregnant Healthcare Workers—A Controlled Clinical Study. *Antimicrob. Resist. Infect. Control* **2015**, *4*, 48. [CrossRef]
29. Liu, C.; Li, G.; He, Y.; Zhang, Z.; Ding, Y. Effects of Wearing Masks on Human Health and Comfort during the COVID-19 Pandemic. *IOP Conf. Ser. Earth Environ. Sci.* **2020**, *531*, 012034. [CrossRef]
30. Beder, A.; Büyükkoçak, U.; Sabuncuoğlu, H.; Keskil, Z.A.; Keskil, S. Preliminary Report on Surgical Mask Induced Deoxygenation during Major Surgery. *Neurocirugía* **2008**, *19*, 121–126. [CrossRef]
31. Fikenzer, S.; Uhe, T.; Lavall, D.; Rudolph, U.; Falz, R.; Busse, M.; Hepp, P.; Laufs, U. Effects of Surgical and FFP2/N95 Face Masks on Cardiopulmonary Exercise Capacity. *Clin. Res. Cardiol.* **2020**, *109*, 1522–1530. [CrossRef] [PubMed]
32. Jagim, A.R.; Dominy, T.A.; Camic, C.L.; Wright, G.; Doberstein, S.; Jones, M.T.; Oliver, J.M. Acute Effects of the Elevation Training Mask on Strength Performance in Recreational Weight Lifters. *J. Strength Cond. Res.* **2018**, *32*, 482–489. [CrossRef]
33. Porcari, J.P.; Probst, L.; Forrester, K.; Doberstein, S.; Foster, C.; Cress, M.L.; Schmidt, K. Effect of Wearing the Elevation Training Mask on Aerobic Capacity, Lung Function, and Hematological Variables. *J. Sports Sci. Med.* **2016**, *15*, 379–386.
34. Kao, T.-W.; Huang, K.-C.; Huang, Y.-L.; Tsai, T.-J.; Hsieh, B.-S.; Wu, M.-S. The Physiological Impact of Wearing an N95 Mask during Hemodialysis as a Precaution against SARS in Patients with End-Stage Renal Disease. *J. Formos. Med. Assoc.* **2004**, *103*, 624–628.
35. Li, Y.; Tokura, H.; Guo, Y.P.; Wong, A.S.W.; Wong, T.; Chung, J.; Newton, E. Effects of Wearing N95 and Surgical Facemasks on Heart Rate, Thermal Stress and Subjective Sensations. *Int. Arch. Occup. Environ. Health* **2005**, *78*, 501–509. [CrossRef]
36. Johnson, A.T. Respirator Masks Protect Health but Impact Performance: A Review. *J. Biol. Eng.* **2016**, *10*, 4. [CrossRef]

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

37. Rosner, E. Adverse Effects of Prolonged Mask Use among Healthcare Professionals during COVID-19. *J. Infect. Dis. Epidemiol.* **2020**. [CrossRef]

38. Azuma, K.; Kagi, N.; Yanagi, U.; Osawa, H. Effects of Low-Level Inhalation Exposure to Carbon Dioxide in Indoor Environments: A Short Review on Human Health and Psychomotor Performance. *Environ. Int.* **2018**, *121*, 51–56. [CrossRef]

39. Drechsler, M.; Morris, J. Carbon Dioxide Narcosis. In *StatPearls*; StatPearls Publishing: Treasure Island, FL, USA, 2020.

40. Noble, J.; Jones, J.G.; Davis, E.J. Cognitive Function during Moderate Hypoxaemia. *Anaesth. Intensive Care* **1993**, *21*, 180–184. [CrossRef]

41. Fothergill, D.M.; Hedges, D.; Morrison, J.B. Effects of $CO_2$ and $N_2$ Partial Pressures on Cognitive and Psychomotor Performance. *Undersea Biomed. Res.* **1991**, *18*, 1–19.

42. Spitzer, M. Masked Education? The Benefits and Burdens of Wearing Face Masks in Schools during the Current Corona Pandemic. *Trends Neurosci. Educ.* **2020**, *20*, 100138. [CrossRef]

43. Heider, C.A.; Álvarez, M.L.; Fuentes-López, E.; González, C.A.; León, N.I.; Verástegui, D.C.; Badía, P.I.; Napolitano, C.A. Prevalence of Voice Disorders in Healthcare Workers in the Universal Masking COVID-19 Era. *Laryngoscope* **2020**. [CrossRef]

44. Roberge, R.J.; Kim, J.-H.; Coca, A. Protective Facemask Impact on Human Thermoregulation: An Overview. *Ann. Occup. Hyg.* **2012**, *56*, 102–112. [CrossRef]

45. Palmiero, A.J.; Symons, D.; Morgan, J.W.; Shaffer, R.E. Speech Intellegibility Assessment of Protective Facemasks and Air-Purifying Respirators. *J. Occup. Environ. Hyg.* **2016**, *13*, 960–968. [CrossRef]

46. Simonton, D.; Spears, M. Human Health Effects from Exposure to Low-Level Concentrations of Hydrogen Sulfide. *Occup. Health Saf. (Waco Tex.)* **2007**, *76*, 102–104.

47. Salimi, F.; Morgan, G.; Rolfe, M.; Samoli, E.; Cowie, C.T.; Hanigan, I.; Knibbs, L.; Cope, M.; Johnston, F.H.; Guo, Y.; et al. Long-Term Exposure to Low Concentrations of Air Pollutants and Hospitalisation for Respiratory Diseases: A Prospective Cohort Study in Australia. *Environ. Int.* **2018**, *121*, 415–420. [CrossRef]

48. Dominici, F.; Schwartz, J.; Di, Q.; Braun, D.; Choirat, C.; Zanobetti, A. *Assessing Adverse Health Effects of Long-Term Exposure to Low Levels of Ambient Air Pollution: Phase 1 Research Report*; Health Effects Institute: Boston, MA, USA, 2019; pp. 1–51.

49. Alleva, R.; Manzella, N.; Gaetani, S.; Bacchetti, T.; Bracci, M.; Ciarapica, V.; Monaco, F.; Borghi, B.; Amati, M.; Ferretti, G.; et al. Mechanism Underlying the Effect of Long-Term Exposure to Low Dose of Pesticides on DNA Integrity. *Environ. Toxicol.* **2018**, *33*, 476–487. [CrossRef]

50. Roh, T.; Lynch, C.F.; Weyer, P.; Wang, K.; Kelly, K.M.; Ludewig, G. Low-Level Arsenic Exposure from Drinking Water Is Associated with Prostate Cancer in Iowa. *Environ. Res.* **2017**, *159*, 338–343. [CrossRef]

51. Deering, K.E.; Callan, A.C.; Prince, R.L.; Lim, W.H.; Thompson, P.L.; Lewis, J.R.; Hinwood, A.L.; Devine, A. Low-Level Cadmium Exposure and Cardiovascular Outcomes in Elderly Australian Women: A Cohort Study. *Int. J. Hyg. Environ. Health* **2018**, *221*, 347–354. [CrossRef] [PubMed]

52. Kosnett, M. Health Effects of Low Dose Lead Exposure in Adults and Children, and Preventable Risk Posed by the Consumption of Game Meat Harvested with Lead Ammunition. In *Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans*; The Peregrine Fund: Boise, ID, USA, 2009. [CrossRef]

53. Crinnion, W.J. Environmental Medicine, Part Three: Long-Term Effects of Chronic Low-Dose Mercury Exposure. *Altern. Med. Rev.* **2000**, *5*, 209–223. [PubMed]

54. Wu, S.; Han, J.; Vleugels, R.A.; Puett, R.; Laden, F.; Hunter, D.J.; Qureshi, A.A. Cumulative Ultraviolet Radiation Flux in Adulthood and Risk of Incident Skin Cancers in Women. *Br. J. Cancer* **2014**, *110*, 1855–1861. [CrossRef] [PubMed]

55. Custodis, F.; Schirmer, S.H.; Baumhäkel, M.; Heusch, G.; Böhm, M.; Laufs, U. Vascular Pathophysiology in Response to Increased Heart Rate. *J. Am. Coll. Cardiol.* **2010**, *56*, 1973–1983. [CrossRef]

56. Russo, M.A.; Santarelli, D.M.; O'Rourke, D. The Physiological Effects of Slow Breathing in the Healthy Human. *Breathe* **2017**, *13*, 298–309. [CrossRef]

57. Nuckowska, M.K.; Gruszecki, M.; Kot, J.; Wolf, J.; Guminski, W.; Frydrychowski, A.F.; Wtorek, J.; Narkiewicz, K.; Winklewski, P.J. Impact of Slow Breathing on the Blood Pressure and Subarachnoid Space Width Oscillations in Humans. *Sci. Rep.* **2019**, *9*, 6232. [CrossRef]

58. Johnson, A.T.; Scott, W.H.; Lausted, C.G.; Coyne, K.M.; Sahota, M.S.; Johnson, M.M. Effect of External Dead Volume on Performance While Wearing a Respirator. *AIHAJ-Am. Ind. Hyg. Assoc.* **2000**, *61*, 678–684. [CrossRef]

59. Xu, M.; Lei, Z.; Yang, J. Estimating the Dead Space Volume between a Headform and N95 Filtering Facepiece Respirator Using Microsoft Kinect. *J. Occup. Environ. Hyg.* **2015**, *12*, 538–546. [CrossRef]

60. Lee, H.P.; Wang, D.Y. Objective Assessment of Increase in Breathing Resistance of N95 Respirators on Human Subjects. *Ann. Occup. Hyg.* **2011**, *55*, 917–921. [CrossRef]

61. Roberge, R.; Bayer, E.; Powell, J.; Coca, A.; Roberge, M.; Benson, S. Effect of Exhaled Moisture on Breathing Resistance of N95 Filtering Facepiece Respirators. *Ann. Occup. Hyg.* **2010**, *54*, 671–677. [CrossRef]

62. Jamjoom, A.; Nikkar-Esfahani, A.; Fitzgerald, J. Operating Theatre Related Syncope in Medical Students: A Cross Sectional Study. *BMC Med. Educ.* **2009**, *9*, 14. [CrossRef]

63. Asadi-Pooya, A.A.; Cross, J.H. Is Wearing a Face Mask Safe for People with Epilepsy? *Acta Neurol. Scand.* **2020**, *142*, 314–316. [CrossRef]

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

64. Lazzarino, A.I.; Steptoe, A.; Hamer, M.; Michie, S. Covid-19: Important Potential Side Effects of Wearing Face Masks That We Should Bear in Mind. *BMJ* **2020**, *369*, m2003. [CrossRef]

65. Guaranha, M.S.B.; Garzon, E.; Buchpiguel, C.A.; Tazima, S.; Yacubian, E.M.T.; Sakamoto, A.C. Hyperventilation Revisited: Physiological Effects and Efficacy on Focal Seizure Activation in the Era of Video-EEG Monitoring. *Epilepsia* **2005**, *46*, 69–75. [CrossRef]

66. Ong, J.J.Y.; Bharatendu, C.; Goh, Y.; Tang, J.Z.Y.; Sooi, K.W.X.; Tan, Y.L.; Tan, B.Y.Q.; Teoh, H.-L.; Ong, S.T.; Allen, D.M.; et al. Headaches Associated With Personal Protective Equipment-A Cross-Sectional Study among Frontline Healthcare Workers During COVID-19. *Headache* **2020**, *60*, 864–877. [CrossRef]

67. Jacobs, J.L.; Ohde, S.; Takahashi, O.; Tokuda, Y.; Omata, F.; Fukui, T. Use of Surgical Face Masks to Reduce the Incidence of the Common Cold among Health Care Workers in Japan: A Randomized Controlled Trial. *Am. J. Infect. Control* **2009**, *37*, 417–419. [CrossRef]

68. Ramirez-Moreno, J.M. Mask-Associated de Novo Headache in Healthcare Workers during the Covid-19 Pandemic. *medRxiv* **2020**. [CrossRef]

69. Shenal, B.V.; Radonovich, L.J.; Cheng, J.; Hodgson, M.; Bender, B.S. Discomfort and Exertion Associated with Prolonged Wear of Respiratory Protection in a Health Care Setting. *J. Occup. Environ. Hyg.* **2011**, *9*, 59–64. [CrossRef]

70. Rains, S.A. The Nature of Psychological Reactance Revisited: A Meta-Analytic Review. *Hum. Commun. Res.* **2013**, *39*, 47–73. [CrossRef]

71. Matusiak, Ł.; Szepietowska, M.; Krajewski, P.; Białynicki-Birula, R.; Szepietowski, J.C. Inconveniences Due to the Use of Face Masks during the COVID-19 Pandemic: A Survey Study of 876 Young People. *Dermatol. Ther.* **2020**, *33*, e13567. [CrossRef]

72. Foo, C.C.I.; Goon, A.T.J.; Leow, Y.; Goh, C. Adverse Skin Reactions to Personal Protective Equipment against Severe Acute Respiratory Syndrome–a Descriptive Study in Singapore. *Contact Dermat.* **2006**, *55*, 291–294. [CrossRef]

73. Hua, W.; Zuo, Y.; Wan, R.; Xiong, L.; Tang, J.; Zou, L.; Shu, X.; Li, L. Short-Term Skin Reactions Following Use of N95 Respirators and Medical Masks. *Contact Dermat.* **2020**, *83*, 115–121. [CrossRef]

74. Prousa, D. Studie zu psychischen und psychovegetativen Beschwerden mit den aktuellen Mund-Nasenschutz-Verordnungen. *PsychArchives* **2020**. [CrossRef]

75. Sell, T.K.; Hosangadi, D.; Trotochaud, M. Misinformation and the US Ebola Communication Crisis: Analyzing the Veracity and Content of Social Media Messages Related to a Fear-Inducing Infectious Disease Outbreak. *BMC Public Health* **2020**, *20*, 550. [CrossRef]

76. Ryan, R.M.; Deci, E.L. Self-determination theory and the role of basic psychological needs in personality and the organization of behavior. In *Handbook of Personality: Theory and Research*, 3rd ed.; The Guilford Press: New York, NY, USA, 2008; pp. 654–678. ISBN 978-1-59385-836-0.

77. Kent, J.M.; Papp, L.A.; Martinez, J.M.; Browne, S.T.; Coplan, J.D.; Klein, D.F.; Gorman, J.M. Specificity of Panic Response to CO(2) Inhalation in Panic Disorder: A Comparison with Major Depression and Premenstrual Dysphoric Disorder. *Am. J. Psychiatry* **2001**, *158*, 58–67. [CrossRef] [PubMed]

78. Morris, L.S.; McCall, J.G.; Charney, D.S.; Murrough, J.W. The Role of the Locus Coeruleus in the Generation of Pathological Anxiety. *Brain Neurosci. Adv.* **2020**, *4*. [CrossRef] [PubMed]

79. Gorman, J.M.; Askanazi, J.; Liebowitz, M.R.; Fyer, A.J.; Stein, J.; Kinney, J.M.; Klein, D.F. Response to Hyperventilation in a Group of Patients with Panic Disorder. *Am. J. Psychiatry* **1984**, *141*, 857–861. [CrossRef] [PubMed]

80. Tsugawa, A.; Sakurai, S.; Inagawa, Y.; Hirose, D.; Kaneko, Y.; Ogawa, Y.; Serisawa, S.; Takenoshita, N.; Sakurai, H.; Kanetaka, H.; et al. Awareness of the COVID-19 Outbreak and Resultant Depressive Tendencies in Patients with Severe Alzheimer's Disease. *JAD* **2020**, *77*, 539–541. [CrossRef]

81. Maguire, P.A.; Reay, R.E.; Looi, J.C. Nothing to Sneeze at-Uptake of Protective Measures against an Influenza Pandemic by People with Schizophrenia: Willingness and Perceived Barriers. *Australas. Psychiatry* **2019**, *27*, 171–178. [CrossRef]

82. COVID-19: Considerations for Wearing Masks|CDC. Available online: https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html (accessed on 12 November 2020).

83. Lim, E.C.H.; Seet, R.C.S.; Lee, K.-H.; Wilder-Smith, E.P.V.; Chuah, B.Y.S.; Ong, B.K.C. Headaches and the N95 Face-mask amongst Healthcare Providers. *Acta Neurol. Scand.* **2006**, *113*, 199–202. [CrossRef]

84. Badri, F.M.A. Surgical Mask Contact Dermatitis and Epidemiology of Contact Dermatitis in Healthcare Workers. *Curr. Allergy Clin. Immunol.* **2017**, *30*, 183–188.

85. Scarano, A.; Inchingolo, F.; Lorusso, F. Facial Skin Temperature and Discomfort When Wearing Protective Face Masks: Thermal Infrared Imaging Evaluation and Hands Moving the Mask. *Int. J. Environ. Res. Public Health* **2020**, *17*, 4624. [CrossRef]

86. Luksamijarulkul, P.; Aiempradit, N.; Vatanasomboon, P. Microbial Contamination on Used Surgical Masks among Hospital Personnel and Microbial Air Quality in Their Working Wards: A Hospital in Bangkok. *Oman Med. J.* **2014**, *29*, 346–350. [CrossRef]

87. Chughtai, A.A.; Stelzer-Braid, S.; Rawlinson, W.; Pontivivo, G.; Wang, Q.; Pan, Y.; Zhang, D.; Zhang, Y.; Li, L.; MacIntyre, C.R. Contamination by Respiratory Viruses on Outer Surface of Medical Masks Used by Hospital Healthcare Workers. *BMC Infect. Dis.* **2019**, *19*, 491. [CrossRef]

88. Monalisa, A.C.; Padma, K.B.; Manjunath, K.; Hemavathy, E.; Varsha, D. Microbial Contamination of the Mouth Masks Used by Post-Graduate Students in a Private Dental Institution: An In-Vitro Study. *IOSR J. Dent. Med. Sci.* **2017**, *16*, 61–67.

89. Liu, Z.; Chang, Y.; Chu, W.; Yan, M.; Mao, Y.; Zhu, Z.; Wu, H.; Zhao, J.; Dai, K.; Li, H.; et al. Surgical Masks as Source of Bacterial Contamination during Operative Procedures. *J. Orthop. Transl.* **2018**, *14*, 57–62. [CrossRef]

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

90. Robert Koch-Institut. *Influenza-Monatsbericht*; Robert Koch-Institut: Berlin, Germany, 2020.
91. Techasatian, L.; Lebsing, S.; Uppala, R.; Thaowandee, W.; Chaiyarit, J.; Supakunpinyo, C.; Panombualert, S.; Mairiang, D.; Saengnipanthkul, S.; Wichajarn, K.; et al. The Effects of the Face Mask on the Skin Underneath: A Prospective Survey During the COVID-19 Pandemic. *J. Prim. Care Community Health* **2020**, *11*, 2150132720966167. [CrossRef]
92. Lan, J.; Song, Z.; Miao, X.; Li, H.; Li, Y.; Dong, L.; Yang, J.; An, X.; Zhang, Y.; Yang, L.; et al. Skin Damage among Health Care Workers Managing Coronavirus Disease-2019. *J. Am. Acad. Dermatol.* **2020**, *82*, 1215–1216. [CrossRef]
93. Szepietowski, J.C.; Matusiak, Ł.; Szepietowska, M.; Krajewski, P.K.; Białynicki-Birula, R. Face Mask-Induced Itch: A Self-Questionnaire Study of 2,315 Responders during the COVID-19 Pandemic. *Acta Derm.-Venereol.* **2020**, *100*, adv00152. [CrossRef]
94. Darlenski, R.; Tsankov, N. COVID-19 Pandemic and the Skin: What Should Dermatologists Know? *Clin. Dermatol.* **2020**. [CrossRef]
95. Muley, P.; 'Mask Mouth'-a Novel Threat to Oral Health in the COVID Era–Dr Pooja Muley. Dental Tribune South Asia 2020. Available online: https://in.dental-tribune.com/news/mask-mouth-a-novel-threat-to-oral-health-in-the-covid-era/ (accessed on 12 November 2020).
96. Klimek, L.; Huppertz, T.; Alali, A.; Spielhaupter, M.; Hörmann, K.; Matthias, C.; Hagemann, J. A New Form of Irritant Rhinitis to Filtering Facepiece Particle (FFP) Masks (FFP2/N95/KN95 Respirators) during COVID-19 Pandemic. *World Allergy Organ. J.* **2020**, *13*, 100474. [CrossRef]
97. COVID-19 Mythbusters–World Health Organization. Available online: https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public/myth-busters (accessed on 28 January 2021).
98. Asadi, S.; Cappa, C.D.; Barreda, S.; Wexler, A.S.; Bouvier, N.M.; Ristenpart, W.D. Efficacy of Masks and Face Coverings in Controlling Outward Aerosol Particle Emission from Expiratory Activities. *Sci. Rep.* **2020**, *10*, 15665. [CrossRef]
99. Wong, C.K.M.; Yip, B.H.K.; Mercer, S.; Griffiths, S.; Kung, K.; Wong, M.C.; Chor, J.; Wong, S.Y. Effect of Facemasks on Empathy and Relational Continuity: A Randomised Controlled Trial in Primary Care. *BMC Fam. Pract.* **2013**, *14*, 200. [CrossRef]
100. World Health Organization; United Nations Children's Fund. *WHO-Advice on the Use of Masks for Children in the Community in the Context of COVID-19: Annex to the Advice on the Use of Masks in the Context of COVID-19, 21 August 2020*; World Health Organization: Geneva, Switzerland, 2020.
101. Person, E.; Lemercier, C.; Royer, A.; Reychler, G. Effet du port d'un masque de soins lors d'un test de marche de six minutes chez des sujets sains. *Rev. Mal. Respir.* **2018**, *35*, 264–268. [CrossRef]
102. Johnson, A.T.; Scott, W.H.; Phelps, S.J.; Caretti, D.M.; Koh, F.C. How Is Respirator Comfort Affected by Respiratory Resistance? *J. Int. Soc. Respir. Prot.* **2005**, *22*, 38.
103. Koh, F.C.; Johnson, A.T.; Scott, W.H.; Phelps, S.J.; Francis, E.B.; Cattungal, S. The Correlation between Personality Type and Performance Time While Wearing a Respirator. *J. Occup. Environ. Hyg.* **2006**, *3*, 317–322. [CrossRef]
104. Deutsche Gesetzliche Unfallversicherung. *DGUV Grundsätze für Arbeitsmedizinische Vorsorgeuntersuchungen*; Alfons, W., Ed.; Gentner Verlag: Stuttgart, Germany, 2010; ISBN 978-3-87247-733-0.
105. Browse by Country-NATLEX. Available online: https://www.ilo.org/dyn/natlex/natlex4.byCountry?p_lang=en (accessed on 28 January 2021).
106. BAuA-SARS-CoV-2 FAQ Und Weitere Informationen-Kennzeichnung von Masken Aus USA, Kanada, Australien/Neuseeland, Japan, China Und Korea-Bundesanstalt Für Arbeitsschutz Und Arbeitsmedizin. Available online: https://www.baua.de/DE/Themen/Arbeitsgestaltung-im-Betrieb/Coronavirus/pdf/Kennzeichnung-Masken.html (accessed on 28 January 2021).
107. Veit, M. Hauptsache Maske!? *DAZ.Online*. 2020, p. S26. Available online: https://www.deutsche-apotheker-zeitung.de/daz-az/2020/daz-33-2020/hauptsache-maske (accessed on 12 November 2020).
108. MacIntyre, C.R.; Seale, H.; Dung, T.C.; Hien, N.T.; Nga, P.T.; Chughtai, A.A.; Rahman, B.; Dwyer, D.E.; Wang, Q. A Cluster Randomised Trial of Cloth Masks Compared with Medical Masks in Healthcare Workers. *BMJ Open* **2015**, *5*, e006577. [CrossRef]
109. MacIntyre, C.R.; Chughtai, A.A. Facemasks for the Prevention of Infection in Healthcare and Community Settings. *BMJ* **2015**, *350*, h694. [CrossRef]
110. MacIntyre, C.R.; Wang, Q.; Seale, H.; Yang, P.; Shi, W.; Gao, Z.; Rahman, B.; Zhang, Y.; Wang, X.; Newall, A.T.; et al. A Randomized Clinical Trial of Three Options for N95 Respirators and Medical Masks in Health Workers. *Am. J. Respir. Crit. Care Med.* **2013**, *187*, 960–966. [CrossRef]
111. Dellweg, D.; Lepper, P.M.; Nowak, D.; Köhnlein, T.; Olgemöller, U.; Pfeifer, M. Position Paper of the German Respiratory Society (DGP) on the Impact of Community Masks on Self-Protection and Protection of Others in Regard to Aerogen Transmitted Diseases. *Pneumologie* **2020**, *74*, 331–336. [CrossRef]
112. Luckman, A.; Zeitoun, H.; Isoni, A.; Loomes, G.; Vlaev, I.; Powdthavee, N.; Read, D. Risk Compensation during COVID-19: The Impact of Face Mask Usage on Social Distancing. *OSF Preprints*. 2020. Available online: https://osf.io/rb8he/ (accessed on 25 October 2020).
113. Sharma, I.; Vashnav, M.; Sharma, R. COVID-19 Pandemic Hype: Losers and Gainers. *Indian J. Psychiatry* **2020**, *62*, S420–S430. [CrossRef] [PubMed]
114. BfArM-Empfehlungen Des BfArM-Hinweise Des BfArM Zur Verwendung von Mund–Nasen-Bedeckungen (z.B. Selbst Hergestellten Masken, "Community-Oder DIY-Masken"), Medizinischen Gesichtsmasken Sowie Partikelfiltrierenden Halbmasken (FFP1, FFP2 Und FFP3) Im Zusammenhang Mit Dem Coronavirus (SARS-CoV-2/Covid-19). Available online: https://www.bfarm.de/SharedDocs/Risikoinformationen/Medizinprodukte/DE/schutzmasken.html (accessed on 12 November 2020).

115. MacIntyre, C.R.; Wang, Q.; Cauchemez, S.; Seale, H.; Dwyer, D.E.; Yang, P.; Shi, W.; Gao, Z.; Pang, X.; Zhang, Y.; et al. A Cluster Randomized Clinical Trial Comparing Fit-Tested and Non-Fit-Tested N95 Respirators to Medical Masks to Prevent Respiratory Virus Infection in Health Care Workers. *Influenza Other Respir. Viruses* **2011**, *5*, 170–179. [CrossRef] [PubMed]

116. Gralton, J.; McLaws, M.-L. Protecting Healthcare Workers from Pandemic Influenza: N95 or Surgical Masks? *Crit. Care Med.* **2010**, *38*, 657–667. [CrossRef] [PubMed]

117. Smith, J.D.; MacDougall, C.C.; Johnstone, J.; Copes, R.A.; Schwartz, B.; Garber, G.E. Effectiveness of N95 Respirators versus Surgical Masks in Protecting Health Care Workers from Acute Respiratory Infection: A Systematic Review and Meta-Analysis. *CMAJ* **2016**, *188*, 567–574. [CrossRef] [PubMed]

118. Lee, S.-A.; Grinshpun, S.A.; Reponen, T. Respiratory Performance Offered by N95 Respirators and Surgical Masks: Human Subject Evaluation with NaCl Aerosol Representing Bacterial and Viral Particle Size Range. *Ann. Occup. Hyg.* **2008**, *52*, 177–185. [CrossRef] [PubMed]

119. Zhu, N.; Zhang, D.; Wang, W.; Li, X.; Yang, B.; Song, J.; Zhao, X.; Huang, B.; Shi, W.; Lu, R.; et al. A Novel Coronavirus from Patients with Pneumonia in China, 2019. *N. Engl. J. Med.* **2020**. [CrossRef]

120. Oberg, T.; Brosseau, L.M. Surgical Mask Filter and Fit Performance. *Am. J. Infect. Control* **2008**, *36*, 276–282. [CrossRef]

121. Eninger, R.M.; Honda, T.; Adhikari, A.; Heinonen-Tanski, H.; Reponen, T.; Grinshpun, S.A. Filter Performance of N99 and N95 Facepiece Respirators Against Viruses and Ultrafine Particles. *Ann. Occup. Hyg.* **2008**, *52*, 385–396. [CrossRef]

122. Morawska, L. Droplet Fate in Indoor Environments, or Can We Prevent the Spread of Infection? *Indoor Air* **2006**, *16*, 335–347. [CrossRef]

123. Ueki, H.; Furusawa, Y.; Iwatsuki-Horimoto, K.; Imai, M.; Kabata, H.; Nishimura, H.; Kawaoka, Y. Effectiveness of Face Masks in Preventing Airborne Transmission of SARS-CoV-2. *mSphere* **2020**, *5*, e00637-20. [CrossRef]

124. Radonovich, L.J.; Simberkoff, M.S.; Bessesen, M.T.; Brown, A.C.; Cummings, D.A.T.; Gaydos, C.A.; Los, J.G.; Krosche, A.E.; Gibert, C.L.; Gorse, G.J.; et al. N95 Respirators vs Medical Masks for Preventing Influenza Among Health Care Personnel: A Randomized Clinical Trial. *JAMA* **2019**, *322*, 824–833. [CrossRef]

125. Loeb, M.; Dafoe, N.; Mahony, J.; John, M.; Sarabia, A.; Glavin, V.; Webby, R.; Smieja, M.; Earn, D.J.D.; Chong, S.; et al. Surgical Mask vs N95 Respirator for Preventing Influenza Among Health Care Workers: A Randomized Trial. *JAMA* **2009**, *302*, 1865–1871. [CrossRef]

126. Konda, A.; Prakash, A.; Moss, G.A.; Schmoldt, M.; Grant, G.D.; Guha, S. Aerosol Filtration Efficiency of Common Fabrics Used in Respiratory Cloth Masks. *ACS Nano* **2020**, *14*, 6339–6347. [CrossRef]

127. Chughtai, A. Use of Cloth Masks in the Practice of Infection Control–Evidence and Policy Gaps. *Int. J. Infect. Control* **2013**, *9*. [CrossRef]

128. Labortest-Schutzmasken im Härtetest: Die Meisten Filtern Ungenügend. Available online: https://www.srf.ch/news/panorama/labortest-schutzmasken-im-haertetest-die-meisten-filtern-ungenuegend (accessed on 12 November 2020).

129. MacIntyre, C.R.; Cauchemez, S.; Dwyer, D.E.; Seale, H.; Cheung, P.; Browne, G.; Fasher, M.; Wood, J.; Gao, Z.; Booy, R.; et al. Face Mask Use and Control of Respiratory Virus Transmission in Households. *Emerg. Infect. Dis.* **2009**, *15*, 233–241. [CrossRef]

130. Xiao, J.; Shiu, E.Y.C.; Gao, H.; Wong, J.Y.; Fong, M.W.; Ryu, S.; Cowling, B.J. Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings—Personal Protective and Environmental Measures. *Emerg. Infect. Dis.* **2020**, *26*, 967–975. [CrossRef]

131. Aiello, A.E.; Murray, G.F.; Perez, V.; Coulborn, R.M.; Davis, B.M.; Uddin, M.; Shay, D.K.; Waterman, S.H.; Monto, A.S. Mask Use, Hand Hygiene, and Seasonal Influenza-like Illness among Young Adults: A Randomized Intervention Trial. *J. Infect. Dis.* **2010**, *201*, 491–498. [CrossRef]

132. Bundgaard, H.; Bundgaard, J.S.; Raaschou-Pedersen, D.E.T.; von Buchwald, C.; Todsen, T.; Norsk, J.B.; Pries-Heje, M.M.; Vissing, C.R.; Nielsen, P.B.; Winsløw, U.C.; et al. Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Mask Wearers. *Ann. Intern. Med.* **2020**. [CrossRef]

133. Smart, N.R.; Horwell, C.J.; Smart, T.S.; Galea, K.S. Assessment of the Wearability of Facemasks against Air Pollution in Primary School-Aged Children in London. *Int. J. Environ. Res. Public Health* **2020**, *17*, 3935. [CrossRef]

134. Forgie, S.E.; Reitsma, J.; Spady, D.; Wright, B.; Stobart, K. The "Fear Factor" for Surgical Masks and Face Shields, as Perceived by Children and Their Parents. *Pediatrics* **2009**, *124*, e777–e781. [CrossRef]

135. Schwarz, S.; Jenetzky, E.; Krafft, H.; Maurer, T.; Martin, D. Corona Children Studies "Co-Ki": First Results of a Germany-Wide Registry on Mouth and Nose Covering (Mask) in Children. *Monatsschrift Kinderheilkde* **2021**, 1–10. [CrossRef]

136. Zoccal, D.B.; Furuya, W.I.; Bassi, M.; Colombari, D.S.A.; Colombari, E. The Nucleus of the Solitary Tract and the Coordination of Respiratory and Sympathetic Activities. *Front. Physiol.* **2014**, *5*, 238. [CrossRef]

137. Neilson, S. The Surgical Mask Is a Bad Fit for Risk Reduction. *CMAJ* **2016**, *188*, 606–607. [CrossRef]

138. SOCIUM Research Center on Inequality and Social Policy, Universität Bremen. Available online: https://www.socium.uni-bremen.de/ueber-das-socium/aktuelles/archiv/ (accessed on 28 January 2021).

139. Fadare, O.O.; Okoffo, E.D. Covid-19 Face Masks: A Potential Source of Microplastic Fibers in the Environment. *Sci. Total Environ.* **2020**, *737*, 140279. [CrossRef]

140. Potluri, P.; Needham, P. *Technical Textiles for Protection (Manchester EScholar-The University of Manchester)*; Woodhead Publishing: Cambridge, UK, 2005.

141. Schnurr, R.E.J.; Alboiu, V.; Chaudhary, M.; Corbett, R.A.; Quanz, M.E.; Sankar, K.; Srain, H.S.; Thavarajah, V.; Xanthos, D.; Walker, T.R. Reducing Marine Pollution from Single-Use Plastics (SUPs): A Review. *Mar. Pollut. Bull.* **2018**, *137*, 157–171. [CrossRef]

142. Reid, A.J.; Carlson, A.K.; Creed, I.F.; Eliason, E.J.; Gell, P.A.; Johnson, P.T.J.; Kidd, K.A.; MacCormack, T.J.; Olden, J.D.; Ormerod, S.J.; et al. Emerging Threats and Persistent Conservation Challenges for Freshwater Biodiversity. *Biol. Rev. Camb. Philos. Soc.* **2019**, *94*, 849–873. [CrossRef]

143. Fisher, K.A.; Tenforde, M.W.; Feldstein, L.R.; Lindsell, C.J.; Shapiro, N.I.; Files, D.C.; Gibbs, K.W.; Erickson, H.L.; Prekker, M.E.; Steingrub, J.S.; et al. Community and Close Contact Exposures Associated with COVID-19 among Symptomatic Adults ≥18 Years in 11 Outpatient Health Care Facilities-United States, July 2020. *MMWR Morb. Mortal. Wkly. Rep.* **2020**, *69*, 1258–1264. [CrossRef]

144. Belkin, N. The Evolution of the Surgical Mask: Filtering Efficiency versus Effectiveness. *Infect. Control Hosp. Epidemiol.* **1997**, *18*, 49–57. [CrossRef]

145. Cowling, B.J.; Chan, K.-H.; Fang, V.J.; Cheng, C.K.Y.; Fung, R.O.P.; Wai, W.; Sin, J.; Seto, W.H.; Yung, R.; Chu, D.W.S.; et al. Facemasks and Hand Hygiene to Prevent Influenza Transmission in Households: A Cluster Randomized Trial. *Ann. Intern. Med.* **2009**, *151*, 437–446. [CrossRef]

146. Cowling, B.J.; Zhou, Y.; Ip, D.K.M.; Leung, G.M.; Aiello, A.E. Face Masks to Prevent Transmission of Influenza Virus: A Systematic Review. *Epidemiol. Infect.* **2010**, *138*, 449–456. [CrossRef]

147. Institute of Medicine (US). Committee on Personal Protective Equipment for Healthcare Personnel to Prevent Transmission of Pandemic Influenza and Other Viral Respiratory Infections: Current Research Issues. In *Preventing Transmission of Pandemic Influenza and Other Viral Respiratory Diseases: Personal Protective Equipment for Healthcare Personnel: Update 2010*; Larson, E.L., Liverman, C.T., Eds.; National Academies Press (US): Washington, DC, USA, 2011; ISBN 978-0-309-16254-8.

148. Matuschek, C.; Moll, F.; Fangerau, H.; Fischer, J.C.; Zänker, K.; van Griensven, M.; Schneider, M.; Kindgen-Milles, D.; Knoefel, W.T.; Lichtenberg, A.; et al. The History and Value of Face Masks. *Eur. J. Med. Res.* **2020**, *25*, 23. [CrossRef] [PubMed]

149. Spooner, J.L. History of Surgical Face Masks. *AORN J.* **1967**, *5*, 76–80. [CrossRef]

150. Burgess, A.; Horii, M. Risk, Ritual and Health Responsibilisation: Japan's "safety Blanket" of Surgical Face Mask-Wearing. *Sociol. Health Illn.* **2012**, *34*, 1184–1198. [CrossRef] [PubMed]

151. Beck, U. *Risk Society, towards a New Modernity*; SAGE Publications Ltd: Thousand Oaks, CA, USA, 1992.

152. Cheng, K.K.; Lam, T.H.; Leung, C.C. Wearing Face Masks in the Community during the COVID-19 Pandemic: Altruism and Solidarity. *Lancet* **2020**. [CrossRef]

153. Melnychuk, M.C.; Dockree, P.M.; O'Connell, R.G.; Murphy, P.R.; Balsters, J.H.; Robertson, I.H. Coupling of Respiration and Attention via the Locus Coeruleus: Effects of Meditation and Pranayama. *Psychophysiology* **2018**, *55*, e13091. [CrossRef] [PubMed]

154. Andresen, M.C.; Kunze, D.L. Nucleus Tractus Solitarius–Gateway to Neural Circulatory Control. *Annu. Rev. Physiol.* **1994**, *56*, 93–116. [CrossRef] [PubMed]

155. Kline, D.D.; Ramirez-Navarro, A.; Kunze, D.L. Adaptive Depression in Synaptic Transmission in the Nucleus of the Solitary Tract after In Vivo Chronic Intermittent Hypoxia: Evidence for Homeostatic Plasticity. *J. Neurosci.* **2007**, *27*, 4663–4673. [CrossRef]

156. King, T.L.; Heesch, C.M.; Clark, C.G.; Kline, D.D.; Hasser, E.M. Hypoxia Activates Nucleus Tractus Solitarii Neurons Projecting to the Paraventricular Nucleus of the Hypothalamus. *Am. J. Physiol. Regul. Integr. Comp. Physiol.* **2012**, *302*, R1219–R1232. [CrossRef]

157. Yackle, K.; Schwarz, L.A.; Kam, K.; Sorokin, J.M.; Huguenard, J.R.; Feldman, J.L.; Luo, L.; Krasnow, M.A. Breathing Control Center Neurons That Promote Arousal in Mice. *Science* **2017**, *355*, 1411–1415. [CrossRef]

158. Menuet, C.; Connelly, A.A.; Bassi, J.K.; Melo, M.R.; Le, S.; Kamar, J.; Kumar, N.N.; McDougall, S.J.; McMullan, S.; Allen, A.M. PreBötzinger Complex Neurons Drive Respiratory Modulation of Blood Pressure and Heart Rate. *eLife* **2020**, *9*, e57288. [CrossRef]

159. Zope, S.A.; Zope, R.A. Sudarshan Kriya Yoga: Breathing for Health. *Int. J. Yoga* **2013**, *6*, 4–10. [CrossRef]

160. Cummins, E.P.; Strowitzki, M.J.; Taylor, C.T. Mechanisms and Consequences of Oxygen and Carbon Dioxide Sensing in Mammals. *Physiol. Rev.* **2020**, *100*, 463–488. [CrossRef]

161. Jafari, M.J.; Khajevandi, A.A.; Mousavi Najarkola, S.A.; Yekaninejad, M.S.; Pourhoseingholi, M.A.; Omidi, L.; Kalantary, S. Association of Sick Building Syndrome with Indoor Air Parameters. *Tanaffos* **2015**, *14*, 55–62.

162. Redlich, C.A.; Sparer, J.; Cullen, M.R. Sick-Building Syndrome. *Lancet* **1997**, *349*, 1013–1016. [CrossRef]

163. Kaw, R.; Hernandez, A.V.; Walker, E.; Aboussouan, L.; Mokhlesi, B. Determinants of Hypercapnia in Obese Patients with Obstructive Sleep Apnea: A Systematic Review and Metaanalysis of Cohort Studies. *Chest* **2009**, *136*, 787–796. [CrossRef]

164. Edwards, N.; Wilcox, I.; Polo, O.J.; Sullivan, C.E. Hypercapnic Blood Pressure Response Is Greater during the Luteal Phase of the Menstrual Cycle. *J. Appl. Physiol.* **1996**, *81*, 2142–2146. [CrossRef]

165. AAFA Community Services. What People with Asthma Need to Know about Face Masks and Coverings during the COVID-19 Pandemic. Available online: https://community.aafa.org/blog/what-people-with-asthma-need-to-know-about-face-masks-and-coverings-during-the-covid-19-pandemic (accessed on 29 January 2021).

166. Shigemura, M.; Lecuona, E.; Angulo, M.; Homma, T.; Rodríguez, D.A.; Gonzalez-Gonzalez, F.J.; Welch, L.C.; Amarelle, L.; Kim, S.-J.; Kaminski, N.; et al. Hypercapnia Increases Airway Smooth Muscle Contractility via Caspase-7-Mediated MiR-133a-RhoA Signaling. *Sci. Transl. Med.* **2018**, *10*, eaat1662. [CrossRef]

167. Roberge, R. Facemask Use by Children during Infectious Disease Outbreaks. *Biosecur. Bioterror.* **2011**, *9*, 225–231. [CrossRef]

168. Schwarz, S.; Jenetzky, E.; Krafft, H.; Maurer, T.; Steuber, C.; Reckert, T.; Fischbach, T.; Martin, D. Corona bei Kindern: Die Co-Ki Studie. *Mon. Kinderheilkde* **2020**. [CrossRef]

169. van der Kleij, L.A.; De Vis, J.B.; de Bresser, J.; Hendrikse, J.; Siero, J.C.W. Arterial CO₂ Pressure Changes during Hypercapnia Are Associated with Changes in Brain Parenchymal Volume. *Eur. Radiol. Exp.* **2020**, *4*, 17. [CrossRef]

Case 6:21-cv-01008-PGB-DCI   Document 1-2   Filed 06/14/21   Page 146 of 155 PageID 305

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

42 of 42

170.  Geer Wallace, M.A.; Pleil, J.D. Evolution of Clinical and Environmental Health Applications of Exhaled Breath Research: Review of Methods: Instrumentation for Gas-Phase, Condensate, and Aerosols. *Anal. Chim. Acta* **2018**, *1024*, 18–38. [CrossRef] [PubMed]

171.  Sukul, P.; Schubert, J.K.; Zanaty, K.; Trefz, P.; Sinha, A.; Kamysek, S.; Miekisch, W. Exhaled Breath Compositions under Varying Respiratory Rhythms Reflects Ventilatory Variations: Translating Breathomics towards Respiratory Medicine. *Sci. Rep.* **2020**, *10*, 14109. [CrossRef] [PubMed]

172.  Lai, P.S.; Christiani, D.C. Long-Term Respiratory Health Effects in Textile Workers. *Curr. Opin. Pulm. Med.* **2013**, *19*, 152–157. [CrossRef] [PubMed]

173.  Goetz, L.H.; Schork, N.J. Personalized Medicine: Motivation, Challenges and Progress. *Fertil. Steril.* **2018**, *109*, 952–963. [CrossRef]

174.  Samannan, R.; Holt, G.; Calderon-Candelario, R.; Mirsaeidi, M.; Campos, M. Effect of Face Masks on Gas Exchange in Healthy Persons and Patients with COPD. *Ann. ATS* **2020**. [CrossRef]

175.  Streeck, H.; Schulte, B.; Kuemmerer, B.; Richter, E.; Hoeller, T.; Fuhrmann, C.; Bartok, E.; Dolscheid, R.; Berger, M.; Wessendorf, L.; et al. Infection Fatality Rate of SARS-CoV-2 Infection in a German Community with a Super-Spreading Event. *medRxiv* **2020**. [CrossRef]

176.  Ioannidis, J. The Infection Fatality Rate of COVID-19 Inferred from Seroprevalence Data. *medRxiv* **2020**. [CrossRef]

177.  Executive Board: Special Session on the COVID-19 Response. Available online: https://www.who.int/news-room/events/detail/2020/10/05/default-calendar/executive-board-special-session-on-the-covid19-response (accessed on 13 November 2020).

178.  International Health Conference. WHO-Constitution of the World Health Organization. 1946. *Bull. World Health Organ.* **2002**, *80*, 983–984.

Plaintiff's Exhibit 37

dallasnews.com

# American Airlines joins Southwest in delaying alcoholic beverage sales due to bad passenger behavior

*By Kyle Arnold6:50 PM on May 29, 2021 CDT*

4-5 minutes

American Airlines will delay selling alcoholic beverages this summer to main cabin passengers due to the uptick in bad passenger behavior in recent months that includes refusing to wear masks and several assaults on flight attendants.

Fort Worth-based American Airlines told crew members that it won't reintroduce the sale of beer, wine and spirits to main cabin class passengers until at federal government officials drop the mask mandate aboard aircraft and airports. The mask mandate is currently set to expire Sept. 14. American was scheduled to bring back alcohol sales Tuesday.

**Featured on Dallas News**

Researchers evaluating how District Attorney John Creuzot's relaxing marijuana enforcement affects…

American Airlines joins Dallas-based Southwest Airlines in pushing back the reintroduction of the sale of alcoholic beverages after flight attendants expressed concern about the recent increase in bad passenger behavior. The concerns peaked after the bloody assault of a Southwest flight attendant last week on a flight landing in San Diego.

"Over the past week we've seen some of these stressors create deeply disturbing situations on board aircraft," said American Airlines vice president of flight safety Brady Byrnes said in a letter to crew members Saturday. "Let me be clear: American Airlines will not tolerate assault or mistreatment of our crews.

"We also recognize that alcohol can contribute to atypical behavior from customers on board, and we owe it to our crew not to potentially exacerbate what can already be a new and stressful situation for our customers."





American Airlines dropped alcoholic beverage service in March 2020 to create less contact between flight attendants and passengers during the COVID-19 pandemic. It also cut back service of soft drinks, juices, snacks and foods. Airlines are beginning to bring those services back, and American started selling alcohol to some premium class customers earlier this year.

But for everyone else, alcohol will have to wait a few more months.

"It is no secret that the threats flight attendants face each day have dramatically increased," said a letter to union members from Julie Hedrick, president of the Association of Professional Flight Attendants, which represents American's 13,400 flight attendants. "Every day, we are subjected to verbal and sometimes physical altercations, mainly centered around mask compliance. These altercations are often exacerbated when customers have consumed alcohol in the airport or alcohol they have brought on board."

Airlines and federal officials have noted an uptick in passenger misbehavior. Flight attendant union leaders have attributed much of the uptick in passengers refusing to wear masks, a COVID-19 precaution that took on deep political symbolism after the November presidential election and the Jan. 6 storming of the U.S. Capitol by Trump supporters who refused to accept Electoral College results.

The Federal Aviation Administration has noted more than 2,500 reports of passenger misbehavior this year, and a spokesman for the agency said there was a sharp uptick starting late last year.

Flight attendants have often been caught in the middle of the issue and heavily lobbied for a federal mandate for face masks on planes. President Joe Biden made a federal face mask rule on planes one of his first executive orders after he took office.

But passenger misbehavior has continued throughout the year despite numerous fines against passengers proposed by the FAA. Several of those fines stemmed from passengers drinking alcohol they had bought in airports.

Airlines are now dealing with their largest crowds since the pandemic began. Nearly 2 million passengers passed through Transportation Security Administration checkpoints on Friday, nearly 80% as many as did on the same date in 2019.

Atlanta-based Delta Airlines began serving alcohol to passengers again in July 2020. Chicago-based United is scheduled to resume sales of alcoholic beverages in June, and a company spokesman said United hasn't made a decision to change that.

Plaintiff's Exhibit 38

cnbc.com

## Unruly behavior from plane passengers has never been this bad, says flight attendant union chief

*Kevin Stankiewicz*

3-4 minutes

Incidents of unruly behavior from airplane passengers has risen to an unprecedented level this year, union leader Sara Nelson told CNBC on Friday, the start of the Memorial Day holiday weekend.

"This is an environment that we just haven't seen before, and we can't wait for it to be over," the president of the Association of Flight Attendants-CWA said on "Squawk Box."

The behavior has become "complete nuts," added Nelson, whose union represents around 50,000 cabin crew members across more than a dozen carriers. "It's a constant combative attitude. ... It's got to stop."

Nelson's comments follow a recent violent confrontation that resulted in a Southwest Airlines flight attendant sustaining facial injuries and losing two teeth. In a statement to NBC News earlier this week, Southwest said the passenger "repeatedly ignored standard inflight instructions and became verbally and physically abusive upon landing."

A 28-year-old woman has been charged with felony battery in the incident, which occurred on a Sacramento to San Diego flight.

The Federal Aviation Administration said Monday it has received around 2,500 reports of unruly passenger behavior since Jan. 1, roughly three-quarters of which involve failure to adhere to the federal face mask mandate that has been instituted due to the coronavirus pandemic.

That's more than 20 times higher than what's normally recorded in an entire year, Nelson told CNBC. She noted the role masks are playing in the surge and expressed disappointment that health protocols on planes are seen as "a political issue."

The federal mask requirement is on the books until Sept. 14, and the FAA intends to keep its zero-tolerance policy for passenger disturbances in place as long as the mandate applies.

While airline travel has picked up in recent months as Covid vaccinations become more available, TSA checkpoint data shows travel is still notably below 2019 levels.

"Typically what flight attendants will do, when we see a conflict arise on the plane, we're trained to deescalate. We look for our helpers," Nelson said. However, she said the passenger mix is different than pre-Covid.

"It's very difficult when you don't have people on the plane who are regularly flying, who sort of know the program, who are our typical people that we'd go to, at least, create peer pressure but also help to try to calm down these incidents," she said.

Nelson said increased messaging around the consequences for passengers who act out — such as FAA fines — would be helpful. That includes not only on-board messages from the flight captain, but also throughout airports, she said.

Temporary restrictions on alcohol sales also would be beneficial, Nelson said.

"A lot of times these events are exacerbated by alcohol, so we've been asking the government and the airlines to make sure they're not selling alcohol right now because that's only adding to the problem that is clearly out of control."

Plaintiff's Exhibit 39

<u>washingtonpost.com</u>

# Sneezed on, cussed at, ignored: Airline workers battle mask resistance with scant government backup

*Michael Laris*

13-17 minutes

---

Other <mark>passengers have verbally abused and taunted flight attendants trying to enforce airline mask requirements,</mark> treating the potentially lifesaving act as a pandemic game of cat-and-mouse. A loophole allowing the removal of masks while consuming food and beverages is a favorite dodge.

Asked to mask up, one passenger pulled out a large bag of popcorn and nibbled her way through it, kernel by kernel, stymieing the cabin crew for the length of the flight. Others blew off requests by chomping leisurely on apple slices, between occasional coughs, or lifting an empty plastic cup and declaring: "I am drinking!"

<mark>The displays of rule-bucking intransigence are described in more than 150 aviation safety reports filed with the federal government since the start of the pandemic</mark> and reviewed by The Washington Post. The reports provide an unguarded accounting of bad behavior by airline customers, something executives hit by a steep drop in travel and billions in pandemic-related losses are loath to share themselves.

Some reports raise safety concerns beyond the risk of <u>coronavirus</u> infection. <mark>A flight attendant reported being so busy seeking mask compliance that the employee couldn't safely reach a seat in time for landing.</mark>

<mark>One airline captain, distracted by mask concerns, descended to the wrong altitude. The repeated talk of problem passengers in Row 12 led the captain to mistakenly head toward 12,000 feet, not a higher altitude given by air traffic control to keep planes safely apart.</mark> The error was caught, and "there was no conflicting traffic," the captain wrote.

The Boeing 737 Max was grounded for 20 months following two crashes that killed 346 people. Now, after design changes, the aircraft is returning to service. (The Washington Post)

Some passengers are portrayed as oblivious, obstinate, foul-mouthed and, at times, dangerous. One called a flight attendant a "Nazi." Another "started to rant how the virus is a political hoax and that she doesn't wear a mask," a flight attendant reported.

With millions of passengers ignoring warnings from the Centers for Disease Control and Prevention to refrain from holiday travel, the reports offer an X-ray into the country's deeper failures against the coronavirus — and insights into the pitfalls and possibilities facing a new presidential administration.

While the White House under President Trump has, at times, been dismissive or hostile toward masks, President-elect Joe Biden is making a patriotic appeal to "mask up for 100 days," whatever people's politics. Biden has said he will sign an order on his first day requiring masks for "interstate travel on planes, trains and buses." How well those efforts will work remains to be seen.

Experts in psychology and decision-making say hostility toward wearing masks, even within the shared confines of a passenger jet, has been fueled by politicization — but also by skewed incentives and inconsistent messaging.

"The reinforcement principles are backward," said Paul Slovic, who studies the psychology of risk at the University of Oregon.

The usual signs of danger, and rewards for following potentially bothersome rules, are thrown off by a virus that is spread easily by people who don't know they have it, Slovic said.

"You get an immediate benefit for not following the guidelines because you get to do what you want to do," Slovic said. "And you don't get punished for doing the wrong thing" because it's not immediately clear who is being harmed.

The "squishiness of the requirement" to wear masks on planes also undermines the message that they are critical for public health, Slovic said. In contrast, he cites the rigid clarity of the ban on flying with a firearm. "It's not, 'You can carry it as long as you don't use it,' " Slovic said.

But passengers are allowed to drop their masks to snack and sip beverages. "When you start opening it up to eating, the whole thing kind of weakens," Slovic said.

Applying mask rules also worsens the already strained position of flight attendants, who are front-line enforcers even as they keep their usual safety responsibilities, experts said.

"Flight attendants are dealing with mask compliance issues on every single flight they work right now," said Taylor Garland, spokeswoman for the Association of Flight Attendants-CWA, noting that those efforts range from friendly reminders to facing passengers "actively challenging the flight attendants' authority."

The Department of Transportation in October rejected a petition to require masks on airplanes, subways and other forms of transportation, with Secretary Elaine Chao's general counsel saying the department "embraces the notion that there should be no more regulations than necessary."

The nation's aviation regulator has deferred to airlines on masks, with Federal Aviation Administration chief Stephen Dickson telling senators at a June hearing "we do not plan to provide an enforcement specifically on that issue."

Such matters are more appropriately left to federal health authorities, Dickson argued. "As Secretary Chao has said, we believe that our space is in aviation safety, and their space is in public health," Dickson said, referring to the CDC and other health officials.

Airline representatives say they take mask usage seriously and the overwhelming majority of customers comply. Some airlines have banned passengers for the length of the pandemic for refusing to mask up. Many have eliminated medical exemptions in their mask requirements.

"Of the hundreds of thousands of passengers who have flown with us, we have only needed to ban

about 370 customers for not complying," United Airlines spokeswoman Leslie Scott said. Delta said its mask-related no-fly list includes about 600 people, despite carrying about 1 million people each week.

Resistance by some passengers prompted Alaska Airlines to begin issuing yellow cards, akin to the warnings in soccer, to problem passengers.

The initial yellow card said employees would file a report that could result in a passenger being suspended. A later version was more aggressive, saying continued defiance would lead to a flight ban "immediately upon landing," even if the customer had a connecting flight.

Alaska Airlines has barred 237 passengers since August, and "in more than half of these incidents we also canceled onward or returning travel," spokeswoman Cailee Olson said.

American Airlines declined to release numbers of banned customers, as did Southwest, which said in a statement it appreciates "the ongoing spirit of cooperation among customers and employees as we collectively take care of each other while striving to prevent the spread of COVID-19."

Yet a small, uncooperative minority can wreak outsize havoc, safety reports show.

The anonymous reports are collected in a National Aeronautics and Space Administration database, part of a program meant to increase aviation safety by encouraging employees to provide candid descriptions of emerging problems without fear of reprisal. Names of people filing the reports, and their airlines, are removed by NASA before they are made available to regulators at the FAA and the public.

NASA analysts screen the reports to weed out irrelevant filings and may call back filers to clarify safety points. But its analysts do not try to verify people's identities or the accuracy of the reports.

The database shows some fliers treat airline mask requirements as a seemingly asinine rule to evade, akin to sneaking a late look at text messages after phones are supposed to be in airplane mode. Passengers berate flight attendants about their noncompliant cabin mates. Some reports read like cries for help.

"It all has to stop," pleaded one flight attendant.

"In the future I would like to feel safe while doing my job," said another.

● A woman refused to wear her mask as the plane rolled away from the terminal, saying it made her ill, and the pilot pulled over temporarily to try to avoid returning to the gate. She continued to resist but finally agreed.

"As soon as we took off, she took it off again and kept it off the entire flight," the flight attendant reported.

● A man started down the aisle, pausing about 18 inches from a flight attendant.

"He sneezed directly in my face, making no attempt to cover his mouth, pull up his mask or turn towards the row 1 window," the employee wrote. The flight attendant, who was wearing a face covering, judged the act unintentional and tried to blot away the remnants.

● A woman propped her foot up and painted her toenails with her mask below her chin, despite

several requests to wear it properly. After another passenger appealed for more to be done, the woman acquiesced, then loudly instructed the flight attendant to "go away!"

After landing, she cut in line to rush off the plane. "Although we understand the importance of wanting to retain customer loyalty, this kind of behavior should not be tolerated for the sake of one over an entire cabin of guests and employees," the flight attendant wrote.

● An immunocompromised passenger was furious at the lack of enforcement as another customer snacked incessantly on chocolate. The concerned passenger then removed his mask to complain to the flight attendant.

● A passenger claimed discrimination, arguing he was singled out for enforcement because of his tattoos. "He said 'I am complying, #%$^!' His nostrils were clearly visible," the flight attendant wrote.

● A pilot flouted the mask requirement with what appeared to be a passive-aggressive display, donning a flimsy, see-through veil described as useless for containing airborne particles.

● Flight attendants made an exception and allowed a distraught mother, whose daughter may have had a disability and screamed about the mask requirement, to remain on the plane. They tried cookies, which didn't help, then moved the family to seats three rows from other passengers, who were supportive.

● A customer, after earlier warnings, stuck his mask-free head in the aisle during the safety demonstration, "making a total mockery out of me," a flight attendant wrote. He repeated his taunt when the plane was fourth in line for takeoff. The captain turned around, and the man was taken off the plane.

The obstinacy cuts against basic health precautions. Experts in cabin air say masks are critical tools for safety. Cabin air is run through powerful filters, mixed with outside air and recirculated. But it takes several minutes for all air to be vented out of the cabin, giving the coronavirus and other viruses the opportunity to spread.

A Harvard study funded by the aviation industry said flying can be done with a relatively low risk of coronavirus infection if precautions are followed. It said masks are "perhaps the most essential layer" among measures to reduce transmission.

The study said removing masks to eat should be kept to an "absolute minimum," and straws should be used when feasible. "When one passenger briefly removes a mask to eat or drink, other passengers in close proximity should keep their masks on," researchers said.

Trump and some of his advisers, meanwhile, have stoked divisions over masks.

The president mocked Biden's frequent mask use, presided over White House events that flouted mask guidelines and relied on a former pandemic adviser who wrongly argued masks were ineffective. The White House also blocked a nationwide order, drafted by the CDC, that would have required masks on all forms of public transportation.

"Masks have been made a political issue from the start of the pandemic, and people don't believe they need to wear them," said Garland, whose union represents about 50,000 flight attendants.

"We do not have a president who tells people to wear a mask, and the federal government, not just in aviation but across the board, has declined to mandate it in any way, shape or form," she added, saying her members are eager to see a Biden administration set a different tone.

An FAA spokesman declined to answer questions about the risks involved with passengers refusing to wear masks.

After inquiries from The Post about enforcement, the agency distributed a news release touting its role in pursuing civil penalties in two assault cases but reiterated that "the failure to wear a face covering is not itself a federal violation."

The cases show how mask disputes can escalate.

On an Allegiant Air flight in August, a passenger hit a flight attendant, yelled obscenities at him and grabbed his phone as he described a mask-related dispute to the captain, according to the FAA. The agency said it is pursuing a $15,000 civil penalty for assault and interfering with a flight attendant.

Allegiant declined to say whether anyone was arrested or charged.

On a SkyWest Airlines flight to Chicago in August, a passenger took off a mask, "continually bothered" fellow customers and "at one point, grabbed a flight attendant's buttock as she walked by the passenger's row of seats," according to the FAA, which is seeking a $7,500 penalty.

Beyond addressing such extreme cases, some outside experts say federal and corporate leaders have fallen short.

"Both industry and government have failed the people on the front line who need to administer these rules," said Baruch Fischhoff, a psychologist and professor at Carnegie Mellon University who researches decision-making.

Politics often has driven responses to the pandemic, while critical public health communication on things like masks has not been tested to make sure it hits the right notes or is convincing, Fischhoff said. "Neither have fulfilled that responsibility for clear, consistent, tested communications," he said.

Fischhoff said that with 330 million people in the United States, it's not surprising the safety reports received by NASA reveal examples of poor behavior.

"Part of the reason they stand out is, I think, the vast majority of people are polite and civil to one another," Fischhoff said. Still, the reports probably represent a dramatic undercount because it takes time and initiative for busy employees to file them.

"If you see 100, there are probably 1,000 or 10,000. This is a widespread enough phenomenon that it needs to be taken seriously," he said. "You have to give credit to people who lodge just complaints and recognize they're just a fraction of the people who are observing things that threaten our health and our economy."

Plaintiff's Exhibit 40

kktv.com

# Canon City man faces charges for allegedly hitting flight attendant and urinating in a seat over a mask dispute

2 minutes

---

DENVER (KKTV) - A Colorado man is now facing federal charges over an alleged mask dispute while taking a flight from Seattle to Denver this week.

The United States Department of Justice shared details of the case with the public on Friday. The incident happened on Tuesday and involved 24-year-old Landon Perry Grier from Canon City.

"According to the facts contained in the complaint, on March 9, 2021, Grier was a passenger onboard Alaska Airlines flight 1474 traveling from Seattle to Denver," a release from the Department of Justice reads. "During the flight, Grier was asked eight to ten times to put on a face mask, as required by airline policy.  Grier initially ignored the flight attendant, but then struck her arm.   Later, passengers notified a different flight attendant that Grier was urinating in his seat.  A flight attendant notified the captain.  When the captain was notified, he was preparing to land after declaring an emergency for an unrelated maintenance issue."

Interfering with a flight crew has a potential penalty of up to 20 years in prison and/or a fine of up to $250,000.

The FBI was involved in the investigation.

*Copyright 2021 KKTV. All rights reserved.*