# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | | |
|---|---|---|
| **LUCAS WALL, AARON ABADI, KLEANTHIS ANDREADAKIS, ERIC CILA, SHANNON GREER CILA, ANTHONY EADES, URI MARCUS, YVONNE MARCUS, KEVIN LEONARDO McDONNELL, PETER MENAGE, CONNIE RARRICK, JARED RARRICK, & JENNIFER RARRICK, *on behalf of themselves and all others similarly situated*,** | : : : : : : : : : : | |
| Plaintiffs, | : : | No. 6:21-cv-1008-PGB-DCI |
| v. | : : | District Judge Paul Byron |
| **SOUTHWEST AIRLINES, ALASKA AIRLINES, ALLEGIANT AIR, DELTA AIR LINES, FRONTIER AIRLINES, JETBLUE AIRWAYS, SPIRIT AIRLINES, & NUMEROUS UNNAMED EXECUTIVES OF THE 7 AIRLINES,** | : : : : : : : : | Magistrate Judge Daniel Irick |
| Defendants. | : | |

## AMENDED COMPLAINT

### I. PROCEDURAL HISTORY

Lucas Wall filed this action against the seven Airline Defendants June 14, 2021, alleging violation of the Air Carrier Access Act ("ACAA") and endangering the health and safety of their passengers by illegally mandating masks that cause harm to human health in violation of the terms of their operator certificate issued by the Federal Aviation Administration ("FAA") under 49 USC § 44702. Doc. 1.

Mr. Wall seeks to end the mask mandates imposed in the aviation industry. He filed an Emergency Motion for Temporary Restraining Order on June 15 (Doc. 5), which the Court denied June 16 (Doc. 8). Without the consent of any party, the Court on June 17 referred this entire case to Magistrate Judge Gregory Kelly for a Report & Recommendations. Doc. 11. (Plaintiffs object to this referral and plan to file a motion later for the case to be transferred back to the district judge given its national significance and numerous questions of first impression).

Magistrate Judge Kelly transferred this case June 22 to Magistrate Judge Daniel Irick "in the interests of justice," without giving any explanation. Doc. 14. The parties can only speculate this transfer took place because Magistrate Judge Irick was already assigned to the companion case *Wall v. Centers for Disease Control & Prevention*, 6:21-cv-975-PGB-DCI. In that action,[1] Mr. Wall seeks to vacate the Federal Transportation Mask Mandate ("FTMM")[2] and International Traveler

---

[1] The parties in the related action are six Federal Defendants (Centers for Disease Control & Prevention, Department of Health & Human Services, Transportation Security Administration, Department of Homeland Security, Department of Transportation, and President Joseph Biden) and two Local Defendants (Central Florida Regional Transportation Authority and Greater Orlando Aviation Authority).

[2] The Federal Transportation Mask Mandate consists of: 1) Executive Order 13998, 86 Fed. Reg. 7205 (Jan. 26, 2021); 2) Department of Homeland Security Determination 21-130 (Jan. 27, 2021); 3) Centers for Disease Control & Prevention Order "Requirement for Persons To Wear Masks While on Conveyances & at Transportation Hubs," 86 Fed. Reg. 8,025 (Feb. 3, 2021); 4) Transportation Security Administration Security Directives 1542-21-01A, 1544-21-02A, and 1582/84-21-01A (May 12, 2021); and 5) TSA Emergency Amendment 1546-21-01A (May 12, 2021).

Testing Requirement.[3] He also asks the Court to strike down the illegal mask mandates imposed by the Orlando transit system and airport.

All seven Airline Defendants filed Motions to Dismiss on Aug. 23. Southwest Airlines, Alaska Airlines, Delta Air Lines, and JetBlue Airways filed a joint motion. Doc. 41. Allegiant Air and Frontier Airlines filed a joint motion. Doc. 42. Spirit Airlines filed its own motion. Doc. 45. The Airline Defendants all argued that there is no private right of action under the ACAA and 49 USC § 44702, therefore the all three counts against them should be dismissed.

The Court ordered the parties to hold a Case Management Conference by Sept. 10 and file a Case Management Report by Sept. 24. Doc. 54. The parties held the conference Sept. 8 and are currently planning a supplemental conference Sept. 20 or 21 before filing the report on the 24th.

The Airline Defendants filed an unopposed Motion for Stay of Discovery on Aug. 30 (Doc. 55), which the Court granted Sept. 1 (Doc. 57).

Mr. Wall has a deadline of today (Sept. 13) to file either oppositions to the three Motions to Dismiss or an Amended Complaint. Pursuant to Fed.R.Civ.P. 15(a)(1)(B), Mr. Wall files this Amended Complaint. This rule states: "A party may amend its pleading once as a matter of course ... if the pleading is one to which a

---

[3] The International Traveler Testing Requirement is the CDC Order "Requirement for Negative Pre-Departure COVID–19 Test Result or Documentation of Recovery from COVID–19 for All Airline or Other Aircraft Passengers Arriving into the United States From Any Foreign Country," 86 FR 7,387 (Jan. 28, 2021). It was mandated by "Executive Order Promoting COVID-19 Safety in Domestic & International Travel." E.O. 13998, 86 Fed. Reg. 7205 (Jan. 26, 2021).

responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."

## II. STATEMENT OF THE AMENDMENT

Mr. Wall amends the original Complaint to add 12 plaintiffs with similar claims of discrimination against the Airline Defendants, who are sued on behalf of the named plaintiffs and all others similarly situated. This is now a putative class action, believed to be the first in the nation targeting the airlines' mask requirements.  The plaintiffs, all proceeding *pro se*, have agreed to appoint Mr. Wall as the lead plaintiff and class representative. A notice will be filed soon to advise the Court and other parties of this selection.

Added as a defendant is a group of parties described as "Numerous Unnamed Executives of the 7 Airlines." The plaintiffs expect to learn the names of these executives during discovery. The group consists of top airline officials who the plaintiffs allege conspired to interfere with their civil rights by banning all disabled passengers who can't wear a face mask from flying and/or knew of the conspiracy, had the power to stop it, but failed to act. The plaintiffs are not serving this Amended Complaint on this group of defendants because their names need to be discovered, and their interests should be fairly represented in the meantime by counsel for the Airline Defendants.

Plaintiffs have opted to drop Count 3 of the original Complaint, which alleged the Airline Defendants violated 49 USC § 44702 by endangering the health and

safety of their passengers by illegally mandating masks that cause harm to human health in violation of the terms of their operator certificate issued by the FAA. Plaintiffs make this decision after reviewing arguments concerning Count 3 raised by the Airline Defendants in their Motions to Dismiss.

Plaintiffs strongly disagree with the Defendant Airlines' arguments that the ACAA does not include a private right of action when the U.S. Department of Transportation ("DOT") has failed its statutory duty to protect the rights of disabled passengers by not enforcing the act in most of 2020 and January 2021. DOT then put out Feb. 5, 2021, a Notice of Enforcement Policy (Ex. 149) telling the Defendant Airiness they may violate numerous ACAA regulations that were promulgated to protect disabled passengers from discrimination. Therefore, the Plaintiffs keep Counts 1 and 2 of the original Complaint, although in a modified form.

Plaintiffs also add 28 additional causes of action. After a careful review of the Defendant Airlines' contentions in their Motions to Dismiss that the ACAA doesn't provide a private of action, plaintiffs believe the arguments – while wrong – are not frivolous. Therefore, after extensive research, we add numerous additional charges containing clear statutory and judicially interpreted private rights of action so that regardless of how the Court ultimately rules on the ACAA counts, this case may proceed to discovery and trial on at minimum the additional charges.

### III. STATEMENT OF THE CASE

Plaintiffs are a group of disabled (and one nondisabled) airline passengers who have been restricted from flying by the defendants for more than a year because of their enforcement of mask mandates that violate numerous provisions of federal and international laws, plus breach their contracts and violate tort law and the Constitution. The one plaintiff who does not have a disability represents a class of flyers who strongly object to forced masking as a violation of their rights under federal law and the contracts of carriage. Plaintiffs, on behalf of themselves and all others similarly situated, ask the Court to: 1) permanently enjoin the Defendants from discriminating against travelers with disabilities who seek exemptions from the FTMM in violation of the ACAA (49 USC § 41705) and other laws; B) permanently enjoin the Defendants from enforcing any mask requirement on their passengers who are not known to have a communicable disease, also in violation of the ACAA; 3) permanently enjoin the Defendants from requiring any passenger be forced to wear a face covering unapproved by the U.S. Food & Drug Administration ("FDA") or approved only under an Emergency Use Authorization ("EUA"); and 4) be awarded compensatory and punitive damages for their suffering.

The evidence plaintiffs present in this Amended Complaint – supported by 525 exhibits attached hereto – is indisputable that all defendants since Summer 2020 during the COVID-19 pandemic have illegally discriminated against millions of flyers with disabilities in refusing to grant any mask exemptions and/or requiring such an onerous exemption process that travelers with a medical condition that

makes it impossible for them to cover their face are essentially banned from using the nation's commercial aviation system. The Defendants have also illegally failed to give all passengers – whether disabled or not – the legally guaranteed option under the Food, Drug, & Cosmetic Act ("FDCA") to refuse to use a medical device (face mask) not approved by FDA or  allowed only under an EUA.

This case appears to be the first putative class action in the nation against the Defendants for violating the civil rights of the disabled and violating the FDCA, among many other charges. Plaintiffs present several questions of law that appear to be of first impression in the nation:

1. Although the ACAA doesn't explicitly provide for a private right for disabled travelers to sue an airline for discrimination, does congressional intent show that a private right of action is nevertheless created when the federal agency responsible for enforcing the act (DOT) abdicates its legal duty to protect the rights of disabled flyers by failing for about 10 months to enforce the ACAA and then issuing an enforcement directive (Ex. 149) to the airlines it regulates Feb. 5, 2021, after the illegal and unconstitutional FTMM was ordered, that clearly violates the act?

2. May an airline require passengers who are not known to be infected with a communicable disease go wear a face mask when such a requirement violates the ACAA?

3. Do mask requirements that exclude disabled passengers violate the Rehabilitation Act, which the Defendants are subject to because they accepted federal funding as part of COVID-19 relief passed by Congress?

4. Have the Defendants engaged in a conspiracy to interfere with the civil rights of disabled Americans by denying them access to the nation's air transportation system?

5. Were the unnamed Individual Defendants aware of the conspiracy and failed to stop it despite having the power to do so?

6. Have the Airline Defendants breached the contracts with tens of millions of flyers by forcing unauthorized and EUA mask usage, and failing to refund the tickets of passengers who were denied flights because of the mask mandates?

7. Have the Airline Defendants violated numerous provisions of international treaties the United States has ratified protecting the fundamental human rights of all people to freely enter and exit their nation(s) of citizenship?

8. Have the Airline Defendants violated numerous provisions of international treaties the United States has ratified guaranteeing fundamental human rights including to move freely and not be discriminated against as a class?

Mr. Wall filed June 7, 2021, a separate lawsuit in this district seeking to strike down all aspects of the FTMM. *Wall v. Centers for Disease Control & Prevention*, Case No. 6:21-cv-975-PGB-DCI.

The facts underlying both of these cases are similar, but the questions of law presented are different. The airline defendants' goal of easing the impact of COVID-19 is laudable but grossly misguided. In mandating masks for all passengers, the defendants have unacceptably violated the ACAA, the Rehabilitation Act, international law, and their contracts with passengers – especially when it comes

8

to illegally discriminating against passengers with disabilities who can't medically tolerate wearing a face covering with first a complete ban and then arduous exemption requirements that aren't supported by law.

Making this matter worse is the fact that the airlines' regulatory agency, DOT, has given them guidance that actually supports their illegal behavior. Ex. 149. Therefore, we bring this suit to enforce the ACAA since the administrative agency has neglected its statutory duty to do so. Because the agency charged by Congress to enforce the rights of passengers with disabilities has failed to protect us and millions of others similarly situated, our only recourse is a private suit in this Court to ensure the defendants cease and desist from their unlawful conduct.

The airlines have acted without statutory or regulatory authority to demand that every passenger – even those with disabilities as well as those who are fully vaccinated and/or with natural immunity – obstruct their breathing by wearing an unauthorized or EUA medical device that covers their nose and mouth. Defendants have illegally required face coverings for the last 17 months or so not only on board their property (aircraft) but also in public areas of airports they do not own or control. The Court must stop them from continuing to discriminate against flyers with disabilities and force them to follow the ACAA and other laws because DOT has refused to do its job.

The Court should declare the defendants' mask-exemption policies illegally discriminate against flyers with disabilities who can't tolerate face coverings and issue

a permanent injunction against the airlines prohibiting them from such discriminatory conduct. The Court must also then declare the airlines' policies of requiring all passengers wear a face mask violate the ACAA's provisions concerning treatment of passengers who are not known to have a communicable disease. A permanent injunction should then issue barring defendants from ever requiring any passenger not known to have a communicable disease from being forced to muzzle themselves. Other relief is demanded below.

## IV. PARTIES

Lead Plaintiff & Class Representative Lucas Wall resides at 435 10th St., NE, Washington, DC 20002. He is currently stranded at his mother's house in The Villages, Florida, (located in this judicial district) because Defendant Southwest refused to let him board a flight June 2, 2021, out of Orlando (MCO) to Fort Lauderdale (FLL) for not wearing a face covering even though he has a qualifying disability that makes it medically harmful for him to wear a mask and submitted an exemption form the same day he booked his flight. Mr. Wall was also unable to fly on the other six Airline Defendants this past summer because of their illegal mask policies. He is a member of the proposed Disabled Class.

Plaintiff Aaron Abadi resides at 82 Nassau St., Apt. 140, New York, NY 10038. With a qualifying disability that makes it medically harmful for him to wear a mask, he has been discriminated against by Defendants Southwest, Allegiant, Frontier, JetBlue, and Spirit. He is a member of the proposed Disabled Class.

Plaintiff Kleanthis Andreadakis resides at 5108 Hunters Meadow Pl., Henrico, VA 23231. With a qualifying disability that makes it medically harmful for him to wear a mask, he has been discriminated against by Defendants Southwest and Jet-Blue. He is a member of the proposed Disabled Class.

Plaintiff Eric Cila resides at 8807 Avondale Ct., Louisville, KY 40299. He is the husband of Plaintiff Shannon Greer Cila. He has reduced the number of flights he takes because of the illegal conduct and breach of contract by the defendants in forcing passengers to don unapproved or EUA masks. He finds breathing while muzzled to be burdensome and restrictive. He is a member of the proposed Non-disabled Class.

Plaintiff Shannon Greer Cila resides at 8807 Avondale Ct, Louisville, KY 40299. She is the wife of Plaintiff Eric Cila. With a qualifying disability that makes it medically harmful for her to wear a mask, she has been discriminated against by Defendants Southwest, Alaska, Delta, Frontier, and Spirit. She is a member of the proposed Disabled Class.

Plaintiff Anthony Eades resides at 19499 Cedar Gate Dr., Warsaw, MO 65355. With a qualifying disability that makes it medically harmful for him to wear a mask, he has been discriminated against by Defendant Southwest. He is a member of the proposed Disabled Class.

Plaintiff Uri Marcus resides at Shmu'el Lupo St. 6/18, Jerusalem, Israel 9355006. His U.S. mailing address is P.O. Box 126, Ojai, CA  93024. He is the hus-

band of Plaintiff Yvonne Marcus. With a qualifying disability that makes it medically harmful for him to wear a mask, he has been discriminated against by Defendant Southwest. He is a member of the proposed Disabled Class.

Plaintiff Yvonne Marcus resides at Shmu'el Lupo St. 6/18, Jerusalem, Israel 9355006. Her U.S. mailing address is P.O. Box 126, Ojai, CA 93024. She is the wife of Plaintiff Uri Marcus. With a qualifying disability that makes it medically harmful for her to wear a mask, she has been discriminated against by Defendants Delta and Southwest. She is a member of the proposed Disabled Class.

Plaintiff Kevin Leonardo McDonnell resides in Melbourne, Florida, in this judicial district. His mailing address is P.O. Box 1113, Melbourne, FL 32902. With a qualifying disability that makes it medically harmful for him to wear a mask, he has been discriminated against by Defendant Delta. He is a member of the proposed Disabled Class.

Plaintiff Peter Menage resides at 3255 N. Mars Ave., Palmer, AK 99645. With a qualifying disability that makes it medically harmful for him to wear a mask, he has been discriminated against by Defendant Alaska. He is a member of the proposed Disabled Class.

Plaintiff Connie Rarrick resides at 36 Lafayette St., Saco, ME 04072. She is the wife of Plaintiff Jared Rarrick and mother of Plaintiff Jennifer Rarrick. With a qualifying disability that makes it medically harmful for her to wear a mask, she has been discriminated against by Defendant Southwest. She is a member of the proposed Disabled Class.

Plaintiff Jared Rarrick resides at 36 Lafayette St., Saco, ME 04072. He is the husband of Plaintiff Connie Rarrick and the mother of Plaintiff Jennifer Rarrick. With a qualifying disability that makes it medically harmful for him to wear a mask, he has been discriminated against by Defendant Southwest. He is a member of the proposed Disabled Class.

Plaintiff Jennifer Rarrick resides at 36 Lafayette St., Saco, ME 04072. She is the daughter of Plaintiffs Connie and Jared Rarrick. With a qualifying disability that makes it medically harmful for her to wear a mask, she has been discriminated against by Defendants Southwest and Delta. She is a member of the proposed Disabled Class.

Defendant Southwest Airlines' corporate headquarters is at 2702 Love Field Dr., Dallas, TX, 75235. Its registered agent in Florida is Prentice-Hall Corporation System, 1201 Hays St., Tallahassee, FL 32301.

Defendant Alaska Airlines' corporate headquarters is at 19300 International Blvd., Seattle, WA 98188. Its registered agent in Florida is Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.

Defendant Allegiant Air's corporate headquarters is at 1201 N. Town Center Dr., Las Vegas, NV 89144. Its registered agent in Florida is Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.

Defendant Delta Air Lines' corporate headquarters is at 1030 Delta Blvd., Atlanta, GA 30354. Its registered agent in Florida is Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.

Defendant Frontier Airlines' corporate headquarters is at 4545 Airport Way, Denver, CO 80239. Its registered agent in Florida is Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.

Defendant JetBlue Airways' corporate headquarters is at 27-01 Queens Plaza N., Long Island City, NY 11101. Its registered agent in Florida is Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.

Defendant Spirit Airlines' corporate headquarters is at 2800 Executive Way, Miramar, FL 33025. Its registered agent is Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.

Southwest Airlines CEO Gary Kelly will likely be a named defendant.

Southwest Vice President Bob Waltz will likely be a named defendant.

Southwest Vice President of Inflight Operations Sonya Lacore will likely be a named defendant.

Delta CEO Ed Bastian will likely be a named defendant. He has targeted the disabled for discrimination as a class and denied passengers the federally required option of using an EUA medical device. "If you insist on not wearing a mask, he insists on you not flying Delta. 'We've been steadily and rather aggressively stepping up our enforcement of the mask policy. You cannot board a Delta plane unless you have a mask on. If you board the plane and insist on not wearing a mask, we insist that you do not fly Delta into the future.'" Exs. 71 & 72. Mr. Bastian showed

his animus for the disabled: He "has urged people who are considering flying without a mask to consider traveling with other airlines that have fewer restrictions, to figure out other means of traveling, or to simply not travel at all." Ex. 132.

Delta Chief Customer Experience Officer Bill Lentsch will likely be named as a defendant.

Frontier Airlines CEO Barry Biffle will likely be named as a defendant.

Spirit CEO Ted Christie will likely be named as a defendant.

## V. POTENTIAL CLASSES & MEMBERS

Plaintiffs bring this suit on behalf of themselves and all others similarly situated. There are two proposed classes: 1) the Disabled Class consisting of passengers who can't medically wear masks and have been discriminated against by the defendants; and 2) and the Nondisabled Class consisting of passengers who have been forced by the defendants to wear unauthorized and/or EUA masks in violation of federal law and in breach of the defendants' contracts of carriage. Both putative classes meet the prerequisites of Fed.R.Civ.P. 23.

Both classes would comprise of all persons who have flown on the seven Airline Defendants during the COVID-19 pandemic (from roughly April 2020 to present and continuing into the future) and/or persons whom the Airline Defendants have refused to carry because they medically can't cover their face. Plaintiffs believe the Disabled Class numbers in the millions and the Nondisabled Class numbers in the tens of millions. "Approximately 43 million people in the United States have some

type of disability," according to the Government Accountability Office. That's about 13% of the population. Ex. 430.

Some estimates put the number of disabled Americans much higher: "[A]t least 60 million in the U.S. ... The number of people affected by a disability, such as family members of a person with a disability, is even higher." Ex. 505.

"The ACAA's implementing regulations define an individual with a disability as any individual who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment." *Id.*

Alisa Akey would be a member of the Disabled Class. She submitted a declaration describing the discrimination by the defendants she has suffered. Ex. 31.

Linda Bunk would be a member of the Disabled Class. She submitted a declaration describing the discrimination by the defendants she has suffered. Ex. 32.

John Caldwell would be a member of the Disabled Class. He submitted a declaration describing the discrimination by the defendants he has suffered. Ex. 33.

Rossana Caponetto would be a member of the Disabled Class. She submitted a declaration describing the discrimination by the defendants he has suffered. Ex. 34.

Amanda Cartwright would be a member of the Disabled Class. She submitted a declaration describing the discrimination by the defendants she has suffered. Ex. 35.

Jennifer Davis would be a member of the Nondisabled Class. She submitted a declaration describing the forced muzzling she's endured by the defendants. Ex. 36.

Gregory Disisto would be a member of the Disabled Class. He submitted a declaration describing the discrimination by the defendants he has suffered. Ex. 38.

Michael Ferris would be a member of the Disabled Class. He submitted a declaration describing the discrimination by the defendants he has suffered. Ex. 39.

Sanshiro Hanafusa would be a member of the Disabled Class. Hanafusa submitted a declaration describing the discrimination by the defendants Hanafusa has suffered. Ex. 40.

Christopher Hedges would be a member of the Disabled Class. He submitted a declaration describing the discrimination by the defendants he has suffered. Ex. 41.

Gilbert Lau would be a member of the Disabled Class. He submitted a declaration describing the discrimination by the defendants he has suffered. Ex. 42.

Tina Lemens would be a member of the Disabled Class. She submitted a declaration describing the discrimination by the defendants she has suffered. Ex. 43.

Shawn Petche would be a member of the Disabled Class. He submitted a declaration describing the discrimination by the defendants he has suffered. Ex. 45.

Michelle Sanoske would be a member of the Nondisabled Class. She submitted a declaration describing the forced muzzling she's endured by the defendants. Ex. 46.

Denise Savoie would be a member of the Disabled Class. She submitted a declaration describing the discrimination by the defendants she has suffered. Ex. 47.

Joshua Schrems would be a member of the Disabled Class. He submitted a declaration describing the discrimination by the defendants he has suffered. Ex. 49.

Lorraine Wall would be a member of the Nondisabled Class. She is the mother of Lead Plaintiff & Class Representative Lucas Wall. She submitted a declaration describing the forced muzzling she's endured by the defendants. Ex. 50.

Tim Cleary and his family would be members of the Disabled Class. They suffered discrimination by Defendant Southwest when they were forced to remove their special needs daughter from the airplane because she wasn't wearing a mask. Ex. 51.

Edwin Rios and his family would be a member of the Disabled Class. They suffered discrimination by Defendant Southwest when they were kicked off a Southwest flight because their 2-year-old son with autism couldn't wear a mask. Ex. 52.

Cody and Paige Petek would be a members of the Disabled Class. They suffered discrimination by Defendant Southwest  when they were prohibited from boarding a flight because their autistic son could not wear his face mask. Instead, the family was forced to rent a car and drive home to Des Moines from St. Louis. The was on a connecting flight in St. Louis after arriving from Florida, where they had been on vacation. Ex. 53.

An unknown family would be a member of the Disabled Class. They suffered discrimination by Defendant Southwest on Aug. 10, 2020, when they were removed from a flight because their 3-year-old was unable to wear his mask on a flight from Midland, Texas, to Houston, Texas. The child has autism and doesn't like his face covered. The mother said she had a doctor's note confirming as much. Ex. 54.

Avi Mandel of Baltimore County, Maryland, would be a member of the Nondisabled Class. He was kicked off a Southwest flight to Florida because he wasn't wearing a mask while eating. Ex. 55.

Ali Cleek and her family would be a member of the Nondisabled Class. Defendant Southwest suggested she glue a mask to her 2-year-old daughter's face. Exs. 56 & 57.

Eric Hansen and his family would be members of the Disabled Class. Defendant Southwest kicked them off the plane when their 3-year-old son refused to keep his face mask on. Ex. 58.

Erik Harvey  and his family would be members of the Nondisabled Class. They were all ready to fly from Denver, Colorado, to Austin, Texas, on April 1, when they were told to leave because their son Jackson was unmasked. *Id.*

Heather Correria and her family would be a member of the Disabled Class. They suffered discrimination by Defendant Southwest because their 14-year-old special-needs child couldn't wear a mask. Ex. 59.

Paige Petek and her family would be a member of the Disabled Class. They suffered discrimination by Defendant Southwest because their 5-year-old autistic son can't wear a mask. Ex. 60.

Caroline Scott and her family would be members of the Disabled Class. They suffered discrimination by Defendant Southwest because their disabled 3-year-old son *might* have difficulty wearing a mask. Ex. 61.

An unknown man would be a member of the Nondisabled Class. He was thrown off a plane by Defendant Southwest (possibly for having a mask the defendant's employees politically did not approve of). Ex. 62.

LaShaunda Jethro and her family would be members of the Disabled Class. She has a 17-year-old son with autism and said it's challenging to make her son wear a mask. She said that "He will not keep a mask on his face. We have tried and tried. He just won't do it." A Southwest flight attendant prevented them from boarding a flight, insisting that her disabled son wear a mask. Ex. 182.

Alaska Sen. Lora Reinbold would be a member of the Nondisabled Class. Defendant Alaska has banned her because of her opposition to mandatory masking. Ex. 63 & 64. This is despite many Alaska employees themselves not wearing masks on board. Ex. 65.

Judy Ferguson would be a member of the Nondisabled Class. She was tossed off an Alaska flight for wearing a respirator helmet instead of an FDA unapproved or EUA face mask. Ex. 66.

An unknown man would be a member of the Nondisabled Class. He was thrown off a flight by Defendant Allegiant when he asked Allegiant's flight attendant to don a face covering. Ex. 67.

Roughly 950 flyers banned by Defendant Delta for not wearing masks would be members of the Disabled or Nondisabled classes, depending on the circumstances. Ex. 68. Plaintiffs expect Delta and all other Airline Defendants to provide during discovery all names of passengers they have placed on any "no-fly list" due to mask issues as they are all potential class members.

Kristen Meghan Kelly would be a member of the Disabled Class. She suffered discrimination by Defendant Delta. Exs. 69 & 70.

Robert O'Neil – the U.S. Navy Seal who killed Osama bin Laden – would be a member of the Nondisabled Class. Defendant Delta banned him for not wearing a mask. Exs. 73 & 74.

Rebecca Sylvia-Cramer and her family would be members of the Nondisabled Class. They were kicked off a plane because their 2-year-old son was eating a lolli-pop. Ex. 75.

Krystyn Linville and her family would be members of the Nondisabled Class. She was harassed by Defendant Delta because her 3-year-old daughter had trouble keeping her face covered. Linville noted Delta's policy is discriminatory because unaccompanied minors are exempt from muzzling but not kids traveling with their parents or legal guardians. Ex. 131.

Martin Joseph and his extended family would be members of the Nondisabled Class. They suffered religious discrimination by Defendant Frontier when they were removed from a flight over mask issues. Exs. 76 & 77.

Chaya Bruck and her family would be members of the Nondisabled Class. They were kicked off a JetBlue flight because her 2-year-old couldn't wear a mask. Ex. 108.

An unknown family would be members of the Nondisabled Class. The family was asked to leave a Spirit flight before takeoff from Orlando International Airport to Atlantic City, New Jersey, after their 2-year-old child didn't have a mask on while eating, according to videos of the confrontation. Exs. 78 & 79.

An unknown family would be members of the Nondisabled Class. Defendant Spirit kicked them off a plane in Orlando when their 2-year-old, who was eating yogurt, removed her mask. Ex. 80.

Callie Kimball and her family would be members of the Disabled Class. The Arkansas family cried foul after their 4-year-old son, who's nonverbal with autism, was removed from a Spirit flight because he wasn't wearing a mask. Spirit admitted after this incident that it has a corporate policy of violating federal law prohibiting discrimination against disabled passengers: "Our existing policy does not provide for medical exemptions, regardless of diagnosis." Exs. 81 & 82.

Zana Shelton of Chicago, Illinois, and her family would be members of the Disabled Class. Her family was banned from Defendant Spirit because her 3-year-old autistic son can't wear a mask. Ex. 83. Again, the defendant told the media about

its corporate policy of excluding disabled people – even 3-year-olds – from flying in violation of numerous federal laws. "Spirit released a statement, saying they require face covering during the entire flight. The only exceptions are children under 2. ***Travelers unable to wear them for any reason, including medical, won't be able to fly Spirit***." *Id.* (emphasis added). "Days later, letters arrived in the mail, one to Zana's sister and another addressed to 3-year-old Cebastian, banning the toddler from flying Spirit for non-compliance of the airline's face covering policy. In 2 years, he can write a letter explaining why the carrier should reconsider." *Id.*

An unknown family would be members of the Nondisabled Class. The family accuses Defendant Spirit of discrimination after a flight attendant asked the group to leave when a child was not wearing a face covering prior to departure from Orlando (MCO) to Atlantic City (ACY). "In fact, the child was not wearing a face mask, as she was eating when the attendant approached." Ex. 84. "This incident is the second time in less than 30 days that the Florida-based ultra-low-cost-carrier stood accused of unfairly removing a child from a flight. In March 2021, another family said they were asked to leave a Spirit flight because their non-verbal Autistic son could not wear a face mask, despite having a doctor's note confirming the condition." *Id.*

## VI. BASIS FOR JURISDICTION, VENUE, & STANDING

This Court has jurisdiction over this case under 28 U.S.C. § 1331: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Our claims arise under the ACAA (49 USC § 41705), several treaties ratified by the United States, the Rehabilitation Act (29 U.S.C. § 794), and other civil-rights statutes.

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: (1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42; (2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent; ... (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights..." 28 USC Code § 1343(a).

This Court has jurisdiction for our state and common-law tort and breach-of-contract claims pursuant to 28 USC § 1367: "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."

This Court has the authority to grant declaratory and injunctive relief as well as monetary damages under the Declaratory Judgment Act and this Court's inherent powers. 28 USC §§ 2201 & 2202.

Venue is proper in this judicial district because a substantial part of the events giving rise to this lawsuit occurred in Orlando, Florida. All seven Airline Defendants operate flights at airports located in this district. "A civil action may be brought in ... a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ..." 28 U.S.C. § 1391(b)(2).

All named plaintiffs have standing to sue the defendants because they illegally discriminated against them on the basis of their medical conditions by denying them to ability to fly without wearing a mask and/or they were forced in violation of federal law and in breach of contract to wear unauthorized and/or EUA masks against their will.

A court order declaring unlawful and enjoining all defendants' illegal discrimination and contract breaches – plus an award of compensatory and punitive damages – would redress our injuries.

As the plaintiffs are all proceeding *pro se*, we ask the Court to construe this pleading liberally, as required by the appellate courts, in the interests of justice and a fair resolution of our complaints against the defendants.

# VII. STATEMENT OF FACTS

## A. Discrimination against Lead Plaintiff & Class Representative Lucas Wall.

1. Mr. Wall submits a declaration, which is incorporated into this Amended Complaint by reference. Ex. 2.

2. Mr. Wall was taking care of his mother in The Villages, Florida – located in this judicial district – during many months of the COVID-19 pandemic.

3. **PURCHASE OF AIRLINE TICKETS FOR SUMMER 2021:** May 31, 2021: Now that his mom and him are both fully vaccinated, Mr. Wall booked eight airline tickets for summer travel to see friends and family as well as visit several National Park Service units. His airline tickets were:

4. June 2, 2021: Southwest Airlines Flight 2204 from Orlando (MCO) to Fort Lauderdale (FLL). Ex. 3.

5. June 16, 2021: JetBlue Airways Flight 2319 from Fort Lauderdale (FLL) to Salt Lake City (SLC). Ex. 4.

6. June 18, 2021: Frontier Airlines Flight 2943 from Salt Lake City (SLC) to Phoenix (PHX). Ex. 5.

7. June 20, 2021: Allegiant Air Flight 543 from Mesa, Arizona, (IWA) to Houston (HOU). Ex. 6.

8. June 22, 2021: Southwest Airlines Flight 32 from Houston (HOU) to Dallas (DAL). Ex. 7.

9. June 24-25, 2021: Delta Airlines Flight 1776 from Dallas (DFW) to Atlanta (ATL), then Delta Airlines Flight 14 from Atlanta (ATL) to Frankfurt, Germany (FRA). June 30, 2021: Delta Airlines Flight 15 from Frankfurt (FRA) to Atlanta (ATL), then Delta Connection Flight 5412 from Atlanta (ATL) to Myrtle Beach, South Carolina (MYR). Ex. 8.

10. July 3, 2021: Spirit Airlines Flight 454 from Myrtle Beach (MYR) home to Baltimore/Washington (BWI). Ex. 9.

11. July 10, 2021: Alaska Airlines Flight 1032 from Washington (IAD) to Seattle (SEA). July 15, 2021: Alaska Airlines Flight 1078 from Seattle (SEA) home to Washington (IAD). Ex. 10.

12. **SUBMISSION OF MASK-EXEMPTION FORMS TO SOUTHWEST:** Immediately after booking his two tickets May 31 on Southwest, Mr. Wall submitted the company's "Passenger Application for Exemption to Federal Mask Requirement" for both his June 2 MCO-FLL flight and his June 22 HOU-DAL flight. Ex. 11.

13. He noted at the bottom of each form: "It is illegal pursuant to 14 CFR Part 382 to require advance notice of disability accommodation. I object to having to submit this form." *Id.*

14. Mr. Wall attached to each of the two forms a printout of the "Exemption to Federal Mask Requirement on Southwest Airlines" webpage. On this printout, he noted the numerous provisions that are illegal under the ACAA (49 USC § 41705) and its accompanying regulations (14 CFR Part 382). *Id.*

15. Southwest requires disabled passengers who can't wear masks to submit the exemption form using its website's "Comment/Question – Disability – Future Travel Assistance" form. *Id.*

16. He wrote in the text box of that form: "Please note it is illegal under the Air Carrier Access Act regulations (14 CFR § 382) for you to require: 1. a disability accommodation request be submitted in advance; 2. a signed letter from my medical physician attesting to my disability that precludes me from wearing a face mask; 3. me to undergo a private medical screening with a third-party medical provider; and 4. me to provide evidence of a qualifying COVID negative viral test taken within three calendar days preceding my scheduled date of travel." *Id.*

17. He also wrote: "Your face-mask-exemption policy constitutes illegal discrimination against passengers with disabilities pursuant to the Air Carrier Access Act (49 USC § 41705). The U.S. Code and Code of Federal Regulations provisions are attached for your reference. I refuse to abide by your requests for a physician letter, private medical screening, and negative COVID test since these are illegal. Also, I am fully vaccinated and don't pose a threat to anyone." *Id.*

18. After submitting his forms, Mr. Wall received two automatic e-mail replies from Southwest stating: "You indicated that your reason for contacting us is regarding a disability-related service. Depending on the nature of your correspondence and regulatory requirements, ***it may take up to 30 days before you receive a response***." *Id.* (emphasis added).

19. Prior to his June 2 blocked flight from MCO to FLL, he did not receive any further response from Southwest.

20. **MR. WALL IS FULLY VACCINATED:** He received his first COVID-19 Moderna vaccine shot March 29, 2021. He received his second and final Moderna vaccine jab April 26, 2021. Ex. 12. According to CDC guidelines that a person becomes "fully vaccinated" two weeks after the final inoculation, he has been fully vaccinated since May 10, 2021.

21. **HE CAN'T TOLERATE WEARING A FACE MASK:** Mr. Wall has suffered from Generalized Anxiety Disorder ("GAD") for many years. Ex. 13.

22. He is currently on medication for GAD. *Id*. While this helps reduce his panic attacks, the medicine does not totally eliminate them. Any time he's tried to put a mask on his face, he's experienced feelings of panic, shortness of breath, and hyperventilating.

23. Due to his GAD, Mr. Wall has never covered his face during the COVID-19 pandemic. He tried a mask a couple times for brief periods last year, but had to remove it after five or so minutes because it caused him to instigate a feeling of a panic attack, including hyperventilating and other breathing trouble. Ex. 2. He carries cards in his wallet to hand to anybody who asks him to wear a mask. Ex. 14.

24. Mr. Wall also strongly oppose any mask mandate on numerous grounds including that it's a violation of his civil liberties to be ordered to block his nose and mouth, his only two sources of oxygen; face masks have proven to be totally

ineffective in reducing COVID-19 spread but harm human health (Ex. 200); and researchers have identified dozens of health problems that occur among maskwearers (*Id.*). Mr. Wall also objects to any corporation requiring him, in violation of the FDCA, to wear a medical device not approved by FDA or approved under EUA.

25. "For many individuals with different types of disabilities the effects of wearing a mask are far more severe than being slightly uncomfortable. Wearing a face mask can have a significant impact on their health, wellbeing, and ability to function. … ***People with anxiety disorders and post-traumatic stress disorder (PTSD) may develop severe anxiety when wearing a face mask***." Ex. 15 (emphasis added).

26. **SOUTHWEST REFUSED TO LET HIM BOARD HIS FLIGHT EVEN THOUGH MR. WALL IS FULLY VACCINATED & SUBMITTED AN EXEMPTION FORM:** Defendant Southwest sent Mr. Wall an e-mail June 1 falsely claiming that "federal law" requires passengers to wear a mask. Ex. 95. There is no such law. This is a deceptive and unfair trade practice as well as a breach of contract.

27. Southwest notes passengers with disabilities are exempt from wearing a mask, but doesn't mention its requirement to seek an exception in advance. *Id*. This is a violation of the ACAA, a deceptive and unfair trade practice, and a breach of contract.

28.    The e-mail from Southwest does not include advising passengers that under the FDCA, passengers have the option of wearing an FDA unauthorized or EUA medical device. This is a deceptive and unfair trade practice as well as a breach of contract.

29.    When Mr. Wall checked in on Defendant Southwest's website June 1, he was falsely informed again that "federal law" requires passengers to wear a mask. Ex. 96. There is no such law. This is a deceptive and unfair trade practice as well as a breach of contract.

30.    Southwest notes on the check-in screen that only passengers younger than 2 years old are exempt from masks. *Id.* It fails to mention that customers with disabilities are also exempt from covering their face. This is a violation of the ACAA, a deceptive and unfair trade practice, and a breach of contract.

31.  Southwest's check-in screen does not include advising passengers that under the FDCA, passengers have the option of wearing an FDA unauthorized or EUA medical device. This is a deceptive and unfair trade practice as well as a breach of contract.

32.  Southwest's check-in screen advises customers they will be provided with a face mask if they don't bring their own. *Id*. This constitutes unauthorized practice of medicine as Southwest airport employees are not physicians; they are not authorized to prescribe use of a medical device (masks obstructing breathing) to customers, especially a device that is FDA unauthorized or EUA approved only, meaning customers have the option to refuse the medical device.

33. Defendant Southwest, in conjunction with the Transportation Security Admin-istration ("TSA"), refused to let him board Flight 2204 from MCO to FLL the morning of June 2, 2021. Watch Mr. Wall's video posted to YouTube at https://bit.ly/LucasFTMM1.

34.    He reached the TSA checkpoint for Gates 70-129. TSA officer immediately hands him back his vaccination card. "Hold that, I don't need that. You need to put your mask on," the officer said. *Id*.

35. The TSA officer was about to hand him a mask. No, I won't wear a mask that's why I have you my vaccination card. "To get in you need a mask," the officer Mr. Wall. *Id*.

36.    "Just wait on the side for me" the officer said, then he calls for a supervisor. *Id*.

37. A TSA uniformed supervisor approaches Mr. Wall. "You can't go through here without a mask," he tells him. Watch this video posted to YouTube at https://bit.ly/LucasFTMM2.

38.    I refuse to comply with that. I can't wear a mask because of my anxiety. The supervisor asks Mr. Wall to stand by. *Id*.

39.    "As a rule people with disabilities do not carry documentation of disability or a doctor's note." Ex. 15.

40.    "In the nonemployment context (i.e., a customer relationship), a business generally cannot demand documentation confirming that an individual is disa-bled or needs a particular accommodation, so businesses may run the risk of

alienating customers with disabilities, or even draw a bona fide complaint to the DOJ or a lawsuit, by requiring a showing of such proof." *Id.*

41.  Next blue-shirt and plain-clothes TSA supervisors approach. Mr. Wall says he's fully vaccinated and suffers from anxiety, so he can't wear a face mask. "Do you have that on your boarding pass?" he's asked. No I don't think so. I sent Southwest a form when I booked my ticket two days ago. "We checked with them and they don't have anything on record for you," he's told. I have the form. Watch this video posted to YouTube at https://bit.ly/LucasFTMM2.

42.   "That's something you have to take up with Southwest, but the federal mandate requires you to wear a mask in the airport," he's told by TSA agents. Defendant Southwest has to recognize disabilities that prevent wearing a face mask under the ACAA. *Id.*

43.   Mr. Wall tells TSA supervisors here I've got the passenger exemption to federal face mask requirement on Southwest form that I filed out when I booked my ticket two days ago. Watch this video posted to YouTube at https://bit.ly/LucasFTMM3.

44.   They're saying even though he sent in the passenger application for exemption to mask mandate requirement on Southwest Airlines form that the airline hasn't placed anything special on his boarding pass to clear him through security. *Id.*

45. The situation definitely makes Mr. Wall anxious being put through all this just to board his flight he paid for. Just patiently waiting see if they are going to

bring someone from Southwest to speak with him. He submitted the form to Southwest two days ago and got an automatic notification that his form had been received but there was no other communication indicating that his exemption had been denied or anything like that. *Id.*

46.    This is taking quite a long time. Definitely aggravating to have to go through this though. A year ago this would be a nonissue. All you had to do is say "I have a medical exemption" and you'd be waived straight through. *Id.*

47. Mr. Wall is now counting 12 people who seem to be assembled for this conversation about his refusal/inability to wear a mask through the TSA security checkpoint. Watch this video posted to YouTube at https://bit.ly/LucasFTMM4.

48.    TSA enforces the FTMM but it's up to the airlines' discretion on whether to grant you the mask exemption, which kind of puts law enforcement into the hands of private companies, which is certainly something Mr. Wall objects to. *Id.*

49.    Defendant Southwest agents and a manager approach him. Mr. Wall tells them he has his boarding pass, his card showing he's fully vaccinated, and the form he submitted to Southwest when he booked his ticket two days ago. He's asked if he got a reply back. Nope, he did not.  "Let's look in your reservation to see if it's been updated," a Southwest agent tells him. *Id.*

50.   "We'll see if [your mask exemption] has been noted. Can I see the medical exemption request?" a Southwest agent asks. She tells Mr. Wall, "You're supposed to submit this 72 hours before your flight." But his flight was just boked two days ago, so how is he supposed to submit a form 72 hours in advance? "That's our requirement" she replied.  Well that's illegal under the ACAA. *Id.*

51.  "We're going to see if it's in there. If it's not in there, you'll have to be required to wear your mask," she says. Well he will not wear a mask because of his anxiety. It gives him panic attacks. He's already starting to have one just based on the adversarial confrontation here. All he's trying to do is board his flight. This makes him very upset. "We're going to check and see if it's in there," the Southwest agent replies. *Id.*

52. Mr. Wall told her if you call your legal department, tell them to look at 14 CFR Part [382]. Airlines are not allowed to request an exemption in advance for any accommodation related to a disability. That is the federal regulation. He's done a lot of research on this. "I have to adhere to the policy of Southwest Airlines," she says. *Id.*

53. "Right now you have to wear a mask in the airport. You have to get past the TSA and you're not wearing a mask, and you don't have the medical exemption in [your reservation]" she says. Just be aware if you deny Mr. Wall boarding, he will see you in federal court. *Id.*

54. Southwest supervisor Tom Starr comes over and he tells Mr. Wall SW is going check about his request for mask exemption he submitted two days ago after

booking his ticket. Watch this video posted to YouTube at https://bit.ly/Lu-casFTMM5.

55. Mr. Kappel (sp?) from the Greater Orlando Aviation Authority, the agency that operates MCO, approaches Mr. Wall. He says he's been in touch with GOAA's lawyer, Mr. Gerber. Mr. Kappel (sp?) asked if Mr. Wall has something showing that he is medically exempt from wearing a mask. Mr. Wall said he submitted the Southwest medical exemption form and he has the card that he normally carries. *Id.*

56. "As long as you have that, you're good to go in the terminal and all the public spaces," Mr. Kappel (sp?) says. "If we can help you, let us know. We have no problem with you because you have a medical exemption." *Id.*

57. GOAA is taking the position it is going to accept Mr. Wall's medical exemption without requiring any other documentation. That should be the policy of TSA and the airlines as well, but they are illegally discriminating against the disabled. *Id.*

58.    A female TSA supervisor in a flowery red-and-pink blouse just came over to talk to Mr. Wall and see his medical exemption form. She said her boss has shown up, so Mr. Wall assumes that's the woman in the navy suit. There are now four TSA managers who are huddling over the situation. Meanwhile we are waiting for someone from Southwest Airlines to come back over here. Watch this video posted to YouTube at https://bit.ly/LucasFTMM6.

59. 9:21 a.m.: Mr. Wall's flight boards in nine minutes and there has been a lengthy disappearance of the Southwest agents. Earlier they told him he had to submit his medical exemption form three days in advance but he booked his ticket two days ago. Defendant Southwest didn't answer the question as to how someone is supposed to submit a form three days in advance when the ticket is purchased two days prior to the flight. *Id.*

60.    A male agent with Southwest just came over to tell him "what we are trying to do, we are trying to expedite the approval but it has to go through our Customer Relations Department. I think they quoted you three days but it's actually a seven-day process." Mr. Wall booked his flight two days ago so he was asking your colleague how he's supposed to submit a form seven days in advance when he booked a ticket two days beforehand. *Id.*

61. "That's just part of the process," the Southwest agent says. "We're trying to get it expedited it but it has to go through an approval process. It's not something we can just come out and say 'he's approved.' The good thing is you have your COVID vaccination card so we did share that with them. You don't happen to have a negative test that you took three days ago?" No, Mr. Wall replied, there's no reason for him to take a test because he's fully vaccinated. *Id.*

62.    This is creating so much anxiety for Mr. Wall right now to be denied the ability to just go board his flight because of his disability. *Id.*

63.    9:39 a.m.: After waiting at the TSA checkpoint for exactly one hour, here comes the people from Southwest Airlines. "Unfortunately I tried to see if I

could push this through, because you didn't meet the requirements, and unfortunately our company is saying now you have to wear a mask if you go through" the TSA checkpoint, an agent tells him. "Also I did want to give this [mask-exemption policy] to you because if you fly on Southwest a lot, that's the exemption…" she says. Ex. 16 and watch this video at https://bit.ly/LucasFTMM7.

64.     That's unreasonable and not possible. "I'm sorry. We did try sir," she says. *Id.*

65.  In the contract of carriage Mr. Wall and Defendant Southwest entered into when he bought his ticket, there was no requirement for passengers to wear face masks.

66.     Three of the Southwest agents Mr. Wall dealt with gave him their business cards: Carolos Dunn, manager customer service; Lisa Tibbs, assistant station manager; and Anita Norris, supervisor. Ex. 17.

67.  9:48 a.m.: Mr. Wall is at the Southwest ticket counter waiting for Mr. Dunn to get him the names and contact information of the people at the corporate office who denied him boarding. The employees at Southwest and TSA have been cooperative but it is outrageous to be denied boarding. Watch this video posted to YouTube at https://bit.ly/LucasFTMM8.

68.     This is the sign at the Southwest check-in area indicating that "We are requiring face coverings for Customers and Employees." Southwest doesn't mention anything on the sign about exemptions for people with disabilities who can't tolerate wearing a face mask. Nor does it mention that mask use is optional

per the FDCA. Right now Mr. Wall is waiting for a final contact for the person at Southwest headquarters in Dallas who refused to let him board his fight without a mask (her name is Melissa Dalton at the office of ground operations standards). *Id.*

69.     Mr. Wall found many signs at airline check-in counters June 2 at MCO telling passengers they have to wear masks without mentioning mandatory exemptions for passengers for disabilities, and without noting that such a requirement only legally applies to travelers with known communicable disease. The signs also don't advise passengers that wearing EUA medical devices is optional per the FDCA. Ex. 85.

70.     It wasn't until the next day (June 3) that Mr. Wall received another reply from Southwest regarding the two mask-exemption forms he had submitted May 31. These e-mails state, "Due to the nature of your issue, we are forwarding your email to our Customer Relations Department for further review. ***You should expect a response to your concern within 30 days*** ..." Ex. 18 (emphasis added).

71.     **MR. WALL HAD TO CANCEL HIS REMAINING AIRLINE TICKETS BECAUSE OF THE DEFENDANTS' ILLEGAL DISCRIMINATION:** Defendant JetBlue sent Mr. Wall an e-mail June 9, 2021, falsely stating that "federal law" requires passengers to wear mask. Ex. 86. Congress has never enacted a law requiring anyone to use an FDA unauthorized or EUA medical device such

a mask. Mr. Wall considers this to be an unfair and deceptive trade practice as well as a breach of contract.

72. Defendant JetBlue's e-mail mentions nothing about medical mask exemptions, which is also an unfair and deceptive trade practice not to mention a violation of the ACAA. *Id.*

73. Defendant JetBlue sent Mr. Wall another e-mail June 15 again falsely stating that "federal law" requires masks. Ex. 87. There is so such law. This is again an unfair and deceptive trade practice.

74. Defendant JetBlue's e-mail mentions nothing about medical mask exemptions, which is also an unfair and deceptive trade practice not to mention a violation of the ACAA. *Id.*

75. Because of Defendant JetBlue's illegal discrimination, Mr. Wall had to cancel his June 16 flight from FLL to SLC.

76. Defendant Frontier send Mr. Wall e-mails June 14, 15, and 17 falsely informing him that "federal law" requires passengers to wear masks. Ex. 88. There is no such federal law. This is a deceptive and unfair trade practice.

77. The e-mails from Frontier did not include information about mask exemptions for the disabled. This violates the ACAA and other laws. It's also a deceptive an unfair trade practice.

78. The e-mails from Frontier do not include advising passengers that under the FDCA, passengers have the option of wearing an FDA unauthorized or EUA

medical device. This is a deceptive and unfair trade practice as well as a breach of contract.

79. Because of Defendant Frontier's illegal discrimination, Mr. Wall had to cancel his June 18 flight from SLC to PHX. Ex. 89.

80.    Even though his fare was fully refundable, Frontier refused to issue Mr. Wall a refund. Numerous correspondence with Frontier lawyer Brian Maye has not resulted in a refund. Mr. Wall filed a dispute with his credit-card bank. Ex. 90.

81. Defendant Allegiant sent Mr. Wall an e-mail June 19 falsely stating that "federal law" requires passengers to wear masks. Ex. 91. There is no such federal law. This is a deceptive and unfair trade practice.

82.    The e-mail from Allegiant does not include information about mask exemptions for the disabled. This violates the ACAA and other laws. It's also a deceptive and unfair trade practice.

83.    The e-mail from Allegiant does not include advising passengers that under the FDCA, passengers have the option of wearing an FDA unauthorized or EUA medical device. This is a deceptive and unfair trade practice as well as a breach of contract.

84.    Because of Defendant Allegiant's illegal discrimination, Mr. Wall had to cancel his June 20 flight from IWA to HOU. Ex. 92.

85.    Allegiant has refused to issue Mr. Wall a refund. Numerous correspondence with Allegiant lawyer Brian Maye has not resulted in a refund. Ex. 93. Mr. Wall filed a dispute with his credit-card bank. Ex. 94.

86.     Mr. Wall received an e-mail from Defendant Southwest on June 17 denying him a medical exemption for his June 22 flight from HOU to DAL: "Per Department of Transportation (DOT) regulation (14 CFR §382.21), a Passenger with a communicable disease or infection, such as COVID-19, may pose a direct threat to the health and safety of others onboard an aircraft." However, Southwest did not present any evidence the Mr. Wall has a communicable disease or infection. Ex. 97. This is a deceptive and unfair trade practice as well as a violation of the ACAA.

87. The June 17 e-mail from Defendant Southwest to Mr. Wall does not advise passengers that under the FDCA, passengers have the option of wearing an FDA unauthorized or EUA medical device. *Id.* This is a deceptive and unfair trade practice as well as a breach of contract.

88.     The Southwest e-mail states numerous requirements for passengers to obtain a mask exemption that violate the ACAA. *Id.*

89.     Defendant Southwest falsely claimed it "is fully aware of and is in compliance with all laws and regulations concerning Passengers with disabilities and with federal mask requirements." *Id.* This is deceptive and unfair trade practice, not to mention a clear violation of the ACAA.

90.     On the reservation details screen Mr. Wall viewed prior to his June 22 Southwest flight from HOU to DAL, it falsely informed him that "Face coverings are required for everyone ages 2 and up." Ex. 97. This is a deceptive and unfair trade practice, a breach of contract, and a violation of the ACAA. Southwest fails

to inform customers on this screen that the disabled are exempt from the mask requirement. It also fails to advise passengers of their right under the FDCA to refuse a medical device that is FDA unauthorized or EUA only.

91.  Defendant Southwest sent Mr. Wall an e-mail June 21 falsely stating that "federal law" requires passengers to wear masks. Ex. 99. There is no such federal law. This is a deceptive and unfair trade practice.

92.  The e-mail from Southwest states passengers with a disability are exempt from the mask mandate, yet Southwest denied Mr. Wall's exemption request. *Id.* and Ex. 97. This violates the ACAA and other laws. It's also a deceptive and unfair trade practice plus a breach of contract.

93.  The e-mail from Southwest does not include advising passengers that under the FDCA, passengers have the option of wearing an FDA unauthorized or EUA medical device. Ex. 99. This is a deceptive and unfair trade practice as well as a breach of contract.

94.  Because of Defendant Southwest's illegal discrimination, Mr. Wall had to cancel his June 22 flight from HOU to DAL. Ex. 100.

95. Because of the disruption to Mr. Wall's travel plans due to the discriminatory conduct by other Airline Defendants, he had to change his Delta ticket to Germany to visit his brother and his wife to July 17-24. Ex. 101.

96.  Defendant Delta sent Mr. Wall e-mails July 14 and 16 falsely stating that "federal law" requires passengers to wear masks. Ex. 102. There is no such federal law. This is a deceptive and unfair trade practice.

97. The e-mails from Delta violate the ACAA by requiring passengers who need a medical mask exemption "to complete a clearance to fly process prior to departure at the airport." *Id*. It's a breach of contract as well since Delta's contract of carriage Mr. Wall agreed to includes no requirement to wear a mask or undergo an invasive "Clearance to Fly" process with Delta's contract doctor who has never examined Mr. Wall and has no knowledge of his medical conditions. This is an invasion of privacy.

98.   The e-mails from Delta do not include advising passengers that under the FDCA, passengers have the option of wearing an FDA unauthorized or EUA medical device. *Id*. This is a deceptive and unfair trade practice as well as a breach of contract.

99.   Mr. Wall visited Delta's website after receiving these two e-mails. It also contains false information that "federal law" requires passengers to wear masks. Ex. 103. There is no such federal law. This is a deceptive and unfair trade practice.

100.   Because of Defendant Delta's illegal discrimination, Mr. Wall had to cancel his July 17-24 trip to see his family in Germany.

101.   Defendant Spirit sent Mr. Wall an e-mail June 19 falsely stating that "federal law" requires passengers to wear masks. Ex. 104. There is no such federal law. This is a deceptive and unfair trade practice.

102.    The e-mail from Spirit does not include information about mask exemptions for the disabled. This violates the ACAA and other laws. It's also a deceptive an unfair trade practice.

103.    The e-mail from Spirit does not advise passengers that under the FDCA, passengers have the option of wearing an FDA unauthorized or EUA medical device. This is a deceptive and unfair trade practice as well as a breach of contract.

104.    Because of Defendant Sprit's illegal discrimination, Mr. Wall had to cancel his flight to MYR to BWI. This resulted in $37.59 in damages to Mr. Wall that was not refunded. Ex. 105.

105.    Because of the illegal discrimination Mr. Wall suffered by the other Airline Defendants, he had to change his Seattle trip on Alaska to July 28 to Aug. 4. Ex. 106. He then had to cancel the trip because of Alaska's illegal mask policy.

**B. Discrimination, illegal conduct, and breach of contract against other Named Plaintiffs.**

106.    Plaintiff Aaron Abadi submits a declaration and supporting documentation that is incorporated into this Amended Complaint by reference. Ex. 19.

107.    Plaintiff Kleanthis Andreadakis submits a declaration and supporting documentation that is incorporated into this Amended Complaint by reference. Ex. 20.

108.    Plaintiff Eric Cila submits a declaration and supporting documentation that is incorporated into this Amended Complaint by reference. Ex. 21.

45

109.   Plaintiff Shannon Greer Cila submits a declaration and supporting documentation that is incorporated into this Amended Complaint by reference. Ex. 22.

110.   Plaintiff Anthony Eades submits a declaration that is incorporated into this Amended Complaint by reference. Ex. 23.

111.   Plaintiff Uri Marcus submits a declaration and supporting documentation that is incorporated into this Amended Complaint by reference. Ex. 24.

112.   Plaintiff Yvonne Marcus submits a declaration and supporting documentation that is incorporated into this Amended Complaint by reference. Ex. 25.

113.   Plaintiff Kevin Leonardo McDonnell submits a declaration and supporting documentation that is incorporated into this Amended Complaint by reference. Ex. 26.

114.   Plaintiff Peter Menage submits a declaration and supporting documentation that is incorporated into this Amended Complaint by reference. Ex. 27.

115.   Plaintiff Connie Rarrick submits a declaration and supporting documentation that is incorporated into this Amended Complaint by reference. Ex. 28.

116.   Plaintiff Jared Rarrick submits a declaration that is incorporated into this Amended Complaint by reference. Ex. 29.

117.   Plaintiff Jennifer Rarrick submits a declaration and supporting documentation that is incorporated into this Amended Complaint by reference. Ex. 30.

## C. Defendants conspired to put illegal mask polices in place last year, interfering with the civil rights of disabled passengers.

118. Defendant JetBlue was the first U.S. airline to require passengers to don face masks during flights, announcing the measure on April 27, for flights starting on May 4, 2020. Ex. 107.

119. Defendant Delta simultaneously announced it would also mandate face masks on flights effective May 4, 2020. *Id.*

120. Defendant Frontier simultaneously announced it would also mandate face masks (effective date not reported). *Id.*

121. Recommending or requiring that someone wear a mask, which is designated by the FDA as a "medical device," constitutes unlicensed practice of medicine. Ex. 109.

122. Lawyers advised the airline industry at the start of the COVID-19 pandemic that the ACAA prohibits airlines from discriminating against a passenger with a disability, which includes a person with a communicable disease or infection, in the provision of air transportation. Ex. 110.

123. Airlines were provided legal advice that "A carrier may ***deny boarding, require a medical certificate, or impose conditions on a passenger (such as wearing a mask) only in cases where a passenger with a communicable disease poses a 'direct threat' to the safety and health of others***. In determining whether a passenger poses such a threat, the airline makes an 'individualized assessment' by relying on current medical

knowledge, the likelihood of potential harm to others, and whether reasonable procedures or modifications could mitigate the risk." *Id.* (emphasis added).

124.   The Airline Defendants conspired to impose mask mandates anyway, ignoring this legal guidance.

125.   All Airline Defendants except Allegiant mandated masks in early May 2020. Ex. 111. Allegiant's role in the conspiracy is unclear, and plaintiffs will need discovery to determine if it participated with the other defendants in interfering with the civil rights of disabled people during this early period of the pandemic.

126.    Recognizing that mandating masks violates the ACAA, the FDCA, other federal and international laws, and their contracts of carriage, the Airline Defendants at first told their flight attendants and pilots they shouldn't actually enforce this mask rule on board the planes. *Id.* Passengers were still denied boarding if they didn't wear a mask at the gate, however. At this point, it appears the conspiracy to implement masks was undertaken with some understanding that the defendants could not interfere with the civil rights of the disabled. This would soon change, however.

127.   It was reported in May 2020: "The major airlines have exceptions so that young children and those with medical issues don't have to wear masks." *Id.* There was compliance with the ACAA at first. The author of this article noted: "Presumably the airlines would be opening themselves up to a lawsuit if they forced someone to put on a mask when they claim they have a medical condition." *Id.*

48

128.   Defendant Alaska said it was aware of the laws protecting disabled passengers from discrimination and privacy laws: "In line with health privacy laws, guests are not required to disclose or prove their specific medical condition to airline employees and are asked to notify our airport staff upon boarding. Airport staff will inform the flight attendants of guests who have a medical exemption." *Id.*

129.   By mid-June 2020, major airlines extended their conspiracy to ban flyers who refused to – or medically can't – wear masks from flying. Ex. 112. Plaintiffs need discovery to determine to what extent the Airline Defendants share their "no-fly lists" among each other.

130.   Through the trade group they belong to, Airlines for America ("A4A"), Defendants Southwest, Alaska, Delta, and JetBlue announced they were conspiring to begin "vigorously enforcing face covering policies." *Id.*

131.   Acknowledging that pilots and flight attendants are not licensed medical providers, the conspirators at this phase continued to permit some medical exemptions because "the crew isn't qualified to assess medical conditions, so there shouldn't be any follow-up questions" when someone self-declares a disability that makes it impossible for them to cover their nose and mouth. *Id.*

132.   "U.S. airlines are very serious about requiring face coverings on their flights. Carriers are stepping up enforcement of face coverings and implementing substantial consequences for those who do not comply with the rules," said A4A President & CEO Nicholas Calio. Ex. 114.

133.    Defendants Allegiant, Frontier, and Spirit do not have appeared to partici-
pate in this part of the conspiracy because they belong to another aviation in-
terest group, the National Air Carrier Association ("NACA"). Plaintiffs will need
discovery to determine if NACA members participated in the conspiracy during
June 2020. At this point, Allegiant was still only recommending use of face
masks.

134.    While the Airline Defendants, except Allegiant, were stepping up their mask
enforcement in early Summer 2020, they were exempting pilots from the muz-
zling rule because of the need for safety in the cockpit. American Airlines, for
example, issued a memo to staff July 2, 2020, noting there is a "Flight Deck
safety exception." Ex. 113. Plaintiffs believe discovery will reveal similar pilot
exceptions issued by the Airline Defendants.

135.    In a July 10, 2020, memo, American detailed its flight deck safety exception:
"Pilots have certain exemptions on wearing masks in the flight deck for safety
reasons. (i.e. A mask may interfere with their ability to see or don an oxygen
mask.) ... The pilots do not have to put on a face covering if they feel it could
impact safety." *Id*.

136.    These memos obtained by the plaintiffs from an American employee show
how the airline industry was well aware that obstructing a person's breathing
by mandating face coverings is dangerous.

137.    "When COVID-19 first became a threat, most airlines prohibited crews from
wearing masks. ... But even when mask usage started to become more common

and ultimately permitted for flight attendants, it remained prohibited for cockpit crews by the FAA." Ex. 115. "Additionally, the FAA issued a ruling that was adopted by most if not all airlines in the US, that allowed but did not require pilots to wear masks in the cockpit." *Id.*

138.   "There are a number of issues that come with wearing a mask in the cockpit and those reasons are why most crew members don't wear one in flight. First, in an explosive decompression getting your facial mask off and the oxygen mask on adds seconds to a procedure that is already time critical. Second is the issue of rebreathing $CO_2$ for hours on end while at altitude in a safety critical position. Third, for those who wear glasses, masks represent a challenge that frequently leads to those glasses becoming fogged. This can be a challenge even for those with perfect vision during daytime flights when you need to wear sunglasses. Even with the built-in shades, it can get very bright in the cockpit at altitude. Consequently, wearing a mask while operating the aircraft compromises safety. With what we know about how air flows on aircraft, the risks posed by wearing a mask greatly outweigh the risks that come from not wearing one inside the flight deck." *Id.*

139.   Some flight attendants and former flight attendants have submitted declarations testifying that they and passengers also should not wear masks for safety because decreased oxygen levels reduce reaction time in an emergency. A cabin full of muzzled, oxygen-deprived flight attendants and passengers could result in a disaster if they are slow to respond to an in-flight emergency.

140.   "I personally witnessed mild to severe illnesses among passengers from mask wearing in flight," declared a flight attendant for a regional carrier. "My oxygen level consistently ranges between 89%-93% during flight (well below normal). After prolonged duty periods, sometimes up to 14-16 hours, I experience nose bleeds, hot flashes, nausea, and headaches." Ex. 37.

141.   "Passengers and crew members have suffered unintended, health injuries, such as headaches, panic, bloody noses, nausea, and vomiting, from wearing a mask over the vital airways, during flight." *Id*. The conspiracy now involved endangering the health and safety of the defendants' passengers.

142.   "FAs were required by the airlines to wear masks before the passengers were federally mandated. However, pilots and other occupants of the Flight Deck are exempt," declared a flight attendant for Defendant Allegiant, who resigned rather than be forced to muzzle passengers. "[A] passenger who is the mother of three children traveling beside her can NOT remove her face mask, place on her O2 mask, and reach over to assist her three children doing the same in less than 3 seconds" in the event of an explosive decompression. Ex. 44.

143.   Masks impair the critical ability for passengers and crew to communicate during an emergency: "Without a doubt, the mask mandate has made it more challenging to perform my regular duties effectively. It's become difficult to communicate with our passengers on a regular basis, and in turn, hard to hear them attempt communication with us," declared a flight attendant for a major airline. Ex. 48.

144.   In addition to endangering aviation security, the conspirators ignored that masks cause physical harm to flight crew and passengers: "[T]hese masks have created a significant amount of bacteria in my mouth & on my face that has definitely had an effect on my health. My face breaks out. I'm constantly struggling to breathe and I get heart palpitations regularly due to stress and anxiety." *Id.*

145.   "These mask mandates are a joke for anybody who has gone through flight-attendant or pilot training. The crew on board every aircraft is there for one main reason: to guarantee the safety of the flight, including the crew and passengers on board the aircraft. To limit the oxygen intake of the crew and the passengers in an already low-oxygen environment like a plane is beyond dangerous as it impedes an optimum oxygen level in our bodies – not only for any pre-existing medical conditions any passenger or crew member might already have but also because it endangers the safety of the flight in case of emergency," declared a former flight attendant and member of the proposed Disabled Class who was recently discriminated against by Defendant Delta. Ex. 34.

146.   "Not only would passengers and crew members lose precious time to wear an oxygen mask in case of a decompression because they would have to remove their own unauthorized or FDA Emergency Use Authorization worthless mask first, but also the flight attendants would be automatically not fit to handle an

emergency because the already low oxygen level in their own bodies would incapacitate them from performing the emergency procedures that we have all been trained for." *Id.*

147.   The conspiracy would soon evolve to indisputably interfere with the civil rights of disabled passengers by totally banning them from most Airline Defendants indefinitely, violating 49 USC § 44902(b), which permits airlines to refuse to carry someone only if "the carrier decides [the passenger] is, or might be, inimical to safety."

148.   Healthy disabled people who can't wear face masks are not "being adverse often by reason of hostility or malevolence" – Miriam-Webster's definition of "inimical." Likewise these people are not "unfriendly; hostile" – dictionary.com's definition of "inimical."

149.   The Individual Defendants should have known forbidding disabled passengers from flying violated numerous federal and international laws, but they did nothing to stop the conspiracy.

150.   Defendant Southwest was the first carrier to institute a blanket ban on passengers with disabilities who cannot not wear a face mask. Southwest stated that it would "temporarily refuse to transport any passenger who is unable to wear a mask even if the Customer has a verifiable medical condition that prevents them from wearing a mask." Ex. 116.

151.   The other defendant conspirators soon followed. Defendant Alaska said "If you are unable to wear a mask throughout the airport and for the duration of your flight for any reason, you will not be able to fly with us." *Id.*

152.   Defendant Allegiant adopted a rule: "Only children under the age of 2 are exempt from wearing a face covering. Customers who are not able to wear a face covering will not be permitted to travel." *Id.*

153.   Defendant Frontier said "We require both passengers and employees to wear a face-covering over nose and mouth throughout the Frontier travel experience including ticket counters, gate areas, baggage claim and onboard all flights. The only exception is for children under the age of 2." *Id.*

154.   JetBlue also banned disabled passengers from flying: "Customers with conditions that prevent them from wearing a face covering should postpone travel until this temporary requirement is no longer in place." *Id.*

155.   Defendant Spirit likewise prohibited any passengers with medical conditions from flying: "Any other Guest who is unable to wear an appropriate face covering for any reason, including medical, will not be permitted to travel with us at this time." *Id.*

156.   "That's 8 of the 10 largest U.S. airlines which have told disabled people with autism, asthma, cerebral palsy, claustrophobia, COPD, PTSD, severe anxiety and other conditions that they are not welcome onboard an aircraft. It is the largest ban on disabled air travel since the Air Carrier Access Act became law in 1986." *Id.*

157.   These policies were all implemented in July 2020, demonstrating both intracorporate and intercorporate conspiracies to interfere with civil rights by prohibiting all disabled Americans who can't obstruct their breathing from flying.

158.   The only outlier among the Airline Defendants was Delta, who didn't agree to the industrywide ban but instead adopted an illegal policy: "Customers with underlying conditions that explicitly prevent the wearing of a face covering or mask are strongly encouraged to reconsider travel or should be prepared to complete a 'Clearance-to-Fly' process prior to departure at the airport. If you require this exemption, please arrive early to complete the process during check-in and avoid missing your flight – this process can take over one hour." *Id.*

159.   Delta's policy violates the ACAA because disabled flyers are treated separately from nondisabled passengers. They must arrive at the airport earlier than nondisabled customers and undergo an invasive health screening with a doctor who has never examined them and is not familiar with their health conditions. This is an invasion of privacy.

160.   Delta's policy also made it so that disabled travelers would not know until close to departure time whether they would be granted a mask exemption or not – leading millions of disabled flyers to not gamble on buying a ticket that could be revoked by Delta in a discriminatory manner because of their disability.

161. A consultation with a third-party medical vendor is prohibited by the ACAA.

162. Plaintiffs need discovery to show how and when Delta decided to withdraw from the conspiracy with the other six Airline Defendants (and the executives of those air carriers who knew of the conspiracy to deprive disabled people of their civil rights but did nothing to stop it).

163. "The major airlines are now serious about enforcing their requirements that passengers (unless they are age 2 and under, usually) wear face masks during boarding and on the plane, as well as in areas throughout airports they serve, such as customer service counters and gates. The only time masks may be removed is for eating or drinking — which experts suggest you keep to a minimum. They've announced that travelers who refuse to wear masks onboard will not be allowed to fly." Pl. Ex. 117.

164. The conspiracy continued into January 2021, when the defendants collectively lobbied for a Federal Transportation Mask Mandate. "[A]irlines and their unions requested [the FTMM] to help with passenger mask compliance…" Ex. 123.

**D. Upon engaging in a conspiracy to interfere with the civil rights of disabled travelers, the Airline Defendants put their illegal policies in place to ban anyone with a medical condition who can't wear a mask.**

165. **SOUTHWEST'S ILLEGAL POLICIES:** "Customers with disabilities are not required to provide advance notice of the need for assistance…" Defendant Southwest correctly states on one of its webpages. Ex. 118.

166. However, Southwest then illegally makes passengers needing a mask exemption to complete a "Passenger Application for Exemption to Federal Mask Requirement on Southwest Airlines" form and submit it at least seven days in advance. *Id.*

167. Southwest's form requires passengers to acknowledge an illegal policy that "Southwest Airlines may change his travel dates and/or flights should one or more of his originally scheduled flights have a capacity of 75% or more, or another Passenger approved for a mask exemption booked on such flight." *Id.*

168. Southwest admits that prior to March 14, 2021, it did not "consider applications for exemptions from this mask requirement from Passengers with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability." *Id.*

169. "Per guidance from the U.S. Department of Transportation, airlines are permitted to impose certain requirements or conditions on a person requesting an exemption from the mask requirement. These requirements/conditions are described below." *Id.*

170. Because DOT's guidance (Ex. 149) is illegal, there's no remedy for plaintiffs for the violation of their rights under the ACAA, therefore giving them this private right of action to enforce the ACAA since DOT has failed its statutory duty to do so.

171. Numerous plaintiffs have noted they haven't filed complaints with DOT because it would be a futile gesture. Index of Declarations at Ex. 1.

172.   "As a mitigation measure, DOT allows airlines to schedule the passenger (not wearing a mask) on a less crowded flight," according to Southwest. Ex. 118. *But see* 14 CFR § 382.11(a)(1).

173.   "Southwest requires that a Passenger obtaining a mask exemption travel on a flight with less than 75% capacity at the time of the flight's departure, and with no other Passengers on board approved for a mask exemption. If the passenger's preferred flight ends up being more than 50% full on the day of travel, Southwest Airlines will work to reaccommodate Passengers who obtain a mask exemption. Please note that Passengers may be required to travel on a different date than their scheduled itinerary." Ex. 118. *But* see 14 CFR § 382.11(a)(1).

174.   "At least seven (7) days prior to the Passenger's planned date of travel, a Passenger requesting a mask exemption for travel on Southwest Airlines must complete and submit [the form]…" Ex. 118. *But see* 14 CFR § 382.25.

175.   "A signed letter [is required] from the requesting Passenger's Medical Physician on the Physician's letterhead stating that the Passenger with a disability has a recognized medical condition precluding the wearing or safe wearing of a mask because of their disability." Ex. 118. *But see* 14 CFR § 382.23.

176.   "Once Southwest Airlines receives a mask exemption application in line with the above criteria, at Southwest's request to Passenger, Passenger may undergo a private medical screening (over the phone) with a third-party medical provider…" Ex. 118. *But see* 14 CFR § 382.23(d).

177.    "No later than 24 hours prior to the Passenger's scheduled departure(s), Passenger must provide evidence of Passenger's qualifying COVID negative viral test result." Ex. 118. This sets different requirements for passengers without and with disabilities to fly; i.e. those who can mask don't need a test, those who can't mask (even if fully vaccinated and/or naturally immune), must get an expensive test *for each segment of their journey*. *See* 49 USC § 41705 and 14 CFR § 382.11(a)(1).

178.    "Roundtrip travel will require an additional qualifying COVID negative viral test result taken within three (3) calendar days preceding the Passenger's scheduled date of return travel and submitted no later than 24 hours prior to the Passenger's scheduled departure…" Ex. 118.

179.    No provision of federal law or regulations permit an airline to require that any person be tested for a disease as a condition of carriage, and such a provision is not contained in Southwest's contract of carriage.

180.    The most outrageous and discriminatory policy of Southwest is that "if the Passenger's originally scheduled date of travel is changed as a result of the flight having a capacity of 75% or more or another Passenger approved for a mask exemption, then you will be required to obtain a qualifying COVID negative viral test result within three (3) calendar days preceding the Passenger's new scheduled date of departure or return travel, as applicable and at your own expense." Ex. 118. So in other words, Southwest is going to violate the law by refusing to carry a disabled person because the flight is pretty full and/or because

there's another disabled person on board, and then it is going to violate the law AGAIN by mandating you get ANOTHER negative COVID-19 test when non-disabled passengers are not subject to the testing requirement. *See* 49 USC § 41705; 14 CFR § 382.11(a)(1); 14 CFR § 382.17.

181.   "Southwest Airlines will introduce tough new face mask rules that will make it even more difficult for passengers with a legitimate medical exemption to fly with the airline…" Ex. 119.

182.   "Once a passenger has jumped through those hoops, Southwest Airlines will still refuse to board them if the flight is booked to 50% capacity or more. Even on a near-empty flight, an exempt passenger may still be refused boarding if there is more than one exempt passenger booked on the same flight." *Id.*

183.   Before the FTMM, "Southwest Airlines barred anyone over the age of two years old from flying with them if they claimed to have a medical condition that prevented them wearing a face mask. Instead, Southwest told passengers to either delay travel indefinitely or find another airline to fly with." *Id.*

184.   Effective July 27, 2020, Southwest's policy was "Due to the Safety risk posed by someone not wearing a mask, we are not able to allow any other exemptions at this time, including those for disabilities or medical conditions. If a Customer cannot travel safely while wearing a mask, the Customer will be refused transportation." Ex. 120.

185.   Customers immediately petitioned Southwest to not implement its discriminatory policy, noting that it was illegally going to enforce mask mandates on

disabled travelers who had booked tickets and relied on the lack of a require-ment in Southwest's contract of carriage: "This new requirement directly im-pacts individuals with special needs, medical conditions and those with devel-opmental disabilities. Over the last 8 years, my life as a mother has been heavily involved in the fair treatment of children (and adults) on the Autism Spectrum. After purchasing tickets to travel several weeks ago for travel on August 6th, the new mandate will go into effect on Monday, July 27, 2020. I contacted South-west Airlines to make arrangements for my autistic daughter and we were told that she will not be allowed to fly on their airline if she is not able to mask for the duration of time before, during and after the flight. They claim they are fol-lowing CDC guidelines, which explicitly states that accommodations for those with disabilities should be made. This is also a violation of the Air Carrier Access Act that states that airlines are prohibited to discriminate against people with mental or physical disabilities." Ex. 121.

186.    Plaintiffs Connie, Jared, and Jennifer Rarrick are among the hundreds of thousands of flyers whose contract Southwest breached. Exs. 28-30.

187.    Defendant Southwest finally changed its tune recently, saying publicly it wants to withdraw from the conspiracy to interfere with the civil rights of disa-bled travelers. Southwest CEO Gary Kelly, a likely named defendant, lobbied for the FTMM to terminate Sept. 13, 2021. Exs. 122-124.

188.   Mr. Kelly serves as A4A chairman. He said the aviation interest group wants the mandate ended due in part because "Reports abound of passengers refusing to wear masks and becoming aggressive with flight crews." Ex. 123.

189.   However, the FTMM was extended from Sept. 13 to Jan. 18, 2022. None of the Airline Defendants have sued the federal government to block it even though they now realize how discriminatory and dangerous it is.

190.   **ALASKA'S ILLEGAL POLICIES:** "Alaska Airlines announced a strengthening of [its] mask policy, requiring all passengers above the age of two to wear face coverings, with no medical exceptions allowed. The change goes into effect August 7[, 2020]. Alaska's announcement comes the same day as New York-based JetBlue's, who also announced it is eliminating medical exemptions for mask wearing, effective August 10th. Alaska, along with JetBlue, now join American and Southwest, which announced similar zero-exceptions policies in recent weeks, as the airlines with the strictest face covering policies in the United States." Ex. 126.

191.   "Alaska Airlines said on Wednesday that it will no longer fly passengers who are unwilling or unable to wear a mask — even when there's a legitimate and documented medical reason — following similar moves by American Airlines and Southwest." Ex. 127.

192.   "If a guest is unwilling or unable to wear a mask for any reason while at the airport, they will not be permitted to travel," the airline said in a statement. "If

a guest refuses to wear a mask after boarding their flight, they will be suspended from future travel." *Id.*

193.   This policy follows a "yellow card" program that Alaska rolled out in June, in which flight attendants would issue a formal notice to passengers who refuse to wear masks. The airline said that going forward, any passenger who does not comply with the mask requirement after receiving a yellow card will be banned from flying with it immediately on landing, and will have any connecting or return flights cancelled. *Id.*

194.   Alaska's current mask rules are: "If you have a disability and are unable to wear a mask, please call our dedicated accessible services line at 1-800-503-0101 … to request an exemption from the mask requirement." Ex. 125.

195.   "Exemptions will require: • Documentation from a licensed health care provider as to your inability to wear a mask due to your disability; and • Proof of a negative test result from an FDA approved molecular NAAT or PCR Covid-19 test taken within 72 hours of your scheduled flight departure." *Id.*

196.   "Documentation from your health care provider must be submitted to Alaska Airlines at least 72 hours before your flight. We recommend that you contact us at least one week before departure to start the exemption process." *Id.*

197.   **ALLEGIANT'S ILLEGAL POLICIES:** As of June 19, 2020, Allegiant was the only major U.S. airline not participating in the conspiracy to interfere with the civil rights of the disabled, and the only major carrier not to break the FDCA

by requiring any passenger to don an FDA unauthorized or EUA medical device on their face. Ex. 129.

198.   Allegiant did provide customers with FDA unauthorized or EUA medical devices, however, practicing medicine without a license: "[E]ach passenger gets a complimentary health and safety kit with a face mask, gloves, and two sanitizing wipes" and Allegiant "strongly encouraged passengers to wear" the devices. *Id*.

199.   Allegiant was the lone holdout in the conspiracy at this time, noting the importance of not interfering with the civil rights of the disabled: "We've also heard from customers with asthma and other health conditions who say they can't wear masks. We want to ensure our policies accommodate them, as well." *Id*.

200.   Defendant Allegiant quickly changed its tune, however, joining the conspiracy and implementing a mandatory mask policy July 2, 2020. Ex. 130.

201.   Allegiant became the last major carrier to mandate muzzling. *Id*.

202.   Defendant Allegiant in June 2021 falsely represented that "federal law requires every person to wear a face covering that covers the nose and mouth at all times while traveling." Ex. 128. There is no such law enacted by Congress. This is a deceptive and unfair trade practice.

203.   Allegiant misrepresents the FTMM by informing customers "Those with limited mobility who are unable to remove a face covering without assistance are exempt from the requirement." *Id*. But there are many other categories of exemptions under the FTMM. This is a deceptive and unfair trade practice.

204.  "To request face mask exemptions. please email our Disabilities Team at ACAA@allegiantair.com at least 10 days prior to the departure of the first flight on your itinerary. Please note, if your exemption is approved, a negative COVID test will be required within 3 days of each flight segment." *Id. But see* 14 CFR Part 382.

205.  Allegiant makes it difficult for customers with disabilities to (illegally) request in advance a mask exemption when booking their ticket. When Mr. Wall booked his flight May 31, a "Special Assistance" form came up. But there was no box to check for mask exemption; he had to write the words in a box under "Other Services Information."

206.  Nobody from Allegiant ever responded to his Special Assistance request.

207.  **DELTA'S ILLEGAL POLICIES:** "Delta's own mandatory mask policy came into effect on May [4, 2020,] and it required all of the company's passengers to wear a mask for the duration of the flight. The company has distinguished itself as having some of the strictest rules regarding masks among airline companies." Ex. 132.

208.  Delta advised customers of its mask policy April 30, 2020, but did not mention the FDCA prohibits it from requiring use of FDA unauthorized or EUA medical devices, that it doesn't have a license to practice medicine, and that customer's contracts did not require them to muzzle. Ex. 133. This is a deceptive and unfair trade practice as well as a breach of contract.

209.   Delta described the mask mandate as a "temporary requirement," but the policy has no2 been in place for 16 months. *Id*. This is a deceptive and unfair trade practice.

210.   "Face coverings will be required throughout the journey, including at check-in, in Delta SkyClubs, at boarding gates, in jet bridges, and onboard flights." Ex. 134.

211.   Delta also practiced medicine without a license by giving FDA unauthorized or EUA face masks to passengers, and declining to give them the option under the FDCA to refuse administration. *Id*.

212.   As noted above, Delta CEO Ed Bastian has been one of the most outspoken airline executives expressing his hostility toward the civil rights of the disabled, telling them to not travel – a shameful statement relegating those with medical conditions to second-class citizens. Mr. Bastian and other yet-to-be-named airline executives must be held liable for their role in the conspiracy.

213.   On July 20, 2020, "Delta Air Lines has become the first major U.S. carrier to require passengers who claim a medical exemption for not wearing a face mask on one of its planes to first obtain clearance from a physician." Ex. 135. *But see* 14 CFR Part 382.

214.   Defendant Delta's animosity toward and harassment of the disabled was made clear then the airline told such passengers that even after they "successfully undergo[] the [illegal] 'Clearance to Fly' pre-flight evaluation, the airline

can require it for future flights, such that those requiring a medical exemption may need to continue to arrive earlier for their Delta flights." Ex. 136.

215.   Tina Lemens is among the many disabled passengers harassed and humiliated by Defendant Delta. Ex. 137; Declaration at Ex. 43. Ms. Lemens is a member of the proposed Disabled Class.

216.   Defendant Delta discriminates against those who can't wear masks by flat-out telling them they "***are strongly encouraged to reconsider travel*** or should be prepared to complete a 'Clearance-to-Fly' process prior to departure at the airport. If you are a customer with a disability who requires this exemption, please arrive early to complete the process during check-in to avoid missing your flight. This process can take over one hour." Ex. 138 (emphasis added).

217.   Delta misinformed customers on its website in May 2021 that "federal law" requires the use of masks. In fact, federal law (the FDCA) prohibits any corporation from requiring any person use an FDA unauthorized or EUA medical device. *Id*. This is a deceptive and unfair trade practice.

218.   Defendant Delta's website continued in June 2021 to misrepresent federal law concerning the option to refuse to wear masks. Ex. 139.

219.   Despite his disgust of the disabled, Mr. Bastian, a likely named defendant, admitted in July 2021: "I appreciate people not wanting to wear the mask. I don't like wearing the mask when I'm on board either…" Ex. 123.

220.   **FRONTIER'S ILLEGAL POLICIES:** Defendant Frontier also illegally requires advance notice and a medical certificate, among other discriminatory

68

rules: "At least 10 days prior to departure: Submit documentation from a licensed medical provider on professional letterhead stating the customer is a person with a disability who cannot wear a mask, or cannot safely wear a mask..." Ex. 140. *But see* 14 CFR Part 382.

221.   This means a Frontier frequent flier would have to see his/her doctor before ***every trip*** on the airline. In other words, Frontier, like other airlines, refuses to grant passengers who have proven their disability a permanent mask emption – meaning Frontier discriminates against disabled passengers on every single trip they take.

222.   "Failure to provide 10 days' notice will result in denial of the request." *Id. But see* 14 CFR Part 382.

223.   "Present evidence that the customer requesting a mask exemption does not have COVID-19 by providing a negative result from a SARS-CoV-2 viral test; the specimen for the test must have been collected no more than 3 days before the applicable flight." Not only is this policy illegal discrimination, it does not logically exempt flyers who are fully vaccinated and/or naturally immune from COVID-19, presenting what's been widely described as insane "pandemic theater."

224.   Flyers with disabilities must endure this torment on each segment of their journey. "These testing requirements apply to return travel." *Id*.

225.   Like Defendant Allegiant, Frontier makes it difficult for passengers to seek mask exemptions. While booking his flight May 31, a screen came up for Mr.

Wall to select if he need any "Special Services" – but there's no box to check for mask exemption. *Id.*

226.   Frontier Airlines CEO Barry Biffle expressed his interest June 23, 2021, in removing himself and his airline from the conspiracy to interfere with the civil rights of the disabled. He said at an industry conference that face coverings are a prime contributor to a string of recent in-flight disruptions: "The reality is, a lot of people don't want to wear masks," Biffle said. "You don't have to wear a mask here [at the convention], you don't have to wear [masks] at Walmart, but yet you've got to do it on a plane." Ex. 143.

227.   Despite his comments, Mr. Biffle has not taken any action to actually end his role in the conspiracy. Frontier has not stopped illegally depriving passengers of their right under the FDCA to refuse administration of an FDA unauthorized or EUA medical device, nor has he eliminated his company's numerous illegal mask-exemption rules that break the ACAA.

228.   **JETBLUE'S ILLEGAL POLICIES:** Defendant JetBlue, like Defendant Delta, blatantly shows contempt for the civil liberties of passengers with disabilities by telling them: "Customers with conditions that prevent them from wearing a mask should consider postponing travel." Ex. 141.

229.   "Exemptions will be limited on board each flight and will require specific documentation." *Id.*

230.   Mr. Wall received an e-mail from JetBlue on June 13 regarding his upcoming June 16 flight from FLL to SLC. The airline explains the mask mandate, but fails

to advise customers with disabilities that by law they may ask for an accommodation at the airport. *Id.*

231.   Defendant JetBlue, unlike the other Airline Defendants, tries to conceal its illegal mask policies by not even publishing on its website what is exemption rules are. Plaintiff Kleanthis Andreadakis, while wanting to buy a JetBlue ticket, had to use the airline's online chat service to determine the exemption policies. Ex. 20.

232.   "On May 24, 2021, I inquired with JetBlue related to obtaining a mask exemption for upcoming travel to help my son. The mask exemption process is not detailed anywhere on the JetBlue website. I was advised by JetBlue via a chat portal I needed to prepurchase a ticket, then submit my request for a mask exemption 'no less than five days prior to travel.' The request required me to provide specific details about my 'permanent disability' for JetBlue to process it," Mr. Andreadakis declared. *Id.*

233.   "I was then advised that 'submitting documentation does not guarantee approval for a mask exemption. After JetBlue reviews your documentation, you will get an email letting you know if the exception is approved or denied. Arrive at the airport no less than 3 hours before departure and check in at the ticket counter, where a JetBlue crewmember will review the documents and confirm that the exempted customer is wearing a face shield. The face shield must be worn at all times.'" *Id.*

234.   Plaintiffs believe JetBlue is the only defendant to require mask-exempt customers to wear a face shield, which many disabled people unable to cover their face can't do. JetBlue thus totally deprives numerous disabled passengers from flying.

235.   "I was not able to prepurchase the ticket because I was not guaranteed 'approval' and had I been approved, I would have been required to wear a face shield, which I am medically unable to wear. And had my request been denied, I would not have received a refund for the unused ticket." *Id.*

236.   **SPIRIT'S ILLEGAL POLICIES:** Defendant Spirit informs passengers it will view mask-exemption requests unfavorably and require illegal actions: "[W]e allow limited exceptions for Guests who cannot wear or safely wear an appropriate face covering due to a disability recognized by the Americans with Disabilities Act (ADA) who meet certain criteria. ***The ADA exemption is narrowly interpreted and will be vetted through a strict approval process***." Ex. 142. *But see* 14 CFR Part 382.

237.   "Contact us through our Chat feature here or via WhatsApp at 855-728-3555 with the words 'ADA face mask exemption' 48 hours prior to scheduled departure to let us know you will be asking for an exemption on the day of your flight." *Id.* Not only is requiring advance notice illegal discrimination, but Spirit also discriminates against passengers who don't use the app "WhatsApp" or have access to a computer for an online chat.

238.  "Arrive at the airport 3 hours prior to your flight's scheduled departure since you may be screened by our medical experts." *Id.* This is illegal discrimination because Spirit doesn't order nondisabled customers to arrive three hours before departure. Also, a screening by medical experts violates 14 CFR Part 382.

239.  "Have your medical doctor or medical professional complete the Spirit ADA Face Covering Exemption Form or provide a letter from your medical doctor that must meet all of the following requirements:" *Id.* Each requirement listed by Spirit violates the ACAA's regulatory provisions concerning when medical certificates may be demanded. 14 CFR Part 382.

240.  "Present a negative COVID-19 PCR or Antigen test result, taken within 24 hours prior to scheduled departure ..." *Id.* This appears to be the most onerous illegal testing requirement of any of the defendants. Many Americans simply do not have access to rapid coronavirus testing, thus Spirit's policy intends to totally ban all passengers with disabilities from flying.

241.  "Guests who have received the COVID-19 vaccine or tested positive for antibodies must still provide a negative viral test result as described above." *Id.* Spirit has not explained the logic behind this absurd and discriminatory statement.

242.  "Spirit agents may contact our third-party medical professionals to determine if you're fit to fly without a mask." *Id. But see* 14 CFR Part 382. This is an invasion of privacy.

243.   "We may place you on a flight that has a lower number of Guests. You may be moved to the back of the aircraft." *Id. But see* 14 CFR Pat 382.

244.   As with some of its codefendants, Spirit displayed a "Special Services" form when Mr. Wall booked his ticket May 31, 2021, but the form lacks any box to check for a mask exemption. *Id.*

245.   Spirit CEO Ted Christie has expressed a desire to get his airline out of the conspiracy to interfere with the civil rights of the disabled. He said June 23, 2021, that the U.S. government can help reduce the incidence of unruly air passenger behavior by doing away with the requirement that travelers wear face coverings: "That's got to be the next step – when facial [covering requirements] are relaxed on airplanes," Chrisite said. "That is going to take a lot of steam out of things." Ex. 143.

246.   "The masks make everyone uncomfortable, and it does drive a lot of friction," Christie admitted. "We are going to have to make a step here, where we are creating less abrasive" conditions. *Id.*

247.   Despite his comments, Mr. Chrisite has not taken any action to actually end his role in the conspiracy. Spirit has not stopped illegally depriving passengers of their right under the FDCA to refuse administration of an FDA unauthorized or EUA medical device, nor has he eliminated his company's numerous illegal mask-exemption rules.

**E. The Defendant Airlines can't hide behind the Federal Transportation Mask Mandate as that order is illegal and unconstitutional. Congress has declined numerous times to amend the ACAA during the pandemic to allow the defendants to impose mask mandates.**

248.  The Airline Defendants are not required to enforce the FTMM because it was issued illegally by the Executive Branch and is unconstitutional, as Mr. Wall has extensively argued in the companion case *Wall v. Centers for Disease Control & Prevention*.

249.  They may not justify their discrimination against the disabled based on the FTMM. The defendants had an obligation to sue the federal government to vacate the FTMM to protect the rights of passengers with disabilities and the ability of all passengers pursuant to the FDCA to refuse administration of an FDA unauthorized or EUA medical device. They failed to do so.

250.  The conspiracy to interfere with the civil rights of the disabled and violate the FDCA began in Spring 2020, well before the FTMM took effect Feb. 1, 2021.

251.  If this Court upholds the FTMM, it still must enjoin the defendants' illegal mask-exemption procedures. The FTMM itself states that passengers with medical conditions who can't tolerate wearing a face mask are exempt from the order, but the defendants have put into place numerous illegal onerous requirements that make obtaining an exemption virtually impossible – essentially banning all Americans who medically can't wear a mask from utilizing the nation's air-transportation system, which they have a statutory right to. 49 USC § 40103.

252.   Some of this case will turn on a novel question of law: When DOT fails its duty to enforce an act of Congress (the ACAA), does that create a private right of action in district court to seek airlines' compliance with the act and its regulations? The plaintiffs answer yes.

253.   In considering congressional intent, this Court has to review actions Congress has taken during the COVID-19 pandemic. Airline mask policies – and especially their discriminatory refusal to follow the law in granting exemptions to those with disabilities – without any doubt goes against the express wishes of Congress. The Legislative Branch has explicitly failed to mandate masks in any setting. This shows clear, unambiguous congressional intent.

254.   The federal legislative response to coronavirus has been enormous with at least 20 bills related to the COVID-19 pandemic enacted into law, eight bills having passed one chamber, and another 452 bills have been introduced. https://coronavirus.skoposlabs.com (visited May 19, 2021). *See also* Ex. 144.

255.   But none of these new laws have waived the defendants' requirement to not discriminate against passengers with disabilities, nor does any provision change ACAA regulations that permit airlines to force only ***those passengers known to have a communicable disease*** from wearing a mask.

256.   None of these new laws authorize DOT to stop its obligation under the law to enforce the ACAA, however DOT has done so anyway.

257.   Many members of Congress want the airlines' mask mandates rescinded. Ex. 155-157.

258. **FTMM, PRESIDENTIAL ACTION:** The day after taking office (Jan. 21, 2021), Defendant Biden issued "Executive Order Promoting COVID-19 Safety in Domestic & International Travel." E.O. 13998, 86 Fed. Reg. 7205 (Jan. 26, 2021). This executive order set in motion the FTMM issued by CDC, HHS, TSA, DHS, and DOT.

259. **FTMM, DHS ACTION:** To carry out E.O. 13998, the Department of Homeland Security issued Determination 21-130 on Jan. 27, 2021: "Determination of a National Emergency Requiring Actions to Protect the Safety of Americans Using & Employed by the Transportation System." Ex. 145.

260. **FTMM, CDC ACTION:** Without providing public notice or soliciting comment, CDC – an agency within HHS – issued an Order "Requirement for Persons To Wear Masks While on Conveyances & at Transportation Hubs" on Feb. 1, 2020, effective immediately. 86 Fed. Reg. 8,025 (Feb. 3, 2021).

261. "This Order exempts the following categories of persons: … ***A person with a disability who cannot wear a mask, or cannot safely wear a mask***, because of the disability as defined by the Americans with Disabilities Act …" *Id.* (emphasis added). All members of the Disabled Class meet this definition.

262. The CDC Order illegally states: "Operators of conveyances or transportation hubs may impose requirements, or conditions for carriage, on persons requesting an exemption from the requirement to wear a mask, including medical con-

sultation by a third party, medical  documentation by a licensed medical provider, and/or other information as determined by the operator, as well as require evidence that the person does not have COVID–19 such as a negative result from a SARS–CoV–2 viral test or documentation of recovery from COVID–19. ... Operators may further require that persons seeking exemption from the requirement to wear a mask ***request an accommodation in advance***." *Id.* (emphasis added). *But see* 14 CFR Part 382.

263.   CDC's FTMM Order is in direct conflict with the ACAA (49 USC § 41705) and the regulations promulgated thereunder. For example, "May a carrier require a passenger with a disability to provide advance notice that he or she is traveling on a flight? As a carrier, ***you must not require a passenger with a disability to provide advance notice of the fact that he or she is traveling on a flight***." 14 CFR § 382.25 (emphasis added).

264.   CDC's FTMM Order is also in gross noncompliance with numerous other regulations promulgated by Defendant DOT, who has thus far neglected its duty to enforce the ACAA. *See* 14 CFR Part 382 for an extensive list of ACAA requirements.

265.    On its website, Defendant CDC falsely claims that "Most people, including those with disabilities, can tolerate and safely wear a mask ..." Ex. 146. Millions of disabled Americans, including the Named Plaintiffs, disagree with that assertion.

78

266. **FTMM, TSA ACTION:** Based on CDC's questionable delegation of its authority, TSA issued three security directives and one emergency amendment Feb. 1, 2021, to transportation operators requiring them to vigorously enforce CDC's FTMM. These four orders were effective until May 11, 2021.

267. When TSA's FTMM security directives and emergency amendment expired, the administration extended their effective date from May 12 to Sept. 13, 2021. They were then extended again until Jan. 18, 2022. These are the SD's and EA currently in effect.

268. "Aircraft operators may impose requirements, or conditions of carriage, on persons requesting an exemption from the requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the air craft operator, as well as require evidence that the person does not have COVID-19 such as a negative result from a SAR-Co V-2 viral test or documentation of recovery from COVID-19." TSA SD 1544-21-02A, Ex. 147. *But see* 14 CFR Part 382.

269. "Aircraft operators may also impose additional protective measures that improve the ability of a person eligible for exemption to maintain social distance (separation from others by 6 feet), such as scheduling travel at less crowded times or on less crowded conveyances, or seating or otherwise situating the individual in a less crowded section of the conveyance or airport. ***Aircraft operators may further require that persons seeking exemption from***

***the requirement to wear a mask request an accommodation in advance.***" *Id.* (emphasis added). *But see* 14 CFR § 382.25.

270.   TSA's FTMM violates numerous other regulations promulgated by Defendant DOT, who has thus far neglected its duty to enforce the ACAA during the pandemic.

271.   **FTMM, DOT ACTIONS:** DOT issued a lengthy "Frequently Asked Questions" bulletin about the FTMM. Ex. 148.

272.   "Additional requirements or conditions may be imposed that provide greater public health protection and are more restrictive than the requirements of the CDC Order, including requirements for persons requesting an exemption from the mask requirement, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the operator." *Id. But see* 14 CFR Part 382.

273.   DOT's FTMM FAQ's lack legal foundation under the ACAA (49 USC § 41705) and the regulations promulgated thereunder.

274.   **DOT HAS FAILED TO ENFORCE THE ACAA & ITS OWN REGULATIONS:** The Office of Aviation Consumer Protection ("OACP"), a unit within the Office of the General Counsel of DOT, issued a Notice of Enforcement Policy ("NEP") Feb. 5, 2021, "Accommodation by Carriers of Persons with Disabilities Who Are Unable to Wear or Safely Wear Masks While on Commercial Aircraft" "to remind U.S. and foreign air carriers of their legal obligation to ac-

commodate the needs of passengers with disabilities when developing proce-
dures to implement the Federal mandate on the use of masks to mitigate the
public health risks associated with the Coronavirus Disease 2019 (COVID-19)."
Ex. 149.

275.  "OACP will exercise its prosecutorial discretion and provide airlines 45 days
from the date of this notice to be in compliance with their obligation under the
Air Carrier Access Act ("ACAA") and the Department's implementing regula-
tion in 14 CFR Part 382 ("Part 382") to provide reasonable accommodations to
persons with disabilities who are unable to wear or safely wear masks, so long
as the airlines demonstrate that they began the process of compliance as soon
as this notice was issued." *Id.*

276.  The 45-day deadline was March 22, 2021. But there is no evidence DOT has
taken any enforcement action against the seven Airline Defendants for violating
the ACAA as these airlines continue to enforce their illegal discriminatory poli-
cies requiring, for example, that passengers with a disability that prevents them
from wearing a mask must submit a request in advance in violation of 14 CFR §
382.25.

277.  "[T]he ACAA and Part 382, which are enforced by OACP, require airlines to
make reasonable accommodations, based on individualized assessments, for
passengers with disabilities who are unable to wear or safely wear a mask due
to their disability." *Id.*

278.   "To ensure that only qualified persons under the exemptions would be able to travel without a mask, the CDC Order permits operators of transportation conveyances, such as airlines, to impose requirements, or conditions for carriage, on persons requesting an exemption, including ***requiring a person seeking an exemption to request an accommodation in advance***, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the operator. The CDC Order also permits operators to require protective measures, such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19 or seating or otherwise." *Id.* (emphasis added). *But see* 14 CFR § 382.25 *et al.*

279.   OACP's NEP did not advise airlines that the CDC's Order allowing carriers to impose additional requirements is illegal (such as requesting a mask exemption in advance, submitting to a third-party medical consultation, submitting a medical certificate, and requiring a negative COVID-19 test). *Id. See* 14 CFR Part 382.

280.   In its Feb. 5 NEP, OACP admitted it had failed to enforce the ACAA and its regulations in 2020 when many airlines banned all passengers with disabilities who could not wear a face covering: "Some carriers have adopted policies that expressly allow 'no exceptions' to the mask requirement other than for children under the age of two. OACP has received complaints from persons who assert they have a disability that precludes their wearing a mask, and who contend

that they were denied transport by an airline under a 'no exceptions allowed' mask policy." *Id.*

281.   "The CDC and other medical authorities recognize that individuals with certain medical conditions may have trouble breathing or other difficulties such as being unable to remove the mask without assistance if required to wear a mask that fits closely over the nose and mouth." *Id.*

282.   OACP informed the airlines they had violated the law from Summer 2020 to January 2021 when they banned all travelers with disabilities: "It would be a violation of the ACAA to have an exemption for children under 2 on the basis that children that age cannot wear or safely wear a mask and not to have an exemption for ... individuals with disabilities who similarly cannot wear or safely wear a mask when there is no evidence that these individuals with disabilities would pose a greater health risk to others." *Id.*

283.   "The ACAA prohibits U.S. and foreign air carriers from denying air transportation to or otherwise discriminating in the provision of air transportation against a person with a disability by reason of the disability. When a policy or practice adopted by a carrier has the effect of denying service to or otherwise discriminating against passengers because of their disabilities, the Department's disability regulations in Part 382 require the airline to modify the policy or practice as necessary to provide nondiscriminatory service to the passengers with disabilities ..." *Id.*

284. "Part 382 allows an airline to refuse to provide air transportation to an individual whom the airline determines presents a disability-related safety risk, provided that the airline can demonstrate that the individual would pose a 'direct threat' to the health or safety of others onboard the aircraft, and that a less restrictive option is not feasible." *Id.*

285. OACP illegally advised airlines that "In accordance with the CDC Order, as conveyance operators, airlines are required to implement face mask policies that ***treat passengers presumptively as potential carriers of the SARS-CoV-2 virus*** and, therefore, as presenting a potential threat to the health and safety of other passengers and the crew." *Id. But see* 14 CFR § 382.23(c)(1), which provides that an airline must have evidence that the passenger ***"has"*** a communicable disease, i.e. has tested positive for the coronavirus. A "presumptive" determination that every single airline passenger – even those who are fully vaccinated and/or naturally immune – is infected with COVID-19 is not only scientifically impossible, it goes against the plain language of 14 CFR § 382.23(c)(1).

286. OACP wrongly informed airlines Feb. 5 that "both the CDC Order and Part 382 permit airlines to require passengers to consult with the airline's medical expert and/or to provide medical evaluation documentation from the passenger's doctor sufficient to satisfy the airline that the passenger does, indeed, have a recognized medical condition precluding the wearing or safe wearing of a mask." Ex. 149. *But see* 14 CFR § 382.23(a).

84

287.   OACP wrongly informed airlines that "Part 382, like the CDC Order, permits airlines to require passengers with disabilities who are unable to wear masks to request an accommodation in advance." *But see* 14 CFR § 382.25.

288.   OACP wrongly informed airlines that they "may impose protective measures to reduce or prevent the risk to other passengers. For example, airlines may require protective measures, such as a negative result from a SARS-CoV-2 test, taken at the passenger's own expense, during the days immediately prior to the scheduled flight." *Id*. As noted above, there is no provision of the ACAA or 14 CFR Part 382 that allows airlines to require a negative test to board a plane.

289.   "Airlines are expected to review their face mask policies immediately and to revise them as necessary to comply with the ACAA and Department's disability regulation in Part 382." *Id.* However, DOT has failed its duty to enforce the ACAA and its regulations, as evidenced by the seven Airline Defendants' continuance of policies that violate Part 382 more than seven months after the DOT issued its faulty NEP.

290.   Information provided to passengers by DOT contradicts OACP's Feb. 5 NEP as well as the Airline Defendants' mask policies. In a document "New Horizons: Information for the Air Traveler with a Disability," DOT informs flyers that "***Airlines may not require passengers with disabilities to provide advance notice of their intent to travel or of their disability*** …" Ex. 150 (emphasis added).

291.   "A medical certificate is a written statement from the passenger's physician saying that the passenger is capable of completing the flight safely without requiring extraordinary medical care. A disability is not sufficient grounds for a carrier to request a medical certificate. ***Carriers shall not require passengers to present a medical certificate unless the person: … Has a communicable disease or infection that has been determined by federal public health authorities to be generally transmittable during flight***." *Id.* (emphasis added).

292.   "If a person who seeks passage ***has an infection or disease*** that would be transmittable during the normal course of a flight, and that has been deemed so by a federal public health authority knowledgeable about the disease or infection, then the carrier may: … ***Impose on the person a condition or requirement not imposed on other passengers (e.g., wearing a mask)***." *Id.* (emphasis added).

293.   DOT publishes a 190-page handbook "What Airline Employees, Airline Contractors, & Air Travelers with Disabilities Need to Know About Access to Air Travel for Persons with Disabilities: A Guide to the Air Carrier Access Act (ACAA) and its implementing regulations, 14 CFR Part 382." Relevant excerpts of this handbook are attached at Ex. 151.

294.   "In 1986, Congress passed the ACAA, which prohibits discrimination by U.S. air carriers against qualified individuals with disabilities. 49 U.S.C. 41705. In 1990, the Department of Transportation (DOT) issued part 382, the regulations

defining the rights of passengers with disabilities and the obligations of U.S. air carriers under the ACAA." *Id.*

295. "In 2000, Congress required DOT to create a technical assistance manual to provide guidance to individuals and entities with rights or responsibilities under the ACAA. This manual responds to that mandate." *Id.*

296. "May I ask an individual what his or her disability is? Only to determine if a passenger is entitled to a particular seating accommodation pursuant to section 382.38. ***Generally, you may not make inquiries about an individual's disability or the nature or severity of the disability***." *Id.*

297. "***You must not refuse transportation to a passenger solely on the basis of a disability***. (Sec. 382.31(a))." *Id.* (emphasis added).

298. "***You shall not require a passenger with a disability*** to travel with an attendant or ***to present a medical certificate***, except in very limited circumstances. (Secs. 382.35(a) and 382.53(a))" *Id.* (emphasis added).

299. "***You cannot require passengers with disabilities to provide advance notice of their intention to travel or of their disability*** except as provided below. (Sec. 382.33(a))." *Id.* (emphasis added).

300. "If you are faced with particular circumstances where you are required to make a determination as to whether a passenger with a communicable disease or infection poses a direct threat to the health or safety of others, ***you must make an individualized assessment*** based on a reasonable judgment, relying on current medical knowledge or the best available objective evidence."

No presumptive judgment that every single person has a communicable disease or infection is permitted. *Id.* (emphasis added).

301.   "If, in your estimation, a passenger ***with a communicable disease or infection*** poses a direct threat to the health or safety of other passengers, you may ... (iii) impose on that passenger a special condition or restriction ***(e.g., wearing a mask)***." ... (Sec. 382.51(b)(4))" *Id.* (emphasis added).

302.   "Except under the circumstances described below, ***you must not require medical certification of a passenger with a disability as a condition for providing transportation***. You may require a medical certificate only if the passenger with a disability is an individual who is traveling on a stretcher or in an incubator (where such service is offered); needs medical oxygen during the flight (where such service is offered); or has a medical condition that causes the carrier to have reasonable doubt that the passenger can complete the flight safely without requiring extraordinary medical assistance during the flight. (Sec. 382.53 (a) and (b))." *Id.*

303.   "In addition, if you determine that a passenger ***with a communicable disease or infection*** poses a direct threat to the health or safety risk of others, you may require a medical certificate from the passenger. (Sec. 382.53(c)(1))." *Id.* (emphasis added).

304.   "Generally, you must not refuse travel to, require a medical certificate from, or impose special conditions on a passenger with a communicable disease or infection." *Id.*

305. "Some Examples of Mental or Psychological Impairments (Sec. 382.5(a)(2)): Mental retardation; Depression; ***Anxiety disorders*** ..." *Id.* (emphasis added).

306. "Discrimination is Prohibited: Management of carriers are required to ensure that the carrier ... does not discriminate against qualified individuals with a disability by reason of such disability. (Sec. 382.7(a)(1))." *Id.* The yet-to-be-named airline executive defendants have failed their legal duties to ensure the disabled are not discriminated against.

307. "***Carriers must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability unless it is expressly permitted*** by the ACAA and part 382. (Sec. 382.31(a))." *Id.* (emphasis added).

308. Airlines are continuing to enforce mask requirements not only in violation of the ACAA but in ignorance of the science showing that masks are totally ineffective at reducing COVID-19 infections and fatalities. Index of Mask Studies & Articles at Ex. 200. The mask policies of the defendants also undermine public confidence in vaccines, as seen by a rapidly decreasing number of daily vaccine doses administered across the nation.

309. Even the CDC official responsible for the FTMM admitted masks are worthless and are just for show: "[W]e mask because it's the way we take care and express our concern for each other," said Marty Cetron, director of CDC's Division of Global Migration & Quarantine. Ex. 158.

310.   CDC's director herself has admitted that local authorities, not airlines or the federal government, should be deciding on mask mandates. Dr. Rochelle Walensky said in late June 2021 the U.S. agency is leaving it up to states and local health officials to set guidelines around maskwearing. The CDC has "always said that local policymakers need to make policies for their local environment," she said. Ex. 159.

311.   Dr. Walensky's opinion is supported by the fact states without mask mandates suffered fewer COVID-19 deaths than states with mandatory muzzling. The Airline Defendants' reliance on mask mandates ignores the reality that the 10 states that never implemented a statewide mask mandate have 157 deaths attributed to COVID-19 per 100,000 residents compared with the national average of 165. Whereas the 40 states that had a statewide mask requirement at some point during the pandemic have a death rate of 167. Ex. 34.

## F. Defendants ignored better options than imposing unlawful mask mandates.

312.   The Defendant Airlines have more effective tools to combat COVID-19 spread than requiring their passengers be muzzled (and refusing to grant medical exemptions). However, the defendants have not worked to implement these better procedures to reduce infections in the transportation sector – especially as they effect the fully vaccinated and/or those who recovered from coronavirus and now have natural immunity. These passengers – more than half of Americans – pose no threat to others. Yet there's no evidence that the airlines have

sought the government's cooperation in using existing federal procedures that actually target the sick.

313.   For example, in June 2007, HHS, CDC, and DHS developed a public-health Do Not Board ("DNB") list, enabling domestic and international health officials to request that individuals with communicable diseases who meet specific criteria, including having a communicable disease that poses a public health threat to the traveling public, be restricted from boarding commercial aircraft arriving into, departing from, or traveling within the United States. CDC published a Notice six years ago concerning the "Criteria for Requesting Federal Travel Restrictions for Public Health Purposes…" 18 Fed. Reg. 16,400 (March 27, 2015); Ex. 152.

314.   There also exists a complimentary Public Health Border Lookout Record ("Lookout") for individuals with communicable diseases that pose a public-health threat to travelers to restrict them from boarding commercial aircraft arriving into, departing from, or traveling within the United States. *Id.*

315.   Once an individual is placed on the DNB list, airlines are instructed not to issue a boarding pass to the individual for any flight. Individuals included on the DNB list are assigned a Lookout record that assists in ensuring that an individual placed on the DNB list is detected if he or she attempts to enter or depart the United States. *Id.*

316. "Currently, HHS/CDC considers whether: (1) The individual is known or reasonably believed to be infectious or reasonably believed to have been exposed to a communicable disease and may become infectious with a communicable disease that would be a public health threat should the individual be permitted to board a commercial aircraft or travel in a manner that would expose the public …" *Id.*

317. TSA "has the authority to accept the services of, or otherwise cooperate with, other federal agencies including implementing the DNB list. … In administering the DNB list, TSA relies on CDC to make public health findings as the basis for its request." *Id.*

318. Plaintiffs have found no evidence that the defendants have worked in conjunction with the federal government to use the DNB list and Lookout system to stop people who have tested positive for COVID-19 from traveling during the time they are a danger to spread the virus to others (typically considered to be two weeks).

319. "Disease is just a flight away. To protect America's health, CDC partners with the Department of Homeland Security to prevent the spread of serious contagious diseases during travel. CDC uses a Do Not Board list to prevent travelers from boarding commercial airplanes if they are known or suspected to have a contagious disease that poses a threat to the public's health. Sick travelers are also placed on a Lookout list so they will be detected if they attempt to enter the

United States by land or sea. These tools can be used for anyone who poses a threat to the public's health." Ex. 153.

320.   If the defendants truly cared about preventing COVID-19 transmission on their planes, they would have worked with CDC, HHS, DHS, TSA, and other federal partners to use the DNB and Lookout systems. Instead, they illegally treat every single passenger as having the coronavirus and mandating they wear masks in defiance of the science that face coverings do nothing to prevent COVID-19 infections and deaths but harm human health. Index of Mask Studies & Articles at Ex. 200.

321.   "The criteria for adding people to the Do Not Board and Lookout lists are 1. Known or believed to be infectious with, or at risk for, a serious contagious disease that poses a public health threat to others during travel; and any of the following three: 1. not aware of diagnosis or not following public health recommendations, or 2. Likely to travel on a commercial flight involving the United States or travel internationally by any means; or 3. Need to issue travel restriction to respond to a public health outbreak or to help enforce a public health order." Ex. 153.

322.   "Once public health authorities confirm a person is no longer contagious, the person is removed from the lists (typically within 24 hours). Also, CDC reviews the records of all persons on the lists every two weeks to determine whether they are eligible for removal." *Id*.

323.   Also, it appears Defendant Frontier is the only airline using a simple mitiga-

tion strategy that doesn't discriminate against anyone who isn't actually ill:

"Frontier is the first U.S. airline to take passengers' temperatures with a touch-

less thermometer before boarding, and will block anyone with a temperature of

100.4 F or higher from flights." Ex. 140.

324.   It's a mystery why the other defendants don't appear to be utilizing this sim-

ple measure to check for fevers (a key symptom of COVID-19) before check in

or boarding.

## G. Defendants' mask policies have created chaos in the skies, recklessly endangering aviation safety and human health.

325.   In addition to the tens of millions of Americans who can't safely obstruct

their breathing because of a medical condition, tens of millions more Americans

vehemently object to anyone ordering them to wear face masks. This is evi-

denced by the at least 4,000 incidents of unruly behavior aboard airplanes re-

ported to FAA during the pandemic. This is understandable since the FDCA

protects all Americans' right to refuse administration of an FDA unauthorized

or EUA medical device such as a face covering.

326.   Airlines continue to mandate masks in violation of the ACAA, FDCA, and

other laws despite the fact they know such rules put airline passengers and

flight crews in danger as some people violently stand up for their legal right

under the FDCA not to wear a mask. This is at odds with their legal "duty … to

provide service with the highest possible degree of safety in the public interest …" to maintain their operating certificates. 49 USC § 44702(b)(1)(a).

327.   There are numerous videos posted to YouTube of in-flight conflicts between flight crews and passengers over the illegal mask mandates. A small sample of these videos is listed at Ex. 154.

328.   As of May 8, 2021, when the Airline Defendants' mask policies had been in place a year, "more than 4,000 fliers have been banned" for exercising their right under the FDCA to refuse an FDA unauthorized or EUA medical device. Ex. 161.

329.   All of the "unruly" behavior seen aboard airplanes when airlines try to enforce their illegal mask policies is explained by science: "Wearing masks, thus, entails a feeling of deprivation of freedom and loss of autonomy and self-determination, which can lead to suppressed anger and subconscious constant distraction, especially as the wearing of masks is mostly dictated and ordered by others. These perceived interferences of integrity, self-determination and autonomy, coupled with discomfort, often contribute to substantial distraction and may ultimately be combined with the physiologically mask-related decline in psychomotoric abilities, reduced responsiveness, and an overall impaired cognitive performance," according to a study recently published in the International Journal of Environmental Research & Public Health. Ex. 299.

330.   Being forced to cover a person's only two sources of oxygen – breathing is of course essential to maintaining life – "leads to misjudging situations as well as

delayed, incorrect, and inappropriate behavior and a decline in the effectiveness of the mask wearer." *Id.*

331.   "The use of masks for several hours often causes further detectable adverse effects such as headaches, local acne, mask-associated skin irritation, itching, sensations of heat and dampness, impairments, and discomfort predominantly affecting the head and face. However, the head and face are significant for well-being due to their large representation in the sensitive cerebral cortex (homunculus)." *Id.*

332.   The defendants are recklessly endangering the health and welfare of their passengers and employees by continuing to require masks 18 months into the pandemic.

333.   "It is no secret that the threats flight attendants face each day have dramatically increased," said a letter to union members from Julie Hedrick, president of the Association of Professional Flight Attendants. "Every day, we are subjected to verbal and sometimes physical altercations, mainly centered around mask compliance." Ex. 162.

334.   "Airlines and federal officials have noted an uptick in passenger misbehavior. Flight attendant union leaders have attributed much of the uptick in passengers refusing to wear masks …" *Id.*

335.   "President Joe Biden made a federal face mask rule on planes one of his first executive orders after he took office. But passenger misbehavior has continued

throughout the year despite numerous fines against passengers proposed by the FAA." *Id.*

336.   May 28, 2021: "Incidents of unruly behavior from airplane passengers has risen to an unprecedented level this year, union leader Sara Nelson told CNBC on Friday, the start of the Memorial Day holiday weekend. 'This is an environment that we just haven't seen before, and we can't wait for it to be over,' the president of the Association of Flight Attendants-CWA said … She noted the role masks are playing in the surge…" Ex. 163.

337.   "[P]assengers have verbally abused and taunted flight attendants trying to enforce airline mask requirements … The displays of rule-bucking intransigence are described in more than 150 aviation safety reports filed with the federal government since the start of the pandemic …" Ex. 164.

338.   "A flight attendant reported being so busy seeking mask compliance that the employee couldn't safely reach a seat in time for landing. One airline captain, distracted by mask concerns, descended to the wrong altitude. The repeated talk of problem passengers in Row 12 led the captain to mistakenly head toward 12,000 feet, not a higher altitude given by air traffic control to keep planes safely apart." *Id.*

339.   But passengers are allowed by defendants to drop their masks to eat and sip beverages, negating all possible positive impacts of required muzzling. "When you start opening it up to eating, the whole thing kind of weakens," Slovic said. *Id.*

340.   Carrying out mask rules also worsens the already strained position of flight attendants, who are frontline enforcers even as they keep their usual safety responsibilities, experts said. "Flight attendants are dealing with mask compliance issues on every single flight they work right now," said Taylor Garland, spokeswoman for the Association of Flight Attendants-CWA, noting that those efforts range from friendly reminders to facing passengers "actively challenging the flight attendants' authority." *Id.*

341.   "One in five flight attendants so far this year has been involved in physical altercations with unruly passengers and 85% of cabin crew members have dealt with disruptive passengers this year..." Ex. 168. "[M]any flight attendants reported ... being subjected to yelling and swearing for federal mask mandate directions."

342.   "The survey found that 85% of flight attendants have dealt with unruly passengers ... The survey of flight attendants confirmed that mask compliance ... [was a] primary cause of unruly behavior." Ex. 170.

343.   The airline-created mask safety problem is so bad the TSA is now offering classes for flight attendants in self-defense. "The eight flight attendants in this Miami-area class were among hundreds the Transportation Security Administration plans to train this summer and fall in self-defense skills. ... About three-quarters of the incidents reported involve passengers violating or repeatedly defying the [illegal] federal requirement to wear a face mask when onboard a plane." Ex. 171.

344.   Airlines already require all inbound passengers from foreign countries to submit a negative COVID-19 test when checking in pursuant to CDC's illegal and unconstitutional International Traveler Testing Requirement (also challenged in *Wall v. Centers for Disease Control & Prevention*). Yet the Defendants still muzzle their passengers on these international flights where everybody has tested negative for coronavirus, agitating many: "[I]t's likely to accelerate mask disputes since everyone on board will have tested negative on flights to the U.S. already. For some passengers masks will feel like an unnecessary imposition." Ex. 172.

345.   The Defendant Airlines force passengers who have already recovered from COVID-19 to obstruct their breathing even though it's impossible for these people to spread the virus. "The raging pandemic ironically means fewer people can spread the virus, some of whom won't want to mask up. Once someone has had Covid-19 and recovers from it, they are highly unlikely to get it and spread it for a period of time..." *Id.*

346.   On one flight, "a maskless woman describing the requirement as tyranny actually said 'I already had the virus and I already had the vaccine and people need to stand up! This is tyranny and this is wrong! This is wrong!'" *Id.*

347.   The majority of Americans, including Lead Plaintiff & Class Representative Lucas Wall, are fully vaccinated. Many are angry at having to restrict their oxygen intake despite being inoculated. "Some people who have been vaccinated will see mask requirements as theater. As more and more people get vaccinated

they'll wonder why they're required to wear masks." *Id*. "To the extent that vaccines are sterilizing, some vaccinated passengers will see mask requirements as theater since it's not providing source control (and masks won't be protecting the wearer after a 95% effective vaccination either)."

348.   The longer the pandemic goes on, flyers – especially those who are fully vaccinated – become more and more agitated with the Airline Defendants' failure to obey the FDCA by offering them the option of refusing an FDA unauthorized or EUA medical device, failing to take into account their vaccination and/or natural immunity status, and harming their health by covering their nose and mouth. The defendants' muzzling requirements have "proven problematic. Physical confrontations on airplanes have dramatically increased this year, and of the 3,000+ that have been recorded by the Federal Aviation Administration so far in 2021, nearly three-quarters of them have been a direct result of arguments over wearing a face mask – whether between crew members and passengers, or passengers vs. passengers." Ex. 173.

349.   "My fear, however, is that the mandate is going to someday cause a far bigger problem while in the air than just some unruly passenger being eventually duct-taped to a seat. One of these days, a confrontation is going to escalate far further than the crew member who had a finger bitten or the flight attendant who caught an errant punch square in the face and had two teeth knocked out. Ask yourself, is it worth it to have a mandate that ostensibly is for your safety but only leads further to unsafe conditions?" *Id*.

350.   The defendant's reckless continual enforcement of mask mandates for 16 months now has led to "a surge in aggressive and violent behavior at airports and on flights..." Ex. 174.

351.   "The system for keeping the peace in America's skies is creaking under the pressure of what airlines and regulators say is an unprecedented proliferation of misbehavior. ... As travel rebounds, that structure is being strained by hostility to mask mandates..." Ex. 175.

352.   ""Even if not intended to bring the plane down, you can imagine the kind of pandemonium on planes that we've seen in some of these videos that people have taken that can cause an incredibly dangerous accident," said U.S. Attorney General Merrick Garland." *Id.* These incidents would mostly vanish if the Defendant Airlines did not enforce their illegal and discriminatory mask mandates.

353.   "The FAA has seen a disturbing increase in incidents where airline passengers have disrupted flights with threatening or violent behavior. These incidents have stemmed ... from passengers' refusals to wear masks..." Ex. 176.

354.   "The stress level is higher than we've ever seen it. People are simply more frazzled than we've ever seen," said Sara Nelson, president of the Association of Flight Attendants union, while announcing results of a recent survey on unruly passenger incidents. Ex. 177.

355.   "The tense situation in the air this summer has led many attendants to say that they feel exhausted, afraid for their personal safety and, in some cases, concerned that the situation could turn dangerous." Ex. 178. Due to the unlawful mask mandates, "encountering unruly passengers, once rare, is now almost expected."

356.   "Flight attendants across many airlines say the situation is wearing on their mental health and physical well-being," which is dangerous for aviation safety. *Id.*

357.   FAA issued a press release Jan. 13, 2021: "FAA Administrator Steve Dickson today signed an order directing a stricter legal enforcement policy against unruly airline passengers in the wake of recent, troubling incidents. The FAA has seen a disturbing increase in incidents where airline passengers have disrupted flights with threatening or violent behavior. These incidents have stemmed both from passengers' refusals to wear masks ... This dangerous behavior can distract, disrupt, and threaten crewmembers' safety functions."

358.   "Numerous two year olds have been kicked off of flights when they had difficulty maintaining their masks. ... we've even seen one airline remove an 18 month old over failure to wear a mask even though it's not required (nor advisable, according to the CDC) and eating is considered a justifiable reason to temporarily remove a mask ..."

359.   With mask mandates "in place, there has been a rise in onboard incidents that have harmed flight attendants, delayed or cancelled flights ... When this

atmosphere is combined with tensions around mask policy, we have seen a summer with more onboard skirmishes and more people injured than ever before," wrote Ben Baldanza, former CEO of Defendant Spirit. Ex. 441.

360. "[T]he root cause of most of these incidents has been the mandated mask policy. It's not the policy itself, but the inconsistency of that policy with other parts of life. While many of us may be able to clearly understand why we must wear a mask on a plane but don't have to in restaurant, to others this makes no sense. Put that view in the stressful and emotional environment of an airline flight and the results we've seen this summer are not totally surprising." *Id.*

361. "[L]etting the [mask] mandate expire would lower the tensions onboard significantly and greatly reduce the number of potentially dangerous confrontations that flight attendants must face." *Id.*

362. **SAFETY INCIDENTS ABOARD SOUTHWEST:** "Two major airlines, American and Southwest, have postponed plans to resume serving alcohol on flights in an effort to stop a surge of unruly and sometimes violent behavior by passengers who have shoved, struck, and yelled at flight attendants. Both airlines announced the policies this week after the latest assault was captured on a widely watched video that showed a woman punching a flight attendant in the face on a Southwest Airlines flight from Sacramento to San Diego," The New York Times reported May 29, 2021. Ex. 179.

363. "A Southwest Airlines flight attendant who lost two teeth after she was physically assaulted by a passenger on Sunday is among the more egregious examples of an unsettling increase in unruly and dangerous behavior on the part of air travelers. There were 477 passenger misconduct incidents on Southwest flights between April 8 and May 15 ..." Ex. 180.

364. "The Southwest Airlines flight attendant who got two of her teeth knocked out by a passenger was 'very unprofessional' and provoked the wild altercation, another flier said. The shocking incident unfolded just after a flight from Sacramento landed in San Diego on Sunday. It began when the unnamed flight attendant confronted passenger Vyvianna Quinonez, 28, and her other family members about putting their face masks back on ..." Ex. 181.

365. "Southwest Airlines issued a statement on Friday citing the 'recent uptick industrywide of incidents in-flight involving disruptive passengers' as it announced that it had paused plans to resume serving alcohol on flights. ... American Airlines announced a similar policy on Saturday. It said that alcohol sales, which had been suspended in the main cabin since late March 2020, would remain suspended through Sept. 13, when a federal mandate requiring passengers to wear masks on airplanes, buses, and trains is set to expire."

366. A "male passenger aboard a Southwest Airlines flight from Chicago to Sacramento on Jan. 26 refused to comply with a flight attendant's instructions to wear a mask over his nose and mouth. The man became combative and used offensive language when a second flight attendant told him he was required to

wear a mask, according to the FAA, which said that the passenger hit one of the flight attendants with his bags when he was ordered to leave the plane." Ex. 165.

367.   "This unprecedented number of incidents has reached an intolerable level, with passenger non-compliance events also becoming more aggressive in nature."

368.   "The FAA alleges that upon boarding, flight attendants instructed the passenger twice to wear his facemask properly. He moved it below his nose and mouth both times. A Southwest Airlines customer service supervisor boarded the aircraft to speak with him about his non-compliance and provided him a facemask that would fit properly after he told flight attendants that his mask was broken. As the supervisor left, he again pulled his facemask below his nose and mouth. The supervisor returned and asked him to get off the aircraft, but the passenger refused." Ex. 169.

369.   **SAFETY INCIDENTS ABOARD ALASKA:** A Colorado man is now facing federal charges over an alleged mask dispute while taking a flight from Seattle to Denver this week. "According to the facts contained in the complaint, on March 9, 2021, Grier was a passenger onboard Alaska Airlines flight 1474 traveling from Seattle to Denver," a release from the Department of Justice reads. "During the flight, Grier was asked eight to ten times to put on a face mask, as required by airline policy. Grier initially ignored the flight attendant, but then struck her arm." Ex. 183.

370.   A "flier on an Alaska Airlines plane preparing to fly from Bozeman, Mont., to Seattle who ignored repeated reminders to wear a mask, causing the plane to return to the gate, according to the FAA. The incidents of passengers being unruly — ignoring crew members' instructions, fighting and refusing to wear a mask — have been surging, according to the FAA, even while the number of Americans flying on commercial planes remains about 40% below pre-pandemic levels." Ex. 167.

371.   FAA "is warning air travelers about what it describes as a dramatic increase in unruly or dangerous behavior aboard passenger airplanes. ... In Fort Lauderdale, Florida, for example, a fistfight broke out amid a dispute over mask-wearing. In Washington, D.C., a passenger was escorted off a flight after arguing with flight attendants over the mask rule. ... In recent days, Alaska Airlines banned an Alaska state senator for refusing to comply with mask requirements..." Ex. 166.

372.   Angela Hagedorn, a former flight attendant with Alaska, tweeted that she recently resigned.  "It has been an exhausting time for all the employees who are just trying to do their job according to their company's policies," she said. "The constant arguing and pushback from guests, it's ridiculous." *Id.*

373.   "What we have seen on our planes is flight attendants being physically assaulted, pushed, choked," Nelson said. "These are some of the things that we have been dealing with," she said, adding that the physical and verbal abuse

that flight attendants have experienced this year has been "way off the charts" compared to the last 20 years. *Id.*

374. "In January, a passenger on Alaska Airlines shoved a flight attendant who was walking down the aisle and documenting which passengers were wearing masks …"

375. **SAFETY INCIDENTS ABOARD ALLEGIANT:**  "On an Allegiant Air flight in August, a passenger hit a flight attendant, yelled obscenities at him, and grabbed his phone as he described a mask-related dispute to the captain…"

376. "A man was removed from an Allegiant Air flight Monday morning to Punta Gorda, Florida, after allegedly asking a flight attendant to put a face mask on…"

377. "A woman is facing a $9,000 fine for continually refusing to wear a mask properly and cursing at flight attendants on a February 15 Allegiant Air flight from Ft. Lauderdale, Florida, to Knoxville, Tennessee."

378.  "The unprecedented number of incidents has reached an intolerable level, with passenger noncompliance events also becoming more aggressive in nature."

379. Allegiant's flight crews, like the other six Airline Defendants, have been forced to act as the Mask Police, neglecting their critical safety duties. The nation is fortunate their mask policies have not yet led to a disaster. "Flight attendants instructed him seven separate times to wear his facemask properly, and each time he moved it off of his nose after the flight attendant walked away." Ex. 169.

380.   "He was not wearing his facemask, and flight attendants reminded him to wear it several times." *Id*.

381.   Theresa Mullins quit her job as an Allegiant flight attendant because of the airline's order she enforce "barbaric mask mandates" she knows create reckless endangerment in the air. "[I]t was against my moral creed to enforce an inhuman, tyrannical mandate for the passengers," she said. Ex. 184.

382.   Mask mandates recklessly endanger passengers and crew for no reason, Mullins declared: "Crew members know that all modern airplanes have the FAA-mandated HEPA-filter system that replaces the cabin air every 4 minutes. The filter systems are regulated and are a maintenance checklist item," thus there's little danger of anyone getting COVID-19 on an airplane. Ex. 44.

383.   **SAFETY INCIDENTS ABOARD DELTA:** "A Delta Air Lines passenger is facing a $27,500 fine for allegedly striking a flight attendant in the face in October. The Federal Aviation Administration on Friday announced the proposed civil penalty for an unnamed passenger traveling on a flight from Miami to Atlanta on Oct. 19. The FAA says the passenger, who has 30 days to respond, was traveling with another passenger who refused to wear a mask, fasten his seat belt, or put up the tray table. As a result, the flight returned to the gate, and the passengers were asked to get off the plane. The passenger facing the fine ignored the flight attendant's instructions to leave the plane, began swearing at the flight attendant, and then struck her under her left eye, the agency says."

384.   "The FAA adopted a stricter policy on unruly passenger behavior in January due to incidents involving Capitol riot participants and a steady stream of passengers refusing to comply with airline mask policies. Passengers will no longer get any warnings. At the time, the FAA said it had seen a 'disturbing increase' in incidents in which passengers have disrupted flights with violent behavior or threats of violent behavior."

385.   "Four people are facing nearly $70,000 in civil fines for clashing with airline crews over mask requirements and other safety instructions on recent flights … The latest round of proposed fines, which passengers have 30 days to contest, came just days after the FAA said that it had received more than 1,300 unruly passenger reports from airlines since February."

386.   "The number of passengers who have been banned from the nation's airlines continues to rise. Delta Air Lines appears to lead all U.S. carriers by putting on its internal no-fly list about 1,200 passengers who refused to wear a mask or became unruly on a plane. It is followed by Frontier Airlines with more than 830, United Airlines with about 750, and Alaska Airlines with 542. American Airlines and Southwest Airlines declined to disclose how many passengers they have banned." Ex. 167.

387.   "Federal officials are seeking a $27,500 civil penalty against an airline passenger who allegedly struck a flight attendant who asked the woman and her companion to leave the plane after a dispute over wearing a face mask. The confrontation on board a Delta Air Lines flight departing from Miami International

Airport for Atlanta began when the passenger's companion refused to wear a mask, secure his tray table or fasten his seatbelt, the Federal Aviation Administration said Friday. Delta, like most airlines, requires most passengers to wear masks except when eating or drinking. Pilots returned the plane to the gate, and the pair was asked to disembark. The female passenger began yelling at the flight attendant and other passengers, then hit the flight attendant under her left eye…" Ex. 185.

388. "A Delta flight from Atlanta to Lexington's Blue Grass Airport was delayed Monday afternoon when a passenger refused to wear a mask."

389. **SAFETY INCIDENTS ABOARD FRONTIER:** A "passenger began fighting with the flight attendant and nearby passengers about the facemask policy. The flight attendant issued the passenger a 'red card' for failing to comply with the facemask instructions, but he continued to argue with nearby passengers, ultimately striking the passenger next to him on the head." Ex. 169.

390. "The FAA alleges [a] passenger refused to wear his facemask during the boarding process despite direct instruction from flight attendants to do so." *Id.*

391. "The FAA alleges the passenger repeatedly removed her facemask and ignored crew instruction to wear it properly." *Id.*

392. **SAFETY INCIDENTS ABOARD JETBLUE:** "One of the passengers, a woman who was traveling from the Dominican Republic on a JetBlue flight bound for New York on Feb. 7, refused to comply with instructions to wear a mask aboard the plane, hurled an empty liquor bottle that almost hit another

passenger, and threw food and shouted obscenities at flight attendants, according to the FAA. The woman grabbed the arm of a flight attendant and hurt her arm, and she struck the arm of another flight attendant twice and scratched that crew member's hand, causing the flight to return to the Dominican Republic…"

393.   "What's causing these incidents?" she asked. "Overwhelmingly, it's passengers who refuse to wear masks."

394.   A "female passenger failed multiple times to comply with flight attendants' instructions to wear a face mask and remain seated with her seatbelt fastened on a JetBlue Airlines flight from Boston to Puerto Rico on Dec. 27. 'The passenger shoved a flight attendant multiple times in her chest/shoulder area, shouted obscenities at the flight attendant, and threatened to have her fired. As a result of the passenger's behavior, the captain diverted the flight back to Boston,' the FAA wrote. She faces a fine of $20,000."

395.   "Then, just days later on another JetBlue Airlines flight from New York to the Dominican Republic, a male passenger failed multiple times to comply with flight attendants' instructions to wear his facemask … 'After flight attendants issued the passenger a 'Notice to Cease Objectionable Behavior' card, he shouted profanities at them, slammed overhead bins and became more and more uncooperative and agitated,' the FAA wrote."

396.   "Meanwhile, airlines have recently reported more than 500 cases involving unruly passengers since late December – most of which started with passengers refusing to wear a face mask."

397.   "The incident took place onboard a JetBlue aircraft as it flew holidaymakers to Cancun, Mexico, when it was forced to divert to Florida. ... The aircraft was diverted to Florida because the passenger repeatedly removed his mask. ... The flight attendants and the pilot made two announcements about the passenger saying that if he didn't keep his mask on then they would have to make an emergency landing and get him off. ... Passengers onboard the flight said they were on the ground in Florida for 90 minutes." Ex. 187.

398.   "This past week a Family with 6 children were removed by JetBlue. A Brooklyn mother traveling with six children from Orlando to New York was kicked off a JetBlue flight on Wednesday because her 2-year-old would not wear a face mask..." Ex. 127.

399.   **SAFETY INCIDENTS ABOARD SPIRIT:** "Two people were arrested at Nashville International Airport earlier this week after reportedly refusing to wear masks on their flights, USA Today reported. One passenger on a Spirit Airlines flight Monday refused to wear a mask and called the flight crew "vulgar names"... Ex. 188.

## H. Defendants have unlawfully discriminated against millions of travelers with disabilities.

400.   The defendants have a long track record during the pandemic of illegally banning passengers with disabilities who request face-mask exemptions, including children as young as two, in violation of the ACAA (49 USC § 41705)

and its accompanying regulations (14 CFR Part 382). There are thousands of media reports of ACAA violations by the defendants.

401.   "The Centers for Disease Control and Prevention (CDC) states that a person who has trouble breathing or is unconscious, incapacitated, or otherwise unable to remove the face mask without assistance should not wear a face mask … Additionally, people with post-traumatic stress disorder, severe anxiety, claustrophobia, autism, or cerebral palsy may have difficulty wearing a face mask." Ex. 189.

402.   **DISCRIMINATION BY SOUTHWEST:** "[A]merican Airlines and Southwest Airlines, two of the largest U.S. carriers, have announced that even medical exemptions won't fly. On Wednesday, they unveiled new policies that require everyone over the age of 2 to don a mask or be denied boarding."

403.   "View from the Wing notes an internal Southwest Airlines document making this policy explicit: 'Due to the Safety risk posed by someone not wearing a mask, we are not able to allow any other exemptions at this time, including those for disabilities or medical conditions. *If a Customer cannot travel safely while wearing a mask, the Customer will be refused transportation*.'"

404.   "Southwest stated that it would 'temporarily refuse to transport any passenger who is unable to wear a mask even if the Customer has a verifiable medical condition that prevents them from wearing a mask.' That's 7 of the 10 largest U.S. airlines which have told disabled people with autism, asthma, cerebral

palsy, claustrophobia, COPD, PTSD, **severe anxiety**, and other conditions that they are not welcome onboard an aircraft. **It is the largest ban on disabled air travel since the Air Carrier Access Act became law in 1986**." Ex. 190 (emphasis added).

405.   "The harshest Child and Toddler enforcement policies appear to be at Southwest and Jet Blue." *Id.*

406.   "Southwest will temporarily refuse to transport any passenger who is unable to wear a mask even if the Customer has a verifiable medical condition that prevents them from wearing a mask." *Id.*

407.   "That's right. Effective July 27, 2020, on Southwest and July 29, 2020, on American, all passengers aged two and older will be required to wear a mask. No exceptions."

408.   "A Georgia family heading to New York said they were kicked off a Southwest Airlines flight because their 2-year-old son with autism wouldn't wear a mask. ... The couple said they've flown with their son, Elias, before but have never encountered this problem. The family of five was leaving Atlanta for a trip to New York."

409.   "According to an advocacy group called Autism Speaks, it can be difficult for some on the autism spectrum to wear a mask. CDC guidelines state exemptions can be made for those with disabilities."

410.   "'I forced it on him, fighting with him to put the mask over him, he ripped it right off and threw it on the floor,' he said. The family was eventually asked to

get off the plane, but Edwin Rios said he told them he would only do so if the family was able to get their checked bags back.

411.   **DISCRIMINATION BY ALASKA:** "Alaska Airlines banned medical exemptions in August [2020]." Ex. 191.

412.   "If you are unable to wear a mask throughout the airport and for the duration of your flight for any reason, you will not be able to fly with us." Ex. 192.

413.   The Disability Law Center of Alaska wrote Defendant Alaska Airlines on Aug. 27, 2020, to object to the carrier's illegal discrimination: "We write to you out of concern that the recent mask policies implemented by Alaska Airlines ... do not allow a disability exception for individuals whose disabilities make it impossible for them to wear a mask for any length of time." Ex. 426.

414.   Air transportation is especially critical in Alaska, where many villages have no road or sea access. Medical care is often hundreds of miles away. "Unfortunately, many people experiencing advanced medical needs also experience disabilities that prevent them from complying with mask mandates during the COVID-19 pandemic. This may include but is not limited to: people experiencing a respiratory disability that may impede breathing; people experiencing PTSD, anxiety, or claustrophobia; people living with autism who may have a sensitivity to touch and texture; people whose disabilities prevent them from having the manual dexterity to put on and take off masks; and people who use mouth control devices." *Id.*

415.   "[W]e have concerns that such an across the board policy will have adverse impacts on Alaskans with disabilities, and does not comply with federal guidance available to help airlines mitigate the risks arising from the COVID-19 pandemic, nor does it comply with the Air Carrier Access Act." *Id.*

416.   "An individual seeking an accommodation or modification to a universal mask policy due to a disability is unlikely to qualify as a direct threat for two reasons. First, a determination that an individual constitutes a direct threat to the health and safety of others requires an individualized assessment of each individual requesting an accommodation or modification. The no exceptions mask policy currently in place is an across the board policy that does not conduct an individualized assessment to take into account the nature, duration, and severity of the risk; the probability that potential harm to the health and safety of others will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk." *Id.*

417.   "[A] universal policy is not likely to find support in everyone seeking an accommodation being a direct threat." *Id.*

418.   "We, as representatives of the disability community, encourage you to review your mask policies and create exceptions for individuals whose disabilities prevent them from wearing masks." *Id.*

419.   **DISCRIMINATION BY ALLEGIANT:** "Only children under the age of 2 are exempt from wearing a face covering. Customers who are not able to wear a face covering will not be permitted to travel." *Id.*

420. **DISCRIMINATION BY FRONTIER:** "We require both passengers and employees to wear a face-covering over nose and mouth throughout the Frontier travel experience including ticket counters, gate areas, baggage claim, and onboard all flights. The only exception is for children under the age of 2." *Id.*

421. **DISCRIMINATION BY JETBLUE:** "Customers with conditions that prevent them from wearing a face covering should postpone travel until this temporary requirement is no longer in place." Ex. 190.

422. "This leaves the ADA Disabled customers who are traveling for medical treatments or surgeries to out of state specialized medical procedures at a great disadvantage. The numbers of Cancer Deaths has skyrocketed globally since these new rules went into place. This is mainly attributed to these patients not having access to their Cancer Screenings and Cancer Treatments." *Id.*

423. **DISCRIMINATION BY SPIRIT:** "Any other Guest who is unable to wear an appropriate face covering for any reason, including medical, will not be permitted to travel with us at this time." Ex. 192.

424. **DISCRIMINATION BY THE AIRLINE INDUSTRY:** Lead Plaintiff & Class Representative Lucas Wall photographed many of the Defendant Airlines' signage June 2, 2021, at Orlando International Airport. They don't indicate that passengers with disabilities are exempt from wearing a mask. The signs also don't advise customers that under the FDCA, they have the right to refuse administration of an FDA unauthorized or EUA medical device. Ex. 198. This is

not only discrimination, it's also a breach of contract as well as a deceptive and unfair trade practice.

425.   "[S]ome carriers have adopted 'no exceptions' mask rules. That, of course, puts them on a collision course with DOT, as some passengers may have legitimate, disability-based reasons for not wearing a mask. ... It would not be permitted, for example, for carriers to decline exemptions to entire categories of disabilities; nor would it be permitted for them to adopt a 'no exceptions' policy. Ex. 424.

426.   Even after the FTMM was put in place Feb. 1, 2021, requiring the defendants to exempt disabled passengers from mask rules, the defendants continued their conspiracy by claiming to permit mask waivers but making it impossible to obtain them with numerous illegal hoops to jump through.

427.   "Some carriers, such as American and Frontier, have created policies designed to make it exceedingly difficult or impossible for disabled people to fly without a mask. It is clear that testing requirements impose an undue burden on disabled travelers as there are few places in the country that guarantee a test result within 72 hours. In areas where rapid testing is possible, it is often not covered by health insurance plans and can cost hundreds of dollars. The DOT's decision to grant airlines the authority to dictate which flights disabled people can take is ripe for abuse and further demonstrates that the Office of Aviation Consumer Protection has little to no interest in protecting the rights of disabled people." Ex. 425.

428.  "Airlines must be held to account for what has been a gross violation of the civil rights of disabled people…" *Id.*

429.  "Air carriers should modify policies related to face mask or covering requirements for passengers as needed in line with the ACAA. For example, the CDC says that face coverings should not be used by people who have difficulty breathing or taking off their mask." Ex. 428.

430.  According to guidance issued to the Defendant Airlines by DOT, "In instances where the carrier reasonably concludes that extraordinary medical assistance may be necessary, it may require a medical certificate. The carrier is also free to offer the passenger the ***option*** of undergoing preflight medical clearance." Ex. 429 (emphasis added).

431.  "When a passenger's ability to complete a flight safely without extraordinary medical assistance is in doubt, the carrier may require a medical certificate that states whether the passenger is medically stable for the flight." *Id.*

432.  "If the passenger has such a medical certificate indicating that he/she is capable of completing the flight safely, ***the carrier may require medical clearance only if there is a legitimate medical reason for believing that there has been a significant adverse change in the passenger's condition*** since the issuance of the medical certificate. ***It would be a violation of Part 382 for a carrier to routinely require a medical clearance*** and refuse to honor a medical certificate provided by a passenger." *Id.* (emphasis added).

433.   The defendants' mask policies violate guidelines from the International Air Transport Association, the major trade group for the worldwide aviation industry: "Accessibility is not just a requirement exclusively designed to meet the need of persons with disabilities. It is important to consider accessibility in the design of aviation-related policy and in the development of inclusive products and services to ensure air travel is open to all. Done with empathy and scientific rigor, the act of mainstreaming accessibility within the field of the overall passenger experience will benefit not just airlines but the aviation ecosystem as a whole." Ex. 431.

434.   "IATA hopes that these recommendations will ensure consistency and identify opportunities to improve the overall travel experience for passengers with disabilities." *Id.*

435.   IATA notes the importance of adhering to the United Nations Convention on the Rights of Persons with Disabilities (although tragically the United States has not ratified this treaty yet): "Article 9 of the CRPD requires state regulators to ensure that persons with disabilities can access transport services on an equal basis with others." *Id.*

436.   The Airline Defendants serve numerous foreign countries that have ratified the CRPD.

437.   The defendants' "lack of accommodation impedes the individual's participation in society. Inequality is not due to the impairment, but to the inability of society to eliminate barriers challenging persons with disabilities. This model

puts the person at the center, not his/her impairment, recognizing the values and rights of persons with disabilities as part of society." *Id.*

438. IATA adopted standards in August 2020 for serving the disabled during the COVID-19 pandemic including: "Ensuring access to aviation facilities, services and information is fundamental to a disability inclusive COVID-19 response and recovery. If public health information, airport terminals, transport, communications, technologies and goods and services are not accessible, persons with disabilities may not be able to live and travel independently." *Id.*

439. The fact that some disabled people "are at higher risk [for coronavirus], however, does not mean that they should be subject to a more stringent medical screening or clearance than that required for other passengers. ***To be equitable, the standards applied should be the same***." *Id.* (emphasis added).

440. "Airlines should develop a specific and detailed company policy for the assistance and support to passengers with disabilities that is consistent across their network during the COVID-19 crisis. This policy should be robust, based on science..." *Id.*

441. The Defendant Airlines' mask policies are NOT based on science. Ex. 200.

442. The Defendant Airlines' policies are out of step with international standards set by IATA: "Airlines should provide reasonable accommodation to passengers ... This will help to ensuring that all passengers exercise their human rights and their fundamental freedoms in an equitable manner." Ex. 431.

443.   "Some passengers, such as those who cannot put on or remove a face mask themselves, small children, and those who have certain types of medical conditions may not be able to tolerate the use of face coverings or masks for a lengthy period." *Id.*

444.   "[I]t is important to note how persons with disabilities are uniquely impacted by the pandemic in various aspects, including in the transport area. As countries relax their border control systems and airlines resume their services, accessibility and inclusion of persons with disabilities in aviation's COVID-19 response and recovery is a vital part of achieving the pledge to leave no one behind." *Id.*

445.   In another document, IATA made clear that "denied boarding and passenger bans have raised criticism on airlines' policies that restrict people with disabilities from accessing air transportation as a violation of anti-discrimination and disability rights regulations." Ex. 440.

446.   "Airlines should provide reasonable accommodation to passengers … This will help to ensure that all passengers exercise their human rights and their fundamental freedoms in an equitable manner." *Id.*

447.   IATA advised airlines worldwide: "Some passengers, such as those who cannot put on or remove face masks themselves, very young children, and those who have certain types of medical conditions may not be able to tolerate the use of face coverings or masks for a lengthy period – or at all." *Id.*

448.   IATA has developed a global system for airlines to mark passengers who are exempt from maskwearing. Plaintiffs have not seen any evidence that the Airline Defendants have adopted this system. "Where airlines wish to identify passengers that have a valid exemption from wearing a face mask (such as a medical condition or a disability that prevents them to wear a face mask), a new standard has also been developed to allow airlines to capture this information and communicate this with third party ground handlers, cabin-crew, partner carriers or internal airport teams. This standard is a new bilateral Special Service Request (SSR) NMOK (No Mask OK) which may be included within a passenger name records (PNR) at check-in, to be exchanged with ground handlers using existing industry standards, to be visible at time of boarding." *Id.*

449.   The Airline Defendants have failed to understand there's a "sizable population who would find it difficult or impossible to comply with mask mandates… With fewer than 1% of Americans having a confirmed, active case of the coronavirus, what is the probability that the lone disabled person not wearing a mask actually poses direct threat?" Ex. 432.

450.   "People who have a legitimate reason not to wear a mask should not face undue barriers in accessing public accommodations as a result of their circumstance." *Id.*

451.   "Under the Americans with Disabilities Act (ADA), individuals cannot be denied transportation services because of a disability. The Air Carrier Access Act (ACAA) is a separate statute specifically for air travel, but provides the same

nondiscrimination requirement," according to the National Council on Disability ("NCD"), an independent federal agency created by Congress to protect the rights of the disabled. Ex. 433.

452.   "The Department of Transportation (DOT) regulations also require proper training of transit employees, which includes treating passengers with disabilities in a respectful and courteous manner, while also recognizing the differences in types of disabilities." *Id.*

453.   The defendants clearly are not training their employees to treat the disabled in a "respectful and courteous manner" by banning them entirely from flying.

454.   "[A]ir travel is an essential component of many jobs in the global economy. For people with disabilities to be part of that economy, participate in the world community, and compete effectively for jobs requiring air travel, air carriers and federal oversight officials must ensure that their right to travel with appropriate accommodations is taken seriously and honored. Unfortunately, NCD has found that although things have improved since ACAA was passed in 1986, people with disabilities continue to encounter frequent, significant violations of the statute and regulations. When they complain, they encounter an enforcement effort that is both inconsistent and limited in scope," according to NCD. Ex. 434.

455.   "As the economy becomes increasingly global, the ability of employees with disabilities to travel by air is critical to their success and upward mobility. ... More accommodations are available for air travelers with disabilities today than

ever before, but the availability of accommodations is inconsistent, and discriminatory treatment continues. It is important to recognize that the negative experiences of disabled travelers go beyond the typical hassles to which frequent travelers are accustomed." *Id.*

456.   "[A]ir travelers with disabilities frequently find air travel unnecessarily humiliating and upsetting. Many problems stem from the unwillingness of some airline staff to recognize that a request for an accommodation in air travel invokes civil rights protections. ... For laws like ACAA to achieve the desired effect, they must be taken seriously and owned by government and industry. The ultimate test of any civil rights law is the extent to which people in the protected class can count on the law for real protection." *Id.*

457.   "Historically, air travel for people with disabilities has not been for the faint of heart. Often, people with certain disabilities either chose not to fly or traveled by air knowing they would probably face prejudice, hostility, disability stereotyping, as well as architectural and other physical barriers; sometimes they faced an outright denial of their right to travel." *Id.*

458.   "The intent of Congress in legislating the ACAA was to mandate nondiscrimination by requiring the accommodations necessary for travelers with disabilities to have equal access to air travel and related services. ... the statute was specifically intended to remedy 'discriminatory, inconsistent, and unpredictable treatment' of air travelers with disabilities. Finally, the statute affirmed that rules for accommodation were to be consistent with safety regulations, and that

restrictions not based on safety and applied solely to passengers with disabilities were to be eliminated." *Id.*

459.   "DOT clarified that air carrier discretion in imposing additional requirements or restrictions on air travelers with disabilities is limited to what is required by FAA safety rules." *Id.*

460.   FAA has no safety rule requiring passengers to wear masks. FAA in June 2020 specifically refused to issue such a rule. "The Federal Aviation Administration won't require the wearing of masks on commercial aircraft, continuing to leave that issue to individual airlines, the agency's chief" told a Senate committee. Ex. 435.

461.   "Each time they travel, passengers with disabilities must cope with a myriad of potential disability-related complications above and beyond those faced by travelers who do not have disabilities. ... Disability policy has clearly established full participation and integration of people with disabilities as a national goal. Access to transportation is a lynchpin for that participation and integration. As airline travel increasingly becomes a major mode of travel for Americans, it is essential that people with disabilities have full access to air travel." Ex. 434.

462.   In conspiring to put into place their illegal mask mandates, the defendants did not consider the special needs of the disabled – even those who are able to tolerate having their breathing blocked. "Face masks have complicated the situation even further, since those with hearing loss rely heavily on facial expressions, non-verbal cues, and sign language to comprehend people." Ex. 438.

463.   Plaintiffs are extremely concerned the defendants, without action by this Court, will be permitted to enforce their mask mandates forever – excluding the disabled from so many important facets of life. Right now there's no end game for these unlawful requirements. "It seems highly unlikely that coronavirus will ever fully die out, so [will mask mandates end when] we're at the point where annual coronavirus deaths are less than average flu deaths, or at some other point? … Then again, I can't help but wonder if this will just be another policy that the airline industry keeps in place forever, as with so many policies that came before this." Ex. 439.

**I. Because DOT hasn't sanctioned the defendants for their illegal discrimination – and actually put out a NEP telling airlines they may violate numerous ACAA regulation – the only remedy for the plaintiffs is this lawsuit.**

464.   Plaintiffs have found no evidence that DOT has penalized any of the defendants for violating the ACAA by discriminating against so many Americans with disabilities. As a result of DOT's refusal to obey its statutory duty to enforce the ACAA, tens of millions of Americans have been barred from flying.

465.   DOT has told the defendant airlines they must accommodate passengers who are unable to tolerate wearing a face mask, however there is no evidence that DOT has actually initiated any civil enforcement proceedings against any air carrier.

466.   "Masks or Cloth Face Covering: Recommendation: Everyone should correctly wear a mask or cloth face covering over their nose and mouth at all times

in the passenger air transportation system (***excluding*** children under age 2, or ***anyone who has a medical condition that causes trouble breathing*** ...," according to a July 2020 report issued by DOT, DHS, and HHS. Ex. 193 (emphasis added).

467.   "Reasonable accommodations should be made for persons with disabilities or ailments who cannot wear masks ... Accommodations for persons with disabilities or ailments who cannot wear cloth face coverings should be considered on a case-by-case basis." *Id.*

468.   Many airlines, including several of the defendants, starting in Summer 2020, banned all passengers who could not wear a face covering for any reason, in clear violation of the ACAA. DOT issued updated guidance in December 2020, stressing a key point: "Mask Use***, specifically the need to accommodate those who cannot wear masks***." Ex. 194. But again, there is no evidence we have located that DOT's OACP has fined any airline who banned customers with disabilities from flying, showing how DOT has failed its statutory duty to enforce the ACAA.

469.   "Masks Recommendation: Everyone should wear a mask per CDC guidance, over their nose and mouth, at all times in the passenger air transportation system (excluding children under age 2, ***or anyone who has a medical condition for which wearing a mask is contraindicated ... Reasonable accommodations should be made for persons with disabilities or ailments who cannot wear masks***." *Id.* (emphasis added).

470.　"Under the Air Carrier Access Act, ***U.S. and foreign air carriers have legal obligations to accommodate the needs of passengers with disabilities when the airlines develop and implement policies requiring the use of masks*** to mitigate the public health risks associated with COVID-19." *Id.* (emphasis added).

471.　"The Air Carrier Access Act and its implementing regulations in 14 CFR Part 382 require airlines to ensure that their mask policies provide for reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear a face covering for medical reasons. The Office of Aviation Consumer Protection within the Department of Transportation and the Office of Civil Rights in the Federal Aviation Administration enforce aspects of these requirements within their jurisdiction." *Id*

472.　"People who are deaf or hard of hearing – or those who care for or interact with a person who is hearing impaired – may be unable to wear cloth face coverings if they rely on lipreading to communicate. Some people, such as people with intellectual and developmental disabilities, mental health conditions, or other sensory sensitivities, may have challenges wearing a cloth face covering." Ex. 195.

473.　"Individuals with asthma, chronic obstructive pulmonary disease (COPD), or other respiratory disabilities may not be able to wear a face mask because of difficulty in or impaired breathing. People with respiratory disabilities should consult their own medical professional for advice about using face masks." *Id.*

474. "Some people with autism are sensitive to touch and texture. Covering the nose and mouth with fabric can cause sensory overload, feelings of panic, and extreme anxiety." *Id.*

475. Showing the futility of pursuing claims against the defendants through DOT, Michael Ferris has submitted nine complaints to the department about airlines' mask discrimination. DOT has not resolved any of them. Ex. 199.

476. "On the matter of enforcing the law, the DOT has failed – unequivocally. The rights and dignity of travelers requiring special assistance and accommodation are violated frequently, while the department remains silent." Ex. 427.

477. "How often does the DOT pursue action? Not often. In the past three years, only five penalties have been levied against airlines for violations of the ACAA. Typically, the DOT receives between 100-200 disability service complaints per month. … Five actions after thousands of complaints – that is not enforcement." *Id.*

478. "Travelers with disabilities, myself included, have no way to ensure that air travel providers will honor the rights they have been guaranteed under the ACAA. Violations occur throughout the travel experience, from booking to baggage claim. Depending on the right that is violated, costs to the passenger may include disrupted travel, financial loss, pain and suffering, emotional distress, physical injury, an affront to personal dignity, or a combination of them all." *Id.*

479.   "It is disheartening to know that the DOT, the agency wholly responsible for enforcement of the law, has failed to protect your rights and mine so miserably." *Id.*

480.   "[A] civil right does not and cannot exist where an individual can take no definitive action to enforce it before the law or protect against its violation. The crux of the issue is this: The only venues within civil society where persons with disabilities cannot seek recourse before the law for discrimination on the basis of disability are on airplanes and in airports. A civil right is meant to be guaranteed." *Id.*

481.   "I have submitted complaints to the DOT, and the agency has affirmed the legitimacy of 100% of my claims. No action has been taken. Those same airlines continue to violate those very same rights, repeatedly and as if they are immune from the law. If my government will not stand up for me, and I cannot seek a redress for my own grievances before the court, what rights do I truly have?" *Id.*

482.   "By definition, civil rights are a class of protections that must be protected to have merit and value. If the air travel industry is permitted to ignore the ACAA without threat of challenge, the protections under the law cannot be classified as civil rights. To the travelers with disabilities who have been denied a voice, they are nothing but recommendations that are trampled on by the very airlines which they were meant to regulate." *Id.*

483.   "[T]he National Council on Disability (NCD) believes that DOT's approach is critically lacking in the key areas of compliance monitoring, complaint handling, and leadership by the Department of Transportation. ... The key findings indicate that ACAA implementation and enforcement efforts over the past 12 years have been so lacking in several essential areas as to constitute nonenforcement." Ex. 434.

**J. The disabled are a class Congress has designated for protection against civil-rights violations. International laws also protect the disabled from discrimination.**

484.   In adopting the Rehabilitation Act of 1973, the Air Carrier Access Act of 1986, and the Americans with Disabilities Act of 1990, *inter alia*, Congress has made unmistakably clear that the national policy of the United States to protect the disabled as a class from discrimination in all facets of American life.

485.   "The Congress finds that — (1) physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination; (2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social prob-

lem; (3) discrimination against individuals with disabilities persists in such critical areas as ... transportation ... (4) ... individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination; (5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion... (6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally; (7) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and (8) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity." 42 USC § 12101(a).

486.   "It is the purpose of this chapter — (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities..." 42 USC § 12101(b).

487.   "[M]ajor life activities include, but are not limited to, ... breathing ... a major life activity also includes the operation of a major bodily function, including but not limited to, ... neurological, brain, respiratory ... functions. ... The definition

of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter…" 42 USC § 12102.

488.  "[M]any barriers to transportation continue to exist that prevent the full inclusion and full participation of people with disabilities in society. … Research in the year 2000 conducted by the Harris Poll and funded by the National Organization on Disability established that nearly one-third of people with disabilities report having inadequate access to transportation. Behind these statistics are many personal stories of lives severely limited by the lack of transportation. Some people with disabilities who are willing and able to work cannot do so because of inadequate transportation. Others cannot shop, socialize, enjoy recreational or spiritual activities, or even leave their homes. And some individuals with disabilities who need medical services must live in institutions due solely to the lack of safe, reliable transportation to needed medical services," according to the National Council on Disability. Ex. 436.

489.  "Transportation enables us to work, choose where to live, pursue an education, access health care, worship, shop, and participate in recreational activities… For many people with disabilities, life is severely limited by the lack of transportation. Some people with disabilities who are willing and able to work cannot do so because of inadequate transportation. Others cannot shop, socialize, enjoy recreational or spiritual activities, or even leave their homes for the same reason. Some individuals with disabilities must live in institutions solely because of the lack of transportation to medical appointments." *Id.*

490.  "Transportation can be the key to obtaining, retaining, and succeeding in the world of work and socialization by people with disabilities... Transportation remains a key challenge for the disability community. Effective, accessible public transit can enhance the quality of life for millions of people with and without disabilities in the United States by increasing access to education, employment, and social interaction," according to NCD. Ex. 437.

491.  "The ability to access transportation is a precondition to the full enjoyment of many human rights by people with disabilities. Inadequate transportation to places of work, education, healthcare, recreation, polling stations, and countless other venues constitutes a significant barrier to the enjoyment of human rights by people with disabilities, and consequently their full participation and inclusion in our communities and societies," according to NCD. Ex. 506.

492.  This Court must address the attitudinal barriers erected by the defendants "such as the beliefs of transport operators and employees that people with disabilities do not or should not wish to utilize their services, or that it is sufficient to provide services for people with disabilities that are not of the same quality and functionality as services for the rest of the public." *Id.*

493.  "Persons with disabilities make up a significant and growing percentage of the world's population and constitute the world's largest minority," according to the International Civil Aviation Organization's Manual on Access to Air Transport by Persons with Disabilities. Ex. 493.

494.  "Aviation, like all other transport modes, needs to recognize and accommo-
date this growing passenger segment. Persons with disabilities have the same
international rights as other citizens, such as accessibility, and full and effective
participation and inclusion in society, including freedom of movement and free-
dom of choice (United Nations Convention on the Rights of Persons with Disa-
bilities, articles 3.c and 3.f). Persons with disabilities should have equivalent
access to air travel. These international rights apply to air travel as to all areas
of life." *Id.*

495.  "All procedures forming part of an air travel journey, including reservations,
check-in, immigration and customs, security clearances, transfers within air-
ports, embarkation and disembarkation, departure, carriage, and arrival should
be adapted to the needs of persons with disabilities in order to facilitate the
clearance and air transportation of such persons in a dignified manner." *Id.*

496.  "The service provided at the request of persons with disabilities should be
professional and 'seamless,' that is, with no points at which such persons may
be left stranded or without assistance." *Id.*

497.  "Aircraft operators should not refuse to transport persons with disabilities
on the basis of their disabilities…" *Id.*

498.  "Hate-motivated violence against individuals with disabilities is also a seri-
ous concern. According to the Bureau of Justice Statistics, in 2014, the rate of
violent victimization against persons with disabilities was 2.5 times higher than

similarly aged persons without disabilities," according to the U.S. Commission on Civil Rights. Ex. 508.

499.  "[N]egative beliefs about individuals with disabilities are further perpetuated in the court system where 'cases of abuse and torture can sometimes be categorized as pranks or bullying, instead of calling them for what they are, hate crimes.' The disvaluing of the lives of people with disabilities is in part why hate crimes occur against these communities in the first place." *Id.*

500.  Congress included the disabled as a protected class in the Hate Crimes Prevention Act of 2009. *Id.*

501.  "[T]here are people [such as the defendants who are] very hostile toward[] people with disabilities. The sadism indicates some kind of need to feel powerful and special and important by targeting someone seen as inferior." *Id.*

**K. Defendants ignore the massive evidence showing masks have proven totally ineffective at reducing COVID-19 but harm human health, recklessly endangering the well-being of all passengers.**

502.  Despite what the defendants and federal government tell us, numerous scientific and medical studies have documented over the past few decades how masks are totally ineffective in reducing the spread of respiratory viruses including COVID-19 but cause harm to human health. Ignoring the science means the defendants have harmed their passengers in violation of their legal "duty … to provide service with the highest possible degree of safety in the public interest …" to maintain their operating certificates. 49 USC § 44702(b)(1)(a).

503.   Plaintiffs have compiled 223 scientific studies and medical articles totaling 1,522 pages detailing how masks do not reduce virus transmission and hurt our health. It would take a couple hundred pages of this Amended Complaint to summarize all of the findings. Instead, plaintiffs incorporate Exs. 201-423 (and all other attached exhibits) into this pleading by reference.

504.   Plaintiffs have indexed all of the studies and articles at Ex. 200. Just a few will be quoted below to give the Court an idea of how dangerous it is to force someone to obstruct their breathing.

505.   The defendants' mask mandates have caused serious health risks to their tens of millions of passengers. A table succinctly summarizes the numerous "Physiological & Psychological Effects of Wearing Facemasks & Their Potential Health Consequences." Ex. 367.

506.   Ignoring the dangers of masks to passengers' health means the defendants have engaged in the tort of reckless endangerment.

507.   Reckless endangerment is defined as acts that create a substantial risk of injury to another person. The accused person isn't required to intend the resulting or potential harm, but must have acted in a way that showed a disregard for the foreseeable consequences of the actions.

508.   The leading authority on this subject is a 42-page paper published April 20, 2021, by eight German doctors and scientists in the International Journal of Environmental Research & Public Health. The doctors reviewed 65 scientific

papers on masks – and determined dozens of adverse health effects of covering your nose and mouth. Ex. 299.

509.   "Extended mask-wearing by the general population could lead to relevant effects and consequences in many medical fields." *Id*.

510.   "The mask-induced adverse changes are relatively minor at first glance, but repeated exposure over longer periods in accordance with the above-mentioned pathogenetic principle is relevant**. Long-term disease-relevant consequences of masks are to be expected**." *Id*. (emphasis added).

511.   "According to a questionnaire survey, ***masks also frequently cause anxiety and psychovegetative stress reactions in children – as well as in adults – with an increase in psychosomatic and stress-related illnesses and depressive self-experience***, reduced participation, social withdrawal, and lowered health-related self-care. Over 50% of the mask wearers studied had at least mild depressive feelings." *Id*. (emphasis added).

512.   "***[C]hanges that lead to hypercapnia are known to trigger panic attacks***. This makes the significantly measurable increase in $CO_2$ caused by wearing a mask clinically relevant. ... The activation of the locus coeruleus by $CO_2$ is used to generate panic reactions via respiratory gases." *Id*. (emphasis added).

513.   "From the physiological, neurological, and psychological side effects and dangers described above (Sections 3.1, 3.3, and 3.4), ***additional problems***

*can be derived for the use of masks in psychiatric cases*. People undergoing treatment for dementia, paranoid schizophrenia, *personality disorders with anxiety and panic attacks*, but also panic disorders with claustrophobic components, *are difficult to reconcile with a mask requirement, because even small increases in CO2 can cause and intensify panic attacks*." *Id.* (emphasis added).

514.    "Since masks are constantly penetrated by germ-containing breath and the pathogen reproduction rate is higher outside mucous membranes, potential infectious pathogens accumulate excessively on the outside and inside of masks. *On and in the masks, there are quite serious, potentially disease-causing bacteria and fungi* such as E. coli (54% of all germs detected), Staphylococcus aureus (25% of all germs detected), Candida (6%), Klebsiella (5%), Enterococci (4%), Pseudomonads (3%), Enterobacter (2%), and Micrococcus (1%) even detectable in large quantities." *Id.* (emphasis added).

515.    "Germany pointed out that *wearers of certain types of masks such as the common fabric masks (community masks) cannot rely on them to protect them or others from transmission of SARS-CoV-2*. … A Swiss textile lab test of various masks available on the market to the general public recently confirmed that most mask types filter aerosols insufficiently." *Id.* (emphasis added).

516. "[M]asks are even considered a general risk for infection in the general population, which does not come close to imitating the strict hygiene rules of hospitals and doctors' offices: *the supposed safety, thus, becomes a safety risk itself.*" *Id.* (emphasis added).

517. "*Since masks impede the wearer's breathing and accelerate it, they work completely against the principles of health-promoting breathing* used in holistic medicine and yoga. According to recent research, *undisturbed breathing is essential for happiness and healthy drive, but masks work against this*. The result of significant changes in blood gases in the direction of hypoxia (drop in oxygen saturation) and hypercapnia (increase in carbon dioxide concentration) through masks, thus, has the potential to have a clinically relevant influence on the human organism…" *Id.*

518. "The study concluded that '*the advocacy of an extended mask requirement remains predominantly theoretical … On the other hand, the side effects of masks are clinically relevant*.'" *Id.* (emphasis added).

519. The U.S. Department of Labor's Occupational Health & Safety Administration ("OSHA") states "Surgical masks are not considered respirators by OSHA … surgical masks do not seal tightly to the wearer's face, nor do they provide a reliable level of protection from inhaling smaller airborne particles." Ex. 474.

520. "Carbon dioxide (CO2) is a colorless, odorless, non-flammable gas that naturally occurs in the atmosphere. CO2 is produced by body metabolism and is a

normal component of exhaled breath. ... $CO_2$ is denser than air and can collect in high concentrations in ... confined spaces [such as within face masks] where it can displace oxygen creating a serious health hazard." Ex. 475.

521.   "The primary health effects caused by $CO_2$ are the result of its behavior as a simple asphyxiant. A simple asphyxiant is a gas which reduces or displaces the normal oxygen in breathing air. Symptoms of mild $CO_2$ exposure may include headache and drowsiness. At higher levels, rapid breathing, confusion, increased cardiac output, elevated blood pressure and increased arrhythmias may occur." *Id.*

522.   Airplanes contain lower oxygen levels than most passengers who live at sea level are used to. Most airplanes are pressurized to an elevation of 8,000 feet. As most people know, oxygen levels decrease with altitude. "For people with conditions – like heart or lung disease – that cause them to have special oxygen requirements, this is a big deal, and means they might need to fly with an oxygen concentrator, or not fly at all. But even for healthy people who are used to the abundant levels of oxygen present at sea level, it can have an effect." Ex. 476.

523.   Mask use also causes terrible damage to the environment. Several studies detailing the environmental disaster of masks are indexed at Ex. 200. Defendants' policies recklessly disregard this degradation of our planet.

524.   **MANY EXPERTS CONSIDER FORCING KIDS TO WEAR MASKS CHILD ABUSE:** Defendants are recklessly endangering the health of young

passengers in particular by requiring face coverings: "***They have become a cruel device on young children everywhere***, kindergarten students covered by masks and isolated by Plexiglas, struggling to understand the social expressions of their peers." Ex. 304 (emphasis added).

525.   "A first-of-its-kind study, involving over 25,000 children, reveals that masks are harming schoolchildren in many physical and psychological ways and have a negative effect on their behavior, focus, and interest in learning." Ex. 231.

526.   By abusing children, the defendants are betraying their legal "duty … to provide service with the highest possible degree of safety in the public interest …" to maintain their operating certificates. 49 USC § 44702(b)(1)(a).

527.   "Universal mask wearing is destroying the health of children, making their immune system more susceptible to disease." Ex. 231.

528.   "[M]asks block the foundation of human communication and the exchange of emotions and not only hinder learning but deprive children of the positive effects of smiling, laughing, and emotional mimicry. ***The effectiveness of masks in children as a viral protection is controversial, and there is a lack of evidence for their widespread use in children*** …" Ex. 299.

529.   The large German study of kids wearing masks described "the results of 17,854 parent submitted reports on health complaints or impairments experienced as a result of wearing masks by their 25,930 children." Ex. 313.

530.   The German research "reveals that major negative impacts on the physical, psychological, and behavioral health of children may be far more widespread

than reported in the media and by government officials – affecting approximately 68% and contributing to 24 distinct health complaints, according to parent submitted observations." *Id.*

531.   "***Requiring children wear masks does more harm than good***, Dr. Jay Bhattacharya told The Epoch Times. Bhattacharya advised Florida Gov. Ron DeSantis not to make children don face coverings. Bhattacharya is a professor of medicine at Stanford University. … 'In the case of masks, the evidence [of how] children spread the disease even without a mask is that they're much less efficient spreaders.'" Ex. 317 (emphasis added).

532.   "[T]here are serious repercussions to child development when they and others around them are wearing masks," Dr. Bhattacharya said. "Children have developmental needs that require them to see other people's faces. Learning to speak, for instance, requires seeing lips move. For slightly older children, they need to see people, the body, they learn body language, how to interact socially, by watching people. And when you ask them to wear a mask, you sort of cut that out. So you have harms on one side, and very little benefit on the other." *Id.*

533.   "The information that is accumulating involves mask wearers within a Covid-19 environment and raises many concerns especially regarding psychological damage and especially to infants and children, ***with potential catastrophic impacts on the cognitive development of children***." *Id.* (emphasis added).

534. **FOREIGN TRIBUNALS HAVE RULED MASKS ARE INEFFEC-TIVE & DANGEROUS:** Courts and arbitrators around the world realize there is a widespread consensus that masks don't reduce the spread of COVID-19 and other respiratory viruses.

535. For instance, a German judge in April 2021 declared mask mandates illegal and harmful to children. "[T]he Weimar District Court banned two schools in that district from enforcing mask mandates … The decision followed a legal action by the mother of two students, aged 8 and 14 respectively, at one of the schools, who argued that such measures were causing physical, psychological, and pedagogical harm to her children, as well as constituting an infringement of her children and parental rights under German and international law." Ex. 494.

536. "The judge, Christian Dettmar, upheld this argument, noting that mask mandates and social distancing requirements for children were not only causing the harm mentioned above, but were in direct violation of Articles 2 and 6 of the German Constitution, which guarantee the rights to freedom of individual development, education, and parental assistance." *Id.*

537. "In examining expert medical, scientific (including biological) and psychological evidence, the judge found the use of masks and social distancing had no effect whatsoever on reducing infection, and cast serious doubt on the ability of asymptomatic persons – particularly children – to spread the virus. This was the first time evidence was presented to a German court regarding the scientific

reasonableness and necessity of the prescribed anti-virus measures. Judge Dettmar found that the anti-virus measures posed a danger to the mental, physical, or psychological well-being of the children to such an extent that significant harm could be foreseen with a high degree of certainty. … The judge agreed with the experts' assessment that masks were not useful for viral protection …" *Id.*

538.   The German judge issued an injunction prohibiting school officials "from ordering or prescribing the following for these and all other children and pupils taught at these schools: 1. to wear face masks of any kind, especially mouth-nose coverings, so-called qualified masks (OP mask or FFP2 mask) or others, in class and on school premises …," according to the court order translated into English. Ex. 495.

539.   Canadian arbitrators found twice in favor of the Ontario Nurses Association, which challenged policies at various hospitals requiring certain staff to wear masks. In lengthy decisions, both concluded science doesn't support forced masking. "ONA has established, on its own evidence and through the admissions of the [hospital] experts in cross-examination, that there is scant scientific evidence … of the use of masks in reducing the transmission of influenza virus to patients." 2015 CanLII 55,643 (ON LA); Ex. 496.

540.   "I also find that the weight of scientific evidence said to support the [Vaccine or Mask] Policy on patient safety grounds is insufficient to warrant the imposition of a mask-wearing requirement for up to six months every year." 2018 CanLII 82,519 (ON LA); Ex. 497.

**L. Airplane cabins pose little risk for coronavirus spread.**

541.   The defendants' mask mandates are especially reckless considering ample evidence for the lack of a need for face coverings comes from the aviation industry itself. U.S. air carriers commissioned a lengthy report "Assessment of Risks of SARS-CoV-2 Transmission During Air Travel & Non-Pharmaceutical Interventions to Reduce Risk" by the Harvard T.H. Chan School of Public Health as part of the Aviation Public Health Initiative ("APHI"). Ex. 196.

542.   "Ventilation Systems on Aircraft: These sophisticated systems deliver high amounts of clean air to the cabin that rapidly disperses exhaled air, with displacement in the downward direction, reducing the risk of passenger-to-passenger spread of respiratory pathogens. Aircraft ventilation offers enhanced protection for diluting and removing airborne contagions in comparison to other indoor spaces with conventional mechanical ventilation and is substantially better than residential situations. This level of ventilation effectively counters the proximity travelers will be subject to during flights. The level of ventilation provided onboard aircraft would substantially reduce the opportunity for person-to-person transmission of infectious particles ..." *Id.*

543.   "***Particular emphasis is placed on the effectiveness of aircraft ventilation systems, which are able to filter 99.97% of SARS-CoV-2 particles out of air found on aircraft***." *Id.* (emphasis added).

544.   The study confirms what the airlines themselves have been promoting to customers: There is little-to-no risk of contracting COVID-19 aboard an aircraft.

"After detailed analysis of these reports***, it is the view of APHI that there have been a very low number of infections that could be attributed to exposure on aircraft during travel***." *Id.* (emphasis added).

545.  CDC has admitted "***the risk of getting a contagious disease on an airplane is low."*** *Id.* (emphasis added).

546.  "Based on the available scientific evidence, it is the view of APHI that ***there have been a very low number of infections that could be attributed to exposure on aircraft during travel***." *Id.* (emphasis added).

547.  "Given the volume of commercial flights daily, carrying millions of passengers and crew worldwide***, the number of documented incidents of infectious disease transmission occurring on board an aircraft remains infrequent***." *Id.* (emphasis added).

548.  "The airlines' disinfection processes have changed significantly in order to reduce any contaminated surfaces or fomites inside the cabin. All airlines have added additional cleaning, prioritizing between flights highly touched areas, and adding additional disinfection overnight or when there is enough time between flights or 'turns.' Between turns, most disinfection activities require wiping down the high touch areas, lavatories, and galleys. Deeper cleaning is done mostly overnight and often includes use of electrostatic spraying." *Id.*

549.  "An aircraft cabin has inherently a high airflow volume and high-quality air filtration during cruising, which are managed through the environmental control system (ECS) that also controls the temperature and cabin pressurization.

All nine airlines mentioned having high air exchange rates of approximately every 2 to 3 minutes (20 to 30 ACH) while cruising, a rate that is similar to, or even higher than the recommended air exchange rates for an operating room in a hospital." *Id.*

550.   "Air recirculation happens mostly when cruising, where about 40% to 50% of the cabin air is recirculated and filtered through a high-efficiency particulate air filter, also known as a HEPA filter. All the airlines interviewed have aircraft that are equipped with HEPA filters, and one of the airlines has increased the replacement frequency of their HEPA filters." *Id.*

551.   "One of the airlines noted that the ground pre-conditioned air is not recirculated, so it is 100% fresh air from outside the aircraft that comes into the cabin." *Id.*

552.   "Specific industry guidance, Federal Aviation Regulations, and international regulations are in place to help ensure acceptable conditions of cabin safety, air quality, and thermal comfort are always maintained inside the aircraft. This includes the need to provide adequate control of potential airborne transmission of infectious diseases, including SARS-CoV-2 virus within the aircraft environment." *Id.*

553.   "With these regulations and standards, the cabin is supplied with outside air and highly filtered 'clean air' providing air exchange rates significantly in excess to those found in well-ventilated offices and retail spaces (see Table 4.2). The high air exchange rates utilized in aircraft ventilation systems mean that any

contaminant introduced into the cabin should be flushed out much faster than would occur in other types of spaces, i.e., in the order of two to five minutes. The HEPA filters remove, at a minimum, 99.97% of the particulate matter from the return air. This high level of filtration ensures that the air supplied to the cabin is virtually free of particulate matter, including bacteria and viruses." *Id.*

554. "Aircraft meeting current ventilation standards with 50% recirculation HEPA-filtered air will supply passengers with a clean air delivery rate of 19 cfm/person, which is essentially free of any virus particles." *Id.*

555. "This analysis shows that aircraft will have a significantly lower age of air, resulting in a very short residence time for particles, and possibility of exposure to infectious particles than any other commonly encountered environment, which will help offset the counteracting effect of being in a smaller volume and in closer proximity to other passengers. For episodic releases, such as from a cough or a sneeze, the very high air exchange rates in aircraft cabins assume that contaminants released in such events are fully flushed from the cabin in as little as two to five minutes, as opposed to some six hours in a commercial or retail space complying with current codes and standards where these particles will be mixed into the large volume of the space." *Id.*

556. "**[T]he risk of SARS-CoV-2 transmission onboard aircraft will be below that found in other routine activities during the pandemic, such as grocery shopping or eating out**." *Id.* (emphasis added).

557.   "[T]he aircraft's environmental control systems effectively diluting and re-
moving pathogens significantly reduce the risk of passengers and crewmembers
from acquiring COVID-19 during the cruise segment of their journey." *Id.*

558.   Many of the defendants tout all the steps they've taken to greatly reduce the
risk of COVID-19 on planes. For example, *see* Frontier's detailed list of en-
hanced cleaning, air filtration, temperature checks, health assessments, and
other measures at Ex. 140. The effectiveness of these measures, unlike mask
wearing, actually are backed by scientific research.

559.   A4A, the trade group representing most major U.S. carriers and part of the
conspiracy to deprive disabled Americans of our civil rights, touts how safe air-
planes are: "Airlines have implemented a robust, multi-layered strategy which
can effectively reduce the risk of exposure to COVID-19 during air travel – this
strategy is aligned with the findings from researchers at Harvard University."
Ex. 122.

560.   "[T]he multiple layers of protection against COVID-19 make being on an air-
plane as safe if not safer than other routine activities, such as grocery shopping
or going to a restaurant." *Id.*

561.   "[I]t's old news that airplane air flows vertically and is replaced with new
outside air every few minutes. Thanks to this, several studies have suggested
that the transmission of viruses onboard a plane is rare, which is one key point
that proponents of dropping the mask mandate on planes point to," wrote Ben
Baldanza, former CEO of Defendant Spirit. Ex. 441.

**M. The Defendant Airlines accepted federal pandemic funding last year, subjecting them to the Rehabilitation Act, which prohibits recipients of federal money from discriminating against the disabled.**

562.   "Since 1977, most U.S. airports have been subject to the implementing regulations of Section 504 of the Rehabilitation Act of 1973 (Section 504), which prohibits discrimination against any qualified individual solely on the basis of the individual's disability by recipients of federal financial assistance," according to the Government Accountability Office. Ex. 430.

563.   Passenger airlines have historically not been subject to the Rehabilitation Act, however that changed last year when they accepted $25 billion in federal assistance from Congress in the Coronavirus Aid, Relief, & Economic Security Act ("CARES Act"), signed into law March 27, 2020 (P.L. 116-136). The act provides assistance to consumers and businesses, including aid to air carriers, according to the Congressional Research Service ("CRS"). Ex. 498.

564.   "Treasury data show that, by October 5, 2020, more than $28 billion in payroll support had been approved for disbursement to 610 recipients, including 352 passenger airlines…" *Id*.

565.   Another $29 billion in federal loans were made available to airlines. Ex. 507.

566.   Plaintiffs believe all seven Airline Defendants accepted federal financial assistance from the CARES Act.

567.   "In the midst of this crisis which threatens the jobs of tens of thousands of employees, distressed airlines have turned to the federal government for financial assistance." Ex. 499.

568. Section 504 of the Rehabilitation Act applies to programs receiving federal funds, according to CRS. Ex. 500.

569. Legislative intent in passing the Rehabilitation Act was: "The time has come to firmly establish the right of these Americans to dignity and self-respect as equal and contributing members of society, and to end the virtual isolation of millions of children and adults from society." *Id.*

570. Discrimination against the disabled is prohibited throughout an entire company if any part of it receives federal financial assistance. *Id.*

571. "The definition of disability applicable to Section 504 was amended by the ADA Amendments Act of 2008 to conform with the new definition of disability for the ADA. … ***the definition of disability shall be construed in favor of broad coverage*** to the maximum extent permitted by the terms of the act… The ADA Amendments Act specifically lists examples of major life activities including … ***breathing***…" *Id.* (emphasis added).

572. The Supreme Court has determined that "Section 504 requires even-handed treatment and an opportunity for individuals with disabilities to participate and benefit from programs receiving federal funds." *Id.*

573. "The Spending Clause empowers Congress to tax and spend for the general welfare. Under this authority, which is subject to several limitations, Congress may offer federal funds to nonfederal entities and prescribe the terms and conditions under which the funds are accepted and used by recipients," according to CRS. Ex. 501.

574.   By agreeing to accept $25 billion from the CARES Act, the defendants and other airlines entered into a contract with the federal government to protect the rights of disabled travelers pursuant to the Rehabilitation Act, the ACAA, and other federal and international laws. Plaintiffs have a remedy to bring this lawsuit when recipients of federal funds illegally discriminate against the disabled.

575.   "Under the Spending Clause, Congress can place certain conditions upon granting federal funds. Under Title VI, the recipient agrees not to discriminate on the grounds of race by accepting the money. A similar analogy applies to § 504 with disability discrimination. When a recipient of federal funds discriminates, he is essentially breaking his agreement with Congress." Ex. 502.

576.   "A funding recipient is generally on notice that it is subject not only to those remedies explicitly provided in the relevant legislation, but also to those remedies traditionally available in suits for breach of contract." *Id.*, *see Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992).

**N. Five of the Airline Defendants do not require masks in their contracts of carriage, thus they have breached their contracts by forcing passengers to wear them who never consented. The other two Airline Defendants' contracts mention masks, but these provisions are legally unenforceable.**

577.   All Airline Defendants are liable for breach of contract.

578.   Defendant Southwest's contract of carriage contains no mention of "mask" or "face covering." Passengers who book a ticket with Southwest do not agree to obstruct their breathing as a condition of carriage. Ex. 442.

579.   Even if Southwest's contract of carriage required passengers to wear masks, such a provision would be legally unenforceable because the FDCA doesn't allow any company to mandate use of unauthorized or EUA medical devices. 21 USC § 360bbb-3(e)(1)(A)(ii)(III).

580.   "[P]rovisions in the carriers' Contracts of Carriage [are] void if they conflict[] with federal law or regulation." Ex. 509.

581.   Defendant Alaska's contract of carriage contains no mention of "mask" or "face covering." Passengers who book a ticket with Alaska do not agree to obstruct their breathing as a condition of carriage. Ex. 443.

582.   Even if Alaska's contract of carriage required passengers to wear masks, such a provision would be legally unenforceable because the FDCA doesn't allow any company to mandate use of unauthorized or EUA medical devices. 21 USC § 360bbb-3(e)(1)(A)(ii)(III).

583.   Defendant Allegiant's contract of carriage contains no mention of "mask" or "face covering." Passengers who book a ticket with Allegiant do not agree to obstruct their breathing as a condition of carriage. Ex. 444.

584.   Even if Allegiant's contract of carriage required passengers to wear masks, such a provision would be legally unenforceable because the FDCA doesn't allow any company to mandate use of unauthorized or EUA medical devices. 21 USC § 360bbb-3(e)(1)(A)(ii)(III).

585.   Defendant Delta's contract of carriage contains no mention of "mask" or "face covering." Passengers who book a ticket with Delta do not agree to obstruct their breathing as a condition of carriage. Ex. 445.

586.   Even if Delta's contract of carriage required passengers to wear masks, such a provision would be legally unenforceable because the FDCA doesn't allow any company to mandate use of unauthorized or EUA medical devices. 21 USC § 360bbb-3(e)(1)(A)(ii)(III).

587.   Defendant Frontier's contract of carriage contains this paragraph: "2019 Novel Coronavirus (COVID-19) – Frontier may screen passengers during the check-in and boarding process, and may deny boarding to passengers who Frontier reasonably believes do not meet Frontier's COVID-19 screening measures. Screening will include, but is not be limited to: completion of a health acknowledgment, *required wearing of facial coverings*, and submission to a temperature check. Notwithstanding Section 11 above, *a passenger who presents a medical certificate dated within 10 days of the date of the flight for which it is being presented may be denied boarding* if, on the planned date of travel, the passenger fails to meet Frontier's COVID-19 screening measures. Ex. 446 (emphasis added).

588.   Frontier's contract of carriage mandating passengers wear masks is legally unenforceable because the FDCA doesn't allow any company to mandate use of unauthorized or EUA medical devices. 21 USC § 360bbb-3(e)(1)(A)(ii)(III).

589.   Frontier's contract of carriage requiring at least 10 days advance notice for mask exemptions is legally unenforceable because the ACCA doesn't allow airlines to demand advance notice from a disabled passenger. 14 CFR § 382.25.

590.   Defendant JetBlue's contract of carriage contains no mention of "mask" or "face covering." Passengers who book a ticket with JetBlue do not agree to obstruct their breathing as a condition of carriage. Ex. 447.

591.   Even if JetBlue's contract of carriage required passengers to wear masks, such a provision would be legally unenforceable because the FDCA doesn't allow any company to mandate use of unauthorized or EUA medical devices. 21 USC § 360bbb-3(e)(1)(A)(ii)(III).

592.   Defendant Spirit's contract of carriage contains this language: "4.4.5. All guests are required to wear an appropriate face covering while at the airport, on the jet bridge, and onboard the aircraft. All face coverings must: • Snugly cover the nose and mouth and be secure under the chin, and • Have at least two layers of fabric (e.g., disposable non-medical face mask, multi-layered cloth face covering)." Ex. 448.

593.   Spirit's contract of carriage mandating passengers wear masks is legally unenforceable because the FDCA doesn't allow any company to mandate use of unauthorized or EUA medical devices. 21 USC § 360bbb-3(e)(1)(A)(ii)(III).

594.   Spirit's contract of carriage also states: "4.4.5.1. Exceptions: The following guests may be exempt from the face covering requirements: • Children under the age of two; and • Guests who cannot wear or safely wear an appropriate face

mask due to a disability recognized by the Americans with Disabilities Act (ADA) who meet certain criteria. Additional information regarding this exemption can be found at our COVID-19 FAQ page under "I have an upcoming flight and cannot wear a face mask due to a disability." NOTE: ***This exemption is narrowly interpreted and will be vetted through a strict approval process***. Spirit will not allow a guest onboard who simply does not want to wear a mask because they find mask-wearing difficult." Ex. 448.

595.   Spirit's contract of carriage requiring "a strict approval process" is legally unenforceable because the ACCA doesn't allow airlines to demand advance notice from a disabled passenger or any other screening such a doctor's notice, negative virus test, etc. 14 CFR Part 382.

## O. The defendants' mask mandates violate federal law prohibiting the mandatory use of any medical device unauthorized or approved under an Emergency Use Authorization by the Food & Drug Administration.

596.   The defendant's mask mandates are illegal because they force passengers to use a medical device (face masks), the vast majority of which are unauthorized or approved by FDA under an EUA.

597.   "All COVID-19 masks … are authorized, not approved or licensed, by the federal government; they are Emergency Use Authorization (EUA) only. They merely 'may be effective.' … EUA products are by definition experimental and thus require the right to refuse. Under the Nuremberg Code, the foundation of ethical medicine, no one may be coerced to participate in a medical experiment.

Consent of the individual is 'absolutely essential.' A federal court held that even the U.S. military could not mandate EUA vaccines to soldiers. *Doe #1 v. Rumsfeld*, 297 F.Supp.2d 119 ([D.D.C.] 2003)." Ex. 510.

598.   "[M]asks are authorized for use by the general public as 'investigational products' under an Emergency Use Authorization ('EUA'). They are not an approved product, and are referred to in the law as 'unapproved products' because they have not been fully tested and approved for use by the FDA. Under the federal law that allows the FDA to issue EUAs (21 U.S.C. § 360bbb-3), you cannot be forced to wear a mask. The law provides that recipients of a product authorized for use under and EUA can refuse to take the product." Ex. 511.

599.   "[T]he recipient of the product (the mask) must be informed of the option to refuse administration of the product." *Id.*

600.   The defendants do not inform their passengers of their legal right to refuse administration of the medical device.

601.   "[B]y the FDA's own admission, face masks such as those in common use by the public are not intended to protect the wearer or others from the COVID-19 virus, as they do not prevent or reduce infection." Ex. 512.

602.   EUA medical devices are experimental in nature. There's "long settled legal precedent which establishes that it is not legal to coerce an individual to accept an experimental product. It further provides the historical background and evidence that Congress' intent in enacting Section 564 [of the FDCA] was to provide only one limited exception to the option to accept or refuse EUA products

– that exception applies only to military personnel and only when national security is at risk. Federal agencies have also historically interpreted Section 564 as a prohibition on mandates of EUA products…" Ex. 513.

603.   "To be licensed, the FDA must find that a medical product is 'safe for use and … effective in use.' Until licensed, a medical product remains investigational, even after issuance of an EUA. … Long settled legal precedent establishes that it is not legal to coerce an individual to accept an unlicensed, and hence experimental, medical product. An individual must voluntarily agree, free from any undue influence, to accept same." Ex. 514.

604.   "The principle that individuals should not be coerced to receive an unlicensed medical product is also codified in the law of at least 84 countries and is an accepted principle of international common law. *See, e.g., Abdullahi v. Pfizer, Inc.,* 562 F.3d 163, 184 (2nd Cir. 2009) ('We have little trouble concluding that a norm forbidding nonconsensual human medical experimentation [which includes unlicensed medical products such as masks] is every bit as concrete – indeed even more so – than the norm prohibiting piracy… The Nuremberg Code, Article 7 of the ICCPR, the Declaration of Helsinki, the Convention on Human Rights and Biomedicine, the Universal Declaration on Bioethics and Human Rights, the 2001 Clinical Trial Directive, and the domestic laws of at least 84 States all uniformly and unmistakably prohibit medical experiments on human beings without their consent, thereby providing concrete content for the norm.')" *Id.*

605.   It's a "longstanding principle that it is not permissible to coerce anyone to receive an unlicensed medical product." *Id*.

606.   Legislative history of Section 564 of the FDCA indicates that "any authority to actually use experimental drugs or medical devices in emergency situations has to be defined and wielded with nothing less than surgical precision. Prior informed consent in connection with the administration of experimental therapy is a basic human right, a right no one should be asked to surrender…" *Id*.

607.   On May 19, 2004, Sen. Ted Kennedy said while deliberating Section 564 that "[t]he authorization for the emergency use of unapproved products also includes strong provisions on informed consent for patients." *Id*.

608.   "Congress specifically carved out only one exception for when an individual would not have 'the option to accept or refuse administration of the product.' Congress permitted required use of an EUA product when the President of the United States finds that providing an individual in the military with the option to accept or refuse the product would not be in the interests of national security." *Id.*, *see* 10 USC § 1107a.

609.   "Congress so highly valued the right to individual choice that it allowed only a threat to national security to trump that right, and even then, only with regard to military personnel." *Id*.

610.   Individuals to whom any EUA product is offered must be informed "of the option to accept ***or refuse administration of the product***, of the consequences, if any, of refusing administration of the product…" 21 USC § 360bbb-

3(e)(1)(A)(ii)(III) (emphasis added).

611.    The Airline Defendants can't force travelers to use EUA products including masks. They may only ***recommend*** masks and advise passengers if they exercise their legal right not to wear a mask, the consequence *might* be a higher risk for contracting COVID-19. Ex. 335.

612.    There's good reason for the law prohibiting forced use of EUA medical devices. Requirements for EUA products are waived for, among other things, "current good manufacturing practice otherwise applicable to the manufacture, processing, packing ... of products subject to regulation under this chapter..." 21 USC § 360bbb-3(e)(3)(A).

613.    "Lay people and manufacturers of just about every type of business are lending assistance to create masks. Companies that once made mattresses, shoes, apparel and many other products are now turning efforts toward the manufacturing face masks. Even a business that manufactures sports jerseys for professional athletes is now making masks using the same jersey material from its products." Ex. 515.

614.    None of these pop-up mask manufactures have FDA certified that their medical devices are safe to place on human faces.

615.    "The FDA is waiving regulatory requirements, including submission of premarket notification under the 510(k) process, registration and listing requirements, quality system regulation requirements, reports or corrections and removals, and unique device identification requirements. ... the labeling should

not include that the mask can be used for antimicrobial or antiviral protection or be used for infection prevention." *Id.*

616.   "FDA notes that because it cannot confirm the authenticity of any alternative respirators from abroad, it recommends that people take appropriate steps to verify the authenticity of the products before importing them. … FDA is now welcoming the opportunity to work with any manufacturer with interest in manufacturing masks and respirators – even if the manufacturer has no previous experience in medical device manufacturing." *Id.*

617.   "Counterfeit medical devices have been a danger in the U.S. supply chain for years, but their presence has been especially of concern during the current pandemic, when there have been shortages of products considered to be medical devices by the FDA, such as medical masks…" Ex. 516.

618.   "FDA has had the power to seize and destroy counterfeit medicines, ensuring that they will not end up in American homes and endangering public health. The FDA does not, currently, however, have this same authority when regulating counterfeit medical devices." *Id.*

619.   Congress' prohibition of mandatory mask use is consistent with U.S. Department of Health & Human Services ("HHS") regulations requiring that participants in trials of experimental medical devices must be informed that "participation is voluntary, refusal to participate will involve no penalty…" 45 CFR § 46.116(a)(8).

620.   Likewise FDA regulations state that no human shall participate in research

trials of uncertified medical devices unless "the investigator has obtained the legally effective informed consent of the subject…" 21 CFR § 50.20.

621. Mandating the use of uncertified medical devices without the consent of the passenger means the defendants are practicing medicine without a license.

622. The Airline Defendants have no authority to require any passenger wear a mask authorized under EUA. But most masks being used by Americans to comply with the defendant's muzzling requirements meet the legal definition of an EUA "eligible product" that is "intended for use to prevent … a disease…" 21 USC § 360bbb-3(a).

623. FDA regulates most face masks under EUAs. Ex. 26.

624. HHS and FDA state:

"On April 18, 2020, in response to concerns relating to insufficient supply and availability of face masks, [FDA] issued an [EUA] authorizing the use of face masks for use by members of the general public… A face mask is a device … that covers the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels. It includes cloth face coverings as a subset. … Face masks are regulated by FDA when they meet the definition of a 'device' under section 201(h) of the Act. Generally, face masks fall within this definition when they are intended for a medical purpose. … Face masks are authorized under this EUA when they are intended for use as source control, by members of the general public … to cover their noses and mouths, in accordance with CDC recommendations, to help prevent the spread of SARS-CoV-2 during the COVID-19 pandemic." Ex. 450.

625. The HHS secretary authorized EUAs for COVID-19 countermeasures (85 Fed. Reg. 17,335; Ex. 451) including respiratory devices (85 Fed. Reg. 13,907; Ex. 452).

626. FDA published the EUA for face masks July 14, 2020. 85 Fed. Reg. 42,410; Ex. 453.

627. Another mask EUA was published Nov. 20, 2020. 85 Fed. Reg. 74,352; Ex. 454.

628. HHS Secretary Xavier Becerra renewed the public-health emergency for COVID-19 July 19, 2021, allowing EUAs for masks and other devices to continue. Ex. 455.

629. FDA confirms plaintiffs' contention that face masks are worthless. Masks must not be

> "labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction... No printed matter, including advertising or promotional materials, relating to the use of the authorized face mask ***may represent or suggest that such product is safe or effective for the prevention or treatment of patients during the COVID-19 pandemic***." Ex. 450 (emphasis added).

630. "Face masks are not personal protective equipment." Ex. 456.

631. The instruction manual for a 3M N95 respirator mask, which is FDA approved, makes clear its wearing still has risks: "Misuse may result in sickness or death. ... [It] cannot eliminate the risk of contracting infection, illness, or disease... Individuals with a compromised respiratory system, such as asthma or emphysema, should consult a physician and must complete a medical evaluation prior to use." Ex. 457.

632. Despite the lack of data that masks are effective (Ex. 200), FDA issued an umbrella EUA for 41 types of surgical masks, many of which are used by passengers to comply with the defendants' requirements. Ex. 458.

633. Notably five types of masks have been withdrawn from the EUA after FDA

found them to be defective. *Id*.

634.   FDA has also revoked the EUA for respirator masks made in China for being faulty. Ex. 459.

635.   CDC's National Institute for Occupational Safety & Health ("NIOSH") found many masks made in China "authorized under the April 3, 2020, EUA did not meet the expected performance standards." *Id*.

636.   An astounding 167 respirator mask brands from China had their EUAs revoked by FDA last month. Another 54 were previously revoked. *Id.*

637.   FDA revokes EUAs when "appropriate to protect the public health or safety." Ex. 460.

638.   Surgical masks (typically light blue in color) made in China are also not authorized by FDA. Ex. 461.

639.   Although these 221 respirator mask brands (plus all surgical masks) manufactured in China may no longer be legally sold in the United States, there are likely tens of millions of these face coverings still being used by passengers due to the defendants' illegal mandates. Lead Plaintiff & Class Representative Lucas Wall's mother is among the numerous Americans who have worn surgical masks made in China because of the defendants' policies. Ex. 50.

640.   So not only are quality masks worthless in CDC's goal of reducing transmission of COVID-19 (Ex. 200), but the vast majority sold in the United States are actually ***defective***, according to FDA. Ex. 462.

641. "The 'may be effective' standard for EUAs provides for a lower level of evidence than the 'effectiveness' standard that FDA uses for product approvals." Ex. 460.

642. Even a well-informed consumer would find it nearly impossible to understand what types and brands of face masks have been authorized and which – if any – are regarded as safe to use for extended periods of time by NIOSH. There's no indication these issues were considered as part of the defendants' conspiracy.

643. When a mask manufacturer applies for an EUA, it must agree it may not "misrepresent the product or create an undue risk in light of the public health emergency. For example, the labeling must not include any express or implied claims for: ... antimicrobial or antiviral protection or related uses, (3) infection prevention, infection reduction, or related uses, or (4) viral filtration efficiency." Ex. 463.

644. Additional details about the FDA unauthorized or EUA nature of most masks used by airline passengers against their will is available at Exs. 464-466.

645. "Simply put: manufacturers producing even simple cloth face coverings are now producing medical devices regulated by FDA and must therefore comply with certain regulatory requirements." Ex. 482.

646. Mask manufacturers themselves admit their products are ineffective in preventing COVID-19 infection: "It is also important to ensure the product does

not have any additional antimicrobial or anti-viral claims made within its labelling." Ex. 483.

647.   Just read the fine print on the boxes of masks you can purchase at Costco in Orlando. Two of the mask boxes contain this disclaimer: "Not for medical use. Intended for single use only – discard after use. This general use mask cannot eliminate the risk of contracting an infectious disease." Pl. Ex. 467 (photographed June 2, 2021).

648.   Another brand's box contains this disclaimer: "These masks are not personal protective equipment and are not intended as replacements or substitutes for personal protective equipment. ***These products are not intended*** for medical use or ***to prevent any disease or illness***. Each mask is intended for single use only – discard immediately after use." Pl. Ex. 468 (emphasis added).

649.   CDC itself admits a mask does "NOT provide the wearer with a reliable level of protection from inhaling smaller airborne particles and is not considered respiratory protection." Ex. 469.

650.   Illustrating the dangers of the defendants' mandatory muzzling policies, U.S. Customs & Border Protection has seized numerous counterfeit surgical masks imported into the United States. Ex. 479.

651.   "Manufacturers of counterfeit devices have certainly taken advantage of the Covid-19 pandemic by seizing the opportunity to sell counterfeit devices amidst shortages and fearful consumers. ... In September [2020], over 500,000 counterfeit N-95 masks were seized at the Chicago O'Hare International Airport.

These counterfeit devices would only contribute to misleading and improperly protecting consumers, a significant threat during a pandemic." Ex. 516.

652.   "FDA is thus left with the choice of storing or returning the counterfeit medical devices. This results in the FDA often returning the counterfeit medical devices to their senders, who often repackage the devices and send them back to the U.S. If they are not caught, the counterfeit devices enter the supply chain. Thus, counterfeit devices are often not fully intercepted and prevented from entering the market and endangering the health of consumers." *Id*.

653.   One can only wonder how many millions of these imposter masks, unauthorized by FDA even under an EUA, have made it onto airline passengers' faces. This shows the reckless disregard for flyers' health by the defendants.

654.   In June 2020, the U.S. Department of Justice charged a Chinese manufacturer with exporting misbranded face masks, purported to be N95 respirators. Ex. 480.

655.   "FDA adopted the International Standards Organization 13485 regulations for medical devices. Claiming that any face mask is a medical devise must have a 'Design and development validation,' including a clinical evaluation. These requirements must be documented. Without meeting the ISO 13485 requirements, the product is not a valid medical devise and is not to be released to the customer(s)." Ex. 481.

656.   OSHA sets standards for respiratory protection. None of the Airline Defendants appear to be following these legal requirements. Exs. 470 & 471.

657.   OSHA's standards apply to employees. There's no evidence the defendants are following these legal requirements for their workers. OSHA also does not permit employers to mandate masks for customers.

658.   Due to the dangers of obstructing a person's breathing, OSHA requires that a Respirator Medical Evaluation Questionnaire be completed by anyone who will be required to wear a mask. Ex. 472.

659.   If any employer demands someone wear a mask, OSHA requires it "Must provide respirators, training, and medical evaluations at no cost…" Ex. 473.

660.   There is no evidence that the Airline Defendants provide training and medical evaluations to their passengers before forcing them to block their oxygen intake.

661.   "All oxygen-deficient atmospheres (less than 19.5% O2 by volume) [such as airplane cabins] shall be considered IDLH," according to OSHA. IDLH stands for "immediately dangerous to life or health." *Id.*

662.   "The percentage oxygen on a plane traveling around [8,000 feet] is equivalent to 15.1% oxygen at sea level. … in people with existing respiratory difficulties, there is a risk of hypoxia." Ex. 477.

663.   "You cannot wear masks in this atmosphere because it can cause serious injury or death. … This is likely why the airlines are having customers who become violent or try to open the emergency exits at 35,000-plus feet. These people are experiencing hypoxemia due to oxygen deprivation from having their nose and mouth covered." Ex. 478.

664.   OSHA requires that before any human be required to don a mask, a company must: 1) provide a medical evaluation to determine person's ability to use a respirator, before fit testing and use; 2) identify a physician or other licensed health care professional to perform medical evaluations using a medical questionnaire or an initial medical examination that obtains the same information as the medical questionnaire; and 3) must obtain a written recommendation regarding the employee's ability to use the medical device. Ex. 473.

665.   OSHA requires companies mandating masks to "provide effective training to respirator users, including: why the respirator is necessary and how improper fit, use, or maintenance can compromise the protective effect of the respirator; limitations and capabilities of the respirator; use in emergency situations; how to inspect, put on and remove, use and check the seals; procedures for maintenance and storage; recognition of medical signs and symptoms that may limit or prevent effective use; and general requirements of this standard." *Id.*

666.   There's no evidence the Airline Defendants have provided the required training to employees or passengers forced to don face coverings.

## P. The defendants' mask policies deprive Americans of their constitutional right to travel interstate and internationally.

667.   By banning travelers who can't wear face masks, the Airline Defendants deprive Americans of their constitutional right to freedom of movement.

668.   "As a fundamental right inherent in American citizenship and the nature of

the federal union, the right to travel in the United States is basic to American liberty. The right precedes the creation of the United States and appears in the Articles of Confederation. The U.S. Constitution and Supreme Court recognize and protect the right to interstate travel. The travel right entails privacy and free domestic movement without governmental abridgement." Ex. 484.

669.    "The original conception of the right to travel embodies it as a broadly based freedom that encompasses all modes of transport. Its explicit articulation in the Articles of Confederation became implicit in the Privileges and Immunities Clause of the Constitution. ... abridgement of any mode of transportation undermines the constitutionally enshrined travel right." *Id.*

670.    "Travel embodies a broadly based personal, political, and economic right that encompasses all modes of transportation and movement. ... The right to travel, inherent in intercourse among the states, is one of the implied and unenumerated rights reserved to the People." *Id.*

671.    The Supreme Court has held that private companies can also be held liable for interfering with a person's constitutional right to travel: "[T]he decision reaffirmed the right to travel, as 'a right broadly assertable against private interference as well as governmental action.' In short, the travel right protects against both restrictive public and private actions, and it empowers those availing themselves of the right's protections." *Id., see Shapiro v. Thompson*, 394 U.S. 618 (1969).

672.    *United States v. Guest*, 383 U.S. 745 (1966), affirmed the "constitutional

right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce [such as commercial airlines] in doing so, occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized." *Id.*

673.   Congress affirmed the constitutional right to fly for disabled Americans by enshrining it into statute: "A citizen of the United States has a public right of transit through the navigable airspace. To further that right, the Secretary of Transportation shall consult with the Architectural and Transportation Barriers Compliance Board established under section 502 of the Rehabilitation Act of 1973 (29 U.S.C. 792) before prescribing a regulation or issuing an order or procedure that will have a significant impact on the accessibility of commercial airports or commercial air transportation for handicapped individuals." 49 USC § 40103.

674.   Plaintiffs have found no evidence that defendants' prohibitions on disabled Americans who can't wear masks have been approved by the transportation secretary or the Architectural & Transportation Barriers Compliance Board.

675.   "[T]he right to travel is not tied to any specific mode of transportation. Consequently, it encompasses all means of travel. … From the perspective of individual rights, the ability to move freely in the United States is a personal liberty, inherent by birth and U.S. citizenship. The travel right is essential to guaranteeing equality of opportunities, and the pursuit of happiness for citizens of the

federal union. Freedom of personal movement is a natural liberty that citizens exercise among fundamental rights and privileges." Ex. 484.

676.   "The travel right also includes the right to movement on common carriers. 'A carrier becomes a common carrier when it 'holds itself out' to the public, or to a segment of the public, as willing to furnish transportation within the limits of its facilities to any person who wants it.' That means that any individual or corporation becomes a common carrier by promoting to the public the ability and willingness to provide transportation service, including air travel. Air transport providers operating in, to, or from the United States act under common carrier rules. 'An air carrier ... may not subject a person in air transportation to discrimination...' If there are available places, the charge is paid, and there are no reasonable grounds to refuse the service to an individual, the air carrier is legally bound to provide the transportation of passengers or goods. Denying someone passage violates federal law." *Id.*

677.   "The air travel network is a part of the public infrastructure open for wide use and enjoyment. The national government advances these goals by ensuring by law that all citizens have adequate access to the air system. ... Therefore, under not only general U.S. sovereignty but also the public right of transit, freedom of travel includes air travel." *Id.*

678.   For many trips – such as when Lead Plaintiff & Class Representative Lucas Wall wants to visit his family in Germany or when Plaintiff Peter Menage wants to travel from his home in Alaska to the Lower 48 states – airlines provide the

only travel option. "Commercial air service is the only mode of passenger common carrier transportation available between many U.S. locations, especially American states and territories outside the continental union." *Id.*

679.   "The impact on a citizen who cannot use a commercial aircraft is profound. He is restricted in his practical ability to travel substantial distances within a short period of time, and the inability to fly to a significant extent defines the geographical area in which he may live his life. … An inability to travel by air also restricts one's ability to associate more generally, and effectively limits educational, employment and professional opportunities." *Id.*, *see Mohamed v. Holder*, 2014 WL 243115 (E.D.Va. Jan. 22, 2014).

680.   "Traveling long distances within the contiguous United States relies on only one mode of travel: commercial airlines. Therefore, restricting this single mode of travel, by air, abridges the right to travel and the right to exercise political and personal liberties." *Id.*

681.   The right to travel includes the right to move from state to state and abroad without burdens on a person's body such as obstructing his/her breathing: "An individual's liberty may be harmed by an act that causes or reasonably threatens a loss of physical locomotion or ***bodily control***." *Id.* (emphasis added).

## Q. The defendants' mask policies violate international law.

682.   In addition to violating the plaintiffs' constitutional right to travel, the defendants' mask requirements break several provisions of international law and

standards.

683. **NUREMBERG CODE:** "The Nuremberg Code is the most important document in the history of the ethics of medical research. The Code was formulated … in August 1947, in Nuremberg, Germany, by American judges sitting in judgment of Nazi doctors accused of conducting murderous and torturous human experiments in the concentration camps…" Ex. 485.

684. "The Nuremberg Code has not been officially adopted in its entirety as law by any nation … Nonetheless, its influence on global human-rights law and medical ethics has been profound. Its  basic requirement of informed consent, for example, has been universally accepted and is articulated in international law in Article 7 of the United Nations International Covenant on Civil and Political Rights (1966)." *Id.*

685. The defendants' forcing all airline passengers to use experimental medical devices (FDA unauthorized or EUA face masks) violates the Nuremberg Code.

686. "The voluntary consent of the human subject is absolutely essential. This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, overreaching, or other ulterior form of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved as to enable him to make an understanding and enlightened decision." Nuremberg Code § 1. *Id.*

687.   The Individual Defendants are as guilty as the Airline Defendants in violating the code. "The duty and responsibility for ascertaining the quality of the consent rests upon each individual who initiates, directs, or engages in the experiment. It is a personal duty and responsibility which may not be delegated to another with impunity." Nuremberg Code § 1. *Id.*

688.   "The experiment should be so conducted as to avoid all unnecessary physical and mental suffering and injury." Nuremberg Code § 4. *Id.*

689.   Airline employees are not proper authorities to conduct medical experiments. "The experiment should be conducted only by scientifically qualified persons. The highest degree of skill and care should be required through all stages of the experiment of those who conduct or engage in the experiment." Nuremberg Code § 8. *Id.*

690.   "During the course of the experiment the human subject should be at liberty to bring the experiment to an end if he has reached the physical or mental state where continuation of the experiment seems to him to be impossible." Nuremberg Code § 9. *Id.*

691.   A desire by the defendants to reduce the spread of COVID-19 – even if masks were effective, which the overwhelming evidence shows they are not (Ex. 200) – does not justify endangering the health of millions of flyers who don't consent to having their oxygen intake obstructed. "[R]esearchers must refuse to conduct experiments on human beings when ordered by the state in order 'to save lives,'

because in such cases subjects would not be volunteers. ... there 'is no justification in killing five people in order to save the lives of 500...'" *Id*.

692.   "Informed consent, the core of the Nuremberg Code, has rightly been viewed as the protection of subjects' human rights. ... Both the Nuremberg Code and the Declaration of Helsinki served as models for the current U.S. federal research regulations, which require ... the informed consent of the research subject..." *Id*.

693.   **DECLARATION OF HELSINKI:** The Declaration of Helsinki was adopted in 1964 by the World Medical Association. "While the primary purpose of medical research is to generate new knowledge, this goal can never take precedence over the rights and interests of individual research subjects." § 8. Ex. 487.

694.   "Medical research involving human subjects must be conducted only by individuals with the appropriate ethics and scientific education, training, and qualifications. Research on patients or healthy volunteers requires the supervision of a competent and appropriately qualified physician or other health care professional." § 12. *Id*.

695.   Airline employees are not individuals with the appropriate ethics and scientific education, training, and qualifications to order passengers to use experimental medical devices unauthorized by FDA or issued under an EUA only.

696.   Airline employees are not competent and appropriately qualified physicians or other healthcare professionals able to evaluate who can medically tolerate

covering their nose and mouth.

697.  "Medical research involving human subjects must conform to generally accepted scientific principles, be based on a thorough knowledge of the scientific literature, other relevant sources of information, and adequate laboratory and, as appropriate, animal experimentation." § 12. *Id.*

698.  Forced mask wearing is not based on a thorough knowledge of the scientific literature or other relevant sources of information. Ex. 200.

699.  "Participation by individuals capable of giving informed consent as subjects in medical research must be voluntary. … no individual capable of giving informed consent may be enrolled in a research study unless he or she freely agrees." § 25. Ex. 487.

700.  Plaintiffs and millions of other Americans have not consented to have their only sources of oxygen obstructed by the defendants. Breathing is, of course, essential to life. An average human can die in three minutes without oxygen.

701.  "In medical research involving human subjects capable of giving informed consent, each potential subject must be adequately informed of the aims, methods, sources of funding, any possible conflicts of interest, institutional affiliations of the researcher, the anticipated benefits and potential risks of the study and the discomfort it may entail, post-study provisions and any other relevant aspects of the study. The potential subject must be informed of the right to refuse to participate in the study or to withdraw consent to participate at any time without reprisal." § 26. *Id.*

702.   The defendants have not informed their passengers about the risks of using FDA unauthorized or EUA face masks. Ex. 200. They have not informed such passengers of their right to refuse.

703.   "After ensuring that the potential subject has understood the information, the physician or another appropriately qualified individual must then seek the potential subject's freely-given informed consent, preferably in writing." § 26. *Id.*

704.   The defendants do not require passengers' informed consent in writing to wear experimental medical devices not fully authorized by FDA.

705.   "The potential subject's dissent should be respected." § 29. *Id.*

706.   The defendants do not respect passengers' dissent when asked to wear a mask. In fact, the defendants ban them from flying and seek their arrest and/or sanction by federal authorities, which constitutes false imprisonment.

707.   **INTERNATIONAL COVENANT ON CIVIL & POLITICAL RIGHTS:** Although the Nuremberg Code and Declaration of Helsinki are not formal international law, the defendants' mask policies violate the International Covenant on Civil & Political Rights ("ICCPR"). Treaty Doc. 95-20 (ratified by the Senate April 2, 1992). Ex. 486.

708.   "[I]n accordance with the principles proclaimed in the Charter of the United Nations, recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world..." *Id.*

709.   The protection of the rights of the disabled is of international concern. "[I]n accordance with the Universal Declaration of Human Rights, the ideal of free human beings enjoying civil and political freedom and freedom from fear and want can only be achieved if conditions are created whereby everyone may enjoy his civil and political rights, as well as his economic, social and cultural rights..." *Id.*

710.   The Nuremberg Code principles are incorporated into treaty. "[N]o one shall be subjected without his free consent to medical or scientific experimentation." ICCPR Art. 7. *Id.*

711.   "No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law." ICCPR Art. 9. *Id.*

712.   There is no law enacted by Congress that authorizes the defendants to require  airline passengers to wear masks, nor is there a law enacted by Congress allowing airlines to discriminate against the disabled. In fact, the ACAA prohibits such discrimination. 49 USC § 41705.

713.   "International human rights law does not recognize a 'right to transportation' per se. Rather, it guarantees the right to liberty of movement, which is elaborated in Article 12 of the International Covenant on Civil and Political Rights," according to NCD. Ex. 506.

714.   "1. Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement ... 2. Everyone shall be free to leave

any country, including his own. 3. The above-mentioned rights shall not be subject to any restrictions except those which are provided by law... 4. No one shall be arbitrarily deprived of the right to enter his own country." ICCPR Art. 12. Ex. 486.

715.   By banning the disabled from flying, the defendants violate our rights under international law to liberty of movement, freedom to leave any country, and ability to enter our own country. Congress has not passed any law allowing the defendants to restrict a person's movement based on their inability (or unwillingness) to impede their breathing.

716.   "1. No one shall be subjected to arbitrary or unlawful interference with his privacy ... 2. Everyone has the right to the protection of the law against such interference or attacks." ICCPR Art. 17. *Id.*

717.   The defendants' onerous requirements for the disabled to obtain a mask exemption arbitrarily and unlawfully interfere with our privacy by forcing us to disclose sensitive medical information to airline employees who are not our physicians. We have a right under international law for this Court to protect us against such interference and attacks on our privacy.

718.   **UNIVERSAL DECLARATION OF HUMAN RIGHTS:** The defendants' conspiracy to exclude the disabled from flying violates the Universal Declaration of Human Rights.

719.   "All human beings are born free and equal in dignity and rights. ... Everyone is entitled to all the rights and freedoms set forth in this Declaration, without

distinction of any kind ... Everyone has the right to life, liberty and the security of person. ... All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination." Ex. 488.

720. "No one shall be subjected to arbitrary interference with his privacy ... Everyone has the right to the protection of the law against such interference or attacks. ... Everyone has the right to freedom of movement and residence within the borders of each State. Everyone has the right to leave any country, including his own, and to return to his country." *Id.*

721. "No one shall be arbitrarily deprived of his property," such as airline tickets in breach of contract. *Id.*

722. **CONVENTION ON INTERNATIONAL CIVIL AVIATION:** The United States ratified the Convention on International Civil Aviation ("CICA") on Aug. 9, 1946. Ex. 489. This treaty is also known as the "Chicago Convention."

723. "Each contracting State undertakes to collaborate in securing the highest practicable degree of uniformity in regulations, standards, procedures, and organization in relation to aircraft, personnel, airways and auxiliary services in all matters in which such uniformity will facilitate and improve air navigation. To this end the International Civil Aviation Organization shall adopt and amend from time to time, as may be necessary procedures dealing with: ... such other matters concerned with the safety, regularity, and efficiency of air navigation as

may from time to time appear appropriate." CICA Art. 37. Ex. 490.

724. "Any State which finds it impracticable to comply in all respects with any such international standard or procedure, or to bring its own regulations or practices into full accord with any international standard or procedure after amendment of the latter, or which deems it necessary to adopt regulations or practices differing in any particular respect from those established by an international standard, shall give immediate notification to the International Civil Aviation Organization of the differences between its own practice and that established by the international standard." CICA Art. 38. *Id.*

725. The International Civil Aviation Organization ("ICAO") "shall enjoy in the territory of each contracting State such legal capacity as may be necessary for the performance of its functions. Full judicial personality shall be granted wherever compatible with the constitution and laws of the State concerned." CICA Art. 47. *Id.*

726. Pursuant to CICA Art. 37, "ICAO has adopted, *inter alia*, Annex 9 – Facilitation to the Chicago Convention, which contains provisions on facilitation of air transport, namely Standards and Recommended Practices (SARPS), including provisions on facilitation of the transport of passengers requiring special assistance." Ex. 491.

727. "The Standards require that all airport facilities and services are adapted to the needs of persons with disabilities and that persons with disabilities have adequate access to air services." *Id.*

728.   The 15th Edition of Annex 9 to CICA became effective Oct. 23, 2017, and became applicable Feb. 23, 2018. *Id.*

729.   Plaintiffs have found no evidence that the United States has given notification to ICAO that is practices differ from that established by the international standard pursuant to CICA Art. 38. Therefore, plaintiffs assert Annex 9 to CICA is binding in this country as part of the treaty.

730.   Standards and Recommended Practices adopted by ICAO are defined in CICA Annex 9 as: "Standard: Any specification, the uniform observance of which has been recognized as practicable and as necessary to facilitate and improve some aspect of international air navigation, which has been adopted by the  Council pursuant to Article 54 (l) of the Convention, and in respect of which non-compliance must be notified by Contracting States to the Council in accordance with Article 38." *Id.*

731.   "Recommended Practice: Any specification, the observance of which has been recognized as generally practicable and as highly desirable to facilitate and improve some aspect of international air navigation, which has been adopted by the Council pursuant to Article 54 (l) of the Convention, and to which Contracting States will endeavor to conform in accordance with the Convention." *Id.*

732.   Annex 9 defines "person with disabilities" as "Any person whose mobility is reduced due to a physical incapacity (sensory or locomotor), an intellectual deficiency, age, illness, or any other cause of disability when using transport and

whose situation needs special attention and the adaptation to the person's needs of the services made available to all passengers." *Id*.

733. "Contracting States shall take the necessary steps to ensure that persons with disabilities have equivalent access to air services." CICA Annex 9 § 8.34. *Id*.

734. "[P]ersons with disabilities should be permitted to travel without the requirement for a medical clearance. Aircraft operators should only be permitted to require persons with disabilities to obtain a medical clearance in cases of a medical condition where it is not clear that they are fit to travel and could compromise their safety or well-being or that of other passengers." CICA Annex 9 § 8.39. *Id*.

735. **CONVENTION ON THE RIGHTS OF PERSONS WITH DISABILITIES:** The United States signed the Convention on the Rights of Persons with Disabilities ("CRPD") July 30, 2009, but it has not been ratified by the Senate. Ex. 503.

736. However, most the world has ratified this treaty. There are 184 nations and territories that have ratified CRPD – including most nations and dependencies the Defendant Airlines fly to from the United States and reverse, subjecting them to CRPD on nearly all of their international service. *Id*.

737. Parties to CRPD include Germany, where Lead Plaintiff & Class Representative Lucas Wall has been banned from flying to by the defendants; Israel, where Plaintiffs Uri and Yvonne Marcus reside; and Italy, where proposed Disabled

Class member Rossana Caponetto was discriminated against by Defendant Delta and refused her international right to board a flight to her own country. *Id.*

738.   CRPD reaffirms "the universality, indivisibility, interdependence, and inter-relatedness of all human rights and fundamental freedoms and the need for persons with disabilities to be guaranteed their full enjoyment without discrimination... disability results from the interaction between persons with, impairments and attitudinal and environmental barriers that hinders their full and effective participation in society on an equal basis with others," Ex. 504.

739.   "[D]iscrimination against any person on the basis of disability is a violation of the inherent dignity and worth of the human person... persons with disabilities continue to face barriers in their participation as equal members of society and violations of their human rights in all parts of the world... the valued existing and potential contributions made by persons with disabilities to the overall well-being and diversity of their communities, and that the promotion of the full enjoyment by persons with disabilities of their human rights and fundamental freedoms and of full participation by persons with disabilities will result in their enhanced sense of belonging and in significant advances in the human, social and economic development of society..." *Id.*

740.   CRPD recognizes "the importance for persons with disabilities of their individual autonomy and independence, including the freedom to make their own

choices ... that persons with disabilities should have the opportunity to be actively involved in decision-making processes about policies and programs, including those directly concerning them ... observance of applicable human rights instruments are indispensable for the full protection of persons with disabilities ... a comprehensive and integral international convention to promote and protect the rights and dignity of persons with disabilities will make a significant contribution to redressing the profound social disadvantage of persons with disabilities and promote their participation in the civil, political, economic, social and cultural spheres with equal opportunities..." *Id.*

741.   "The purpose of the present Convention is to promote, protect, and ensure the full and equal enjoyment of all human rights and fundamental freedoms by all persons with disabilities, and to promote respect for their inherent dignity. Persons with disabilities include those who have long-term physical, mental, intellectual or sensory impairments which in interaction with various barriers may hinder their full and effective participation in society on an equal basis with others." CRPD Art. 1. *Id.*

742.   "'Discrimination on the basis of disability' means any distinction, exclusion or restriction on the basis of disability which has the purpose or effect of impairing or nullifying the recognition, enjoyment or exercise, on an equal basis with others, of all human rights and fundamental freedoms in the political, economic, social, cultural, civil or any other field. It includes all forms of discrimi-

nation, including denial of reasonable accommodation; 'Reasonable accommodation' means necessary and appropriate modification and adjustments not imposing a disproportionate or undue burden, where needed in a particular case, to ensure to persons with disabilities the enjoyment or exercise on an equal basis with others of all human rights and fundamental freedoms…" CRPD Art. 2. *Id.*

743.   "The principles of the present Convention shall be: (a) Respect for inherent dignity, individual autonomy including the freedom to make one's own choices, and independence of persons; (b) Non-discrimination; (c) Full and effective participation and inclusion in society; (d) Respect for difference and acceptance of persons with disabilities as part of human diversity and humanity; (e) Equality of opportunity…" CRPD Art. 3. *Id.*

744.   All corporations operating in member nations and territories should "undertake to ensure and promote the full realization of all human rights and fundamental freedoms for all persons with disabilities without discrimination of any kind on the basis of disability." CRPD Art. 4. *Id.*

745.   "[A]ll persons are equal before and under the law and are entitled without any discrimination to the equal protection and equal benefit of the law. … shall prohibit all discrimination on the basis of disability and guarantee to persons with disabilities equal and effective legal protection against discrimination on all grounds." CRPD Art. 5. *Id.*

746.   All parties "shall take appropriate measures to ensure persons with disabilities access, on an equal basis with others, to the physical environment, to transportation…" CRPD Art. 9. *Id.*

747.   "[P]ersons with disabilities enjoy legal capacity on an equal basis with others in all aspects of life." All parties "shall ensure that persons with disabilities are not arbitrarily deprived of their property" such as airline tickets. CRPD Art. 12. *Id.*

748.   "[P]ersons with disabilities, on an equal basis with others [shall]: (a) Enjoy the right to liberty and security of person; (b) [not be] deprived of their liberty unlawfully or arbitrarily, and that any deprivation of liberty is in conformity with the law, and that the existence of a disability shall in no case justify a deprivation of liberty." CRPD Art. 14. *Id.*

749.   No disabled person "shall be subjected without his or her free consent to medical or scientific experimentation." CRPD Art. 15. *Id.*

750.   "Every person with disabilities has a right to respect for his or her physical and mental integrity on an equal basis with others." CRPD Art. 17. *Id.*

751.   All parties "shall recognize the rights of persons with disabilities to liberty of movement … on an equal basis with others, including by ensuring that persons with disabilities: … (c) Are free to leave any country, including their own; (d) Are not deprived, arbitrarily or on the basis of disability, of the right to enter their own country." CRPD Art. 18. *Id.*

752.   "No person with disabilities, regardless of place of residence or living ar-

rangements, shall be subjected to arbitrary or unlawful interference with his or

her privacy..." CRPD Art. 22. *Id.*

## VIII. CAUSES OF ACTION

## Count 1: Conspiracy to Interfere with Civil Rights.

753.   For this and all other causes of action, plaintiffs reallege and incorporate by

reference the allegations and facts contained in Sections I-VIII and all 525 ex-

hibits attached hereto as though set forth fully herein.

754.   The defendants conspired to deprive disabled Americans, a protected class,

of their civil rights by adopting policies in Summer 2020 that banned anyone

medically unable to wear a face mask from using the nation's air-transportation

system.

755.   After the FTMM took effect Feb. 1, 2021, the defendants continued to con-

spire against disabled Americans by making mask exemptions impossible to

obtain by requiring applicants to jump through numerous illegal hoops.

756.   The defendants' conspiracy continues today as tens of millions of disabled

Americans are banned from their statutory right to use the nation's airspace

solely because of their disability that precludes them from safely wearing a

mask.

757.   "If two or more persons in any State or Territory conspire ... for the purpose

of depriving, either directly or indirectly, any person or class of persons of the

equal protection of the laws, or of equal privileges and immunities under the laws... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 USC § 1985(3).

758.   The essential elements of a § 1985 claim are: 1) a conspiracy; 2) to deprive plaintiffs of equal protection or equal privileges and immunities; 3) an act in furtherance of the conspiracy; and 4) an injury or deprivation resulting therefrom. Plaintiffs and proposed class members meet all four elements.

759.   Plaintiffs expect to prove through discovery that the defendants conspired to ban disabled flyers because of a discriminatory motive. The conspiracy was not driven by public-health considerations since masks are totally worthless in reducing the transmission of respiratory viruses such as COVID-19 and harm human health. Ex. 200. Rather the defendants were motivated by a class-based, invidiously discriminatory animus resulting in an unfounded, ridiculous fear that healthy, uninfected people who can't wear a face mask were somehow a grave danger.

760.   The conspiracy applies to both intercorporate and intracorporate actions. The 11th Circuit permits claims for intracorporate conspiracy in the civil rights

area. "[W]here civil rights are at issue discrimination by an individual business is no less harmful than discrimination by multiple businesses nor does internal discrimination confer any benefit on society." *McAndrew v. Blackwell*, No. 97-8483 (June 18, 1999).

761.   Therefore, all defendants are liable to the Named Plaintiffs and members of the proposed Disabled Class for conspiring to interfere with our civil rights.

## Count 2: Neglecting to Prevent Interference with Civil Rights.

762.   Defendants Numerous Unnamed Executives of the 7 Airlines (whose names will be obtained during discovery) were aware of the conspiracy to interfere with the civil rights of the disabled by banning us from all flights but did nothing to stop it.

763.   These Individual Defendants possess the power to stop the conspiracy today but have not taken any action to do so. This claim is thus ongoing and the one-year statute of limitations does not apply.

764.   "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number

of persons guilty of such wrongful neglect or refusal may be joined as defend-ants in the action…" 42 USC § 1986.

765.   Section 1986 creates a remedy against persons whose acquiescence make conspiracies to interfere with civil rights possible.

766.   "Designed to provide private remedies to individuals deprived of their civil rights, these statutes were written in general terms that have been interpreted broadly to protect individuals from a wide range of discriminatory conduct," according to CRS. Ex. 517.

767.   Therefore, all to-be-named Individual Defendants are personally liable to all Named Plaintiffs and the proposed Disabled Class for neglecting to prevent in-terference with our civil rights.

## Count 3: Violation of the Rehabilitation Act.

768.   All Defendant Airlines accepted federal financial last year as part of the CARES Act, subjecting them to the Rehabilitation Act.

769.   Recipients of federal funds are prohibited from discriminating against the disabled. The defendants have banned from their aircraft all passengers with medical conditions that prohibit them from safely covering their face.

770.   "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any pro-gram or activity receiving Federal financial assistance…" 29 USC § 794(a).

771.   "[T]he term 'program or activity' means all of the operations of … an entire corporation, partnership, or other private organization, or an entire sole proprietorship — (i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole…" 29 USC § 794(b).

772.   "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq*.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title." 29 USC § 794a(2).

773.   A recipient of federal funds is subject to suit for compensatory damages, which traditionally includes damages for both pecuniary and nonpecuniary injuries. Examples of nonpecuniary damages include pain and suffering, emotional trauma/distress, deprivation of constitutional and legal rights, and diminished quality of life – all of which the Named Plaintiffs and proposed Disabled Class members have suffered because of the defendants' conduct.

774.   Therefore, all Airline Defendants are liable to all Named Plaintiffs and the proposed Disabled Class for violating the Rehabilitation Act.

## Count 4: Violation of Federal Law: Refusing to Provide Mask Exemptions.

775.   All Airline Defendants have since Summer 2020 illegally discriminated against disabled passengers with medical conditions who seek exemptions from

mask requirements. They first banned all disabled flyers entirely, then modified their policies in February/March 2021 to supposedly permit exceptions but make it impossible to obtain them.

776.  "In providing air transportation, an air carrier … may not discriminate against an otherwise qualified individual on the following grounds: (1) the individual has a physical or mental impairment that substantially limits one or more major life activities. (2) the individual has a record of such an impairment. (3) the individual is regarded as having such an impairment." 49 USC § 41705(a).

777.  A private right of action exists under the ACAA for numerous reasons. According to the U.S. Department of Justice, "people may enforce rights under the Air Carrier Access Act by filing a complaint with the U.S. Department of Transportation, or by bringing a lawsuit in Federal court." Ex. 518.

778.  Defendant Alaska was held liable for $3.2 million in a February 2021 verdict in Washington state under the ACAA. Exs. 519 & 520. The Court must also find Alaska and the other defendants liable in the case at bar.

779.  The Cause of Action codes table issued April 25, 2021, by the Administrative Office of the U.S. Courts includes a code for a private action under the ACAA: "49:41705 Air Carrier Access Act (discrimination against handicapped individuals)." Ex. 521.

780.  The Eighth Circuit is among those that recognize a private right of action under the ACAA.

781.   "Case law has established that a plaintiff has a private right of action for ACAA violations," according to NCD. Ex. 434.

782.   Even if this Court determines that in normal circumstances, there is not a right of private action for the disabled to enforce the ACAA, none of the prior caselaw cited by the Airline Defendants in their recent Motions to Dismiss is relevant to the case at bar because never before has DOT put out a Notice of Enforcement Policy (Ex. 149) telling airlines they may violate the law. This creates an issue of first impression, which the Court must resolve by deciding a private right of action exists when the administrative agency tasked with enforcing a statute blatantly abdicates its legal duty by telling the companies it regulates that they don't have to obey the law.

783.   Congress passes civil-rights laws to protect classes of people subject to discrimination – including the disabled. If the executive department tasked with enforcing the statute neglects its duty, Congress intends for those illegally discriminated against to have a remedy – and in this case, the only remedy is a private lawsuit.

784.   Even if the Court fails to allow a private right of action under the ACAA, it should enforce the statute and its underlying regulations via the Rehabilitation Act, which has a clearly defined private right to sue for compensatory damages.

785.   Therefore, all Airline Defendants are liable to all Named Plaintiffs and the proposed Disabled Class for violating the Air Carrier Access Act and Rehabilitation Act.

**Count 5: Violation of Federal Regulation: Requiring Passengers Not Known to Have a Communicable Disease to Wear a Face Covering.**

786.   All seven Airline Defendants require passengers who do not have a communicable disease to don a face mask.

787.   The ACAA, 49 USC § 41705, and its accompanying regulations, 14 CFR Part 382, spell out specific procedures for dealing with airline passengers who are ***known*** to have a communicable disease. The defendants' mask policies violate these regulations by assuming that every passenger has a communicable disease such as COVID-19.

788.   Airlines are prohibited from requiring that a passenger wear a face covering or refuse him/her transportation unless they determine that the passenger "has" a communicable disease and poses a "direct threat" to other passengers and the flight crew. 14 CFR § 382.21.

789.   The defendants' rules illegally assume every single traveler is infected with COVID-19, even those who are fully vaccinated and/or have natural immunity. This violates the regulation that "In determining whether an individual poses a direct threat, you must make an individualized assessment." 14 CFR § 382.19(c)(1).

790.   The defendants' mask policies don't provide for making an "individualized assessment" of whether someone is known to have COVID-19 or another communicable disease. They do not use the Do Not Board and Lookout systems to

identify passengers who have tested positive for coronavirus or another communicable disease to prevent them from boarding a flight, using the knowledge from these databases that a person "has" a virus. The defendants instead impose a blanket policy that every single traveler must wear a face covering, even though more than 99% of passengers every day are virus-free.

791.   According to DOT, "If a person who seeks passage **has an infection or disease** that would be transmittable during the normal course of a flight, and that has been deemed so by a federal public health authority knowledgeable about the disease or infection, then the carrier may: … **Impose on the person a condition or requirement not imposed on other passengers (e.g., wearing a mask)**." Ex. 150. (emphasis added). This is the only scenario airlines are permitted to force any passenger to don a face covering.

792.   Therefore, all Airline Defendants are liable to all Named Plaintiffs, the proposed Disabled Class, and the proposed Nondisabled Class for violating the Air Carrier Access Act and Rehabilitation Act.

## Count 6: Violation of Federal Regulation: Banning Passengers for Asserting Their Rights Under the ACAA.

793.   All seven Airline Defendants have illegally retaliated against the Named Plaintiffs and the proposed Disabled Class for asserting their rights under the ACAA, including refusing transportation and placing on no-fly lists.

794.   "You must not take any adverse action against an individual (*e.g.*, refusing to provide transportation) because the individual asserts, on his or her own behalf or through or on behalf of others, rights protected by this part or the Air Carrier Access Act." 14 CFR § 382.11 (a)(4).

795.   Therefore, all Airline Defendants are liable to all Named Plaintiffs and the proposed Disabled Class  for violating the Air Carrier Access Act and Rehabilitation Act.

## Count 7: Violation of Federal Regulation: Requiring Passengers Seeking Mask Exemptions to Do So in Advance.

796.   All seven Airline Defendants require passengers asking for a mask exemption to do so in advance (from hours before departure time in the case of Defendant Delta to 10 days beforehand in the case of Defendant Frontier).

797.   "May a carrier require a passenger with a disability to provide advance notice that he or she is traveling on a flight? As a carrier, ***you must not require a passenger with a disability to provide advance notice of the fact that he or she is traveling on a flight***." 14 CFR § 382.25 (emphasis added).

798.   Therefore, all Airline Defendants are liable to all Named Plaintiffs and the proposed Disabled Class  for violating the Air Carrier Access Act and Rehabilitation Act.

**Count 8: Violation of Federal Regulation: Refusing Transportation Solely on the Basis of a Passenger's Disability.**

799.   All seven Airline Defendants refuse to carrier disabled passengers who can't wear a mask.

800.   "As a carrier, you must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability, except as specifically permitted by this part." 14 CFR § 382.19(a).

801.   Therefore, all Airline Defendants are liable to all Named Plaintiffs and the proposed Disabled Class  for violating the Air Carrier Access Act and Rehabilitation Act.

**Count 9: Violation of Federal Regulation: Requiring a Medical Certificate from Disabled Passengers Who Ask for a Mask Exemption.**

802.   The Airline Defendants require disabled passengers wanting a mask exemption to submit a doctor's letter, also known as a medical certificate. Many impose this for every single flight a person takes, necessitating numerous costly doctor's appointments, especially for those without health insurance.

803.   "Except as provided in this section, ***you must not require a passenger with a disability to have a medical certificate as a condition for being provided transportation***." 14 CFR § 382.23(a) (emphasis added).

804.   "You may ... require a medical certificate for a passenger ***if he or she has a communicable disease or condition that could pose a direct threat to the health or safety of others on the flight***." 14 CFR §

382.23(c)(1) (emphasis added). This requirement does not include ***speculation*** that a person ***might*** have a communicable disease such as COVID-19; evidence is required that the passenger ***has*** a communicable disease, i.e. has tested positive for the coronavirus.

805.   Therefore, all Airline Defendants are liable to all Named Plaintiffs and the proposed Disabled Class  for violating the Air Carrier Access Act and Rehabilitation Act.

## Count 10: Violation of Federal Regulation: Requiring Disabled Passengers Needing a Mask Exemption to Undergo a Medical Screening.

806.   The Airline Defendants – in particular Delta with its "Clearance to Fly" requirement – mandate a disabled passenger needing a mask exception undergo a health screening with a contractor doctor hired by the airline.

807.   Since airlines may not require a medical certificate for a passenger unless he/she has a communicable disease, they may also not require a third-party medical consultation. "As a carrier, you may require that a passenger ***with a medical certificate*** undergo additional medical review by you ***if there is a legitimate medical reason for believing that there has been a significant adverse change in the passenger's condition*** since the issuance of the medical certificate ..." 14 CFR § 382.23(d) (emphasis added).

808.   Therefore, all Airline Defendants are liable to all Named Plaintiffs and the proposed Disabled Class for violating the Air Carrier Access Act and Rehabilitation Act.

**Count 11: Violation of Federal Regulation: Requiring Disabled Passengers Who Seek a Mask Exemption to Submit a Negative COVID-19 Test for Each Flight When Nondisabled Customers Aren't Subject to This Same Requirement.**

809.   All seven Airline Defendants won't grant anyone a mask exemption unless they submit a negative COVID-19 test.

810.   No provision of the ACAA or its accompanying regulations promulgated by DOT (nor any other law enacted by Congress) permits airlines to require passengers submit a negative test for any communicable disease.

811.   Mandating disabled flyers submit an expensive COVID-19 test before checking in but not requiring the same of nondisabled travelers is illegal discrimination. The only legal way airlines could possibly impose a testing requirement is if ALL customers, regardless of disability, were forced to submit virus test results.

812.   "You must not discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air transportation..." 14 CFR § 382.11(a)(1). *See also* 49 USC § 41705.

813.   Therefore, all Airline Defendants are liable to all Named Plaintiffs and the proposed Disabled Class  for violating the Air Carrier Access Act and Rehabilitation Act.

**Count 12: Violation of Federal Regulation: Limiting the Number of Disabled Passengers with Mask Exemptions on a Flight.**

814.   Some of the Airline Defendants refuse to permit more than one mask-exempt passenger per flight, or otherwise restrict the number of exempt customers on each plane.

815.   "As a carrier, you must not limit the number of passengers with a disability who travel on a flight." 14 CFR § 382.17.

816.   Therefore, all Airline Defendants are liable to all Named Plaintiffs and the proposed Disabled Class  for violating the Air Carrier Access Act and Rehabilitation Act.

**Count 13: Violation of Federal Regulation: Banning Mask-Exempt Passengers from Flying if a Plane Is More than a Certain Percentage Full.**

817.   Some of the Airline Defendants refuse to board a disabled passenger if a flight is over a set percentage full.

818.   Defendant Southwest, for example, has a policy that it may change the travel dates of a passenger with a disability if a flight is more than 75% booked. This policy does not apply to any nondisabled travelers.

819.   "As a carrier, you must not limit the number of passengers with a disability who travel on a flight." 14 CFR § 382.17.

820.   "You must not discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air transportation..." 14 CFR § 382.11(a)(1). *See also* 49 USC § 41705.

821.   Therefore, all Airline Defendants are liable to all Named Plaintiffs and the proposed Disabled Class for violating the Air Carrier Access Act and Rehabilitation Act.

## Count 14: Violation of the Federal Regulation: Changing the Seat Assignment of a Mask-Exempt Passenger without His/Her Consent.

822.   Some of the Airline Defendants maintain policies instructing gate agents and/or flight attendants to move a mask-exempt passenger to the back of the aircraft. This should make any American's blood boil, as it's reminiscent of forcing colored people to sit in the back of the bus before passage of the Civil Rights Act of 1964. It shows the clear animus the defendants have for the disabled.

823.   "As a carrier, you must not exclude any passenger with a disability from any seat or require that a passenger with a disability sit in any particular seat, on the basis of disability, except to comply with FAA or applicable foreign government safety requirements." 14 CFR § 382.87(a).

824.   Therefore, all Airline Defendants are liable to all Named Plaintiffs and the proposed Disabled Class for violating the Air Carrier Access Act and Rehabilitation Act.

## Count 15: Violation of Federal Regulation: Forcing a Disabled Passenger to Disclose His/Her Medical Conditions.

825.   All Airline Defendants maintain policies requiring passengers needing a mask exemption to complete paperwork stating their medical conditions.

826.   "May I ask an individual what his or her disability is? Only to determine if a passenger is entitled to a particular seating accommodation pursuant to section 382.38. ***Generally, you may not make inquiries about an individual's disability or the nature or severity of the disability***," according to DOT. Ex. 151 (emphasis added).

827.   Therefore, all Airline Defendants are liable to all Named Plaintiffs and the proposed Disabled Class for violating the Air Carrier Access Act and Rehabilitation Act.

## Count 16: Violation of Federal Regulation: Refusing Transportation to Disabled Passengers Who Are Healthy & Don't Pose a Direct Threat to Anyone.

828.   All seven Airline Defendants refuse to transport a disabled person who can't wear a face mask even when there's no evidence that person is positive for COVID-19 or any other communicable disease.

829.   Even if a passenger were determined to be infected and deemed a direct threat to others, the defendants would still have to use measures other than banning the disabled person from flying.

830.   "If you determine that the passenger does pose a ***direct threat***, you must select the least restrictive response from the point of view of the passenger … For example, ***you must not refuse transportation to the passenger*** if you can protect the health and safety of others by means short of a refusal." 14 CFR § 382.19(c)(2) (emphasis added).

831.   Therefore, all Airline Defendants are liable to all Named Plaintiffs and the proposed Disabled Class  for violating the Air Carrier Access Act and Rehabilitation Act.

## Count 17: Breach of Contract: Forcing Passengers to Wear Masks When They Never Agreed to Do So in the Contract of Carriage.

832.   Five Airline Defendants include no provisions in their contract of carriage mandating that passengers wear face coverings. Two Airline Defendants include legally unenforceable mask provisions.

833.   Forcing passengers to wear a mask constitutes a breach of contract.

834.   This is especially true for the Named Plaintiffs such as the Rarrick family (plus all proposed class members) who booked tickets with no mask provision in the contract of carriage, but were then denied use of their tickets and refused refunds when mask mandates were applied retroactively – or, it seems, never included in the contracts at all. *See, e.g.,* Rarrick Declarations at Exs. 28-30.

835.   A "DOT rule prohibits airlines from changing a term in your contract after you buy your ticket if the change will have a significant negative effect on you." Ex. 522.

836.   "[A] contract of carriage that conflicts with federal laws or regulations may not be enforceable by the airline," according to CRS. Ex. 523.

837.   "Consumers may sue airlines for damages or breach of contract in a state or local court." A "source of airline passengers' rights is each air carrier's 'Contract

of Carriage,' the legal agreement between an airline and its ticket holders. ... Passengers may take legal action in federal courts based on the contracts." *Id.*

838. "A contract of carriage is the agreement between the passenger and the airline that encompasses all contractual rights, liabilities, and duties of the two parties. For example, contracts of carriage include such provisions as airline liability limits for lost baggage and passenger entitlements when flights are delayed or canceled. Any term or condition of this contract is legally binding on the airline and the passenger and may be enforced in state court," according to the Government Accountability Office. Ex. 525.

839. Contracts of carriage must "reflect federal regulations requiring airlines to provide specific services and facilities for passengers with disabilities." *Id.*

840. In this case, if the Court finds federal jurisdiction lacking for our breach-of-contract and tort claims, it should exercise its supplemental jurisdiction pursuant to 28 USC § 1367 to adjudicate all of our state common-law claims as they directly relate to the violations of federal laws, international treaties, and the Constitution.

841. Airline contracts of carriage are subject to applicable laws and regulations imposed by governmental agencies. Such contracts are subject to rules issued by DOT.

842. The Airline Deregulation Act does not pre-empt breach-of-contract claims.

843.   Therefore, all Airline Defendants are liable to all Named Plaintiffs, the proposed Disabled Class, and the proposed Nondisabled Class for breach of contract.

**Count 18: Reckless Endangerment: Forcing Passengers to Wear Masks in Violation of the Food, Drug, & Cosmetic Act that Are Experimental Medical Devices Proven to Harm Human Health.**

844.   All Airline Defendants violate the FDCA by not giving passengers their legal option to refuse administration of an FDA unauthorized or EUA medical device (a face mask). 21 USC § 360bbb-3(e)(1)(A)(ii)(III).  All defendants even provide illegal and/or EUA masks to their passengers without informing them use of the device is optional and they must give informed consent. This constitutes reckless endangerment.

845.   Masks have been shown by the global scientific and medical communities for decades to be ineffective at reducing transmission of respiratory viruses such as COVID-19, yet they cause dozens of harms to human health. Index of Mask Studies & Articles at Ex. 200. It is reckless endangerment for the defendants to require muzzling of passengers when the known risks of oxygen deprivation are severe – especially at high altitude.

846.   Because of this obstructed breathing by forced masking, the defendants have created chaos in the skies with numerous oxygen-starved passengers taking off their masks and being met with hostility and battery by flight attendants and pilots, not to mention other passengers.

847.   Reckless endangerment is a tort consisting of acts that create a risk of physical injury to another person. The accused person isn't required to intend the resulting or potential harm, but must have acted in a way that showed a disregard for the foreseeable consequences of the actions.

848.   The defendants' mask policies endanger the health and safety of their passengers by causing thousands of incidents of customers and flight crews battling over mask enforcement to the detriment of flight safety and security in violation of the terms of their operator certificate issued by the FAA under 49 USC § 44702.

849.   Therefore, all defendants are liable to all Named Plaintiffs, the proposed Disabled Class, and the proposed Nondisabled Class for reckless endangerment.

## Count 19: Battery.

850.   All Airline Defendants have committed the intentional tort of battery, which is defined as the intentional causation of harmful or offensive contact with another's person without that person's consent. For example, Plaintiff Kevin Leonardo McDonnell was subjected to unwanted touching while he slept aboard a Defendant Delta airplane by flight attendants molesting him to put his mask back over his nose. Declaration at Ex. 26.

851.   There are thousands of reports in the media of the Defendant Airlines' employees improperly touching customers who weren't wearing their masks

properly. There are also numerous reports of physical altercations initiated by airline employees with passengers refusing or unable to wear a mask.

852.   Plaintiffs will need discovery to uncover all of the reported incidents of battery by employees of the Defendant Airlines related to mask rules.

853.   The *prima facie* case for battery contains four components: 1) The defendant acts; 2) The defendant intends to cause contact with the victim; 3) The defendant's contact with the victim is harmful or offensive; and 4) The defendant's contact causes the victim to suffer a contact that is harmful or offensive.

854.   Therefore, all defendants are liable to all Named Plaintiffs, the proposed Disabled Class, and the proposed Nondisabled Class for battery.

## Count 20: Invasion of Privacy.

855.   All Airline Defendants require disabled passengers seeking mask exemptions to provide sensitive, intimate details of their medical conditions to airline personnel, sometimes in hearing range of other passengers and workers at busy airport check-in counters and boarding gates.

856.   The law protects people against many types of harms, including harm to one's personal space and private life. Infringing on these interests is known as invasion of privacy. Invasion of privacy has been divided into four distinct categories. Each category covers a different aspect of the right to privacy and personal identity but they are all geared towards protecting the right "to be left alone."

857.   The category at issue here is public disclosure of private facts. Airline pas-
sengers do not have to disclose their private medical history to airline employ-
ees, who are not medical professionals, just to board a flight they bought a ticket
for.

858.   Therefore, all defendants are liable to all Named Plaintiffs and the proposed
Disabled Class for invasion of privacy.

## Count 21: Practicing Medicine without a License.

859.   All defendants prescribe all passengers to wear FDA unauthorized or EUA
medical devices, but none of them have a license to practice medicine.

860.   Practicing medicine without a license is illegal in every state.

861.   A person may freely choose to accept medical risks for the benefit of others;
they cannot be compelled by the defendants. We don't harvest organs without
consent, even if doing so would save many lives. Those who make such sacri-
fices for others must truly be volunteers, not conscripts.

862.   Airline employees have no medical license to order passengers to obstruct
their breathing, causing numerous harms (Ex. 200) to perhaps spare another
customer from catching a virus. Passengers willingly take on the risk of catching
a communicable disease when they buy an airline ticket, knowing they will
squeezed into a metal tube like sardines in a can. If they don't want to take that
risk, they have the option not to fly – but they nor the defendants have a medical

license to demand others suffer to mitigate the fear and anxiety of those para-noid about catching COVID-19.

863.  "Protection of others" does not relieve the defendants from the central canon of medical ethics requiring voluntary and informed consent.

864.  Therefore, all defendants are liable to all Named Plaintiffs, the proposed Dis-abled Class, and the proposed Nondisabled Class for practicing medicine with-out a license.

## Count 22: Intentional Infliction of Emotional Distress.

865.  All Airline Defendants, by banning customers with disabilities from flying, intentionally inflict emotional distress.

866.  Lead Plaintiff & Class Representative Lucas Wall, for example, has a long history of mental illness including Major Depressive Disorder, Bipolar Type 2 Disorder, and Generalized Anxiety Disorder. Mr. Wall's #1 joy in life is traveling across the United States and through foreign nations. He has been denied that pleasure for 15+ months now as a direct result of the defendants' intentional conduct, causing him great anguish and despair. Other Named Plaintiffs and numerous proposed class members similarly are suffering.

867.  Some passengers such as proposed Disabled Class member Rossana Capon-etto have been subjected to the emotional distress of being stranded in a foreign country because the defendants (Delta in her case) refused to let her fly home. Declaration at Ex. 33.

868.   The *prima facie* case of this tort is: 1) The defendant acts; 2) The defendant's conduct is outrageous; 3) The defendant acts for the purpose of causing the victim emotional distress so severe that it could be expected to adversely affect mental health; and 4) The defendant's conduct causes such distress.

869.   Therefore, all defendants are liable to all Named Plaintiffs, the proposed Disabled Class, and the proposed Nondisabled Class for intentional infliction of emotional distress.

## Count 23: Deceptive & Misleading Trade Practices.

870.   All Airline Defendants have deceived their customers regarding masks rules, efficacy, and harms, and have mislead them into believing face coverings are good for their health when the reality is they cause dozens of harm and create havoc in the sky due to oxygen deprivation.

871.   "Intent is not an element of either unfairness or deception," according to DOT. 85 Fed. Reg. 78,707 (Dec. 7, 2020); Ex. 524. However, it's clear the defendants had an intent to deceive passengers that face masks are effective in reducing COVID-19 spared, are authorized by FDA, etc. They clearly mislead customers that masks may be forced passengers without their consent in violation of the FDCA.

872.   DOT defines an unfair trade practice by airlines as "demonstrating that the harm to consumers is (1) substantial; (2) not reasonably avoidable; and (3) not outweighed by offsetting benefits to consumers or competition." *Id*.

873.   DOT defines a practice as "deceptive" by showing that: "(1) The practice actually misleads or is likely to mislead consumers; (2) who are acting reasonably under the circumstances; (3) with respect to a material matter." *Id*.

874.   These requirements are codified at 14 CFR § 399.79.

875.   The airlines have a statutory duty not to deceive and mislead their customers. 49 USC § 41712.

876.   Therefore, all defendants are liable to all Named Plaintiffs, the proposed Disabled Class, and the proposed Nondisabled Class for deceptive and misleading trade practices.

## Count 24: Fraudulent Misrepresentation.

877.   All Airline Defendants provide FDA unauthorized or EUA face masks without disclosing that: 1) the masks (if authorized at all) are only designated for emergency use; 2) that there are "significant known and potential benefits and risks of such use" (or "the extent to which such benefits and risks are unknown"); or 3) flyers have the "option to accept or refuse administration of the product."

878.   All Airline Defendants have falsely represented on their websites, in e-mails to passengers, signage at airports, etc. that "federal law" requires airline passengers wear face masks. But Congress has never enacted such a law. This is a fraudulent misrepresentation of the law.

879.   The defendants also haven't told their passengers of the dozens of health risks of covering their sources of oxygen or that the scientific consensus is that masks are totally worthless in reducing COVID-19 spread. Ex. 200.

880.   Failing to disclose this information pursuant to the FDCA and the defendant's other legal obligations is a fraudulent misrepresentation.

881.   This tort consists of: 1) There was a material representation made that was false; 2) The person who made the representation knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; 3) The person who made the representation intended to induce another to act upon the representation; and 4) The person to whom the material representation was made actually and justifiably relied on the representation, which caused the injury.

882.   Therefore, all defendants are liable to all Named Plaintiffs, the proposed Disabled Class, and the proposed Nondisabled Class for fraudulent misrepresentation.

**Count 25: False Imprisonment.**

883.   All Airline Defendants have vigorously and excessively enforced their illegal mask mandates, going so far as to return aircrafts to gates when a passenger takes off his/her mask and even in some instances diverting planes in flight. The passengers exercising their FDCA right to refuse administration of an FDA

unauthorized or EUA medical device are then threatened with arrest by the defendants when they haven't done anything wrong.

884. The tort of false imprisonment occurs when a defendant willfully acts intending to confine a person without the person's consent and without authority of law. The defendant's act causes the person's confinement.

885. Therefore, all defendants are liable to all Named Plaintiffs, the proposed Disabled Class, and the proposed Nondisabled Class for false imprisonment.

## Count 26: Nuisance.

886. All Airline Defendants deprive disabled passengers who can't wear masks of their constitutional right to travel and their statutory right to use the public airspace.

887. A public nuisance is when a person unreasonably interferes with a right that the general public shares in common.

888. Therefore, all defendants are liable to all Named Plaintiffs and the proposed Disabled Class for nuisance.

## Count 27: Infringement on the Constitutional Right to Travel.

889. All Airline Defendants deprive disabled Americans and those who refuse to wear masks for health reasons of the ability to fly.

890. In many cases, such as traveling from noncontinental states and territories to other states and territories, as well as going overseas, commercial airplanes are the only means of transportation.

891.   The Constitution protects against Americans' infringement on our freedom of movement by government actors and common carriers.

892.   Therefore, all defendants are liable to all Named Plaintiffs, the proposed Disabled Class, and the proposed Nondisabled Class for infringement on the constitutional right of freedom of movement.

## Count 28: Violation of International Law: International Covenant on Civil & Political Rights.

893.   All Airline Defendants require passengers to wear masks without giving his/her free consent, deprive them of their freedom to travel for not wanting to obstruct their breathing, curtail the liberty of movement, prevent them from entering or exiting their country of citizenship, and unlawfully interfere with their privacy.

894.   The United States has ratified the International Covenant on Civil & Political Rights, which makes it binding treaty law upon all persons and corporations in our country.

895.   "[N]o one shall be subjected without his free consent to medical or scientific experimentation." ICCPR Art. 7.

896.   "No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law." ICCPR Art. 9.

897.   "1. Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement ... 2. Everyone shall be free to leave

any country, including his own. 3. The above-mentioned rights shall not be subject to any restrictions except those which are provided by law... 4. No one shall be arbitrarily deprived of the right to enter his own country." ICCPR Art. 12.

898.   "1. No one shall be subjected to arbitrary or unlawful interference with his privacy ... 2. Everyone has the right to the protection of the law against such interference or attacks." ICCPR Art. 17.

899.   Therefore, all defendants are liable to all Named Plaintiffs, the proposed Disabled Class, and the proposed Nondisabled Class for violating ICCPR.

## Count 29: Violation of International Law: Convention on International Civil Aviation.

900.   All Airline Defendants require passengers with disabilities needing a mask exemption to submit a medical clearance.

901.   The United States has ratified the Convention on International Civil Aviation, which makes it binding treaty law upon all persons and corporations in our country.

902.   "[P]ersons with disabilities should be permitted to travel without the requirement for a medical clearance. Aircraft operators should only be permitted to require persons with disabilities to obtain a medical clearance in cases of a medical condition where it is not clear that they are fit to travel and could compromise their safety or well-being or that of other passengers." CICA Annex 9 § 8.39.

903.   Therefore, all defendants are liable to all Named Plaintiffs and the proposed Disabled Class for violating CICA.

## Count 30: Violation of International Law: Convention on the Rights of Persons with Disabilities.

904.   All Airline Defendants discriminate on the basis of disability, deny persons with disabilities equal access to transportation services, mandate the use of un-approved experimental medical devices without free consent, deprive them of liberty movement, forbid them from entering or exiting their nation of citizen-ship, and subject them to arbitrary or unlawful interference with their privacy.

905.   The United States has signed the Convention on the Rights of Persons with Disabilities, but the Senate hasn't ratified it. That means CRPD isn't enforceable on domestic flights, but it is binding treaty law upon all U.S.-flagged airlines flying to the 188 nations and territories who have ratified the treaty. Plaintiffs believe all Airline Defendants operate substantial numbers of flights to CRPD party countries.

906.   All corporations doing business in member nations and territories should "under-take to ensure and promote the full realization of all human rights and fundamental freedoms for all persons with disabilities without discrimination of any kind on the basis of disability." CRPD Art. 4.

907.   All parties "shall take appropriate measures to ensure to persons with disa-bilities access, on an equal basis with others, to the physical environment, to transportation…" CRPD Art. 9.

908.   No disabled person "shall be subjected without his or her free consent to medical or scientific experimentation." CRPD Art. 15.

909.   All parties "shall recognize the rights of persons with disabilities to liberty of movement ... on an equal basis with others, including by ensuring that persons with disabilities: ... (c) Are free to leave any country, including their own; (d) Are not deprived, arbitrarily or on the basis of disability, of the right to enter their own country." CRPD Art. 18.

910.   "No person with disabilities, regardless of place of residence or living arrangements, shall be subjected to arbitrary or unlawful interference with his or her privacy..." CRPD Art. 22.

911.   Therefore, all defendants are liable to all Named Plaintiffs and the proposed Disabled Class for violating CRPD on international flights to/from countries and territories that have ratified the treaty.

## IX. PRAYER FOR RELIEF

WHEREFORE, the plaintiffs, on behalf of themselves and all others similarly situated, request this Court grant the following relief:

A.   Declare that DOT has failed its statutory obligation to enforce the ACAA, thereby creating a private right of action in this Court for us to enforce the anti-discrimination law as Congress intended.

B.   Declare that the defendants have violated the ACAA and its underlying regulations by requiring advance notice by customers with disabilities seeking

a mask exemption and imposing unauthorized requirements including obtaining mandatory COVID-19 testing (even for fully vaccinated and/or naturally immune travelers), medical certificates, and third-party medical consultations, among others.

C.  Issue a permanent injunction prohibiting all defendants from requiring advance notice, medical certificates, third-party medical consultations, COVID-19 testing, and other illegal actions from any passenger asserting a mask exemption because of a medical condition unless that person is known to have a communicable disease such as COVID-19 by information showing the person has tested positive for the coronavirus in the last two weeks or the person presents with a fever of more than 100.4°F.

D.  Declare that the defendants have violated the ACAA and its underlying regulations by discriminating against passengers with mask exemptions by making them take a later flight because their ticketed flight is too full and/or has other mask-exemption customers on board.

E.  Issue a permanent injunction prohibiting all defendants from forcing mask-exempt passengers to take a later flight because their ticketed flight is above a certain percentage full and/or has other mask-exempt customers on board.

F.  Declare that the defendants have violated the ACAA and its underlying regulations by permitting their employees to move a mask-exempt passenger to the back of the aircraft.

G. Issue a permanent injunction prohibiting all defendants from forcing any mask-exempt passenger from sitting in any seat other than the one that person selected in advance or was assigned at check-in.

H. Award each Named Plaintiff and proposed class member as compensatory and punitive damages for all causes of action in the amount of $100,000 per Airline Defendant and $10,000 per Individual Defendant.

I. Declare that the defendants have violated the ACAA and its underlying regulations by requiring customers not known to be infected with a communicable disease wear a face mask.

J. Issue a permanent injunction prohibiting all defendants from forcing any passenger not known to be infected with a communicable disease to cover their face.

K. Declare that the defendants' mask mandates violate the Food, Drug, & Cosmetic Act.

L. Issue a permanent injunction prohibiting all defendants from forcing any passenger to use an FDA unauthorized or EUA medical device such a face mask without written informed consent and the option to refuse.

M. Issue a permanent injunction prohibiting all defendants from creating and enforcing any future rules putting in place any requirement that any passenger cover his/her face unless the person is known to be infected with a communicable disease as alerted by the government's Do Not Board and Lookout systems or other public-health authority.

N. Award plaintiffs all costs and attorneys' fees (if we later hire an attorney to represent us in this lawsuit) pursuant to any applicable statute or authority; or, if we elect to continue proceeding *pro se*, an award of all costs and fees to us in lieu of an attorney for the time we have spent litigating this matter at the rate of $50 per hour. Costs and fees are specifically authorized by 29 USC § 794a and 42 USC § 1988.

O. Grant other declaratory and injunctive relief as may be necessary to ensure that all defendants comply with the Air Carrier Access Act; Rehabilitation Act; Food, Drug, & Cosmetic Act; their legal duty to ensure the health and safety of their passengers; international law; and the Constitution.

P. Grant such other and further relief as the Court may deem just and proper under the circumstances.

**Certification:** Under F.R.Civ.P. 11, by signing below, we certify to the best of our knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully submitted this 13th day of September 2021.

*Lucas Wall*

Lucas Wall, lead plaintiff and class representative
435 10th St., NE
Washington, DC 20002
Telephone: 202-351-1735
E-Mail: Lucas.Wall@yahoo.com


*Aaron Abadi*

Aaron Abadi, plaintiff
Apt. 140
82 Nassau St.
New York, NY 10038
Telephone: 516-639-4100
E-Mail: aa@neg.com


*Kleanthis Andreadakis*

Kleanthis Andreadakis, plaintiff
5108 Hunters Meadow Pl.
Henrico, VA 23231
Telephone: 804-988-1402
E-Mail: mrradioactive@protonmail.com


*Eric Cila*

Eric Cila, plaintiff
8807 Avondale Ct.
Louisville, KY 40299
Telephone: 319-795-5552
E-Mail: ericlcila@yahoo.com


*Shannon Greer Cila*

Shannon Greer Cila, plaintiff
Telephone: 319-795-5552
8807 Avondale Ct.
Louisville, KY 40299
E-Mail: shannonrgreer@yahoo.com

## *Anthony Eades*

Anthony Eades, plaintiff
19499 Cedar Gate Dr.
Warsaw, MO 65355
Telephone: 813-786-8960
E-Mail: teades2603@live.com

## *Uri Marcus*

Uri Marcus, plaintiff
P.O. Box 126
Ojai, CA  93024
Telephone: 909-833-0065
E-Mail: uri@ntcf.org

## *Yvonne Marcus*

Yvonne Marcus, plaintiff
P.O. Box 126
Ojai, CA  93024
Telephone: 909-833-0065
E-Mail: adi@ntcf.org

## *Kevin Leonardo McDonnell*

Kevin Leonardo McDonnell, plaintiff
P.O. Box 1113
Melbourne, FL 32902
Telephone: 305-416-8024
E-Mail: Leo_McDonnell@icloud.com

## *Peter Menage*

Peter Menage, plaintiff
3255 N. Mars Ave.
Palmer, AK 99645
Telephone: 907-715-1205
E-Mail: pmenage@googlemail.com

*Connie Rarrick*

Connie Rarrick, plaintiff
36 Lafayette St.
Saco, ME 04072
Telephone: 207-423-2479
E-Mail: connierarrick@yahoo.com

*Jared Rarrick*

Jared Rarrick, plaintiff
36 Lafayette St.
Saco, ME 04072
Telephone: 207-423-2479
E-Mail: pastor@anchor-baptist.com

*Jennifer Rarrick*

Jennifer Rarrick, plaintiff
36 Lafayette St.
Saco, ME 04072
Telephone: 207-423-2479
E-Mail: jenniferrarrick@gmail.com