Plaintiff's Exhibit 151

# What Airline Employees, Airline Contractors, and Air Travelers with Disabilities Need to Know About Access to Air Travel for Persons with Disabilities

### *A Guide to the Air Carrier Access Act (ACAA) and its implementing regulations, 14 CFR Part 382 (Part 382)*

# Chapter 1:  Understanding How to Use this Manual

**A.  Introduction**
**B.  Background**
**C.  Keyword Definitions**

**A.  Introduction**

<u>*Purpose of the Manual*</u>

This manual is a guide to the Air Carrier Access Act (ACAA) and its implementing regulations, 14 CFR part 382 (part 382).  It is designed to serve as a brief but authoritative source of information about the services, facilities, and accommodations required by the ACAA and the provisions of part 382.  The manual does not expand air carriers' legal obligations or establish new requirements under the law.   It contains suggested practices and procedures for carriers to use on a voluntary basis to implement Part 382.

The primary purpose of the manual is to help you, employees/contractors of air carriers and employees/contractors of indirect air carriers that provide services or facilities to passengers with disabilities, to assist those passengers in accordance with the law.  Knowing your legal responsibilities will help ensure consistent compliance with the law and protect the civil rights of air travelers with disabilities when providing services, facilities, and accommodations to them.

Throughout the manual, rather than talking about air carriers' or indirect air carriers' employees/contractors such as yourself in the third person, the word "you" is used.  In most instances, the word "you" refers to personnel who deal directly with the traveling

1

public.  Moreover, the obligations and responsibilities under the law as set forth in the manual must be read within the context of each specific employee's duties on the job.

A second purpose of this manual is to offer air travelers with disabilities information about their rights under the ACAA and the provisions of part 382.  Accordingly, in addition to the other useful information in this manual, Appendix I contains a list of "Tips for Air Travelers with Disabilities" to help ensure a smooth and comfortable trip.  In addition, Appendix III provides a list of "Frequently Asked Questions" and answers and Appendix IV contains a list of "Recent DOT Enforcement Orders Related to the ACAA." These DOT enforcement orders are useful because they provide examples in which DOT has interpreted some of the provisions of the ACAA and part 382 under particular circumstances.

**B.  Background**

*U.S. Air Carriers*

In 1986, Congress passed the ACAA, which prohibits discrimination by U.S. air carriers against qualified individuals with disabilities.  49 U.S.C. 41705.  In 1990, the Department of Transportation (DOT) issued part 382, the regulations defining the rights of passengers with disabilities and the obligations of U.S. air carriers under the ACAA.  Since then, these regulations have been amended a number of times.  DOT has also issued guidance to air carriers on the ACAA and part 382 in a variety of ways:  preambles to regulatory amendments, industry letters, correspondence with individual carriers or complainants, enforcement actions, website postings, and informal conversations with the public and air carriers.

*Foreign Air Carriers*

On April 5, 2000, the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21"; Pub. L. 106-181) amended the ACAA to cover foreign air carriers. Although a final rule modifying part 382 to cover foreign air carriers has not yet been issued, in May 2000 DOT's Office of the Assistant General Counsel for Aviation Enforcement and Proceedings (Enforcement Office) issued a notice informing the public of its intent to use the provisions of part 382 as guidance in investigating any complaints of non-compliance with the ACAA by foreign carriers. In addition, in July 2003 DOT amended part 382 by adding a new section, 382.70, that requires both U.S. carriers and foreign carriers to record and report to DOT on written disability-related complaints that they receive. At the present time, section 382.70 is the only provision of part 382 that specifically states that it applies to foreign carriers. Finally, a notice of proposed rulemaking (NPRM) proposing to extend the other provisions of part 382 to foreign carriers was published on November 4, 2004. Therefore, while the majority of this manual does not expressly apply to foreign carriers, they should look to this document and part 382 in satisfying their general nondiscrimination obligations under AIR-21 and DOT's May 2000 guidance.

*Development of Technical Assistance Manual*

In 2000, Congress required DOT to create a technical assistance manual to provide guidance to individuals and entities with rights or responsibilities under the ACAA. This manual responds to that mandate. In creating this manual, DOT held meetings with representatives from the disability community, air carriers, and organizations that contract with air carriers to provide disability-related services. Those who attended the

meetings made suggestions for this manual.  All of these suggestions have been thoroughly considered by DOT and incorporated where appropriate.

*ACCESS*

A step-by-step process for resolving issues involving passengers with disabilities appears later in this manual.  Whether the issue is a matter of law, customer service, or both, the ACCESS checklist will be useful in identifying the needs of passengers with disabilities and determining what accommodations the air carriers are required to provide as a matter of law.  *See* Chapter 6, section B.

**How to use this Manual**

This manual is structured in the same sequence as the steps a passenger would encounter on a trip, *i.e.*, requirements concerning

- planning a flight,

- the airport experience,

- enplaning, deplaning, and making connections,

- services during a flight, and

- responding to disability-related complaints.

This manual contains the following tools to assist you in quickly and easily finding the answer to your questions:

- A Table of Contents at the beginning of the manual;

- An Alphabetical Index at the back of the manual; and

- A part 382 Index listing the citations to part 382 at the back of the manual.

4

Also, the following appendices appear at the end of the manual:

- Appendix I:  "Tips for Air Travelers with Disabilities" as they relate to the most commonly-used accommodations, facilities, and services that carriers are required to make available to such passengers;

- Appendix II:  a list of concerns applicable mainly to air carrier management, as opposed to frontline customer service personnel;

- Appendix III:  a list of "Frequently Asked Questions" and answers;

- Appendix IV:  a list of "Recent DOT Enforcement Orders Related to the ACAA";

- Appendix V:  the full text of part 382; and

- Appendix VI:  the DOT document "Guidance Concerning Service Animals in Air Transportation."

### *Themes of this Manual*

#### *Legal Requirements and Customer Service*

This manual highlights the difference between actions you must take according to the law as stated in part 382 and actions that you may choose to take in an effort to provide superior customer service to passengers with disabilities.  Legal requirements are generally designated by the words, "must" or "shall" in the manual.  Words such as "should" or "may" indicate accommodations that part 382 does not require but that DOT recommends and that you may decide to provide as a matter of good customer service.

#### *Safety*

**Indirect Air Carrier:**

A company not directly involved in the operation of an aircraft that sells air transportation services to the general public, such as tour and charter operators.  [Sec. 382.5]

**Individual with a Disability:**

Any individual who:

- has a physical or mental impairment that, on a permanent or temporary basis,

- substantially limits one or more major life activities,

- has a record of such an impairment, or

- is regarded as having such an impairment. [Sec. 382.5]

**Qualified Individual with a Disability:**

An individual with a disability who:

- accompanies or meets a traveler using airport facilities;

- seeks information about schedules, fares, or policies;

- attempts to use facilities or services offered to the general public by an air carrier;

- has a ticket, or makes a good faith attempt to buy a valid ticket for a flight;

- arrives with a valid ticket for the flight; and

- meets reasonable, nondiscriminatory requirements applicable to all passengers.

  [Sec. 382.5]

## Chapter 2:  Learning the Basics about the Law

## Protecting Air Travelers with Disabilities

- **What does the Air Carrier Access Act (ACAA) say?** The ACAA prohibits U.S. and foreign air carriers from discriminating against an air traveler with a disability on the basis of such disability (49 U.S.C. 41705).

- **What is 14 CFR Part 382 (part 382)?**  Part 382 is a detailed set of rules that define air carriers' responsibilities under the ACAA and ensures that individuals with disabilities will be treated without discrimination consistent with the safe carriage of all passengers.

- **Who has to follow part 382?**  The following organizations and individuals must comply with part 382: (1) air carriers and their employees (*e.g.*, ticket and gate agents, flight attendants, baggage handlers, pilots, etc.); (2) authorized agents of an air carrier (*e.g.*, travel agents); (3) organizations and their employees that have business arrangements with air carriers to provide disability-related services (*e.g.*, wheelchair service, baggage handling, etc.); and (4)  indirect air carriers and their employees (*e.g.*, tour operators) that provide facilities, services, or other accommodations to passengers with disabilities.

- **Who is protected by part 382?** Part 382 protects three categories of individuals with disabilities: (1) individuals who have a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities; (2) individuals who

have a record of such impairment; and (3) individuals who are regarded as having such an

impairment, whether they have the impairment or not.

- **What is a physical or mental impairment?**

   **Physical impairments** include (1) physiological disorders or conditions; (2) cosmetic

   disfigurements; or (3) anatomical loss affecting one or more of the following body systems:

   neurological, musculoskeletal, special sense organs, respiratory including speech organs,

   cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and

   endocrine.

   Examples of physical impairments include orthopedic, visual, speech, and hearing

   impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart

   disease, diabetes, HIV disease, drug addition, and alcoholism.

   **Mental impairments** include mental or psychological disorders, such as mental retardation,

   organic brain syndrome, emotional or mental illness, and specific learning disabilities.

   Physical characteristics such as the color of one's eyes, hair, or skin, baldness, and left-

   handedness do not constitute physical impairments.  Similarly, neither age nor obesity alone

   constitutes a physical impairment.  Disadvantages due to cultural or economic factors are not

   covered by part 382.  Moreover, the definition of "physical or mental impairment" does not

   include personality traits such as poor judgment or a quick temper, where these are not

   symptoms of a mental or psychological disorder.

- **What is a substantial limitation on major life activities?** To qualify as a "disability" under part 382 a condition or disease must substantially limit a major life activity.  Major life activities include, but are not limited to, activities such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

- **When does an impairment "substantially limit" a major life activity?**  There is no absolute standard for determining when an impairment is a substantial limitation.  Some impairments obviously limit the ability of an individual to engage in a major life activity.

  *Example 1*:  *A person who is deaf is substantially limited in the major life activity of hearing.*

  *Example 2*:  *A person with traumatic brain injury may be substantially limited in the major life activities of:  (a) caring for himself or herself; and (b) working, because of memory deficiency, confusion, contextual difficulties, and the inability to reason appropriately.*

  *Example 3*:  *An individual who is paraplegic may be substantially limited in the major life activity of walking.*

- **Are temporary mental or physical impairments covered by part 382?**  Yes.

  *Example*:  *While on a skiing trip, Jane breaks her leg and is placed in a cast that keeps her from bending her leg and walking without the use of crutches.  Jane will eventually recover the full use of her leg, but in the meantime she is substantially limited in the major life*

*__Example 2__: Karen, an individual born with a prominent facial disfigurement, has been refused transportation on the grounds that her presence has upset several passengers who have complained to gate agents about her appearance.  Karen's physical disfigurement becomes substantially limiting only as a result of the attitudes of others and she is protected by the provisions of part 382.  Refusing to provide transportation to Karen would violate section 382.31 because you must not refuse to provide transportation to a qualified individual with a disability, such as Karen, solely because her appearance may offend or annoy other passengers.  As in the example above, and regardless whether the decision to refuse transportation was correct, you must provide Karen with a written explanation of the specific basis for the refusal within 10 calendar days of the incident.*

- **How do I determine whether a person is an individual with a disability?**

  Provide an opportunity for the passenger to self-identify by asking how you can best assist him or her.

- **How do I assist a passenger with a disability?**  Ask the passenger how you can best assist him or her.  A passenger with a disability has the most information about his or her abilities, limitations, level of familiarity with the airport and airline, and needs in connection with traveling by air.

- **May I ask an individual what his or her disability is?** Only to determine if a passenger is entitled to a particular seating accommodation pursuant to section 382.38. Generally, you may not make inquiries about an individual's disability or the nature or

20

severity of the disability.  However, you may ask questions about an individual's ability to perform specific air travel-related functions, such as enplaning, deplaning, walking through the airport, etc.

*Example 1:  You may not ask a person, "What is your disability?"  You may not ask, "Do you have diabetes?"*

*Example 2:  You may ask, "Can you walk from the gate area to your aircraft seat?"  You may ask, "Are you able to transfer from the aisle chair over a fixed aisle seat armrest?" You may ask, "Can you walk from this gate to your connecting gate?"  You may ask (by writing a note if necessary), "Do you need me to notify you if I make any announcements over the public address speaker?"*

*Example 3:  Susan asks for a bulkhead seat because the condition of her leg necessitates her need for greater legroom. You may ask, "Are you unable to bend your leg or is your leg fused or immobilized?"  [Sec. 382.38]*

- **What are some of the requirements of part 382 that you should be aware of?**  Following are some of the principal requirements of part 382.  It is important to note that the requirements of part 382 listed below are not meant to be exhaustive.  Rather, it is a list of requirements governing situations that you are likely to encounter on a regular basis.

- You must not discriminate against qualified individuals with a disability. [Sec. 382.7(a)(1)] You must not *require* a passenger with a disability to accept special services (including, but not limited to, pre-boarding) not requested by the passenger. [Sec. 382.7(a)(2)] Instead, you may *ask* a passenger with a disability if he or she would like a particular service, facility, or other accommodation. ==In addition, you must not exclude a qualified individual with a disability from or deny the individual the benefit of any air transportation or related services that are available to other passengers. [Sec. 382.7(a)(3)]== For example, if you choose to provide ground transportation and overnight accommodations to passengers because of a flight cancellation, you must ensure that the ground transportation to the hotel, and the hotel itself, are accessible to a passenger with a disability.

- ==You must not refuse transportation to a passenger solely on the basis of a disability. [Sec. 382.31(a)]==

- You must provide transportation to an individual with a disability who has an impairment that affects his or her appearance or results in involuntary behavior except under limited circumstances specified below. You must provide transportation to such individuals with disabilities even if the disability may offend, annoy, or inconvenience crewmembers or other passengers. [Sec. 382.31(b)] However, if the person's disability results in involuntary behavior that would or might be inimical to the safety of the flight, then the person may properly be refused transportation. [Sec. 382.31(d)]

- You shall not limit the number of individuals with disabilities on a particular flight. [Sec. 382.31(c)]

- If transportation of a passenger with a disability would endanger the safety of the aircraft or the health or safety of its passengers or violate an FAA safety regulation, you may refuse transportation to the individual with a disability.  [Sec. 382.31(d)]

- You shall not require a passenger with a disability to travel with an attendant or to present a medical certificate, *except* in very limited circumstances.  [Secs. 382.35(a) and 382.53(a)]

- You shall not exclude a passenger with a disability from any seat in an exit or other row solely on the basis of his or her disability except to comply with FAA safety rules.  FAA safety rules establish criteria that must be met in order for a passenger to occupy a seat in the emergency exit rows.  [14 CFR 121.585]  If a passenger with a disability meets these FAA criteria, he or she must be allowed to sit in an emergency exit row.  As with any other passenger, you must look at the individual passenger with a disability and reasonably assess whether he or she meets FAA criteria for exit-row seating.  [Sec. 382.37(a)]

- You must provide timely enplaning, deplaning, and connecting assistance to passengers with disabilities requesting such assistance.  As part of this duty, you must provide equipment (*e.g.*, wheelchairs, electric carts, and aisle chairs) and personnel (*e.g.*, individuals to propel wheelchairs and aisle chairs and individuals to assist passengers with disabilities in carrying and stowing their baggage).  [Secs. 382.39(a)(1) and 382.39(b)(5)]

- You must allow a passenger with a disability to stow his or her cane or other assistive device inside the cabin of the aircraft close to his or her seat if it fits, consistent with FAA safety rules on carry-on items.  [Sec. 382.41(c)]

# Chapter 3:  Assisting Air Travelers with Disabilities

# Planning a Trip

A.  **Advance Notice**
B.  **Information about the Aircraft**
C.  **Mobility Aids and Assistive Devices**
D.  **Service Animals**
E.  **Accommodations for Air Travelers  who are Deaf, Hard of Hearing, or Deaf-Blind**
F.  **Communicable Diseases**
G.  **Medical Certificates:  When are They Allowed?**
H.  **Your Obligation to Provide Services and Equipment**
I.  **Attendants**

## A.    Advance Notice

You cannot require passengers with disabilities to provide advance notice of their intention to travel or of their disability except as provided below.  [Sec. 382.33(a)]

*Advance Notice Only for Particular Services and Equipment*

You may require up to 48 hours' advance notice and one hour's advance check-in from a passenger with a disability who wishes to receive the following services:

- Transportation for a battery-powered wheelchair on an aircraft with fewer than 60 seats;

- Provision by the carrier of hazardous materials packaging for the battery of a wheelchair or other assistive device;

- Accommodations for 10 or more passengers with disabilities who travel as a group; and

27

- Provision of an on-board wheelchair on an aircraft that does not have an accessible lavatory for passengers with disabilities who can use an inaccessible lavatory but need an on-board chair to do so.  [Secs. 382.33(b)(5)-(8)]

**<u>Example</u>**:  *While making his reservation, a passenger with a disability gave the reservation agent 48 hours' advance notice that he would need an aisle chair to access the lavatory on his upcoming flight.  The flight is on an aircraft with more than 60 seats and it does not have an accessible lavatory.  During the call, the passenger is made aware of the fact that the lavatory is inaccessible, but explains that he can use an inaccessible lavatory as long as he has access to a carrier-provided aisle chair.  Because the passenger has complied with the advance notice requirement here, normally this information would have been entered into the passenger's reservation record (otherwise known as the passenger name record (PNR)) by the carrier and the request for an aisle chair would have been handled through that notification process.  You are a new gate agent for your carrier and when this passenger approaches you at the gate more than an hour before the scheduled departure time of the flight and asks about the aisle chair, you are not sure how to reply.  What should you do?*

*To begin, as a matter of good customer service, you should tell the passenger that you are not sure but you will find out for him.  You should ask a colleague and, if necessary, contact a CRO.  When you ask your colleague, you are told that all aircraft with more than 60 seats in your carrier's fleet maintain an in-cabin aisle chair.  Once you receive this information you should assure the passenger that an aisle chair is available so he can use the inaccessible lavatory on the aircraft.*

*Advance Notice for Optional Services and Equipment*

Although carriers are not required to provide the following services or equipment, if they choose to provide them, you may require 48 hours' advance notice and one hour's advance check-in for:

- Medical oxygen for use on board the aircraft;

- Carriage of an incubator;

- Hook-up for a respirator to the aircraft's electrical power supply; and

- Accommodation for a passenger who must travel on a stretcher.  [Secs. 382.33(b)(1)-(4)]

If appropriate advance notice has been given and the requested service is available on that particular flight, you must ensure that the service or equipment is provided.

*Make a Reasonable Effort to Accommodate, Even Without Advance Notice*

In addition, even if a passenger with a disability does *not* meet the advance notice or check-in requirement, you must make a reasonable effort to furnish the requested service or equipment, provided that making such accommodation would not delay the flight. [Secs. 382.33(c) and (e)]

**Example 1**:  *Mr. Thomas uses a battery-powered wheelchair.  He travels frequently between Washington, DC, and New York for business.  One day, he finds out that he has an important business meeting in New York and must travel up to New York that afternoon.  He has no time to provide advance notice regarding the transportation of his battery-powered wheelchair and arrives at the gate 45 minutes before his flight is*

29

*scheduled to depart.  The aircraft for the flight has fewer than 60 passenger seats.  What should you do?*

*Carriers may require 48 hours' advance notice and one-hour advance check-in for transportation of a battery-powered wheelchair on a flight scheduled to be made on an aircraft with fewer than 60 seats.  Carriers may require the same advance notice for provision of hazardous materials packaging for a battery.  However, airline personnel are required to make reasonable efforts to accommodate a passenger who fails to provide the requisite notice to the extent it would not delay the flight.  Therefore, you must make a reasonable effort to accommodate Mr. Thomas as long as it would not delay the flight.*

*Mr. Thomas is a frequent traveler on this particular route and he knows that usually it is feasible to load, store, secure, and unload his battery-powered wheelchair and spillable battery in an upright position [Sec. 382.41(g)(2)] or detach, "box", and store the spillable battery [Sec. 382.41(g)(3)] within about 20-25 minutes.  If this is the case, you must accommodate Mr. Thomas, his battery-powered wheelchair, and the spillable battery even though Mr. Thomas did not provide advance notice, since doing so would not delay the flight.*

**<u>Example 2</u>***:  Ms. Webster must travel with medical oxygen and shows up at the airport without providing advance notice of her need for medical oxygen.  As a policy, your carrier does not provide medical oxygen on any flights.  What should you do?*

30

*To begin, you should confirm that your carrier does not provide the optional service of medical oxygen for use on board a flight.  If no medical oxygen service is available on your carrier, you should explain this to Ms. Webster and tell her that the carrier cannot accommodate her.*

*As a matter of customer service, you may direct Ms. Webster to another carrier that does provide medical oxygen service in that market.  The passenger should be aware, however, that the provision of medical oxygen involves coordination with the passenger's physician to determine the flow rate and the amount of oxygen needed and arranging for the delivery of the oxygen by the carrier to the point of origin of the passenger's trip.  Therefore, normally, it is not possible to accommodate a passenger who needs medical oxygen on a flight unless the advance notice is provided because the accommodation cannot be made without delaying the flight.*

### *If Aircraft is Substituted, Make an Effort to Accommodate*

Even if a passenger with a disability provides advance notice, sometimes weather or mechanical problems require cancellation of the flight altogether or the substitution of another aircraft.  Under these circumstances, you must, to the maximum extent feasible, assist in providing the accommodation originally requested by the passenger with a disability.  [Sec. 382.33(f)]

## B.    Information about the Aircraft

You should be familiar with and be able to provide information about aircraft accessibility for passengers with a disability when they request this information.  [Secs.

*Requests for Seat Assignments by a Passenger Accompanied by a Service Animal*

For a disabled passenger traveling with a service animal, you must provide, as the passenger with a disability requests, either a bulkhead seat or a seat other than a bulkhead seat.  [Sec. 382.38(a)(3)]

If carriers provide special information concerning the transportation of animals outside the continental United States to any passengers, you must provide such information to all passengers with a disability traveling with a service animal on the flights.  [Sec. 382.55(a)(3)]

## E.    Accommodations for Air Travelers who are Deaf, Hard of Hearing, or Deaf-Blind

If your carrier makes available a telephone reservation and information service to the public, you must make available a text telephone (TTY) to permit individuals who are deaf or hard of hearing to make reservations and obtain information.  The TTY must be available during the same hours as the telephone service for the general public and the same wait time and surcharges must apply to the TTY as the telephone service for the general public.  [Secs. 382.47(a) and (b)]

## F.    Communicable Diseases

*Passengers with a Communicable Disease Are Permitted on Flight*

Except as described below, you must not (i) refuse transportation to; (ii) require provision of a medical certificate from; or (iii) impose any condition, restriction, or requirement not

37

imposed on other passengers on, a passenger with a communicable disease or infection. [Sec. 382.51(a)]

### *If Direct Threat to Health or Safety of Others, Limitations May be Imposed*

Only if a passenger with a communicable disease or infection poses a *direct threat* to the health or safety of others, can you take any of the actions listed above.  [Sec. 382.51(b)(1)]  A *direct threat* means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services.

If you are faced with particular circumstances where you are required to make a determination as to whether a passenger with a communicable disease or infection poses a direct threat to the health or safety of others, you must make an individualized assessment based on a reasonable judgment, ***relying on current medical knowledge or the best available objective evidence.***  If the presentation of a medical certificate would alleviate concerns over the passenger's condition, or reasonable modification of policies, practices, or procedures would lessen the risk to other passengers, then you should consider this in making such an individualized assessment.  You should also confer with appropriate medical personnel and a CRO when making this assessment.

### *If the Passenger Poses a Direct Threat to the Health and Safety of Others*

If, in your estimation, a passenger with a communicable disease or infection poses a direct threat to the health or safety of other passengers, you may (i) refuse to provide transportation to that person; (ii) require that person to provide a medical certificate

stating that the disease at its current stage would not be transmittable during the normal course of a flight or, if applicable, describing measures that would prevent transmission during the flight [Sec. 382.53(c)]; or (iii) impose on that passenger a special condition or restriction (*e.g.*, wearing a mask).  You must ***choose the least restrictive*** of the three options set forth above that would accomplish the objective.  [Sec. 382.51(b)(4)]

At all times, as a matter of good customer service, you should treat the passenger with courtesy and respect.

## G.     Medical Certificates:  When are they Allowed?

A medical certificate is a written statement from the passenger's physician saying that the passenger is capable of completing the flight safely without requiring extraordinary medical assistance during the flight.  Except under the circumstances described below, you must not require medical certification of a passenger with a disability as a condition for providing transportation.

You may require a medical certificate only if the passenger with a disability is an individual who

- is traveling on a stretcher or in an incubator (where such service is offered);

- needs medical oxygen during the flight (where such service is offered); or

- has a medical condition that causes the carrier to have reasonable doubt that the passenger can complete the flight safely without requiring extraordinary medical assistance during the flight.  [Sec. 382.53 (a) and (b)]

_Medical Certificate and a Passenger with a Communicable Disease or Infection_

In addition, if you determine that a passenger with a communicable disease or infection poses a direct threat to the health or safety risk of others, you may require a medical certificate from the passenger.  [Sec. 382.53(c)(1)]  The medical certificate must be dated within 10 days of the flight date.  [Sec. 382.53(c)(2)]

In the event that you determine the need for a medical certificate, you should indicate to the passenger with a disability the reason for the request.  You should base your request on the reasons set forth under the law and outlined above.

At all times, you should treat the passenger from whom you are requesting a medical certificate with courtesy and respect.

**_Example_**_:  A passenger arrives at the gate with her six year old daughter.  The girl's face and arms are covered with red lesions, resembling chicken pox.  What should you do?_

_Generally, you must not refuse travel to, require a medical certificate from, or impose special conditions on a passenger with a communicable disease or infection.  However, if a passenger appears to have a communicable disease or infection that poses a direct threat to the health or safety of other passengers, you may be required to make a determination about the best course of action based on the seriousness of the health risk and the ease of disease transmittal.  For a communicable disease or infection to pose a direct threat, the condition must both be readily transmitted under conditions of flight and have serious health consequences (e.g., SARS).  Medical conditions that are easily_

40

*transmitted in aircraft cabins but have limited health consequences (e.g., a common cold) as well as conditions that are difficult to transmit in aircraft cabins but have serious health consequences (e.g., AIDS) do not pose a direct threat to the health or safety of passengers.*

*The first thing you should do is interview the passenger and her mother to obtain basic information about the girl's condition. This exchange should be done discreetly and in a courteous and respectful manner. If you still have a question about the nature of the child's condition that will impact decisions about transportation, you should contact a CRO and explain the situation.*

*Here, the mother tells you and the CRO that the child has chicken pox but is no longer contagious. The CRO would likely consult with appropriate medical personnel to verify whether the child could be contagious based on the mother's statement.*

*If there is a reasonable basis for believing that the passenger poses a direct threat to the health or safety of others, you must choose the least restrictive alternative among the following options: (i) refusing transportation to the individual; (ii) requiring a medical certificate; or (iii) imposing a special condition or limitation on the individual. If the medical support people indicate that there is a chance that the child is no longer contagious but only if a certain number of days have passed since the outbreak of the lesions, you could request a medical certificate before you permit the child to travel.*

*Having discussed the situation with the passenger and her mother and consulted the CRO and the medical support personnel, the request for a medical certificate appears to be reasonable under the circumstances and the least restrictive of the three options.*

*Keep in mind that section 382.53(c)(2) specifies that the medical certificate be from the child's physician and state that the child's chicken pox would not be communicable to other passengers on the flight. The medical certificate must also include any conditions or precautions that would have to be observed to prevent the transmission of the chicken pox to other passengers and be dated within ten days of the date of the flight. If the medical certificate is incomplete or if the passenger is attempting to travel before the date specified in the medical certificate or without implementing the conditions outlined to prevent transmission, the child would not be permitted to fly.*

## H.    Your Obligation to Provide Services and Equipment

When assistance getting on or off a plane, making flight connections, or receiving transportation between gates is requested by a passenger with a disability, or offered by carrier personnel and accepted by the passenger, you must provide it.  [Sec. 382.39(a)] More specifically, you must provide, as needed, the following:

- services personnel

- ground wheelchairs

- boarding wheelchairs

- ramps or mechanical lifts.  [Sec. 382.39(a)(1)]

Aircraft with more than 60 passenger seats having an accessible lavatory must be equipped with an operable on-board wheelchair.  [Sec. 382.21(a)(4)]  On-board

It may not be apparent whether a person is an individual with a disability.  You should provide an opportunity for a passenger to self-identify as an individual with a disability by asking if the person needs assistance and, if so, how best you can assist with those needs.  Keep in mind that you cannot require an individual with a disability to accept special services, including pre-boarding.

### *Some Examples of Physical Impairments [Sec. 382.5(a)(1)]:*

- Orthopedic impairment;

- Deafness (profound hearing loss);

- Hard of hearing (mild to profound hearing loss);

- Vision impairment and blindness;

- Speech disorder;

- Cerebral palsy;

- Epilepsy;

- Muscular dystrophy;

- Multiple sclerosis;

- Cancer;

- Heart disease; and

- Diabetes.

### *Some Examples of Mental or Psychological Impairments [Sec. 382.5(a)(2)]:*

- Mental retardation;

- Depression;

- Anxiety disorders;

- Specific learning disabilities; and

- Brain injury.

Below is a list of general tips to consider when interacting with people with disabilities followed by tips relating to interacting with individuals with one or more of the five basic types of disabilities.  These tips are aimed at ensuring that services, facilities, and other accommodations are provided to passengers with disabilities in a respectful and helpful manner.

Some of the tips relate to specific legal requirements, but most of them set forth suggestions for interacting in a way that would constitute good customer service and demonstrate a sensitivity to the issues concerning passengers with disabilities.  The following tips should be read and employed with the above qualification in mind.

# APPENDIX II

# Airline Management-Related Issues

# Airline Management-Related Issues

Appendix II highlights provisions of the ACAA and the accompanying regulations outlining specific responsibilities of management of carriers, *i.e.*, requirements to be implemented by management employees as opposed to personnel who deal with the traveling public, including passengers with a disability.  In places, these are overlapping responsibilities and cross-references will be made to specific sections of this manual.

## Discrimination is Prohibited

Management of carriers are required to ensure that the carrier (either directly or indirectly through its contractual, licensing, or other arrangements for provision of air transportation) does not discriminate against qualified individuals with a disability by reason of such disability.  [Sec. 382.7(a)(1)]  In addition, management of carriers should be aware that they are responsible for compliance with the ACAA and part 382 not only by their *own* employees, but also by employees of any company or entity performing functions on behalf of the carrier.

More specifically, carriers cannot require a passenger with a disability to accept special services, *e.g.*, pre-boarding, not requested by the passenger.  [Sec. 382.7(a)(2)]  Carriers cannot exclude a qualified individual with a disability from or deny that individual the benefit of air transportation or related services that are available to other individuals, even if there are separate or different services available for passengers with a disability, except as provided by the ACAA and part 382.  [Sec. 382.7(a)(3)]  Carriers cannot take actions adverse to passengers with a disability if they assert their rights under the ACAA and part 382.  [Sec. 382.7(a)(4)]

Carriers cannot limit the number of passengers with a disability on a given flight.  [Sec. 382.31(c)]   Carriers must modify policies, practices, and facilities as necessary to ensure nondiscrimination consistent with the standards of Section 504 of the Rehabilitation Act, as amended.  Carriers are not required to make modifications that would constitute an undue burden or would fundamentally alter their program.  [Sec. 382.7(c)]

### *Refusal of Transportation*

Carriers cannot refuse transportation to a qualified individual with a disability solely because the person's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience others.  [Sec. 382.31(b)]  Carriers must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability unless it is expressly permitted by the ACAA and part 382.  [Sec. 382.31(a)]

### *Safety Considerations*

The ACAA does not require air carriers to disregard applicable FAA safety regulations.  [Sec. 382.3(d)]

Carriers may refuse to provide transportation to *any* passenger on the basis of safety and if carriage would violate FAA regulations.  However, when carriers exercise this authority, they must not discriminate against a passenger with a disability on the basis of disability.  [Sec. 382.31(d)]

**Written Explanation for Refusal of Transportation**

When a carrier refuses to provide transportation to a passenger on a basis relating to disability, the carrier must specify in writing to the passenger the basis for the determination within 10 days of the refusal of transportation.  [Sec. 382.31(e)]  In the situation where refusal of transportation is based on safety concerns, the written notice must include the carrier's reasonable and specific basis for its opinion that transporting the passenger would be inimical to the safety of the flight.

**No Charge for Accommodating Passengers with a Disability**

Carriers cannot impose charges for providing facilities, equipment, or services that are required by the ACAA and its accompanying regulations for passengers with a disability.  [Sec. 382.57]

**Indirect Air Carriers**

If an indirect air carrier provides facilities or services for passengers that are covered for other carriers by sections 382.21 through 382.55, the indirect air carrier must do so in a manner consistent with those regulations.  [Sec. 382.7(b)]

**Contractors and Travel Agents**

Carriers must receive assurances from their contractors who provide services, including travel agents (except non-U.S. citizens providing services outside the U.S.), that they will not discriminate on the basis of disability when providing such services and include a clause with that assurance in their contracts.  [Sec. 382.9(a)]  Similarly, their contracts must contain a

# APPENDIX III

# Frequently Asked Questions

# Frequently Asked Questions

**QUESTION**:  What's the difference between the Air Carrier Access Act (ACAA) and the Americans with Disabilities Act (ADA)?

**ANSWER**:  The ACAA, signed into law by then-President Reagan in 1986, prohibits discrimination by *airlines* against individuals with disabilities in commercial air transportation. The ADA, signed into law after the ACAA in 1990 by then-President Bush, prohibits discrimination against individuals with disabilities in employment, public accommodations, commercial facilities, telecommunications, and *transportation other than by commercial airlines* (*e.g.*, subway and bus systems).  [Sec. 382.1]

**QUESTION**:  Do the ACAA and its implementing regulations (14 CFR part 382 or part 382) apply to both U.S. and foreign carriers?

**ANSWER**:  When initially passed in 1986, the ACAA and part 382 (subsequently issued in March 1990) applied only to U.S. carriers.  However, on April 5, 2000, Congress extended the applicability of the ACAA to cover foreign carriers.  At approximately the same time, DOT issued a notice to foreign carriers advising them that the Department intended to use the provisions of part 382, which by its terms does not impose requirements on foreign air carriers, as guidance in investigating any complaints it receives alleging noncompliance with the ACAA by foreign carriers.  The only provision of part 382 that currently applies to foreign air carriers is Section 382.70(b), which expressly requires foreign carriers to record, categorize, and report written disability-related complaints associated with any flight segment originating or

**Glossary**

***Direct Threat to the Health or Safety of Others***
A significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services.

***Fundamental Alteration***
A modification that substantially alters the basic nature or purpose of a program, service, product or activity.

***Individual with a Disability***
"Any individual who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment."  (Section 382.5).

***Qualified Individual with a Disability***
Any individual with a disability who:
(1) "takes those actions necessary to avail himself or herself of facilities or services offered by an air carrier to the general public with respect to accompanying or meeting a traveler, use of ground transportation, using terminal facilities, or obtaining information about schedules, fares or policies";
(2) "offers, or makes a good faith attempt to offer, to purchase or otherwise validly to obtain . . . a ticket" "for air transportation on an air carrier"; or
(3) "purchases or possesses a valid ticket for air transportation on an air carrier and presents himself or herself at the airport for the purpose of traveling on the flight for which the ticket has been purchased or obtained; and meets reasonable, nondiscriminatory contract of carriage requirements applicable to all passengers."  (Section 382.5).

***Service Animal***
Any animal that is individually trained or able to provide assistance to a qualified person with a disability; or any animal shown by documentation to be necessary for the emotional well being of a passenger.

**Sources**
*See:* 14 CFR 382.5**,** 14 CFR 382.37(a) and (c), 14 CFR 382.38 (a)(3), (b), (d) & (h)-(j), 14 CFR 382.55(a)(1)-(3), 14 CFR 382.57, "Guidance Concerning Service Animals in Air Transportation," (61 FR 56420-56422, (November 1, 1996)), "Commonly Asked Questions About Service Animals in Places of Business" (Department of Justice, July, 1996), and "ADA Business Brief: Service Animals" (Department of Justice, April 2002).
Questions regarding this notice may be addressed to the Office of Aviation Enforcement and Proceedings, C-70, 400 7th Street, SW, Washington, D.C. 20590.  A copy of this notice will be published in the Federal Register.
An electronic version of this document is available on the World Wide Web at
http://airconsumer.ost.dot.gov
Issued in Washington, DC on May 2, 2003.

Samuel Podberesky,

Assistant General Counsel for Aviation Enforcement and Proceedings

*www.fitness.gov* when it has been finalized.

The meeting that is scheduled to be held on May 5, 2015, is open to the public. Every effort will be made to provide reasonable accommodations for persons with disabilities and/or special needs who wish to attend the meeting. Persons with disabilities and/or special needs should call (240) 276–9567 no later than close of business on April 21, 2015, to request accommodations. Members of the public who wish to attend the meeting are asked to pre-register by sending an email to *rsvp.fitness@hhs.gov* or by calling (240) 276–9567. Registration for public attendance must be completed before close of business on April 28, 2015.

Dated: March 20, 2015.

**Shellie Y. Pfohl,**
*Executive Director, Office of the President's Council on Fitness, Sports, and Nutrition, U.S. Department of Health and Human Services.*

[FR Doc. 2015–06999 Filed 3–26–15; 8:45 am]

**BILLING CODE 4150–35–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

**Criteria for Requesting Federal Travel Restrictions for Public Health Purposes, Including for Viral Hemorrhagic Fevers**

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC) in the Department of Health and Human Services (HHS) is publishing this Notice to inform the public of the criteria CDC considers for requesting federal travel restrictions for public health purposes, including for use of the Do Not Board (DNB) list and Public Health Border Lookout records. Individuals with communicable diseases that pose a public health threat to travelers can be placed on this list to restrict them from boarding commercial aircraft arriving into, departing from, or traveling within the United States. This notice further describes the factors that HHS/CDC will consider in evaluating whether to request that an individual who may have been exposed to a hemorrhagic fever virus be placed on the DNB list, which is administered by the Department of Homeland Security (DHS). It also contains information for

individuals who have been placed on this list to respond to this decision in writing, if they believe the decision was made in error. This notice is effective immediately.

**DATES:** This notice is effective on March 27, 2015.

**FOR FURTHER INFORMATION CONTACT:** For information regarding this Notice: Ashley A. Marrone, J.D., Division of Global Migration and Quarantine, Centers for Disease Control and Prevention, 1600 Clifton Road NE., MS–E03, Atlanta, GA 30329. For information regarding CDC operations related to this Notice: Travel Restrictions and Intervention Activity, ATTN.: Francisco Alvarado-Ramy, M.D., Division of Global Migration and Quarantine, Centers for Disease Control and Prevention, 1600 Clifton Road NE., MS–C–01, Atlanta, GA 30329. Either may also be reached by telephone 404–498–1600 or email *travelrestrictions@cdc.gov*.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

Individuals with communicable diseases who travel on commercial aircraft can pose a risk for infection to the traveling public. In June 2007, HHS/CDC and DHS developed a public health DNB list, enabling domestic and international public health officials to request that individuals with communicable diseases who meet specific criteria, including having a communicable disease that poses a public health threat to the traveling public, be restricted from boarding commercial aircraft arriving into, departing from, or traveling within the United States.[1] The public health DNB list, administered by DHS and based on HHS/CDC's requests, is intended to supplement state and/or local public health measures to prevent individuals who are infectious, or reasonably believed to have been exposed to a communicable disease and may become infectious, from boarding commercial aircraft. Use of the list is limited to those communicable diseases that would pose a public health threat to travelers should the infected individual be permitted to board a flight. Once an individual is placed on the DNB list, airlines are instructed not to issue a boarding pass to the individual for any commercial domestic flight or for any commercial international flight arriving in or departing from the United States.

An individual is typically removed from the DNB upon receipt by HHS/CDC of the treating physician's or public health authority's statement (or other medical documentation) that the individual is no longer considered infectious, or lapse of the period that the individual is at risk of becoming infectious without development of symptoms.

Individuals included on the DNB list are assigned a Public Health Border Lookout ("Lookout") record that assists in ensuring that an individual placed on the DNB is detected if he or she attempts to enter or depart the United States through a port of entry. When this happens, officials from U.S. Customs and Border Protection (CBP), a component agency of DHS, notify HHS/CDC so that a thorough public health inquiry and evaluation can be conducted and appropriate public health action taken, as needed.

Requests for an individual to be placed on the public health DNB list with an associated Lookout record happen through a number of means, including: State or local public health officials contact the CDC Quarantine Station of jurisdiction, health-care providers make requests by contacting their state or local public health departments, and foreign and U.S. government agencies contact the CDC's Emergency Operations Center (EOC) in Atlanta. HHS/CDC may also request that DHS place an individual on the public health DNB and Lookout lists if HHS/CDC becomes independently aware of an individual who meets the placement criteria.[2]

HHS/CDC has refined the criteria that it initially considered, as published in the Morbidity and Mortality Weekly Report (MMWR) in 2008, and this notice describes the criteria CDC currently considers when making requests to DHS to include an individual on the DNB list and associated Lookout record. If an individual satisfies the first criteria and any of the three other criteria, then he/she may qualify to be placed on the list. Currently, HHS/CDC considers whether:

(1) The individual is known or reasonably believed to be infectious or reasonably believed to have been exposed to a communicable disease and may become infectious with a communicable disease that would be a public health threat should the individual be permitted to board a commercial aircraft or travel in a manner that would expose the public; and

---

[1] CDC. *Federal air travel restrictions for public health purposes—United States, June 2007–May 2008.* MMWR 2008; 57:1009–12. Available at *http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5737a1.htm.*

[2] CDC. *Federal air travel restrictions for public health purposes—United States, June 2007–May 2008.* MMWR 2008; 57:1009–12. Available at *http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5737a1.htm.*

(2) the individual is not aware of his or her diagnosis, has been advised regarding the diagnosis and is non-compliant with public health requests or has shown potential for non-compliance, or is unable to be located; or

(3) the individual is at risk of traveling on a commercial flight or of traveling internationally by any means; or

(4) the individual's placement on the DNB is necessary to effectively respond to outbreaks of communicable disease or other conditions of public health concern. For example, an individual's placement on the DNB may be considered when necessary to aid in the application of controlled movement [3] or in the execution of a federal, state, or local quarantine, isolation, or conditional release order.

**II. Authority**

The DNB list and Lookout record are based on requests made by HHS/CDC regarding public health decisions and actions, and are administered by DHS. Under the Public Health Service Act, the Secretary of HHS is authorized to make and enforce regulations and take other actions necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the United States or between states.[4] Under its delegated authority, the HHS/CDC Division of Global Migration and Quarantine fulfills this responsibility through a variety of activities that may include operating quarantine stations at ports of entry, conducting routine public health screening, and administering quarantine regulations that govern the international and interstate movement of persons, animals, and cargo.[5]

*Authority of DHS*

Federal law authorizes CBP, U.S. Immigration and Customs Enforcement (ICE), and U.S. Coast Guard (USCG) officers to assist HHS by enforcing quarantine rules and regulations.[6] In addition, other DHS Components such as the Transportation Security

Administration (TSA), relying on their existing authorities, may provide supportive roles to federal screening efforts designed to prevent the introduction and spread of communicable disease.

TSA has the authority to accept the services of, or otherwise cooperate with, other federal agencies including implementing the DNB list.[7] Further, TSA may "develop policies, strategies, and plans for dealing with the threats . . . including coordinating countermeasures with appropriate departments, agencies, and instrumentalities of the United States."[8] Consistent with this authority, TSA may assist another Federal agency in carrying out its authority in order to address a threat to transportation. These threats may involve passenger safety.[9] In administering the DNB list, TSA relies on CDC to make public health findings as the basis for its request. As the medical authority for DHS,[10] the Office of Health Affairs reviews and approves the medical appropriateness of HHS/CDC's request prior to DHS implementing HHS/CDC's request by placing the person on the DNB list.

**III. Operations**

Because of the urgency involved in restricting individuals with serious communicable diseases from boarding commercial aircraft, individuals might not be notified prior to their inclusion on the DNB list and associated Lookout record. When an individual is placed on the DNB list with an associated Lookout record, HHS/CDC advises in writing that the individual is temporarily restricted from traveling by commercial air carrier and provides the reasons why HHS/CDC has reached this decision. HHS/CDC interprets "temporarily restricted" to mean that the individual will remain on the lists until no longer considered to be infectious or at risk of becoming infectious. HHS/CDC's notification to the individual also explains that, while the individual is on these lists, travel by commercial aircraft is forbidden and any attempt to enter the United States through any port of entry will be stopped by CBP officials and that the individual will be referred for public health evaluation. If an individual cannot be located, HHS/CDC works with state and local public health officials to contact the individual through family or other contacts. HHS/CDC and DHS take great care to ensure personal medical information is safeguarded.

As part of its notification process HHS/CDC also asks the appropriate state or local health department to notify the individual directly, state the reasons for the placement on the DNB list and associated Lookout record, and provide the medical or public health requirements that must be satisfied to be removed from the lists. The primary consideration for requesting removal from the DNB list and associated Lookout record is CDC's determination that the individual is no longer considered to be infectious or at risk of becoming infectious; however, other factors may be taken into consideration including the individual's return to treatment, if applicable, and following public health recommendations. Once HHS/CDC receives documentation that these medical and other stated requirements have been met, it sends a request to DHS to lift the travel restrictions (both the DNB list and the Lookout record).[11] Once an individual is removed from the DNB list and the associated Lookout record is removed, a second notification letter is sent by HHS/CDC to the individual informing him or her that the public health travel restrictions have been removed and providing further recommendations on an as-needed basis (*e.g.*, advising that the individual continue treatment, if applicable).

HHS/CDC's letter informing individuals that they have been placed on the DNB list and associated Lookout records invites individuals who believe that HHS/CDC's public health decision was made in error to submit a written response to the Director of HHS/CDC's Division of Global Migration and Quarantine and provide any supporting facts or other evidence supporting their belief. These operations and procedures will not change as a result of this Notice.

**IV. Requesting Travel Restrictions for Viral Hemorrhagic Fevers**

To date, the DNB list and associated Lookout records have been used primarily with respect to individuals with suspected or confirmed pulmonary tuberculosis (TB), including multidrug-resistant tuberculosis (MDR–TB), and a very small number with measles. However, travel restrictions are also applicable to other suspected or confirmed communicable diseases that could pose a public health threat during travel, including viral hemorrhagic fevers such as Ebola virus disease

---

[3] See *http://www.cdc.gov/vhf/ebola/exposure/monitoring-and-movement-of-persons-with-exposure.html.*

[4] 42 U.S.C. 264–265. The Secretary has promulgated implementing regulations at 42 CFR parts 70 and 71, administered by the CDC.

[5] See generally U.S. Department of Health and Human Services Centers for Disease Control and Prevention, Public Health Screening at U.S. Ports of Entry: A Guide for Federal Inspectors (July 2007) (describing port of entry health screening procedures); 42 CFR part 70 (interstate quarantine regulations); 42 CFR part 71 (foreign quarantine regulations).

[6] See 42 U.S.C. 97, 268(b).

[7] 49 U.S.C. 106(l), (m), 114(m).

[8] 49 U.S.C. 114(f)(3), (4).

[9] See, *e.g.*, 49 U.S.C. 114(h)(3).

[10] 6 U.S.C. 321e(c)(1).

[11] In addition to contacting CDC, individuals seeking removal from the Public Health DNB may also seek assistance through the redress process established by DHS in 49 CFR 1560.205.

(Ebola). Ebola is a type of viral hemorrhagic fever that is often fatal in humans and nonhuman primates. Ebola can spread through human-to-human transmission, with infection resulting from direct contact (through broken skin or mucous membranes) with the blood, secretions, droplets, or other body fluids of infected people, and indirectly from contact with surfaces or items (such as needles) contaminated with such fluids.

With respect to viral hemorrhagic fevers, placement on the DNB list and associated Lookout record is requested for people known or suspected to have a viral hemorrhagic fever. Placement may also be requested for people without symptoms who have been exposed to a viral hemorrhagic fever, particularly if these individuals intend to travel against public health recommendations. Even though people without symptoms are not infectious, these restrictions are requested because of the possibility that symptoms could develop during travel, particularly long international flights. Exposure is determined through a CDC risk factor assessment using information available from a variety of public health, medical and other official sources. Examples of types of potential exposure to viral hemorrhagic fevers contained within the CDC risk factor assessment include the following. It should be noted that not all of these exposures may result in travel restrictions.

- Having been in a country with widespread Ebola virus transmission within the past 21 days and, although having had no known exposures, is showing symptoms
- Percutaneous (*e.g.,* needle stick) or mucous membrane exposure to blood or body fluids of a person with Ebola while the person was showing symptoms
- Exposure to the blood or body fluids (including but not limited to feces, saliva, sweat, urine, vomit, and semen) of a person with Ebola while the person was showing symptoms without appropriate personal protective equipment (PPE) (see *http://www.cdc.gov/vhf/ebola/hcp/procedures-for-ppe.html*)
- Laboratory processing of blood or body fluids of a person with Ebola while the person was showing symptoms without appropriate PPE or standard biosafety protections
- Direct contact with a dead body without appropriate PPE in a country with widespread Ebola virus transmission (see *http://www.cdc.gov/vhf/ebola/outbreaks/2014-west-africa/distribution-map.html*)
- Having lived in the immediate household and provided direct care to

a person with Ebola while the person was showing symptoms
- In countries with widespread Ebola virus transmission: Direct contact while using appropriate PPE with a person with Ebola while the person was showing symptoms, or with the person's body fluids, or any direct patient care in other healthcare settings
- Close contact in households, healthcare facilities, or community settings with a person with Ebola while the person was showing symptoms
  ○ Close contact is defined as not wearing appropriate PPE within approximately 3 feet (1 meter) of a person with Ebola while the person was showing symptoms
- Having brief direct contact (*e.g.,* shaking hands), while not wearing appropriate PPE, with a person with Ebola while the person was in the early stage of disease
- In countries without widespread Ebola virus transmission: Direct contact while using appropriate PPE with a person with Ebola while the person was showing symptoms
- Traveled on an aircraft with a person with Ebola while the person was showing symptoms

Exposure risk factors, such as those just described, will be considered by HHS/CDC in their totality when determining whether an individual meets the first criteria for placement on the DNB List, as described in Section I of this notice. HHS/CDC would also consider other facts and information it may have to make a decision with respect to the other criteria, as described in Section I of this notice. It should be noted that all facts are considered when applying the criteria. Again, with the exception of the first criteria, not all of the other criteria need to be present for HHS/CDC to make a request to DHS to have an individual placed on DNB and Lookout.

HHS/CDC would also consider these risk factors when assessing an individual who has been in a country where outbreaks of viral hemorrhagic fevers were occurring and refuses to comply with a public health assessment, and otherwise meets the travel restriction criteria. Refusing to comply with a public health assessment in this situation could include refusing to provide relevant information that would allow public health officials to assess the exposure risk.

**V. Provisions of This Notice**

HHS/CDC will make requests of DHS based on the criteria in this notice effective immediately. Individuals who have had their travel temporarily

restricted as a result of placement on the DNB list and associated Lookout records may submit a written response to the Director, Division of Global Migration and Quarantine, if they believe that HHS/CDC has erred in its public health request to DHS. The response should be addressed to: Director, Division of Global Migration and Quarantine, ATTN: Travel Restriction and Intervention Activity, Centers for Disease Control and Prevention, 1600 Clifton Road, MS E–03, Atlanta, GA 30329. Responses may also be faxed to CDC at (404) 718–2158 or emailed to *travelrestrictions@cdc.gov.*

As part of the response, individuals should include the reference number listed in the notification letter they received and any facts or other evidence indicating why they believe that HHS/CDC's public health request was made in error.

The policy and program operations described above will become effective on March 27, 2015.

Dated: March 24, 2015.

**Sylvia M. Burwell,**

*Secretary.*

[FR Doc. 2015–07118 Filed 3–26–15; 8:45 am]

**BILLING CODE 4163–18–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

[Docket No. FDA–2011–N–0908]

**Agency Information Collection Activities; Proposed Collection; Comment Request; Guidance for Clinical Trial Sponsors: Establishment and Operation of Clinical Trial Data Monitoring Committees**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

---

**SUMMARY:** The Food and Drug Administration (FDA) is announcing an opportunity for public comment on the proposed collection of certain information by the Agency. Under the Paperwork Reduction Act of 1995 (the PRA), Federal Agencies are required to publish notice in the **Federal Register** concerning each proposed collection of information, including each proposed extension of an existing collection of information and to allow 60 days for public comment in response to the notice. This notice solicits comments on the collection of information concerning the establishment and operation of clinical trial data monitoring committees.

Plaintiff's Exhibit 153

cdc.gov

# Travel Restrictions | CDC

3 minutes



*Credit: David Snyder*

Disease is just a flight away. To protect America's health, CDC partners with the Department of Homeland Security to prevent the spread of serious contagious diseases during travel. CDC uses a **Do Not Board list** to prevent travelers from boarding commercial airplanes if they are known or suspected to have a contagious disease that poses a threat to the public's health. Sick travelers are also placed on a **Lookout** list so they will be detected if they attempt to enter the United States by land or sea. **These tools can be used for anyone who poses a threat to the public's health.**

Local and state public health officials can request CDC's assistance if a person who poses a public health threat intends to travel. CDC helps ensure these people do not travel while contagious.

**Placing people on the lists**

The criteria for adding people to the **Do Not Board** and **Lookout** lists are

1. Known or believed to be infectious with, or at risk for, a serious contagious disease that poses a public health threat to others during travel; **and** any of the following three:

1. **not** aware of diagnosis or **not** following public health recommendations, **or**

2. Likely to travel on a commercial flight involving the United States or travel internationally by any means; **or**

3. Need to issue travel restriction to respond to a public health outbreak or to help enforce a public

health order.

Criteria number one plus one of the three subsets must be met for a person to be placed on the **Do Not Board** and **Lookout** lists.



*Credit: David Heaberlin*

Once a person is placed on these lists, airlines will not issue a boarding pass to the person for any commercial flight within, arriving to, or departing from the United States.

To date, the Do Not Board and Lookout lists have been used for people with suspected or confirmed infectious tuberculosis (TB), including multidrug-resistant tuberculosis (MDR-TB), and measles. However, travel restrictions can also be used for other suspected or confirmed contagious diseases that could pose a public health threat during travel, including viral hemorrhagic fevers such as Ebola.

Preventing people with contagious diseases from traveling also helps to make sure they get or continue medical treatment, such as for infectious tuberculosis.

**Taking people off the lists**

Once public health authorities confirm a person is no longer contagious, the person is removed from the lists (typically within 24 hours). Also, CDC reviews the records of all persons on the lists every two weeks to determine whether they are eligible for removal.

Plaintiffs' Exhibit 154

## List of YouTube Videos Documenting Mask Confrontations on Flights & at Airports:

1.  "***Mother and 5-year-old with autism kicked off Southwest flight for not wearing mask***; 'Ava Breiterman is struggling with her emotions after a traumatic event over the weekend. A Brighton woman and her daughter were kicked off a Southwest Flight …daughter who is autistic wouldn't wear a mask…has level 2 autism, sensory issues, causes meltdowns…'"; Denver7 – The Denver Channel; Sep 29, 2020. https://youtu.be/5RAXbHmd4KU

2.  "***Passengers removed from Detroit plane for not wearing mask***; 'A Delta flight from Detroit Metropolitan Wayne County Airport to Hartsfield-Jackson Atlanta International Airport was delayed for about an hour Thursday when two people refused to wear a mask.'"; Click On Detroit | Local 4 | WDIV channel; Jul 29, 2020. "A passenger was escorted off of Delta flight 654 operating from Aruba to Atlanta by security personnel (as crowd claps and cheers) after refusing to wear a mask on board the aircraft in compliance with Delta's mask wearing requirements. A Delta flight from Detroit Metropolitan Wayne County Airport to Hartsfield-Jackson Atlanta International Airport was delayed for about an hour Thursday when two people refused to wear a mask. Not sure what happened to them." https://youtu.be/qoWMBhvF6fo

3.  "***A Woman Kicked Out of an American Airlines Plane After Refusing to do one Thing***; '…because she wasn't wearing a mask.'" Woman had a medical condition, asked staff to board first. Other passengers were shouting at her, told her to hurry up and get off, clapping as she was escorted off the plane. American Airlines had issued a rule that 'Every passenger must wear a face mask in the airport and on the plane." Video narrator states that "Crisis airline companies" conspired to make the mask rules [4:24 timestamp], and cites American Airlines' policy to require each and every passenger to wear a mask… over the age of 2. Video taken by Jordan Slade. Wonderbot channel; Oct 22, 2020. https://youtu.be/MKqJtViTL-I

4.  "***New Hampshire 2-yr old and mother get tossed from plane for mask policy violation***; 'New Hampshire mom (Rachel Star Davis) says she was thrown off a plane because her 2-yr-old son refused to wear a coronavirus mask.'"; NEWS CENTER Maine channel June 15, 2020. https://youtu.be/ivgcoO3Ddm4

5.  "***Flight passenger removed for refusing to wear mask***; A passenger was forced off of a crowded American Airline flight after refusing to wear a mask. 'This is the first time we're hearing about something like this happening since American Airlines announced plans to more strictly enforce masks.'" The passenger, Brandon Straka, was ordered off and told not to record the video (video

seen on Twitter). The airline has permanently banned him for the duration of the Coronavirius pandemic. KTNV Channel 13 Las Vegas channel. June 19, 2020. https://youtu.be/djZytYu9exM and https://youtu.be/gxizFmZ6Dy8

6.   "***Family kicked off flight***: 'A Houston area family is removed from a ==Southwest Airlines== flight over a face covering issue; …3 year old son had autism and a doctor's note would not wear a mask" on ==Southwest Airlines== at Hobby Airport. Alyssa Sadler, mother.     KPRC 2 Click2Houston; August 11, 2020. https://youtu.be/3XpnZAmEuxs

7.   "***Family kicked off ==JetBlue== flight over 2-year-old's mask refusal:*** ' Eyewitness News ABC7NY; Aug 20, 2020.  https://youtu.be/MXEaSmxOi6Q "A Brooklyn mother is speaking out after ==JetBlue Airways== forced her and her six children off a plane this week when her 2-year-old daughter refused to wear a mask. "I was shaken," Chaya Bruck said. "My kids started crying. They didn't know what was going on."  Passengers on the Orlando-to-Newark flight stood up for the family… The 39-year-old Bruck was heading home from a family vacation in Florida Wednesday. Everyone in her party was wearing the mandatory masks, except her young daughter. "She never wore masks this entire few months," she said. "I would never make her wear a mask, She's a baby." Bruck said three crew members told her she had to put a mask on her daughter, and one of them happened to be on her outbound flight and had told her the same thing. JetBlue requires masks for all passengers ages 2 and up.  Read More: https://7ny.tv/2EakuEg

8.   "***Airlines strictly enforcing mask policy***;  'Passengers who refuse to wear a mask or face coverings may get banned from flying with some of the major U.S. airlines [American, Delta, united, ==Southwest== named].'";  ABC15 Arizona channel; 614K subscribers.     June 15, 2020.     https://www.youtube.com/watch?v=-nU2q8bmdrE&list=PL1f7fFhGIAu9G38QbpPu-focnPp71ZbUw&index=109

9.   "***Man Refuses To Wear Maks [sic] On Plane***;  'Police had to be called inside a Fort Lauderdale-bound plane in New York when a man (unnamed) refused to wear a mask while onboard a plane [==Spirit Airlines==].'";  CBS Miami channel; June 15, 2020. "No mask, no flight. That's the rule on almost every airline these days…"  https://youtu.be/1cjkLFqAqBM

10.   "***Police arrest belligerent passenger on flight at Jacksonville International Airport***: '…latest in the uptick in reports of unruly passengers according to the Federal Aviation Administration from Jan 1- May 24th there were approximately 2500 reports…surge in complaints especially with the mask mandate."     News4JAX channel; Jun 4, 2021. https://youtu.be/QEomO2VEn2U

11. "***Man in Trump gear booted from ==Southwest== flight for removing mask to eat | New York ==Post:==*** ==‘A black man wearing a "Trump 2020" mask was kicked off a Southwest== Airlines after lowering it to eat a snack, a video appears to show.  The passenger — who was also sporting a "Black Voices for Trump" hat — is seen talking to a crew member while holding a bag of mixed nuts and wearing a face mask under his chin....'"; New York Post channel; Oct 15, 2020. https://youtu.be/q8WlF8eU5Rg

12. "***Caught-on-video brawl erupts after maskless passengers pulled off plane | New York Post***;  '...brawl erupted at a Florida airport after two women who were kicked off a plane for not wearing masks were mocked by other passengers in the terminal... when the covidiots [sic] who were escorted through the American Airlines terminal were booed by other travelers, WSVN reported.'"; New York Post channel; Mar 19, 2021. https://youtu.be/irOqodUbobQ

3

Plaintiff's Exhibit 155

rollcall.com

# Senators running out of patience on mask mandate for travelers

*David Higgins*

5-6 minutes

Congress

**Buttigieg cites justifications for keeping restrictions for air travel**



Sen. Roger Wicker, R-Miss., complained that certain restrictions due to COVID-19 were "hogwash." A mask mandate for air travel remains in effect even as restrictions are lifted elsewhere. (Caroline Brehman/CQ Roll Call file photo)



- 

<mark>Posted June 17, 2021 at 9:30am</mark>

<mark>Republican senators are expressing mounting impatience with the federal mask mandate for travelers, arguing that the lifting of restrictions in most public places should extend to airplanes, rail and transit.</mark>

In a markup of rail and safety legislation on Wednesday, the Commerce, Science and Transportation Committee rejected along party lines an amendment introduced by Sen. Rick Scott, R-Fla., that would end the mandate, but not before Sen. Brian Schatz, D-Hawaii, acknowledged that he, too, was feeling impatient.

<mark>Schatz suggested that the Senate introduce a "sense of the Senate" resolution that would encourage the Biden administration to reconsider its rule, acknowledging that while the agencies are the experts on issues, they "are not infallible."</mark>

"Sometimes they move slowly," Schatz said. "Sometimes they're a little too precautionary."

<mark>Sen. Roger Wicker, R-Miss., backed the Scott amendment. "I think we should express the sense of this committee that what is being foisted on us now in the name of science is hogwash," he said.</mark>

Hours later, Sen. Susan Collins of Maine, the ranking Republican on the Transportation-HUD Appropriations Subcommittee, asked Transportation Secretary Pete Buttigieg why travelers on airplanes were required to wear masks while those gathered in crowded airport bars were not.

She said she asked because of a recent conversation with two flight attendants who expressed concern about passengers who had become violent because of the mandate. The Federal Aviation

Administration has received reports of about 2,500 unruly passengers this year.

Buttigieg said the mandate remains in place because of some unique circumstances, such as the fact that planes feature "a number of people from different places passing through the same small place," as well as the presence of children on airplanes. No vaccine has been approved for those under 12.

"I share the impatience to be able to return to where they're not required," Buttigieg said of masks, but he said the process of removing that mandate is an interagency process guided by public health experts.

"This is something we need to continue to revisit," he said. "And while I haven't seen … a specific rubric that says if we hit this benchmark we can say goodbye to the masks, which we're all eager to do, I do think it's of course true that the sooner we get as many people as possible vaccinated, the sooner we can get there."

The Centers for Disease Control and Prevention on Jan. 29 required travelers to wear masks in order to prevent the spread of the virus that causes COVID-19 both while traveling and in transportation hubs such as airports and rail stations.

In mid-May, the CDC issued updated guidance, advising that fully vaccinated people could resume activities without a mask, but recommended those who had not been vaccinated continue to wear them. The travel requirement, however, remained unchanged.

The Association of Flight Attendants-CWA said in a statement that they remain supportive of the mask mandate, which is in place through Sept. 13.

## Budget

Buttigieg spoke during an appearance before the appropriations panel to defend President Joe Biden's proposed $88 billion transportation budget for fiscal 2022, which includes a 14.3 percent increase in discretionary funding.

The budget includes $25.7 billion in discretionary spending over the fiscal 2021 enacted budget, a $411 million increase, according to Collins. But it also includes $621 billion for transportation programs as part of a sweeping $2 trillion infrastructure proposal that has become Biden's key economic priority.

The budget includes boosts to Amtrak and aviation safety, but also prioritizes climate change and equity. It proposes a new $110 million "Thriving Communities" pilot program, which Buttigieg said would push the administration's equity goals.

Buttigieg cited St. Paul, Minn., Pittsburgh and New Orleans as examples of cities "where we've seen a piece of federally funded highway infrastructure, for example, literally cut a community in half."

"We've got a chance to do something about that," he said. "Sometimes that means capping a highway and reclaiming the land that was torn up in order to produce it. Other times it means introducing bridges over or tunnels under or transit routes around these divisions. But the most important thing is to make sure that transportation really does connect."

'Damn good to be back' — Congressional Hits and Misses

Volume 0%

## Trending Stories

Plaintiff's Exhibit 156

commerce.senate.gov

# Senators Ask CDC, TSA for Update on Travel Guidance, Mask Requirements on Planes, Buses

4-5 minutes          June 30, 2021

---

**WASHINGTON** – U.S. Sens. Roger Wicker, R-Miss., ranking member of the Committee on Commerce, Science, and Transportation, Brian Schatz, D-Hawaii, Amy Klobuchar, D-Minn., Susan Collins, R-Maine, and Jerry Moran, R-Kan., asked the Centers for Disease Control and Prevention (CDC) and the Transportation Security Administration (TSA) for more information on when and how the agencies will update their travel guidance for vaccinated people.

"As there has not yet been any change in the requirement for masks while traveling, we request an update on the CDC's and TSA's process for updating the mask requirement for fully vaccinated individuals and what the science is showing about the transmission of COVID-19 for fully vaccinated individuals while traveling," the senators wrote.

The full text of the letter can be found below.

Dear Dr. Walensky and Adminstrator Pekoske:

We are writing regarding the Centers for Disease Control and Prevention's (CDC) order and the  Transportation Security Administration's (TSA) security directive to require the wearing of masks by individuals on public transportation conveyances—such as airplanes, buses, and trains—or at transportation hubs to prevent the spread of the virus that causes COVID-19.  We support measures to prevent the spread of COVID-19 and end the pandemic as soon as possible, but we also support steps to safely lift restrictions when appropriate.

We understand that CDC and TSA issued and have maintained the mask requirement for travel for several reasons, including that public transportation conveyances and transportation hubs are locations where many people gather, physical distancing can be difficult, and the option to get off or move to another area is not always available. In addition, people may need to take public transportation for their livelihoods, and individuals working or traveling on transportation conveyances may be unvaccinated or at increased risk of severe illness.

The CDC's guidance on face masks for fully vaccinated people has evolved as new data have become available and as more individuals are vaccinated.  In May, the CDC announced new guidance that fully vaccinated individuals could resume activities without wearing a mask or staying six feet apart.  At that time, the CDC said that it would continue to update its guidance for travel as the science emerges and that it would need to collaborate with other agencies as the face mask requirement is an interagency policy.

As there has not yet been any change in the requirement for masks while traveling, we request an update on the CDC's and TSA's process for updating the mask requirement for fully vaccinated individuals and what the science is showing about the transmission of COVID-19 for fully vaccinated individuals while traveling.  Specifically, we request answers by no later than July 12, 2021, to the following questions:

1. What has the CDC learned about the transmission of COVID-19 on airplanes and other forms of transportation for fully vaccinated individuals?

2. What additional factors beyond how COVID-19 spreads, such as the impact on flight attendants or airline operations, are informing the mask requirement for travel?

3. Would removing the mask requirement for travel for fully vaccinated people encourage vaccination against COVID-19?

4. Would lifting the mask requirement for fully vaccinated travelers create administrability challenges?

5. What steps have the CDC, TSA, and other relevant federal agencies taken together to update the travel guidance and mask requirement?

If the requirement for wearing masks while traveling can be safely lifted and would serve the public health interest, then we believe it would benefit the traveling public. We appreciate your prompt attention to this matter and hard work in responding to the COVID-19 pandemic.

Sincerely,

Plaintiff's Exhibit 157

## Republicans are seizing on backlash to new mask and vaccine mandates

By Melanie Zanona, CNN
August 11, 2021

Republicans have found a new boogeyman in the battle for the House: the nation's top public health agency.

As Republicans head back to their districts for the August recess, they are hammering the US Centers for Disease Control and Prevention and seizing on the backlash to new mask and vaccine mandates -- part of a GOP-wide effort to use the fears and frustrations of Americans worried about another round of school closures and lockdowns as cudgels against their Democratic opponents.

Those were the dominant themes of a House GOP news conference right before the summer break, and House Minority Leader Kevin McCarthy, a California Republican, continued to beat that drum on Tuesday, firing off a new letter to the Capitol physician and saying in a separate statement that President Joe Biden has "threatened a return to lockdowns and government-mandated restrictions for American citizens."

Meanwhile, "Fire Fauci" -- a reference to infectious disease expert Dr. Anthony Fauci -- has become a new rallying cry on the right, with some campaigns even selling anti-Fauci merchandise. And Sen. Rand Paul, a Kentucky Republican and doctor, recently went on a tirade against the CDC and brazenly called on the public to defy health protocols.

"Americans no longer trust Dr. Fauci or the CDC. We clearly need new leadership," said Rep. Warren Davidson, an Ohio Republican who's a member of the hard-line House Freedom Caucus. "Americans should be trusted to provide informed consent for vaccines. Americans should make their own personal decisions about masks. They're sick of others imposing their will on them."

Republicans feel like they have a potent political message following an agonizing and exhausting stretch of pandemic life, and are making the case to voters that things would be different if they're in power. Plus, whacking Biden's handling of the deadly virus is a way for the GOP to dent an area where the President had received strong marks at the beginning of his presidency.

"There's practically no one in America who isn't tired and frustrated with wearing masks," said GOP strategist Doug Heye. "For Republicans, they very clearly see something that they can tap into here."

But turning the CDC into a punching bag -- and villainizing scientists -- is also an irresponsible and risky strategy, as the Delta variant continues to ravage communities with low vaccination rates and pediatric hospitalizations are on the rise, just as kids return to school. While the GOP is harping on the reemergence of safety measures, it is largely ignoring that the country likely wouldn't be in this position if it weren't for some of the anti-vaccine sentiment being pushed by party members.

And that rhetoric has continued to spread inside the GOP: Freshman Rep. Marjorie Taylor Greene, the controversial Georgia Republican, was once again suspended from Twitter on Tuesday for peddling misinformation about the vaccine, while Paul was suspended from YouTube for claiming that masks are ineffective in fighting Covid-19.

"If you're not interested in following the public health guidelines to protect the lives of people in your state, to give parents some comfort as they're sending their kids to school, then get out of the way and let public officials, let local officials, do their job to keep students safe," press secretary Jen Psaki said at Tuesday's White House briefing.

**Republicans rally around resistance to mandates**

With coronavirus cases back on the rise and just over half of the US population fully vaccinated, fears have started to grow about the potential for new -- and even more deadly -- variants. As a result, mask mandates have started to return around the country, while a number of governments, schools and businesses have begun to require employees and patrons to get the vaccine.

But the renewed safety protocols have spurred a fierce backlash on the right. Several red states have imposed bans on mask mandates in schools -- including GOP Florida Gov. Ron DeSantis, a potential 2024 presidential contender who threatened to withhold the salaries of school officials who defy his no-mask policy. And in Washington, Republicans from both ends of the Capitol have introduced a stack of bills to prohibit federal vaccine passports, repeal mask mandates and eliminate Fauci's salary. Senate Republicans on Tuesday proposed amendments to the Democrats' budget resolution that would bar schools from mandating vaccines and masks, though the provisions would be nonbinding even if they were adopted, making them purely a messaging exercise.

The GOP's crusade against masks has gone even further than drafting legislation. Dozens of Republicans recently refused to wear facial coverings on the House floor. And a trio of GOP lawmakers filed a new lawsuit against House Speaker Nancy Pelosi over the chamber's mask fines -- including Rep. Ralph Norman, a South Carolina Republican who has refused to mask up inside the Capitol and recently contracted a breakthrough case of Covid.

Republicans have broadly framed the health requirements as infringing on American liberties and freedoms. They've also accused Biden and the CDC of shifting the goalposts, arguing that requiring vaccinated individuals to now wear masks will actually discourage people from getting inoculated against the virus. And the GOP has been quick to highlight what it sees as examples of Democratic hypocrisy when it comes to the rules -- including former President Barack Obama's outdoor birthday bash last weekend.

"The CDC has become a political arm of the administration. It wants to control every element of our life," McCarthy said at the pre-recess news conference, which was designed to solidify their midterm message and get Republicans on the same page. "We have a President in the White House and Democrats in Congress that are completely oblivious to the frustration the American people are feeling at this moment."

**Democrats and health experts push back on 'terrible' GOP message**

For their part, Democrats have empathized with the frustrations of many Americans and acknowledged that the guidance has evolved as the data has changed. But they have also said it's Republicans who bear the responsibility for the country's inability to stomp out the virus once and for all, which would eliminate the need for mask wearing.

"I just went to an outdoor event that required masks," Rep. Eric Swalwell, a California Democrat, tweeted on Tuesday. "Why?! Because those guys in the Radical Republican Party keep spinning vaccine lies and risking all our lives. We are backsliding and there's a straight line of responsibility to Kevin McCarthy's GOP."

Public experts, meanwhile, have warned that the anti-CDC messaging coming from the GOP is dangerous. While Republicans this summer started to shift their tone on encouraging voters to get the vaccine, the party has dug in hard when it comes to opposing mandates for shots and masks.

"The impact is terrible. I want freedom too, but I also believe in public health," Dr. Carlos del Rio, executive associate dean at Emory School of Medicine, said on CNN. "I'm particularly offended by Sen. Rand Paul saying that we shouldn't listen to the CDC. ... We have the best public health agency in the world and we are lucky to have CDC working 24/7 to get us over this outbreak."

Even some in the GOP have pushed back on their party's resistance to pandemic protocols. That includes Republican Sen. Bill Cassidy, a doctor who represents Louisiana, a state that is being hit particularly hard by the Delta variant.

"Whenever politicians mess with public health, usually it doesn't work out for public health, and ultimately it doesn't work out for the politician, because public health suffers and the American people want public health," Cassidy told CNN's Dana Bash on "State of the Union" on Sunday. "When it comes to local conditions, if my hospital's full, vaccination rate is low and infection rate is going crazy, we should allow local officials to make those decisions best for their communities."

Plaintiff's Exhibit 158

reuters.com

# CDC defends U.S. transit mask mandate as some call for scrapping

*David Shepardson*

4 minutes

---

Travelers board the air train ahead of the July 4th holiday, at the Newark Liberty International Airport, in Newark, New Jersey, U.S., July 2, 2021. REUTERS/Eduardo Munoz

WASHINGTON, July 16 (Reuters) - A senior U.S. health official who signed a sweeping order for masks to be worn on nearly all forms of public transport said they were a key tool in preventing COVID-19 transmission even as some lawmakers call for ending the rules.

Marty Cetron, director for the Centers for Disease Control and Prevention's (CDC) Division of Global Migration and Quarantine, told Reuters Thursday the agency's "current position" is the mandate should not be lifted.

"Masks are really powerful and we should make sure they're part of our arsenal," Cetron said in an interview. "We mask not just to protect ourselves - we mask because it's the way we take care and express our concern for each other."

The rules in place since January require masks to be worn by all travelers on airplanes, ships, trains, subways, buses, taxis, and ride-shares and at transport hubs like airports, bus or ferry terminals, train and subway stations and ports.

"The truth is that the unvaccinated portion that's out there is extremely vulnerable," Cetron said, especially in an indoor transportation hub "where the ventilation may not be optimized."

A group of Republican lawmakers this week introduced legislation to prohibit

mask mandates for public transport, arguing they no longer make sense with a growing number of Americans getting vaccinated. Republican Representative Andy Biggs said transit mask rules "are only being kept in place by those who relish controlling our day-to-day lives."

In mid-May, CDC said fully vaccinated people could avoid wearing masks indoors in most places - with some exceptions like transit.

The mask mandate has been a huge source of friction on U.S. airplanes. The Federal Aviation Administration said Tuesday that since Jan. 1 it has received 3,420 unruly passenger reports, including 2,559 for refusing to wear masks.

The Transportation Security Administration (TSA) said Sunday was the single-busiest day since February 2020, with nearly 2.2 million passengers.

"I get we're all just over this emotionally but I do think we will succeed together if we realize the virus is the enemy and it's not your fellow citizen or the person sitting next to you on a plane or a piece of cloth that you have to wear over your face," Cetron said.

The CDC transit mask order has no expiration date. In April, the TSA extended its mask requirement until Sept. 13.

"As long as the CDC order is in place, the expectation is the implementing modes ... would continue with their own directives," Cetron said.

"We won't wait until September to reevaluate," Cetron said, adding CDC is regularly reviewing the mandate. "If the pandemic were to suddenly disappear before then we have the ability to take down the order."

Under Donald Trump, a CDC push to mandate masks in transit was blocked.

Asked if he still believes there is a scientific or public health basis for U.S. travel restrictions that bar entry from some countries in the United States, Cetron said: "I'm not going to get into the details" but said U.S. government discussions are going on.

Reporting by David Shepardson Editing by Robert Birsel

Our Standards: The Thomson Reuters Trust Principles.

Plaintiff's Exhibit 159

[nbcwashington.com](nbcwashington.com)

# CDC Is Leaving It Up to States to Set Guidelines for Mask-Wearing, Director Says

*Berkeley Lovelace Jr., CNBC*

4-5 minutes    Published June 30, 2021

- CDC Director Dr. Rochelle Walensky said Wednesday the U.S. agency is leaving it up to states and local health officials to set guidelines around mask-wearing.

- The CDC has "always said that local policymakers need to make policies for their local environment," she said.

CDC Director Dr. Rochelle Walensky said Wednesday the U.S. agency is leaving it up to states and local health officials to set guidelines around mask-wearing even after the World Health Organization urged fully vaccinated people to continue the practice.

The Centers for Disease Control and Prevention has "always said that local policymakers need to make policies for their local environment," Walensky said during an interview on the NBC program "TODAY." She added that the agency's guidelines broadly recommend that vaccinated people don't need to wear masks.

**Money Report**





"There are areas of this country where about a third of people are vaccinated, they have low vaccination rates," Walensky said. "There are areas where they have more disease in the context of people not being vaccinated. So, in those areas, we've always said please look, make suggestions."

She added, "If you are vaccinated, you are safe from the variants that are circulating here in the United States."

The CDC director's comments come days after WHO officials urged fully vaccinated people to continue to wear masks, social distance and practice other pandemic safety measures as the highly contagious delta variant spreads rapidly across the globe.

Delta, now in at least 92 countries, including the United States, is expected to become the dominant variant of the disease worldwide, according to the WHO. In the U.S., the prevalence of the strain is doubling about every two weeks.

WHO officials said Friday they are asking fully vaccinated people to continue to

"play it safe" because a large portion of the world remains unvaccinated and highly contagious variants, like delta, are spreading in many countries and spurring outbreaks.

"People cannot feel safe just because they had the two doses. They still need to protect themselves," Dr. Mariangela Simao, WHO assistant director-general for access to medicines and health products, said during a news briefing.

The WHO's comments were a departure from the CDC, which has said fully vaccinated Americans can go maskless in most settings, and sparked widespread confusion.

Walensky said Wednesday that the WHO makes recommendations for a global population, adding many regions of the world remain unvaccinated.

"When the WHO makes those recommendations, they do so in that context," she said.

Still, while many states have lifted most of their mask restrictions, places like Mississippi are recommending that residents continue to wear masks indoors even if they are fully vaccinated.

Delta is the dominant variant in Mississippi right now and only 31% of the state's eligible population is vaccinated, state health officials said on a call late Tuesday. About 96% of new Covid cases are unvaccinated people, they added.

*– CNBC's Rich Mendez contributed to this report.*

**Also on CNBC**

- Dr. Gottlieb: U.S. unlikely to have 'raging epidemic' from Covid delta variant

- 5 things to know before the stock market opens Wednesday

- Putin reveals he had the Sputnik V shot as Russia struggles to convince public

Plaintiff's Exhibit 160

**COVID-19 Deaths Reported by State per 100,000 Residents**
*Data updated through May 26, 2021*

| STATE | DEATHS | MASK MANDATE | REPEALED | NOTES |
|---|---|---|---|---|
| Hawaii | 35 | Yes | In Effect | |
| Vermont | 41 | Yes | In Effect | Applies only to unvaccinated; ends when 80% vaccinated |
| Alaska | 50 | No | N/A | |
| Maine | 61 | Yes | 5/24/2021 | |
| Oregon | 62 | Yes | In Effect | Applies only to unvaccinated |
| Utah | 71 | Yes | 4/10/2021 | Repealed by legislature |
| Washington | 75 | Yes | In Effect | Applies only to unvaccinated |
| New Hampshire | 99 | Yes | 4/16/2021 | |
| Colorado | 113 | Yes | 5/14/2021 | |
| Nebraska | 116 | No | N/A | |
| Idaho | 117 | No | N/A | |
| North Carolina | 124 | Yes | 5/14/2021 | |
| Wyoming | 124 | Yes | 3/16/2021 | |
| Virginia | 130 | Yes | 5/28/2021 | |
| Minnesota | 133 | Yes | 5/14/2021 | |
| Wisconsin | 133 | Yes | 3/31/2021 | Struck down by Wisconsin Supreme Court |
| Maryland | 149 | Yes | 5/15/2021 | |
| Montana | 150 | Yes | 2/12/2021 | |
| Kentucky | 151 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 6/11/21 |
| Missouri | 154 | No | N/A | |
| West Virginia | 155 | Yes | In Effect | Scheduled to end 6/20/21 |
| California | 159 | Yes | In Effect | Scheduled to end 6/15/21 |
| District of Columbia | 160 | Yes | In Effect | Now applies only to unvaccinated |
| Ohio | 169 | Yes | In Effect | Applies only to unvaccinated; scheduled to end 6/2/21 |
| Delaware | 170 | Yes | 5/21/2021 | |
| Florida | 170 | No | N/A | Local mandates prohibited by EO |
| Kansas | 174 | Yes | 4/1/2021 | Repealed by legislature; counties could opt out when in effect |
| Oklahoma | 175 | No | N/A | |
| Texas | 177 | Yes | 3/10/2021 | Local mandates prohibited by EO |
| Nevada | 181 | Yes | In Effect | Now applies only to unvaccinated |
| Tennessee | 182 | No | N/A | Local mandates prohibited by EO |
| South Carolina | 188 | No | N/A | Local mandates prohibited by EO |
| Iowa | 191 | Yes | 2/7/2021 | Local mandates prohibited by new law |
| Arkansas | 193 | Yes | 3/31/2021 | Local mandates prohibited by new law |
| Georgia | 195 | No | N/A | |
| Illinois | 198 | Yes | In Effect | Now applies only to unvaccinated |
| Indiana | 202 | Yes | 4/6/2021 | |
| New Mexico | 202 | Yes | In Effect | Applies only to unvaccinated |
| North Dakota | 202 | Yes | 1/18/2021 | |
| Michigan | 203 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 7/1/21 |
| Pennsylvania | 211 | Yes | In Effect | Applies only to unvaccinated; scheduled to end 6/28/21 |
| Alabama | 227 | Yes | 4/9/2021 | |
| Louisiana | 227 | Yes | 4/28/2021 | |
| South Dakota | 227 | No | N/A | |
| Connecticut | 231 | Yes | In Effect | Now applies only to unvaccinated |
| Arizona | 241 | Yes | 3/25/2021 | Local mandates prohibited by EO |
| Mississippi | 245 | Yes | 3/3/2021 | |
| Rhode Island | 256 | Yes | In Effect | Applies only to unvaccinated |
| Massachusetts | 259 | Yes | In Effect | Scheduled to end 5/29/21 |
| New York | 273 | Yes | In Effect | Applies only to unvaccinated |
| New Jersey | 294 | Yes | 5/28/2021 | |
| **NATIONAL AVERAGE** | **165** | | | |

| | |
|---|---|
| **States that never had a mask mandate** | **10** |
| **Mandate repealed before 5/13/21 CDC guidance** | **15** |
| **Mandate repealed after 5/13/21 CDC guidance** | **8** |
| **Mandate still in effect for unvaccinated only** | **14** |
| **Mandate still in effect for everyone** | **4** |

*Chart by Lucas Wall*
*Data Sources: www.statista.com/statistics/1109004/coronavirus-covid19-cases-rate-us-americans-by-state*
*www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-coronavirus.html*

**COVID-19 Deaths Reported by State per 100,000 Residents**
**Sorted by Whether State Had a Mask Mandate**
*Data updated through May 26, 2021*

| STATE | DEATHS | MASK MANDATE | REPEALED | NOTES |
|---|---|---|---|---|
| Alaska | 50 | No | N/A | |
| Nebraska | 116 | No | N/A | |
| Idaho | 117 | No | N/A | |
| Missouri | 154 | No | N/A | |
| Florida | 170 | No | N/A | Local mandates prohibited by EO |
| Oklahoma | 175 | No | N/A | |
| Tennessee | 182 | No | N/A | Local mandates prohibited by EO |
| South Carolina | 188 | No | N/A | Local mandates prohibited by EO |
| Georgia | 195 | No | N/A | |
| South Dakota | 227 | No | N/A | |
| **AVERAGE** | **157** | | | |
| | | | | |
| Hawaii | 35 | Yes | In Effect | |
| Vermont | 41 | Yes | In Effect | Applies only to unvaccinated; ends when 80% vaccinated |
| Maine | 61 | Yes | 5/24/2021 | |
| Oregon | 62 | Yes | In Effect | Applies only to unvaccinated |
| Utah | 71 | Yes | 4/10/2021 | Repealed by legislature |
| Washington | 75 | Yes | In Effect | Applies only to unvaccinated |
| New Hampshire | 99 | Yes | 4/16/2021 | |
| Colorado | 113 | Yes | 5/14/2021 | |
| North Carolina | 124 | Yes | 5/14/2021 | |
| Wyoming | 124 | Yes | 3/16/2021 | |
| Virginia | 130 | Yes | 5/28/2021 | |
| Minnesota | 133 | Yes | 5/14/2021 | |
| Wisconsin | 133 | Yes | 3/31/2021 | Struck down by Wisconsin Supreme Court |
| Maryland | 149 | Yes | 5/15/2021 | |
| Montana | 150 | Yes | 2/12/2021 | |
| Kentucky | 151 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 6/11/21 |
| West Virginia | 155 | Yes | In Effect | Scheduled to end 6/20/21 |
| California | 159 | Yes | In Effect | Scheduled to end 6/15/21 |
| District of Columbia | 160 | Yes | In Effect | Now applies only to unvaccinated |
| Ohio | 169 | Yes | In Effect | Applies only to unvaccinated; scheduled to end 6/2/21 |
| Delaware | 170 | Yes | 5/21/2021 | |
| Kansas | 174 | Yes | 4/1/2021 | Repealed by legislature; counties could opt out when in effect |
| Texas | 177 | Yes | 3/10/2021 | Local mandates prohibited by EO |
| Nevada | 181 | Yes | In Effect | Now applies only to unvaccinated |
| Iowa | 191 | Yes | 2/7/2021 | Local mandates prohibited by new law |
| Arkansas | 193 | Yes | 3/31/2021 | Local mandates prohibited by new law |
| Illinois | 198 | Yes | In Effect | Now applies only to unvaccinated |
| Indiana | 202 | Yes | 4/6/2021 | |
| New Mexico | 202 | Yes | In Effect | Applies only to unvaccinated |
| North Dakota | 202 | Yes | 1/18/2021 | |
| Michigan | 203 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 7/1/21 |
| Pennsylvania | 211 | Yes | In Effect | Applies only to unvaccinated; scheduled to end 6/28/21 |
| Alabama | 227 | Yes | 4/9/2021 | |
| Louisiana | 227 | Yes | 4/28/2021 | |
| Connecticut | 231 | Yes | In Effect | Now applies only to unvaccinated |
| Arizona | 241 | Yes | 3/25/2021 | Local mandates prohibited by EO |

| | | | | |
|---|---|---|---|---|
| Mississippi | 245 | Yes | 3/3/2021 | |
| Rhode Island | 256 | Yes | In Effect | Applies only to unvaccinated |
| Massachusetts | 259 | Yes | In Effect | Scheduled to end 5/29/21 |
| New York | 273 | Yes | In Effect | Applies only to unvaccinated |
| New Jersey | 294 | Yes | 5/28/2021 | |
| **AVERAGE** | **167** | | | |

| | |
|---|---|
| **No Mask Mandate** | **157** |
| **National Average** | **165** |
| **Statewide Mandate** | **167** |

**Deaths in states that never implemented a mask mandate are 6.0% lower than states that had a requirement**
**Deaths in states that never implemented a mask mandate are 4.9% lower than the national average**
**Deaths in states that required face coverings are 1.2% higher than the national average**
**The 7 worst states in per-capita deaths all have/had mask requirements**

*Chart by Lucas Wall*
*Data Sources: www.statista.com/statistics/1109004/coronavirus-covid19-cases-rate-us-americans-by-state*
*www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-coronavirus.html*

**COVID-19 Deaths Reported by State per 100,000 Residents**
**Sorted by When State Had a Mask Mandate**
*Data updated through May 26, 2021*

| STATE | DEATHS | MASK MANDATE | REPEALED | NOTES |
|---|---|---|---|---|
| Alaska | 50 | No | N/A | |
| Nebraska | 116 | No | N/A | |
| Idaho | 117 | No | N/A | |
| Missouri | 154 | No | N/A | |
| Florida | 170 | No | N/A | Local mandates prohibited by EO |
| Oklahoma | 175 | No | N/A | |
| Tennessee | 182 | No | N/A | Local mandates prohibited by EO |
| South Carolina | 188 | No | N/A | Local mandates prohibited by EO |
| Georgia | 195 | No | N/A | |
| South Dakota | 227 | No | N/A | |
| **AVERAGE** | **157** | **Never** | | |
| | | | | |
| Utah | 71 | Yes | 4/10/2021 | Repealed by legislature |
| New Hampshire | 99 | Yes | 4/16/2021 | |
| Wyoming | 124 | Yes | 3/16/2021 | |
| Wisconsin | 133 | Yes | 3/31/2021 | Struck down by Wisconsin Supreme Court |
| Montana | 150 | Yes | 2/12/2021 | |
| Kansas | 174 | Yes | 4/1/2021 | Repealed by legislature; counties could opt out when in effect |
| Texas | 177 | Yes | 3/10/2021 | Local mandates prohibited by EO |
| Iowa | 191 | Yes | 2/7/2021 | Local mandates prohibited by new law |
| Arkansas | 193 | Yes | 3/31/2021 | Local mandates prohibited by new law |
| North Dakota | 202 | Yes | 1/18/2021 | |
| Indiana | 202 | Yes | 4/6/2021 | |
| Alabama | 227 | Yes | 4/9/2021 | |
| Louisiana | 227 | Yes | 4/28/2021 | |
| Arizona | 241 | Yes | 3/25/2021 | Local mandates prohibited by EO |
| Mississippi | 245 | Yes | 3/3/2021 | |
| **AVERAGE** | **177** | **Repealed before 5/13/21 CDC guidance** | | |
| | | | | |
| Maine | 61 | Yes | 5/24/2021 | |
| Colorado | 113 | Yes | 5/14/2021 | |
| North Carolina | 124 | Yes | 5/14/2021 | |
| Virginia | 130 | Yes | 5/28/2021 | |
| Minnesota | 133 | Yes | 5/14/2021 | |
| Maryland | 149 | Yes | 5/15/2021 | |
| Delaware | 170 | Yes | 5/21/2021 | |
| New Jersey | 294 | Yes | 5/28/2021 | |
| **AVERAGE** | **167** | **Repealed after 5/13/21 CDC guidance** | | |
| | | | | |
| Hawaii | 35 | Yes | In Effect | |
| Vermont | 41 | Yes | In Effect | Now applies only to unvaccinated; ends when 80% vaccinated |
| Oregon | 62 | Yes | In Effect | Now applies only to unvaccinated |
| Washington | 75 | Yes | In Effect | Now applies only to unvaccinated |
| Kentucky | 151 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 6/11/21 |
| West Virginia | 155 | Yes | In Effect | Scheduled to end 6/20/21 |
| California | 159 | Yes | In Effect | Scheduled to end 6/15/21 |
| District of Columbia | 160 | Yes | In Effect | Now applies only to unvaccinated |
| Ohio | 169 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 6/2/21 |

| | | | | |
|---|---|---|---|---|
| Nevada | 181 | Yes | In Effect | Now applies only to unvaccinated |
| Illinois | 198 | Yes | In Effect | Now applies only to unvaccinated |
| New Mexico | 202 | Yes | In Effect | Now applies only to unvaccinated |
| Michigan | 203 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 7/1/21 |
| Pennsylvania | 211 | Yes | In Effect | Now applies only to unvaccinated; scheduled to end 6/28/21 |
| Connecticut | 231 | Yes | In Effect | Now applies only to unvaccinated |
| Rhode Island | 256 | Yes | In Effect | Now applies only to unvaccinated |
| Massachusetts | 259 | Yes | In Effect | Scheduled to end 5/29/21 |
| New York | 273 | Yes | In Effect | Now applies only to unvaccinated |
| **AVERAGE** | **168** | **Still in Effect** | | |

| | | |
|---|---|---|
| **No Mask Mandate** | **157** | **4.9% below national average** |
| *National Average* | *165* | |
| **Mandate repealed after 5/13/21 CDC guidance** | **167** | **6.4% higher than national average** |
| **Mandate still in effect** | **168** | **1.2% higher than national average** |
| **Mandate repealed before 5/13/21 CDC guidance** | **177** | **7.3% higher than national average** |

**Deaths in states that never implemented a mask mandate are 6.5% lower than states that still have a requirement**
**All 3 groups of states that adopted a mask mandate at some point fared worse than the 10 states that never did**

*Chart by Lucas Wall*

*Data Sources: www.statista.com/statistics/1109004/coronavirus-covid19-cases-rate-us-americans-by-state*
*www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-coronavirus.html*

Plaintiff's Exhibit 161

[travelpulse.com](travelpulse.com)

# More Than 4,000 Passengers Banned From Airlines Over Mask Mandate

2-3 minutes   May 8, 2021

Since the onset of the COVID-19 pandemic last year, and the introduction of face mask-wearing mandates aboard flights, the [number of naughty passengers](#) has increased exponentially.

But this much?

ADVERTISING

The airlines and the Federal Aviation Administration have been cracking down on unruly behavior, to the point where more than 4,000 fliers have been banned in the last year [according to CBS News](#).

In fact, some passengers are facing fines of up to $30,000 for their activities on some flights.

Trending Now



Here's a breakdown of the top 10 U.S. carriers and the number of passengers they've banned:

– Alaska: 538 since May 11, 2020

– Allegiant: 15 since July 2, 2020

– American: does not report

– Delta: more than 1,200 since May 4, 2020

– Frontier: 830 since May 8, 2020

– Hawaiian: 106 since May 8, 2020

– JetBlue: 140 since May 4, 2020

– Spirit: 604 since May 11, 2020

– Southwest: does not report

– United: 750 since May 4, 2020

That's 4,183 without two major airlines reporting.

And we haven't even talked about the FAA fines yet. The agency has its sights set on four passengers, including one that owes more than $30,000 in penalties.

CBS noted that this includes a February 7 JetBlue flight headed to New York that had to return to the Dominican Republic after a passenger refused to wear a face mask after being asked by flight attendants to wear one. The passenger threw an empty alcohol bottle and food, cursed at crew members, grabbed one flight attendant and hit another and drank alcohol that wasn't served to her.

At least one airline said it isn't as bad as it seems.

"With the federal mandate for air travel (including airports), and our face covering policy designed to ensure to the greatest degree that issues are addressed on the ground and potential violators do not board an aircraft, we find that the great majority comply," says a statement from Allegiant. "For the most part, those few who may need a reminder in flight also comply."

Plaintiff's Exhibit 162

dallasnews.com

## American Airlines joins Southwest in delaying alcoholic beverage sales due to bad passenger behavior

*By Kyle Arnold 6:50 PM on May 29, 2021 CDT*

4-5 minutes

American Airlines will delay selling alcoholic beverages this summer to main cabin passengers due to the uptick in bad passenger behavior in recent months that includes refusing to wear masks and several assaults on flight attendants.

Fort Worth-based American Airlines told crew members that it won't reintroduce the sale of beer, wine and spirits to main cabin class passengers until at federal government officials drop the mask mandate aboard aircraft and airports. The mask mandate is currently set to expire Sept. 14. American was scheduled to bring back alcohol sales Tuesday.

**Featured on Dallas News**

Researchers evaluating how District Attorney John Creuzot's relaxing marijuana enforcement affects…

American Airlines joins Dallas-based Southwest Airlines in pushing back the reintroduction of the sale of alcoholic beverages after flight attendants expressed concern about the recent increase in bad passenger behavior. The concerns peaked after the bloody assault of a Southwest flight attendant last week on a flight landing in San Diego.

"Over the past week we've seen some of these stressors create deeply disturbing situations on board aircraft," said American Airlines vice president of flight safety Brady Byrnes said in a letter to crew members Saturday. "Let me be clear: American Airlines will not tolerate assault or mistreatment of our crews.

"We also recognize that alcohol can contribute to atypical behavior from customers on board, and we owe it to our crew not to potentially exacerbate what can already be a new and stressful situation for our customers."





American Airlines dropped alcoholic beverage service in March 2020 to create less contact between flight attendants and passengers during the COVID-19 pandemic. It also cut back service of soft drinks, juices, snacks and foods. Airlines are beginning to bring those services back, and American started selling alcohol to some premium class customers earlier this year.

But for everyone else, alcohol will have to wait a few more months.

"It is no secret that the threats flight attendants face each day have dramatically increased," said a letter to union members from Julie Hedrick, president of the Association of Professional Flight Attendants, which represents American's 13,400 flight attendants. "Every day, we are subjected to verbal and sometimes physical altercations, mainly centered around mask compliance. These altercations are often exacerbated when customers have consumed alcohol in the airport or alcohol they have brought on board."

Airlines and federal officials have noted an uptick in passenger misbehavior. Flight attendant union leaders have attributed much of the uptick in passengers refusing to wear masks, a COVID-19 precaution that took on deep political symbolism after the November presidential election and the Jan. 6 storming of the U.S. Capitol by Trump supporters who refused to accept Electoral College results.

The Federal Aviation Administration has noted more than 2,500 reports of passenger misbehavior this year, and a spokesman for the agency said there was a sharp uptick starting late last year.

Flight attendants have often been caught in the middle of the issue and heavily lobbied for a federal mandate for face masks on planes. President Joe Biden made a federal face mask rule on planes one of his first executive orders after he took office.

But passenger misbehavior has continued throughout the year despite numerous fines against passengers proposed by the FAA. Several of those fines stemmed from passengers drinking alcohol they had bought in airports.

Airlines are now dealing with their largest crowds since the pandemic began. Nearly 2 million passengers passed through Transportation Security Administration checkpoints on Friday, nearly 80% as many as did on the same date in 2019.

Atlanta-based Delta Airlines began serving alcohol to passengers again in July 2020. Chicago-based United is scheduled to resume sales of alcoholic beverages in June, and a company spokesman said United hasn't made a decision to change that.

Plaintiff's Exhibit 163

cnbc.com

## Unruly behavior from plane passengers has never been this bad, says flight attendant union chief

*Kevin Stankiewicz*

3-4 minutes

Incidents of unruly behavior from airplane passengers has risen to an unprecedented level this year, union leader Sara Nelson told CNBC on Friday, the start of the Memorial Day holiday weekend.

"This is an environment that we just haven't seen before, and we can't wait for it to be over," the president of the Association of Flight Attendants-CWA said on "Squawk Box."

The behavior has become "complete nuts," added Nelson, whose union represents around 50,000 cabin crew members across more than a dozen carriers. "It's a constant combative attitude. ... It's got to stop."

Nelson's comments follow a recent violent confrontation that resulted in a Southwest Airlines flight attendant sustaining facial injuries and losing two teeth. In a statement to NBC News earlier this week, Southwest said the passenger "repeatedly ignored standard inflight instructions and became verbally and physically abusive upon landing."

A 28-year-old woman has been charged with felony battery in the incident, which occurred on a Sacramento to San Diego flight.

The Federal Aviation Administration said Monday it has received around 2,500 reports of unruly passenger behavior since Jan. 1, roughly three-quarters of which involve failure to adhere to the federal face mask mandate that has been instituted due to the coronavirus pandemic.

That's more than 20 times higher than what's normally recorded in an entire year, Nelson told CNBC. She noted the role masks are playing in the surge and expressed disappointment that health protocols on planes are seen as "a political issue."

The federal mask requirement is on the books until Sept. 14, and the FAA intends to keep its zero-tolerance policy for passenger disturbances in place as long as the mandate applies.

While airline travel has picked up in recent months as Covid vaccinations become more available, TSA checkpoint data shows travel is still notably below 2019 levels.

"Typically what flight attendants will do, when we see a conflict arise on the plane, we're trained to deescalate. We look for our helpers," Nelson said. However, she said the passenger mix is different than pre-Covid.

"It's very difficult when you don't have people on the plane who are regularly flying, who sort of know the program, who are our typical people that we'd go to, at least, create peer pressure but also help to try to calm down these incidents," she said.

Nelson said increased messaging around the consequences for passengers who act out — such as FAA fines — would be helpful. That includes not only on-board messages from the flight captain, but also throughout airports, she said.

Temporary restrictions on alcohol sales also would be beneficial, Nelson said.

"A lot of times these events are exacerbated by alcohol, so we've been asking the government and the airlines to make sure they're not selling alcohol right now because that's only adding to the problem that is clearly out of control."

Plaintiff's Exhibit 164

<u>washingtonpost.com</u>

## Sneezed on, cussed at, ignored: Airline workers battle mask resistance with scant government backup

*Michael Laris*

13-17 minutes

Other passengers have verbally abused and taunted flight attendants trying to enforce airline mask requirements, treating the potentially lifesaving act as a pandemic game of cat-and-mouse. A loophole allowing the removal of masks while consuming food and beverages is a favorite dodge.

Asked to mask up, one passenger pulled out a large bag of popcorn and nibbled her way through it, kernel by kernel, stymieing the cabin crew for the length of the flight. Others blew off requests by chomping leisurely on apple slices, between occasional coughs, or lifting an empty plastic cup and declaring: "I am drinking!"

The displays of rule-bucking intransigence are described in more than 150 aviation safety reports filed with the federal government since the start of the pandemic and reviewed by The Washington Post. The reports provide an unguarded accounting of bad behavior by airline customers, something executives hit by a steep drop in travel and billions in pandemic-related losses are loath to share themselves.

Some reports raise safety concerns beyond the risk of <u>coronavirus</u> infection. A flight attendant reported being so busy seeking mask compliance that the employee couldn't safely reach a seat in time for landing.

One airline captain, distracted by mask concerns, descended to the wrong altitude. The repeated talk of problem passengers in Row 12 led the captain to mistakenly head toward 12,000 feet, not a higher altitude given by air traffic control to keep planes safely apart. The error was caught, and "there was no conflicting traffic," the captain wrote.

The Boeing 737 Max was grounded for 20 months following two crashes that killed 346 people. Now, after design changes, the aircraft is returning to service. (The Washington Post)

Some passengers are portrayed as oblivious, obstinate, foul-mouthed and, at times, dangerous. One called a flight attendant a "Nazi." Another "started to rant how the virus is a political hoax and that she doesn't wear a mask," a flight attendant reported.

With millions of passengers ignoring warnings from the Centers for Disease Control and Prevention to refrain from holiday travel, the reports offer an X-ray into the country's deeper failures against the coronavirus — and insights into the pitfalls and possibilities facing a new presidential administration.

While the White House under President Trump has, at times, been dismissive or hostile toward masks, President-elect Joe Biden is making a patriotic appeal to "mask up for 100 days," whatever people's politics. Biden has said he will sign an order on his first day requiring masks for "interstate travel on planes, trains and buses." How well those efforts will work remains to be seen.

Experts in psychology and decision-making say hostility toward wearing masks, even within the shared confines of a passenger jet, has been fueled by politicization — but also by skewed incentives and inconsistent messaging.

"The reinforcement principles are backward," said Paul Slovic, who studies the psychology of risk at the University of Oregon.

The usual signs of danger, and rewards for following potentially bothersome rules, are thrown off by a virus that is spread easily by people who don't know they have it, Slovic said.

"You get an immediate benefit for not following the guidelines because you get to do what you want to do," Slovic said. "And you don't get punished for doing the wrong thing" because it's not immediately clear who is being harmed.

The "squishiness of the requirement" to wear masks on planes also undermines the message that they are critical for public health, Slovic said. In contrast, he cites the rigid clarity of the ban on flying with a firearm. "It's not, 'You can carry it as long as you don't use it,' " Slovic said.

But passengers are allowed to drop their masks to snack and sip beverages. "When you start opening it up to eating, the whole thing kind of weakens," Slovic said.

Applying mask rules also worsens the already strained position of flight attendants, who are front-line enforcers even as they keep their usual safety responsibilities, experts said.

"Flight attendants are dealing with mask compliance issues on every single flight they work right now," said Taylor Garland, spokeswoman for the Association of Flight Attendants-CWA, noting that those efforts range from friendly reminders to facing passengers "actively challenging the flight attendants' authority."

The Department of Transportation in October rejected a petition to require masks on airplanes, subways and other forms of transportation, with Secretary Elaine Chao's general counsel saying the department "embraces the notion that there should be no more regulations than necessary."

The nation's aviation regulator has deferred to airlines on masks, with Federal Aviation Administration chief Stephen Dickson telling senators at a June hearing "we do not plan to provide an enforcement specifically on that issue."

Such matters are more appropriately left to federal health authorities, Dickson argued. "As Secretary Chao has said, we believe that our space is in aviation safety, and their space is in public health," Dickson said, referring to the CDC and other health officials.

Airline representatives say they take mask usage seriously and the overwhelming majority of customers comply. Some airlines have banned passengers for the length of the pandemic for refusing to mask up. Many have eliminated medical exemptions in their mask requirements.

"Of the hundreds of thousands of passengers who have flown with us, we have only needed to ban

about 370 customers for not complying," United Airlines spokeswoman Leslie Scott said. Delta said its mask-related no-fly list includes about 600 people, despite carrying about 1 million people each week.

Resistance by some passengers prompted Alaska Airlines to begin issuing yellow cards, akin to the warnings in soccer, to problem passengers.

The initial yellow card said employees would file a report that could result in a passenger being suspended. A later version was more aggressive, saying continued defiance would lead to a flight ban "immediately upon landing," even if the customer had a connecting flight.

Alaska Airlines has barred 237 passengers since August, and "in more than half of these incidents we also canceled onward or returning travel," spokeswoman Cailee Olson said.

American Airlines declined to release numbers of banned customers, as did Southwest, which said in a statement it appreciates "the ongoing spirit of cooperation among customers and employees as we collectively take care of each other while striving to prevent the spread of COVID-19."

Yet a small, uncooperative minority can wreak outsize havoc, safety reports show.

The anonymous reports are collected in a National Aeronautics and Space Administration database, part of a program meant to increase aviation safety by encouraging employees to provide candid descriptions of emerging problems without fear of reprisal. Names of people filing the reports, and their airlines, are removed by NASA before they are made available to regulators at the FAA and the public.

NASA analysts screen the reports to weed out irrelevant filings and may call back filers to clarify safety points. But its analysts do not try to verify people's identities or the accuracy of the reports.

The database shows some fliers treat airline mask requirements as a seemingly asinine rule to evade, akin to sneaking a late look at text messages after phones are supposed to be in airplane mode. Passengers berate flight attendants about their noncompliant cabin mates. Some reports read like cries for help.

"It all has to stop," pleaded one flight attendant.

"In the future I would like to feel safe while doing my job," said another.

● A woman refused to wear her mask as the plane rolled away from the terminal, saying it made her ill, and the pilot pulled over temporarily to try to avoid returning to the gate. She continued to resist but finally agreed.

"As soon as we took off, she took it off again and kept it off the entire flight," the flight attendant reported.

● A man started down the aisle, pausing about 18 inches from a flight attendant.

"He sneezed directly in my face, making no attempt to cover his mouth, pull up his mask or turn towards the row 1 window," the employee wrote. The flight attendant, who was wearing a face covering, judged the act unintentional and tried to blot away the remnants.

● A woman propped her foot up and painted her toenails with her mask below her chin, despite

several requests to wear it properly. After another passenger appealed for more to be done, the woman acquiesced, then loudly instructed the flight attendant to "go away!"

After landing, she cut in line to rush off the plane. "Although we understand the importance of wanting to retain customer loyalty, this kind of behavior should not be tolerated for the sake of one over an entire cabin of guests and employees," the flight attendant wrote.

● An immunocompromised passenger was furious at the lack of enforcement as another customer snacked incessantly on chocolate. The concerned passenger then removed his mask to complain to the flight attendant.

● A passenger claimed discrimination, arguing he was singled out for enforcement because of his tattoos. "He said 'I am complying, #%$^!' His nostrils were clearly visible," the flight attendant wrote.

● A pilot flouted the mask requirement with what appeared to be a passive-aggressive display, donning a flimsy, see-through veil described as useless for containing airborne particles.

● Flight attendants made an exception and allowed a distraught mother, whose daughter may have had a disability and screamed about the mask requirement, to remain on the plane. They tried cookies, which didn't help, then moved the family to seats three rows from other passengers, who were supportive.

● A customer, after earlier warnings, stuck his mask-free head in the aisle during the safety demonstration, "making a total mockery out of me," a flight attendant wrote. He repeated his taunt when the plane was fourth in line for takeoff. The captain turned around, and the man was taken off the plane.

The obstinacy cuts against basic health precautions. Experts in cabin air say masks are critical tools for safety. Cabin air is run through powerful filters, mixed with outside air and recirculated. But it takes several minutes for all air to be vented out of the cabin, giving the coronavirus and other viruses the opportunity to spread.

A Harvard study funded by the aviation industry said flying can be done with a relatively low risk of coronavirus infection if precautions are followed. It said masks are "perhaps the most essential layer" among measures to reduce transmission.

The study said removing masks to eat should be kept to an "absolute minimum," and straws should be used when feasible. "When one passenger briefly removes a mask to eat or drink, other passengers in close proximity should keep their masks on," researchers said.

Trump and some of his advisers, meanwhile, have stoked divisions over masks.

The president mocked Biden's frequent mask use, presided over White House events that flouted mask guidelines and relied on a former pandemic adviser who wrongly argued masks were ineffective. The White House also blocked a nationwide order, drafted by the CDC, that would have required masks on all forms of public transportation.

"Masks have been made a political issue from the start of the pandemic, and people don't believe they need to wear them," said Garland, whose union represents about 50,000 flight attendants.

"We do not have a president who tells people to wear a mask, and the federal government, not just in aviation but across the board, has declined to mandate it in any way, shape or form," she added, saying her members are eager to see a Biden administration set a different tone.

An FAA spokesman declined to answer questions about the risks involved with passengers refusing to wear masks.

After inquiries from The Post about enforcement, the agency distributed a news release touting its role in pursuing civil penalties in two assault cases but reiterated that "the failure to wear a face covering is not itself a federal violation."

The cases show how mask disputes can escalate.

On an Allegiant Air flight in August, a passenger hit a flight attendant, yelled obscenities at him and grabbed his phone as he described a mask-related dispute to the captain, according to the FAA. The agency said it is pursuing a $15,000 civil penalty for assault and interfering with a flight attendant.

Allegiant declined to say whether anyone was arrested or charged.

On a SkyWest Airlines flight to Chicago in August, a passenger took off a mask, "continually bothered" fellow customers and "at one point, grabbed a flight attendant's buttock as she walked by the passenger's row of seats," according to the FAA, which is seeking a $7,500 penalty.

Beyond addressing such extreme cases, some outside experts say federal and corporate leaders have fallen short.

"Both industry and government have failed the people on the front line who need to administer these rules," said Baruch Fischhoff, a psychologist and professor at Carnegie Mellon University who researches decision-making.

Politics often has driven responses to the pandemic, while critical public health communication on things like masks has not been tested to make sure it hits the right notes or is convincing, Fischhoff said. "Neither have fulfilled that responsibility for clear, consistent, tested communications," he said.

Fischhoff said that with 330 million people in the United States, it's not surprising the safety reports received by NASA reveal examples of poor behavior.

"Part of the reason they stand out is, I think, the vast majority of people are polite and civil to one another," Fischhoff said. Still, the reports probably represent a dramatic undercount because it takes time and initiative for busy employees to file them.

"If you see 100, there are probably 1,000 or 10,000. This is a widespread enough phenomenon that it needs to be taken seriously," he said. "You have to give credit to people who lodge just complaints and recognize they're just a fraction of the people who are observing things that threaten our health and our economy."

Plaintiff's Exhibit 165

nytimes.com

# FAA Fines Airline Passengers Who Clashed Over Mask Rules

*Neil Vigdor*

5-6 minutes

---

## Cases of Unruly Airline Passengers Are Soaring, and So Are Federal Fines

Dozens of people face fines of up to $35,000 for assaulting and interfering with flight attendants under a zero-tolerance policy introduced by the F.A.A. this year.



Credit...Erin Schaff/The New York Times

May 10, 2021

Four people are facing nearly $70,000 in civil fines for clashing with airline crews over mask requirements and other safety instructions on recent flights, part of what

the Federal Aviation Administration called a "disturbing increase" in the number of unruly passengers who have returned to the skies with the easing of pandemic restrictions.

The latest round of proposed fines, which passengers have 30 days to contest, came just days after the F.A.A. said that it had received more than 1,300 unruly-passenger reports from airlines since February. In the previous decade, the agency said, it took enforcement actions against 1,300 passengers total.

"We will not tolerate interfering with a flight crew and the performance of their safety duties," Stephen Dickson, the administrator of the F.A.A., said on Twitter on May 3. "Period."

None of the passengers now facing fines were identified by the F.A.A., which this year imposed a zero-tolerance policy for interfering with or assaulting flight attendants that carries a fine of up to $35,000 and possible jail time.

One of the passengers, a woman who was traveling from the Dominican Republic on a JetBlue flight bound for New York on Feb. 7, refused to comply with instructions to wear a mask aboard the plane, hurled an empty liquor bottle that almost hit another passenger, threw food and shouted obscenities at flight attendants, according to the F.A.A.

The woman grabbed the arm of a flight attendant and hurt her arm, and she struck the arm of another flight attendant twice and scratched that crew member's hand, causing the flight to return to the Dominican Republic, the F.A.A. said last week. It recommended a fine of $32,750 for the woman.

So far, the F.A.A. has identified potential violations in about 260 of the 1,300 cases referred by airlines, a spokesman for the agency said in an email on Sunday. Officials have begun enforcement actions in 20 of the cases and are preparing a number of additional enforcement actions, the spokesman said.

In 2019, before the coronavirus pandemic, there were 142 enforcement actions that stemmed from unruly passengers, according to the F.A.A. There were 159 in 2018, and 91 in 2017.

In an opinion column on Sunday on NBCNews.com, Sara Nelson, the president of the Association of Flight Attendants union, attributed the rising tensions in the skies to the politically charged atmosphere over health protocols.

"What's causing these incidents?" she asked. "Overwhelmingly, it's passengers

who refuse to wear masks."

Ms. Nelson said that flight attendants would never tell passengers that it was a matter of personal choice to wear oxygen masks in the event of cabin depressurization or seatbelts in case of turbulence. The same is true now for wearing face masks to protect against the coronavirus.

"We're also trained to help stop the spread of infectious disease," she said. "We're not just enforcing these long-overdue mask policies because we have to: We understand that masks are a way we keep ourselves and each other safe. And we're grateful policymakers are backing us up."

In April, the Transportation Security Administration extended a requirement for airline passengers to wear masks on commercial flights and at U.S. airports through Sept. 13. The order had been scheduled to expire on May 11.

"It has been an exhausting time for all the employees who are just trying to do their job according to their company's policies," the woman, Angela Hagedorn, said on April 26. "The constant arguing and pushback from guests, it's ridiculous."

As part of the latest round of fines recommended by the F.A.A., the agency said that a male passenger aboard a Southwest Airlines flight from Chicago to Sacramento on Jan. 26 refused to comply with a flight attendant's instructions to wear a mask over his nose and mouth. The man became combative and used offensive language when a second flight attendant told him he was required to wear a mask, according to the F.A.A., which said that the passenger hit one of the flight attendants with his bags when he was ordered to leave the plane. Officials recommended a $16,500 fine for the man.

On Dec. 22, a Delta Air Lines flight from Minneapolis to Philadelphia returned to the airport after a female passenger began walking up and down the aisle during takeoff and refused to return to her seat, the F.A.A. said. A $9,000 fine was recommended for the woman, who the agency said told the crew repeatedly that she wanted to get off the plane.

A Jan. 30 flight from Bozeman, Mont., to Seattle also returned to the airport after a male passenger refused to put on a mask, according to the F.A.A., which also recommended a $9,000 fine in his case.

Plaintiff's Exhibit 166

nbcnews.com

# FAA reports 'off the charts' spike in unruly, dangerous passenger behavior on flights

*By Tom Costello*

3-4 minutes

---

The Federal Aviation Administration is warning air travelers about what it describes as a dramatic increase in unruly or dangerous behavior aboard passenger airplanes.

In a typical year, the transportation agency sees 100 to 150 formal cases of bad passenger behavior. But since the start of this year, the agency said, the number of reported cases has jumped to 1,300, an even more remarkable number since the number of passengers remains below pre-pandemic levels.

The behavior in question includes passengers refusing to wear masks, drinking excessively and engaging in alleged physical or verbal assault, including what the agency describes as political intimidation and harassment of lawmakers.

In Fort Lauderdale, Florida, for example, a fistfight broke out amid a dispute over mask-wearing. In Washington, D.C., a passenger was escorted off a flight after arguing with flight attendants over the mask rule.

In another case, a flight bound for Los Angeles was diverted to Denver and forced to make an emergency landing after a passenger allegedly tried to open an emergency exit.

In recent days, Alaska Airlines banned an Alaska state senator for refusing to comply with mask requirements, according to The Anchorage Daily News.

"It is not permissible and we will not tolerate interfering with a flight crew and the performance of their safety duties," Stephen Dickson, the administrator of the FAA, said of the wave of incidents. "Period."

The FAA is now taking a "zero-tolerance" approach to poor behavior: Unruly passengers face potential criminal charges, fines up to $35,000 or lifetime bans on

certain airlines.

The bad behavior appears to be taking a toll. ==Angela Hagedorn, a former flight attendant with Alaska Airlines, tweeted that she recently resigned.==

=="It has been an exhausting time for all the employees who are just trying to do their job according to their company's policies," she said. "The constant arguing and pushback from guests, it's ridiculous."==

Sara Nelson, president of the Association of Flight Attendants union, said airline employees have reported a wide range of troubling incidents.

=="What we have seen on our planes is flight attendants being physically assaulted, pushed, choked," Nelson said. "We have a passenger urinate. We had a passenger spit into the mouth of a child on board.==

=="These are some of the things that we have been dealing with," Nelson said, adding that the physical and verbal abuse that flight attendants have allegedly experienced this year has been "way off the charts" compared to the last 20 years.==

In the months ahead, as parts of the United States begin to rebound from the pandemic and a greater number of people take to the skies, the FAA — along with the Transportation Security Administration and Air Marshals — plan to watch closely for behavior that threatens crew members or passenger safety.

Tom Costello

Tom Costello is an NBC News correspondent based in Washington, D.C.

Daniel Arkin contributed.

Plaintiff's Exhibit 167

latimes.com

# More airline passengers refuse masks; FAA levies big fines - Los Angeles Times

*Hugo Martín*

6-7 minutes

---

A passenger on a JetBlue flight from the Dominican Republic to New York refused to wear a face mask, threw food and an empty liquor bottle in the plane, shouted obscenities and hit a flight attendant in the arm, the Federal Aviation Administration said Wednesday.

A passenger on a Southwest Airlines flight about to take off from Chicago to Sacramento also refused to wear a mask, called two flight attendants who ordered him off the plane "pathetic" and hit one of the crew members with his luggage as he walked off, the agency said.

And then there is the flier on an Alaska Airlines plane preparing to fly from Bozeman, Mont., to Seattle who ignored repeated reminders to wear a mask, causing the plane to return to the gate, according to the FAA.

The incidents of passengers being unruly — ignoring crew members' instructions, fighting and refusing to wear a mask — have been surging, according to the FAA, even while the number of Americans flying on commercial planes remains about 40% below pre-pandemic levels.

The rise comes despite a new federal law that makes wearing a mask on commercial flights mandatory, punishable by a fine of $250 for the first offense and up to $1,500 for repeat offenses. Before it became law, the nation's airlines adopted mask-wearing policies, enforcing them by banning repeat offenders from flying.

The federal mask mandate, which began Feb. 1, was set to expire May 11. But the U.S. Transportation Security Administration recently extended it through Sept. 13.

"The physical and verbal abuse that flight attendants have been taking has been way off the charts," Sara Nelson, president of the Assn. of Flight Attendants-CWA, AFL-CIO, told NBC News.

"The physical and verbal abuse that Flight Attendants have been taking has been way off the charts." @FlyingwithSara says there will be no second chances for passengers who fail to comply with crewmember instructions that keep everyone safe. pic.twitter.com/YzXse6RphL

— AFA-CWA (@afa_cwa) May 5, 2021

The rise also comes despite FAA Administrator Steve Dickson issuing a zero-tolerance order in January against unruly passengers. Instead of receiving warnings or being required to seek counseling, he said, violators will face criminal prosecution or fines of up to $35,000. The order took effect March 30.

"The FAA has recently observed a proliferation of such conduct," he said in the order.

The FAA proposed civil penalties ranging from $9,000 to $32,750 against the passengers who the agency alleges refused to wear a mask and caused a ruckus in the incidents on JetBlue, Southwest

and Alaska Airlines. Those incidents took place in January and February. The passengers, whose names were not released, can appeal the fines to an administrative law judge for the National Transportation Safety Board.

Three passengers who disrupted three separate flights on JetBlue and SkyWest airlines in January face civil penalties of $14,500 to $31,750, the FAA said. In all three incidents, the FAA said, the passengers drank alcohol — which they had brought with them onto the plane — to excess, caused a scene and shouted obscenities. Each passenger was escorted off the plane by local police upon arrival.

The number of passengers who have been banned from the nation's airlines continues to rise.

Delta Air Lines appears to lead all U.S. carriers by putting on its internal no-fly list about 1,200 passengers who refused to wear a mask or became unruly on a plane. It is followed by Frontier Airlines with more than 830, United Airlines with about 750 and Alaska Airlines with 542. American Airlines and Southwest Airlines declined to disclose how many passengers they have banned.

In September, Delta had only 270 passengers on its no-fly list, Frontier had 106, United had 150 and Alaska had 108.

The FAA typically enforces and imposes fines on as many as 180 cases of unruly passengers a year. So far this year, the number of incidents referred by airlines to the FAA for enforcement has reached 1,300, with the FAA saying it has identified about 260 of those cases for potential enforcement.

"There's absolutely no question there has been an increase," FAA spokesperson Ian Gregor said.

The rise in onboard incidents comes as airlines are starting to see a gradual increase in travel demand, thanks in part to the vaccine rollout, a drop in coronavirus cases in several states, a loosening of local pandemic travel restrictions and the start of the peak summer travel season.

Since mid-March, the number of travelers passing through TSA checkpoints in the nation's airports has been consistently above 1 million a day, reaching a high of 1.6 million on Saturday, according to the TSA. On the same Saturday last year, with air travel down sharply because of the pandemic, about 170,000 people passed through TSA checkpoints. On the first Saturday of May in 2019, more than 2.1 million travelers passed through TSA checkpoints.

More recently, the FAA alleges that an American Airlines passenger assaulted a crew member Saturday on a flight from Miami to New York after refusing to wear a mask. Law enforcement officers met the plane when it landed, and American Airlines put the passenger on its no-fly list, the airline said.

And on March 17, three passengers on an American Airlines flight from Fort Lauderdale to Chicago were removed from the plane before takeoff after refusing to wear masks. The flight was delayed, and after the passengers got back to the gate, a fight broke out in the terminal, the airline said.

FAA officials say they have yet to complete investigations into the American Airlines incidents.

Plaintiff's Exhibit 168

skift.com

# 1 in 5 Flight Attendants Have Had Physical Altercations With Unruly Passengers so Far This Year

— *Ruthy Muñoz*

5-6 minutes          July 29, 2021

One in five flight attendants so far this year has been involved in physical altercations with unruly passengers and 85 percent of cabin crew members have dealt with disruptive passengers this year as more are returning to travel, a survey released by the Association of Flight Attendants-CWA (AFA) revealed on Thursday.

The online survey of 5,000 flight attendants across 30 airlines found more than half have experienced at least five incidents with unruly passengers, with flight attendants reporting incidents of swearing, yelling, aggressive behaviors, racial and homophobic slurs, and physical assaults.

Unwilling to accept this new normal, the AFA is calling on the Federal Aviation Administration and the U.S. Department of Justice to make the 'zero tolerance' policy permanent.

**Don't miss another mission critical story**

Get Unlimited Access To Daily News Coverage With Skift Pro

"This survey confirms what we all know, the vitriol, verbal and physical abuse from a small group of passengers is completely out of control, and is putting other passengers and flight crew at risk. This is not just about masks as some have attempted to claim. There is a lot more going

on here and the solutions require a series of actions in coordination across

aviation," said Sara Nelson, President of AFA-CWA.

In response to the rise of disruptive passengers, the Federal Aviation Administration in January enacted new security measures for airlines by issuing a temporary "zero tolerance" policy, making bad behavior an enforceable federal offense and extending it at the end of March.

But union officials representing 50,000 flight attendants across 17 airlines, feel it's not enough. The AFA said existing measures in place are failing to address the problem and wants the FAA and DOJ to protect passengers and crew from verbally, physically abusive, and disruptive travelers.

One survey respondent reported being on the ground at the back of the aircraft without the other crew members noticing until after the attacker had deplaned.

"We tell them (passengers) that it is a federal offense to not comply with crew member instructions, use foul and/or threatening language onboard, and then the plane is met by airline supervisors or airport law enforcement and the passenger gets a slap on the wrist and sent on their way," wrote one flight attendant in the survey.

The flight attendant who said she's been threatened, yelled, and cursed at countless times in the last year and has only seen at most a temporary suspension of travel for the passenger.

"We need real consequences if flight attendants are ever going to feel safe at work again," the unnamed flight attendant said.

For airline frontline workers, the incessant rise of bad behavior inflight is taking a toll with many flight attendants feeling unheard and unprotected.

Survey data found 71 percent of flight attendants who filed incident reports with their management didn't receive a follow-up and a majority didn't observe efforts by the airlines to address issues with unruly passengers.

"It is time to make the FAA 'zero tolerance' policy permanent, the Department of Justice to utilize existing statute to conduct criminal prosecution, and implement a series of actions proposed by our union to keep problems on the ground and respond effectively in the event of incidents," Nelson said.

Flight attendants cite multiple factors contributing to disruptive incidents and

point to mask compliance, flight delays, routine safety reminders, alcohol, and cancelations as common factors when dealing with unruly passengers, an AFA spokesperson said.

To date, the FAA has received 3,615 unruly passenger complaints, more than half of them mask-related incidents. The agency has initiated 610 investigations and 95 enforcement cases, said the FAA's website.

Additionally, many flight attendants reported facing extensive verbal abuse from visibly drunk passengers, being subjected to yelling and swearing for federal mask mandate directions. Survey respondents also reported being aggressively challenged by unruly passengers in other ways including kicking seats, shoving, being thrown thrash at and passengers defiling a restroom in defiance of instructions, it said.

The FAA has been enforcing some cases and issuing historic fines for unruly passengers.

AFA said its union has fought discrimination and prejudice for decades, and won't allow this moment to set it back.

"Aviation is about bringing people together, not tearing us apart," it said.

Airlines joined unions asking the U.S. Attorney General to prosecute unruly passengers in June.

Photo Credit: Passengers and flight attendant on an aircraft. StockSnap / Pixabay

Plaintiff's Exhibit 169

faa.gov

# Press Release – FAA Releases New PSA, Levies $119K Against 9 Passengers for Alleged Unruly Behavior

11-13 minutes

---

### For Immediate Release

July 6, 2021
Contact: pressoffice@faa.gov

---

**WASHINGTON** – The U.S. Department of Transportation's Federal Aviation Administration (FAA) released a new public service announcement and levied $119,000 in civil penalties against passengers for alleged violations of federal regulations as part of its Zero Tolerance efforts against unruly behavior.

As part of the FAA's Zero Tolerance campaign, the web video features children explaining how to behave on a plane and expressing their disgust about increased unruly passenger behavior.

Today's cases propose civil penalties against nine passengers ranging from $7,500 to $21,500 for allegedly interfering with flight attendants who instructed passengers to obey cabin crew instructions and various federal regulations. The cases involve assaulting the flight crew and other passengers, drinking alcohol brought aboard the plane and refusing to wear facemasks.

Since Jan. 1, 2021, the FAA has received approximately 3,271 reports of unruly behavior by passengers, including about 2,475 reports of passengers refusing to comply with the federal facemask mandate. We have identified potential violations in 540 cases and have initiated enforcement action in 83 cases. During the same timeframe, the FAA has proposed more than $682,000 in fines against unruly passengers, including today's cases.

The cases are as follows:

- $21,500 against a passenger on a Dec. 27, 2020, Frontier Airlines flight from Nashville, Tenn., to Orlando, Fla. The FAA alleges the passenger drank alcohol that Frontier did not serve, which is against FAA regulations. He refused to comply with a flight attendant's

instruction to stop drinking the alcohol and wear a facemask. The FAA further alleges the passenger began fighting with the flight attendant and nearby passengers about the facemask policy. The flight attendant issued the passenger a "red card" for failing to comply with the facemask instructions, but he continued to argue with nearby passengers, ultimately striking the passenger next to him on the head. The flight attendant reseated him in another row, notified the captain of the disturbance, and requested law enforcement to meet him at the gate upon arrival.

- $18,500 against a passenger on a Feb. 19, 2021, Republic Airlines flight from Indianapolis, Ind., to Philadelphia, Penn. The FAA alleges that flight attendants repeatedly told the passenger to wear her facemask properly prior to boarding and during the boarding process. The passenger and members of her travel party were also playing loud, obscene music and refusing to wear their masks during the preflight safety announcements. During a flight attendant's cabin check, she instructed the passenger to wear her seatbelt and facemask. During taxi from the gate, the passenger threatened the passenger in front of her when they closed the window shade. A flight attendant again instructed the party to settle down and wear their facemasks, but they did not comply. They continued to play loud, obscene music and use obscene language against the flight attendants and other passengers. The crew notified the captain, and the plane returned to the gate for law enforcement to meet the passenger. When the captain left the cockpit to notify the passenger that she was being removed from the flight, she began to argue and use obscene language with the captain. As she stood up to leave the aircraft, she punched the female passenger who was seated in front of her, holding a small infant, in the back of the head.

- $17,000 against a passenger on a Jan. 25, 2021, Frontier Airlines flight from St. Louis, Mo., to Las Vegas, Nev. The FAA alleges the passenger refused to wear his facemask during the boarding process despite direct instruction from flight attendants to do so. Furthermore, the flight attendant had to pause the preflight safety demonstration twice to tell him to hang up his phone, put it on airplane mode, and wear his mask. During the flight, a flight attendant instructed him a second time to wear his mask. During the final descent, the passenger unbuckled his seatbelt, stood up, and moved to a different seat closer to the front of the aircraft. He ignored crew instructions that it was unsafe to be unbuckled and move about the cabin at that time.

- $13,000 against a passenger on a Jan. 29, 2021, Frontier Airlines flight from San Diego, Calif., to Las Vegas, Nev. The FAA alleges the passenger repeatedly removed her facemask and ignored crew instruction to wear it properly. The FAA further alleges that the passenger drank alcohol that Frontier didn't serve, which is against FAA regulation.

- $10,500 against a passenger on a Feb. 27, 2021, Allegiant Air flight from Provo, Utah, to Mesa, Ariz. The FAA alleges the passenger refused to wear his facemask over his mouth

and nose throughout the flight. Flight attendants instructed him seven separate times to wear his facemask properly, and each time he moved it off of his nose after the flight attendant walked away. When told that he needed to cooperate and provide information to fill out a passenger disturbance report, he argued with the flight attendant, refused to provide his identification, said he would continue to pull his facemask down, and claimed that it was fine just over his mouth. After the plane landed, he approached a flight attendant from behind as she prepared to open the cabin door and touched her. He stated that she was being aggressive about the facemask policy and got very close to her while complaining about her enforcement of the policy. This behavior intimidated the flight attendant and caused her to cry.

- $10,500 against a passenger on a Jan. 23, 2021, Alaska Airlines flight from Seattle, Wash., to Ketchikan, Alaska. The FAA alleges that as the flight was preparing to depart from the gate, the passenger made a 911 call reporting that the aircraft was being hijacked. He told the 911 dispatcher that a man was holding up a flight attendant at knifepoint near the front of the aircraft and repeatedly asked the dispatcher to stop the flight. While the aircraft was taxiing to the runway, he left his seat twice to enter the lavatory despite flight attendant instructions to stay seated. Due to the 911 calls, the pilots taxied the aircraft to a cargo ramp where law enforcement met the flight. Law enforcement boarded the aircraft armed with rifles and evacuated passengers and crew. While at the cargo ramp, the passenger called the FBI and made mention of a bomb. The aircraft was temporarily taken out of service for bomb screening.  Law enforcement also screened all passengers and crew as a result of the passenger's comments. All of the passenger's claims were false and resulted in a multi-hour delay of the flight.

- $10,500 against a passenger on a Dec. 19, 2020, Allegiant Air flight from Syracuse, N.Y., to Punta Gorda, Fla. The FAA alleges that while the fasten-seatbelt sign was on during a period of moderate turbulence, the passenger got out of his seat to use the lavatory. When flight attendants told him it was unsafe to do so, he argued that he was drinking at the airport for five hours prior to the flight. Flight attendants allowed him to use the lavatory, but upon exiting, he nearly fell on the flight attendants three times and argued with them about being allowed out of his seat. He was not wearing his facemask, and flight attendants reminded him to wear it several times. After flight attendants got him in his seat, he began vaping despite flight attendant instructions to stop. Throughout the rest of the flight he continued to vape, not wear his facemask, and get out of his seat. The captain called for law enforcement to meet the passenger at the gate.

- $10,000 against a passenger on a Feb. 19, 2021, Republic Airlines flight from Indianapolis, Ind., to Philadelphia, Penn. The FAA alleges that during the boarding process, flight attendants twice asked the passenger to wear her facemask. The FAA further alleges that the passenger and her party refused to wear their facemasks, played loud music, and spoke

loudly during the safety announcements. During the cabin check, a flight attendant asked her to buckle her seatbelt and wear her facemask, but she did not comply. The passenger continued to play loud, obscene music and used obscene language about the flight attendants and other passengers. Flight attendants notified the captain, who returned the flight to the gate, where law enforcement met the passenger. When the captain told the passenger that she and her party would be removed from the aircraft, she began arguing with the captain and used obscene language. This passenger was a member of the party mentioned in the second case listed in this release.

- $7,500 against a passenger on a Feb. 25 2021, Southwest Airlines flight from Denver, Colo., to Los Angeles, Calif. The FAA alleges that upon boarding, flight attendants instructed the passenger twice to wear his facemask properly. He moved it below his nose and mouth both times. A Southwest Airlines customer service supervisor boarded the aircraft to speak with him about his non-compliance and provided him a facemask that would fit properly after he told flight attendants that his mask was broken. As the supervisor left, he again pulled his facemask below his nose and mouth. The supervisor returned and asked him to get off the aircraft, but the passenger refused. As a result, the airline had every passenger deplane. The non-compliant passenger was not allowed to reboard. His actions caused the flight to be delayed by 38 minutes.

The Centers for Disease Control and Prevention (CDC), the Transportation Security Administration (TSA), and the U.S. Department of Transportation (DOT) reminded the traveling public on May 14 that if you travel, you are still required to wear a mask on planes, buses, trains, and other forms of public transportation traveling into, within, or out of the United States. Masks are also required in U.S. transportation hubs such as airports and stations.

Federal law prohibits interfering with aircraft crew or physically assaulting or threatening to physically assault aircraft crew or anyone else on an aircraft. Passengers are subject to civil penalties for such misconduct, which can threaten the safety of the flight by disrupting or distracting cabin crew from their safety duties. Additionally, federal law provides for criminal fines and imprisonment of passengers who interfere with the performance of a crewmember's duties by assaulting or intimidating that crewmember.

The FAA is strictly enforcing a zero-tolerance policy toward passengers who cause disturbances on flights, fail to obey flight crew instructions in violation of the FAA's regulations, or engage in conduct proscribed by federal law.

The passengers have 30 days after receiving the FAA's enforcement letter to respond to the agency. The FAA does not identify individuals against whom it proposes civil penalties.

Plaintiff's Exhibit 170

latimes.com

# Flight attendants say unruly passengers need more penalties - Los Angeles Times

*Hugo Martín*

5-6 minutes       July 29, 2021

As air travel demand increases, a vast majority of flight attendants say they have dealt with unruly passengers, and nearly 1 in 5 experienced a physical incident, including shoving, kicking seats and harassing flight crews at airports, according to a survey of flight attendants released Thursday.

The Assn. of Flight Attendants-CWA conducted the survey of nearly 5,000 flight attendants across 30 airlines to pressure airlines and government officials to take stronger measures against passengers who verbally or physically abuse flight crews.

"The atmosphere that these relatively small number of passengers are creating is increasingly hostile," Sara Nelson, president of the association, said during a Zoom news conference Thursday. She called on the Federal Aviation Administration to continue its "zero-tolerance" policy against unruly behavior and pursue more criminal prosecutions of violators.

The survey found that 85% of flight attendants have dealt with unruly passengers and that 71% of those who filed incident reports with airline management said they received no follow-up. Most said they have not seen efforts by airlines to address the rise in unruly passengers, according to the survey.

Nelson also called on airlines to address the problem by adding more employees at airport gates to spot potentially difficult passengers early and by emphasizing the message that bad behavior on planes won't be tolerated.

"The communication from start to finish can be better," she said.

Airlines for America, a trade group for the nation's air carriers, wrote a letter to the U.S. attorney general last month, expressing concern over the rising numbers of incidents and urging federal authorities to crack down on passengers who misbehave on planes.

"We ask that more be done to deter egregious behavior, which is in violation of federal law and crewmember instruction," the letter stated.

Air travel demand has been rising steadily for the last few months but still represents only about 65% of the passenger totals reported in the same period in 2019, according to industry statistics.

According to federal reports, the number of incidents of unruly passengers on U.S.-based airlines began to surge in February, shortly after the federal government mandated that all passengers wear masks during a flight, except when eating and drinking.

This year, airlines have reported 3,615 incidents of unruly passengers, with most of the incidents — 2,666 — related to disputes over the mask mandate, according to the FAA.

The rise of incidents comes despite FAA Administrator Steve Dickson issuing a zero-tolerance order in January against unruly behavior. Instead of receiving warnings or being required to seek counseling, violators now face criminal prosecution or fines of as much as $35,000.

The survey of flight attendants confirmed that mask compliance, alcohol and routine safety reminders were the primary cause of unruly behavior. Flight delays and cancellations were also common factors in the ugly onboard incidents, the survey found.

One flight attendants quoted in the survey said: "I've been yelled at, cursed at and threatened countless times in the last year and the most that has come out if has been a temporary suspension of travel for the passenger. We need real consequences if flight attendants are ever going to feel safe at work again." The report did not identify the airline where that flight attendant works.

Soon after the pandemic struck in the spring of 2020, most airlines adopted

==policies that require passengers to wear masks. The U.S. Department of Transportation imposed a federal mask mandate that took effect Feb. 1 of this year.== Violators face a fine of $250 for the first offense and as much as $1,500 for repeat offenses. In addition, the FAA can also impose criminal prosecution and civil penalties for unruly behavior.

The rising number of ugly scenes on flights prompted several FAA staffers to record a public service announcement this summer, urging passengers to behave on planes. But because the FAA did not have funding for a PSA, the staffers videotaped their own children to deliver the message.

Among those children in the video was Benjamin, the 9-year-old son of Kristina Harris, an FAA communications strategist in Tucson. "Fighting is not good when you are on a plane," the boy said in the video.

The video was launched in early July, timed to appear before the Fourth of July travel surge.

"I think we had the right combination of ideas," Harris said. "Let's have the kids carry this message."

Plaintiff's Exhibit 171

## Flight attendants train in self-defense amid spike in unruly passengers

By Gregory Wallace & Pete Muntean, CNN
Published 28th July 2021

Miami (CNN) — "Help!" yelled a flight attendant as she grabbed a knife-wielding man and wrestled to pin the knife against her hip. "I need help!"

Then the struggle stopped. "Alright, let's do it again," the instructor said. "Reset!"

The knife was made of rubber. The man was a fellow flight attendant. They struggled not in a life-or-death brawl inside a cramped airplane cabin, but instead practiced at a padded gymnasium with their federal air marshal instructors.

The eight flight attendants in this Miami-area class were among hundreds the Transportation Security Administration plans to train this summer and fall in self-defense skills. It is restarting the half-day course first developed in 2004 that was recently put on hold due to the coronavirus pandemic.

The skills include how to strike, stomp and subdue a violent attacker -- a scenario these flight attendants said they hope to never encounter.

Amid the return to air travel this year, the number of unruly and violent passengers is spiking. More than 100 incidents were reported to the Federal Aviation Administration in the last week -- for a total of more than 3,600 so far this year.

Flight attendants are taught a set of de-escalation techniques to handle difficult passengers -- the ones who won't stow a tray table or who insist an oversize suitcase fit in the bin last time.

But they say the defiance and violence that accompanies this return to travel is testing those skills.

"You get on a plane full of people and some of them are not very happy and you just never know what's going to happen," said Carrie, a flight attendant who took the class as she returns to work after a pandemic-related leave of absence.

"It's just more imperative that we take care of ourselves and take care of our passengers because people are anxious, and they're upset, and they're frustrated, and sometimes that comes out inappropriately," she said. (Carrie asked CNN not publish her last name because she was not authorized by her airline to speak publicly.)

### Learning last-resort tactics
Instructors taught a range of skills, from a defensive stance to blows that can be delivered on a would-be hijacker desperate to commandeer the plane.

One instructor used a mannequin to demonstrate a last-resort method of going at an attacker's eyes.

"You are going to possibly die. You need to defend yourself at all costs," he said. (CNN agreed to not identify the instructors because they are active-duty federal air marshals whose work on aircraft is done undercover.)

Most encounters will never rise to that level. But Federal Aviation Administration summaries of more than 40 onboard incidents in recent months show the brazen dissent flight attendants are tasked with addressing. In one instance, the FAA said a passenger "tried to open the cockpit door, repeatedly refused to comply with crew members' instructions, and physically assaulted a flight attendant by striking him in the face and pushing him to the floor." After crewmembers restrained the passenger in plastic handcuffs, he "freed himself from one of the handcuffs and struck the flight attendant in the face a second time." The passenger was not named in the report.

In another instance, the union representing Southwest Airlines flight attendants said a passenger's punch knocked out two of a flight attendant's teeth.

About three-quarters of the incidents reported involve passengers violating or repeatedly defying the federal requirement to wear a face mask when onboard a plane. Another common theme is alcohol -- so much so that many airlines have withheld alcohol service on flights.

**'I don't ever want to use any of this'**
Sara Nelson, international president of the Association of Flight Attendants, said a small set of passengers are "treating flight attendants as punching bags, and they're doing that verbally and physically."

"We are finding that our jobs are harder than ever," Nelson said. "Conflict is rising very quickly. When we can't get to that and diffuse that because we have so much going on ... problems can become big very quickly."

Back at the training, Donna O'Neil was practicing an elbow strike that she could use if a violent passenger charges her in the aisle or galley from behind. She has 47 years of experience and said she is "pretty good at calming things down."

"I don't ever want to use any of this," O'Neil said after the training. "But if I had to, I certainly feel much more confident."

An air marshal supervisor, Noel Curtin, walked in to watch some of the training, and said he hopes crew members walk away with that type of confidence.

"We're not omnipresent, so it's important to have crew members able to deal with individual incidents on the aircraft," Curtin said later in his office.

"There's no backup at 30,000 feet."

https://www.cnn.com/travel/article/flight-attendants-self-defense-training/index.html

Plaintiff's Exhibit 172

viewfromthewing.com

# Inflight Mask Fights Will Rise This Winter. The New CDC Testing Rule Will Make It Worse. - View from the Wing

*About Gary Leff*

4-5 minutes

---

Back in November I predicted that mask disputes on planes would become more common over the winter and that seems to becoming the case, at least based on social media reports and continued reporting from airlines on the number of people banned over masks. Even tiny Alaska Airlines is now over 300 passengers banned.

Starting January 26 the CDC will require all passengers flying to the U.S. to have received a negative Covid-19 test within 3 days of travel. For everything else that's been written about the new requirement, it's likely to accelerate mask disputes *since everyone on board will have tested negative* on flights to the U.S. already. For some passengers masks will feel like an unnecessary imposition.

There are three major reasons that passengers – some of whom object to masks to begin with – will become increasingly impatient with the rules to wear one.

- **The raging pandemic ironically means fewer people can spread the virus, some of whom won't want to mask up.** Once someone has had Covid-19 and recovers from it, they are highly unlikely to get it and spread it for a period of time – that's yet to be determined but that is almost certainly on average longer than a year. Over 22 million Americans have tested positive for the virus. The CDC said in the fall that we're catching only 1 in 8 cases. This would suggest half the country has already had the virus. (Although only those with positive tests would know it with some degree of certainty.)

- **Some people who have been vaccinated will see mask requirements as theater.** As more and more people get vaccinated they'll wonder why they're required to wear masks. BioNTech's CEO says that they'll have data in late January or early February laying out the extent to which their mRNA vaccine doesn't just

prevent symptomatic Covid but is also sterilizing such that it prevents spread. Most experts believe it will reduce spread, but we need data to demonstrate that this is true, and to show the extent of the effect.

To the extent that vaccines are sterilizing, some vaccinated passengers will see mask requirements as theater since it's not providing source control (and masks won't be protecting the wearer after a 95% effective vaccination either).

- **New CDC testing rules for inbound international flights will make people feel masks are unnecessary.** If everyone on flights to the U.S. has had a negative Covid-19 test, as required by the CDC (starting January 26), many passengers will be wondering *why they need to wear a mask*? Of course,

- Having had a negative test within 3 days doesn't mean not having the virus during travel

- Mask rules are imposed by the airlines and not the CDC, so the CDC's rule doesn't affect the requirement

- Airlines aren't going to make flight-by-flight exceptions (required on outbound flights from the U.S. but not return flights to the U.S.). So the mask rules stay.

The viral video from Sunday's American Airlines flight AA2198 from Charlotte to Washington National airport, a maskless woman describing the requirement as tyranny actually said "I already had the virus and I already had the vaccine and people need to stand up! This is tyranny and this is wrong! This is wrong!"

Here's the woman immediately following that explanation,

There's no reasonable way for airlines and other passengers to know who is and who is not a risk of spread. That's why the norm is going to be mask-wearing, even for those that aren't a significant risk of spread, until the pandemic is under control – and perhaps longer to the extent mask-wearing is imposed as a federal mandate by the incoming Biden administration, since government mandates tend to take longer to be removed even when they're no longer needed. And that's going to mean more conflict.

Plaintiff's Exhibit 173

travelpulse.com

# Is It Time to End the Mask Mandate in Airports and on Planes?

4-5 minutes       July 15, 2021

The Centers for Disease Control and Prevention (CDC) and the Biden Administration have a difficult decision to make in two months.

The federal mask mandate expires on Sept. 13. The mandate requires passengers on public transportation to wear a mask at all times, including while in airports and during flight – whether that flight is 50 minutes or five hours.

It's time.

It's time to stop enforcing this policy.

And I understand this is likely an unpopular opinion but, then again, I have hundreds of those. Like, Van Halen was better with Sammy Hagar as the lead singer instead of David Lee Roth, or Reggie Jackson wasn't a true Yankee because he only played five years in New York, or Skor is the better toffee candy bar than Heath.

Trending Now



Or, the CDC should let the deadline on the mask mandate pass without further action.

The mandate is in place to better prevent the spread of the COVID-19 virus, and for the better part of a year that has been a worthy goal.

But it has also proven problematic.

Physical confrontations on airplanes have dramatically increased this year, and of the 3,000+ that have been recorded by the Federal Aviation Administration so far in 2021, nearly three-quarters of them have been a direct result of arguments over wearing a face mask – whether between crew members and passengers, or passengers vs. passengers.

The whole idea of face masks was that it was something the airlines encouraged in the summer of 2020, at the height of the pandemic – they wanted a uniform policy mandated by the federal government instead of having various, or differing, policies set by each airline.

Here we are a year later, and the irony has set in. The airlines see the unintended consequence of face masks in every disagreement aboard a flight; they see the efficacy that the vaccines are having; they have noted that nearly 70 percent of the country has had at least one shot against the virus, and now they want the CDC to let the mandate quietly expire on Sept. 13 without being renewed for another four months.

For many reasons, I believe this is the best course of action.

People who are vaccinated can now come and go as they please, except for some stores and businesses that still require a mask. The vaccinated still have their reasons and still have the option to wear a mask if they so choose. You don't need a mandate to wear one if you believe it protects you.

The unvaccinated have their reasons. And they, too, have the option to not wear a mask if they so choose. See, the thing is, anti-vaxxers are not going to have their minds changed. But should they be denied the privilege of flying over a mask?

That's the touchy question.

When first proposed a year ago, we can't deny that the idea of wearing a mask was a comfort zone for an airline industry struggling with the dramatic loss of customers. Simply put, having the entire plane wear a mask encouraged more people to fly. It made them feel safer.

To be blunt, while I say it's time to rescind the mask mandate, I still regard it as a minor inconvenience. Honestly, wearing a mask is about as big a problem to me as having to take my shoes and belt off. And we've been doing that for the better part of 20 years now.

My fear, however, is that the mandate is going to someday cause a far bigger problem while in the air than just some unruly passenger being eventually duct-taped to a seat.

One of these days, a confrontation is going to escalate far further than the crew member who had a finger bitten or the flight attendant who caught an errant punch square in the face and had two teeth knocked out.

Ask yourself, is it worth it to have a mandate that ostensibly is for your safety but only leads further to unsafe conditions?

That's not something I want to find out.

Plaintiff's Exhibit 174

thehill.com

# Only two people cited by TSA for mask violations have agreed to pay fine | TheHill

*Alex Gangitano*

7-8 minutes

Only two people have agreed to pay fines to the Transportation Security Administration (TSA) among more than 2,400 incidents of noncompliance since a federal mask mandate took effect this year, according to new data provided to The Hill.

TSA said it has received referrals concerning 2,413 incidents of possible noncompliance and has completed investigations into 1,793 incidents.

The agency issued more than 1,690 warning notices and referred 38 matters for civil penalties. Only two individuals did not challenge their fines of $250 each, TSA said in response to a Freedom of Information Act request.

The eye-opening figures come amid an uproar over the federal mask mandate for transportation that has been linked to numerous reports of scuffles and obnoxious behavior by airplane passengers.

"One explanation could be that the people who already violated it to start with are people who feel very strongly to begin with and don't think the federal government could even mandate something like that. They do it partially as a protest, so it's not surprising they haven't paid the fine," said Retsef Levi, professor at the MIT Sloan School of Management specializing in risk management and analytics.

Such incidents could very well persist as the Centers for Disease Control and Prevention (CDC) and other public health officials say masks are increasingly needed again, even for those who are fully vaccinated.

"It's perhaps not surprising that the people who are most adamant about not wearing a mask are also the most adamant about not paying a fine and feeling their personal liberties are infringed upon," said Gretchen Chapman, a professor in social and decision sciences at Carnegie Mellon University.

The Federal Aviation Administration (FAA), which proposes fines against passengers for behavior on aircrafts, said that it takes "significant time" to settle cases against unruly passengers but that passengers who face fines have the right to due process.

"Developing a case that we believe will hold up in court takes a considerable amount of work from our safety inspectors and attorneys, and they currently are working a record number of cases," an FAA spokesperson said.

The FAA has received more than 3,600 reports of unruly behavior by passengers, including 2,666 reports of passengers refusing to comply with federal mask mandates. It has identified potential violations in 610 cases and has initiated enforcement action in 95 cases.

Fines can range from $250 to $52,500. Earlier this month, the FAA said it had issued a $10,500 fine to a passenger who refused to wear a mask during a February flight.

TSA's authorization to fine passengers who fail to comply with mask requirements on public transportation systems stems from an executive order



signed by President Biden                          Joe BidenBriahna Joy Gray: White House thinks extending student loan pause is a 'bad look' Biden to meet with 11 Democratic lawmakers on DACA: report Former New York state Senate candidate charged in riot MORE on his first day in office. TSA has since extended the mask mandate, which was set to expire in May, to September.

When mask mandates for vaccinated people indoors were lifted, it remained in place for people traveling on public transportation: on airplanes, buses and trains.

The CDC on Tuesday revised its mask recommendations to say fully

vaccinated people should wear masks in indoor settings in areas of the country with "substantial" or "high" levels of transmission, which includes much of the South and West.

Meanwhile, <mark>Republicans have pressured the Biden administration to end the federal mask mandate for public transportation.</mark>



Sen. Rand Paul            Randal (Rand) Howard PaulOnly two people cited by TSA for mask violations have agreed to pay fine Senators reach billion deal on emergency Capitol security bill GOP Rep. Cawthorn says he wants to 'prosecute' Fauci MORE (R-Ky.) earlier this month introduced legislation that would prohibit the federal government from imposing a mask mandate when using any "conveyance" or "transportation hub."

"Right now, the CDC is doubling down on indoor mask guidance. The last thing that we need is any masking to be lifted. It would be a major mistake while delta is surging and infections are skyrocketing again to lift any restrictions. In fact, we should be implementing more," said Leana Wen, an emergency physician and public health professor at George Washington University, referring to the new delta variant of COVID-19.



A group of GOP senators led by Sen. Ted Cruz            Rafael (Ted) Edward CruzGOP, Democrats battle over masks in House, Senate Human rights can't be a sacrificial lamb for climate action Only two people cited by TSA for mask violations have agreed to pay fine MORE (Texas) introduced a resolution in June calling on the CDC to lift the public transportation mask mandate. That effort came before the July surge in cases.

"The problem right now is the unvaccinated are making it much harder for the rest of us. If the requirement is lifted, it would take us back to an honor system, which we have already seen that does not work," Wen added.

White House press secretary [Jen Psaki](#) [Jen PsakiWhy in the world are White House reporters being told to mask up again? Only two people cited by TSA for mask violations have agreed to pay fine Democrats ramp up pressure for infrastructure deal amid time crunch MORE](#) on Monday said she doesn't want to get ahead of any guidance by the CDC when asked if air travelers who have been required to wear a mask should anticipate the mandate will likely stay in place.

==There was a surge in aggressive and violent behavior at airports and on flights this month,== with the FAA recording nearly 100 cases of unruly passengers in just one week. In one instance, an American Airlines flight was delayed for a day after a passenger wouldn't comply with the mask mandate and became disruptive.

In May, a Southwest Airlines flight attendant lost two teeth when she was punched by a passenger over a disagreement about the mask policy. Spirit Airlines in April removed all passengers from a flight when a maskless family got in an argument with a flight attendant over the mandate.

Chapman, of Carnegie Mellon, suggested other ways for TSA to collect fines, like a disclaimer when a traveler purchases a ticket that their credit card could be charged if they do not comply with mask mandates or charging ticket purchasers an extra $50 that is removed if you comply with mandates.

"They don't want to collect people's money, they want people to wear masks. But those two things are linked. There's no sense in having a rule that you have to do this and if you don't do it, you have to pay a fine, and no one actually pays the fine," she said.

Plaintiff's Exhibit 175

washingtonpost.com

# Unruly airplane passengers are straining the system for keeping peace in the sky

*Michael Laris, Lori Aratani*

17-21 minutes          July 18, 2021

Both men were arrested earlier this year in Denver, charged with the same broad federal crime: interference with flight crew members and attendants.

They were, in many ways, the exceptions.

The system for keeping the peace in America's skies is creaking under the pressure of what airlines and regulators say is an unprecedented proliferation of misbehavior.

The Federal Aviation Administration has received more than 3,400 reports of "unruly" passengers this year. But despite launching a "zero-tolerance" enforcement policy in January — amid a rise in conflicts often tied to mask requirements in the air — the agency said that as of mid-July it had "completely closed" just seven cases.

The sprawling, multitiered system for enforcing regulations and federal laws covering passengers can take years to play out. As travel rebounds, that structure is being strained by confrontations fueled by alcohol, hostility to mask mandates and small conflicts that careen out of control. One passenger hit a woman holding an infant amid an apparent dispute over a window shade. Another ran through business class and stomped on a flight attendant's foot after the power outlet at her seat wouldn't charge her phone, according to court records.

The system involves airline employees, FAA inspectors and lawyers, Transportation Department judges, local authorities, state and federal courts, FBI agents and U.S. attorneys, who all have roles in a sometimes messy and protracted process.

**An escalation in 'air rage'**

The incidents that take place miles high in pressurized cabins are filled with many of the same pathologies and clashes that occur on the ground.

A review of federal cases by The Washington Post points to alcohol, drug use and mental illness as key factors in outbursts that have terrified passengers and crew members,

sometimes leaving them hospitalized. The tools for dealing with those problems in the air are more limited than on land.

Court records describe ad hoc policing teams made up of passengers recruited by flight attendants to help subdue rampaging fellow fliers using plastic handcuffs and seat belt straps. The records detail several instances of passengers trying to pry open doors on planes, leading to scenes of panic and violence.

"I am waiting for a signal," a distressed passenger declared on a Hawaiian Airlines flight from Los Angeles in October before lunging for the emergency door and smashing a flight attendant's head against it, causing a "ping pong ball sized hematoma" on her temple, federal prosecutors said.

After the third lunge, passengers and crew members zip-tied the man's ankles to a seat. His lawyer said he "was in an altered state of mind when he tried to exit a commercial aircraft mid-flight. … This activity was not violent and was not driven by anger towards any other person."

The flight attendant's injuries, after she "properly blocked him," were minor, the lawyer added. Authorities said that after the man's arrest, he choked a nurse at a Hawaii hospital until he lost consciousness. The passenger, in his early 30s, was detained for eight months and released to his parents with an order that he take medication pending a March trial.

Earlier this month, a woman tried to open an airplane door on a flight from Dallas, then bit a flight attendant, according to American Airlines. She was duct-taped to her seat. In May, a Southwest Airlines flight attendant had two teeth knocked out, allegedly by a passenger who refused to remain seated.

Aviation experts say cases of "air rage" are nothing new, but verbal attacks are turning physical more quickly.

"What we're really seeing is an increased level of hostility on the aircraft, which is something I don't think we've ever seen before in this industry," said Paul Hartshorn, spokesman for the Association of Professional Flight Attendants, which represents American Airlines employees. "It's just incredibly dangerous."

**'My life is changed forever'**

Federal prosecutions in cases where "interference with flight crew members and attendants" is the lead charge were down sharply in the past decade following a rise after the Sept. 11, 2001, terrorist attacks, according to a Post examination of federal prosecution data housed at Syracuse University, raising questions about resources and priorities.

For most of the 2000s, there were more than 50 such prosecutions annually, with case counts sometimes topping 70, according to data compiled by the university's Transactional

Records Access Clearinghouse. Over the past decade, that number has been in the teens and 20s each year, according to the research center, which built a vast database through decades of public records requests.

The Justice Department said prosecutions under the "interference" statute — by its count there were 20 in fiscal year 2019, 16 in 2020 and 14 through this month in 2021 — do not reflect the scope of its efforts because other charges are also used. At a Senate hearing in June, Attorney General Merrick Garland said the Justice Department takes the recent onboard assaults "extremely seriously."

"Even if not intended to bring the plane down, you can imagine the kind of pandemonium on planes that we've seen in some of these videos that people have taken that can cause an incredibly dangerous accident," Garland said.

In a June letter to Garland, a consortium of airline industry and labor groups called on the Justice Department to "direct federal prosecutors to dedicate resources for egregious cases." It noted inconsistencies in which cases are prosecuted in different jurisdictions, and said more criminal prosecutions are needed. The department is reviewing the letter, an agency spokesman said.

In selecting which airborne cases to pursue, federal prosecutors said they weigh damage to victims, airlines and threats to public safety. Considerations include whether flights were diverted, lives were endangered, the quality of the evidence and a suspect's mental health status, federal prosecutors said.

In Congress, some lawmakers want the Justice Department to create a new "no-fly list" for passengers convicted of assault or who have paid civil penalties in such cases. Airlines, which have banned more than 2,700 customers for refusing to wear masks, don't share information about customers who cause problems. Someone barred by one carrier can simply book a flight on another airline.

The incidents can leave a lasting mark.

Delta Air Lines flight attendant Eunice DePinto was shoved after trying to pull a first-class passenger off the airplane door he was fighting to open on a 2017 flight from Seattle. A second flight attendant was punched in the face, prosecutors said. The raging passenger — and another customer who aided flight attendants — were smashed in the head with bottles of red wine during the struggle, according to court records. Airline employees said the pressure at high altitude would have kept the door from opening, but it could have opened as the plane descended.

"In the galley there were flying objects, toppled galley equipment, yelling, physical blows and blood," DePinto told a federal court in Washington state.

Six passengers eventually cuffed and subdued the Florida man, Joseph Hudek IV, who

pleaded guilty to interfering with a flight crew and assault resulting in serious bodily injury. Hudek was sentenced to two years in prison and barred from commercial flights until next year.

"My life is changed forever," the assaulted flight attendant told the court. "I am always aware of passengers — where they are and what they are doing at times — to the point of distrust."

Airlines have sought restitution from convicted passengers, although results have been mixed.

Hudek, whose consulting doctor said he had a psychotic episode after eating cannabis gummies, was ordered to pay restitution of $67,000, including $60,000 to Delta. As of January, a court report indicated he still owed the airline $59,000 and was making regular payments of $171.

A passenger on a 2019 flight from Las Vegas falsely told a flight attendant that a woman on the plane had a knife, prompting the pilot to make an emergency landing in Denver. He pleaded guilty to interfering with a flight crew and was sentenced to the nearly six months he had served. American Airlines asked a judge to order him to pay $32,800 in restitution. Among the costs cited by American: $6,119 for fuel, $13,623 for "passenger inconvenience," including vouchers, and $2,497 for "goodwill lost," according to court filings.

The Illinois man's lawyer said he earned $125 a week collecting scrap before his father's truck broke down and that he wouldn't be able to pay. The judge rejected the airline's request and ordered him to pay $100.

**Passengers are on edge**

As flight attendants endured taunts and abuse last year over airline mask requirements, the FAA resisted calls to help with enforcement, reflecting the Trump administration's approach to the pandemic. But after increasing reports of conflicts and rowdy groups returning home from the Jan. 6 riot at the Capitol, FAA Administrator Stephen Dickson ordered stricter enforcement to tame the behavior, marking the start of a more aggressive approach.

Over the past six months, the FAA has taken "much quicker and transparent [action] on this issue than we have seen in decades," said Taylor Garland, spokeswoman for the Association of Flight Attendants-CWA, the nation's largest flight attendants union. "It's the first time flight attendants feel like there are real consequences on the ground for unruly behavior on our planes."

Still, the vast number of cases and messy mechanics of trying to ensure those consequences stick have, at times, overwhelmed the agency.

Part of the FAA's latest strategy to combat the rise in airplane incidents is to publicize large

proposed penalties and promote a message of deterrence on social media. "You could have spent $35,000 on a brand new truck. But instead you are paying a fine because you punched a flight attendant," said one agency [tweet].

The FAA said three-quarters of its 3,400 unruly passenger reports are related to a federal mask requirement on planes and public transportation, even though it often takes more than refusing to wear a mask for the FAA to take action.

Sara Nelson, international president of the Association of Flight Attendants-CWA, said that after more than a year grappling with the global pandemic, flight attendants' stress levels are high and passengers are on edge.

"People get on a plane and they're taking it out on each other, or most commonly, on the flight attendants," she said. "And what we're really seeing is that you're having like entire airplanes full of people who are aggressive rather than the one-off passenger."

Rick Domingo, who oversees onboard safety as executive director of the FAA's Flight Standards Service, echoed that sentiment.

"It used to be individual events," Domingo said during a recent FAA forum. Now, "it's group events. You have a number of people exhibiting that same behavior on aircraft."

As of July 13, the FAA had opened 555 investigations in unruly passenger cases — triple its total for all of last year. It has taken action against passengers in 80 cases.

That's just the beginning of a labyrinthine process written into FAA regulations, in which the agency sends a Notice of Proposed Civil Penalty. Passengers can try to demonstrate they did not violate FAA regulations; seek a shrunken penalty; or request an informal or formal hearing and an appeal.

While international aviation groups for years have noted concerns about passenger problems aboard aircraft, the recent U.S. surge appears to be an outlier.

In Canada, where passengers who refuse to comply with crew member instructions face fines up to $100,000 (about $80,000 in U.S. dollars) and as much as five years' imprisonment, the nation had recorded 14 reports of unruly passengers through May. In 2020, 73 incidents were reported.

"Canadian airlines have not seen a significant uptick in the number of passengers acting out on flights," said Frederica Dupuis, a spokeswoman for Transport Canada.

Willie Walsh, director general of the International Air Transport Association, a trade group that represents nearly 300 carriers worldwide, said "it's not completely isolated to the U.S., but it is predominantly a U.S. domestic issue that we're witnessing at the moment."

In addition to masks, alcohol has been a contributor to bad behavior. Some airlines aren't serving alcohol during the pandemic, so some passengers are drinking before boarding or

bringing their own, which is against federal rules.

Of the 43 enforcement cases this year for which the FAA has made some details public, nearly one-third involved alcohol. About the same number involved alleged assaults. A flight had to be diverted from its original destination in eight cases.

Some aviation industry officials said there are early signs that the frequency of incidents could be falling, but it's too soon to know whether that signals a downward trend.

**'Reaching for the hammer'**

In the past, the FAA might rely on warning letters or counseling to deal with passenger misbehavior. But under its "zero-tolerance" policy toward passengers interfering with crew members, aviation safety inspectors are required to fill out investigative reports that could lead to sanctions.

"It's one strike and you're out," said Arjun Garg, a former chief counsel at the FAA who is a partner at law firm Hogan Lovells. *"*There's no more of just counseling an offending passenger about behaving better. They are immediately reaching for the hammer."

Behind the scenes, the agency is struggling to keep up with the barrage. FAA officials are seeking to better prioritize the torrent of reports coming from airlines and rushing to train personnel on the basics of building cases that can stand up to challenge. The investigative process can be slow.

"We have to collect evidence, do due diligence to prove our case," the FAA said in a statement. "This takes time."

An FAA document tracking potential cases shows that information provided by airline employees sometimes falls short, undercutting would-be investigations.

The FAA has issued public statements touting more than $680,000 in proposed penalties this year. But the agency has sometimes struggled to force passengers to pay more limited amounts in the past, raising questions about the success of its enforcement push.

The FAA is seeking $10,500 from a Southwest Airlines passenger who allegedly made a maskless phone call while the plane sat on a runway in February, then swore at flight attendants before being removed.

But in a case resolved in June, a D.C. man made a call one hour into a November 2018 flight to Minneapolis. The FAA sought a $5,000 penalty, but after pursuing the case for more than 18 months — and an appeal by the passenger to the U.S. Court of Appeals for the D.C. Circuit — the FAA agreed to settle for an undisclosed amount.

Following an unfavorable ruling by an administrative law judge last year, the FAA settled another case — a proposed $10,000 penalty for alleged abusive behavior on a 2009 flight

from Miami — 10 years after the incident.

Other rulings and arguments made by the same judge, J.E. Sullivan, challenged the FAA's interpretation of what it means for someone to "interfere" with a flight crew. As one of a handful of judges in the Transportation Department's Office of Hearings, Sullivan provides interpretations that help shape how the FAA can enforce its rules, including its push to control unruly passengers.

In a case involving vaping on a plane, a passenger on a flight to Portland, Ore., set off a lavatory smoke alarm in 2019. The FAA charged the passenger with smoking — and also with violating a rule against interfering with a crew member performing their duties.

By putting on oxygen masks, making queries to gauge the threat and communicating with dispatchers over the incident, the flight crew was distracted from its regular safety preparations, an FAA lawyer argued. "We consider that an interference with their duties," the lawyer said.

Sullivan countered that "there's no interference," adding, "the activity that they engaged in is the activity that they're trained to engage in as part of their flight crew duties."

It's unclear whether mask-related cases working through the system could encounter similar issues. An internal FAA memo in February said persistent refusals to wear masks, requiring multiple instructions from a flight attendant, could be considered interference because of "the consequent distraction from safety-related duties." Sullivan declined to be interviewed.

Regulators have given little attention to some onboard safety concerns raised years ago.

Congress passed a law in October 2018 giving the FAA administrator one year to issue an order requiring the installation of a "secondary cockpit barrier" on new planes as added protection against would-be intruders. Nearly three years later, the FAA is still working on it.

The legislation was named after Capt. Victor J. Saracini, who was killed on United Airlines Flight 175, which terrorists crashed into the South Tower of the World Trade Center on Sept. 11, 2001. The barriers are meant to be installed between the cabin and cockpit door to block passengers from rushing in when the door is opened for food or restroom breaks.

Beyond addressing hijacking fears, a 2020 advisory report to the FAA noted that the barriers also could stop disturbed and impaired passengers. The Biden administration put the barriers on its "priority list for 2021," the FAA said.

On June 4, a passenger on a Delta Air Lines flight from Los Angeles to Nashville allegedly rushed up and started pounding on the cockpit door, forcing the plane to divert to Albuquerque. He was charged in U.S. District Court for New Mexico with interfering with a member of a flight crew.

 **Federal Aviation Administration**          `Plaintiff's Exhibit 176`

# Press Release – Federal Aviation Administration Adopts Stricter Unruly Passenger Policy

## For Immediate Release

January 13, 2021
Contact: pressoffice@faa.gov

---

**WASHINGTON –** FAA Administrator Steve Dickson today signed an order (PDF) directing a stricter legal enforcement policy against unruly airline passengers in the wake of recent, troubling incidents.

The FAA has seen a disturbing increase in incidents where airline passengers have disrupted flights with threatening or violent behavior. These incidents have stemmed both from passengers' refusals to wear masks and from recent violence at the U.S. Capitol.

"Flying is the safest mode of transportation and I signed this order to keep it that way," Administrator Dickson said.

Historically, the agency has addressed unruly-passenger incidents using a variety of methods ranging from warnings and counseling to civil penalties. Effective immediately, however, the FAA will not address these cases with warnings or counseling. The agency will pursue legal enforcement action against any passenger who assaults, threatens, intimidates, or interferes with airline crew members. This policy will be in effect through March 30, 2021.

Passengers who interfere with, physically assault, or threaten to physically assault aircraft crew or anyone else on an aircraft face stiff penalties, including fines of up to $35,000 and imprisonment. This dangerous behavior can distract, disrupt, and threaten crewmembers' safety functions.

The FAA has initiated more than 1,300 enforcement actions against unruly passengers during the past 10 years, including recent cases for allegedly interfering with and assaulting flight attendants who instructed them to wear masks.

While the FAA does not have regulatory authority over aviation security or no-fly lists, the agency works closely with federal law enforcement and national security partners on any reported security threats that may impact aviation safety.

Watch a video message from Administrator Dickson on Zero Tolerance for Disruptive Passengers.

###

Plaintiffs' Exhibit 177

columbian.com

# FAA attempts to wrangle airlines' unruly passengers

*Kelly Yamanouchi, The Atlanta Journal-Constitution*

5-6 minutes

## Agency slaps dozens with fines totaling more than $1M

By

Published: August 22, 2021, 6:00am



A passenger wears a face mask to help prevent the spread of the new coronavirus as he waits for a Delta Airlines flight at Hartsfield-Jackson International Airport in Atlanta. Federal officials are seeking fines against 34 more airline passengers accused of unruly behavior, bringing the total of such

penalties to more than $1 million this year. (Charlie Riedel/Associated Press)

ATLANTA — Airline pa ssengers are facing record federal fines for lashing out at 30,000 feet amid conflicts over mask mandates, flight cancellations and because of behaviors fueled by the consumption of alcohol.

The Federal Aviation Administration has slapped dozens of unruly passengers with fines amounting to more than $1 million so far in 2021, the agency announced Thursday. The total has already reached the highest ever in a single year, according to the FAA.

The issue has frustrated flight attendants, airlines and federal authorities — and heightened the tension and stress of flying amid a pandemic — but the prospect of losing flight privileges and hefty fines hasn't deterred thousands of people reported for disruptive behavior.

Travelers have reportedly punched crew members or other passengers, thrown things at people and tried to break into the cockpit.

"As the number of passengers traveling has increased, so has the number of unruly and unsafe behavior incidents on planes and in airports," according to FAA administrator Steve Dickson.

So far this year, the FAA has fielded 3,889 reports of unruly passengers, including 2,867 related to masks. In response, the agency started 682 investigations in 2021 to date. That's the most on record dating back to 1995, and marks a sharp increase from 183 in 2020 and 146 in 2019.

"The stress level is higher than we've ever seen it. People are simply more frazzled than we've ever seen," said Sara Nelson, president of the Association of Flight Attendants union, while announcing results of a recent survey on unruly passenger incidents. The stressors of the pandemic and economic uncertainties are contributing factors, she said.

The highest federal fine so far — $52,500 — was levied against a Delta passenger who struck a flight attendant and tried to open a cockpit door on a flight from Honolulu to Seattle on Dec. 23, 2020.

More recent cases include two Delta Connection passengers, one on a flight from Atlanta in March and another in April who refused to comply with the

mask mandate and now face fines of $9,000 and $10,500, respectively.

In another incident, a Frontier Airlines passenger on a Jan. 3 flight from Atlanta to New York tried to get into the flight deck by "physically assaulting two flight attendants, threatening to kill one of them, and demanding them to open the door," according to the FAA. That passenger faces a proposed fine of $30,000.

Those are three of 34 unruly passenger cases amounting to $531,545 in proposed civil penalties announced by the FAA Thursday.

And mask conflicts in the air are unlikely to disappear anytime soon. The Transportation Security Administration, which requires face masks on flights and in airports, this week said it plans to extend the mandate until Jan. 18, 2022, instead of allowing it to expire under the previous end date of Sept. 13.

Key drivers for the increase in incidents and enforcement this year are the FAA's "zero tolerance" policy for unruly and dangerous behavior on airline flights in place since Jan. 13, and the mask mandate in place since Feb. 1 after an executive order from President Joe Biden.

Airlines have had policies requiring masks on board since mid-2020 and have put thousands of disruptive passengers on their no-fly lists for noncompliance. Atlanta-based Delta has put more than 1,500 travelers on its no fly list for not complying with its mask policy. Delta may also terminate passengers' SkyMiles frequent flier memberships "on the basis of documented abusive behavior." The airline issued a statement supporting the extension of the federal mask mandate and the FAA's "continued support of our customers and crews."

Receive latest stories and local news in your email:

Plaintiffs' Exhibit 178

nytimes.com

# Flight Attendants' Hellish Summer: 'I Don't Even Feel Like a Human'

*Tacey Rychter*

13-16 minutes          8-26-21

For cabin crews, the peak travel season has turned into a chronic battle involving frequent delays, overwork and unruly passengers that leaves them feeling battered by the public and the airlines.







Credit...Michelle Litvin for The New York Times

Aug. 26, 2021

As stranded Spirit Airlines travelers grew desperate at San Juan Airport in Puerto Rico during a chaotic night of cancellations on Aug. 1, banging on a gate door and yelling at staff, police officers rounded up the airline's cabin crews to hide them.

A 28-year-old flight attendant recounted being rushed to a jet bridge, behind a secure metal door, and then later to an office on the tarmac.

There, about 35 Spirit employees were told by a manager to change out of their uniforms for their safety.

"We were scared," said the attendant, who asked not to be identified by name because of the airline's media policy. "I've seen some crazy stuff, but this moved into number one."

Air travelers have faced an unusually high number of disruptions this summer because of widespread labor shortages, bad weather and technical problems. Nearly a quarter of U.S. passenger planes between June and mid-August were delayed, while almost 4 percent of flights were canceled in the first half of August, according to data from Flight Aware, a flight tracking service. Spirit alone canceled nearly 2,500 flights between Aug. 1 and 15.

Flight attendants across the country say they are struggling to cope, facing not only these prolonged operational issues, but also an increase in aggressive passenger behavior. Nearly 4,000 unruly passenger incidents have been reported to the Federal Aviation Administration in 2021, a figure described by the agency as "a rapid and significant increase."

Most of those reports deal with attendants enforcing rules on proper masking in the cabin, with passengers who range from careless to belligerent, and at times verbally or physically abusive. Shaky, vertical footage of brawls and insults are now a familiar staple on social media.

A 28-year-old American Airlines flight attendant who asked not to be identified for fear of losing her job said she had law enforcement called following verbal assaults twice since June, after six years of flying with no incidents. Both confrontations were related to mask

enforcement.

"What really hurts are the people who won't even look at you in the eye," she said. "I don't even feel like a human anymore."

In interviews with more than a dozen attendants from major and regional carriers, crew members said they were getting squeezed on both sides — from passengers and the airlines. They described regularly working shifts of more than 14 hours, being assigned up to four or five flights a day, not being given sufficient time to sleep and being deterred from taking leave if fatigued or unwell.

The tense situation in the air this summer has led many attendants to say that they feel exhausted, afraid for their personal safety and, in some cases, concerned that the situation could turn dangerous.

A spokeswoman for Airlines for America, a trade group, said its member airlines "recognize the importance of prioritizing the safety and well-being of all employees, who are the backbone of our industry," and "comply fully with robust F.A.A. regulations, which include stringent rest requirements and limitations on duty, as well as with all federal policies."



Image





Credit...Tom Williams/CQ Roll Call

Sara Nelson, president of the Association of Flight Attendants union that represents nearly 50,000 flight attendants at 17 airlines, noted that the difference in passenger response to the pandemic compared with the Sept. 11 terrorist attacks has been "night and day."

Twenty years ago, "every single person who came on our plane was completely on our team," she said. But now, flight attendants have become "punching bags for the public."

## Staffing can't keep up with demand

This spring, as vaccination rates increased, coronavirus cases dropped and restrictions melted away, demand for summer travel rebounded more quickly than many had expected. On July 1, 2.1 million air travelers passed through Transportation Security Administration airport checkpoints, even more than on the same day in 2019. Many airlines ramped up their scheduling and added new routes.

But while airlines are eager to capitalize on the demand, many appear to lack the staffing to keep up.

Bureau of Transportation Statistics data show that the number of full-time-equivalent employees at U.S. scheduled passenger airlines was nearly 14 percent lower in June 2021 than in March 2020. Tens of thousands of flight attendants took leave during the pandemic, the A.F.A. union said. American Airlines said about 3,300 flight attendants have yet to return from leave.

"So many people were let go so quickly on extended leave of absence, early retirement, that they're struggling to meet the travel demand," said Paul Hartshorn, a flight attendant and spokesman for the Association of Professional Flight Attendants, which represents about 24,000 American Airlines attendants. "And staffing is tight, there's not a lot of wiggle room for storms and maintenance delays."

At Southwest Airlines, the chief operating officer, Mike Van de Ven, shared a message with staff on Aug. 20, saying that the increase in bookings has "taken a toll on our operation and put a significant strain on all of you. And for that, I am sincerely sorry." He also said that "historical staffing models have not been effective in this pandemic environment."

"There's not enough people," said Nas Lewis, a flight attendant with a major U.S. airline and founder of th|AIR|apy, a website and Facebook group that addresses flight attendants' mental health. Ms. Lewis, who asked that the name of her airline not be published because of its media policy, said the situation generates anxiety for attendants "because we don't know what we're going to deal with on any given day."

A shortage of pilots is another critical pain point for air travel, as is inadequate numbers of gate agents, baggage handlers and delivery drivers, all of which can easily throw a wrench into getting a flight out on time.

When a cabin is short staffed, the airlines depend on on-call, or "reserve," flight attendants. This summer, airlines have been stretching their reserves to the maximum, to the point where they are running low or out of available attendants before the day has even begun.

American Airlines' staff scheduling system for Chicago on Aug. 10, which a flight attendant for the company described as an average day this summer, showed that by 7 a.m. every reserve attendant based there was either already scheduled or unavailable.

When an airline runs out of reserves, flight attendants who are already assigned to a flight can be abruptly rescheduled to work hours longer than expected, which attendants and union representatives say occurs more frequently now and adds to their fatigue.

## Long days, minimum rest

Jacqueline Petzel, a Chicago-based flight attendant with American Airlines who is currently working on reserve, said that during the first week of August, she was woken up repeatedly at 2 a.m. by American and had only two hours to race to the airport and then work a 15-hour shift.

Between some recent shifts, Ms. Petzel, 34, said she had been given only the minimum 10 hours of rest at the hotel.

During that time, she had to get dinner, shower, call family, wind down, sleep, eat breakfast and get ready for the next shift, leaving just four or five hours for actual sleep, Ms. Petzel said.

"It's hard to keep your eyes open when you're up that early and it's a long flight," Ms.

Petzel said. On a recent layover in Las Vegas after a 15-hour day, she fell asleep in her uniform.

A 30-year-old flight attendant who works with United Airlines, who asked not to be identified for fear of jeopardizing her job, said she had to work a double red-eye during a four-day trip in July.

"I actually felt kind of tipsy, almost kind of drunk," she said. "I was slow, and I know that even if something comes up the adrenaline will kick in, but I know that my decisions aren't going to be the best."

In response, Rachael Rivas, a spokeswoman for United, said: "We have what we believe is an industry-leading, safety-focused Fatigue Risk Management Program, which includes a strong collaboration between union representatives and in-flight management."

Flight attendants have a maximum number of hours that they can be assigned to work, although many say scheduling teams are increasingly pressuring them to accept longer and longer shifts. When an attendant exceeds the maximum hours, it's known colloquially as "going illegal."

Attendants say it has become difficult to push back.

"They have it in the computer that you're getting to the gate at 14 hours and 59 minutes, but it's obvious that's not going to happen," said the 28-year-old attendant with American, where domestic shifts are limited to 15 hours.

"There's this saying: fly now, grieve later," she said. "You fly the illegal reassignment now, and you grieve it with your union later."

Whitney Zastrow, a spokeswoman for American Airlines, said, "we've taken and continue to take steps to materially improve the quality of our flight attendants' work life, including working closely with our hotel and limo vendor."

### Facing conflict and discouraged from taking leave

A video circulating online earlier this month of Frontier flight attendants duct taping a belligerent passenger to his seat made news reports and shocked viewers. While this is an extreme incident, attendants and unions say that encounter unruly passengers, once rare, is now almost expected.



Image



Credit...

An F.A.A. spokeswoman said that before 2021, the numbers of disturbances were fairly consistent year over year, with the agency investigating on average less than 150 incidents annually. As of Aug. 23, the F.A.A. has launched investigations into 693 incidents in 2021.

"You would think a pandemic affecting a ton of people would cause people to maybe pause and be more compassionate to each other," said Ms. Petzel, the American Airlines attendant. "For whatever reason, it's made it go the complete other way."

Flight attendants across many airlines say the situation is wearing on their mental health and physical well-being.

"I have never experienced this level of anxiety, depression in my entire life," said the 28-year-old flight attendant who works for American. "We're really breaking down."

"We're used to getting B.S. from the company, from the passengers, we're used to weather — but not all at the same time for an extended period of time. It's every single day, it's every single trip," she said.

Many attendants say they fear retribution for taking leave, especially now.

Some airlines have a point-based attendance policy, whereby if a flight attendant has an unplanned absence when scheduled to work (say, because they call in sick), they accrue a point. Too many points can trigger an investigation or even termination.

JetBlue warned crew members that they would incur double attendance points if they took an unplanned absence over a weekend between July 23 through to Labor Day weekend.

One JetBlue flight attendant, who requested anonymity for fear of losing his job, said that last month he worked more than 17 hours on a shift and had been given only the legal minimum amount of rest, eight hours, between some flights.

He has called in sick a number of times but worries that he may accrue too many attendance points and face termination.

"When you try to talk to people about it, they say, 'This is what you signed up for,'" he said, referring to a conversation he had with his manager.

"Our attendance policy is similar to most airlines, and on peak periods (like holidays) it's especially important that crew members show up for assigned trips so that customers can get where they plan on going," said Derek Dombrowski, a JetBlue spokesman. JetBlue is also offering financial incentives to encourage crews to take shifts.

Normally, Southwest Airlines is contractually obliged to let attendants call in sick without requiring a physician's note. But the company can invoke an "emergency sick-call procedure," requiring staff to verify their illness with a company doctor. Southwest has invoked this policy three times this summer.

"It should not be used as a usual or normal way of controlling the operation," said Lyn Montgomery, the president of Transport Workers Union Local 556, which represents Southwest Airlines flight attendants. The last time this procedure was used was in 2017.

"While never a desired option, Southwest may, when operationally necessary, enact emergency sick call procedures to protect the airline's schedule and support working flight attendants," said Brian Parrish, a spokesman for Southwest Airlines. "Southwest Airlines supports employees' physical, emotional and mental health with a variety of programs and offerings — including free employee assistance services that are available 24/7."

The union and attendants said they felt that these doctors could be dismissive of symptoms. Staff also may not feel comfortable seeing the airline's doctor, especially if dealing with mental health concerns.

"Our mental health has never been more disrupted than now, obviously since 9/11," said a 30-year-old flight attendant for Southwest, who asked not to be identified for fear of losing her job. "You can't even call out sick if you're having major anxiety or depression episodes. It doesn't matter."

Ms. Lewis, of th|AIR|apy, said in May she was shoved by a hostile passenger who was upset about an overbooked flight. She did not report the incident, she said, because she was too exhausted.

"As flight attendants, we are at our wits' end," she said.

Plaintiff's Exhibit 179

nytimes.com

# 2 Airlines Will Postpone Serving Alcohol Amid Surge of In-Flight Violence

*Maria Cramer, Michael Levenson*

5-7 minutes

American and Southwest announced the policies after the latest assault was captured on a widely watched video that showed a woman punching a flight attendant in the face.





Credit...Charlie Riedel/Associated Press

May 29, 2021

Two major airlines, American and Southwest, have postponed plans to resume serving alcohol on flights in an effort to stop a surge of unruly and sometimes violent behavior by passengers who have shoved, struck and yelled at flight attendants.

Both airlines announced the policies this week after the latest assault was captured on a widely watched video that showed a woman punching a flight attendant in the face on a Southwest Airlines flight from Sacramento to San Diego on Sunday.

The flight attendant lost two teeth in the assault, according to her union, and the passenger, who was identified by the police as Vyvianna Quinonez, 28, has been charged with battery causing serious bodily injury. She has also been barred for life from flying Southwest, the airline said.

It was not immediately clear if Ms. Quinonez had a lawyer, and she did not respond on Saturday to messages left at a number listed under her name.

Since Jan. 1, the Federal Aviation Administration has received about 2,500 reports of unruly behavior by passengers, including about 1,900 reports of passengers refusing to comply with a federal mandate that they wear masks on planes.

The agency said that in the past it did not track reports of unruly passengers because the numbers had been fairly consistent over the years, but that it began receiving reports of a "significant increase" in disruptive behavior starting in late 2020.

"We have just never seen anything like this," Sara Nelson, the international president of the Association of Flight Attendants, said during an online meeting with federal aviation officials on Wednesday. "We've never seen it so bad."

Southwest Airlines issued a statement on Friday citing the "recent uptick industrywide of incidents in-flight involving disruptive passengers" as it announced that it had paused plans to resume serving alcohol on flights.

"We realize this decision will be disappointing for some customers, but we feel it to be the right decision now in the interest of safety and comfort of all onboard," the statement said.

American Airlines announced a similar policy on Saturday.

It said that alcohol sales, which had been suspended in the main cabin since late March 2020, would remain suspended through Sept. 13, when a federal mandate requiring passengers to wear masks on airplanes, buses and trains is set to expire.

In a memo, American said it recognized that "alcohol can contribute to atypical behavior from customers onboard and we owe it to our crew not to potentially exacerbate what can already be a new and stressful situation for our customers."

"Over the past week we've seen some of these stressors create deeply disturbing situations on

board aircraft," said the memo, which was issued to American's flight attendants on Saturday. "Let me be clear: American Airlines will not tolerate assault or mistreatment of our crews."

American said that alcohol would continue to be served in first class and business class, but only during the flight and not before departure.

The changes came after Lyn Montgomery, the president of Transport Workers Union Local 556, which represents flight attendants on Southwest Airlines, urged the airline's chief executive, Gary Kelly, to stop the "abuse" employees have been facing.

"We ask that you take a strong stance to ensure that unruly passengers are not welcome to travel with us, period, full stop," she wrote in a letter to Mr. Kelly on Monday. "Flight crews must feel safe and supported when reporting to work."

The changes also came after the F.A.A. said on Monday that it had proposed fines of $9,000 to $15,000 for five passengers who had exhibited disruptive behavior on flights.

One of those passengers was in the main cabin of a JetBlue flight in February. She yelled obscenities and pushed a flight attendant who took away champagne and food that had been brought to her by a passenger in first class, the F.A.A. said.

Another passenger on a JetBlue flight in January ignored instructions to stop drinking alcohol and yelled at crew members after they told him to stop talking on his cellphone, the agency said.

In January, a passenger on Alaska Airlines shoved a flight attendant who was walking down the aisle and documenting which passengers were wearing masks, the F.A.A. said.

Steve Dickson, the F.A.A. administrator, said in a videotaped statement that the agency has a "zero-tolerance policy" for passengers who cause disturbances on flights or fail to obey instructions from the flight crew.

Passengers, regardless of their vaccination status, must wear masks on planes and in airports, he said.

"But this isn't just about face masks," Mr. Dickson said. "We've seen incidents related to alcohol, violence toward flight attendants and abusive behavior in general."

Those who violate the rules, he said, may be subject to fines and jail time. As a former commercial airline captain, Mr. Dickson said, he knows that disruptive passengers can pose a safety risk.

"Flying is the safest mode of transportation," he said, "and we intend to keep it that way."

Plaintiff's Exhibit 180

cbsnews.com

# Flight attendant's bloody assault by passenger part of disturbing trend

*Kate Gibson*

7-9 minutes

Updated on: May 26, 2021 / 6:58 PM / MoneyWatch



Violent airline incidents on the rise

Violent airline incidents on the rise 01:55

A Southwest Airlines flight attendant who lost two teeth after she was physically assaulted by a passenger on Sunday is among the more egregious examples of an unsettling increase in unruly and dangerous behavior on the part of air travelers.

There were 477 passenger misconduct incidents on Southwest flights between April 8 and May 15, including one Sunday morning on a flight landing at San Diego International Airport, according to the carrier's flight attendant union.

"This past weekend, one of our flight attendants was seriously assaulted, resulting in injuries to the face and a loss of two teeth," TWU Local 556 President Lyn Montgomery wrote in a letter to Southwest CEO Gary Kelly.

"This unprecedented number of incidents has reached an intolerable level, with passenger non-compliance events also becoming more aggressive in nature," Montgomery said.

"We are asking our carrier, the government and the flying public's help in ending this epidemic

of aggression and assault. Flight attendants are first responders in the sky who are focused on safety. As people return to the skies, we are asking for everyone's help in complying with flight attendant requests to help ensure a safe and fun atmosphere for all," she said in an emailed statement to CBS MoneyWatch.

## "Verbally and physically abusive"

Southwest confirmed the recent incident in an emailed statement.

"Our reports indicate that a passenger physically assaulted a flight attendant upon landing on Flight #700 from Sacramento to San Diego Sunday morning," the spokesperson stated. "The passenger repeatedly ignored standard inflight instructions and became verbally and physically abusive upon landing. Law enforcement officials were requested to meet the flight upon arrival, and the passenger was taken into custody."

A woman who shared a video of police officers escorting a woman from the aircraft said the flight attendant told a passenger to keep her seat belt fastened while the plane was still moving, with the passenger responding by punching her in the head.

So a typical short uneventful flight from Sacramento to San Diego, early Sunday morning, on Southwest Airlines, turns violent. As we are pulling up to the gate, a woman in the back row took off her seat belt and stood up. The flight attendant told her to keep her seat belt fastened while we were still moving. What I saw was the flight attendant in the front suddenly start screaming "No, No, No! Stop!", and running toward the back. I thought maybe someone was trying to open the back doors at first, but the woman in the back was attacking the flight attendant, punching her in the head. While the flight attendant was staggering back with a bloody face, we were all told to stay in our seats while they brought in police to remove the unruly passenger. Good grief people. Lady, welcome to the "no fly list".

Posted by Susan Marie Stidham on Sunday, May 23, 2021

"While the flight attendant was staggering back with a bloody face, we were all told to stay in our seats while they brought in police to remove the unruly passenger," she relayed in a post on Facebook.

"We do not condone or tolerate verbal or physical abuse of our flight crews, who are responsible for the safety of our passengers," the Southwest spokesperson said.

The incident came a day before the Federal Aviation Administration fined a passenger $52,500 for trying to open the cockpit door and hit a flight attendant in the face twice on a Delta Air Lines flight in late December.

Bad behavior on an airplane has serious consequences. #FlySmart https://t.co/7IK9dbc8Kv

— FAA Steve Dickson (@FAA_Steve) May 24, 2021

The FAA also said it was seeking fines against three other passengers for behavior including refusing to wear a mask and for threatening others. They include:

- A woman facing a $9,000 fine for continually refusing to wear a mask properly and cursing at flight attendants on a February 15 Allegiant Air flight from Ft. Lauderdale, Florida, to Knoxville, Tennessee.

- A passenger on a February 5 flight facing a fine of $18,500 for bringing his own alcohol on board a JetBlue flight from Fort Lauderdale to Las Vegas and refusing to stop drinking it when asked by flight attendants. The FAA said he also kept removing his face mask and wearing it improperly despite the directions of flight attendants.

- The agency is also seeking a $27,000 fine against a passenger who allegedly threatened to kill someone and claimed to have access to a bomb on a January 1, 2020, flight Southwest flight from Phoenix to Chicago. The flight was diverted to Oklahoma City where police took the man into custody.

The FAA has received about 2,500 reports of unruly passenger behavior and 1,900 reports of passengers refusing to wear masks in defiance of a federal mandate.

While fewer people have been flying since the coronavirus took hold in the U.S. in March 2020, Transportation Security Administration data show an increase in recent weeks of passengers being screened at airports. More than 1.6 million people were screened Sunday, the most on any single day since last year. The number of passengers was down 61% in 2020.

Travel industry prepares for post-pandemic su... 06:54

At the same time, more passengers are getting banned by airlines for unruly behavior. The lists maintained by the airlines — different from the federal no-fly list — had swelled to more than 3,000 as of February, data compiled by CBS News showed.

Montgomery, the Transport Workers Union official, is concerned matters will only get worse when Southwest brings back alcoholic beverages this summer after largely going without during much of the pandemic. She's calling on Southwest to take stronger action to curtail passenger misconduct, including adding more to the carrier's restricted travelers list.

"The flying public needs to understand that egregious behavior will result in being banned from flying with Southwest," Montgomery wrote. "No passenger should be removed from one flight only to be permitted to board the very next Southwest Airlines flight after a non-compliance incident."

The union also urged the airline demand the government add federal air marshals to aircraft to help ensure safe travel.

Plaintiff's Exhibit 181

nypost.com

# Southwest passenger claims flight attendant sparked fight that left her teeth busted

*Jackie Salo*

3-4 minutes

The Southwest Airlines flight attendant who got two of her teeth knocked out by a passenger was "very unprofessional" and provoked the wild altercation, another flier said.

The shocking incident unfolded just after a flight from Sacramento landed in San Diego on Sunday.

It began when the unnamed flight attendant confronted passenger Vyvianna Quinonez, 28, and her other family members about putting their face masks back on, news station Fox40 reported.

"It was so unnecessary. In the first altercation, she had said that she was going to call the captain," said passenger Michelle Manner, who was sitting two rows in front of them.

"And she should've just stayed there in her back cubby, but she came back out screaming at them again."

The altercation then escalated from there.

"Vyvianna had said to her three times, that we could hear, 'Get off of me. Quit touching me. Get your hands off of me,'" Manner told the news station.

Manner recorded the rest of the encounter in which Quinonez punched the flight attendant before another passenger intervened.

"The flight attendant continued to yell. And I mean she was yelling. We got to the point to, where we're like, should we start videoing this?" Manner said.

Passenger Michelle Manner says that the injured Southwest flight attendant acted "very unprofessional" toward Vyvianna Quinonez (left).

Passenger Michelle Manner says the injured Southwest flight attendant acted very unprofessionally toward Vyvianna Quinonez (left).
Michelle Manner

Michelle Manner's video shows passenger Vyvianna Quinonez punch a Southwest flight attendant.

Michelle Manner's video shows passenger Vyvianna Quinonez punch a Southwest flight attendant.
Michelle Manner

"She was very unprofessional. Very rude, about the way she handled anything," she added of the flight attendant.

A Southwest spokesman, however, said the incident occurred when the passenger "repeatedly ignored standard inflight instructions and became verbally and physically abusive upon landing."

Quinonez was arrested on suspicion of battery causing serious injury. She was released from jail on $35,000 bond, CBS8 reported.

Reached for comment, she said she acted in self-defense and would not speak further about the incident without an attorney present, the outlet reported.

The flight attendant, who has not been identified, was treated at a hospital and released.

Lyn Montgomery, president of the Southwest flight attendants union, said the employee is recovering.

"She is recovering, I'm giving her privacy to recover and get over the shock of this to occur," Montgomery told CBS8.

Passenger Vyvianna Quinonez Quinonez was arrested on suspicion of battery causing serious injury.

Passenger Vyvianna Quinonez was arrested on suspicion of battery causing serious injury.
Michelle Manner

In her letter to CEO Gary Kelly on Sunday, Montgomery said the incident was one of hundreds in a trend of unruly passengers.

"The unprecedented number of incidents has reached an intolerable level, with passenger non-compliance events also becoming more aggressive in nature," the union boss wrote.

Plaintiff's Exhibit 182

onthejetset.com

# Southwest Flight Attendant Hesitates to Let Maskless Teen with Autism Board | The Jet Set

*John Michael Jayme*

2-3 minutes          July 20, 2021

---

A Long Beach, California family with a teenager with autism tried to board a Southwest Airlines flight from St. Louis. However, a flight attendant of Southwest prevented the family from boarding.

LaShaunda Jethro, mother of a 17-year-old son with autism said that it's challenging to make her son wear a mask. She said that "He will not keep a mask on his face. We have tried and tried. He just won't do it". She added that a flight attendant prevented them from boarding insisting that her son needs to wear a mask.

LaShaunda claims that she pulled out the doctor's letter from her phone but was still denied to board. She and her family were allowed to board when she called a St. Louis TV station. However, it wasn't the end of it. They were then asked to get off the plane.

According to Southwest, Jethro was asked to deplane since she wasn't wearing her mask at one point when talking to the flight attendants. Jethro denies that such an incident happened.

The family decided to get off the plane together with the teen suffering from autism. Their luggage remained checked on the flight, and they had to rebook a flight.

## Federal Mask Mandate and Exemptions for Passengers with Disabilities

With the number of unruly passengers, there is now a federal mask mandate on public transportation including airports and planes. Refusal to wear a mask is the main reason why the FAA recorded thousands of unruly passengers. However, there are exemptions.

According to the CDC, there is an exemption on individuals with disabilities. This includes "A person with a severe sensory disability or a severe mental health disability who would pose an imminent threat of harm to themselves or others if required to wear a mask."

It is also suggested by the CDC that they are provided with a "Seat or otherwise situate the person in a less crowded section of the conveyance or transportation hub".

Plaintiff's Exhibit 183

kktv.com

# Canon City man faces charges for allegedly hitting flight attendant and urinating in a seat over a mask dispute

2 minutes

---

DENVER (KKTV) - A Colorado man is now facing federal charges over an alleged mask dispute while taking a flight from Seattle to Denver this week.

The United States Department of Justice shared details of the case with the public on Friday. The incident happened on Tuesday and involved 24-year-old Landon Perry Grier from Canon City.

"According to the facts contained in the complaint, on March 9, 2021, Grier was a passenger onboard Alaska Airlines flight 1474 traveling from Seattle to Denver," a release from the Department of Justice reads. "During the flight, Grier was asked eight to ten times to put on a face mask, as required by airline policy.  Grier initially ignored the flight attendant, but then struck her arm.   Later, passengers notified a different flight attendant that Grier was urinating in his seat.  A flight attendant notified the captain.  When the captain was notified, he was preparing to land after declaring an emergency for an unrelated maintenance issue."

Interfering with a flight crew has a potential penalty of up to 20 years in prison and/or a fine of up to $250,000.

The FBI was involved in the investigation.

*Copyright 2021 KKTV. All rights reserved.*

Plaintiff's Exhibit 184

thegatewaypundit.com

## EXCLUSIVE: One Courageous Airline Stewardess Resigns Rather than Enforce Passenger Mask Mandates

*Joe Hoft*

6-7 minutes



**A stewardess with an airline carrier in the US resigned rather than enforce the mask mandate on her airline.**

Here is what Theresa Mullins shared with us about her decision to refuse to enforce barbaric mask mandates on her airline. ==Ms. Mullins begins by stating that she quit her excellent flight attendant job because of the passenger mask mandates:==

I was a career crew member that flew for the experience.  I loved it.  But then my airline mandated masks for the passengers at the beginning of July 2020.   I had great hope that the mask mandate would be temporary.

In July 2020, I had been on a voluntary leave, at first because of the convenience offered by the company.  I was disappointed and offended for the airline's mandate that began in July. "I refuse to tell anyone they must wear a mask, and this is not what my company expects of me." Voluntary leave decreased my income. I wanted to support the company so over the summer, I took the time to paint

Germany About Election Fraud - New Evidence Shows Germany Was Made Aware of Election Fraud on Election Night And Hid This From President Trump



The company wanted me back on January 31st this year. Even with money tight, I struggled with the thought. I can not participate in what I perceive as an oppressive compliance ritual.  That was the thought weighing heavy on my mind as my show time approached.  The day I was due back to work, I paced the house for hours contemplating the best action to take.  Do I contact the Union? I saw pro-mask dialogue in the Union's newsletters, so what would be the point to contact them? With numerous Covid-19 updates, the Union didn't seem offended for the passengers at all! I didnt think it would help.

And I continued to stress about it until I made the last minute call on the day I was due back, "I think I quit."

Afterwards, I notified my immediate supervisor of the resignation, and told her I'd be willing to return once the mask mandates are removed from the passengers. Then I turned in my badge. And on a whim, I made an attempt to notify the union. I was very surprised when the Union responded in a non-biased manner notifying me that I may file a grievance.

I needed to cite a breach in the collective bargaining agreement.  I turned in the grievance citing discrimination of Creed, that it was against my moral creed to enforce an inhuman, tyrannical mandate for the passengers. I explained that I wanted to return when the mandates were removed, and the Union seemingly backed me up.

As I anticipated, my airline rejected the grievance, (ie, we follow the CDC guidelines and she quit) and the appeal that followed. I captured the last couple of paragraphs of the company's reply to the grievance appeal below.

> Flight Attendants are on the frontline in enforcing policies that some passengers might not understand or believe in (i.e., wearing a seatbelt during critical phases of flight, no smoking or vaping in the restroom, not allowing passengers to stand up or walk the aircraft during certain phases of flight, amongst several others). It is disturbing that Ms. Mullins believes that enforcing a Company policy that complies with, and is supported by DOT safety guidelines and the CDC,[2] is discriminatory conduct by the Company. There is nothing in the Company's July 2, 2020 policy that can reasonably construed as violating Ms. Mullins' sincerely held beliefs and/or her creed.

> The Union is apparently arguing that Ms. Mullin should not be required to enforce a policy that restricts passengers' behavior and/or conduct during flight. Taken to its logical extreme, Ms. Mullin would not enforce a policy that requires a passenger to remain seated during critical phases of flight because being able to stand up and move is a passenger's fundamental human right; or even more disturbing, perhaps Ms. Mullin would not restrict a passenger from carrying a firearm onto the aircraft because it would violate the passenger's Second Amendment rights. Federal law and regulations, along with Company policy, and the entire commercial flying process requires Flight Attendants to enforce policies and regulations that will inevitably restrict a passenger's fundamental rights but that is the condition upon which air travel is based. It is abundantly clear that the Company did not violate Section 28 of the CBA by implementing the July 2, 2020 passenger mask policy.

> I concur with the findings as communicated in Mr. ▬▬▬▬ Step 1 response. The grievance is denied.

> Respectfully,



With this reply, they tried to shame me, and insinuated that I couldn't be trusted as a flight attendant anymore. The Union has advised me that they will consider a "hearing," which involves a 3rd party arbitrator. The arbitrator needs to be paid, the Union may not want to go that far. I expect to hear back from the Union any day with their answer.

**I do not know of any other Airline Employee taking a stand against the passenger mask mandates. I hope there are some. Cabin safety and the passenger comfort is what I care about. Mask mandates support neither.** I loved my airline, I miss my job and co-workers so much, but Im currently seeking private fly gigs, and trying to promote my online boutique store. Airlines never want crew members talking to the press. In this case, I must pursue attention to this matter. It's too important. It's for the passengers.

**Ms. Mullins is the one flight attendant in the US who had enough courage to stand up to the insane mask mandate. Please support her boutique here:**

www.gentleladyboutique.com

Plaintiff's Exhibit 185

<u>11alive.com</u>

# FAA: Woman who hit Delta flight attendant after mask dispute faces $27,500 fine

*Author: Associated Press*

2 minutes

---

The confrontation on board a Delta flight from Miami to Atlanta began when the passenger's companion refused to wear a mask or fasten his seatbelt.

WASHINGTON — Federal officials are seeking a $27,500 civil penalty against an airline passenger who allegedly struck a flight attendant who asked the woman and her companion to leave the plane after a dispute over wearing a face mask.

The confrontation on board a Delta Air Lines flight departing from Miami International Airport for Atlanta began when the passenger's companion refused to wear a mask, secure his tray table or fasten his seatbelt, the Federal Aviation Administration said Friday. Delta, like most airlines, requires most passengers to wear masks except when eating or drinking.

Pilots returned the plane to the gate, and the pair was asked to disembark. The female passenger began yelling at the flight attendant and other passengers, then hit the flight attendant under her left eye, according to the FAA.

The FAA did not identify the passengers. The woman has 30 days to respond to the proposed penalty. The FAA said it appears that she violated a federal regulation against assaulting a crew member, which carries a civil penalty of up to $35,000.

The FAA announced tighter enforcement of rules against disturbances on planes after several rowdy incidents in early January on flights to and from Washington.

Plaintiffs' Exhibit 186

wtvq.com

# Flight from Atlanta to Lexington delayed, passenger refused to wear a mask - ABC 36 News

*Tom Kenny*

1-2 minutes

8-24-21



ATLANTA, Ga. (WTVQ) – A Delta flight from Atlanta to Lexington's Blue Grass Airport was delayed Monday afternoon when a passenger refused to wear a mask, according to the airline.

Flight 1088 had to return to the gate in Atlanta where the passenger voluntarily got off the plane, which led to a delay of approximately 30 minutes around 2 p.m., according to Delta.

Passengers are required to wear a mask on public transportation, which includes commercial flights.

Delta sent the following statement to ABC 36 News:

"We apologize to our customers for the delay on Delta flight 1088 which returned to the gate due to a customer not complying with the federal mask mandate. The customer deplaned voluntarily and the flight departed approximately 30 minutes behind schedule."

Father Jim Sichko, a Papal Missionary of Mercy based in the Catholic Diocese of Lexington, was on the flight. He posted to social media, "Don't get on the airplane if you aren't going to be compliant with the mask policy."



Plaintiff's Exhibit 187

stationgossip.com

# 'I hope you get eaten by an alligator!' Passengers heckle and boo man as he is escorted off plane after it is diverted to Florida because he refused to wear a mask

4 minutes

---

 This is the moment a man is heckled by fed-up passengers after he refused to wear his mask and the airline made an unscheduled landing to take him off the flight.

==The incident took place onboard a JetBlue aircraft as it flew holidaymakers to Cancun, Mexico when it was forced to divert to Florida.==

Several passengers including Lawrence T Redick IV, 22, from New York filmed the incident.

One passenger called out they hoped the Covid-19 denier would be fed to Florida's alligator community.

It shows a flight attendant standing next to the passenger who would not wear the mask while telling him: 'let's go, get up, let's go.'

Plane forced to land early after passenger refuses to wear a mask



Loaded: 0%

Progress: 0%

0:00

Disgruntled passengers on board a jetBlue flight to Cancun, Mexico, heckled a man who refused to wear a mask and forced the aircraft to be diverted to Florida so he could be thrown off

==The aircraft was diverted to Florida because the passenger repeatedly removed his mask==

Other passengers can be seen filming the anti-masker and shouting: 'get him out of here,' and 'shame!'

Moments later, after what appears to be two Sheriffs walk up the aisle behind the flight attendant, the passenger - who is dressed in a black t-shirt and straw hat -can be seen getting up from his

seat.

Passengers erupt into cheering and clap their hands while others shout 'boo' as the man slowly makes his way off the plane.

As he is exiting, one hilarious person onboard shouts: 'I hope you get eaten by an alligator!' prompting an outburst of laughter.

'I started filming after we landed in Florida.

'Me and my family were on our way to Cancun and the passenger initially wore a mask to get on the flight but during the flight, he kept taking it off.

'The flight attendants and the pilot made two announcements about the passenger saying that if he didn't keep his mask on then they would have to make an emergency landing and get him off.

'Sure enough, he didn't keep the mask on and so we had to land early and then he put his mask on to leave.

Passengers onboard the flight said they were on the ground in Florida for 90 minutes

'We were on the plane for roughly three hours before we landed early and then we had to stay on the plane in Florida for about an hour to an hour-and-a-half because of this.'

Almost 3,000 people have commented on the footage which was uploaded to TikTok on Monday. More than 60,000 people have liked the short video and more than 2,500 users have shared the story.

'If you want to anti-mask, do it home, not at the inconvenience of everyone else flying. Even if you don't believe it, just wear it to be polite,' one TikTok user wrote.

Another person suggested that masks alone would not prevent the virus from spreading.

'If anyone on that plane has covid, everyone on there will get it, with masks or without. Masks work but social distancing is much more important,' they said.

A final person seemed more concerned with why the flight was so full, adding: 'Why are there so many people on the plane? Are they not seating people spaced out anymore?'

'I hope you get eaten by an alligator!' Passengers heckle and boo man as he is escorted off plane after it is diverted to Florida because he refused to wear a mask 'I hope you get eaten by an alligator!' Passengers heckle and boo man as he is escorted off plane after it is diverted to Florida because he refused to wear a mask Reviewed by STATION GOSSIP on 06:29 Rating: 5

Plaintiffs' Exhibit 188

thehill.com

# Two arrested at Nashville airport after reportedly refusing to wear masks on separate flights | TheHill

*Natalie Prieb*

3 minutes

---

By Natalie Prieb - 08/19/21 12:05 PM EDT 660

Two arrested at Nashville airport after reportedly refusing to wear masks on separate flights

Volume 90%

Two people were arrested at Nashville International Airport earlier this week after reportedly refusing to wear masks on their flights, USA Today reported.

One passenger on a Spirit Airlines flight Monday refused to wear a mask and called the flight crew "vulgar names," according to the arrest affidavit.

They were denied further travel with the airline and attempted to board an American Airlines flight at the Nashville airport the next day, where they once again refused to wear their mask, USA Today reported. They were arrested soon after.

The other passenger allegedly displayed "unruly" behavior after they were asked to wear a mask on a Southwest Airlines flight Tuesday and caused the plane to return to the gate, according to USA Today.

The passenger smelled of alcohol, was yelling obscenities and was aggressive toward officers before they were arrested, the affidavit showed.

"The safety and security of passengers, employees and guests is the utmost priority of Nashville International Airport," Nashville International Airport

spokesperson Kym Gerlock told USA Today. "Working with our airline partners and adhering to the federal mask mandate, the airport's Department of Public Safety is committed to carrying out that mission and is fully trained and equipped to do so."

The incidents come as the Federal Aviation Administration (FAA) said Thursday that it will be seeking more than $500,000 in fines from 34 passengers for "unruly behavior." The fines are part of the FAA'a zero-tolerance policy that it adopted earlier this year in light of a rise in reported incidents on flights.

The Biden administration announced this week that the federal mask mandate for all transportation networks will be extended through January.



The Hill 1625 K Street, NW Suite 900 Washington DC 20006 | 202-628-8500 tel | 202-628-8503 fax

The contents of this site are ©2021 Nexstar Media Inc. | All Rights Reserved.

Plaintiff's Exhibit 189

americanlibrariesmagazine.org

# Are There Exceptions to Face-Mask Requirements? | American Libraries Magazine

*By Mary Minow |*

8-10 minutes



 Our online column *Letters of the Law* explores the wide range of legal issues that arise in libraries, with the help of a pair of leading authorities: Mary Minow, a librarian who became a lawyer, and Tomas A. Lipinski, a lawyer who became a librarian. Together they have authored four books on the subject, including The Library's Legal Answer Book (ALA Editions, 2003, with a new edition forthcoming in 2021), and led forums at American Library Association (ALA) conferences in collaboration with the Public Library Association (PLA).

In this edition, Minow addresses legal issues that have arisen around the COVID-19 pandemic, including exceptions to face-mask requirements and *force majeure* clauses in contracts, as well as the legality of taking time off to vote.

**If a library has a policy requiring users to wear face masks, how do patrons with disabilities that directly conflict with mask-wearing use the library?**

As libraries navigate the complicated process of reopening while providing a safe environment within the confines of the law, they would do well to read Theresa Chmara's recommended guidelines, approved by ALA's Intellectual Freedom Committee, for common questions and concerns. (Chmara is general counsel of the Freedom to Read Foundation.)

First, know that there are fake exemption cards circulating on social media, some bearing the seal of the US Department of Justice (DOJ), claiming the holder has a disability that prevents them from wearing a mask. The cards say it's illegal for any business to ask bearers to disclose their condition. These cards are not issued or endorsed by DOJ. Read more about the phenomenon here.

The Centers for Disease Control and Prevention (CDC) states that a person who has trouble breathing or is unconscious, incapacitated, or otherwise unable to remove the face mask without assistance should not wear a face mask or cloth face covering. Other examples may include individuals with respiratory conditions such as asthma, chronic obstructive pulmonary disease, or cystic fibrosis. Additionally, people with post-traumatic stress disorder, severe anxiety, claustrophobia, autism, or cerebral palsy may have difficulty wearing a face mask.

The Americans with Disabilities Act (ADA) does not specifically address face masks, but the Atlanta-based Southeast ADA Center and Burton Blatt Institute at Syracuse University offer a useful fact sheet on the topic. Under the ADA, a library must consider reasonable modifications—changing policies, practices, or procedures—for individuals with disabilities so they can participate in or benefit from library programs and services.

Reasonable modifications to mask requirements may include:

- allowing a person to wear a scarf, loose face covering, or full-face shield
- allowing curbside pickup or no-contact delivery in a timely manner
- offering phone or video appointments

There are three reasons a state or local government agency or private library may not have to provide a reasonable modification under the ADA:

- **Fundamental alteration.** A library may not have to provide a reasonable modification if the modification would change the nature of the service, program, activity, goods, services, or facilities. A fundamental alteration is a change to such a degree that the original program, service, or activity is no longer the same. An example would be a request for home delivery when the library does not already offer that service.

- **Undue burden,** such as a significant difficulty or expense. This could include a request to visit the library before or after its regular hours, as it would place an undue burden on limited staff.

- **Direct threat,** or a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. If an individual with a disability poses a direct threat despite reasonable accommodation, they are not protected by the ADA.

In order to limit a direct threat around COVID-19, state and local government agencies and businesses may:

- develop policies and procedures to promptly identify and isolate patrons with symptoms of COVID-19

- offer face masks to patrons (public libraries should include a free option)

- inform library users about symptoms of COVID-19

- limit in-person access to buildings as appropriate

For guidance on the decision-making process for reasonable accommodations, see discussion of two DOJ settlement agreements (one involving a YMCA, one involving the District of Columbia) from the Southeast ADA Center. For more on reasonable accommodation for employees, along with other pandemic-related employment issues, consult the Equal Employment Opportunity Commission's guidance.

**With everything going on in the world, why should I bother looking at provisions in old contracts the library has signed in the past?**

A boilerplate clause in most types of library contracts known as *force majeure* (French for "superior force") has suddenly become important amid the COVID-19 pandemic. Sometimes known as "acts of God" clauses, they refer to natural catastrophes and can allow one or both parties to get out of or change its obligations.

The clauses are not uniform, and whether they apply to the library or vendor and what they affect (payment, timing, nonperformance) depends entirely on their wording. I recommend looking at your library's most important contracts now rather than later because invoking *force majeure* generally requires timely notice.

Sample *force majeure* clauses and checklists abound (here's one good example). Especially useful with respect to electronic licenses are the samples given at the Liblicense project hosted by the Center for Research Libraries. Liblicense, a rich resource for libraries negotiating vendor contracts for many years, evaluates two sample *force majeure* clauses from a library's point of view, primarily making the point that libraries should ensure that the clause applies equally to the library as well as the vendor.

A court in Illinois recently excused a restaurant from paying 75% of its rent because the governor had ordered the restaurant to shut down most of its operations. A typical *force majeure* clause says that it does not excuse an obligation to pay money, but this particular one did not carve out monetary obligations. *Forbes* reports that although probably only a minority of clauses may allow a party to reduce rent, this shows how important it is to closely read even boilerplate language.

**A common reason people give for not voting is that they're too busy with work demands. May (or must) libraries give employees time off to vote?**

Illinois passed a law in June that expands early voting and vote by mail and also makes November 3, 2020, a legal holiday for public schools and state and local government offices. But what about other dates and other libraries?

The federal government has a longstanding policy of granting federal library employees a limited amount of administrative leave to vote in elections (read more here). And most state and local governments require employers to allow employees time off to vote, particularly when their working hours do not permit sufficient time to do so.

State laws vary widely in their details. Workplace Fairness and XpertHR offer state-by-state guides. Read your state law with an eye to see if it requires paid time, whether it requires notice by employees, whether employers may designate the hours off, and whether the employer can demand written proof of voting or penalize employees who take time off to vote.

Private library employers may set their own policies. Time to Vote is a current movement in the corporate world to encourage paid time off.

Even in states with no voting leave law, it is good practice to encourage voting by giving up-to-date information about early and absentee voting options.

*The information in this column does not constitute legal advice, nor does it necessarily reflect the views of ALA or PLA. It is meant to serve as a starting point for librarians and library lawyers who wish to research the law and consider its applications. Different jurisdictions will have different laws and may even apply the same laws differently. If you require legal advice or expert assistance, we urge you to seek the services of a competent legal professional.*

*Look for a new column by Lipinski this fall. Send questions or ideas to Associate Editor Sallyann Price at sprice@ala.org.*

Plaintiff's Exhibit 190

aviationtravelwriter.com

# ADA and Child Mask Policy

11-14 minutes



American Airlines and Southwest Airlines were the first carriers to institute a blanket ban on passengers with ADA disabilities who cannot not wear a face mask. Southwest stated that it would "temporarily refuse to transport any passenger who is unable to wear a mask even if the Customer has a verifiable medical condition that prevents them from wearing a mask."

That's 7 of the 10 largest U.S. airlines which have told disabled people with autism, asthma, cerebral palsy, claustrophobia, COPD, PTSD, severe anxiety and other conditions that they are not welcome onboard an aircraft. It is the largest ban on disabled air travel since the Air Carrier Access Act became law in 1986.

## These airlines still permit disabled people to fly without a face mask

If you or someone you are traveling with has any of these conditions or is unable to wear a mask due to a legitimate disability, you will only be able to fly on the following carriers:

Allegiant Air — "Those with medical conditions that prevent the use of a face covering must provide documentation from a medical physician to the gate agent one hour prior to departure."

Delta Air Lines — "Customers with underlying conditions that explicitly prevent the wearing of a face covering or mask are strongly encouraged to reconsider travel or should be prepared to complete a 'Clearance-to-Fly' process prior to departure at the airport. If you require this exemption, please arrive early to complete the process during check-in and avoid missing your flight – this process can take over one hour."

Hawaiian Airlines — "Guests with a medical condition or disability preventing its use, will be exempt

from the policy."(wheelchairtravel.org)

*Please keep in mind that airline mask policies for ADA Passengers are quite fluid at the moment and changing without notice. A passenger could book an expensive out of town life saving surgery or medical treatment. They may arrive at the airport a few weeks later only to find out that they are no longer welcome onboard without a mask due to a policy change. There are only 3 airlines left with some limited type of ADA travel policy.

However, this only addresses the flight. It is a catch 22 situation for the ADA Disabled Passenger since there are Mandatory Mask requirements now for being inside the airport and going through TSA. There are no exemptions for these areas. Therefore, an ADA Disabled passenger could have the exemption for the particular flight but has no legal way to make it onto the flight without a mask in the secured and common areas.

**No Exceptions for Autistic Children and Toddlers 2 Years or older:**

These Child Mask Policies are all over the map and may change at the drop of a hat. As of today, Delta is not requiring compliance for young children who cannot maintain a face covering and unaccompanied minors are exempt from the mask requirement and do not require a pre-travel clearance. However, they are one of the most stringent in the news for banning adults for even the slightest non-compliance. Therefore, I do not know how trustworthy that policy statement is or how long it will remain in effect.

Allegiant may be the last semi-flexible hold out. We will see just how long this one lasts. As of today Allegiant is the only one of the remaining 3 carriers in America with some vague type of ADA Waiver policy. Allegiant currently only requires a Doctors Note and is not requiring the hour long airport Virtual Medical Evaluation for the ADA Disabled Traveler Mask Wavier. Allegiant seems to be the only airline offering ADA Waiver for their actual Airline Employees as well. The airline will make exceptions for those employees with medical conditions that prevent the use of a face covering.

The harshest Child and Toddler enforcement policies appear to be at Southwest and Jet Blue:

This past week Southwest Airlines removed a passenger and her 3-year-old son from a Monday flight after the boy, who has autism, refused to wear a face mask and became upset. Passenger Alyssa Sadler, who was also traveling with her 1-year-old daughter, told CNN affiliate KPRC that the family was deplaned from the Southwest flight from Midland, Texas, to Houston, Texas. "It was just not a good morning," said Sadler. "He was screaming. He was throwing a fit. He was screaming no, no, no."Sadler told KPRC her son has a sensory processing disorder and doesn't like his face being touched and that she had a medical note explaining the condition. (cnntravel)

# Strict mask policy





Sadler told CNN she would have to wait several days for a ride home.

**Southwest Mask Policy:**

All travelers 2 years and older must wear a face covering over their nose and mouth throughout their journey, including during check-in, boarding, while in flight and deplaning. Masks with vents or exhalation valves are not permitted. Plastic face shields may be worn in addition to a face covering but not in place of one. Customers with conditions that prevent them from wearing a face covering should postpone travel until this temporary requirement is no longer in place.

- **ONLY** young children under the age of 2 are exempt.

- If a Customer is unable to wear a face covering for any reason (even a verifiable medical condition), we regret that we **are unable to transport the Customer at this time**, due to safety risk of asymptomatic COVID-19 transmission by Customers without face coverings. In other words, because of public health guidance recognizing the important role of face coverings in preventing the transmission of COVID-19, Southwest will temporarily refuse to transport any passenger who is unable to wear a mask even if the Customer has a verifiable medical condition that prevents them from wearing a mask.

- In the future, if there is a change in public health guidance on face coverings or other changed circumstances impacting Safety, Southwest looks forward to welcoming all passengers on board again safely.  In the meantime, Southwest encourages all Customers who are unable to wear a face covering (even due to a verifiable medical condition) to postpone air travel, or consider other forms of transportation.

This past week a Family with 6 children were removed at JetBlue:

A Brooklyn mother traveling with six children from Orlando to New York was kicked off a JetBlue flight on Wednesday because her 2-year-old would not wear a face mask as required. Videos of the mother, Chaya Bruck, speaking with a flight attendant before the plane took off have been shared widely on social media. A video posted on social media shows Bruck talking to a flight attendant about her daughter not wearing a mask. "You realize she's 2?" Bruck says."I do, and also, it's not something we can excuse," the flight attendant responds in the video.

"So should I tie her hands? What should I do?" Bruck asks the flight attendant in the video. The toddler sitting next to her appears to be visibly uncomfortable by the arguing. JetBlue told CBS News that Bruck told a flight attendant her child was not going to wear a mask. The doors of the flight were still open and the flight attendant followed procedure by calling a JetBlue airport supervisor to handle the situation.  Videos of the incident show fellow passengers becoming frustrated, many of them coming to Bruck's defense, saying the 2-year-old should be excused for not keeping the mask on.

JetBlue said the cabin became boisterous and a decision to deboard the plane was made.(cbsnews.com)



This screenshot of a video taken by Chardette Poinsette shows Bruck speaking with the flight attendant before passengers deboarded.

**JetBlue Mask Policy:**

All travelers 2 years and older must wear a face covering over their nose and mouth throughout their journey, including during check-in, boarding, while in flight and deplaning. Masks with vents or exhalation valves are not permitted. Plastic face shields may be worn in addition to a face covering but not in place of one. Customers with conditions that prevent them from wearing a face covering should postpone travel until this temporary requirement is no longer in place.



Flying for families with small children or ADA Disabled Passengers has become a very slippery slope these days. The policies for children and the disabled are changing without notice. Therefore, you can not really plan or know how things will go. Families with children and disabled may have to travel by car or postpone travel for the near future. This leaves the ADA Disabled customers who are traveling for medical treatments or surgeries to out of state specialized medical procedures at a great

disadvantage. The numbers of Cancer Deaths has skyrocketed globally since these new rules went into place. This is mainly attributed to these patients not having access to their Cancer Screenings and Cancer Treatments.

## Report Airlines for ADA and ACAA Violations:

Airlines violate the **Air Carrier Access Act** and **Americans with Disabilities Act** at the expense of disabled travelers every day. Most travelers take these violations in stride and put the negative experiences behind them. As a result, airlines have little incentive to comply with the law. This article outlines the process for enforcing your rights under the ACAA and holding airlines responsible for any violations. When violations occur, **passengers should first report the violation to the airline within 45 days**. This is best done through a comment or complaint form on the carrier's website. This allows for the airline to respond in writing and creates a paper trail. After you have received a response to your complaint with the airline, you may **file a complaint with the DOT at** www.transportation.gov. This allows the agency to investigate violations of the ACAA, impose sanctions, and require the airline to demonstrate efforts to prevent future violations. You can file an Americans with Disabilities Act (ADA) complaint alleging disability discrimination against a State or local government or a public accommodation (private business including, for example, an airline, restaurant, doctor's office, retail store, hotel, etc.). A complaint can be filed online using the link below, by mail, or by facsimile. (wheelchairtravel.org) (ADA.gov)

ADA Americans with Disabilities Act: Online Complaint Form

It seems as though the ADA Laws have just been thrown out the window for the time being. This combined with just the combative, hostile and miserable travel experience these days has caused travel bookings to plummet by 75 percent. Those kind of load factors are not sustainable for airlines to survive. Many passengers have instead chosen to do more car trips at nearby vacation spots. The more affluent wealthier and business travelers which are the bread and butter for commercial airline profit margins have opted for Private Jet Travel. Corporate Jet business is up 250 percent for 2020 while commercial aviation is down 75 percent.

Business Travelers are now working remotely and doing business conferences as well as meetings via Zoom. This is a very dangerous trend for the First Class and Business Class Markets. These travelers are making major changes to how they travel and do business. The million dollar question is to whether any of those passengers will be back if and when commercial aviation ever normalizes again. Only time will tell.

Aviation Travel Writer: The Flight Times Blog

aviationtravelwriter.com

Link: cbsnews.com

Link: cnntravel

Link: wheelchairtravel.org

Link: wheelchairtravel.org

Link: ADA.gov

Plaintiff's Exhibit 191

news.yahoo.com

## Airlines will now allow passengers to fly without masks after Biden's mandate allows for medical exemptions

*Thomas Pallini*

4-5 minutes

---

- American Airlines and Alaska Airlines issued new policies that allow exceptions for mask-wearing.

- Flyers with a medical condition who get a doctor's note and negative COVID-19 test can go maskless.

- President Biden issued an executive order mandating mask-wearing on all public transportation.

- Visit Business Insider's homepage for more stories.

The Centers for Disease Control and Prevention's mask mandate for air travel took effect on February 2, requiring flyers to mask up or face the consequences following an executive order from President Joe Biden. But as the policy goes federal, the Americans with Disabilities Act is pumping the brakes on enforcement when it comes to some flyers.

Specifically exempted from the order are those who can't wear a mask due to a medical condition, as part of the few exceptions allowed by the CDC. Other carve-outs include flyers younger than two years of age and those who cannot wear a mask due to workplace safety regulations.

***Read More:*** *Airline workers have lower rates of COVID-19 than the general population - and airline CEOs say it's proof that flying is safe*

Airlines had cracked down on medical exemptions to the face mask rule over the summer but the consequence of having the federal government step in is now requiring them to relent.

American Airlines, after banning medical exemptions in July, is allowing those with a doctor's note and a negative COVID-19 test to eschew the mask while flying. That's provided the note is supplied to the airline's special assistance team beyond 72 hours from boarding and the COVID-19 test is taken within three calendar days of departure or the flyer shows proof of recovery.

The order doesn't regulate exactly how airlines have to accommodate exempted passengers, however, allowing some to impose stricter rules than others. Alaska Airlines banned medical exemptions in August but now has a similar policy to American's and requires flyers seeking an exemption to make accommodations at least five days from their scheduled flights.

Delta Air Lines, alternatively, required passengers claiming an exemption to undergo a virtual screening with an airline-provided medical professional. Flyers would do the screening on the same day as their flight and were advised to arrive extra early to have it done.

Airlines have been requiring masks since the spring as they sought to dampen the threat of asymptomatic spread onboard aircraft. Biden's executive order, however, gives airlines federal backing in enforcing the mask rule and those who don't comply can face civil penalties, according to the Transportation Security Administration.

More than 2,700 passengers have been banned from the skies for mask non-as of mid-January, eight airlines confirmed to Insider. Incidents rose in early January as rioters traveled by plane to Washington, DC to take part in the "Stop the Steal" protests that resulted in the storming of the US Capitol Building.

Alaska Airlines, which devised a soccer-style yellow card system to discreetly remind passengers to wear their masks, had banned 14 passengers on a single flight from Washington to Seattle. And before the protests even began, a Delta flight from Salt Lake City to Washington saw six passengers who had been flouting the mask rule while harassing US Senator Mitt Romney, banned from the airline.

Starting February 2, TSA has begun cracking down on maskless passengers before they even reach the gate.

"Passengers who refuse to wear a mask will not be permitted to enter the secure area of the airport, which includes the terminal and gate area," the agency said in a statement. "Depending on the circumstance, those who refuse to wear a mask may be subject to a civil penalty for attempting to circumvent screening requirements, interfering with screening personnel, or a combination of those offenses."

The Federal Aviation Administration is also stepping in when offenses become egregious, proposing fines of up to $35,000 for those who don't comply.

Read the original article on Business Insider

Plaintiff's Exhibit 192

wheelchairtravel.org

# Only 2 Airlines Permit Disabled People Who Cannot Wear Face Masks to Fly - Wheelchair Travel

*John Morris*

6-8 minutes

---

**Face Mask Exemption for Disabled People** — As of February 2021, the Centers for Disease Control and U.S. Department of Transportation require airlines to waive the face mask requirement for qualified disabled people. To learn more about the procedures for getting an exemption at the 10 largest U.S. airlines, click here.

In July, American Airlines and Southwest Airlines were the first carriers to institute a blanket ban on passengers with disabilities who cannot not wear a face mask. Southwest stated that it would "temporarily refuse to transport any passenger who is unable to wear a mask even if the Customer has a verifiable medical condition that prevents them from wearing a mask."

The majority of other U.S. airlines followed with similar policies, including:

- **Alaska** Airlines — "If you are unable to wear a mask throughout the airport and for the duration of your flight for any reason, you will not be able to fly with us."

- **Allegiant** Airlines — "Only children under the age of 2 are exempt from wearing a face covering. Customers who are not able to wear a face covering will not be permitted to travel."

- **Frontier** Airlines — "We require both passengers and employees to wear a face-covering over nose and mouth throughout the Frontier travel experience including ticket counters, gate areas, baggage claim and onboard all flights. The only exception is for children under the age of 2."

- **JetBlue** Airways — "Customers with conditions that prevent them from wearing a face covering should postpone travel until this temporary requirement is no longer in place."

- **Spirit** Airlines — "Any other Guest who is unable to wear an appropriate face covering for any reason, including medical, will not be permitted to travel with us at this time."

Buried in a July 22 press release, United Airlines states that "if a passenger believes that there are extraordinary circumstances that warrant an exception, they should contact United or speak to a representative at the airport." Repeated requests for clarification were refused and, because the statement is not included on the airline's customer-facing website, I do not believe that United is willing to serve disabled passengers who cannot wear a mask.

That's 8 of the 10 largest U.S. airlines which have told disabled people with autism, asthma, cerebral palsy, claustrophobia, COPD, PTSD, severe anxiety and other conditions that they are not welcome onboard an aircraft. It is the largest ban on disabled air travel since the Air Carrier Access Act became law in 1986.

## These airlines still permit disabled people to fly without a face mask

If you or someone you are traveling with has any of these conditions or is unable to wear a mask due to a legitimate disability, you will only be able to fly on the following carriers:

**Delta Air Lines** — "Customers with underlying conditions that explicitly prevent the wearing of a face covering or mask are strongly encouraged to reconsider travel or should be prepared to complete a 'Clearance-to-Fly' process prior to departure at the airport. If you require this exemption, please arrive early to complete the process during check-in and avoid missing your flight – this process can take over one hour." (Read the policy)

**Hawaiian Airlines** — "Guests who are unable to wear a face covering due to a medical condition or disability will be required to complete an assessment with a medical professional via phone at the airport. We recommend arriving at the airport early with ample time to complete the assessment, as the process may take more than one hour, and your flight will not be held. Please notify one of our Guest Services Agents as soon as you are ready to complete the medical assessment." (Read the policy)

Delta and Hawaiian both require passengers to submit to a virtual medical examination. It is unclear whether these are permitted under the Air Carrier Access Act, but it nonetheless provides a pathway to access that other airlines do not.

## Can airlines really ban disabled people from flying?

It is my belief that policies which restrict disabled people from accessing air transportation are a violation of the Air Carrier Access Act, specifically §382.19(a), which states that carriers "must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability."

Although airlines are permitted to refuse disabled passengers who pose a "direct threat" to the health and safety of others, they are required to conduct an "individualized assessment" of each disabled passenger to consider the following:

1. The nature, duration, and severity of the risk;

2. The probability that the potential harm to the health and safety of others will actually occur; and

3. Whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

Blanket bans like those instituted by 8 of the 10 largest U.S. airlines are not permitted by the ACAA and fail to consider a number of circumstances that would result in a passenger being deemed a non-threat, such as a negative COVID-19 test or self-isolation prior to travel.

## What if you booked a flight before stricter face mask policies were put into place?

As recently as August 5th, Alaska Airlines policy stated that "Mask and face covering exceptions include: children under age 2, anyone with trouble breathing, anyone who cannot remove a mask without assistance or anyone with a disability that prevents wearing a mask." Passengers who purchased tickets at a time when disabled people were granted an exception to face mask policies should ask to be accommodated on another airline free of charge. If your request is refused, file a complaint with the DOT as described below.

## What to do if you cannot wear a mask and have been prevented from flying

If you have have a disability, cannot wear a mask and have been prevented from booking a new trip or taking a previously booked trip due to these airline policies, please file a complaint with the U.S. Department of Transportation's Aviation Consumer Protection Division. Describe your disability and allege a violation of the Air Carrier Access Act.

---

**Note:** *The Centers for Disease Control has advised that any person who is able to wear a mask should do so. By wearing our masks, we can create an environment where our disabled peers, including those who cannot wear masks, can safely exist and participate in the community.*

Plaintiff's Exhibit 193



# Runway to Recovery

The United States Framework for Airlines and Airports to Mitigate the Public Health Risks of Coronavirus

Guidance Jointly Issued by the U.S. Departments of Transportation, Homeland Security, and Health and Human Services

July 2020

used within the airport (e.g. trains, buses, etc.). It is imperative that airlines and airports inform passengers when it may not be possible to meet social distancing expectations and, as a result, emphasize the additional importance of observing all the other preventive measures, including strict hand hygiene, respiratory etiquette, and wearing a face mask or cloth face covering.

**Rationale:** SARS-CoV-2, the virus that causes COVID-19, spreads mainly among people who are in close contact for greater than 15 minutes. Social distancing of at least six feet is the best way to reduce the spread of infection. However, the air transportation system presents many areas where confined physical spaces make recommended social distancing difficult or impossible to achieve at times. Where space constraints limit the practice of social distancing, such as onboard aircraft or within the Federal Inspection Station (FIS) area during peak international arrival times, it is essential that passengers, crew members, and aviation workers adhere at all times to all other preventive measures, especially hand washing, respiratory etiquette[5], and wearing face masks or cloth face covering.

**Resources:** CDC developed guidance on social distancing, including for people with disabilities, on its website:

» cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html

## Masks or Cloth Face Covering

**Recommendation:** Everyone should correctly wear a mask or cloth face covering over their nose and mouth at all times in the passenger air transportation system (excluding children under age 2, or anyone who has a medical condition that causes trouble breathing, is unconscious and unable to be awakened, or otherwise unable to remove the mask without assistance). Airlines and airports are strongly encouraged to require that everyone correctly wear a mask or cloth face covering in shared spaces unless they meet the exceptions described above. Airports and airlines should have masks or cloth face coverings available for passengers and aviation workers who may arrive without one or require a replacement. Wearing a mask or cloth face covering is particularly necessary any time social distancing cannot be maintained. Reasonable accommodations

---

5 cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

should be made for persons with disabilities or ailments who cannot wear masks or cloth face coverings.

> » ***Note:*** *Passengers and aviation workers may be asked to briefly remove their masks or cloth face coverings when interacting with government officials or systems that must verify identity, such as U.S. Customs and Border Protection (CBP) Officers, Transportation Security Administration staff, law enforcement, airline or airport staff, and biometric exit controls. Physical barriers or face shields should be used to protect employees and the public in these instances. Accommodations for persons with disabilities or ailments who cannot wear cloth face coverings should be considered on a case-by-case basis. This may include seating that allows social distancing from non-companion passengers. Brief removal of masks or cloth face coverings should be permitted for drinking or eating.*

**Rationale:** The greatest risk of spreading COVID-19 is when an infected person coughs, sneezes, or talks and droplets from his or her mouth or nose are launched into the air and land in or near the mouths or noses of people nearby. Requiring all persons to wear masks or cloth face coverings prevents droplets from spreading, including from potentially asymptomatic individuals. If everyone in an environment participates in covering their mouths and noses, cloth face coverings can be effective at reducing viral spread:

**Resources:** cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html

## Cleaning and Disinfection

**Recommendation:** Airlines and airports should require all areas with potential for human contact and transmission be disinfected per defined schedules as recommended by CDC and the Occupational Safety and Health Administration (OSHA). Special attention should be given to increasing the frequency of cleaning high-touch surfaces like door handles, armrests, elevator buttons, escalator/stair handrails, and kiosks. Additionally, hand sanitizer stations and disinfecting wipes should be provided at kiosks and other common areas passengers are expected to touch frequently.

Plaintiff's Exhibit 194



# Runway to Recovery

The United States Framework for Airlines and Airports to Mitigate the Public Health Risks of Coronavirus

Guidance Jointly Issued by the U.S. Departments of Transportation, Homeland Security, and Health and Human Services

**Version 1.1  |  December 2020**



# OVERVIEW

A safe, secure, efficient, and resilient air transportation system is essential to our Nation's physical, economic, and social health.  The Coronavirus Disease 2019 (COVID-19) public health emergency has demonstrated that protecting public health in the air transportation system is just as critical as aviation safety and security to the confidence of the flying public.  Government, aviation, and public health leaders have been working together—and must continue to do so—to meaningfully reduce the public health risk and restore passenger, aviation workforce (including aircrew), and public confidence in air travel. The U.S. Government continues to assess the evolving situation and the effectiveness of actions and recommendations implemented to date.  This updated guidance reflects this continual assessment and updated information. Although there are some updates and adjustments throughout, the key additions and changes in this document include new information on:

- » Passenger and Aviation Workforce Education
- » Contact Tracing
- » Mask Use, specifically the need to accommodate those who cannot wear masks
- » Passenger Testing

This document provides the U.S. Government's updated guidance to airports and airlines for implementing measures to mitigate the public health risks associated with COVID-19, support an increase in travel volume, and ensure that traditional aviation safety and security measures are not compromised. This guidance addresses public health concerns and supports U.S. air carriers and airports as they make decisions and implement changes to reduce the spread of SARS-CoV-2 (the virus that causes COVID-19).  The aviation industry has maintained a safe and secure system because stakeholders do not compete on safety and security; we expect the aviation industry to take the same system-level approach to implement guidance on public health risk mitigations.

themselves, but should maintain at least six feet of distance from others outside of their group. Strategies to allow for social distancing should also be employed for passenger transports used within the airport (e.g., trains, buses, etc.). It is imperative that airlines and airports inform passengers when it may not be possible to meet social distancing expectations and, as a result, emphasize the additional importance of observing all the other preventive measures, including strict hand hygiene, respiratory etiquette[7], and wearing a mask.

**Rationale:** SARS-CoV-2 spreads mainly among people who are in close contact with an infected person or persons for greater than 15 minutes over a 24-hour period.  Social distancing of at least six feet is a way to reduce the spread of infection in an indoor setting.  However, the air transportation system presents many areas where confined physical spaces make recommended social distancing difficult or impossible to achieve at times. Where space constraints limit the practice of social distancing, such as onboard aircraft or within the Federal Inspection Station (FIS) area during peak international arrival times, it is essential that passengers, crew members, and aviation workers adhere at all times to all other preventive measures, especially handwashing, respiratory etiquette, and wearing a mask.

**Resources:** CDC developed guidance on social distancing, including for people with disabilities, on its website: https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html

## Masks

**Recommendation:** Everyone should wear a mask per CDC guidance, over their nose and mouth, at all times in the passenger air transportation system (excluding children under age 2, or anyone who has a medical condition for which wearing a mask is contraindicated, is unconscious and unable to be awakened, or otherwise unable to remove the mask without assistance). Masks should have two or more layers of non-synthetic and tightly woven materials, fit snugly on the face without gaps, be large enough to comfortably cover the mouth and nose during speech and physical activity, and should not contain an exhalation valve or vent. Airlines and airports are strongly encouraged to

---

7 https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

require that everyone correctly wear a mask in shared spaces unless they meet the exceptions described above. People should also wear masks over the mouth and nose in other transportation settings that are connected to airports, such as shuttle vans, buses, trains, subways, or similar transportation systems or car rental locations. Airports and airlines should have masks available for passengers and aviation workers who may arrive without one or require a replacement. Wearing a mask is particularly necessary any time social distancing cannot be maintained. Brief removal of masks should be permitted for minimal drinking, eating, or taking medication. During the brief removal of the mask in these circumstances, individuals should refrain from conversation.

Reasonable accommodations should be made for persons with disabilities or ailments who cannot wear masks. However, under the Americans with Disabilities Act, entities may impose legitimate safety requirements necessary for safe operation that do not require modification, so long as those safety requirements are based on actual risks, and not mere speculation, stereotypes, or generalizations about persons with disabilities. Other accommodations for persons with disabilities or ailments who cannot wear a mask should be considered on a case-by-case basis. This may include, for example, seating in waiting areas that allows social distancing from non-companion passengers.

Airport and airline personnel should consider reasonable alternatives to removing their own face masks in order to communicate with persons who are deaf or hearing impaired, such as using clear face masks, writing on a pad of paper that can be shown without contact, or protective barriers.

> » **Note:** *Passengers and aviation workers may be asked to remove their masks briefly when interacting with government officials or systems that must verify identity or confirm entry/exit, such as U.S. Customs and Border Protection (CBP) Officers, Transportation Security Administration staff, law enforcement, or airline or airport staff. Physical barriers or face shields should be used to protect employees and the public in these instances.*

**Rationale:** The greatest risk of spreading COVID-19 is when an infected person coughs, sneezes, talks, or breathes and respiratory droplets or small particles, such as those in aerosols, are launched into the air from his or her mouth or nose. Requiring all persons to wear masks reduces the risk of droplets or airborne particles from spreading, including from potentially asymptomatic

infected individuals. If everyone in an environment participates in covering their mouths and noses, masks can be effective at reducing viral spread.

Airports must comply with the Americans with Disabilities Act and the Rehabilitation Act regulations in considering reasonable modifications for persons with disabilities who cannot wear a mask. However, as discussed above, reasonable modifications of legitimate safety requirements are not required. Under the Air Carrier Access Act, U.S. and foreign air carriers have legal obligations to accommodate the needs of passengers with disabilities when the airlines develop and implement policies requiring the use of masks to mitigate the public health risks associated with COVID-19.  The Air Carrier Access Act and its implementing regulations in 14 CFR Part 382 require airlines to ensure that their mask policies provide for reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear a face covering for medical reasons.  The Office of Aviation Consumer Protection within the Department of Transportation and the Office of Civil Rights in the Federal Aviation Administration enforce aspects of these requirements within their jurisdiction.

**Resources:** The following websites provide information related to appropriate mask use and special accommodations:

» https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html

» https://www.cdc.gov/coronavirus/2019-ncov/travelers/face-masks-public-transportation.html

» https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html

» https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/about-face-coverings.html

» https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-to-wear-cloth-face-coverings.html

» https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html

» https://www.transportation.gov/airconsumer

Plaintiff's Exhibit 195

tulsaworld.com

# Do mask requirements violate civil rights? How can businesses accommodate the disabled? Get answers to these questions and more

*Kendrick Marshall Tulsa World*

7-8 minutes

Do mask requirements violate civil rights? How can businesses accommodate the disabled? Get answers to these questions and more

Get answers to questions about what the city's mask ordinance means for Tulsans.

**Disabilities or medical conditions that make mask wearing difficult**

Disabilities or medical conditions that make mask wearing difficult

*In some situations, wearing a cloth face covering may exacerbate a physical or mental health condition, lead to a medical emergency, or introduce significant safety concerns, the Center for Disease Control explains.*

- *People who are deaf or hard of hearing — or those who care for or interact with a person who is hearing impaired—may be unable to wear cloth face coverings if they rely on lipreading to communicate.*

- *Some people, such as people with intellectual and developmental disabilities, mental health conditions or other sensory sensitivities, may have challenges wearing a cloth face covering.*

- *Individuals with asthma, chronic obstructive pulmonary disease (COPD), or other respiratory disabilities may not be able to wear a face mask because of difficulty in or impaired breathing. People with respiratory disabilities should consult their own medical professional for advice about using face masks.*

- *Some people with autism are sensitive to touch and texture. Covering the nose and mouth with fabric can cause sensory overload, feelings of panic, and extreme anxiety.*

- *A person who has cerebral palsy may have difficulty moving the small muscles in the hands, wrists, or fingers.*

- *A person who uses mouth control devices such as a sip and puff to operate a wheelchair or assistive technology, or uses their mouth or tongue to use assistive ventilators.*

*MIKE SIMONS/Tulsa World*

**Are individuals without disabilities exempt under ADA guidelines?**

Are individuals without disabilities exempt under ADA guidelines?

*According to the ADA, people without disabilities or medical conditions are not protected under the ADA. MIKE SIMONS/Tulsa World*

**Are mask mandates a violation of civil rights?**

Are mask mandates a violation of civil rights?

*While opinions vary on the validity of face covering requirements, Tulsa attorney Jim Milton, of the law firm Hall Estill, said the city can exercise its government powers to impose an ordinance.*

*"So far, the city of Tulsa meets the requirements of, 'Do they have the power?' and 'Is this a reasonable way to exercise that power?'" Milton said. "But what folks are really talking about is whether there's a prohibition to their rights, their constitutional rights in the Bill of Rights and otherwise in the constitution and prevent them from this particular exercise of power ..."*

*Milton, in familiarizing himself with similar mask ordinances across the country, said he's yet to come across language that would prevent any municipality from requiring masks be worn in public to protect the health and safety of citizens.*

*"You know I haven't studied the details of the rule that is being proposed (for Tulsa), but presumably there are exceptions," he said. "Presumably they (the city) are giving the proper amount of exception for people who have health conditions. Presumably they are not requiring me to wear a mask when I'm home alone and don't have anyone else around me.*

*When I go to the grocery store, or when I fill up my gas tank and I'm going to be in a reasonable proximity of another person, I don't have any constitutional right that would be violated by the simple act of me being asked to wear a mask."*

*The Under the U.S. Constitution's 10th Amendment and U.S. Supreme Court decisions over nearly 200 years, state governments have the primary authority to control the spread of dangerous diseases within their jurisdictions. The 10th Amendment, which gives states all powers not specifically given to the federal government, allows them the authority to take public health emergency actions, such as setting quarantines and business restrictions.*

*IAN MAULE/Tulsa World*

## Current Oklahoma jurisdictions with face covering ordinances

Current Oklahoma jurisdictions with face covering ordinances

Plaintiff's Exhibit 196

  

The National Preparedness Leadership Initiative is a joint program of the Harvard T.H. Chan School of Public Health and the Harvard Kennedy School of Government, Center for Public Leadership

**Aviation Public Health Initiative**

# Assessment of Risks of SARS-CoV-2 Transmission During Air Travel and Non-Pharmaceutical Interventions to Reduce Risk

## Phase One Report:
## Gate-to-Gate Travel Onboard Aircraft

Prepared by

**Faculty and Scientists at the Harvard T.H. Chan School of Public Health**

ACKNOWLEDGEMENTS

This project arose in response to a complex set of problems during an unprecedented crisis. Three months into the COVID-19 pandemic, the aviation industry faced a significant decline in passenger traffic and revenue. There was interest in finding an independent, science-based resource to answer difficult public health safety questions, critical to both protect the workforce and the public, and essential to restarting this important segment of the national economy.

Out of that interest to reopen the sector safely, discussions began between Airlines for America (A4A) and faculty at the National Preparedness Leadership Initiative (NPLI), a joint program of the Harvard T.H, Chan School of Public Health and the Harvard Kennedy School of Government.

Those conversations led to development of the Aviation Public Health Initiative (APHI). As lead sponsoring organization, A4A engaged their member organizations, along with a group of manufacturers and airport operators. These companies generously provided financial support, shared data and information, facilitated conversations with airline COVID-19 working groups, and opened opportunities to speak with the airline crewmembers. That breadth of conversation and data access was critical to collecting the body of knowledge required to reach the findings and recommendations in this report. That interest led to discussions and briefs with numerous government officials associated with the aviation industry. Through it all, this group of industry and government leaders respected the independence of the APHI scientists and their research. The APHI team deeply appreciates the numerous contributions, the support, and the commitment of these sponsors and leaders to the scientific objectives of this inquiry.

The APHI project team includes faculty and associates of the Harvard T.H. Chan School of Public Health. The leadership includes Director Leonard J. Marcus, PhD; Deputy Director Vice Admiral Peter V. Neffenger, USCG (ret); Science Director John D. Spengler, PhD.; and Deputy Science Director John F. McCarthy, ScD, C.I.H. The project team includes Senior Project Manager Leila Roumani, DMD, MPH; Communications Specialist Richard Ades; Infectious Disease Consultant, Edward A. Nardell, MD; and Lead Science and Technical Writer Wendy M. Purcell, PhD, FRSA. The science and technology research team includes Ramon Alberto Sanchez, PhD; Ted Myatt, ScD; Jose Guillermo Cedeno Laurent, PhD; Jerry F. Ludwig, PhD; Steve Hanna, PhD; Judith Irene Rodriquez, MS; and Steve Bloom, MS. Susan Flaherty, Regina Jungbluth, Michelle Tracanna, and Joan Arnold provided essential administrative support.

The findings and recommendations of this report are the independent conclusions of the Harvard T.H. Chan School of Public Health Aviation Public Health Initiative. The APHI team hopes its contents will underscore the importance of following science, to save lives, to reinvigorate economic well-being, and to lead the country and the world to overcome the COVID-19 crisis.

Leonard J. Marcus, PhD
Director, Aviation Public Health Initiative
Harvard T.H. Chan School of Public Health

susceptibility of the person exposed, the biological dose of virus particles delivered to a target organ and the duration over which the exposure occurs. The infectious dose for SARS-CoV-2 is yet unknown. Particles (detectable, viable, and infectious) are estimated from source measurements, but include many particles that do not cause infection due to viability, infectivity, host defenses, etc. In such situations, the concept of quanta is used (see Section 3.2.6) to describe whatever that unknown number might be, and probability is applied to estimate the likelihood of inhaling an infectious dose, i.e., quanta of infection. Quanta are therefore agnostic about the actual number of particles, but quantifies the number of doses generated by the source under specific circumstances and considering the probability of inhaling an infectious dose. As such, quanta allows quantification of risk reductions for mitigation strategies and calculations of comparative risk for different social activities, and it applies to analysis of disease transmission in the unique circumstances of an aircraft cabin.

2. **The Layered Approach to Risk Reduction:** The NPI (Non-Pharmaceutical Interventions) proposed for risk mitigation of SARS-CoV-2 transmission includes the consistent operation of ventilation systems, disinfection of surfaces, consistent wearing of face masks, and procedures during boarding and deplaning to maximize social distancing among passengers and crewmembers. The efficacy of these combined strategies is given in Table 1.1. Details underpinning the approach are found in the thematic sections of the Report that present the detailed scientific rationale and evidence in support of the strategy. This layered NPI approach serves to reduce significantly the risks of disease transmission in the aircraft environment.

3. **Ventilation Systems on Aircraft:** These sophisticated systems deliver high amounts of clean air to the cabin that rapidly disperses exhaled air, with displacement in the downward direction, reducing the risk of passenger-to-passenger spread of respiratory pathogens. Aircraft ventilation offers enhanced protection for diluting and removing airborne contagions in comparison to other indoor spaces with conventional mechanical ventilation and is substantially better than residential situations. This level of ventilation effectively counters the proximity travelers will be subject to during flights. The level of ventilation provided onboard aircraft would substantially reduce the opportunity for person-to-person transmission of infectious particles, when coupled with consistent compliance with mask-wearing policies.

4. **Crew and Passenger Behavior:** Deterrence of behaviors that increase the likelihood of transmission of SARS-CoV-2 from one person to the next is the most critical factor in enhancing public health safety onboard aircraft. Health attestations and screening for crew and passengers who show symptoms of COVID-19 reduce the likelihood that an infectious individual will board a plane until rapid, reliable, and inexpensive testing becomes available. Face masks significantly reduce transmission and airlines now require passengers to wear

strategies. ==Particular emphasis is placed on the effectiveness of aircraft ventilation systems, which are able to filter 99.97% of SARS-CoV-2 particles out of air found on aircraft.==

**Air travel demands the design of effective strategies to mitigate transmission given people are typically in close proximity to one another. These conditions may be exacerbated onboard. Prior to arrival at the airport, at check-in and/or before boarding, passengers may be subject to health screening and testing (see Section 6.0), with those of concern isolated or refused boarding. Passengers can be required to wear an appropriate face covering, typically a mask (see Section 7.0). Upon boarding and deplaning, an orderly process can be implemented to support physical distancing and reduced density (see Section 8.0). In reality, 100% compliance with these measures will be difficult to achieve in all settings. The success of these NPI depends upon educating travelers to the benefits they offer travelers and workers associated with their travel. Compliance and enforcement are essential. Furthermore, transmission is reduced by enhanced cleaning protocols and disinfection of surfaces (see Section 9.0) along with physical engineering controls and ventilation (see Section 10.0). New technologies and innovative techniques are being developed and implemented to meet the continuing challenges posed by the COVID-19 pandemic.**

The risk of transmission on an aircraft can be reduced to very low levels with full compliance of the recommended NPI. ==Few peer-reviewed reports have been published on in-flight transmission of communicable illnesses, including COVID-19.== As of September 30, 2020, there were 13 peer-reviewed case studies available for analysis that focused on COVID-19 transmission and exposure mitigation on aircraft. Of these studies, eight were commercial flights and five were evacuation or repatriation flights. Section 2.0 provides a critical account of each case study, including type of flight, number of passengers, number of potential cases, and transmission mitigation procedures reportedly in use.

==**After detailed analysis of these reports, it is the view of APHI that there have been a very low number of infections that could be attributed to exposure on aircraft during travel.**== **Also, had transmission mitigation procedures, i.e., maintaining appropriate physical distancing prior to travel and use of face masks throughout the trip, been used consistently on these flights a further reduced probability of transmission of COVID-19 during the flights would be anticipated. When masks were used by crewmembers (Yang et al., 2020), no transmission to crew was found. A significant finding from the evaluation of the evacuation flight procedures was that there was no COVID-19 infection among any of the air medical crews, despite the exposure to numerous positive cases. The lack of transmission to air medical crews indicates the effectiveness of the layering approach to reduce the risk of COVID-19 transmission.**

warning to passengers who refuse to follow airline public health safety rules, such as properly wearing masks. After reaching the limit of successive warnings, most major airlines make it clear to the public that offenders will be placed on a no-fly list. It is noteworthy that while each airline developed its own protocols, there is overall uniformity in how the airlines address risk reduction for passengers and crew.

The airlines have issued hundreds of no-fly determinations during the COVID-19 crisis. After the limit of successive warnings have been issued, passengers may receive a yellow slip on board or a notification after the flight to signify this designation. In order to avoid in-air conflict, crewmembers may also gently request onboard compliance. If it is not given, notification of service denial occurs only after the flight is completed. The vast majority of passengers and crew conform to mandated protocols. In the most egregious situations, pilots have interrupted a flight and landed in order to discharge a defiant passenger. Though notification procedures vary, the airlines are uniformly unwavering in their stance about compliance. It is a powerful motivator to achieve passenger behavioral compliance, and it is essential for achieving consistent public health-protecting behaviors during flight.

In addition to the face mask policies, most airlines require a **health attestation** prior to boarding. The enforcement policies extend to compliance with physical distancing in the gate area prior to boarding, and include aircraft boarding and deplaning procedures. The airlines vary on their load factors, with some though not all keeping the middle seat on larger aircraft or the aisle seat on smaller aircraft unoccupied. All airlines have policies that address concerns about crowding on aircrafts, in some cases allowing passengers to rebook flights when they learn that their booked flight is at more than 70% capacity.

*Safety as a Signal for Potential Fliers*

The combination of mandate and strict enforcement will likely be required for the course of the COVID-19 public health crisis. Should fast and definitive pre-boarding viral testing become available, this may change such requirements. Passengers routinely comply with requirements for security screening, seat belt use, and other safety protocols. However, in the U.S. behaviors relating to wearing face masks and/or physical distancing during the pandemic have assumed a level of symbolic significance, translating nonconformity into a statement on politics or injustices, contrary to the science-based recommendations.

For prospective passengers, confidence in their safety from COVID-19 is a key factor in their decision to fly (Lamb et al., 2020). This involves the universal adoption of face masks and enforcement of face mask policies, along with other risk-reducing procedures (Graham et al., 2020). These interventions support public health safety, and trust in their enforcement has become equivalent to trust in the airworthiness of the plane and security from a terrorist threat. As with any activity, such as driving, playing sports, or lifestyle choices, there are risks.

with mild to moderate disease (Wolfel et al., 2020; He et al., 2020; Zhou et al., 2020), and can be much longer in patients with severe COVID-19 disease (Pan et al., 2020). One case study reported that infectivity of asymptomatic people may be weak (Gao et al., 2020), while another reported that infectiousness may last for as long as 21 days in asymptomatic individuals (Hu et al., 2020). Approximately 40-45% of SARS-COV-2 infections are considered asymptomatic (Oran et al., 2020), although it has been reported that mild or asymptomatic cases could be as high as 80% (WHO, 2020c). This is an important consideration for the aviation industry, as asymptomatic and pre-symptomatic passengers and/or crew could board aircraft and pose a risk. For this reason, strict enforcement of face mask policies are critical, since such cases cannot be identified.

## 2.4    CRITICAL REVIEW OF POSSIBLE TRANSMISSION ON AIRCRAFT

Although the CDC has stated that *"the risk of getting a contagious disease on an airplane is low",* they have developed specific protocols to contact and investigate travelers who may have been exposed to a passenger harboring a contagious disease on a flight (CDC, 2019). The CDC document states that the major contacts of concern are within two rows of the *"Index patient (case)"* and specifies that *"Identifying contacts is based on the disease, how it spreads, and where a passenger was seated in relation to the index patient."* It recommends contact tracing for those individuals seated two rows in front and two rows behind the index case for highly contagious infectious diseases, such as measles and tuberculosis that have recognized airborne or droplet transmission vectors.

Airline travel presents many unique environments and opportunities to come into close contact with possible infectious people and materials. The chance for infectious contact can occur in many locations during a trip, such as in the general population at the origin or destination city, during transit to the airport, in the terminal, at an amenity destination or at the gate, besides being on an aircraft. Specifically, when onboard an aircraft, which is the focus of this Report, there are several physical factors such as very high air exchange rates, limited mobility in cabins and cabin crews that are trained in management processes to identify and segregate ill passengers, that are particular to air travel and likely help to mitigate potential exposure. During 2020, the aviation industry and the government in the United States have engaged in discussions to introduce contact-tracing systems when a case is identified on board a flight. At the time of writing, these proposed policies and practices have not been implemented.

### 2.4.1    Summary of Case Studies

Few reports have been published on **in-flight transmission of communicable illnesses, including COVID-19.** Indeed, a transmission event is a trigger for development of an academic paper; as such, non-transmissions are likely under-represented in the literature. As of September 28, 2020, there were 13 peer-reviewed case studies, describing 12 flights (two authors

**Based on the available scientific evidence, it is the view of APHI that there have been a very low number of infections that could be attributed to exposure on aircraft during travel.** **Also, had transmission mitigation procedures, i.e., maintaining appropriate physical distancing prior to travel and use of face masks throughout the trip, been used consistently on these flights, a further reduced probability of transmission of COVID-19 during the flights would be anticipated.**

The use of masks is an important consideration when drawing conclusions from these studies. The case study with the highest estimated COVID-19 transmission rate (7%) reported that masks were not mandatory during the flight (Khanh et al., 2020). The cases that had the next highest COVID-19 transmission rate (up to 2%) either did not provide masks, or provided masks to passengers on the plane instead of prior to boarding; this posed a risk of transmission among passengers during the check-in and boarding process (Hoehl et al., 2020). Other studies that described the use of masks reported a transmission rate of less than 1%. When masks were employed on commercial flights by infectious cases (Ng et al., 2020; Nir-Paz et al., 2020; Schwartz et al., 2020) close contacts on the aircraft remained uninfected. (Note: The son of one patient in the Ng et al. 2020 study tested positive on quarantine day 3, possibly indicating transfer on the aircraft or possibly exposure prior to boarding.) **When masks were used by crewmembers (Yang et al., 2020), no transmission to crew was found.**

The next most common reported transmission mitigation strategy was the use of **temperature checks and/or medical screening of passengers prior to boarding the flight**. The practice of temperature checking as a pre-boarding screening method has come into question, simply because presymptomatic positive cases may not be exhibiting a fever even though they are infectious. It can be effective at identifying symptomatic individuals so that they might be isolated and prevented from exposing passengers in the terminal or on the flight, though its limitations must be acknowledged. Without quick and reliable pre-boarding viral testing, it will be difficult to distinguish a COVID-19 symptomatic passenger from a passenger experiencing another respiratory illness. Temperature screenings and symptom self-declarations have limitations and can still result in the boarding of symptomatic passengers; therefore, these approaches should not be relied upon as the only implemented transmission mitigation strategy.

The only studies that reported implementing **social distancing outside the flight**, for example at check-in and during onboarding, were evacuation flights. Similarly, case studies on evacuation or repatriation flights were the only ones that reported the use of barriers on the plane to segregate patients; enhanced ventilation on the plane was also noted with cabin ventilation remaining on at all times, including while on the ground and at the gate (Cornelius et al., 2020), and specific decontamination procedures during the flight were also reported. One study described using nearly all the transmission mitigation strategies listed in Table 2.1. This study summarized multiple flights that resulted in the repatriation of over 2,000 individuals flown on

39 flights, all of whom were either COVID-19 positive, persons under investigation (PUI), or individuals who were asymptomatic. These evacuation flights all employed a layered approach to risk mitigation, implementing multiple levels of transmission mitigation strategies. **A significant finding from the evaluation of these evacuation flight procedures was that there was no COVID-19 infection among any of the air medical crews, despite the exposure to numerous positive cases.** The lack of transmission to air medical crews supports the effectiveness of the layering approach to reduce the risk of COVID-19 transmission.

### 2.4.2   Summary of Past Transmission of Diseases Attributed To Air Travel

**Given the volume of commercial flights daily, carrying millions of passengers and crew worldwide, the number of documented incidents of infectious disease transmission occurring on board an aircraft remains infrequent.** Outbreaks of respiratory diseases associated with air travel have however been reported, such as severe acute respiratory syndrome (SARS), measles, tuberculosis, and influenza (Olsen et al., 2003; Lei, 2018; Amler et al., 1982; CDC, 1983; CDC, 2004; Mangili & Gendreau, 2005; de Barros et al., 2006). Generally, these diseases are transmitted via aerosols (e.g., measles, tuberculosis) or via multiple routes (e.g., influenza). Each disease differs in the susceptibility of non-infected persons and the degree of infectiousness of the virus concerned. These cases however did not involve use of protective measures, such as wearing a face mask, now being employed. Furthermore, most of these appear to have occurred on aircraft that were likely in-service before 1990 when HEPA filters became standard equipment on most commercial aircraft. Regardless, useful information relevant to the COVID-19 pandemic can be gleaned from such accounts.

While there are occurrences of transmissibility that could inform the current crisis, **SARS** is the most closely related disease to COVID-19. In a SARS-related investigation, passengers and crew on three flights that included an infected person were interviewed. On one flight with a pre-symptomatic SARS case, no infection was documented among the passengers (Olsen et al., 2003). Another flight carried four SARS symptomatic people, with reported potential transmission to one passenger (Olsen et al., 2003). A flight with one symptomatic passenger confirmed SARS infections in 16 persons, two others were diagnosed as probable SARS, and four were reported to have SARS but could not be interviewed (Olsen et al., 2003). Illness in passengers was related to physical proximity to the index (i.e., infected) patient, with illness reported in eight of the 23 persons seated in the three rows in front of the index patient; this compared with 10 of the 88 persons seated elsewhere. Based on the locations of the secondary cases, the report suggested that airborne transmission had occurred (Olsen et al., 2003).

Lei et al. (2018) conducted a meta-analysis of 10 studies with possible **influenza** outbreaks on aircraft. The analysis showed that the risk of acquiring influenza was greater for passengers within two rows of the infected person; the risk was greater the longer the duration of the flight and the total infectivity of the index cases (Lei et al., 2018).

**Measles** is transmitted via aerosols and is highly infectious (CDC, 2018). However, measles transmission onboard aircrafts is believed to be uncommon (Amornkul et al., 2004; Mangili & Gendreau, 2005), with few case studies describing measles transmission during commercial air travel (Amler et al., 1982; CDC, 1983; CDC, 2004; Mangili & Gendreau, 2005; de Barros et al., 2006). In one of the most recent cases, an infectious individual traveled on six flights (one international flight arriving in Brazil and five local flights within Brazil) over a short period of

time while infected, and the investigation identified just six confirmed cases (de Barros et al., 2006).

Several studies about the in-flight transmission of **tuberculosis** have been reported, with most undertaken in the mid-1990s (MacFarland, 1993; Driver, 1994; CDC, 1995; Kenyon, 1996; WHO, 1998; Wang, 2000). Of these six investigations, two revealed a probable link to onboard transmission. In one case (Kenyon et al., 1996), four of 15 fellow passengers seated within two rows of the index passenger had a positive tuberculin skin test conversion. Overall, transmission of tuberculosis onboard aircraft is a rare event, most likely to happen to those in close proximity to the infectious passenger (within two rows) and/or exposed over a long time (greater than eight hours).

**Based on the investigations of outbreaks of other respiratory diseases on aircraft, it appears that transmission on aircraft is relatively infrequent.** Where transmission does occur, those close to the infectious passenger are at a higher risk than those seated at some distance. Depending on the transmissibility of the particular disease agent, determining how transmission occurs on aircraft (e.g., aerosol, direct contact, fomite) can be difficult. For example, did the transmission occur prior to boarding, during the use of a public lavatory or on the flight? In none of the published cases of respiratory disease transmission on aircraft did the authors indicate that the reference case(s) or the passengers were wearing protective face masks, as they must do on U.S. airlines today.

In many of the case reports, the difficulty of contact tracing due to lack of contact information was noted. Therefore, it would be beneficial to improve contact information to be able to respond more efficiently to a disease outbreak (Sevilla, 2018).

### 2.4.3    Potential Transmission of SARS-Cov-2 on a Flight from Singapore to Hangzhou, China: An Epidemiological Investigation (Chen et al., 2020)

An outbreak of COVID-19 among 324 passengers accompanied by 11 crew on a 5-hour flight from Changi Airport, Singapore to Hangzhou, China on January 24, 2020, was investigated (Chen et al., 2020). Though the flight originated in Singapore, it was strictly managed upon arrival in Hangzhou because approximately 100 passengers had departed from Wuhan to Singapore on a flight on January 19, 2020.

On the flight, face coverings were not required. No Personal Protective Equipment (PPE) was provided to the passengers and no barriers were erected on the plane. The flight operated at 89% seating capacity; the middle seat was not left unoccupied. The Boeing 787-9 aircraft was equipped with standard air handling systems.

Upon arrival in Hangzhou, passengers' temperatures were taken before deplaning. All passengers were required to follow medical isolation and observation protocols for at least 14 days. During this time, passengers were asked to take their temperature twice daily and report any upper respiratory symptoms. Crewmembers (n=11), all Singaporean, returned to Singapore on January 26, 2020, and were not part of this investigation.

All infected passengers from the January 24, 2020, flight to Hangzhou were also on the January 19, 2020, flight to Singapore. Three cases reported symptoms before the January 24, 2020, flight: two on January 23, 2020, and one on the day of the flight. On January 26, 2020, all passengers were tested for SARS-CoV-2 by RT-PCR; eight passengers tested positive, six of whom reported symptoms and two of whom were asymptomatic. On January 31, 2020, one passenger reported symptoms and on February 2, 2020, an additional two passengers reported symptoms. All passengers were tested again for SARS-CoV-2 by RT-PCR and no additional cases were identified by February 6, 2020. On February 8, 2020, all passengers not originating from Wuhan were released and the rest were released on February 15, 2020.

All the cases belonged to tour groups while in Singapore, denoted as Tour Groups A, B, C and D. There were 15 members of Tour Group A and 12 of them were confirmed SARS-CoV-2 positive. Therefore, investigators in this study attributed all infections among Tour Group A to activities amongst the tour group members prior to the flight. Three other cases, one from Tour Group B and two from Tour Group C (all asymptomatic) were identified by RT-PCR on January 26, 2020. As such, investigators ruled out transmission during the flight given the incubation time of COVID-19 being inconsistent with that timeline. Investigators concluded there was only evidence that one case, identified on February 2, 2020 and part of Tour Group D, was attributable to transmission during the flight. They reasoned that this case was consistent with the incubation time expected for COVID-19, was the only member of the tour group to become infected and was the only one not to have been on the January 19, 2020, flight from Wuhan to Singapore. This case reported that he removed his mask to eat and drink during the flight and that when he spoke, he had not worn the mask "tightly" and had his nose exposed. This actually implies that the true attack rate was 0.3%.

### 2.4.4    Asymptomatic Transmission of SARS-CoV-2 on Evacuation Flight (Bae et al., 2020)

A cohort study of passengers on an evacuation flight from Milan, Italy to South Korea on March 31, 2020, was evaluated (Bae et al., 2020). Prior to the flight, medical staff performed physical examinations, medical interviews, and temperature checks on 310 planned passengers; 11 were subsequently excluded from the flight. The investigation followed 299 passengers who boarded the 11-hour flight. During pre-boarding, passengers were kept 2 meters (6.56-feet) apart and were provided with N95 respirators. During the flight, most passengers wore the N95s the entire time, except for mealtimes and restroom use, though they were not required to do so. No other PPE was provided. Physical barriers were not in place during the flight and middle seats

All nine airlines prohibited masks with holes, vents, valves, openings, or made from mesh materials. In addition, face shields cannot be worn without wearing a mask underneath. One airline updated their policy to prohibit powered air purifying respirators (PAPRs) or breathing apparatus that enclose the face or the head. For passengers without a mask or with a non-compliant mask, all nine airlines provide one. Airlines have surgical-style or disposable masks available for crewmembers and passengers. A few airlines have branded masks or face shields available for crew or are considering offering face shields to their flight crew.

> *"...we've restricted face mask types to either the surgical mask or to the cotton mask that would be worn, not N95 mask, and not a gaitor or a neck gaitor or a bandana... not a valve mask either."* (Airline #3)

All nine airlines deny boarding to passengers without a mask and have a process to handle non-compliance during a flight. Flight attendants and pilots remind people to wear their masks, and issue warnings to non-compliant passengers. The warning process varies among the airlines, albeit most provide three warnings, verbal and written; a final warning is issued before filing a report or instituting a flight ban. Such no-fly bans remain in place for a defined period, which can be a year, for the duration of the passenger's passport, or until the airline's mask policy subsides; the latter is the most common ban among the airlines examined. Only one airline indicated that non-compliance could lead to a permanent no-fly ban on the airline. Overall, the airlines reported having good compliance, but on average, an airline may handle up to 15 reports per day where passengers had not complied but have fewer than 65 people listed on a no-fly ban.

> *"What we have done though is ensure that we are enforcing the mask policy. So essentially we have a three strikes or you are out, so we tell you about it before you get on board the aircraft, once you do get on, we reiterate it from both the captain and attendants, and if you take it off during flight, you can only do that if you're eating or drinking..."* (Airline #3)

> *"For in flight, we've actually adopted a three strike policy. ... at the third time they actually provide them this face mask policy enforcement card... if there is no further compliance from the passenger then the flight attendant brings up an in-flight incident report and reviews the situation ... we have been basically suspending travel ...for a period of a year."* (Airline #6)

The only time a passenger onboard is permitted to remove their mask briefly is while eating and/or drinking. Most airlines have limited the beverage and snack service on board, and/or have suspended it altogether on shorter flights, and/or suspended offering food for purchase. Some airlines only offer or sell bottled water or have available a pre-sealed snack bag for customers, which can be self-served or provided upon request. One airline has straws available upon request.

*"... we're trying to get our customers to stay seated when they're deplaning ... getting them to deplane a little bit more slowly, ... it's something we're going to have to work on how do we get that behavior to change* (Airline #1)

*"... additional information for our customers, whether it be on a seat back TV screens, for example, so upon landing it will it queue up a brief commercial or a brief kind of reminder for the deplaning processes, 'Please remain seated until the front row in front of you deplanes'."* (Airline #7)

The lower load factors airlines are experiencing have helped to maintain physical distancing in the cabin, as well as while boarding and deplaning. Three of the airlines continue to block the middle seat to provide more spacing between travelers. For capacity control on seating, one airline caps non-revenue flying and stand-by boarding while another offers to rebook passengers where a flight has a 70% loading factor. Several airlines do not block the middle seat and noted that there is no evidence currently on how blocking seats might help to reduce COVID-19 infections. In order to attract customers and reinstate trust, all nine airlines have loosened the flight change policies, most have eliminated fees altogether, and a couple have eliminated change fees permanently.

### 2.5.4   Aircraft Cleaning and Disinfection

The airlines' disinfection processes have changed significantly in order to reduce any contaminated surfaces or fomites inside the cabin. All airlines have added additional cleaning, prioritizing between flights highly touched areas, and adding additional disinfection overnight or when there is enough time between flights or "turns." Between turns, most disinfection activities require wiping down the high touch areas, lavatories, and galleys. Deeper cleaning is done mostly overnight and often includes use of electrostatic spraying (see Section 9.2.1).

Seven of the airlines have implemented electrostatic spraying of disinfectants, which should reach most areas inside the cabin. Some airlines perform electrostatic spraying at least once per day, or between flights, when having at least two to six hours or more. The other two airlines are not undertaking electrostatic spraying and have instead implemented use of fogging disinfectants overnight or once a week. In addition to antiviral spraying, three airlines have incorporated antimicrobial spraying, ranging from a weekly application to once a month. In order to carry out these extensive cleaning protocols, almost all airlines have included additional cleaning training.

*"... before onboard the aircraft, we do go through an extensive cleaning process ... we've done really two significant enhancements. One, ... we've increased just the number of touch points on the aircraft. ... The other ... has been the electrostatic spraying, which I think there's been a lot about that in the media...."* (Airline #3)

*"we're looking at thermal, heating aircraft to a certain temperature... waiting for their studies to come out because there's a lot of things that need to happen to heat up to a certain temperature and sustain that."* (Airline #6)

### 2.5.5   Healthy Air in the Cabin: Ventilation During Different Stages

An aircraft cabin has inherently a high airflow volume and high-quality air filtration during cruising, which are managed through the environmental control system (ECS) that also controls the temperature and cabin pressurization. All nine airlines mentioned having high air exchange rates of approximately every 2 to 3 minutes (20 to 30 ACH) while cruising, a rate that is similar to, or even higher than the recommended air exchange rates for an operating room in a hospital.

*"...we've accomplished a fair amount of work on understanding onboard air quality, being so important to our customers...."*  (Airline #3)

The ECS air supply when flying is bleed air, or air that is compressed and sent to the air conditioning units, known as A/C packs. The ECS has been designed to recirculate some of the air inside the cabin. Air recirculation happens mostly when cruising, where about 40% to 50% of the cabin air is recirculated and filtered through a high-efficiency particulate air filter, also known as a HEPA filter. All the airlines interviewed have aircraft that are equipped with HEPA filters, and one of the airlines has increased the replacement frequency of their HEPA filters.

*"For the most part, onboard air is composed of approximately 50% fresh air from the engine-driven pneumatic system and 50% recycled air, the recycled air goes through every circulation system through HEPA filters. We began by increasing the frequency by which we maintained and replace the HEPA filters."* (Airline #3)

Once an aircraft is on the ground, the source of air supply can come from various sources, it is then mixed and distributed to the cabin. One source is through the airplane auxiliary power unit (APU) with the engine in operation, which consumes fuel and can generate noise and emissions at the airport. The air supply may also come from airport ground sources (jet-bridge or cart), known as pre-conditioned air (PCA) that supplies the cabin with fresh air, usually outside air, but at a more reduced flow. Whether the airline owns or controls the ground-based systems varies by airport. In many cases, the air that is being supplied by jet-bridge or cart, is managed by the airport. One of the airlines has been conducting air quality studies in their fleet and at different flight stages, to understand when the risk of SARS-CoV-2 might be higher inside the cabin.

*"We then began sampling onboard air at the various stages of flight from the boarding process to ..., push back, taxi out, climb, cruise, descent, landing, ride, and deplaning... as a proxy for clean air we only measured particles, fine particles 0.3 to 25 microns in*



**Figure 2.3**   Example of a Jet-bridge Mounted PCA Unit and Yellow Hose Supplying Air to the Aircraft Parked at the Gate (Source: Munich Airport, retrieved from https://www.munich-airport.com/a-fresh-breeze-thanks-to-pca-1229006#)

One of the airlines noted that the ground pre-conditioned air is not recirculated, so it is 100% fresh air from outside the aircraft that comes into the cabin. Another airline mentioned that when running the APU, the air has a recirculated percentage, as it is outside air that is initially compressed at high temperatures. It is then passed thorough the A/C packs in the ECS to be cooled down, is unfiltered as it enters the cabin, then a certain percentage of cabin air is recirculated and passed through the HEPA filtration, while the rest is vented.

# 4.0    VENTILATION REQUIREMENTS ASSOCIATED WITH AIRCRAFT

The airline cabin is a unique setting given its rigorous requirements for maintaining critical control of its environment and the compact seating arrangements in passenger aircraft. Ventilation, essential in all enclosed spaces for basic respiratory needs, also supports thermal comfort and dilutes and removes gaseous and particulate contaminants from breathing zones. The aircraft Environmental Control System (ECS) is designed to meet these needs and must be able to operate in extremes of temperature, ambient air quality, and air pressure.

Travelers and crewmembers have long expressed potential concerns regarding the air quality inside commercial aircraft cabins (NRC, 1986; NRC, 2002). However, much of that concern is likely due to not having a clear understanding of the way aircraft ventilation systems operate. The cabin environment must be safe and comfortable for occupants, given extreme external environmental conditions. Pressurizing the cabin to meet the metabolic requirements of passengers and crew, means that ventilation must be sufficient to dilute contaminants and odors as well as dissipate the heat emanating from people, entertainment systems, galleys and avionics. Specific industry guidance, Federal Aviation Regulations and international regulations are in place to help ensure acceptable conditions of cabin safety, air quality and thermal comfort are always maintained inside the aircraft. This includes the need to provide adequate control of potential airborne transmission of infectious diseases, including SARS-CoV-2 virus within the aircraft environment.

**The current pandemic demands a critical evaluation of the interaction of the ventilation system components and their performance through the different phases of air travel, from boarding the aircraft to deplaning upon arrival. Since individual airlines are not required to audit actual ventilation performance it is strongly recommended that airlines adopt voluntary programs to ensure OEM recommendations are being met during all phases of travel.**

The aircraft ECS is different from ventilation systems used in most other settings, such as typical buildings and road vehicles, in that it is absolutely essential in enabling the aircraft to operate in the extremes of outside air temperature, ambient air quality, and air pressure encountered while flying. Given the rigorous operating specifications, the ECS can be optimized to reduce the potential risk of exposure to airborne viruses; this analysis is discussed in Section 10.0. The description given here largely apply to narrow body and wide body commercial transport aircraft of recent design; older regional jets or turboprops will not incorporate all these ventilation systems.

The aircraft components include the onboard ECS powered by engines or the auxiliary power unit (APU). When the plane is at the gate, a ground air supply system may be used to provide conditioned air to the cabin. While aircraft systems are generally similar across airplane models

and manufacturers there are a variety of ground preconditioned air units (PCAs). Both the onboard and ground systems have variable settings of airflow rates and thermal conditions. Operating parameters for the ECS, APU, and PCAs are determined by air carriers, with PCA settings (flow/pressure) in practice set for the type of aircraft.

The following sections discuss the various elements of ventilation on the "Gate-to-Gate" journey and evaluates how they may affect potential risk of infection.

## 4.1    AIRCRAFT VENTILATION SYSTEM AND VENTILATION RATES

Ventilation standards for the aircraft cabin vary by country, following the regulations and guidelines of the corresponding international and national aviation authorities. In the USA, the minimum ventilation rates in an aircraft cabin is mandated by FAA regulations, while the ANSI/ ASHRAE Standard 161-2018 (ANSI/ASHRAE, 2018) guidance defines the requirements for air quality in the aircraft and specifies methods for measurement and testing. The FAA established FARs to guide the operation of commercial airliners. FAR 14 CFR 25.831 states that *"the cabin ventilation system must provide at least 0.55 lb. (0.25 kg) of fresh air for each passenger per minute"*. This is equivalent to 4.7 L/s/p at 8000-feet and a cabin temperature of 22°C (72°F). The NRC report (NRC, 1986) states, *"This ventilation rate is also specified by the joint design regulation FAR/JAR Part 25 for crewmembers to perform their duties without undue discomfort or fatigue and to provide reasonable passenger comfort."* The ASHRAE standard specifies ventilation requirements for maintenance of air quality within commercial aircraft.

As detailed in Table 4.1, ventilation requirements can vary based on whether an aircraft is in flight or on the ground. As such, it does not discriminate between specific activities that may be occurring at various times i.e., boarding, deplaning, and when seated. With these regulations and standards, the cabin is supplied with outside air and highly filtered "clean air" providing air exchange rates significantly in excess to those found in well-ventilated offices and retail spaces (see Table 4.2). **The high air exchange rates utilized in aircraft ventilation systems mean that any contaminant introduced into the cabin should be flushed out much faster than would occur in other types of spaces, i.e., in the order of two to five minutes.**

**The HEPA filters remove, at a minimum, 99.97% of the particulate matter from the return air. This high level of filtration ensures that the air supplied to the cabin is virtually free of particulate matter, including bacteria and viruses.**

## 4.2   AIR DISTRIBUTION AND CIRCULATION – ENGINES ON AND ECS OPERATING

The air supplied to the cabin to dilute occupant generated gaseous and particulate emissions is a mixture of outside air, and HEPA-filtered recirculated air set to remove particles and aerosols of all sizes with efficiencies greater than 99.97%.



**Figure 4.1**   Typical Cabin Air Distribution System (NRC, 2002)

As shown in Figure 4.1, a common architecture exists for delivering outside air and filtered recirculated air, extracted air from the galley, lavatories, and cabin. Typically, air is supplied and exhausted relatively equally through air inlets distributed along the cabin to avoid overheating or overcooling at any specific location. Personal Airflow Outlets (PAOs) or "gaspers", common for short-haul rather than long-haul aircraft, and while not the main source of air allow limited and fine tuning of air to an occupant's breathing zone. Although the air mixes locally in the cabin, the air supply and air exhaust flow rates are generally well matched along the length of the cabin to minimize net flows along the length of the aircraft. Distribution of the air to the cabin can occur through diffusers located in the center of the ceiling in the aisles, above the windows, or along the overhead baggage compartments. Wide-body aircraft will use multiple ceiling diffusers across the

typically correspond to a MERV 6 rating that have no reliable efficacy for removing 1 um particles. The filtration of smaller particles increases as the MERV value increases.

**Aircraft meeting current ventilation standards with 50% recirculation HEPA-filtered air will supply passengers with a clean air delivery rate of 19 cfm/person, which is essentially free of any virus particles.** This far exceeds the ventilation rate in a typical naturally ventilated home of 1,000 ft$^2$ occupied by four persons without mechanical ventilation (8 cfm/person), where the only source of clean dilution air is the outdoor air. In the grocery store and office with no filtration, the only way to dilute virus concentrations in the space is to introduce outdoor air via mechanical systems. As the filtration efficiency increases the percentage of the smaller particles, including viruses, are removed by the systems' recirculated air increases. Another way to look at this is, as the filtration efficiency of recirculated air is increased, the clean air delivery rate will be increased proportionally. The amount of clean air per person is equivalent to the amount of outdoor air per person and the filtration efficiency times the flow of recirculated air per person. In equation form:

$$\text{Clean Air (cfm/person)} = \text{OA cfm/person} + \text{Filter Eff} * \text{Recirculated cfm/person}$$

For example, in an office, increasing the filtration from MERV 6A to MERV 11A will increase filtration efficiency from 0 to 62% for 1 μm particles. With a total supply airflow rate of 1 cfm/ft$^2$ in 1,000 ft$^2$ of space, with the ASHRAE design recommendations of 17 cfm of outdoor air per person, and an occupancy of five persons per 1,000 ft$^2$ of office space, 85 cfm of outdoor air is delivered, with the remaining 915 cfm of air recirculating through the system. Increasing the filtration efficiency of the recirculation air to 62% results in an additional 567 cfm of clean air for five persons (or 113 cfm/person) for a total of 130 cfm/person.

Table 4.3 shows the comparison of clean air delivery expressed in terms of rate of clean air delivery per person, air exchange rates for the volume of the occupied space (air changes per hour), as well as the average age of air for control of potentially infectious particles. It is presented for code compliant conditions and evaluates the effect of using enhanced particulate filtration in the different environments. Note that as filtration efficiency is increased in various environments, as is being currently recommended to reduce the impact of the pandemic, the Clean Air ACH increases and the Average Age of Air decreases.

These values permit comparison of ventilation rates of different environments in which people commonly find themselves. These environments are further compared by increasing the air exchange rates accomplished by improving the filtration efficiency. When the pollutant generation rate is relatively uniformly distributed among occupants over time, such as individually generated bio effluents ($CO_2$, body odors, etc.), they will be best controlled by increasing the outdoor air delivery rate per person. If the source were related to relatively rare, periodic/occasional emissions,

such as one or two individual passengers shedding viruses during a cough or sneeze, then the air exchange rate of total air and the age of air would be more relevant since these terms will better reflect the length of time other passengers could be potentially exposed to infectious aerosols.

The aircraft environment, when meeting current ventilation standards, with 50% recirculation of HEPA-filtered air, supplies a much higher delivery rate of clean air than any other commonly encountered environment. In fact, the aircraft air exchange rate significantly exceeds all normally encountered environments. When infectious particles are released in a typical, code compliant ventilated building and the aerosol has much more volume in which to disperse than that found on an aircraft, mitigating much of the exposure potential.

**This analysis shows that aircraft will have a significantly lower age of air, resulting in a very short residence time for particles, and possibility of exposure to infectious particles than any other commonly encountered environment, which will help offset the counteracting effect of being in a smaller volume and in closer proximity to other passengers.**

**For episodic releases, such as from a cough or a sneeze, the very high air exchange rates in aircraft cabins assume that contaminants released in such events are fully flushed from the cabin in as little as two to five minutes, as opposed to some six hours in a commercial or retail space complying with current codes and standards where these particles will be mixed into the large volume of the space.**

## 11.0   CONCLUDING REMARKS

The Harvard T.H. Chan School of Public Health Aviation Public Health Initiative (APHI) developed this Phase 1 report. The multi-disciplinary academic scientific and technical team were informed by regular dialogue with a consortium of airline operators, aviation industry manufacturers, airport operators, and independent experts at universities and private research organizations. The report is an independent research-led account of the COVID-19 crisis as it affects operations across the aviation industry. It presents the scientific evidence in support of adopting a non-pharmaceutical interventions (NPI) strategy using a layered approach to control the transmission of the novel coronavirus SAR-CoV-2 on board aircraft.  The report provides a series of recommendations for risk mitigation that can be adopted readily by airlines, airline passengers and crewmembers. **This layered NPI approach, of wearing face masks, disinfection of surfaces and maintenance of appropriate ventilation gate-to-gate, will ensure the risk of SARS-CoV-2 transmission onboard aircraft will be below that found in other routine activities during the pandemic, such as grocery shopping or eating out.**

The pandemic is a health crisis with profound economic impact, with efforts to control its spread exerting a devastating impact on business in general and, relevant here, to the aviation sector in particular. In the United States alone, airline capacity declined seven to 17 times more than during the 2008 global financial crisis (Boin et al. 2020). Many airports closed entirely, others shut one or more terminals and airlines suspended operations or cancelled a significant proportion of flights, with seat miles for US airlines down by 71% in April 2020 (Curley et al. 2020; Dalrymple et al. 2020). To adapt to the COVID-19 crisis, airlines have closed and/or altered routes and frequency, with the number of seats offered by airlines in 2020 some 42-52% less than originally planned (ICAO, 2020). Most airlines furloughed or laid off staff. Recognizing the economic impact of the sector, governments were quick to announce bailout and stimulus packages, with US passenger airlines calling for US$50 billion to survive the crisis (Financial Times, 2020). Reopening and recovery will focus on 'building back better', using science and the best evidence available currently to design and implement risk mitigation strategies that reduce the risk of disease transmission. Adopted widely, the recommendations in this report build upon aviation's central premise of safety.

The charge to APHI was to capture the science of SARS-CoV-2, in a field that is fast moving with new information emerging globally every day. The team then considered this information in light of the unique defined indoor environment presented by an aircraft to understand how the virus and its transmission will be affected by the conditions experienced across the passenger journey. They went on to develop strategies to mitigate transmission in the confined space of an aircraft, taking due account of behavioral change needed by crewmembers and passengers to protect themselves and others nearby them.

This Phase 1 report address the Gate-to-Gate portion, with air travel segmented into the pre-boarding, boarding, cruise and deplaning. The team's balanced view took into account the rigor of scientific studies, published and in pre-print format, and informed original investigation undertaken by the team.  The recommendations also thought through the suitability of the NPI measures to routine and widespread adoption by the airlines and those traveling, including passengers and crewmembers.  The layered approach proposed is thus a unique combination of engineering and physical controls as well as hygiene and physical distancing as applied to air travel.

Key findings from the report highlight the interactions of the different NPI layers to risk mitigation and include:

- Compliance with face mask-wearing and the aircraft's environmental control systems effectively diluting and removing pathogens significantly reduce the risk of passengers and crewmembers from acquiring COVID-19 during the cruise segment of their journey.

- Mask compliance reduces the dispersion of larger droplets that may deposit on surfaces, while general airline cleaning practices and passengers sanitizing hard surfaces around their seats lowers the probability of contacting SARS-CoV-2 infected surfaces (which is already low to begin with).

- Taken together, mask compliance, managed physical distancing and improved ventilation during boarding and deplaning, can effectively reduce the risk of potential transmission to the very low levels encountered during cruise conditions.

- Requiring passengers to attest to the absence of COVID-19 symptomatology, mandating they comply with all the airline's COVID-related procedures including physical distancing during boarding and deplaning provides some degree of protection (yet to be determined). The role of gate and flight crewmembers in assuring compliance will be essential and supported by airlines' policies to hold passengers accountable.

Implementing the layered risk mitigation strategies described in this report will help to ensure that air travel, with respect to SARS-CoV-2 transmission, is as safe as or substantially safer than the routine activities people undertake during these times. The potential effectiveness of any one NPI remains uncertain given that estimates of their effectiveness are based upon models. Thus, assessing the individual effects of any one intervention relative to the cumulative effect of concurrent use of multiple NPI must rely on application of the best available science at the time. Hence, the report recommends a layered NPI strategy so that additive and synergistic benefits can be harnessed to reduce the risk of disease transmission.  As more information becomes available with respect to the spread of SARS-CoV-2, various control measures will continue to evolve and their effectiveness will be quantified.

Plaintiff's Exhibit 197

## Fly Healthy, Fly Smart – Airlines Take Action

U.S. airlines want you to Fly Healthy and Fly Smart. Everyone can work together to protect each other.

The safety and well-being of all travelers is our top priority. Airlines have implemented a robust, multi-layered strategy which can effectively reduce the risk of exposure to COVID-19 during air travel – this strategy is aligned with the findings from researchers at Harvard University.

**Safety Measures Have Reduced Onboard Exposure Risk**

Faculty at Harvard have issued a new study revealing that the multiple layers of protection against COVID-19 make being on an airplane as safe if not safer than other routine activities, such as grocery shopping or going to a restaurant.

U.S. airlines are transforming the check-in process to reduce touchpoints for passengers. Passengers are encouraged to check-in on their airline's website or smartphone application so they can proceed straight to TSA when arriving at the airport.

For passengers who need to check-in when they arrive, U.S. airlines are sanitizing counters, kiosks and gate areas more frequently. U.S. airlines' enhanced cleaning protocols meet or exceed CDC disinfection guidelines to stop the spread of COVID-19.

U.S. airlines have also implemented temporary health acknowledgment policies and procedures for passenger travel as an additional level of protection during the pandemic

**Hospital-Grade Air Filtration**

Researchers at the Harvard T.H. Chan School of Public Health concluded that the ventilation on airplanes is so good that it reduces the possibility of exposure to COVID-19 to a point so low that it "effectively counters the proximity travelers are subject to during flights."

Because of the frequent exchange of air on planes coupled with the use of HEPA filters, over 99% of the particles containing the virus are removed from cabin air.

All A4A members have aircraft equipped with high-efficiency particulate air (HEPA) filters, which generate air as clean as an intensive care unit. The Centers for Disease Control and Prevention (CDC) has said, "Because of how air circulates and is filtered on airplanes, most viruses and other germs do not spread easily on flights."

"[HEPA filters] block particulates like the COVID, but more generally, viruses, microbes, at 99.9 percent, at least. Even if you sneeze, the air around you is renewed every two to three minutes. Within a minute, there's nothing left around you."

— Airbus EVP for Engineering Jean-Brice Dumont

"Cabin air flows primarily from ceiling to floor in a circular pattern and leaves through the floor grilles near the same seat row where it enters. This helps minimize front-to-back air movement and helps to limit the potential spread of contaminants."

— Travel Confidently with Boeing

**Inflight Protection**

U.S. airlines are setting an industry standard for cleanliness and disinfection. Before boarding, passengers can expect carriers to sanitize frequent customer touchpoints, including seat cushions, seatbelt buckles, and tray tables. Lavatories are subject to routine cleaning and systematically disinfected between flights.

U.S. airlines have implemented intensive cleaning protocols, in some cases to include electrostatic cleaning and fogging procedures. Our members use EPA-approved and CDC-recommended disinfection and cleaning protocols to provide a key layer of protection against the spread of viruses and bacteria inflight.

**What Experts are Saying**

"The ventilation system requirements for airplanes meet the levels recommended by the Centers for Disease Control and Prevention for use with covid-19 patients in airborne infection isolation rooms."

-- Joseph Allen, Assistant Professor of Exposure Assessment Science, Harvard T.H. Chan School of Public Health

"[HEPA filters] block particulates like the COVID, but more generally, viruses, microbes, at 99.9 percent, at least. Even if you sneeze, the air around you is renewed every two to three minutes. Within a minute, there's nothing left around you … The fact that you're seated for a couple of hours next to somebody doesn't represent a higher risk than being in another area where you will be close to people for a given period of times like shops, but there the air doesn't move much."

-- Jean-Brice Dumont, Airbus EVP for Engineering

https://airlinestakeaction.com/fly-healthy-fly-smart
Visited May 25█████ 2021
Published by Airlines for America

Plaintiff's Exhibit 198





















```
Plaintiff's Exhibit 199
```

Airconsumer Acknowledgement

From:  Michael Faris (michaelfaris@me.com)

To:    lucas.wall@yahoo.com

Date:  Monday, July 26, 2021, 3:17 PM EDT

For use as you see fit.

Explanation to dot at the bottom of the email.

*Michael Faris*
*H-60 MX Supervisor*
*Bluesky Helicopters*
*2015 McKinley Ave Ste.F4*
*Laverne, CA 91750*
*270-723-4944*

Begin forwarded message:

**From:** airconsumer@dot.gov
**Date:** July 26, 2021 at 12:11:48 PM PDT
**To:** michaelfaris@me.com
**Subject: Airconsumer Acknowledgement**

Thank you for contacting us concerning your air travel service issue. The U.S. Department of Transportation (DOT) seeks to ensure that airline passengers are treated fairly. Complaints and comments from consumers are helpful for determining whether airlines or ticket agents are complying with Federal aviation consumer protection and civil rights statutes and DOT regulations, and to track trends or spot areas of concern that warrant further action. Your complaint or inquiry will be assigned to an analyst for review and you will receive a more detailed acknowledgment.

The Department is receiving a high volume of complaints given the unprecedented impact of the 2019 Novel Coronavirus (COVID-19) public health emergency on air travel.  As a result, the time to process complaints is taking longer than normal. We are working hard to provide the best support we can, but it may take several weeks to process your complaint. We apologize for the delay.

Thank you again for taking the time to contact us.

Office of Aviation Consumer Protection
U.S. Department of Transportation

PERSONAL INFO:
Passenger - Mr Michael Faris michaelfaris@me.com

CONTACT INFO:
160 Charlotte Circle Elizabethtown,KY 42701

Home Phone: 2707234944
Daytime Phone: 2707234944

COMPLAINT INFO:
Airline Code: UA

Flight Date: N/A
Flight Itinerary: SDF TO DFW UA5506

Description of Problem/Inquiry/Comment:
Hello, this is my second complaint against United Airlines and ninth overall since  I have began this battle.  This morning on my flight from SDF to DFW I was  once again forced to comply  with the airlines onerous, illegal, discriminatory and  unconstitutional mask  mandate. Unfortunately, on this flight, I was not able to  evade the flight  attendants  attention as easily as I usually do. After the third time  of being  instructed to put my mask on by Cheryl Reesy, I did. About five minutes  later I  became very nauseous and light headed. I could feel my self start to  shake and  my vision started to become blurry.

I had been eating a sucker, which the flight attendant (Cheryl) informed me that I could not have, because it was preventing me from wearing the mask. So, after holding on to the sucker for so long, mixed with the feeling I was starting to feel, I decided to get up from my seat and proceed to the forward galley. My intent was to throw the sucker away, then follow up with a visit to the lavatory so I could remove my mask and regain mental and physical awareness. ==When I got just forward of the second set of first class seats I lost all consciousness and fell rapidly to the floor. I== was told by a passenger I was unconscious for approximately 10-12 seconds. The passenger also said the flight attendant did try to aid me as soon as possible. I do believe the flight attendant (Christine Boulet) saw me faint, as when I came to, she mentioned how startled and shocked she was by what had happened. Christine said she was so worried that she was considering checking my pulse and performing CPR. The flight attendants, after learning of my medical exemption and reviewing the letter from my physician, instructed me not to put the mask back on, as they didn't want it to happen again. Two passengers verbally announced they were scared. When the people witness to the incident learned of the fact that the airline knew this could happen and forced me to take the risk anyway, they mentioned they were truly disgusted. They offered to file DOT complaints as well and I instructed them on how they could follow through with such. ==When falling, I hit my head on the galley cart and then again on the floor. Both of my knees are very sore from catching the abrupt fall without brace. My right shoulder is very sore and must have smashed a seat armrest.== When I got to my connecting flight in Dallas, I approached the gate agent and let her know what had happened. I showed her my exemption and she called a manager. ==They refused to accommodate me again and forced me to wear a mask to board my flight from DFW to ONT.== This negligence and appalling behavior by the airlines must end as abruptly as my face smashed into their aircraft floor. These airlines need to immediately allow any passenger with exemptions to board without question or notice. I have now been caused physical and mental injury and pain. At what point do we decide enough is enough? Shame!!

This is System generated message, and a response to this email will not be delivered. 07/26/2021 15:04:52

Plaintiffs' Exhibit 200

*Wall v. Southwest Airlines*

**Masks Are Totally Ineffective at Reducing COVID-19 Spread & Harm Human Health**

**Index of Scientific Studies & Medical Articles**

| EX | TITLE |
|----|-------|
| 201 | 20 Reasons Mandatory Face Masks Are Unsafe, Ineffective, & Immoral |
| 202 | 6 Times the Media Credited Masks with Stopping a Pandemic that Then Spread Even More |
| 203 | A Cluster Randomized Trial of Cloth Masks Compared with Medical Masks in Healthcare Workers |
| 204 | A Group of Parents Sent Their Kids' Face Masks to a Lab for Analysis |
| 205 | A Model to Explain Statewide Differences in COVID-19 Death Rates |
| 206 | Adolescents' Face Mask Usage & Contact Transmission in Novel Coronavirus |
| 207 | Adverse Effects of Prolonged Mask Use among Healthcare Professionals during COVID-19 |
| 208 | Aerosol Penetration & Leakage Characteristics of Masks Used in the Health Care Industry |
| 209 | Aerosol Penetration through Surgical Masks |
| 210 | All That Mask-Wearing Could Be Giving You (Gasp!) Mouth Fungus |
| 211 | America's Frontline Doctors Summit 2 -- Face Masks |
| 212 | Analysis of the Effects of COVID-19 Mask Mandates on Hospital Resource Consumption & Mortality at the County Level |
| 213 | Application to Covid-19 |
| 214 | Are Cloth Masks Still Effective? And Other Questions Answered |
| 215 | Are Masks Stopping Us From Building Up Immunity? |
| 216 | Arguments Against Mask Requirements During the Coronavirus (COVID-19) Pandemic |
| 217 | As Face Masks Become the Norm, Many Wearers Quietly Suffer "Mask Anxiety" |
| 218 | Austrian Court Overturns Coronavirus Mask Mandate in Schools |
| 219 | Book Review "The Case Against Masks" by Dr. Judy Mikovits |
| 220 | Can the Elastic of Surgical Face Masks Stimulate Ear Protrusion in Children? |
| 221 | Carbon Dioxide Increases with Face Masks but Remains Below Short-Term NIOSH Limits |
| 222 | Carbon Dioxide Rebreathing in Respiratory Protection Devices |
| 223 | Carbon Dioxide Rebreathing with Close-Fitting Face Respirator Masks |
| 224 | CDC Admits No Conclusive Evidence Cloth Masks Work Against COVID |
| 225 | CDC Face Masks Don't Prevent COVID-19, Study Finds -- Masks Have Negligible Impact on Coronavirus Numbers |
| 226 | CDC Reversal on Indoor Masking Prompts Experts to Ask, "Where's the data?" |

227  CDC Schools with Mask Mandates Didn't See Statistically Significant Different Rates of COVID
228  CDC Study 85% of COVID-19 Cases in July Were People Who Often or Always Wear Masks
229  CDC Study Finds Overwhelming Majority of People Getting Coronavirus Wore Masks
230  Chemical Cocktail Found in Face Masks
231  Child Abuse Masked Schoolchildren Are Harmed Physically, Psychologically, Behaviorally & Suffer from 24 Distinct Health Issues
232  Children Wearing Masks Could be Exposed to Dangerous Levels of Carbon Dioxide, Study Finds
233  Children Wearing Masks Will Suffer Irreversible Brain Damage
234  Cloth Masks Are NOT Enough to Stop the Spread of COVID-19
235  Community & Close Contact Exposures Associated with COVID-19 Among Symptomatic Adults
236  Comparison of Filtration Efficiency & Pressure Drop in Anti-Yellow Sand Masks
237  Comparison of the Filter Efficiency of Medical Nonwoven Fabrics Against 3 Different Microbe Aerosols
238  Comprehensive Analysis of 50 States Shows Greater Spread with Mask Mandates
239  Contact Settings & Risk for Transmission in 3,410 Close Contacts of Patients with COVID-19 in Guangzhou, China
240  Contamination by Respiratory Viruses on Outer Surface of Medical Masks Used by Hospital Healthcare Workers
241  Could Wearing a Face Mask Trigger Lung Disease?
242  Cover Up The Lack of Evidence for Vaccinate or Mask Policies
243  COVID-19 & Face Masks To Wear or Not to Wear?
244  COVID-19 Continuous Wearing of Mask Aggravates Risk of Infection. "Psychological Terrorism"?
245  COVID-19 Face Masks A Potential Source of Microplastic Fibers in the Environment
246  COVID-19 Shortages of Masks & the Use of Cloth Masks as a Last Resort
247  COVID-19 Will the National Mask Mandate Save Us?
248  Data Do Not Block Cloth Masks to Limit COVID-19, Experts Say
249  Death by Mask: Mask Wearing, Bacterial Pneumonia Infections & the 1918 Flu Video
250  Definitive Study Establishes Conclusively Not Only that Masks Don't Work, But Why
251  Disposable Surgical Face Masks A Systematic Review
252  Disposable Surgical Face Masks for Preventing Surgical Wound Infection in Clean Surgery
253  Do Masks Work Video
254  Do Masks Work? The Science that Supports or Rebuts Whether Face Masks Stop the Spread of COVID-19
255  Do Physical Measures Such as Hand-Washing or Wearing Masks Stop or Slow Down the Spread of Respiratory Viruses?
256  Do Surgical Masks Stop the Coronavirus?
257  Doctor Raises Serious Doubts About Effectiveness of Face Masks, Busts Common Misperceptions
258  Doctors Say Avoiding Illness Is Literally in Flyers' Hands
259  Does Wearing a Face Mask During the COVID-19 Pandemic Increase the Incidence of Dermatological Conditions in HCWs?
260  Dr. Marty Makary Explains Why Renewed Panic over COVID-19 Is Unwarranted

261  Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection
262  Effectiveness of N95 Respirators Versus Surgical Masks Against Influenza A Systematic Review & Meta-Analysis
263  Effectiveness of Personal Protective Measures in Reducing Pandemic Influenza Transmission
264  Effectiveness of Surgical & Cotton Masks in Blocking SARS-CoV-2 A Controlled Comparison in 4 Patients
265  Effects of Wearing N95 & Surgical Facemasks on Heart Rate, Thermalstress & Subjective Sensations
266  E-Mails from Dr. Anthony Fauci
267  Everyone Wore Masks During the 1918 Flu Pandemic. They Were Useless.
268  Examining the Research for Mask Mandates
269  Excerpts from Studies Involving Mask-Wearing
270  Exercise with Facemask; Are We Handling a Devil's Sword? – A Physiological Hypothesis
271  Experimental Assessment of Carbon Dioxide Content in Inhaled Air with or without Face Masks in Healthy Children
272  Fabric Masks the Belgian Government Gave Pharmacists May Be Toxic
273  Face Coverings Are Unsafe & Ineffective – Here's All the Evidence
274  Face Masks Are a "Ticking Plastic Bomb" for the Environment
275  Face Masks Benefits & Risks During the COVID-19 Crisis
276  Face Masks Cause Children to Inhale Dangerous Levels of Carbon Dioxide at 6 Times the Safe Limit
277  Face Masks Could Increase Risk of Getting Coronavirus, Medical Chief Warns
278  Face Masks Cut Disease Spread in the Lab, But Have Less Impact in the Community
279  Face Masks During the COVID-19 Pandemic A Simple Protection Tool with Many Meanings
280  Face Masks for Children Are Damaging More than Just Their Mental Health
281  Face Masks Pose Serious Risks to the Healthy
282  Face Masks to Prevent Transmission of Influenza Virus a Systematic Review
283  Face Masks, Lies, Damn Lies, & Public Health Officials "A Growing Body of Evidence"
284  Facemasks & Similar Barriers to Prevent Respiratory Illness Such as COVID-19 a Rapid Systematic Review
285  Facemasks in the COVID-19 Era A Health Hypothesis
286  Farce Mask It's Only Safe for 20 Minutes
287  Fauci Admits He Wore Mask for Optics: "Didn't Want to Look Like I Was Giving Mixed Signals"
288  Fox News Sunday 9-5-21 Transcript
289  Frequently Asked Questions
290  Headaches Associated with Personal Protective Equipment
291  Health Authorities Silent on Damage to Lungs Caused by Graphene in Masks
292  Health Canada Issues Advisory for Disposable Masks with Graphene
293  Here's One Kind of Mask that Won't Protect You from the Delta Variant
294  How Effective Are Masks in Stopping the Spread of COVID-19?

295   How to Overcome Mask Anxiety
296   Improper Use of Medical Masks Can Cause Infections
297   IPBES Workshop on Biodiversity & Pandemics
298   Is a Mask Necessary in the Operating Theatre?
299   Is a Mask that Covers the Mouth & Nose Free from Undesirable Side Effects in Everyday Use & Free of Potential Hazards?
300   Israel COVID Cases
301   Landmark Danish Study Finds No Significant Effects for Facemask Wearers
302   Lockdowns and Mask Mandates Do Not Lead to Reduced COVID
303   Long-Term Mask Use Breeds Microbes that Infiltrate the Lungs & Contribute to Advanced Stage Lung Cancer
304   Long-Term Mask Use May Contribute to Advance Stage Lung Cancer, Study Finds
305   Making Pupils Wear Masks Is Pointless & Cruel
306   Mandatory Masks Endanger Your Health & Your Liberties
307   Mandatory Masks in the Age of Climate Emergency & Planetary Biodiversity Crisis
308   Many Studies Find that Cloth Masks Do Not Stop Viruses Like COVID
309   Mask Anxiety, Face Coverings, & Mental Health
310   Mask Facts
311   Mask Facts -- The Science & History of Masks
312   Mask Facts Companion Video
313   Mask Harms in Kids 68% of Parents Report Alarming Psychological & Physical Problems in First-of-Its-Kind Study
314   Mask Letter Template -- Adult
315   Mask Madness – The Death of Science
316   Mask Mandate & Use Efficacy in State Level COVID-19 Containment
317   Mask Mandates for Children Mostly Harmful Professor of Medicine
318   Mask Mandates May Affect a Child's Emotional, Intellectual Development
319   Mask Mouth Is a Seriously Stinky Side Effect of Wearing Masks
320   Mask Production Video
321   Mask Safety -- Your Face Mask May Be Making You Sick
322   Mask States vs. No Mask States
323   Mask Whistleblowers Tell All
324   Mask-Free Sweden Is Close to ZERO Daily Covid Deaths as Country's Chief Epidemiologist Plays Down Fears
325   Mask-Induced Anxiety Is Real
326   Masking a Careful Review of the Evidence
327   Masking Children Is Unnecessary & Harmful
328   Masking Children Tragic, Unscientific, & Damaging

329   Masking Lack of Evidence with Politics
330   Masking the Issue of Dry Eye
331   Maskne Is Now a Thing Here's What to Do If Your Face Mask Is Making You Break Out
332   Maskne Is Real, Local Dermatologist Says
333   Masks
334   Masks -- Civil Liberties
335   Masks Are Experimental Medical Devices that Must Be Optional, According to Law
336   Masks Are Neither Effective or Safe A Summary of the Science
337   Masks Are Symbolic, Say Dr. Fauci & The New England Journal of Medicine
338   Masks DO NOT Protect Anyone -- Even in Operating Rooms!
339   Masks Do Nothing to Stop the Spread of COVID & Are Harming Children
340   Masks Don't Work, Are Damaging Health & Are Being Used to Control Population
341   Masks Don't Work
342   Masks Don't Work A Review of Science Relevant to COVID-19 Social Policy
343   Masks for Prevention of Viral Respiratory Infections among Health Care Workers & the Public
344   Masks in Different Jurisdictions
345   Masks on the Beach The Impact of COVID-19 on Marine Plastic Pollution
346   Masks Simply Don't Work The Truth About COVID-19 & Masks
347   Masks, False Safety & Real Dangers, Part 1 Friable Mask Particulate & Lung Vulnerability
348   Masks, False Safety, & Real Dangers, Part 2 Microbial Challenges from Masks
349   Masks, False Safety, & Real Dangers, Part 3 Hypoxia, Hypercapnia, & Physiological Effects
350   Masks, False Safety, & Real Dangers, Part 4 Proposed Mechanisms by Which Masks Increase Risk of COVID-19
351   Masks-for-All for COVID-19 Not Based on Sound Data
352   Medical Doctor Warns that Bacterial Pneumonias Are on the Rise from Mask Wearing
353   Medical Mask Exemptions Video
354   Medical Masks
355   Modeling of the Transmission of Coronaviruses … in Dental Clinics
356   More Evidence Masks Don't Work to Prevent COVID-19
357   N95 Respirators vs Medical Masks for Preventing Influenza among Health Care Personnel a Randomized Clinical Trial
358   Natural Disasters & Severe Weather
359   New WHO Guidelines for Face Masks Admit No Known Medical Benefits
360   Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings -- Personal Protective & Environmental Measures
361   Non-Pharmaceutical Public Health Interventions for Pandemic Influenza An Evaluation of the Evidence Base
362   Oh Those Masks? They've Been Poisoning You Too

363    Optical Microscopic Study of Surface Morphology & Filtering Efficiency of Face Masks
364    OSHA Frequently Asked Questions
365    Philippine Reef Covered with Used Face Masks
366    Physical Interventions to Interrupt or Reduce the Spread of Respiratory Viruses
367    Physiological & Psychological Effects of Wearing Facemask & Their Potential Health Consequences
368    Please Remove Your Mask!
369    Preliminary Report on Surgical Mask Induced Deoxygenation During Major Surgery
370    Protective Facemask Impact on Human Thermoregulation: An Overview
371    Rapid Expert Consultation on the Effectiveness of Fabric Masks for the COVID-19 Pandemic
372    Respiratory Consequences of N95-Type Mask Usage in Pregnant Healthcare Workers -- A Controlled Clinical Study
373    Respiratory Performance Offered by N95 Respirators & Surgical Masks
374    SARS-CoV-2 Transmission Among Marine Recruits During Quarantine
375    School Nurse Is Suspended after Branding Masks Child Abuse & Refusing to Wear One at Work
376    Scientists Find Evidence of Toxic Chemicals in Some Face Masks
377    Second Study This Time from CDC Website Confirms Study on Face Masks Being Harmful, Cause Serious Side Effects
378    Simple Respiratory Protection -- Evaluation of the Filtration Performance of Cloth Masks & Common Fabric Materials
379    Still No Conclusive Evidence Justifying Mandatory Masks
380    Stop Children Wearing Masks Legal Challenge as Masks "Cause Mental & Physical Harm"
381    Study Shows How Masks Are Harming Children
382    Surgeon Destroys Myth "If Masks Don't Work, Why Do Surgeons Wear Them?"
383    Surgical Face Masks in Modern Operating Rooms -- A Costly & Unnecessary Ritual?
384    Surgical Mask to Prevent Influenza Transmission in Households: A Cluster Randomized Trial
385    That Mask Is Giving You Lung Cancer
386    The Case Against Masks 10 Reasons Why Mask Use Should Be Limited
387    The Case Against Masks for Children
388    The CDC Is About to Be Canceled
389    The CDC's Mask Mandate Study Debunked
390    The Efficacy of Medical Masks & Respirators Against Respiratory Infection in Healthcare Workers
391    The Evolution of the Surgical Mask: Filtering Efficiency Versus Efficiency
392    The Illogical & Injustice of Mask Shaming
393    The Potential for Cloth Masks to Protect Health Care Clinicians from SARS-CoV-2 A Rapid Review
394    The Science of Masking Kids at School Remains Uncertain
395    The Science of Masks
396    The States without Mask Mandates Have Lower COVID Rates

397   The Strangely Unscientific Masking of America
398   The Use of Masks & Respirators to Prevent Transmission of Influenza: A Systematic Review of the Scientific Evidence
399   These 12 Graphs Show Mask Mandates Do Nothing to Stop COVID
400   Transmission of COVID-19 in 282 Clusters in Catalonia, Spain A Cohort Study
401   Truth About Masks
402   UK Government Advisor Admits that Masks Are Just Comfort Blankets that Do Virtually Nothing
403   Universal Masking in Hospitals in the Covid-19 Era
404   University of Florida Lab Finds Dangerous Pathogens on Children's Face Masks
405   Unmasking the Facts -- The Now Word
406   Unmasking the Surgeons: The Evidence Base Behind the Use of Facemasks in Surgery
407   Unreported Truths About COVID-19 & Lockdowns Part 3 -- Masks
408   Use of Surgical Face Masks to Reduce the Incidence of the Common Cold Among Health Care Workers in Japan
409   Using Face Masks in the Community First Update
410   Various Face Mask Studies Prove Their Ineffectiveness
411   What Is the Evidence for Cloth Masks?
412   What Is the Science Behind Your Mask Mandate?
413   What Isn't Being Said -- The Science Is In
414   What to Do If You Can't Wear a Mask
415   Whatever Happened to the Right to Breathe Freely?
416   WHO You Do NOT Need to Wear a Mask
417   Why Face Masks Can Trigger Unpleasant Emotions
418   Why Face Masks Don't Work: A Revealing Review of Their Inadequacies
419   Why Masks Are a Charade
420   Why Masks Don't Work Against COVID-19
421   You Asked, We Answered
422   Your Health, Your Responsibility
423   Your Mask May Be Causing Candida Growth in Your Mouth

| SOURCE | PAGES |
|---|---|
| Global Research | 2 |
| The Blaze | 5 |
| British Medical Journal | 10 |
| Town Hall | 4 |
| Chapman University | 30 |
| Journal of Public Health Research | 4 |
| Journal of Infectious Diseases & Epidemiology | 5 |
| National Center for Biotechnology Information | 1 |
| AJIC | 8 |
| Well & Good | 2 |
| America's Frontline Doctors | 1 |
| Southern Medical Journal | 6 |
| Corbin Barr, Independent Health Researcher | 1 |
| British Medical Journal | 4 |
| Daily Sceptic | 2 |
| Ballotpedia | 7 |
| Salon | 3 |
| Straits Times | 1 |
| Vaxxter | 5 |
| International Society of Aesthetic Plastic Surgery | 4 |
| BMC Infectious Diseases | 7 |
| Ergonomics | 2 |
| Association of Anesthetists | 2 |
| The New American | 3 |
| One America News Network | 2 |
| The Washington Post | 2 |

| | |
|---|---|
| Fee.org | 4 |
| The Blaze | 3 |
| The Federalist | 2 |
| Eco Textile | 4 |
| Patriot Rising | 2 |
| Daily Mail | 2 |
| Great Mountain Publishing | 4 |
| Daily Mail | 3 |
| CDC Morbidity & Mortality Weekly Report | 7 |
| Aerosol & Air Quality Research | 12 |
| Biocontrol Science | 9 |
| The Blaze | 4 |
| ACP Journals | 8 |
| BMC Infectious Diseases | 8 |
| Green Med Info | 3 |
| BC Medical Journal | 2 |
| Medical News Today | 4 |
| Global Research | 6 |
| Science of the Total Environment | 4 |
| University of New South Wales | 2 |
| Association of American Physicians & Surgeons | 2 |
| CIDRAP News | 2 |
| Wake Up Planet | 2 |
| No Maskers | 11 |
| National Center for Biotechnology Information | 2 |
| Cochrane Database of Systematic Reviews | 11 |
| PBS | 1 |
| The Helpful Dad | 15 |
| Cochrane | 6 |
| Slate | 3 |
| Natural News | 3 |
| Travel Weekly | 3 |
| JMIR Dermatology | 10 |
| American Enterprise Institute | 5 |

| | |
|---|---|
| Annals of Internal Medicine | 10 |
| Chinese Cochrane Center | 9 |
| Epidemics | 8 |
| Annals of Internal Medicine | 2 |
| International Archives of Occupational and Environmental | 9 |
| Dr. Anthony Fauci | 22 |
| The Washington Post | 2 |
| Follow the Mask Science | 29 |
| Unknown | 3 |
| Medical Hypotheses | 4 |
| JAMA Pediatrics | 2 |
| Brussels Times | 2 |
| Daily Expose | 6 |
| Daily Mail | 4 |
| European Journal of Medical Research | 8 |
| Daily Sceptic | 2 |
| Independent | 2 |
| The Conversation | 4 |
| Frontiers in Public Health | 5 |
| Telegraph | 3 |
| Citizens for Free Speech | 5 |
| Cambridge University Press | 9 |
| Research Gate | 37 |
| medRxiv | 20 |
| National Center for Biotechnology Information | 12 |
| SMH | 1 |
| Washington Examiner | 2 |
| Fox News Channel | 5 |
| Follow the Mask Science | 2 |
| American Headache Society | 14 |
| Coronanews123 | 5 |
| CBC News | 2 |
| The Hill | 2 |
| Maciver Institute | 10 |

| | |
|---|---|
| Cleveland Clinic | 1 |
| Anadolu Agency | 3 |
| Intergovernmental Science-Policy Platform on Biodiversity & ES | 8 |
| Annals of the Royal College of Surgeons of England | 3 |
| International Journal of Environmental Research & Public Health | 42 |
| Johns Hopkins CSSE Data | 1 |
| Spectator | 2 |
| American Institute for Economic Research | 4 |
| Science News | 3 |
| Blacklisted News | 2 |
| Reaction Life | 2 |
| Stand for Health Freedom | 8 |
| Dennis Riches | 11 |
| The Federalist | 3 |
| Mind | 7 |
| Association of American Physicians & Surgeons | 23 |
| The Model Health Show | 2 |
| The Model Health Show | 1 |
| Green Med Info | 5 |
| The Healthy American | 5 |
| No Maskers | 8 |
| medRxiv | 23 |
| The Epoch Times | 2 |
| WISH TV | 3 |
| New York Post | 2 |
| YouTube | 1 |
| Jennifer Margulis | 3 |
| Centers for Disease Control & Prevention | 1 |
| The High Wire | 2 |
| News Break | 3 |
| The Bold Italic | 6 |
| American Institute for Economic Research | 20 |
| City Journal | 5 |
| American Institute for Economic Research | 6 |

| | |
|---|---|
| Centre for Evidence-Based Medicine | 6 |
| Ophthalmology Times | 2 |
| Health.com | 2 |
| CBS Baltimore | 3 |
| Caucus 99% | 9 |
| Dr. Simone Gold | 1 |
| The Blaze | 3 |
| Unknown | 14 |
| Hennessys Views | 2 |
| Benjamin Fulford | 4 |
| The Civil Rights Lawyer | 10 |
| Life Site News | 7 |
| The Healthy American | 6 |
| RC Reader | 10 |
| Canadian Family Physician | 8 |
| Yinon Weiss | 1 |
| OceansAsia | 77 |
| Asia Pacific Today | 3 |
| Boris Borovoy, Colleen Huber, Q Makeeta | 9 |
| Primary Doctor Medical Journal | 19 |
| Primary Doctor Medical Journal | 24 |
| Primary Doctor Medical Journal | 9 |
| Center for Infectious Disease Research & Policy | 15 |
| Global Research | 2 |
| America's Frontline Doctors | 2 |
| Journal of the American Medical Association | 4 |
| Journal of Dental Research | 7 |
| Mask Sickness | 8 |
| Journal of the American Medical Association | 14 |
| Centers for Disease Control & Prevention | 5 |
| Health Impact News | 2 |
| CDC Emerging Infectious Diseases | 9 |
| BioMed Central | 9 |
| Coronanews123 | 4 |

| | |
|---|---|
| PeerJ | 14 |
| Occupational Health & Safety Administration | 4 |
| Daily Sceptic | 1 |
| Cochrane Library | 9 |
| Unknown | 1 |
| Mask Anxiety | 6 |
| Neurocirugia | 1 |
| Annals of Occupational Hygiene | 11 |
| National Academies of Sciences, Engineering, & Medicine | 8 |
| Antimicrobial Resistance & Infection Control | 10 |
| British Occupational Hygiene Society | 9 |
| New England Journal of Medicine | 10 |
| Daily Mail | 4 |
| Daily Mail | 5 |
| The Gateway Pundit | 2 |
| Annals of Occupational Hygiene | 10 |
| RC Reader | 7 |
| Express UK | 4 |
| LifeSite | 9 |
| CNS News | 3 |
| Journal of Hospital Infection | 1 |
| Plos One | 6 |
| Global Research | 2 |
| Dr. Judy Mikovit & Kent Heckenlively | 54 |
| Wall Street Journal | 2 |
| Investment Watch Blog | 3 |
| American Institute for Economic Research | 5 |
| Wiley Online Library | 13 |
| Infection Control Hospital Epidemiology | 1 |
| Spectator | 2 |
| Annals of Family Medicine | 8 |
| New York Magazine | 8 |
| Children's Health Defense Fund | 8 |
| Lid Blog | 2 |

| | |
|---|---|
| American Institute for Economic Research | 5 |
| Influenza Journal | 11 |
| The Federalist | 12 |
| Lancet Infectious Diseases | 8 |
| The COVID Blog | 5 |
| Zero Hedge | 3 |
| New England Journal of Medicine | 3 |
| C-Vine | 2 |
| Mark Mallett | 31 |
| Journal of the Royal Society of Medicine | 6 |
| Alex Berenson | 22 |
| American Journal of Infection Control | 2 |
| European Centre for Disease Prevention & Control | 20 |
| Unknown | 9 |
| British Medical Journal | 2 |
| No Maskers | 5 |
| Journey Guy | 3 |
| The Mighty | 5 |
| The Blaze | 4 |
| Principia Scientific | 3 |
| Psychology Today | 3 |
| Oral Health | 6 |
| Mask Sickness | 8 |
| Citizens for Free Speech | 11 |
| Pandemics Data & Analytics | 2 |
| YouTube | 1 |
| Everyday Health | 2 |
| **TOTAL 223 SCIENTIFIC STUDIES & MEDICAL ARTICLES** | **1522** |