thecovidblog.com                      Plaintiff's Exhibit 401

# TRUTH ABOUT MASKS - The COVID Blog

*()x*

8-10 minutes



<mark>Surgical masks were used as torture tools at the notorious Guantanamo Bay detention camp in Cuba.</mark>

*Last updated March 9, 2021.*

- 40 years of research showing mask ineffectiveness, harm to humans

- Annals of the Royal College of Surgeons of England (1981)

- World Journal of Surgery (1991)

- Anaesthesia and Intensive Care Medicine (2001)
- Neurocirugía – Official Journal of the Spanish Society of Neurosurgery (2008)
- Journal of the Royal Society of Medicine (2015)
- BMC Infectious Disease (2019)
- Schwarz, Jenetzky, et al. (2020)

### 40 years of research showing mask ineffectiveness, harm to humans

The evidence is crystal clear: masks cannot and do not prevent the spread of communicable diseases and are essentially petri dishes that grow fungi and bacteria that you are breathing in all day while wearing said masks. Not to mention, masks are produced in squalid, unsanitary conditions around the world.

Surgeons have long debated whether wearing masks was beneficial to them and their patients. The consensus is that masks are unnecessary and probably do more harm than good.

**RELATED:** Mask Mouth – extended mask wearing leads to gum disease, tooth decay **(August 5, 2020)**

COVID czar Dr. Anthony Fauci said in a March 8, 2020 interview on "60 Minutes" interview that "nobody should be wearing masks."

He was right, based on well-established research from the medical industry. This list will expand. But here is the well-established science regarding masks, with the name of the scientific journals as headings.

### Annals of the Royal College of Surgeons of England (1981)

The study by Dr. Neil WM Orr states at the very beginning, "No masks were worn in one operating theater for six months. There was no increase in the incidence of wound infection."

The study continues, "It would appear that minimum contamination can best be achieved by not wearing a mask at all" and that wearing a mask during surgery "is a standard procedure that could be abandoned. The conclusion is that the wearing of a mask has very little relevance to the well-being of patients undergoing routine general surgery and it is a standard practice that could be abandoned." Read the full study here.

### World Journal of Surgery (1991)

The abstract of this study by Dr. Th. Göran Tunevall says it all: "It has never been shown

that wearing surgical face masks decreases postoperative wound infections. On the contrary, a 50% decrease has been reported after omitting face masks. The present study was designed to reveal any 30% or greater difference in general surgery wound infection rates by using face masks or not."

The study concludes, "These results indicate that the use of face masks might be reconsidered. Masks may be used to protect the operating team from drops of infected blood and from airborne infections, but have not been proven to protect the patient operated by a healthy operating team." In other words, wearing masks in public do nothing to protect other people from you if you're sick. Read the full study here.

### Anaesthesia and Intensive Care Medicine (2001)

Dr. Marcus W. Skinner and Dr. Brett A. Sutton conducted a meta-analysis.  They searched the Medline database using the index terms "surgical mask," "anaesthetist," and "infection control." All original studies published in peer-reviewed journals in the English language were reviewed, with no restrictions on year of publication. Thirty-seven (37) suitable journal articles were obtained, reporting on altogether 44 studies published between 1905 and 2000.

The study concluded, "There is little evidence to suggest that the wearing of surgical face masks by staff in the operating theatre decreases postoperative wound infections. Published evidence indicates that postoperative wound infection rates are not significantly different in unmasked versus masked theatre staff. However, there is evidence indicating a significant reduction in post-operative wound infection rates when theatre staff are unmasked."

Finally, the study states, "A decision to eliminate masks would generate much discussion. The evidence for discontinuing the use of surgical face masks would appear to be stronger than the evidence available to support their continued use." Read the full study here.

### Neurocirugía – Official Journal of the Spanish Society of Neurosurgery (2008)

Beder et al. set out to show "whether the surgeons' oxygen saturation of hemoglobin was affected by the surgical mask or not during major operations." Repeated measures, longitudinal and prospective observational studies were performed on 53 surgeons using a pulse oximeter pre and postoperatively.

The study revealed a decrease in the oxygen saturation of arterial pulsations ($SpO_2$) and a slight increase in pulse rates compared to preoperative values in all surgeon groups.

The decrease was more prominent in the surgeons aged over 35. Pulse rates of the surgeons increase and $SpO_2$ decrease after the first hour. This early change in $SpO_2$ may be either due to the facial mask or the operational stress.

In other words, wearing masks probably decreases your blood oxygen levels after only one hour, and increases pulse rates. Imagine what is happening after 8+ hours wearing masks. Read the full study: Postoperative wound infections and surgical face masks: A controlled study.

### Journal of the Royal Society of Medicine (2015)

Examination of the literature revealed much of the published work on the matter to be quite dated and often studies had poorly elucidated methodologies. As a result, we recommend caution in extrapolating their findings to contemporary surgical practice. However, overall there is a lack of substantial evidence to support claims that facemasks protect either patient or surgeon from infectious contamination. More rigorous contemporary research is needed to make a definitive comment on the effectiveness of surgical facemasks.

In the medical field where common practice can so easily become dogma, it is necessary to recognise the constant need to maintain a healthy skepticism towards established beliefs and to periodically re-evaluate and critically assess their scientific merit. Read the full study here.

### BMC Infectious Disease (2019)

Note: *BMC Infectious Diseases* is an open access, peer-reviewed journal that considers articles on all aspects of the prevention, diagnosis and management of infectious and sexually transmitted diseases in humans, as well as related molecular genetics, pathophysiology, and epidemiology.

"Medical masks are commonly used in health care settings to protect healthcare workers (HCWs) from respiratory and other infections. Airborne respiratory pathogens may settle on the surface of used masks layers, resulting in contamination. The main aim of this study was to study the presence of viruses on the surface of medical masks."

"**Conclusion:** Respiratory pathogens on the outer surface of the used medical masks may result in self-contamination. The risk is higher with longer duration of mask use (> 6 h) and with higher rates of clinical contact. Protocols on duration of mask use should specify a maximum time of continuous use, and should consider guidance in high contact settings. Viruses were isolated from the upper sections of around 10% samples, but other sections of masks may also be contaminated. HCWs should be aware of these risks in order to

protect themselves and people around them."

Read the full study: "Contamination by respiratory viruses on outer surface of medical masks used by hospital healthcare workers."

### Schwarz, Jenetzky, et al. (2020)

By 26.10.2020 the registry had been used by 20,353 people. In this publication we report the results from the parents, who entered data on a total of 25,930 children. The average wearing time of the mask was 270 minutes per day. Impairments caused by wearing the mask were reported by 68% of the parents. These included irritability (60%), headache (53%), difficulty concentrating (50%), less happiness (49%), reluctance to go to school/kindergarten (44%), malaise (42%) impaired learning (38%) and drowsiness or fatigue (37%). See full study here.

**Please help keep us online. Join our fight against censorship and DDoS attacks against the #1 source for COVID and mRNA news.** SUBSCRIBE TODAY **and** SUPPORT US VIA PAYPAL.

Plaintiff's Exhibit 402

zerohedge.com

# UK Government Advisor Admits Masks Are Just "Comfort Blankets" That Do Virtually Nothing

*by Tyler Durden*

4-5 minutes

Authored by Steve Watson via Summit News,

**As the UK Government heralds "freedom day" today, which is** anything but**, a prominent government scientific advisor has admitted that face masks do very little to protect from coronavirus and are basically just "comfort blankets".**



Dr Colin Axon, a SAGE advisor for the government told the London Telegraph that medics have given people a "cartoonish" view of how how microscopic viruses travel through the air, and the masks have gaps in them that are up to 5000 times bigger than Covid particles.

"The small sizes are not easily understood but **an imperfect analogy would be to imagine marbles fired at builders' scaffolding,** some might hit a pole and rebound, but obviously most will fly through," Axon said.

"Once a particle is not on a biological surface it is no longer a biomedical issue, it is simply about physics. **The public has only a partial view of the story if information only comes from one type of source,**" Axon continued, adding

**"Medics have some of the answers but not a whole view."**

Noting that the "mask debate is about the particle journey," Axon explained that "Masks can catch droplets and sputum from a cough but **what is important is that SARS CoV-2 is predominantly distributed by tiny aerosols.**"

"A Covid viral particle is around 100 nanometres, material gaps in blue surgical masks are up to 1,000 times that size, cloth mask gaps can be 500,000 times the size," Axon urged.

The professor noted that "those aerosols escape masks and will render the mask ineffective," adding "The public were demanding something must be done, they got masks, it is just a comfort blanket. But now it is entrenched, and we are entrenching bad behaviour."

"All around the world you can look at mask mandates and superimpose on infection rates, you cannot see that mask mandates made any effect whatsoever," Axon further noted, adding that "The best thing you can say about any mask is that any positive effect they do have is too small to be measured."

**Axon's comments echo those of Dr. Anthony Fauci, who** wrote in February 2020 **that a typical store-bought face mask "is not really effective in keeping out virus, which is small enough to pass through material."**

Fauci later reversed his position after the CDC began recommending that Americans wear face coverings. Similar recommendations were then made worldwide, with World Health Organisation officials even recommending

that masks remain INDEFINTELY.

**Social media networks have long censored and deleted information pertaining to the efficacy of masks, or lack thereof, despite numerous credible studies concluding that they are largely useless at stopping the spread of COVID-19.**

A study in Denmark involving 6,000 participants found that "there was no statistically significant difference between those who wore masks and those who did not when it came to being infected by Covid-19," the Spectator reported.

*"1.8 per cent of those wearing masks caught Covid, compared to 2.1 per cent of the control group. As a result, it seems that any effect masks have on preventing the spread of the disease in the community is small."*

While the government says that from today masks are optional in the UK, many train companies and other businesses have said that they remain mandatory, causing widespread confusion.

\*  \*  \*

*Brand **new merch** now available! Get it at https://www.pjwshop.com/*

*In the age of mass Silicon Valley censorship It is crucial that we stay in touc.h We need you to sign up for our free newsletter here. Support our sponsor – Turbo Force – a supercharged boost of clean energy without the comedown. Also, we urgently need your financial support here.*



# The NEW ENGLAND JOURNAL of MEDICINE

Plaintiff's Exhibit 403

## Perspective
**MAY 21, 2020**

# Universal Masking in Hospitals in the Covid-19 Era

Michael Klompas, M.D., M.P.H., Charles A. Morris, M.D., M.P.H., Julia Sinclair, M.B.A., Madelyn Pearson, D.N.P., R.N., and Erica S. Shenoy, M.D., Ph.D.

As the SARS-CoV-2 pandemic continues to explode, hospital systems are scrambling to intensify their measures for protecting patients and health care workers from the virus. An increasing number of frontline providers are wondering whether this effort should include universal use of masks by all health care workers. Universal masking is already standard practice in Hong Kong, Singapore, and other parts of Asia and has recently been adopted by a handful of U.S. hospitals.

We know that wearing a mask outside health care facilities offers little, if any, protection from infection. Public health authorities define a significant exposure to Covid-19 as face-to-face contact within 6 feet with a patient with symptomatic Covid-19 that is sustained for at least a few minutes (and some say more than 10 minutes or even 30 minutes). The chance of catching Covid-19 from a passing interaction in a public space is therefore minimal. In many cases, the desire for widespread masking is a reflexive reaction to anxiety over the pandemic.

The calculus may be different, however, in health care settings. First and foremost, a mask is a core component of the personal protective equipment (PPE) clinicians need when caring for symptomatic patients with respiratory viral infections, in conjunction with gown, gloves, and eye protection. Masking in this context is already part of routine operations for most hospitals. What is less clear is whether a mask offers any further protection in health care settings in which the wearer has no direct interactions with symptomatic patients. There are two scenarios in which there may be possible benefits.

The first is during the care of a patient with unrecognized Covid-19. A mask alone in this setting will reduce risk only slightly, however, since it does not provide protection from droplets that may enter the eyes or from fomites on the patient or in the environment that providers may pick up on their hands and carry to their mucous membranes (particularly given the concern that mask wearers may have an increased tendency to touch their faces).

More compelling is the possibility that wearing a mask may reduce the likelihood of transmission from asymptomatic and minimally symptomatic health care workers with Covid-19 to other providers and patients. This concern increases as Covid-19 becomes more widespread in the community. We face a constant risk that a health care worker with

The New England Journal of Medicine
Downloaded from nejm.org on August 25, 2021. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

e63(1)

early infection may bring the virus into our facilities and transmit it to others. Transmission from people with asymptomatic infection has been well documented, although it is unclear to what extent such transmission contributes to the overall spread of infection.[1-3]

More insidious may be the health care worker who comes to work with mild and ambiguous symptoms, such as fatigue or muscle aches, or a scratchy throat and mild nasal congestion, that they attribute to working long hours or stress or seasonal allergies, rather than recognizing that they may have early or mild Covid-19. In our hospitals, we have already seen a number of instances in which staff members either came to work well but developed symptoms of Covid-19 partway through their shifts or worked with mild and ambiguous symptoms that were subsequently diagnosed as Covid-19. These cases have led to large numbers of our patients and staff members being exposed to the virus and a handful of potentially linked infections in health care workers. Masking all providers might limit transmission from these sources by stopping asymptomatic and minimally symptomatic health care workers from spreading virus-laden oral and nasal droplets.

What is clear, however, is that universal masking alone is not a panacea. A mask will not protect providers caring for a patient with active Covid-19 if it's not accompanied by meticulous hand hygiene, eye protection, gloves, and a gown. A mask alone will not prevent health care workers with early Covid-19 from contaminating their hands and spreading the virus to patients and colleagues. Focusing on universal masking alone may, paradoxically, lead to more transmission of Covid-19 if it diverts attention from implementing more fundamental infection-control measures.

Such measures include vigorous screening of all patients coming to a facility for symptoms of Covid-19 and immediately getting them masked and into a room; early implementation of contact and droplet precautions, including eye protection, for all symptomatic patients and erring on the side of caution when in doubt; rescreening all admitted patients daily for signs and symptoms of Covid-19 in case an infection was incubating on admission or they were exposed to the virus in the hospital; having a low threshold for testing patients with even mild symptoms potentially attributable to a viral respiratory infection (this includes patients with pneumonia, given that a third or more of pneumonias are caused by viruses rather than bacteria); requiring employees to attest that they have no symptoms before starting work each day; being attentive to physical distancing between staff members in all settings (including potentially neglected settings such as elevators, hospital shuttle buses, clinical rounds, and work rooms); restricting and screening visitors; and increasing the frequency and reliability of hand hygiene.

The extent of marginal benefit of universal masking over and above these foundational measures is debatable. It depends on the prevalence of health care workers with asymptomatic and minimally symptomatic infections as well as the relative contribution of this population to the spread of infection. It is informative, in this regard, that the prevalence of Covid-19 among asymptomatic evacuees from Wuhan during the height of the epidemic there was only 1 to 3%.[4,5] Modelers assessing the spread of infection in Wuhan have noted the importance of undiagnosed infections in fueling the spread of Covid-19 while also acknowledging that the transmission risk from this population is likely to be lower than the risk of spread from symptomatic patients.[3] And then the potential benefits of universal masking need to be balanced against the future risk of running out of masks and thereby exposing clinicians to the much greater risk of caring for symptomatic patients without a mask. Providing each health care worker with one mask per day for extended use, however, may paradoxically improve inventory control by reducing one-time uses and facilitating centralized workflows for allocating masks without risk assessments at the individual-employee level.

There may be additional benefits to broad masking policies that extend beyond their technical contribution to reducing pathogen transmission. Masks are visible reminders of an otherwise invisible yet widely prevalent pathogen and may remind people of the importance of social distancing and other infection-control measures.

It is also clear that masks serve symbolic roles. Masks are not only tools, they are also talismans that may help increase health care workers' perceived sense of safety, well-being, and trust in their hospitals. Although such reactions may not be strictly logical, we are all subject to fear and anxiety, especially during times of crisis. One might argue that fear and anxiety are better countered with data and education than with a marginally beneficial mask, par-

The New England Journal of Medicine
Downloaded from nejm.org on August 25, 2021. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

UNIVERSAL MASKING IN HOSPITALS IN THE COVID-19 ERA

ticularly in light of the worldwide mask shortage, but it is difficult to get clinicians to hear this message in the heat of the current crisis. Expanded masking protocols' greatest contribution may be to reduce the transmission of anxiety, over and above whatever role they may play in reducing transmission of Covid-19. The potential value of universal masking in giving health care workers the confidence to absorb and implement the more foundational infection-prevention practices de-scribed above may be its greatest contribution.

Disclosure forms provided by the authors are available at NEJM.org.

From the Department of Population Medicine, Harvard Medical School and Harvard Pilgrim Health Care Institute (M.K.), Brigham and Women's Hospital (M.K., C.A.M., J.S., M.P.), Harvard Medical School (M.K., C.A.M., E.S.S.), and the Infection Control Unit and Division of Infectious Diseases, Massachusetts General Hospital (E.S.S.) — all in Boston.

This article was published on April 1, 2020, at NEJM.org.

**1.** Rothe C, Schunk M, Sothmann P, et al. Transmission of 2019-nCoV infection from an asymptomatic contact in Germany. N Engl J Med 2020;382:970-1.
**2.** Bai Y, Yao L, Wei T, et al. Presumed asymptomatic carrier transmission of COVID-19. JAMA 2020 February 21 (Epub ahead of print).
**3.** Li R, Pei S, Chen B, et al. Substantial undocumented infection facilitates the rapid dissemination of novel coronavirus (SARS-CoV2). Science 2020 March 16 (Epub ahead of print).
**4.** Hoehl S, Rabenau H, Berger A, et al. Evidence of SARS-CoV-2 infection in returning travelers from Wuhan, China. N Engl J Med 2020;382:1278-80.
**5.** Ng O-T, Marimuthu K, Chia P-Y, et al. SARS-CoV-2 infection among travelers returning from Wuhan, China. N Engl J Med 2020;382:1476-8.

DOI: 10.1056/NEJMp2006372
*Copyright © 2020 Massachusetts Medical Society.*

The New England Journal of Medicine
Downloaded from nejm.org on August 25, 2021. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

Plaintiff's Exhibit 404

c-vine.com

# University of Florida Lab Finds Dangerous Pathogens on Children's Face Masks

*By Meiling Lee   June 19, 2021 Updated: June 19, 2021*

4-5 minutes

---

A laboratory at the University of Florida that recently analyzed a small sample of face masks, detected the presence of 11 dangerous pathogens that included bacterias that cause diphtheria, pneumonia, and meningitis.

Gainesville parents in Florida concerned about the harm caused to their children wearing face masks all day at school in 90 °F weather sent out six masks—five that were worn by children ages 6 to 11 for five to eight hours at school, and one worn by an adult—to be analyzed for contaminants at the University of Florida's Mass Spectrometry Research and Education Center.

Of the six masks, three were surgical, two cotton, and a poly gaiter. Masks that have not been worn and a t-shirt worn at school acted as the control samples.

Five of the masks were found to be contaminated with parasites, fungi, and bacteria, according to Rational Ground. Only one mask was found to contain a virus that can cause a fatal systemic disease in cattle and deer. Other less harmful pathogens that can cause ulcers, acne, and strep throat were also detected.

None of the controls were contaminated with pathogens, while "samples from the front top and bottom of the t-shirt found proteins that are commonly found in skin and hair, along with some commonly found in soil."

Amanda Donoho, a mother of three elementary school children, teamed up with other parents to send the masks to the lab because her sons broke out in rashes from prolonged mask-wearing.

"Our kids have been in masks all day, seven hours a day in school," Donoho told Fox & Friends on June 17. "The only break that they get is to eat or drink."

Donoho said that while students do not have to wear a mask outside at school since April 2021, masks were still required when they were within six to eight feet of each other. Masks must also be worn on school buses.

Further research is needed to better understand what is being put on children's faces, says Donoho.

Superintendent Carlee Simon at the Alachua County Public Schools (ACPS) in Gainesville, Fla. did not respond to a request for comment.

The director of the Centers for Disease Control and Prevention (CDC) says that kids should continue to wear masks and social distance until they are able to get vaccinated, despite data showing that children are minimally affected by COVID-19 and are not super-spreaders of the virus.

Gov. Ron DeSantis, a Republican, signed an executive order on May 3, suspending all COVID-19 emergency restrictions, including mask-wearing. However, certain school districts like ACPS kept their mask policy in place for the remainder of the school year, while masks were optional within the community.

ACPS says masks will be optional for the 2021–22 school year but would continue to be required on school buses until mid-September unless the federal transportation regulation changes.

The CDC says masks are still required on planes, trains, buses, and at airports.

In an updated June 17 guidance, masks are no longer required in "outdoor areas of a conveyance (like a ferry or the top deck of a bus)" and fully vaccinated individuals may resume everyday activities that were done prior to the pandemic without mask-wearing or physically distancing unless required by federal or state law.

People are considered fully vaccinated two weeks after their second shot of a messenger RNA vaccine or after a single-dose Johnson & Johnson vaccine.

The CDC did not give guidance for people who've recovered from COVID-19 and have natural immunity.

The Epoch Times has contacted the CDC for comment.

Here are the results of the testing posted by Dr. Tenpenny on Telegram:



<pre>
                         Plaintiff's Exhibit 405
</pre>

markmallett.com

# Unmasking the Facts - The Now Word

*Tom Jefferson*

62-79 minutes

---



*Mark Mallett is a former award-winning journalist with CTV News Edmonton (CFRN TV) and resides in Canada. The following article is regularly updated to reflect new science.*

---

**THERE** perhaps is no issue more contentious than the mandatory mask laws spreading across the world. Aside from sharp disagreements on their effectiveness, the issue is dividing not only the general public but churches. Some priests have forbidden parishioners to enter the sanctuary without masks



while others have even called the police on their flock.[1]October 27th, 2020; lifesitenews.com Some regions have required that face coverings be enforced in one's own home [2]lifesitenews.com while some countries have mandated that individuals wear masks while driving alone in your car.[3]Republic of Trinidad and Tobago, looptt.com Dr. Anthony Fauci, heading up the U.S. COVID-19 response, goes even further saying that, aside from a facial mask, "If you have goggles or an eye shield, you should use it"[4]abcnews.go.com or even wear two.[5]webmd.com, January 26th, 2021 And Democrat Joe Biden stated, "masks save lives — period," [6]usnews.com and that when he becomes President, his first action will be to force mask wearing across the board claiming, "These masks make a gigantic difference." [7]brietbar.com And that he did. Some Brazilian scientists alleged that actually refusing to wear a facial covering is a sign of a "serious personality disorder."[8]the-sun.com And Eric Toner, a senior scholar at the Johns Hopkins Center for Health Security, flatly stated that mask wearing and social distancing will be with us for "several years"[9]cnet.com as did a Spanish virologist.[10]marketwatch.com

Given the extraordinary imposition this is, under pain of fines or jail;[11]texastribune.org given that new strains of the coronavirus are emerging in Denmark[12]November 5th, 2020, theguardian.com and the U.K.[13]December 15th, 2020; ctvnews.casparking fears of

a "new pandemic"; given that none of this is going away soon… the question of the hour that *should* be relevant to politicians and bishops alike is whether enforced mask policy is actually sound science. This article is a followup to *Unmasking the Plan* — one of the most widely shared writings on this website on the *spiritual* consequences of masking. The following is a resource for you and your families, based on *scientific studies* and data, about the physical consequences…

ASSUMPTIONS vs SCIENCE

"How could masks *not* work?" That's the basic assumption behind most people who dutifully don their designer bandanas as they venture into the public. "It's covering my mouth and nose so it must be doing *something.* Therefore, it's the loving, charitable thing to do, right?"

In getting to the bottom of that question, one of the challenges today is getting past the media's censorship monster. As I carefully explained in *The Pandemic of Control*, there is clearly a narrative being fed to the public that is strictly guarded and that even many accredited scientists and medical doctors are not allowed to challenge. The level of censorship is truly remarkable, unlike anything we've seen in the Western world until now. Recent news broke that a top medical journal has allowed authors to secretly alter data sets in their papers without publishing notices of correction, hence obscuring the weaponized origins [14]The evidence, according to scientists, continues to mount that COVID-19 was possibly manipulated in a laboratory before it was accidentally or intentionally released into the populace. While some scientists in the UK assert that COVID-19 came from natural origins alone,(nature.com) a paper from South China's University of Technology claims 'the killer coronavirus probably originated from a laboratory in Wuhan.'(Feb. 16th, 2020; dailymail.co.uk) In early February 2020, Dr. Francis Boyle, who drafted the U.S. "Biological Weapons Act", gave a detailed statement admitting that the 2019 Wuhan Coronavirus is an offensive Biological Warfare Weapon and that the World Health Organization (WHO) already knows about it.(cf. zerohedge.com) An Israeli biological warfare analyst said much the same.(Jan. 26th, 2020; washingtontimes.com) Dr. Peter Chumakov of the Engelhardt Institute of Molecular Biology and Russian Academy of Sciences claims that "while the Wuhan scientists' goal in creating the coronavirus was not malicious—instead, they were trying to study the pathogenicity of the virus… They did absolutely crazy things… For example, inserts in the genome, which gave the virus the ability to infect human cells."(zerohedge.com) Professor Luc Montagnier, 2008 Nobel Prize winner for Medicine and the man who discovered the HIV virus in 1983, claims that SARS-CoV-2 is a manipulated virus that was accidentally released from a laboratory in Wuhan, China.(cf. mercola.com) A new documentary, quoting several scientists, points toward COVID-19 as an engineered virus.(mercola.com) A team of Australian scientists has produced new evidence the novel coronavirus shows

signs "of human intervention."(lifesitenews.com; washingtontimes.com) Former head of the British intelligence agency M16, Sir Richard Dearlove, said he believes the COVID-19 virus was created in a lab and spread accidentally.(jpost.com) A joint British-Norwegian study alleges that the Wuhan coronavirus (COVID-19) is a "chimera" constructed in a Chinese lab.(Taiwannews.com) Professor Giuseppe Tritto, an internationally known expert in biotechnology and nanotechnology and president of the World Academy of Biomedical Sciences and Technologies (WABT) says that "It was genetically engineered in the Wuhan Institute of Virology's P4 (high-containment) lab in a program supervised by the Chinese military."(lifesitnews.com) Respected Chinese virologist Dr. Li-Meng Yan, who fled Hong Kong after exposing Bejing's knowledge of the coronavirus well before reports of it emerged, stated that "the meat market in Wuhan is a smoke screen and this virus is not from nature… It comes from the lab in Wuhan."(dailymail.co.uk) And Dr. Steven Quay, M.D., PhD., published a paper in January 2021: "A Bayesian analysis concludes beyond a reasonable doubt that SARS-CoV-2 is not a natural zoonosis but instead is laboratory derived", cf. prnewswire.com and zenodo.org for the paper of COVID-19.[15]"Top Medical Journal Caught in Massive Cover-Up", November 5th, 2020; mercola.com There truly is a massive *Pandemic of Control* breaking out.

So, here's what your favorite news network is probably not reporting.

<mark>Up until COVID-19 was declared a "pandemic," the science did *not* support mask wearing,</mark> even though social media lit up with black and white photos from the



1918 influenza pandemic of people wearing masks, as if this were proof that they worked. On the contrary, W.H. Kellogg, M.D., infectious diseases expert and then-executive officer of the California State Board of Health, <mark>made this observation in 1920 on the failure of masking to contain the rampant influenza spread:</mark>

**The masks, contrary to expectation, were worn cheerfully and universally, and also, contrary to expectation of what should follow under such circumstances, no effect on the epidemic curve was to be seen. Something was plainly wrong with our hypotheses.** —W Kellogg. "An experimental study of the efficacy of gauze face masks." Am J Pub Health, 1920.  34-42.

Fast forward one hundred years, and the World Health Organization's (WHO) own literature echoes the same:

**Meta-analyses in systematic literature reviews have reported that the use of N95 respirators compared with the use of medical masks is not associated with any statistically significant lower risk of the clinical respiratory illness outcomes or laboratory-confirmed influenza or viral infections… The use of cloth masks (referred to as fabric masks in this document) as an alternative to medical masks is not considered appropriate for protection of health workers based on limited available evidence… At present, there is no direct evidence (from studies on**



**COVID- 19 and in healthy people in the community) on the effectiveness of universal masking of healthy people in the community to prevent infection with respiratory viruses, including COVID-19.** —"Guidance on the use of masks for the general public", June 5th, 2020; who.int

Epidemiologist Dr. Andrew Bostom of Brown University likewise confirms that limited experimental observations…

**…provide no rational, evidence-based justification for daily, prolonged mask usage by the general public to prevent infection with COVID-19. Moreover, a subsequent pooled (so-called "meta-") analysis of ten controlled trials assessing extended, real-world, non-health-care-setting mask usage revealed that masking did not reduce the rate of laboratory-proven infections with the respiratory virus influenza.** —July 11th, 2012; medium.com

Indeed, the very latest CDC statistics reveal that, of the symptomatic adults with COVID-19, 70.6% *always* wore a mask and still got sick, compared to 7.8% for those who rarely or never wore a mask. [16]"Community and Close Contact Exposures Associated with COVID-19 Among Symptomatic Adults ≥18 Years in 11 Outpatient Health Care Facilities", United States, July 2020; cdc.gov It's obviously noteworthy that with mask-wearing being enforced and increasing in countries, cases are still rising—which doesn't make a good case for masks. Again, there are evidence-based reasons as to why. A policy review paper published in *Emerging Infectious Diseases* in May 2020—the CDC's own journal—states:

**Although mechanistic studies support the potential effect of hand hygiene or face masks, evidence from 14 randomized controlled trials of these measures did not support a substantial effect on transmission of laboratory-confirmed influenza… In our systematic review, we identified 10 RCTs [randomized controlled trials] that reported estimates of the effectiveness of face masks in reducing laboratory-confirmed influenza virus infections in the community from literature published during 1946–July 27, 2018. In pooled analysis, we found no significant reduction in influenza transmission with the use of face masks…** — "Emerging Infectious Diseases", Abstract; pps. 97-972, Vol. 26, no. 5; cdc.gov

The Public Health Agency of Canada (PHAC) also released similar study findings[17]Cowling BJ, Zhou Y, Ip DKM, Leung GM, Aiello AE. "Face masks to prevent influenza transmission: a systematic review", *Epidemiol Infect,* 2010,138:449–56/Bin-Reza F, Lopez VC, Nicoll A, Chamberland ME. "The use of masks and respirators to prevent transmission of influenza: a systematic review of the scientific evidence", *Influenza Other Respi Viruses,* 2012,6:257–67 after the 2009 influenza outbreak.

**The key findings include: Masks worn by ill individuals may protect uninfected individuals from virus transmission, but little evidence exists that mask use by well individuals avoids infection…** — "Public health measures: Canadian Pandemic Influenza Preparedness: Planning Guidance for the Health Sector", December 18, 2018, 2.3.2, canada.ca

A study of 15 randomized trials[18], Mark Jones, Lubna A Al Ansari, Ghada Bawazeer, Elaine Beller, Justin Clark, John Conly, Chris Del Mar, Elisabeth Dooley, Eliana Ferroni, Paul Glasziou, Tammy Hoffman, Sarah Thorning, Mieke Van Driel; April 7th, 2020; medrxiv.org concluded in April 2020 that,

**Compared to no masks there was no reduction of influenza-like illness cases or influenza for masks in the general population, nor in healthcare workers.** —"Physical interventions to interrupt or reduce the spread of respiratory viruses", April 7th, 2020;

[medrxiv.org](medrxiv.org)

A 2019 study published in the JAMA journal of 2862 participants showed that both N95 respirators and surgical masks "resulted in no significant difference in the incidence of laboratory confirmed influenza."[19]"N95 Respirators vs Medical Masks for Preventing Influenza Among Health Care Personnel", September3rd, 2019; [jamanetwork.com](jamanetwork.com)

One study claiming to show "Decrease in Hospitalizations for COVID-19 after Mask Mandates in 1083 U.S. Counties" was just withdrawn by its authors. The revised Abstract states:

**The authors have withdrawn this manuscript because there are increased rates of SARS- CoV-2 cases in the areas that we originally analyzed in this study.**
—November 4th, 2020; [medrxiv.org](medrxiv.org)

Swiss Policy Research asserted in September that "the WHO-commissioned meta-study on the effectiveness of facemasks and social distancing, published in *The Lancet*, is seriously flawed and should be retracted." Among five serious flaws in the study, "seven studies are unpublished and non-peer-reviewed observational studies", only four of 29 studies were about the SARS-CoV-2 virus (that leads to the disease COVID-19), which has very different transmission characteristics; the studies focused almost exclusively on transmission by severely ill hospitalized patients and not by community transmission; and "The authors of the Lancet meta-study acknowledge that the certainty of the evidence regarding facemasks is "low" as all of the studies are observational and none is a randomized controlled trial (RCT). The WHO itself admitted that its updated facemask policy guidelines were based not on new evidence but on ["political lobbying](political lobbying)" [verified by BBC correspondent Deborah Cohen.][20]September 9th, 2020; [swprs.org](swprs.org)

A July 2020 review by the *Oxford Centre for Evidence-Based Medicine* stated: "It would appear that despite two decades of pandemic preparedness, there is considerable uncertainty as to the value of wearing masks."[21]July 23rd, 2020; [cebm.net](cebm.net)

A July 2020 cross-study by the University of East Anglia concluded in a non-peer-reviewed pre-print that, "stay at home orders, closure of all non-businesses and requiring the wearing of face masks or coverings in public was not associated with any independent additional impact,"[22][medrxiv.org](medrxiv.org) and "The evidence is not sufficiently strong to support widespread use of facemasks as a protective measure against COVID-19."[23][medrxiv.org](medrxiv.org); April 6th, 2020

On November 10th, 2020, the CDC released a [new brief](new brief) on masking that cited several studies. It is notable that in most of the studies that claimed some benefit in mask wearing, they occurred at the same time that *social distancing* and *lockdowns* as well as *hand*

*hygiene* protocols were put into place. Several of the authors noted that these were *not* factored into their studies, and simply lumped all methods together.

**The decrease in […] infections could be confounded by other interventions inside and outside of the health care system, such as restrictions on elective procedures, social distancing measures, and increased masking in public spaces, which are limitations of this study. <mark>Despite these local and statewide measures, the case number continued to increase in Massachusetts throughout the study period…</mark>**
—July 14th, 2020, "Association Between Universal Masking in a Health Care System and SARS-CoV-2 Positivity Among Health Care Workers", Xiaowen Wang, MD et al., jamanetwork.com

Most of the cited CDC's studies focused on comparing material efficacy as opposed to real-world results. Nonetheless, <mark>the studies often unwittingly prove the results of the aforementioned studies that found no significant benefits from facial coverings.</mark> For example, <mark>one such study found that "surgical and handmade masks, and face shields,</mark>



<mark>generate significant leakage jets that</mark> <mark>may present major hazards.</mark>"[24]"Face Coverings, Aerosol Dispersion and Mitigation of Virus Transmission Risk", Cornell University, May 19th, 2020; arxiv.org Another noted that "many of these mask designs have not been tested in practice… such as neck gaiters or bandanas, which offer very little protection."[25]"Low-cost measurement of face mask efficacy for filtering expelled droplets during speech", Sept. 2020, pubmed.ncbi.nlm.nih.gov <mark>Along the same lines, another CDC cited study warned that "there are insufficient data on cloth-based coverings, which are being used by a vast majority of the general public… Loosely folded face masks and bandana-style coverings provide minimal stopping-capability for the smallest aerosolized respiratory droplets."</mark>

[26]"Visualizing the effectiveness of face masks in obstructing respiratory jets", June 2020, pubmed.ncbi.nlm.nih.gov However, some government officials, such as Dr. Theresa Tam heading Canada's pandemic response, have actually recommend non-medical cloth-based coverings thereby contradicting the CDC's sources.[27]ctvnews.ca Other studies showed increased reduction of aerosols through multi-layers of cloth, however that presented another problem: "fabric and fabric combinations were more difficult to breathe through than N95 masks",[28]"Ability of fabric face mask materials to filter ultra-fine particles at coughing velocity", Sept. 22nd, 2020, pubmed.ncbi.nlm.nih.gov/32963071 which as you'll read shortly, can cause other serious health issues.

Yet, another of the CDC's cited studies revealed that "medical masks (surgical masks and even N95 masks) were not able to completely block the transmission of virus droplets/aerosols even when completely sealed."[29]"Effectiveness of Face Masks in Preventing Airborne Transmission of SARS-CoV-2", Oct. 21st, 2020, pubmed.ncbi.nlm.nih.gov/33087517 And these droplets can remain suspended in the air for as long as fourteen minutes.[30]"The airborne lifetime of small speech droplets and their potential importance in SARS-CoV-2 transmission", June 2nd, 2020, pnas.org/content/117/22/11875

Another perspective on the inefficacy of masks came from an expert on mask fitting and usage. In an open letter to "Physicians and the Public of Alberta", Chris Schaefer wrote that "filter respirator masks, especially N95, surgical and non-medical masks, provide negligible COVID-19 protection for the following reasons":

1. **Viruses in the fluid envelopes that surround them can be very small, so small in fact that you would need an electron microscope to see them. N95 masks filter 95% of particles with a diameter of 0.3 microns or larger. COVID-19 particles are .08 – .12 microns.**

2. **Viruses don't just enter us through our mouth and nose, but can also enter through our eyes and even the pores of our skin. The only effective barrier one can wear to protect against virus exposure would be a fully encapsulated hazmat suit with cuffs by ankles taped to boots and cuffs by wrists taped to gloves, while receiving breathing air from a self-contained breathing apparatus (SCBA). This barrier is standard gear to protect against a biohazard (viruses) and would have to be worn in a possible virus hazard environment 24/7 and you wouldn't be able to remove any part of it even to have a sip of water, eat or use the washroom while in the virus environment. If you did, you would become exposed and would negate all the prior precautions you had taken.**

3. **Not only are N95, surgical and non-medical masks useless as protection from**

**COVID-19, but in addition, they also create very real risks and possible serious threats to a wearer's health for the following reasons.** — "Mask expert warns Dr. Deena Hinshaw mask use will not protect against COVID-19", June 2029; todayville.com

Again, I'll address those threats in a few moments, which are increasingly serious.

As mentioned earlier, one study that purported to show the benefits of mask wearing in several American states had to be withdrawn on November 4th, 2020, as cases were increasing in these same areas after the study was published. Since neither the size of the virus nor the physics of masks have changed, the only thing that has changed is social distancing, hand hygiene, lockdowns, that have only postponed the spread of the virus. How many of the studies cited in this new brief by the CDC will end up having to revise their studies as "positive tests" continue to rise nearly everywhere now, even *while mask-wearing has become the norm*, if not mandatory?[31]medrxiv.org (**Note**: this article will not go into length into the now proven and serious controversy that PCR tests for COVID-19 are deeply flawed. This is huge and potentially affects many of the studies cited here. The medical journal BMJ published an article on December 18th, 2020 that addressed this serious crisis, which is falsely inflating the seriousness of this epidemic with catastrophic consequences. See: "Covid-19: Mass testing is inaccurate and gives false sense of security, minister admits"; bmj.com . See also this article in *The Lancet*, and the FDA's warning of PCR "false-positives" here.)

A major and comprehensive Danish study was published on November 18th, 2020 in the *Annals of Internal Medicine* which involved 4862 who completed the study. It found that between those who wore masks and those who didn't, "the difference observed was not statistically significant" in those who became infected with SARS-CoV-2.

In this community-based, randomized controlled trial conducted in a setting where mask wearing was uncommon and was not among other recommended public health measures related to COVID-19, a recommendation to wear a surgical mask when outside the home among others did not reduce, at conventional levels of statistical significance, incident SARS-CoV-2 infection compared with no mask recommendation. — "Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Mask Wearers", Henning Bundgaard, DMSc et. al., November 18th, 2020; acpjournals.org

This was followed by a new massive study of nearly 10 million people published on November 20th, 2020 in the prestigious *Nature Communications* journal perhaps gives the strongest evidence yet that mask-wearing by the healthy (ie. asymptomatic) and lockdowns is unnecessary. It found that…

**All city residents aged six years or older were eligible and 9,899,828 (92.9%)**

participated. *No new symptomatic cases* and 300 asymptomatic cases… were identified. There were no positive tests amongst 1,174 close contacts of asymptomatic cases… Virus cultures were negative for all asymptomatic positive and repositive cases, indicating no "viable virus" in positive cases detected in this study. — "Post-lockdown SARS-CoV-2 nucleic acid screening in nearly ten million residents of Wuhan, China", Shiyi Cao, Yong Gan et. al, nature.com

Regarding the effectiveness of mask mandates, Harvard and Berkley alumni, Yinon Weiss, published the following graphs showing how mask wearing has not impacted the rise or fall of "cases" in several countries.



Note the arrows when masks were mandated… showing that cases were already dropping, or that mask mandates failed to stop the rise in cases, thereby confirming what dozens of studies have concluded regarding mask effectiveness in the general public.

To view the graphs more closely with brief commentary, go to Yinon's Twitter feed *here*.

Researchers at RationalGround.com, a clearinghouse of COVID-19 data trends run by a grassroots group of data analysts, computer scientists, and actuaries, analyzed all 50 U.S. States, separating those that had mask mandates and those that did not. Their conclusions line up with Weiss's data showing that mask mandates have had no beneficial

effect:

**When comparing states with mandates vs. those without, or periods of times within a state with a mandate vs. without, there is absolutely no evidence the mask mandate worked to slow the spread one iota… We can turn the numbers upside down and inside out, but no matter how we examine them, there is no evidence of masks correlating with reduced spread. If anything, the opposite is true.** —Justin Hart, "Comprehensive analysis of 50 states shows greater spread with mask mandates", December 21st, 2020; theblaze.com

A working paper released by the National Bureau of Economic Research concurred, finding that for all the countries and U.S. States studied, once the region experienced 25 cumulative COVID-19 deaths, the growth rates of daily COVID-19 deaths fell from initially high levels to close to zero within 20 to 30 days.

**This occurred regardless of what type of nonpharmaceutical interventions, including mask mandates, travel restrictions, stay-at-home orders, quarantines and lockdowns, were put in place.** —mercola.com; study: August 2020, nber.org

Using data culled from YouGov.com and the Covid Tracking Project from March 20, 2020, to March 3, 2021, economist Brian Westbury created the following chart. It shows that while mask usage reached about 80% by midsummer last year, and has remained consistent since then, the number of daily positive cases rose and fell precipitously as epidemics typically do — showing masks to have been irrelevant in stopping the spread of the virus.[32] March 7th, 2021, wnd.com



Sources: YouGov.com, covidtracking.com

As a sidenote, since March 2020, over 30 studies have concluded that lockdowns have provided little or no efficacy in the prevention of spreading SARS-CoV-2…

[33]climatedepot.com but that's another story.

Another study released in January 2021 that found now evidence or use for the healthy to wear masks points to the basic science that asymptomatic individuals are not viral spreaders.

**A randomized controlled trial (RCT) of 246 participants [123 (50%) symptomatic)] who were allocated to either wearing or not wearing surgical facemask, assessing viruses transmission including coronavirus. The results of this study showed that among symptomatic individuals (those with fever, cough, sore throat, runny nose etc…)** ==there was no difference between wearing and not wearing a facemask for coronavirus droplets transmission of particles of >5 μm.== **Among asymptomatic individuals, there was no droplets or aerosols coronavirus detected from any participant with or without the mask, suggesting that asymptomatic individuals do not transmit or infect other people.**[34]Leung N.H.L., Chu D.K.W., Shiu E.Y.C., Chan K.H., McDevitt J.J., Hau B.J.P. Respiratory virus shedding in exhaled breath and efficacy of face masks. Nat Med. 2020;26:676–680. [PubMed] [Google Scholar] [Ref list] **This was further supported by a study on infectivity where 445 asymptomatic individuals were exposed to asymptomatic SARS-CoV-2 carrier (been positive for SARS-CoV-2) using close contact (shared quarantine space) for a median of 4 to 5 days. The study found that none of the 445 individuals was infected with SARS-CoV-2 confirmed by real-time reverse transcription polymerase.**[35]Gao M., Yang L., Chen X., Deng Y., Yang S., Xu H. A study on infectivity of asymptomatic SARS-CoV-2 carriers. Respir Med. 2020;169 [PMC free article] [PubMed] [Google Scholar] [Ref list] —"Facemasks in the COVID-19 era: A health hypothesis", Baruch Vainshelboim,PhD., November 22nd, 2020; ncbi.nlm.nih.gov

In fact, says Dr. Mike Yeadon, former Vice President and Chief Scientist for Allergy & Respiratory of Pfizer, the theory that healthy people with no symptoms are "spreaders" is pure invention.

**Asymptomatic transmission: the concept a perfectly well person can represent a respiratory virus threat to another person; that was invented about a year ago, never been mentioned before in the industry… it's not possible to have a body full of respiratory virus to the point that you're an infectious source and for you not to have symptoms… It's not true that people without symptoms are a strong respiratory virus threat.** —April 11th, 2021, interview on The Last American Vagabond

Thus, concluded Dr. Vainshelboim:

==**The existing scientific evidences challenge the safety and efficacy of wearing facemask as preventive intervention for COVID-19. The data suggest that both**==

**medical and non-medical facemasks are ineffective to block human-to-human transmission of viral and infectious disease such SARS-CoV-2 and COVID-19, supporting against the usage of facemasks. Wearing facemasks has been demonstrated to have substantial adverse physiological and psychological effects… Long-term consequences of wearing facemask can cause health deterioration, developing and progression of chronic diseases and premature death.** — "Facemasks in the COVID-19 era: A health hypothesis", Baruch Vainshelboim, PhD., November 22nd, 2020; ncbi.nlm.nih.gov

Indeed, a new meta-analyses of 65 studies published in March 2021 concluded that there is no evidence for viral protection and that "strictly speaking, it only protects symbolically and at the same time represents the fear of infection. This phenomenon is reinforced by the collective fear mongering, which is constantly nurtured by main stream media."

[36]greenmedinfo.com; mdpi.com

This is echoed by a new study published on May 25th, 2021 examining the spread of COVID-19 in the United States. It concluded:

**Mask mandates and use are not associated with slower state-level COVID-19 spread during COVID-19 growth surges.** — "Mask mandate and use efficacy in state-level COVID-19 containment", Damian D. Guerra, Daniel J. Guerra, medrxiv.org

Confirming this long-standing science on the futility of masks against such viruses, Dr. Colin Axon stated in July of 2021 that they are little more than 'comfort blankets' and do little to reduce the spread of Covid particles.

**The small sizes are not easily understood but an imperfect analogy would be to imagine marbles fired at builders' scaffolding, some might hit a pole and rebound, but obviously most will fly through… A Covid viral particle is around 100 nanometres, material gaps in blue surgical masks are up to 1,000 times that size, cloth mask gaps can be 500,000 times the size… Not everyone carrying Covid is coughing, but they are still breathing, those aerosols escape masks and will render the mask ineffective.** —SAGE adviser for the UK Government, July 17th, 2021; *The Telegraph*

**We know today that many of the face cloth coverings that people wear are not very effective in reducing any of the virus movement in or out, either you're breathing out or breathing in.** —Dr. Michael Thomas Osterholm, advisor to Pres. Joe Biden, August 2nd, 2021; CNN interview, :41, rumble.com

MASKS: ARE THEY SPREADING THE VIRUS?

The University of East Anglia study stated that…

**…the wide spread use of face masks or coverings in the community do not provide any benefit. Indeed, there is even a suggestion that they may actually increase risk…** —July 17th, 2020; [medrxiv.org](medrxiv.org)

That has not stopped some governments pushing ahead non-scientifically based protocols that actually may be spreading the virus more rapidly.

Dr. Bostom points out that the authors of the meta-analyses he cites **"further concluded with a caution that using face masks improperly might 'increase the risk**



**for (viral) transmission."**[37][medium.com](medium.com) It does not take a scientist to know why. Spend five minutes in your local box store watching everyone from shoppers to cashiers adjusting their masks, pulling them off, putting them back on, touching merchandise, surfaces, keypads, etc. and, clearly, this is a failing experiment. As CBC News reported:

**A face mask is meant to limit the spread of COVID-19. But if it slips below your nose, hovers around your chin, or you touch the outside with your hands, medical experts say that might be riskier than not wearing one at all.** —[cbc.ca](cbc.ca)

**If not used properly, masks may lead to a greater risk of pandemic influenza transmission because of contamination…** — "Public health measures: Canadian Pandemic Influenza Preparedness: Planning Guidance for the Health Sector", December 18, 2018, 3.5.1.5, [canada.ca](canada.ca)

Indeed, the "Danish researchers recently conducted a randomized trial in an effort to prove the usefulness of face masks against COVID-19 infection but ended up proving the opposite."[38] mercola.com The study[39] thieme-connect.com concluded:

> **…tens of millions of contaminations can occur each day as people use the masks inappropriately, touch their faces and neglect to wash their hands. For this reason, universal mask wearing may actually do more harm than good. This is clearly important information that should be disseminated to the general public, yet medical journals are shunning the paper, probably because it doesn't align with their narrative that supports universal mask recommendations.** —November 2nd, 2020; Dr. Joseph Mercola, mercola.com

Watch this brief video clip of a nurse demonstrating how easily touching your mask can spread a virus. It starts at 8:23 for about a minute and a half:

In fact, a South Korean study found that there was "greater contamination on the *outer* than the inner mask surfaces" — precisely where everyone is adjusting them.[40] "Effectiveness of Surgical and Cotton Masks in Blocking SARS–CoV-2: A Controlled Comparison in 4 Patients", July 7th, 2020; acpjournals.org As detailed in WHO's guidance memo,[41] "Guidance on the use of masks for the general public", June 5th, 202o; who.int at the very least, you need to make sure your medical mask is:

- Changed when wet, soiled or damaged;

- Untouched. Do not adjust or displace it from your face for *any* reason. "If this happens, the mask should be safely removed and replaced; and hand hygiene performed";

- Discarded and changed after caring for any patient on contact/droplet precautions for other pathogens;

- Staff who do not work in clinical areas do not need to use a medical mask during routine activities (e.g., administrative staff)."

Dr. Joseph Mercola therefore asks,

> **…if administrative hospital staff do not need to wear masks, why would healthy individuals need to wear them when walking around, especially in open-air areas?** Broward county, Florida, has gone so far as to issue an emergency order mandating masks to be worn inside your own residence. But why, if administrative hospital staff aren't even advised to wear them at work? — "WHO Admits: No Direct Evidence Masks Prevent Viral Infection", August 3rd, 2020; mercola.com

On August 2020, a thorough review by Dr. Ines Kappstein, a German professor in virology, epidemiology and hygiene, examined the studies and basis for a mask mandate,

encouraged by the Robert Koch Institute (RKI) primarily for "altruism." She concluded:

**There is no scientifically sound evidence from the specialist literature cited in the article by the RKI, nor from the "current" studies mentioned there, that masks that are worn by the normal population in public spaces (shops, public transport), regardless of which type… could reduce the transmission of pathogens in respiratory infections, such as influenza or COVID-19 in particular, in order to achieve "a sustainable reduction in the rate of spread of COVID-19 in the population and a falling number of new cases to achieve ",** as it says in the RKI article. —Thieme E-Journals; thieme-connect.com

In fact, the RKI article states that…

**…it is important to ensure that the MNB [mouth and nose covering] — especially when putting it on and taking it off — is *not touched* in order to prevent contamination through the hands. In general, a longer period of wear is associated with an *increased* risk of contamination.** —Thieme E-Journals; thieme-connect.com

The reason also comes down to the very physics of masks and their capabilities, or lack thereof. Surgical masks used in healthcare settings, such as during surgery, are meant to prevent bacterial or viral infections by blocking respiratory droplets.[42]Cowling BJ, Zhou Y, Ip DK, Leung GM, Aiello AE, "Face masks to prevent influenza transmission: a systematic review", *Epidemiol Infect,* 2010; 138:449-56 The PHAC study states:

**Face masks (i.e., disposable surgical, medical or dental procedure masks) provide a physical barrier that may help prevent the transmission of influenza viruses from an ill person to a well person by blocking *large-particle respiratory droplets* propelled by coughing or sneezing.** —Ibid; 3.5.1.5 Use of Masks, canada.ca

So while it is true that surgical masks or highly dense cloth masks may reduce the transmission of respiratory droplets, they are completely ineffective in stopping the spread of *aerosolized* particles that the infected exhale. Here's why, and it's not rocket science. The coronavirus (SARS-CoV-2) can range in diameter from 0.06 to 0.14 microns. Medical N95 masks—which are considered the most effective—can filter particles as small as 0.3 microns, so their openings are too large. Surgical masks, homemade masks, T-shirts and bandanas are even more porous.[43]"More Evidence Masks Don't Work to Prevent COVID-19", Dr. Joseph Mercola, September 11th, 2020; mercola.com

Hence, it is no surprise that researchers from the University of Massachusetts Lowell and California Baptist University published a study on December 15th, 2020 confirming this. They cite the common myth that the general public has assumed:

**"It is natural to think that wearing a mask, no matter new or old, should always be**

better than nothing," said author Jinxiang Xi. "Our results show that this belief is only true for particles *larger* than 5 micrometers [ie. microns], but *not* for fine particles smaller than 2.5 micrometers [microns]." They found that wearing a mask "significantly slows down" airflow, reducing a mask's efficacy and making a person more susceptible to inhaling aerosols into the nose — where SARS-CoV-2 likes to lurk. —*New York Post*, December 16th, 2020; study: aip.scitation.org

They also noted that wearing a used mask is even worse than not wearing one.

Second, most controlled studies have focused on influenza viruses that have revealed masks to be ineffective in stopping airborne flu particles. Thus, it's totally



illogical to assume that masks can stop SARS-CoV-2, which is roughly *half* the size of a flu virus. As stated by The National Academies of Sciences in its "Rapid Expert Consultation on the Effectiveness of Fabric Masks for the COVID-19 Pandemic" report:

The evidence from… laboratory filtration studies suggest that… fabric masks may reduce the transmission of larger respiratory droplets. There is little evidence regarding the transmission of small aerosolized particulates of the size potentially exhaled by asymptomatic or presymptomatic individuals with COVID-19. —April 8, 2020, nap.edu

Hence, the CDC's own journal adds:

**Disposable medical masks (also known as surgical masks) are loose-fitting devices that were designed to be worn by medical personnel to protect accidental contamination of patient wounds, and to protect the wearer against splashes or sprays of bodily fluids. There is limited evidence for their effectiveness in preventing influenza virus transmission either when worn by the infected person for source control or when worn by uninfected persons to reduce exposure. Our systematic review found no significant effect of face masks on transmission of laboratory-confirmed influenza.** — "Emerging Infectious Diseases", Vol. 26, no. 5, May 2020; cdc.gov

This is confirmed by the authors of a study in *The New England Journal of Medicine*:

**We know that wearing a mask outside health care facilities offers little, if any, protection from infection.** Public health authorities define a significant exposure to COVID-19 as face-to-face contact within 6 feet with a patient with symptomatic COVID-19 that is sustained for at least a few minutes (and some say more than 10 minutes or even 30 minutes). The chance of catching COVID-19 from a passing interaction in a public space is therefore minimal. **In many cases, the desire for widespread masking is a reflexive reaction to anxiety over the pandemic…**

—"Universal Masking in Hospitals in the Covid-19 Era", Michael Klompas, M.D., M.P.H., Charles A. Morris, M.D., M.P.H., Julia Sinclair, M.B.A., Madelyn Pearson, D.N.P., R.N., and Erica S. Shenoy, M.D., Ph.D.[44]From the Department of Population Medicine, Harvard Medical School and Harvard Pilgrim Health Care Institute (M.K.), Brigham and Women's Hospital (M.K., C.A.M., J.S., M.P.), Harvard Medical School (M.K., C.A.M., E.S.S.), and the Infection Control Unit and Division of Infectious Diseases, Massachusetts General Hospital (E.S.S.) — all in Boston.; May 21, 2020; nejm.org

Another peer-reviewed study published on December 7th, 202o, also concluded that masks not only show no reductions in infections, but may actually contribute to higher incidences of COVID-19:

**Mask "mandates" in 2020 have resulted in no reductions in incidence of COVID-19, as detected by positive polymerase chain reaction (PCR) tests among nations or US states. Increased rates or insignificant change in incidence of SARS-CoV-2 infections, as detected by PCR tests, have followed mask mandates throughout the world and in US states. Masks are therefore a possible risk factor for infection with SARS-CoV-2 and higher incidence of COVID-19 disease.** —"Masks, false safety and real dangers", Colleen Huber, NMD; *Primary Doctor Medical Journal*

In March 2021, the CDC published a new study on the effectiveness of mask mandates. The study examined the association between state-issued mask mandates and changes in COVID-19 case and death growth rates after they were lifted. After 1-20 days, the rate

of infection was reported to decrease by only 0.5%. After 80-100 days, that figure only increased to 1.8%. This is hardly the "game-changer" study the media are widely reporting it to be.[45]"Association of State-Issued Mask Mandates and Allowing On-Premises Restaurant Dining with County-Level COVID-19 Case and Death Growth Rates — United States, March 1–December 31, 2020", March 12th, 2021; cdc.gov

For the *collective* science simply does not support any significant reduction of these viruses through facial coverings, much less non-standardized masks made out of a variety of cloths. Which is why Coen Berends, spokesman for the National Institute for Public Health and the Environment in Holland, states, "Face masks in public places are not necessary, based on all the current evidence. There is no benefit and there may even be negative impact."[46]August 1st, 2020; dailymail.co.uk Henning Bundgaard, chief physician at Denmark's Rigshospitalet, worries that facials masks are giving the public a "false sense of security."[47]July 26th, 2020; bloombergquint.com Dutch Medical Care Minister Tamara van Ark said: "From a medical point of view, there is no evidence of a medical effect of wearing face masks, so we decided not to impose a national obligation."

[48]August 3rd, 2020; the-sun.com In the U.S., experts from the Center for Infectious Disease Research and Policy defended their report that there is "limited impact on lowering COVID-19 transmission" through wearing facial masks or coverings.[49]April 1st, 2020; cidrap.umn.edu And Dr. Anders Tegnell, Sweden's top infectious disease expert, stated:

**The studies so far have not shown a dramatic effect, countries such as France and others, which have obligatory mask-wearing in place, have still experienced a big spread of the disease.** —October 19th, 2020; newstatemen.com

What makes all of these facts that much more painful is that disposable masks are now posing an environmental disaster:

**…researchers find 129 billion face masks are being thrown out each month around the globe. That works out to three million masks in the trash *every minute*… "With increasing reports on inappropriate disposal of masks, it is urgent to recognize this potential environmental threat and prevent it from becoming the next plastic problem."** — "Preventing masks from becoming the next plastic problem", link.springer.com; cited at studyfinds.org, March 11th, 2021

POTENTIAL HARM

Once again, here is the World Health Organization in its June 5th, 2020 interm "Guidance on the use of masks for the general public":

**Many countries have recommended the use of fabric masks/face coverings for the**

general public. ==At the present time, the widespread use of masks by healthy people in the community setting is *not yet supported by high quality or direct scientific evidence* and there are potential benefits and harms to consider...== —pg. 6, apps.who.int

Before we answer the obvious question emerging as to "why" governments are therefore not only recommending masks but *forcing* the public to wear them, ==it's crucial to note the actual *harm* wearing masks can cause.== Dr. Denis Rancourt, Ph.D. is a researcher with the Ontario Civil Liberties Association in Canada. They have written a letter to the WHO laying out several logical arguments against their demands that face masks be worn in the general public. Among their concerns,

In one of the randomized control trials, a big one that compared masks and N95 respirators among health care workers, ==the only statistically significant outcome they discovered and reported on was that the health care workers who wore the N95 respirators were much more likely to suffer from headaches.== —July 19th, 2020; mercola.com; see study "Effectiveness of N95 respirators versus surgical masks against influenza: A systematic review and meta-analysis", March 13th, 2020; wiley.com

==A study involving 158 healthcare workers aged 21 to 35 years of age found that 81% developed headaches from wearing a face mask.==[50]"Headaches Associated With Personal Protective Equipment – A Cross-Sectional Study Among Frontline Healthcare Workers During COVID-19", Jonathan J.Y. Ong et al.; published in *Headache: The Journal of Head and Face Pain*, March 30th, 2020 Nationally recognized U.S. board-certified neurosurgeon, Dr. Russell Blaylock, ==warns that face masks can create other serious==



==health risks to the wearer as well.==

**Now that we have established that there is no scientific evidence necessitating the**

**wearing of a face mask for prevention… Several studies have indeed found significant problems with wearing such mask. This can vary from headaches, to increased airway resistance, carbon dioxide accumulation, to hypoxia, all the way to serious life-threatening complications…** — "Face Masks Pose Serious Risks To The Healthy", May 11th, 2020; technocracy.news

He adds that, for those wearing these masks on a daily basis, especially if worn for several hours by an infected person, they will be constantly re-breathing the virus, raising the concentration of the virus in the lungs and the nasal passages.

**We know that people who have the worst reactions to the coronavirus have the highest concentrations of the virus early on. And this leads to the deadly cytokine storm in a selected number.**

Chief medical officer of health in New Brunswick, Canada, Dr. Jennifer Russell, agrees, warning that "people should wear masks for a short period of time."[51]cbc.ca But other provincial health officials are calling for the populace to make mask wearing a "habit" while Canada's chief public health officer, Dr. Theresa Tam, actually recommends that Canadians wear a "non-medical mask or facial covering".[52]ctvnews.ca However, a 2015 study published in the BMJ military medical journal warns:

**Penetration of cloth masks by particles was almost 97% and medical masks 44%. Moisture retention, reuse of cloth masks and poor filtration may result in increased risk of infection**. —BMJ Journals, "A cluster randomised trial of cloth masks compared with medical masks in healthcare workers", C Raina MacIntyre et al. bmjopen.bmj.com

The study also found that healthcare workers wearing cloth masks were found to have 13 times the risk of influenza-like illness than those wearing medical masks. As for habitually wearing masks, healthcare workers wearing cloth masks had significantly higher rates of influenza-like illness after four weeks of continuous on-the-job use, when compared to controls.[53]BMJ Journals, "A cluster randomised trial of cloth masks compared with medical masks in healthcare workers", C Raina MacIntyre et al. bmjopen.bmj.com

Tam revised her recommendations recently advising that people use paper towels or baby wipes to add a third layer to their masks.[54]November 5th, 2020, globalnews.ca Dr. Anna Banerji, an infectious disease expert with the University of Toronto, says most two-layer cotton masks can be easily transformed into a three-layer filtered mask by ripping out the seams and adding a filtered material.[55]Ibid., globalnews.ca However, MacIntyre et al.'s study concluded: "Observations during SARS suggested double-masking and other practices increased the risk of infection because of moisture, liquid diffusion and pathogen retention. These effects may be associated with cloth masks."[56]C Raina MacIntyre et al.

bmjopen.bmj.com

Moreover, tearing apart one's mask and adding non-medical propylene materials such as the above or "craft" fabric, could be dangerous. Researchers have found that "Loose particulate was seen on each type of mask", which can be breathed into the deep tissue of the lungs.

**If widespread masking continues, then the potential for inhaling mask fibers and environmental and biological debris continues on a daily basis for hundreds of millions of people. This should be alarming for physicians and epidemiologists knowledgeable in occupational hazards.** —September 2020, researchgate.net

Surgical masks are made of polypropylene and are a known asthma trigger.[57]saswh.ca Professor Michael Braungart, director at the Hamburg Environmental Institute, conducted tests on masks which had caused people to break out in rashes. They discovered the carcinogen formaldehyde as well as aniline and other chemicals.

**What we are breathing through our mouth and nose is actually hazardous waste… All in all, we have a chemical cocktail in front of our nose and mouth that has never been tested for either toxicity or any long-term effects on health.** —April 1st, 2021; dailymail.co.uk

Dr Dieter Sedlak, managing director and co-founder of Modern Testing Services in Augsburg, also detected hazardous fluorocarbons (PFCs), which are heavily restricted.

**Honestly, I had not expected PFCs would be found in a surgical mask, but we have special routine methods in our labs to detect these chemicals easily and can immediately identify them. This is a big issue… on your face, on your nose, on the mucus membranes, or on the eyes is not good.** —Ibid.

Dentists are also warning of "mask mouth" since wearing a mask increases dryness of the mouth and a buildup of bad bacteria.

**We're seeing inflammation in people's gums that have been healthy forever, and cavities in people who have never had them before. About 50% of our patients are being impacted by this, [so] we decided to name it 'mask mouth'.** —Dr. Rob Ramondi, August 5th, 2020; newyorkpost.com

**Typically, a good quality fitting mask will be tight around your nose. So, as a result, what people are doing is they're breathing through their mouth. And when you're breathing through your mouth it will dry out your mouth… A dry mouth can lead to oral-health issues. The bacteria in your mouth will have a more fertile breeding ground, you'll be more likely to have tooth decay, you'll smell bad breath, those sorts of things.** —Dentist, Justin Russo, ABC11.com



I have also learned that teachers are reporting increased eye infections among children wearing masks. In a press conference, Dr. James Meehan, MD testifies:

**I'm seeing patients that have facial rashes, fungal infections, bacterial infections. Reports coming from my colleagues, all over the world, are suggesting that the bacterial pneumonias are on the rise. Why might that be? Because untrained members of the public are wearing medical masks, repeatedly… in a non-sterile fashion… They're becoming contaminated. They're pulling them off of their car seat, off the rearview mirror, out of their pocket, from their countertop, and they're reapplying a mask that should be worn fresh and sterile every single time. New research is showing that cloth masks may be increasing the aerosolization of the SARS-COV-2 virus into the environment causing an *increased* transmission of the disease.** —August 18th, 2020; [activistpost.com](activistpost.com)

Mask users are now reporting a condition coined as "Maskne", the breakout of acne. "(There's) so much more irritation from the mask, whether it's causing friction, moisture, the heat," Dr. Sarah Cannon of Cannon Dermatology told a CBS News affiliate. "We're seeing a lot of new cases of patients coming in with new-onset acne who have never had acne before."[58][baltimore.cbslocal.com](baltimore.cbslocal.com)

In fact, the University of Witten/Herdecke in Germany established a registry to examine adverse effects of mask wearing. The study of 25,930 students (as of Oct 26th, 2020) found the average wearing time of a mask was 270 minutes per day. Impairments caused by wearing the mask were reported by 68% of the parents. These included irritability (60%), headache (53%), difficulty concentrating (50%), less happiness (49%), reluctance to go to school/kindergarten (44%), malaise (42%) impaired learning (38%) and

drowsiness or fatigue (37%).[59]"Corona children studies "Co-Ki": First results of a Germany-wide registry on mouth and nose covering (mask) in children", January 5th, 2021; researchsquare.com

However, as if totally ignoring these detrimental effects and previous studies with just *one* mask, the CDC is actually promoting *double-masking* now. One doctor went so far as to promote *four* layers.[60]January 28th, 2021; newspunch.com In a February 10th, 2021 report, they go so far as to promote wearing panty-hose over top of one's mask:

**…tucking a medical procedure mask or placing a sleeve made of sheer nylon hosiery material around the neck and pulling it up over either a cloth or medical procedure mask also significantly improved the wearer's protection by fitting the mask more tightly to the wearer's face and reducing edge gaps.** —"Maximizing Fit for Cloth and Medical Procedure Masks to Improve Performance and Reduce SARS-CoV-2 Transmission and Exposure, 2021″, cdc.gov

The report admits, however, that "double masking might impede breathing or obstruct peripheral vision for some wearers."[61]cdc.gov And that's serious. German neurologist *Dr. Margarite Griesz-Brisson MD, PhD* warns that chronic oxygen deprivation through mask wearing, especially for the young, amplify "the degenerative processes in your brain." Thus, she says, "For children and adolescents, masks are an absolute no-no."[62]Sept. 26th, 2020; youtube.com; cf. sott.net

All this ignores the hidden emotional and psychological dangers caused by the stress of such heavy-handed mandates as mask wearing. Rancourt notes that the prolonged stress of these measures can actually make one *more* susceptible to disease.

**Psychological stress is proven to be a factor that can measurably depress the immune system and induce diseases, including: immune response dysfunction, depression, cardiovascular disease and cancer.** —Letter to Dr Tedros Adhanom Ghebreyesus, WHO, June 21st, 2020; ocla.ca

Indeed, a decision from a Weimar, Germany court read:

**The compulsion imposed on school children to wear masks and to keep their distance from each other and from third persons harms the children physically, psychologically, educationally, and in their psychosocial development, without being counterbalanced by more than at best marginal benefit to the children themselves or to third persons. Schools do not play a significant role in the "pandemic" event… There is no evidence that facemasks of various types can reduce the risk of infection by SARS-CoV-2 at all, or even appreciably. This statement is true for people of all ages, including children and adolescents, as well**

**as asymptomatic, presymptomatic, and symptomatic individuals.** —April 14th, 20201; 2020news.de; English: jdfor2024.com

And here's where all of this takes a bizarre turn. Dr. Anthony Fauci, one of the lead members of the Trump administration's White House Coronavirus Task Force, stated on *60 Minutes* in March of 2020:

**Right now, in the United States, people should not be walking around with masks. There's no reason to be walking around with a mask. When you're in the middle of an outbreak, wearing a mask may make people feel a little bit better, and it might even stop a droplet, but it's not providing the perfect protection that people think that it is.** —March 8th, 2020; cbsnews.com

Not long after, Fauci did a complete turnabout. In an interview with Facebook founder, Mark Zuckerberg, Fauci claimed that it was "evolving" science that changed his mind (though he cited no evidence). Astonishingly, he goes on to tell Zuckerberg that there is no indication *whatsoever* that wearing a mask "has any deleterious effects" and that he wears a mask when he's outside "all the time", *even* while running.[63]July 17th, 2020; NBC News, youtube.com

In fact, shortly after recommending people wear two masks, Dr. Fauci did yet another turnabout noting that there was "no data to indicate that is going to make a difference." [64]https://twitter.com/MarinaMedvin/status/1356194462775570434 Even the "fact-checkers" are having difficulty keeping up with the seemingly random and nonsensical flip-flops.[65]newsweek.com On March 5th, 2021, Reuters published the results of Japanese researchers who confirmed the fallacious assumptions behind double-masking:

**Japanese supercomputer simulations showed that wearing two masks gave limited benefit in blocking viral spread compared with one properly fitted mask.**
—news.trust.org

The Reuters article then falsely concludes that the "scientific consensus has grown that the virus is spread through the air and masks are effective in controlling contagion," which as you've just read, is the opposite of what the science says.

Another rising concern is whether masks could trigger lung disease like cancer due to adverse affects on the lung microbiome.[66]March 8th, 2021; greenmedinfo.com

**This is directly relevant to the question of home-made cloth face masks. There is a potential for bacterial pathogens to grow in moist mucus soaked within the material, this could adversely alter the upper respiratory tract flora. Inhalation of bacteria and viruses directly into the lung in patients incubating Covid 19 could then risk synergistic interaction and a rapid deterioration in the patient's condition.**

— "Face masks for the public during the covid-19 crisis", James A. Morris, consultant pathologist (retired), Education Centre, Royal Lancaster Infirmary; April 9th, 2020; bmj.com

An excellent summary of not only the failure of masks to prevent COVID-19 but also the physiological harms they cause is "Facemasks in the COVID-19 era: A health hypothesis." The article, published in November 2020, can be found on the US National Library of Medicine and National Institute of Health website. [67]ncbi.nlm.nih.gov/pmc/articles /PMC7680614/ Indeed, a new meta-analyses of 65 studies in March 2021 found "potential drastic and undesirable effects" such as "N95 mask and CO2 rise (82%), N95 mask and O2 drop (72%), N95 mask and headache (60%), respiratory impairment and temperature rise (88%), but also temperature rise and moisture (100%) under the masks. Extended mask-wearing by the general population could lead to relevant effects and consequences in many medical fields." The study referred to "the psychological and physical deterioration as well as multiple symptoms described because of their consistent, recurrent and uniform presentation from different disciplines as a Mask-Induced Exhaustion Syndrome (MIES)."

[68]greenmedinfo.com; mdpi.com

Given the overwhelming science above and below in this article, it is no surprise that Dr. Jim Meehan published an op-ed stating:

**Since the beginning of the pandemic, I've read hundreds of studies on the science of medical masks. Based on extensive review and analysis, there is no question in my mind that healthy people should not be wearing surgical or cloth masks. Nor should we be recommending universal masking of all members of the population. That recommendation is not supported by the highest level of scientific evidence.**

—March 10th, 2021, csnnews.com

Watch the World Health Organization's stunning about face on masks without any scientific basis.

WHY MANDATED MASKS THEN?

Since the science almost unanimously fails to support the effectiveness of a healthy general population wearing face masks, and that they may actually be spreading the virus more rapidly as such, why are governments desperate to impose these laws while threatening fines or prison for those not in compliance? The authors of the *New England Journal of Medicine* study concluded:

**…masks serve symbolic roles. Masks are not only tools, they are also talismans that may help increase health care workers' perceived sense of safety, well-being, and trust in their hospitals. Although such reactions may not be strictly logical, we are all subject to fear and anxiety, especially during times of crisis. One might**

argue that <mark>fear and anxiety are better countered with data and education than with a marginally beneficial mask.</mark>… **Expanded masking protocols' greatest contribution may be to reduce the transmission of anxiety, over and above whatever role they may play in reducing transmission of Covid-19.** —May 21, 2020; nejm.org

Of course, barring people from Mass, threatening healthy people with fines, <mark>forcing uncomfortable masks that make breathing, talking, and hearing more difficult, arguably *increases* anxiety.</mark>

Perhaps the World Health Organization's June 2020 report[69] June 5th, 2020; who.int gives us a bit clearer picture of the "benefits" of wearing masks that actually have little to



do with personal health:

- Reduced potential stigmatization of individuals wearing masks to prevent infecting others or of people caring for COVID-19 patients in nonclinical settings;

- Making people feel they can play a role in contributing to stopping spread of the virus;

- Reminding people to be compliant with other measures.

In other words, <mark>it's an opportunity for virtue-signaling and psychological game-play.</mark> But the WHO does not stop there. They also cite…

- Potential social and economic benefits:

**Encouraging the public to create their own fabric masks may promote individual enterprise and community integration… The production of non-medical masks may offer a source of income for those able to manufacture masks within their communities. Fabric masks can also be a form of cultural expression, encouraging public acceptance of protection measures in general.** —June 5th, 2020; who.int

Yes, while governments continue to wipe out the small business sector by unprecedented

lockdowns, at least "Jimmy the Mask Maker" can thrive.

This is utterly bizarre and contradictory. People should not be threatened with 180 days in prison for choosing not to virtue-signal and actually protect their health *based* on sound science.

THE PUSHBACK



If that's you, you're not alone. America's Frontline Doctors (AFLD), a "diverse, exceedingly well-credentialed" growing group of doctors have characterized mask wearing as "completely irrelevant to blocking the… virus."[70]October 29th, 2020, lifesitenews.com They've taken their message to the steps of the White House with videos that have gone viral—and, of course, that have been promptly censored. Their message is to counter "the massive disinformation campaign regarding the pandemic." [71]americasfrontlinedoctors.com

And then there is The Great Barrington Declaration, which was spearheaded by doctors from Harvard, Stanford and Oxford University. They warn that current pandemic policies targeting the healthy are having "damaging physical and mental health impacts" and recommend letting the healthy "live their lives normally to build up immunity through natural infection," while improving safeguards for the elderly and others at greater risk of death from COVID-19.[72]October 8th, 2020, washingtontimes.com The Declaration has been signed now by over 41,000 scientists and doctors from around the globe. Of course, they too are being attacked by both governments and armchair critics for what amounts to common sense and sound science, given that the CDC reports a recovery rate of 99.5% for everyone beneath the age of 69.[73]September 10th, 2020; cdc.gov As a meme circulating on the internet said, "It's now 'conspiracy theory' to believe the immune system

 is capable of doing the job it was designed to do."

In their letter to the WHO, the Ontario Civil Liberties Association warned that countries such as Canada are quickly sliding into totalitarianism through the extreme measures that are pounding the public into submission and destroying local economies.

**The way to slow that and prevent it is for people to object and to scale it back. As soon as you agree with an irrational order, an irrational command that is not science-based, then you are doing nothing to bring back society towards the free and democratic society that we should have. You are allowing this slow march towards totalitarianism.** —Letter to Dr Tedros Adhanom Ghebreyesus, WHO, June 21st, 2020; ocla.ca

Hence, organizations such as the U.S. nonprofit Stand for Health Freedom are urging citizens to practice peaceful civil disobedience to protect their "health" and "liberty."

THE GREAT RESET

It would be wrong not to bring this article around to the "big picture." Clearly, as social media censors the facts, as the mainstream media controls the narrative, as billion dollar pharmaceutical companies prepare for mandatory vaccines, as the economic sector is being destroyed… there is more here than meets the eye.

In February and March we were told not to wear masks. What changed? The science didn't change. The politics did. This is about compliance. It's not about science… —Dr. James Meehan, August 18th, 2020; press conference, activistpost.com

There could be no better proof of this than my own province of Saskatchewan, Canada. Since the outbreak of the novel coronavirus, only 25 people have died as of this writing, and just one in the past few months—hardly a pandemic. Because we are entering a

colder season, people are staying indoors and getting less Vitamin D while testing is increasing; it is no surprise then that cases are now rising. *But excess deaths are not.* [74]Note: In December 2020, the death toll rose to above 90 — with statistically only nine of those directly from COVID-19 [StatsCan stated that 10% of COVID-19 deaths in the country are from the virus alone]; the rest had comorbidities but tested positive at time of death.  And yet, tomorrow, the province is set to make masks *mandatory* under penalty. ==It's as if the science no longer matters; leaders are now promoting a practice that science clearly shows may be doing more harm than good.==



The public is indeed being forced into submission while curiously, with one, sudden common voice, global leaders are now telling us *why*: it is to completely "reset" the entire global system—the *"Great Reset"* they're calling it. As I explained in that article and *The Pandemic of Control*, the ultimate goal is global Communism. To enter this Reset, compliance by not just individuals but entire nations is compulsory and will likely include a vaccination, a Digital ID, and the surrender of private property in order to "reset" ballooning global debt. Everything I've just stated is directly from the United Nations' websites and their affiliates. In that light, the flagrant disregard for science can only be understood at this point as "propaganda", as Dr. Mark Crispin Miller, PhD. explains in "Masking Ourselves to Death."[75]September 5th, 2020, markcrispinmiller.com; read research paper *here*

But don't worry. The Great Reset is for the common good. Just like mandatory masks.

RELATED READING

*Why Talk About Science?*

*The Religion of Scientism*

*Science Will Not Save Us*

*Taking Back God's Creation*

Plaintiff's Exhibit 406

*Review*

THE ROYAL
SOCIETY of
MEDICINE

Journal of the Royal Society of Medicine; 2015, Vol. 108(6) 223–228
DOI: 10.1177/0141076815583167

# Unmasking the surgeons: the evidence base behind the use of facemasks in surgery

**Charlie Da Zhou[1], Pamela Sivathondan[2] and Ashok Handa[2]**
[1]New College, University of Oxford, Oxford OX1 3BN, UK
[2]Nuffield Department of Surgical Sciences, University of Oxford, Oxford OX3 9DU, UK
**Corresponding author:** Charlie Da Zhou. Email: Charlie.zhou@new.ox.ac.uk

## Summary

The use of surgical facemasks is ubiquitous in surgical practice. Facemasks have long been thought to confer protection to the patient from wound infection and contamination from the operating surgeon and other members of the surgical staff. More recently, protection of the theatre staff from patient-derived blood/bodily fluid splashes has also been offered as a reason for their continued use. In light of current NHS budget constraints and cost-cutting strategies, we examined the evidence base behind the use of surgical facemasks.

Examination of the literature revealed much of the published work on the matter to be quite dated and often studies had poorly elucidated methodologies. As a result, we recommend caution in extrapolating their findings to contemporary surgical practice. However, overall there is a lack of substantial evidence to support claims that facemasks protect either patient or surgeon from infectious contamination. More rigorous contemporary research is needed to make a definitive comment on the effectiveness of surgical facemasks.

## Keyword

Surgery

Picture a surgeon operating in a theatre, and chances are that you will imagine them wearing a surgical facemask. Masks are a quintessential part of the surgical attire that has become so deeply ingrained in the public perception of the profession. However, even today, it remains unclear as to whether they confer any tangible benefits to surgical outcomes. As 'efficiency' and 'cost-cutting' have increasingly become the *topics du jour* in the National Health Service, it seems reasonable to assess the efficacy, effectiveness and cost-to-benefit ratio for this particular component of the surgical uniform.

## Methodology

We searched the PubMed journal database and Google Scholar with the search terms 'surgical

facemask/mask', 'splash', 'contamination', 'infection' and 'outcomes' in order to identify salient publications. We also searched the guidance on surgical site infection from the National Institute for Health and Care Excellence. Furthermore, a manual search of reference lists from relevant papers was performed.

## Contemporary attitudes to the surgical mask

A contemporary questionnaire-based study, which attempted to assess the attitudes of surgeons, revealed that 96% of responders wore facemasks.[1] About equal numbers did so with the primary aim of protecting the patients compared to protecting themselves. However, it was also found that 20% of responding surgeons wore the mask for the sole purpose of respecting tradition. Furthermore, 30% of responding surgeons felt that masks could make surgery more difficult by increasing breath condensation on spectacles, endoscopes and microscopes and thereby obscuring vision.

In May 2014, the first installation of the Glass Surgery project was broadcast to viewers around the world. This project, based at the Barts and the London School of Medicine and Dentistry, was the first of its kind to live-stream a surgical procedure, using new Google Glass technology, to any medical student or trainee with an internet connection. Mr Ahmed, the lead colorectal surgeon, elected not to wear a mask while performing the open right hemicolectomy and partial liver resection in question. In the immediate aftermath of the broadcast, Mr Ahmed came under scrutiny from various medical comment threads, blogs and chat rooms on the Internet questioning his decision to omit the facemask and whether this might have compromised patient safety.

## Protection of the patient

The facemask has been used in surgical settings for over a hundred years;[2] first described in 1897, at its

© The Royal Society of Medicine 2015
Reprints and permissions: sagepub.co.uk/journalsPermissions.nav

inception, it consisted merely of a single layer of gauze to cover the mouth,[3] and its primary function was to protect the patient from contamination and surgical site infection. This practice was substantiated, at the time, by a recent discovery which demonstrated that bacteria could be disseminated from the nose and mouth during normal conversation as observed by bacterial colony growth on strategically placed agar plates in theatres. In the 1940s and 1950s, antibiotics and aseptic technique came to the forefront of infection control strategies within the surgical setting. Until recently, it has remained unclear as to whether bacterial colony growth on an agar plate was a direct correlate of surgical site infections and also whether the purpose of the surgical mask has been superseded by more modern strategies of infection control.

In order to advocate the validity of an intervention in medicine, it must satisfy three levels of evidence: efficacy, effectiveness and cost-effectiveness.[4] In the context of facemask, efficacy is whether masks prevent the propagation of droplets derived from the mouth and nose of the operating staff. Effectiveness is whether efficacy translates into a significant reduction in surgical site infection morbidity and mortality. And finally, cost-effectiveness determines whether the cost-to-benefit ratio of this effect would be desirable compared to an alternative course of action.

Intuition would suggest that facemasks offer a physical barrier preventing the emanation of droplets from the oral or nasal passages and therefore satisfy the efficacy requirement of the evidence ladder. However, there are a number of different hypotheses as to why this may not be the case. 'Venting' is a phenomenon whereby air leaks at the interface between mask and face which can act to disperse potential contaminants originating from the pharynx.[5] The accumulation of moisture, during prolonged usage, may exacerbate this problem by increasing resistance to air flow through the filter itself. Moisture accumulation is also thought to facilitate the movement of contaminants through the material of the mask itself by capillary action. These bacteria can subsequently be dislodged by movement. Friction at the face/mask interface has also been demonstrated to disperse skin scales which can further contribute towards wound contamination.[6]

In the modern era, there has also been a scarcity of experimental evidence to support the effectiveness of facemasks in the prevention of surgical site infections. The earliest retrospective studies[7] failed to demonstrate any statistically significant improvement in surgical site infection rates following the use of masks. Indeed, the latest National Institute for Health and Care Excellence guidelines on the matter do not require operating staff to wear a mask in theatre.[8]

This decision was based primarily upon the findings of a Cochrane systematic review.[9] This review was guided by the findings of two particular randomised/quasi-randomised control trials.[10,11] The latest update of this review,[12] which was amended after the publication of current National Institute for Health and Care Excellence guidelines, included one further study.[13]

The Cochrane review[12] searched through six established databases (Appendix 1) looking for randomised control trials and quasi-randomised control trials investigating surgical outcomes comparing the use of disposable surgical masks with the use of no masks. The authors limited the scope of their analysis only to patients undergoing clean procedures (whereby the operating procedure does not enter a body cavity or viscus normally colonised by bacteria). The review chose not to investigate the role of mask in clean-contaminated, contaminated or dirty wounds as one would expect that masks would contribute less towards the prevention of surgical site infections under such circumstances. Primary outcomes of postoperative surgical wound infection and secondary outcomes of costs, length of hospital stay and mortality rates were ascertained.

Three studies were identified as fulfilling all the selection criteria of the review.[10,11,13] A total of 2106 participants were identified across the three studies (Table 1). All the studies reported on the primary outcome of postoperative surgical wound infection, none of the studies reported on any of the secondary outcomes. Furthermore, identified studies were assessed for risk of bias based on eight specific criteria (Table 2).

Statistical analysis of the extracted data revealed no statistically significant association between mask usage and the incidence of surgical site infection. The study concluded that 'it is unclear whether the wearing of surgical facemasks by members of the surgical team has any impact on surgical wound infection rates for patients undergoing clean surgery'. However, each of the studies included could be criticised for risk of bias (Table 2). Indeed, the Webster study, arguably the most rigorous of the three, only investigated the impact of mask on non-scrubbed members of the surgical team. There is uncertainty over whether the findings of some of these studies are applicable to contemporary surgical practice.

Based upon the findings of this review, National Institute for Health and Care Excellence guidelines state that there is 'limited evidence concerning the use of non-sterile theatre wear' such as surgical masks when trying to minimise the risk of surgical site infection, although there was an overall 'consensus that wearing non-sterile theatre wear is important in maintaining theatre discipline'. This latter

**Table 1.** Characteristics of included studies.[12]

| Study | Methods | Participants | Outcomes | Notes |
|---|---|---|---|---|
| Chamberlain and Houang[10] | Quasi-randomised controlled trial | 41 female patients undergoing gynaecology surgery. 24 clean and 17 non-clean. Of the clean surgeries: masked cohort $n = 14$, unmasked cohort $n = 10$ | Wound infection defined as serious enough to warrant antibiotics in 2 cases and via high vaginal swab in third case. Follow-up until discharge only. No postoperative wound infections in the masked group and 3/10 (30%) in the non-masked group (no statistically significant difference: OR 0.07, 95% CI 0.00–1.63) | Study discontinued due to 3 surgical wound infections in unmasked group, although not proven as causal. Data extracted for clean surgery only. Unit of analysis error present. |
| Tunevall[11] | Quasi-randomised controlled trial | 3088 patients undergoing general, vascular, breast, acute and elective surgery. 1429 clean and 1659 unclean. Of the clean surgeries: masked cohort $n = 706$, unmasked cohort $n = 723$ | Wound infection defined as visible pus and/or cellulitis without pus requiring debridement, drainage and/or antibiotics. Duration of follow-up not stated but until after discharge from ward. 13/706 (1.8%) postoperative wound infections in the masked group and 10/723 (1.4%) in the non-masked group (no statistically significant difference: OR 1.34, 95% CI 0.58–3.07) | Data extracted from clean surgery only. Patients had 2 to 3 body washes preoperatively with 4% chlorhexidine prior to elective surgery. In most acute cases, at least one body wash was given. Unit of analysis error present. |
| Webster et al.[13] | Randomised controlled trial | 811 patients undergoing gynaecological, obstetric, general (open), general (laparoscopic), urology and breast surgery. 660 clean and 151 non-clean. Of the clean surgeries: masked cohort $n = 313$, unmasked cohort $n = 340$ | Wound infection defined by criterial used by National Nosocomial Infection Surveillance System of Australia. Clean surgery masked cohort, mean follow-up 33.4 days (SD 22.1). Clean surgery unmasked cohort, mean follow-up 33.4 days (SD 22.8). Infection rate 33/313 (10.5%) in the masked group and 31/340 (9.1%) in the non-masked group (no statistically significant difference: OR 1.17, 95% CI 0.70–1.97) | Scrubbed staff were not included in trial. Data extracted from clean surgery only. Missing data for 7 clean cases. Unit of analysis error present. |

statement seems to be a rather vague and likely unfounded assertion which implies a correlation between dress code, staff discipline and thereby patient safety outcomes. This may reflect a reluctance among the medical profession to deviate from embedded tradition as reflected in Leyland and McCloy's questionnaire study.[1] Alternatively, it may reflect a prevailing intuition that surgical masks ought to protect against surgical site infections.

*Journal of the Royal Society of Medicine 108(6)*

**Table 2.** Assessment for risk of bias in included studies.[12]

| Study | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| Chamberlain and Houang[10] | ? | ? | ? | L | L | L | ? | H | ? |
| Tunevall[11] | H | H | ? | H | L | L | ? | L | L |
| Webster et al.[13] | L | L | L | L | ? | L | L | L | L |

L: low risk; ?: uncertain risk; H: high risk.
Bias was assessed by the following aspects: (1) method of randomisation: how the randomisation schedule was generated, the method of randomisation, e.g. envelopes, computer etc., (2) allocation concealment, (3) blinding of patients (recipients), (4) blinding of outcome assessors to wearing of masks, (5) extent of loss to follow-up and use of intention-to-treat analysis, (6) source of funding, (7) selective reporting, (8) early stopping and (9) baseline comparability of treatment and control groups.

Unfortunately, publically available information regarding the financial costs of facemask usage on the National Health Service is lacking. However, as part of the Freedom of Information Publication Scheme, the data are available for the West Hertfordshire Hospitals NHS Trust which purchased 44,482 single-use facemasks in 2012.[14] During this year, the West Hertfordshire Hospitals NHS Trust performed a total of 63,250 operative procedures or interventions.[15] Extrapolation to the 10,594,814 total operative procedures and interventions carried out across NHS England during the same period[15] would equate to an annual procurement of almost 7.5 million single-use masks across hospitals in England. The NHS Atlas of Procurement lists the per unit expenditure of surgical facemasks to be between £0.34 to £1.22, depending on trust and supplier.[16] This suggests that annual NHS England expenditure on facemasks lies somewhere in the region of £2.5 to £9.1 million.

Hospital-acquired infections, of which surgical site infections are a subset, are a major problem for all health systems. Media coverage, in recent times, has heightened public awareness of their associated morbidity and mortality. Their socioeconomic impact is also substantial,[17] and it is estimated that iatrogenic infection increases the duration of average hospital stay by a factor of 2.5 while incurring almost three times the monetary cost of uninfected patients. Across the whole of the United Kingdom, it is estimated that annually hospital-acquired infections cost the National Health Service almost £1 billion in excess expenditure and a loss of 3.6 million bed days. Personal costs for the patients are also affected as their return to normal daily activity and employment are delayed.

Given the uncertainty in effectiveness of facemasks in preventing surgical site infection, it is impossible to perform a cost-to-benefit analysis on mask usage. It is clear, however, that the National Health Service expenditure on facemasks is a mere fraction of the costs incurred due to hospital-acquired infections.

## Protection of the surgeon

An increasingly prevalent belief, in favour of mask usage, is the idea that they also confer some degree of protection to the operating staff from patient-derived infectious material.[18] Most obviously, they can act as a physical barrier against blood and bodily fluid splashes during surgery. One prospective study revealed that facemasks prevented blood/bodily fluid splashes that would have otherwise contaminated the surgeon's face in 24% of procedures.[19] The incidence of blood/bodily fluid splashes varies substantially between settings and between individuals. The risk is modified by the role of surgical staff (lead surgeons are at higher risk than first assistants, who in turn have a higher risk than scrub nurses), by surgical specialty as well as by surgical technique.[19,20] The frequency of blood/bodily fluid splashed has been reported to be as high as 62.5% in lead surgeons performing Caesarean section.[20]

Despite clear evidence that facemasks act to protect the theatre staff from macroscopic facial contamination, there are studies to suggest that they fail to protect surgeons from potentially hazardous sub-micrometre contaminants.[21] This corresponds roughly to the size range of infectious bacteria while viruses are even smaller. Therefore, the protection that masks confer in the form of macroscopic facial contamination may not necessarily extend towards any microscopic infectious agents present within that contamination.

Proponents of the surgical facemask may argue that even if they fail to completely negate the risks of infection they are likely to reduce exposure in a dose-dependent manner. While this field has not been extensively investigated, preliminary work suggests that facemasks fail to confer any degree of protection from infection due to streptococcal and staphylococcal bacterial species[22] or hepatitis B virus.[23] Furthermore, a facemask splash may promote a false sense of security, as surgeons may be less likely to report these as an

occupational exposure to bodily fluid compared to frank facial contamination.

## Tying things together

In surgery, there are many aspects of current clinical practice that do not necessarily have an established evidence base. Indeed, it is permissible to bypass the evidence ladder when an intervention is so convincing that it is possible to discern its effect signal from noise by observation alone.[24] In such circumstances, interventions have a very clear mechanistic cause and effect relationship. Historically, it may have been thought that surgical masks fulfilled such criteria. This would explain why published literature examining surgical mask effectiveness has been lacking despite their ubiquitous nature within the surgical profession.

What literature that is available on the subject tends to be dated with poorly explained methodology. There is also uncertainty over whether the results of such studies can be extrapolated to current surgical practice given the advent of new antiseptic techniques since they were completed. The evidence base investigating the effects of facemask usage on patient-based outcomes is, in general, more extensive than that of surgeon-centred outcomes. Facemasks do have a clear role in maintaining the social cleanliness of surgical staff, but evidence is lacking to suggest that they confer protection from infection either to patients or to the surgeons that wear them.

Given that there is no evidence that they cause any harm either, proponents would rather err on the side of caution and encourage their continued use, stressing that there is no room for complacency when it comes to ensuring patient safety.[25] This opinion is similarly echoed by the National Institute for Health and Care Excellence guidelines which assert that mask usage contributes towards 'maintaining theatre discipline'.

Another unavoidable aspect of this debate is that of public perception. In the public psyche, facemasks have become so strongly associated with safe and proper surgical practice that their disposal could cause unnecessary patient distress. Indeed, the response on various medical forums following Mr Ahmed's decision not to wear a mask during his broadcasted surgeries would reflect the prevalence of such a belief among the public.

It is clear that more studies are required before any absolute conclusions can be drawn regarding the effectiveness or, indeed, ineffectiveness of surgical masks. The published literature does suggest that it may be reasonable to further examine the need for masks in contemporary surgical practice given the interests of comfort, budget constraints and potential ease of communication, although

any such study would undoubtedly have to be large and well controlled to prove causality given the low event frequency of surgical site infections. It is possible, if not probable, that if surgical facemasks were to be introduced today, without the historical impetus currently associated with their use, the experimental evidence would not be sufficiently compelling to incorporate facemasks into surgical practice.

However, when current surgical practice is the culmination of layer upon layer of precautions in the hope of preventing surgical site infection, do we dare to experiment with their omission to see if they have any tangible consequence on morbidity and mortality? A randomised control trial investigating the uncertainty surrounding prophylactic antibiotic use in clean coronary artery surgery turned out to be catastrophic – the study had to be terminated early for ethical reasons due to an unacceptable increase in postoperative infection in the placebo cohort.[26] Perhaps an annual expenditure of a few million pounds in a healthcare budget of almost £100 billion is a small price to pay for an intervention of unknown but potentially dramatic effectiveness.

It is important not to construe an absence of evidence for effectiveness with evidence for the absence of effectiveness. While there is a lack of evidence supporting the effectiveness of facemasks, there is similarly a lack of evidence supporting their ineffectiveness. With the information currently available, it would be imprudent to recommend the removal of facemasks from surgery. Instead, in the medical field where common practice can so easily become dogma, it is necessary to recognise the constant need to maintain a healthy scepticism towards established beliefs and to periodically re-evaluate and critically assess their scientific merit.

### Declarations

**Competing interests:** None declared.

**Funding:** None declared.

**Ethical approval:** Not applicable.

**Guarantor:** CDZ.

**Contributorship:** CDZ drafted the paper and all other authors commented on the paper and contributed to amendments.

**Acknowledgements:** None.

**Provenance:** Not commissioned; peer-reviewed by Tom Treasure.

## References

1. Leyland M and McCloy R. Surgical face masks: protection of self or patient? *Ann R Coll Surg Engl* 1993; 75: 1.

2. Spooner JL. History of surgical face masks. *AORN J* 1967; 5: 76–80. See http://www.aornjournal.org/article/S0001-2092(08)71359-0/abstract (last checked 31 March 2015).

3. Mikulicz J. Das Operieren in Sterilisirten Zwirnhandschuhen und Mit Mundbinde. *Cent f Chir* 1897; 25: 714–717.

4. Järvinen TLN, Sievänen H, Kannus P, Jokihaara J and Khan KM. The true cost of pharmacological disease prevention. *BMJ* 2011; 342: d2175.

5. Belkin NL. A century after their introduction, are surgical masks necessary? *AORN J* 1996; 64: 602. See http://www.aornjournal.org/article/S0001-2092(06)63628-4/abstract (last checked 31 March 2015).

6. Schweizer RT. Mask wiggling as a potential cause of wound contamination. *Lancet* 1976; 2: 1129–1130.

7. Orr NW. Is a mask necessary in the operating theatre? *Ann R Coll Surg Engl* 1981; 63: 390–392.

8. National Collaborating Centre for Women's and Children's Health. *Surgical Site Infection: Prevention and Treatment of Surgical Site Infection.* UK: Nursing standard (Royal College of Nursing 1987), 2008. See www.rcog.org.uk (last checked 31 March 2015).

9. Lipp A and Edwards P. Disposable surgical face masks for preventing surgical wound infection in clean surgery. *Cochrane Database Syst Rev* 2002; 1: CD002929.

10. Chamberlain GV and Houang E. Trial of the use of masks in the gynaecological operating theatre. *Ann R Coll Surg Engl* 1984; 66: : 432–433.

11. Tunevall TG. Postoperative wound infections and surgical face masks: a controlled study. *World J Surg* 1991; 15: 383–387. DOI: 10.1007/BF01658736.

12. Lipp A and Edwards P. Disposable surgical face masks for preventing surgical wound infection in clean surgery. *Cochrane Database Syst Rev* 2014; 2: CD002929.

13. Webster J, Croger S, Lister C, Doidge M, Terry MJ and Jones I. Use of face masks by non-scrubbed operating room staff: a randomized controlled trial. *ANZ J Surg* 2010; 80: 169–173.

14. Filochowski J. FOI Reply 560, 2012. p. 3. See https://www.westhertshospitals.nhs.uk/foi_publication_scheme/disclosure_log/2012/may/documents/FOI Reply 560.pdf (last checked 30 October 2014).

15. Health and Social Care Information Centre. *Hospital Episode Statistics Database.* See http://www.hscic.gov.uk/hesdata (last checked 30 October 2014).

16. NHS Procurement Atlas of Variation. See http://ccgtools.england.nhs.uk/procurement/ProcAtlasJuly2014/atlas.html (last checked 30 October 2014).

17. Plowman R, Graves N, Griffin MAS, Roberts JA, Swan AV, Cookson B, et al. The rate and cost of hospital-acquired infections occurring in patients admitted to selected specialties of a district general hospital in England and the national burden imposed. *J Hosp Infect* 2001; 47: 198–209.

18. Siegel JD, Rhinehart E, Jackson M and Chiarello L. 2007 guideline for isolation precautions: preventing transmission of infectious agents in health care settings. *Am J Infect Control* 2007; 35: S65–S164.

19. Davies CG, Khan MN, Ghauri ASK and Ranaboldo CJ. Blood and body fluid splashes during surgery – the need for eye protection and masks. *Ann R Coll Surg Engl* 2007; 89: 770–772.

20. Aisien AO and Ujah IAO. Risk of blood splashes to masks and goggles during cesarean section. *Med Sci Monit* 2006; 12: CR94–CR97.

21. Weber A, Willeke K, Marchioni R, Myojo T, McKay R, Donnelly J, et al. Aerosol penetration and leakage characteristics of masks used in the health care industry. *Am J Infect Control* 1993; 21: 167–173.

22. Ransjö U. Masks: a ward investigation and review of the literature. *J Hosp Infect* 1986; 289–294.

23. Reingold AL, Kane MA and Hightower AW. Failure of gloves and other protective devices to prevent transmission of hepatitis B virus to oral surgeons. *JAMA* 1988; 259: 2558–2560.

24. Glasziou P, Chalmers I, Rawlins M and McCulloch P. When are randomised trials unnecessary? Picking signal from noise. *BMJ* 2007; 334: 349–351.

25. Hogan B and Samaranayake LP. The surgical mask unmasked: a review. *Oral Surgery, Oral Med Oral Pathol* 1990; 70: :–34–36.

26. Penketh ARL, Wansbrough-Jones MH, Wright E, Imrie F, Pepper JR and Parker DJ. Antibiotic prophylaxis for coronary artery bypass graft surgery. *Lancet* 1985; 325: 1500. See http://www.sciencedirect.com/science/article/pii/S0140673685922676 (last checked 31 March 2015).

## Appendix 1. Databases included in the search strategy[12]

| |
|---|
| The Cochrane Wounds Group Register (searched 23 October 2013) |
| The Cochrane Central Register of Controlled Trials (CENTRAL) (*The Cochrane Library 2013*, Issue 9) |
| Ovid MEDLINE (1946 to October Week 3 2013) |
| Ovid MEDLINE (In-process and other non-indexed citations, October 23, 2013) |
| Ovid EMBASE (1974 to 23 October 2013) |
| EBSCO CINAHL (1982 to 18 October 2013) |

Plaintiffs' Exhibit 407

# Unreported Truths about COVID-19 and Lockdowns

## Part 3: Masks

# Alex Berenson

UNREPORTED TRUTHS PART 3: Masks

I wish masks worked.

I wish masks worked. If they did they'd be a cheap, easy way to slow the spread of Sars-Cov-2.

I wish masks worked. The idea they protect not just their wearers but also the people around them seems wonderfully selfless.

I wish masks worked. Americans are spending billions of dollars on them and they can cause acne and frighten small children and people with disabilities. Wearing them for no reason seems perverse.

I wish masks worked. Most Americans now wear them. Telling people they have been conned doesn't make them happy.

I wish masks worked. They have become *the* flashpoint in the political battles around Sars-Cov-2. Anyone who opposes wearing masks, much less making everyone wear them, draws scorn from the media and scientific establishment. *Bet you think the virus is fake, too. People are dying!*

I wish masks worked. We have so many other battles to fight around coronavirus: lockdowns, school closings, travel restrictions, and other government intrusions into our lives. Masks seem at first like one that isn't worth the trouble. *Wear a mask,* the advocates insist. *Stop arguing, just wear it. It's nothing.*

I wish masks worked.

But they don't.

Not the ordinary cloth and surgical masks that nearly everybody wears, anyway. Despite everything the media and public health experts have told you, *they don't work.*

More accurately, we have no real evidence they do – and plenty of evidence they don't.

Welcome to Part 3 of Unreported Truths: masks. As protection, masks are largely useless, and mask mandates even more so. But as a symbol that the coronavirus is a serious danger requiring us to give up our rights, they are incredibly effective.

A lot has happened since the last installment came out in August. President Trump was infected with Sars-Cov-2 and recovered. A new outbreak raced across Europe and the United States. Several drug and biotechnology companies announced positive results for vaccines.

And Joe Biden narrowly won the presidential election, eking out a coin flip win over Donald Trump. (Whatever you think of mail-in ballots, Republicans have found no evidence of large-scale vote fraud. We should all assume Biden will take the oath of office in January.)

*Elections have consequences,* Barack Obama famously said. The 2020 presidential election surely will, especially for the way we respond to the coronavirus.

Biden, who was rarely photographed without a mask during the campaign, has already promised to try to make all Americans wear masks. "We can save tens of thousands of lives if everyone would just wear a mask," he said at a press conference on Nov. 9.

(https://www.nbcnews.com/politics/2020-election/biden-kicks-presidential-transition-begging-americans-wear-masks-n1247143)

Biden's official Website, "Buildbackbetter.com," calls for:

"Every American to wear a mask when they are around people outside their household.

"Every Governor to make that mandatory in their state.

"Local authorities to also make it mandatory to buttress their state orders."

Biden's proposal makes no distinction between requiring masks indoors and outdoors, or only when strangers are close together. Its language suggests Biden wants to force all of us to wear masks all the time, except when we are home with only family members around.

Biden's win also emboldened public health authorities to press masks even harder. A week after Election Day, the Centers for Disease Control issued a new advisory in which it claimed even cloth masks reduce the risk of infection in the people who wear them. The CDC wrote:

> Masks are primarily intended to reduce the emission of virus-laden droplets ("source control")... Masks also help reduce inhalation of these droplets by the wearer ("filtration for personal protection").

(https://www.cdc.gov/coronavirus/2019-ncov/more/masking-science-sars-cov2.html)

The CDC's promise that cloth and surgical masks protect the people wearing them is notable. It stands in marked contrast to what pro-mask epidemiologists have said since April. Usually, they focus on the protection masks supposedly offer to *other* people ("My mask protects you, your mask protects me.")

So why the change? The CDC decided to talk up personal protection in the hope of convincing people who aren't wearing masks to do so, according to NBC News:

> Infectious disease doctors who have urged the CDC to change the messaging around masks believe it will be a more effective public health strategy. "I'm thrilled that it's happening now," said Dr. Monica Gandhi, professor of medicine at the University of California San Francisco. "I think it helps people comply with the regulation if they think it's helping them."

(https://www.nbcnews.com/health/health-news/two-way-street-cdc-report-says-masks-protect-wearers-everyone-n1247258)

The not very well-hidden subtext here: People who are too selfish to wear masks to protect *others* might do so for their own safety.

Biden's request for *local* governments to press for mandatory mask-wearing is also notable. For the most part, states have led the push for masks, focusing on businesses rather than individuals. State health departments now make stores, restaurants, and offices require masks for entry. But local police departments have generally avoided arresting people for going maskless. The mention of "local authorities" looks to be Biden's backdoor way to change that.

Still, law enforcement is not the main driver of mask use. Public pressure is.

Ironically, in February and March, as the epidemic was taking off, the pressure came the other way. Health experts discouraged the public from using face coverings. On Feb. 29,

Dr. Jerome Adams, the Surgeon General, tweeted a warning that would become infamous:

> Seriously people – STOP BUYING MASKS! They are NOT effective in preventing general public from catching #Coronavirus, but if healthcare providers can't get them to care for sick patients, it puts them and our communities at risk!

A week later, on March 8, Dr. Anthony Fauci, the director of the National Institute of Allergy and Infectious Diseases, told 60 Minutes:

> There's no reason to be walking around with a mask. When you're in the middle of an outbreak, wearing a mask might make people feel a little bit better and it might even block a droplet, but it's not providing the perfect protection that people think that it is. And, often, there are unintended consequences — people keep fiddling with the mask and they keep touching their face."

The World Health Organization also warned against wearing masks. "WHO stands by recommendation to not wear masks if you are not sick or not caring for someone who is sick," CNN reported on March 30.

1(https://twitter.com/surgeon_general/status/1233725785283932160?lang=en)

(https://www.reuters.com/article/uk-factcheck-fauci-outdated-video-masks/fact-checkoutdated-video-of-fauci-saying-theres-no-reason-to-be-walking-around-with-a-mask-idUSKBN26T2TR)

(https://www.cnn.com/2020/03/30/world/coronavirus-who-masks-recommendation-trnd/index.html)

(https://www.nejm.org/doi/full/10.1056/NEJMp2006372)

On April 1, the *New England Journal of Medicine* – the leading American health-care journal – wrote:

> We know that wearing a mask outside health care facilities offers little, if any, protection from infection... In many cases, the desire for widespread masking is a reflexive reaction to anxiety over the pandemic.[1]

But within days of that article, health experts reversed course and insisted people must wear masks – whether they were feeling sick or well, whether they were in hospitals or stores or even outside.

On April 22, Dr. Adams – he of "STOP BUYING MASKS" – unveiled the new mantra at a White House press conference: "You wear your mask to protect me... I wear my mask to protect you."

(https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-30/)

As states rolled back lockdowns in May and June, the advice became more strident. Masks were now the most important step to slow the epidemic. Face coverings were crucial not just for people with Covid but for those without, because even people without symptoms could spread the disease.

By June 3, the authors of the April 1 New England Journal of Medicine were claiming readers had misunderstood their original piece:

> We understand that some people are citing our Perspective article... as support for discrediting widespread masking. In truth, the intent of our article was to push for more masking, not less.

(https://www.nejm.org/doi/full/10.1056/NEJMc2020836)

Sure. The statement that masks outside hospitals offer *"little if any protection from infection"* was meant to encourage their use.

But the same media outlets which failed to ask questions about the need for lockdowns were just as credulous on the sudden 180-degree turn over masks. News organizations happily accepted the excuse by public health authorities that they had initially offered anti-mask advice only to prevent a run on masks that healthcare workers needed. In newspapers and on cable networks, pro-mask messages became the norm.

"Overnight, masks have become a symbol of social responsibility," The New York Times wrote on April 10. "If you still need convincing, here's why you now should be wearing a mask in public spaces." Two months later, the Times cheerily offered "Tips for Making Your Mask Work."

The Washington Post took slightly longer. On April 17, it called mask-wearing a "tough decision" and noted many states had originally enacted anti-mask laws to combat the Ku Klux Klan. On May 1, it warned that masks could cause painful rashes and acne for their wearers:

---

2 https://www.nytimes.com/2020/04/10/well/live/coronavirus-face-masks-guides-protection-personal-protective-equipment.html

https://www.nytimes.com/interactive/2020/06/25/burst/how-to-get-the-most-out-of-your-mask.html

https://www.washingtonpost.com/health/tips-on-alleviating-face-masks-rashes-and-skin-irritations/2020/05/01/5cd3f2ac-88b0-11ea-ac8a-fe9b8088e101_story.html

https://www.washingtonpost.com/health/2020/06/13/spate-new-research-supports-wearing-masks-control-coronavirus-spread/

Skin irritation from wearing personal protective equipment is a hazard already familiar to health-care providers working in settings where infection control is critical. Now it has also become familiar to many people wearing masks in public.

But by June, the Post was fully on board, explaining how "new research supports wearing masks to control coronavirus spread."[2]

The next step followed logically.

Having decreed masks could save people from Sars-Cov-2, media outlets tried to embarrass anyone who refused. Not to wear a mask was to refuse to "follow the science" – a catchphrase repeated endlessly – and a sign of selfishness.

Newspapers and magazines published insufferably arrogant pieces telling readers how to deal with the cretins who wouldn't wear masks. "It can be difficult to find common ground with someone who refuses to wear a mask for whatever reason," Teen Vogue wrote in July. "You might find the most resistance from people who are ideologically opposed to wearing masks because they believe doing so is a sign of weakness (it isn't)."

(https://www.teenvogue.com/story/how-to-talk-to-people-who-wont-wear-face-masks)

The Washington Post went a step further, warning in September, "Some Covid-19 rule-breakers could be narcissists, experts say. Here's how to approach them –" as if people who'd decided to keep their faces uncovered were inherently dangerous. The article even offered strategies to approach those awful narcissists. Craig Malkin, a psychologist, suggested telling them how important they were:

"For example, [say] "You can make the difference between life and death because we're all in this together.""

"The less significant they feel in all of this, the more they're going to have to pound their chests and push back against what's being expected to feel like they matter," Malkin said.

(https://www.washingtonpost.com/lifestyle/wellness/narcissism-mask-covid-psychology/2020/09/25/63e1b32-fe9c-11ea-9ceb-061d646d9c67_story.html)

In August, a study would take this argument to the extreme. People who didn't wear masks were no longer just dumb or self-centered. They were sociopaths:

New research from Brazil has found that people who are unconcerned with adhering to measures to prevent the spread of Covid-19 tend to display higher levels of traits associated with antisocial personality disorder, also known as sociopathy.

(https://www.news-medical.net/news/20200824/Sociopaths-less-likely-to-comply-with-COVID-mask-hygiene-and-social-distancing.aspx)

The relentless pressure has caused a sharp rise in mask wearing. In blue states like California, masks are essentially standard, even outside. People who wear masks are increasingly willing to challenge people who don't. I live in New York and try not to wear a mask outside, so I have seen the change in attitudes firsthand. Recently, a masked woman in her sixties asked me if I would step aside since she needed to walk around me and I wasn't wearing a mask. We were standing several feet apart on a hiking trail.

National surveys confirm mask wearing has risen substantially. In June, about 65 percent of Americans said they wore masks in stores all or most of the time, according to Pew Research. By August the figure had risen to 85 percent.
(https://www.pewresearch.org/fact-tank/2020/08/27/more-americans-say-they-are-regularly-wearing-masks-in-stores-and-other-businesses/)

Other surveys show even more mask use.

Those percentages might slightly overstate real-world mask wearing, for the same reason polls understated Trump's support. People don't like to admit they deviate from media-promoted social norms. Still, mask wearing is clearly now the default, indoors everywhere and outdoors in most states.

Which is why it may be so surprising that the United States is now going through its third and apparently largest wave of coronavirus infections. The first and second epidemics were largely regional: the spring wave in the Northeast and Midwest, the summer outbreak in the Sunbelt. The fall outbreak seems to be everywhere. The number of reported infections – which the media calls "cases," though they are based mainly on test results and include many people with no symptoms – has reached record highs.

The number of positive tests overstates the scope of the fall epidemic because the United States now tests more than 10 million people a week, far more than it did during the spring. Further, many positive tests represent people who *had* rather than currently have Sars-Cov-2 infections. (I may address the details of the issues around PCR tests in a future booklet; they are technical but crucially important.)

Still, hospitalizations are also rising. More than 80,000 Americans are now hospitalized with the coronavirus, more than the spring or summer peaks. The growth in testing is

partially driving that rise. A significant fraction of those patients have been hospitalized for other problems. They are then found to be infected with Sars-Cov-2 when they are tested in the hospital.

But part of the increase in hospitalizations is real. And some regional hospital networks are under strain. The evidence is clear: the coronavirus is spreading faster in the United States than it has in months.

All by itself this fact should raise serious questions about how well masks prevent the transmission of the coronavirus. Health authorities have told Americans for six months to wear masks. We have listened. More of us are wearing masks more often than ever before. Yet the virus is spreading faster.

How can that be, if masks work?

2

The answer is that the evidence that face coverings do any good turns out to be even more porous than masks themselves.

Understanding why requires some background in the biology of viruses and the ways they spread.

Figuring out how Sars-Cov-2 – or any respiratory virus – jumps between people is very complicated. Figuring out if masks reduce transmission is even more so. Some of the language scientists use adds to the confusion in ways that make masks seem more effective than they are.

We know Sars-Cov-2 spreads mainly through the air. Transmission through touching "fomites" on contaminated surfaces is less common than was initially thought. Infected people exhale viral particles – virions – that are usually carried inside larger molecules made mostly of water and called "aerosols" or "droplets." People around the infected person inhale those aerosols or droplets and are exposed to the virus.

The distinction between an aerosol and a droplet is size: aerosols are smaller. But the word "droplet" doesn't mean what it seems to mean. It does *not* imply a raindrop-sized visible particle, like a mucus ball that a person with a cold might blow into a handkerchief.

An average raindrop is about 1/25th of an inch, or 1 millimeter – 1/1000th of a meter. Most people can't see objects smaller than about 0.1 millimeters without using a magnifying glass or microscope.

Viruses, aerosols, and droplets are measured on much smaller scales.

Below a millimeter, the next common unit of length is the micrometer or micron. A micron is 1/1000th of a millimeter, or 1/1,000,000th of a meter. The smallest object people can see – 0.1 millimeters – equals 100 microns.

When scientists talk about "droplets," they mean any exhaled particle more than 5 microns, 1/5000th of an inch, far too small for anyone to see unaided. Aerosols are even smaller – less than 5 microns.

The coronavirus itself is smaller still. For it, scientists use still another measure of length, the nanometer. 1 nanometer is 1/1000th of a micron. In other words, 1 meter equals one *billion* nanometers. An average-sized man is about 1,700,000,000 nanometers tall.

But a single virion of Sars-Cov-2 is about 60 to 140 nanometers, or 0.1 microns.

The different measurement scales can be confusing.

But the first takeaway is simple. Whatever masks do – or don't do – to protect us from the coronavirus is mostly *invisible*. Masks can obviously catch visible chunks of spit or phlegm, but the virus mostly travels on much smaller particles.

The second takeaway is also simple. All masks are not created equal, even if they all look more or less the same. For a mask to provide decent protection, it must be made of a material fine enough to catch nearly all of those tiny aerosols and droplets.

Such face coverings do exist.

Technically, they aren't called masks at all, but respirators.

Respirators must be certified as offering specific levels of protection before they're sold. In the United States, the most

common models are called N95s. They have that name because manufacturers must prove they catch at least 95 percent of all particles of 300 nanometers – 0.3 microns. Many N95 masks prove even more effective than that standard in laboratory testing, blocking up to 99 percent of all but the smallest particles.

In contrast, standards for surgical masks are far less strict, and standards for homemade cloth masks don't exist. (Surgical masks are often light blue and made of three layers. The inside and outside are non-woven fabric, the middle a thin melted plastic layer, usually polypropylene. Cloth masks can be made of almost any fabric and can be one or multiple layers. Most Americans now seem to wear cloth masks in public, though surgical masks are also common.)

Further, unlike ordinary masks, N95 respirators are supposed to be "fit-tested." In other words, they're meant to attach tightly to the face of the person wearing them, with no gaps that allow unfiltered air between their edges and the skin. "The respirator must fit the user's face snugly (i.e., create a seal," the Centers for Disease Control wrote in an advisory about masks in March.

(https://blogs.cdc.gov/niosh-science-blog/2020/03/16/n95-preparedness/)

But ordinary masks are not fit-tested. Sometimes they are tied over the ear. More frequently they come with preattached loops. So ordinary masks start with two huge disadvantages compared to N95s. Their material offers less protection, *and* they don't fit as well.

But N95s are expensive, and even trained medical staff dislike wearing them for more than a few hours. As two doctors wrote in a commentary in August, "when worn properly, N95 masks

are suffocating, uncomfortable, and difficult to tolerate for long durations."

(https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2769441)

As a practical matter, if civilians are going to wear face coverings, they will be standard cloth or surgical masks. But the limitations of those masks were well documented long before the coronavirus epidemic.

In 2009, four researchers examined how well surgical masks worked to filter small particles, those of 1 micron (1000 nanometers) or less. Their conclusion: badly.

In a paper called "Filtration Performance of FDA-Cleared Surgical Masks," the scientists tested five surgical mask brands. Four of the five masks allowed 15 percent or more of 100-nanometer (virus-sized) to 1 micron-sized particles through. Two of the five allowed more than half of those particles through.

Making matters worse, the authors believed their results actually overstated the real-world performance of the masks. They had sealed their masks to the "faces" of their mannikins with silicone. "A surgical mask user would be expected to get protection levels far less than that observed in this study, because a complete sealing of a surgical mask to a human face cannot be achieved," they wrote.

They concluded with a warning: "The wide variation in penetration levels for room air particles, which included particles in the same size range of viruses, confirms that **surgical masks should not be used for respiratory protection** [emphasis added]."

(https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7357397/)

More recent studies have also found surgical masks were mostly ineffective compared to N95s.

One paper was published in August and focused on the question of whether expired N95s were still safe to use. On that issue, the researchers found good news. Long after their posted expiration dates, most N95s still worked.

But as part of the study, the researchers also checked the performance of surgical masks. And they used human subjects rather than mannikins, for a more realistic demonstration of the way masks fit.

The scientists found the surgical masks barely worked. Masks with ties filtered about 70 percent of small particles. Those with ear loops filtered less than 40 percent and often had "visible gaps between the face mask and the wearer."

(Dr. Michael Osterholm, an infectious disease expert, made the same point more graphically in a June podcast interview. Based on the pictures he saw of people wearing masks, about one person in four was wearing them wrongly, the equivalent "of fixing three of the five screen doors on your submarine." Rather than masks, Osterholm said he preferred to focus on encouraging people to stay at least six feet apart.[3])

The August paper makes clear that – if a shortage of new N95s forces them to choose – health-care workers should pick old N95s over new surgical masks. But the authors didn't explicitly say so in their conclusion, maybe because they were aware that *any* criticism of masks is off-limits in the coronavirus era.

Instead, they pointed out that their work offered "quantitative results.... [for] evidence-based decisions."

---

[3] https://www.ama-assn.org/delivering-care/public-health/covid-19-s-first-wave-may-be-only-wave-no-pause)

In other words, *we're not going to tell you surgical masks don't work – you can read.*

(https://jamanetwork.com/article.aspx?2css=10.1001/jamainternmed.2020.4221)

What's true for surgical masks appears to be doubly true for homemade cloth masks, which generally filter even fewer small particles and are even *less* effective. The overall evidence is clear: Standard cloth and surgical masks offer next to no protection against virus-sized particles or small aerosols.

But maybe that failure doesn't matter. Can we be sure that the virus actually floats in particles that small?

Yes.

In a paper published in the November International Journal of Infectious Diseases, a team of researchers reported finding Sars-Cov-2 viral particles floating in the air of a hospital room. The virus they collected could reproduce in cell cultures – meaning it was "alive," not merely dead fragments of viral particles.

In their conclusion, the researchers explained:

> The public health implications are broad, particularly as current best practices for limiting the spread of COVID-19 center on social distancing, **wearing of face coverings while in proximity to others** [emphasis added] and hand washing. For aerosol-based transmission, measures such as physical distancing by 6 feet would not be helpful in an indoor setting, provide a false sense of security, and lead to exposures and outbreaks.

Once again, the researchers didn't explicitly say that if physical distancing "would not be helpful" against aerosol-based

The weakest evidence comes from anecdotes based on one person's experience. Just because I didn't have an accident after driving drunk doesn't mean doing so is safe.

On the other hand, the gold standard of evidence comes from what scientists and physicians call randomized controlled trials. In those trials, researchers recruit people and split them into evenly matched groups. They then offer one group a certain treatment and another no treatment.

Suppose I believe a cholesterol-lowering drug called a statin can reduce heart disease. I give some of the people in my trial the statin and the rest a placebo pill that contains no medicine. When the trial is over, I check whether the people who took the statin had fewer heart attacks and strokes than the ones who received the placebo pill. If they did, I can assume the statin is responsible for the difference. In fact, companies and independent researchers have run many such trials and consistently found statins reduce heart disease. So if you have high cholesterol, your doctor will prescribe a statin.

But it's crucial to remember that even if I have reason to think a treatment will work, *unless I run the trial I don't know.* Drug companies spent billions of dollars on another kind of cholesterol-lowering medicine called a CETP inhibitor. But when they tested those drugs in clinical trials, they found deaths *rose.* They had to quit developing them.

Even a good idea can fail in practice, which is why the four most important words in medicine are *"First, do no harm."* For centuries, well-meaning physicians used techniques we find horrifying today, in part because they depended on anecdotal evidence and hope rather than hard data from clinical trials.

---

transmission, *masks* also wouldn't be. Such is the pressure to encourage mask wearing.

(https://www.sciencedirect.com/science/article/pii/S1201971220307396)

The fact dormitories, prisons, ships, and other "congregate" settings can see very high rates of coronavirus infection – as high as 90 percent – also provides strong real-world evidence that Sars-Cov-2 spreads through tiny aerosol particles that stay in the air for long periods. Person-to-person transmission would be unlikely to spread the virus that quickly or effectively.

In one study of coronavirus transmission in a San Francisco homeless shelter, researchers found that they could track only four "close contacts" to the two original cases at the shelter, and 18 people in beds within six feet. But in testing only three to four days after the initial positive tests from the first two cases, 101 residents of the shelter tested positive. At the time, San Francisco had very low community transmission of Sars-Cov-2, so it is likely the residents were infected inside the shelter.

(https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7454344/)

In fact, as early as February, Chinese health authorities warned that "aerosol transmission" was a major transmission route. They urged people to keep windows open.
(https://www.chinadaily.com.cn/a/202002/08/WS5e3e7e97a3101282172725c3.html)

The theoretical evidence that cloth and surgical masks do not protect their wearers is overwhelming. But we have even *stronger* evidence. It comes from real-world clinical trials of people wearing masks.

Medical proof comes in many different forms.

Thus when we're trying to figure out whether a treatment actually works, the best evidence by far comes from clinical trials. Nothing else comes close.

And clinical trials consistently find that masks *don't* protect people from respiratory viruses.

In February, seven researchers in Hong Kong reviewed *all* the trials they could find that tested whether masks outside hospital settings protected their wearers against the flu. They found 10 studies that had been conducted since 1946. (The number is relatively small, given the importance of the question. The reason is that trials are expensive. Prescription drug companies, which pay for most of them, have no incentive to spend money figuring out if masks work.)

The researchers combined the results of the 10 trials into a single "meta-analysis" – a review that looks at each study and figures out what they say as a whole. Their conclusion – published in Emerging Infectious Diseases, a Centers for Disease Control journal – was straightforward:

> We **did not find evidence** that surgical-type face masks are effective in reducing laboratory-confirmed influenza transmission, either when worn by infected persons (source control) or by persons in the general community to reduce their susceptibility. [Emphasis added]

(https://wwwnc.cdc.gov/eid/article/26/5/19-0994_article)

A trial published in 2015 on cloth and surgical masks used by healthcare workers in Vietnam reached an even more depressing conclusion. The study was the first randomized trial

---

Anecdotes are on one end; clinical trial evidence is on the other. A huge variety of data exists between the two. Some is what scientists call pre-clinical, like "in vitro" studies on cells in laboratories, or animal research, or mechanistic studies designed to show how and why a treatment might work. All those studies should be viewed with caution. No one can be sure how lab results will translate into humans. Cancer researchers often joke that they've cured tumors many times – in mice.

Another form of evidence is real-world data in people that doesn't come out of a clinical trial.

For example, researchers might track whether people who have quit drinking are less likely to start again if they go to Alcoholics Anonymous meetings. Or they might try to figure out what's causing changes in even larger groups. Why have car accidents risen in one state but not another? We call this kind of work epidemiology – trying to measure and control diseases and dangerous behaviors in groups of people.

But this research has a huge caveat. Unless they set up the groups in advance, researchers cannot know if the people in the two groups were truly the same going in. So they can't be sure what has caused the changes they see.

In the AA example, maybe the people who went to AA meetings seem less likely to drink again *because they were so motivated to stop drinking that they went to meetings*, not because of any help the meetings themselves provide. Or maybe not – maybe the meetings actually work. (Addiction researchers have debated this issue for decades.)

Worse, as the groups get bigger and more diverse, researchers will have a harder and harder time figuring out what's really causing the changes.

to examine the use of cloth masks, which healthcare workers in poorer countries commonly wear.

The researchers found healthcare workers who wore cloth masks were *more* likely to develop infections than those who wore surgical masks as well as a third control group who were not required to wear masks at all. The trial did not include N95 respirators, since respirators are uncommon in poorer countries and the researchers wanted to offer realistic alternatives.

But the researchers did put both masks and N95s through lab tests to see how easily particles penetrated them. They found that cloth masks stopped only 3 percent of particles, and medical masks stopped just over half. The N95s stopped 99.9 to 99.99 percent of particles.

In their discussion, the researchers wrote that the trial

suggests HCWs [health-care workers] should not use cloth masks as protection against respiratory infection... the physical properties of a cloth mask, reuse, the frequency and effectiveness of cleaning, and increased moisture retention, may potentially increase the infection risk for HCWs.

(https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4420971/)

Of course, none of these studies specifically looked at Sars-Cov-2, since they were all conducted before this year. They were also all relatively small.

If only we had a large randomized controlled trial that specifically examined whether masks protected their wearers from the coronavirus.

Now we do.

In a paper published on Nov. 18, Danish researchers reported on a trial that covered almost 5,000 people in Denmark in the spring. The trial was carefully designed and executed, with half the participants told to wear high-quality surgical masks and provided 50 for free. The other half were not asked to wear masks. Participants were followed for a month to see if they had been infected with Sars-Cov-2.

Within the month, 53 people in the maskless group had been infected, compared to 42 who wore masks. The difference was indistinguishable from chance, and suggested masks might really cause anywhere from a 46 percent decrease to a 23 percent *increase* in infections among their wearers.

The reason for the failure was not that people in the masked group didn't follow the rules, either. When they looked at only at participants who always wore masks, the researchers found an even smaller difference. Mask wearing "did not reduce, at conventional levels of statistical significance, the incidence of Sars-Cov-2 infection," the authors wrote in their discussion.

Unless future large randomized controlled trials find different results, the Danish mask study essentially should end the debate if surgical masks protect people who wear them outside hospitals.

As physicians and infectious disease professionals largely agreed until April, the answer is that they don't. Anyone who says otherwise, for whatever reason, is being untruthful – and as of Nov. 10, that group, unfortunately, includes the Centers for Disease Control.

3

But what about the second part of the promise mask advocates make: that my mask protects *you*, while yours protects *me*?

And what about the mandates that flow out of that promise – that for us to protect each other, we *all* must wear masks, even if we are not showing symptoms of Covid?

Those questions turn out to be even *more* complicated than the one of whether masks protect their wearers. For the "my mask protects you" theory to be true and universal mask mandates to make sense, several different and highly technical questions must align. Those include:

The size of the particles people exhale;

The filtration characteristics of ordinary cloth and surgical masks;

Whether people are wearing masks properly;

The number of viral particles needed to cause an infection;

The relative risk of infection inside and outside and how well the virus can survive in sunlight or harsh conditions;

The question of whether people who are infected with Covid but not showing symptoms can have sufficient viral loads to infect other people.

We don't have precise answers to all of those questions. But the answers we do have tend not to support the logic behind source control – "my mask protects you."

The theory is essentially as follows: infected people exhale the virus in both droplets and aerosols, large and small particles. A mask, even a cloth mask, can catch droplets and thus reduce the total amount of virus a person is exhaling. Plus, because large particles tend to fall to the ground quickly, masks are even *more* important when two people are close together. The reason is in that case the mask might provide some protection to the wearer, too – because it will catch droplets that the person would otherwise inhale before they hit the ground.

Intuitively, the idea makes sense. But the details are crucial.

For example, if most particles people exhale are very small, catching larger particles may not matter much. Measuring the exact size of the particles in people's breath is technically challenging. But in 2009 researchers did so. What they found is not good for mask advocates. The vast majority of particles in exhaled breath are tiny, smaller than a micron.

In the paper, called "Size distribution and sites of origin of droplets expelled from the human respiratory tract during expiratory activities," the researchers reported:

> The majority of droplets from human expiratory activities are very small, being in low micrometer and high sub-micrometer ranges. Where Papineni and Rosenthal [an earlier study] found that 80–90% of droplets were smaller than 1 μm [micron], the current study agrees, showing that these smallest particles are located within an aerosol mode, centered in the range 0.1–1 μm.

(https://www.sciencedirect.com/science/article/pii/S0021850208002036)

In basic terms, masks have almost no chance of catching most of the particles we exhale.

Of course, if larger droplets happen to hold most Sars-Cov-2 virions, then maybe masks can help even if they don't do much good against smaller particles. For many years, scientists believed large droplets *did* hold most viral particles – in part because they simply have much more room. Imagine a marble in a box – if the box is a foot on each side, it can hold the marble easily, but if it is only an inch, the marble will have to drop in perfectly.

But just as researchers can now determine the size of the particles that people exhale, they now know which particles hold virions. Again, the answer is not good for the source control theory.

In a remarkable paper published in the September 2020 issue of The Lancet: Respiratory Medicine, Dr. Kevin P. Fennelly – a pulmonologist at the National Heart, Lung, and Blood Institute – debunked the view that larger droplets are responsible for most viral transmission. Fennelly wrote:

> Current infection control policies are based on the premise that most respiratory infections are transmitted by large respiratory droplets—ie, larger than 5 μm [microns] – produced by coughing and sneezing...

Unfortunately, that premise is wrong, Fennelly explained.

Studies "that included methods to measure particle sizes have consistently found pathogens in small particles (i.e. under 5 microns)." A study of influenza patients found about two-thirds of all the virus was contained in particles under 4 microns.

Other researchers found that particles under 5 microns contained 9 times as much flu virus as larger particles. (That

paper did show surgical masks cut the amount of virus found in smaller particles – a point for "my mask protects you" – but by far less than they reduced the virus in larger particles.)

"There is no evidence that some pathogens are carried only in large droplets," Fennelly wrote. Even the fact that risk rose when people were close together didn't provide much evidence for the droplet theory. Small particles also had a higher risk of infecting people at short distances.

Making matters worse, some pathogens are *more* dangerous when they spread via smaller particles, probably because smaller particles penetrate more deeply into the lungs than larger ones. Fennelly noted a breakthrough 1953 paper on anthrax that showed that single bacterial spore of about one micron was significantly more lethal than larger clumps of spores.

Fennelly did not go so far as to call masks useless – a near impossibility in the current environment – but he was lukewarm at best on their value to protect other people even in the most obvious case, when they are worn by symptomatic patients in hospitals. "Masking of patients can help to partly reduce infectious aerosol exposures to health-care workers, but are not a substitute for physical distancing and other infection control measures."

Instead, he called for a focus on improving ventilation as well as "air disinfection with ultraviolet germicidal irradiation," especially for nursing homes, where so many Covid deaths have occurred.

(https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext)

Further, even if masks do keep people from exhaling enough large particles to reduce the amount of virus around them

substantially, and even if large and small particles are equally dangerous, and even if people wear masks properly –

Forcing everyone to wear masks will matter very little unless asymptomatic people spread the coronavirus in large numbers. Everyone agrees people who are symptomatic with a fever or cough should stay home or wear a mask if they must go out. If only sick people are wearing masks, face coverings may function as a public signal: *I don't feel well, stay away.*

But the *point* of universal mask mandates is to force people who do not feel sick to wear masks anyway, on the theory that people without symptoms can also spread the virus.

Like practically every other part of the "my mask protects you" theory, this aspect is unproven. Worse – like the advice around general lockdowns, which were never recommended before March – it has become highly politicized. Scientists including Anthony Fauci have reversed course on the likelihood of asymptomatic transmission. At a press conference in January, Fauci could not have been clearer. Asymptomatic transmission was not a threat:

> The one thing historically people need to realize is that even if there is some asymptomatic transmission, in all the history of respiratory-borne viruses of any type, asymptomatic transmission has never been the driver of outbreaks. The driver of outbreaks is always a symptomatic person. Even if there's a rare asymptomatic person that might transmit, an epidemic is not driven by asymptomatic carriers.

(https://www.youtube.com/watch?v=x1orSO094uY)

At a press conference on June 8, a senior World Health Organization scientist also said people almost never transmitted the coronavirus if they did not have at least mild symptoms. In response to a question about asymptomatic transmission, Maria Van Kerkhove, an epidemiologist and the "technical lead" for WHO's Covid-19 response team, said:

> We have a number of reports from countries who are doing very detailed contact tracing. They're following asymptomatic cases, they're following contacts and they're not finding secondary transmission onward. It's very rare.

People who were reported to be asymptomatic generally had at least mild disease, like a low fever or cough, Van Kerkhove said.

(https://www.who.int/docs/default-source/coronaviruse/transcripts/who-audio-emergencies-coronavirus-press-conference-08jun2020.pdf?sfvrsn=f6fd460a_0)

The relative lack of asymptomatic transmission shouldn't be surprising, for the coronavirus or any respiratory illness, because *symptoms and severity of illness usually rise with viral load.* As early as March, Chinese researchers reported that "our data indicate that... patients with severe Covid-19 tend to have a high viral load and a long shedding period." An August study reached a similar conclusion.

(http://www.thelancet.com/journals/laninf/article/PIIS1473-3099(20)30232-2/fulltext)

Of course, some people can show no symptoms even when testing reveals they have relatively high levels of the virus. Other studies have shown no or a small overall difference in viral loads between symptomatic and asymptomatic patients.

And computer modeling suggests that up to 40 percent of infections could come from asymptomatic cases.

But when real-world contact tracers tried to find actual evidence of asymptomatic spread of Sars-Cov-2, they are basically unable to do so. In July, the WHO noted that four studies had showed that "between 0% and 2.2% of people with asymptomatic infection infected anyone else."

(https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions)

The most stunning example of this came from a city-wide screening for Sars-Cov-2 in May in Wuhan, China, where the virus apparently originated. Researchers tried to test everyone in Wuhan. They nearly succeeded, carrying out almost 10 million tests. They found 303 people who tested positive for the virus. All 303 cases were asymptomatic. The scientists then traced 1174 close contacts of those people  and found not one had been infected. "There was no evidence of transmission from asymptomatic positive persons," they wrote.

(https://www.nature.com/articles/s41467-020-19802-w)

But the media and other public health experts immediately pushed back on Van Kerkhove's accidental honesty in the June 8 press conference. Why? Because the threat of asymptomatic transmission is critical to the argument for universal mask mandates.

If people without symptoms are very unlikely to transmit Sars-Cov-2 to others, why make them wear masks at all? The evidence is overwhelming that surgical or cloth masks don't protect their wearers, so whom exactly are the masks protecting?

Within 48 hours, Van Kerkhove and the WHO were forced to walk back their statement, at least partially. The organization tried to distinguish between "asymptomatic" and "presymptomatic" carriers – people who had just been infected and were about to get sick but hadn't yet. Those presymptomatic carriers might have a short window where they were infectious.

In reality, though Van Kerkhove's statement was in keeping with the WHO's views about asymptomatic transmission and masks. On June 5, the organization had released a statement entitled "Advice on the use of masks in the context of Covid-19." The paper ran 16 pages and included 80 footnotes and this stunning statement:

> At the present time, the widespread use of masks by healthy people in the community setting is not yet supported by high quality or direct scientific evidence and there are potential benefits and harms to consider. [emphasis added]

(https://www.who.int/publications/i/item/advice-on-the-use-of-masks-in-the-community-during-home-care-and-in-healthcare-settings-in-the-context-of-the-novel-coronavirus-(2019-ncov)-outbreak)

The WHO then managed to choke out the weakest possible recommendation for mask use by healthy people: "In areas of community transmission, governments should encourage the general public to wear masks in specific situations and settings."

How many caveats did WHO put on this supposed recommendation?

In a table, the paper explained that – for example – people working in countries with "limited or no capacity to implement other containment measures such as physical distancing [and] contact tracing" might "be encouraged" to wear non-medical

control" – protecting *patients* from nurses who might be spreading the flu before they had symptoms.

In December 2013 the nurses' union filed a grievance against the policy. The case went to a neutral arbitrator, James Hayes. He heard thousands of pages of testimony from six expert witnesses, consulted 249 exhibits, and read more than 100 scientific papers.

In September 2015, Hayes issued a 136-page ruling saying hospitals could not make nurses wear masks. The "scientific evidence said to support the [mask mandate] on patient safety grounds is insufficient," he wrote.

Even the theory that masks could prevent droplet transmission was unproven, Hayes found:

At best, there appears to be limited evidence of what to a layperson may seem obvious: a mask may prevent the transmission of large droplets. Two literature reviews refer specifically to "limited data" and to "the limited evidence base supporting the efficacy and effectiveness of face masks to reduce influenza virus transmission."

He went on to quote one of the experts the nurses offered:

Coughing, sneezing and talking produce a wide range of particle sizes, all of which can be infectious. The smaller-sized particles will easily bypass the filter and facepiece of a surgical mask—and are likely to remain airborne for long periods of time.

masks. The reason: "**potential benefit** of source control." [emphasis added]

Just why was the WHO so lukewarm on wearing masks?

Though it runs to billions of dollars a year, the cost of forcing healthy adults to wear disposable surgical masks will be relatively minor for wealthy countries. And cloth masks are easy to clean in places that have access to clean water. In poor countries the calculus is different. Making people wear cloth masks that cannot be easily cleaned or spend a significant part of their income on disposable ones is much harder to justify if masks don't work.

The WHO said as much in the report, saying governments should consider "availability and costs of masks, access to clean water to wash non-medical masks, and ability of mask wearers to tolerate adverse effects of wearing a mask."

The science around masks and mask mandates has become deeply politicized since April.

That's why two Canadian arbitration decisions about masks from 2015 and 2018 – before face coverings became so totemic that people who didn't wear them risked being called sociopaths – are highly instructive.

The decisions arose from efforts by hospitals in the Canadian province of Ontario to force nurses to be vaccinated against influenza. The hospitals could not contractually make nurses take the vaccine.

Instead they decreed that any nurse who refused would instead be required to wear a surgical mask while working. Crucially, the hospitals were mainly concerned with using masks for "source

These arbitrators were not anti-mask. They were chosen for their neutrality. But both looked at the evidence and reached the same conclusion.

The decisions came in the context of the flu, not the coronavirus. But all the evidence we have suggests that both viruses, which are roughly the same size, are transmitted in the same way.

The theoretical evidence lines up nearly as strongly against the idea that "my mask protects you" as it does against "my mask protects me."

What about the real-world evidence?

Unfortunately, we do not currently have a study as definitive as the Danish mask trial for the source control theory. Such a trial would be very hard to run – it would require something like picking two similarly sized *cities* and requiring every healthy person in one to wear masks for a month or more while banning everyone in the other from doing so.

In the absence of such a trial, mask advocates have pointed to a more or less random series of case reports and observational data. For example, they have pointed to a CDC report showing two coronavirus-infected hairdressers in Missouri who wore masks did *not* infect 139 clients.

(https://www.cdc.gov/mmwr/volumes/69/wr/mm6928e2.htm)

The problem is that in the absence of other facts, we cannot know if the masks were the reason the hairdressers didn't infect their clients. Maybe the salon had good ventilation. Maybe the hairdressers happened not to be very infectious, since contact tracing studies show many people with Covid do not infect other people, while a small number of people appear to be so-called "super-spreaders."

Later in the report, Hayes noted that even the experts the hospitals had offered agreed that "there is limited evidence on the significant point of the utility of masks in reducing transmission risk."

In addition, wearing masks for long periods came with downsides, the nurses' experts told Hayes. Masks were uncomfortable, became moist, and could cause skin irritation. (One referred to a "grunge factor.")

So Hayes struck down the requirement, finding that even in hospitals – where masks are likely far *more* useful than other settings, given that they are filled with vulnerable patients and regularly have outbreaks of respiratory illness – the evidence did not support for mask mandates for healthy adults.

(https://www.canlii.org/en/on/la/doc/2015/2015canlii62106/2015canlii62106.pdf)

The fight didn't end there. Some hospitals kept trying to make nurses wear masks. The nurses objected again. Again they won.

In a September 6, 2018 decision, arbitrator William Kaplan agreed with Hayes's ruling. In fact, Kaplan went further than Hayes, calling the evidence in favor of mask mandates "insufficient, inadequate, and completely unpersuasive." Later in his ruling, he wrote:

> The preponderance of the masking evidence is compelling – surgical and procedural masks are extremely limited in terms of source control: they do not prevent the transmission of the influenza virus.

(https://www.ona.org/wp-content/uploads/ona_kaplanarbitrationdecision_vaccinateormask_stmicha elsoha_20180906.pdf)

Public health advocates also point to reports showing individual counties with mask mandates appeared to have slower growth in transmission rates than neighboring counties that did not. For example, a CDC report about the state of Kansas claimed that growth in positive tests was far lower in counties with mask mandates than those without.

(https://www.cdc.gov/mmwr/volumes/69/wr/mm6947e2.htm)

But this Kansas data is also much weaker than it appears at first. We don't know whether the rules translated into a major or even minor difference in mask use. More importantly, at the end of the period the CDC reviewed, the counties with mask mandates actually still had *higher* overall rates of Covid than those without.

Many, many other observational datapoints suggest that mask mandates have made no difference to the spread of Sars-Cov-2. Florida ended statewide mask mandates in late September, for example. But in the two months since, the state has had significantly slower growth in positive tests than the United States as a whole.

On a national basis, masks appear to have made even less difference. The United States is not alone in seeing huge spikes in positive Covid tests despite mask mandates and high levels of mask use. Most of Europe has had the same trend.

Epidemiologists agree that when clinical trials are impossible, real-world evidence must be nearly overwhelming to reach anything like the same level of proof. The best example comes with tobacco and lung cancer. Running a clinical trial to examine whether tobacco causes cancer would be both impossible and unethical. But heavy cigarette smokers develop lung cancer at rates 20 times those of nonsmokers – a difference that cannot

be explained for any other reason. Even so, doctors and scientists argued for decades over potential other explanations before rejecting them.

In the case of the source control theory for masks, the real-world evidence is somewhere between weak and nonexistent. Yet instead of decades, public health authorities changed their collective mind on masks nearly overnight.

Meanwhile, though we don't have anything as good as the Danish study for source control, we do have the results of one real world trial that touches on "my mask protects you." It was short, but well-run – and it too offers no joy to mask advocates.

This year, more than 3,000 Marine recruits participated in a two week quarantine that included cloth mask wearing, social distancing, and daily temperature and symptom checks. They lived on a closed college campus which they could not leave. They did not even have access to "personal electronics and other items that might contribute to surface transmission."

Yet at the end of the quarantine, almost 2 percent of the Marines tested positive for the coronavirus – even in a group of Marines who were tested when the quarantine started to remove anyone who was already infected.

(https://www.nejm.org/doi/full/10.1056/NEJMoa2029717)

The study does not *prove* masks don't work as source control. Perhaps the Marines would have been infected at much higher rate if they had not been wearing face coverings. But an infection rate of 1 percent per week is hardly evidence masks work, especially given the many other protective measures the recruits used.

we must wear masks. Tomorrow we'll need negative Covid tests to travel between countries. Or vaccines to go to work.

I wish masks worked. I wish we didn't have to fight about them.

But they don't.

And we do.

Yet despite the evidence that masks are of extremely marginal benefit at most for source control, public health authorities continue to insist on them.

The most obvious reasons are not medical but political.

The "good" reason is that masks are a visible totem that we are all working together against the coronavirus. We cannot all be physicians or nurses, but as they work to save lives, we all can sacrifice in this small way.

As Anthony Fauci said at a press conference in May, "It's not 100 percent effective. I mean, it's sort of respect for another person, and have that person respect you." He added that he wears masks "because I want to make it be a symbol for people to see that that's the kind of thing you should be doing."

(https://www.politico.com/news/2020/05/27/fauci-wears-mask-as-symbol-of-good-behavior-283847)

Of course, encouraging people to take actions that are (supposedly) symbolically valuable is different than *forcing* them. I may want to wear a pink pin to show I care about beating breast cancer, but Governor Cuomo can't make me.

At least I don't think he can, though I'm not so sure anymore.

The not-so-good reason is that making people wear masks frightens them. Frightens *us*. Masks are warnings none of us can escape. This virus is different. This virus is dangerous. This virus is *not* the flu. We had better hunker down until a vaccine is ready to save us all.

But the worst reason of all is that mask mandates appear to be an effort by governments to find out what restrictions on their civil liberties people will accept on the thinnest possible evidence. They are the not-so-thin edge of the wedge. Today,



Credit: Sigrid Estrada

Former New York Times reporter Alex Berenson presents the third installment in the best-selling series that offers an honest counterpart to credulous media coverage about the risks of the coronavirus and ways to stop it.

Unreported Truths Part 1 focused on the way we count deaths from COVID-19. Part 2 explained lockdowns. But Part 3 covers a topic even more central to our lives - the evidence that masks do or do not work to reduce the spread of the coronavirus.

For months, public health experts have proclaimed, "My mask protects you, while yours protects me." Governments all over the world now make people wear face coverings in public. But the proof that masks do any good is far weaker than almost anyone understands.

Like Parts 1 and 2, this section draws on primary sources like Centers for Disease Control and World Health Organization reports, along with news articles, government documents, and scientific papers. It will give you a new perspective on whether masks work - and the truthful and accurate information you need as the debate over mask requirements rages on.

Please note: This booklet contains only the third section of Unreported Truths. Parts 1 and 2 are available separately.



ISBN 9781953039071

Plaintiffs' Exhibit 408

pubmed.ncbi.nlm.nih.gov

# Use of surgical face masks to reduce the incidence of the common cold among health care workers in Japan: a randomized controlled trial - PubMed

*Joshua L Jacobs* 1 ,

8-10 minutes

---

Randomized Controlled Trial

. 2009 Jun;37(5):417-419.

doi: 10.1016/j.ajic.2008.11.002. Epub 2009 Feb 12.

Affiliations

- PMID: **19216002**

- DOI: 10.1016/j.ajic.2008.11.002

Randomized Controlled Trial

## Use of surgical face masks to reduce the incidence of the common cold among health care workers in Japan: a randomized controlled trial

Joshua L Jacobs et al. Am J Infect Control. 2009 Jun.

## Abstract

**Background:** Health care workers outside surgical suites in Asia use surgical-type face masks commonly. Prevention of upper respiratory infection is one reason given, although evidence of effectiveness is lacking.

**Methods:** Health care workers in a tertiary care hospital in Japan were randomized into 2 groups: 1 that wore face masks and 1 that did not. They provided information about demographics, health habits, and quality of life. Participants recorded symptoms daily for 77 consecutive days, starting in January 2008. Presence of a cold was determined based on a previously validated measure of self-reported symptoms. The number of colds between groups was compared, as were risk factors for experiencing cold symptoms.

**Results:** Thirty-two health care workers completed the study, resulting in 2464 subject days. There were 2 colds during this time period, 1 in each group. Of the 8 symptoms recorded daily, subjects in the mask group were significantly more likely to experience headache during the study period (P < .05). Subjects living with children were more likely to have high cold severity scores over the course of the study.

**Conclusion:** Face mask use in health care workers has not been demonstrated to provide benefit in terms of cold symptoms or getting colds. A larger study is needed to definitively establish noninferiority of no mask use.

## Similar articles

- [Disposable surgical face masks: a systematic review.](#)

  Lipp A, Edwards P. Lipp A, et al. Can Oper Room Nurs J. 2005 Sep;23(3):20-1, 24-5, 33-8. Can Oper Room Nurs J. 2005. PMID: 16295987 Review.

Plaintiffs' Exhibit 409



**TECHNICAL REPORT**

# Using face masks in the community: first update

**Effectiveness in reducing transmission of COVID-19**

15 February 2021

## Key messages

The role of face masks in the control and prevention of COVID-19 remains an issue of debate. Prior to COVID-19, most studies assessing the effectiveness of face masks as a protective measure in the community came from studies on influenza, which provided little evidence to support their use. This technical report reviews the evidence that has been accumulated since the emergence of COVID-19, in addition to what has existed on this topic prior to the pandemic, and updates the ECDC opinion on the suitability of using face masks in the community [1] published on 9 April 2020.

## Assessment of the evidence

The evidence regarding the effectiveness of medical face masks for the prevention of COVID-19 in the community is compatible with a small to moderate protective effect, but there are still significant uncertainties about the size of this effect. Evidence for the effectiveness of non-medical face masks, face shields/visors and respirators in the community is scarce and of very low certainty.

Additional high-quality studies are needed to assess the relevance of the use of medical face masks in the COVID-19 pandemic.

## Recommendations

Although the evidence for the use of medical face masks in the community to prevent COVID-19 is limited, face masks should be considered as a non-pharmaceutical intervention in combination with other measures as part of efforts to control the COVID-19 pandemic.

Taking into account the available evidence, the transmission characteristics of SARS-CoV-2, the feasibility and potential harms associated with the use of various types of face masks, the following options are proposed:

- In areas with community transmission of COVID-19, wearing a medical or non-medical face mask is recommended in confined public spaces and can be considered in crowded outdoor settings.
- For people vulnerable to severe COVID-19, such as the elderly or those with underlying medical conditions, the use of medical face masks is recommended as a means of personal protection in the above-mentioned settings.
- In households, the use of medical face masks is recommended for people with symptoms of COVID-19 or confirmed COVID-19 and for the people who share their household.

Suggested citation: European Centre for Disease Prevention and Control. Using face masks in the community: first update. 15 February 2021. ECDC: Stockholm; 2021.

© European Centre for Disease Prevention and Control, Stockholm, 2021.

- Based on the assessment of the available scientific evidence, no recommendation can be made on the preferred use of medical or non-medical face masks in the community.
- When non-medical face masks are used, it is advisable that masks that comply with available guidelines for filtration efficacy and breathability are preferred.

The very limited scientific evidence regarding the use of respirators in the community does not support their mandatory use in place of other types of face masks in the community. Although respirators would not be expected to be inferior to non-medical or medical face masks, the difficulties to ensure their appropriate fitting and use in community settings as well as potential adverse effects related to lower breathability should be taken into account.

The use of face masks in the community should complement and not replace other preventive measures such as physical distancing, staying home when ill, teleworking if possible, respiratory etiquette, meticulous hand hygiene and avoiding touching the face, nose, eyes and mouth.

The appropriate use of face masks and promoting compliance with their use when recommended as public health measures are key to the effectiveness of the measure and can be improved through education campaigns.

# Scope of this document

This document provides an update to and replaces the ECDC opinion on the suitability of using face masks in the community [1] published on 9 April 2020. The aim was to review whether the scientific evidential basis has changed since April 2020. This document therefore builds on the evidence available in the literature and presents the main findings and recommendations for public health measures. The use of face masks by healthcare workers for the prevention of COVID-19 is out of the scope of this document and is covered in the latest update to the technical report Infection prevention and control and preparedness for COVID-19 in healthcare settings', published on 9 February 2021.

# Target audience

Public health authorities and the public in Member States of the European Union (EU) and European Economic Area (EEA).

**Figure 1.** Types of face mask and shield








Medical face mask          Non-medical/'community' face mask          Respirator          Face shield/visor

# Glossary

**Face mask** is an overarching term used for any device (i.e. a non-medical, medical face mask or a respirator) that is worn over the mouth and nose to prevent the inhalation of harmful substances such as infectious respiratory droplets or the release of infectious respiratory droplets produced by breathing, speaking, coughing or sneezing in the environment

**Source control:** When face masks are used to prevent the release of infectious respiratory particles such as droplets or aerosols by SARS-CoV-2-positive people into the environment to decrease the likelihood that these particles are inhaled by another healthy person or deposited on mucous membranes (i.e. protection of others).

**Wearer protection:** When face masks are intended to prevent SARS-CoV-2-containing infectious splashes and respiratory droplets, including aerosols from the environment to be inhaled or deposited on mucous membranes.

**Non-medical face masks (also known as 'community' masks)** include various forms of self-made and commercial masks, including re-usable face covers made of cloth, other textiles and other disposable materials

such as paper. They are not standardised and are not intended to be used in healthcare settings or by healthcare workers.

**A medical face mask (also known as surgical or procedure mask)** is a disposable medical device used by healthcare workers to prevent large respiratory droplets and splashes reaching the mouth and nose of the wearer, and as a means of source control to stop the spread of large respiratory droplets by the person wearing them [2]. Requirements for medical face masks, including the duration of use, are defined in the European Committee for Standardization's published standards [3]. Medical face masks are not defined as personal protective equipment in Regulation (EU) 2016/425 of 9 March 2016 or Directive 89/656/EEC on personal protective equipment [4]. However, for the purpose of this document and in accordance with guidance on infection prevention and control in the context of COVID-19 by the World Health Organization (WHO) [5] and on transmission-based precautions [6], medical face masks are considered to provide protection against infections transmitted by droplets.

**A respirator (also known as a filtering face piece (FFP) mask or filtering half mask)** is a device designed to protect the wearer from exposure to airborne contaminants (e.g. from inhaling dust or infectious particles). Requirements for respirators, including the intended duration of use, are specified in the European Committee for Standardization's published standards [7], and respirators are classified as personal protective equipment [2]. **An N95/N99 respirator** is the United States' equivalent of FFP2/FFP3 respirators as defined by U.S. standard NIOSH 42 CFR, part 84 [8].

FFP2 respirators have a filtering capacity of at least 94% for 0.3 µm particles, while FFP3 respirators have a filtering capacity of at least 99% for 0.3 µm particles. Respirators are mainly used by workplace users, including healthcare professionals, to protect themselves, especially during dust- and aerosol-generating procedures, and require a fitting test to ensure proper protection.

**A face shield or visor** is a device used to protect the face from hazards such as splashes. It is used by healthcare workers as part of droplet precautions for face and eye protection against large infectious droplets and splashes.

# Background

In most instances, SARS-CoV-2 is believed to be transmitted from person to person primarily via large respiratory droplets and aerosols produced when breathing, talking or coughing, either by being inhaled or deposited on mucous membranes. People with mild or no symptoms at the pre-symptomatic and early stages of infection contribute to the spread of COVID-19 [9]. People with asymptomatic infection contribute to transmission, although to a lesser extent compared with symptomatic patients [9].

SARS-CoV-2 transmission has been mainly reported in crowded, confined indoor spaces such as workplaces (offices, factories), churches, restaurants, resorts, weddings, parties, shopping centres, worker dormitories, dance classes, cruise ships and vehicles [10]. Outdoor events, such as carnival celebrations [11] and football matches [12], have also been implicated in the spread of COVID-19, indicating a risk associated with crowding during outdoor events. However, such events are also linked to concurrent crowding in related indoor spaces, such as restaurants and bars, making it difficult to assess the contribution of outdoor spaces to transmission.

Medical face masks have been used in healthcare settings for both personal protection and source control. Prior to the COVID-19 pandemic, medical face masks have been recommended in the community as a mean of source control for people who are symptomatic for other diseases, in order to prevent the spread of respiratory droplets produced by coughing or sneezing. The use of medical face masks has been recommended for the reduction of transmission of other diseases, such as tuberculosis [13] and influenza [14].

A medical face mask may help reduce the spread of COVID-19 in the community by reducing the release of respiratory droplets *from* infected individuals who may not be aware they are infected (asymptomatic) and before they develop any symptoms (presymptomatic) or when they have mild non-specific symptoms.

Due to past shortages in the availability of medical face masks and the fact that they were prioritised for use in healthcare settings, non-medical face masks have also been extensively used in an attempt to reduce the spread of COVID-19 in the community. Non-medical face masks can be made from a range of materials, such as cotton or synthetics, and are either commercially available or home-made.

During the course of the pandemic and as of 12 February 2021, all EU/EEA countries have implemented various recommendations regarding the use of medical and non-medical face masks as a complementary non-pharmaceutical intervention in closed places (including retail and public transportation) as well as in public places where physical distancing is not always possible. In the vast majority of these countries, the use of medical or non-medical face masks has been or continues to be mandatory. For more details on the current national recommendations, please see the ECDC-Joint Research Centre response measures database [15] or ECDC's weekly Country Overview [16].

# Methodological approach

This technical report draws upon evidence from a systematic literature search on the effectiveness of different types of face masks. Our primary question for the literature search was 'What is the effectiveness of face masks in preventing the spread of COVID-19 in the community?' We searched for different types of study designs (e.g. interventional and observational studies) that looked at the effectiveness of wearing face masks, either for personal protection or source control or both, for preventing the spread of COVID-19. Indirect evidence from other settings, such as households and healthcare settings, was also considered, as was evidence from other respiratory viral infections with similar modes of transmission to COVID-19 and potential for pandemic spread, such as influenza and SARS. We also searched for indirect evidence from experimental studies and for evidence on adverse effects of face mask use. Searches were run in the databases PubMed, Embase, Scopus, and CENTRAL on 10 November 2020, and re-run on 11 December 2020. Daily email search alerts for the above listed databases were established to keep the review team informed of any new studies published after 11 December 2020 and until 18 January 2021. The reference lists of identified reviews were searched for additional primary studies. Records were screened by two independent reviewers in two steps on the level of title and abstracts and on the level of full texts, using pre-defined selection criteria. Discrepancies between reviewers were resolved by consensus. Data were extracted using a pre-determined and tested extraction form. For the sake of time, the references were distributed between reviewers and each study was extracted and summarised by a single reviewer, together with the quality and risk of bias assessment. Details on the methodology of the systematic review can be found in the **supplementary material**.

The body of this document summarises the main findings. ECDC experts assessed the evidence according to the Grading of Recommendations, Assessment, Development and Evaluation (GRADE) criteria [17], as well as the certainty/confidence of evidence (Table 1, Annex). Confidence in evidence was deemed to be lower where, for instance, inconsistencies in the findings were found or the literature only indirectly addressed the topic in question, i.e. other settings than community settings or other viral infections than COVID-19.

**Table 1.** **GRADE definitions for the ratings of the overall confidence of evidence [17]**

| Rating | Definition |
| --- | --- |
| High | This research provides a very good indication of the likely effect. The likelihood that the effect will be substantially different is low. |
| Moderate | This research provides a good indication of the likely effect. The likelihood that the effect will be substantially different is moderate. |
| Low | This research provides some indication of the likely effect. However, the likelihood that it will be substantially different (a large enough difference that it might have an effect on a decision) is high. |
| Very low | This research does not provide a reliable indication of the likely effect. The likelihood that the effect will be substantially different (a large enough difference that it might have an effect on a decision) is very high. |

In addition, the effect estimates of the studies were assessed to provide information on the magnitude of the effects observed in the studies. Due to the large heterogeneity in the methodologies and the reported effect estimates, it was not possible to perform a meta-analysis. We therefore summarised the effect estimates qualitatively based on the sample size, direction of effect (favourable or unfavourable), magnitude and statistical significance [18]. The summary of the effect estimates and certainty of the evidence from the interventional and observational studies is provided in the Annex.

It is important to note that this document was not developed as a formal GRADE process. However, given the rapidly growing evidence surrounding SARS-CoV-2 and COVID-19, it was deemed important to attempt to provide such an assessment of the available scientific evidence.

# Scientific evidence for the use of face masks in the community

In this section, the scientific evidence for the effectiveness of face masks is presented. It is divided into four sections, namely medical face masks; non-medical face masks; visors and transparent face masks; and respirators. The key messages of each section are highlighted in a summary box.

## Effectiveness of medical face masks for the prevention of COVID-19 in the community

### Summary

There is evidence of low to moderate certainty for the use of medical face masks providing a small to moderate protective effect against COVID-19 in the community, both in terms of personal protection as well as source control (protection of others).

Most, but not all, studies show a favourable effect for medical face masks for protecting against COVID-19. However, this effect was not statistically significant in several studies, and the quality of the evidence was assessed as low in several studies, so the results should be interpreted with caution.

Looking at the evidence from studies in healthcare settings or other diseases than COVID-19 (i.e. influenza and other respiratory viral infections) did not improve the certainty of the evidence. Some of these studies show a statistically significant favourable effect and others a non-statistically significant favourable effect, while a few studies show an unfavourable effect for the use of medical face masks. In addition, these findings may not be directly extrapolated to COVID-19 and community settings, thus making it difficult to draw conclusions from these studies for the prevention of COVID-19 in the community.

The large heterogeneity in the methodology of the different studies makes it difficult to generalise results to all community settings as well as to compare different studies or settings. Additional high-quality studies are needed to investigate the relevance of medical face masks in the COVID-19 pandemic.

| | Effect estimate | Certainty of evidence |
|---|---|---|
| **Effectiveness of medical face masks for the prevention of COVID-19 in the community** | Small to moderate | Low to moderate |

**Community settings:** There is limited evidence on the effectiveness of medical face masks for the prevention of COVID-19 in the community. We identified only one randomised controlled trial (RCT), with around 3 000 participants in each of the intervention (medical face mask) and the control group [19]. The study showed an 18% decrease in the incidence of COVID-19 among people in the intervention group compared to the control group; however, this difference was not statistically significant. Although this study was conducted at a time of low incidence of COVID-19, leading to a relatively low number of events, the results support a relative reduction of risk lower than 50%. There was a risk of bias due to suboptimal compliance with the use of masks in the intervention group. No conclusion can be drawn from this study on the effectiveness of medical face mask use as source control (transmission to others), as the study was not designed to assess this. The evidence from this study is compatible with low or no effect of medical face masks for personal protection in the community, and the certainty of the evidence is moderate due to risk of bias.

Our search further identified one case-control [20] and four cross-sectional studies [21-24] that assessed the effectiveness of face masks for the prevention of COVID-19 in the community. These studies did not distinguish between medical face masks, non-medical face masks and respirators. With only one exception, these studies showed a very favourable statistically significant effect of face masks (OR range 0.16-0.3). The remaining study - a cross-sectional study -also showed a favourable effect, but it was not statistically significant. Despite the consistent favourable effect of face masks for the prevention of COVID-19, the certainty of evidence was considered low due to serious risk of bias and indirectness in some studies (one study was performed on a U.S. Navy ship and another in a school).

Furthermore, the literature search identified 11 ecological studies. These either compared various measures of the incidence of COVID-19 before and after the introduction of face mask use recommendations or mandates, or conducted comparisons between countries or regions with and without recommended or mandated face mask use in the community [25-35]. Nine studies showed a reduction in the number of COVID-19 cases after the introduction of the use of face masks, ranging from a reduction of 6% to 82% while one study resulted in a

significant reduction in the number of deaths due to COVID-19 (p<0.001). Finally, one study did not find a significant decrease in the number of new daily COVID-19 cases in the month before *vs.* after the mandatory use of face masks. Nevertheless, potential confounding factors associated with the evolution of the COVID-19 pandemic and the concurrent application of other control interventions limit the certainty of the evidence from these ecological studies. Furthermore, in these studies both medical and non-medical face masks were used in the community, making it difficult to distinguish the effect of each type of face mask.

**Healthcare settings:** Due to the limited evidence on the effectiveness of the use of medical face masks for personal protection from COVID-19 in the community, we also assessed evidence from studies performed in healthcare settings. Two case-control studies [36,37] and five cross-sectional studies [38-42] in healthcare settings assessed the protective effect of medical face masks against COVID-19 for healthcare workers. Both case-control studies showed a statistically significant favourable effect of medical face masks. However, both studies had a serious risk of bias due to selection bias, confounding and recall bias, which must be considered when interpreting the results. Four of the five cross-sectional studies showed a favourable effect, some statistically significant and some not. The remaining cross-sectional study found a higher risk of COVID-19 among healthcare workers wearing medical face masks than among healthcare workers wearing N95 respirators or no mask. Overall, there was large heterogeneity in the methodologies, the types of face mask used (medical face mask or respirator) and the study outcomes (seropositivity or PCR-confirmed infection). The risk of bias was also assessed as serious. The certainty of the evidence from these studies was assessed as low due to the risk of bias and indirectness, since these studies were performed in healthcare settings and the results may not be directly extrapolated to the community.

## Use of medical face masks for the prevention of influenza, SARS and other respiratory viral infections

To complement the evidence from studies on COVID-19, our search also included evidence on the effectiveness of face masks in preventing influenza, SARS and other respiratory viral infections.

**Community:** Eight cluster randomised controlled trials (RCTs) studied the effectiveness of the use of medical face masks in preventing influenza and other respiratory tract infections in households when a member of the household is ill [43-49]. These RCTs showed inconsistent non-statistically significant results. In two of the RCTs, a statistically significant favourable effect was found in the subgroup that included use of a medical face mask within 36 hours from symptom onset [45,49]. In most of these RCTs, medical face masks were used both by the person that was ill and their contracts. It is therefore difficult to distinguish the part of the effect that is related to personal protection from that due to source control.

Two cluster RCTs studied the effect of medical face masks for the prevention of influenza and other viral respiratory infections in other community settings; one during Hajj pilgrimage [50] and one in university residence halls [51]. The first RCT showed a non-statistically significant unfavourable effect of the use of medical face masks for the prevention of viral respiratory infections. Compliance was low in the intervention group and even several participants in the control group were using medical face masks. The RCT in university residence halls showed a non-statistically significant favourable effect of the use of medical face masks.

The cluster RCTs were characterised by large heterogeneity due to variable settings, studied outcomes and effect measures, making the synthesis and comparison of results challenging. Furthermore, deviations from interventions were very common in the included RCTs. Commonly, there was moderate compliance in the intervention group while in several studies individuals in the control group were also applying the intervention.

Two case-control studies of the transmission of SARS in the community showed a large statistically significant favourable effect for the use of face masks with a range of OR 0.3-0.36 [52,53]. A cross-sectional study showed a favourable but not statistically significant effect [54].

**Healthcare settings:** One small RCT in a healthcare setting did not identify any effect of wearing a medical face mask at work for the prevention of clinical respiratory infection [55]. The sample size was very small and the study did not adjust for exposure of the participants out of the workplace.

Five case-control studies [53,56-59] and two cross-sectional studies [60] investigated the role of medical face masks in preventing the transmission of SARS. Four out of the five case-control studies showed a very favourable statistically significant effect (range of aOR: 0.08-0.29) and one study showed a favourable but non-statistically significant effect (there were very few participants without any face mask in this study). One cross-sectional study also showed a large statistically significant favourable effect when comparing wearing any face mask (including N95 respirators and medical face masks) to not wearing any mask. However, when only comparing wearing a medical face mask to not wearing any mask, the effect was favourable but not statistically significant (the number of participants wearing a medical face mask was small and most of the exposure occurred during aerosol generating procedures). The second cross-sectional study showed favourable not significant effect for wearing either a medical face mask or a N95 respirator. The certainty of the evidence derived from these studies was assessed as low due to risk of bias and indirectness.

## Medical face masks for source control

Only a few of the identified studies specifically examined the effectiveness of medical face masks as source control for the prevention of COVID-19 and other respiratory tract infections. We identified only one such retrospective study, which estimated a COVID-19 incidence of 8.1% among contacts of presymptomatic index cases who were wearing a face mask compared to 19% among contacts of presymptomatic index cases who were not wearing a face mask [23].

One of the clustered RCTs showed a small non-statistically significant decrease in clinical respiratory illness and laboratory-confirmed viral respiratory infection [61]. In the other identified cluster RCTs of the use of medical face masks for the prevention of influenza and other respiratory tract infections in households and other community settings, medical face masks were used both by index cases with infection and their contacts making it difficult to distinguish the effect of medical face masks when used for personal protection from the effect when used for source control. However, these studies, as described above, had inconsistent non-statistically significant results with the exception of a statistically significant favourable effect in the subgroup that only included early use (within 36 hours from the onset of symptoms) of a medical face mask. A prospective interventional before-after study that specifically assessed the effectiveness of medical face masks when used as source control by healthcare workers in a haematopoietic stem cell transplantation unit showed a decrease in the incidence of respiratory viral infections in patients, from 10.3% to 4.4%, after the introduction of a universal masking policy among healthcare workers [62].

Several experimental studies have shown that face masks decrease the amount or otherwise limit the release and spread of respiratory droplets during activities such as breathing, speaking and coughing [63-65]. These studies also show an additive effect when both the source and the exposed wear a face mask. An experimental study in an animal model (hamsters) showed a decrease of transmission from 66.7% (10/15) when a medical face mask partition was not used between the cages to 25% (6/24, P = .018) when a medical face mask partition was used as a protection of the naïve animals, and to 16.7% (2/12, P = .019) when a medical face mask partition was used as source control on the side of the partition of the infected index animals [66].

## Effectiveness of non-medical face masks for the prevention of COVID-19 in the community

### Summary

Evidence regarding the effectiveness of non-medical face masks for the prevention of COVID-19 is scarce. We did not identify any interventional or observational study directly comparing the effectiveness of non-medical face masks with that of medical face masks and no masks.

As non-medical masks can consist of different types of material and be constructed in different ways, the filtration effectiveness varies between types of non-medical face mask.

Experimental studies on non-medical face masks conducted in the laboratory show inconsistent results with large variability in their effectiveness.

Limited indirect evidence from experimental studies showed that non-medical face masks may decrease the release to the environment of respiratory droplets, although there was conflicting evidence about the relative efficiency of medical versus non-medical face masks.

| | Effect estimate | Certainty of evidence |
|---|---|---|
| **Effectiveness of non-medical face masks for the prevention of COVID-19 in the community** | Small to moderate | Very low |

We did not find any interventional or observational studies directly comparing the effectiveness of non-medical face masks with that of medical face masks for the prevention of COVID-19.

One cluster RCT compared cloth non-medical masks with medical face masks in healthcare workers and found a statistically significant increase in the incidence of clinical respiratory infection and of influenza-like illness among the healthcare workers in the wards randomised to cloth mask use. However, the results of this study have not been replicated and the cloth non-medical masks used were not representative of non-medical face masks [67].

Several ecological studies have either compared various measures of the incidence of COVID-19 before and after the introduction of recommendations or mandates on the use of face masks, or conducted comparisons between countries or regions with and without recommended or mandated use of face masks in the community [25-35]. As in most cases the requirements for face masks in the community have not distinguished between medical and non-medical face masks, these studies only provide indirect evidence of the effect of non-medical face masks.

The results of these ecological studies are summarised in the section on effectiveness of medical face masks (see above).

Overall, experimental studies have shown inconsistent results with large variability in the efficiency of various non-medical face masks. Several experimental studies showed that non-medical face masks can have filtering properties comparable to that of medical face masks [63-66,68-104]. The filtration efficiency depends on the material and the construction of the face mask, including thickness and layering (from three to 16 layers [90]) and the combination of materials. However, results are often inconsistent, probably due to the large heterogeneity of applied experimental methodologies and conditions, and it is difficult to draw general conclusions from the results. To date, no interventional or observational study has directly evaluated the effect of non-medical face masks on the transmission of SARS-CoV-2. The European Committee for Standardization (CEN) and other standardisation agencies have established guidelines for the filtration characteristics and the breathability of non-medical face masks [105,106]. Factors such as the difficulty of breathing linked to various commonly available materials, especially when layered, must be taken into account when assessing the suitability of materials for non-medical face masks.

There is indirect evidence from experimental studies that non-medical face masks made from various materials may decrease the release to the environment of respiratory droplets produced by breathing, speaking and coughing, although there is conflicting evidence about the relative efficiency of medical versus non-medical face masks in this respect [64,65,107]. One of the advantages of non-medical face masks made of cloth or other textiles is that they can be easily made and can also be washed and reused.

Non-medical face masks with a transparent window are proposed to address communication impairment linked to face masks. We did not find any studies on the efficacy or effectiveness of such face masks to prevent exposure to respiratory droplets, but they would be expected to work similarly to other non-medical face masks if properly fit on the face of the wearer.

## Effectiveness of face shields/visors for the prevention of COVID-19 in the community

### Summary

There is a lack of scientific evidence on the effectiveness of face shields/visors and transparent face masks for the prevention of COVID-19.

One simulation study showed that face shields can reduce the short-term exposure to large respiratory droplets, although this was less effective for smaller droplets.

|  | Effect estimate | Certainty of evidence |
|---|---|---|
| **Effectiveness of face shields/visors and transparent face masks for the prevention of COVID-19 in the community** | Cannot be assessed | Very low |

Face shields and visors have been proposed to be worn by the general public instead of face masks for the prevention of COVID-19 transmission. There is a lack of interventional and observational studies to address the question of their effectiveness. One experimental study using a coughing patient simulator and a breathing healthcare worker simulator showed that face shields can reduce the short-term exposure to large respiratory droplets by up to 96%, but are less effective against smaller droplets that tend to be suspended in the air (68–80% reduction) [108]. Other experimental studies have also shown that face shields block the jet cloud released in the forward direction through simulated sneezing [65]. In one observational study that examined the protective effect of face shields, the face shields were used in combination with medical face masks [109]. It is therefore difficult to determine the size of protective effect provided by the face shield alone.

# Effectiveness of respirators for the prevention of COVID-19 in the community

## Summary

Respirators, e.g. FFP2 masks, have a higher filtration efficacy than medical face masks as defined by standardised specifications.

Evidence regarding the effectiveness of respirators in community settings remains very limited. While two experimental studies have shown favourable results when compared to medical face masks, a household study did not find any difference between respirators and medical face masks.

The identified studies comparing medical face masks with respirators in healthcare settings showed conflicting results, some in favour and others not in favour of respirators.

Due to difficulties to ensure appropriate use and fitting of respirators when used in the community, any possible added value of respirators in preventing respiratory infections is expected to be lower in the community than in healthcare.

| | Effect estimate | Certainty of evidence |
|---|---|---|
| Effectiveness of respirators for the prevention of COVID-19 in the community | Small to moderate | Low |

Due to their better filtration efficiency, respirators have been considered for use in the community, in particular since the emergence of more transmissible new variants of SARS-CoV-2. We did not identify any RCT of the impact of respirators on community transmission of any respiratory infection in a pandemic.

One study in household settings, comparing respirators with medical face masks and with no mask for the prevention of influenza, did not show any difference in the incidence of infection between the groups using respirators and medical face masks [44].

Studies in healthcare settings comparing respirators with medical face masks have shown conflicting results. Two RCTs found small non-statistically significant differences in laboratory-confirmed influenza either in favour of or not in favour of respirators [110,111]. Two other RCTs found a statistically significant favourable difference for clinical respiratory infection, but the difference between healthcare workers wearing medical face masks and those using respirators was not statistically significant for influenza-like illness and for laboratory-confirmed influenza [112,113].

Respirators have a higher filtration efficacy than medical masks as defined by standardised specifications. An experimental study showed that, when coughing through the medical face mask or respirator at a distance of 20 cm from a Petri dish, respirators were more effective than medical face masks in limiting the release of infectious respiratory droplets containing SARS-CoV-2 from patients with COVID-19 [63]. Another experimental study applying a cough simulator showed that respirators were more efficient than medical face masks when worn by the coughing mannequin and when worn by the exposed mannequin [64]. The efficacy was higher when the respirator was worn by the coughing mannequin and when the respirator was tightly fit. Efficacy was also dependent on distance and viral load.

The choice of suitable respirator for the shape of a user's face (type and size) and training to ensure that the user knows how carry out a pre-use seal check are crucial requirements for respirators to be effective [114]. The seal check should be repeated every time a user dons the respirator. Therefore, due to difficulties to ensure appropriate use and fitting of respirators when used in the community, any possible added value of respirators in preventing respiratory infections is expected to be lower in the community than in healthcare.

# Considerations for implementation of face mask policies in the community

The proper use of face masks is key to their effectiveness and can be improved by clear guidance and appropriate communication and educational campaigns. ECDC has produced and published infographics and videos [115-117] on how to correctly put on and discard a face mask in the community. Concerns that the mandatory use of face masks would generate a false sense of security that could decrease adherence to other types of protective behaviour, such as physical distancing, have been both supported by some studies [118] and disputed by other studies [119,120]. The use of face masks has been associated with decreased face-touching [121]. The decision to introduce the mandatory

use of face masks in community settings should take into account the epidemiology, the local context, the availability of face masks for the public (which should not compromise the availability of medical face masks or respirators for health and social care workers) and the resources available to monitor implementation. When non-medical face masks are used, it is advisable that masks complying with available guidelines for filtration efficacy and breathability are preferred (CEN Workshop Agreement (CWA) guidelines CWA 17553) [122].

Compliance with the use of face masks is affected by several factors, such as availability, gender, age, and perceptions of one's own vulnerability and severity of COVID-19; women and the elderly are more willing to wear face masks than men and young people. [123]. Social acceptance and perceived pressure from the family, mass media and the government are also associated with the increased use of face masks in the community. In contrast, limited knowledge of COVID-19 is linked to lower compliance with wearing a face mask [123].

## Potential adverse effects of face mask use

Policies on the widespread use of face masks for the prevention of COVID-19 in the community should take into account potential barriers and adverse effects [124]. People wearing a face mask may perceive anxiety and difficulty in breathing [125]. This may be pronounced in people with underlying respiratory disease. However, there is no evidence that wearing a face mask exacerbates respiratory or other diseases [126]. Of note, several studies found that there are no substantial physiological effects on wearing a face mask even during vigorous exercise [127-130]. On the other hand, there are many reports of adverse skin reactions, such as erythema and pruritus due to the prolonged use of face masks [131-141]. It should also be highlighted that the tight fit of some face masks often results in limited tolerability, discomfort and headaches [142-145].

In addition, face masks may also impede communication, especially among people with hearing impairment, due to the presence of background noise and lack of speechreading cues [146-149]. As a result, the use of face masks can impair speech perception and therefore transparent masks can be considered for communication among people with hearing difficulties [150].

The availability of medical face masks may be limited during a pandemic. This can be a serious barrier for the implementation of face mask policies in the community and needs to be addressed. The costs incurred by individuals in complying with a face mask policy could be high and should be taken in consideration. This may hamper the successful implementation of the policy. Furthermore, individuals may choose to re-use face masks designed for single use, which could result in an increased risk of self-contamination [151].

The use of non-medical face masks is an option that has been adopted widely and may successfully address the issues of availability, cost and environmental impact. Although there is no direct evidence that non-medical face masks are effective in protecting the user from COVID-19, data from experimental studies show that certain non-medical face masks have filtration characteristics similar to that of medical face masks and that they are equally effective in reducing the release of respiratory droplets in the environment. Furthermore, non-medical face masks can easily be produced in large quantities and are reusable [152].

Finally, the potential environmental implications of the widespread use of face masks should be considered when developing a face mask policy. The production and disposal of large amounts of face masks made of synthetic materials may have a harmful impact on the environment if not appropriately managed [153].

The impact of using face masks depends on the prevalence of COVID-19 in the community and would be more pronounced in settings with widespread community transmission. In places without significant community transmission of COVID-19, the potential harms and costs may outweigh the benefits [121,153].

## Recommendations for the use of face masks for the prevention of COVID-19 in the community

In areas with community transmission of COVID-19, wearing a medical or non-medical face mask is recommended in confined public spaces (such as stores, supermarkets and public transport).

The use of face masks can be considered in crowded outdoor settings.

For people vulnerable to severe COVID-19, such as the elderly or those with underlying medical conditions, the use of medical face masks is recommended as a means of personal protection in the above-mentioned settings.

In households, the use of medical face masks is recommended for people with symptoms of COVID-19 or confirmed COVID-19 and for the people who share their household, especially when isolation of the person with symptoms of or confirmed COVID-19 is not possible.

The use of face masks can be considered in certain workplaces and for certain professions that involve physical proximity to many other people (such as members of the police force, cashiers – if not behind a glass partition, etc.) as a complementary measure to technical measures (for example specific ventilation in areas with particular risk of transmission) and organisational measures (e.g. limiting the access of workers in such areas).[1]

When non-medical face masks are used, it is advisable that masks that comply with available guidelines for filtration efficacy and breathability are preferred.

The very limited scientific evidence on the use of respirators in the community does not support a recommendation for their mandatory use in place of other types of face masks in the community. Although respirators would not be expected to be inferior to non-medical or medical face masks, the difficulties to ensure their appropriate fitting and use when used in the community as well as potential harms related to lower breathability should be taken into account.

The use of face shields as a replacement for medical or non-medical face masks is not recommended, but can be considered when the impact of wearing a medical or non-medical face mask on communication is significant, such as for interaction with people with hearing impairment. A risk assessment should be made on individual cases. Non-medical face masks with a small transparent window but which still correctly fit the user's face can also be considered in these cases.

The use of face masks in the community should only complement and not replace other preventive measures that are recommended to reduce community transmission such as physical distancing, staying home when ill, respiratory etiquette, meticulous hand hygiene and avoiding touching the face, nose, eyes and mouth, teleworking if possible and appropriate ventilation of indoor spaces.

The appropriate use of face masks is important. The face mask should completely cover the face from the bridge of the nose down to the chin. The mask should be correctly adjusted on the bridge of the nose and to the face to minimise open space between the face and the mask. Hands should be cleaned with soap and water or alcohol-based hand sanitiser before putting on and taking off the face mask. The face mask should be removed from behind when taking it off; touching the front side should be avoided. Disposable face masks, e.g. medical face masks, should be safely disposed after use. Immediately after removing the face mask, hands should be washed or alcohol-based hand sanitiser applied. Washable, reusable face masks should be washed as soon as possible after each use, following the manufacturer's instructions. Common cotton face masks can be washed at 60°C with a common detergent. Campaigns for the appropriate use of face masks can improve the effectiveness of the measure.

Promoting compliance is recommended to increase the effectiveness of the measure. Monitoring adherence and addressing potential factors that reduce compliance are recommended.

## Justification for the recommendations

Although there is only low to moderate certainty of evidence for a small to moderate effect of the use of medical face masks in the community for the prevention of COVID-19, the balance of results towards a protective effect across the wide variety of studies reviewed, the very low risk of serious adverse effects and applying the precautionary principle leads us to conclude that face masks should be considered an appropriate non-pharmaceutical intervention in combination with other measures in the effort to control the COVID-19 pandemic.

For people vulnerable to severe COVID-19, the recommendation for the use of medical face masks for personal protection is based on the fact that most available evidence comes from studies on medical face masks and that they are standardised, as well as on the high impact of COVID-19 in these people.

The lack of definitively convincing evidence and of an accurate estimate of the effectiveness of face masks illustrates the challenges of the assessment of the effectiveness of public health measures at population level. RCTs are challenging to design and conduct in community settings while observational studies suffer from several forms of bias that are difficult to account for. Factors such as compliance and the large variability of transmission dynamics in different settings compound this assessment.

---

[1] At workplaces with risk of transmission of COVID-19, workplace risk assessments in accordance with occupational safety and health legislation will need to be revised and the occupational health and safety measures adapted in agreement with occupational safety and health services and workers, taking into account all types of risk (also taking into account the additional physical load when wearing personal protective equipment). The prevention measures should be set in a certain order of priority: technical and organisational measures have priority over personal protective measures. Where there is a safety and health committee in place, it should be consulted. More information on occupational safety and health is available at the following links:
Overview: https://osha.europa.eu/en/themes/covid-19-resources-workplace
COVID-19: guidance for the workplace: https://oshwiki.eu/wiki/COVID-19:_guidance_for_the_workplace
COVID-19: Back to the workplace - Adapting workplaces and protecting workers
https://osha.europa.eu/en/publications/covid-19-back-workplace-adapting-workplaces-and-protecting-workers/view

There is very limited evidence from interventional or observational studies on the use of non-medical face masks, respirators and face shields in the community. Most studies on face masks in the community have assessed medical face masks. Experimental studies indicate that several types of non-medical face masks have filtration characteristics comparable to that of medical face masks.

Regarding respirators, experimental studies have confirmed that they have a better filtration efficiency than that of medical and other types of face mask. However, the effectiveness of respirators depends on their appropriate fitting and use, and decreases if fitting is not optimal. Moreover, breathability and comfort are reduced and potential skin problems more frequent with respirators, e.g. FFP2 masks, especially if used for longer duration than recommended. Some respirators with an unprotected valve to facilitate exhalation do not prevent the release of exhaled respiratory particles from the wearer into the environment and therefore may not be appropriate for use as a means of source control in the case of respiratory infections. Finally, the cost of respirators is significantly higher than that of face masks. Altogether, the anticipated added value of the universal use of respirators in the community is currently considered very low. Taking into account the potential costs and harms, a recommendation for the use of respirators in place of other types of face masks in the community is not considered currently justifiable.

Based on experimental studies, options to maximise the fitting of medical face masks have been proposed, e.g. making knots close to the mask on each of the mask's ear-loops, applying a mask fitter or wearing a non-medical cloth mask over a medical face mask [102,154]. However, the results of such experimental studies cannot be directly extrapolated to real-life situations as these options have not been shown to decrease the transmission of respiratory viral infections, nor are the face masks and other products used in such experiments representative of what is used in real life. Considerations about breathability when increasing the number of filtering layers also apply.

We did not provide recommendations for use of face masks in children. Considerations for the use of face masks in children have been published by the World Health Organization [155].

# Limitations

This assessment is undertaken based on facts known to ECDC at the time of publication. There are some limitations related to the methodological approach used for the literature review, e.g. search limitations, and quality and risk of bias assessment performed by one reviewer for each study among a team of 10 reviewers. The data extraction table and the risk of bias assessment were agreed and piloted within the review team. Other limitations relate to the identified evidence, such as: small number of studies addressing the primary review question; small number of randomised studies; and large heterogeneity. Although we included all studies on adverse effects identified through our search, we did not perform a systematic review of these studies nor did we include knowledge, attitude and perception (KAP) studies and surveys, so some information on adverse effects may have been missed. We did not apply a GRADE evidence-to-decision framework for the development of the recommendations.

# Contributing ECDC experts (in alphabetical order)

Agoritsa Baka, Helena de Carvalho Gomes, Orlando Cenciarelli, Tjede Funk, Aikaterini Mougkou, Diamantis Plachouras, Senia Rosales-Klintz, Carl Suetens, Maria Tseroni, Klaus Weist

# References

1.  European Centre for Disease Prevention and Control (ECDC). Using face masks in the community - Reducing COVID-19 transmission from potentially asymptomatic or pre-symptomatic people through the use of face masks [Internet]. Stockholm: ECDC; 2020 [cited 28 January 2021]. Available from: https://www.ecdc.europa.eu/en/publications-data/using-face-masks-community-reducing-covid-19-transmission.

2.  U.S. National Institute for Occupational Safety and Health (NIOSH). Use of Respirators and Surgical Masks for Protection Against Healthcare Hazards [Internet]. Washington, D.C., U.S.: NIOSH; 2018 [updated 19 November 2018; cited 25 January 2021]. Available from: https://www.cdc.gov/niosh/topics/healthcarehsps/respiratory.html.

3.  European Committee for Standardization (CEN). CEN/TC 205 - Non-active medical devices [Internet]. Brussels, Belgium: CEN; 2019 [cited 28 January 2021]. Available from: https://standards.cen.eu/dyn/www/f?p=204:110:0::::FSP_PROJECT,FSP_ORG_ID:69675,6186&cs=19F67DA57C81359DD409C62A083C97AD7.

4.  European Parliament. Regulation (EU) 2016/425 of the European Parliament and the Council of 9 March 2016 on personal protective equipment and repealing Council Directive 89/686/ ECC [Internet]. Official Journal L81, 31/3/20166 P51-98; 2016. Available from: https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32016R0425.

5.  World Health Organization (WHO). Infection prevention and control during health care when novel coronavirus (nCoV) infection is suspected [Internet]. Geneva, Switzerland: WHO; 2020 [cited 25 January 2021]. Available from: https://www.who.int/publications/i/item/10665-331495.

6.  U.S. Centers for Disease Control and Prevention (CDC). Transmission-based precautions [Internet]. Atlanta, Georgia, U.S.2016 [updated 7 January 2019; cited 25 January 2021]. Available from: https://www.cdc.gov/infectioncontrol/basics/transmission-based-precautions.html

7.  European Committee for Standardization (CEN). CEN/TC 79 - Respiratory protective devices [Internet]. Brussels, Belgium: CEN; 2009 [cited 28 January 2021]. Available from: https://standards.cen.eu/dyn/www/f?p=204:110:0::::FSP_PROJECT,FSP_ORG_ID:32928,6062&cs=1FC98AD34A5EE26A0CB5A6155ED4D6E5E.

8.  U.s. National Institute for Occupational Safety and Health (NIOSH). 42 CFR Part 84 Respiratory Protective Devices [Internet]. Washington, D.C., U.S.: NIOSH; 1997 [updated 4 March 1997; cited 25 January 2021]. Available from: https://www.cdc.gov/niosh/npptl/topics/respirators/pt84abs2.html.

9.  Buitrago-Garcia D, Egli-Gany D, Counotte MJ, Hossmann S, Imeri H, Ipekci AM, et al. Occurrence and transmission potential of asymptomatic and presymptomatic SARS-CoV-2 infections: A living systematic review and meta-analysis. PLoS Med. 2020;17(9):e1003346.

10. Leclerc Q, Fuller N, Knight L, null n, Funk S, Knight G. What settings have been linked to SARS-CoV-2 transmission clusters? [version 2; peer review: 2 approved]. Wellcome Open Research. 2020;5(83).

11. Pladson K. 1.8 million people in Germany could be infected with coronavirus, researchers find [Internet]. Bonn, Germany: Deutsche Welle (DW); 2020 [updated 04 May 2021; cited 4 February 2020]. Available from: https://www.dw.com/en/18-million-people-in-germany-could-be-infected-with-coronavirus-researchers-find/a-53330608.

12. Azzoni T, Dampf A. Game Zero: Spread of virus linked to Champions League match [Internet]. New York, U.S.: The Associated Press (AP); 2020 [updated 25 March 2020; cited 04 February 2021]. Available from: https://apnews.com/article/ae59cfc0641fc63afd09182bb832ebe2.

13. World Health Organization (WHO). WHO Guidelines on tuberculosis infection prevention and control, 2019 update [Internet]. Geneva, Switzerland: WHO; 2019 [cited 31 January 2021]. Available from: https://www.who.int/tb/publications/2019/guidelines-tuberculosis-infection-prevention-2019/en/.

14. World Health Organization (WHO). Non-pharmaceutical public health measures for mitigating the risk and impact of epidemic and pandemic influenza [Internet]. Geneva, Switzerland: WHO; 2019 [cited 31 January 2021]. Available from: https://www.who.int/influenza/publications/public_health_measures/publication/en/.

15. European Centre for Disease Prevention and Control (ECDC) and the Joint Research Centre (JRC). Response Measures Database (RMD) [Internet]. ECDC/JRC; 2021. Available from: https://covid-statistics.jrc.ec.europa.eu/RMeasures.

16. European Centre for Disease Prevention and Control (ECDC). Weekly COVID-19 country overview [Internet]. Stockholm: ECDC; 2021 [cited 28 January 2020]. Available from: https://www.ecdc.europa.eu/en/covid-19/country-overviews.

17. GRADE Handbook [Internet]. 2013 [cited 1 February 2021]. Available from: https://gdt.gradepro.org/app/handbook/handbook.html#h.svwngs6pm0f2.

18. McKenzie JE, Brennan SE. Chapter 12: Synthesizing and presenting findings using other methods. 2020. In: Cochrane Handbook for Systematic Reviews of Interventions version 61 (updated September 2020) [Internet]. Cochrane. Available from: https://training.cochrane.org/handbook/current/chapter-12.

19. Bundgaard H, Bundgaard JS, Raaschou-Pedersen DET, von Buchwald C, Todsen T, Norsk JB, et al. Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Mask Wearers : A Randomized Controlled Trial. Ann Intern Med. 2020.

20. Doung-Ngern P, Suphanchaimat R, Panjangampatthana A, Janekrongtham C, Ruampoom D, Daochaeng N, et al. Case-Control Study of Use of Personal Protective Measures and Risk for SARS-CoV 2 Infection, Thailand. Emerg Infect Dis. 2020;26(11):2607-16.

21. Lopez L, Weber G, Nguyen T, Kleimola K, Bereda M, Liu Y, et al. Seroprevalence of anti-SARS-CoV-2 IgG Antibodies in the Staff of a Public School System in the Midwestern United States. medRxiv [preprint]. 2020. DOI: http://dx.doi.org/10.1101/2020.10.23.20218651. Available from: https://www.medrxiv.org/content/10.1101/2020.10.23.20218651v1.

22. Payne DC, Smith-Jeffcoat SE, Nowak G, Chukwuma U, Geibe JR, Hawkins RJ, et al. SARS-CoV-2 Infections and Serologic Responses from a Sample of U.S. Navy Service Members - USS Theodore Roosevelt, April 2020. MMWR Morb Mortal Wkly Rep. 2020;69(23):714-21.

23. Hong LX, Lin A, He ZB, Zhao HH, Zhang JG, Zhang C, et al. Mask wearing in pre-symptomatic patients prevents SARS-CoV-2 transmission: An epidemiological analysis. Travel Med Infect Dis. 2020;36:101803.

24. Wang Y, Tian H, Zhang L, Zhang M, Guo D, Wu W, et al. Reduction of secondary transmission of SARS-CoV-2 in households by face mask use, disinfection and social distancing: a cohort study in Beijing, China. BMJ Glob Health. 2020;5(5).

25. Cheng VC, Wong SC, Chuang VW, So SY, Chen JH, Sridhar S, et al. The role of community-wide wearing of face mask for control of coronavirus disease 2019 (COVID-19) epidemic due to SARS-CoV-2. J Infect. 2020;81(1):107-14.

26. Li Y, Zhang R, Zhao J, Molina MJ. Understanding transmission and intervention for the COVID-19 pandemic in the United States. Sci Total Environ. 2020;748:141560.

27. Bo Y, Guo C, Lin C, Zeng Y, Li HB, Zhang Y, et al. Effectiveness of non-pharmaceutical interventions on COVID-19 transmission in 190 countries from 23 January to 13 April 2020. Int J Infect Dis. 2020.

28. Kenyon C. Widespread use of face masks in public may slow the spread of SARS CoV-2: an ecological study. medRxiv [preprint]. 2020. DOI: https://doi.org/10.1101/2020.03.31.20048652. Available from: http://medrxiv.org/content/early/2020/04/06/2020.03.31.20048652.abstract.

29. Mitze T, Kosfeld R, Rode J, Wälde K. Face Masks Considerably Reduce Covid-19 Cases in Germany. Proc Natl Acad Sci U S A. 2020;117(51):32293-301.

30. Miyazawa D, Kaneko G. Face mask wearing rate predicts country's COVID-19 death rates. medRxiv [preprint]. 2020. DOI: 10.1101/2020.06.22.20137745. Available from: http://medrxiv.org/content/early/2020/06/23/2020.06.22.20137745.abstract.

31. Maloney MJ, Rhodes NJ, Yarnold PR. Mask mandates can limit COVID spread: Quantitative assessment of month-over-month effectiveness of governmental policies in reducing the number of new COVID-19 cases in 37 US States and the District of Columbia. medRxiv [preprint]. 2020. DOI: 10.1101/2020.10.06.20208033. Available from: http://medrxiv.org/content/early/2020/10/08/2020.10.06.20208033.abstract.

32. Von Batten K. The Effects of Statewide Stay-at-Home Orders, Mandatory Protective Face Mask Provisions, and COVID-19 Testing on the Number of Confirmed COVID-19 Infections. SSRN [preprint]. 2020. DOI: 10.2139/ssrn.3616422. Available from: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3616422.

33. Van Dyke ME, Rogers TM, Pevzner E, Satterwhite CL, Shah HB, Beckman WJ, et al. Trends in County-Level COVID-19 Incidence in Counties With and Without a Mask Mandate - Kansas, June 1-August 23, 2020. MMWR Morb Mortal Wkly Rep. 2020;69(47):1777-81.

34. Karaivanov A, er, Lu SE, Shigeoka H, Chen C, Pamplona S. Face Masks, Public Policies and Slowing the Spread of COVID-19: Evidence from Canada. SSRN [preprint]. 2020. DOI: 10.3386/w27891. Available from: https://coronavirus.1science.com/api/resolver/?id=c588d0356e9dbb1aca979417a5351e0ec3aa29d9&idx=4.

35. Kanu FA, Smith EE, Offutt-Powell T, Hong R, Dinh TH, Pevzner E. Declines in SARS-CoV-2 Transmission, Hospitalizations, and Mortality After Implementation of Mitigation Measures- Delaware, March-June 2020. MMWR Morb Mortal Wkly Rep. 2020;69(45):1691-4.

36. Çelebi G, Pişkin N, Bekleviç A, Altunay Y, Keleş AS, Tüz MA, et al. Specific risk factors for SARS-CoV-2 transmission among health care workers in a university hospital. Am J Infect Control. 2020.

37. Chatterjee P, Anand T, Singh K, Rasaily R, Singh R, Das S, et al. Healthcare workers & SARS-CoV-2 infection in India: A case-control investigation in the time of COVID-19. Indian J Med Res. 2020;151(5):459-67.

38. Self WH, Tenforde MW, Stubblefield WB, Feldstein LR, Steingrub JS, Shapiro NI, et al. Seroprevalence of SARS-CoV-2 Among Frontline Health Care Personnel in a Multistate Hospital Network - 13 Academic Medical Centers, April-June 2020. MMWR Morb Mortal Wkly Rep. 2020;69(35):1221-6.

39. Saban O, Levy J, Chowers I. Risk of SARS-CoV-2 transmission to medical staff and patients from an exposure to a COVID-19-positive ophthalmologist. Graefes Arch Clin Exp Ophthalmol. 2020;258(10):2271-4.

40. Sims MD, Maine GN, Childers KL, Podolsky RH, Voss DR, Berkiw-Scenna N, et al. COVID-19 seropositivity and asymptomatic rates in healthcare workers are associated with job function and masking. Clin Infect Dis. 2020.

41. Akinbami LJ, Vuong N, Petersen LR, Sami S, Patel A, Lukacs SL, et al. SARS-CoV-2 Seroprevalence among Healthcare, First Response, and Public Safety Personnel, Detroit Metropolitan Area, Michigan, USA, May-June 2020. Emerg Infect Dis. 2020;26(12).

42. Oksanen L-MAH, Sanmark E, Oksanen S, Anttila V-J, Paterno JJ, Lappalainen M, et al. Healthcare workers high COVID-19 infection rate: the source of infections and potential for respirators and surgical masks to reduce occupational infections. medRxiv [preprint]. 2020. DOI: 10.1101/2020.08.17.20176842. Available from: https://www.medrxiv.org/content/10.1101/2020.08.17.20176842v1.

43. Larson EL, Ferng YH, Wong-McLoughlin J, Wang S, Haber M, Morse SS. Impact of non-pharmaceutical interventions on URIs and influenza in crowded, urban households. Public health reports (Washington, DC : 1974). 2010;125(2):178-91.

44. MacIntyre CR, Cauchemez S, Dwyer DE, Seale H, Cheung P, Browne G, et al. Face mask use and control of respiratory virus transmission in households. Emerg Infect Dis. 2009;15(2):233-41.

45. Suess T, Remschmidt C, Schink SB, Schweiger B, Nitsche A, Schroeder K, et al. The role of facemasks and hand hygiene in the prevention of influenza transmission in households: results from a cluster randomised trial; Berlin, Germany, 2009-2011. BMC Infec Dis. 2012;12(1):26.

46. Canini L, Andréoletti L, Ferrari P, D'Angelo R, Blanchon T, Lemaitre M, et al. Surgical Mask to Prevent Influenza Transmission in Households: A Cluster Randomized Trial. PLoS One. 2010;5(11):e13998.

47. Cowling BJ. Facemasks and Hand Hygiene to Prevent Influenza Transmission in Households. Ann Intern Med. 2009;151(7):437-46.

48. Cowling BJ, Fung ROP, Cheng CKY, Fang VJ, Chan KH, Seto WH, et al. Preliminary Findings of a Randomized Trial of Non-Pharmaceutical Interventions to Prevent Influenza Transmission in Households. PLoS One. 2008;3(5):e2101.

49. Simmerman JM, Suntarattiwong P, Levy J, Jarman RG, Kaewchana S, Gibbons RV, et al. Findings from a household randomized controlled trial of hand washing and face masks to reduce influenza transmission in Bangkok, Thailand. Influenza Other Respir Viruses. 2011;5(4):256-67.

50. Alfelali M, Haworth EA, Barasheed O, Badahdah AM, Bokhary H, Tashani M, et al. Facemask against viral respiratory infections among Hajj pilgrims: A challenging clusterrandomized trial. PLoS One. 2020;15(10).

51. Aiello AE, Perez V, Coulborn RM, Davis BM, Uddin M, Monto AS. Facemasks, Hand Hygiene, and Influenza among Young Adults: A Randomized Intervention Trial. PLoS One. 2012;7(1):e29744.

52. Wu J, Xu F, Zhou W, Feikin DR, Lin C-Y, He X, et al. Risk factors for SARS among persons without known contact with SARS patients, Beijing, China. Emerg Infect Dis. 2004;10(2):210-6.

53. Lau JTF, Tsui H, Lau M, Yang X. SARS transmission, risk factors, and prevention in Hong Kong. Emerg Infect Dis. 2004;10(4):587-92.

54. Tuan PA, Horby P, Dinh PN, Mai LTQ, Zambon M, Shah J, et al. SARS transmission in Vietnam outside of the health-care setting. Epidemiology and Infection. 2006;135(3):392-401.

55. Jacobs JL, Ohde S, Takahashi O, Tokuda Y, Omata F, Fukui T. Use of surgical face masks to reduce the incidence of the common cold among health care workers in Japan: a randomized controlled trial. Am J Infect Control. 2009;37(5):417-9.

56. Nishiyama A, Wakasugi N, Kirikae T, Quy T, Ha le D, Ban VV, et al. Risk factors for SARS infection within hospitals in Hanoi, Vietnam. Jpn J Infect Dis. 2008;61(5):388-90.

57. Teleman MD, Boudville IC, Heng BH, Zhu D, Leo YS. Factors associated with transmission of severe acute respiratory syndrome among health-care workers in Singapore. Epidemiol Infect. 2004;132(5):797-803.

58. Nishiura H, Kuratsuji T, Quy T, Phi NC, Van Ban V, Ha LE, et al. Rapid awareness and transmission of severe acute respiratory syndrome in Hanoi French Hospital, Vietnam. The American journal of tropical medicine and hygiene. 2005;73(1):17-25.

59. Seto WH, Tsang D, Yung RW, Ching TY, Ng TK, Ho M, et al. Effectiveness of precautions against droplets and contact in prevention of nosocomial transmission of severe acute respiratory syndrome (SARS). Lancet (London, England). 2003;361(9368):1519-20.

60. Loeb M, McGeer A, Henry B, Ofner M, Rose D, Hlywka T, et al. SARS among critical care nurses, Toronto. Emerg Infect Dis. 2004;10(2):251-5.

61. MacIntyre CR, Zhang Y, Chughtai AA, Seale H, Zhang D, Chu Y, et al. Cluster randomised controlled trial to examine medical mask use as source control for people with respiratory illness. BMJ Open. 2016;6(12):e012330.

62. Sung AD, Sung JAM, Thomas S, Hyslop T, Gasparetto C, Long G, et al. Universal Mask Usage for Reduction of Respiratory Viral Infections After Stem Cell Transplant: A Prospective Trial. Clin Infect Dis. 2016;63(8):999-1006.

63. Kim MC, Bae S, Kim JY, Park SY, Lim JS, Sung M, et al. Effectiveness of surgical, KF94, and N95 respirator masks in blocking SARS-CoV-2: a controlled comparison in 7 patients. Infect Dis (Lond). 2020:1-5.

64. Ueki H, Furusawa Y, Iwatsuki-Horimoto K, Imai M, Kabata H, Nishimura H, et al. Effectiveness of Face Masks in Preventing Airborne Transmission of SARS-CoV-2. mSphere. 2020;5(5).

65. Arumuru V, Pasa J, Samantaray SS. Experimental visualization of sneezing and efficacy of face masks and shields. Phys Fluids (1994). 2020;32(11):115129.

66. Chan JFW, Yuan S, Zhang AJ, Poon VKM, Chan CCS, Lee ACY, et al. Surgical mask partition reduces the risk of non-contact transmission in a golden Syrian hamster model for Coronavirus Disease 2019 (COVID-19). Clin Infect Dis. 2020.

67. MacIntyre CR, Seale H, Dung TC, Hien NT, Nga PT, Chughtai AA, et al. A cluster randomised trial of cloth masks compared with medical masks in healthcare workers. BMJ Open. 2015;5(4):e006577.

68. Carnino JM, Ryu S, Ni K, Jin Y. Pretreated household materials carry similar filtration protection against pathogens when compared with surgical masks. Am J Infect Control. 2020;48(8):883-9.

69. Derrick JL, Gomersall CD. Protecting healthcare staff from severe acute respiratory syndrome: filtration capacity of multiple surgical masks. J Hosp Infect. 2005;59(4):365-8.

70. Ho KF, Lin LY, Weng SP, Chuang KJ. Medical mask versus cotton mask for preventing respiratory droplet transmission in micro environments. Sci Total Environ. 2020;735:139510.

71. Kähler CJ, Hain R. Fundamental protective mechanisms of face masks against droplet infections. J Aerosol Sci. 2020;148:105617.

72. Ma QX, Shan H, Zhang HL, Li GM, Yang RM, Chen JM. Potential utilities of mask-wearing and instant hand hygiene for fighting SARS-CoV-2. J Med Virol. 2020.

73. Zangmeister CD, Radney JG, Vicenzi EP, Weaver JL. Filtration Efficiencies of Nanoscale Aerosol by Cloth Mask Materials Used to Slow the Spread of SARS-CoV-2. ACS Nano. 2020;14(7):9188-200.

74. Hao W, Parasch A, Williams S, Li J, Ma H, Burken J, et al. Filtration performances of non-medical materials as candidates for manufacturing facemasks and respirators. Int J Hyg Environ Health. 2020;229:113582.

75. Hill WC, Hull MS, MacCuspie RI. Testing of Commercial Masks and Respirators and Cotton Mask Insert Materials using SARS-CoV-2 Virion-Sized Particulates: Comparison of Ideal Aerosol Filtration Efficiency versus Fitted Filtration Efficiency. Nano Lett. 2020;20(10):7642-7.

76. Li Y, Wong T, Chung J, Guo YP, Hu JY, Guan YT, et al. In vivo protective performance of N95 respirator and surgical facemask. Am J Ind Med. 2006;49(12):1056-65.

77. Teesing GR, van Straten B, de Man P, Horeman-Franse T. Is there an adequate alternative to commercially manufactured face masks? A comparison of various materials and forms. J Hosp Infect. 2020;106(2):246-53.

78. Wang D, You Y, Zhou X, Zong Z, Huang H, Zhang H, et al. Selection of homemade mask materials for preventing transmission of COVID-19: A laboratory study. PLoS One. 2020;15(10):e0240285.

79. Zhao M, Liao L, Xiao W, Yu X, Wang H, Wang Q, et al. Household Materials Selection for Homemade Cloth Face Coverings and Their Filtration Efficiency Enhancement with Triboelectric Charging. Nano Lett. 2020;20(7):5544-52.

80. Li IWS, Fan JKM, Lai ACK, Lo CM. Home-made masks with filtration efficiency for nano-aerosols for community mitigation of COVID-19 pandemic. Public Health. 2020;188:42-50.

81. Maurer L, Peris D, Kerl J, Guenther F, Koehler D, Dellweg D. Community Masks During the SARS-CoV-2 Pandemic: Filtration Efficacy and Air Resistance. J Aerosol Med Pul Drug Deliv. 2020.

82. Verma S, Dhanak M, Frankenfield J. Visualizing the effectiveness of face masks in obstructing respiratory jets. Phys Fluids (1994). 2020;32(6):061708.

83. Whiley H, Keerthirathne TP, Nisar MA, White MAF, Ross KE. Viral Filtration Efficiency of Fabric Masks Compared with Surgical and N95 Masks. Pathogens. 2020;9(9).

84. Xiao L, Sakagami H, Miwa N. A new method for testing filtration efficiency of mask materials under sneeze-like pressure. In Vivo. 2020;34:1637-44.

85. Konda A, Prakash A, Moss GA, Schmoldt M, Grant GD, Guha S. Aerosol Filtration Efficiency of Common Fabrics Used in Respiratory Cloth Masks. ACS Nano. 2020;14(5):6339-47.

86. Lai ACK, Poon CKM, Cheung ACT. Effectiveness of facemasks to reduce exposure hazards for airborne infections among general populations. J R Soc Interface. 2012;9(70):938-48.

87. Li Y, Guo YP, Wong KCT, Chung WYJ, Gohel MDI, Leung HMP. Transmission of communicable respiratory infections and facemasks. J Multidiscip Healthc. 2008;1:17-27.

88. Wen Z, Yu L, Yang W, Hu L, Li N, Wang J, et al. Assessment the protection performance of different level personal respiratory protection masks against viral aerosol. Aerobiologia. 2013;29(3):365-72.

89. Asadi S, Cappa CD, Barreda S, Wexler AS, Bouvier NM, Ristenpart WD. Efficacy of masks and face coverings in controlling outward aerosol particle emission from expiratory activities. Sci Rep. 2020;10(1):15665.

90. Aydin O, Emon B, Cheng S, Hong L, Chamorro LP, Saif MTA. Performance of fabrics for home-made masks against the spread of COVID-19 through droplets: A quantitative mechanistic study. Extreme Mech Lett. 2020;40:100924.

91. Bandiera L, Pavar G, Pisetta G, Otomo S, Mangano E, Seckl JR, et al. Face Coverings and Respiratory Tract Droplet Dispersion. medRxiv [preprint]. 2020. DOI: 10.1101/2020.08.11.20145086. Available from: http://medrxiv.org/content/early/2020/08/14/2020.08.11.20145086.abstract.

92. Foschini M, Monte AF, Mendes AC, Scarabucci RJ, Maletta A, Giuliani CD, et al. Aerosol blocking assessment by different types of fabrics for homemade respiratory masks: spectroscopy and imaging study. medRxiv [preprint]. 2020. DOI: https://doi.org/10.1101/2020.05.26.20100529. Available from: https://www.medrxiv.org/content/10.1101/2020.05.26.20100529v1.

93. Lindsley WG, Blachere FM, Law B, F. o, Beezhold DH, Noti JD. Efficacy of face masks, neck gaiters and face shields for reducing the expulsion of simulated cough-generated aerosols. Aerosol Science and Technology. 2021.

94. Loupa G, Karali D, RAPSOMANIKIS S. Aerosol filtering efficiency of respiratory face masks used during the COVID-19 pandemic. medRxiv [preprint]. 2020. DOI: 10.1101/2020.07.16.20155119. Available from: https://www.medrxiv.org/content/10.1101/2020.07.16.20155119v1.

95. Lustig SR, Biswakarma JJH, Rana D, Tilford SH, Hu W, Su M, et al. Effectiveness of Common Fabrics to Block Aqueous Aerosols of Virus-like Nanoparticles. ACS Nano. 2020;14(6):7651-8.

96. Mueller AV, Eden MJ, Oakes JM, Bellini C, Fernandez LA. Assessment of Fabric Masks as Alternatives to Standard Surgical Masks in Terms of Particle Filtration Efficiency. Matter. 2020;3(3):950-62.

97. O'Kelly E, Pirog S, Ward J, Clarkson PJ. Ability of fabric face mask materials to filter ultrafine particles at coughing velocity. BMJ Open. 2020;10(9):e039424.

98. Ronen A, Rotter H, Elisha S, Sevilia S, Parizer B, Hafif N, et al. Examining the protection efficacy of face shields against cough aerosol droplets using water sensitive papers. medRxiv [preprint]. 2020. DOI: 10.1101/2020.07.06.20147090. Available from: https://www.medrxiv.org/content/10.1101/2020.07.06.20147090v2.

99. Varallyay C, Li N, Case B, Wolf B. Material Suitability Testing for Non-Medical Grade Community Face Masks to Decrease Viral Transmission during a Pandemic. Disaster Med Public Health Prep. 2020:1-19.

100. Viola IM, Peterson B, Pisetta G, Pavar G, Akhtar H, Menoloascina F, et al. Face Coverings, Aerosol Dispersion and Mitigation of Virus Transmission Risk. arXiv [preprint]. 2020. DOI: 10.1109/OJEMB.2021.3053215. Available from: https://arxiv.org/abs/2005.10720.

101. Li L, Niu M, Zhu Y. Assessing the effectiveness of using various face coverings to mitigate the transport of airborne particles produced by coughing indoors. Aerosol Science and Technology. 2020.

102. Clapp PW, Sickbert-Bennett EE, Samet JM, Berntsen J, Zeman KL, Anderson DJ, et al. Evaluation of Cloth Masks and Modified Procedure Masks as Personal Protective Equipment for the Public During the COVID-19 Pandemic. JAMA Intern Med. 2020.

103. Pei C, Ou Q, Kim SC, Chen SC, Pui DYH. Alternative face masks made of common materials for general public: Fractional filtration efficiency and breathability perspective. Aerosol and Air Quality Research. 2020;20(12):2581-91.

104. Wang P, Liu Z, Chen DR. Performance of composite filters assembled from multiple layers of basic filtration media. Aerosol and Air Quality Research. 2020;20(11):2299-308.

105. Eurofins. New EU CEN guidelines for Community masks | Quality & Compliance [Internet]. Luxembourg, Luxembourg 2020. Available from: https://www.eurofins.com/consumer-product-testing/covid-19-product-testing/cwa-cen-mask-testing/.

106. Association Française de Normalisation (AFNOR). AFNOR Spec - Barrier masks V1.0 [Internet]. Paris, France: AFNOR; 2020 [updated 27 March 2020; cited 31 January 2021]. Available from: https://masques-barrieres.afnor.org/home/TelechargementS76?culture=en-GB.

107. Davies A, Thompson K-A, Giri K, Kafatos G, Walker J, Bennett A. Testing the efficacy of homemade masks: would they protect in an influenza pandemic? Disaster Med Public Health Prep. 2013;7(4):413-8.

108. Lindsley WG, Noti JD, Blachere FM, Szalajda JV, Beezhold DH. Efficacy of face shields against cough aerosol droplets from a cough simulator. Journal of occupational and environmental hygiene. 2014;11(8):509-18.

109.  Bhaskar ME, Arun S. SARS-CoV-2 Infection Among Community Health Workers in India Before and After Use of Face Shields. JAMA. 2020;324(13):1348-9.

110.  Radonovich LJ, Jr., Simberkoff MS, Bessesen MT, Brown AC, Cummings DAT, Gaydos CA, et al. N95 Respirators vs Medical Masks for Preventing Influenza Among Health Care Personnel: A Randomized Clinical Trial. JAMA. 2019;322(9):824-33.

111.  Loeb M, Dafoe N, Mahony J, John M, Sarabia A, Glavin V, et al. Surgical Mask vs N95 Respirator for Preventing Influenza Among Health Care Workers: A Randomized Trial. JAMA. 2009;302(17):1865-71.

112.  MacIntyre CR, Wang Q, Cauchemez S, Seale H, Dwyer DE, Yang P, et al. A cluster randomized clinical trial comparing fit-tested and non-fit-tested N95 respirators to medical masks to prevent respiratory virus infection in health care workers. Influenza Other Respir Viruses. 2011;5(3):170-9.

113.  MacIntyre CR, Wang Q, Seale H, Yang P, Shi W, Gao Z, et al. A randomized clinical trial of three options for N95 respirators and medical masks in health workers. American journal of respiratory and critical care medicine. 2013;187(9):960-6.

114.  Health and Safety Executive (HSE). Fit testing face masks to avoid transmission during the coronavirus pandemic [Internet]. Bootle, Engalnd: HSE; 2020 [updated 31 December 2020; cited 08 February 2021]. Available from: https://www.hse.gov.uk/coronavirus/ppe-face-masks/face-mask-ppe-rpe.htm.

115.  European Centre for Disease Prevention and Control (ECDC). Infographic: Using face masks in the community [Internet]. Stockholm: ECDC; 2020 [updated 14 April 2020; cited 31 January 2021]. Available from: https://www.ecdc.europa.eu/en/publications-data/infographic-using-face-masks-community.

116.  European Centre for Disease Prevention and Control (ECDC). Video on COVID-19: Do you know how to wear a face mask properly? (long version) [Internet]. Stockholm: ECDC; 2020 [updated 28 August 2020; cited 31 January 2021]. Available from: https://www.ecdc.europa.eu/en/publications-data/video-covid-19-do-you-know-how-wear-face-mask-properly-long-version.

117.  European Centre for Disease Prevention and Control (ECDC). Video on COVID-19: How to wear your single use face mask? (short version) [Internet]. Stockholm: ECDC; 2020 [updated 28 August 2020; cited 31 January 2021]. Available from: https://www.ecdc.europa.eu/en/publications-data/video-covid-19-how-wear-your-single-use-face-mask-short-version.

118.  Cartaud A, Quesque F, Coello Y. Wearing a face mask against Covid-19 results in a reduction of social distancing. PLoS One. 2020;15(12):e0243023.

119.  Mantzari E, Rubin GJ, Marteau TM. Is risk compensation threatening public health in the covid-19 pandemic? BMJ. 2020;370:m2913.

120.  Seres G, Balleyer AH, Cerutti N, Friedrichsen J, Süer M. Face Mask Use and Physical Distancing before and after Mandatory Masking: Evidence from Public Waiting Lines. SSRN [preprint]. 2020. DOI: 10.2139/ssrn.3641367. Available from: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3641367.

121.  Chen Y-J, Qin G, Chen J, Xu J-L, Feng D-Y, Wu X-Y, et al. Comparison of Face-Touching Behaviors Before and During the Coronavirus Disease 2019 Pandemic. JAMA Network Open. 2020;3(7):e2016924-e.

122.  European Committee for Standardization (CEN). CEN publishes a free workshop agreement on community face coverings [Internet]. Brussels: CEN-CENELEC; 2020 [updated 17 June 2020; cited 10 February 2021]. Available from: https://www.cencenelec.eu/news/press_releases/Pages/PR-2020-004.aspx.

123.  Seale H, Dyer CEF, Abdi I, Rahman KM, Sun Y, Qureshi MO, et al. Improving the impact of non-pharmaceutical interventions during COVID-19: examining the factors that influence engagement and the impact on individuals. BMC Infec Dis. 2020;20(1):607.

124.  Bakhit M, Krzyzaniak N, Scott AM, Clark J, Glasziou P, Del Mar C. Downsides of face masks and possible mitigation strategies: a systematic review and meta-analysis. medRxiv [preprint]. 2020. DOI: 10.1101/2020.06.16.20133207. Available from: https://www.medrxiv.org/content/10.1101/2020.06.16.20133207v1.

125.  Bhutani H, Hernandez P, Yang C, Bourbeau J, Licskai C, Dechman G, et al. Canadian Thoracic Society recommendations regarding the use of face masks by the public during the SARS-CoV-2 (COVID-19) pandemic. Canadian Journal of Respiratory, Critical Care, and Sleep Medicine. 2020:1-2.

126.  Özdemir L, Azizoğlu M, Yapıcı D. Respirators used by healthcare workers due to the COVID-19 outbreak increase end-tidal carbon dioxide and fractional inspired carbon dioxide pressure. J Clin Anesth. 2020;66:109901.

127.  Ciocan C, Clari M, Fabbro D, De Piano ML, Garzaro G, Godono A, et al. Impact of wearing a surgical mask on respiratory function in view of a widespread use during COVID-19 outbreak. A case-series study. Med Lav. 2020;111(5):354-64.

128.  Dattel AR, O'toole NM, Lopez G, Byrnes KP. Face mask effects of co2, heart rate, respiration rate, and oxygen saturation on instructor pilots. Collegiate Aviation Review. 2020;38(2):1-11.

129.  Shaw K, Butcher S, Ko J, Zello GA, Chilibeck PD. Wearing of Cloth or Disposable Surgical Face Masks has no Effect on Vigorous Exercise Performance in Healthy Individuals. Int J Environ Res Public Health. 2020;17(21).

130. Chan NC, Li K, Hirsh J. Peripheral Oxygen Saturation in Older Persons Wearing Nonmedical Face Masks in Community Settings. JAMA. 2020.

131. Techasatian L, Lebsing S, Uppala R, Thaow, ee W, Chaiyarit J, et al. The Effects of the Face Mask on the Skin Underneath: A Prospective Survey During the COVID-19 Pandemic. J Prim Care Community Health. 2020;11:2150132720966167.

132. Singh M, Pawar M, Bothra A, Maheshwari A, Dubey V, Tiwari A, et al. Personal protective equipment induced facial dermatoses in healthcare workers managing Coronavirus disease 2019. J Eur Acad Dermatol Venereol. 2020;34(8):e378-e80.

133. Purushothaman PK, Priyangha E, Vaidhyswaran R. Effects of Prolonged Use of Facemask on Healthcare Workers in Tertiary Care Hospital During COVID-19 Pandemic. Indian J Otolaryngol Head Neck Surg. 2020:1-7.

134. Hu K, Fan J, Li X, Gou X, Li X, Zhou X. The adverse skin reactions of health care workers using personal protective equipment for COVID-19. Medicine. 2020;99(24):e20603.

135. Battista RA, Ferraro M, Piccioni LO, Malzanni GE, Bussi M. Personal Protective Equipment (PPE) in COVID 19 Pandemic: Related Symptoms and Adverse Reactions in Healthcare Workers and General Population. J Occup Environ Med. 2020.

136. Xie Z, Yang YX, Zhang H. Mask-induced contact dermatitis in handling COVID-19 outbreak. Contact Dermatitis. 2020;83(2):166-7.

137. Szepietowski JC, Matusiak Ł, Szepietowska M, Krajewski PK, Białynicki-Birula R. Face Mask-induced Itch: A Self-questionnaire Study of 2,315 Responders During the COVID-19 Pandemic. Acta Derm Venereol. 2020;100(10):adv00152.

138. Krajewski PK, Matusiak Ł, Szepietowska M, Białynicki-Birula R, Szepietowski JC. Increased Prevalence of Face Mask-Induced Itch in Health Care Workers. Biology (Basel). 2020;9(12).

139. Marinova E, Dabov D, Zdravkov Y. Ophthalmic complaints in face-mask wearing: prevalence, treatment, and prevention with a potential protective effect against SARS-CoV-2. Biotechnology and Biotechnological Equipment. 2020;34(1):1323-36.

140. Foo CCI, Goon ATJ, Leow YH, Goh CL. Adverse skin reactions to personal protective equipment against severe acute respiratory syndrome - A descriptive study in Singapore. Contact Dermatitis. 2006;55(5):291-4.

141. Hua W, Zuo Y, Wan R, Xiong L, Tang J, Zou L, et al. Short-term skin reactions following use of N95 respirators and medical masks. Contact Dermatitis. 2020;83(2):115-21.

142. Ong JJY, Bharatendu C, Goh Y, Tang JZY, Sooi KWX, Tan YL, et al. Headaches Associated With Personal Protective Equipment – A Cross-Sectional Study Among Frontline Healthcare Workers During COVID-19. Headache. 2020;60(5):864-77.

143. Lim ECH, Seet RCS, Lee KH, Wilder-Smith EPV, Chuah BYS, Ong BKC. Headaches and the N95 face-mask amongst healthcare providers. Acta Neurol Scand. 2006;113(3):199-202.

144. Ramirez-Moreno JM, Ceberino D, Gonzalez A, Rebollo B, Macias P, Hariramani R, et al. Mask-associated de novo headache in healthcare workers during the Covid-19 pandemic. Occup Environ Med. 2020.

145. Klimek L, Huppertz T, Alali A, Spielhaupter M, Hörmann K, Matthias C, et al. A New Form of Irritant Rhinitis to Filtering Face-Piece Particle (FFP) Masks (FFP2/N95/KN95 Respirators) during COVID-19 Pandemic. World Allergy Organ J. 2020:100474.

146. Chodosh J, Weinstein BE, Blustein J. Face masks can be devastating for people with hearing loss. BMJ. 2020;370:m2683.

147. Naylor G, Burke LA, Holman JA. Covid-19 Lockdown Affects Hearing Disability and Handicap in Diverse Ways: A Rapid Online Survey Study. Ear Hear. 2020;41(6):1442-9.

148. Bandaru SV, Augustine AM, Lepcha A, Sebastian S, Gowri M, Philip A, et al. The effects of N95 mask and face shield on speech perception among healthcare workers in the coronavirus disease 2019 pandemic scenario. J Laryngol Otol. 2020:1-4.

149. Agarwal A, Agarwal S, Motiani P. Difficulties Encountered While Using PPE Kits and How to Overcome Them: An Indian Perspective. Cureus. 2020;12(11):e11652.

150. Ribeiro VV, Dassie-Leite AP, Pereira EC, Santos ADN, Martins P, Irineu RA. Effect of Wearing a Face Mask on Vocal Self-Perception during a Pandemic. J Voice. 2020.

151. Chughtai AA, Stelzer-Braid S, Rawlinson W, Pontivivo G, Wang Q, Pan Y, et al. Contamination by respiratory viruses on outer surface of medical masks used by hospital healthcare workers. BMC Infec Dis. 2019;19(1).

152. Chughtai AA, Seale H, Macintyre CR. Effectiveness of Cloth Masks for Protection Against Severe Acute Respiratory Syndrome Coronavirus 2. Emerg Infect Dis. 2020;26(10).

153. Aragaw TA. Surgical face masks as a potential source for microplastic pollution in the COVID-19 scenario. Mar Poll Bull. 2020;159:111517.

154.   Brooks JT, Beezhold DH, Noti JD, Coyle JP, Derk RC, Blachere FM, et al. Maximizing Fit for Cloth and
       Medical Procedure Masks to Improve Performance and Reduce SARS-CoV-2 Transmission and Exposure.
       MMWR Morb Mortal Wkly Rep. 2021;ePub: 10 February 2021. DOI:
       http://dx.doi.org/10.15585/mmwr.mm7007e1external.

155.   World Health Organization (WHO). Mask use in the context of COVID-19: interim guidance, 1 December
       2020 [Internet]. Geneva, Switzerland: WHO; 2020 [cited 15 February 2020]. Available from:
       https://apps.who.int/iris/handle/10665/337199.

# VARIOUS FACE MASK STUDIES PROVE THEIR INEFFECTIVENESS

`Plaintiffs' Exhibit 410`

### 1. Surgical mask / cloth face mask studies
**Community and Close Contact Exposures Associated with COVID-19 Among Symptomatic Adults ≥18 Years in 11 Outpatient Health Care Facilities — United States, July 2020**
The US Centre for Disease Control performed a study which showed that 85 percent of those who contracted Covid-19 during July 2020 were mask wearers. Just 3.9 percent of the study participanets never wore a mask.
Original: https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6936a5-H.pdf
Erratum. correction:
 https://www.cdc.gov/mmwr/volumes/69/wr/mm6938a7.htm?s_cid=mm6938a7_w
https://www.theblaze.com/op-ed/horowitz-cdc-study-covid-masks

### 2. Facial protection for healthcare workers during pandemics: a scoping review
This study used 5462 peer-reviewed articles and 41 grey literature records.
"Conclusion: The COVID-19 pandemic has led to critical shortages of medical-grade PPE. Alternative forms of facial protection offer inferior protection. More robust evidence is required on different types of medical-grade facial protection. As research on COVID-19 advances, investigators should continue to examine the impact on alternatives of medical-grade facial protection"
So how is your cloth and surgical mask working again if EVEN medical grade alternatives are failing ?
Study Article: https://pubmed.ncbi.nlm.nih.gov/32371574/

### 3. Physical interventions to interrupt or reduce the spread of respiratory viruses
"There is moderate certainty evidence that wearing a mask probably makes little or no difference to the outcome of laboratory-confirmed influenza compared to not wearing a mask"
Study Article: https://pubmed.ncbi.nlm.nih.gov/33215698/

### 4. Disposable surgical face masks for preventing surgical wound infection in clean surgery
"We included three trials, involving a total of 2106 participants. There was no statistically significant difference in infection rates between the masked and unmasked group in any of the trials"
Study article: https://pubmed.ncbi.nlm.nih.gov/27115326/

### 5. Disposable surgical face masks: a systematic review
Two randomised controlled trials were included involving a total of 1453 patients. In a small trial there was a trend towards masks being associated with fewer infections, whereas in a large trial there was no difference in infection rates between the masked and unmasked group.
Study article: https://pubmed.ncbi.nlm.nih.gov/16295987/

### 6. Evaluating the efficacy of cloth facemasks in reducing particulate matter exposure
"Our results suggest that cloth masks are only marginally beneficial in protecting individuals from particles<2.5 μm"
Study article: https://pubmed.ncbi.nlm.nih.gov/27531371/

### 7. Face seal leakage of half masks and surgical masks
"The filtration efficiency of the filter materials was good, over 95%, for particles above 5 micron in diameter but great variation existed for smaller particles.
Coronavirus is 0.125 microns. therefore these masks wouldn't protect you from the virus"
Study article: https://pubmed.ncbi.nlm.nih.gov/4014006/

### 8. Comparison of the Filter Efficiency of Medical Nonwoven Fabrics against Three Different Microbe Aerosols
"The filter efficiencies against influenza virus particles were the lowest"
"We conclude that the filter efficiency test using the phi-X174 phage aerosol may overestimate the protective performance of nonwoven fabrics with filter structure compared to that against real pathogens such as the influenza virus"
Study article: https://pubmed.ncbi.nlm.nih.gov/29910210/

### 9. Aerosol penetration through surgical masks
"Although surgical mask media may be adequate to remove bacteria exhaled or expelled by health care workers, they may not be sufficient to remove the submicrometer-size aerosols containing pathogens "
Study article: https://pubmed.ncbi.nlm.nih.gov/1524265/

10. **Particle removal from air by face masks made from Sterilization Wraps: Effectiveness and Reusability**
"We found that 60 GSM face mask had particle capture efficiency of 94% for total particles greater than 0.3 microns"
How big is the virus again? 0.125 microns.
Study article: https://pubmed.ncbi.nlm.nih.gov/33052962/

11. **A New Method for Testing Filtration Efficiency of Mask Materials Under Sneeze-like Pressure**
This study states that "alternatives" like silk and gauze etc could possibly be good options in the pandemic. It's done on starch particles. Does not state how big they are either, but they can still get through the material and my research points that starch particles are "big" much bigger than most viruses.
Study article: https://pubmed.ncbi.nlm.nih.gov/32503823/

12. **Protecting staff against airborne viral particles: in vivo efficiency of laser masks**
"The laser mask provided significantly less protection than the FFP2 respirator (P=0.02), and only marginally more protection than the surgical mask. The continued use of laser masks for respiratory protection is questionable. Taping masks to the face only provided a small improvement in protection"
Study article: https://pubmed.ncbi.nlm.nih.gov/16920222/

13. **Quantitative Method for Comparative Assessment of Particle Removal Efficiency of Fabric Masks as Alternatives to Standard Surgical Masks for PPE**
"Worn as designed, both commercial surgical masks and cloth masks had widely varying effectiveness (53 – 75 percent and 28 – 91 percent particle removal efficiency, respectively)". Different brand, different results and only when they applied a "nylon layers" did the "efficiency" improve. Synthetic fibres do not breathe, so this will inevitably effect your breathing.
Study article: https://pubmed.ncbi.nlm.nih.gov/32838296/

14. **The efficacy of standard surgical face masks: an investigation using "tracer particles"**
"Since the microspheres were not identified on the exterior of these face masks, they must have escaped around the mask edges and found their way into the wound" human albumin cells aka aborted fetal tissue, is much larger than the virus and still escaped the mask.
Study article: https://pubmed.ncbi.nlm.nih.gov/7379387/

15. **Testing the efficacy of homemade masks: would they protect in an influenza pandemic?**
"Our findings suggest that a homemade mask should only be considered as a last resort to prevent droplet transmission from infected individuals" so why have the government suggested you make your own when they are not effective ?
Study article: https://pubmed.ncbi.nlm.nih.gov/24229526/

16. **Using half-facepiece respirators for H1N1**
"Increasing the filtration level of a particle respirator does not increase the respirator's ability to reduce a user's exposure to contaminants"
https://pubmed.ncbi.nlm.nih.gov/19927872/

17. **Why Masks Don't Work Against COVID-19**
The site is full of studies proving masks dont work for coronavirus or the flu.
Article:
https://www.citizensforfreespeech.org/why_masks_don_t_work_against_covid_19?fbclid=IwAR0Qviyvt6BObOgaMijO3Cj0fgTcm_gm5jhXcMkO8GcH3Kur-bwib0o8rf8

18. **Masks Don't Work: A Review of Science Relevant to COVID-19 Social Policy**
This is full of studies proving mask protection is negligible for coronavirus, flu etc
Article: https://www.rcreader.com/commentary/masks-dont-work-covid-a-review-of-science-relevant-to-covide-19-social-policy?fbclid=IwAR0Qviyvt6BObOgaMijO3Cj0fgTcm_gm5jhXcMkO8GcH3Kur-bwib0o8rf8

19. **Face masks to prevent transmission of influenza virus: a systematic review**
There is fewer data to support the use of face masks or respirators to prevent becoming infected.
Study article: https://pubmed.ncbi.nlm.nih.gov/20092668/

20. **"Exercise with facemask; Are we handling a devil's sword?" – A physiological hypothesis**
No evidence to suggest that wearing a mask during exercise offers any benefit from the droplet transfer from the virus.

"Exercising with facemasks may reduce available Oxygen and increase air trapping preventing substantial carbon dioxide exchange. The hypercapnic hypoxia may potentially increase acidic environment, cardiac overload, anaerobic metabolism and renal overload, which may substantially aggravate the underlying pathology of established chronic diseases"

Study article: https://pubmed.ncbi.nlm.nih.gov/32590322/

21. **Use of face masks by non-scrubbed operating room staff: a randomized controlled trial**
Surgical site infection rates did not increase when non-scrubbed personnel did not wear face masks. 2010
Study article: https://pubmed.ncbi.nlm.nih.gov/20575920/

22. **Surgical face masks in modern operating rooms – a costly and unnecessary ritual?**
When the wearing of face masks by non-scrubbed staff working in an operating room with forced ventilation seems to be unnecessary.
Study article: https://pubmed.ncbi.nlm.nih.gov/1680906/

23. **Masks: a ward investigation and review of the literature**
Wearing multi layer operating room masks for every visit had no effect on nose and throat carriage rates.
Study article: https://pubmed.ncbi.nlm.nih.gov/2873176/

24. **Aerosol penetration and leakage characteristics of masks used in the health care industry**
The protection provided by surgical masks may be insufficient in environments containing potentially hazardous submirconometer-sized aerosols.
"Conclusion: We conclude that the protection provided by surgical masks may be insufficient in environments containing potentially hazardous submicrometer-sized aerosols"
Study article: https://pubmed.ncbi.nlm.nih.gov/8239046/

25. **Masks for prevention of viral respiratory infections among health care workers and the public: PEER umbrella systematic review**
Meta analysis review that says there is limited evidence to suggest that the use of masks may reduce the risk of spreading viral respiratory infections.
Study article: https://pubmed.ncbi.nlm.nih.gov/32675098/

26. **Modeling of the Transmission of Coronaviruses, Measles Virus, Influenza Virus, *Mycobacterium tuberculosis*, and *Legionella pneumophila* in Dental Clinics**
Evidence to suggest that transmission probability is strongly driven by indoor air quality, followed by patient effectiveness and the least by respiratory protection via mask use.
So this could explain "second waves" and has nothing to do with hand shaking, or not wearing a mask.
Study article: https://pubmed.ncbi.nlm.nih.gov/32614681/

27. **Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings-Personal Protective and Environmental Measures**
The use of face masks, either by infected or non infected peresons, does not have a significant effect on influenza transmission.
SO MASKS DON'T PROTECT YOU FROM ME, AND VICE VERSA.
Study article: https://pubmed.ncbi.nlm.nih.gov/32027586/

28. **Effectiveness of personal protective measures in reducing pandemic influenza transmission: A systematic review and meta-analysis**
Meta analyses suggest that regular hand hygiene provided a significant protective effect over face masks and their insignificant protection.
Study article: https://pubmed.ncbi.nlm.nih.gov/28487207/

29. **Effectiveness of N95 respirators versus surgical masks against influenza: A systematic review and meta-analysis**
Use of n95 respirators compared to surgical masks is not associated with a lower risk of laboratory confirmed influenza.
Study article: https://pubmed.ncbi.nlm.nih.gov/32167245/

30. **Adolescents' face mask usage and contact transmission in novel Coronavirus**
Face masks surfaces can become contamination sources. People are storing them in their pockets, bags, putting them on tables, people are reusing them etc. This is why this study is relevant:

Study article: https://pubmed.ncbi.nlm.nih.gov/32582579/

31. **Visualizing the effectiveness of face masks in obstructing respiratory jets**
Loosely folded face masks and "bandana style" face coverings provide minimum stopping capability for the smallest aerosolized droplets.
This applies to anyone who folds or shoves a mask into their pockets or bad. It also applies to cloth and homemade cloth masks:
Study article: https://pubmed.ncbi.nlm.nih.gov/32624649/

32. **Use of surgical face masks to reduce the incidence of the common cold among health care workers in Japan: a randomized controlled trial**
Face mask use in healthcare workers has not been demonstrated to provide benefit in terms of colds symptoms or getting colds.
Study article: https://pubmed.ncbi.nlm.nih.gov/19216002/

33. **A cluster randomised trial of cloth masks compared with medical masks in healthcare workers**
Penetration of cloth masks by influenza particles was almost 97 percent and medical masks 44 percent. so cloth masks are essentially useless, and "medical grade" masks don't provide adequate protection.
Study article: https://pubmed.ncbi.nlm.nih.gov/25903751/

34. **Simple respiratory protection–evaluation of the filtration performance of cloth masks and common fabric materials against 20-1000 nm size particles**
Cloth masks and other fabric materials tested in the study had 40-90 percent instantaneous penetration levels against polydisperse NaCl aerosols.
"Results obtained in the study show that common fabric materials may provide marginal protection against nanoparticles, including those in the size ranges of virus-containing particles in exhaled breath"
Study article: https://pubmed.ncbi.nlm.nih.gov/20584862/

35. **Respiratory performance offered by N95 respirators and surgical masks: human subject evaluation with NaCl aerosol representing bacterial and viral particle size range**
"The study indicates that N95 filtering facepiece respirators may not achieve the expected protection level against bacteria and viruses"
Study article: https://pubmed.ncbi.nlm.nih.gov/18326870/

36. **Do N95 respirators provide 95% protection level against airborne viruses, and how adequate are surgical masks?**
The n95 filtering respirators may not provide expected protection level against small virons
Study article: https://pubmed.ncbi.nlm.nih.gov/16490606/

37. **Do Surgical Masks Stop the Coronavirus?**
Study article: https://slate.com/news-and-politics/2020/01/coronavirus-surgical-masks-china.html

38. **Effectiveness of personal protective measures in reducing pandemic influenza transmission: A systematic review and meta-analysis**
This study states that an N95, depending on the brand, can range from 0.1-0.3 microns. however, most people cannot buy an N95 with a micron smaller than 0.3 micron because they are expensive and not readily available on the public market.
"N95 respirators made by different companies were found to have different filtration efficiencies for the most penetrating particle size (0.1 to 0.3 micron)"
" Above the most penetrating particle size the filtration efficiency increases with size; it reaches approximately 99.5% or higher at about 0.75 micron"
" Meta-analyses suggest that regular hand hygiene provided a significant protective effect (OR=0.62; 95% CI 0.52-0.73; I2=0%), and facemask use provided a non-significant protective effect (OR=0.53; 95% CI 0.16-1.71; I2=48%) against 2009 pandemic influenza infection"
Study article: https://pubmed.ncbi.nlm.nih.gov/28487207/

39. **Effectiveness of N95 respirators versus surgical masks against influenza: A systematic review and meta-analysis**
"The use of N95 respirators compared with surgical masks is not associated with a lower risk of laboratory-confirmed influenza. It suggests that N95 respirators should not be recommended for the general public, neither non high-risk medical staff who are not in close contact with influenza patients or suspected patients"

N95 masks did show a positive effect for BACTERIA but not viruses.
Study article: https://pubmed.ncbi.nlm.nih.gov/32167245/

### 40. Adolescents' face mask usage and contact transmission in novel Coronavirus

This study used dye to show if masks were contaminated. "As a result, masks surface become a contamination source. In the contact experiment, ten adults were requested to don and doff a surgical mask while doing a word processing task. The extended contamination areas were recorded and identified by image analysis"
Study article: https://pubmed.ncbi.nlm.nih.gov/32582579/

### 41. Use of surgical face masks to reduce the incidence of the common cold among health care workers in Japan: a randomized controlled trial

"Of the 8 symptoms recorded daily, subjects in the mask group were significantly more likely to experience headache during the study period"
"Face mask use in health care workers has not been demonstrated to provide benefit in terms of cold symptoms or getting colds"
Study article: https://pubmed.ncbi.nlm.nih.gov/19216002/

### 42. Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Mask Wearers : A Randomized Controlled Trial

"The recommendation to wear surgical masks to supplement other public health measures did not reduce the SARS-CoV-2 infection rate among wearers by more than 50 percent in a community with modest infection rates, some degree of social distancing, and uncommon general mask use"
Study article: https://pubmed.ncbi.nlm.nih.gov/33205991/

### 43. A cluster randomised trial of cloth masks compared with medical masks in healthcare workers

"An analysis by mask use showed ILI (RR=6.64, 95 percent CI 1.45 to 28.65) and laboratory-confirmed virus (RR=1.72, 95 percent CI 1.01 to 2.94) were significantly higher in the cloth masks group compared with the medical masks group. Penetration of cloth masks by particles was almost 97 percent and medical masks 44 percent"
Study article: https://pubmed.ncbi.nlm.nih.gov/25903751/

### 44. Respiratory performance offered by N95 respirators and surgical masks: human subject evaluation with NaCl aerosol representing bacterial and viral particle size range

"The study indicates that N95 filtering facepiece respirators may not achieve the expected protection level against bacteria and viruses. An exhalation valve on the N95 respirator does not affect the respiratory protection"
Study article: https://pubmed.ncbi.nlm.nih.gov/18326870/

### 45. Performance of N95 respirators: filtration efficiency for airborne microbial and inert particles

Coronavirus is 0.125 micron, as you can read in this study, it states that most N95 masks can only filter particles as small as 0.75 microns. This is too big to trap this virus. that is a fact.
And even with an efficiency of 95 percent (depending on brand, so filtration may be lower) IF the virus can be trapped… it's still missing 5 percent and maybe more based on an N95 that has 0.1 microns .
Study article: https://pubmed.ncbi.nlm.nih.gov/9487666/
CORONAVIRUSES ARE 0.125 MICRON. SO THE BEST N95 ON THE MARKET WOULD DO NOTHING .

### 46. A Novel Coronavirus from Patients with Pneumonia in China, 2019

a chinese study that proves that an airborne coronavirus particle (0.125 micron) can pass directly through an n95 mask
Study article: https://pubmed.ncbi.nlm.nih.gov/31978945/

### 47. Airborne coronavirus particle (<0.125 micron) will pass directly through a N95 face mask.

Study article: https://www.greenmedinfo.com/article/airborne-coronavirus-particle
SIZE OF THE CORONAVIRUS.
Size can vary but all are smaller than 0.3 micron .
"Human coronaviruses measure between 0.1 and 0.2 microns, which is one to two times below the cutoff"
This "cut off" is referring to the size an N95 mask can trap. Most of us, are not using MEDICAL or regular N95s.

# FACE MASK SIDE EFFECTS AND HEALTH IMPLICATIONS

## 1. Preliminary report on surgical mask induced deoxygenation during major surgery

Face mask side effects include lowered oxygen levels

This study proved that surgeons that wore a mask in surgery for an hour + had significant reductions in blood oxygen saturation.

This is relevant because most of us are being made to wear face masks at work for the whole shift, long journeys on public transport, and when we are in a public places doing shopping etc. and this requires a degree of exertion that is not taken into account.

"Considering our findings, pulse rates of the surgeon's increase and SpO2 decrease after the first hour"

Decreasing oxygen and increasing carbon dioxide in the bloodstream stimulates a compensatory response in the respiratory centers of the brain. These changes in blood gases result in increases in both frequency and depth of breaths. This exposes another risk – if your mask traps some virus you are breathing more hence increasing viral load and exposure.

https://www.sciencedirect.com/science/article/abs/pii/S1130147308702355?via%3Dihub

Study article: https://pubmed.ncbi.nlm.nih.gov/18500410/

## 2. Impact of structural features on dynamic breathing resistance of healthcare face mask

Face mask side effects include impeded breathing.

Ask people if they have issues breathing in these masks. anecdotal or not, as everyone is different.

"The results showed that each evaluation index was significantly different ($P < 0.05$) among different test masks"

Study article: https://pubmed.ncbi.nlm.nih.gov/31280156/

## 3. Respiratory consequences of N95-type Mask usage in pregnant healthcare workers-a controlled clinical study

The benefits of using N95 mask to prevent serious emerging infectious diseases should be weighed against potential respiratory consequences associated with extended N95 respirator usage.

Study article: https://pubmed.ncbi.nlm.nih.gov/26579222

"It is known that the N95 mask, if worn for hours, can reduce blood oxygenation in as much as 20 percent, which can lead to a loss of consciousness, as happened to the hapless fellow driving around alone in his car wearing an N95 mask, causing him to pass out, crash his car and sustain injuries. I am sure that we have several cases of elderly individuals or any person with poor lung function passing out, hitting their head. This, of course, can lead to death"

"CONCLUSIONS: Breathing through N95 mask materials have been shown to impede gaseous exchange and impose an additional workload on the metabolic system of pregnant healthcare workers, and this needs to be taken into consideration in guidelines for respirator use"

Yet we force pregnant women to use them…? What could this do to the fetus?

## 4. Headaches and the N95 face-mask amongst healthcare providers

Face mask side effects include headaches.

These headaches can force you to use added or unnecessary medications like painkillers that carry their own side effects. The theory as to why masks can trigger headaches is the RESTRICTION OF OXYGEN.

What are the long-term health effects on Health Care Workers with headaches arising from impeded breathing? Here are several sources and studies that back up this claim:

Study article: https://pubmed.ncbi.nlm.nih.gov/16441251/

**Headaches Associated With Personal Protective Equipment – A Cross-Sectional Study Among Frontline Healthcare Workers During COVID-19**

Study article: https://pubmed.ncbi.nlm.nih.gov/32232837/

**How to Avoid Migraine Triggers While Wearing Your Mask**

https://www.withcove.com/learn/migraine-triggers-mask

## 5. Use of surgical face masks to reduce the incidence of the common cold among health care workers in Japan: a randomized controlled trial

"Of the 8 symptoms recorded daily, subjects in the mask group were significantly more likely to experience headaches during the study period"

"Face mask use in health care workers has not been demonstrated to provide benefit in terms of cold symptoms or getting colds"

Study article: https://pubmed.ncbi.nlm.nih.gov/19216002/

**6.  Your Health Your Responsibility**
This video shows that even reading a book with a mask on decreases blood oxygen levels to your brain. what implications does this have for developing children forced to wear masks at school etc?
https://youtu.be/ul5E5BUrll4

**7.  Physiological impact of the N95 filtering facepiece respirator on healthcare workers**
"CONCLUSIONS: In healthy healthcare workers, FFR did not impose any important physiological burden during 1 hour of use, at realistic clinical work rates, but the FFR dead-space carbon dioxide and oxygen levels were significantly above and below, respectively, the ambient workplace standards, and elevated P(CO2) is a possibility"
Remember in "healthy healthcare workers" even their carbon dioxide levels rose. Most of the wider public have at least one health problem. Even healthy people were shown to have elevated CO2 levels above the healthy guidelines.
Study article: https://pubmed.ncbi.nlm.nih.gov/20420727/

**8.  The adverse skin reactions of health care workers using personal protective equipment for COVID-19**
Face mask side effects include adverse skin reactions
The adverse skin reactions of health care workers using personal protective equipment for COVID-19
Study article: https://pubmed.ncbi.nlm.nih.gov/32541493/

**9.  Your Mask May Be Causing Candida Growth in Your Mouth**
Face mask side effects include yeast infections
https://www.everydayhealth.com/coronavirus/your-mask-may-be-causing-candida-growth-in-your-mouth/

**10. 'Mask mouth' is a seriously stinky side effect of wearing masks**
Face mask side effects include dental issues
"We're seeing inflammation in people's gums that have been healthy forever, and cavities in people who have never had them before," says Dr. Rob Ramondi, a dentist and co-founder of One Manhattan Dental. "About 50 percent of our patients are being impacted by this, [so] we decided to name it 'mask mouth' — after 'meth mouth.' "
"While mask mouth isn't quite as obvious, if left untreated, the results could be equally harmful.
Gum disease — or periodontal disease — will eventually lead to strokes and an increased risk of heart attacks," says Dr. Marc Sclafani, another co-founder of One Manhattan Dental"
https://nypost.com/2020/08/05/mask-mouth-is-a-seriously-stinky-side-effect-of-wearing-masks/

**11. All That Mask-Wearing Could Be Giving You (Gasp!) Mouth Fungus—Here's How to Deal**
https://www.wellandgood.com/mouth-sores-from-wearing-masks/

**12. 'Maskne' Is a Real Thing—Here's How to Stop Face Mask Breakouts**
Face mask side effects include acne
https://www.health.com/condition/skin-conditions/maskne-mask-acne-mechanica

**13. Improper use of medical masks can cause infections**
Face mask side effects include mould and infections
Masks can cause bacterial and fungal infections around the mouth,and  in the mouth and lungs EVEN if you wash the cloth mask. Mould colonies were found in masks in as little as one day.
https://www.aa.com.tr/en/health/improper-use-of-medical-masks-can-cause-infections-/1766676

**14. Mould Colonization in Your Sinuses Could Be Holding You Back From Making a Full Recovery**
Information on mould and how it can affect your health.
https://moldfreeliving.com/2019/01/26/could-mold-colonization-in-your-sinuses/

**15. An investigation into the efficiency of disposable face masks**
What are the dangers of bacterial and fungal growths on a used and loaded mask?
This study tested all kinds of disposable masks and proved they cause you to breathe back in your own crap.
Study article: https://pubmed.ncbi.nlm.nih.gov/7440756/

**16. Can the Elastic of Surgical Face Masks Stimulate Ear Protrusion in Children?**
Disfiguration in children. Can masks stimulate ear protrusion in children?
This is due to masks that are too tightly fitted.
Tight masks can also cause tension headaches. Is this healthy for children long term?

Study article: https://pubmed.ncbi.nlm.nih.gov/32556449/

**17. When You Wear A Face Mask Every Day, This Is What Happens To Your Lungs**
Mask use can trigger allergies due to the mask collecting particles that stay on you for long periods of time.
https://www.thelist.com/214073/when-you-wear-a-face-mask-every-day-this-is-what-happens-to-your-lungs/

**18. The physiological impact of wearing an N95 mask during hemodialysis as a precaution against SARS in patients with end-stage renal disease**
The physiological impact of wearing an N95 mask during hemodialysis as a precaution against SARS in patients with end-stage renal disease.
And yet, we make sick people wear them. Even people without breathing issues, have lowered oxygen rates.
Study article: https://pubmed.ncbi.nlm.nih.gov/15340662/

**19. Other Face Mask Side Effects and Health Implications to Consider**
There is a great potential for harm that may arise from public policies forcing mask use on the wider population. The following unanswered questions arise unanswered:
• Can masks shed fibers or micro plastics that we can breathe in?
• Do these masks excrete chemical substances that are harmful when inhaled?
• Can masks excrete chemicals or fumes when heated, either with bodyheat sunlight or other sources of heat?
• Clothing dye can cause reactions, so how do we know that the manufacturing process of these masks do not pose a risk to us? Because, in reality, we do not buy our masks from medical companies or facilities who operate in sterile environments.

**20. [Gaps in asepsis due to surgical caps, face masks, external surfaces of infusion bottles and sterile wrappers of disposable articles]**
"It is obvious that the surfaces of the boxes of sterile packed disposable instruments and infusion bottles are not sterile. The disposable surgical masks and surgical caps used for sterile clothing are delivered by the producers not sterile, either." AND THIS IS HOSPITAL EQUIPMENT.
Study article: https://pubmed.ncbi.nlm.nih.gov/6099666/

**21. Mask Production Video**
This is a "factory" that produces alot of masks. Does this look a sterile environment to you? This is what the majority of us are getting when we purchase online or in stores that sell them in bulk. Do you want that on your face? https://youtu.be/8gyO9TSlC0Q

**22. Allergies and the Immune System**
Can pathogen-laden droplets interact with environmental dust and aerosols captured on the mask? Can this elicit a greater reaction to viruses? For example, if you have a dust allergy your mask is collecting this thus causing inflamation to the wearer and lowering his or her immune system.
"This can cause wheezing, itching, runny nose, watery or itchy eyes, and other symptoms" would that not facilitate spread and infection rate of viruses?
https://www.hopkinsmedicine.org/health/conditions-and-diseases/allergies-and-the-immune-system

**23. Virus interactions with bacteria: Partners in the infectious dance**
Bacteria and viruses can interact an increase infection suseptability:
https://journals.plos.org/plospathogens/article?id=10.1371/journal.ppat.1008234

**24. When viruses and bacteria unite!**
https://blogs.scientificamerican.com/lab-rat/when-viruses-and-bacteria-unite/

**25. An empirical and theoretical investigation into the psychological effects of wearing a mask**
Face mask side effects include altered behaviour
Are there negative social consequences to a masked society? This study implies that, yes, masks do cause people to adopt altered behaviours based on mask use.
https://strathprints.strath.ac.uk/43402/

**26. Mask mandates may affect a child's emotional, intellectual development**
Face mask side effects stagnate a child's natural intellectual development
It is well known that children find it hard to recognise faces up untill a certain age. Mask use will further interfere with this. Is this healthy for a developing child?

https://www.wishtv.com/news/mask-mandates-may-affect-a-childs-emotional-intellectual-development/

### 27. Disabled People and Masks Contributing Toward Mental Health Issues

Face mask side effects and mental health

What about disabled people? Deaf /people hard of hearing  rely on mouth reading. What are the implications for them? What about people who suffer cognitive and behavioural disorders like autism? This could cause them HUGE distress. Not just from wearing a mask, but seeing others in masks (because let's face it – IT'S NOT NORMAL BEHAVIOUR).

Can masks cause anxiety, or make other mental health disorders worse?

Since masks CAN impede breathing, this can cause fainting and other bodily reaction that would otherwise be  avoided if masks were not used. Here is a search engine link to prove that it is very common:

https://duckduckgo.com/?q=mask+anxiety&ia=web

### 28. Maine study looks into long-term psychological effects of wearing face masks coronavirus, COVID-19 pandemic

This is a study on the psychological effects of masks.

https://www.msn.com/en-us/health/wellness/umaine-study-looks-into-long-term-psychological-effects-of-wearing-face-masks-coronavirus-covid-19-pandemic/ar-BB13EfiU

### 29. Masks: Have You Been Captured by This Psyop?

Are there negative psychological consequences to wearing a mask, as a fear-based behavioral modification? This can easily trigger fear as a mask is reminding you there's a virus. The use of mask can also cause you to engage in risky behaviours due to a "false sense of security" because you feel protected.

https://kellybroganmd.com/masks-have-you-been-captured-by-this-psyop/

### 30. Masking the Truth – Face Masks, Empathy and Dis-inhibition

https://podtail.com/fi/podcast/conspiracy-theoryology/masking-the-truth-face-masks-empathy-and-dis-inhib/

### 31. Covid-19 face masks: A potential source of microplastic fibers in the environment

What are the environmental consequences of mask manufacturing and disposal?

Proof of increased littering due to increased mask use. a quick engine search will tell you, people are dumping them EVERYWHERE – into our rivers, into greenland areas etc. Plastics like nylon leach chemicals are going into our environment.

https://pubmed.ncbi.nlm.nih.gov/32563114/

### 32. Why Masks Don't Work Against COVID-19

Can used and loaded masks become vectors of enhanced transmission for both the wearer and other people? (The evidence from studies suggest yes). Masks become useless after about 20 minutes due to the moisture in your breath. This moisture can become the droplets that viruses travel on. Can this not facilitate transmission?

Can masks become collectors and retainers of pathogens that otherwise, could be avoided when breathing without a mask? (The evidence suggests yes).

Can large droplets trapped via a mask become atomized or aerosolized into breathable components? Even down to the virion size. (The evidence suggests yes).

https://www.citizensforfreespeech.org/why_masks_don_t_work_against_covid_19

BMJ 2020;369:m1422 doi: 10.1136/bmj.m1422 (Published 7 April 2020)

# NEWS

# Covid-19: What is the evidence for cloth masks?

As the US Centers for Disease Control and Prevention has advised all Americans to wear cloth masks in public to prevent the spread of covid-19, *The BMJ* examines the evidence

Elisabeth Mahase

The BMJ

## What has the CDC recommended?

People should wear cloth face coverings in public places where social distancing measures are "difficult to maintain," such as supermarkets and pharmacies, the CDC advises. It said the masks can be "fashioned from household items or made at home from common materials at low cost." It also warned that surgical masks and N-95 respirators should not be used by the public, as these were "critical supplies that must continue to be reserved for healthcare workers and other medical first responders."

## How do you make a homemade cloth mask?

The CDC recommends using tightly woven cotton fabric, such as quilting fabric, cotton sheets, or T shirt fabric. It provided instructions on how to make masks with or without sewing, including using a bandana and coffee filter to create a face covering.[1]

## But are they effective?

Very little good quality research exists on the use of cloth masks, especially in non-medical settings. One randomised controlled clinical trial of cloth masks, published in *BMJ Open* in 2015,[2] compared their effectiveness with that of medical masks worn by hospital healthcare workers. The study, involving the industry partner 3M (which makes medical masks), reported that healthcare workers "should not use cloth masks as protection against respiratory infection. Cloth masks resulted in significantly higher rates of infection than medical masks, and also performed worse than the control arm."

In an updated comment on the study (30 March),[3] the authors said, "There have been a number of laboratory studies looking at the effectiveness of different types of cloth materials, single versus multiple layers and about the role that filters can play. However, none have been tested in a clinical trial for efficacy."

They also advised healthcare workers who choose to wear cloth masks to "have at least two and cycle them, so that each one can be washed and dried after daily use. Sanitizer spray or UV disinfection boxes can be used to clean them during breaks in a single day. These are pragmatic, rather than evidence-based suggestions, given the situation."

A preprint of a rapid systematic review has assessed the current evidence on respiratory illnesses and the use of face masks (mainly surgical paper masks) in community settings.[4] The paper, yet to be peer reviewed, included 31 studies, of which 12 were randomised controlled trials. The researchers reported that "wearing facemasks can be very slightly protective against primary infection from casual community contact, and modestly protective against household infections when both infected and uninfected members wear facemasks." However, they said that many of the studies "suffered from poor compliance and controls."

They concluded, "The evidence is not sufficiently strong to support widespread use of facemasks as a protective measure against covid-19. However, there is enough evidence to support the use of facemasks for short periods of time by particularly vulnerable individuals when in transient higher risk situations."

Commenting on these findings, Simon Clarke, associate professor in cellular microbiology at the University of Reading, said, "There is only very limited evidence of the benefits of wearing face masks by the general public, no evidence that wearing them in crowded places helps at all, and no evidence at all yet related to covid-19 . . . The authors also acknowledge that mass face mask wearing by the public would likely cause shortages among people who genuinely need protective equipment—healthcare workers on the front line in our hospitals."

But Ian Jones, professor of virology at the University of Reading, said, "If an aerosol droplet hits the weave of the mask fabric rather than the hole it is clearly arrested. And lessening the aerosol dose chips away at the R0 [reproduction number] and helps to slow the epidemic . . . They are not a cure but they address the longer flatter epidemic curve everyone is trying to achieve."

## Have other countries recommended masks for the public?

Israel, Austria, the Czech Republic, Hong Kong, and Mongolia are among the countries that have implemented or recommended mask wearing in the community.

## Could it have negative effects?

Experts have warned that recommending that members of the public wear masks can lead to shortages for those who are more

BMJ: first published as 10.1136/bmj.m1422 on 7 April 2020. Downloaded from http://www.bmj.com/ on 19 May 2021 by guest. Protected by copyright.

NEWS

in need: health and care workers and immunocompromised people, for example. It can also lead to complacency.

Susan Michie, director of University College London's Centre for Behaviour Change and a fellow of the Academy of Medical Sciences, said, "There are several explanations as to why face masks have not generally been found to be effective if worn by the general population: they do not protect against the virus getting into the eyes (only close fitting goggles do this); people may not fit the masks properly or take them on and off; and people may have a false sense of reassurance and thus pay less attention to other behaviours key to reducing transmission, such as social distancing and handwashing."

This was echoed by the infectious disease physician Ben Killingley. He said there were several reasons why masks were not seen as being as effective in the community. These included that people "find it difficult to be compliant with mask use all of the time and that people may start wearing the masks too late." The other problem, he said, was that the public did not have the resources to ensure safe mask use: changing them often, frequent hand hygiene, and removing and disposing of them safely.

Killingley added, "Face masks are not an infinite resource and should be reserved for when they are most effective. It would not be good if we were not able to provide masks to healthcare workers because the public had consumed supplies."

## What does WHO say?

In guidance issued on 6 April,[5] WHO said that medical masks should be reserved for health workers. Most spread of the covid-19 virus is from known cases and requires contact with droplets from a cough or sneeze or infected surfaces. It said that "there is currently no evidence that wearing a mask (whether medical or other types) by healthy persons in the wider community setting, including universal community masking, can prevent them from infection with respiratory viruses, including covid-19." Wearing masks in the community can also give people a false sense of security, it said, and lead to them neglecting other measures, such as hand hygiene and physical distancing.

1   Centers for Disease Control and Prevention. Use of cloth face coverings to help slow the spread of COVID-19. https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html.

2   MacIntyre CR, Seale H, Dung TC, etal . A cluster randomised trial of cloth masks compared with medical masks in healthcare workers. BMJ Open 2015;5:e006577. 10.1136/bmjopen-2014-006577.  25903751

3   MacIntyre CR. A cluster randomised trial of cloth masks compared with medical masks in healthcare workers[response]. BMJ Open 2020;30. https://bmjopen.bmj.com/content/5/4/e006577.responses#covid-19-shortages-of-masks-and-the-use-of-cloth-masks-as-a-last-resort.25903751

4   Brainard JS, Jones N, et al. Facemasks and similar barriers to prevent respiratory illness such as COVID-19: a rapid systematic review. medRxiv 2020.04.01.20049528; 10.1101/2020.04.01.20049528.

5   World Health Organization. Advice on the use of masks in the context of COVID-19. 6 Apr 2020. https://www.who.int/publications-detail/advice-on-the-use-of-masks-in-the-community-during-home-care-and-in-healthcare-settings-in-the-context-of-the-novel-coronavirus-(2019-ncov)-outbreak.

Published by the BMJ Publishing Group Limited. For permission to use (where not already granted under a licence) please go to http://group.bmj.com/group/rights-licensing/permissions

BMJ: first published as 10.1136/bmj.m1422 on 7 April 2020. Downloaded from http://www.bmj.com/ on 19 May 2021 by guest. Protected by copyright.

Plaintiffs' Exhibit 412

nomaskers.org

# What is the science behind your mask mandate?

*Copyright Benchmark Technologies, Incorporated*

13-16 minutes



**Posted By: Fielden Nolan (nolanf)**

**Post Date: 02/18/2021**

Is the wearing of masks to reduce the spread of the COVID-19 virus "settled science?" Countless articles in the mainstream media simply label critical thinkers as "conspiracy theorists" or "vaccine deniers" without consideration of the facts.

Everybody loves "fact checks." Let's "fact check" the "settled science." Here is an example of the kind of "settled science" you will find in the mainstream narrative:

*Both the Centers for Disease Control and Prevention (CDC) and the World Health Organization now recommend cloth masks for the general public... (UC San Francisco)*

FACT CHECK: The UCSF Medical Center, which is educating a host of young, enthusiastic medical students, is wrong in the claim that the CDC and the WHO recommend cloth masks:

*More research on cloth masks is needed to inform their use as an alternative to surgical masks/respirators in the event of shortage or high-demand situations. To our knowledge, only 1 randomized controlled trial has been conducted to examine the efficacy of cloth masks in healthcare settings, and the results do not favor use of cloth masks.*

*More randomized controlled trials should be conducted in community settings to test the efficacy of cloth masks against respiratory infections. (CDC, October 2020, Source)*

In fact, that same month, in a report in Emerging Infectious Diseases, the CDC revealed:

*...more than 70 percent of COVID-positive patients contracted the virus in spite of faithful mask wearing while in public. Moreover, 14 percent of the patients who said they "often" wore masks were also infected. Meanwhile, just four percent of the COVID-positive patients said they "never" wore masks in the 14 days before the onset of their illness. (Source)*

It gets worse. In the same study, the CDC stated:

*"This finding suggest that risk for infection was higher for those wearing cloth masks."*

The CDC does not recommend cloth masks in protecting yourself and others from the virus. Don't believe me. One needs only to take the time to look at their published position.

As of late March, 2020, the efficacy of any face mask in reducing the spread of COVID-19 was generally questioned. In April 2020, the World Health Organization stated that healthy people don't need to wear face masks to prevent coronavirus spread. Masks, they said, should be for the sick, their caretakers, and healthcare workers. At the very end of 2020, the WHO updated their guidelines, noting that any kind of mask was ineffective if the wearer come into close contact with someone for 15 minutes or more. By the end of the year, the WHO was equivocating; they admitted there was no real evidence to support the wearing of ANY mask, but nevertheless recommended them. Their "interim guidance" for the wearing of ANY face masks now contains this:

*The World Health Organization (WHO) advises the use of masks as part of a comprehensive package of prevention and control measures to limit the spread of SARS-CoV-2, the virus that causes COVID-19.* **A mask alone, even when it is used correctly, is insufficient to provide adequate protection or source control.**

The European Centre for Disease Prevention and Control reached a similar conclusion:

*"It is not known how much the use of masks in the community can contribute to a decrease in transmission in addition to the other countermeasures" (Source)*

It can be safely concluded that the World Health Organization or CDC have NEVER explicitly supported the wearing of cloth masks. It's clear that both organizations are reluctant to endorse the effectiveness of cloth face masks in reducing the spread of the COVID-19 virus. FACT CHECK: FALSE

If upon actual investigation the oft-quoted WHO and CDC will not commit themselves to the wearing of masks as being effective in reducing the spread of the COVID-19 virus, how can their effectiveness be "settled science?"

Once again: it gets worse.

In September of 2020, the CDC reported that 85% of COVID-19 cases in July were people who often or always wear masks. (Source)

Briefly, let's do some simple math. According to a 2015 randomized clinical trial conducted by the University of South Wales, in testing the effectiveness of cloth masks among health care workers in Hanoi against bacterial infections among schoolchildren, cloth masks were found to be wholly ineffective.

*Remember streptococcus cells are between 0.5 and 2 microns, roughly 5-20 times larger than SARS-CoV-2 virions (which are about 0.06-0.14 microns), yet the masks still failed to protect against them and perhaps contributed to the spread of the bacteria. (Source)*

Unless you can establish that a BB cannot easily get through a fish net, or that a chain-link fence can stop a sandstorm, you cannot establish that ANY mask (let alone a cloth one) is effective in

any sense against the spread of the COVID-19 virus. It really is that simple.

*The size of the virus based on electron micrographs show that the virus varies from 60 to 140 nanometers in diameter (.06 to .14 microns). N95 filters provide filtration down to .3 microns. On this basis alone, they should not be relied on for protection from small virus particles such as those of SARS-CoV-2. (Source)*

*..the pores in surgical masks are about 30 times larger than the average size of SARS-CoV-2 virions, and some of the cheap (but more comfortable) cotton masks that are commonly worn have pores hundreds of times larger than the virus particles. (Source)*

At .1 micrometers, the size of the COVID-19 virus is about 1000X smaller than the width of a human hair! Until the invention of the electron microscope in the 1930's, a pathogen this tiny could not be seen – even with the best optics. Yet here is another study offered as "evidence" by UCSF Medical Center that that wearing a mask is effective in preventing COVID-19:

*An experiment using high-speed video found that hundreds of droplets ranging **from 20 to 500 micrometers** were generated when saying a simple phrase, but that nearly all these droplets were blocked when the mouth was covered by a damp washcloth. (NEJM: Visualizing Speech-Generated Oral Fluid Droplets with Laser Light Scattering)*

Of course, attempting to prove that a wet washcloth can inhibit the spread of droplets which are thousands of times greater in size than the COVID-19 virus is of course silly and makes no sense. Moreover, within this simple mechanistic study, the authors stated:

*We did not assess the relative roles of droplets generated during speech, droplet nuclei, and aerosols in the transmission of viruses.*

There you have it. The assumption driving the test was the validity of the still-unsubstantiated "droplet theory" promoted by the CDC, as well as their well-documented avoidance of the possibility of aerosol involvement in in viral spread. Your taxpayer money probably funded this study. Preschoolers with a box of crayons could have been as persuasive as this one.

How many times have you seen a person wearing a mask below their nose, are constantly adjusting it, or are not changing their mask frequently? According to the World Health Organization (WHO) these are practices which can actually increase the likelihood of COVID-19 transmission!

*The following from WHO is listed as behavior that can increase transmission:*

- *Touching mouth and nose*
- *Touching a mask in use*
- *Touching a clean mask with unwashed hands*
- *Not washing hands every time after touching a dirty mask*
- *Wearing a mask that is not new and clean*
- *Continuing to wear a mask after it has become damp*
- *Re-using a single-use mask*

- *Not discarding a single-use mask immediately upon removal, as opposed to leaving it in the immediate environment*

*(Source: Alan Stevo)*

What do you actually know about masks? A properly-fitted N95 mask is designed for use in a contaminated environment, and can be effective, for instance, in dealing with chemical spills, or working in a fabrication shop, but not in dealing with viruses. If you purchase a domestically-produced N95 mask, read the CDC statement on the box:

*The Centers for Disease Control and Prevention (CDC) does not recommend that the general public wear N95 respirator masks to protect themselves from respiratory diseases, including coronavirus (COVID-19) (Source)*

The CDC continues:

'*Cloth masks actually risk your health rather than protect it. The moisture caught in these masks will become mildew-ridden in thirty minutes. Dry coughing, enhanced allergies, sore throat are all symptoms of a micro-mold in your mask*'

So far, we've been mostly focused only on the combined, dubious wisdom of the CDC and the WHO. There isn't enough room and time to cover all the studies, going back decades, which all call into question the use of masks (particularly cloth masks) in reducing the spread of the COVID-19 virus. Nomaskers.org is full of resources so you can do your own research. Studies from the Annals of Internal Medicine, Association of American Physicians and Surgeons, World Health Organization, U.S. Navy and more can be found from the Resources menu.

But, again, it gets worse.

The wearing of masks can harm your health. Masks can come from anywhere, and often contain all kinds of toxic substances and material used in their manufacture. Here is an excerpt from a study which contains a long list of them:

*Disposable surgical face masks are made of synthetic fibers, including polymers such as polypropylene, polyurethane, polyacrylonitrile, polystyrene, polycarbonate, polyethylene or polyester. There is an inner layer of soft fibers and a middle layer, which is a melt-blown filter, as well as a water-resistant outer layer of nonwoven fibers.9 This study shows FT-IR spectra of the degrading fibers of disposable masks. It found that disposable face masks "could be emerging as a new source of microplastic fibers, as they can degrade/fragment or break down into smaller size/pieces . . . .*

*Research on synthetic fibers has shown a correlation between the inhalation of synthetic fibers and various bronchopulmonary diseases, such as asthma, alveolitis, chronic bronchitis, bronchiectasis, fibrosis, spontaneous pneumothorax and chronic pneumonia. Cellular proliferation made up of histiocytes and fibroblasts were found in the lungs of those exposed to synthetic fibers in ambient air. Focal lesions in the lungs showed granulomas and collagen fibers containing both fine dust and long fibers. Some of the lung illnesses from this exposure could be reversed, while others had already proceeded to pulmonary fibrosis. (Source)*

==Scores of dermatologists, dentists, immunologists, virologists, pediatricians all over the world have been sounding the alarm for months over the continued use of face masks.== They consistently try communicate to anyone who will listen that patients generally have no training or real understanding of how masks work.

*... untrained members of the public are wearing medical masks, repeatedly… in a non-sterile fashion… They're becoming contaminated. They're pulling them off of their car seat, off the rearview mirror, out of their pocket, from their countertop, and they're reapplying a mask that should be worn fresh and sterile every single time. (Dr. James Meehan, MD)*

Prolonged wearing of face masks has been tied to advanced stage lung cancer. It should be noted here that would-be debunkers like USA Today have attempted to dispute this finding by deceptively tying its source to a Facebook post, rather than a reputable medical journal. Ethylene Oxide, a carcinogen which is found in Teflon, is often used in the sterilizing process of cheap surgical masks. Even though the Occupational Health & Safety Agency (OSHA) has recommended them only for short-term use, our executive figures, the major media, Big Tech, fake science proponents support a mandate that you wear them for many hours you spend at work. In some states, you were even required to wear them in your home! OSHA has also concluded that surgical masks do not reliably provide protection against "smaller airborne particles." Of course, 100 nanometers is about as small as an airborne particulate can get.

Active duty and defense support personnel know the drill. Handlers in pharmaceutical products production know the drill. So do EMTs and medical professionals. They've all had formal training regarding the selection and fitment of PPE (Personal Protective Equipment). I suspect that all these people should all have spotted by now the many problems with mask mandates.

Face masks for use in limiting the spread of pathogens are classified as Class 1 medical devices by the FDA. Your governors, mayors, grocer, neighbors or evening news announcers are not qualified to prescribe medical devices to you, regardless of how convincing they appear. The use of medical devices require informed consent by the patient. Like many other medical devices, face masks can save your life, but they can also harm you. Know the science about masks, and don't believe everything you hear. *After you have become informed, and you do not agree you should wear a mask, simply do not consent.*

Mask mandates are useless and potentially harmful. There is no "science" behind them. For every resource the major media presents to you in building the case supporting mask efficacy, you can easily respond with ten resources endorsing the opposite position. Truly, their mask "science" is not settled.

-

Plaintiffs' Exhibit 413

journeyguy.com

# What isn't being said: the science is in • Notes from the Trail

*()x*

7-9 minutes

---

Thanks so much for stopping by! If you enjoy the content, please subscribe to the RSS feed for more. Feel free to leave comments. Your participation enriches the blog!

I hesitated calling it science. What's been called "science" over the past year is up for grabs. I'll leave it to others to debate that.

The pandemic is essentially over. COVID-19 perhaps should not have ever been designated as a pandemic. Its known mortality rate is on par with a severe flu. Now, with vaccines widely available, the hospitals able to manage crises, medicines to treat the ill and an awareness of who and how COVID most impacts, *we're ready for life again*. And yet, our politicians and the CDC have served up a colossal stew of mixed messaging.

This week, the CDC has changed course *again* and now announced that it's safe for vaccinated people to not wear masks outside, and that they can also take off their masks inside in most situations. The last remaining governors who had instituted mask mandates rushed to end them and not be the last man standing who wasn't following new guidelines. Governor Roy Cooper of North Carolina and Governor Ralph Northam of Virginia both ended mask mandates (for the fully vaccinated) on May 14.

However, this same message should apply for ANYONE WHO HAS ALREADY HAD COVID.

**Here's the science:**

1. **Natural immunity is better than vaccinated immunity.** It lasts longer, and it is evidence of the divine design of our immune systems and our resiliency. **What this means is that anyone who has had COVID can take off their masks (and be safer for it than vaccinated people)**. [Source: Forbes – *Coronavirus Immunity May Last Years, Possibly Even Decades, Study Suggests*, 11/17/20]

   these antibodies were "durable," showing remarkably slow rates of decline that were consistent with many years, and potentially even decades, of protection… the New York Times refers to it as "the most comprehensive and long-ranging study of immune memory to the coronavirus to date."

2. **Wearing masks continuously is bad for your health, and studies consistently show that masks cannot stop the spread of a respiratory virus** (which aligns with all the scientific findings prior to April 2020).A paper published at the National Center for Biotechnological Information (and since retracted) said:*"The existing scientific evidence[s] challenge the safety and efficacy of wearing facemask as preventive intervention for COVID-19. **The data suggest that both medical and non-medical facemasks are ineffective to block human-to-human transmission of viral and infectious disease such SARS-CoV-2 and COVID-19, supporting against the usage of facemasks.** Wearing facemasks has been demonstrated to have substantial adverse physiological and psychological effects."* [Source; NCBI original link]

The American Institute for Economic Research has a series of articles about the ineffectiveness of masks here:

• *Masks 'don't work,' are damaging health*, 2/19/21
• Anders Tegnell, chief epidemiologist at Sweden's Public Health Agency, stated that evidence about the effectiveness of face mask use was "astonishingly weak." [*Sweden's disease expert says just wearing face masks could be 'very dangerous'*, 8/19/20)
• "A September report by the CDC found that more than 70 percent of COVID-positive patients contracted the virus in spite of faithful mask wearing while in public. Moreover, 14 percent of the patients who said they "often" wore masks were also infected. Meanwhile, just four percent of the COVID-positive patients said they "never" wore masks in the 14 days before the onset of their illness." [Source]

3. **Social distancing is completely ineffective**. "The risk of being exposed to Covid-19 indoors can be as great at 60 feet as it is at six feet in a room where the air is mixed — even when wearing a mask, according to a new study by Massachusetts Institute of Technology researchers who challenge social distancing guidelines adopted across the world." [Source]

4. **COVID is treatable, and has a 99% survivability rate in people between 0-70 (95% in people over 70).** (Source: CDC) We've known how to treat it since last April when America's Frontline Doctors were censored for claiming so.

5. **The idea of asymptomatic spread is at best speculative.** Why is that important? Masking up people who feel *perfectly healthy* is the basis for the entire universal masking narrative. The reason? No one knows who has COVID, so *everyone* needs to mask up (even though the vast majority of people have nothing to fear from COVID). [Source: *A severely symptomatic lie about asymptomatic spread* (*The Blaze*), *Covid-19: Asymptomatic cases may not be infectious, Wuhan study indicates* (*British Medical Journal*), Asymptomatic Spread Revisited (AIER)]

There has been **an active and misguided (and perhaps evil) effort to suppress, censor and eliminate information** that contradicts the overall fear narrative that has been the primary motivational tool by politicians and leaders to enforce mitigation strategies.

With the ending of mandates, lockdowns and COVID-19 mitigation measures, we can rejoice

as life begins to return to normal. The trauma that has been inflicted by the pandemic and governmental response (and our responses to one another) will be slower to heal.

**What about people who have had or tested positive from COVID?**

I think I understand why the messaging from our political leaders these days is targeting the fully vaccinated. They want to urge as many as they can to become vaccinated. It remains for others to decide what truly led to the abatement of the pandemic, but there's very good arguments on many sides. Some will claim that masks, social distancing, lockdowns, etc. worked. Others will claim (with just as much evidence) that they didn't, and that this virus, like all before it, had a life cycle, we have immune systems and have reached herd immunity.

But here are some questions that perhaps someone can answer:

**Why hasn't the messaging included people who have had COVID?**

Remember, *natural immunity is **better** than vaccinated immunity*. So why isn't the CDC communicating the **good news** that *millions* of Americans can now unmask safely? I think it's because it's tough to answer who has had COVID. Do they say:

- People who have tested positive and had symptoms
- People who tested positive
- People who were sick and suspected COVID but never had a test

It's confusing, and at some point, leaders will simply have to let people make their own decisions. And we will all get to remember the phrase, "mind your own business" when snarky folks criticize people for being masked *or* unmasked.

**Get ready to smile**

If you're living in Virginia or North Carolina, smile big tomorrow. Let others see that smile! You'll join millions of other citizens who have been enjoying mandate-less living for months. Let's be patient with those who cling to their masks like Linus clinged to his blanket. It took over a year to exit this craziness. The remnants of it won't be removed by a governor's declaration.

(Visited 27 times, 1 visits today)

Plaintiffs' Exhibit 414

themighty.com

# What to Do If You Can't Wear a Mask

*Renee Fabian • Follow May 14, 2020*

8-10 minutes

---

Despite mixed advice early on in the COVID-19 pandemic, face masks have emerged as one of the most important tools we have to prevent COVID-19. When worn properly, studies suggest face masks can significantly slow the spread of the virus in communities. The Centers for Disease Control and Prevention (CDC) has since updated its guidance to recommend everyone wear a face mask while out in public. Some cities and states now require masks.

No matter the importance for the health and safety of you, your loved ones and the community, there's no getting around that for some people, wearing a face mask doesn't seem like an option. Maybe the restriction to your breathing causes a spike in panic or the feel of elastic around your ears triggers your sensory sensitivities. If you're struggling to wear a face mask, you're not alone.

"I keep having trouble with moisture buildup and heat trapping with my homemade ones, but I don't want to buy one if I'm going to have those sensory problems," said Mighty community member Alice N. "I definitely need a solution."

**Here are some of the most common face mask difficulties and some suggestions for problem-solving**:

## Face Masks Cause Anxiety or Breathing Issues

Wearing a face mask definitely impacts your breathing. If you already struggle with breathing issues or discomfort, wearing a face mask may be a major source of anxiety. In addition, feeling like you can't breath can trigger anxiety and even panic attacks for some people. These are valid concerns.

Ross Feinman, an emergency department nurse at Long Island Jewish Medical Center, said if you're having trouble with wearing masks, it's OK to take breaks when you're not around other people. He said if you're alone in a car or out at a time or place when you're not near anyone else, you can take a mask break.

"It's not a virus that's just in the air everywhere, it comes from other people," Feinman told The Mighty. "Taking those breaks is a really good tip, and those are the safe ways that people can take breaks."

When you remove the mask, avoid touching anything other than its straps and don't touch your face. Carry hand sanitizer, and wash your hands thoroughly when you get home. Be prepared to safely put your mask back on if other people enter your area, and mask or not, stay at least 6 to 12 feet away from other people.

There are other reasons wearing a face mask can trigger your anxiety. For example, Feinman said the source of anxiety may be more related to the fear of the virus and getting sick when you see people wearing masks. It's important to identify the source of your face mask-related anxiety so you can work with your therapist or loved ones to come up with some strategies.

## Face Masks and Sensory Sensitivities

Face masks are full of potential discomforts if you have sensory sensitivities — the fabric against your face may not feel good, nor the straps around your ears.

It may be possible to reduce sensitivities if the feel of the mask on your face is the main issue:

- **Look for sensory-friendly pre-made masks**: Companies like SensaCalm have developed masks with the same fabrics as its other clothing

- **Look for sensory-friendly fabrics**: If you know certain fabrics or features are comfortable in other clothing (like no seams) try to find (or make) a mask that meets those needs and see how it works

- **Use an alternative face covering**: Find a face mask alternative (like a bandana or other fabric) that eliminates some of the sensory sensitivities

"Technically any sort of face covering, whether it's a bandana or fabric is OK," Feinman said. "Some people do find making [masks] out of their own cloth, their own fabrics, are more comfortable. Also, if they have anxiety, it's something that they are in control of."

If your sensory sensitivities are triggered more by the elastic straps (or anything) around the ears, you can try a mask design that uses strings that tie around the head. Other options include attaching the elastic straps to hair clips or a headband with buttons. According to Margaret Krepp, RN, director of patient care services at Huntington Hospital, this is a strategy health care workers often rely on.

**"**Masks worn by the public can often be more comfortable with the use of headbands with buttons, which help to relieve the pressure behind the ears," Krepp told The Mighty.

## Face Masks for Kids

<mark>Whether due to anxiety, sensory sensitivities or not understanding why so many people are wearing face masks, it can be difficult to get kids to wear mask</mark>s. Some parents are turning to kid-friendly masks that make the experience a little more fun and palatable, in addition to being mindful of kid preferences and comfort levels.

"I'm going to buy my son one like this I think he will be more likely to wear," shared Mighty community member Gina R.

*Photo courtesy of Gina R.*

"Etsy has a lot of custom mask makers — try different styles or a unique, personalized fabric," Mighty community member Jennifer N. added. "I got airplanes and my son's favorite logo, United. Also, I'm sure someone would work directly with a customer for sensory needs."

If your child is feeling particularly anxious about COVID-19 or wearing a face mask, psychotherapist and Mighty contributor Kate Sheehan, LCSW, recommended several strategies, including giving kids a sense of control with choices.

"Anxiety can overwhelm our brains and make it hard to come up with a plan for ourselves," Sheehan wrote. "Offering choices to a child with anxiety can help them make better decisions."

## Accessible Masks for Deaf and Hard-of-Hearing People

Face masks have proven to be a major accessibility issue for deaf and hard-of-hearing people. Masks that completely block your lips mean those who rely on lip-reading can no longer participate in conversations. Face masks dampen your speech, which can make it difficult for people who are hard-of-hearing or rely on Cochlear implants to understand what you're saying.

All of these issues — including the inability to clearly read facial expressions — are heightened by the need to stay at least six feet away from others.

Some companies have created face masks that have a clear plastic front that both protects the wearer and allows people to effectively read lips. The Hearing, Speech & Deaf Center created a pattern so you can make your own clear-fronted mask. Face shields can also be a good alternative.

Work with deaf loved ones or community members to co-create a more accessible way to communicate. For example, you may need to speak more slowly so your words aren't as muddled by the mask or ensure you're making deliberate eye contact. Depending on the situation, it may be helpful to communicate through written modes as well.

## What to Do If You Can't Wear a Mask

It can be frustrating and distressing when face masks aren't comfortable or cause symptoms of your other conditions. And sometimes, problem-solving the face mask itself won't be enough.

There are a few groups of people the CDC says should *not* wear face masks:

- Toddlers and babies under the age of 2
- People with a health condition that causes trouble breathing
- Those who can't remove a face mask without help

If you're not in one of those limited groups, Feinman said you really shouldn't be out in the community around other people without a face mask. Where possible, rely on delivery services or loved ones to get essential items and only go out at times and in areas when

you won't encounter other people.

This may be hard to hear, but Feinman highlighted it's essential until we have a better grip on treating and preventing COVID-19.

"The purpose [of masks] is not to protect you, it's actually to protect other people from you," Feinman said, adding:

Until we have a better grip on what's going on. I don't think they should be really that close to or around people … because, again, the rationale is that we can all be carriers without any symptoms, and we could be giving the virus to other people unknowingly.

**Struggling with anxiety due to COVID-19? Check out the following articles from our community:**

- 6 Tips If You're Anxious About Being Unable to Go to Therapy Because of COVID-19
- 7 Things to Do If Social Distancing Is Triggering Your Depression
- What to Do If the Coronavirus Health Guidelines Are Triggering Your Anxiety or OCD
- How Can You Tell the Difference Between Anxiety and COVID-19 Symptoms?
- Feeling Calm in the Midst of the Coronavirus Pandemic Might Be a Trauma Response

Plaintiffs' Exhibit 415

theblaze.com

# Horowitz: What ever happened to the right to breathe freely?

*Daniel Horowitz*

13-16 minutes

---

"*No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.*" ~Union Pacific Railway Co. v. Botsford (1891)

For how long can American governments continue denying the basic human right to breathe freely without showing a modicum of evidence that masking is effective, necessary in all circumstances, and outweighs the cost to liberty and human health?

**Some rights are so natural that they need not be enumerated in the Constitution**

We know there is a right to freely exercise religion or bear arms, but how do we know there is a right to breathe without the cruel and draconian covering of our mouths? Sadly, our court system seems to believe that no such right exists, even as judges concoct novel rights to numerous privileges and enshrine them in the Constitution nearly every day through ordinary litigation. However, some rights are so natural and inalienable that they need not be written. Breathing without a dangerous bacteria and carbon dioxide trap over our mouths is a pretty obvious one.

In fact, in many ways, this is why Madison initially opposed the concept of a written Bill of Rights – because it would imply that only those rights listed are inalienable and that rights only come from government and are not indeed self-evident truths of nature. Even as he was pragmatically introducing the Bill of Rights on the House floor on June 8, 1789, Madison noted that some objected to it on the grounds that "by enumerating particular exceptions to the grant of power, it would disparage those rights which were not placed in that enumeration, and it might follow by implication, that those rights which were not singled out, were intended to be assigned into the hands of the general government, and were consequently insecure."

While introducing his first draft, Madison even conceded that he found this argument to be "one of the most plausible arguments I have ever heard urged against the admission of a bill of rights into this system." The only reason he felt he "guarded against" this concern was because of the language he originally proposed in "the last clause of the 4th resolution." That original draft language was very strong and categorical:

"The exceptions here or elsewhere in the constitution, made in favor of particular rights, shall not be so construed as to diminish the just importance of other rights retained by the people; or as to enlarge the powers delegated by the constitution; but either as actual limitations of such powers, or

as inserted merely for greater caution."

Although part of the spirit of this clause remained in the final versions of the Ninth and Tenth Amendments, the language is not as strong as Madison's original draft. Perhaps the fact that we think government can indefinitely regulate human breath is a fulfillment of Madison's original concern.

On Friday, the Supreme Court, yet again, slapped down a California executive branch edict using COVID to interfere with freedom of religious worship. In a 5-4 decision, the court issued an injunction on the California health department's rule banning home-based group worship or Bible study during the reign of COVID terror. "The government has the burden to establish that the challenged law satisfies strict scrutiny," wrote the unsigned order. "To do so in this context, it must do more than assert that certain risk factors 'are always present in worship, or always absent from the other secular activities' the government may allow."

I found myself shouting "Amen!" while reading this, but at the same time wondering why the courts only seem to apply strict scrutiny to COVID rules affecting a selection of very specific liberties, such as religious practice or gun rights, but not the more fundamental natural right to move freely and unrestricted, without one's nose and mouth being restrained, or shutdown orders in general. Somehow it seems like our court system only recognizes unenumerated rights when they are fabricated and not rooted in natural law.

Even without questions of cruel and unusual punishment or a violation of the Fourth Amendment's dictate against illegal search and seizure, it's obvious that making someone cover his or her nose and mouth – to the draconian extent the government has applied it – violates the most basic definition of individual liberty itself. As defined by Blackstone, individual liberty is "the power of loco-motion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint, unless by due course of law." William Blackstone wrote that the right to "personal security" includes "a person's legal and uninterrupted enjoyment of his life, his limbs, his body, [and] his health," as well as "the preservation of a man's health from such practices as may prejudice or annoy it." [1 Commentaries *125, *130.]

It's one thing to mandate masks for a limited time on certain people in certain places – for example, for people with clear symptoms, in health care settings, or on mass transit. But to mandate them indefinitely in order to move freely, obtain vital goods and services, and basically live life in any way clearly violates the most basic individual liberties that never needed to be enumerated in the Constitution. And to do so without showing evidence that someone is a threat or aren't already immune, or that the masks even work, violates the Fifth and 14th Amendments' due process clause.

### Ex post facto criminalizing human breath

The Supreme Court stated in the landmark *Calder v. Bull* (1798) case that a legislature cannot go so far as to violate natural law even if the "authority should not be expressly restrained by the constitution or fundamental law of the state."

Chief Justice Samuel Chase stated: "An act of the legislature (for I cannot call it a law) contrary to the great first principles of the social compact cannot be considered a rightful exercise of legislative authority." Chase was referring to the idea of a state criminalizing behavior ex post facto. His point was that even if Art. I Sec. 10 of the Constitution didn't explicitly bar legislatures from passing ex

post facto laws, "To maintain that our federal or state legislature possesses such powers if it had not been expressly restrained would, in my opinion, be a political heresy altogether inadmissible in our free republican governments."

In many ways, the mask mandates going on indefinitely forever for children to obtain an education or for humans to live a free life is the ultimate form of ex post facto "law," which was defined in *Calder v. Bull* as making "an action done before the passing of the law, and which was innocent when done, criminal." We were all born as humans and are forced to live and obtain certain services. It's one thing to force someone to wear a mask for a limited time, place, or scope. But to do so essentially all his life or for a child in school when healthy is retroactively criminalizing human existence predating COVID.

Mind you, Chase was speaking of a law duly passed by both branches of government, not the government edicts we have today. The notion that the CDC can simply mandate masks on two- and three-year olds, which fundamentally violates their bodily integrity and their cognitive abilities in the most basic function of their individual liberty, shocks the conscience. It's mind-numbing how there hasn't been a major lawsuit on this issue. This is especially jarring given the lack of evidence that children pose a risk of spreading the virus or that masks are even effective.

**It's impossible to harmonize COVID fascism with decades of case law on right to privacy**

It's not like we haven't lived through decades of the courts inventing novel rights that aren't written in the Constitution and most certainly aren't natural. For example, in 2017, the Supreme Court, in *Packingham v. North Carolina*, ruled that the state's law restricting child sex offenders from accessing social media was not enough of a "compelling interest" to outweigh what the court believed to be an important right, even though the state clearly had a much more compelling case for blocking pedophiles from social media than masking children for COVID.

The court in *Packingham* designated social media a place "to engage in a wide array of protected First Amendment activity" like streets and parks and noted, "By prohibiting sex offenders from using those websites, North Carolina with one broad stroke bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge."

Think about that: One has a right to access social media even as a convicted child sex offender because one basically can't live life properly without it, according to the court. Yet, at the same time, government can restrict human breathing in nearly every setting without having to provide any evidence one is a threat or that the experimental medical device of masks – authorized only under an emergency use authorization – even works. They can place people at risk for shortness of breath, headaches, lack of cognitive function, bacterial infections and rashes, and self-contamination, all without showing that they work.

Justice William Douglas was able to suggest in the famous *Griswold v. Connecticut* (1965) case, "The First Amendment has a penumbra where privacy is protected from governmental intrusion," even though there is no right to privacy in the Constitution. Justice Arthur Goldberg stated in his concurrence that birth control is covered by the unenumerated rights of the Ninth Amendment. "*The concept of liberty ... embraces the right of marital privacy*" and "*The right of privacy is a fundamental personal right.*"

Well, if birth control is a concept of liberty and privacy so fundamental as to serve as the backbone for *Roe v. Wade* to kill babies, then what about the privacy and liberty of breathing? If anything, in this case it's worse because you are not asking to take an action (consume birth control), but to refrain from an inaction and not have government force you to wear an experimental medical device that has not been approved for respiratory viruses.

As Clarence Thomas stated in his famous dissent in *Obergefell*:

"In the American legal tradition, liberty has long been understood as individual freedom from governmental action, not as a right to a particular governmental entitlement."

The court punctuated this right to privacy under the 14th Amendment by stating in the *Lawrence v. Texas* (2003) sodomy case, "The State cannot demean their existence or control their destiny by making their private sexual conduct a crime."

Think of how they are demeaning the existence of people who are in pain and have trouble breathing under a mask and are controlling the destiny of the most sensitive parts of our body with these Chinese face burka edicts. Mandatory mask-wearing for long periods of time to obtain vital services (especially outdoors) clearly violates the liberty of "bodily integrity" enumerated in the landmark *Glucksberg* (1997) case among those liberty interest secured under the 14th Amendment.

Moreover, a person certainly has a greater right and compelling human need to breathe without oxygen reduction and rebreathing their own toxins left on a mask than to engage in sodomy. This is especially true for children being forced to exercise and play sports for a protracted period of time with a face covering that undoubtedly compromises their intake of oxygen and exfiltration of $CO_2$ while laboring with rigorous physical activity.

In *Roe v. Wade*, the court said, "The abortion decision in all its aspects is inherently, and primarily, a medical decision." The court applied that even to when that decision is 100% directly killing a particular baby. It's extremely hard to see how that doesn't apply to human breathing, especially when there is no evidence that an individual is carrying the virus, has the ability to spread it, is a danger to a particular individual, or that said governmental regulation even helps.

When the court established the right to bodily integrity in the aforementioned *Union Pacific Railway Co. v. Botsford* case, Justice Gray noted, "The right to one's person may be said to be a right of complete immunity; to be let alone." That would imply that perhaps the forcing of a human to place something over his nose and mouth might not even be subject to any government interest balancing test. But even if we are to believe that the pandemic would align bodily integrity more in line with a typical right, like any fundamental right, it can indeed be regulated to some extent, but the burden of proof must be on the government to demonstrate it is necessary and efficacious in that particular circumstance, not the other way around.

Indeed, 80 years into the Supreme Court's crusade to invent new rights not mentioned in the Constitution, the only rights the justices won't recognize are those that didn't even need to be stated in that document, such as the right to breathe.

Plaintiffs' Exhibit 416

principia-scientific.com

# WHO: You Do NOT Need to Wear a Mask | Principia Scientific Intl.

4-5 minutes

Published on January 25, 2021

Written by John O'Sullivan



The World Health Organization admits there is no scientific medical reason for any healthy person to wear a mask outside of a hospital. Sadly, our corrupt politicians and mainstream media only relate the bad news.

If you do not have any respiratory symptoms, such as fever, cough, or runny nose, you do not need to wear a medical mask. When used alone, masks can give you a false feeling of protection and can even be a source of infection when not used correctly.

The most recent press announcement is at www.who.int

**Update & Correction (January 26, 2021): Our apologies for omitting a**

**reference for the above. The following is added as evidence on current WHO advice:**

Last month (December, 2020) WHO issued the following advice that masks are only of some benefit if used in conjunction with a range of other measures and of limited value.

WHO tells us that:

**"…the use of a mask alone, even when correctly used (see below), is insufficient to provide an adequate level of protection for an uninfected individual or prevent onward transmission from an infected individual**." [1]

As Dr Joseph Mercola, who analysed the WHO advice pointed out in *WHO Admits: Not Clear Masks Prevent Viral Infection'*

"….the literature rather strongly suggests the usefulness of masks depends on a significant number of factors — type, fit, length of use, purpose and circumstances — which are effectively impossible to account for in public universal-masking policies.

The science, contrary to the ignorant platitudes we are bombarded with, has NOT proven that universal masking is effective for viral containment, and has instead provided substantial grounds for skepticism of such a policy."

[1] 'Mask use in the context of COVID-19 Interim guidance', December 01, 2020, https://apps.who.int/iris/bitstream/handle/10665/337199/WHO-2019-nCov-IPC_Masks-2020.5-eng.pdf?sequence=1&isAllowed=y

**Update January 30, 2021:**

**So angered that our original link to the latest WHO press announcement did not contain a specific suggestion for people not to wear masks USATODAY and other haters have been on our case saying we 'lied' and WHO did not say you did not need to wear a mask.**

Well, to all you misinformed haters, you are clearly not good at checking your facts because in December 2020 WHO stated that:

*"…the use of a mask alone, even when correctly used (see below), is insufficient to provide an adequate level of protection for an uninfected individual or prevent onward transmission from an infected individual."*

Moreover, Dr. Mike Ryan, an epidemiologist who specializes in infectious diseases and public health and who is the executive director of the WHO health emergencies program is on record stating that:

"WHO stands by recommendation to not wear masks if you are not sick or not caring for someone who is sick. There is no specific evidence to suggest that the wearing of masks by the mass population has any potential benefit. In fact, there's some evidence to suggest the opposite in the misuse of wearing a mask properly or fitting it properly" (source).

USATODAY have written to us saying they are going to do a 'fact check' hit piece on us. We gladly welcome them addressing this important topic and will be delighted to offer further scientific evidence that mask wearing is nothing more than a 'talisman' and will likely do more harm than good for healthy, uninfected wearers.

If you doubt that, simply check out the photo below:



This is bacteria grown in a PetriDish from a swab taken from the inside of a mask after 20 minutes of use.
This is what you are breathing.

Plaintiffs' Exhibit 417

psychologytoday.com

# Why Face Masks Can Trigger Unpleasant Emotions

*Susanne Babbel, Ph.D., M.F.T., is a psychologist specializing in trauma and depression.*

6-7 minutes          5-13-20



Facemasks required

Source: babbel

Many of you may be experiencing strong feelings of being upset, sad, anxious, or irritated when wearing or seeing others wearing a face mask. However, you may not be able to put your finger on exactly why you feel these intense emotions.

There are many reasons why you might feel this way. Traumatic memories may be connected to face masks, and there is also the lack of social cues via facial expressions—any and all of which can cause us to go into fight, flight, or freeze survival mode, depending on our own individual trauma history.

Identifying what is causing your reactions and learning how to calm them down can help

you to move through these challenging times of COVID-19 a little more easily.

When I called my mother for Mother's Day, I was reminded how face masks can prompt memories of a traumatic time, even if it was many years ago. My mother immediately mentioned how sad she becomes when going to the store these days and seeing others wearing masks. Everyone knows that it is a requirement under the present circumstances and the importance of it, yet that does not alleviate our reactions.

My mother, who lives in Germany, mentioned that the masks remind her of the time when she was a little girl. Growing up after World War II in 1945, she recalled having to wear a face mask due to the debris and toxins in the air that remained from the fires and bombings. She expressed to me: "I thought I was done with my childhood and was surprised to have memories from so long ago." It was with great grief that she recalled these times, but suddenly many additional childhood memories appeared in the following days as well.

Her story helped me realize why I am stricken with sadness wearing a mask. In the last few years, we had serious fires in California near where I live. They were so large that ashes covered my car and it was hard to breathe. Every day, I was worried if my house would be burned down when I came home after work, or that I would have to evacuate. Although that never became a reality for me, for many people nearby it did. Fortunately, I was not harmed, but the memory of the threat of being harmed gets triggered every time I pull the mask over my face.

Many traumatic memories can be linked to face masks. For example, people are sometimes robbed or assaulted by someone with a mask, or perhaps they endured medical procedures such as cancer treatments or developed a virus that required others to wear face masks around them. There are many more such incidents.

When we are reminded of a traumatic experience, we suddenly are thrown back in time, which can trigger emotions and even the re-experiencing of symptoms that accompanied the original incident. This is because "subconsciously (but not randomly), a connection or association has been made between the present and a dangerous situation of the past" (Babbel).

But even if you have never experienced major trauma, the sight of a face mask can be unsettling. Face masks can make you feel uncomfortable for many reasons, such as when you are claustrophobic, you feel your freedom is taken away, you fear getting sick or making someone sick, there is confusion about whether you should wear one or not, it reminds you that things are not normal, and more.

My client Elisa felt uneasy with the sight of others wearing masks and complained, "I can't read facial expressions and it makes me anxious." Stephen Porges (2011), a professor of

psychiatry, observes that we need cues about others such as facial expressions, tone of voice, and body posture to appraise whether or not a person is safe. As trauma specialist Bessel van der Kolk points out, "To survive and thrive, we must be able to distinguish friend from foe, know when a situation is safe or dangerous … and without it, we are prone to misinterpret safety as a threat" (Porges, 2011, p. xiv). Facial expressions of others help us to calm our nervous system, but if we don't receive those signals, we might go into survival mode.

Whenever you are "triggered" by trauma, your nervous system goes into fight, flight, or freeze mode. Because your nervous system does not listen to logical reasoning, you need to engage your sensations to calm it down and to reduce your stress response. Relaxation techniques such as breathing in and out deeply, listening to soothing or inspiring music on headphones, or smelling a beautiful scent (put a drop or two of soothing essential oil on your mask such as lavender) while wearing a face mask can be helpful to keep you calm. Engaging your facial muscles — such as by chewing gum, humming, or singing — activates the vagus nerve with its function of taming your stressed nervous system (Babbel, 2018).

If you try to be curious about what is causing your reactions, become aware of your feelings and name them, realize they are normal, and use supportive and compassionate self-talk along with tools to calm down your nervous system, you might feel very different the next time you are exposed to face masks or must deal with stressful situations. But most of all, being kind to yourself and each other can make us all feel safer in a world that feels so unsafe and unpredictable right now.

Ideally, learning that it is common to experience anxiety around wearing or seeing others wear face masks, and acquiring a few tools to manage "mask anxiety," will give you reassurance and strength to cope more easily during this time of COVID-19.

References

Babbel, S. 2018. Heal the Body. Heal the Mind. A Somatic Approach to Moving Beyond Trauma. Oakland, CA: New Harbinger Publications.

Porges, S. 2011. The Polyvagal Theory. Neurophysiological Foundation of Emotions, Attachment, Communication, Self-Regulation. New York, NY: W.W. Norton & Company.

Plaintiff's Exhibit 418

# Why Face Masks Don't Work:
## A Revealing Review of Their Inadequacies

*Yesterday's Scientific Dogma is Today's Discarded Fable.*

John Hardie, BDS, MSc, PhD, FRCDC

## Introduction

The above quotation is ascribed to Justice Archie Campbell author of Canada's SARS Commission Final Report.[1] It is a stark reminder that scientific knowledge is constantly changing as new discoveries contradict established beliefs. For at least three decades a face mask has been deemed an essential component of the personal protective equipment worn by dental personnel. A current article, "Face Mask Performance: Are You Protected" gives the impression that masks are capable of providing an acceptable level of protection from airborne pathogens.[2] Studies of recent diseases such as Severe Acute Respiratory Syndrome (SARS), Middle Eastern Respiratory Syndrome (MERS) and the Ebola Crisis combined with those of seasonal influenza and drug resistant tuberculosis have promoted a better understanding of how respiratory diseases are transmitted. Concurrently, with this appreciation, there have been a number of clinical investigations into the efficacy of protective devices such as face masks. This article will describe how the findings of such studies lead to a rethinking of the benefits of wearing a mask during the practice of dentistry. It will begin by describing new concepts relating to infection control especially personal protective equipment (PPE).

## Trends in Infection Control

For the past three decades there have been minimal opposition to what have become seemingly established and accepted infection control recommendations. In 2009, infection control specialist Dr. D. Diekema questioned the validity of these by asking what actual, front-line hospital-based infection control experiences were available to such authoritative organization as the Centers for Disease Control and Prevention (CDC), the Occupational Safety and Health Association (OSHA) and the National Institute for Occupational Safety and Health (NIOSH).[3] In the same year, while commenting on guidelines for face masks, Dr. M. Rupp of the Society for Healthcare Epidemiology of America noted that some of the practices relating to infection control that have been in place for decades, "haven't been subjected to the same strenuous investigation that, for instance, a new medicine might be subjected."[4] He opined that perhaps it is the relative cheapness and apparent safety of face masks that has prevented them from undergoing the extensive studies that should be required for any quality improvement device.[4] More recently, Dr. R. MacIntyre, a prolific investigator of face masks, has forcefully stated that the historical reliance on theoretical assumptions for recommending PPEs should be replaced by rigorously acquired clinical data.[5] She noted that most studies on face masks have been based on laboratory simulated tests which quite simply have limited clinical applicability as they cannot account for such human factors as compliance,

coughing and talking.[5]

Covering the nose and mouth for infection control started in the early 1900s when the German physician Carl Flugge discovered that exhaled droplets could transmit tuberculosis.[4] The science regarding the aerosol transmission of infectious diseases has, for years, been based on what is now appreciated to be "very outmoded research and an overly simplistic interpretation of the data."[6] Modern studies are employing sensitive instruments and interpretative techniques to better understand the size and distribution of potentially infectious aerosol particles.[6] Such knowledge is paramount to appreciating the limitations of face masks. Nevertheless, it is the historical understanding of droplet and airborne transmission that has driven the longstanding and continuing tradition of mask wearing among health professionals. In 2014, the nursing profession was implored to "stop using practice interventions that are based on tradition" but instead adopt protocols that are based on critical evaluations of the available evidence.[7]

A December 2015 article in the National Post seems to ascribe to Dr. Gardam, Director of Infection Prevention and Control, Toronto University Health Network the quote, "I need to choose which stupid, arbitrary infection control rules I'm going to push."[8] In a communication with the author, Dr. Gardam explained that this was not a personal belief but that it did reflect the views of some infection control practitioners. In her 2014 article, "Germs and the Pseudoscience of Quality Improvement", Dr. K Sibert, an anaesthetist with an interest in infection control, is of the opinion that many infection control rules are indeed arbitrary, not justified by the available evidence or subjected to controlled follow-up studies, but are devised, often under pressure, to give the appearance of doing something.[9]

The above illustrate the developing concerns that many infection control measures have been adopted with minimal supporting evidence. To address this fault, the authors of a 2007 New England Journal of Medicine (NEJM) article eloquently argue that all safety and quality improvement recommendations must be subjected to the same rigorous testing as would any new clinical intervention.[10] Dr. R. MacIntyre, a proponent of this trend in infection control, has used her research findings to boldly state that, "it would not seem justifiable to ask healthcare workers to wear surgical masks."[4] To understand this conclusion it is necessary to appreciate the current concepts relating to airborne transmissions.

## Airborne Transmissions

Early studies of airborne transmissions were hampered by the fact that the investigators were not able to detect small particles (less than 5 microns) near an infectious person.[6] Thus, they assumed that it was the exposure of the face, eyes and nose to large particles (greater than 5 microns) or "droplets" that transmitted the respiratory condition to a person in close proximity to the host.[6] This became known as "droplet infection", and 5 microns or greater became established as the size of large particles and the traditional belief that such particles could, in theory, be trapped by a face mask.[5] The early researchers concluded that since only large particles were detected near an infectious person any small particles would be transmitted via air currents, dispersed over long distances, remain infective over time and might be inhaled by persons who never had any close contact with the host.[11] This became known as "airborne transmission" against which a face mask would be of little use.[5]

Through the use of highly sensitive instruments it is now appreciated that the aerosols transmitted from the respiratory tract due to coughing, sneezing, talking, exhalation and certain medical and dental procedures produce respiratory particles that range from the very small (less than 5 microns) to the very large (greater than a 100 microns) and that all of these particles are capable of being inhaled by persons close to the source.[6, 11] This means that respiratory aerosols potentially contain bacteria averaging in size from 1-10 microns and viruses ranging in size from 0.004 to 0.1 microns.[12] It is also acknowledged that upon their emission large "droplets" will undergo evaporation producing a concentration of readily inhalable small particles surrounding the aerosol source.[6]

The historical terms "droplet infection" and "airborne transmission" defined the routes of infection based on particle size. Current knowledge suggests that these are redundant descriptions since aerosols contain a wide distribution of particle sizes and that they ought to be replaced by the term, "aerosol transmissible."[4, 5] Aerosol transmission has been defined as "person –to – person transmission of pathogens through air by means of inhalation of infectious particles."[26] In addition, it is appreciated that the physics associated with the production of the aerosols imparts energy to microbial suspensions facilitating their inhalation.[11]

Traditionally face masks have been recommended to protect the mouth and nose from the "droplet" route of infection, presumably because they will prevent the inhalation of relatively large particles.[11] Their efficacy must be re-examined in light of the fact that aerosols contain particles many times smaller than 5 microns. Prior to this examination, it is pertinent to review the defence mechanism of the respiratory tract.

## Respiratory System Defences

Comprehensive details on the defence mechanisms of the respiratory tract will not be discussed. Instead readers are reminded that; coughing, sneezing, nasal hairs, respiratory tract cilia, mucous producing lining cells and the phago-

cytic activity of alveolar macrophages provide protection against inhaled foreign bodies including fungi, bacteria and viruses.[13] Indeed, the pathogen laden aerosols produced by everyday talking and eating would have the potential to cause significant disease if it were not for these effective respiratory tract defences.

These defences contradict the recently published belief that dentally produced aerosols, "enter unprotected bronchioles and alveoli."[2] A pertinent demonstration of the respiratory tract's ability to resist disease is the finding that- compared to controls- dentists had significantly elevated levels of antibodies to influenza A and B and the respiratory syncytial virus.[14] Thus, while dentists had greater than normal exposure to these aerosol transmissible pathogens, their potential to cause disease was resisted by respiratory immunologic responses. Interestingly, the wearing of masks and eye glasses did not lessen the production of antibodies, thus reducing their significance as personal protective barriers.[14] Another example of the effectiveness of respiratory defences is that although exposed to more aerosol transmissible pathogens than the general population, Tokyo dentists have a significantly lower risk of dying from pneumonia and bronchitis.[15] The ability of a face mask to prevent the infectious risk potentially inherent in sprays of blood and saliva reaching the wearers mouth and nose is questionable since, before the advent of mask use, dentists were no more likely to die of infectious diseases than the general population.[16]

The respiratory tract has efficient defence mechanisms. Unless face masks have the ability to either enhance or lessen the need for such natural defences, their use as protection against airborne pathogens must be questioned.

### Face Masks

*History*: Cloth or cotton gauze masks have been used since the late 19th century to protect sterile fields from spit and mucous generated by the wearer.[5,17,18] A secondary function was to protect the mouth and nose of the wearer from the sprays and splashes of blood and body fluids created during surgery.[17] As noted above, in the early 20th century masks were used to trap infectious "droplets" expelled by the wearer thus possibly reducing disease transmission to others.[18] Since the mid-20th century until to-day, face masks have been increasingly used for entirely the opposite function: that is to prevent the wearer from inhaling respiratory pathogens.[5,20,21] Indeed, most current dental infection control recommendations insist that a face mask be worn, "as a key component of personal protection against airborne pathogens".[2]

Literature reviews have confirmed that wearing a mask during surgery has no impact whatsoever on wound infection rates during clean surgery.[22,23,24,25,26] A recent 2014 report states categorically that no clinical trials have ever shown that wearing a mask prevents contamination of surgical sites.[26] With their original purpose being highly questionable it should be no surprise that the ability of face masks to act as respiratory protective devices is now the subject of intense scrutiny.[27] Appreciating the reasons for this, requires an understanding of the structure, fit and filtering capacity of face masks.

*Structure and Fit*: Disposable face masks usually consist of three to four layers of flat non-woven mats of fine fibres separated by one or two polypropylene barrier layers which act as filters capable of trapping material greater than 1 micron in diameter.[18,24,28] Masks are placed over the nose and mouth and secured by straps usually placed behind the head and neck.[21] No matter how well a mask conforms to the shape of a person's face, it is not designed to create an air tight seal around the face. Masks will always fit fairly loosely with considerable gaps along the cheeks, around the bridge of the nose and along the bottom edge of the mask below the chin.[21] These gaps do not provide adequate protection as they permit the passage of air and aerosols when the wearer inhales.[11,17] It is important to appreciate that if masks contained filters capable of trapping viruses, the peripheral gaps around the masks would continue to permit the inhalation of unfiltered air and aerosols.[11]

*Filtering Capacity*: The filters in masks do not act as sieves by trapping particles greater than a specific size while allowing smaller particles to pass through.[18] Instead the dynamics of aerosolized particles and their molecular attraction to filter fibres are such that at a certain range of sizes both large and small particles will penetrate through a face mask.[18] Accordingly, it should be no surprise that a study of eight brands of face masks found that they did not filter out 20-100% of particles varying in size from 0.1 to 4.0 microns.[21] Another investigation showed penetration ranges from 5-100% when masks were challenged with relatively large 1.0 micron particles.[29] A further study found that masks were incapable of filtering out 80-85% of particles varying in size from 0.3 to 2.0 microns.[30] A 2008 investigation identified the poor filtering performance of dental masks.[27] It should be concluded from these and similar studies that the filter material of face masks does not retain or filter out viruses or other submicron particles.[11,31] When this understanding is combined with the poor fit of masks, it is readily appreciated that neither the filter performance nor the facial fit characteristics of face masks qualify them as being devices which protect against respiratory infections.[27] Despite this determination the performance of masks against certain criteria has been used to justify their effectiveness.[2] Accordingly, it is appropriate to review the limitations of these performance standards.

 on page 69

 **from page 66**

*Performance Standards*: Face masks are not subject to any regulations.[11] The USA Federal Food and Drug Administration (FDA) classifies face masks as Class II devices. To obtain the necessary approval to sell masks all that a manufacturer need do is satisfy the FDA that any new device is substantially the same as any mask currently available for sale.[21] As ironically noted by the Occupational Health and Safety Agency for Healthcare in BC, "There is no specific requirement to prove that the existing masks are effective and there is no standard test or set of data required supporting the assertion of equivalence. Nor does the FDA conduct or sponsor testing of surgical masks."[21] Although the FDA recommends two filter efficiency tests; particulate filtration efficiency (PFE) and bacterial filtration efficiency (BFE) it does not stipulate a minimum level of filter performance for these tests.[27] The PFE test is a basis for comparing the efficiency of face masks when exposed to aerosol particle sizes between 0.1 and 5.0 microns. The test does not assess the effectiveness of a mask in preventing the ingress of potentially harmful particles nor can it be used to characterize the protective nature of a mask.[32] The BFE test is a measure of a mask's ability to provide protection from large particles expelled by the wearer. It does not provide an assessment of a mask's ability to protect the wearer.[17] Although these tests are conducted under the auspices of the American Society of Testing and Materials (ASTM) and often produce filtration efficiencies in the range of 95-98 %, they are not a measure of a masks ability to protect against respiratory pathogens. Failure to appreciate the limitations of these tests combined with a reliance on the high filtration efficiencies reported by the manufacturers has, according to Healthcare in BC, "created an environment in which health care workers think they are more protected than they actually are."[21] For dental personnel the protection sought is mainly from treatment induced aerosols.

## Dental Aerosols

For approximately 40 years it has been known that dental restorative and especially ultrasonic scaling procedures produce aerosols containing not only blood and saliva but potentially pathogenic organisms.[33] The source of these organisms could be the oral cavities of patients and/or dental unit water lines.[34] Assessing the source and pathogenicity of these organisms has proven elusive as it is extremely difficult to culture bacteria especially anaerobes and viruses from dental aerosols.[34] Although there is no substantiated proof that dental aerosols are an infection control risk, it is a reasonable assumption that if pathogenic microbes are present at the treatment site they will become aerosolized and prone to inhalation by the clinician which a face mask will not prevent. As shown by the study of UK dentists, the inhalation resulted in the formation of appropriate antibodies to respiratory pathogens without overt signs and symptoms of respiratory distress.[14] This occurred whether masks were or were not worn. In a 2008 article, Dr. S. Harrel, of the Baylor College of Dentistry, is of the opinion that because there is a lack of epidemiologically detectable disease from the use of ultrasonic scalers, dental aerosols appear to have a low potential for transmitting disease but should not be ignored as a risk for disease transmission.[34] The most effective measures for reducing disease transmission from dental aerosols are pre-procedural rinses with mouthwashes such as chlorhexidine, large diameter high volume evacuators, and rubber dam whenever possible.[33] Face masks are not useful for this purpose, and Dr. Harrel believes that dental personnel have placed too great a reliance on their efficacy.[34] Perhaps this has occurred because dental regulatory agencies have failed to appreciate the increasing evidence on face mask inadequacies.

## The Inadequacies

Between 2004 and 2016 at least a dozen research or review articles have been published on the inadequacies of face masks.[5,6,11,17,19,20,21,25,26,27,28,31] All agree that the poor facial fit and limited filtration characteristics of face masks make them unable to prevent the wearer inhaling airborne particles. In their well-referenced 2011 article on respiratory protection for healthcare workers, Drs. Harriman and Brosseau conclude that, "facemasks will not protect against the inhalation of aerosols."[11] Following their 2015 literature review, Dr. Zhou and colleagues stated, "There is a lack of substantiated evidence to support claims that facemasks protect either patient or surgeon from infectious contamination."[25] In the same year Dr. R. MacIntyre noted that randomized controlled trials of facemasks failed to prove their efficacy.[5] In August 2016 responding to a question on the protection from facemasks the Canadian Centre for Occupational Health and Safety replied:

- The filter material of surgical masks does not retain or filter out submicron particles;
- Surgical masks are not designed to eliminate air leakage around the edges;
- Surgical masks do not protect the wearer from inhaling small particles that can remain airborne for long periods of time.[31]

In 2015, Dr. Leonie Walker, Principal Researcher of the New Zealand Nurses Organization succinctly described- within a historical context – the inadequacies of facemasks, "Health care workers have long relied heavily on surgical masks to provide protection against influenza and other infections. Yet there are no convincing scientific data that support the effectiveness of masks for respiratory protection. The

 **from page 34**

masks we use are not designed for such purposes, and when tested, they have proved to vary widely in filtration capability, allowing penetration of aerosol particles ranging from four to 90%."[35]

Face masks do not satisfy the criteria for effectiveness as described by Drs. Landefeld and Shojania in their NEJM article, "The Tension between Needing to Improve Care and Knowing How to Do It.[10] The authors declare that, "…recommending or mandating the widespread adoption of interventions to improve quality or safety requires rigorous testing to determine whether, how, and where the intervention is effective…" They stress the critical nature of this concept because, "…a number of widely promulgated interventions are likely to be wholly ineffective, even if they do not harm patients."[10] A significant inadequacy of face masks is that they were mandated as an intervention based on an assumption rather than on appropriate testing.

## Conclusions
The primary reason for mandating the wearing of face masks is to protect dental personnel from airborne pathogens. This review has established that face masks are incapable of providing such a level of protection. Unless the Centers for Disease Control and Prevention, national and provincial dental associations and regulatory agencies publically admit this fact, they will be guilty of perpetuating a myth which will be a disservice to the dental profession and its patients. It would be beneficial if, as a consequence of the review, all present infection control recommendations were subjected to the same rigorous testing as any new clinical intervention. Professional associations and governing bodies must ensure the clinical efficacy of quality improvement procedures prior to them being mandated. It is heartening to know that such a trend is gaining a momentum which might reveal the inadequacies of other long held dental

infection control assumptions. Surely, the hallmark of a mature profession is one which permits new evidence to trump established beliefs. In 1910, Dr. C. Chapin, a public health pioneer, summarized this idea by stating, "We should not be ashamed to change our methods; rather, we should be ashamed not to do so."[36] Until this occurs, as this review has revealed, dentists have nothing to fear by unmasking. **OH**

---

Oral Health welcomes this original article.

## References
1. Ontario Ministry of Health and Long-term Care. SARS Commission-Spring of Fear: Final Report. Available at: http://www.health.gov.on.ca/english/public/pub/ministry_reports/campbell06/campbell06.html
2. Molinari JA, Nelson P. Face Mask Performance: Are You Protected? Oral Health, March 2016.
3. Diekema D. Controversies in Hospital Infection Prevention, October, 2009.
4. Unmasking the Surgical Mask: Does It Really Work? Medpage Today, Infectious Disease, October, 2009.
5. MacIntyre CR, Chughtai AA. Facemasks for the prevention of infection in health-care and community settings. BMJ 2015; 350:h694.
6. Brosseau LM, Jones R. Commentary: Health workers need optimal respiratory protection for Ebola. Center for Infectious Disease Research and Policy. September, 2014.
7. Clinical Habits Die Hard: Nursing Traditions Often Trump Evidence-Based Practice. Infection Control Today, April, 2014.
8. Landman K. Doctors, take off those dirty white coats. National Post, December 7, 2015.
9. Sibert K. Germs and the Pseudoscience of Quality Improvement. California Society of Anesthesiologists, December 8, 2014.
10. Auerbach AD, Landfeld CS, Shojania KG. The Tension between Needing to

Improve Care and Knowing How to Do It. NEJM 2007; 357 (6):608-613.
11. Harriman KH, Brosseau LM. Controversy: Respiratory Protection for Healthcare Workers. April, 2011. Available at: http://www.medscape.com/viewarticle/741245_print
12. Bacteria and Viruses Issues. Water Quality Association, 2016. Available at: https://www.wqa.org/Learn-About-Water/Common-Contaminants/Bacteria-Viruses
13. Lechtzin N. Defense Mechanisms of the Respiratory System. Merck Manuals, Kenilworth, USA, 2016
14. Davies KJ, Herbert AM, Westmoreland D. Bagg J. Seroepidemiological study of respiratory virus infections among dental surgeons. Br Dent J. 1994; 176(7):262-265.
15. Shimpo H, Yokoyama E, Tsurumaki K. Causes of death and life expectancies among dentists. Int Dent J 1998; 48(6):563-570.
16. Bureau of Economic Research and Statistics, Mortality of Dentists 1961-1966. JADA 1968; 76(4):831-834.
17. Respirators and Surgical Masks: A Comparison. 3 M Occupational Health and Environment Safety Division. Oct. 2009.
18. Brosseau L. N95 Respirators and Surgical Masks. Centers for Disease Control and Prevention. Oct. 2009.
19. Johnson DF, Druce JD, Birch C, Grayson ML. A Quantitative Assessment of the Efficacy of Surgical and N95 Masks to Filter Influenza Virus in Patients with Acute Influenza Infection. Clin Infect Dis 2009; 49:275-277.
20. Weber A, Willeke K, Marchloni R et al. Aerosol penetration and leakage characteristics of masks used in the health care industry. Am J Inf Cont 1993; 219(4):167-173.
21. Yassi A, Bryce E. Protecting the Faces of Health Care Workers. Occupational Health and Safety Agency for Healthcare in BC, Final Report, April 2004.
22. Bahli ZM. Does Evidence Based Medicine Support The Effectiveness Of Surgical Facemasks In Preventing Postoperative

Case 6:21-cv-01008-PGB-DCI   Document 62-7   Filed 09/14/21   Page 134 of 451 PageID 3626

Wound Infections In Elective Surgery. J Ayub Med Coll Abbottabad 2009; 21(2)166-169.

23. Lipp A, Edwards P. Disposable surgical face masks for preventing surgical wound infection in clean surgery. Cochrane Database Syst Rev 2002(1) CD002929.

24. Lipp A, Edwards P. Disposable surgical face masks: a systematic review. Can Oper Room Nurs J 2005; 23(#):20-38.

25. Zhou Cd, Sivathondan P, Handa A. Unmasking the surgeons: the evidence base behind the use of facemasks in surgery. JR Soc Med 2015; 108(6):223-228.

26. Brosseau L, Jones R. Commentary: Protecting health workers from airborne MERS-CoV- learning from SARS. Center for Infectious Disease Research and Policy May 2014.

27. Oberg T, Brosseau L. Surgical mask filter and fit performance. Am J Infect Control 2008; 36:276-282.

28. Lipp A. The effectiveness of surgical face masks: what the literature shows. Nursing Times 2003; 99(39):22-30.

29. Chen CC, Lehtimaki M, Willeke K. Aerosol penetration through filtering facepieces and respirator cartridges. Am Indus Hyg Assoc J 1992; 53(9):566-574.

30. Chen CC, Willeke K. Characteristics of Face Seal Leakage in Filtering Facepieces. Am Indus Hyg Assoc J 1992; 53(9):533-539.

31. Do surgical masks protect workers? OSH Answers Fact Sheets. Canadian Centre for Occupational health and Safety. Updated August 2016.

32. Standard Test Method for Determining the Initial Efficiency of Materials Used in Medical Face Masks to Penetration by Particulates Using Latex Spheres. American Society of Testing and Materials, Active Standard ASTM F2299/F2299M.

33. Harrel SK. Airborne Spread of Disease-The Implications for Dentistry. CDA J 2004; 32(11); 901-906.

34. Harrel SK. Are Ultrasonic Aerosols an Infection Control Risk? Dimensions of Dental Hygiene 2008; 6(6):20-26.

35. Robinson L. Unmasking the evidence. New Zealand Nurses Organization. May 2015. Available at: https://nznoblog.org.nz/2015/05/15/unmasking-the-evidence

36. Chapin CV. The Sources and Modes of Transmission. New York, NY: John Wiley & Sons; 1910.

masksickness.com

Plaintiff's Exhibit 419

# Why Masks Are a Charade

*By Dr Joseph Mercola DO, 23 August, 2021*

17-21 minutes

---

### At-a-Glance

For more than 18 months, we've dealt with questionable advice on masking, ranging from head-scratching and mildly amusing to outright laughable, and there seems to be no end in sight, despite the lack of scientific underpinning for universal masking.

---

Driving this insanity is the censoring of truthful and factual information by tech platforms such as YouTube. In the Fox News report above, Tucker Carlson calls out YouTube CEO Susan Wojcicki for censoring a video by U.S. Sen. Rand Paul, in which he pointed out that most masks cannot and will not protect you from the virus.

*"Saying cloth masks work, when they don't, actually risks lives,"* Paul said in his banned video. Contrary to Wojcicki, Paul is an actual medical doctor, yet Wojcicki believes she's capable of determining what is and is not medical misinformation.

### Mask Recommendations Spiraled From Sensible to Irrational

Paul's statement is far from controversial. In a 2020 email obtained via a freedom of information act request, Dr. Anthony Fauci stated, *"The typical mask you buy in the drug store is not really effective in keeping out virus, which is small enough to pass through the material."*

In March 2020, Fauci also went on TV stating[1,2] that *"people should not be walking around with masks"* because *"it's not providing the perfect protection that people think that it is."*

Ditto for then-Surgeon General Jerome Adams, who February 29, 2020, tweeted: *"Seriously people — STOP BUYING MASKS! They are NOT effective in preventing general public from catching #Coronavirus."*[3] Adams has since deleted the tweet, but it

lives in infamy all over the internet.[4,5,6]

- *"The point is there was nothing kooky or inaccurate about Rand Paul's video about masks,"* Carlson says. *"It was … provably true, people who know what they're talking about agree with it, including the people in charge of our COVID response, but it was censored anyway. And the fact that it was censored anyway is a scandal."*

Carlson goes on to point out that censorship always backfires because, eventually, the masses catch on to the fact that they're being lied to, at which point they stop listening altogether. Heavy-handedness also backfires, and the COVID injection campaign is a perfect example.

Had we just been treated like adults, the vaccination rate would probably have been far higher than it currently is. The irrational push with ostentatious bribes followed by illegal implementation of vaccine mandates simply raised too many suspicions in too many people.

- *"Obviously, this can't continue,"* Carlson says. *"You cannot have a self-governing country in which people aren't allowed to read what they want. A free press is not an optional feature of a democracy; it's the center of democracy. That's obvious. It's written down in our founding documents."*

### How Did Health Authorities Get So Irrational on Masks?

In an August 11, 2021, City-Journal article,[7] Jeffrey Anderson reviews the scientific evidence for universal masking, noting that February 25, 2020, U.K. health authorities published guidance discouraging the use of masks even for health care workers in residential care facilities due to the fact that they don't prevent viral spread.

Although the guidance apparently has been wiped from the internet like Adams' tweet, Anderson quotes it as saying, *"During normal day-to-day activities facemasks do not provide protection from respiratory viruses, such as COVID-19 and do not need to be worn by staff."*

Similarly, March 30, 2020, the executive director for the World Health Organization's Health Emergency Program stated *"there is no specific evidence to suggest that the wearing of masks by the mass population has any particular benefit."*[8]

Such guidance was truthful and logical. Surgical masks are not designed to protect the wearer or others against viral transmission, as the holes in the fabric are far larger than any virus. They're merely meant to prevent a health care worker from inadvertently infecting a patient's wound with bacteria-laden saliva or respiratory droplets. As reported by Anderson:[9]

- *"Public-health officials' advice in the early days of COVID-19 was consistent with that understanding. Then, on April 3, 2020, Adams announced that the CDC was changing its guidance and that the general public should hereafter wear masks whenever sufficient social distancing could not be maintained.*

- *Fast-forward 15 months. Rand Paul has been suspended from YouTube for a week for saying, 'Most of the masks you get over the counter don't work.'*

- *Many cities across the country, following new CDC guidance handed down amid a spike in cases nationally caused by the Delta variant, are once again mandating indoor mask-wearing for everyone, regardless of inoculation status.*

- *The CDC further recommends that all schoolchildren and teachers, even those who have had COVID-19 or have been vaccinated, should wear masks …*

- *How did mask guidance change so profoundly? Did the medical research on the effectiveness of masks change — and in a remarkably short period of time — or just the guidance on wearing them?"*

## Why Is the CDC Using Inferior Science to Support Masking?

We're routinely told to follow the science and that public health recommendations are based on just that. But are they really? Where is the evidence showing that masking has any impact on viral transmission?

- **It's striking how much the CDC, in marshalling evidence to justify its revised mask guidance, studiously avoids mentioning randomized controlled trials.**
  **—Jeffrey Anderson**

Randomized controlled trials (RCTs) have long been regarded as the gold standard in medical research, as they allow you to isolate a specific variable and reduce the ability of researchers to produce a preferred outcome. It's still possible through a variety of tricks, but at least then you can see the bias. Curiously, RCTs are now routinely ignored when it comes to mask wearing. Why is that? Anderson reports:[10]

- *"It's striking how much the CDC, in marshalling evidence to justify its revised mask guidance, studiously avoids mentioning randomized controlled trials ...*

- *In a 'Science Brief'[11] highlighting studies that 'demonstrate that mask wearing reduces new infections' and serving as the main public justification for its mask guidance, the CDC provides a helpful matrix of 15 studies — none RCTs.*

- *The CDC instead focuses strictly on observational studies completed after Covid-19*

*began. In general, observational studies are not only of lower quality than RCTs but also are more likely to be politicized, as they can inject the researcher's judgment more prominently into the inquiry and lend themselves, far more than RCTs, to finding what one wants to find.*

- *A particular favorite of the CDC's … is an observational (specifically, cohort) study12 focused on two COVID-positive hairstylists at a beauty salon in Missouri.*

- *The two stylists, who were masked, provided services for 139 people, who were mostly masked, for several days after developing Covid-19 symptoms. The 67 customers who subsequently chose to get tested for the coronavirus tested negative, and none of the 72 others reported symptoms.*

- *This study has major limitations. For starters, any number of the 72 untested customers could have had COVID-19 but been asymptomatic, or else had symptoms that they chose not to report to the Greene County Health Department, the entity doing the asking.*

- *The apparent lack of spread of COVID-19 could have been a result of good ventilation, good hand hygiene, minimal coughing by the stylists, or the fact that stylists generally, as the researchers note, 'cut hair while clients are facing away from them.'*

- *The researchers also observe that 'viral shedding' of the coronavirus 'is at its highest during the 2 to 3 days before symptom onset.' Yet no customers who saw the stylists when they were at their most contagious were tested for COVID-19 or asked about symptoms.*

- *Most importantly, this study does not have a control group. Nobody has any idea how many people, if any, would have been infected had no masks been worn in the salon."*

**RCTs Show Masks Don't Prevent Viral Transmission**

Another piece of evidence leaned on by the CDC is a survey, which is even lower-quality evidence than an observational cohort study.

- *"Mask supporters often claim that we have no choice but to rely on observational studies instead of RCTs, because RCTs cannot tell us whether masks work or not. But what they really mean is that they don't like what the RCTs show," Anderson writes.*

Indeed, you'd be hard-pressed to find even a single RCT showing mask wearing has a notable benefit. Anderson goes through 14 RCTs, conducted around the world, that have investigated the effectiveness of masks against respiratory viruses, discussing their findings.

Among them is a French study[13] from 2010, which randomly placed sick patients and their household contacts into a mask group or a non-mask group. Adherence to the designated

intervention was "good."

Within one week, 15.8% of household contacts in the no-mask control group and 16.2% in the mask group developed an influenza-like illness. The 0.4% difference between the groups was statistically insignificant. According to the authors: "In various sensitivity analyses, we did not identify any trend in the results suggesting effectiveness of facemasks."

The CDC's own data[14,15,16] also show 70.6% of COVID-19 patients reported "always" wearing a cloth mask or face covering in the 14 days preceding their illness; 14.4% reported having worn a mask "often." So, a total of 85% of people who came down with COVID-19 had "often" or "always" worn a mask.

### Handwashing Beats Masks and Mask-Plus-Handwashing Combo

A 2009 study[17] funded by the CDC added hand washing to the mix to see if mask wearing would work better in combination with hand hygiene. One group was instructed on the use of hand hygiene only, a second group used both handwashing and face masks, and a third group did nothing.

While the mask-plus-handwashing group fared statistically better than the control group in one measure, the handwashing-only group beat the control group to a statistically significant degree in two measures.

This suggests handwashing alone was actually the most effective measure. According to the authors, *"no additional benefit was observed when facemask [use] was added to hand hygiene by comparison with hand hygiene alone."*

The notion that handwashing alone beats even the combination of handwashing and mask wearing gained support in a 2011 study,[18] which discovered that among those who washed their hands and wore face masks, the secondary attack rate of influenza-like illness was double that of the control group, which did nothing.

Multivariate analysis showed the same thing, leading the authors to conclude that relative to the control group, the odds of infection among those wearing masks and washing their hands was *"twofold in the opposite direction from the hypothesized protective effect."*

### COVID-19 Specific Mask Trial Failed to Prove Benefit

The first and to my knowledge only COVID-19-specific randomized controlled surgical mask trial,[19,20] published November 18, 2020, also undermined the official narrative that masking works. Interestingly, it found routine mask wearing may either reduce your risk of

SARS-CoV-2 infection by as much as 46%, or it may increase your risk by 23%.

Either way, the vast majority — 97.9% of those who didn't wear masks, and 98.2% of those who did — remained infection-free, so SARS-CoV-2 infection isn't nearly as widespread as we think it is.

The study included 3,030 individuals assigned to wear a surgical face mask and 2,994 unmasked controls. Of them, 80.7% completed the study. Based on the adherence scores reported, 46% of participants always wore the mask as recommended, 47% predominantly as recommended and 7% failed to follow recommendations.

Among mask wearers, 1.8% ended up testing positive for SARS-CoV-2, compared to 2.1% among controls. When they removed those who did not adhere to the recommendations for use, the results remained the same — 1.8%, which suggests adherence makes no significant difference either.

Among those who reported wearing their face mask *"exactly as instructed,"* 2% tested positive for SARS-CoV-2 compared to 2.1% of the controls. So, essentially, we're destroying economies and lives around the world to protect a tiny minority from getting a positive PCR test result, which we now know means nothing.

Another investigation[21] that compared caseloads between states with mask mandates and those without showed states with mask mandates had an average of 27 positive SARS-CoV-2 "cases" per 100,000 people, whereas states with no mask mandates had just 17 cases per 100,000. This too suggests mask mandates have no positive impact to speak of.

## More Science

If you're still on the fence about whether masks are a necessity that must be forced on everyone, including young children, consider reading through some of the available medical literature. In addition to the research reviewed above, here's a small sampling of what else you'll find when you start searching for data on face masks as a strategy to prevent viral infection:

- **Surgical masks and N95 masks perform about the same —** A 2009 study[22] published in JAMA compared the effectiveness of surgical masks and N95 respirators to prevent seasonal influenza in a hospital setting; 24% of the nurses in the surgical mask group still got the flu, as did 23% of those who wore N95 respirators.

- **"No evidence" masks prevent transmission of flu in hospital setting —** In September 2018, the Ontario Nurses Association (ONA) won its second of two grievances filed against the Toronto Academic Health Science Network's (TAHSN) "vaccinate or mask"

policy. This information also appears to have been scrubbed from the internet, but it is available in Wayback archives. As reported by the ONA:[23]

- *"After reviewing extensive expert evidence submitted … Arbitrator William Kaplan, in his September 6 decision,[24] found that St. Michael's VOM policy is 'illogical and makes no sense' …*

- *In 2015, Arbitrator James Hayes struck down the same type of policy in an arbitration that included other Ontario hospitals across the province … Hayes found there was 'scant evidence' that forcing nurses to use masks reduced the transmission of influenza to patients …*

- *ONA's well-regarded expert witnesses, including Toronto infection control expert Dr. Michael Gardam, Quebec epidemiologist Dr. Gaston De Serres, and Dr. Lisa Brosseau, an American expert on masks, testified that there was … no evidence that forcing healthy nurses to wear masks during the influenza season did anything to prevent transmission of influenza in hospitals.*

- *They further testified that nurses who have no symptoms are unlikely to be a real source of transmission and that it was not logical to force healthy unvaccinated nurses to mask.*

- **No significant reduction in flu transmission when used in community setting —** A policy review paper[25] published in Emerging Infectious Diseases in May 2020, which reviewed *"the evidence base on the effectiveness of nonpharmaceutical personal protective measures … in non-health care settings"* concluded, based on 10 randomized controlled trials, that there was *"no significant reduction in influenza transmission with the use of face masks…"*

- **"No evidence" that universal masking prevents COVID-19 —** A 2020 guidance memo by the World Health Organization pointed out that:[26]

- *"Meta-analyses in systematic literature reviews have reported that the use of N95 respirators compared with the use of medical masks is not associated with any statistically significant lower risk of the clinical respiratory illness outcomes or laboratory-confirmed influenza or viral infections …*

- *At present, there is no direct evidence (from studies on COVID-19 and in healthy people in the community) on the effectiveness of universal masking of healthy people in the community to prevent infection with respiratory viruses, including COVID-19."*

- **Mask or no mask, same difference —** A meta-analysis and scientific review[27] led by respected researcher Thomas Jefferson, cofounder of the Cochrane Collaboration, posted on the prepublication server medRxiv in April 2020, found that, compared to no mask, mask wearing in the general population or among health care workers did not reduce

==influenza-like illness cases or influenza.==

In one study, which looked at quarantined workers, it actually increased the risk of contracting influenza, but lowered the risk of influenza-like illness. They also found there was no difference between surgical masks and N95 respirators.

**Let's Follow the Actual Science**

==If we are to follow the science — which is a good idea in general and particularly when it comes to public health mandates — we should not wear masks.== As reported by Anderson:[28]

- *"In sum, of the 14 RCTs that have tested the effectiveness of masks in preventing the transmission of respiratory viruses, three suggest, but do not provide any statistically significant evidence in intention-to-treat analysis, that masks might be useful.*

- ==*The other eleven suggest that masks are either useless — whether compared with no masks or because they appear not to add to good hand hygiene alone — or actually counterproductive.*==

- *Of the three studies that provided statistically significant evidence in intention-to-treat analysis that was not contradicted within the same study, one found that the combination of surgical masks and hand hygiene was less effective than hand hygiene alone, one found that the combination of surgical masks and hand hygiene was less effective than nothing, and one found that cloth masks were less effective than surgical masks."*

Plaintiffs' Exhibit 420

citizensforfreespeech.org

# Why Masks Don't Work Against COVID-19

*Posted by Denis Rancourt, PhD 0sc on July 08, 2020*

25-31 minutes

---

Masks and respirators do not work. There have been extensive randomized controlled trial (RCT) studies, and meta-analysis reviews of RCT studies, which all show that masks and respirators do not work to prevent respiratory influenza-like illnesses, or respiratory illnesses believed to be transmitted by droplets and aerosol particles.

Furthermore, the relevant known physics and biology, which I review, are such that masks and respirators should not work. It would be a paradox if masks and respirators worked, given what we know about viral respiratory diseases: The main transmission path is long-residence-time aerosol particles (< 2.5 μm), which are too fine to be blocked, and the minimum-infective-dose is smaller than one aerosol particle.

The present paper about masks illustrates the degree to which governments, the mainstream media, and institutional propagandists can decide to operate in a science vacuum, or select only incomplete science that serves their interests. Such recklessness is also certainly the case with the current global lockdown of over 1 billion people, an unprecedented experiment in medical and political history.

**Review of the Medical Literature**

Here are key anchor points to the extensive scientific literature that establishes that wearing surgical masks and respirators (e.g., "N95") does not reduce the risk of contracting a verified illness:

Jacobs, J. L. et al. (2009) "Use of surgical face masks to reduce the incidence of the common cold among health care workers in Japan: A randomized controlled trial",nAmerican Journal of Infection Control, Volume 37, Issue 5, 417 419. https://www.ncbi.nlm.nih.gov/pubmed/19216002

N95-masked health-care workers (HCW) were significantly more likely to experience headaches. Face mask use in HCW was not demonstrated to provide benefit in terms of cold symptoms or getting colds. Cowling, B. et al. (2010) "Face masks to prevent transmission of influenza virus: A systematic review", Epidemiology and Infection, 138(4), 449-456. doi:10.1017/S0950268809991658 https://www.cambridge.org/core/journals

/epidemiology-and-infection/article/facemasks-to-prevent-transmission-of-influenza-virus-a systematicreview/64D368496EBDE0AFCC6639CCC9D8BC05

==None of the studies reviewed showed a benefit from wearing a mask,== in either HCW or community members in households (H). See summary Tables 1 and 2 therein. bin-Reza et al. (2012) "The use of masks and respirators to prevent transmission of influenza: a systematic review of the scientific evidence", Influenza and Other Respiratory Viruses 6(4), 257–267. https://onlinelibrary.wiley.com/doi/epdf/10.1111/j.1750-2659.2011.00307.x

=="There were 17 eligible studies. … None of the studies established a conclusive relationship between mask∕respirator use and protection against influenza infection."==

Smith, J.D. et al. (2016)

"Effectiveness of N95 respirators versus surgical masks in protecting health care workers from acute respiratory infection: a systematic review and meta-analysis", CMAJ Mar 2016, cmaj.150835; DOI: 10.1503/cmaj.150835
https://www.cmaj.ca/content/188/8/567

"We identified 6 clinical studies … In the meta-analysis of the clinical studies, we found no significant difference between N95 respirators and surgical masks in associated risk of (a) laboratory-confirmed respiratory infection, (b) influenza-like illness, or (c) reported work-place absenteeism."

Offeddu, V. et al. (2017) "Effectiveness of Masks and Respirators Against Respiratory Infections in Healthcare Workers: A Systematic Review and Meta-Analysis", Clinical Infectious Diseases, Volume 65, Issue 11, 1 December 2017, Pages 1934–1942, https://doi.org/10.1093/cid/cix681
https://academic.oup.com/cid/article/65/11/1934/4068747

"Self-reported assessment of clinical outcomes was prone to bias. ==Evidence of a protective effect of masks or respirators against verified respiratory infection (VRI) was not statistically significant";==

as per Fig. 2c therein: Radonovich, L.J. et al. (2019) "N95 Respirators vs Medical Masks for Preventing Influenza Among Health Care Personnel: A Randomized Clinical Trial", JAMA. 2019; 322(9): 824–833. doi:10.1001/jama.2019.11645 https://jamanetwork.com/journals/jama/fullarticle/2749214

"Among 2862 randomized participants, 2371 completed the study and accounted for 5180 HCW-seasons. … Among outpatient health care personnel, N95 respirators vs medical masks as worn by participants in this trial resulted in ==no significant difference in the incidence of laboratory-confirmed influenza."==

Long, Y. et al. (2020) "Effectiveness of N95 respirators versus surgical masks against influenza: A systematic review and meta-analysis", J Evid Based Med. 2020; 1- 9. https://doi.org/10.1111/jebm.12381
https://onlinelibrary.wiley.com/doi/epdf/10.1111/jebm.12381

"A total of six RCTs involving 9 171 participants were included. There were no statistically significant differences in preventing laboratory-confirmed influenza, laboratory-confirmed respiratory viral infections, laboratory-confirmed respiratory infection and influenza-like illness using N95 respirators and surgical masks. Meta-analysis indicated a protective effect of N95 respirators against laboratory-confirmed bacterial colonization (RR = 0.58, 95% CI 0.43-0.78). The use of N95 respirators compared with surgical masks is not associated with a lower risk of laboratory-confirmed influenza."

**Conclusion Regarding that Masks Do Not Work**

No RCT study with verified outcome shows a benefit for HCW or community members in households to wearing a mask or respirator. There is no such study. There are no exceptions. Likewise, no study exists that shows a benefit from a broad policy to wear masks in public

(more on this below).

Furthermore, if there were any benefit to wearing a mask, because of the blocking power against droplets and aerosol particles, then there should be more benefit from wearing a respirator (N95) compared to a surgical mask, yet several large meta-analyses, and all the RCT, prove that there is no such relative benefit. Masks and respirators do not work.

**Precautionary Principle Turned on Its Head with Masks**

In light of the medical research, therefore, it is difficult to understand why public-health authorities are not consistently adamant about this established scientific result, since the distributed psychological, economic and environmental harm from a broad recommendation to wear masks is significant, not to mention the unknown potential harm from concentration and distribution of pathogens on and from used masks. In this case, public authorities would be

turning the precautionary principle on its head (see below).

**Physics and Biology of Viral Respiratory Disease and of Why Masks Do Not Work**

In order to understand why masks cannot possibly work, we must review established knowledge about viral respiratory diseases, the mechanism of seasonal variation of excess deaths from pneumonia and influenza, the aerosol mechanism of infectious disease transmission, the physics and chemistry of aerosols, and the mechanism of the so-called minimum-infective-dose.

In addition to pandemics that can occur anytime, in the temperate latitudes there is an extra burden of respiratory-disease mortality that is seasonal, and that is caused by viruses. For  example, see the review of influenza by Paules and Subbarao (2017).

This has been known for a long time, and the seasonal pattern is exceedingly regular. For example, see Figure 1 of Viboud (2010), which has

"*Weekly time series of the ratio of deaths from pneumonia and influenza to all deaths, based on the 122 cities surveillance in the US (blue line). The red line represents the expected baseline ratio in the absence of influenza activity,*" here:

The seasonality of the phenomenon was largely not understood until a decade ago. Until recently, it was debated whether the pattern arose primarily because of seasonal change in virulence of the pathogens, or because of seasonal change in susceptibility of the host (such as from dry air causing tissue irritation, or diminished daylight causing vitamin deficiency or hormonal stress). For example, see Dowell (2001).

In a landmark study, Shaman et al. (2010) showed that the seasonal pattern of extra respiratory-disease mortality can be explained quantitatively on the sole basis of absolute humidity, and its direct controlling impact on transmission of airborne pathogens.

Lowen et al. (2007) demonstrated the phenomenon of humidity-dependent airborne-virus virulence in actual disease transmission between guinea pigs, and discussed potential underlying mechanisms for the measured controlling effect of humidity.

The underlying mechanism is that the pathogen-laden aerosol particles or droplets are neutralized within a half-life that monotonically and significantly decreases with increasing ambient humidity. This is based on the seminal work of Harper (1961). Harper experimentally showed that viral-pathogen-carrying droplets were inactivated within shorter and shorter times, as ambient humidity was increased.

Harper argued that the viruses themselves were made inoperative by the humidity ("viable decay"), however, he admitted that the effect could be from humidity-enhanced physical removal or sedimentation of the droplets ("physical loss"):

"Aerosol viabilities reported in this paper are based on the ratio of virus titre to radioactive count in suspension and cloud samples, and can be criticized on the ground that test and tracer materials were not physically identical."

The latter ("physical loss") seems more plausible to me, since humidity would have a universal physical effect of causing particle / droplet growth and sedimentation, and all tested viral pathogens have essentially the same humidity-driven "decay".

Furthermore, it is difficult to understand how a virion (of all virus types) in a droplet would be molecularly or structurally attacked or damaged by an increase in ambient humidity. A

"virion" is the complete, infective form of a virus outside a host cell, with a core of RNA or DNA and a capsid.

The actual mechanism of such humidity-driven intra-droplet "viable decay" of a virion has not been explained or studied.

In any case, the explanation and model of Shaman et al. (2010) is not dependent on the particular mechanism of the humidity-driven decay of virions in aerosol / droplets. Shaman's quantitatively demonstrated model of seasonal regional viral epidemiology is valid for either mechanism (or combination of mechanisms), whether "viable decay" or "physical loss".

The breakthrough achieved by Shaman et al. is not merely some academic point. Rather, it has profound health-policy implications, which have been entirely ignored or overlooked in the current coronavirus pandemic.

In particular, Shaman's work necessarily implies that, rather than being a fixed number (dependent solely on the spatial-temporal structure of social interactions in a completely susceptible population, and on the viral strain), the epidemic's basic reproduction number (R0) is highly or predominantly dependent on ambient absolute humidity.

For a definition of R0, see HealthKnowlege-UK (2020): R0 is

"the average number of secondary infections produced by a typical case of an infection in a population where everyone is susceptible."

The average R0 for influenza is said to be 1.28 (1.19–1.37); see the comprehensive review by Biggerstaff et al. (2014).

In fact, Shaman et al. showed that R0 must be understood to seasonally vary between humid summer values of just larger than "1" and dry-winter values typically as large as "4" (for example, see their Table 2). In other words, the seasonal infectious viral respiratory diseases that plague temperate latitudes every year go from being intrinsically mildly contagious to  virulently contagious, due simply to the bio-physical mode of transmission controlled by atmospheric humidity, irrespective of any other consideration.

Therefore, all the epidemiological mathematical modelling of the benefits of mediating policies (such as social distancing), which assumes humidity-independent R0 values, has a large likelihood of being of little value, on this basis alone. For studies about modelling and regarding mediation effects on the effective reproduction number, see Coburn (2009) and Tracht (2010).

To put it simply, the "second wave" of an epidemic is not a consequence of human sin regarding mask wearing and hand shaking. Rather, the "second wave" is an inescapable consequence of an air-dryness-driven many-fold increase in disease contagiousness, in a

population that has not yet attained immunity.

If my view of the mechanism is correct (i.e., "physical loss"), then Shaman's work further necessarily implies that the dryness-driven high transmissibility (large R0) arises from small aerosol particles fluidly suspended in the air; as opposed to large droplets that are quickly gravitationally removed from the air.

Such small aerosol particles fluidly suspended in air, of biological origin, are of every variety and are everywhere, including down to virion-sizes (Despres, 2012). It is not entirely unlikely that viruses can thereby be physically transported over inter-continental distances (e.g., Hammond, 1989).

More to the point, indoor airborne virus concentrations have been shown to exist (in day-care facilities, health centres, and onboard airplanes) primarily as aerosol particles of diameters smaller than 2.5 μm, such as in the work of Yang et al. (2011):

"Half of the 16 samples were positive, and their total virus concentrations ranged from 5800 to 37 000 genome copies m−3. On average, 64 per cent of the viral genome copies were associated with fine particles smaller than 2.5 μm, which can remain suspended for hours. Modelling of virus concentrations indoors suggested a source strength of 1.6 ± 1.2 × 105 genome copies m−3 air h−1 and a deposition flux onto surfaces of 13 ± 7 genome copies m−2 h−1 by Brownian motion.

Over 1 hour, the inhalation dose was estimated to be 30 ± 18 median tissue culture infectious dose (TCID50), adequate to induce infection. These results provide quantitative support for the idea that the aerosol route could be an important mode of influenza transmission."

Such small particles (< 2.5 μm) are part of air fluidity, are not subject to gravitational sedimentation, and would not be stopped by long-range inertial impact. ==This means that the slightest (even momentary) facial misfit of a mask or respirator renders the design filtration norm of the mask or respirator entirely irrelevant. In any case, the filtration material itself of  N95 (average pore size ~0.3−0.5 μm) does not block virion penetration, not to mention surgical masks.==

For example, see Balazy et al. (2006). Mask stoppage efficiency and host inhalation are only half of the equation, however, because the minimal infective dose (MID) must also be considered. For example, if a large number of pathogen-laden particles must be delivered to the lung within a certain time for the illness to take hold, then partial blocking by any mask or cloth can be enough to make a significant difference.

On the other hand, ==if the MID is amply surpassed by the virions carried in a single aerosol particle able to evade mask-capture, then the mask is of no practical utility, which is the case.== Yezli and Otter (2011), in their review of the MID, point out relevant features:

• most respiratory viruses are as infective in humans as in tissue culture having optimal laboratory susceptibility

• it is believed that a single virion can be enough to induce illness in the host

• the 50%-probability MID ("TCID50") has variably been found to be in the range 100−1000 virions

• there are typically 103−107 virions per aerolized influenza droplet with diameter 1 μm −10 μm

• the 50%-probability MID easily fits into a single (one) aerolized droplet

For further background:

• A classic description of dose-response assessment is provided by Haas (1993).

• Zwart et al. (2009) provided the first laboratory proof, in a virus-insect system, that the action of a single virion can be sufficient to cause disease.

• Baccam et al. (2006) calculated from empirical data that, with influenza A in humans, "we estimate that after a delay of ~6 h, infected cells begin producing influenza virus and continue to do so for ~5 h. The average lifetime of infected cells is ~11 h, and the half-life of free infectious virus is ~3 h. We calculated the [in-body] basic reproductive number, R0, which indicated that a single infected cell could produce ~22 new productive infections."

• Brooke et al. (2013) showed that, contrary to prior modeling assumptions, although not all influenza-A-infected cells in the human body produce infectious progeny (virions), nonetheless, 90% of infected cell are significantly impacted, rather than simply surviving unharmed.

All of this to say that: ==if anything gets through (and it always does, irrespective of the mask), then you are going to be infected. Masks cannot possibly work. It is not surprising, therefore, that no bias-free study has ever found a benefit from wearing a mask or respirator== in this application.

Therefore, the studies that show partial stopping power of masks, or that show that masks can capture many large droplets produced by a sneezing or coughing mask-wearer, in light of the above-described features of the problem, are irrelevant. For example, such studies as these: Leung (2020), Davies (2013), Lai (2012), and Sande (2008).

**Why There Can Never Be an Empirical Test of a Nation-Wide Mask-Wearing Policy**

As mentioned above, ==no study exists that shows a benefit from a broad policy to wear masks in public.== There is good reason for this. It would be impossible to obtain unambiguous and biasfree results:

• Any benefit from mask-wearing would have to be a small effect, since undetected in controlled experiments, which would be swamped by the larger effects, notably the large

effect from changing atmospheric humidity.

• Mask compliance and mask adjustment habits would be unknown.

• Mask-wearing is associated (correlated) with several other health behaviours; see Wada (2012).

• The results would not be transferable, because of differing cultural habits.

• Compliance is achieved by fear, and individuals can habituate to fear-based propaganda, and can have disparate basic responses.

• Monitoring and compliance measurement are near-impossible, and subject to large errors.

• Self-reporting (such as in surveys) is notoriously biased, because individuals have the self-interested belief that their efforts are useful.

• Progression of the epidemic is not verified with reliable tests on large population samples, and generally relies on non-representative hospital visits or admissions.

• Several different pathogens (viruses and strains of viruses) causing respiratory illness generally act together, in the same population and/or in individuals, and are not resolved, while having different epidemiological characteristics.

**Unknown Aspects of Mask Wearing**

Many potential harms may arise from broad public policies to wear masks, and the following unanswered questions arise:

• Do used and loaded masks become sources of enhanced transmission, for the wearer and others? 10

• Do masks become collectors and retainers of pathogens that the mask wearer would otherwise avoid when breathing without a mask?

• Are large droplets captured by a mask atomized or aerolized into breathable components? Can virions escape an evaporating droplet stuck to a mask fiber?

• What are the dangers of bacterial growth on a used and loaded mask?

• How do pathogen-laden droplets interact with environmental dust and aerosols captured on the mask?

• What are long-term health effects on HCW, such as headaches, arising from impeded breathing?

• Are there negative social consequences to a masked society?

• Are there negative psychological consequences to wearing a mask, as a fear-based behavioural modification?

• What are the environmental consequences of mask manufacturing and disposal?

• Do the masks shed fibres or substances that are harmful when inhaled?

**Conclusion**

By making mask-wearing recommendations and policies for the general public, or by

expressly condoning the practice, ==governments have both ignored the scientific evidence and done the opposite of following the precautionary principle.==

In an absence of knowledge, governments should not make policies that have a hypothetical potential to cause harm.

The government has an onus barrier before it instigates a broad socialengineering intervention, or allows corporations to exploit fear-based sentiments.

Furthermore, ==individuals should know that there is no known benefit arising from wearing a mask in a viral respiratory illness epidemic, and that scientific studies have shown that any benefit must be residually small,== compared to other and determinative factors. Otherwise, what is the point of publicly funded science?

The present paper about masks illustrates the degree to which governments, the mainstream media, and institutional propagandists can decide to operate in a science vacuum, or select only incomplete science that serves their interests. Such recklessness is also certainly the case with the current global lockdown of over 1 billion people, an unprecedented experiment in medical and political history.

**Endnotes:**

Baccam, P. et al. (2006) "Kinetics of Influenza A Virus Infection in Humans", Journal of Virology

Jul 2006, 80 (15) 7590-7599; DOI: 10.1128/JVI.01623-05

https://jvi.asm.org/content/80/15/7590

Balazy et al. (2006) "Do N95 respirators provide 95% protection level against airborne viruses,

and how adequate are surgical masks?", American Journal of Infection Control, Volume 34,

Issue 2, March 2006, Pages 51-57. doi:10.1016/j.ajic.2005.08.018

http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.488.4644&rep=rep1&type=pdf

Biggerstaff, M. et al. (2014) "Estimates of the reproduction number for seasonal, pandemic, and

zoonotic influenza: a systematic review of the literature", BMC Infect Dis 14, 480 (2014).

https://doi.org/10.1186/1471-2334-14-480

Brooke, C. B. et al. (2013) "Most Influenza A Virions Fail To Express at Least One Essential Viral

Protein", Journal of Virology Feb 2013, 87 (6) 3155-3162; DOI: 10.1128/JVI.02284-12

https://jvi.asm.org/content/87/6/3155

Coburn, B. J. et al. (2009) "Modeling influenza epidemics and pandemics: insights into the future of swine flu (H1N1)", BMC Med 7, 30. https://doi.org/10.1186/1741-7015-7-30

Davies, A. et al. (2013) "Testing the Efficacy of Homemade Masks: Would They Protect in

an

Influenza Pandemic?", Disaster Medicine and Public Health Preparedness, Available on CJO

2013 doi:10.1017/dmp.2013.43

http://journals.cambridge.org/abstract_S1935789313000438

Despres, V. R. et al. (2012) "Primary biological aerosol particles in the atmosphere: a review",

Tellus B: Chemical and Physical Meteorology, 64:1, 15598, DOI:

10.3402/tellusb.v64i0.15598

https://doi.org/10.3402/tellusb.v64i0.15598

Dowell, S. F. (2001) "Seasonal variation in host susceptibility and cycles of certain infectious

diseases", Emerg Infect Dis. 2001;7(3):369–374. doi:10.3201/eid0703.010301

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2631809/

Hammond, G. W. et al. (1989) "Impact of Atmospheric Dispersion and Transport of Viral Aerosols on the Epidemiology of Influenza", Reviews of Infectious Diseases, Volume 11, Issue 3,

May 1989, Pages 494–497, https://doi.org/10.1093/clinids/11.3.494

Haas, C.N. et al. (1993) "Risk Assessment of Virus in Drinking Water", Risk Analysis, 13: 545-552.

doi:10.1111/j.1539-6924.1993.tb00013.x

https://doi.org/10.1111/j.1539-6924.1993.tb00013.x

12

HealthKnowlege-UK (2020) "Charter 1a – Epidemiology: Epidemic theory (effective & basic

reproduction numbers, epidemic thresholds) & techniques for analysis of infectious disease

data (construction & use of epidemic curves, generation numbers, exceptional reporting & identification of significant clusters)", HealthKnowledge.org.uk, accessed on 2020-04-10.

https://www.healthknowledge.org.uk/public-health-textbook/research-methods/1aepidemiology/epidemic-theory

Lai, A. C. K. et al. (2012) "Effectiveness of facemasks to reduce exposure hazards for airborne

infections among general populations", J. R. Soc. Interface. 9938–948

http://doi.org/10.1098/rsif.2011.0537

Leung, N.H.L. et al. (2020) "Respiratory virus shedding in exhaled breath and efficacy of face

masks", Nature Medicine (2020). https://doi.org/10.1038/s41591-020-0843-2

Lowen, A. C. et al. (2007) "Influenza Virus Transmission Is Dependent on Relative

Humidity and

Temperature", PLoS Pathog 3(10): e151. https://doi.org/10.1371/journal.ppat.0030151

Paules, C. and Subbarao, S. (2017) "Influenza", Lancet, Seminar| Volume 390, ISSUE 10095,

P697-708, August 12, 2017.

http://dx.doi.org/10.1016/S0140-6736(17)30129-0

Sande, van der, M. et al. (2008) "Professional and Home-Made Face Masks Reduce Exposure to

Respiratory Infections among the General Population", PLoS ONE 3(7): e2618. doi:10.1371/journal.pone.0002618

https://doi.org/10.1371/journal.pone.0002618

Shaman, J. et al. (2010) "Absolute Humidity and the Seasonal Onset of Influenza in the

Continental United States", PLoS Biol 8(2): e1000316.

https://doi.org/10.1371/journal.pbio.1000316

Tracht, S. M. et al. (2010) "Mathematical Modeling of the Effectiveness of Facemasks in

Reducing the Spread of Novel Influenza A (H1N1)", PLoS ONE 5(2): e9018.

doi:10.1371/journal.pone.0009018

https://doi.org/10.1371/journal.pone.0009018

Viboud C. et al. (2010) "Preliminary Estimates of Mortality and Years of Life Lost Associated

with the 2009 A/H1N1 Pandemic in the US and Comparison with Past Influenza Seasons", PLoS

Curr. 2010; 2:RRN1153. Published 2010 Mar 20. doi:10.1371/currents.rrn1153

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2843747/

Wada, K. et al. (2012) "Wearing face masks in public during the influenza season may reflect

other positive hygiene practices in Japan", BMC Public Health 12, 1065 (2012).

https://doi.org/10.1186/1471-2458-12-1065

Yang, W. et al. (2011) "Concentrations and size distributions of airborne influenza A viruses

measured indoors at a health centre, a day-care centre and on aeroplanes", Journal of the Royal

Society, Interface. 2011 Aug;8(61):1176-1184. DOI: 10.1098/rsif.2010.0686.

https://royalsocietypublishing.org/doi/10.1098/rsif.2010.0686

Yezli, S., Otter, J.A. (2011) "Minimum Infective Dose of the Major Human Respiratory and

Enteric Viruses Transmitted Through Food and the Environment", Food Environ Virol 3, 1–30.

https://doi.org/10.1007/s12560-011-9056-7

Zwart, M. P. et al. (2009) "An experimental test of the independent action hypothesis in

Plaintiffs' Exhibit 421

pandata.org

# You Asked, We Answered - PANDA

Pandemics Data & Analytics

18-23 minutes

Jan. 22, 2021

*Publisher's note: The opinions and findings expressed in articles, reports and interviews on this website are not necessarily the opinions of PANDA, its directors or associates.*

**Lyndon Wood posed questions that are on many people's minds. PANDA scientists, doctors, researchers and writers applied their minds.**

*Disclaimer: The answers in this document are based on the science available at the time of writing. Scientific evidence might change in the future and seeking up to date information might be needed.*

**GENERAL**

**Is the COVID-19 pandemic real?**
Pragmatic definitions of "pandemic" vary. They commonly include a rapid spread of an infectious disease across many countries simultaneously that causes widespread severe disease or death above the normal level and that is not a seasonal occurrence. In some parts of the world, this applied to COVID-19 in the first half of 2020, although the mortality overall is relatively mild compared to past severe pandemics such as the 1918-19 Spanish flu and several more recent influenza pandemics such as the Hong Kong flu of 1968 and the Beijing Flu of 1993. The UK government even declared that "[a]s of 19 March 2020, COVID-19 is no longer considered to be a high consequence infectious disease (HCID) in the UK".

Opinions vary on whether COVID-19 still constitutes a pandemic. In many countries, it now has endemic seasonal characteristics of a winter respiratory virus, while in some countries less affected in early 2020, and countries that had hard early lockdowns, it is causing more significant mortality.

**Do you believe governments have overreacted to the pandemic?**
Indeed, governments have chosen a disproportionate response to the pandemic. More specifically, there has been an unprecedented imposition of restrictions on individual

liberties with a single-minded focus on stopping the infections at all costs, without regard for the harms of the policies themselves. ==That extreme government action has been based on very debatable data and often unsound models.==

**What do you think about the predictions made by the scientists advising governments?**

Predictions based on wrong assumptions are likely to prompt wrong policies. Conflicts of interest affect government experts. Their judgment may be compromised and their opinion should be questioned .

**Are lockdowns necessary to contain COVID-19?**

Lockdowns may possibly slow the spread if implemented prior to the start of a respiratory season, but under no circumstances can they contain or eradicate a virus. Most studies found no effect of lockdown stringency on the spread of COVID-19 or the resulting mortality. At best, such strategies kick the can down the road. The virus will only stop spreading quickly once herd immunity is reached and few susceptible hosts remain in the population. The low mortality across the South East Asia and Oceania super region is likely driven by other factors, possibly prior immunity.

==**Do masks work against COVID-19?**==
==We are unaware of any studies using sound methodology that show a benefit for masks in the general population. The only COVID-19-specific mask study using sound methodology found no significant impact of mask wearing on the spread of the disease. This is consistent with such studies for other respiratory viruses. Mask wearing is a personal choice and should never be mandated.==

**Can you catch COVID-19 by touching surfaces?**

Surface contact is not a major source of transmission. Excessive disinfecting and wearing gloves probably won't make much of a difference. This could, in fact, lead to a false sense of security as it is impossible to disinfect surfaces from all germs. Regular hygiene should be enough.

**ABOUT COVID-19**

**Does COVID-19 exist?**

COVID-19 is a disease caused by a virus called SARS-CoV-2. SARS-CoV-2 exists. It belongs to the coronavirus family, of which seven are known to cause disease in humans. It is a very close relative of SARS-CoV-1, which caused the disease SARS in 2003.

**Has the virus ever been isolated in humans?**

SARS-CoV-2 has been cultured from humans, by swabbing the throat of a sick person and then growing the virus in a specific cell culture.

Plaintiffs' Exhibit 422

 ☰ ▶ YouTube          🎤  🎥  ⠿  🔔⁹⁺

All   Re

Watch this video at
https://www.youtube.com/watch?v=ul5E5BUrII4



 ▶



This video shows that even reading a book with a mask on decreases
blood oxygen levels to your brain. what implications does this have
for developing children forced to wear masks at school etc?



 Chiropractor Cape Coral FL | Your Health, Your Responsibility v1 at Experience
Family Chiropractic

11,702 views • Sep 6, 2020        👍 465  👎 4   ➤ SHARE   ≡₊ SAVE   •••



 **Experience Family Chiropractic**
126 subscribers                                        SUBSCRIBE



https://www.efchealth.com

Experience Family Chiropractic



▶  Try YouTube Kids
LEARN MORE >

SHOW MORE



Comments are turned off. Learn more



Plaintiffs' Exhibit 423

everydayhealth.com

## Your Mask May Be Causing Candida Growth in Your Mouth | Everyday Health

*By Jessica MigalaMedically Reviewed by Ross Radusky, MDReviewed: August 4, 2020*

4-5 minutes     8 - 4 - 2 0

---

While candida typically exists without causing a problem, a specific species, called *Candida albicans*, can cause an infection if it grows out of control, notes the CDC. If this type of candida overgrows in the vagina, it's called a yeast infection; if it overgrows inside the mouth, it's called thrush. It's also possible to have this yeast growth in the folds of your skin, such as under your breasts.

==Anyone who's worn a mask in the summertime knows that it can get hot under there. And masks offer the perfect conditions for overgrowth. "Candida thrives in humid environments, much like the one created under your mask," says Lucy Chen, MD, a board-certified dermatologist at Riverchase Dermatology in Miami. "While a face mask can't be the sole cause of a skin infection, the combination of heat, humidity, and a tight mask could worsen underlying conditions that prompt a fungal or bacterial infection," she says.==

**RELATED: What Face Masks Are Best for Exercise?**

The result can appear to be a raw, red, irritated, or chapped area, or a skin rash. The appearance of candida overgrowth, though, can be tough to distinguish from acne, says Joshua Zeichner, MD, the director of cosmetic and clinical research in the department of dermatology at Mount Sinai Hospital in New York City. That's because symptoms of this type of candida infection may also look like red bumps or pus pimples, he adds.

One telltale sign is that the irritation is in the corners of your mouth. "If you have an urge to compulsively lick your lips when they're dry, you may be at a higher risk [of this type of infection] if saliva gets trapped in the corners of your mouth. It becomes a breeding ground for candida," explains Dr. Chen.

==This type of infection, which will appear as cracking, irritation, bleeding, and redness in the corners of the mouth, is commonly called angular cheilitis, says Chen. Mask wearing is one risk,== but it also happens to people who wear dentures or young kids who use

pacifiers.

**RELATED:** [**What Is the Candida Diet and Does It Work?**](#)

## How to Treat Candida Overgrowth Caused by Your Mask

If you are unsure what's going on with your skin or are having a tough time distinguishing acne from candida, call your dermatologist. If you are hesitant to go in for an appointment at this time, many offices are doing virtual appointments. Your provider may be able to tell if you have acne or candida overgrowth through a video call, or they may ask you to send a photo.

The good news with this infection is that it's fairly straightforward to treat, says Dr. Zeichner. "The same types of topical antifungal creams used for athlete's foot can be helpful." He also suggests using a [dandruff](#) shampoo that contains [ketoconazole](#), an antifungal ingredient, as a face wash. Use it on the affected part of your skin.

If angular cheilitis is your main problem, Chen suggests applying antifungal ointment on the corners of your mouth twice daily. Try [Lotrimin](#) ($8.44; [Amazon.com](#)) or [clotrimazole](#) ($11.49; [CVS.com](#)). If symptoms don't improve, talk to your dermatologist, she says.

**RELATED:** [**A Guide for Preventing and Treating Chapped Lips**](#)

## Protect Your Skin From Mask-Induced Problems With Common-Sense Skin Care

If wearing your mask contributes to skin problems, you'll want to take some extra precautions. "If you're wearing a mask, you're also covering half your face. Don't put makeup and lipstick on. It's better to wear a mask over clean skin," says Dr. Peredo. That doesn't mean you can't wear makeup at all, but that you'll have to put in a bit more time and effort to touch up your mask area at the end of the day. "When you remove your mask, apply or minimize what you're using to your lower face," she adds. Wash your mask regularly (after each use).

Now that there are so many cloth masks to choose from, and they're readily available online, it helps to keep several on hand to swap out throughout the day, "especially if they feel damp after wearing them for long periods," says Chen. Ultimately, a few tweaks to your habits will help keep your skin and mouth looking and feeling healthy.

**RELATED:** [**Why You Shouldn't Skip Your Dermatology Appointment During COVID-19**](#)

Plaintiffs' Exhibit 424

jdsupra.com

# A Delicate Balancing Act for Airlines: the CDC Mask Mandate v. the Rights of Passengers with Disabilities | JD Supra

7-9 minutes

---

The COVID-19 pandemic has not been kind to air carriers. Not only have they seen the loss of up to 75 percent of their passenger traffic, but — in the United States — they have been left to develop and enforce their own policies regarding wearing of masks and other measures designed to protect the health of their employees and passengers. This has resulted in innumerable YouTube videos of onboard altercations as truculent passengers resisted compliance with the airline rules. The absence of a federal mandate has made this situation even more difficult.

On January 21, 2021, the day after his inauguration, President Joe Biden signed an executive order (E.O. No. 13998) requiring, *inter alia*, the wearing of masks on transportation conveyances. This order was implemented by the U.S. Centers for Disease Control (CDC), by order issued on February 1, 2021, under Section 361 of the Public Health Service Act. The CDC order mandates wearing masks by all persons (including employees and crews) "when traveling on conveyances into and within the United States," as well as at "transportation hubs." These terms are defined to include airports and both U.S. and foreign air carriers. The CDC order imposes an obligation on carriers and airport operators to enforce these requirements through "best efforts," which include:

- Boarding or admitting only those persons who wear masks;

- Instructing individuals that federal law requires wearing a mask on the aircraft or within the airport;

- Monitoring persons while on board or in the airport;

- Disembarking or removing from the premises persons who refuse to comply;

- Providing adequate notice of the mandate to the public, including on websites.

Naturally, there are certain exceptions, such as while eating, drinking, or taking medications, if wearing an oxygen mask is necessary due to pressure loss, if unconscious, or when removal is required by the Transportation Security Administration

(TSA), ticket or gate agent, or law enforcement to verify a person's identity. Further, the CDC order exempts persons under the age of two years, and (most significantly) "a person with a disability who cannot wear a mask, or cannot safely wear a mask, because of a disability as defined by the Americans with Disabilities Act …" (ADA). The TSA also issued a security directive on January 31, 2021, intended to implement and enforce the executive order and CDC order. Notably, both the CDC and TSA directives allow a narrow exception for disability-based inability to wear a mask, and permit airlines to require medical certificates and a negative COVID-19 test as a condition for granting an exemption.

These requirements, while significant, are straightforward and they apply to both U.S. and foreign airlines. They have the advantage of taking the burden off air carriers of making their own, sometimes inconsistent, policies about mask wearing; now carriers can simply tell their passengers that masks are required by federal law, just like wearing seatbelts or not smoking on the aircraft. This should make it easier for carriers to enforce practices that protect their own employees as well as other passengers.

The complication comes, however, where the CDC mask mandate intersects with the legal rights of airline passengers with qualifying disabilities. The CDC order makes reference to persons with disabilities as defined in the ADA. In fact, air carriers are subject to the Air Carrier Access Act (ACAA) (49 U.S.C. § 41705), as implemented through copious regulations issued by the Department of Transportation (DOT) in 14 CFR Part 382. DOT has long been zealous in enforcing the rights of persons with disabilities. In general, air carriers are required to make reasonable accommodation for passengers with disabilities. Not surprisingly, carriers have had to contend with passengers claiming that they should be exempted from the rule on the grounds of a claimed medical problem. Carriers believe most of these claims are spurious and, in any event, they are not able to make the necessary determination when the passengers are about to be boarded.

Thus, air carriers are required to walk the fine line between complying with the broad CDC and TSA mandates, and accommodating passengers with a disability whose disability prevents them from wearing a mask. To guide carriers in this delicate task, DOT's Office of Aviation Consumer Protection issued, on February 5, 2021, a "Notice of Enforcement Policy" describing what that office will take into consideration in deciding how to enforce these potentially conflicting obligations.

The notice states that some carriers have adopted "no exceptions" mask rules. That, of course, puts them on a collision course with DOT, as some passengers may have legitimate, disability-based reasons for not wearing a mask. At the same time, carriers are properly concerned that any unmasked passengers may pose a risk of infection to other passengers. The DOT notice guides airlines in making a determination whether or not to

carry a passenger, even if that passenger has a legitimate disability-based reason for not masking. The DOT's guidance is in line with that provided in the CDC and TSA directives, even though those directives didn't take into account the more stringent requirements of the ACAA.

The DOT noted that "Part 382 allows an airline to refuse to provide air transportation to an individual whom the airline determines presents a disability-related safety risk, provided that the airline can demonstrate that the individual would pose a 'direct threat' to the health or safety of others onboard the aircraft, and that a less restrictive option is not feasible." (See 14 CFR § 382.19(c).) A "direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services."

The DOT notice states that passengers who request an exemption from the CDC order may be required to do so "in advance." Airlines may require them to "check in early and to agree to undergo the required individualized assessment a reasonable period in advance of the scheduled flight, provided that the process is completed on the day of travel." Airlines may also require passengers to undergo a COVID-19 test (at the passenger's expense), and show a negative result. Other mitigation efforts may include arranging for them to sit in a less crowded section of the plane or fly at a different time when flights or airports are less crowded.

Note that these determinations must be "individualized" in accordance with Part 382. It would not be permitted, for example, for carriers to decline exemptions to entire categories of disabilities; nor would it be permitted for them to adopt a "no exceptions" policy.

DOT indicates that it will refrain from enforcement actions against airlines on account of their masking policies for a period of 45 days from the date of the notice, as a matter of prosecutorial discretion. Carriers should take advantage of this period to review their policies and practices and determine how to thread this needle. It will not be easy.

Plaintiffs' Exhibit 425

wheelchairtravel.org

# U.S. Government: Airlines Must Waive Face Mask Rule for Disabled Passengers - Wheelchair Travel

*John Morris*

15-18 minutes

One truth that is widely accepted around the world, but which has been met with skepticism and in some cases vitriol in the United States, is that some disabled people cannot wear face masks. The Southeast ADA Center, in partnership with Syracuse University, released a list of medical and psychiatric conditions that prevent mask use last year, which I shared with readers of this website.

In the Summer of 2020, airlines instituted policies requiring passengers to wear face masks. Only a handful of carriers offered an exception for disabled people — a list which grew smaller as the months wore on. Entering the new year, only two of those carriers maintained a face mask exception for disabled passengers. On this website and in interviews with the news media, I shared my belief that airlines who refused to transport disabled people who could not wear face masks were violating the Air Carrier Access Act, a civil rights law.

Recent action from the federal government suggests that I was right. On February 1, the Centers for Disease Control, under the direction of President Joe Biden, introduced new requirements for the use of face masks on interstate transportation — including on planes, trains, buses and ferries. The order stated clearly that the following groups are exempt:

- A child under the age of 2 years.
- A person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.).
- A person for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

The CDC notes that the disability exception is intended to be narrow, meaning someone like me, who is disabled but can wear a mask, is required to comply, but a person whose disability prevents mask use cannot be forced to do so.

## Airline policies relating to face mask exemptions for disabled people

The CDC's order takes precedence over any airline policy that may have been in place prior to the president's executive action. On February 5, the DOT's Office of Aviation Consumer Protection finally informed airlines that they must grant face mask exceptions to qualified disabled people, giving carriers **45 days of immunity from enforcement action** to develop necessary procedures. Some carriers intend to delay for the full 45 days, but others have already implemented policies to comply with the CDC order.

Below, you will find the current policies for disability-related face mask exceptions on the 10 latest U.S. airlines. This page will be regularly updated to include the latest information.

## Alaska Airlines

On its travel advisories webpage, Alaska Airlines states that "federal law requires guests to wear a mask over their nose and mouth at all times during travel, including throughout the flight, during boarding and deplaning, and while traveling through an airport." The airline makes no mention of an exception for disabled passengers. Because the DOT's 45 day pause on enforcement action ends March 22, 2021, we expect that Alaska Airlines will publish a clear policy on face mask exceptions by that date.

## Allegiant Air

Following the CDC's order, the Allegiant Air policy was updated and now reads that only "only children under the age of 2 and those with limited mobility who are unable to remove a face covering without assistance are exempt" from the face mask mandate. Requests for exemption status should be emailed to ACAA@allegiantair.com at least 72 hours prior to departure.

## American Airlines

Previously refusing to accommodate disabled people in violation of federal civil rights law, American has now updated its policy to list an exception for customers with disabilities. It reads:

*If you may be exempt because you have a disability that prevents you from safely wearing a mask as defined by the Americans with Disabilities Act (42 USC 12101 et. seq) you must contact us at least 72 hours before you plan to travel and travel with documentation confirming a negative COVID test or recovery.*

*Call Special Assistance: 800-237-7976*

Note that American requires a negative COVID test result or confirmation that the passenger has previously recovered from the coronavirus in order to fly. Whether this requirement is (or should be) legal is discussed later in this article.

**Delta Air Lines**

Delta Air Lines had previously granted waivers to the face mask requirement for disabled passengers, and its policy remains unchanged. The carrier asks customers with a disability who require an exemption to the face mask policy to arrive early "to complete a 'Clearance-to-Fly' process prior to departure at the airport." The process involves a virtual consultation with a third-party medical professional at the airline's expense.

**Frontier Airlines**

Frontier Airlines has published that it will grant an exception to the face mask policy for disabled passengers only if the following conditions are met:

- At least 10 days prior to departure:
- Submit documentation from a licensed medical provider on professional letterhead stating the customer is a person with a disability who cannot wear a mask, or cannot safely wear a mask, because of that disability as defined by the Americans with Disabilities Act. (Frontier Medical Form)
- State license number (or, if applicable, other medical license information) from the medical provider must be included on the letter.

- Frontier will contact your licensed medical provider to validate the document.

- Any customer who presents falsified medical documentation will be subject to suspension of their privileges for future travel on Frontier.

- Failure to provide 10 days' notice will result in denial of the request.

- At the airport on each day of travel:
- The customer must check in at the Frontier ticket counter a minimum of 2 hours prior to departure.

- Present evidence that the customer requesting a mask exemption does not have COVID-19 by providing a negative result from a SARS-CoV-2 viral test; the specimen for the test must have been collected no more than 3 days before the applicable flight. This evidence must be shown to the Frontier representative at the airport before boarding each flight.

- These testing requirements apply to return travel.

  Whether these requirements are (or should be) legal is discussed later in this article.

**Hawaiian Airlines**

Hawaiian Airlines had previously granted waivers to the face mask requirement for disabled passengers, and its exception policy remains unchanged.

*Guests who are unable to wear a face mask due to a medical condition or disability will be*

*required to complete an assessment with a medical professional via phone at the airport. We recommend arriving at the airport early with ample time to complete the assessment, as the process may take more than one hour, and your flight will not be held. Please notify one of our Guest Services Agents as soon as you are ready to complete the medical assessment.*

The mandatory telephone consultation with a medical professional is provided at the airline's expense.

**JetBlue Airways**

On its coronavirus travel notices webpage, JetBlue states that "federal law requires masks to be worn by all travelers 2 years and older at all times throughout the flight including during boarding and deplaning, and in the airport." It makes no mention of the disability exception mandated by the CDC and DOT, but we should expect that policy to be published by March 22, 2021.

**Southwest Airlines**

Southwest has previously refused to accommodate disabled people who could not wear a mask, but has posted the following statement to its website:

*Southwest is currently finalizing steps for a Customer to take to apply for a disability-related exemption from the mask requirement. The first date Southwest would allow a Customer with an exemption to travel is March 21. When the process is finalized in the coming weeks, Southwest will post more information in this FAQ.*

Southwest's statement indicates that it intends to use the full 45 days of immunity granted by the DOT to further delay disabled people's right to travel.

**Spirit Airlines**

Spirit Airlines has previously refused to accommodate disabled people who cannot wear a mask, and it continues to do so according to the following entry in its list of Frequently Asked Questions:

*Spirit is aware of and analyzing a new federal directive regarding a requirement for masks to be worn in airports and onboard flights. We will promptly share any information regarding exemptions or policy changes. At this time, our current policy still stands that all guests, except children under the age of 2 years old, are required to wear an appropriate face covering.*

Spirit has promised to "promptly share any information regarding exemptions on policy changes," but three weeks has already passed since the CDC order to grant disabled people a face mask exception.

**United Airlines**

The policy on face mask exceptions for disabled people at United Airlines has always been murky. Previously, the only mention of an exception appeared in a July 22 press release, wherein the carrier states that "if a passenger believes that there are extraordinary circumstances that warrant an exception, they should contact United or speak to a representative at the airport." Repeated requests for clarification were refused and, because the statement was not included on the airline's customer-facing website, I did not believe that United was willing to serve disabled passengers who cannot wear a mask.

Following the federal mandate for an exception, I contacted the carrier by telephone to enquire about the process for receiving one. A customer service representative told me that there were no exceptions for anyone over the age of 2. I requested a supervisor, and was told that no one at the contact center could grant an exception, but that passengers should speak to a supervisor at the airport. The telephone supervisor could not say what a customer's interaction at the airport might look like or under what circumstances an exception might be granted. She did say that "an exception is very unlikely," even for a legitimately disabled person who cannot wear a face mask. When pressed about the lack of a clearly communicated policy and the harm that could do to disabled people, she said that if the airline published reasons for an exception, "bad people would try to circumvent the policy."

It is my hope that United's failure to disclose its policy will be remedied by the deadline set in the DOT's February 5th notice. United's previous refusal to clarify its exception policy was a clearly calculated action that violated disabled people's civil rights, an action which WheelchairTravel.org denounces.

## What barriers can airlines legally erect around face mask exceptions for disabled people?

The Department of Transportation is the final arbiter of what is legal under the Air Carrier Access Act. In its February 5th notice to airlines, the agency laid out several ways in which carriers can make traveling harder (or perhaps impossible) for disabled people who cannot wear a face mask. I have reproduced some of those below:

- Airlines are permitted to "require passengers to consult with the airline's medical expert and/or to provide medical evaluation documentation from the passenger's doctor sufficient to satisfy the airline that the passenger does, indeed, have a recognized medical condition precluding the wearing or safe wearing of a mask."

- Airlines can require passengers to check-in early in order to go through the required clearance processes.

- Airlines can "require passengers with disabilities who are unable to wear masks to request an accommodation in advance."

- Airlines can require "a negative result from a SARS-CoV-2 test, taken at the passenger's own expense, during the days immediately prior to the scheduled flight."

- Carriers may arrange (i.e. require) "for the passenger to sit in a less crowded section of the plane, to take a flight at times when airports are less crowded, and/or scheduling the passenger on a less crowded flight."

Some carriers, such as American and Frontier, have created policies designed to make it exceedingly difficult or impossible for disabled people to fly without a mask. It is clear that testing requirements impose an undue burden on disabled travelers as there are few places in the country that guarantee a test result within 72 hours. In areas where rapid testing is possible, it is often not covered by health insurance plans and can cost hundreds of dollars.

The DOT's decision to grant airlines the authority to dictate which flights disabled people can take is ripe for abuse and further demonstrates that the Office of Aviation Consumer Protection has little to no interest in protecting the rights of disabled people.

Although I strongly disagree with many of these actions, the DOT has determined that they are permissible. Travelers who are inconvenienced or unable to travel as a result of these hurdles should file a complaint with the DOT, while also writing to elected officials and perhaps even the President of the United States.

## What to do if you cannot wear a mask and have been prevented from flying

WheelchairTravel.org believes that a violation of the Air Carrier Access Act has occurred if you are disabled, cannot wear a face mask due to your disability and any of the following are true:

- An airline refused to grant an exception to its face mask policy and you were denied boarding on a flight for which you held a valid ticket.

- You chose not to take a trip that you had previously booked because an airline's policy stated that you could not receive an exception to its face mask policy.

- You decided not to book a trip because an airline's policy stated that you could not receive an exception to its face mask policy.

- You paid more to fly another airline, or purchased an itinerary that was less convenient because your preferred flights were operated by a carrier that refused to grant exceptions to its face mask policy.

If any of the circumstances described above match your experience, please file a

complaint with the U.S. Department of Transportation's Aviation Consumer Protection Division. Describe your disability, explain why you are unable to wear a face mask, speak to how the airline's policy has harmed you (financially, emotionally or through some other means), and allege that the carrier has violated your rights under the Air Carrier Access Act. Airlines must be held to account for what has been a gross violation of the civil rights of disabled people, and your complaints can inform the DOT's future action.

## An important note on face masks and my perspective

My commentary on accessible travel comes from the perspective that disabled people possess a clear right to freedom from discrimination. That belief influences my thinking at all times, even during this global pandemic. While many have said disabled people should be forced to stay inside, I have advocated for safety precautions that will allow every person access to society, with at least some expectation of safety. I have also stated, clearly and repeatedly, that those who can wear face masks should be required to do so. By wearing our masks, we can create an environment where our disabled peers, including those who cannot wear masks, can safely exist and participate in the community.

Plaintiffs' Exhibit 426

# DISABILITY LAW CENTER

3330 Arctic Boulevard, Suite 103                    www.dlcak.org
Anchorage, AK 99503

August 27, 2020

Sent via certified mail, copied: newsroom@alaskaair.com
mediarelations@aa.com

Ben Minicucci                          Doug Parker
President                              Chairman and CEO
Alaska Airlines                        American Airlines
19530 International Blvd. S, Ste. #108, P.O. Box 619616
SeaTac, Washington, 98188              DFW Airport, TX 75261-9616

Max Tidwell                            Elise Eberwein
Vice President, Safety and Security    Executive Vice President, People and Communications
Alaska Airlines                        American Airlines
19300 International Blvd                P.O. Box 619616
Seattle, Washington, 98188             DFW Airport, TX 75261-9616

Dear President Minicucci, CEO Parker, VP Tidwell, and Executive VP Eberwein;

We write to you out of concern that the recent mask policies implemented by Alaska Airlines and American Airlines do not allow a disability exception for individuals whose disabilities make it impossible for them to wear a mask for any length of time. For the purposes of the Air Carrier Access Act of 1986, please treat this letter as a complaint so that we may follow up with the United State Department of Transportation, as necessary. Responses can be directed to Chad Hansen, staff attorney with Disability Law Center, chansen@dlcak.org.

We represent a network of disability advocacy organizations within the State of Alaska. As you may know, many communities within the State of Alaska are dependent on air travel for access. Many of these communities can provide only limited medical services to their members before community members must travel by air to a larger community such as Anchorage or Fairbanks to have their medical needs met. In some cases, an individual's medical needs are greater than what the medical infrastructure in the State of Alaska can meet and these individuals must travel by air to Seattle, Washington or elsewhere in the continental United States to have their needs met. Unfortunately, many people experiencing advanced medical needs also experience disabilities that prevent them from complying with mask mandates during the COVID-19 pandemic. This may include but is not limited to: people experiencing a respiratory disability that may impede breathing;



# DISABILITY LAW CENTER

3330 Arctic Boulevard, Suite 103                                    www.dlcak.org
Anchorage, AK 99503

people experiencing PTSD, anxiety, or claustrophobia; people living with autism who may have a sensitivity to touch and texture; people whose disabilities prevent them from having the manual dexterity to put on and take off masks; and people who use mouth control devices.

While we applaud the efforts that both airlines have taken to combat the COVID-19 pandemic and ensure safe travel for your customers, we have concerns that such an across the board policy will have adverse impacts on Alaskans with disabilities, and does not comply with federal guidance available to help airlines mitigate the risks arising from the COVID-19 pandemic, nor does it comply with the Air Carrier Access Act of 1986.

Recently, the United States Departments of Transportation, Homeland Security, and Health and Human Services jointly issued guidance for airlines and airports titled "Runway to Recovery: The United States Framework for Airlines and Airports to Mitigate the Public Health Risks of Coronavirus."[1] Promoting Public Health within the Air Transportation System is one of the principles this guidance is meant to promote and in so doing recognizes that evidence based measures meant to minimize disease transmission should:

> Reflect the full range of passenger needs, including requirements under the Rehabilitation Act, the Americans with Disabilities Act, and the Air Carrier Access Act. Consistent with these laws, it may be necessary for airports and airlines to modify certain measures to accommodate passengers with a disability while maintaining public health.[2]

Specifically, while this guidance suggests that everyone over the age of 2 years should wear a mask at all times, it does provide the exception that "Reasonable accommodations should be made for persons with disabilities or ailments who cannot wear masks or cloth face coverings."[3]

While the guidance available in "Runway to Recovery" does not carry the full weight of the Code of Federal Regulations, it is meant to promote best practices by the administrative agencies that issue regulations and it is not unlikely that further guidance or regulation related to this matter may issue as the pandemic progresses.

---

[1] U.S. Departments of Transportation, Homeland Security, and Health and Human Services: Runway to Recovery: The United States Framework for Airlines and Airports to Mitigate the Public Health Risks of Coronavirus (2020). Available at https://www.transportation.gov/sites/dot.gov/files/2020-07/Runway_to_Recovery_07022020.pdf.
[2] Id at 7.
[3] Id. at 18-19.



# DISABILITY LAW CENTER

3330 Arctic Boulevard, Suite 103                                                  www.dlcak.org
Anchorage, AK 99503

==Additionally, an across the board mask policy that does not allow an exception for individuals with disabilities and does not make an individualized determination based on need likely does not comply with the Air Carrier Access Act of 1986== (ACAA).[4]

The ACAA states that "As a carrier, you must not… discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air transportation."[5] This nondiscrimination requirement requires air carriers to modify "policies, practices, and facilities when needed to provide nondiscriminatory service to a particular individual with a disability, ==consistent with the standards of section 504 of the Rehabilitation Act,== as amended."[6]

Air carriers are not required to make modifications that would constitute an undue burden or would fundamentally alter their programs.[7] However, using "Runway to Recovery" as a model that recognizes that reasonable accommodations should be made for persons with disabilities who are unable to wear masks, ==it is unlikely that the inability to wear a mask alone would constitute an undue burden or fundamental alteration unless the specific modification or alteration requested falls into either category.== In such a case your airline should work with the individual to find a modification or accommodation that will work.

Additionally, an air carrier can refuse to transport a passenger with a disability if there is a disability related safety basis because that individual poses a "direct threat."[8] A direct threat means "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services."[9] The regulations instruct that:

> In determining whether an individual poses a direct threat, you must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain:
>
> (i) The nature, duration, and severity of the risk;
> (ii) The probability that the potential harm to the health and safety of others will actually occur; and

---

[4] 49 U.S.C. § 41705, 14 C.F.R. § 382.1 et seq.
[5] 14 C.F.R. § 382.11(a)(1).
[6] 14 C.F.R. § 382.13(a).
[7] 14 C.F.R. § 382.13(c).
[8] 14 C.F.R. § 382.19(c)(1).
[9] 14 C.F.R. § 382.3.



# DISABILITY LAW CENTER

3330 Arctic Boulevard, Suite 103                    www.dlcak.org
Anchorage, AK 99503

(iii) Whether reasonable modifications of policies, practices, or procedures will mitigate the risk.[10]

Further, once an individual passenger is determined to be a direct threat, "you must select the least restrictive response from the point of view of the passenger, consistent with protecting the health and safety of others. For example, you must not refuse transportation to the passenger if you can protect the health and safety of others by means short of a refusal."[11]

The regulations provide further guidance that in assessing whether an individual is a direct threat, air carriers may rely on directives by public health authorities and must consider the significance of the consequences of a communicable disease and the degree to which it can be readily transmitted by casual contact in an aircraft cabin environment.[12] Examples provided by this regulation include the following:

> Example 1: The common cold is readily transmissible in an aircraft cabin environment but does not have severe health consequences. Someone with a cold would not pose a direct threat.

> Example 2: AIDS has very severe health consequences but is not readily transmissible in an aircraft cabin environment. Someone would not pose a direct threat because he or she is HIV–positive or has AIDS.

> Example 3: SARS may be readily transmissible in an aircraft cabin environment and has severe health consequences. Someone with SARS probably poses a direct threat.[13]

An individual seeking an accommodation or modification to a universal mask policy due to a disability is unlikely to qualify as a direct threat for two reasons.

First, a determination that an individual constitutes a direct threat to the health and safety of others requires an individualized assessment of each individual requesting an accommodation or modification. The no exceptions mask policy currently in place is an across the board policy that does not conduct an individualized assessment to take into account the nature, duration, and severity of the risk; the probability that potential harm to the health and safety of others will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk.[14] This does not negate the fact that some individuals seeking an accommodation

---

[10] 14 C.F.R. § 382.19(c)(1).
[11] 14 C.F.R. § 382.19(c)(2).
[12] 14 C.F.R. § 382.21(b).
[13] Id.
[14] 14 C.F.R. § 382.19(c)(1)



# DISABILITY LAW CENTER

3330 Arctic Boulevard, Suite 103                                    www.dlcak.org
Anchorage, AK 99503

might individually present a direct threat after an assessment meeting the criteria above, but a universal policy is not likely to find support in everyone seeking an accommodation being a direct threat.

Second, while a positive COVID-19 infection may be most closely related to the SARS example given above, it is important to note that this example covers someone with SARS and not someone who may have potentially been exposed to SARS. That is to say, an individual that is currently experiencing a COVID-19 infection likely does present a direct threat to the health and safety of others. However, the no exceptions mask policy is based on the idea that any passenger is potentially positive for COVID-19, and does not mean that all individuals wearing masks are currently infected by COVID-19.[15] There are additional methods to mitigate the risk presented by COVID-19 besides the use of a mask. For example, as part of an accommodation, an airline may agree to let a person with a disability fly without the use of a mask if they are able to provide documentation that their disability needs prevent them from wearing a mask, provide proof of a recent negative COVID-19 test, and agree to sit at a greater distance from others in the plane who are wearing masks. Other examples of accommodations may exist, and we invite you to explore them as part of the collaborative process contemplated by the ACAA, as well as Section 504 of the Rehabilitation Act, and the Americans with Disabilities Act.

We, as representatives of the disability community, encourage you to review your mask policies and create exceptions for individuals whose disabilities prevent them from wearing masks. We recognize the valued service that your airlines provide the State of Alaska and we look forward to hearing from you.

Sincerely,

Disability Law Center of Alaska
Northern Justice Project
Alaska Association on Developmental Disabilities
Stone Soup Group
Statewide Independent Living Council of Alaska (SILC)

---

[15] For example, it is unlikely that an individual who is currently suffering from COVID-19 or a current asymptomatic carrier would be allowed to fly even if they agreed to wear a mask.

Plaintiffs' Exhibit 427

wheelchairtravel.org

# Barriers to Equal Access for Disabled Remain in Air Travel, After 30 Years of DOT Inaction - WheelchairTravel.org

*John Morris*

9-11 minutes



*"It is not possible to be in favor of justice for some people and not be in favor of justice for all people."*

I saw this quote, attributed to Dr. Martin Luther King, Jr., featured in a blog post highlighting his legacy in the civil and disability rights movements. The quote got me thinking about the challenges to justice for people with disabilities, particularly in relation to the Air Carrier Access Act (ACAA).

The ACAA is largely regarded as civil rights legislation. I disagree, and believe that it is little more than a guideline for how travelers such as myself (a triple amputee and wheelchair user) *should* be treated.

Disability rights activists have long held that the ACAA does not go far enough. Its lack of a private right of action forces travelers with disabilities to rely on the Department of Transportation (DOT) to investigate potential violations and hold airlines accountable to the law. On the matter of enforcing the law, the DOT has failed – unequivocally. The rights and dignity of travelers requiring special assistance and accommodation are violated

==frequently, while the department remains silent.==

## A History of Discrimination in Air Travel

The discriminatory practices of airlines and their contracted agents have existed since the ACAA became law in 1986. The National Council on Disability (NCD), an independent federal agency focused on disability policy, released a report in 1999 investigating the DOT's success (or lack thereof) in enforcing the ACAA. Taken from the attached cover letter:

*"…air carriers and federal oversight officials must ensure that their right to travel with appropriate accommodations is taken seriously and honored. Unfortunately, NCD has found that although things have improved since ACAA was passed in 1986, people with disabilities continue to encounter frequent, significant violations of the statute and regulations. When they complain, they encounter an enforcement effort that is both inconsistent and limited in scope."*

This report, which was sent to President Bill Clinton and to leaders in both houses of Congress, exposed a pattern of significant disability service failures at airlines, and ==revealed a DOT that was either unwilling or unable to enforce the law. It is tragic that this report, released nearly 17 years ago, reads as though it were written yesterday. The realities of air travel for persons with disabilities have changed little over the past two decades.==



## The DOT's Inaction

The DOT collects and investigates complaints regarding potential violations of the law via their online web form. I encourage my readers and all travelers with disabilities to file these complaints. Submissions are tracked in the monthly Air Travel Consumer Reports, which tally the number of complaints filed and violations charged for each carrier operating to, from and/or within the United States.

The agency has been afforded the ability to respond to violations with enforcement action against the offending air carrier, in the form of civil penalties and policy directives. If a passenger's rights under the ACAA have been curtailed, the DOT can fine the airline $27,500 per violation. The fine amount is significant, and was set as such to deter airlines from violating the rights of the most vulnerable – travelers with disabilities.

How often does the DOT pursue action? Not often. In the past three years, only five penalties have been levied against airlines for violations of the ACAA. Typically, the DOT receives between 100-200 disability service complaints per month. With so many travelers uninformed about their rights and the applicable complaint procedures, this is only a small fraction of the violations that do occur. Complaints made directly to the airline are not included in this monthly account. Five actions after thousands of complaints – that is not enforcement.

Travelers with disabilities rightly expect the DOT to levy enforcement action when it is warranted. The department refuses to issue fines on a per-case basis, instead holding them until a major media story generates negative public opinion. In October, the story of a man forced to crawl off a United Airlines flight swept through the news media. Just this month, the DOT filed an enforcement order – their first since July 2014 – against United Airlines. The lesson is this: If you want the DOT to act on your behalf, in defense of your rights, you have to become a headline.



## Congress must act.

Rules governing the ACAA were last updated in 2008, and the changes took effect in May 2009. The NCD's 1999 report recommended the following amendments to the law, which

have still not been established:

- *a statutory private right of action;*

- *the award of plaintiffs' attorney's fees; and*

- *the award of compensatory and punitive damages to successful litigants.*

Travelers with disabilities, myself included, have no way to ensure that air travel providers will honor the rights they have been guaranteed under the ACAA. Violations occur throughout the travel experience, from booking to baggage claim. Depending on the right that is violated, costs to the passenger may include disrupted travel, financial loss, pain and suffering, emotional distress, physical injury, an affront to personal dignity, or a combination of them all. The NCD's report noted the varied nature of these service failures:

*"…people who use wheelchairs continue to encounter regular problems, from not being given a bulkhead seat to being mishandled and occasionally dropped by poorly trained or insensitive staff. Flight crews continue to refuse to stow adaptive equipment such as walkers and folding wheelchairs in the aircraft cabin. Travelers with disabilities who are accompanied by able-bodied friends, colleagues, or relatives often find that airline personnel have a tendency to direct questions and instructions to their travel partners rather than address them directly. In short, air travelers with disabilities frequently find air travel unnecessarily humiliating and upsetting."*

These same issues occur today, perhaps in greater frequency, and are as much a violation of the ACAA now as they were in 1999. It is disheartening to know that the DOT, the agency wholly responsible for enforcement of the law, has failed to protect your rights and mine so miserably.

Congress must act to protect travelers with disabilities, by including the private right of action that was proposed by the NCD. The ability for travelers to seek damages for ACAA violations will disincentivize the airlines' blatant disregard for the law. It is the only solution that makes sense after three decades of DOT inaction.

## The ACAA is not a Civil Rights law.

What are Civil Rights? According to Wikipedia, they are a "class of rights that protect individuals' freedom from infringement by governments, social organizations and private individuals, and which ensure one's ability to participate in the civil and political life of the society and state without discrimination or repression." These rights include, among other things, "the ensuring of peoples' physical and mental integrity, life and safety; protection from discrimination on grounds such as race, gender, national origin, colour, sexual orientation, ethnicity, religion, or disability."

I contend that a civil right does not and cannot exist where an individual can take no definitive action to enforce it before the law or protect against its violation.

The crux of the issue is this: The only venues within civil society where persons with disabilities cannot seek recourse before the law for discrimination on the basis of disability are on airplanes and in airports. A civil right is meant to be guaranteed. Numerous federal courts have ruled that Congress withheld a private right of action under the ACAA, reserving that right exclusively to the DOT.

Airlines have violated the rights afforded to me by the law, and I have been denied equal access to air travel. I have submitted complaints to the DOT, and the agency has affirmed the legitimacy of 100% of my claims. No action has been taken. Those same airlines continue to violate those very same rights, repeatedly and as if they are immune from the law. If my government will not stand up for me, and I cannot seek a redress for my own grievances before the court, what rights do I truly have?

By definition, civil rights are a class of protections that must be protected to have merit and value. If the air travel industry is permitted to ignore the ACAA without threat of challenge, the protections under the law cannot be classified as civil rights. To the travelers with disabilities who have been denied a voice, they are nothing but recommendations that are trampled on by the very airlines which they were meant to regulate.

I encourage the United States Congress to heed Dr. King's warning, by recognizing that the right to justice cannot be provided only to some of us – it must be available to everyone.

**Join the conversation on** [Facebook](), **[Twitter]() and [Instagram]()!**
**Share your thoughts & use the hashtag, #AirAccessForAll**

Plaintiffs' Exhibit 428

# Considerations for Assisting Air Travel Passengers with Disabilities During the Coronavirus Pandemic

In response to the coronavirus pandemic, the undersigned organizations have developed the below considerations that air carriers should observe or implement to ensure that service to passengers with disabilities is provided in a safe and dignified manner in accordance with the Air Carrier Access Act (ACAA).

- Assistance for passengers with disabilities:
  - Air carrier personnel and contractors who assist passengers with disabilities must use appropriate Personal Protective Equipment (PPE) and be trained on its use. This is particularly true for those providing hands-on transfer assistance to passengers with disabilities who use an aisle chair for boarding and deplaning the aircraft. Airport wheelchairs and aisle chairs must also be in good working condition, readily available, and regularly sanitized. Our recommendations are generally in line with those from the Centers for Disease Control (CDC)—What Airport Passenger Assistance Workers Need to Know about COVID-19.
  - Air carriers must continue to assist passengers with disabilities from the curb, even if curbside check-in is not being provided due to a decrease in passenger travel.
- At the gate:
  - Seating in the gate area must allow social distancing, including in areas where passengers with disabilities are typically staged near the jetway prior to boarding.
  - Gate agents must stay attuned to communicating with passengers who are blind or low-vision about a flight's boarding process as it may be more difficult for them to rely on fellow passengers for information about the flight due to social distancing.
- Boarding/aircraft:
  - Passengers with disabilities are allowed to preboard but are not required to do so. Instead, passengers with disabilities may prefer to board last or as their row is boarded to avoid being in close proximity to other passengers during the boarding process. Upon arrival, aisle chair passengers and others needing wheelchair assistance should be given the opportunity to deplane first or as their row is called instead of having to wait until the flight is empty.
  - Passengers with disabilities who are high-risk for the virus should be allowed additional space such as no row mates, if requested and can be accommodated. This would prevent other passengers from climbing over passengers with disabilities who are unable to move from their seat during boarding, deplaning, and lavatory visits.
  - Air carriers must not implement physical access barriers in aircraft to assist with social distancing in a manner that prohibits access by people with disabilities, including those who use the aisle chair to board.

- **Mask/Face Covering Considerations:**
  - Air carriers should modify policies related to face mask or covering requirements for passengers as needed in line with the ACAA.
    - For example, the CDC says that face coverings should not be used by people who have difficulty breathing or taking off their mask.
  - Air carrier personnel and their contractors should use clear face masks when possible to communicate with passengers who are deaf or hard of hearing. In the alternative, white boards and markers should be available at all customer contact points, including the aircraft to facilitate communication.
  - Use of face shields instead of face masks/coverings should also be considered.

ALS Association
American Association of People with Disabilities
American Council of the Blind
Autistic Self Advocacy Network
Bazelon Center for Mental Health Law
Christopher & Dana Reeve Foundation
Cure SMA
Epilepsy Foundation
Muscular Dystrophy Association (MDA)
National Association of the Deaf
National Council on Independent Living
National Disability Rights Network
National Multiple Sclerosis Society
Paralyzed Veterans of America
The Arc of the United States
United Spinal Association

Plaintiffs' Exhibit 429

**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF AVIATION ENFORCEMENT AND PROCEEDINGS
WASHINGTON, DC**

—————————————————————

**May 13, 2009**

**Answers to Frequently Asked Questions Concerning Air Travel of People with Disabilities
Under the Amended Air Carrier Access Act Regulation**

**Section 382.7 – Applicability**

1. **Does the rule apply to foreign-originating charter flights?**

   **Answer:** Charter flights by foreign carriers that originate at a foreign airport and operate to a United States airport and then back to a foreign airport without picking up any passengers who did not begin their journey at the foreign airport are not subject to the requirements of Part 382 with respect to any passengers on those flights, including U.S. citizens.

2. **On a code-share flight operated by a foreign carrier between two foreign points, is the U.S. code-share partner responsible for ensuring compliance with the service provisions of Subpart I with respect to passengers holding tickets bearing that U.S. carrier's code?**

   **Answer:** Generally, no. In section 382.7 (c) of the final rule, Subpart I was inadvertently omitted from the list of subparts for which a U.S. carrier is responsible to ensure compliance with the service-related provisions on a flight operated by its foreign code share partner between two foreign points with respect to passengers traveling under its code. The correction of this omission will be addressed in an upcoming notice of proposed rulemaking. Until then, the Department's Aviation Enforcement Office will only hold U.S. carriers responsible for their passengers carried on a code-share flight operated by a foreign airline under the Air Carrier Access Act (i.e., the statute itself) for ensuring that the basic services outlined in this subpart are provided. Examples of basic services include: allowing passengers to bring mobility aids and other assistive devices, including a passenger's folding wheelchair, in the aircraft cabin to be stowed consistent with safety and security requirements; stowage of wheelchairs, other mobility aids, or other assistive devices in the baggage compartment if an approved stowage area is not available in the cabin; and returning wheelchairs, mobility aids and other assistive devices to the passenger in the condition in which they were received. An example of a service that will not be required on such flights is the acceptance of a passenger's electronic respiratory assistive device (e.g., POC) for use on board an aircraft.

3. **On a code-share flight operated by a U.S. carrier between a U.S. airport and a foreign airport where a passenger is holding a ticket bearing a foreign carrier's code, which carrier is responsible for Part 382 violations involving that passenger?**

   **Answer:** In the above scenario, as the operating carrier, the U.S. airline would be responsible for violations of Part 382 with respect to all passengers on the flight, while the foreign carrier code-share partner would be responsible only with respect to passengers holding tickets bearing that carrier's code. As a matter of policy, the Aviation Enforcement Office would generally attribute responsibility to the carrier determined to actually be at fault after conducting an investigation.

**Section 382.10(c) – Equivalent Alternative Determination**

4. **What information should be included in a request for an equivalent alternative determination?**

   **Answer:** Part 382 requires a carrier that submits an application for an equivalent alternative determination to include a detailed description of the alternative policy, practice, or other accommodation the carrier proposes to use in place of compliance with the cited provision(s) of Part 382, and an explanation of how the carrier will provide substantially equivalent accessibility to passengers with disabilities. We cannot specify what information would be appropriate in all circumstances. However, in the context of an equivalent alternative request involving movable aisle armrests, for example, diagrams, photos, and videos would likely be useful in showing that what the carrier desires to do is an equivalent alternative to the accommodation described in the cited provision(s) of Part 382. The Department has also found it to be useful for carriers to consult with organizations representing persons with disabilities when developing an equivalent alternative application to ensure the alternative policy, practice, or other accommodation actually provides an equivalent alternative to the requirements of Part 382 for which the equivalent alternative request is being made. Providing the Department the views of such organizations would be helpful.

**Section 382.11 (a)(3) – Non-discrimination and Benefits of Air Transportation Related Services**

5. **If a carrier's premium service includes airline-provided transportation from the customer's home or a central pick-up location in the city to the airport, must that transportation be accessible to passengers with disabilities?**

   **Answer:** Yes. Both U.S. and foreign air carriers are subject to ACAA requirements generally prohibiting discrimination in the provision of air transportation and related services (14 CFR 382.11(a)(1) and (3)). If an airline provides ground transportation services to its premium customers (e.g., first class passengers or elite frequent flyers), the Aviation Enforcement Office would regard the failure or refusal of an airline to provide

"equivalent service" to a passenger with a disability in connection with a covered flight in the same class of service as a violation of these provisions.  Equivalent service means that the airlines must ensure that, in all relevant respects (e.g., response time, where and when the service is provided, any limitations on service availability), the service provided to people with disabilities must be equivalent to that provided to everyone else.  The equivalent service obligation does not mean that the airline itself must necessarily own accessible vehicles.  It could be possible, for example, for the airline to have a contract or arrangement with another provider (e.g., ground transportation company that has accessible vehicles) to pick up a passenger with a disability for the airline, as long as the service provided was truly equivalent.  The obligation of U.S. and foreign airlines to provide equivalent service under the ACAA applies both in the U.S. and in other countries (with respect to flights to and from the United States in the case of foreign carriers).  It should be noted that, in addition to the ACAA requirements, U.S. and foreign carriers also have an obligation to provide "equivalent service" with respect to such airline-provided ground transportation in the U.S. under the Americans with Disabilities Act and the Department of Transportation's ADA rules (49 CFR Part 37).

## Section 382.23 – Medical Certificates and Medical Clearances

6.  **Under what circumstances may a carrier determine that there is reasonable doubt that a passenger can complete the flight safely without requiring extraordinary medical assistance during the flight and thus require the passenger to obtain a medical clearance as a condition for providing air transportation?  How is "extraordinary medical assistance" defined?**

   **Answer:** A carrier may determine that there is reasonable doubt that a passenger can complete the flight safely without requiring extraordinary medical assistance during the flight when the passenger's condition does not appear to be medically stable (e.g., the passenger has apparent significant difficulty in breathing, appears to be in substantial pain, etc.).  Extraordinary medical care is care that may require the use of onboard emergency medical equipment (e.g., automated external defibrillator or enhanced emergency medical kit (EEMK)) or voluntary assistance from another medically trained passenger, or a delay/diversion to obtain the medical assistance necessary to stabilize that passenger.  Extraordinary medical assistance may also be needed when a passenger is unable to self-administer medication or routine medical care necessary to maintain the stability of his/her condition during a flight (e.g., insulin injection).  In instances where the carrier reasonably concludes that extraordinary medical assistance may be necessary, it may require a medical certificate.  The carrier is also free to offer the passenger the option of undergoing preflight medical clearance.

7.  **When there is reasonable doubt that a passenger can complete a flight safely without extraordinary medical assistance, and the carrier consequently requires the passenger to provide a medical certificate from his/her physician as a condition for air travel, what information should the certificate contain?**

**Answer:** When a passenger's ability to complete a flight safely without extraordinary medical assistance is in doubt, the carrier may require a medical certificate that states whether the passenger is medically stable for the flight.  The medical certificate should also explicitly state that the passenger is capable of completing the flight safely without requiring extraordinary medical assistance.  The passenger may assist the carrier by providing information regarding his/her condition and prognosis including whether the condition is chronic or acute, although the rule does not permit airlines to require this information as a condition of travel.  If the passenger has such a medical certificate indicating that he/she is capable of completing the flight safely, the carrier may require medical clearance only if there is a legitimate medical reason for believing that there has been a significant adverse change in the passenger's condition since the issuance of the medical certificate.  It would be a violation of Part 382 for a carrier to routinely require a medical clearance and refuse to honor a medical certificate provided by a passenger.

8. **Are airlines required to provide in-flight emergency medical assistance to passengers?**

   **Answer:** No.  There are no federal regulations requiring carriers to provide emergency medical care or to establish a standard of care for the provision of emergency medical care.  The FAA does have certain requirements for equipment, training, and procedures which crewmembers and/or medical professionals providing voluntary medical assistance can use to respond to medical events on the aircraft.  Under most airline policies, however, the use of certain emergency medical equipment (e.g., EEMK) is restricted to medical professionals providing voluntary assistance.

9. **What should carriers do to safeguard the personal medical information (e.g., physician's statements, medical certificates, and documentation from licensed mental health professionals for emotional support and psychiatric service animals) that Part 382 permits them to require of certain passengers in order to provide certain accommodations?**

   **Answer:** We recommend that airlines not retain personal medical information that they require a passenger to provide as a condition for obtaining disability accommodations.  If airlines choose to retain such information, we recommend that they take steps to safeguard it (e.g., maintaining the information in a separate confidential file for as long as they retain the passenger's reservation records for the flights involved).

**382.27 – Advance Notice**

10. **When must a carrier accommodate a passenger accompanied by an emotional support or psychiatric service animal who has not provided 48 hours' advance notice?**

    **Answer:** Carriers must accommodate a passenger accompanied by an emotional support or psychiatric service animal who has not provided 48 hours' advance notice if the carrier



**United States Government Accountability Office**

## Report to Congressional Committees

`Plaintiffs' Exhibit 430`

**April 2021**

# PASSENGERS WITH DISABILITIES

# Airport Accessibility Barriers and Practices and DOT's Oversight of Airlines' Disability-Related Training

Accessible Version



**GAO-21-354**

# GAO Highlights

Highlights of GAO-21-354, a report to congressional committees

April 2021

## PASSENGERS WITH DISABILITIES

## Airport Accessibility Barriers and Practices and DOT's Oversight of Airlines' Disability-Related Training

## Why GAO Did This Study

Approximately 43 million people in the United States have some type of disability, which may affect mobility, vision, hearing, and cognition. Without accessible airport facilities and accommodations—such as appropriate assistance from the check-in counter to the gate, or effective communication of flight information—air travel for people with disabilities can be extremely challenging.

The FAA Reauthorization Act of 2018 includes provisions for GAO to review leading airport accessibility practices for passengers with disabilities, as well as required training for airline and contract service personnel who assist these passengers within the airport. This report examines, among other objectives: stakeholder-identified barriers that passengers with disabilities face when accessing airport facilities, accessibility practices to assist passengers with disabilities, as well as how DOT has overseen airlines' disability-related training.

GAO reviewed relevant federal laws, regulations, DOT documents, literature, as well as information describing disability training provided by selected airlines and contractors. GAO interviewed a non-generalizable sample of stakeholders, including those at 16 U.S. airports selected based on size and geography, eight large and low-cost domestic airlines selected based on the greatest number of disability-related passenger complaints and enplanements, and six aviation service contractors working for those airlines. GAO also conducted interviews with DOT officials and 10 disability advocacy organizations, among others.

View GAO-21-354. For more information, contact Heather Krause at (202) 512-2834 or krausoh@gao.gov.

## What GAO Found

Passengers with disabilities face infrastructure, information, and customer service barriers at U.S. airports, according to representatives of selected airports, disability advocacy organizations, as well as a review of relevant literature.

- Infrastructure barriers can include complex terminal layouts and long distances between gates and can be difficult for some to navigate.

- Essential travel information is not always available in a format accessible to all. For example, a person with hearing loss could miss crucial gate information that is solely provided over a loudspeaker.

- A passenger might not receive appropriately sensitive service, such as wheelchair assistance, at the airport, although the service provided is required by the Air Carrier Access Act of 1986 (ACAA) regulations.

According to stakeholders, while no solution meets all needs, a number of practices can help reduce or eliminate some of these barriers to equal access at airports. For example, some selected airports use external disability community and passenger groups to proactively engage in identifying barriers and develop solutions. Other airports have implemented technology-based solutions, such as mobile phone applications to make airport navigation easier.

**Examples of Stakeholder-Identified Features to Assist Airport Passengers with Disabilities**



Source: GAO. | GAO-21-354

The Office of Aviation Consumer Protection within the Department of Transportation (DOT) is responsible for oversight of airlines' compliance with the ACAA. In 2008, DOT updated its entire ACAA regulation, including adding new training requirements for airline personnel, such as requiring training to be recurrent. Following this update, DOT conducted outreach to domestic and foreign airlines on the changes and reviewed airlines' disability training sessions and materials. Agency officials said that in recent years, DOT has conducted reviews of airlines' training only when passengers' complaints indicate a possible problem, as officials' analyses have not shown training generally to be a significant cause of service violations. DOT officials and stakeholders said other factors, such as limited availability of staff to assist passengers with disabilities, at times may affect the service passengers with disabilities receive. DOT is assessing some of these factors through the statutorily mandated ACAA Advisory Committee, formed in late 2019 to make recommendations to improve accessibility to air travel. The committee met in 2020, established three subcommittees, and plans to reconvene by summer 2021.

United States Government Accountability Office

# Contents

GAO Highlights                                                                     2

      Why GAO Did This Study                                      2
      What GAO Found                                             2

Letter                                                                             1

      Background                                                  6
      Stakeholders Said Passengers with Disabilities Continue to Face
        Barriers, and Variation in Airports' Accessibility Adds to
        Difficulties                                           15
      Stakeholders Identified Some Approaches to Help Passengers
        with Disabilities at Airports, but No Solution Meets All Needs   23
      Selected Airlines Said They Design Disability-Related Training to
        Address Requirements, but Other Factors Also Affect Service      29
      DOT's Disability-Related Training Oversight Has Included
        Outreach, Reviews of Materials, and Passenger Complaint
        Analyses                                               35
      Agency Comments                                            44

Appendix I: Department of Transportation's Key Disability Training Requirements    45

Appendix II: Selected Characteristics of Disability-Related Training for Public-Facing Airline and Contractor
Employees at Airports                                                              47

Appendix III: GAO Contact and Staff Acknowledgments                                49

Tables

      Text of Figure 1: Example of Disability-Related Training Content
        Tailored for Selected Airline or Contract Personnel Roles
        at Airports                                            13
      Table 1: The Department of Transportation's (DOT) Oversight
        Roles and Responsibilities Related to Disability        14
      Data table for Figure 2: Disability-Related Complaints Submitted
        to Airlines and Reported to DOT from 2010 through 2018   20
      Table 2: Selected Characteristics of Disability-Related Training for
        Public-Facing Employees at Airports Described by
        Selected Airlines and Service Contractors               47

Figures

Figure 1: Example of Disability-Related Training Content Tailored for Selected Airline or Contract Personnel Roles at Airports                                                13

Figure 2: Disability-Related Complaints Submitted to Airlines and Reported to DOT from 2010 through 2018                20

Figure 3: Selection of Airport Accessibility Features to Help Passengers with Disabilities Access and Navigate Airports, as Identified by Stakeholders                27

**Abbreviations**

| | |
|---|---|
| ACAA | Air Carrier Access Act |
| ACAA Advisory Committee | Air Carrier Access Act Advisory Committee |
| ACRP | Airport Cooperative Research Program |
| ADA | Americans with Disabilities Act |
| COVID-19 | Coronavirus Disease 2019 |
| CRO | Complaints Resolution Officials |
| DOT | Department of Transportation |
| FAA | Federal Aviation Administration |
| OJT | on-the-job training |
| OST | Office of the Secretary |
| TRB | Transportation Research Board |
| TSA | Transportation Security Administration |
| WCAG | Web Content Accessibility Guidelines |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**
*A Century of Non-Partisan Fact-Based Work*

**441 G St. N.W.**
**Washington, DC 20548**

April 14, 2021

The Honorable Maria Cantwell
Chair
The Honorable Roger Wicker
Ranking Member
Committee on Commerce, Science, and Transportation
United States Senate

The Honorable Peter A. DeFazio
Chairman
The Honorable Sam Graves
Ranking Member
Committee on Transportation and Infrastructure
House of Representatives

Prior to the Coronavirus Disease 2019 (COVID-19) pandemic, passenger traffic at U.S. airports had grown steadily since 2009, causing airports to become more crowded and noisy. In addition, terminal expansions and renovations have increased the size and complexity of many of the nation's largest airports. These conditions can make travel stressful for all passengers, but even more so for those with disabilities and older travelers. The Census Bureau estimates that over 42.6 million people in the United States (or 13 percent) have some type of disability, which may affect mobility, vision, hearing, or cognition, among other things.[1] Also, according to the U.S. Census Bureau, older adults are more likely to have a disability, and their numbers have grown rapidly and continue to rise, both absolutely and as a share of the U.S. population. Furthermore, as air travel has become more affordable, older adults and people with disabilities are travelling in greater numbers. However, without accommodations—such as appropriate assistance from the check-in counter to the gate, or effective communication of flight information through technologies or other means—air travel for people with disabilities can be extremely challenging.

In general, airports and airlines are required to provide accessible facilities and reasonable accommodations through federal statutes such

---

[1]Based on 2018 American Community Survey (data.census.gov) disability data.

Letter

as the Americans with Disabilities Act (ADA) of 1990, as amended,[2] the Air Carrier Access Act (ACAA) of 1986, as amended,[3] and their related regulations. The ACAA regulations also require airlines to provide some disability-related training for employees and contractors who deal with the traveling public such as reservation agents, gate agents, and wheelchair agents, though some disability groups have questioned whether the training airlines provide could be improved given that service problems persist. At the federal level, the Department of Transportation (DOT) oversees airlines' and airports' compliance with these statutes and regulations through the Federal Aviation Administration's (FAA) Office of Civil Rights and the Office of the Secretary's (OST) Office of Aviation Consumer Protection.

The FAA Reauthorization Act of 2018 includes provisions for us to examine best practices in airport accessibility and airlines' training programs related to properly assisting passengers with disabilities within the airport environment.[4] This report examines: (1) stakeholder-identified barriers that passengers with disabilities face when accessing airport facilities, information, and services; (2) stakeholder-identified airport accessibility approaches that help improve passengers with disabilities' access to and navigation of airports; (3) selected airlines' approaches to disability-related training requirements and other factors that may affect the provision of services to passengers with disabilities in airports; and (4) how DOT has overseen airlines' disability-related training.

The scope of this report focuses on the airport travel experience for passengers with disabilities. The ACAA's implementing regulations define an individual with a disability as any individual who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment.[5] For our purposes, airport travel includes passengers' experiences at the departure airport from the point they arrive at that airport, move through the airport terminal—including their use of facilities such as restrooms

---

[2]Pub. L. No. 101-336, 104 Stat. 327 (codified as amended at 42 U.S.C. §§ 12101-12213).

[3]Pub. L. No. 99-435, 100 Stat. 1080 (codified as amended at 49 U.S.C. § 41705).

[4]Pub. L. No. 115-254, § 431, 132 Stat. 3186, 3342. In statute and regulation, airlines are generally referred to as "air carriers"; we refer to them as "airlines" for the purpose of this report.

[5]14 C.F.R. § 382.3.

and concessions—and reach the aircraft gate and begin the boarding process. It does not include passengers' experiences onboard the aircraft. Also in our scope of passengers' airport travel experience is their travel from the destination airport's arrival gate to baggage claim and ultimately to ground transportation. Excluded from our scope is the security-screening process conducted by the Transportation Security Administration (TSA), accessibility services onboard the aircraft, or handling and stowage of wheelchairs and other assistive devices. Previous GAO reports have explored some of those topics in more detail.[6]

To determine stakeholders' views on barriers passengers with disabilities may face when accessing airport facilities, services, and information as well as accessibility practices airports are using to improve access and navigation, we interviewed officials from the FAA's Office of Civil Rights and OST's Office of Aviation Consumer Protection, 16 U.S. airports, and four aviation industry associations.[7] We also interviewed representatives from 10 organizations advocating for people with various types of disabilities, including those affecting mobility, vision, hearing, and cognitive function.[8] We selected a non-generalizable sample of 16 U.S. airports to identify practices to assist passengers with disabilities access and navigate airport facilities, information, and services. Our selection was designed to obtain a mix of small, medium, and large hub airport perspectives, as well as geographic representation, and considered recommendations from the disability advocacy organizations. The organizations were selected to represent a diverse range of disabilities, and based on involvement in advocacy and outreach activities such as

[6]See, for example, GAO, *Aviation Security: Basic Training Program for Transportation Security Officers Would Benefit from Performance Goals and Measures*, GAO-18-552 (Washington, D.C: July 26, 2018); and GAO, *Aviation Consumer Protection: Few U.S. Aircraft Have Lavatories Designed to Accommodate Passengers with Reduced Mobility*, GAO-20-258 (Washington, D.C.: Jan. 7, 2020).

[7]Selected airports included: Dallas Fort Worth (DFW), Dallas Love Field (DAL), Fort Lauderdale-Hollywood (FLL), Hartsfield-Jackson Atlanta (ATL), John F. Kennedy (JFK), Kansas City (MCI), LaGuardia (LGA), Memphis (MEM), Minneapolis-St. Paul (MSP), Newark Liberty (EWR), Norman Y. Mineta San José (SJC), Oakland (OAK), Phoenix Sky Harbor (PHX), San Francisco (SFO), Seattle-Tacoma (SEA), and Spokane (GEG). Aviation industry associations included: American Association of Airport Executives, Airports Council International- North America, Airlines for America, and the Regional Airline Association.

[8]Disability advocacy organizations included: AARP, the American Council of the Blind, Arc of King County, National Council on Disability, National Association of the Deaf, National Disability Rights Network, National Federation of the Blind, Open Doors Organization, Paralyzed Veterans of America, and the U.S. Access Board.

Letter

testifying to Congress or publishing articles on subjects relevant to airport accessibility.

To obtain additional context on these issues, we reviewed FAA documents and relevant literature. For example, we reviewed a sample of eight FAA compliance reviews provided by FAA's Office of Civil Rights and selected airports from the 33 reviews FAA told us they completed from fiscal year 2016 through 2019 to identify any accessibility barriers and leading practices. We also reviewed literature such as reports from the National Academies of Sciences' Airport Cooperative Research Program (ACRP), in addition to reports that we obtained from a comprehensive literature search including scholarly and legal articles, government reports, and association or nonprofit reports that were published in the United States within the previous 5 years.[9] We also interviewed officials from TSA about their perspectives on the airport experience for passengers with disabilities, but we did not ultimately discuss specific TSA initiatives in this report.

Also, to obtain additional perspectives on barriers passengers with disabilities may face, we analyzed two sets of the most recently available airline passenger complaint data related to disability:

- complaints submitted by passengers directly to the Office of Aviation Consumer Protection from 2009 through 2019, and

- complaints submitted directly to U.S. and foreign airlines, and reported by the airlines to DOT from 2009 through 2018 as required by regulation.[10]

To assess the reliability of DOT's data, we reviewed DOT documentation related to the data and agency officials' written responses to our questions about the reliability of the data. We also manually tested the data for outliers or obvious errors, and reviewed recent data reliability

---

[9]The team searched ProQuest, EBSCO, Dialog, Scopus, Transportation Research Board (TRB), and Westlaw databases.

[10]Airlines are to annually submit to DOT a report summarizing the disability-related complaints received during the prior calendar year.14 C.F.R. § 382.157(d). In general, passengers can submit written disability-related complaints directly to airlines, and airlines must respond to each such complaint. Additionally or alternatively, passengers can submit formal or informal disability-related complaints directly to DOT and DOT must investigate each complaint alleging discrimination against an individual with a qualified disability. 49 U.S.C. § 41705(c). Passengers may submit complaints to DOT via the agency website, by mail, or through a telephone hotline.

Letter

documentation from prior GAO work using data from the same source. We determined that the data were sufficiently reliable for the purpose of providing background and context on barriers that passengers with disabilities may face at airports.

To address selected airlines' approaches to disability-related training requirements and other factors that may affect service, we reviewed relevant federal statutes, regulations, and guidance related to airlines' training for public-facing personnel who provide customer service and deal with the traveling public.[11] The scope of this work did not include airline training related to non-customer-facing personnel. We also reviewed information describing disability-related training provided to us by selected airlines and selected companies that contract with airlines to provide wheelchair assistance and other passenger services—which we refer to as aviation service contractors—to identify similarities and differences in how these entities sought to address training requirements.[12] We requested airlines and contractors provide us with training materials; nearly all airlines and one contractor submitted either excerpts or high-level summaries. We interviewed or obtained written responses from representatives[13] from eight domestic airlines, including four network and four low-cost airlines: we selected airlines based on those that received the largest number of complaints and were among those that boarded the most passengers in 2018.[14] We also interviewed representatives from six aviation service contractors, selected to include a mix of small and large-sized companies, and to ensure representation of the interests of employees of airlines we interviewed, we interviewed a

---

[11]We did not review airport-provided disability-related training issues. While some airport authorities are subject to certain ADA (e.g., 49 C.F.R. § 37.173) or Section 504 (e.g. 49 C.F.R. § 27.72(g)) provisions requiring certain airport personnel to receive specific types of disability-related training, airport authorities are not subject to the same type of broadly scoped disability-related training provisions for their personnel as are required of airlines under ACAA regulations (14 C.F.R. § 382.141). These ACAA disability training regulations are set out in more detail in appendix I.

[12]We did not review airline employee and contractor training records to verify that staff were in compliance with the required training schedules.

[13]We requested interviews with eight airlines, six airlines granted our request for interviews and two airlines provided written responses instead of an interview.

[14]Network airlines support large, complex hub-and-spoke operations, which provide service at various fare levels to many destinations. Low cost airlines generally operate less costly point-to-point service using fewer types of aircraft. The following eight airlines were selected: Alaska, Allegiant, American, Delta, JetBlue, Southwest, Spirit, and United.

Letter

labor union representing employees of aviation service contractors and three service employees.[15]

To determine how the Office of Aviation Consumer Protection within DOT has overseen airline disability-related training we interviewed DOT officials and reviewed DOT documents, such as guidance on relevant federal statutes and regulations, and disability-related consent orders that DOT issued from 2008 through 2019 to address complaints alleging airlines' violations of requirements to assist passengers. We also reviewed materials related to DOT's Air Carrier Access Act Advisory Committee, which is addressing issues related to the air travel needs of passengers with disabilities, and our prior work on aviation consumer issues.[16]

We conducted this performance audit from October 2019 to April 2021 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

Passengers with different types of disabilities may encounter different obstacles when accessing services and navigating through an airport. For

---

[15]We met with service contractor representatives from Prospect Airport Services, Superior Aircraft Services, PrimeFlight Aviation Services, G2 Secure Staff, ABM Aviation Solutions, and Eulen America. The representatives told us they each provided passenger support services at between 5 and 85 U.S. airports. Industry-wide, these service contractors generally provide a range of airport-based services for airlines beyond passenger support services, including janitorial, baggage handling, and security services. To identify service employees to interview, we consulted with representatives from the Service Employees International Union, a labor union that represents these workers. The service employees we interviewed worked for three of the contractor companies we selected.

[16]See, for example, GAO, *Passengers with Disabilities: Air Carriers' Disability-Training Programs and the Department of Transportation's Oversight* GAO-17-541R (Washington, D.C.: May 31, 2017); GAO, *Airline Consumer Protections: Additional Actions Could Enhance DOT's Compliance and Education Efforts*, GAO-19-76 (Washington D.C.: Nov. 20, 2018); and GAO, *Aviation Consumer Protection: Increased Transparency Could Help Build Confidence in DOT's Enforcement Approach*, GAO-21-109 (Washington, D.C.: Oct. 13, 2020).

example, passengers with blindness and low vision may have difficulty using the information systems—known as wayfinding—that guide people through the airport, those with mobility impairments may have difficulty walking long distances, and those with cognitive disabilities may have difficulty navigating through unfamiliar airport facilities that may be complex and overwhelming.[17] In addition, different passengers with the same disability may also have different needs or types of preferred assistance. For example, some passengers with mobility impairments might use their own wheelchair in an airport, others might ride an electric cart generally used to transport groups of travelers together, while others might request a wheelchair at the airport as well as wheelchair assistance. Passengers may also have multiple disabilities. According to ACRP research, it is typically older adults who develop multiple disabilities, which can be a natural result of aging.[18]

The responsibility of ensuring access through different points in a public use airport depend on the agreements in place between the airport owner or operator and tenants or leaseholders; agreements can vary. Public use airports in the U.S. are generally owned by a variety of public entities including states, municipalities, or other authorities. Airlines are tenants and leaseholders at airports paying for the use of gates, ticket counters and other facilities at these airports, but may also own or manage certain assets such as terminals.

## Federal Accessibility Framework at U.S. Airports

Various federal statutory and regulatory requirements are designed to help ensure that U.S. airports are accessible. The purpose of these requirements can be grouped into the following two categories:

- **Prohibitions against discrimination.** Since 1977, most U.S. airports have been subject to the implementing regulations of Section 504 of the Rehabilitation Act of 1973[19] (Section 504), which prohibits

---

[17]Wayfinding refers to navigating from point to point and to information systems that help guide people through a physical environment and enhance their understanding and experience of the space. See ACRP Research Report 177, *Enhancing Airport Wayfinding for Aging Travelers and Persons with Disabilities* (Washington, D.C.: 2017).

[18]ACRP Research Report 177, *Enhancing Airport Wayfinding for Aging Travelers and Persons with Disabilities* (Washington, D.C.: 2017).

[19]Pub. L. No. 93-112, § 504, 87 Stat. 355, 394 (codified as amended at 29 U.S.C. § 794).

Letter

discrimination against any qualified individual solely on the basis of the individual's disability by recipients of federal financial assistance.[20] In addition, Section 504, as amended, incorporates certain requirements of the ADA, as amended, such as the prohibition on discrimination against people[21] with disabilities[22] by public entities.[23] In the case of air travel, Title II of the ADA and its implementing regulations are applicable to public entities, including state and local authorities that operate airports, but not airlines. Instead, the ACAA, as amended, prohibits airlines from discriminating when providing air transportation on the basis of disability. The ACAA implementing regulations cover airport terminal facilities owned, leased, or controlled by airlines at U.S. airports.[24]

- **Accessibility design standards**. Two separate acts and their respective implementing provisions lay out building accessibility standards and requirements: (1) the act commonly known as the Architectural Barriers Act of 1968[25], as amended, and (2) Section 504 of the Rehabilitation Act. Specifically, the Architectural Barriers Act is

---

[20]In general, the Rehabilitation Act of 1973, as amended, defines "individual with a disability" to mean any individual who (1) has a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment, and (2) can benefit in terms of employment outcome from certain specified vocational rehabilitation services. 29 U.S.C. § 705(20) as adopted by § 794.

[21]More specifically, the ADA prohibits such discrimination against a qualified individual with a disability and defines the phrase "qualified individual with a disability" to mean an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. 42 U.S.C. § 12111(8).

[22]In general, the ADA defines the term "disability" to include a physical or mental impairment that substantially limits one or more major life activities of such individual, or a record of such impairment, or being regarded as having such an impairment. 42 U.S.C. § 12102(1).

[23]Under the ADA, the term "public entity" is defined to include (1) any State or local government, and (2) any department, agency, special purpose district, or other instrumentality of a State or States or local government. 42 U.S.C. § 12131(1).

[24]The ACAA prohibits discrimination on the basis of disability in air travel, whereas the ADA, among other things, prohibits discrimination and ensures equal opportunity and access for persons with disabilities in public accommodations, commercial facilities and transportation by bus, rail, or any other conveyance, other than by aircraft.

[25]Pub. L. No. 90-480, 82 Stat. 718 (1968) (codified as amended at 42 U.S.C. §§ 4151-4156).



Plaintiffs' Exhibit 431

# Guidance on Accessible Air Travel in Response to COVID-19
## Edition 1 – 31 August, 2020



## Disclaimer

The purpose of this document is to provide guidance and best practice examples for airlines to support passengers with disabilities within their organization in response to COVID-19. The guide is not intended to endorse any current regulation, nor to provide any mandatory requirements. The intended audience for this guide is IATA member airlines. It may also be a useful reference for other aviation stakeholders such as airports, regulatory bodies, and organizations dealing with accessibility. The information contained in this publication is subject to constant review in the light of changing requirements and regulations. No reader should act on the basis of any such information without referring to applicable laws and regulations applicable to reader jurisdiction and/or without taking appropriate professional as well as technical advice. Although every effort has been made to ensure accuracy, IATA shall not be held responsible for any loss or damage caused by errors, omissions, misprints or misinterpretation of the contents hereof. Furthermore, IATA expressly disclaim any and all liability to any person or entity in respect of anything done or omitted by any such person or entity in reliance on the contents of this publication. This document was produced by IATA. The party asserts the right to control the distribution and use of the content.

**All IATA Covid19 related guidance materials can be found at**
https://www.iata.org/en/programs/covid-19-resources-guidelines/

For additional information on the IATA accessibility policy please contact IATA at gia@iata.org



# Contents

Revision record ................................................................................................................................ 3

Introduction .................................................................................................................................... 4

1      Regulation ............................................................................................................................ 4

2      ICAO Council Aviation Recovery Taskforce (CART) Take off Guidance ........................... 5

3      Key principles ...................................................................................................................... 6

       3.1     Safety and security .................................................................................................... 6

       3.2     Assistance to passengers with disabilities ............................................................... 6

       3.3     Access ....................................................................................................................... 6

       3.4     Communication .......................................................................................................... 6

       3.5     Application of consistent measures ........................................................................... 7

4      Persons with disabilities and COVID-19 ............................................................................. 7

5      Establishing an airline policy ............................................................................................... 8

6      Information to employees ..................................................................................................... 8

7      Information to passengers .................................................................................................... 9

       7.1     Search and book ....................................................................................................... 9

       7.2     On your way ............................................................................................................. 10

       7.3     At destination ........................................................................................................... 10

8      Assistance to passengers .................................................................................................. 10

       8.1     Passengers with reduced mobility .......................................................................... 10

       8.2     Passengers with sensory disabilities ...................................................................... 11

       8.3     Passengers with intellectual disabilities .................................................................. 12

9      Health measures ................................................................................................................ 12

       9.1     Physical distancing .................................................................................................. 12

       9.2     Use of face covering, mask and protective personal equipment ............................. 13

       9.3     Hygiene measures ................................................................................................... 13

       9.4     Cleaning and disinfection of equipment .................................................................. 14

10     Staff training ...................................................................................................................... 14

11     Conclusion ......................................................................................................................... 15

       Annex A - Helping Blind Travelers During COVID-19 ....................................................... 16



# Introduction

Accessibility is not just a requirement exclusively designed to meet the need of persons with disabilities. It is important to consider accessibility in the design of aviation-related policy and in the development of inclusive products and services to ensure air travel is open to all. Done with empathy and scientific rigour, the act of mainstreaming accessibility within the field of the overall passenger experience will benefit not just airlines but the aviation ecosystem as a whole.

To help airlines craft an inclusive response to COVID-19, the IATA Accessibility Working Group has developed this guidance document in collaboration with international, national and local partners as well as the disability community such as Open Doors Organization[1] and Reduced Mobility Rights Limited[2].

The purpose of this guidance document is to explore, in brief, the aspects that should be considered within the concept of accessible travel in order to appropriately adapt existing policies during COVID-19 and beyond. IATA hopes that these recommendations will ensure consistency and identify opportunities to improve the overall travel experience for passengers with disabilities. As the COVID-19 pandemic is still evolving with myriad unknown variables, this guidance document should be considered as a live tool that will be revised and updated as necessary.

# 1  Regulation

Further to the UN Convention on the Rights of Persons with Disabilities (CRPD)[3] , efforts were made to change the focus by considering the environment as a disabling factor and by taking a more positive view, oriented towards accessibility as a measure to create inclusive environments, irrespective of the capabilities of each individual, i.e. environments for all.

Instead of being seen as solely a characteristic of the individual, the CRPD asserts that "disability results from the interaction between persons with impairments and attitudinal and environmental barriers that hinders their full and effective participation in society[4]." This more positive view challenges governments and corporations to create accessible and welcoming environments, i.e., environments for all that function for everyone irrespective of their capabilities, size or age.

Among other crucial accessibility topics, Article 9 of the CRPD requires state regulators to ensure that persons with disabilities can access transport services on an equal basis with others. One of the most important changes generated by the so-called social model[5] and stated in the UN International Convention is the adoption of a new term: person with disabilities.

---

[1] https://opendoorsnfp.org/
[2] https://www.reducedmobility.eu/
[3] United Nations Organization (2006), Convention on the Rights of Persons with Disabilities:
https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=IV-15&chapter=4
[4] UN CRPD, Art.1
[5] In response to the medical view, the UNCRPD  termed the 'social model': disability is recognized as the consequence of the interaction of the individual with an environment that does not accommodate that individual's differences. This lack of accommodation impedes the individual's participation in society. Inequality is not due to the impairment, but to the inability of society to eliminate barriers challenging persons with disabilities. This model puts the person at the centre, not his/her impairment, recognizing the values and rights of persons with disabilities as part of society.



As the social model of accessibility has evolved, the concept of accessibility for passengers with disabilities is laid out in several standards, rules, regulations and guidelines, including the following:

- ICAO Annex 9, Chapter 8 H
- Manual on Access to Air Transport by Persons with Disabilities (ICAO Doc 9984)
- Regulation (EC) No 1107/2006
- US Air Carrier Access Act (ACAA)
- Canadian Accessible Transportation for Persons with Disabilities Regulations, Phase 1
- ECAC Doc 30, Part I, Section 5 Recommendations
- IATA Resolution 700
- IATA AGM Resolution on Passengers with disabilities and its core principles

# 2 ICAO Council Aviation Recovery Taskforce (CART) Take off Guidance

The deliverables of the ICAO Council's Aviation Recovery Task Force (CART)[6] are aimed at providing practical, aligned guidance to governments and industry operators in order to restart the international air transport sector and recover from the impacts of COVID-19 on a coordinated global basis.

When developing their policy and mitigation procedures to restore passenger air travel, airlines should be guided by the ICAO CART Take off guidance .

The guidance recommends a phased approach (from stage 0 to stage 4) to enable the safe return to high-volume domestic and international air travel. It is important to note that there are several different phases to resuming full operations.



In all the above stages, airlines should consider the need to raise additional awareness and educational messaging for passengers with disabilities and older adults before the re-start of operations.

---

[6] https://www.icao.int/covid/cart/Pages/CART-Take-off.aspx



# 3  Key principles

## 3.1    Safety and security

In developing the assistance measures airlines should be guided by the underpinning principles of aviation: Safety and Security. Any measure applied to support passengers with disabilities should be commensurate with the health risk level of the country and shall not compromise the safety and security of the ground staff, the crew nor the passengers themselves.

## 3.2    Assistance to passengers with disabilities

Assistance to passengers with disabilities should include safe handling, transferring, and storing of their mobility equipment during travel in addition to supporting passengers themselves.

Passengers with disabilities should be allowed to access the terminal with their family members, travel companions, personal assistants and if applicable qualified, trained assistance dog meeting existing travel criteria (training, certificate by an accredited entity, Pet Passport, required vaccinations).

This means that physical distancing measures and restrictions on non-traveling individuals should not hinder passengers with disabilities from being in close contact with their family members, travel companions and assistants. This may mean allowing a non-passenger to enter a terminal in order to assist or meet a passenger with a disability even when other non-passengers are barred from entry. Staff of transport services should be aware of this

## 3.3    Access

Ensuring access to aviation facilities, services and information is fundamental to a disability inclusive COVID-19 response and recovery. If public health information, airport terminals, transport, communications, technologies and goods and services are not accessible, persons with disabilities may not be able to live and travel independently.

When changing the circulation patterns of passengers to facilitate physical distancing, it is important to maintain accessible entrances and step-free routes and minimize lengthen walking distances.

## 3.4    Communication

Governments, travel agents, airports and airlines all have a role to play to communicate COVID-19 measures and identify the best channels to reach out to passengers with disabilities. This could include websites, social media, text messages, signage, print brochures, etc.  Information, prior to travel and throughout the travel process should be universally accessible, clear, accurate, simple and as consistent as possible across the entire passenger journey and all channels of communication.

Airlines should adapt their communication to passengers with all types of disabilities—physical, sensory, cognitive, hidden, medical--and explain why certain requirements are in place as well as the additional measures that they are taking to ensure the health and safety of those who require assistance services.



For their safety and reassurance, passengers, including those with disabilities and older adults should seek information ahead of their journey to clear all the formalities to which they may be subject. Whereas passengers might have been familiar with the previous travel policies will likely be less familiar with the additional health measures required to prevent the spread of COVID-19 especially as these may change over time. It is therefore critical that passengers are informed before reaching the airport.

## 3.5    Application of consistent measures

In principle, passengers with disabilities require a consistent level of accessible conditions and services that are adapted to meet their individual needs, wherever they travel. Airlines, governments and airports should therefore strive to apply international measures and standards as much as possible. This principle is especially important to strengthen passengers' confidence during COVID-19 pandemic. While national and regional needs may require different safety approaches, it is of paramount importance to avoid a global patchwork of incompatible health safety measures. Measures that impose unreasonable costs or burdens on the industry, without any scientific basis, must be avoided. Instead, carefully considered and justifiable measures should be adopted to promote safety and public health while boosting confidence of passengers and crew[7].

# 4  Persons with disabilities and COVID-19

Some persons with disabilities may be more likely to experience severe or fatal symptoms if they contract COVID-19, particularly older individuals or those with chronic health conditions such as Chronic Obstructive Pulmonary Disease (COPD), heart disease or diabetes. The fact that they are at higher risk, however, does not mean that they should be subject to a more stringent medical screening or clearance than that required for other passengers. To be equitable, the standards applied should be the same.

In the interests of safety, a passenger whose medical condition may pose a "direct threat" to his or her safe transportation or to the health of other passengers and the crew may be asked to provide additional medical documentation (e.g. MEDIF[8] ) to ensure that they are fit-to-fly.

Certain government regulations regarding accessibility in air travel do not prohibit air carriers from assessing whether a passenger is fit-to-fly. They provide grounds for requiring a medical clearance to support that assessment in situations where the person in question has a medical condition or communicable disease that threatens his or her safe transportation or the health of other passengers and the crew.   Other government regulations regarding accessibility in air travel do not address communicable diseases, as this is a topic separate from disability[9].

---

[7] https://www.icao.int/covid/cart/Pages/CART-Report---Executive-Summary.aspx
[8] The MEDIF is the name given to the forms used by airlines to manage passengers requiring special assistance and medical clearance. For additional guidance see the IATA medical manual   For example the U.S. Air Carrier Access Act regulations (14 CFR Part 382) define "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services."  In accordance with public health guidelines, this currently includes passengers whose symptoms, e.g., a fever, indicate that they may have COVID-19.
For additional guidance, see Air Carrier Access Act, part 382.19 and part 382.21 which address medical clearance for persons with disabilities and passengers with communicable diseases : https://www.ecfr.gov/cgi-bin/text-idx?node=pt14.4.382&rgn=div5
[9] This is the case for European regulation EC1107/2006 and for the Canadian Accessible Transportation for Persons with Disabilities Regulations (ATPDR).



# 5  Establishing an airline policy

Airlines should develop a specific and detailed company policy for the assistance and support to passengers with disabilities that is consistent across their network during the COVID-19 crisis. This policy should be robust, based on science and endorsed by senior management.

It is recommended that company policy be properly communicated to all airline employees who assist passengers with disabilities as well as their managers and supervisors. It needs to be workable and translatable into practical operational procedures.

It is recommended that such a policy be guided by the underpinning principles of aviation: Safety and Security. Any applied measure should be commensurate to the risk level and shall not compromise the safety and security of passengers with disabilities, other passengers, ground staff and the crew.

The policy should consist of the following provisions:

- Modifications of assistance services to minimize health risks while remaining responsive to specific needs;
- Provide appropriate training to employees (e.g. ground staff and cabin crew) to assist passengers with disabilities during COVID-19;
- Provide appropriate and consistent information to passengers' pre-travel and throughout all airline channels;
- Develop processes to manage specific health procedures such as physical distancing; and
- Inform passengers on what to do in specific cases when recommended health procedures are not possible due to a person's medical condition or disability, e.g. in case of face masks/coverings.

Airlines should provide reasonable accommodation to passengers aligned with measures recommended by health authorities. Provision of such accommodation must be consistent with operational feasibility and without imposing a disproportionately high safety burden on fellow passengers. This will help to ensuring that all passengers exercise their human rights and their fundamental freedoms in an equitable manner.

# 6  Information to employees

It is recommended that the company policy related to accessibility and safety measures during COVID-19 be communicated throughout the organization and especially to frontline ground employees and crew members who may be the first point of contact with passengers with disabilities and their assistants.

Effective and consistent internal communication on how to assist passengers with disabilities travelling during COVID-19 will reassure employees that they are supported by management and encourage them to work with peace of mind.

A communication campaign could be launched and implemented to inform employees and passengers about the safety and security as well as cleaning protocols in place at airports and onboard aircraft.



gloves, wipes, hand sanitizer and masks where needed. This is particularly important during the processes of wheelchair transport, securement and lift transfer during boarding and de-boarding.

Where transport wheelchairs, electric buggies, ambu-lifts, boarding chairs or other types of equipment are provided, airlines or service companies should consider additional cleaning procedures, e.g., cleaning them after each use.

## 8.2    Passengers with sensory disabilities

During COVID-19, airlines should address the communication and assistance needs of passengers with hearing and/or vision loss. Ground staff and cabin crew should take measures to ensure that these passengers can access information through easily findable, clear and easy to understand instructions at the airports and onboard[13].

Communication systems employed by airlines before and during the journey should be inclusive and accessible to all. This may be achieved by means of multiple, redundant means of communication, i.e., verbal, visual and virtual (digital).

For passengers who are blind or have low vision, information may be provided audibly via public announcements and spoken instructions, visually by use of larger fonts with good colour contrast and no glare, or virtually on an accessible website, mobile application or via text message.

For those who require a sighted guide to navigate the airport, airlines should develop a set of procedures to ensure that this assistance service is provided as safely as possible despite the lack of physical distancing. Ground staff and cabin crew providing assistance should first ask how the passenger wishes to be guided. Some passengers may wish to receive verbal instructions or to hold the end of their cane, while others may want to hold a shoulder rather than an elbow or give their guide dog a "follow" command. To reassure these passengers regarding safety, ground and cabin staff should let them know that staff and other passengers are wearing masks and respecting physical distance guidelines[14].

For passengers who are deaf or hard of hearing, the availability of detailed information pre-trip via websites, apps, emails, text messages and chat lines minimize the need for communication at the airport. This is especially important during COVID-19 when the use of non-transparent masks creates a communication barrier for those who rely on lip reading, and physical distancing also limits the ability to hear. Having visors or transparent masks available for frontline staff can help alleviate the problem. Also helpful are counter and gate hearing/induction loops, visual information on gate and flight information displays (GIDS and FIDS), plexiglass shields at counters to allow for closer approach, and pen and paper or tablet readily at hand to write a message if necessary. Some airports now offer Video Remote Interpreting (VRI) to facilitate communication via sign language.

---

[13] EDF Recommendations on exit measure for transport services in light of COVID-19- May 2020
[14] Guidance on this topic is available online from Open Doors Organization (https://opendoorsnfp.org/wp-content/uploads/2020/05/Guidance-for-Airline-Service-Companies.doc).



## 9.2    Use of face covering, mask and protective personal equipment

Face coverings for passengers, ground staff and cabin crew is a critical part of a layered approach to safety measures implemented temporarily to prevent the spread of COVID-19.

All operators, including airline ground staff, handlers and cabin crew assisting passengers with disabilities, should be equipped with personal protective equipment (PPE)[16]. Ground staff and airline crew should wear face coverings consistent with the applicable public health guidelines and government regulations.

The type of face covering (non-medical or medical) should be selected based on the level of risk and the availability of such masks while taking into consideration the potential risks and disadvantages of wearing masks.

Best practices should be followed regarding when and how to wear, remove, replace, and dispose of masks and face coverings, as well as the adoption of hand hygiene after removal. It is recommended that PPE of staff assisting passengers with disabilities be changed after each time assistance is provided to a passenger.

Some passengers, such as those who cannot put on or remove a face mask themselves, small children, and those who have certain types of medical conditions may not be able to tolerate the use of face coverings or masks for a lengthy period. Airlines should consider this within their risk assessment process and identify whether additional questions and/or supporting medical documentation as permitted by local laws and regulations are necessary at pre-screening stage(s), and whether any exceptions in the acceptance of these passengers can be made within their policy. Exceptions should be made in consideration of the health authorities' recommendations and the risk level. Where exceptions are made, other passengers may need to be advised of the reasons and additional steps to mitigate the risks in order to reassure them and prevent discomfort between passengers.

The use of fraudulent documentation by passengers to obtain an exemption from the requirement to wear face masks has been drawn to IATA's attention and is of concern. Airlines should consult with their legal department on procedures for addressing the validity of exemption documentation under local requirements.

## 9.3    Hygiene measures

Hygiene materials should always be available for all passengers. These should be at easily reachable accessible locations, and easy to find with accessible signage indicating their location at transport facilities. The mechanism and information to dispose of hygiene and sanitary materials must be accessible as well.

---

[16] PPE could include gloves, medical masks, goggles or a face shield, and gowns or aprons



# 11  Conclusion

The aviation industry is experiencing unprecedented challenges from COVID-19, as the pandemic has forced the world to a standstill. Persons with disabilities might have underlying health needs that can increase the morbidity and mortality of the disease and/or may require assistance that limits social distancing. In this scenario, it is important to note how persons with disabilities are uniquely impacted by the pandemic in various aspects, including in the transport area. As countries relax their border control systems and airlines resume their services, accessibility and inclusion of persons with disabilities in aviation's COVID-19 response and recovery is a vital part of achieving the pledge to leave no one behind. Such inclusive strategies are central to the IATA's commitment in order to achieve transformative and lasting change regarding disability inclusion and accessibility.

Plaintiffs' Exhibit 432

wheelchairtravel.org

# List of Disabilities that Could Make Wearing a Mask Impossible - Wheelchair Travel

*John Morris*

6-7 minutes

---

Many states, cities and businesses are requiring the use of face masks in public spaces due to the COVID-19 pandemic. Everyone who can reasonably wear a face mask should do so, if not for their own protection, then at least for the protection of others. As countless medical and health professionals have said, there is no good argument against face mask use, except for certain people with disabilities for whom a face mask could cause further harm.

Numerous stories have documented nondisabled people using the ADA as a way to get an exemption from mandatory face mask policies. These impostors have made things much more difficult for disabled people who cannot wear masks, as the public assumes that they too are taking advantage of the law. Social media posters often use the refrain, "If I can jog with a mask in the summer heat, you can wear one in a grocery store," or something of the like. That anecdote is worthless, of course, but many still find the argument compelling.

The Centers for Disease Control has issued guidance stating that face coverings should not be worn by "anyone who has trouble breathing" or "anyone who is unconscious, incapacitated, or otherwise unable to remove the cloth face covering without assistance."

We know that many disabilities can cause breathing difficulty, or limit one's physical function to the point where they cannot attach or remove a face mask. Since the CDC guidance provides little specificity, nondisabled members of the community have little context for who might require an exemption to the face mask rule. Fortunately, the Southeast ADA Center, together with Syracuse University, has released a disability issues brief entitled The ADA and Face Mask Policies. That brief contains the following examples of persons who might not be able to wear a face mask:

- Individuals with asthma, chronic obstructive pulmonary disease (COPD), or other respiratory disabilities may not be able to wear a face mask because of difficulty in or impaired breathing. The CDC also states that anyone who has trouble breathing should not wear a face mask.

- People with post-traumatic stress disorder (PTSD), severe anxiety, or claustrophobia (an abnormal fear of being in enclosed or narrow places), may feel afraid or terrified when wearing a face mask. These individuals may not be able to stay calm or function when wearing a face mask.

- Some people with autism are sensitive to touch and texture. Covering the nose and mouth with fabric can cause sensory overload, feelings of panic, and extreme anxiety.

- A person who has cerebral palsy may have difficulty moving the small muscles in the hands, wrists, or fingers. Due to their limited mobility,  they may not be able to tie the strings or put the elastic loops

of a face mask over the ears. This means that the individual may not be able to put on or remove a face mask without assistance.

- A person who uses mouth control devices such as a sip and puff to operate a wheelchair or assistive technology, or uses their mouth or tongue to use assistive ventilators will be unable to wear a mask.

This list, of course, is not exhaustive. But it is useful for government officials and business owners to understand the sizable population who would find it difficult or impossible to comply with mask mandates, and who would be eligible for a reasonable accommodation.

There is some debate over whether people with a legitimate reason not to wear a mask should be permitted to move about as normal, such as into a grocery store or other public accommodation. Both Title II and Title III of the ADA include a "Direct Threat" clause which states that the ADA "does not require a public entity to permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others."

Some would argue that, given the persistence of COVID-19 transmission through asymptomatic carriers, every person not wearing a mask is a "direct threat" to the health of others. Of course, in choosing whether to deny service to a customer under this clause, an entity must "make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: The nature, duration, and severity of the risk; the probability that the potential injury will actually occur…"

That last point, about the need to assess of the probability that the injury will actually occur, raises an important question. With fewer than 1% of Americans having a confirmed, active case of the coronavirus, what is the probability that the lone disabled person not wearing a mask actually poses a direct threat? That is ultimately a question for the courts to answer, but it is worthy of consideration by those who are asked to grant an exemption or an accommodation to a disabled customer.

I have written this article for information purposes only, and not with any particular agenda in mind. It is worth noting that I am able to (and do) wear a mask on the rare occasion that I leave my home, a practice that we should all follow. That said, people who have a legitimate reason not to wear a mask should not face undue barriers in accessing public accommodations as a result of their circumstance. Let's all be safe – and sensible, together.



Follow along as I travel the world with one hand, a passport and my power wheelchair!

Plaintiffs' Exhibit 433

ncd.gov

# National Council on Disability Topical Overviews - Access to Transportation by People with Disabilities Illustrations of Implementation from the United States - Quick Reference

6-7 minutes

Access to Transportation by People with Disabilities
Illustrations of Implementation from the United States – Quick Reference

National Council on Disability
1331 F Street, NW, Suite 850
Washington, DC 20004
202-272-2004 Voice
202-272-2074 TTY
202-272-2022 Fax

Lex Frieden, Chairperson
Publication date: August 2, 2005

This paper provides examples of the implementation of U.S. disability laws pertaining to accessible transportation. A more detailed description is provided in the attached policy paper.

Legislation

Under the Americans with Disabilities Act (ADA), individuals cannot be denied transportation services because of a disability. The Air Carrier Access Act (ACAA) is a separate statute specifically for air travel, but provides the same nondiscrimination requirement. In promulgating these statutes, federal agencies were mindful of several types of existing barriers and addressed these issues when crafting regulations, which apply to all public entities, and those private entities whose primary business is transporting individuals.

• Physical Barriers
Federal law and regulations require modifications which include providing alternative transportation systems (paratransit) to individuals with disabilities; installing wheelchair

lifts and securement devices on buses and ensuring that these lifts and devices are properly maintained; providing accessible rest stops, stations, and airport facilities (including restrooms, elevators, and station platforms); assisting in boarding passengers with disabilities when needed; allowing service animals to accompany individuals with disabilities in facilities and vehicles; ensuring accessible public rights-of-way (including curb cuts and ramps on sidewalks); and making any other reasonable modifications to policies or practices in order to comply with the ADA or ACAA. One example of a modification in a policy or practice is allowing passengers with disabilities to give their bus fare directly to the bus driver rather than to place the coinage in the fare machine.

• Informational Barriers
Federal regulations also require accessible travel information. These modifications include announcing bus stop and transfer points on buses and providing signage that can be easily understood by individuals with sensory or developmental disabilities.

• Attitudinal Barriers
The Department of Transportation (DOT) regulations also require proper training of transit employees, which includes treating passengers with disabilities in a respectful and courteous manner, while also recognizing the differences in types of disabilities.

DOT awards grants annually for new local programs and initiatives that improve accessible transportation. In addition, DOT, along with the Department of Justice (DOJ), has implemented several safeguards to help ensure that individuals are not discriminated against because of a disability.

• Technical Assistance
DOT and DOJ offer technical assistance to help the transportation industry, the disability community, and other individuals or entities that have rights and responsibilities under the ADA and ACAA provisions better understand the law. Technical assistance is offered through a variety of methods, including the dissemination of literature and several websites that provide guidance on the implementation of the statutes.

• Compliance Monitoring
DOT will periodically review ADA and ACAA compliance reports, which must be furnished by entities receiving federal transportation funding. Reports usually contain the background of the entity's transportation system, findings and observations of ADA compliance, and recommendations. Along with the report, entities are required to keep all complaints on file.

• Enforcement
Upon receiving a complaint against a public entity for an ADA violation, DOT will investigate the complaint, attempt conciliation, and if necessary, take action against the entity, including making cuts in financial assistance. DOT can only enforce complaints

against public entities for ADA violations involving transportation; complaints against private entities are under the jurisdiction of DOJ. ==Individuals who have experienced discrimination can also pursue an ADA claim through the courts.== Under the ACAA, air carriers are required to implement their own grievance process; however, violations of the ACAA can result in enforcement action by DOT. For many years most courts recognized an implied private right of action to enforce the ACAA, but in the last few years the courts have moved to prohibit hearing these claims.

Other Initiatives

President George W. Bush has established the Federal Interagency Coordinating Council on Access and Mobility, a collaboration between various federal agencies. The Council has launched a "United We Ride" initiative, providing resources to promote governmental and non-governmental collaboration in the provision of improved transportation for individuals with disabilities. One resource under the initiative is a "Framework for Action" self-assessment tool, to assist states and local communities in identifying areas for improvement in transportation.

Several agencies and the disability community have engaged in informal collaboration to eliminate barriers for people with disabilities in the context of airport security screening. The collaboration has led to the development of guidelines and training programs to increase awareness of disability issues among security staff and ensure the rights of travelers with disabilities and their traveling companions during security screenings.

The U.S. Department of Agriculture (USDA) and DOT have collaborated to improve access to transportation by people with disabilities in rural areas. The USDA, for example, offers direct and guaranteed loans and grants to facilitate the development of public transportation facilities serving rural populations, where an estimated 40 percent of Americans with disabilities have no public transportation available to them.

Plaintiffs' Exhibit 434

ncd.gov

# Enforcing the Civil Rights of Air Travelers with Disabilities: Recommendations for the Department of Transportation and Congress

264-336 minutes

February 26, 1999

This report is also available in braille and large print, on diskette and audiocassette, and on the Internet at the National Council on Disability's award-winning website (www.ncd.gov).

The views contained in this report do not necessarily represent those of the administration, as this document has not been subjected to the A-19 Executive Branch review process.

LETTER OF TRANSMITTAL

February 26, 1999

The President
The White House
Washington, D.C. 20500

Dear Mr. President:

On behalf of the National Council on Disability (NCD), I am pleased to submit a report entitled *Enforcing the Civil Rights of Air Travelers with Disabilities: Recommendations for the Department of Transportation and Congress.*

This report is the first in a series on enforcement of federal laws protecting the civil rights of children and adults with disabilities. Title IV of the Rehabilitation Act requires NCD to gather information about the implementation, effectiveness, and impact of the Americans with Disabilities Act (ADA), among other duties. NCD was encouraged to monitor and evaluate federal enforcement efforts of ADA and other civil rights laws when we convened a diverse group of more than 300 leaders from the disability community for a policy summit in 1996. In response, we initiated the Disability Civil Rights Monitoring Project. In addition to this study of enforcement of the Air Carrier Access Act (ACAA), NCD will in the

coming months issue reports evaluating enforcement of the Americans with Disabilities Act, the Fair Housing Act, and the Individuals with Disabilities Education Act.

As you know, air travel is an essential component of many jobs in the global economy. For people with disabilities to be part of that economy, participate in the world community, and compete effectively for jobs requiring air travel, air carriers and federal oversight officials must ensure that their right to travel with appropriate accommodations is taken seriously and honored. Unfortunately, NCD has found that although things have improved since ACAA was passed in 1986, people with disabilities continue to encounter frequent, significant violations of the statute and regulations. When they complain, they encounter an enforcement effort that is both inconsistent and limited in scope.

NCD stands ready to work with you and stakeholders outside the government to address the problems identified in this report and to advance the civil rights of all Americans with disabilities and their families.

Sincerely,

Marca Bristo
Chairperson

(This same letter of transmittal was sent to the President Pro Tempore of the U.S. Senate and the Speaker of the House of Representatives.)

---

**NATIONAL COUNCIL ON DISABILITY
MEMBERS AND STAFF**

Members
Marca Bristo, Chairperson
Kate Pew Wolters, First Vice Chairperson
Hughey Walker, Second Vice Chairperson
Yerker Andersson, Ph.D.
Dave N. Brown
John D. Kemp
Audrey McCrimon
Gina McDonald
Bonnie O'Day, Ph.D.
Lilliam Rangel-Diaz
Debra Robinson
Shirley W. Ryan
Michael B. Unhjem
Rae E. Unzicker
Ela Yazzie-King

Staff

Ethel D. Briggs, Executive Director

Andrew J. Imparato, General Counsel and Director of Policy

Mark S. Quigley, Public Affairs Specialist

Jamal Mazrui, Program Specialist

Kathleen A. Blank, Attorney/Program Specialist

Lois T. Keck, Research Specialist

Janice Mack, Administrative Officer

Brenda Bratton, Executive Secretary

Stacey S. Brown, Staff Assistant

---

PREFACE

This report on federal enforcement of the Air Carrier Access Act (ACAA) is the first in a series on enforcement of federal laws protecting the civil rights of children and adults with disabilities. When the National Council on Disability (NCD) brought together a diverse group of disability community leaders from around the country in 1996, one of the strongest themes to emerge from three days of policy development in 11 different areas was the need for stronger and more consistent enforcement of federal civil rights laws for people with disabilities. In fact, the first overarching recommendation from the summit was that existing civil rights laws should be more vigorously enforced. In its role as an independent federal agency, NCD was encouraged by disability community leaders to monitor and evaluate federal enforcement efforts. Moreover, NCD is required by Title IV of the Rehabilitation Act to gather information on the implementation, effectiveness and impact of the Americans with Disabilities Act (ADA).

After NCD published the recommendations that emerged from the 1996 Disability Policy Summit in *Achieving Independence*, it began to study four key civil rights statutes for people with disabilities as part of the Disability Civil Rights Monitoring Project. The statutes selected were ACAA, Part B of the Individuals with Disabilities Education Act (IDEA), ADA, and the Fair Housing Act. This report is the first in a series of four that will evaluate the effectiveness of federal enforcement of disability civil rights laws.

Next year, the United States will celebrate the 10th anniversary of the passage of ADA and the 25th anniversary of the passage of IDEA. These milestones present an opportunity to retool and reinvigorate federal enforcement of disability civil rights laws so that more Americans with disabilities and their families can enjoy equal access to the American dream. Too many children and adults with disabilities and their families are unaware of their right under federal law to be free from discrimination and are often unable to enforce that right. The Disability Civil Rights Monitoring Project will assess federal civil rights enforcement in the past and evaluate how these important laws can be translated

into real equality of opportunity for all Americans.

This report focuses on federal enforcement of ACAA. As the economy becomes increasingly global, the ability of employees with disabilities to travel by air is critical to their success and upward mobility. As the President has recognized, the employment rate of working-age adults with disabilities is approximately 30 percent, and this is unacceptable. NCD commends the President for creating a Presidential Task Force on Employment of Adults with Disabilities to bring together cabinet leaders and agency heads to work on improving employment outcomes for this population. NCD supports the work of the task force and sees this report on ACAA implementation as an important call to action for members of the task force, including the secretary of transportation.

This report, like the others that will follow, is grounded in the real world experiences of people with disabilities who have endured countless violations of their rights as air travelers under ACAA. More accommodations are available for air travelers with disabilities today than ever before, but the availability of accommodations is inconsistent, and discriminatory treatment continues. It is important to recognize that the negative experiences of disabled travelers go beyond the typical hassles to which frequent travelers are accustomed. Notwithstanding the fact that ACAA has been the law for more than 12 years, people who use wheelchairs continue to encounter regular problems, from not being given a bulkhead seat to being mishandled and occasionally dropped by poorly trained or insensitive staff. Flight crews continue to refuse to stow adaptive equipment such as walkers and folding wheelchairs in the aircraft cabin. Travelers with disabilities who are accompanied by able-bodied friends, colleagues, or relatives often find that airline personnel have a tendency to direct questions and instructions to their travel partners rather than address them directly. In short, air travelers with disabilities frequently find air travel unnecessarily humiliating and upsetting. Many problems stem from the unwillingness of some airline staff to recognize that a request for an accommodation in air travel invokes civil rights protections. ACAA is a rights law, but it has been largely implemented with the consistency of a customer service policy.

NCD urges the President, Congress, the federal enforcement agencies, and covered entities to work together to address the inadequacies described in this report and the three reports to follow. For laws like ACAA to achieve the desired effect, they must be taken seriously and owned by government and industry. The ultimate test of any civil rights law is the extent to which people in the protected class can count on the law for real protection.

---

CONTENTS

ACKNOWLEDGMENTS

EXECUTIVE SUMMARY

INTRODUCTION

Background
Purpose of this Report
Scope of the Report
Research Approach
Research Activities
Report Structure

PART I. THE LAW, THE REGULATION, AND THE CONTEXT

1.0 The Law: The Air Carrier Access Act of 1986

1.1 Why the Air Carrier Access Act?
1.2 ACAA Impact: Progress but Persistent Problems
1.3 Background on the Air Carrier Access Act of 1986

2.0 The Implementing Regulation: 14 CFR Part 382--Nondiscrimination on the Basis of Disability in Air Travel

2.1 Definitions
2.1.1 Who is an "Individual with a Disability"?
2.1.2 Who is a "Qualified Individual with a Disability"?
2.1.3 Nondiscrimination: What It Means

2.2 Implementation Requirements
2.2.1 Implementation Issues
2.2.2 Airline Administrative Responsibilities
2.2.3 Department of Transportation Administrative Responsibilities

3.0 Recently Approved Changes to the Regulation and Proposed Changes to the Law

3.1 Final Rule Amending Part 382, Issued March 4, 1998
3.1.1 Clarification of the Definition of Nondiscrimination
3.1.2 Procedures for Providing Seating Accommodations
3.1.3 In-Cabin Stowage of Collapsible Electric Wheelchairs
3.1.4 Issues Not Addressed by the Final Rule

3.2 Proposed Amendments to the Air Carrier Access Act
3.2.1 Draft Miller Amendment
3.2.2 Inclusion of Code-Sharing Foreign Carriers

PART II. THE ROLE OF THE UNITED STATES DEPARTMENT OF TRANSPORTATION (DOT)

[4.0 Background on DOT Enforcement Philosophy and Operations](#)

4.1 Regulation of the Aviation Industry and Consumer Protection
4.2 The Transition to Industry Deregulation
4.3 Impact on the DOT Organization
4.4 Consumer Protection in a Postregulation Environment
4.5 Civil Rights Enforcement as a Function of Consumer Protection

[5.0 DOT Organizational Components Involved in ACAA Enforcement](#)

5.1 Office of General Counsel
5.2 Regulation and Enforcement
5.3 Aviation Enforcement and Proceedings
5.4 Office of Environment, Energy, and Safety
5.5 Departmental Office of Civil Rights
5.6 Analysis and Recommendations

[6.0 Implementation and Enforcement Functions](#)

[6.1 Consumer Information Explaining the Law](#)
6.1.1 Public Information: Print Material
6.1.2 Website Information
6.1.3 Available Formats
6.1.4 Methods of Dissemination
6.1.5 Analysis and Recommendations

[6.2 General Guidance to the Aviation Industry](#)
6.2.1 Letters to the Airline Industry
6.2.2 Consumer Complaint Review Meetings
6.2.3 General Compliance Review Meetings
6.2.4 DOT Presentations at Industrywide Conferences
6.2.5 Analysis and Recommendations

[6.3 Technical Assistance to the Aviation Industry](#)
6.3.1 Aircraft Accessibility Federal Advisory Committee
6.3.2 Analysis and Recommendations

[6.4 Informal Complaints Alleging Potential Violations of 14 CFR Part 382](#)
6.4.1 The Informal Consumer Complaint Process
6.4.2 Characteristics of Informal Complaints Received by DOT
6.4.3 Complaint Data from the Airlines: A Different Picture
6.4.4 Analysis and Recommendations

[6.5 Formal Complaints and Enforcement Actions](#)

6.5.1 Filing a Formal Complaint

6.5.2 The Formal Complaint Process

6.5.3 Informal Enforcement Strategy

6.5.4 Enforcement Orders

6.5.5 Formal Enforcement Proceedings

6.5.6 Amicus Briefs

6.5.7 Analysis and Recommendations

6.6 Compliance Monitoring

6.6.1 Review of Airline Compliance and Personnel Training Plans

6.6.2 Analysis and Recommendations

6.7 ACAA Rulemaking--14 CFR Part 382 and Modifications

6.7.1 The Rulemaking Process

6.7.2 Analysis and Recommendations

6.7.3 The Regulatory Negotiation Process

6.7.4 Analysis and Recommendations

6.8 Monitoring the Law

PART III. STAKEHOLDER VIEWS ON ACAA ENFORCEMENT

7.0 Aviation Industry Perspectives

8.0 Perspectives of Air Travelers with Disabilities

8.1 Accessibility of Air Travel--A Customer Perspective

8.2 Industry Compliance with ACAA and DOT Enforcement of ACAA: A Sample of Customer Complaints

8.3 Analysis

PART IV. CONCLUSIONS

9.0 Summary of Recommendations

9.1 Recommendations for Organizational Changes

9.2 Recommendations for Process Changes

9.3 Recommendations for Statutory Changes and Increased Appropriations

ENDNOTES

APPENDICES

Appendix A -- 14 CFR Part 382 Requirements Summary

Appendix B -- Summaries of Complaints Filed Directly with a Major Air Carrier

Appendix C -- Summarized Selected Complaints from the Consumer Protection Division

Appendix D -- Glossary of Acronyms

Appendix E -- 14 CFR 302.3 Filing of Documents

Appendix F -- List of Interviews and Consultations

LIST OF FIGURES

Figure 1 -- U.S. Department of Transportation Air Carrier Access Act Implementation and Enforcement Functions

Figure 2 -- U.S. Department Of Transportation Organizational Chart

Table 1 -- Summary of ACAA Informal Consumer Complaints--April 5, 1990-October 23, 1997

Table 2 -- ACAA Informal Complaints against Major U.S. Carriers Received by DOT Aviation Consumer Protection Division

Table 3 -- Informal ACAA Complaints: Disability Categories

Table 4 -- ACAA Informal Complaints: Types of Disability Complaints Received

Table 5 -- Complaints Filed Directly with a Major Air Carrier--January 1993-November 1996

Table 6 -- Complaints Filed Directly with a Major Air Carrier--January 1993-through November 1996--Rank Ordering of Recurring Complaint

---

ACKNOWLEDGMENTS

All research, data collection, and analysis for this study were conducted under contract for the National Council on Disability's (NCD) Disability Civil Rights Monitoring Project by the Disability Rights Education and Defense Fund (DREDF). Kathleen Blank, J.D., was the principal researcher and lead author for this report before she joined the NCD staff in the spring of 1998. Nancy Mudrick, Ph.D., senior data and methodological consultant; Mary Lou Breslin, project director; and Jane West, Ph.D., research director, were co-authors. Statistical analysis of complaint data was performed under the direction of Nancy Mudrick. Jennifer Thau and Anne Marie Sullivan, social work graduate students at Syracuse University, provided research assistance.

We wish to acknowledge the many individuals, including members of the support staff, at the U.S. Department of Transportation (DOT) who helped the researchers with this study. With few exceptions, DOT staff cooperated fully in providing information, recommending valuable alternative sources of information and facilitating internal access to key DOT personnel. We particularly appreciate the candor of the DOT interviewees and the opportunity to speak candidly with them about the Air Carriers Access Act (ACAA) enforcement from a disability community perspective. The thorough review and valuable comments on the final draft provided by the Office of General Counsel contributed

significantly to the quality of this report.

Finally, we wish to thank the many stakeholder group representatives, from both the aviation industry and the disability community, who generously gave their time and expertise to provide information to our researchers. Their input helped to clarify where change is most critically needed and alternative strategies for achieving enforcement goals. In particular, we acknowledge the many members and representatives of the disability community who shared their firsthand knowledge and experience of ACAA implementation and enforcement. Their observations added a real-world perspective to our research.

---

EXECUTIVE SUMMARY

The Air Carrier Access Act (ACAA) became law in 1986, prohibiting discrimination against passengers with disabilities by air carriers in providing air transportation services.[1] Congress charged the Secretary of Transportation with promulgating the implementing regulations within 120 days of the statute's enactment. Following deadlocked regulatory negotiations and a notice of proposed rulemaking that produced more than 300 stakeholder comments, 14 CFR Part 382 went into effect on April 5, 1990, with many issues still unresolved.[2] These unresolved issues, coupled with a regulatory environment dating back to the Reagan administration that encourages voluntary compliance and minimizes federal oversight, have contributed to an enforcement effort that is both inconsistent and limited in scope.

The findings of this study show that the Department of Transportation (DOT) model for ACAA enforcement relies heavily on monitoring of complaints and voluntary compliance by air carriers. This approach does not emphasize traditional investigation and prosecution of complaints similar to other federal civil rights enforcement agencies. Accordingly, the National Council on Disability (NCD) believes that DOT's approach is critically lacking in the key areas of compliance monitoring, complaint handling, and leadership by the Department of Transportation. Despite DOT's stated commitment to ACAA enforcement, there is no regular monitoring program to ensure compliance in day-to-day airline operations. DOT's informal complaint-handling process serves more as a tool for monitoring general compliance across the industry than as a system for resolving individual discrimination claims. Even the formal complaint process focuses only on issues of broad public interest, so that individual complainants have no reliable administrative means to obtain satisfaction unless the airline voluntarily cooperates. Research data show that a long-standing lack of resources has substantially limited DOT's leadership in addressing difficult compliance problems (i.e., providing lifts and other boarding devices, providing regular training of airline personnel, and ensuring that new aircraft meet accessibility standards).

The problems of ACAA enforcement arise from inadequacies not only in DOT's enforcement mechanism but in the law itself. Unlike some other civil rights laws, the ACAA does not establish a private right of action and contains no provisions for attorneys' fees and damages. Neither does the law extend the nondiscrimination mandate to foreign air carriers operating in the United States, including code-sharing partners of domestic airlines. The law's general language invites contradictory interpretations. In lieu of an adequate budget and specific enforcement provisions in the law, DOT has adopted a minimalist approach that has delayed full compliance and consistent implementation across the industry.

Although the regulations mandate clear requirements for services such as boarding assistance, teletypes in airports, and other accommodations to make air travel accessible for passengers with disabilities, widespread implementation and compliance problems persist 12 years after ACAA became law. Obtaining service accommodations continues to be a major challenge at airports, ticketing offices, and travel services across the nation. When they fly, people with disabilities still face uncertainty about whether air carriers will provide accommodations such as effective communication of flight information, accessible seats, appropriate boarding assistance, and careful handling and stowage of their wheelchairs and other assistive devices.

This study examines federal ACAA enforcement efforts and the impact of these efforts on the civil rights of persons with disabilities.

Key Findings

The key findings indicate that ACAA implementation and enforcement efforts over the past 12 years have been so lacking in several essential areas as to constitute nonenforcement. A significant part of the problem is an extreme lack of resources that has affected DOT's capacity to develop and maintain a credible enforcement program or to adequately support ACAA implementation.

- DOT's budget and staff for ACAA enforcement are drastically inadequate.
  The impact of changing political and fiscal priorities on ACAA enforcement cannot be underestimated. Since the 1970s, Congress has steadily cut the budget of the Office of the Secretary within DOT. As a result, the staff required for a credible ACAA enforcement program is simply not there. The Consumer Protection Division, where most ACAA-related activity originates, has less than one full-time equivalent assigned to ACAA enforcement.

- Most informal ACAA complaints are not individually investigated as are discrimination complaints filed with other federal agencies.

- DOT enforcement of ACAA is not within the purview of a civil rights office.
  The Office for Aviation Enforcement and Proceedings and the Aviation Consumer

Protection Division are primarily responsible for ACAA enforcement, using an approach that combines customer service, consumer protection, and civil rights enforcement perspectives. Informal ACAA complaints are classified as "Category C" (Reservations/Ticketing/Boarding) consumer complaints and are reported monthly in DOT's *Air Travel Consumer Report* as an aggregate figure. Although ACAA complaints are subject to a higher standard of review (based on Part 382) than other consumer complaints, the vast majority are not individually investigated, like discrimination complaints filed with most other federal agencies.

- DOT has taken little initiative to educate the public in general, and people with disabilities in particular, about their rights under the law.
  Most of the ACAA public information materials provided during October 1997 were sparse, giving only a general overview of ACAA provisions. *New Horizons*, the most detailed DOT consumer publication on ACAA, was still awaiting incorporation of new information resulting from the November 1996 amendment to Part 382. DOT staff reported that *New Horizons* was usually sent only on request and not routinely to ACAA complainants with their acknowledgment letters. Now it is available on DOT's website. On the other hand, DOT publishes and disseminates its monthly *Air Travel Consumer Report* to many aviation industry and consumer constituencies. The report provides performance rating information (i.e., on-time flights and consumer complaint statistics) for each of the major and national air carriers. Disability-related complaints, however, are reported in a single aggregate figure, precluding any comparisons among carriers.

- DOT's informal complaint-handling system functions primarily to track, not investigate, complaints.
  Between April 1990 and October 1997, DOT received 1,831 disability-related complaints. DOT did not investigate the majority of these complaints, even though Part 382 directs complainants to contact DOT for assistance. The recorded message on DOT's customer assistance line tells callers that DOT is not staffed to return phone calls or mediate individual complaints but will register their complaints in the database and send an acknowledgment letter for any complaints made in writing. In addition, DOT sends a letter of notification to the airline(s) cited in the written complaint instructing them to respond to the complainant and forward a copy of their response to DOT within thirty days. DOT personnel record the airline response in the complaint record, and followup with the airline if no response has been made within the 30-day time frame. However, DOT follow-up does not always occur, and a response by the airline does not mean that any resolution was reached from the complainant's point of view. Once the airline response is recorded in the complaint record, the complaint is typically closed, regardless of the result. Only complaints determined to involve an airline's established policy or procedure that is out of compliance with the ACAA receive additio nal follow-up. The majority of complaints are

determined not to be matters of established policy or procedure.

- DOT rarely evaluates the ACAA complaints passengers send directly to airlines.
  Under Part 382, passengers alleging an ACAA violation are first required to seek
  resolution directly with the airlines involved. Airlines are then required to take the
  necessary steps to correct the problem and inform complainants about their right to
  elevate their complaints to DOT. Our research showed conclusively that DOT receives
  only a fraction of the ACAA complaints actually registered with airlines. Despite its
  authority under the law to request any reports it requires to enforce DOT
  regulations,[3] DOT does not request even summary data on the complaints received
  directly by an airline, unless investigating in connection with a potential enforcement
  action. An independent analysis of one major airline's complaint data conducted by our
  researchers showed a ratio of 36 to 1 for airline v. DOT complaints. By DOT's own
  account, an airline receives about 100 ACAA complaints for every 1 DOT receives.
  Furthermore, the yearly number of ACAA complaints received for the past eight years has
  either increased or remained constant each year. From a consumer perspective, these
  numbers would indicate marginal improvement in compliance.

- The ACAA provides no private remedy for individuals alleging civil rights violations.
  The ACAA statute does not provide a private right of action, but Part 382 directs any
  consumer wishing to file a formal complaint to do so in accordance with 14 CFR Part 302.
  Part 302 sets forth an administrative enforcement process adopted during the 1950s for
  complaints alleging violations of federal aviation statutes and DOT rules or orders. Like
  the administrative enforcement mechanisms for adjudicating complaints brought under the
  Americans with Disabilities Act, the Rehabilitation Act (Section 504), and other disability
  civil rights laws, DOT cannot assess damages on behalf of successful complainants. DOT
  can only require air carriers to take prompt action to change policies and procedures not in
  compliance with ACAA and assess civil penalties. The private right of action established
  through ACAA case law should be codified to ensure the individual plaintiff's right of
  redress.

- DOT has yet to file a single amicus brief on an ACAA case.
  DOT is not authorized under ACAA to file amicus briefs in cases alleging ACAA violations
  but can petition the Department of Justice (DOJ) for permission to do so. DOT also reports
  that it has been asked only once to participate as an amicus. In this case, DOT intervened
  through private correspondence with both the plaintiff and defendant, resulting in the
  defendant agreeing to modify its policies and procedures to comply with the rule. DOT
  chose not to petition DOJ to file an amicus brief after the defendant failed to appeal the
  court's verdict of liability.

It should be noted that agencies with responsibility for enforcing civil rights statutes

routinely request permission to file amicus briefs, and DOJ typically approves these requests. By not filing amicus briefs, DOT takes no initiative to influence the development of case law as it applies to ACAA enforcement. DOT's failure to take a position on the litigated issues has slowed the development of a positive and consistent body of case law.

- DOT's ACAA compliance monitoring is infrequent, inconsistent, and largely ineffective. Under Part 382, DOT was required to review the ACAA compliance programs and training plans by December 1990. By 1992, DOT had reviewed the compliance and training plans of between 30 and 40 air carriers, and had required changes to any plans found out of compliance with Part 382. Since then, DOT has conducted no regular monitoring to ensure airline implementation of their ACAA compliance and training plans.

  Part 382 requires airlines to train all new personnel and conduct periodic refresher training for all personnel with job duties affected by ACAA requirements. Initially, researchers were told that DOT typically does not review ACAA training programs or records, the complaint handling process, or complaint records when conducting routine on-site reviews with airlines, unless complaints received by DOT indicate a problem. Later, researchers were told that these on-site visits did include such reviews. Despite the request of researchers for reports documenting the scope and findings of these on-site reviews, none were provided.

- DOT has not satisfactorily addressed significant gaps in the application of ACAA. Foreign air carriers operating in the United States are presently not bound either by the ACAA or by U.S. aviation safety laws and regulations. Although a general nondiscrimination provision of the Federal Aviation (FA) Act has applied to foreign carriers since the 1950s,[4] DOT has generally invoked it in connection with rate or fare issues. As of the date of this report, DOT has based only two formal enforcement actions on this provision for discrimination on the basis of disability.[5] Although consumers generally benefit from the competition resulting from the globalization of air travel networks, Americans with disabilities continue to encounter discrimination during international air travel. As the executive agency primarily responsible for international air transportation policy, DOT negotiates the terms of international agreements under which foreign carriers must operate in the United States. Foreign air carriers enjoying access to the U.S. airport facilities and air travel market, especially through code-sharing arrangements with U.S. carriers, must conform to the requirements of the same civil rights laws that bind U.S. carriers.

- Part 382 lacks provisions requiring DOT to undertake implementation activities such as public education and to engage in enforcement activities regularly such as compliance monitoring and investigation of informal complaints.
  Other than the provisions to review airline compliance programs and training plans and

ensure that they conform to the requirements of the regulation, Part 382 has no provisions requiring DOT to engage in implementation and regular compliance-monitoring activities to ensure airline follow-through. Without authorizing DOT to engage in proactive monitoring of airline compliance, the mandate to enforce ACAA carries little substance.

Below are key recommendations addressing organizational, process, and statutory changes needed to address and correct the deficiencies in ACAA enforcement.

Key Recommendations

DOT must make substantive organizational and process changes if ACAA enforcement is to become effective. It must

- Establish a discrete unit for ACAA civil rights enforcement that is independent of the Consumer Protection Division, within either the Departmental Office on Civil Rights or the Office of General Counsel.

- Request that Congress appropriate the funds necessary for adequate staff and resources to effectively run an enforcement office, including a line item for an aggressive public education initiative.

- Develop and carry out strategic ACAA education campaigns geared to persons with disabilities and to the general public.

- Further articulate and consistently apply the assessment criteria for determining when an ACAA violation has occurred and when enforcement action is appropriate.

- As for other civil rights laws, any ACAA complaint alleging a prima facie violation, including an informal complaint, should have standing. DOT should investigate all prima facie violations to determine whether a violation has likely occurred and take appropriate corrective action.

- Expand enforcement action for ACAA complaints beyond the Part 302 administrative process to allow remedies for individual plaintiffs. Administrative action under Part 302 was never intended as a means for redressing individual civil rights complaints.

- Redesign DOT's database dedicated to complaint processing and compliance monitoring to maintain the data necessary for an accurate picture of ACAA compliance.

- Require air carriers to submit to DOT at regular intervals their Part 382 complaint data in a standardized summary format that tracks and compares the numbers and types of complaints, as well as trends in their complaint data. Publish the results of the summarized complaint data for all major airlines in the DOT *Air Travel Consumer Report.*

- Undertake more extensive investigation and analyses of the causes of Part 382 noncompliance among air carriers and airports.

- Expand compliance monitoring and enforcement activities and commit more resources (both staff and funds) to them. Regularly analyze the summaries prepared by air carriers of their Part 382 complaint data to identify noncompliance areas and to monitor potential "pattern and practice" trends.

- Review noncompliance areas identified in the airline complaint data summaries with airline representatives at quarterly intervals and require airlines to submit correction plans, including objective measures of success and a time frame for achieving compliance.

- Provide more training and targeted technical assistance to the aviation industry in all aspects of ACAA implementation and compliance.

- Exercise leadership in facilitating resolution of the remaining technical issues impeding ACAA compliance as well as ongoing disagreements concerning appropriate accommodations.

The weaknesses of Part 382 and DOT's current enforcement mechanism make an effective private right of action especially important. DOT's efforts to create the necessary incentives for ACAA compliance have been grossly inadequate. If ACAA's nondiscrimination mandate is to be realized, the disability community will have to use private right of action to create effective incentives. For this reason, a private right of action must be made more accessible through the same statutory right to attorneys' fees and damages as plaintiffs under Title VII and the Americans with Disabilities Act. Such statutory rights have a common goal: to minimize the cost of litigation to plaintiffs and maximize the incentive of potential defendants to stop discriminatory policies and practices.

In light of the above, we recommend that Congress

- Amend the ACAA to establish

- a statutory private right of action;

- the award of plaintiffs' attorney's fees; and

- the award of compensatory and punitive damages to successful litigants.

- Amend the ACAA to authorize the Access Board to develop standards in consultation with the Federal Aviation Administration (FAA) for accessible cabin interiors and for any equipment related to air travel access, including boarding assistance equipment.

- Amend ACAA to expand DOT's authority to:

- conduct public education activities geared to consumers with disabilities and the general public;

- conduct regular ACAA compliance monitoring with the airlines; and

- levy fines when the finding of an individual informal complaint investigation indicates a violation has occurred, and impose civil penalties for findings of pattern and practice violations.

- Amend ACAA to include foreign air carriers operating in the U.S. travel market and using U.S. airport facilities within the scope of the law and its implementing regulation.

While the FA Act prohibits unreasonable discrimination by foreign air carriers in providing foreign air transportation, it has been applied only twice in cases of disability discrimination. In both cases, the foreign carrier disputed that their treatment of the passengers was discriminatory and challenged the statute's applicability on this and other grounds. The ACAA mandate of nondiscrimination, on the other hand, is clear in its legislative history: "to provide equal access to air transportation,"[6] ensuring that people with disabilities are "treated equally when they [use] commercial air carriers"[7] and not as "second class citizens when it comes to air travel."[8] This mandate should apply equally to domestic and foreign air transportation service providers operating regularly within the U.S. air travel market.

This report candidly assesses current federal enforcement of the ACAA and recommends changes necessary to fully realize its mandate.

---

INTRODUCTION

Background

The Disability Civil Rights Monitoring Project is a policy initiative of the National Council on Disability (NCD) to research, evaluate, and report to Congress on federal implementation and enforcement of disability civil rights laws. The impetus for this project was the 1996 National Summit on Disability Policy, at which a diverse group of disability community leaders from across the country recommended that NCD

- work with the responsible federal agencies to develop strategies for greater enforcement of existing disability civil rights laws "consistent with the philosophy of...ADA (Americans with Disabilities Act)" ;[9]

- continue working "toward elimination of contradictory laws, regulations and programs"; and

- "promote coordination and commonality of goals across agencies."[10]

NCD responded to these directives with a request for proposals to assess the Federal Government's compliance, enforcement, and public information efforts for ADA, Part B of the Individuals with Disabilities Education Act (IDEA), the Fair Housing Act with 1988 Amendments, and the Air Carrier Access Act (ACAA).[11] NCD selected the Disability

Rights Education and Defense Fund to assess and report on federal enforcement of each of the four laws and on the cumulative impact of federal enforcement of all four laws.

Purpose of this Report

This first report evaluates the effectiveness of the Department of Transportation (DOT) in implementing and enforcing ACAA. Areas of assessment include

- responsiveness of the regulation and approved modifications in addressing key areas of discriminatory practice;

- clarity of the provisions;

- timeliness in issuing and implementing the regulation;

- quality and availability of public information to consumers on the provisions of ACAA;

- quality and timeliness of guidance to the aviation industry in implementing the provisions of ACAA;

- effectiveness of compliance and enforcement activities in identifying and eliminating patterns of discriminatory practice, reducing the overall frequency of incidents of alleged violations, and creating equal access to quality air transportation service for persons with disabilities;

- overall effectiveness of the agency in orchestrating interdepartmental (intermodal) collaboration and coordination of resources to achieve industry compliance; and

- effectiveness of agency leadership in helping to resolve obstacles to the elimination of discriminatory practices and access barriers.

Scope of the Report

Although this report addresses federal enforcement of the ACAA carried out by DOT, it does not cover several significant aspects of implementation or enforcement. Specifically, it does not address private litigation or the activities of the federally funded protection and advocacy system. Nor does this report advocate specific solutions to the many unresolved ACAA implementation issues. Finally, the report does not attempt to evaluate DOT enforcement procedures in relation to the Administrative Procedures Act.

Research Approach

ACAA federal enforcement activities are assessed from two perspectives. The "whole agency" approach examines the effectiveness of DOT internal coordination and collaboration in achieving all enforcement objectives for which it is responsible. The "whole law" approach examines the overall effectiveness of external coordination and collaboration (i.e., interagency and with the private sector) in achieving all the enforcement

objectives of the law.

Research Activities

The research activities for this study included the following:

- identifying the functions and organizational components of the overall federal ACAA enforcement mechanism;

- identifying, collecting, and analyzing data on ACAA implementation, compliance monitoring, and enforcement activities of the agency;

- identifying, collecting, and analyzing data on ACAA public information activities of the agency and its contractors;

- conducting interviews with the responsible agency staff to validate understanding of the day-to-day operation of ACAA enforcement functions;

- analyzing interactions and interrelationship of enforcement functions and their net impact in addressing noncompliance;

- reviewing and evaluating overall enforcement operations in light of the requirements, legislative history, and judicial interpretations of the regulation;

- identifying issues and areas for improvement in the enforcement mechanism and operations (i.e., gaps, duplication, overlaps, inconsistencies);

- conducting a literature review to add dimension and perspective to research findings on identified issues, including model practices for enhancing compliance; and

- deriving conclusions and developing preliminary recommendations from the entire analysis.

Report Structure

The report is presented in four parts. Part I provides background on the enactment of ACAA, as well as a brief overview of the current law, regulation, and proposed amendments. An overview of DOT's role in implementing and enforcing ACAA is presented in Part II. This part includes research findings, analysis, conclusions, and recommendations with respect to each of the major ACAA enforcement functions. Part III presents feedback from representatives of the primary ACAA stakeholder groups (the aviation industry and the disability community) on DOT's role in implementing and enforcing ACAA. Part IV summarizes NCD's recommendations for strengthening federal ACAA enforcement.

---

PART I: THE LAW, THE REGULATION, AND THE CONTEXT

1.0 The Law: The Air Carrier Access Act (ACAA) of 1986

1.1 Why the Air Carrier Access Act?

Historically, air travel for people with disabilities has not been for the faint of heart. Often, people with certain disabilities either chose not to fly or traveled by air knowing they would probably face prejudice, hostility, disability stereotyping, as well as architectural and other physical barriers; sometimes they faced an outright denial of their right to travel.

Before enactment of ACAA, airlines commonly refused to transport motorized wheelchairs, alleging that the wet cell batteries were hazardous. Airline workers frequently either drained the acid from the batteries before loading the chair or left the batteries behind without notifying the passengers, who then were stranded when they arrived at their destination. Often travelers were required to sign liability waivers to protect the airlines from responsibility for damaging wheelchairs, scooters, and other assistive devices. Because aircraft lacked accessible lavatories, some people with mobility disabilities would limit fluid intake hours before and often during their flight to avoid needing to use the bathroom, especially for long flights. Assistance with boarding and deplaning the aircraft for people with mobility disabilities was often unavailable. When available, it was often unpredictable and even dangerous because of the lack of personnel training and uniform policies on boarding assistance.

Last-minute denials and capricious and arbitrary requirements were commonplace. A passenger told by a customer service representative that a guide dog would be allowed in the passenger cabin would be told at the airport that the dog must travel in the baggage compartment. Travelers with certain disabilities were commonly told they could fly only if accompanied by a person who did not have a disability, whether or not they needed or wanted assistance. Passengers were told on the phone that they could travel unaccompanied, only to learn at the airport that they would not be allowed to fly alone. People perceived as having HIV/AIDS were denied the right to board flights because of fears and misperceptions about their illness.

In the terminal and on the aircraft, deaf and hearing-impaired passengers had little or no access to publicly announced flight information and safety instructions. Access to information about flight delays or changes in departure gates and times often depended on the willingness of an airline worker or fellow traveler to pass on the necessary information. Telephone communication from an airport for a passenger with a hearing disability was virtually impossible.

Although passage of the Federal Aviation Act of 1958 (FA Act)[12] created a legal duty of nondiscrimination for air carriers, the will to implement and enforce both the spirit and letter of this provision concretely on behalf of persons with disabilities did not exist until much more recently. Airlines and airports did little or nothing to accommodate persons with disabilities. The inconsistency with which the same airline provided the meager

==accommodations available resulted in a denial of access to many disabled travelers.==

==The intent of Congress in legislating the ACAA was to mandate nondiscrimination by requiring the accommodations necessary for travelers with disabilities to have equal access to air travel and related services.==[13] Despite some significant improvements over the past 10 years, most of the scenarios described above could well have taken place in many airports around the country during the past six months. The remaining challenge is to remove the barriers to full implementation of ACAA's mandate of nondiscrimination.

1.2 ACAA Impact: Progress but Persistent Problems

More accommodations are available for air travelers with disabilities today than at any time in history. Yet the availability of accommodations is inconsistent, and discriminatory treatment continues. The following recent experiences of air travelers with disabilities were reported by several technical assistance organizations serving individuals with disabilities.

*Wheelchair Delivery: "It's against our policy"*

A woman with muscular dystrophy who uses a motorized wheelchair fractured her leg shortly before traveling from New Zealand to Los Angeles. She was experiencing much pain when she boarded her flight. A frequent traveler, she requested that a tag be placed on her wheelchair instructing the Los Angeles ground crew to deliver it to the arrival gate immediately after the flight landed. Upon arriving, she was told by airline officials that airline policy prevented them from delivering wheelchairs to the gate. She would have to transfer into an airport chair and be pushed to the baggage claim area to retrieve her own chair. She refused, telling the officials she was in great pain and could not endure being lifted unnecessarily. The officials insisted their policy was valid and in force, and that she must deplane. She refused, citing the ACAA and drawing attention to the extenuating circumstances created by her recently fractured leg. An hour passed before the airline officials relented and arranged to have her chair delivered to the plane.

Following the incident, she wrote a letter to the airline complaining about her treatment citing ACAA violations. In a telephone interview, the complainant said, "I have never been so humiliated and embarrassed. They treated me with such hostility. At one point I broke down and cried, I was so frustrated and in pain."

*"We do not provide escort service"*

The parent of a 12-year-old child with a cognitive impairment made an advance request for airline personnel assistance to help her child travel between gates to make a connecting flight. The child had flown several times before, but on direct flights. On this occasion, there were no direct flights to the child's destination city. In various communications, including letters, airline agents repeatedly told the child's parent that they do not provide "escort service" (i.e., supervision to ensure that the passenger does not

wander off) or "custodial assistance" for children. The parent had requested neither; she had simply requested that someone help her child travel from one gate to another to wait for her connecting flight.

*"Sorry, no refunds for unused oxygen"*

A woman with severe arthritis and heart problems was charged $300 for six canisters of medical oxygen for in-flight use. According to FAA safety regulations, passengers may not bring their own oxygen on board and must pay for oxygen canisters provided by the airline. Two canisters of oxygen were unused at the conclusion of her trip. When she requested a refund, the airline said it was not their policy to issue refunds for unused oxygen. Another passenger who requested a refund for unused oxygen from a different airline complained that the price of oxygen canisters had tripled (from $50 to $150) between 1995 and 1997. This passenger received a modest refund for several unused canisters and assurances that the airline was working to reduce the cost.

*"Sorry, we don't have time to board you"*

A man who uses a manual wheelchair was en route from Houston to Billings with a plane change in Denver. He had notified the airline that he would require a boarding chair and boarding assistance for each leg of the trip. Upon arriving in Denver he reminded the gate agent for the departing flight that he required a boarding chair. The gate agent told him a boarding chair was not available and the airline did not have time to board him. He objected, informing the agent that he had provided advance notice that he required a boarding chair. The passenger missed his flight and was forced to spend the night in Denver. He elected not to file a complaint because he felt it would not result in any significant change in the system.

*"Please deplane immediately"*

A man and his wife, both of whom have Tourette syndrome, had boarded a flight from New York bound for San Francisco. Tourette syndrome is a condition characterized by involuntary vocalizations exacerbated by stress. Upon learning of their presence on the plane, the captain asked them to deplane because he believed they would be disruptive. They provided literature on Tourette syndrome to the captain, explaining that their vocalizations were involuntary and would subside when the stress of the moment had passed. The pilot refused to allow the passengers to remain on the flight. The couple filed a lawsuit against the airline.

Each of the incidents above describes a potential ACAA violation. The following section gives a brief history of the ACAA and explains the intent of Congress to remedy discrimination against air travelers with disabilities.

1.3 Background on the Air Carrier Access Act of 1986

The ACAA was enacted after an extended and unsuccessful struggle to establish through case law the illegality of discriminatory practices against air travelers with disabilities.[14] The legal obligation of nondiscrimination created by the FA Act in 1958 was based on two provisions addressing air carriers' service. Section 404(a) required air carriers to provide "safe and adequate" service.[15] Section 404(b), as originally written, prohibited "undue or unreasonable preference or advantage to any particular person, port, locality, or description of traffic."[16]

Gradually, the legal meaning of these two provisions became linked and any kind of unjustified discrimination toward air travelers was understood to be a violation of the air carriers' duty to provide adequate air transportation service. The Civil Aeronautics Board (CAB),[17] however, generally invoked the provision in connection with rate or fare issues. While acknowledging section 404's potential application to cases of noneconomic discrimination that directly affected the provision of air transportation, CAB never applied it to any specific case involving alleged discrimination on the basis of disability, race, gender, or ethnicity.[18] Consequently, these provisions had little actual impact on improving access to air transportation for persons with disabilities. Airline and airport policies, as a rule, remained unresponsive to the unique service requirements of persons with disabilities, justified on the basis of safety, economics, and the convenience of other passengers.[19]

Fifteen years after the FA Act was enacted, discrimination on the basis of disability was specifically prohibited by law with the passage of the Rehabilitation Act of 1973.[20] Section 504, as amended, prohibits discrimination on the basis of disability in any federally assisted program.[21] This provision, along with the provisions of sections 404(a) and (b) of the FA Act, formed the legal basis for the original nondiscrimination regulation (old Part 382).[22] Subpart A contained a general prohibition against discrimination on the basis of disability in providing air transportation; subpart B contained specific requirements for service to disabled passengers; and subpart C outlined record-keeping, reporting, and enforcement responsibilities. The general prohibition contained in subpart A was based on section 404 of the FA Act and applied to all certificated air carriers. The specific requirements of subparts B and C, based on the Section 504 provisions, applied only to certificated carriers receiving direct federal subsidies under the Essential Air Service program.[23]

The Paralyzed Veterans of America (PVA) challenged the limited application of subparts B and C in court, arguing that all carriers benefit from federal assistance in the form of Federal Aviation Administration (FAA) air traffic control services and federal grants for improving airport facilities. Therefore, PVA argued, Part 382 should be applied in its

entirety to all air carriers, in accordance with section 504. Although the U.S. District Court agreed with PVA's reasoning,[24] the Supreme Court did not, holding that unsubsidized carriers were not recipients of federal assistance and thus outside the scope of section 504.[25] The Supreme Court's decision exempted most air carriers from the duty to make specific accommodations in providing services to passengers with disabilities.

In response to this decision, Congress enacted and President Reagan signed into law the Air Carrier Access Act of 1986.[26] Codified as section 404_ of the FA Act, the amendment prohibits discrimination on the basis of disability by all air carriers, and authorizes DOT to issue regulations "to ensure nondiscriminatory treatment of qualified handicapped individuals consistent with safe carriage of all passengers on air carriers."

Congress's multiple objectives are clear in the statute's legislative history. First, all air carriers were to be bound by affirmative responsibilities similar to those set forth in subparts B and C of the existing regulation. Second, the statute was specifically intended to remedy "discriminatory, inconsistent and unpredictable treatment" of air travelers with disabilities. Finally, the statute affirmed that rules for accommodation were to be consistent with safety regulations, and that restrictions not based on safety and applied solely to passengers with disabilities were to be eliminated.

The new ACAA rule, replacing the old Part 382, took more than four years to develop. Stakeholders in the aviation industry and the disability community provided significant input to the final rule through a regulatory negotiation process. In promulgating the final rule, the Department of Transportation (DOT) clarified five core issues:

First, DOT applied the section 504 "undue burden" principle to strike a balance between requiring accommodations sufficient to enable equal access while containing the costs to the aviation industry in making those accommodations.[27]

Second, DOT clarified that air carrier discretion in imposing additional requirements or restrictions on air travelers with disabilities is limited to what is required by FAA safety rules.[28]

Third, DOT emphasized that the new Part 382 resulted from a regulatory negotiation requested by the parties.[29] DOT used much of the information generated through the process to develop the new, more detailed regulation to supersede the old Part 382.

Fourth, DOT declared that Part 382 should preempt state regulations protecting persons with disabilities in the area of air transportation services but should be applied on a case-by-case basis.[30]

Finally, DOT declared its responsibility to implement the ACAA by prohibiting discriminatory practices. Given the continued prevalence of many discriminatory practices

under the old Part 382, the new rule required greater clarity in establishing standards to ensure consistent practices by the airlines.[31]

The following section provides a summary of key Part 382 implementation provisions, as well as an overview of ongoing and unresolved ACAA implementation issues.

2.0 The Implementing Regulation: 14 CFR Part 382--Nondiscrimination on the Basis of Disability in Air Travel

The purpose of Part 382 is to implement the ACAA nondiscrimination mandate: "[N]o air carrier may discriminate against any otherwise qualified individual with a disability, by reason of such disability, in the provision of air transportation."[32] Part 382 details the actions necessary for compliance. Although clear in many respects, the regulation's areas of uncertainty and stalemate continue to hamper its effectiveness. And clarity notwithstanding, many of the basic Part 382 requirements are poorly understood and not consistently implemented.

2.1 Definitions

2.1.1 Who is an "Individual with a Disability?"

Any individual who

- has physical or mental impairment that on a permanent or temporary basis substantially limits one or more major life activities;

- has a record of such impairment; or

- is regarded as having such impairment.

   It should be noted that a person with a substantially limiting temporary impairment (e.g., broken limb, acute allergic reaction) is within the scope of the nondiscrimination provision.

2.1.2 Who is a "Qualified Individual with a Disability"?

Any individual with a disability who

- with respect to using airport terminal facilities and ground transportation or obtaining information, acts to avail himself or herself of facilities or services offered by an air carrier to the general public, with reasonable accommodations provided by the air carrier, as needed;

- with respect to obtaining an airline ticket, offers or makes a good faith attempt to offer to buy, or otherwise validly obtain, an airline ticket; and

- with respect to obtaining air transportation or other services or accommodations required by Part 382, possesses a valid ticket, presents himself or herself for travel at the airport for

the ticketed flight, and meets reasonable, nondiscriminatory contract of carriage[33] requirements applicable to all passengers.[34]

2.1.3 Nondiscrimination: What It Means

Air carriers are prohibited from

- excluding or denying passengers with disabilities the benefit of any air transportation or related services available to other persons, even if separate or different services are provided, except when specifically permitted by the regulation;[35]

- requiring individuals with disabilities to accept special services they did not request;[36]

- restricting the movement of passengers with disabilities in terminals or requiring them to remain in a special holding area in order to receive assistance, or mandating any other separate treatment, unless permitted or required by Part 382;[37]

- requiring passengers with disabilities to sit on blankets;[38]

- imposing charges on persons with disabilities for providing the facilities, equipment, or services required by Part 382;[39] or

- taking adverse action against an individual who asserts rights protected by the ACAA, whether on his or her own behalf, or through or on behalf of someone else.[40]

Air carriers shall also ensure that their contractors who provide services to passengers are bound contractually by a nondiscrimination provision to

- perform their activities on behalf of the air carriers consistent with Part 382; and

- comply with directives issued by the air carriers' complaint resolution officers (CROs).[41]

2.2 Implementation Requirements

2.2.1 Implementation Issues

Detailed descriptions of the Part 382 nondiscrimination requirements are in Appendix A, organized under headings corresponding to those in the regulation. For many of these requirements, compliance has been uneven. In some instances, requirements are being challenged or disregarded by airline policies that effectively circumvent the intent of certain provisions and prevent their implementation. A brief commentary on some of the unresolved implementation issues follows.

*Accessible Cabin Interiors*

DOT has no design inspection program to ensure that all aircraft ordered after August 5, 1990, conform to the Part 382 accessibility requirements. It is difficult to imagine how

compliance can otherwise be ensured. In 1997, 187 new aircraft were scheduled for delivery to Air Transport Association member airlines, which are mostly U.S. air carriers.[42] By 2002, another 457 new aircraft will be delivered.[43] Most of these deliveries will be commercial passenger aircraft. If these new aircraft are not designed and built in compliance, retrofitting will be the only viable remedy. Because the cost will far exceed building the aircraft to correct specification, retrofitting will likely be viewed as an "undue burden" inconsistent with the legal standard for reasonable accommodation. The result will be further delays in access to service for air travelers with disabilities.

*Lifting and Carrying Passengers*

Lifting and carrying is an issue involving the safety and dignity of passengers, as well as air carrier personnel.[44] Although assistance from air carrier personnel in using ground wheelchairs, boarding wheelchairs, on-board chairs, ramps, and mechanical lifts is within the intended scope of the regulation, "hand-carrying" passengers onto small aircraft (fewer than 30 seats) is not. The reason is that in-door stairs, by which passengers enter aircraft not accessible by a mechanical lift, can safely accommodate only one person at a time.[45]

In other circumstances, lifting and carrying assistance is required where such assistance is reasonable. The problem in implementing the "lifting and carrying" provisions is one of differing interpretations of what is required. Some air carrier personnel will help with transfers that involve lifting, and others will not. On the other hand, some personnel will refuse to allow even friends, family, or personal attendants to lift the passenger with a disability, insisting that air carrier personnel do the lifting. The unfortunate results have sometimes been injuries from being dropped or otherwise mishandled by personnel not well trained in lifting techniques, or refusals to provide needed assistance.

Inconsistencies in policy and practice add to the frustration and unpredictability encountered by air travelers with mobility impairments. More work is needed to define appropriate guidelines for limited physical assistance that minimizes the risk of injury to either passengers or air carrier personnel.

*Traveling with an Attendant*

Given the inconsistencies among airlines in their lifting/carrying policies, traveling with an attendant is the only way for persons with mobility disabilities to ensure such assistance while traveling. Many passengers with disabilities traveling with an attendant have experienced two major problems. First, persons whose health is unpredictable because of severe disabilities may not always be able to travel on the date they are scheduled to fly. Unless they have purchased full-priced tickets, they typically lose anywhere from $150 ($75 for each ticket to change their travel date) to the entire cost of two tickets upon canceling their trip. Exceptions are rarely made to allow the customer to reschedule, even

with restrictions. More flexible ticketing policies are needed to accommodate passengers when circumstances related to their disabilities arise, impairing their ability to travel at the scheduled departure time.

A similar problem results when a person traveling with an attendant is notified at the last minute that a different attendant will accompany him or her. Because airline tickets are nontransferable, the passenger must purchase another ticket, usually at full price, for the new attendant. The cost of air travel, already far more expensive for the person who must travel with an attendant, becomes prohibitive without accommodations in airline ticketing practices for these special needs and circumstances.

*Seat Assignments*

In November 1996, DOT issued a notice of proposed rulemaking requesting comment on a number of issues, including seating accommodations. On March 4, 1998, DOT issued the final rule containing modifications responsive to the comments received from stakeholders. Effective as of April 3, 1998, the final rule details the requirements as well as the methods airlines can use to accommodate any individual who self-identifies to an airline as having a disability.[46]

The final rule is a clear improvement over the very limited accommodation provided for in the NPRM. Yet the rule is complicated, requiring an automated tracking mechanism and personnel training to implement it effectively. As with other provisions of Part 382, successful implementation depends greatly on the initiative taken by air carriers in quickly issuing procedures explaining the new requirements and ensuring timely training of their personnel.

*Preboarding*

Under Part 382, passengers who wish to stow assistive devices in the aircraft cabin must preboard in order to have priority access to closet space. In the past several years, airlines have increasingly eliminated preboarding procedures. Ostensibly, this was a result of overuse of preboarding by passengers who simply wish to board the plane ahead of everyone else. Because several accommodations under the regulation are contingent upon the passenger with a disability preboarding the aircraft, without preboarding, this passenger must rely on the goodwill of flight attendants and other passengers to make already occupied storage space or an appropriate seat available. Preboarding is the mechanism by which people with disabilities can ensure that the priority access they are entitled to as an accommodation is in fact given.

*Cost and Availability of Oxygen*

Under the regulation, passengers who must travel with oxygen need give only 48 hours advance notice and 1 hour advance check-in when the carrier provides oxygen service. A

significant number of problems have been reported concerning both the price and availability of oxygen. The cost of oxygen canisters, which must be supplied by the air carrier to comply with safety regulations, varies significantly depending on the carrier, the airport, and even the flight. (Prices are reported to vary from $50 to $250 per canister.) Some carriers do not permit passengers to return unused canisters for which they have paid a premium price. Other complaints document the failure of personnel to ensure that oxygen requested in advance is available at the gate for use while awaiting a connecting flight.

*Inaccessible Websites*

An issue that has received little attention is the accessibility of websites and other online means of communication between consumers and airline reservation systems. Airlines frequently offer incentives for making online reservations at websites, which often are inaccessible to consumers with visual and other impairments. Offering incentives without offering consumers with disabilities an alternative means to take advantage of them does not meet the regulation's program accessibility standard. Both consumers and airlines could benefit from a fully accessible web-based reservation system that allowed consumers to enter their own special needs information to their reservation at the point of sale.

2.2.2 Airline Administrative Responsibilities

*Training*

Under 14 CFR Part 382.61, air carriers are required to:

- provide training to all personnel dealing with the traveling public on the requirements of Part 382 pertinent to their duties, if the carrier operates aircraft having more than 19 seats.[47]

- ensure that employees are proficient and knowledgeable concerning

- Requirements of Part 382 and other DOT and FAA regulations affecting air transportation service to persons with disabilities and

- The carrier's own procedures implementing these regulations, including the safe and proper operation of equipment used to accommodate persons with disabilities.[48]

- train their employees in

- Awareness of the different kinds of disabilities, including physical, sensory, mental, and emotional;

- responding appropriately to persons with disabilities; and

- Distinguishing among the differing abilities of persons with disabilities.[49]

- consult with organizations representing persons with disabilities to develop programs for training employees in the policies and procedures for implementing federal requirements.[50]

- ensure that the initial training of employees takes place as follows:

- All crew members subject to training under 14 CFR Part 121 or 135 and employed on the date the air carrier's program is established shall receive training as part of their next scheduled recurrent training.[51]

- All other personnel employed on the date the air carrier's program is established shall receive training within 180 days of that date.

- All crew members subject to training under 14 CFR Part 121 or 135 and employed subsequent to the date the air carrier's program is established shall receive training before they assume their duties.

- All other personnel employed subsequent to the date the air carrier's program is established shall receive training within 60 days after they begin employment.[52]

- ensure that

- all employees receive refresher training as needed to maintain proficiency regarding the requirements of Part 382 pertaining to their duties.[53]

- training, in accordance with the above requirements, is provided to every contractor employee who deals directly with the traveling public at airports.[54]

- employees who are designated CROs receive training on the requirements of Part 382 and CRO responsibilities by June 5, 1990 (within 60 days of the regulation's effective date). Employees subsequently designated as CROs must receive training before assuming their duties. All employees performing CRO functions must receive annual refresher training.[55]

- training is provided to flight crew members and other appropriate personnel to ensure their familiarity and compliance with the requirements of Part 382, if the carrier operates aircraft having 19 or fewer seats.[56]

*Compliance Programs*

Under 14 CFR Part 382.63, air carriers are required to

- establish and implement a written program for carrying out the requirements of Part 382 by December 4, 1990, if the carrier operates aircraft having more than 19 seats.[57]

- comply with Part 382 requirements before their programs are established.[58]

- include a schedule for training personnel implementing Part 382 requirements on policies and procedures.[59]

- submit their programs for review by December 4, 1990, and implement them immediately upon submission to DOT, if the carrier is a major or national carrier or shares a designator code with a major or national carrier.[60]

- maintain their programs on file, make them available to DOT upon request, and incorporate changes into their programs as directed by DOT.[61]

- establish and maintain a complaint resolution mechanism that includes the availability of one or more CROs at each airport the carrier serves.[62]

- make a CRO available to any person who complains of an alleged violation of Part 382 during all times the carrier is operating at the airport. If the CRO is not present in person at the airport at the time of the complaint, the air carrier shall make the CRO available via telephone or via teletype service for the hearing impaired at no cost to the customer.[63]

- ensure that the CRO is thoroughly familiar with the requirements of Part 382.[64]

- ensure that the CRO has authority to make dispositive resolution of complaints on behalf of the carrier[65] as follows:

- If a complaint is made before an action has resulted in a violation, the CRO will take action or direct other carrier personnel to take the action necessary to ensure compliance. If the refusal to comply is based on safety, the CRO may not countermand a decision of the pilot in command of an aircraft.

- If a complaint is based on an alleged violation that has already occurred and the CRO agrees that a violation has occurred, the CRO shall provide to the complainant a written summary of the facts and the steps the carrier proposes to take, if any, in response to the violation.

- If the CRO determines that no violation has occurred, the CRO shall provide to the complainant a written summary of the facts and the reasons, under Part 382, for the determination.

- The CRO's summary will inform the complainant of the right to pursue DOT enforcement action. The summary will be provided to the complainant at the airport or forwarded to him or her within 10 calendar days of the complaint.[66]

- establish the following procedures for resolving written complaints alleging violations of

Part 382:[67]

- Complaints postmarked more than 45 days after the alleged violation do not require a response.[68]

- Written complaints shall state whether the complainant has contacted a CRO, and shall include the CRO's name, date of contact, and any written summary or response received from the CRO.[69]

- Written complaints alleging violations shall receive a dispositive written response within 30 days of receipt[70] as follows:

- If the carrier agrees that a violation has occurred, the carrier shall provide a written statement setting forth the summary of the facts and the steps the carrier proposes to take, if any, in response to the violation.

- If the carrier denies that a violation has occurred, the response shall include a written summary of the facts and the reasons, under Part 382, for the determination.

- The written response shall inform the complainant of his or her right to pursue DOT enforcement action.[71]

Under 14 CFR Part 382.65, air carriers are obliged to inform complainants of their right to pursue DOT enforcement action.[72]

2.2.3 Department of Transportation Administrative Responsibilities

Under 14 CFR Part 382.63, DOT is required to review the implementation plan of each air carrier and direct them to amend their plans as needed to comply with the requirements of Part 382.[73]

Under 14 CFR Part 382.65, consumers with a complaint about an ACAA violation may contact the DOT Office of Consumer Affairs for assistance. Consumers may also file formal complaints for DOT administrative review in accordance with 14 CFR Part 302.[74]

Since 1986, no ACAA amendments have been passed, but Part 382 has been modified several times. Section 3.0 summarizes recent changes and proposed amendments.

---

3.0 Recently Approved Changes to the Regulation and Proposed Changes to the Law

3.1 Final Rule Amending Part 382, Issued March 4, 1998

3.1.1 Clarification of the Definition of Nondiscrimination

In the final rule issued on March 4, 1998, to the November 1996 NPRM, DOT establishes the nondiscrimination standard set forth in the Rehabilitation Act, Section 504, as

amended, as the applicable standard for ACAA implementation and enforcement. This standard requires that air carriers, in addition to meeting the specific requirements of Part 382, to modify policies, practices, or facilities as needed to ensure nondiscrimination, unless making the modifications would constitute "an undue burden or fundamentally alter their program."[75]

DOT's purpose in adding the Section 504 standard to Part 382.7 was to clarify that air carriers have a duty to proactively implement modifications in accordance with the general principle of nondiscrimination, and not limit accommodations to those enumerated in Part 382.[76]

3.1.2 Procedures for Providing Seating Accommodations

Under the new amendment to the regulation, air carriers are required to make the following accommodations

- Any person who self-identifies to the carrier as having a disability and who cannot readily transfer over a fixed armrest from an aisle chair must be seated in a row with a moveable armrest.[77]

- Personal assistants performing functions for a passenger that airline personnel are not required to perform shall be seated next to the person they are assisting.[78]

- Air carriers shall provide either a bulkhead seat or another seat as requested by passengers traveling with service animals or passengers having a fused or immobilized leg;[79]

- Air carriers that provide advance seat assignments shall use either a "seat blocking," a "designated priority seating," or some other mechanism approved by DOT to comply with seating accommodation requirements.[80]

3.1.3 In-Cabin Stowage of Collapsible Electric Wheelchairs

Air carriers are required to accept a passenger's battery-powered wheelchair as checked baggage, subject to requirements such as timely check-in and proper labeling, securement and packaging.[81] Air carriers shall not drain wheelchair batteries.[82] Upon passenger request, collapsible wheelchairs shall be stowed in the cabin stowage area, subject to the Part 382 stowage guidelines.[83] Passengers also may provide written directions to airline personnel for disassembly and reassembly of their wheelchairs.[84]

3.1.4 Issues Not Addressed by the Final Rule

In the 1996 NPRM, DOT also sought comment on additional accommodations for persons with hearing impairments and the provision of a smoke-free accessible path through

airports for persons with respiratory disabilities. DOT deferred decisions on whether to propose rules on both of these matters until after further consideration.[85]

3.2 Proposed Amendments to the Air Carrier Access Act

3.2.1 Draft Miller Amendment

Case law has established that a plaintiff has a private right of action for ACAA violations. However, guidelines regarding damages and legal fees have not been established. Sharon G. Miller, lead attorney in a recent ACAA case,[86] has proposed the following amendments to codify plaintiffs' standing and the terms of a private right of action:

- persons filing lawsuits pursuant to ACAA violations should have the same private right of action and private remedies as persons filing lawsuits regarding any other civil rights statutes;

- public remedies pursuant to violations of the ACAA should be assessed in the same amounts as violations of other civil rights statutes ($50,000 for first violation and $100,000 each for subsequent violations, with each discriminatory act counted as a violation);

- each airline should be required to forward copies of written complaints and its written summaries of oral complaints relating to disability to DOT within 30 days of receipt; and

- DOT should be required to investigate individual complaints against airlines, determine whether a violation has occurred, and penalize the airlines for each occurrence of an ACAA violation.[87]

3.2.2 Inclusion of Code-Sharing Foreign Air Carriers

The number of Americans with disabilities who travel internationally is increasing. Because ACAA applies only to U.S. domestic carriers, passengers on international flights of foreign air carriers operating within the United States often experience discrimination in the form of inaccessible facilities and lack of reasonable accommodations such as wheelchair assistance. Although a general prohibition against discrimination applies to foreign carriers under the FA Act, DOT has applied it to only two cases of discrimination involving a disability issue.[88] The economic advantages to foreign carriers operating in the U.S. market and using U.S. airport and air traffic control facilities are clear. Those advantages are further enhanced when foreign carriers enter into code-sharing arrangements with U.S. domestic carriers whose flight networks they share. Foreign carriers operating in the U.S. market must be required to comply with the same laws as U.S. domestic carriers in providing air travel services to the American public. The ACAA should be amended to include foreign carriers within its scope, and the necessary international agreements should be developed or revised to reflect these legal obligations.

In light of this background on ACAA's history and the continuing problems in realizing its goals, Part II begins the analysis of federal enforcement with a description of its organizational and functional components at the U.S. Department of Transportation.

## PART II. THE ROLE OF THE UNITED STATES DEPARTMENT OF TRANSPORTATION (DOT)

4.0 Background on DOT Enforcement Philosophy and Operations

4.1 Regulation of the Aviation Industry and Consumer Protection

Some history on the federal aviation enforcement function will aid in understanding the Air Carriers Access Act (ACAA) enforcement today. Informal complaints alleging ACAA violations are handled by the Consumer Protection Division within DOT's Office of General Counsel (OGC). Aviation consumer protection, initially established by the Civil Aeronautics Board (CAB) during the 1950s, was originally linked to the economic regulation of the airline industry.

CAB's mission as the agency for the regulation of aviation industry economic issues, including consumer protection, grew for two decades. At its peak, the CAB regulatory enforcement mechanism consisted of more than 100 enforcement and legal staff in Washington, DC,[89] in addition to a national network of field office auditors.[90] By the late 1970s, changes in the national political climate and fiscal priorities led to the phase-out of CAB and most of its organizational structure.

4.2 The Transition to Industry Deregulation

The Airline Deregulation Act of 1978 abolished CAB by calling for the gradual lapsing of its powers to set airline rates and routes and to exercise antitrust functions by 1984.[91] The Deregulation Act also called for the elimination of all requirements of section 404(a), except the provision for "safe and adequate service" and the general nondiscrimination provision of section 404(b) as applied to domestic, but not foreign, air transportation by 1982. By the end of the sunset period in 1984, CAB had been entirely dissolved except for a few components transferred to DOT. Initially excluded from those organizations scheduled for transfer to DOT, the Aviation Consumer Protection Division was transferred into DOT's Office of Intergovernmental Affairs in 1985, as a result of the Civil Aeronautics Board Sunset Act of 1984.[92] The Sunset Act amended and clarified the provisions of the Deregulation Act regarding the transfer of certain functions to DOT, including the consumer protection function. The legislation was a reprieve, saving the entire division from the fate of its parent organization.[93]

Although the Federal Aviation Act of 1958 (FA Act) mandated nondiscrimination in air travel,[94] the standard was interpreted in conjunction with the "safe and adequate" service

provision of section 404 (a).[95] Nondiscrimination was understood more as a matter of fair and consistent commercial practices (e.g., ticketing, pricing) than of equal access to air travel. Enforcement of this provision did not extend to the protection of civil rights, though CAB affirmed that instances of race or age discrimination might come within the scope of section 404 if the alleged discrimination directly affected the provision of air transportation.[96]

Not until the enactment of the Rehabilitation Act in 1973 was the issue of systemic discrimination against persons with disabilities addressed on a broad scale. Interpretation of the FA Act's nondiscrimination provision was broadened by the Rehabilitation Act, which created a stronger basis for legal challenges to discriminatory practices restricting access to air travel by passengers with disabilities. With the passage of the Deregulation Act in 1978, however, the nondiscrimination provision applying to domestic air transportation was abolished, undercutting the movement toward greater definition of the nondiscrimination standard.[97]

To clarify the applicability of the general nondiscrimination provision to discrimination on the basis of disability, CAB promulgated Part 382, specifically prohibiting discrimination by certificated airlines on the basis of disability. Drawing on the Rehabilitation Act, Part 382 targeted systemic discrimination against air travelers with disabilities, starting with air carriers receiving federal assistance. It did so by spelling out the affirmative requirements of a policy of nondiscrimination and equal access for passengers with disabilities. The irony is that even as the original Part 382 went into effect in 1982, creating new CAB regulatory enforcement responsibilities, the Consumer Protection Division was reducing staff and curtailing operations in response to legislated cutbacks.

4.3 Impact on the DOT Organization

Significantly, Part 382 became effective as the CAB organization and functions were phasing out. In the eleventh hour of the CAB phase-out, the Consumer Protection Division got a reprieve and was transferred to DOT, where it resumed scaled-down operations with approximately 40 staff members in the Office of Intergovernmental Affairs.[98] In 1995, the staff was reduced again and transferred to OGC as a separate division under the Assistant General Counsel for Aviation Enforcement and Proceedings.[99]

The scope of post-CAB consumer protection responsibility includes monitoring all categories of incoming aviation consumer complaints and working directly with the airlines to improve their service and compliance with commercial regulations. ACAA compliance monitoring is actually a very small subset of the larger aviation consumer protection function as it has evolved. The Deregulation Act shifted the government's role in the economics of aviation from strict control of competition and fare discounting to reliance on

competitive market forces to promote both increased consumer choices and the financial viability of the industry. Yet as the emphasis on regulation waned, a new emphasis on the protection of consumer's civil rights emerged. CAB's dismantling weakened the role of government regulators just as new regulations having a different objective were being created. In a new era of deregulation, the scaled-down Consumer Protection Division became responsible for protecting consumer economic interests without imposing burdensome compliance requirements and for ensuring that aviation consumers were not denied their civil rights under Part 382.

4.4 Consumer Protection in a Postregulation Environment

Deregulation brought about a new approach to consumer protection. With far fewer resources at its disposal, DOT adopted a nonadversarial approach as more economically feasible and in keeping with the philosophy of deregulation. Consumer complaints were no longer routinely investigated on a case-by-case basis, and investigation was largely replaced by complaint monitoring.[100] With a staff of seven including administrative staff, Consumer Protection interfaces regularly with airline representatives on all consumer issues, including complaints and compliance with non-safety regulations.[101] The actual resource level dedicated to handling all informal ACAA complaints is currently estimated at less than one full-time equivalent (FTE) per year.[102] Compliance monitoring activities generally have been scaled back in number and scope such that proactive monitoring of ACAA compliance is both inadequate and inconsistent.

4.5 Civil Rights Enforcement as a Function of Consumer Protection

The sweeping changes to consumer protection following the Deregulation Act affected DOT's approach to ACAA enforcement in three ways. First, the dismantling of the complaint investigation mechanism has meant fewer resources for follow-up on the complaints of persons with disabilities alleging discrimination. Like most complaints received by the Consumer Protection Division, informal ACAA complaints are usually not investigated on a case-by-case basis, although they are subject to a higher standard of review. Second, airline compliance monitoring became very limited in scope, in keeping with deregulation.

Finally, the filing of formal ACAA complaints seeking enforcement action has not been encouraged as it is in other agencies having civil rights enforcement responsibilities. All formal complaints by private individuals, as well as formal complaints DOT files on the basis of pattern and practice violations, are investigated by the staff of the Assistant General Counsel for Aviation Enforcement and Proceedings. Of the seven lawyers on staff (one of whom is part-time), two handle ACAA issues along with other matters.[103] Yet since 1990, startlingly few formal complaints have been filed, and the majority of these

have been dismissed. The analysis below will address some of the features of both the informal and the formal complaint mechanisms that contribute to their limited role in ACAA enforcement. The following section briefly describes the functions performed by each organizational component involved in ACAA implementation and enforcement.

5.0 DOT Organizational Components Involved in ACAA Enforcement

Figure 1 identifies the ACAA/Part 382 implementation and enforcement functions carried out by DOT. Figure 2 shows DOT's organizational plan correlating the implementation and enforcement functions with the responsible organizations shown in bold. The Secretary of Transportation is ultimately responsible for Part 382 enforcement. Under the Secretary, OGC performs most of the ACAA enforcement activity, with some implementation responsibilities performed by other organizations. The overview of roles presented in this section will be followed by a more detailed description and analysis in sections 6.1 through 6.7.

5.1 Office of General Counsel

OGC oversees and ensures integration of ACAA implementation and enforcement activities carried out by the Assistant General Counsel for Regulation and Enforcement and the Assistant General Counsel for Aviation Enforcement and Proceedings. Regulation and Enforcement develops Part 382, and Aviation Enforcement and Proceedings monitors and enforces compliance. Communication and coordination between the two offices are intended to ensure that the regulation is effective in fulfilling its legislative mandate and is modified as needed in response to stakeholders' concerns.

5.2 Regulation and Enforcement

The Office of Regulation and Enforcement manages the standard and negotiated rulemaking processes. It acts as intermediary among the ACAA stakeholder groups in developing a regulation satisfying the goals of nondiscrimination and access to air travel, in accordance with applicable legal standards (e.g., reasonable accommodation).

5.3 Aviation Enforcement and Proceedings

The Office of Aviation Enforcement and Proceedings is responsible for activities relating to the enforcement of aviation economic laws under DOT's jurisdiction.[104] Consumer protection and legal support on aviation economic licensing matters are its two main spheres of responsibility. ACAA enforcement constitutes a very small subset of its consumer protection responsibilities, which include

- unfair and deceptive practices;
- unfair competition by air carriers and travel agents;

- deceptive advertising;

- denied boarding compensation;

- violations of rules pertaining to discrimination against air travelers on the basis of race, ethnicity, national origin, age, religion, gender, disability, and so forth;

- violations of rules pertaining to ticket refunds;

- violations of rules pertaining to lost baggage liability;

- violations of public charter rules; and

- violations of restrictions on ticket sales and service to countries posing security threats.[105]

The Enforcement Office handles formal complaints alleging any of the above infractions that may result in enforcement action.[106]

**Figure 1.**

U.S. Department of Transportation Air Carrier Access Act

Implementation and Enforcement Functions

(1) Chief executive enforcement authority
(2) Rulemaking process and regulatory negotiations
(3) Development and dissemination of public information
(4) Guidance and technical assistance to the aviation industry
(5) Reviews and compliance monitoring
(6) Informal consumer complaint handling
(7) Formal complaint process handling
(8) Enforcement actions
(9) Maintenance of tracking system for all civil rights complaints handled within every DOT mode and division

The Enforcement Office's responsibilities in the area of economic licensing are somewhat broader. The office provides legal review and investigative support to authorize all air transportation concerns operating in the United States and their continuing fitness for service. The Enforcement Office is public counsel in formal proceedings involving carrier fitness and selection, and prosecutes to obtain civil penalties in cases involving fraudulent statements or claims made to the Office of the Secretary of Transportation (OST) under the Program Fraud Civil Remedies Act.[107]

Figure 2. U.S. Department of Transportation Organizational Chart not available.

Most ACAA activity originates within the Aviation Consumer Protection Division, a subdivision of Aviation Enforcement and Proceedings. The division's responsibilities are to

- receive informal complaints from members of the public regarding aviation consumer issues;

- verify compliance with DOT's consumer protection requirements;

- provide guidance to the industry and members of the public on consumer protection matters; and

- make available to the public information on consumer protection matters.[108]

Of the division's seven full-time staff (including clerical), less than one FTE is dedicated to ACAA-related activity. As mentioned earlier, the current Enforcement Office has fewer than seven full-time attorneys, two of whom work on ACAA issues part time. These staffing constraints are part of continuing budget cutbacks affecting OGC's operations at every level.

For example, the entire OGC with a staff of about 85 had an annual travel budget of $46,250 in Fiscal Year (FY) 98[109] and $30,000 in FY99.[110] There has been no training budget for some time.[111] The Office of Aviation Enforcement and Proceedings comprises less than 20 percent of OGC's entire operation and competes for funds with six other offices, including the Office of International Law; the Office of Environmental, Civil Rights, and General Law; and the Office of Regulation and Enforcement. In FY97, the Office of Aviation Enforcement and Proceedings spent less than less $4,000 on all business travel. For each of the past two years, only $20,000 has been allocated to OGC for subscriptions and supplies.[112]

None of the subdivisions within OGC is funded for any specific compliance or implementation monitoring activities.[113]OGC docketing facility, however, has a total annual budget of $800,000 for all expenses related to litigation, rulemaking and DOT certification activities.[114] Salaries are the only budget line items broken out by subdivision of OGC. Salaries and benefits for the Enforcement Office (including the Consumer Protection Division) total over $1.4 million annually.[115] The picture emerges of a small staff having a broad range of responsibilities with little or no budget authority and consequently few resources (or incentives) to develop an effective system for monitoring compliance, supporting implementation, and enforcing the ACAA.

5.4 Office of Environment, Energy, and Safety

DOT's Office of Environment, Energy, and Safety operates under the Assistant Secretary for Transportation Policy. Although no official document was available describing the

office's general responsibilities, an interview with staff members provided an overview of its ACAA implementation responsibilities. To date, these responsibilities have included review and comment on the initial Part 382 compliance plans submitted by major and national airlines, development of ACAA public information pamphlets, and sponsorship of a federal advisory committee on the feasibility of incorporating accessible lavatories in single-aisle airplanes with a seating capacity of between 100 and 199 seats.

5.5 Departmental Office of Civil Rights

DOT's Departmental Office on Civil Rights (DOT Civil Rights) plays no direct role in ACAA enforcement, but does maintain a website with links to public information on ACAA and Americans with Disabilities Act (ADA) transportation access provisions. ADA enforcement is the responsibility of the civil rights offices within the Federal Transit Administration, Federal Aviation Administration (FAA) and other modes responsible for regulatory enforcement (see Figure 1). The DOT Civil Rights website directs persons with disabilities to contact OGC for complaints against airlines (ACAA enforcement) and the FAA Office of Civil Rights for complaints against airports (Section 504 and ADA Title II enforcement).

The relationship between OGC and DOT Civil Rights is informal. OGC may consult with DOT Civil Rights concerning its ACAA enforcement cases and gives them advance notice concerning its enforcement actions.[116] OGC has two civil rights staff attorneys serving as advisors on ACAA and other civil rights issues and as liaisons with DOT Civil Rights.

Because of the decentralized DOT environment, the civil rights offices in each mode have developed their own enforcement philosophies, methods, and priorities. As a step toward a more unified departmental civil rights policy, DOT Civil Rights is developing a central database for tracking and analyzing trends among all civil rights complaints handled anywhere within DOT.[117]

5.6 Analysis and Recommendations

Finding No. 1: DOT enforces ACAA from a consumer affairs office, not a civil rights enforcement office.

Recommendation No. 1: DOT should establish a unit for ACAA civil rights enforcement that is separate from consumer affairs monitoring.

Such a unit might be located in OGC or DOT Civil Rights. Congress should appropriate funds for adequate staff and resources to run the enforcement office effectively.

Finding No. 2: There is little coordination and integration of activities among the many offices having ACAA implementation and enforcement responsibilities.

Recommendation No. 2: DOT should develop and carry out an integrated implementation and enforcement strategy with clearly defined roles and responsibilities for the various

offices involved.

Effective implementation requires a relationship among compliance monitoring, technical assistance, public information, and enforcement. The many offices involved in these activities should develop an overall blueprint for implementing the law, and work with outside stakeholders to refine the blueprint and see that the law is implemented effectively.

Finding No. 3: DOT has perpetuated nonaction by taking away fiscal control from the offices responsible for ACAA enforcement, removing both the resources and the incentives to effectively perform their assigned enforcement role.

Recommendation No. 3: DOT must realistically reassess its fiscal priorities and budget strategy in light of its responsibilities under the law.

As part of a comprehensive ACAA enforcement strategy, DOT must identify ways to more effectively use resources. When additional funds are unavailable, DOT must encourage the offices involved to collaborate, seek outside resources, share resources internally, and find alternative ways to meet the objectives of their integrated enforcement strategy.

---

6.0 Implementation and Enforcement Functions

6.1 Consumer Information Explaining the Law

Unlike some other disability rights statutes, ACAA contains no statutory requirements for the development or dissemination of public information about the rights of people with disabilities under the law and its regulation. Nonetheless, since the enactment of the law in 1986, DOT has developed a variety of public information materials related to ACAA.

6.1.1 Public Information: Print Material

*Fly-Rights: A Consumer Guide to Air Travel*--September 1994 (tenth revised edition). This 58-page brochure explains the rights and responsibilities of air travelers. Topics include air fares, overbooking, frequent-flyer programs, and travel scams. The brochure includes two pages on the ACAA and its regulations.

*New Horizons: Information for the Air Traveler with a Disability*--July 1995 (second edition). This 40-page brochure describes the rights and responsibilities of air travelers with disabilities under the ACAA. It includes directions on how to file an informal complaint.

*Plane Talk on Passengers with Disabilities*--This one-page fact sheet provides highlights of the provisions of the ACAA and its regulations.

*Air Travel Consumer Report*--Published monthly, this reports presents statistics on airline performance in baggage handling, oversales and on-time flights. Complaint statistics are reported for the following categories: customer service, flight problems (including delays,

cancellations, and misconnections), ticketing/boarding (including "disabled"), baggage, refunds, oversales, other (including frequent flyer), fares, tours, advertising, smoking, and credit. ACAA disability complaints are included in this report subsumed under Category C complaints regarding ticketing/boarding.

6.1.2 Website Information

Information about ACAA and the disability discrimination complaint process is available on the Internet at www.dot.gov/ost/ogc/subject/consumer/aviation/index.html (Aviation Consumer Protection Division publication page); www.dot.gov/ost/docr/HOME.HTM (DOT Civil Rights home page); and www.faa.gov/acr/acrhome.htm (Federal Aviation Administration Civil Rights Office page).

6.1.3 Available Formats

*New Horizons* is available on audiotape and in large print. *New Horizons*, *Fly-Rights*, *Plane Talk*, and the *Air Travel Consumer Report* are available on the websites listed above.

6.1.4 Methods of Dissemination

Copies of *New Horizons* are usually sent only upon request. Copies of *Fly-Rights* are routinely provided to all consumers who send complaints and inquiries to DOT. Thus, consumers who send disability complaints are routinely sent a copy of *Fly-Rights* but not *New Horizons.*

The monthly *Air Travel Consumer Report* is disseminated by DOT's Public Affairs Office and the Consumer Protection Division. On the mailing list are approximately 400 individuals, primarily airline and airport officials, but also academics and consumer organizations. The *Report* is provided to the media, which report selected statistics. Upon request, anyone can be placed on the mailing list. The mailing list is updated annually, purging names and addresses that are defunct and people who no longer wish to receive the *Report.* Because many publications are available on the Internet, DOT plans eventually to phase out some of its mailing lists, although the Consumer Protection Division does not plan to do so.

Airlines use the data in the monthly reports to rate their performance relative to that at their competitors and to analyze their industry status in corporate management reports. Airline representatives review the consumer complaints received by DOT every month for a quality assurance check on their customer service.

Data from specific complaint areas, such as on-time performance for specific flights, are also available on the computerized reservation systems used by airline ticket offices and travel agents to advise customers.

6.1.5 Analysis and Recommendations

Finding No. 4: DOT has done little to educate people with disabilities about either their rights under ACAA or how to exercise them.

Since the inception of ACAA in 1986, DOT has published only one brochure fully dedicated to explaining the law. There have been no public service announcements, no videos, no outreach campaigns, and no grants to nonprofits for public education. In contrast to the ADA public education materials and programs developed by the Department of Justice (DOJ) and the Equal Employment Opportunity Commission (EEOC), DOT has done little to train people with disabilities about their rights and responsibilities under the law and how to use them.

Recommendation No. 4: DOT should request that Congress appropriate funding for a comprehensive ACAA public education effort geared to informing air travelers with disabilities about their civil rights.

DOT should seek a budget appropriation to develop and carry out a strategic ACAA education campaign geared to developing ACAA awareness among air travelers with disabilities. Many people with disabilities remain unaware of their rights under ACAA or have limited information about how it works. DOT should develop a plan for training adults with disabilities and parents of children with disabilities about their rights under the law, the obligations of airlines, and the procedures for carrying out the law.

The plan should include development of regular ACAA publications and updates of materials for consumers with disabilities. As regulations change and procedures and practices evolve, DOT should ensure that its publications reflect current practice. DOT should also develop a dissemination strategy targeting adults with disabilities and parents of children with disabilities. Materials should be available at airports, through the airlines, from disability organizations, on-line, and in libraries. All materials should be in accessible formats.

Finding No. 5: DOT has done little to educate the public about the rights of people with disabilities and ACAA's nondiscrimination mandate.

Recommendation No. 5: DOT should request that Congress appropriate funds for a general public education campaign on the ACAA's nondiscrimination mandate.

Public awareness of disability rights laws is generally low, particularly as it relates to air travel. Public education campaigns can be most effective in promoting changed attitudes in relation to important social justice issues, such as disability rights.

Finding No. 6: The disability community has yet to be viewed as a market to be sought by the airlines industry.

Private industry always seeks new markets to enhance competitive advantages. People with disabilities and their families offer a potentially lucrative market for air carriers. However, uneven ACAA compliance would suggest that they are not yet viewed in this manner.

Recommendation No. 6(a): DOT should develop an explicit category for tracking disability complaints in the consumer complaint database and should publish the statistics monthly in the *Air Travel Consumer Report*.

Currently, data about disability complaints are reported as a subcategory of ticketing/boarding. This categorization provides no information for assessing the airlines' performance regarding disability issues. Airline customers who have access to on-time performance statistics can use the information in deciding which airlines to patronize. Creating a distinct category for disability complaints would provide an opportunity for people with disabilities, federal officials, advocates, and researchers to monitor airline performance in serving customers with disabilities. Disability organizations could widely disseminate such information for consumers with disabilities to use in determining where to take their air travel business.

Recommendation No. 6(b): DOT should ensure that disability community organizations and researchers with an interest in disability policy are part of the target audience for monthly dissemination of the *Air Travel Consumer Report*.

Recommendation No. 6(c): Federal officials overseeing ACAA enforcement should develop a strategy for using these statistics to hold airlines accountable for their performance.

6.2 General Guidance to the Aviation Industry

Education and technical assistance to industry in implementing a regulation is an important component of a successful enforcement strategy. DOT has several approaches to providing general guidance and technical assistance to the aviation industry. This section describes each of these approaches, NCD's findings regarding how they have been carried out, and recommendations.

6.2.1 Letters to the Airline Industry

DOT periodically sends letters to the airlines and others interested in the aviation industry about rules concerning passengers with disabilities. NCD's research team was given about a dozen letters sent between 1988 and 1997. Although the present Part 382 did not become effective until 1990, the requirements of the old Part 382 were in effect. The ACAA-related letters are summarized briefly below, as they have been a major avenue for DOT in providing compliance guidance to the industry.

April 25, 1990--Immediately after Part 382 went into effect in April 1990, DOT sent copies of the rule to the major U.S. carriers with a letter notifying them to submit their required written compliance plans.[118] They were also notified to implement a disability complaint resolution mechanism, designate their complaint resolution officers (CROs), and provide DOT with their names by June 4, 1990.[119]

November 29, 1990--DOT sent a second letter advising airline executives of "a clear and troubling trend" of "numerous complaints stress[ing] that many airline employees do not even know that the new rule exists!"[120] The letter also criticized the insufficiency of many airline responses to disability complaints that neither addressed the specific complaint nor stated what corrective action had been or would be taken. Finally, the letter stated that DOT would "refer to the Enforcement Office any matter which appears to warrant enforcement action because of a lack of employee awareness of the requirements of Part 382."[121]

December 20, 1991--DOT sent a letter to airline executives clarifying Part 382 boarding assistance requirements and explaining that it was imperative for airlines to inform passengers about accessibility limitations on all legs of their journeys.[122] DOT outlined the standard industry method for coding a need for special assistance into the passenger's reservation. DOT stressed the importance of training airline reservationists and travel agents to be aware of disability issues when making or checking existing reservations, and to identify potential accessibility conflicts. This letter was sent to all major and national U.S. airlines, encouraging them to work together and to avoid enforcement action through voluntary action. DOT also sent the letter to the major travel agency associations with a request to distribute it to their members.

April 2, 1992--In a letter sent to all *Air Travel Consumer Report* recipients, DOT emphasized the need for greater cooperation between airline and airport personnel to effect ACAA compliance in two key areas: providing lift devices and improving communication among airline and airport personnel regarding the special needs of passengers.[123] The availability of a free booklet and audio cassette for air travelers with disabilities was announced, and carriers were reminded that new aircraft delivered as of April 1992 must meet Part 382 accessibility standards.

March 16, 1993 and April 5, 1993--In two different letters, DOT notified all airlines and *Aviation Consumer Report* recipients of required cabin interior accessibility features for various types of aircraft.[124] Enclosed with the second letter was a booklet on accessible lavatory design for two aisle aircraft developed by an ATA-sponsored ad hoc working group. The letter emphasized that compliance with Part 382 accessibility standards is mandatory.[125]

July 15, 1993--This communication was sent to airline officials as a cover letter with copies of two recent letters to industry representatives discussing the interpretation and proper application of Part 382 guidelines concerning passengers with communicable diseases.[126]

October 7, 1993--DOT solicited recipients of the *Air Travel Consumer Report* for input on the NPRM concerning the design of lifts, ramps, and other suitable boarding devices, as well as a workable division of responsibility between airlines and airports in providing this equipment.[127]

During 1994 and 1995, apparently no industry letters addressing Part 382 issues were sent.

November 4, 1996--DOT sent the 1996 NPRM dealing with communicable diseases, seating accommodations, wheelchair stowage, and airport accessibility standards and accommodations with an industry letter to recipients of the *Aviation Consumer Report* and requested comments.[128]

May 23, 1997--This letter was sent to all major and national carriers, air transport organizations and "certain disability organizations" with a copy of Part 382 and the 1996 amendments.[129] Recipients were reminded that Part 382 can be downloaded from the Internet and must be made available to consumers at all airports at all times.

August 2, 1998--This letter was sent to the 10 largest U.S. certificated airlines, explaining DOT's policy under Part 382 on accommodating air travelers with documented severe peanut allergies. The letter explained the reasoning of the Office of Aviation Enforcement and Proceedings that creating peanut-free buffer zones in response to the request of a traveler with a medically documented peanut allergy was a reasonable accommodation and did not constitute an undue burden on air carriers.[130]

6.2.2 Consumer Complaint Review Meetings

Each month, DOT staff meets with representatives from the individual major airlines to review consumer complaints received by DOT during the previous month. A summary of their complaint statistics is published in the *Air Travel Consumer Report*. Airline representatives willingly participate in these meetings because complaint levels are considered such an important measure of airline performance. The meetings aim to identify corrective action, discuss any problem patterns, and improve the airline's overall customer service record.

Consumer complaints received by DOT, not by the airline itself,[131] are reviewed as part of the exercise. As currently conducted, these meetings do not address the specific issues of airline compliance with Part 382 arising from their own complaint data.

6.2.3 General Compliance Review Meetings

In 1995, DOT began a series of airline reviews as part of the Travelers First initiative. Since 1995, DOT has visited the headquarters offices of 10 major U.S. airlines and 15 smaller carriers as part of this initiative.[132] The program was designed to promote improvement in the quality of service to the public by the aviation industry. DOT also wanted the program to promote its new image as a consumer protection "facilitator" with the airlines. By approaching the compliance reviews in the spirit of information-sharing rather than investigation, DOT began its move away from a regulatory and toward a more "programmatic" mode of operation.[133] Travelers First is still in effect and includes a general review of consumer protection operations for all the major airlines.

DOT reports that it has emphasized voluntary compliance with the law. During each Travelers First review, DOT representatives met with airline officials and staff responsible for general consumer protection. The 10 major air carriers received a briefing on Part 382 requirements, but no inspections were conducted.[134] DOT staff examined the Part 382 complaint-handling processes and training programs for 15 regional and large commuter air carriers, and also may have randomly inspected their aircraft cabins and equipment for Part 382 compliance (movable armrests, availability of wheelchairs, onboard wheelchairs, etc.). During the reviews, ACAA complaint data typically were not reviewed.[135] DOT is currently planning action to require airlines to certify the extent to which all their aircraft meet Part 382's physical accessibility requirements.[136]

An area not currently within the scope of Travelers First or any other ACAA monitoring activity is compliance with the requirements for accessible lavatories in newly delivered double-aisle aircraft. OGC reports that it is currently considering the advisability and feasibility of working with FAA to inspect aircraft for compliance with all physical specifications required by ACAA regulations.

Each Travelers First review concludes with an information-sharing session on the various implementation strategies used by airlines in meeting Part 382 requirements. Following each airline visit, DOT sends a follow-up letter listing improvement/compliance recommendations and requests a response to the recommendations. It is not clear how many airlines sent responses. Researchers were not provided with samples of the follow-up letters or airline responses.

Airlines found to be noncompliant during the reviews are warned about possible legal consequences, and DOT reports that follow-up visits have been conducted with four of those airlines to date. In several instances, carriers have been required to change policies and procedures to modify aircraft to ensure compliance with the physical accessibility requirements of Part 382.[137]

6.2.4 DOT Presentations at Industrywide Conferences

DOT regularly gives presentations on Part 382 requirements and implementation issues at annual conferences sponsored by the Air Transport Association and the Paralyzed Veterans of America. DOT has presented at a number of Access to the Skies conferences, which provide a forum for the aviation industry, government, and disability group representatives to exchange information on accessibility problems for air travelers with disabilities.

6.2.5 Analysis and Recommendations

Finding No. 7: There appears to be little or no DOT follow-up to ensure compliance with DOT directives and guidance.

The guidance letters sent since 1990 have raised a number of compliance issues and concerns. However, there appears to be virtually no follow-up or resolution of concerns raised. For example, DOT's industry letter dated November 1990 expressed great concern about the many complaints pointing to a lack of airline personnel training. The letter threatened that enforcement action would be warranted if complaints continued.

After raising this concern in 1990, DOT did not mention it again, or any action it had taken to encourage compliance. Yet DOT's complaint files and records provide many current examples indicating inadequate training of airline personnel. The threat of enforcement action has also been empty. Of the five penalties issued, only one even mentions training as a factor that directly relates to the many violations.

Recommendation No. 7: DOT should use industry letters to report on both problem areas and the actions taken by DOT and the airlines to correct them.

Industry letters can be another forum for communicating about ACAA problem-solving initiatives and inviting airlines to communicate the solutions they are developing internally.

Finding No. 8: The monthly reviews of airline consumer complaints are underused as a resource for improving ACAA compliance.

Currently, a discussion of specific disability issues that appear in the airlines' own ACAA complaint data is not part of the monthly review of consumer complaints. There is no mechanism to ensure that recurring complaints and problem facilities identified in the airlines' complaint data are regularly addressed.

Recommendation No. 8: Once a quarter, DOT should use the monthly airline consumer complaint review meetings to focus on ACAA complaints.

During the quarterly meetings, airlines should be prepared to review *their own disability complaint data* with DOT, their own trend analysis of these data, and their own "get-well plan" (i.e., action plan for correcting any identified problems).

Finding No. 9: DOT does not provide incentives to encourage airline ACAA compliance.

Having dropped the regulatory role, DOT currently uses the Travelers First program as a form of compliance monitoring. Yet Travelers First is not so much a tool for compliance monitoring as for DOT collaboration with airlines to encourage overall performance improvement. It assumes a willingness to improve performance, an assumption that does not always apply to ACAA compliance. Other alternatives must be explored.

Recommendation No. 9: DOT should reward the airlines that are best in ACAA compliance and complaint resolution.

Airlines that are doing especially well in a particular area of ACAA compliance or complaint resolution should be given special recognition. Public recognition (free publicity) for a job well done in making travel accessible for people with disabilities is one of the most powerful tools available to encourage compliance.

Finding No. 10: The failure to include any regular review of ACAA complaints received directly by the airlines impairs effective monitoring.

The failure to include any regular review of ACAA complaints received directly by the airlines has many and varied implications for the implementation of ACAA. Because the vast majority of ACAA complaints go directly to the airlines, a regular examination of these data to determine where the real compliance problems are for each airline and a comparison of their statistics over time to measure improvements in performance are essential.

Recommendation No. 10: DOT should conduct routine follow-up reviews.

Airlines demonstrating borderline compliance or noncompliance should not only expect DOT check-ups but also should be required to produce evidence periodically that their compliance efforts are resulting in improvement.

Finding No. 11: DOT appears to take no initiative to provide appropriate, targeted assistance when airline problems are identified.

Recommendation No. 11: DOT should assist airlines in developing corrective action plans and compliance improvement objectives.

Finding No. 12: DOT does not appear to have a mechanism for facilitating intermodal and interdepartmental or external collaboration to meet ACAA enforcement responsibilities.

For example, no monitoring of any kind is under way in the delivery of new (double- aisle) aircraft with accessible lavatories.[138] While DOT claims that no complaints based on a failure to comply with lavatory accessibility requirements have been received to date,[139] noncompliance will have long-term consequences for a many people with

disabilities. DOT must be more proactive, despite resource limitations, in meeting its civil rights enforcement responsibilities. It must do some creative problem-solving and activate a mechanism for better use of existing resources. Redistributing resources and sharing responsibility within the agency, as well as aligning with outside resources and expertise may be necessary for DOT to ensure aircraft design monitoring is carried out and ACAA compliance achieved.[140]

Recommendation No. 12(a): DOT should require collaboration between OST departments having official ACAA enforcement responsibility and FAA departments having operational responsibilities directly affected by ACAA requirements.

For example, FAA provides review and final approval for all airline flight attendant training programs. DOT should work with FAA to identify any training programs for aviation industry personnel who interface with air travelers within FAA's purview. DOT should collaborate with FAA to expand FAA's role to ensure ACAA requirements are a required component of every applicable training program.

Another example is that FAA inspectors must review and approve all aircraft designs to ensure compliance with FAA safety regulations. No aircraft can be built without an FAA-approved specification. Including ACAA access requirements within the scope of FAA's design inspection is an economical alternative that can significantly strengthen enforcement; it eliminates the need for multiple inspections of the same specification and makes design approval contingent upon compliance with the full spectrum of safety and access requirements. OGC is currently considering the feasibility of working with FAA on new aircraft inspections to ensure compliance with ACAA physical accessibility requirements.

Recommendation No. 12(b): The Rehabilitation Act should be amended to expand the authority of the Access Board.

The Access Board is a small independent federal agency that develops accessibility standards and guidelines. It developed ADA accessibility guidelines that were subsequently adopted by DOJ as part of the implementing regulations for the law. The Access Board's expertise in accessibility and standards development uniquely qualifies it for this role in relation to ACAA. This role parallels the one the Access Board plays for ADA in relation to DOJ.

Access Board responsibilities should include the development of airplane access standards and guidelines (including restrooms, deplaning equipment, and enplaning equipment) that should be incorporated into ACAA regulations. Congress should appropriate adequate funds to enable the Access Board to carry out this function. The Access Board should work in conjunction with FAA, other divisions of DOT, and disability

community stakeholders as they carry out ACAA compliance activities. The participation of FAA in this process is critical because it is already involved in the inspection and approval of aircraft designs.

Recommendation No. 12(c): DOT should anticipate where industry noncompliance may be most pervasive and develop appropriate countermeasures and incentives.

DOT should notify airlines and aircraft manufacturers about the accessibility standards their aircraft must meet and institute periodic inspections to monitor compliance. Airlines with a demonstrated record of compliance should be given special recognition in the *Air Travel Consumer Reports*. Where noncompliance is found, enforcement action should be initiated immediately to obtain voluntary compliance; civil penalties should be levied whenever a pattern of inconsistency in meeting accessibility standards is found. Severe penalties should be imposed for every instance in which the requirement for accessible lavatories in double aisle aircraft ordered after April 1990 or delivered after April 1992 has not been met.

6.3 Technical Assistance to the Aviation Industry

DOT has not had a formal technical assistance program to support Part 382 implementation. Aside from notifying airline officials about technical guidance available through external sources (e.g., ATA's design specification for accessible lavatories in two-aisle aircraft) and occasionally sending an implementation guidance letter, DOT technical assistance has consisted primarily of giving informal guidance to airlines, passengers, and disability rights organizations in interpreting and implementing ACAA regulations.[141]

Regarding specific technical issues such as transmitting a passengers' special seating assignment information between airlines, DOT has sent an industry letter detailing a workable implementation approach. Researchers did not, however, encounter any materials indicating ongoing involvement in resolving specific problems involving technical issues (e.g., lifting/transferring passengers in wheelchairs, lavatory design for single-aisle aircraft).

Another issue indirectly affecting technical implementation of ACAA requirements is the dual accessibility standards (those applying to ADA Titles II and III) called for under Part 382. Although guidance for meeting both ADA standards is available through DOJ and DOT has distinguished the responsibilities of airlines and airports in Part 382, some confusion remains about which technical standards ought to apply (for example, airport operators may choose between ADA Accessibility Guidelines and the Uniform Federal Accessibility Standards in meeting certain ACAA accessibility requirements). This uncertainty is compounded when airlines and airports are required to share responsibility for meeting certain ACAA accessibility requirements (e.g., in providing mechanical lift

equipment and an accessible path into an aircraft). Airport operators are held to ADA Title II's standards of "program accessibility" and "barrier removal," while airlines must meet the ADA Title III "reasonable accommodation" and "readily achievable" standards. These differing legal standards only add complexity to negotiations between airports and airlines in jointly developing solutions.

Finally, DOT has made limited efforts to tackle controversial but major cabin design problems. Under the leadership of the Office of Environment, Energy, and Safety and the Office of Regulation and Enforcement, the Aircraft Accessibility Federal Advisory Committee was formed to develop a workable design for accessible lavatories in single-aisle aircraft. To that end, the committee of stakeholders met to address technical issues and to resolve the many conflicting interests among the participants.

6.3.1 Aircraft Accessibility Federal Advisory Committee

Advisory committee members were representatives from the airline industry, disability groups, aircraft designers and manufacturers, and flight attendants. The committee met approximately eight times over 18 months to develop design options for accessible lavatories in single-aisle aircraft. Unable to reach consensus, the committee disbanded in 1996. A major area of disagreement was whether a curtain-enclosed partition was the only economically and technically feasible lavatory design option. The committee's final report, recently made available to the public, can be obtained from DOT's website ostpxweb.dot.gov.[142]

6.3.2 Analysis and Recommendations

Finding No. 13: Confusion concerning which standards apply continues to impede full cooperation between airport operators and airlines where Part 382 mandates joint action to meet ACAA accessibility requirements.

Recommendation No. 13: Although DOT issued clarifying regulations as part of the November 1, 1996, amendments to Part 382 and 49 CFR Part 27, DOT must exercise stronger leadership to ensure that airports and airlines take joint action, consistent with the standards that apply to each, to provide an accessible path through the airport and proper equipment for boarding an aircraft.

Finding No. 14: DOT leadership is needed to find solutions to ACAA implementation problems and encourage collaborative stakeholder initiatives.

Recommendation No. 14: DOT must actively encourage airlines to collaborate with the disability community in developing solutions to common ACAA implementation problems.

DOT has used the regulatory negotiation process to address some technical issues in the past with limited success. DOT should build on its experience with these past negotiations

to address controversial access issues. The most recent advisory committee on accessible lavatories in single-aisle aircraft failed because of intransigent conflict among the stakeholders. A relatively high level of disagreement and controversy among the stakeholders is a given. It is within DOT's ACAA enforcement mandate to initiate consensus-based processes and keep participants focused on working through stalemates to solve the problems. Issues calling for immediate attention include conflicts between Part 382 requirements and airline policies that seem to circumvent ACAA requirements (e.g., changes in airline preboarding practices).

6.4 Informal Complaints Alleging Potential Violations of 14 CFR Part 382

6.4.1 The Informal Consumer Complaint Process

Under Part 382, consumers should first lodge complaints about discriminatory treatment with the airline itself through the airline's CRO. The responsibilities of the CRO are twofold. First, the CRO is to have the authority to resolve complaints, instructing other air carrier personnel to take the actions required to ensure ACAA compliance (except to countermand pilot decisions based on safety considerations). Second, the CRO makes a written record of any disability-related consumer complaint and provides to the complainant a written statement containing a summary of the facts.

If the CRO determines that a potential violation of the ACAA occurred, the statement provided to the complainant must include information about what steps the air carrier has taken or will take in response. If the CRO determines that the actions of air carrier personnel did not violate the ACAA, the statement must include the reasons for this determination. The written statement to the complainant must also "inform the complainant of his or her right to pursue DOT enforcement action."[143] Although the airline must keep written records, these complaints are considered informal complaints.

Airline passengers may also contact DOT directly with a complaint about discriminatory treatment by an air carrier. Complaints sent directly to DOT are simultaneously logged into the DOT complaint database and forwarded with a form letter to the particular airline for action by its consumer affairs division. Thus, some complaints appear only in the records of the specific air carrier, while other complaints appear in both the air carrier's database and the complaint database at DOT. The vast majority of complaints are sent directly to the airlines, with no copy to DOT.

Disability discrimination complaints sent to DOT are entered into the same DOT database that stores information on all categories of aviation consumer complaints, as well as complaints of discrimination under Title VI or any other civil rights laws. All these complaints, whether customer service or civil rights in nature, are considered informal complaints. The information profile on a disability complaint includes the date received,

airline and flight number, type of disability of the passenger (broken into eight broad categories), basis of the complaint, identity of the person filing the complaint (e.g., the passenger, a relative of the passenger, a lawyer for the complainant, or a congressperson), date of the potential violation, disposition of the complaint, and status of the complaint (open or closed). In addition to the profile in the complaint database, DOT maintains a paper file on the complaint that includes correspondence about the complaint received by DOT, DOT letter of notification to the airline, and the airline response to DOT and to the customer. Files of cases older than 12 months are purged regularly; only cases determined to be potential enforcement actions are retained.

DOT receives complaints in the form of phone calls, letters addressed directly to DOT, and copies of letters addressed directly to the airline. As the complaints come into DOT, an analyst reviews them and records them in the complaint database. The hard copy file may have letters and materials with information from the complainant and from the airline about actions taken in response to the complaint. After reviewing the file, the analyst may make further inquiries of the airline or the complainant and seek to clarify the pertinent ACAA requirements. Telephone complaints are usually followed up with a phone call to the complainant telling him or her to send a written complaint. After the complaint is logged in, the case is classified as "potential violation" or it is closed, or both, depending on whether the complaint was originally received in writing, by telephone, or other means. Complaints by telephone are generally closed the day they are received. Complaints sent by letter are coded "potential violation" and sent with a form letter to the airline requesting that it respond to the complainant and notify DOT of its actions within 30 days. When DOT receives a copy of the airline response, the complaint record is typically closed. DOT follows up with the airline only when the complaint involves an established policy or procedure that is out of compliance with ACAA. The vast majority of complaints are not determined to be matters of policy or procedure.

Even when they receive a finding of potential violation, individual informal complaints are rarely referred to the Enforcement Office for investigation. Although the Enforcement Office might file a formal complaint based on a single complaint that appears conspicuously egregious and raises issues of general public concern, no individual informal complaints have been referred for enforcement since 1990.[144] Generally, when an airline accumulates a significant number of complaints of the same type, indicating a problem of general public concern, these cases will be forwarded to the Enforcement Office for further investigation of a possible pattern and practice violation. The Enforcement Office may then seek a settlement with the airline or file a formal complaint. Most ACAA complaints received by DOT are informal, and only 17 formal complaints alleging an ACAA violation have been fully processed since 1986. These are discussed in section 6.5 of this report.

6.4.2 Characteristics of Informal Complaints Received by DOT

Summary data from the complete DOT database made available to NCD show that complaints involving disability constitute approximately 4.5 percent of all consumer complaints received on the major airlines. Table 1 shows the total number of consumer complaints in all categories received for each of 10 major U.S. carriers during the entire ACAA enforcement period, what percentage of this total were identified as potential enforcement actions, and of those what percentage were disability-related.

Between April 1990 and October 1997, DOT received approximately 1,831 informal disability-related complaints. Of these, 140 appear to be multiple complaints generated from a single "travel occurrence" involving the same airline, actions, and date of travel. Although ACAA does not apply to foreign air carriers, 103 (5.6%) complaints in the database are from foreign carriers. Approximately 80 percent of the complaints involved one of the major U.S. airlines or their commuter airline affiliate (see Table 2). The remaining complaints involved smaller air carriers or tour operators.

The DOT database also shows that 72.5 percent of the complaints are made by letter, with 27.5 percent by telephone. More than one complainant can be listed for a single complaint. In fact, some complaints list up to four different complainants; these may include the traveler with the disability, a relative of the traveler, a lawyer, a congressperson, or other individual. The person registering the complaint is most often the passenger with the disability, although relatives (16 percent of all complainants), congresspersons (6.3 percent), and lawyers (3.2 percent) also appear in the records as complainants.

Table 3 displays the distribution of complaints against U.S. air carriers by type of disability, using the categories contained in the DOT database. DOT coding categories for the type of disability do not clearly describe the types of disabilities of the complainants, as some of the categories refer to conditions while others refer to assistive devices. It is also not clear how people with multiple disabilities are categorized by the analysts who create the complaint record on the basis of the oral or written statement of the complainant. Approximately 60 percent of the complaints involve a person who uses a wheelchair, while another 19 percent are from persons classified as "other handicapped." Nearly 6 percent of the complaints come from persons with hearing or vision impairments, and 8.7 percent involve someone who uses oxygen.

The types of actions upon which the complaints are based are listed in Table 4. Failure to provide assistance is by far the most common complaint, accounting for 50 percent of the complaints. Complaints involving the handling of assistive devices constitute another large category. Approximately 21 percent of the complaints allege an ACAA violation involving problems with storage, loss, or damage to an assistive device, delay in returning the

device to the owner; or the insistence upon a liability waiver (not allowed under ACAA). Although the database does not identify the types of devices involved in these complaints, a review of selected complaint files suggests that many of these cases involve wheelchairs. A smaller, but still significant, number of complaints involve refusal to board or seat assignment restrictions (the April 1998 NPRM addresses seating assignment rules).

Of the 1,728 disability-related complaints logged against U.S. carriers from April 1990 through October 1997, 169 or 9.8 percent were identified as "potential enforcement actions." In addition, all but 6.5 percent (113) of the complaints were considered closed cases. A determination of potential violation is made based on the complainant's statement (written or taken by telephone) and the airline's written response. DOT usually does not independently investigate these complaints by interviewing the major parties to the complaint or contacting other persons who may have witnessed the actions that form the basis of the complaint.

In summary, most of the complaints filed with DOT involve experiences with the major U.S. air carriers. This situation is not illogical because these carriers account for more flights and passengers overall. However, the concentration of most of the complaints among a small number of large carriers suggests that better oversight and increased support and consultation with a few airlines could produce a noticeable improvement in the air travel experience of people with disabilities. The DOT database also indicates that people who use wheelchairs continue to experience problems--in the airport, in boarding and deplaning, the planes, and in the storage and retrieval of their wheelchairs. DOT should be able to monitor and address these problems through its database and compliance processes.

6.4.3 Complaint Data from the Airlines: A Different Picture

The complaints received by DOT constitute only a small proportion of all the complaints directly lodged with the airlines. Each airline has its own complaint handling system for recording complaints received and the actions taken. This record is required in Part 382, even though DOT has to date conducted no formal, systematic review of airline complaint records to date. Researchers learned of two instances in which these airline records had been obtained as part of discovery for lawsuits brought under ACAA by air travelers with disabilities. In both cases, the number of complaints filed directly with the airline far exceeded the number of complaints filed with DOT about that same airline.

The complaint log from one of these lawsuits was made available for our analysis. Table 5 summarizes this log, showing complaints received from January 1993 through November 1996 by a major U.S. carrier. More detail about the content of those complaints is given in Appendix B. Analysis of the log is useful not only because it provides a more accurate

picture of the volume of disability complaints, but because it provides more detail about the types of actions that are the bases of complaints.

A total of 5,072 disability-related complaints were logged with this air carrier during a 47-month period. Approximately 38 percent of the complaints (1,942) were categorized by the airline as involving damaged or delayed wheelchairs. Nearly 25 percent of the complaints (1,258) were classified as failures on the part of the airline's customer service agents to provide sufficient or appropriate assistance to passengers with disabilities. Over 10 percent of the complaints were logged as problems with seating, particularly with requests for the bulkhead.

In analyzing the specific complaints, researchers found that a single complaint sometimes described several problems. Complaints about "delayed wheelchairs" also appeared in other categories such as "disabled passenger seating problem" or "disabled passenger left unattended." To get a better sense of the true frequency of certain kinds of complaints, researchers tabulated each problem reported regardless of the main category into which the overall complaint had been logged. These results are shown in Table 6.

These complaints indicate significant problems with the level of training and knowledge of airline personnel about their obligations under ACAA, assisting someone with a disability, reassembling wheelchairs, and helping passengers with other assistive devices. It is also noteworthy that the complaints record insensitive, rude, and irresponsible treatment of passengers with disabilities. For example, there are 65 complaints of a passenger being left unattended in a manner that violated the requirement to provide assistance and that may have compromised the safety of the passenger.

To provide additional insight into the bases of ACAA disability complaints, researchers extracted the complaint details from the hard copy files for a small set of complaints filed with DOT. This information is located in Appendix C. The descriptions of the airlines' actions are very similar to the kinds of actions described in the individual airline database summarized in Table 5. Although the cases profiled here are not from a random sample of cases, they do present typical examples of the relationship between the nature of the complaints and their resolution.

For many of these cases, even cases that have been closed, no specific determination by DOT is noted. Apologies or compensatory vouchers by the airline appear to be treated as satisfactory responses in most cases. In a couple of instances, complaints have been marked as a "potential enforcement action," while complaints alleging similar violations are coded "potential violations." Even complaints marked as "potential enforcement actions" were not necessarily forwarded to the Enforcement Office for investigation. Researchers were told that the "potential enforcement action" notation flag problems that may become the basis for a pattern or practice enforcement action in the future.[145]

Table 1. Summary of ACAA Informal Consumer Complaints not available

**Table 2. ACAA Informal Complaints Against Major U.S. Carriers Received by DOT Aviation Consumer Protection Division**

April 5, 1990-October 23, 1997

| Air Carrier | % of Informal ACAA Complaints | Ranking based on share of customer base* |
|---|---|---|
| American Airlines (includes American Eagle) | 15.5 | 3 |
| United Airlines (includes United Express) | 14.9 | 2 |
| US Airways/USAIR (includes US Air Express) | 10.7 | 4 |
| Delta Airlines | 10.0 | 1 |
| Northwest Airlines (includes Northwest Airlink) | 9.8 | 6 |
| Continental Airlines (includes Continental Express) | 7.6 | 7 |
| Trans World Airlines (includes Trans World Express) | 6.4 | 8 |
| America West Airlines | 2.6 | 6 |
| Southwest Airlines | 1.9 | 5 |
| Alaska Airlines | 1.4 | 10 |
| Total | 80.8 (N=1476) | |

*Ranking based on total number of passengers served in 1996 as reported in the *Air*

*Transport Association 1997 Annual Report*, p. 16. The major carriers listed above carry an estimated 92 percent of all commercial air traffic.

**Table 3. Informal ACAA Complaints: Disability Categories [1]**

| DOT Disability Category [2] | % of Complaints |
|---|---|
| Other wheelchair | 59.8 |
| Other handicapped | 18.7 |
| Oxygen | 8.7 |
| Vision impaired | 3.2 |
| Hearing impaired | 2.0 |
| Paraplegic | 2.0 |
| Mentally impaired | 1.9 |
| Quadriplegic | 1.4 |
| Vision/hearing impaired | 0.7 |
| Other assistive device | 0.7 |
| Communicable disease | 0.6 |
| Stretcher | 0.4 |
| Total | 100.1 (N=1728) |

[1] Based upon data from U.S. carriers only.

[2] The categories are those used in the DOT complaint database.

Percentages are rounded to the nearest tenth.

**Table 4. ACAA Informal Complaints: Types of Disability Complaints Received [1]**

| DOT Complaint Types (2) | % of Complaints |
|---|---|
| Failure to provide assistance (3) | 50.0 |
| Assistive device; storage; loss/damage/ delay; Liability waiver | 21.1 |
| Other | 8.5 |
| Seat assignment restriction | 7.9 |
| Refusal to board passenger | 5.8 |
| Aircraft not accessible | 2.0 |
| Unsatisfactory information | 1.2 |
| Airport not accessible | 1.1 |
| Service animal problem | 0.9 |
| Refusal to board without attendant | 0.8 |
| Advance notice dispute | 0.3 |
| Ticket not received; ticket/reservation incorrect | 0.3 |
| Refusal to accept other airline ticket/ Required to repurchase lost ticket | 0.1 |
| Unable to contact | 0.1 |
| Total | 100.1 (N=1728) |

[1] Based upon data from U.S. carriers only.

[2] The complaint types are those used in the DOT complaint database. Percentages are rounded to the nearest tenth.

[3] "Failure to provide assistance" includes not providing a wheelchair or assistance in

getting to a restroom, or not communicating information in a manner appropriate to a person's disability.

**Table 5. Complaints Filed Directly with a Major Air Carrier**

**January, 1993-November, 1996** [1]

| CODE | CATEGORY TITLE | Number of Complaints |
|------|----------------|----------------------|
| DDWC | Delayed wheelchair | 1871 |
| DCSAH | Disabled pax assistance by CSA | 1258 |
| DSEAT | Disabled pax seating problems | 524 |
| DIFAT | Lack of F/A assistance with disabled pax | 322 |
| DCONT | Contract employee complaint | 305 |
| DMISC | Disabled miscellaneous | 225 |
| DRR | Lack of res. assistance with disabled pax | 123 |
| DPRO | Agent unfamiliar with disabled procedures | 79 |
| DAF | Disabled dissatisfied with aircraft facilities | 74 |
| DFAC | Disabled facility complaint | 72 |
| DDDWC | Damaged wheelchair | 71 |
| DUNAT | Disabled PAX left unattended | 65 |
| DPB | Disabled PAX preboarding | 63 |
| DTIPS | Disabled PAX solicitation of tips | 20 |

|  | Total Complaints | 5072 |
|--|------------------|------|

[1]The complaints summarized in this table are from the records of a single airline. The major category headings are listed verbatim from the airline's file. Some of these complaints may have been sent to the Department of Transportation as well. The criteria for defining each category are unclear, as similar types of complaints often were found under several different categories.

PAX = passenger
CSA = customer service agent
F/A = flight attendant

---

**Table 6. Complaints Filed Directly with a Major Air Carrier**

**January 1993-November 1996**

**Rank Ordering of Recurring Specific Complaints***

| Recurring Complaints | Number of Complaints |
|----------------------|----------------------|
| Denied/delayed/challenged wheelchair use | 2395 |
| Refused/challenged need for assistance | 354 |
| Mistreated/rude/incompetent staff | 229 |
| Refused bulkhead seating | 218 |
| Left abandoned/unattended | 202 |
| No preboarding/boarding assistance | 162 |
| Missed connection/misboarded/wrong gate | 151 |
| Oxygen mishandling/overcharge/no delivery | 143 |
| Reservation assistance complaints | 123 |
| Injury during transfer/transport | 95 |
| Damaged wheelchair | 83 |

| | |
|---|---|
| Seated at rear of plane | 73 |
| Disabled in restricted (middle) seat | 42 |
| Solicitation of tips | 41 |
| No movable armrests | 40 |
| Forced to check assistive device before gate | 39 |
| Separated from companion | 37 |
| Nondisabled seated in bulkhead | 36 |
| No lift/jetway | 28 |
| Closed captioning complaints | 26 |
| Refused assistance to transfer/transport | 25 |
| Pre-assigned seat request denied | 22 |
| Staff incompetent/untrained | 19 |
| Nondisabled complaints of disabled as obstruction/safety hazard in aisle seats | 17 |
| Non-English speaking | 15 |
| ACAA violation complaints | 15 |
| Safety complaints/safety info transmission | 13 |
| No TTY | 12 |
| Restrooms inaccessible | 11 |
| Total | 4666 |

* The complaints summarized in this table are from the records of a single airline. Specific complaints with fewer than 10 occurrences are not included.

6.4.4 Analysis and Recommendations

Finding No. 15: The informal complaint handling process does not result in consistent enforcement and remediation to individuals whose civil rights were abridged in violation of ACAA.

The manner in which DOT handles ACAA complaints raises the issue of whether it is appropriate to treat complaints of civil rights violations as informal complaints. The process and the database used by DOT are much the same as those used for consumer complaints that do not involve violations of an individual's legally protected civil rights or, in some cases, any law at all. When draft ACAA regulations were issued, Eastern Paralyzed Veterans of America brought this issue to the attention of DOT. However, DOT nonetheless decided to structure the primary complaint process as an informal one. In its response to the comments received about the NPRM of June 22, 1988, DOT describes the role of the Consumer Protection Division as follows:

The Department's Consumer Affairs Office is often able to help resolve problems between passenger and carriers on disability issues as well as other airline consumer matters. We recommend that, before filing a part 302 complaint [this is a formal complaint], a passenger write or call this office to determine if it can work out a solution to the problem.

DOT goes on to say,

In the absence of other enforcement mechanisms the Department will consider individual complaints as well as so-called "pattern or practice" complaints under part 302 procedures. The office [Aviation Enforcement and Proceedings Office] will evaluate all complaints that come in. To mandate that every complaint be prosecuted, however, regardless of its merits, would entail a considerable waste of resources, both the Department's and those of carriers and complainants.

Researchers did not survey any ACAA complainants to learn what their expectations of the complaint process were. However, because complaints of housing discrimination and employment discrimination are generally handled on a case-by-case basis, with investigation and individual case resolution and enforcement, it is logical to expect that complaints of disability discrimination in air travel would get similar individual case attention. The New Horizons brochure states, "Any person believing that a carrier has violated any provision of the rule may contact the following office," followed by the address for the Consumer Protection Division. Nothing in the DOT brochure or website information about the ACAA compliance process makes it clear that most complaints sent to DOT are processed with a brief assessment, a tracking record created in a database, a form letter to the respondent airline, and monitoring of the complaint until an airline response is received and the complaint closed.[146] Only the few complaints determined to involve

policies or procedures out of compliance with ACAA are investigated. It is not clear whether consumers with disabilities relying on DOT's public information brochures would be aware of the limitations of filing an informal complaint with DOT to obtain complaint resolution.

Complainants who are not satisfied with the airline response to their complaint are encouraged to contact DOT. However, even if DOT has determined that a potential violation occurred and that the airline response was inappropriate, further formal action usually does not result. DOT may contact the airline and request that it amend its response to the passenger, but it does not levy a fine or engage in any formal mediation or adjudication between the complainant and the airline unless a formal complaint is filed. Thus, passengers dissatisfied with the airline response to their complaint are left with civil litigation as the primary means for obtaining a satisfactory or enforceable redress for the alleged violation of their rights.

Recommendation No. 15(a): Complaints filed under the Air Carrier Access Act should be individually investigated and given a specific determination by DOT that is communicated to the complainant.

The process should be modeled on the Equal Employment Opportunity Commission (EEOC) procedures for handling discrimination complaints and should involve the possibility of mediation and compensation or awards to complainants as an alternative to litigation.

Recommendation No. 15(b): The public information materials distributed by DOT should clearly describe the types of outcomes possible from filing an ACAA complaint with DOT.

Finding No. 16: DOT's complaint database is inadequate for adjudicating individual ACAA complaints and monitoring ACAA compliance across all air carriers.

The usefulness of the DOT complaint database as a vehicle for monitoring and enforcing ACAA is questionable. For example, all disability-related complaints are logged into a central database containing every category of consumer complaint received by DOT. Complaints about foreign air carriers, which are not currently enforced under ACAA, are included in DOT's statistical reporting of disability complaints.

The DOT database resides on an antiquated mainframe having limited capability to sort on user-selected data fields for different types of analysis. Researchers requested a variety of reports sorted according to different selection criteria and with different sets of data fields. DOT declined to provide all but two on the grounds that the requested reports required complicated reprogramming of the reporting function which none of the consumer protection staff knew how to do. However, following a review of the second draft of this report, DOT staff members said that the mainframe was capable of producing a broad

range of reports, including those initially requested.

Another factor affecting the usefulness of the complaint data is the categories for type of disability and type of discriminatory action. Some categories are so broad (e.g., "other wheelchair") that it is difficult to produce a clear profile of the travelers and the events triggering their complaints.

Furthermore, specific information is lacking in the database records concerning the nature and circumstances of the complaints. Capturing this information is particularly important because it is DOT's policy to destroy the hard copies of most complaint files (other than those identified as a "potential enforcement action") a year after they have been received. Although the database record can be expanded indefinitely to document specifics of a given complaint file, the vast majority of complaint records contain only the most basic information about the complainant and the nature and disposition of the complaint. Part of the difficulty may be that complaint letters are written in a narrative style and contain varying amounts of relevant details about the occurrences. A carefully developed complaint form would allow more consistent and specific data to be collected. In the National Council on Disability (NCD) interviews, DOT staff did acknowledge that the database categories could be improved and indicated that a standardized complaint form had been drafted and was under consideration for approval.[147] Between November 1997 and January 1998, researchers asked several different staff persons about the status of the complaint form. Most staff members indicated that no consensus had been reached on whether such a form would be useful or desirable. At the time of NCD's last inquiry, the form apparently was in limbo at an unknown level.[148]

Still another concern is the use to which the complaint data are put. The database complaint records serve primarily to provide DOT with an aggregate picture of the problems reported by the public for each airline. DOT uses the data mainly to work with each airline at the big picture level in correcting compliance problems affecting its overall performance assessment or potentially leading to enforcement action. Although this is a legitimate and useful purpose for the data, the effort expended by individual consumers to document and report their complaints frequently does not result in a satisfactory outcome for them. In addition, as described above, disability complaints are not identified by individual airline in the public report of consumer complaints issued monthly by DOT. Instead, the disability complaints are grouped within the aggregate category "ticketing/boarding."

Finally, no data are regularly maintained by DOT that can be used to assess the full extent of ACAA problems or ACAA compliance across the nation. This is partly because the DOT database contains only a small fraction of the actual number of ACAA complaints generated each year. Most complaints are sent directly to the airline with no copy sent to

DOT. Regarding those complaints that are sent to DOT, researchers were not able to determine whether they came from the most dissatisfied or aggrieved passengers, those most knowledgeable about the ACAA, or neither. Although the airline CROs by law must keep a written record of all complaints, DOT does not ask the airlines for these records or for a summary report of the records to analyze, unless in connection with the investigation of a formal complaint or enforcement action.

Yet complaint data produced by a defendant airline during the discovery phase of litigation in which it was involved indicated conclusively that the number of disability-related complaints made directly to the airline were many times greater than the number of complaints received by DOT over the same period. Between January 1993 and November 1996, this major carrier received 5,072 disability-related complaints;[149] over the same period, DOT received only 142 complaints against that carrier and 1,009 disability-related complaints against all air carriers, including foreign carriers.

Researchers asked Enforcement Office staff what the estimated discrepancy was between the number of disability complaints received by DOT and the number received directly by the airlines. Using airline complaint data during enforcement investigations, they estimated that for every single complaint received by DOT against an airline, about 99 more disability complaints were recorded only in that airline's own records.[150]

Recommendation No. 16(a): DOT should maintain a technically proficient database adequate to perform ACAA complaint tracking and analysis.

A database using modern application software should be developed to track the data items and codes required for ACAA complaint processing, investigation, enforcement, and compliance monitoring. In addition, the complaint data categories should be redesigned into clearly defined categories that describe meaningful data.

Recommendation No. 16(b): DOT should require all air carriers whose activities are covered by ACAA to submit annually the record of disability complaints that they are required by law to maintain.

DOT should review these records and evaluate them as part of its responsibility for compliance review.

Finding No. 17: The criteria are unclear for determining when complaints alleging similar violations are to be coded as potential violations only or as potential enforcement actions for investigation by the Enforcement Office.

Although the complaints handled by DOT are considered informal complaints, at some point they may be coded as potential violations or potential enforcement actions of both. Researchers noticed that complaints alleging similar violations were inconsistently coded--

sometimes as potential violations and sometimes as potential enforcement actions--and asked about the distinction between the two codes. When asked what the rules were for deciding which code to apply, DOT staff said there was "no written list" of criteria for distinguishing potential violations from potential enforcement actions or for referring cases to the Enforcement Office for formal enforcement. DOT staff explained that DOT routinely codes as "potential violations" all records generated from complaint letters after a copy of the complaint letter and a DOT form letter go out to the airline requesting a response to the complainant within 30 days.[151]

When pressed to provide the criteria used to distinguish a potential enforcement action from a potential violation, DOT staff said that some of the criteria for determining whether enforcement action should be taken on a complaint were

- the (perceived) potential effect of the enforcement action on consumers (positive and negative);

- the uniqueness of the complaint issue (i.e., whether it involves a new service the airlines are not yet accustomed to providing);

- how widespread the alleged violation is throughout the industry; and

- the potential impact of the enforcement action on the aviation industry.[152]

Months later, DOT staff members reviewing the second draft of this report with NCD staff members, identified another criterion: whether a complaint involves an established airline policy or procedure that is not in compliance with ACAA. NCD staff members were told that this is the main benchmark for determining whether a complaint is a potential enforcement action. Relatively few complaints receive this designation because it is narrowly applied. Researchers were told that when enough complaints (potential violations) of a similar nature against a given airline had accumulated to suggest a pattern or practice not in the public interest, those cases might be forwarded to the Enforcement Office for review as "potential enforcement actions" against the airline.[153]

Researchers received conflicting information from DOT staff regarding the categories "potential violation" and "potential enforcement action." During early interviews with DOT staff, researchers were told that some complaints are initially determined to be "potential enforcement actions," while all other complaints are routinely coded as "potential violations." Later, DOT staff said that most complaints are classified as potential enforcement actions from the outset.

Recommendation No. 17: DOT should develop written materials that articulate the decision rules for deciding the status of consumer complaints at each step of the enforcement process.

Objective criteria need to be defined for analyzing informal complaints to identify the elements of liability for prima facie violations, potential enforcement actions, and the imposition of civil penalties.

The next section presents an in-depth description of the formal complaint process and its relationship to ACAA enforcement.

6.5 Formal Complaints and Enforcement Actions

6.5.1 Filing a Formal Complaint

Formal complaints under ACAA are filed following the rules of 14 CFR Part 302. These rules apply not only to ACAA formal complaints but to all complaints alleging violations of any federal aviation statute or DOT rule or order. Any individual, corporation, or public entity, including DOT itself, may file a formal complaint alleging violation of the ACAA with DOT's Dockets section under Part 302.

The complaint must conform to the procedural requirements of section 302.3 (see Appendix E) with respect to the form and filing of documents. These requirements, which are exacting and time-consuming, serve as procedural safeguards intended to meet due process requirements with respect to the respondent air carrier.[154]

There are no public education documents describing how to file a formal complaint under the ACAA. The *New Horizons* brochure, DOT's only publication for the public that describes in detail the protections afforded air passengers with disabilities, does not inform the public of the possibility of filing a formal complaint. Nor does it list the Enforcement Office as one of the federal offices involved with ACAA enforcement. Thus, anyone seeking to file a Part 302 complaint would need to find out on his or her own whom to contact to file the complaint. To file correctly, it would be necessary to consult the federal regulations. Without the assistance of a lawyer, an individual would probably not know about the formal complaint process or successfully be able to file a complaint under it.

6.5.2 The Formal Complaint Process

After the complaint has been filed with DOT's Dockets section, the respondent has 15 days to file an answer. After all answers have been filed and any necessary investigation has been conducted, the Enforcement Office has a reasonable period (60 days unless an extension is granted) to file the notice of enforcement and proposed assessment of civil penalty or to dismiss the complaint.[155] At any time after the filing, the respondent may file an answer and a motion to dismiss the complaint. The Enforcement Office will consider matters raised in the answer in deciding whether to dismiss the complaint or institute an enforcement proceeding. The Enforcement Office will dismiss a third-party complaint if it

finds either that

- the allegations do not provide sufficient grounds for believing that a violation of a federal aviation statute or department rule or order has occurred, or

- further investigation is not in the public interest.

A notice stating the reason must accompany the dismissal order. If the Enforcement Office does not act within a reasonable period, the complainant may file a motion with the Deputy General Counsel to docket the complaint.

If the Enforcement Office decides to file a notice of enforcement proceeding and its own formal complaint, the case is then assigned to an administrative law judge for a formal hearing under the requirements of 14 CFR 302.3-302.4. In keeping with its overall enforcement strategy, DOT will seek to resolve complaints informally whenever possible before resorting to formal enforcement action.

6.5.3 Informal Enforcement Strategy

The Enforcement Office maintains that the goal of enforcement is to ensure that consumers are protected adequately, and that formal enforcement action can actually impede consumer protection, depending on the approach taken.[156]Regulatory enforcement hinders a business's ability to satisfy customer needs, whereas collaborative enforcement supports efforts towards compliance in meeting customers needs.[157] The goal is to use the lowest level of enforcement appropriate to achieve satisfactory compliance on any given issue.

- In keeping with this goal, the ACAA informal enforcement mechanism is graduated as follows:

- a telephone call explaining the need for compliance, followed by

- correspondence stating the same, followed by

- explicit warning notice, followed by

- referral for administrative enforcement action.

As a matter of policy, the Enforcement Office does not publicize formal complaint cases resulting in voluntary compliance, presumably to encourage voluntary compliance by respondents. If compliance is not forthcoming, enforcement action may begin.[158] Enforcement action can take the form of a voluntary consent order or administrative adjudication, either of which can impose cease and desist provisions (with or without civil penalties) or a federal lawsuit for injunctive relief.[159]

Those staff persons who carry out DOT's enforcement strategy repeatedly emphasized:

Collaboration is the key to DOT's enforcement strategy. The subtext of the collaborative strategy is that the rules governing success in the marketplace will ensure that consumer issues will eventually correct themselves. When asked what economic incentive an airline would have for Part 382 compliance, DOT staff frankly admitted that the main business incentive for complying with Part 382 is projecting the image of a customer-caring business to the general public.[160]

Key DOT staff members believe this enforcement strategy is highly effective, saying that "air carriers are complying 99 percent" with the regulation (Part 382).[161] The Enforcement Office also noted that the drastic cutback in compliance monitoring since deregulation seems to have had little real effect on the compliance picture. In support of its view on the extent of ACAA compliance problems, the Enforcement Office cites a statistical analysis of consumer complaint data samples from a number of airlines over several years during the 1990s. Their findings showed that disability complaints consistently represented only about 4 percent of the total consumer complaints across the board for every airline and for each year sampled.

6.5.4 Enforcement Orders

From 1987 until September 1998, DOT received 17 formal complaints filed by third parties and one formal complaint filed by the Enforcement Office. The formal complaint filed by the Enforcement Office resulted in a cease and desist order. Fourteen of the third-party complaints were dismissed.

Of the 14 third-party complaints dismissed, two resulted in cease and desist orders that also carried civil penalties. Four of the 14 were dismissed upon request of the complainants after private settlements had been reached with the airlines. Three complaints were dismissed because of insufficient cause and one because the accommodation requested constituted an undue burden. Four other dismissals were based on a finding that, while a violation may have occurred, mitigating factors led to a determination that it was not in the public interest to pursue enforcement action.

As of September 1998, the total amount in civil penalties imposed on airlines as a result of third-party formal complaints alleging discrimination on the basis of disability was $28,000. Summaries of the three complaints resulting in cease and desist orders or civil penalties or both, follow.

6.5.5 Formal Enforcement Proceedings

A notice of the enforcement proceeding and a formal complaint initiated by the Enforcement Office commence an oral evidentiary proceeding, which may be based on a formal third-party complaint, on informal complaints received by DOT, or on information gathered by DOT without any complaint being filed.[162]

Once a hearing has been held and the parties have filed briefs on the issues raised in the complaint, the administrative law judge issues a recommended decision or may certify the record to the DOT decisionmaker, who is either the Assistant Secretary for Aviation and International Affairs or the Secretary. Any final DOT order may be appealed to the U.S. Circuit Courts under 49 U.S.C. § 46110.[163]

The procedures in a formal enforcement case are burdensome to all parties, imposing a continuing need to meet filing requirements or to make appearances at hearings or conferences. As a result, this process typically takes place over a protracted period of time. Enforcement decisions are based upon the information and materials supplied by the complainant and the respondent, as well as any additional information resulting from the Enforcement Office's investigation. The only disability discrimination case to make it through the full hearing and review process was the *Southwest Airlines Enforcement Proceeding*.[164] The third-party plaintiff filed the initial complaint in August 1984 and DOT rendered its decision (cease and desist order) on November 6, 1987. Since the sunset of the Civil Aeronautics Board in 1985, no enforcement case initiated by DOT has proceeded through all stages of the formal process.

*Moody v. Delta*[165]

This consent order found that Delta violated Part 382 by failing to provide adequate assistance to passengers using wheelchairs and assessed a $25,000 civil penalty. The order also required Delta Airlines (1) to increase the availability of self-mobile wheelchairs at its terminal stations and (2) to emphasize in training its gate agents that they must give first priority to requests for assistance from passengers who use wheelchairs.

*Del Colle v. Continental Airlines*[166]

This consent order assessed Continental Airlines a $3,000 civil penalty for the air carrier's failure to provide accurate information on the availability of seats with movable armrests and ordered the carrier to cease and desist from further such violations.

*Southwest Airlines Enforcement Proceeding*[167]

DOT received the original complaint in this case in 1984 and subsequently pursued its own complaint pursuant to a policy of Southwest Airlines that required passengers who are totally blind and deaf to travel with a ticketed companion. DOT determined that Southwest's requirement that all deaf-blind passengers travel with a companion was over-broad because it unjustly discriminated against deaf-blind individuals who can demonstrate an ability to understand general safety instructions. DOT directed Southwest to cease and desist from its categorical refusal to transport unaccompanied deaf-blind passengers and instead to treat deaf-blind passengers in a nondiscriminatory manner.

Below are summaries of cases dismissed because informal settlements were reached, insufficient cause was found, or enforcement action was deemed not to be in the public interest.

*Wood v. American Airlines, Manning v. American Airlines*[168]

This dismissal order combined two complaints against American Airlines filed within a two-year period. The first complaint alleged that American Airlines failed to provide adequate assistance to Ms. Wood, who is a wheelchair user, in boarding and deplaning the aircraft and in transporting her wheelchair during a flight in 1992. Amanda Manning filed a similar complaint against American on June 13, 1994. The complainants and the airline reached an amicable resolution and requested that the complaints be dismissed.

*Roberts and EPVA v. USAir*[169]

In this order, DOT dismissed a third-party complaint after the airport at issue, Stewart International Airport, modified its terminal area to make it accessible to wheelchair users. The airport also purchased a mechanized chairlift for passengers who use wheelchairs.

*Seligman v. Northwest Airlines*[170]

This order dismissed a third-party complaint against Northwest Airlines alleging that the carrier failed to provide adequate attention to a passenger with Tourette syndrome. The dismissal order was issued after the carrier agreed to enhance its personnel training to place greater emphasis on meeting the special needs of passengers with this condition.

*Segarra v. America West Airlines*[171]

The complaint in this case alleged that America West Airlines failed to remove a series of steps at its terminal at JFK Airport. According to the complaint, the steps constituted a barrier to disabled individuals that under ACAA and Part 382 should have been removed by April 1993. The order dismissed the complaint, citing the carrier's move, subsequent to the filing of the complaint, to facilities that complied with the requirements for accessibility. The order, however, found that the steps were a technical violation of the rules and that the carrier was in violation of Part 382 during the six months prior to the transfer of the gate area in October 1993.

*Hacker v. Southwest Airlines*[172]

This complaint alleged discrimination on the basis of disability when Southwest refused Ms. Hacker and her husband boarding as standbys on a Southwest flight in favor of all other passengers holding standby passes, solely because she was a wheelchair user. The airlines asserted, and the DOT concurred, that the Hackers were denied standby boarding, along with other passengers, because they arrived at the gate too late to board,

not because of her disability. The complaint was dismissed.

*Vasquez v. Southwest Airlines*[173]

This complaint alleged that Southwest refused to allow Ms. Vasquez, a person with cerebral palsy and a wheelchair user, to travel unaccompanied on a flight. Southwest admitted that it did not permit Ms. Vasquez to travel unaccompanied, but maintained that the refusal was justified based on a determination by Southwest personnel that she could present a safety risk in an emergency and could require extensive special assistance during the flight.

DOT found that affidavits filed by Ms. Vasquez and her sisters differed so significantly from those given by Southwest's employees as to put at issue whether Southwest could have reasonably concluded that Ms. Vasquez was not a person with a disability within the meaning of the statute. The complaint was dismissed because DOT further found that the extensive fact-finding required to investigate the issue would not be in the public interest and because the facts in Ms. Vasquez' complaint gave Southwest sufficient information to resolve its concerns about her ability to fly safely without an attendant in the future. In addition, two other issues raised in the complaint and the respondent's answer were in the process of being addressed in rulemaking at that time: when to require mobility-impaired passengers to fly with attendants and whether airlines were required to provide personal assistance to passengers with mobility impairments in using the lavatory. DOT elected to allow these issues to be clarified through the release of the NPRM rather than through a formal enforcement proceeding.

*Sontag v. Simmons Airlines*[174]

The complainants, who are both blind, alleged that Simmons' failure to allow them to stow their flexible white canes at their seats constituted discrimination. Simmons asserted that its actions were based on safety considerations. DOT dismissed the complaint, concurring with Simmons that the carrier's decision was necessary in the interest of safety, not because the complainants were blind.

*Greenberg v. American Airlines*[175]

The complainant alleged that American Airlines refused to allow him to sit in an emergency exit row because he is blind and subsequently refused to board him at all. He also alleged that he was not provided with the name of an official or agent to make a determination regarding their refusal to provide service. DOT dismissed his complaint, noting that it was their policy not to institute enforcement actions against carriers for refusing to transport blind passengers in emergency exit rows. In addition, DOT deemed American justified in refusing to board Mr. Greenberg. The risk of confrontation onboard between Mr. Greenberg and passengers angered by the flight delay resulting from his

refusal to relocate from his seat in the emergency exit row was considered a threat to flight safety. DOT found no violation in relation to the claim regarding provision of airline personnel to resolve issues for disabled patrons.

In addition to the 17 formal complaints received since 1987, DOT has issued consent orders imposing civil penalties in six cases involving ACAA violations and two cases involving violations of the FA Act's general nondiscrimination provision. Each of these actions resulted from an independent investigation undertaken by the Enforcement Office. In five of those cases, failure to comply with several consumer notice regulations, including the requirement to have Part 382 available for review upon request, was the cause of action. The civil penalties imposed in those five cases, ranging from $15,000 to $40,000, were for failure to comply with multiple consumer notice regulations, among them the provision in Part 382. The other enforcement action that resulted in a civil penalty, involving an independent investigation of informal ACAA complaints by the Enforcement Office, is summarized below.

*American Airlines*[176]

After the Enforcement Office investigated a number of informal consumer complaints filed with DOT, this order found that American violated numerous provisions of Part 382 by failing to provide adequate assistance to people with disabilities. The order directed American Airlines to increase the number of wheelchairs available at its airport stations and to significantly increase the number of wheelchairs with movable armrests. The order assessed a $25,000 penalty.

The Enforcement Office has recently issued two other enforcement orders for violations of 49 U.S.C. §41310 involving disability discrimination by a foreign carrier and its U.S. code-sharing counterpart that imposed civil penalties in the amounts of $1,000 and $3,000, respectively.

Since 1987, only three enforcement orders with civil penalties totaling $53,000 have been issued in cases primarily involving ACAA violations. Another five enforcement orders with civil penalties totaling $161,000 have been issued in cases involving noncompliance with multiple consumer notice regulations, including the provision in Part 382. These orders do not indicate what portion of the penalty was assessed for the ACAA violation. Two additional enforcement orders involving disability discrimination in violation of the FA Act's general nondiscrimination provision applied to foreign carriers imposed penalties totaling $4,000 ($3,000 for the foreign carrier and $1,000 for the U.S. carrier). These findings indicate that civil penalties have not been a primary tool in DOT's overall strategy for obtaining ACAA compliance.

Also noticeably absent from DOT's enforcement strategy is the practice of filing amicus

briefs in civil actions alleging ACAA violations, a finding discussed in the following section.

6.5.6 Amicus Briefs

DOT has never participated in an ACAA case as an amicus. However, DOT is not authorized under the ACAA statute to file an amicus brief in civil actions relating to alleged ACAA violations and therefore must obtain prior approval from the Department of Justice (DOJ) to do so. In addition, the Enforcement Office reports that DOT has been invited only once to participate as an amicus party by an ACAA plaintiff;[177] in correspondence to both the plaintiff and the carrier. DOT concurred with the plaintiff's interpretation of the provision in Part 382 limiting a carrier's discretion to require attendants for deaf and blind passengers. DOT also indicated to the plaintiff its willingness to intervene as an amicus if DOJ granted permission and if the case reached the Circuit Court level. However, the carrier agreed to modify its training manuals and instructions to conform to the rule and declined to appeal the District Court's verdict of liability and imposition of nominal damages, so no amicus was filed.

Inquiries into the practices of other federal agencies showed that agencies having civil rights enforcement responsibilities typically take a different approach to participating as amicus parties. These agencies will petition to file an amicus brief, usually at the appeal stage, in selected cases in which the agency wants to clarify its position to the court on a particular issue. In instances in which the requesting agency is a designated enforcer of a civil rights statute, DOJ generally grants permission. Despite DOJ's liberality in granting petitions, DOT has chosen not to be proactive in using amicus briefs to assist the court in interpreting the ACAA and its regulation.

6.5.7 Analysis and Recommendations

Finding No. 18: The ACAA enforcement process at DOT does not adequately address the need for satisfactory resolution of individual complaints.

As discussed in detail earlier, DOT's informal complaint-handling procedure largely catalogues incoming complaints and tracks whether the airline makes a formal response as required in Part 382. Investigation of informal complaints usually takes place as part of a formal complaint or independent DOT investigation looking at the pattern and practice of a particular airline. Most informal complaints are not investigated at all. Further, because DOT does not actively investigate most informal complaints, its role in informal complaint resolution is also limited. Other than tracking to ensure that airlines send a response to the complainant, DOT intervenes only when the complaint is determined to be a matter of airline policy or procedure not in compliance with ACAA. Part 382 states that complainants should contact DOT for assistance in connection with their ACAA complaints. Under the current informal complaint- handling procedure, it is unclear what assistance they can

expect to receive.

Recommendation No. 18: DOT's enforcement mechanism must be made more credible and vigorous. At a minimum, the following are necessary:

- investigation and evaluation of all individual complaints received by DOT;
- explicit criteria consistently applied in assessing complaints as potential violations and enforcement actions;
- penalties for violations;
- monitoring of complaints received directly by airlines; and
- development of a database dedicated to complaint processing and tracking compliance-monitoring activities.

Persistent problems with noncompliance will not resolve themselves. Congress must work with DOT to insist on a commitment to effective ACAA enforcement and remove the remaining obstacles to such enforcement, including resource barriers. ACAA enforcement must become a DOT civil rights priority, starting with allocation of the necessary resources for more extensive investigation and analysis of complaints.

Finding No. 19: Lack of available attorneys' fees and damages under ACAA hampers consumers in exercising their private right of action.

Another weakness in ACAA enforcement is the disincentives to exercising a private cause of action. The right to a private cause of action for ACAA violations was established through case law, not the ACAA.[178] If the plaintiff wins, the damages awarded, if any, are usually small. Reimbursement for legal fees and expenses is solely at the court's discretion.

Many people with disabilities who would file an ACAA lawsuit simply cannot afford an attorney. Without an attorney's fee provision, a lawyer has little incentive to take even a strong case on contingency. It is widely believed within the disability community that few ACAA cases have been brought to date precisely because attorneys' fees are unavailable. These strong disincentives to private legal action, combined with DOT's meager enforcement role, virtually eliminate any credible threat of enforcement, even when persistent violations occur. Under the ADA and other civil rights laws, plaintiffs who bring suit and win are entitled to reimbursement for attorney's fees and damages. The same should apply to cases brought under ACAA.

Recommendation No. 19: ACAA should be amended to authorize a private right of action and the awarding of attorneys' fees, as well as compensatory and punitive damages for successful litigants. DOT should notify complainants of their private right of action and the

availability of fees and damages.

To bring the ACAA into parity with other disability civil rights laws, attorneys' fees and damages provisions should be included. Such provisions are necessary to ensure that individuals protected by the law are able to exercise their rights fully. Establishing a private right of action in the statute will ensure the security of the provision.

Finding No. 20: Despite a number of ACAA lawsuits, DOT has never filed an amicus brief.

Recommendation No. 20: DOT should petition DOJ to file amicus briefs in ACAA cases.

It is in the public interest and part of DOT's enforcement responsibility to exercise leadership in clarifying the legal implications of ACAA. Without DOT's initiative in clarifying the intent of the law and regulation, further confusion results as courts in different jurisdictions make inconsistent decisions on similar issues. It is DOT's prerogative to clarify the intent of the law when the regulation is not clear. Therefore, DOT should request notification from the general public regarding pending ACAA lawsuits, and petition DOJ to file an amicus brief in every meritorious case involving an issue of public interest.

6.6 Compliance Monitoring

6.6.1 Review of Airline Compliance and Personnel Training Plans

All air carriers are required to have ACAA compliance plans. Major and national carriers were required to submit them to DOT by October 1990. Other carriers are required to have them on file and make them available for review by DOT. DOT was required to review the plans of all major and national air carriers by December 1990. If DOT requests amendments to any plan, the carrier is required to make the amendments and implement them immediately. DOT reports that it asks new air carriers to submit compliance plans.[179] The plan must include a schedule for personnel training, as well as the carrier's policies and procedures for accommodating passengers with disabilities.

DOT reports that it has received between 35 and 40 plans since the inception of the law. However, DOT did not have a list of which airlines were required to submit plans in 1990 and did not track those that did and did not comply. Today there is still no current list, even though new airlines are notified by FAA of the requirement to submit a plan as part of the certification process. DOT used a standardized checklist to evaluate the plans. A review of the plans provided to researchers showed that DOT required revisions to most of the original submissions, and that most airlines complied by submitting a revised plan.

When asked whether DOT was monitoring whether and how the compliance and training plans were being implemented, DOT staff members frankly admitted that no monitoring was done unless the volume of ACAA complaints received for a given airline indicated a compliance problem.[180]

6.6.2 Analysis and Recommendations

Finding No. 21: DOT's ACAA compliance monitoring is not proactive.

DOT reports that there is no regular monitoring of the implementation of compliance plans, nor of the specific accessibility requirements for new aircraft. DOT reports that it received 35 to 40 compliance plans, most between 1990 and 1991. Since the initial plan revisions were submitted in 1991-1992, DOT has not required any updates to the plans submitted by major and national carriers.

A major feature of the air carrier compliance mechanism is the designation of a CRO at every airport. DOT has occasionally requested a list of such officials but was not able to explain to researchers whether these lists were received and from which airlines. To NCD's knowledge, DOT has never attempted to monitor the performance of CROs.

DOT reports no regular ACAA compliance monitoring mechanism or regular compliance monitoring activities for air carriers at this time.

Recommendation No. 21: DOT should strengthen ACAA compliance monitoring.

Effective enforcement of ACAA requires a robust compliance monitoring mechanism. Air carriers need to know that they are accountable to DOT for their compliance and need to ensure ongoing efforts to achieve compliance. Part 382 should require a compliance monitoring program that includes, at a minimum

- annual reviews by DOT of the records of major and national air carriers to verify ACAA compliance (e.g., a list of the CROs designated at every airport served by the airline; records on when ACAA trainings are conducted; the most recent date of ACAA training for all employees who work with the public; and a description of a system for complying with ACAA seating assignment requirements);

- air carrier submission of "correction plans" to DOT within a specified time frame when implementation records indicate noncompliance with ACAA requirements;

- DOT review and evaluation of all major and national air carrier ACAA compliance plans triennially;

- air carrier submission, within a specified time frame, of revisions to plans found insufficient; and

- regular DOT site visits to spot-check airline ACAA compliance at airports. Adequate funds should be made available for such activities.

6.7 ACAA Rulemaking--14 CFR Part 382 and Modifications

This section will review both the rulemaking and regulatory negotiation processes to evaluate their effectiveness and assess their impact on 14 CFR Part 382.

6.7.1 The Rulemaking Process

In developing new regulations under the standard rulemaking process, the Office of Regulation and Enforcement conducts extensive research on the statute's legislative history. When there is not enough information to develop an appropriate rule on a given issue, the Office of Regulation and Enforcement will request technical and other input through advance notices of proposed rulemaking published in the *Federal Register*. Such notices may simply be for the purpose of getting advance comments on specific issues affecting the regulated and protected parties. All comments received in response to these notices are considered in developing the rule.

The Office of Regulation and Enforcement publishes the draft regulation as an NPRM in the Federal Register. The public, particularly stakeholder groups, are invited to submit comments. During the comment and review period, new issues may arise. The Office of Regulation and Enforcement may publish supplemental notices of proposed rulemaking for additional information on the new issues. In developing the final rule, the Office of Regulation and Enforcement considers all comments and weighs the interests of all the parties in formulating its regulatory position. The Office of Regulation and Enforcement directly addresses all substantive comments received on each major section and states the reasons for its position in the preamble of the proposed regulation.

After ACAA was passed in 1986, DOT intended to make the old Part 382 applicable to all carriers as an interim final rule and use the standard rulemaking process to develop revisions and address new issues. However, an interim rule was not issued. At the request of the parties, DOT instead initiated a regulatory negotiation process to develop an entirely new rule. The negotiation took somewhat longer to complete than the standard rulemaking process, contributing to a long delay in issuing the final rule.

The request for negotiations in place of the standard rulemaking procedure indicated the parties' belief that they themselves could develop a rule to serve their individual and mutual interests better. However, negotiations did not fully succeed. Stalemate on several issues could not be resolved, and negotiations terminated without reaching consensus on a final rule. DOT resumed the rulemaking process to finalize a concrete set of nondiscrimination requirements that did not impose undue burdens on the industry.

Members of the disability community complain repeatedly that the rulemaking process is that exceedingly slow. On two occasions lawsuits were filed against DOT for failure to act in a timely manner in issuing the regulation or changes.[181] It would seem that some reasons for these delays go beyond bureaucratic inefficiency. Part 382 is quite precise in defining how to comply with its target objective: nondiscrimination against air travelers with disabilities. Because Part 382 was intended to lay out specific rather than broad general requirements, all stakeholders had a heightened interest in how each provision would be

crafted. Indeed, the intensity of conflict on several specific requirements hindered the regulatory negotiation (reg neg) process from reaching overall consensus on a package of provisions.

The rulemaking process was inadequate for several additional reasons. The most obvious is that the regulation lacked the enforcement provisions necessary to ensure ready compliance. This lack was a result not only of opposition from the aviation industry but also of DOT's own ambivalence about enforcement. As mentioned earlier, a lack of consensus within DOT led to dropping every enforcement proposal involving imposition of penalties in conjunction with the informal complaint process. Enforcement provisions that involved the commitment of DOT resources to specific monitoring tasks also failed to survive in the final regulation. The result was a regulation with great promise but inadequate tools for actualizing it. The regulation did not sufficiently empower DOT to exercise the authority and leadership necessary to implement a controversial law in an unwilling environment.

The purpose of the reg neg process was to resolve some of the controversial issues sufficiently to agree on the language of the regulation. It was also intended to give parties greater insight into the concerns of other stakeholders and to begin dealing with the implementation issues that would create obstacles to compliance. Although this process might have resulted in a regulation having a high voluntary compliance rate, this has not been the case with Part 382. The next section presents findings as to why this has been the case and some recommendations for structuring a more effective reg neg process.

6.7.2 Analysis and Recommendations

Finding No. 22: The rulemaking process does not adequately

- identify and explicitly address the underlying obstacles to compliance;

- identify/create incentives for industry compliance; or

- respond proactively to noncompliance issues that emerge over time.

Recommendation No. 22: Supplement the rulemaking process by sponsoring multiple stakeholder processes, each of which is targeted to develop alternative solutions for a specific issue; incorporate the findings/results into the regulation.

DOT must take the lead to bring stakeholders together in task forces aimed at finding solutions to the specific obstacles to implementation and compliance. A partnership with the private sector must be formed, having ACAA implementation problem-solving as its focus.

6.7.3 The Regulatory Negotiation Process

The reg neg process is consensus rulemaking by committee. Under the Federal Advisory Committee Act, DOT has authority to convene an advisory committee of representatives from groups having interests affected by the proposed rulemaking. Usually a neutral mediator from the Federal Mediation and Conciliation Service facilitates the committee. The negotiated rulemaking process takes place in an extended series of meetings during which the parties discuss each issue covered by the regulation to develop a consensus recommendation on the applicable regulatory language. If consensus is achieved, DOT must issue the final advisory committee recommendations as the official rule.

The reg neg process to develop Part 382 was only partially successful. The advisory committee met from June through November 1987 and produced many draft consensus recommendations. The advisory committee was unable to reach consensus on all the issues and therefore did not produce a final rule. DOT incorporated many of the committee's recommendations to its proposed rule and finalized it under the standard rulemaking procedure.

Despite the consensus-building work of the advisory committee, the proposed rule was in review for over six months, twice the normal time. An additional 30 days were granted for commenting parties to reply to the comments of other parties. DOT received more than 300 comments. In drafting the final regulation, DOT essentially took the role of arbitrator. Weighing the interests and input of all the parties, DOT crafted the final rule to balance all stakeholder interests in light of the overall ACAA objective--civil rights protection.

It should be noted that DOT itself is a stakeholder in this process, and its own interests strongly influenced the final rule. When the regulation was drafted, several different enforcement mechanisms were under consideration. Most of them involved a stronger monitoring function and the imposition of penalties for violations. No consensus could be reached within DOT on any mechanism involving penalties, supposedly because of a lack of resources.[182] DOT also dropped a proposal to monitor ACAA complaints received by the airlines, in part because DOT was concerned that such monitoring would not comport with the Paperwork Reduction Act and in part because of a lack of resources.[183]

6.7.4 Analysis and Recommendations

Finding No. 23: Many problems with ACAA interpretation remain, and consensus on definitions and implementation is lacking. The rulemaking and regulatory negotiation processes are not adequate to resolve these problems.

Some examples of implementation issues that remain unresolved are appropriate application of the "threat to safety" standard when making denial of boarding determinations; clear requirements concerning lifting and transferring passengers with

mobility disabilities; and ensuring passengers with disabilities priority in stowing assistive devices.

Recommendation No. 23: Tighten up the regulation with guidelines and definitions developed by stakeholder groups.

DOT has stated that the regulation provides flexibility in determining on a case-by-case basis whether its provisions constitute an undue burden or fundamentally alter the nature of an airline's program.[184] At the same time, the many implementation problems indicate that more guidance is needed on how to comply without creating undue burden or fundamental program alteration. Finding solutions to difficult implementation problems requires joint participation by the concerned stakeholders in developing practical guidelines for eventual incorporation to the regulation. DOT should create avenues and encourage experimentation with alternative approaches to working through implementation issues.

6.8 Monitoring the Law

As the executive agency responsible for ACAA enforcement, DOT plays a key role in monitoring its impact and assessing what changes are needed to achieve its legislative objectives. This monitoring responsibility includes not only ensuring compliance with the regulation by airlines and airport operators but also examining where regulatory changes are needed to clarify the requirements of the law. One area where discrimination continues legally in spite of the law is international air travel. Although the legal authority to extend a general nondiscrimination mandate to foreign air carriers exists under 49 U.S.C. §41310, DOT has applied this provision only twice in discrimination cases against foreign air carriers on the basis of disability (in September and December 1998). As the federal agency responsible for international air transportation policy, DOT negotiates the terms of international agreements under which foreign carriers must operate in the United States. DOT must ensure that foreign air carriers that have access to U.S. airport facilities and air travel markets conform to the requirements of the same civil rights laws that bind U.S. carriers. NCD urges DOT to continue exercising its authority to require all air travel service providers operating in U.S. markets to comply with the established standard of nondiscrimination.

Part III explores the views of stakeholders in the aviation industry and the disability communities on DOT's role in enforcing ACAA compliance.

## PART III. STAKEHOLDER VIEWS ON ACAA ENFORCEMENT

7.0 Aviation Industry Perspectives

As part of this study, researchers met with representatives from the operations and legal

divisions in the Air Transport Association (ATA) for their thoughts on Air Carrier Access Act (ACAA) implementation.[185] In addition to its stakeholder participation in ACAA regulatory negotiations, ATA supports ACAA implementation, including being the prime mover behind a task force to develop design specifications for accessible lavatories in wide-body aircraft. ATA was involved in another task force to develop solutions to problems with transporting power wheelchairs. "Products" of the task force included (1) a training video on disassembling and reassembling power wheelchairs; (2) successful passage of a regulation to label all batteries as "spillable" or "nonspillable"; (3) packaging instructions for spillable batteries; and (4) a portable placard for the back of wheelchairs illustrating proper disassembly and reassembly.[186]

ATA developed a model ACAA training plan in 1990 and coordinated with the Federal Aviation Administration for the inclusion of the ACAA segment in flight attendant training programs. Recently ATA sponsored a joint meeting of all airline executives responsible for the complaint resolution officer (CRO) function.[187]

The persons interviewed raised several important points. They readily admitted that ACAA compliance has been uneven across the major airlines but generally felt that the situation has vastly improved since 1990. They also believed that Access to the Skies conferences and other joint forums have strengthened communication between disability groups and the aviation industry on ACAA issues. However, they conceded the following points: these forums do not provide an ongoing process for moving toward consensus or actually resolving compliance problems; many compliance problems might stem from the market-driven, decentralized decision-making processes characteristic of the industry; there is a need for an ongoing process to resolve issues arising from "poor service decisions" and to design programs that permit "flexible accommodation based on responsible decision-making."[188]

The ATA executives interviewed readily agreed that some follow-up mechanism is needed to improve compliance and suggested that ATA would like to help facilitate it. ATA represents most of the passenger and cargo airline operations in the United States, and has the "infrastructure for communicating with 97 percent of the industry." They recognize that continuing dialogue on these issues is necessary to finding solutions that meet the needs and can be successfully implemented.

8.0 Perspectives of Air Travelers with Disabilities

Enacted almost 12 years ago, the ACAA prohibits commercial air carriers from discriminating against travelers with disabilities. Despite the sweep of the law and its potential impact on travelers with disabilities, limited research has been conducted measuring its effectiveness from the perspectives of persons with disabilities.

Nevertheless, the available research, written ACAA complaints, and personal anecdotes reveal patterns of continued discrimination by air carriers and weak enforcement by DOT. The following perspectives illustrate the problems that remain and suggest areas for improving implementation and enforcement of the law.

8.1 Accessibility of Air Travel--A Customer Perspective

"[I]f you are a wheelchair user and travel even occasionally by air, it's a safe bet that you have had trouble on just about every flight you have ever taken."[189]

The Paralysis Society of America (PSA) conducted a year-long poll completed in 1996 that reveals mixed air travel experiences by persons with disabilities.[190] Although flying conditions for people with disabilities have improved since ACAA's enactment, many air travelers with disabilities still fare poorly. The PSA poll, responded to by 550 self-selected individuals answering survey questions by toll-free number or on the Internet, revealed:

- about one-third of respondents requesting specific seats (i.e., bulkhead, aisle) did not receive them (accessible seating was addressed in the March 1998 notice of proposed rulemaking that became effective September 30, 1998);

- 41 percent of respondents specifically requesting bulkhead seats did not receive them;

- only 16 percent of people who requested seats with movable armrests received them;

- of 56 people traveling on flights not serviced by jet bridges, 19 (34%) had to be carried up the stairs in a boarding chair or by hand;[191]

- 17 people said they were charged a fee for a requested service, including charges for a wheelchair as extra baggage, a fee for retrieving a wheelchair, and a fee for connection assistance;

- more than half the people responding to the poll (52.18%) said their mobility aids had not been returned to them in good working order; and

- 49 percent said that airline personnel communicated with someone other than them concerning service, rather than directly with them.

It must be noted that the March 1998 amendment to Part 382 contains provisions addressing most of the issues related to seating assignments and requests mentioned in this survey. Many survey respondents said that airline personnel need more and better training, especially regarding disassembly and reassembly of motorized wheelchairs, lifting and transferring travelers with mobility disabilities, and persons with hidden disabilities. Airline personnel frequently told wheelchair users they could not stow their folding chairs in the aircraft cabin and failed to communicate gate information effectively. The PSA survey results suggest that DOT's weak ACAA enforcement and monitoring

result in inconsistent access to safe and reliable air transportation services by people with disabilities.[192]

8.2 Industry Compliance with ACAA and DOT Enforcement of ACAA: A Sample of Customer Complaints

Review of a sample of written complaints filed during 1997 with DOT by individuals with disabilities, their families, or attorneys reveals problems similar to those identified in the PSA poll.

- A frequent complaint involved air carrier response to requests for special needs accommodations such as boarding assistance, stowage of a power wheelchair or seating requirements. Despite giving advance notice in accordance with ACAA regulations, travelers with special needs encountered the following situations at the airport:

- the airline's computer database contained no record at all of the advance request;

- airline personnel had not noted the advance request in the database and were unprepared to provide the requested assistance;

- airline personnel failed to act in a timely manner or simply did not act at all to provide the requested assistance; and

- in some cases, airline personnel refused outright to provide the requested assistance.

- One passenger with a heart condition requested boarding and deplaning assistance. When her flight was rerouted because of weather conditions, her daughter telephoned the airline to inform them of her mother's requirements. She encountered an airline official whom she described as "very confrontational--rather than trying to diffuse the situation and see how he might be able to help, he [said] 'perhaps your mother should not be flying at all if she has a heart condition,' then he hung up."[193]

- One traveler alleged that an air-carrier-operated frequent flyer lounge was not accessible to him. Only after he wrote three letters of complaint and his attorney contacted both DOT and the airline was a method to access the lounge provided.[194]

- Several complaints alleged that flight crews, ramp agents, and other ground personnel were unaware of the ACAA requirement for a CRO at each airport, who the airport CRO was, or even what a CRO was. However, passengers reported that problems were resolved when CROs were available to assist. For example, one complainant who had been unable to convince the flight crew to allow his wife's manual wheelchair to be stowed in the passenger storage area asked to speak to the CRO. He wrote " [she] moved mountains. Within minutes, the wheelchair that wouldn't fit did fit like I said it would. [She] showed a lot of sensitivity and concern. When [she] spoke, it was a done deal."[195]

- Many of the complaints alleged that flight crews frequently refused to stow adaptive equipment such as walkers and folding wheelchairs in the aircraft cabin. For example, one complainant wrote that she was told by a flight attendant, "We never allow wheelchairs in the cabin--you have to gate-check it."[196]

- Several travelers alleged that advance special seat assignments (e.g., bulkhead and aisle) either could not be scheduled or were not honored at flight time.

- Many complaints alleged that airline contractors, such as those who provide boarding assistance or transport passengers to and from flights, are not trained adequately and are insensitive to the rights and requirements of travelers with disabilities.

- One complainant reported that an airline contract escort service at New York's Kennedy Airport would not allow her husband, who has a mobility disability, to use a wheelchair provided by the airline beyond the passenger arrival area. The contractor told her husband the chair was needed for another passenger, a claim that proved false.[197]

The following sample of case summaries of ACAA complaints filed with various airlines and DOT during 1997 further illustrate common experiences of air travelers with disabilities.

*DOT Case Summary No. 1*: An elderly woman who had recently undergone knee surgery was traveling with her husband from Philadelphia to Detroit. He had made their airline reservations well in advance, requesting bulkhead seating to accommodate his wife's inability to bend her knee. He received a letter from the airline confirming the reservations and bulkhead seat assignments. When they arrived at the airport they learned that their seat assignments had been changed. The ticket agent refused to try to accommodate them in bulkhead seating, indicating the flight was full although the woman's husband observed vacant seats on the flight. In a letter to airline officials he said, "we boarded and endured the flight. This resulted in a very painful flight and a couple of painful nights. I hope this episode has not set back her [his wife's] recovery."[198]

The man wrote twice to the airline complaining of poor treatment. A copy of his complaint was forwarded to DOT's Consumer Protection Division. At the time, the current regulation requiring airlines to accommodate individuals having certain impairments with accessible seats had not been written. Eventually the airline responded saying advanced seating is offered as a courtesy and cannot be guaranteed. The letter also stated that it is the responsibility of the traveler to confirm the flight in advance, but the letter did not state that a change of schedule regarding this particular flight had taken place. It also stated that it was not the policy of the airlines to compensate in these instances; however, two $25 dollar vouchers toward future flights were provided.

*DOT Case Summary No. 2*: Traveling with her husband on a round trip flight from

Pittsburgh to Ft. Lauderdale, a woman who used a manual wheelchair requested permission to stow her chair in the passenger cabin's storage area. Their flights required a plane change on both legs of the trip. The cabin crews for each of four flights insisted that she stow her chair in baggage, although her husband explained that the chair was frequently damaged when it was stowed in the luggage area. Armed with DOT's booklet entitled *New Horizons for the Air Traveler with a Disability*, the passenger's husband showed the flight crews the provision for on- board storage of manual wheelchairs but was told the storage area was not "approved" or was reserved for coats. He explained that her chair would fit easily in the cabin's storage area but the crew insisted it be stored below.

He sent a complaint letter to DOT requesting a definition of approved storage. DOT referred his letter to the airline and sent the complainant a copy of Fly Rights. Because DOT did not explain the meaning of "approved storage", the complainant sent a second letter in an effort to obtain an answer to his original question. His second letter triggered a written explanation by DOT of the ACAA rules providing for on-board stowage of manual wheelchairs. This letter was copied to the airline. His second inquiry also triggered an internal DOT memo in which the airline personnel's conduct was characterized as "egregious" and the airline's response to the complainant called "a classic nonresponse that doesn't come close to the 'dispositive' reply required by section 382.65."[199] The airline wrote the complainant acknowledging that it permits stowage of folding wheelchairs in most of its aircraft and informing him of its plans to issue a bulletin to "airport personnel reminding them of the applicable regulations." It also gave the couple vouchers for $150 each toward the purchase of future tickets.

*DOT Case Summary No. 3*: A woman with multiple sclerosis traveling from Miami to Chicago was not permitted to stow her walker in the aircraft's storage area although she had been allowed to keep the walker with her on a previous flight. She was taking various medications for her medical condition, including diuretics and steroids that caused frequent urination. She was unable to walk to the aircraft's lavatory without the walker. In a letter to DOT's Consumer Protection Division, her daughter stated that a member of the flight crew said she didn't care what had been allowed on a previous flight, the passenger couldn't carry the walker on with her. The daughter went on to state, " My mother was forced to sit the entire flight without being able to go to the rest room. She suffered not only from discomfort but from the humiliation and fear of being unable to control her bladder."[200] DOT forwarded the letter to the airline, which issued an apology and two $200 travel vouchers.

8.3 Analysis

The preceding case summaries and anecdotes illustrate some of the problems air travelers with disabilities still encounter. Taken as a whole, they reveal inconsistent ACAA

implementation by the airline industry and weak, inconsistent enforcement of the law by DOT.

Each time they travel, passengers with disabilities must cope with a myriad of potential disability-related complications above and beyond those faced by travelers who do not have disabilities. They must arrive for their flights armed with information about their rights and prepared to advocate for themselves or their traveling companions. When their complaints do receive attention from an air carrier, the solution is often an apology and a ticket voucher. Carriers appear to respond to ACAA violations in the same manner in which they respond to customer service complaints involving lost baggage or flight delays, rather than as civil rights violations. There is little evidence to suggest that carriers take action to resolve systemic ACAA violations or that DOT fully exercises its enforcement authority and responsibility when it is aware of such problems.

Private litigation is not a reasonable option for many people with disabilities because ACAA itself does not provide explicitly for monetary damages and attorneys' fees. Although an attorney can recover reasonable fees if the complainant prevails in a litigation matter regarding other civil rights laws, few attorneys are willing to represent clients with disabilities in ACAA claims because clients cannot afford to pay the legal fees. It is imperative that DOT fulfill its public trust to ensure that persons with disabilities are given equal access to air travel service at a level of quality and comfort comparable to that afforded the traveling public generally.

---

## PART IV: CONCLUSION

### 9.0 Summary of Recommendations

Disability policy has clearly established full participation and integration of people with disabilities as a national goal. Access to transportation is a lynchpin for that participation and integration. As airline travel increasingly becomes a major mode of travel for Americans, it is essential that people with disabilities have full access to air travel. The Air Carriers Access Act (ACAA) is the federal law ensuring that access. Yet federal enforcement of the law falls far short of protecting people with disabilities from discrimination in airline travel.

Our recommendations for change are far-reaching and fall into three major categories: organizational change, process change, and changes to the law and regulation.

### 9.1 Recommendations for Organizational Changes

- DOT should establish an ACAA civil rights enforcement unit that is separate from consumer affairs monitoring.

- Such a unit might be located in the Office of General Counsel or in the Department of

Plaintiffs' Exhibit 435

usatoday.com

# Only 'guidelines': FAA won't make wearing of face masks on airlines mandatory

3 minutes          6-17-20

The Federal Aviation Administration won't require the wearing of masks on commercial aircraft, continuing to leave that issue to individual airlines, the agency's chief said Wednesday.

Administrator Stephen Dickson told a Senate committee that the Centers for Disease Control and Prevention, not the FAA, is the lead agency charged with requiring safety precautions against the spread of the coronavirus.

"Our space is aviation safety, and their space is public health," he said.

Two senators expressed dismay that the FAA would suggest, rather than require, anti-COVID-19 safety measures on planes in the face of a public health crisis that has resulted in the deaths of more than 110,000 people in the U.S.

**More:** Traveling again? Leisure and business travelers share tips to stay safe from coronavirus

When it comes to having passengers wear face masks on planes, "reports have shown enforcement for noncompliance has been uneven and difficult," said Sen. Kyrsten Sinema, a Democrat from Arizona, "The FAA needs to do more to ensure the aviation system is mitigating the spread of the virus."

Sen. Brian Schatz reacted when Dickson referred to new "guidelines" being developed to aid airlines with practices to help ward off COVID-19.





"Is this, like, a philosophical thing with you folks?" the Democrat from Hawaii asked. "I just don't get why you wouldn't want this to be mandatory,"

Dickson replied by citing Transportation Secretary Elaine Chao's policy that "these will not be regulatory mandates."

**More:** Travelers accused of breaking coronavirus quarantine set to leave Hawaii

Dickson added, however, that the agency is monitoring airlines' voluntary safety programs "to make sure they are following through" and that airlines have been better about enforcement.

Most airlines require passengers to wear masks. Some say they are trying to take other precautions, like checking passengers' temperatures before they board planes and leaving middle seats empty when flights aren't full.

**More:** Airlines got coronavirus aid, so why are they stingy on flight refunds and safety?

But it isn't always easy. United Airlines, for instance, said it is developing a list of passengers who refuse to wear masks. Those who refuse could be barred from future flights.

Plaintiffs' Exhibit 436

ncd.gov

# The Current State of Transportation for People with Disabilities in the United States

375-477 minutes

This report is also available in alternative formats and on the award-winning National Council on Disability (NCD) Web site (www.ncd.gov).

Publication date: June 13, 2005

The views contained in this report do not necessarily represent those of the Administration as this and all NCD documents are not subject to the A-19 Executive Branch review process.

Dear Mr. President:

On behalf of the National Council on Disability (NCD), I am very pleased to submit this report entitled The Current State of Transportation for People with Disabilities in the United States. The report was developed with the input of individuals with disabilities and transportation professionals from around the country. The purpose in undertaking this project was to develop a better understanding of access to transportation and mobility for people with disabilities, including access to traditional public transportation systems, private transportation services, alternative transportation initiatives, and the pedestrian environment; to identify transportation barriers as well as promising practices and models; and to develop recommendations in keeping with the goals of the New Freedom Initiative to "expand transportation opportunities for people with disabilities."

There have been many advances in America's transportation systems and services for citizens with disabilities, particularly since the passage of the Americans with Disabilities Act of 1990. The U.S. Department of Transportation and the nation's public transportation industry are to be applauded for their part in bringing about this progress. However, research reveals that many barriers to transportation continue to exist that prevent the full inclusion and full participation of people with disabilities in society.

This report highlights many best practices and successful initiatives that can serve as models for other communities for enhancing transportation and mobility for people with disabilities. This report also sets forth a variety of recommendations for service

improvements and for additional research that will lead to greater options for the 6 million Americans with disabilities who have difficulties obtaining the transportation they need to live independent and productive lives.

NCD hopes the information in this report will serve as a useful resource for individuals with disabilities, transportation professionals, and lawmakers working to improve access to transportation and mobility for people with disabilities. NCD looks forward to working with this Administration and Congress to continue to develop and support laws, policies, and practices that will ensure that every person with a disability is able to participate fully in all aspects of American life.

Sincerely,

Lex Frieden

Chairperson

(The same letter of transmittal was sent to the President Pro Tempore of the U.S. Senate and the Speaker of the U.S. House of Representatives.)

---

National Council on Disability Members and Staff

Members
Lex Frieden, Chairperson, Texas
Patricia Pound, First Vice Chairperson, Texas
Glenn Anderson, Ph.D., Second Vice Chairperson, Arkansas

Milton Aponte, J.D., Florida
Robert R. Davila, Ph.D., New York
Barbara Gillcrist, New Mexico
Graham Hill, Virginia
Joel I. Kahn, Ph.D., Ohio
Young Woo Kang, Ph.D., Indiana
Kathleen Martinez, California
Carol Novak, Florida
Anne M. Rader, New York
Marco Rodriguez, California
David Wenzel, Pennsylvania
Linda Wetters, Ohio

Staff
Ethel D. Briggs, Executive Director
Jeffrey T. Rosen, General Counsel and Director of Policy
Mark S. Quigley, Director of Communications

Allan W. Holland, Chief Financial Officer

Julie Carroll, Senior Attorney Advisor

Joan M. Durocher, Attorney Advisor

Martin Gould, Ed.D., Senior Research Specialist

Geraldine Drake Hawkins, Ph.D., Program Analyst

Mark Seifarth, Congressional Liaison

Pamela O'Leary, Interpreter

Brenda Bratton, Executive Assistant

Stacey S. Brown, Staff Assistant

Carla Nelson, Office Automation Clerk

---

Acknowledgments

The National Council on Disability (NCD) wishes to express its appreciation to Marilyn Golden of the Disability Rights Education and Defense Fund and Richard Weiner of Nelson/Nygaard Consulting Associates for conducting research into the current state of transportation for people with disabilities and for drafting this report. NCD also wishes to express its appreciation to the many individuals with disabilities and transportation professionals across the country who provided the input and personal experiences that were essential for the development of this report.

---

Table of Contents

Section 1: Executive Summary

Fixed-Route Public Transit

Paratransit

Approaches That Have Resulted in Service Improvements on Public Transit

Public Rights-of-way

Private Transportation

Flex Service and Other Nontraditional Forms of Transit Service

Transportation in Rural Areas

Section 2: Introduction

Section 3: Fixed-Route Public Transit

Bus Transit

General assessment

Low-floor ramped buses and other features of universal design

Focus Group Participants, August 31, 2004

Persons Interviewed or Consulted

Appendix E: Mission of the National Council on Disability

Overview and Purpose

The Current Statutory Mandate of NCD Includes the Following:

International

Consumers served and current activities

Statutory history

Section 14: Endnotes

---

Section 1: Executive Summary

A national study conducted by the U.S. Bureau of Transportation Statistics in 2002 found that 6 million people with disabilities have difficulties obtaining the transportation they need.[1] Research in the year 2000 conducted by the Harris Poll and funded by the National Organization on Disability established that nearly one-third of people with disabilities report having inadequate access to transportation.[2] Behind these statistics are many personal stories of lives severely limited by the lack of transportation. Some people with disabilities who are willing and able to work cannot do so because of inadequate transportation. Others cannot shop, socialize, enjoy recreational or spiritual activities, or even leave their homes. And some individuals with disabilities who need medical services must live in institutions due solely to the lack of safe, reliable transportation to needed medical services.

This paper analyzes existing transportation systems in the United States with the acknowledgment that these systems are inherently inadequate due to a chronic lack of funding. As the United States focuses its resources on travel by automobile, all other modes are neglected in comparison.

As a consistent theme in most transit systems across the United States, the Americans with Disabilities Act of 1990 (ADA) has spawned great improvements, but many compliance gaps remain that pose significant problems to transportation for people with disabilities. Additionally, because the ADA merely requires that, where public transportation is provided, it must be made accessible for people with disabilities, where there is no public transportation, it is likely that no transportation exists at all for people with disabilities. In some sectors, such as in rural areas, grossly insufficient funding imposes harsh gaps in the transportation grid. In other sectors, such as accessible taxis, a

of recommendations for service improvements and for additional research that will lead to greater options for the 6 million Americans with disabilities who have difficulties obtaining the transportation they need. The continued underfunding of public transportation, however, directly limits the mobility of large sections of the disability community who are unable to use a car, and this problem will not be fully addressed without a fundamental shift in funding priorities to support a comprehensive, accessible public transportation system.

Section 2: Introduction

Transportation enables us to work, choose where to live, pursue an education, access health care, worship, shop, and participate in recreational activities. A national study conducted by the U.S. Bureau of Transportation Statistics in 2002 found that 6 million people with disabilities have difficulties obtaining the transportation they need. Four times as many disabled people as nondisabled people lack suitable transportation options to meet their daily mobility needs.[3] Research in the year 2000 conducted by the Harris Poll and funded by the National Organization on Disability established that nearly one-third of people with disabilities report having inadequate access to transportation.[4] And the Community Transportation Association of America reports that nearly 40 percent of the country's transit-dependent population—primarily senior citizens, persons with disabilities, and low-income individuals—reside in rural areas. Yet in many of these communities, public and community transportation are limited or absent.[5] More than half a million people with disabilities cannot leave their homes because of transportation difficulties.[6]

For many people with disabilities, life is severely limited by the lack of transportation. Some people with disabilities who are willing and able to work cannot do so because of inadequate transportation. Others cannot shop, socialize, enjoy recreational or spiritual activities, or even leave their homes for the same reason. Some individuals with disabilities must live in institutions solely because of the lack of transportation to medical appointments.

The transportation difficulties faced by people with disabilities occur in a broad context of inequitable funding that forms the backdrop to all discussions of transportation programs in this country. The United States dedicates enormous amounts of funding to infrastructure and other functions that facilitate transportation by automobile—some $118 billion was authorized during the 1998 reauthorization of federal highway legislation, compared with $36 billion for public transportation.[7]

These priorities inherently disfavor large sections of the population, including people with disabilities. Research and anecdotal information indicate that people with disabilities who cannot drive, who cannot use cars, or for whom cars are unavailable participate less in all

Plaintiffs' Exhibit 437



# Transportation Update:

**Where We've Gone and
What We've Learned**



**National Council on Disability**

May 4, 2015

National Council on Disability
1331 F Street, NW, Suite 850
Washington, DC 20004

***Transportation Update: Where We've Gone and What We've Learned***

This report is also available in alternative formats upon request and on the National Council on Disability (NCD) website (www.ncd.gov).

May 4, 2015

202-272-2004 Voice
202-272-2074 TTY
202-272-2022 Fax

The views contained in this report do not necessarily represent those of the Administration, as this and all NCD documents are not subject to the A-19 Executive Branch review process.

 **National Council on Disability**

An independent federal agency making recommendations to the President and Congress
to enhance the quality of life for all Americans with disabilities and their families.

# Letter of Transmittal

May 4, 2015

President Barack Obama
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20500

Dear Mr. President:

The National Council on Disability (NCD) is pleased to submit the enclosed report, *Transportation Update: Where We've Gone and What We've Learned*. As we celebrate the 25th anniversary of the Americans with Disabilities Act (ADA), this report updates a 2005 study about the state of our country's surface transportation, explains changes for people with disabilities during the past 10 years, and recommends public policy to address new and persistent problems.

The report is based upon a review of the literature, the current state of the industry, state and local implementation of federal legislation, and information gleaned from outreach to stakeholders, including people with disabilities and other experts. NCD's findings address accessibility-related progress as well as problems associated with fixed route and bus and rail transit (including Amtrak); paratransit; public rights-of-way; enforcement of existing laws; and other issues for all modes of public transit. The report also addresses concerns with rural, coordinated, and privately funded transportation, and commercial driver's license rules. Finally, the report makes recommendations to Congress and the Executive Branch designed to improve federal collaborative efforts and to close gaps in transportation access in ways that benefit people with disabilities and families, including but not limited to the following:

- **Public rights-of-way:** Congress should pass The Safe Streets Act (S2004/HR 2468), which would implement the "complete streets" concept that makes streets and sidewalks accessible for all people, including people with disabilities, using all modes of travel, including pedestrians with and without disabilities and bicycle riders, rather than only considering the needs of automobile drivers and their vehicles

- **Rail transportation:** As it has for Amtrak, Congress should set aside funds specifically for achieving station accessibility on rapid rail (subways) where it

1331 F Street, NW ■ Suite 850 ■ Washington, DC 20004
202-272-2004 Voice ■ 202-272-2074 TTY ■ 202-272-2022 Fax ■ www.ncd.gov

1

does not yet exist, including platform connectivity, detectable warning installation, elevators, ramps, and full-length platform-level boarding. There should be clear objectives, deadlines, and outcomes analysis to achieve full and timely accessibility.

- **Rural transportation:** Congress should place far greater emphasis than it has to date on funding rural transportation programs. The situation today still shows minimal or non-existent public transit services in most rural areas. Furthermore, compared to the resources allocated to urban areas, those allocated for rural public transportation are significantly inequitable. This creates serious, ongoing barriers to employment, accessible health care, and full participation in society for people with disabilities.

- **Enforcement:** (a) The U.S. Department of Justice (DOJ) and the Federal Motor Carrier Safety Administration (FMCSA) should continue to prioritize, fund, and increase the scope and depth of oversight and enforcement efforts of privately funded transit; (b) the federal agencies that enforce various aspects of the ADA transportation requirements should collectively establish a clear means (e.g., shared website and phone number) for individuals to request and obtain assistance with concerns about local or state noncompliance; and (c) the Department of Transportation (DOT) and DOJ should promulgated guidance on disseminating information about the website, how covered entities (e.g., DOT's Federal Transit Administration, the Federal Railroad Administration, the Federal Highway Administration, and FMCSA) will initiate a public awareness campaign.

NCD appreciates the opportunity to present an independent and nonpartisan assessment of transportation progress as it affects the daily lives of Americans with disabilities—including equal access that most people take for granted. Transportation can be the key to obtaining, retaining, and succeeding in the world of work and socialization by people with disabilities. NCD stands ready to work with you, the Administration, Congress, and other stakeholders to ensure that affordable and accessible transportation is available to all Americans.

Respectfully,


/s/



Jeff Rosen
Chairperson

(The same letter of transmittal was sent to the President Pro Tempore of the U.S. Senate and the Speaker of the House of Representatives.)

2

# National Council on Disability Members and Staff

## Members

Jeff Rosen, *Chairperson*
Kamilah Oni Martin-Proctor, *Co-Vice Chair*
Lynnae Ruttledge, *Co-Vice Chair*
Gary Blumenthal
Chester A. Finn
Sara Gelser
Captain Jonathan F. Kuniholm, USMC (Retired)
Janice Lehrer-Stein
Ari Ne'eman
Benro T. Ogunyipe
Stephanie Orlando
Katherine D. Seelman
Clyde E. Terry
Royal P. Walker, Jr.
Alice Wong

## Staff

Rebecca Cokley, Executive Director
Phoebe Ball, Legislative Affairs Specialist
Stacey S. Brown, Staff Assistant
Lawrence Carter-Long, Public Affairs Specialist
Joan M. Durocher, General Counsel & Director of Policy
Lisa Grubb, Management Analyst
Geraldine-Drake Hawkins, Senior Policy Analyst
Amy Nicholas, Attorney Advisor
Robyn Powell, Attorney Advisor
Anne Sommers, Director of Legislative Affairs & Outreach

# Executive Summary

Nearly 10 years ago, the National Council on Disability published *The Current State of Transportation for People with Disabilities in the United States*, a major transportation overview report. That 2005 report received high acclaim and contributed to major developments in the field.

In this related document, *Transportation Update: Where We've Gone and What We've Learned*, NCD explains where the U.S. disability community found itself in 2005 and what has changed since then. This update addresses the achievements and advances that have occurred in the field of transportation for people with disabilities, as well as what has been learned and where problems remain in the United States.

Much has happened in the past 10 years. Many in the transit industry and in government agencies have greater insight into how to improve public transit systems for the disability community. Changed circumstances and advancements in operational knowledge must also be taken into account.

In many ways, the transportation accessibility situation has advanced. More people with disabilities are riding public transit than ever before; new rulemaking has provided pathways forward; and new research has revealed insights that cast doubt on common transit industry beliefs about transportation for people with disabilities that were accepted as truth until quite recently, and often still are.

At the same time, transportation problems persist for people with disabilities, including many obstacles to taking full advantage of all forms of public transit. Rural areas across the country still lag well behind in terms of transportation options, although programs to improve rural transportation are proliferating.

Across the United States, transportation accessibility remains a key challenge, even though we know from research and stakeholder experiences what is needed. The

National Council on Disability remains in the forefront in analyzing our current status and shining a light toward the future.

This report is confined to surface transportation. It does not address transportation by air carriers or passenger vessels, although those are important areas that merit further examination.

## Overview of Chapters

The report is divided into 11 topics by chapter—Fixed-Route Bus Transit; Rail Transit; ADA Paratransit; Enforcement; Fixed Route Deviation; Issues for All Modes of Public Transportation; Rural Transportation; Coordinated Transportation; Commercial Driver's License Rules; Public Rights-of-Way; and Privately Funded Transit. Each chapter presents findings about specific topics and the impacts on the lives of people with disabilities. At the end of the report is a list of overall recommendations addressing selected broad issues, as well as chapter-by-chapter recommendations to Congress, federal agencies, state regulators and local jurisdictions, transit authorities, agencies, providers, and other stakeholders, including the disability community, public works departments, private companies, and transportation designers.

**Chapter 1, Fixed-Route Bus Transit**, addresses the improvements and remaining challenges for fixed-route bus transit. Promising research shows that ridership by people with disabilities on fixed-route bus and rail systems in the United States has grown far faster than ridership on Americans with Disabilities Act (ADA) paratransit, casting doubt on the common transit industry view to the contrary. Gains and challenges in equipment maintenance include information about best practices, although these practices are often not implemented. Ramp slopes on accessible buses are generally too steep, but the U.S. Access Board might implement policies that require more gradual slopes. Bus boarding issues are still a challenge in some cities; litigation alleges that local bus systems deny boarding to people with disabilities despite having accessible equipment. Gains and challenges in the area of stop announcements

on buses include extensive information about best practices, although these practices are often not implemented. Several examples illustrate what is needed to implement fully accessible fixed-route systems.

**Chapter 2, Rail Transit**, addresses two key issues: (1) full-length platform-level boarding and (2) impediments to the use of Amtrak. The former—also referred to as "level boarding"—full-length platform level boarding is considered the best approach for people with mobility disabilities to board and disembark from trains. This section focuses on a major set of changes made in 2011 to the U.S. Department of Transportation (DOT) ADA regulation requiring level boarding at certain stations. A subsection on new boarding options explores the development of a second-best alternative: large setback platforms.

Although many people with disabilities use Amtrak successfully, particularly along the northeast corridor, Amtrak has lagged behind (despite the requirements of the ADA) in its stations, train cars, reservations capacity, and in the area of communications access. We also explore a disturbing report from the Amtrak Office of Inspector General.

**Chapter 3, ADA Paratransit**, addresses many key concerns, including the myth of runaway growth. We explore recent research that casts doubt on the common transit industry view that the graying of America will cause explosive growth in ADA paratransit demand.

A section on commuter bus exception discusses how to determine which forms of transit qualify for the commuter bus exemption to the ADA paratransit requirements.

The section on eligibility provides up-to-date resources; explores conditional and trip-by-trip eligibility; and addresses topics such as assessing an applicant's most limiting condition, medical professionals who know the applicant, weather-related eligibility, explaining how blanket denials based on type of disability are not allowed, the relationship between eligibility and safety, and the eligibility determination process, including discrimination based on native language.

Trip denials are disallowed by the ADA if they occur in substantial numbers, but they still occur in many transit systems. A discussion of telephone hold time addresses best practices in measuring hold time and a number of related issues, including "where's my ride" calls, secondary holds, and busy signals. The section on origin-to-destination service describes an important ADA guidance document.

On-time performance is a key issue in ADA paratransit compliance; this section provides examples of on-time performance problems in ADA paratransit systems around the United States and how to prevent them, including information on best practices.

The section on no-show policies explores new findings and provides best practices, including not counting no-shows that are beyond the rider's control, basing policies on the proportion of missed trips rather than on the absolute number, not canceling the return trip, implementing suspensions properly, no-strand policies, and late cancellations.

Other sections in this chapter explore using taxis in ADA paratransit, respecting ADA paratransit as a legitimate transit mode, ADA paratransit feeder service and important considerations to guide its use, transitions between contractors and service models, parents traveling with children, and passengers with dementia.

**Chapter 4, Enforcement**, addresses the many ways that federal disability rights protections governing transportation are overseen and enforced by a plethora of agencies. It discusses enforcement challenges and describes where progress has been made. The chapter covers DOT guidance and its role in ADA implementation; ADA compliance reviews of publicly funded transit by the Federal Transit Administration (FTA); ADA administrative complaints investigated by the FTA; triennial reviews, state management reviews, and key station reviews conducted by the FTA; and over-the-road bus enforcement by the Department of Justice (DOJ) and the Federal Motor Carrier Safety Administration (FMCSA).

**Chapter 5, Fixed Route Deviation**, discusses fixed route deviation service, the various ADA challenges it presents, and how the ADA affects its provision.

**Chapter 6, Issues for All Modes of Public Transit**, addresses major issues that affect every surface transit mode, including fixed-route, demand-responsive, bus, and train. The chapter covers the following topics:

- Removal of the "common wheelchair" section from the DOT ADA regulations, including implications of the change and examples of difficulties that remain with some transit agencies.

- Reasonable modifications of policies, practices, procedures, and other nondiscrimination requirements—what it means to modify policy to avoid discrimination, problems that stem from court decisions ruling that the modification of policy provision in the DOJ rule may not apply to publicly funded transit, and efforts by DOT to adopt the provision into its own regulation.

- Securing mobility devices—common misinterpretations of this critical safety issue and its requirements. The chapter also addresses WC-19, a voluntary standard for wheelchairs used in motor vehicles; SAE J2249, a voluntary standard for securement devices (tie-downs); scooter securement; and rear-facing securement.

Chapter 6 also discusses discriminatory practices in the transportation arena against users of service animals and offers technical assistance suggestions for boarding wheelchair users with service animals on a lift vehicle. A section on communications access addresses a variety of practices—some that are encouraged and others that are discouraged—for transit agencies to make their communications more accessible to people with hearing, speech, vision, and cognitive disabilities. Other sections in this chapter address traveling with a respirator or portable oxygen supply; navigating public

transit with a cognitive or intellectual disability or with chemical or electrical sensitivities; and training staff to proficiency.

**Chapter 7, Rural Transportation**, identifies critical gaps and barriers resulting in minimal or nonexistent transit services in rural and remote areas. This situation creates serious barriers to employment, accessible health care, and full participation in society for people with disabilities; however, MAP-21, the federal reauthorization of DOT surface transportation programs through fiscal year 2014, offered coordination opportunities. This chapter discusses funding sources for rural transportation, as well as successful strategies such as voucher programs, volunteers, flex services, taxicabs, mobility management, coordinated services, and car ownership.

**Chapter 8, Coordinated Transportation**, addresses the increasing focus on coordinated transportation programs and services to provide transportation to people with disabilities; it includes examples of successful coordination in Oregon, Iowa, and Maine.

**Chapter 9, Commercial Driver's License Rules**, addresses the problems posed by commercial driver's license rules for hard-of-hearing and deaf people—as well as people with seizure disorders and those with insulin-treated diabetes—in jobs as interstate truck drivers. Several important recent advances have struck down barriers that have existed for years, and even decades, thus increasing employment opportunities.

**Chapter 10, Public Rights-of-Way**, addresses the critical nature of accessibility to public rights-of-way (PROW)—the network of streets and sidewalks. This chapter describes key court decisions for PROW and explains important issues such as "complete streets"; bus stop access and detectability; accessible pedestrian signals; detectable warnings; curb ramps (including recent gains in the relationship between street resurfacing and curb ramps); and snow removal.

**Chapter 11, Privately Funded Transit**, addresses two key areas: (1) taxicab service and (2) intercity transit using over-the-road buses. It discusses the importance of transit by taxi and the barriers that prevent people with disabilities from taking full advantage of taxi travel, including accessibility. Topics include the need for incentives, keeping accessible vehicles in use, training, and enforcement. Case studies are presented of accessible taxi service in Chicago, Rhode Island, and New York City. The chapter also addresses new payment technology in taxicabs for people who are blind or have vision impairments. Finally, it covers the problems presented by the burgeoning sector of smartphone transportation applications such as Uber, SideCar, Lyft, and similar services, which have resisted the regulation normally imposed on the taxi sector.

With regard to intercity bus service and over-the-road buses (OTRBs), the chapter describes the gradual implementation of the 1998 DOT ADA regulation changes concerning private transportation that uses OTRBs, the rise of curbside carriers that have disregarded the ADA for many years, and the successful struggle to push for ADA enforcement. This section also addresses a major 2012 deadline for fully accessible bus fleets operated by large carriers; how a problem with interlined service between large and small carriers has been resolved; the phasing out of the period during which large carriers may require advance notice from riders with disabilities; and other OTRB issues and problems, including boarding denials and difficulties in moving seats to create wheelchair spaces.

**Recommendations**. The report closes with chapter/topic-specific recommendations, as well as these four overall recommendations for consideration and action:

1. All transportation providers must comply with the requirements of the Americans with Disabilities Act (ADA). They should establish policy and conduct training to ensure proper implementation.

2. All federal agencies that enforce any aspect of the ADA transportation requirements should enforce them thoroughly and robustly, and take the

initiate to undertake robust compliance oversight activities, such as compliance reviews, to ensure that the ADA is implemented properly.

3.  Congress should undertake oversight activities to ensure compliance with the ADA transportation requirements, as well as proper implementation.

4.  Transit agencies and other stakeholders should be encouraged to follow all the best practices identified in this report.

# Introduction

This report describes the transportation access changes for people with disabilities, positive and otherwise, that have occurred in the past decade. Key considerations include (1) the impact of new regulations and court decisions that have spurred improvements in surface transportation, and (2) innovations and new technologies that provide opportunities for people with disabilities.

Accounts of achievements in increasing transportation accessibility for Americans with disabilities, and some of the unmet needs, are presented in great detail. This report identifies relevant data and calls attention to best practices, as well as areas that still require significant reform. The research, data analysis, and insights from the disability community promote understanding of how to provide meaningful access to public transit systems that work well for the disability community. Changed circumstances and advancements in operational knowledge signal trends that can create new transportation opportunities in the future. At the same time, problems persist for people with disabilities, who rely heavily on public transportation. Many still face obstacles to taking full advantage of all forms of public transit. Notably, the rural areas of our country lag well behind in terms of transportation options, although the proliferation of programs to improve rural transportation is a positive development.

The overall context for disability transportation issues was expressed in the 2005 NCD report:

> This paper analyzes existing transportation systems in the United States with the acknowledgment that these systems are inherently inadequate due to a chronic lack of funding. As the United States focuses its resources on travel by automobile, all other modes are neglected in comparison.[1]

This situation continues today, and there is ample reason for concern for the future, as certain parts of the U.S. electorate turn against public services. For example, in April

2014, a state law was passed in the Tennessee Senate that banned new mass transit projects across the state:

> The Tennessee Senate has approved a measure that would ban new mass transit projects across the state. The bill was introduced to undermine a proposed rapid bus system in Nashville called the Amp, but would apply statewide.[2]

Meanwhile, mass transit ridership is at an all-time high. According to the American Public Transportation Association, 10.7 billion trips were taken on U.S. public transportation in 2013, the highest transit ridership in 57 years.[3] Is our nation for or against mass transit? The answer will mean a lot for people with disabilities.

Transportation remains a key challenge for the disability community. Effective, accessible public transit can enhance the quality of life for millions of people with and without disabilities in the United States by increasing access to education, employment, and social interaction.

The scope of this update is limited to surface transportation. It does not address transportation by air carriers or passenger vessels, although those are important areas that merit further examination and may become the subject of analysis and recommendations in the future.

Plaintiffs' Exhibit 438

hearingaidclinics.ca

# Travelling With Hearing Loss, and Now Face Masks - Pt. 2 - Hearing Aid Clinics

3 minutes

In our last blog post, we addressed what steps people who experience hearing loss can take to make travel more comfortable. Let's now take a look at what airline staff can do to assist hearing-impaired people while traveling.

1. CLEAR FACE MASKS

International travel signifies fun, exploration, rest, and relaxation for most people. Those with hearing loss experience both excitement and trepidation, and navigating new and unpredictable listening situations isn't always easy. Face masks have complicated the situation even further, since those with hearing loss rely heavily on facial expressions, non-verbal cues, and sign language to comprehend people. By encouraging airline staff to wear clear masks, this problem will decrease to some degree.

2. TRAIN AIRCREW IN SIGN LANGUAGE

Another step to making travel more inclusive is by adding sign language to the list of languages that aircrew can converse in.



3. VISUAL CUES

It's a good idea for airlines to provide visual cues – for instance, tablets with important boarding/disembarking/emergency instructions and menus (please don't just say, "Chicken or pasta") – so that passengers with hearing issues feel safe and at ease throughout the journey.



The correct disability service

When we reserve online, there is a space to note a disability and the kinds of services offered. Why, then, is someone who checks "Deaf and Hard of Hearing" offered a wheelchair? Airlines should ask people with hearing loss to specify what kind of services they would need beforehand.



Pre-boarding the plane

Air carriers should provide electronic displays that will tell a person with hearing loss what zone is boarding, as well as information about upgrades and standby status. A gate attendant shouldn't just tell a person to go sit until their zone is called. This is against the Air Carrier Access Act, when someone identifies themselves as a person with hearing loss, the gate attendant must provide equal access to the boarding announcements, even if that means coming over to where the passenger is sitting to repeat the announcement. Better still, passengers with hearing loss should be offered pre-boarding.

Captioned safety announcements (and movies!)

Airlines should live-caption important information on the screens right in front of a passenger with hearing loss. Oh and movies as well!



Plaintiffs' Exhibit 439

onemileatatime.com

# Will Masks Be Required On Airplanes Forever? | One Mile at a Time

5-6 minutes          4-9-21

While I think the mask mandate on planes and at airports has made a lot of sense during the pandemic (and continues to make sense, until things are more under control), I can't help but wonder when it will be lifted… if at all.

- Airline safety policies are often added, rarely reversed

- Masks could be helpful long-term, but at what cost?

- Bottom line

## Airline safety policies are often added, rarely reversed

When you look at the pain points of airline travel, it's interesting the extent to which some policies have been introduced in the name of safety, but have never been undone. There are some changes that absolutely make sense, like reinforced cockpit doors, which are an easy, permanent solution, that don't inconvenience anyone.

But then look at some of the other policies in the airline industry that are more questionable:

- We're still not allowed to take liquids of over 100ml through security, out of fear that they might be explosive

- We're still (for the most part) required to take our shoes off at airport security, because in 2001 there was an attempted "shoe bomber"

- We're still not allowed to "congregate" near bathrooms, exits, or lavatories, on US-bound flights, out of fear that we might be coordinating some sort of an attack on the plane

- Whenever a pilot uses the bathroom, a cart needs to be set up to block the way

Heck, forget safety for a moment, and just look at airline fuel surcharges. They were added when oil prices spiked, but have never been eliminated, even when oil prices were at an all-time low.

The point is, ==I can't think of many policy changes in the airline industry that were added and then later undone.==

## Masks could be helpful long-term, but at what cost?

Coronavirus has taught me a lot about health and human interaction in general. To some extent the way I interact with humans will probably never be the same. For example:

- I have a hard time imagining going to a social event where there are dozens of people you're expected to hug and talk to in close proximity

- Having gotten the flu a few years back on a trip to Asia, I have a new appreciation for how this was probably preventable to some extent

- I have a new appreciation for the outdoors, maintaining distance, etc.

As I always say, I'm an introvert, so in some ways coronavirus hasn't been as tough on me as on others. If I never have to awkwardly hug someone again or have unnecessary small talk with strangers at some sort of a social event, I'd be absolutely delighted.

Anyway, that's a bit of a tangent. Specific to airlines, at what point could we actually realistically expect an airplane mask mandate to be lifted?

- ==It seems highly unlikely that coronavirus will ever fully die out, so is it once we're at the point where annual coronavirus deaths are less than average flu deaths, or at some other point?==

- Even if we're at that point, with the new knowledge we have, isn't there merit to wearing masks on planes, at least during flu season (we've seen some people do this in Asia for years)? There does seem to be some potential upside in terms of saving lives, at least in comparison to liquids and shoe restrictions, no?

- As good as air filtration is on planes, there aren't any public spaces I can think of where you're forced to sit so close to a stranger for such a long period of time

To be clear, ==I hope that masks aren't required on planes forever.== Personally I don't think the mask mandate will be lifted in the coming months (I'd be shocked if it's lifted in 2021), though I think it could be within a couple of years. ==Then again, I can't help but wonder if this will just be another policy that the airline industry keeps in place forever, as with so many policies that came before this.==

## Bottom line

At this point [wearing masks on airplanes](#) has become the norm, and it's something travelers have gotten used to. That's good during the pandemic, though I think we're all

hoping that the mask mandate is eventually lifted.

That being said, I can't help but wonder if it's here to stay forever. I'd argue that there's more upside in terms of saving lives with a mask mandate on planes than with liquids and shoe restrictions, yet those have stuck around for a couple of decades now.

And to be clear, that's not to say that I think the mask mandate should stick around forever, but rather that it has more relative merit than some of the other policies that have stuck around.

I could see myself voluntarily wearing a mask in the future when flying during flu season, but I don't think it should be mandated forever.

**What do you think — could a mask mandate become a permanent aspect of flying, or at what point do you think it will be lifted?**



Plaintiffs' Exhibit 440

# Face-covering policy for passengers with disabilities travelling during a pandemic

## Introduction

- The requirement to wear face masks onboard aircraft can be imposed by government regulations, and/or by a carrier's contract of carriage.

- Some government regulations regarding accessibility in air travel do not prohibit air carriers from assessing whether a passenger is fit-to-fly. They provide grounds for requiring a medical clearance to support that assessment in situations where the person in question has a medical condition or communicable disease that threatens his or her safe transportation or the health of other passengers and the crew.

- Other government regulations regarding accessibility in air travel do not address communicable diseases, as this is a topic separate from disability[1].

- Recently, state regulators and airlines have expressed concerns over a possible increase in non-compliance from passengers with health regulations (including those on the wearing of face masks or equivalent face shields). Unfortunately, several member airlines have had to deal with incidents, some of which received high profile reporting in social media for passengers who have refused to wear a face covering.

- At the same time denied boarding and passenger bans have raised criticism on airlines' policies that restrict people with disabilities from accessing air transportation as a violation of anti-discrimination and disability rights regulations.

- This paper intends to clarify the position of IATA members on face-covering for passengers who have disabilities (or underlying medical conditions) that make them unable to wear face-coverings.

## IATA policy position

- IATA recognizes that face-covering for passengers, ground staff, and cabin crew is a critical part of a layered approach to biosafety to allow passengers to travel safely during a pandemic.

- Airlines should provide reasonable accommodation to passengers aligned with measures recommended by states' health authorities. Provision of such accommodation must be consistent with operational feasibility and without compromising the safety of fellow passengers. This will help to ensure that all passengers exercise their human rights and their fundamental freedoms in an equitable manner.

- The type of face-covering (non-medical or medical) should be selected based on the level of risk and the availability of such masks while taking into consideration the potential risks and disadvantages of wearing a specific mask type.

---

[1] This is the case for European regulation EC1107/2006 and for the Canadian Accessible Transportation for Persons with Disabilities Regulations (ATPDR).



- Best practices should be followed regarding when and how to wear, remove, replace, and dispose of masks and face coverings, as well as the adoption of hand hygiene after removal. It is recommended that the PPE of staff assisting passengers with disabilities be changed after each time assistance is provided to a passenger.

- A general practice, ==rules applied by a carrier as part of a contract of carriage should be clearly communicated in advance to passengers.== Carriers should consider drawing special attention to a requirement to wear a face mask during booking, online check-in, and via other communication channels.

- ==Some passengers, such as those who cannot put on or remove face masks themselves, very young children, and those who have certain types of medical conditions may not be able to tolerate the use of face coverings or masks for a lengthy period -or at all.==

- Airlines should consider this within their risk assessment process and identify whether additional questions are necessary at the pre-screening stage(s) and whether any exceptions in the acceptance of these passengers can be made within their policy. Exceptions should be made in consideration of the health authorities' recommendations and the risk level. Where exceptions are made, other passengers may need to be advised of the reasons and additional steps to mitigate the risks in order to reassure them and prevent discomfort between passengers.

- In the interests of all passengers' safety, a passenger whose medical condition may pose a "direct threat" to his or her safe transportation or to the health of other passengers and the crew may be asked to provide additional medical documentation (e.g. MEDIF2 ) to ensure that they are fit-to-fly.

- The phenomenon of fraudulent claims by passengers to obtain an exemption from the requirement to wear face masks has been drawn to IATA's attention and is of concern. Airlines should consult with their legal department on procedures for addressing the validity of exemption documentation under local government requirements.

- In the implementation of safety measures, care should be taken to follow all applicable laws, regulations, requirements, standards, and guidance issued by relevant sub-national, national, and international authorities. IATA position is not intended to supersede or contradict such requirements.

## SSRs codes on additional documentation checks and mask exemptions

- Airlines may develop their own policies around additional documentation requirements and wearing of masks

---

[2] The MEDIF is the name given to the forms used by airlines to manage passengers requiring special assistance and medical clearance. For additional guidance see the IATA medical manual  For example the U.S. Air Carrier Access Act regulations (14 CFR Part 382) define "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services." In accordance with public health guidelines, this currently includes passengers whose symptoms, e.g., a fever, indicate that they may have COVID-19.
For additional guidance, see Air Carrier Access Act, part 382.19 and part 382.21 which address medical clearance for persons with disabilities and passengers with communicable diseases : https://www.ecfr.gov/cgi-bin/text-idx?node=pt14.4.382&rgn=div5



- New bilateral SSRs have been adopted for the collection and exchange of information regarding additional documentation checks and mask exemptions

- Where airlines wish to identify passengers that have been cleared to travel (e.g. where additional documentation s such as a valid test have been checked), new standards have been developed to allow airlines to capture this information and communicate this with third party ground handlers or internal airport teams. This standard is a new bilateral Special Service Request (SSR) ADOC (Additional Documentation)  which may be included within a passenger name record (PNR) at check-in, to be exchanged with ground handlers using existing industry standards, to be visible at time of boarding.

- Where airlines wish to identify passengers that have a valid exemption from wearing a face mask (such as a medical condition or a disability that prevents them to wear a face mask), a new standard has also been developed to allow airlines to capture this information and communicate this with third party ground handlers, cabin-crew, partner carriers or internal airport teams. This standard is a new bilateral Special Service Request (SSR) NMOK (No Mask OK) which may be included within a passenger name records (PNR) at check-in, to be exchanged with ground handlers using existing industry standards, to be visible at time of boarding.

- Both SSRs have been developed and adopted by IATA member airlines and will take effect from 1 June 2021 (subject to government filing).

- Regulation is changing rapidly.   For up to date information on current requirements, member airlines should refer to the IATA Travel Centre at travelcentre.iata.org

Plaintiffs' Exhibit 441

forbes.com

# Why Some In The Airline Industry Want To End The Mask Mandate On Planes

*Ben Baldanza*

6-7 minutes

8-7-21



Edit Story

Aug 7, 2021,03:40pm EDT|6,517 views



I write about airlines and travel to explain this crazy industry.



The airline mask mandate is scheduled to expire in September, and some in the airline industry agree ... [+] with this though others feel it should be extended.

getty

The airline mask mandate is scheduled to expire on September 13, 2021. With this mandate in place, there has been a rise in onboard incidents that have harmed flight attendants, delayed or cancelled flights, and shown some of the worst of how society can behave.

In July, Southwest Airlines CEO Gary Kelly, the chairman of the industry group Airlines For America, indicated that U.S. airlines would like to see the mandate mandate lapse. Not extending the mandate would prevent some risks, mostly from onboard aggression and what people will continue to see as unfair and inconsistent policy application, some in the airline industry believe. When combined with the relatively safe environment of an aircraft cabin and an upcoming seasonal drop in travel, it makes sense to some to let the mandate end as scheduled in September.

Yet the rapid spread of the Delta variant of the coronavirus is making everyone re-think what the next steps should be – Airlines For America is not taking a public position on the issue — and certainly the federal government will consider extending the mask mandate on airplanes if it determines that the Delta variant presents too much risk.

**Airplanes Are Safer Than Most Places**

By now, it's old news that airplane air flows vertically and is replaced with new outside air every few minutes. Thanks to this, several studies have suggested that the transmission of viruses onboard a plane is rare, which is one key point that proponents of dropping the

==mask mandate on planes point to.== Yet the higher rate of contagion with the Delta variant will challenge this view. Letting the mask mandate expire on its current chosen date with the Delta variant active poses some risk not found with the original virus.

**Emotions Run High When Flying**

Flying is a stressful time for many flyers. People who normally have a lot of control in their lives give up all control, and are subject to delays, unexpected events, and more and must adapt. Not everyone is good at this. ==When this atmosphere is combined with tensions around mask policy, we have seen a summer with more onboard skirmishes and more people injured than ever before.== The FAA has suggested big fines in some cases, but these will take years to go through the courts and likely be dropped or settled for pennies on the dollar. The fines make good headlines and may deter some otherwise bad behaviors, but ==the root cause of most of these incidents has been the mandated mask policy. It's not the policy itself, but the inconsistency of that policy with other parts of life. While many of us may be able to clearly understand why we must wear a mask on a plane but don't have to in restaurant, to others this makes no sense. Put that view in the stressful and emotional environment of an airline flight and the results we've seen this summer are not totally surprising.==

**Many Flight Attendants Are Vaccinated**

Flight attendants are on the front line of the abusive behavior by passengers, and the national flight attendant unions supported the initial mask mandate and its extension to September. That is understandable, but also during the summer vaccinations are continuing and now 70% of adults in the U.S. have had at least one shot of a vaccine. Further, United Airlines is now requiring all employees to be vaccinated and so it's reasonable to assume that more flight attendants are vaccinated than the population as a whole. As travel reduces naturally in the fall, ==letting the mandate expire would lower the tensions onboard significantly and greatly reduce the number of potentially dangerous confrontations that flight attendants must face.==

But then there's the health risks to passengers and those they come into contact with after their trip.

The fairly widespread distribution of vaccines in the U.S. and Europe has made a huge difference. Today, nearly all of the deaths related to Covid are in people who have chosen not to be vaccinated.

However, the delta variant is far more contagious than previous forms of the coronavirus – research suggests it's anywhere from 40% to 60% more transmissible than the alpha variant and twice more than the original Wuhan form of the virus. And research that showed that vaccinated people who are infected pose as much of a risk to spread the

virus to others as unvaccinated people led the Centers for Disease Control to recommend last week that vaccinated people wear masks in areas where the virus is spreading rapidly – which is most of the U.S. right now.

A number of cities and businesses have moved to reinstate mask mandates. All this may make it less likely that the federal government will let the mask mandate on airplanes lapse.

Managing risk does not mean eliminating risk. Managing risk means mitigating the most significant risk, and finding a good balance between different types of risk. There would be no inflight incidents or onboard transmission if we made it illegal to fly, for example, but the cost of that to society is far worse than the risk of onboard incidents. In a similar way, we know that the mask mandate upsets enough customers to have created a difficult summer for flight attendants and airlines. We also know that more people are vaccinated each day, and that travel will seasonally drop once we hit September. Given these balancing forces, there will be arguments to both let the mandate expire and to extend it. In either case, clearly the answer is to get more people vaccinated!

Follow me on LinkedIn. Check out my website.



I am the former CEO of Spirit Airlines, where my strong team transformed the company into the highest margin airline in North America and created a new model for air

…

- Print
- Reprints & Permissions

SpaceX Launches Its 'Operational' Flight To The ISS

Plaintiffs' Exhibit 442



# Southwest Airlines Co.

# Contract of Carriage - Passenger

**(CoC) – English Version**

**Revision: 33rd Revised**          **Effective Date:** 08/05/2021

# Southwest Airlines Co. Contract of Carriage

## Table of Contents

Southwest Airlines Co. Contract of Carriage .................................................................. 1

1.   Introduction ........................................................................................................... 3
     a.   Application of Conditions of Contract ................................................... 3
     b.   Definitions ................................................................................................ 3

2.   Reservations .......................................................................................................... 7
     a.   Reservations ............................................................................................ 7
     b.   Group Policies .......................................................................................... 9

3.   Fares ...................................................................................................................... 10
     a.   Application of Fares ............................................................................... 10
     b.   Stopovers ................................................................................................ 10
     c.   Special Fares ........................................................................................... 11

4.   Tickets ................................................................................................................... 14
     a.   Tickets ..................................................................................................... 14
     b.   Ticket Acceptability ............................................................................... 15
     c.   Refunds ................................................................................................... 15

5.   Check-in ................................................................................................................ 17
     a.   Boarding Passes ..................................................................................... 17
     b.   Check-in Requirements ......................................................................... 17

6.   Acceptance of Passengers .................................................................................. 18
     a.   Refusal to Transport – General ............................................................ 18
     b.   Refusal to Transport – Unruly/Disruptive Passenger ...................... 19
     c.   Carriage of Children .............................................................................. 22
     d.   Carriage of Passengers with Disabilities ............................................ 24
     e.   Pets .......................................................................................................... 26
     f.   Law Enforcement and Search and Rescue Dogs ............................... 27

7.   Baggage ................................................................................................................. 28
     a.   Carryon Baggage .................................................................................... 28
     b.   Acceptance of Checked Baggage ......................................................... 29
     c.   Surveillance and Inspection of Baggage ............................................ 30

d.    Checking of Baggage ..................................................................................... 30

e.    Free Checked Baggage Allowance ................................................................ 30

f.    Excess, Oversize, and Overweight Baggage Charges ................................ 32

g.    Special Items ................................................................................................. 33

h.    Unsuitable Baggage Subject to Limited Release of Liability .......................... 33

i.    Limitations of Liability ..................................................................................... 34

8.    International Travel .................................................................................................... 37

a.    Application of Montreal or Warsaw Convention ............................................. 37

b.    Death or Injury of Passengers ....................................................................... 37

c.    Delay of Passengers ..................................................................................... 38

d.    Destruction, Loss, or Delay of Baggage ........................................................ 39

e.    Time Limitations on Claims and Actions ........................................................ 40

f.    International Travel Documents ...................................................................... 40

g.    Foreign Currency ........................................................................................... 40

h.    Partial Tax Refunds in Limited Circumstances............................................. 41

i.    Check-in Times for International Flights ......................................................... 41

j.    Travel by Minors ............................................................................................ 41

k.    Carriage of Animals ....................................................................................... 41

l.    Firearms ......................................................................................................... 41

9.    Service Interruptions ............................................................................................... 42

a.    Failure to Operate as Scheduled .................................................................. 42

b.    Denied Boarding Procedures ......................................................................... 42

c.    Ground Transportation ................................................................................... 45

10.    Miscellaneous ......................................................................................................... 46

a.    Claims ............................................................................................................ 46

b.    Customer Service Commitment ..................................................................... 46

c.    Choice of Law, Entire Agreement.................................................................. 46

# 1. Introduction

a.  Application of Conditions of Contract

(1)   Transportation by Southwest Airlines Co. (hereafter "Carrier") is subject to the following terms and conditions, in addition to any terms and conditions printed on any Ticket, or specified on the Carrier's website. The terms and conditions contained in this *Contract of Carriage* shall govern all published routes and services provided by the Carrier as well as all fares and charges published by the Carrier. This *Contract of Carriage* is subject to applicable laws, regulations and rules imposed by U.S. or foreign governmental agencies. In the event of a conflict between the terms of this Contract and such applicable laws, regulations or rules, the latter shall apply. By purchasing a Ticket or accepting transportation, the Passenger agrees to be bound by all of the following terms and conditions.

(2)   Carrier reserves the right, in its sole discretion and to the extent not prohibited by federal law, to change, delete, or add to any of the terms of this *Contract of Carriag*e without prior notice. All changes must be in writing and approved by a corporate officer of the Carrier. To the extent there is a conflict between the *Contract of Carriage* and information printed on the Ticket or specified on the Carrier's website, the *Contract of Carriage* governs.

(3)   By purchasing and accepting transportation, the Passenger agrees to adhere to and comply with all the requirements of this *Contract of Carriage* and applicable laws and regulations, including but not limited to federal laws protecting federal, airport, and air carrier employees who have security duties from assault and interference with the performance of duties. Transportation offered by the Carrier under this *Contract of Carriage* is subject to the Passenger's compliance with these obligations, and a Passenger's failure to comply shall constitute a material breach of this *Contract of Carriage*.

(4)   Applicable terms and conditions are those in effect as of the date a Passenger commences travel on a given itinerary. In the event these conditions of Carriage are amended after a Ticket is purchased but prior to commencement of travel in a way that substantially affects the terms and conditions of a Passenger's Carriage, a full refund of the Ticket price may be requested if the Passenger does not agree to be bound by the conditions as amended.

b.  Definitions

**Baggage** means all luggage and contents contained inside, including suitcases, garment bags, tote bags, packages, camera and electronics bags, computer and equipment cases, briefcases, musical instruments, and similar articles, whether carried by the Passenger in the cabin or carried in the aircraft cargo compartments. Coats and wraps, when carried by the Passenger in the passenger cabin, will not be considered as Baggage.

**Boarding Pass** means a document issued by Carrier entitled Boarding Pass bearing the Passenger's first and last name, flight number and date, departure and destination airports, and a boarding group letter and number, which represents the Passenger's boarding group and reserved spot in the boarding group line. A Passenger must have a Boarding Pass to be considered as having Confirmed Reserved Space as defined in Section 9(b)(1). Boarding Passes may be obtained at Southwest.com®, or at the airport from Southwest at:

(1) E-Ticket Check-In kiosks (where available), (2) skycap podiums (where available), (3) ticket counters, or (4) departure gate podiums. Carrier reserves the right to restrict Boarding Pass distribution to the departure gate podium.

**Carriage** means the transportation of Passengers and/or Baggage by air, gratuitously or for hire, and all services of Carrier related thereto.

**Carrier** means Southwest Airlines Co. and its officers and employees, contractors and agents acting in their official capacities.

**Checked Baggage** means Baggage of which Carrier takes sole custody and for which Carrier has issued a Baggage Claim Check and affixed a Baggage Tag.

**Fare Component** means each local currency fare (except Add-On-Fares) where more than one such fare is used in construction of the total fare for a journey.

**Flight Coupon** means the portion of the Passenger Ticket that is valid for Carriage.

**Force Majeure Event** means any event outside of Carrier's control, including, without limitation, acts of God, and meteorological events, such as storms, rain, wind, fire, fog, flooding, earthquakes, haze, or volcanic eruption. It also includes, without limitation, government action, disturbances or potentially volatile international conditions, civil commotions, riots, embargoes, wars, or hostilities, whether actual, threatened, or reported, strikes, work stoppage, slowdown, lockout or any other labor related dispute involving or affecting Carrier's service, mechanical difficulties by entities other than Carrier, Air Traffic Control, the inability to obtain fuel, airport gates, labor, or landing facilities for the flight in question or any fact not reasonably foreseen, anticipated or predicted by Carrier.

**Limited Release of Liability** means Passenger's tender, and Carrier's acceptance, of Checked Baggage in a condition, or of a nature, unsuitable for Carriage where Carrier limits or excludes liability for loss, damage, or delay under Section 7.

**Montreal Convention** means, unless the context requires otherwise, the Convention for the Unification of Certain Rules for International Carriage by Air, done at Montreal, May 28, 1999 ("Montreal Convention").

**Nonstop Flight** means a flight scheduled to operate between origin and destination airports without any intermediate stops.

**Nonrevenue Passenger** means a Passenger who is traveling on a Southwest reduced-rate pass of any kind (e.g., employee travel, companion pass, buddy/guest pass, dependent pass or other airline industry employee travel).

**One-way** means Scheduled Air Service on Carrier from an originating airport to a destination airport.

**Passenger** means any person, except members of the Crew working on the flight, who is carried or will be carried in an aircraft with the consent of Carrier and is bound by this *Contract of Carriage*.

**Qualified Individual with a Disability**, as defined in 14 CFR § 382.3, means an individual with a disability who, as a Passenger:

1. With respect to obtaining a Ticket for air transportation on Carrier, offers, or makes a good faith attempt to offer, purchase, or otherwise validly obtain a Ticket.

2. With respect to obtaining air transportation, or other services or accommodations.

   a. Buys or otherwise validly obtains, or makes a good faith effort to obtain, a Ticket for air transportation on Carrier and presents himself at the airport for the purpose of traveling on the flight to which the Ticket pertains.

   b. Meets reasonable, nondiscriminatory *Contract of Carriage* requirements applicable to all Passengers.

3. With respect to accompanying or meeting a traveler, using ground transportation, using terminal facilities, or obtaining information about schedules, fares, reservations, or policies, takes those actions necessary to use facilities or services offered by Carrier to the general public, with reasonable accommodations, as needed, provided by the Carrier.

**Roundtrip** means Scheduled Air Service on Carrier from an originating airport to a destination airport and back to the originating airport or Carrier-recognized co-terminal.

**Same-Plane Service** means service between an origin and destination airport with scheduled stops at one or more intermediate airports. With the exception of unexpected ground delays or other unforeseen flight disruptions, Passengers on Same-Plane Service are not required to disembark the aircraft at any intermediate stop.

**Scheduled Air Service** means any current or future flight published on Carrier's website or in computer reservation system used by Carrier.

**Special Drawing Rights (SDR)** means a unit of currency created by the International Monetary Fund (IMF) in 1969, which operates as a supplement to the existing reserves of member countries. The current value of an SDR in U.S. dollars is provided daily by the IMF at http://www.imf.org/external/np/fin/data/rms_sdrv.aspx.

**Standby Passengers** means Passengers who will be enplaned on a flight subject to availability of space at departure time and only after all Passengers with confirmed reserved space for such flight have been enplaned on such flight.

**Ticket** means the electronic six-digit alpha-numeric confirmation number issued by Carrier or an authorized travel agent, which provides for the Carriage of the Passenger occupying a single seat.

**Ticketing Time Limit (TTL)** means the time by which the Passenger must secure his/her ticket for a confirmed reservation.

**Trained Service Animal** means a dog, regardless of breed or type that is individually trained to do work or perform tasks for the benefit of a Qualified Individual with a Disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. A Trained Service Animal also must be trained to behave properly in a public setting, remain under the control of the handler and to avoid engaging in disruptive behavior at all times. Animal species other than dogs, emotional support animals, comfort animals, companionship animals, and service animals in training are not Trained Service Animals for the purposes of this *Contract of Carriage.*

## 2. Reservations

a. Reservations

(1) Confirmation of Reservations. A reservation on a given flight is confirmed by the issuance of a Ticket.

(2) Cancellation of Confirmed Reservations.

(i) Passenger Initiated Cancellation Prior to Date of Travel. If a Passenger cancels his/her reservation prior to the date of travel, his/her ticket is eligible for a refund or the funds will be available for future use consistent with the fare rule and refund procedures specified in Section 4c.

(ii) Check-in Requirements. Failure of the Passenger to obtain a Boarding Pass and be present, available, and appropriate as discussed in Section 6 for boarding in the flight's boarding gate area at least ten minutes before the scheduled departure time may result in cancellation, at the Carrier's sole discretion, of the Passenger's reservation without notice. Section 5 contains additional information on Carrier's check-in procedures.

(iii) No Show Policy.

(a) If a Wanna Get Away Fare segment on a reservation is not changed or canceled at least ten (10) minutes prior to departure and the Customer does not travel, all segments associated with the reservation are canceled, and funds associated with the Wanna Get Away Fare segment(s) are forfeited.

(b) If a Business Select Fare, Anytime Fare, Child Fare, or Infant Fare segment on a reservation is not changed or canceled at least ten (10) minutes prior to departure and the Customer does not travel, all segments associated with the reservation are canceled, and funds associated with the Business Select Fare, Anytime Fare, Infant Fare, or Child Fare  segment(s) are held as travel credit for use by the Passenger on Southwest Airlines.

(c) When a ticket contains flight segments with mixed fare types and the ticket is not changed or canceled at least ten (10) minutes prior to departure and the Customer does not travel, all segments of the reservation are canceled and the individual flight segments will follow the aforementioned rules associated with the fare type in regard to forfeiture of funds under Section 2a(2)(iii)(a) and (b) .

(d) When a ticket is purchased using Rapid Rewards points and the ticket is not changed or canceled at least ten (10) minutes prior to departure and the Customer does not travel, all segments associated with the reservation are canceled, but the points will be returned to the Rapid Rewards account from which the points were initially debited. Taxes and fees associated with Rapid Rewards points and Companion Pass tickets follow the aforementioned rules under Section 2a(iii)(a)(b), and (c).

(e) Conditions Beyond Carrier's Control. Carrier will refuse to carry and will cancel the reservations of any Passenger when such refusal is necessary to comply with a government regulation, a request for emergency transportation in connection with the national defense, or when necessary or advisable by reason of weather or other conditions beyond Carrier's control.

(f)   Prohibited Booking Practices

(i)   Fraudulent, fictitious and/or abusive bookings violate Southwest Airlines' rules. Bookings made or Tickets issued by Passengers must be made only in respect of a Passenger's genuine travel requirements. Reservations made to exploit or circumvent fare and ticket rules are strictly prohibited. Examples include (but are not limited to):

1.   Purchasing a Ticket without intending to fly all flights to gain lower fares (hidden cities);

2.   Purchasing a Ticket without intent to travel, including to gain access to our facilities;

3.   Combining two or more roundtrip excursion fares end-to-end to circumvent minimum stay requirements (back-to-back ticketing);

4.   Booking a Ticket in someone's name without the person's consent; and

5.   Booking duplicate or impossible trips, for example multiple trips for the same Passenger around the same time (i.e., trips a Passenger physically could not complete) or multiple trips for the same Passenger departing from the same city on the same date.

(ii)   If Southwest Airlines finds evidence that the Passenger or the Passenger's travel agent is using a prohibited practice, then without advance notice to the Passenger or purchaser, Southwest Airlines reserves the right to cancel any unused part of the ticket or any other reservations that it believes, in its sole discretion, were made without intent to travel, refuse to let the Passenger fly and check bags, not refund an otherwise refundable ticket, charge the Passenger for what the ticket would have cost if the Passenger or the travel agent hadn't booked it fraudulently and/or require the Passenger or the travel agent refund to us any compensation Southwest Airlines provided (such as costs for delivering bags or reimbursements for clothes or toiletries).

(iii)   With the exception of Southwest® gift cards, funds from proactively canceled reservations by Southwest will be returned to the original form of payment. Reservations paid for with a Southwest® gift card will have the amount applied from the Southwest® gift card held as travel funds for use by the Customer on a future Southwest Airlines flight.

(g)   Limitation of Liability. Carrier is not liable for any type of special, incidental or consequential damages when it cancels the reservations of any Passenger pursuant to Section 2a(2); however, the fare paid for the unused portions of travel that are canceled by Carrier may be refunded or applied toward the purchase of future travel in accordance with the applicable fare rules and Section 9.

b. Group Policies

(1) Groups Booked as Individuals. When ten or more Passengers are booked by a single individual, company, corporation, booking agency, or other entity for travel on the same scheduled flight(s), the reservations must be made as a group through the Carrier's Group Desk, and all applicable group policies and procedures must be followed. If a booking entity fails to make such reservations as a group, Carrier reserves the right, in its sole discretion, to assess a penalty upon and/or revoke the authority of the booking entity to sell Carrier's transportation services.

(2) Multiple Group Reservations. Carrier reserves the right to:

(i) Limit seats by flight for group reservations.

(ii) Cancel group reservation requests.

(iii) Make changes to group reservations to accommodate Carrier's flight schedule.

(iv) Not accept group reservations.

(v) Require that group reservations be converted to ticketed individual reservations at the applicable individual fare or be forfeited if group reservation utilization reveals what Carrier considers, in its sole discretion, to be an inadequate usage of reserved seats.

(3) Travel on Group Reservations is valid on flights operated by Southwest Airlines only and is not available for travel on itineraries that combine flights with other carriers.

## 3. Fares

    a. Application of Fares

       (1)   Transportation is subject to the fares and charges in effect when the Ticket is purchased. The fare is guaranteed once a reservation is made and a Ticket is purchased. If a Ticket is purchased before an increase in the fare becomes effective, the Ticket shall be honored for transportation between the airports and at the fare for which it was purchased.

       (2)   Changes to any portion of a Ticket initiated by the purchaser, Passenger, or his/her authorized agent after its original issue will be subject to the fares, fare rules, tax increases, and charges in effect on the date the change is initiated. A change constitutes a change in flight number, origin, destination, intermediate points, flight date, class of service, or fare.

           Ticket changes and exchanges within the same reservation will result in the initial Ticket being applied as the form of payment for the new ticket. Our unrestricted fares are fully refundable if canceled and then refunded instead of exchanging or changing your Ticket.

       (3)   Fares may be obtained on Carrier's website at Southwest.com®; through the Southwest Airlines mobile app; from Southwest Airlines by telephone at 1-800-435-9792 (1-800-I-FLY-SWA), in Spanish at 1-800-826-6667 (1-800-VAMONOS), from Mexico (Border Cities) at 001-800-435-9792 (English) or 001-800-826-6667 (Spanish), through TTY service at 1-800-533-1305; at a Southwest Airlines ticket counter; or through an authorized travel agent.

       (4)   All published fares and charges are stated in U.S. currency.

       (5)   At the airport, on the day of travel, when Passengers voluntarily request to travel standby on an itinerary differing from their purchased Ticket, Carrier will quote an estimated amount for that standby travel, including taxes and fees, in line with the planned standby itinerary at the time of request by the Passenger. Voluntary standby travel is subject to the availability of seats at departure time. Passengers flying standby have an unconfirmed status for all scheduled stops at any intermediate or connecting points on the flight and must receive confirmation of reserved space for each intermediate or connecting points on the flight in order to be provided travel on such flight.

           Because the Passenger's requested (voluntary standby) itinerary may not be available as originally planned, and a new itinerary may be required, the amount of the taxes and fees may vary from the initial estimated amount at the time that the Passenger made the request for standby travel. Passengers who travel on an itinerary of a standby nature are responsible for any increase or decrease in taxes and/or fees that result from the Passenger's final completed ticketed routing, regardless of the initial proposed standby upgrade quote.

    b. Stopovers

       (1)   A stopover is an intentional interruption of the itinerary by the Passenger. No stopovers are permitted on published fares, except upon combination of individually

purchased One-way fares.

c. Special Fares

(1)   Infant Fares

**NOTE**: Beginning June 1, 2021, Infant fares are no longer available for purchase.

(i)   Infants at least 14 days old and younger than two years of age on the date of travel, traveling on a confirmed reservation and occupying a reserved seat, with or without the use of an FAA-approved child restraint device, are eligible for Infant Fares. This rule also applies to infants younger than 14 days of age traveling on a confirmed reservation and who are permitted to fly in accordance with Section 6c.

(ii)   At the time of check-in, either government-issued photo identification or another identification document acceptable to Carrier bearing the birth date of the Passenger who is traveling on an Infant Fare must be presented to Carrier.

    (iii)  Infant Fares are not available on Southwest.com® and may only be purchased by calling Southwest Airlines or at a Southwest Airlines airport ticket counter. Those Passengers traveling on an Infant Fare whose ages have not been previously verified at a Southwest Airlines ticket counter or as a member of Southwest's Rapid Rewards program must secure their Boarding Passes at the airport and are not eligible to check in online.

(2)   Child Fares

**NOTE**: Beginning June 1, 2021, Child fares are no longer available for purchase.

    (i)  Children ages two through 11 who are accompanied by a Passenger at least 12 years of age or older on the date of travel are eligible for Child Fares.

    (ii)  At the time of check-in, either government-issued photo identification or another identification document acceptable to Carrier bearing the birth date of the Passenger who is traveling on a Child Fare must be presented to Carrier.

    (iii)  Child Fares are not available on Southwest.com® and may only be purchased by calling Southwest Airlines or at a Southwest Airlines airport ticket counter. Those Passengers traveling on a Child Fare whose ages have not been previously verified at a Southwest Airlines ticket counter or as a member of Southwest's Rapid Rewards program must secure their Boarding Passes at the airport and are not eligible to check in online.

(3)   Military Fares

    (i)  United States military personnel on active duty (including reservists, National Guard members, and Coast Guard members with active orders, cadets/midshipmen attending the US Air Force Academy, US Naval Academy, US Military Academy [West Point], and the US Coast Guard Academy) and their authorized dependents are eligible for Military Fares. Military dependents ages two through 11 years old must be accompanied by a military Passenger or a military dependent Passenger at least 12 years of age. Military personnel who have been discharged from active military duty and their authorized dependents traveling together remain eligible for Military Fares if travel will be completed within seven days of the military member's date of discharge.

    (ii)  Government Transportation Requests (GTRs) are not permitted or accepted for purchase of transportation booked at a Military Fare.

    A valid United States Uniformed Services Active Duty Identification Card or a copy of discharge orders must be presented at the time of check-in for military personnel. Dependents, other than dependents traveling with a discharged military member within seven days of the member's discharge from active duty, must present a United States Uniformed Services Identification and Privilege Card marked Active.

(4)   Military Fares are not available on <u>Southwest.com®</u> and may only be purchased by calling Southwest Airlines or at a Southwest Airlines airport ticket counter. Passengers travelling on a Military Fare will be able to check-in and secure a boarding position at 24 hours; however, since eligibility verification is required, Passengers will need to verify ID at the airport ticket counter in order to receive a boarding pass.

(5)   Government Fares

(i) For information on both Federal Government (GVT) and State Government (GST) Fares, including Policies & Procedures specific to Federal Government bookings, contact Southwest Business at 1-800-I-FLY-SWA.

(6)   Wanna Get Away Fares

(i) Wanna Get Away Fares are discounted, restricted, nonrefundable fares. Unused funds can be used toward the purchase of future Tickets as long as the Passenger has canceled the confirmed reservation at least ten (10) minutes prior to the scheduled departure time for the flight. Passengers who do not cancel their confirmed reservation will forfeit any unused funds pursuant to <u>Section 2a(2)(iii)</u>.

## 4. Tickets

a.  Tickets

(1)   No person shall be entitled to transportation except upon presentation of a valid Ticket or proof of identification acceptable to Carrier to confirm that transportation has been purchased. Such Ticket shall entitle the Passenger to transportation subject to this *Contract of Carriage* and, in particular, certain terms and conditions as follows.

(i)   Such Ticket is valid between the points of origin and destination via the specific routing designated on the Passenger's itinerary only.

(ii)   Passenger is in compliance with fare requirements as provided in Section 3c, including proof of age and status where applicable, that entitle the Passenger to special or military fares.

(iii)   Passenger is in compliance with any other requirements of the Passenger's fare class.

(iv)   The Passenger's Ticket is in the Passenger's own name.

(v)   The Ticket has not been altered or improperly issued.

(2)   Tickets are Nontransferable. Tickets, and any travel credit issued for unused Tickets, are nontransferable unless specified explicitly on the Ticket. Carrier is not liable to the holder of a Ticket for use or refund of such Ticket when presented by a person other than the person to whom the Ticket was issued. If a Ticket is used by a person other than the person to whom it was issued, Carrier shall not be liable for the loss, destruction, damage, or delay of such unauthorized person's Baggage or other personal property or the death or injury of such unauthorized person arising from or in connection with such unauthorized use.

(3)   Purchase of Additional Seat. The purchase of more than one seat for use by a single Passenger is required when necessary to transport large musical instruments or electronic audio/video, medical, or otherwise sensitive equipment unsuitable for Carriage as Checked Baggage, as specified in Section 7.

It is the Passenger's responsibility to notify Carrier of any unique seating needs. In accordance with Section 6, Carrier may refuse to transport individuals who are unable or unwilling to comply with Carrier's seating requirements. Purchase of more than one seat for use by a single Passenger for the sole purpose of ensuring additional personal space is prohibited, except in limited circumstances when the Carrier, in its discretion, permits it.

(4)   Tickets Issued Outside of Southwest Airlines Systems

(i)   For Passengers holding a Ticket issued by an entity other than Southwest Airlines (such as an authorized travel agent), flight changes, Ticket cancelations, and Ticket exchanges and refunds must be processed via the Ticket's original booking source/agent in order to retain the forms of payment on the initial Ticket and keep the Ticket and funds associated with such Ticket accessible to the initial booking source/agent.

    (ii)  If a Passenger holding a Ticket issued by an authorized travel agent exchanges such Ticket or cancels such Ticket via a Southwest Airlines system or by a Southwest Airlines Agent then funds associated with such Ticket become nonrefundable but remain reusable for travel on Southwest Airlines upon cancelation in accordance with the Ticket's validity period. Section 4 (c) (3) below will apply to the funds associated with such Ticket.

b.  Ticket Acceptability

    (1)  Tickets Accepted. Carrier will accept only its own Tickets. Any Tickets issued in conjunction with travel on another airline will not be accepted unless required by federal government regulation or at the Carrier's sole discretion.

    (2)  In the event that a Passenger does not comply with the terms and conditions in this *Contract of Carriage*, his/her Ticket shall be invalidated, and Carrier has the right to:

        (i)  Cancel any remaining portion of the Passenger's itinerary.

        (ii)  Refuse to allow the Passenger to board or check Baggage.

        (iii)  Confiscate the Ticket.

c.  Refunds

    (1)  Refundable Tickets.

        (i)  Ticket changes and exchanges within the same reservation will result in the initial Ticket being applied as the form of payment for the new Ticket. The fare paid for unused travel by Passengers who purchase fully refundable, unrestricted Tickets, including taxes, security fees, and Passenger Facility Charges, may, for any reason and upon surrender or cancellation of the unused Ticket, either be refunded if canceled and refunded instead of exchanging or changing the Ticket or applied as travel credit toward the purchase of future travel for the originally ticketed Passenger in accordance with the form of payment utilized for the Ticket. Such refund or travel credit must be requested within the Ticket's eligibility period. Refund or credit requests will not be honored after the Ticket's expiration date.

        (ii)  If a fully refundable fare segment on a reservation is not changed or canceled at least ten (10) minutes prior to departure and the Customer does not travel, all segments associated with the reservation are canceled, and funds associated with the fully refundable fare segment(s) are held as travel credit for use by the Passenger on Southwest Airlines. Reservations paid for with a Southwest® gift card will have the amount applied from the Southwest® gift card held as travel funds for use by the Customer on a future Southwest Airlines flight.

        (iii)  When the Ticket combines a fully refundable fare with a Wanna Get Away nonrefundable fare and the Passenger does not travel on the Wanna Get Away segment and has not canceled, the reservation at least ten (10) minutes prior to the scheduled departure time, all unused travel funds will be forfeited or held in accordance with Section 2a(2)(iii) and all remaining segments of the reservation are canceled.

(2)   Eligible fare refunds procedures:

(i)   When no portion of the transportation has been provided, the refund or credit will be issued in an amount equal to the fare paid.

(ii)   When a portion of the transportation has been provided, the refund or credit will be made in an amount equal to the difference, if any, between the total fare paid and the fare applicable to the transportation provided.

(iii)   Carrier shall make eligible refunds in the same form as the original payment. Refunds for Tickets purchased with a credit card shall be processed for crediting to the same credit card account no later than seven business days from the date the refund request is received by Carrier. Refunds for Tickets purchased with cash will be issued by check no later than 20 business days after the refund request is received by Carrier. Refunds for tickets purchased with an exchanged ticket will be processed to the form of a travel credit for use by the Passenger on Southwest Airlines.

(iv)   Carrier shall make all refunds in U.S. dollars. See Section 8 for additional information for international travel.

(3)   Nonrefundable Tickets.

(i)   General. The fare paid for unused travel by Passengers who purchase restricted, nonrefundable Tickets are not eligible for refunds, except as provided in this Section and Section 9b. Taxes, security fees, and Passenger Facility Charges associated with a nonrefundable fare are also not eligible for refund except as required by applicable regulations.

(ii)   Travel Credit. Unless otherwise stated by Carrier, the fare paid for unused nonrefundable Tickets, including taxes, security fees, and Passenger Facility Charges, may be applied toward the purchase of future travel on Carrier for the originally ticketed Passenger only. The new Ticket may be more or less expensive or subject to different terms, conditions, or restrictions from the original Ticket.  If the fare is lower, travel credit will be issued for the difference. No cash refund or credit card adjustments will be made for nonrefundable Tickets.

(iii)   Travel Credit Eligibility. The expiration date of any travel credit will apply to any Tickets purchased with these funds. If a Ticket is purchased with multiple travel credits, the earliest expiration date will apply to the entire Ticket.

(iv)   Travel Credit Forfeiture. Should a Passenger fail to apply the nonrefundable Ticket or travel credit toward the purchase of future travel within the eligibility period, the entire amount of the fare, including all taxes, security fees, and Passenger Facility Charges, will be forfeited.

(4)   Delays or Involuntary Cancellations. If a Passenger's scheduled transportation is canceled, terminated, or delayed before the Passenger has reached his/her final destination as a result of a flight cancellation, Carrier-caused missed connection, flight delay, or omission of a scheduled stop, Carrier will either transport the Passenger at no additional charge on another of Carrier's flights, refund the fare for the unused transportation in accordance with the form of payment utilized for the Ticket, or provide a credit for such amount toward the purchase of future travel.

## 5. Check-in

a. Boarding Passes

(1) General. Boarding Passes may be obtained at Southwest.com®, the Southwest mobile app, or at the airport from Southwest at:

(i) E-Ticket Check-In kiosks (where available)

(ii) Skycap podiums (where available)

(iii) Ticket counters, or

(iv) Departure gate podiums. Carrier reserves the right, in its sole discretion, to restrict Boarding Pass distribution to the departure gate podium.

(2) Standby Travel. Boarding Passes for Standby Passengers are available for issuance only at the flight's departure gate. A Boarding Pass must be retrieved by Standby Passengers at the flight's departure gate for each scheduled stop at any intermediate or connecting points on the flight.

(3) Invalid Boarding Passes. A Boarding Pass that has been altered or improperly issued shall not be valid and will not be accepted by Carrier.

(4) Transferability. Boarding Passes are nontransferable unless explicitly stated on the Boarding Pass. Carrier is not liable to the holder of a Boarding Pass for use of such Boarding Pass when presented by a person other than the person to whom it was issued. If a Boarding Pass is used by a person other than the person to whom it was issued, Carrier shall not be liable for the loss, destruction, damage or delay of such unauthorized person's Baggage or other personal property or the death or injury of such unauthorized person arising from or in connection with such unauthorized use.

b. Check-in Requirements

(1) Ten-Minute Rule. Failure of a Passenger to obtain a Boarding Pass and be present, available, and appropriate as described in Section 6 for boarding in the flight's boarding gate area at least ten minutes before the scheduled departure time may result in cancellation of the Passenger's reservation without notice at the Carrier's sole discretion. Refer to Section 8 for information regarding check-in requirements for international travel.

(2) Early Departure. Carrier reserves the right, in its sole discretion, to depart early when all Passengers who have met the check-in requirements as outlined in Section 5.b.(1) are onboard the aircraft. The scheduled departure and arrival times as published for the flight will not be changed or otherwise affected if the Carrier departs early. It is the Passenger's responsibility to arrive at the departure airport with adequate time to allow for check-in requirements and security screening.

# 6. Acceptance of Passengers

By purchasing and accepting carriage under this *Contract of Carriage,* the Passenger agrees to adhere to and comply with all the requirements of this Section 6. Transportation offered by the Carrier under this *Contract of Carriage*, including International Travel described in Section 8, is subject to the Passenger's compliance with these obligations, and a Passenger's failure to comply shall constitute a material breach of this *Contract of Carriage.*

a.  Refusal to Transport – General

Carrier may, in its sole discretion, refuse to transport, or may remove from an aircraft at any point, any Passenger in any of the circumstances listed below. The fare of any Passenger denied transportation or removed from Carrier's aircraft en route under the provisions of Section 6a will be refunded in accordance with Section 9. The sole recourse of any Passenger refused transportation or removed en route under Section 6a will be the recovery of the refund value of the unused portion of his/her Ticket. Under no circumstances shall Carrier be liable to any Passenger for any type of special, incidental, or consequential damages.

(1)  Safety. Whenever such action is necessary, with or without notice, for reasons of aviation safety.

(2)  Force Majeure Event: Whenever advisable due to Force Majeure Events outside of Carrier's control, including, without limitation acts of God, meteorological events, such as storms, rain, wind, fire, fog, flooding, earthquakes, haze, or volcanic eruption. It also includes, without limitation, government action, disturbances or potentially volatile international conditions, civil commotions, riots, embargoes, wars, or hostilities, whether actual, threatened, or reported, strikes, work stoppage, slowdown, lockout or any other labor related dispute involving or affecting Carrier's service, mechanical difficulties by entities other than Carrier, Air Traffic Control, the inability to obtain fuel, airport gates, labor, or landing facilities for the flight in question or any fact not reasonably foreseen, anticipated or predicted by Carrier.

(3)  Government Request or Regulation. Whenever such action is necessary to comply with any Federal Aviation Regulation or other applicable government regulation, or to comply with any governmental request for emergency transportation in connection with the national defense.

(4)  Incompatible Medical Requirements. Carrier will refuse to transport persons requiring the following medical equipment or services, which either are not authorized or cannot be accommodated on Carrier's aircraft: medical oxygen for use onboard the aircraft except FAA-approved and Carrier accepted Portable Oxygen Concentrators (POCs), incubators, medical devices requiring electrical power from the aircraft, or travel on a stretcher.

(5)  Comfort and Safety. Carrier may refuse to transport, or remove from the aircraft at any point, any Passenger in any of the circumstances listed below as may be necessary for the comfort or safety of such Passenger or other Passengers and Crew members:

(i)  Persons who are barefoot and older than five years of age, unless required due to a disability.

    (ii)   Persons who are unable to occupy a seat with the seatbelt fastened.

    (iii)   Persons who have an offensive odor, unless caused by a disability.

    (iv)   Any person who cannot be transported safely for any reason.

(6)    Prisoners. Prisoners (persons charged with or convicted of a crime) under escort of law enforcement personnel; other persons in the custody of law enforcement personnel who are being transported while wearing manacles or other forms of restraint; persons brought into the airport in manacles or other forms of restraint; persons who have resisted escorts; or escorted persons who express to Carrier an objection to being transported on the flight.

### b.  Refusal to Transport – Unruly/Disruptive Passenger

Carrier may, in its sole discretion, refuse to transport, or may remove from an aircraft at any point, any Passenger in any of the circumstances described below. A Passenger who is so refused or removed is without further recourse to Carrier for any damages claimed by Passenger, including the refund value of any unused portion of his/her Ticket, and may be liable to Carrier for costs and damages as set forth in this Section 6b.

(1)    The Passenger, at all times, agrees to conduct himself or herself in a manner that is not disruptive, unruly or in contravention of any laws of any state which has jurisdiction over the aircraft.

Conduct is considered to be disruptive or unruly when a Passenger fails to adhere to orderly rules of conduct while embarking upon or being carried onboard Carrier's aircraft or fails to follow the instructions of the Crew and thereby disturbs the good order and discipline onboard the aircraft. (In this Section, the term "Crew" shall mean flight crew, cabin crew, or any other employee of Carrier.) Disruptive or unruly conduct includes, but is not limited to:

    (i)   Interfering in any way with or disrupting the operation of the aircraft or any of its components or parts;

    (ii)   Interfering in any way with or disrupting the Crew, including, but not limited to: failing to cooperate or interfering with the Crew's duties, refusing to follow instructions to board or leave the aircraft, using portable electronic devices in contravention of instructions from the Crew;

    (iii)   Refusing to comply with safety instructions (e.g., instructions to fasten a seat belt, not to smoke, turn off a portable electronic device or disrupting a safety announcement);

    (iv)   Verbal confrontation with Crew members or other passengers;

    (v)   Physical confrontation with Crew members or other passengers;

    (vi)   Refusing to permit the search of his/her person or property by Carrier, Crew or an authorized government agency for explosives, hazardous materials, contraband, or concealed, deadly, or dangerous weapons or articles;

(vii) Refusing to produce positive identification acceptable to the Carrier upon request. For international travel, any Passenger that has not obtained and completed all documentation required for entry into and exit from each country, as well as compliance with the laws, requirements or procedures of each country listed on such itinerary;

(viii) Making an intentional misrepresentation in response to a question or inquiry by the Carrier or Crew, or otherwise attempting to commit, or committing, a fraudulent act against the Carrier;

(ix) Making threats against the safety of the Crew, passengers and aircraft (includes all types of threats, whether directed against a person, e.g., threat to injure someone, or intended to cause confusion and chaos, such as statements referring to a bomb threat, or simply any threatening behavior that could affect the safety of the Crew, passengers and aircraft);

(x) Boarding or attempting to board an aircraft when the passenger has an infectious disease or infection that poses a direct threat (as defined in 14 CFR § 382.3) to the health or safety of passengers and/or Crew;

(xi) Boarding or attempting to board an aircraft with a weapon (Carrier will carry Passengers who meet the qualifications and conditions established in 49 CFR § 1544.219);

(xii) Being or appearing to be intoxicated or under the influence of drugs or alcohol;

(xiii) Engaging in, or threatening, sexual abuse or harassment;

(xiv) Engaging in lewd, obscene or patently offensive behavior, including wearing clothes that are lewd, obscene or patently offensive;

(xv) Refusing to comply with instructions given by Carrier or Crew prohibiting the solicitation of items for sale or purchase, including airline Tickets, reduced-rate travel passes, or travel award certificates;

(xvi) Smoking or attempting to smoke onboard the aircraft;

(xvii) Other types of riotous, disorderly, offensive, threatening, intimidating, violent or belligerent behavior (e.g., screaming; annoying behavior; kicking and/or banging seat backs/tray tables; harassment related to race, color, gender, religion, national origin, disability, age, ethnicity, or sexual orientation).

(2)     Carrier Action

If the Carrier determines, in its sole discretion, that a Passenger has failed or is failing to comply with any of the requirements of this Section 6.b, the Carrier may take any of the following actions that it considers necessary to prevent the continued disruptive or unruly conduct, protect aircraft passengers and/or Crew, and/or protect the good order, safety and discipline onboard the aircraft.

- Physical restraint of that Passenger
- Diversion of the aircraft
- Removal of that Passenger from the aircraft and termination of carriage of that Passenger
- Refusal to carry that Passenger on ticketed and/or future flights
- Reporting of that Passenger to law enforcement authorities

(3)     Exoneration of Liability

That Passenger is without recourse against the Carrier for any actions described in Section 6b(2)

In any action for damages, however founded, if the Carrier proves that the loss or damage was caused or contributed to by the disruptive or unruly conduct of the Passenger claiming compensation, the Carrier shall be exonerated from liability to the extent the conduct caused or contributed to the damage.

When the loss or damage is claimed by a person other than that Passenger, the Carrier, to the extent permitted by applicable law, shall likewise be exonerated from its liability to the extent it proves that the damage was caused or contributed to by the unruly or disruptive conduct of that Passenger.

In the case of damage occasioned by delay the Carrier shall not be liable if it proves that: (a) the delay was caused by the disruptive or unruly conduct of that Passenger; or (b) in the case of International Travel, it and its servants and agents took all measures that could reasonably be required to avoid the damage caused wholly or partly by that Passenger's unruly or disruptive conduct, or that it was impossible for it or them to take such measures.

(4)     Carrier's Right of Recourse Against that Passenger

Passenger agrees that he or she shall be liable, upon demand by the Carrier, for all of the Carrier's costs and damages incurred as a result of that Passenger's disruptive or unruly conduct within the meaning of Section 6b including, but not limited to:

- Repair or replacement of property, including baggage, that was damaged or destroyed by the disruptive or unruly conduct of that Passenger or that resulted from efforts to subdue, restrain, or remove that disruptive or unruly Passenger;
- Any damage, including death or bodily injury, of any passenger or Crew member caused or contributed to by the disruptive or unruly conduct of that Passenger;
- Compensation for delay to passengers, Crew members, and Carrier caused by the disruptive or unruly conduct of that Passenger; and
- The costs incurred by Carrier attributable to any diversion or delay or other interference with the operation of the aircraft due to the disruptive or unruly conduct of that Passenger, including landing and parking fees, fuel purchases, and payments for food and lodging made available to passengers as a result of the diversion.

The Carrier expressly preserves, any other right of recourse or remedy it may have under applicable law against any Passenger engaged in disruptive or unruly conduct, including without limitation, all rights of contribution and indemnity.

c.  Carriage of Children

(1)   Accompanied Minor Children

(i)    Infants younger than 14 days of age.  Carrier will not provide transportation services to any infant younger than 14 days of age, unless a written statement is provided by an attending physician approving such infant for air travel. Infants must be accompanied by a Passenger 12 years old or older.

(ii)   Children 14 days old and younger than two years old. One child 14 days up to two years old on the date of travel may be carried on the lap of an accompanying Passenger 12 years of age or older.  If an adjacent unoccupied seat is available, the child may be secured in an FAA-approved child restraint device without charge. However, if the child is traveling without a confirmed reservation and no adjacent unoccupied seats are available, the child restraint device may have to be transported as Checked Baggage.

(iii)  See Section 8 for additional requirements for the Carriage of Children for international travel.

(2)   Unaccompanied Minor Children

(i)   Children younger than five years old. Carrier will not accept for Carriage any child less than five years old unless accompanied by a Passenger at least 12 years of age.

(ii)   Children five through 11 years old. Unaccompanied children ages five through 11 years old will be required to use Carrier's unaccompanied minor service and will be accepted for Carriage by Carrier provided the child has a confirmed reservation and the flight on which he or she travels does not require a change of aircraft or flight number.  However, any unaccompanied child age five through 11 years old will not be accepted for Carriage if, because of operational disruptions, the Carrier determines, in its sole discretion, that the flight on which the child holds a reservation is anticipated to terminate short of or bypass the child's destination. Carrier will not transport unaccompanied minor children on international itineraries. See Section 8 for additional information.

(iii)   Child drop off and pick up. The parent or guardian who brings an unaccompanied minor child to the departure airport will be required to remain at the departure gate until the flight is airborne. Carrier must be furnished with documentation (duplicate of which must be in the child's possession) that the child will be met by another parent or guardian upon deplaning at his or her destination. The parent or guardian meeting the child at his or her destination will be required to present a valid government-issued photo ID and sign a release form designated by Carrier.

(iv)   Unaccompanied Minor Charge. In addition to the applicable fare, children for whom unaccompanied minor Carriage is required must pay the applicable unaccompanied minor charge. The unaccompanied minor charge may be refundable under the following circumstances:
- The reservation is canceled by the Customer.
- The Carrier cancels the flight, and the Customer elects to not rebook.
- The child does not travel unaccompanied (i.e., the fee was paid, but an accompanying adult ultimately travels with the child).

(3)   Child Restraint Devices

(i)   Unless unoccupied seats are available on a flight, Carrier requires a reservation and purchase of a Ticket for Carriage of a child restraint device on board the aircraft to ensure that a child restraint device may be used during flight. Only federally approved child restraint devices are permitted for use aboard Carrier's aircraft. Federal regulations prohibit the use of child booster seats and harness-or vest-type restraining devices, unless such devices have been specifically approved by the Federal Aviation Administration under a Type Certificate (TC), Supplemental Type Certificate (STC), or Technical Standard Order (TSO). Customers are responsible for providing Carrier copies of TC, STC, or TSO documentation for review at the departure gate. Child restraint devices will be considered as items of carryon Baggage counting toward the adult Passenger's carryon allowance, unless the child has been ticketed and a seat reserved for use of the CRD.

d.  Carriage of Passengers with Disabilities

(1)  Carrier will transport Qualified Individuals with a Disability in accordance with the requirements of the U.S. Department of Transportation regulations, 14 CFR Part 382, unless the Carriage of such individuals may impair the safety of the flight or violate Federal Aviation Regulations. Pursuant to 14 CFR § 382.113, the Carrier will not provide certain extensive inflight special services such as assistance in eating, assistance with elimination functions in the lavatory or at the Passenger's seat, or provision of medical services. Carrier may require, at its sole discretion, pursuant to 14 CFR § 382.29, that a Qualified Individual with a Disability be accompanied by a safety assistant as a condition of being provided air transportation in the following circumstances:

(i)  When the Passenger is unable to comprehend or respond appropriately to safety instructions from Carrier, including the safety briefing required by 14 CFR §§ 121.571(a)(3) and (a)(4) because of a mental disability;

(ii)  When the Passenger has a mobility impairment so severe that the Passenger is unable to physically assist in his or her own emergency evacuation of the aircraft; or

(iii)  When the Passenger has both severe hearing and severe vision impairments that prevent the Passenger from establishing a means of communication with Carrier in order to permit transmission of the safety briefing required by 14 CFR §§ 121.571 (a)(3) and (a)(4).

If Carrier determines, in its sole discretion, that an individual meeting the criteria above must travel with a safety assistant and the individual disagrees and believes he/she is capable of traveling independently, Carrier will not charge the individual for Carriage of a safety assistant of the Carrier's choosing. If a seat is not available for the safety assistant and the individual with a disability is unable to travel on the flight, the individual will be eligible for denied boarding compensation.  For purposes of determining whether a seat shall be available, the safety assistant shall be deemed to have checked in at the same time as the individual with the disability.

(2)  Assistive Devices. Mobility and other assistive devices used by a Qualified Individual with a Disability may be carried in the aircraft cabin in addition to the carryon Baggage allowance. If necessary due to the Passenger's disability, Carrier will provide assistance in loading, stowing, and retrieving carryon items, including assistive devices. If the device cannot be carried in the Passenger cabin in accordance with FAA regulations, the device will be checked and carried free of charge in addition to the free Baggage allowance. No oversize or excess weight charges will be assessed.  Assistive devices not for the personal use of the Passenger will be accepted subject to a limited release of liability, and may be subject to oversized or overweight charges as described in Section 7f.

(3)  Limitation of Liability. Carrier's liability with respect to damage to or loss of mobility and other assistive devices shall not exceed the documented original purchase price of the assistive device pursuant to 14 CFR § 382.131. Carrier will also compensate the Passenger for other reasonable expenses incurred as a direct result of the loss of, damage to, or delayed delivery of the mobility or assistive device.

(4)   Trained Service Animals

(i)   Per 14 CFR §§382.72 to 382.80, Carrier permits fully Trained Service Animals used by a Qualified Individual with a Disability, as that term is defined in this Contract of Carriage, to accompany the Passenger onboard the aircraft at no charge. See Section 8 for additional information for international travel.

(ii)   Per 14 CFR §382.73, to determine if an animal is a Trained Service Animal that must be accepted for transport, Carrier may ask appropriate questions of the Qualified Individual with a Disability, or may observe the behavior of the animal. To travel with a Trained Service Animal, a Qualified Individual with a Disability must provide a completed form – a U.S. Department of Transportation Service Animal Air Transportation Form.

(iii)   Per 14 CFR §382.79, Carrier may refuse to transport a Trained Service Animal if (a) the animal poses a direct threat to the health or safety of others; (b) the animal causes a significant disruption in the cabin or at an airport gate area, or its behavior on the aircraft or at an airport gate area indicates that it has not been trained to behave properly in public (e.g., running freely, barking or growling repeatedly at other persons on the aircraft, biting or jumping on people, or urinating or defecating in the cabin or gate area); or (c) the animal's carriage would violate applicable safety or health requirements of any U.S. federal agency, U.S. territory, or foreign government.

(iv)   For large Trained Service Animals, which do not fit in the passenger's lap or foot space, Carrier will follow the procedures set forth in 14 CFR §382.77.

(v)   The Trained Service Animal must be harnessed, leashed, or otherwise tethered at all times by the Trained Service Animal user or handler while in the airport and on the aircraft.

(vi)   Carrier will accept a maximum of two (2) Trained Service Animals per Qualified Individual with a Disability.

(vii)   A Trained Service Animal accompanied by a trainer will be permitted to travel aboard Carrier's aircraft only if the animal is being delivered to the domicile of a Qualified Individual with a Disability who either owns or, upon delivery, will take immediate ownership of the animal for that individual's personal use. No charge will be assessed for Carriage of a Trained Service Animal being delivered to the domicile of the animal's owner under such circumstances.

(viii)   Southwest Airlines only accepts service animals in training from Canine Companions for Independence (CCI). CCI dogs are transported at no charge and are exempt from the requirements for pets. The following guidelines apply to the transport of CCI dogs:

- CCI ID or letter must be presented.

- Current vaccination record on CCI or veterinarian letterhead must be presented.

- Young or small puppies may need to be transported in carriers.

- Trainers and dogs preboard after Customers with disabilities.

- Cabin seating restrictions apply (e.g., no exit row, must not block egress).

(ix)     Local laws and regulations at a Qualified Individual with a Disability's final or intermediate destination(s) may apply and impose further requirements or restrictions. Qualified Individuals with a Disability assume full responsibility for compliance with all governmental laws and regulations, including but not limited to, health certificates, permits and vaccinations required by the country, state, or territory from and/or to which the Trained Service Animal is being transported. Carrier is not liable for any assistance or information provided by the Carrier or any employee or agent thereof to any Qualified Individual with a Disability relating to compliance with such laws and regulations. Subject to applicable laws and regulations, a Qualified Individual with a Disability is solely responsible for any expenses incurred or any consequences resulting from his or her failure to comply with applicable laws and regulations. Carrier expressly reserves the right to seek reimbursement from a Qualified Individual with a Disability for any loss, damage, or expense suffered or incurred by Carrier resulting from such Qualified Individual with a Disability's failure to comply with applicable laws and regulations.

e.  Pets

(1)     Pets Allowed in the Cabin. Carrier accepts small vaccinated domestic cats and dogs at least eight weeks old contained in a pet carrier and traveling with a Passenger. One pet carrier is allowed per Passenger. The carrier may contain up to two animals of the same species. Unaccompanied Minors may not travel with a pet. Carrier reserves the right to limit the number of pet carriers per flight to six, and pets will be accepted on a first-come, first-served basis.

(2)     Pet Carriers. All pets in the cabin must be carried in an appropriate pet carrier and remain in the carrier at all times (including head and tail) while in the gate area, during boarding/deplaning, and while onboard the aircraft. The carriers must be leak-proof and well-ventilated, and the pet(s) must be able to stand up and move around the carrier with ease. The carrier must be of a size small enough to fit under the seat in front of the Passenger and must remain stowed under the seat in front of the Passenger during the entire duration of the flight.  Passengers traveling with a pet may not occupy an exit row seat or a seat with no forward under seat stowage.

(3)     Pet Fares. All occupied pet carriers are subject to the applicable pet fare. Pet reservations can only be booked by calling Southwest Airlines. The pet fare must be collected at the airport ticket counter and may not be applied toward future travel if unused. Passenger traveling with a pet must check the pet in at the airport ticket counter and pay the pet fare before proceeding to the departure gate. The pet fare may be refundable under the following circumstances:
- The reservation is canceled by the Customer.
- The Carrier cancels the flight, and the Customer elects not to rebook.

(4)     Pets Incompatible with Air Travel. Carrier retains the right, at its sole discretion, to refuse to transport any pet that exhibits aggressive behavior or any other characteristics that appear to Carrier to be incompatible with air travel at the airport, in the boarding gate area, or onboard the aircraft. The pet(s) must be healthy, harmless, inoffensive, odorless, and require no attention during the flight. If the pet becomes ill during the flight, oxygen or other first aid procedures will not be administered. In the event of an emergency, an oxygen mask will not be available for the pet.   Carrier assumes no liability for the heath or wellbeing of carryon pets.

(5)   No Pets Carried in Cargo Compartment. Carrier will not transport pets in the aircraft cargo compartments.

(6)   No Pets are accepted on international itineraries. See Section 8 for additional information.

(7)   In accordance with Section 4.(a).3, purchase of an additional seat may be required, at discretion of Carrier, to accommodate the pet of a Passenger with unique seating needs.

(8)   No pets are accepted on itineraries between the continental United States and Hawaii.

f.   Law Enforcement and Search and Rescue Dogs

(1)   Law Enforcement and Search and Rescue Dogs Allowed in the Cabin. Carrier accepts fully-trained law enforcement service dogs trained in explosives or drug detection (or other specific functions) and search and rescue dogs for transportation, without charge, when accompanied by their respective handlers on official business. See Section 8 for additional information for international travel.

(2)   Documentation. Each Customer traveling with a law enforcement or search and rescue dog must present a letter of mission and a copy of the animal's certification.

(3)   Law enforcement and search and rescue animals in training will not be accepted by Carrier for transport.

(4)   Law Enforcement and Search and Rescue Dogs Incompatible with Air Travel. Carrier retains the right, at its sole discretion, to refuse to transport any dog that exhibits aggressive behavior or any other characteristics that appear to Carrier to be incompatible with air travel at the airport, in the boarding gate area, or onboard the aircraft.

(5)   No Law Enforcement or Search and Rescue Dogs Carried in Cargo Compartment. Carrier will not transport law enforcement or search and rescue dogs in the aircraft cargo compartments.

## 7. Baggage

a. Carryon Baggage

(1) General. Carrier, in its sole discretion, will determine whether or not any Baggage, because of its weight, size, contents, or character, may be carried in the Passenger cabin of the aircraft. All carryon Baggage must be stowed underneath a seat or in an overhead bin.

(2) Responsibility of Passenger. Carryon Baggage is the sole responsibility of the Passenger.

(3) Allowable Carryon Baggage. Passengers are restricted to one item of carryon Baggage (e.g., roller bag, garment bag, tote bag) that does not exceed external dimensions of 10" x 16" x 24" plus one smaller personal type item (e.g., purse, briefcase, laptop computer case, backpack, small camera), provided that such items are capable of being carried onboard the aircraft by one Passenger without additional assistance, unless the Passenger requires assistance due to a disability, and are capable of being stowed under a seat or in an overhead compartment. Sizing boxes or charts with 10" x 16" x 24" dimensions are located at many of Carrier's curbside check-in locations (where available), ticket counters, departure gates, boarding locations, and on many jetbridges. Carrier reserves the right to further restrict the number of carryon items.

(i) A roller bag that otherwise would meet the 10" x 16" x 24" dimensions if the wheels were removed will be accepted.

(ii) Oversized articles of reasonable carryon size that protrude from only one side of the sizing box or chart and, because of their fragile nature, would be at greater than normal risk of damage if carried in the cargo hold (e.g., blueprints, map tubes, fishing poles, artwork, media cameras/video equipment) are considered personal type items and may be carried in the passenger cabin if remaining onboard space permits and the item fits in an overhead bin without depriving other Passengers of sufficient overhead bin space.

(iii) A small musical instrument is considered a personal-type item and may be carried in the passenger cabin regardless of whether it meets the 10" x 16" x 24" dimensions if the instrument can be stowed safely in a suitable baggage compartment in the aircraft cabin or under a passenger seat, and there is space for such stowage at the time the Passenger boards the aircraft.

(iv) Other medical assistance items (e.g., breast pumps, breast milk) may be carried in the aircraft cabin in addition to the carryon baggage allowance when they can be stowed in accordance with FAA regulations. For assistive devices for qualified Customers with disabilities, reference 6.d(2).

(4) Outerwear. In addition to the carryon Baggage allowance provided herein, a coat, jacket, wrap, or similar outer garment may be carried onboard the aircraft.

(5)   Instruments and Equipment. The following conditions apply to acceptance for Carriage in the cabin of large musical instruments and electronic, computer, audio/video, or other equipment and parts thereof, the size or shape of which prevents such instruments or equipment from being handled as normal carryon Baggage.

  (i)   The instrument or equipment must be contained in a case or covered so as to avoid injury to other Passengers.

  (ii)   A reservation must be made for the instrument or equipment at a charge no greater than the Child Fare for each seat used.

  (iii)   The instrument or equipment must be stowed in accordance with FAA requirements for carriage of carryon baggage.

(6)   Carrier, at its sole discretion, will not transport items of carryon Baggage that it determines may be harmful or dangerous to a Passenger(s), the flight crew, or the aircraft.

b.   Acceptance of Checked Baggage

(1)   General. Carrier, in its sole discretion, will accept personal property of the Passenger as Baggage subject to the following conditions:

  (i)   Carrier will only accept Baggage for transportation on a flight on which the Passenger is transported.

  (ii)   Carrier will only accept Baggage for transportation if it and its contents can withstand ordinary handling, and if its weight, size, and character render it suitable for transportation on the particular aircraft on which it is to be carried, unless the Passenger agrees to assume the risk of checking the Baggage and the Carrier accepts the Baggage subject to a limited release of liability, as outlined in Section 7h.

  (iii)   Each piece of Baggage tendered to Carrier must have a current identification tag or label with the Passenger's name, address, and telephone number.

  (iv)   With the exception of musical instruments and wheelchairs, mobility aids, and other assistive devices used by a Qualified Individual with a Disability, Carrier will not accept as Baggage any item having outside measurements (i.e., the sum of the greatest outside length plus height plus width) that exceed 80 inches or that weigh more than 100 pounds. Carrier will not accept as Baggage any musical instrument if the sum of the length, height, and width of the outside linear dimensions of the instrument (including case or covering) exceeds 150 inches, or the weight of the musical instrument exceeds 165 pounds (including case or covering).

  (v)   Carrier will not accept Baggage to an intermediate stop or connection point on the Passenger's Ticket or to a point beyond the Passenger's final ticketed destination.

  (vi)   Carrier will not accept Baggage that, because of its nature, contents, or characteristics (e.g., sharp objects, paint, corrosives, or other prohibited hazardous materials), might cause injury to Passengers or Carrier, damage to aircraft or other equipment, or damage to other Baggage.

(vii) Carrier will not accept Baggage that it determines cannot safely be carried in the Baggage compartment of the aircraft for any reason.

c.  Surveillance and Inspection of Baggage

(1)  All Baggage tendered to Carrier for transportation is subject to surveillance and inspection by electronic and/or physical means with or without the Passenger's consent or knowledge by Carrier and/or authorized government agencies.

d.  Checking of Baggage

(1)  Carrier will not accept or hold Baggage from a Passenger on day of travel at Carrier's airport ticket counter or curbside check-in locations (where available) if tendered to Carrier earlier than four hours in advance of flight departure time.

(2)  Where available, Baggage may be accepted at an earlier time at authorized offsite Baggage check-in facilities.

(3)  Baggage must be checked at Carrier's airport ticket counter or curbside check-in locations (where available) at least 45 minutes prior to the flight's scheduled departure time, See Section 8 for additional requirements for international travel.

(4)  Baggage checked in 45 minutes or less prior to a flight's scheduled departure time is subject to Section 7h(8).

(5)  Baggage for international flights will not be accepted if presented to Carrier 60 minutes or less (75 minutes or less for flights departing from Aruba) prior to scheduled departure. Passengers cannot voluntarily separate from luggage on international flights.

e.  Free Checked Baggage Allowance

(1)  General. Upon presentation by a Passenger of a valid Ticket, Carrier will transport two pieces of Baggage without charge, each piece of which has outside measurements (i.e., the sum of the greatest outside length plus width plus height) not exceeding 62 inches, does not weigh more than 50 pounds per piece, and provided such Baggage is suitable to be checked for Carriage in the cargo hold of the aircraft.

(2)  Military Baggage Allowance. Military Passengers traveling on active duty or permanent change of station (PCS) orders will be exempt from the two-piece Baggage limit and will not be subject to excess, oversize, or overweight Baggage charges, provided that none of the pieces of Baggage exceeds 100 pounds in weight and 80 inches in size (outside length plus height plus width).

(3)  Travel Equipment for Infants and Small Children. One stroller and one Child Restraint Device (car seat) per fare-paying Passenger will be accepted subject to a limited release of liability, as outlined in Section 7h. Carrier will accept the items without charge and will not count toward a Passenger's free Checked Baggage allowance.

(4)  Firearms. Carrier will not accept assembled firearms and ammunition for transportation, except as provided below and subject to the size and weight specifications contained below and in Section 7f. Carrier will not accept firearms or ammunition for international travel.  See Section 8 for additional information.

(i)   General. Firearms (e.g., sport rifles, shotguns, and handguns) may be transported as Checked Baggage, so long as they are unloaded and encased in a hard sided, locked container acceptable to Carrier for withstanding normal Checked Baggage handling without sustaining damage to the firearm, with the Passenger retaining possession of the key or combination to the container lock. Firearms may not be packed loose inside a checked bag. Locking, hard-sided baggage will not be considered an acceptable container.

(ii)   Ammunition. Small arms ammunition intended for sport or hunting will be accepted only if carried within sturdy Checked Baggage and in the manufacturer's original container or an equivalent fiber, wood, or metal container specifically designed to carry ammunition and providing for sufficient cartridge separation. Magazines and clips containing ammunition must be securely packaged so as to protect the cartridge primers. Carrier will accept no more than 300 rounds of pistol (rim fire) ammunition, 120 rounds of rifle (center fire) ammunition, or 150 shotgun shells per Passenger, with a total gross weight of the ammunition plus containers not to exceed 11 total pounds per Passenger.

(iii)   Gun Boxes. Gun boxes designed to hold no more than two sporting rifles, shotguns or handguns are exempt from oversize Baggage charges; however, they will be subject to excess Baggage and weight charges if applicable.

(5)   Sporting Equipment. Any of the items listed below may be checked in substitution of one piece of the free Checked Baggage allowance for each Passenger at no charge on a one-item-for-one-bag basis. If the item of sporting equipment exceeds 50 pounds in weight or 62 inches in size (outside length plus height plus width), excess weight and size charges may apply in accordance with Section 7f.

(i)   Archery equipment, including a bow, arrows, and an average size target (large target stands cannot be accepted), so long as the bow and arrows are encased in a container acceptable to Carrier for withstanding normal Baggage handling without sustaining damage to the equipment.

(ii)   Baseball/Softball equipment, including one bag generally consisting of four bats, one helmet, one pair of cleats, one uniform, one glove, and one pair of batting gloves. The catcher may have additional equipment.

(iii)   Bicycles (defined as nonmotorized and having a single seat) properly packed in a hard-sided bicycle box that fall within the dimensions and weight limits established for normal Checked Baggage, (i.e., 62 inches or less in overall dimensions and less than 50 pounds in weight). Pedals and handlebars must be removed and packaged in protective materials so as not to be damaged by or cause damage to other Baggage. Bicycles packaged in cardboard or soft-sided cases will be accepted subject to a limited release of liability, as outlined in Section 7h.

(iv)   Boogieboard, kneeboard or wakeboard.

(v)   Bowling bag, including ball(s) and shoes.

(vi)   Fishing tackle box and fishing rod, so long as the rod is encased in a cylindrical fishing rod container suitable to Carrier for withstanding normal Checked Baggage handling without sustaining damage to the rod.

(vii) Golf bag in hard-sided golf bag carrying case provided by Passenger, including clubs, balls, and shoes. (Hooded golf bags or golf bags in a soft-sided carrying case provided by the Passenger will be accepted subject to a limited release of liability, as outlined in Section 7h).

(viii) Hockey and/or lacrosse stick(s), two hockey or lacrosse sticks taped together and one equipment bag generally consisting of pads, helmets, pants, jersey, gloves, and skates.

(ix) SCUBA equipment, provided air tanks are empty and all accompanying equipment (e.g., BCD, weight belt, one regulator, one tank harness, one tank pressure gauge, one mask, two fins, one snorkel, one knife, and one safety vest) are encased together in a container acceptable to Carrier.

(x) Skateboard.

(xi) Snow ski equipment, including skis or snowboards, ski boots, and ski poles, including one pair of skis or one snowboard, one set of poles, and one pair of ski/snowboard boots encased in a container(s) acceptable to Carrier.

(xii) Water ski equipment encased in a container(s) acceptable to Carrier and including no more than one pair of water skis and one life preserver.

(6) Musical Instruments. Musical instruments may be checked in substitution of one piece of the free Checked Baggage allowance for each Passenger at no charge on a one-item-for-one-bag basis. If the musical instruments exceed 50 pounds (including case or covering) in weight or 62 inches in size (outside length plus height plus width, including case or covering), excess weight and size charges may apply in accordance with Section 7f.

f.  Excess, Oversize, and Overweight Baggage Charges

(1) Excess Baggage. Each piece of Baggage in excess of the free Baggage allowance specified above that is not in excess of 62 inches (outside length plus height plus width) and 50 pounds or less will be accepted for a charge of $75.00 per item One-way.

(2) Oversize Baggage. Subject to Section 7f(4), Baggage in excess of 62 inches but not more than 80 inches (outside length plus height plus width) and musical instruments in excess of 62 inches but not more than 150 inches (outside length plus height plus width, including case or covering) will incur an oversize charge of $75.00 per item One-way.

(3) Overweight Baggage. Subject to Section 7f(4), Baggage weighing between 51 and 100 pounds and musical instruments weighing between 51 and 165 pounds (including case or covering)will be accepted as Checked Baggage for an excess weight charge of $75.00 per item One-way.

(4) Excess, Oversize and/or Overweight Baggage Embargos. Excess, oversize and/or overweight Baggage may not be accepted on flights to/from certain cities during certain specified dates. Contact Southwest Airlines Reservations or Southwest.com® Baggage Policies for a list of cities and effective dates.

(5)     Prohibited Baggage. Baggage in excess of 80 inches (outside length plus height plus width) and/or Baggage weighing more than 100 pounds will not be accepted for Carriage, except if mobility or other assistive devices, hanging garment sample bags with outside length, width, and height measurements up to a maximum of 110 inches, if flexible, or as provided in Section 7e.

g.   Special Items

The items listed below shall be acceptable for Carriage as Checked Baggage upon the Passenger's compliance with the special packing requirements and payment of the applicable One-way charge as outlined on our website, https://www.southwest.com/html/customer-service/baggage/index.html.

(1)     Bicycle (defined as nonmotorized and having a single seat) properly packed in a bicycle box or hard sided case larger than 62 inches in total dimensions will be accepted as Checked Baggage. Pedals and handlebars must be removed and packaged in protective materials so as not to be damaged by or cause damage to other Baggage. Bicycles packaged in cardboard or soft sided cases will be accepted subject to a limited release of liability, as outlined in Section 7h.

(2)     Camera, film, video, lighting, and sound equipment will be accepted when tendered by representatives of network or local television broadcasting companies or commercial film-making companies. A charge will be applied for each item in excess of the free Baggage allowance.

(3)     Javelins in a single bag, regardless of the number of javelins encased together, will be accepted.

(4)     Kayak (other than a sea kayak).  Paddle(s) must be secured.

(5)     Life Raft

(6)     Surfboard and Kiteboards

(i)    Surfboards and Kiteboards may be subject to a limited release of liability, as outlined in Section 7h.

(ii)   Intrastate Hawaii Travel: Surfboards checked on an itinerary that is for wholly intrastate Hawaii travel (tickets that have an origin and destination solely in the state of Hawaii) are not subject to applicable One-way charges as long as they meet weight restrictions as outlined on our website, https://www.southwest.com/html/customer-service/baggage/index.html.

(7)     Vaulting poles will be accepted in a single bag, regardless of the number of poles in the bag.

(8)     Wind surfing board, sail, boom.

h.   Unsuitable Baggage Subject to Limited Release of Liability

Carrier may, at its sole discretion, but is not obligated to, accept Baggage unsuitable for Carriage as Checked Baggage, subject to a Limited Release of Liability, as provided below:

(1)     Voluntary Separation for which Carrier is not liable for delay;

(2)    Fragile and unsuitably packed items for which Carrier is not liable for damage and loss of contents;

(3)    Previously damaged items for which Carrier is not liable for damage and loss of contents;

(4)    Inadequately packaged or over-packed items for which Carrier is not liable for damage and loss of contents;

(5)    Perishable items for which Carrier is not liable for spoilage, damage, or delay;

(6)    Soft-sided cases or unprotected/unpacked items, for which Carrier is not liable for damage and loss of contents;

(7)    High-Value Items described in paragraph (i) of this Section, for which Carrier assumes no responsibility for loss, damage, or delay;

(8)    Late-tendered Baggage for which Carrier is not liable for delay; and

(9)    Items where specific requirements under this Section are not met, for which Carrier is not liable for loss, damage, or delay.

Passenger's tender of unsuitable baggage for check-in constitutes Passenger's agreement to the Limited Release of Liability specified in this paragraph. Carrier, in its sole discretion, may require Passenger to sign a Limited Release of Liability form, but it is not necessary.

i.   Limitations of Liability

(1)    General. The liability, if any, of Carrier for loss of, damage to, or delay in the delivery of Checked or carryon Baggage and/or its contents, with the exception of wheelchairs, mobility aids, and assistive devices used by a Qualified Individual with a Disability, is limited to the proven amount of damage or loss, but in no event shall be greater than $3,800.00 per fare paying Passenger pursuant to 14 CFR § 254.4 unless the Passenger at time of check-in has declared the value of the baggage to be in excess of Three Thousand Eight Hundred Dollars ($3,800.00) ("excess valuation") and has paid an additional charge of One Dollar ($1.00) for each One Hundred Dollars ($100.00) of excess valuation. See Paragraph (2) below for excess valuation limitations and Section 8 for information regarding international travel.

(i)    Carrier will compensate the Passenger for reasonable, documented damages incurred as a direct result of the loss of, damage to, or substantially delayed delivery of such Baggage up to the limit of liability, provided the Passenger has exercised reasonable efforts and good judgment to minimize the amount of damage. Actual value for reimbursement of lost or damaged property shall be determined by the documented original purchase price less depreciation for prior usage.

(ii)    Southwest does not assume liability for claims of missing or damaged articles if a Passenger's Checked Baggage is not damaged, delayed, or lost.

(2)   Excess Valuation

    (i)   The declared excess valuation for baggage shall not exceed One Thousand Two Hundred and Fifty Dollars ($1,250.00) above the Three Thousand Eight Hundred Dollar ($3,800.00) limitation of Carrier's liability established by this *Contract of Carriage*, for a total maximum declared valuation of Five Thousand and Fifty Dollars ($5,050.00). Excess valuation coverage is not available for money; jewelry; photographic, video, and optical equipment; computers and other electronic equipment; computer software; silverware and china; fragile or perishable items; liquids; precious gems and metals; negotiable papers; securities; business or personal documents; samples; items intended for sale; paintings, artifacts, and other works of art; antiques; collectors' items; unique or irreplaceable items; heirlooms; research, experimental, and scholastic items and documents; manuscripts; furs; irreplaceable books or publications; and similar valuables.

    (ii)   When excess value is declared, the Passenger's baggage and its contents may be inspected by Carrier's Employees. Such baggage must be checked, and excess valuation coverage will apply only to the point to which it is checked by Carrier and claimed by the Passenger.

(3)   Baggage Delivery

    (i)   General. Carrier will pay delayed Checked Baggage delivery charges only so long as such Baggage was tendered to the Carrier by the Passenger at least 45 minutes prior to the scheduled departure time of the Passenger's first flight. If a Passenger's Baggage is tendered to Carrier less than 45 minutes prior to the scheduled departure of the Passenger's first flight, Carrier will make reasonable efforts, but cannot guarantee, to transport such Baggage on the Passenger's flights, and Carrier will not assume responsibility for delivery charges if such Baggage arrives at the Passenger's destination on a subsequent flight. See Section 8 for conditions applicable to international travel.

(4)   Personal Property Carried Onboard Aircraft. Except as otherwise provided in Section 8, Carrier assumes no responsibility and will not be liable for loss of or damage to personal property carried onboard an aircraft by a Passenger.

(5)   High-Value Items Unsuitable for Checked Baggage. Carrier assumes no responsibility for and will not be liable for money; jewelry; photographic, video, and optical equipment; computers and other electronic equipment; computer software; silverware and china; fragile or perishable items; liquids; precious gems and metals; negotiable instruments; securities; business or personal documents; samples; items intended for sale; paintings, artifacts, and other works of art; antiques; collectors' items; unique or irreplaceable items; heirlooms; research, experimental, and scholastic items and documents; manuscripts; furs; irreplaceable books or publications; and similar valuables contained in carryon or Checked Baggage. For the Passenger's protection, these items should not be transported in or as Checked Baggage.  See Section 8 for information about coverage for international travel.

(6)   Normal Wear and Defects. Carrier assumes no responsibility and will not be liable for loss or damage arising from normal wear and tear, such as cuts, scratches, scuffs, stains, dents, punctures, marks, and dirt. Furthermore, Carrier assumes no liability for defects in Baggage manufacture.

(7)    Previously Damaged Items. Carrier assumes no responsibility and will not be liable for further damage to previously damaged items. Carrier may, but is not obligated to, accept previously damaged items subject to a limited release of liability, as outlined in in Section 7h.

(8)    Claims. In the case of loss of, damage to, or substantial delay in delivery of Checked Baggage, a claim will not be entertained by Carrier unless the following steps are completed by Passenger:

   (i)    In all cases, Passenger must notify Carrier of the claim and receive a Baggage report number not later than four hours after either: (1) arrival of the flight on which the loss, damage, or delay is alleged to have occurred or (2) receipt of the Baggage, whichever is applicable to the claim; and

   (ii)   In all cases, Passenger must submit either: (1) the completed Lost/Delayed Report Receipt form provided by Carrier or (2) a written correspondence that includes the Baggage report number to the Carrier not later than 21 days after the occurrence of the event giving rise to the claim; and

   (iii)  In the case of lost Baggage, Passenger must also submit a completed Property Loss Claim form to Carrier. The form will be mailed to the Passenger upon receipt of written notice of the claim as stated in 7i(8)(ii). The form must be completed and postmarked within 30 days of date of issue by the Carrier.

## 8. International Travel

a. Application of Montreal or Warsaw Convention

   (1)   For the purposes of international carriage governed by the Montreal Convention or the Warsaw Convention, whichever may apply, the liability rules set out in the applicable Convention as implemented by this Section are fully incorporated by reference in this *Contract of Carriage* and shall supersede any other provisions of this contract which may be inconsistent with those rules.

b. Death or Injury of Passengers

   (1)   The Carrier shall be liable under Article 17 of the Montreal Convention or Warsaw Convention, whichever may apply, for recoverable compensatory damages sustained in the case of death or bodily injury of a Passenger, as provided in the following paragraphs:

      (i)   The Carrier shall not be able to exclude or limit its liability for damages not exceeding 128,821 Special Drawing Rights for each Passenger.

      (ii)   The Carrier shall not be liable for damages to the extent that they exceed 128,821 Special Drawing Rights for each Passenger if the Carrier proves that: (a) such damage was not due to the negligence or other wrongful act or omission of the Carrier or its servants or agents; or (b) such damage was solely due to the negligence or other wrongful act or omission of a third party.

      (iii)   The Carrier reserves all other defenses and limitations available under the Montreal Convention or Warsaw Convention, whichever may apply, to such claims including, but not limited to, the exoneration defense of Article 20 of the Montreal Convention and Article 21 of the Warsaw Convention, except that the Carrier shall not invoke Articles 20 and 22(1) of the Warsaw Convention in a manner inconsistent with paragraphs (i) and (ii) hereof.

      (iv)   With respect to third parties, the Carrier reserves all rights of recourse against any other person, including, without limitation, rights of contribution and indemnity.

      (v)   The Carrier agrees that, subject to applicable law, recoverable compensatory damages for such claims may be determined by reference to the laws of the country of the domicile or country of permanent residence of the Passenger.

   (2)   In cases of bodily injury or death, the Carrier shall make an advance payment where the Carrier determines it is necessary to meet the immediate economic needs of, and hardship suffered by, a Passenger as provided in the following paragraphs:

      (i)   Unless a dispute arises over the identity of the person to whom an advance payment shall be made, the Carrier shall, without delay, make the advance payment to the Passenger in an amount or amounts determined by the Carrier in its sole discretion. In the event of death of a Passenger, the amount of the advance payment shall not be less than 16,000 Special Drawing Rights, which shall be paid to a representative of the Passenger's next of kin eligible to receive such advance payment as determined by the Carrier in its sole discretion.

(ii)   The Carrier shall make the advance payment as an advance against the Carrier's liability under the Montreal Convention or the Warsaw Convention, whichever may apply. An advance payment shall not constitute recognition of liability. An advance payment shall be offset against, or deducted from the payment of, any settlement or judgment with respect to any claim for compensation on behalf of the Passenger.

(iii)   The Carrier, in making an advance payment, does not waive any rights, defenses, or limitations available under the Montreal Convention or the Warsaw Convention, whichever may apply, to any claim, nor shall acceptance of an advance payment constitute a release of any claim, whatsoever, by any person.

(iv)   The Carrier, in making an advance payment, preserves its right to seek contribution or indemnity from any other person for such payment, which shall not be deemed to be a voluntary contribution or contractual payment on the part of the Carrier.

(v)   The Carrier may recover an advance payment from any person where it is proven that the Carrier is not liable for any damage sustained by the Passenger, or where it is proven that the person was not entitled to receive the payment, or where and to the extent that it is proven that the person who received the advance payment caused, or contributed to, the damage.

c.   Delay of Passengers

(1)   Carrier shall be liable for damage occasioned by delay in the carriage of Passengers by air, as provided in the following paragraphs or in accordance with local law for flights departing from an international location:

(i)   The Carrier shall not be liable if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage, or that it was impossible for it or them to take such measures.

(ii)   Airport, Air Traffic Control, security, and other facilities or personnel, whether public or private, not under the control and direction of the Carrier are not servants or agents of the Carrier, and the Carrier is not liable to the extent the delay is caused by these kinds of facilities or personnel.

(iii)   Damages occasioned by delay are subject to the terms, limitations and defenses set forth in the Montreal Convention and the Warsaw Convention, whichever may apply. They include foreseeable compensatory damages sustained by a Passenger and do not include mental injury damages.

(iv)   The Carrier reserves all defenses and limitations available under the Montreal Convention or the Warsaw Convention, whichever may apply to claims for damage occasioned by delay, including, but not limited to, the exoneration defense of Article 20 of the Montreal Convention and Article 21 of the Warsaw Convention. Under the Montreal Convention, the liability of the Carrier for damage caused by delay is limited to 5,346 Special Drawing Rights per Passenger. The limits of liability shall not apply in cases described in Article 22 (5) of the Montreal Convention or Article 25 of the Warsaw Convention, whichever may apply.

d.  Destruction, Loss, or Delay of Baggage

(1)  The Carrier is liable for damages sustained in the case of destruction or loss of, damage to, or delay of checked and unchecked Baggage, as provided in the following paragraphs:

(i)  Except as provided below, the liability of the Carrier is limited to 1,288 Special Drawing Rights for each passenger in the case of destruction, loss, damage, or delay of Baggage, whether checked or unchecked, under the Montreal Convention or the Warsaw Convention, whichever may apply. Unless the Passenger proves otherwise: (a) all Baggage checked by a Passenger shall be considered to be the property of that Passenger; (b) a particular piece of Baggage, checked or unchecked, shall not be considered to be the property of more than one Passenger; (c) unchecked Baggage, including personal items, shall be considered to be the property of the Passenger in possession of the Baggage at the time of embarkation.

(ii)  If a Passenger makes, at the time checked Baggage is handed to the Carrier, a special declaration of interest and has paid a supplementary sum, if applicable, the Carrier will be liable for destruction, loss, damage, or delay of such checked Baggage in an amount not exceeding the declared amount, unless the Carrier proves that the declared amount is greater than the Passenger's actual interest in delivery at destination. The declared amount, and the Carrier's liability, shall not exceed the total amount of declaration permissible under the Carrier's regulations, inclusive of the limitation of paragraph (1)(i) hereof. In the case of transportation under the Warsaw Convention, no supplementary sum shall apply unless the declared amount exceeds 22 Special Drawing Rights per kilogram of the total recorded weight of the checked Baggage at the time the Baggage is handed to the Carrier. Nevertheless, the Carrier may impose charges for pieces of Baggage in excess of any free allowance the Carrier may provide.

(iii)  In the case of unchecked Baggage, the Carrier is liable only to the extent the damage resulted from its fault, or that of its servants or agents.

(iv)  The Carrier is not liable for destruction, loss, damage, or delay of baggage not in the charge of the Carrier, including Baggage undergoing security inspections or measures not under the control and direction of the Carrier.

(v)  The Carrier reserves all defenses and limitations available under the Montreal Convention and the Warsaw Convention, whichever may apply, to such claims including, but not limited to, the defense of Article 20 of the Warsaw Convention and Article 19 of the Montreal Convention, and the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention, except that the Carrier shall not invoke Article 22(2) and (3) of the Warsaw Convention in a manner inconsistent with paragraph (i) hereof.  The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22 (5) of the Montreal Convention, whichever may apply.

e.  Time Limitations on Claims and Actions

(1)  Under the Montreal Convention and the Warsaw Convention, whichever may apply, an action for damages must be brought within two years, and a complaint must be made to the Carrier no later than seven calendar days in the case of damage to baggage, and 21 calendar days in the case of delay thereof.

f.  International Travel Documents

(1)  Each Passenger traveling on an international itinerary is solely responsible for obtaining and completing all documentation required for entry into and exit from each country, as well as for complying with the laws, requirements or procedures of each country listed on such itinerary. Carrier is not liable for any assistance or information provided by any employee or agent of Carrier to any Passenger relating to such documents or compliance with such laws.

(2)  Parents/guardians of minor children are responsible for compliance with all requirements and procedures for minor children traveling internationally, which may include, but may not be limited to, documentary evidence, such as a notarized letter of relationship and permission for the child's travel from the birth parent(s) or legal guardian(s) not present.

(3)  Carrier reserves the right, in its sole discretion, to deny boarding to any Passenger whose documentation is deemed by either Southwest or a governmental agency to be insufficient for travel or who otherwise does not comply with laws, requirements or procedures of the specific country the Passenger is traveling to, departing from, transiting through, or returning to.

(4)  Subject to applicable laws and regulations, the Passenger is solely responsible for any expenses incurred or any consequences resulting from his or her failure to obtain, complete, or present sufficient documentation for entry into and exit from each country, as well as for complying with the applicable laws and regulations. Carrier expressly reserves the right to seek reimbursement from the Passenger for any loss, damage, or expense suffered or incurred by Carrier resulting from Passenger's failure to obtain, complete, or present sufficient documentation for entry into and exit from each country, as well as for complying with the applicable laws and regulations.

g.  Foreign Currency

(1)  To the extent permitted by local law, Passenger agrees to contract exclusively in U.S. dollars.

(2)  All refunds will be subject to government laws, rules, regulations, or orders of the country in which the Ticket was originally purchased and of the country in which the refund is being made.

(3)  Refunds will be made in the currency in which the fare was paid, or, at Carrier's election where legally permissible, in U.S. dollars in the amount equivalent to the amount due in the currency in which the fare or fares for the flight covered by the Ticket as originally issued was collected.

h.  Partial Tax Refunds in Limited Circumstances

   (1)  Customers traveling on an international itinerary may be exempt from certain taxes or charges if applicable criteria are met. The Carrier will refund taxes or other charges collected for international transportation only where required by law or where such taxes or other charges were collected in error and the passenger submits evidence of exemption from the taxes or other charges to: Southwest Airlines Refunds Department, P.O. Box 36649, Dallas, Texas 75235-1649.

i.  Check-in Times for International Flights

   (1)  Minimum check-in time for Passengers (with or without checked baggage) is at least 60 minutes prior to scheduled departure. Passengers who do not meet this check-in time will not be permitted to check-in or board the flight. For flights departing Aruba, the minimum check-in time for Passengers (with or without checked baggage) is at least 75 minutes prior to scheduled departure. Passengers who do not meet this check-in time will not be permitted to check-in or board the flight.

   (2)  Passengers must arrive at the gate and be ready to board at least 10 minutes prior to scheduled departure. See Section 2a(2) for complete information on check-in requirements.

j.  Travel by Minors

   (1)  Unaccompanied Minor Travel.  Carrier will not transport unaccompanied minor children on international itineraries. No person under the age of 18 is permitted to travel on an international flight unless accompanied by a parent or companion at least 18 years of age or older.

   (2)  Minors Accompanied by One Parent or Someone who is not a Parent. Special documentation may be required for admission to or departure from certain countries when a minor child is accompanied by only one parent or a person who is not the minor's legal guardian.  See Section 8(f) International Travel Documents herein.

k.  Carriage of Animals

   (1)  Pets. No pets are accepted on international itineraries.

   (2)  Law Enforcement and Search and Rescue Dogs. Law enforcement and search and rescue dogs are allowed subject to the requirements contained in Section 6f, except where prohibited due to a conflict of law.

   (3)  Trained Service Animals. Trained Service Animals for Qualified Individuals with a Disability are accepted as required by 14 CFR § 382, except where prohibited due to a conflict of law. See Section 6.c.(4) Trained Service Animals  for more information.

l.  Firearms

   (1)  Carrier will not accept firearms or ammunition for international travel.

## 9. Service Interruptions

Refer to Section 8 for conditions applicable to international travel.

a. Failure to Operate as Scheduled

(1) Canceled Flights or Irregular Operations. In the event Carrier cancels or fails to operate any flight according to Carrier's published schedule, or changes the schedule of any flight, Carrier will, at the request of a Passenger with a confirmed Ticket on such flight, take one of the following actions:

(i) Transport the Passenger at no additional charge on Carrier's next flight(s) on which space is available to the Passenger's intended destination, in accordance with Carrier's established reaccommodation practices; or

(ii) Refund the unused portion of the Passenger's fare in accordance with Section 4c.

(2) Diverted Flights. In the event Carrier diverts any flight, Carrier, at its sole discretion, will take reasonable steps to transport Passenger to his/her final destination or to provide reasonable accommodations.

(3) Flight Schedule Changes. Flight schedules are subject to change without notice, and the times shown on Carrier's published schedules, Tickets, and advertising are not guaranteed. At times, without prior notice to Passengers, Carrier may need to substitute other aircraft and may change, add, or omit intermediate stops. Carrier cannot guarantee that Passengers will make connections to other flights by the Carrier or by other airlines. In the event of flight schedule changes or service withdrawals, Carrier will attempt to notify affected Passengers as early as possible.

(4) Limitation of Liability. Except to the extent provided in Section 9a, Carrier shall not be liable for any failure or delay in operating any flight, with or without notice for reasons of aviation safety or when advisable, in its sole discretion, due to Force Majeure Events, including, without limitation, acts of God, meteorological events, such as storms, rain, wind, fire, fog, flooding, earthquakes, haze, or volcanic eruption. It also includes, without limitation, government action, disturbances or potentially volatile international conditions, civil commotions, riots, embargoes, wars, or hostilities, whether actual, threatened, or reported, strikes, work stoppage, slowdown, lockout or any other labor related dispute involving or affecting Carrier's service, mechanical difficulties by entities other than Carrier, Air Traffic Control, the inability to obtain fuel, airport gates, labor, or landing facilities for the flight in question or any fact not reasonably foreseen, anticipated or predicted by Carrier.

b. Denied Boarding Procedures

(1) The following definitions, as prescribed in 14 CFR § 250.1, pertain solely to the denied boarding compensation provisions of this Section:

**Airport** means the airport at which the direct or connecting flight on which the Passenger holds confirmed reserved space is planned to arrive, or some other airport serving the same metropolitan area, provided that the transportation to the other airport is accepted (i.e., used) by the Passenger.

**Alternate transportation** means air transportation with a confirmed reservation at no additional charge, operated by a Carrier as defined below, or other transportation accepted and used by the Passenger in the case of denied boarding.

**Class of service** means seating in the same cabin class such as First, Business, or Economy class, or in the same seating zone if the Carrier has more than one seating product in the same cabin such as Economy and Premium Economy class.

**Confirmed reserved space** means space on a specific date and on a specific flight and class of service of a Carrier which has been requested by a Passenger, including a Passenger with a ''zero fare ticket,'' and which the Carrier or its agent has verified, by appropriate notation on the ticket or in any other manner provided therefore by the Carrier, as being reserved for the accommodation of the Passenger.

**Fare** means the price paid for air transportation including all mandatory taxes and fees. It does not include ancillary fees for optional services.

**Stopover** means a deliberate interruption of a journey by the Passenger, scheduled to exceed four hours, at a point between the place of departure and the place of final destination.

**Zero fare ticket** means a ticket acquired without a substantial monetary payment such as by using frequent flyer points or vouchers, or a consolidator ticket obtained after a monetary payment that does not show a fare amount on the ticket. A zero fare ticket does not include free or reduced rate air transportation provided to airline employees and guests.

(2)   Request for Volunteers.

(i)   In the event of an oversold flight, Carrier shall request volunteers for denied boarding before using any other boarding priority in accordance with 14 CFR § 250.2b. A "volunteer" is a person, including the holder of a zero fare ticket, who responds to Carrier's request for volunteers and who willingly accepts Carrier's offer of compensation, in any amount, in exchange for relinquishing his/her confirmed reserved space. Any other Passenger denied boarding is considered to have been denied boarding involuntarily, even if that Passenger accepts denied boarding compensation.

(ii)   Carrier will advise each Passenger solicited to volunteer for denied boarding, no later than the time the Carrier solicits that Passenger to volunteer, whether he or she is in danger of being involuntarily denied boarding and, if so, the compensation the Carrier is obligated to pay if the Passenger is involuntarily denied boarding.  If an insufficient number of volunteers come forward, Carrier may deny boarding to other Passengers in accordance with Carrier's boarding priority rules as specified in Section 6.

(3)   Conditions for Payment of Compensation to Passengers Involuntarily Denied Boarding due to an Oversale. Subject to the exception in Section 4, Carrier will tender to a Passenger the amount of compensation specified in Section 5, provided that:

    (i)   The Passenger holds a Ticket, including a Zero Fare Ticket, for confirmed reserved space and presents himself for Carriage at the appropriate time and place, having complied fully with Carrier's requirements as to ticketing, check-in, and acceptability for transportation in accordance with this *Contract of Carriage*; and

    (ii)   Other than for reasons set forth in Section 6, or when resulting from substitution, for operational or safety reasons, of an aircraft having a lesser seating capacity than the aircraft originally scheduled, Carrier is unable to accommodate the Passenger on the flight for which the Passenger holds confirmed reserved space, and such flight departs without the Passenger.

(4)   Comparable Transportation. The Passenger will not be eligible for compensation if Carrier offers comparable air transportation, or other transportation used by the Passenger at no extra cost, that, at the time such arrangements are made, is planned to arrive at the airport of the Passenger's next stopover or, if none, at the airport of the Passenger's final destination no later than one hour after the planned arrival time of the Passenger's original flight or flights.

(5)   Involuntarily Denied Boarding Compensation for an Oversale in Accordance with 14 CFR Part 250(c).

    (i)   Compensation shall be at least 200% of the fare to the Passenger's destination or first stopover, or $775.00, whichever is lower, if the Carrier offers alternate transportation that, at the time the arrangement is made, is planned to arrive at the airport of the Passenger's first stopover, or if none, the airport of the Passenger's final destination:

        •   More than one (1) hour but less than two (2) hours after the planned arrival time of the Passenger's original flight on a domestic itinerary; or

        •   More than one (1) hour but less than four (4) hours after the planned arrival time of the Passenger's original flight on an international itinerary; and

    (ii)   Compensation shall be at least 400% of the fare to the Passenger's destination or first stopover, or $1550.00, whichever is lower, if the Carrier does not offer alternate transportation that, at the time the arrangement is made, is planned to arrive at the airport of the Passenger's first stopover, of if none, the airport of the Passenger's final destination:

        •   Less than two (2) hours after the planned arrival time of the Passenger's original flight on a domestic itinerary; or

        •   Less than four (4) hours after the planned arrival time of the Passenger's original flight on an international itinerary.

(iii)   Compensation will be paid by Carrier on the day and at the place where the denied boarding occurs, except that if Carrier arranges, for the Passenger's convenience, alternate means of transportation that departs before the payment can be made, payment will be sent by mail or other means within 24 hours after the time the denied boarding occurs.

(iv)   Compensation will initially be provided in the form of a draft payable to the Passenger. With the Passenger's consent, Carrier may also offer travel credit to be applied toward future travel in lieu of the draft. The Passenger may refuse Carrier's offer of travel credit and insist on receiving compensation by draft in the amount specified in Section 5.

(v)   Acceptance of compensation by the Passenger relieves Carrier from any further liability to the Passenger caused by Carrier's failure to honor the confirmed reservation.

(6)   Denied Boarding Priority Rules. Carrier's boarding priority is established on a first-come, first served basis in the order boarding positions are secured. In determining which Passengers holding confirmed reserved space shall be denied boarding involuntarily, Carrier shall deny boarding in reverse order from the order in which the Passengers' boarding positions were secured (i.e., the last Passenger who receives a boarding position will be the first Passenger denied boarding involuntarily in an oversale situation), with no preference given to any particular person or category of fares.

(7)   Written Explanation of Denied Boarding Compensation and Boarding Priority Rules. When a denied boarding occurs, Carrier will give Passengers who are denied boarding involuntarily a written explanatory statement describing the terms and conditions of denied boarding compensation and Carrier's boarding priority rules.

(8)   In addition to the denied boarding compensation specified herein Carrier shall refund all unused ancillary fees for optional services paid by a Passenger who is voluntarily or involuntarily denied boarding. Carrier is not required to refund the ancillary fees for services that are provided with respect to the Passenger's alternate transportation.

c.   Ground Transportation

(1)   Unless provided at the direction of Carrier, Carrier does not assume responsibility for the ground transportation of any Passenger or his/her Baggage between any airport used by Carrier and any other location. Ground Transportation is at the Passenger's expense.

## 10.   Miscellaneous

a. Claims

   (1)   No claim for personal injury or death of a Passenger will be entertained by Carrier unless written notice of such claim is received by Carrier within 21 days after the occurrence of the event giving rise to the claim.

   (2)   No legal action on any claim described above may be maintained against Carrier unless commenced within one year of the Carrier's written denial of a claim, in whole or in part.

   (3)   See Section 8 for additional information for international travel.

b. Customer Service Commitment

   (1)   The *Southwest Airlines Customer Service Commitment (CSC)* is incorporated by reference in this *Contract of Carriage*. Carrier's CSC further explains, augments, and expands upon Carrier's policies, procedures, methods of operation, obligations, and dedication to Customer safety, service, and satisfaction in accordance with 14 CFR § 259.5.

c. Choice of Law, Entire Agreement

   (1)   Any and all matters arising out of or relating to this *Contract of Carriage* and/or the subject matter hereof shall be governed by, construed, and enforced in accordance with the laws of the United States of America and, to the extent not preempted by Federal law, the laws of the State of Texas without regard to conflict of law principles, regardless of the legal theory upon which such matter is asserted. This *Contract of Carriage* represents the entire, integrated agreement between the parties relating to transportation by Carrier, and shall supersede all prior representations, understandings or agreements pertaining thereto, either oral or written. No other covenants, warranties, undertakings or understandings may be implied, in law or in equity.

Plaintiffs' Exhibit 443 Part 1 of 2

 

# Alaska Airlines, Inc. Contract of Carriage

Revised April 13, 2021

Domestic Carriage and/or International Carriage of Passengers and Baggage provided by Alaska Airlines, Inc. ("Alaska"), as well as by other Carriers operating flights on behalf of Alaska under a capacity purchase or other agreement, including, but not limited to, our regional partners Horizon Air Industries, Inc. ("Horizon"), and SkyWest Airlines, Inc. ("SkyWest"), are subject to the terms and conditions of this Contract of Carriage, in addition to any terms and conditions printed on or in any Ticket or e-Ticket receipt. In addition, Alaska may sell tickets operated by one or more of our Codeshare Partners, and such tickets would also be subject to this Contract of Carriage except as stated herein. By purchasing a Ticket or accepting Domestic Carriage or International Carriage on Alaska and/or Alaska's regional partners or Codeshare Partners, the Passenger agrees to be bound by all of the terms and conditions of this Contract of Carriage, and no covenants at law or in equity shall be implied or incorporated. This Contract of Carriage is subject to applicable laws, regulations and rules imposed by U.S. and foreign governmental agencies. In the event of a conflict between the terms of this Contract of Carriage and such applicable laws, regulations or rules, the latter shall apply.

View all rules

Rule 1. Definitions

Rule 2. Standard Format of Electronic Rules for Tariff Filing Purposes

Rule 3. Application of Contract

Rule 4. Tickets

Rule 5. Reservations

Rule 6. Routing, Rerouting and Stopovers

Rule 7. Cancellation of Reservations and Prohibited Practices

Rule 8. Liability for Delays, Cancellations, and Denied Boarding



Passenger

*Alaska.*

Rule 10. Screening of Passengers and Baggage

Rule 11. Refusal to Transport

Rule 12. Special Services

Rule 13. Acceptance of Children

Rule 14. Acceptance of Service Animals

Rule 15. Acceptance of Baggage

Rule 16. Codeshare Services

Rule 17. Refunds

Rule 18. Fares, Charges and Currency

Rule 19. Additional Liability Limitations for International Carriage

Rule 20. Consent to Use of Personal Data

# Rule 1. Definitions

Ver esta regla en español

As used in this Contract of Carriage, the following terms, whether or not capitalized, shall have the meanings ascribed below:

**Adult** means a person who has reached his/her eighteenth birthday as of the date of commencement of travel.

**Assistive Device** means any piece of equipment that assists a Qualified Individual with a Disability to cope with the effects of his or her disability. Such devices are intended to assist a Qualified Individual with a Disability to hear, see, communicate, maneuver, or perform other functions of daily life, and may include medical devices and medications.

**Baggage** means all luggage and contents contained therein, such as articles, effects and other personal property of a ticketed Passenger as are reasonably necessary or appropriate for the wear, use, comfort or convenience of the Passenger in connection with the Passenger's trip. Unless otherwise specified, Baggage shall include both Checked Baggage and Unchecked Baggage, such as suitcases, garment bags, tote bags, packages, camera and electronic bags, computer and equipment cases, and briefcases and similar articles, whether carried by the Passenger in the cabin or carried in the aircraft cargo compartments. Coats and wraps, when carried by the Passenger in the Passenger cabin, will not be considered as Baggage.

**Baggage Check or Baggage Claim Tag** mean those portions of the Ticket that identify the Carriage of a Passenger's Checked Baggage and that are issued by the Carrier as a receipt for the Passenger's Checked Baggage.

**Baggage Tag** means a document issued by the Carrier solely for identification of Checked Baggage, the portion of which is attached by the Carrier to a particular article of Checked Baggage.

**Battery-Powered Mobility Aid** means an Assistive Device used by a Qualified Individual with a Disability, such as a wheelchair or scooter when it is used as a mobility device by a person with a mobility-related disability.

**Cabin-Seat Baggage** means Carry-On Baggage that due to its size and nature requires the purchase of a seat on board the aircraft to transport the piece of Baggage.

**Carriage** means transportation of Passengers and their Baggage by air or ground, either gratuitously or for payment, together with any related services provided by the Carrier in connection with such transportation.

**Carrier** means the Carrier (air or ground) issuing the Ticket and all Carriers that carry or undertake to carry the Passenger and/or his/her Baggage thereunder.

**Carry-On Bag or Carry-On Baggage** means Baggage, other than Checked Baggage, carried on board an aircraft by a ticketed Passenger, and is also known as Unchecked Baggage, including but not limited to roller bags, duffle bags, backpacks, and garment bags, as long as by its dimensions or nature does not diminish the comfort and safety of the aircraft passengers.

**Checked Baggage** means Baggage that a ticketed Passenger has requested be carried by the Carrier and for which the Carrier has issued a Baggage Claim Tag to the Passenger.

**Child** means a person who has reached his/her second birthday but not his/her 12th birthday as of the date of commencement of travel.

**Circle Trip** means any trip, the ultimate Destination of which is the point of Origin, but which includes a stop at at least one other point, and which is not made via the same Routing in both directions. No more than two (2) Stopovers may be made in the fare construction. Two (2) Stopovers means one (1) Stopover in addition to the stop permitted at the Outward Destination.

**Codeshare Partner** means a Carrier, other than Alaska or one of our regional partners, operating a flight on which Alaska has placed its airline designator code "AS," or whose airline designator code is displayed on flights operated by Alaska or by one of our regional partners.

**Connection** means a stop at an intermediate point on the route to be traveled where a change of planes is made and which does not fall within the definition of a Stopover.

**Consequential Damages** means damages which are the result of an act but are not direct or immediate.

**Contract of Carriage** means the terms and conditions contained in this document, as it may be amended from time to time by Alaska.

**Credit** means a Credit in a specified dollar amount valid for one (1) year from the date of issuance. A Credit must be used for travel booked and flown within one (1) year from date of issuance. Credits are non-transferable unless

otherwise stated herein.

**Domestic Carriage or Domestic Air Transportation ("Domestic")** means transportation in which the place of departure, the place of Destination or Stopover, and the entire transportation is between points within the United States.

**DOT Hazardous Materials Regulations** means the hazardous materials regulations issued by the DOT's Pipeline and Hazardous Materials Safety Administration and its predecessor agencies in Title 49 of the Code of Federal Regulations, Parts 171 through 180 (49 C.F.R. Parts 171-180).

**Endorsement** means the transfer of authority required when a Passenger with an international Ticket wishes to rebook to a Carrier other than the Carrier shown on the Ticket.

**Force Majeure Event** means any event outside Carrier's control, which includes, but is not limited to, weather conditions and meteorological events, such as storms, rain, wind, fire, fog, flooding, earthquakes, haze, or volcanic eruption; acts of government or airport authorities (e.g., air traffic control delays, runway closures, airport construction); acts of God; pandemics, quarantines, U.S. military or airlift emergency or substantially expanded U.S. military airlift requirements, as determined by the U.S. government; grounding of a substantial number of aircraft as a result of activation of the U.S. Civil Reserve Air Fleet; strikes, work stoppages, slowdowns, lockouts or any other labor unrest or disputes involving or affecting Carrier's service; civil commotions, disturbances or potentially volatile conditions, riots, embargoes, wars or other hostilities, whether actual, threatened or reported; government regulation, demand or requirement; damage to aircraft caused by a third party; mechanical difficulties by entities other than Alaska; inability to obtain fuel, airport gates, labor or landing facilities for the flight in question; an emergency situation requiring care, protection or response to protect persons or property; or any event that is not reasonably foreseen, predicted or anticipated by Carrier.

**Government Transportation Request (GTR)** is a form used by the U.S. federal government for Ticket payment and travel authorization for Passengers traveling on official business for the U.S. federal government.

**IATA Intercarrier Agreement on Passenger Liability** means the agreement entered into by members of the International Air Transport Association ("IATA") on October 31, 1995, in order to take action to waive the limitation on recoverable compensatory damages in Article 22, Paragraph 1 of the Warsaw Convention as to claims for death, wounding or other bodily injury of a Passenger within the meaning of Article 17 of the Convention.

**Infant** means a person who has not reached his/her second birthday as of the date of commencement of travel.

**Interline or Interline Transportation** means Carriage on the air transportation services of more than one Carrier where Carriers agree to accept each other's Tickets and Baggage.

**International Carriage or International Air Transportation ("International")** means any Carriage other than Domestic Carriage; however, when the Warsaw Convention and/or Montreal Convention apply, the definitions of "International" stated therein shall prevail.

**Local Passengers** are those who are originating their travel or those who are on a Stopover and are continuing their travel.

**Maximum Outside Linear Dimensions** means the sum of the greatest outside length plus the greatest outside width

plus the greatest outside height.

 

**Mileage Plan** means Alaska Airlines' frequent flyer program as described at www.alaskaair.com.

**Montreal Convention** means the Convention for the Unification of Certain Rules for International Carriage by Air, signed at Montreal, May 28, 1999.

**Most Significant Carrier ("MSC")** means the Carrier performing the most significant part of the service. The Canadian Transportation Agency has stipulated that only a single set of Baggage rules may apply to any given interline itinerary. The selecting Carrier is permitted to use the MSC to determine which Carrier's Baggage rules apply to an international Interline itinerary to or from Canada, while reinforcing the role of tariffs in the determination of which Carrier's rules apply.

**On-line Tariff Data Base** means the remotely accessible, on-line version of (1) the electronically filed tariff data submitted to the "official DOT tariff database," and (2) the DOT approvals, disapprovals and other actions required by DOT, maintained by the filer.

**Oversold Flight** means a flight where there are more Passengers holding valid confirmed reservations and Tickets that check-in for the flight within the prescribed check-in time than there are available seats.

**Participating Carrier(s)** includes both the selecting Carrier and other Carriers who are identified on the Passenger's Ticket as providing interline transportation to the Passenger.

**Passenger** means any person, except members of the crew working on the flight, carried or holding a Confirmed Reservation to be carried in an aircraft with the consent of the Carrier and who is bound by this Contract of Carriage.

**Qualified Individual with a Disability** means an individual with a disability who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment as further defined in the U.S. Department of Transportation regulations in 14 C.F.R. Section 382.3 and who (1) as a Passenger (referred to as a "Passenger with a disability") (a) with respect to obtaining a Ticket for air transportation on a Carrier, offers, or makes a good faith attempt to offer, purchase or otherwise validly obtain a Ticket; (b) with respect to obtaining air transportation, or other services or accommodations required by the U.S. Department of Transportation regulations in 14 C.F.R. Part 382 (i) buys or otherwise validly obtains, or makes a good faith effort to obtain, a Ticket for air transportation on a Carrier and presents himself or herself at the airport for the purpose of traveling on the flight to which the Ticket pertains; and (ii) meets reasonable Contract of Carriage requirements applicable to all Passengers; or (2) with respect to accompanying or meeting a traveler, using ground transportation, using terminal facilities, or obtaining information about schedules, fares, reservations, or policies, takes those actions necessary to use facilities or services offered by the Carrier to the general public, with reasonable accommodations, as needed, provided by the Carrier.

**Schedule Change** means:

A. The cancellation of a scheduled flight where no Alaska flight of comparable routing is available within sixty (60) minutes of the original time of departure; or

B. A change in the scheduled departure time of an Alaska flight which exceeds sixty (60) minutes; or

C. A change in the routing of a scheduled Alaska flight which adds one (1) or more stops to the original itinerary;

*or*

~~Alaska~~ the rerouting of an Alaska scheduled flight that results in a scheduled arrival time more than sixty

A 1 2(60) minutes later than the original scheduled arrival time; or

   E. Any change in the arrival time of an Alaska flight that results in a misconnection to any flight shown in the same reservation and Ticket.

**Schedule Irregularity** means:

   A. Delay in scheduled departure or arrival of flight resulting in a misconnection; or

   B. Flight or service cancellation, omission of a scheduled stop, or any other delay or interruption in the scheduled operation of an Alaska flight; or

   C. Substitution of aircraft type that provides a different class of service or different seat configuration; or

   D. Schedule Changes which require rerouting of the Passenger at departure time of the original flight. Exception: Schedule Irregularity does not include Force Majeure Events.

**Segment** means that part of a journey from a Passenger's boarding point to a deplaning point. Each flight coupon represents a Segment of a trip.

**Selected Carrier** means the Carrier whose Baggage rules apply to the entire interline itinerary.

**Selecting Carrier** means the Carrier whose designator code is identified on the first flight Segment of the Passenger's Ticket at the beginning of an interline itinerary issued on a single Ticket whose origin or ultimate destination is in Canada.

**Service Animal** means a dog, regardless of breed or type, that is individually trained to do work or perform tasks for the benefit of a Qualified Individual With a Disability, including a visual, sensory, psychiatric, intellectual, or other mental disability. Animal species other than dogs, emotional support animals, comfort animals, companionship animals, and service animals in training are not Service Animals.

**Special Drawing Right** ("SDR") means a special unit of currency created by the International Monetary Fund ("IMF"), the value of which in U.S. dollars fluctuates and is recalculated each banking day. These values are known to most commercial banks and are provided daily by the IMF at http://www.imf.org/external/np/fin/data/rms_sdrv.aspx.

**Standby Passengers** means Passengers who will be enplaned on a flight subject to availability of space at departure time and only after all Passengers having a confirmed reservation for such flight and all Passengers without reservations but paying fares other than Adult standby fares, have been enplaned on such flight.

**Stopover** means a deliberate or intentional interruption of a journey by a Passenger, agreed to in advance by Alaska, scheduled to exceed four (4) hours at a point between the place of departure and the place of destination.

**Ticket** means the record of agreement, including electronic Tickets or "e-Tickets," for Passenger air transportation provided by Alaska under certain terms and conditions to the Passenger named on the Ticket and in accordance with applicable governing tariffs and regulations and this Contract of Carriage. An "e-Ticket" is the record of the Ticket agreement maintained and processed within Alaska's or other Carrier's electronic reservation system. A receipt is provided to the purchaser of the Ticket that contains an alpha-numeric reference number for retrieving the record within Alaska's or other Carrier's reservation system and summary of the Ticket information. Alaska or other Carrier

may require the issuance of an e-Ticket, regardless of market, Carrier, form of payment, or customer type. The Ticket
is the Passenger's evidence of their Contract of Carriage with Carrier.

**Transit Passengers** are those onboard a flight at an en route stop, or a connecting Passenger with a Stopover,
to/from other scheduled flights.

**Unaccompanied Minor** means a Child/Minor of 5 to 17 years of age when traveling alone or not accompanied on the
same flight and in the same compartment by a companion Passenger of at least 18 years of age or with a legal
guardian or parent.

**Unchecked Baggage** means Baggage, other than Checked Baggage, carried on board an aircraft by a ticketed
Passenger, and is also known as Carry-On Baggage.

**Warsaw Convention** means the Convention for the Unification of Certain Rules relating to International Carriage by
Air, signed at Warsaw, October 12, 1929, or where applicable, that Convention, as amended, including without
limitation, by the Protocol signed at The Hague, September 28, 1955.

# Rule 2. Standard Format of Electronic Rules for Tariff Filing Purposes

Ver esta regla en español

Rule number reserved for Airline Tariff Publishing Company ("ATPCO") filings.

# Rule 3. Application of Contract

Ver esta regla en español

    A. The terms and conditions contained in this Contract of Carriage, and any terms and conditions printed on any
       Alaska Ticket, constitute the conditions of Carriage upon which Alaska agrees to provide Domestic Carriage
       and/or International Carriage and are expressly agreed to by the Passenger. This Contract of Carriage
       incorporates by reference all fare rules filed with the Airline Tariff Publishing Company. The terms and
       conditions contained in this Contract of Carriage shall govern all published routes and services provided by
       Alaska, as well as fares and charges published by Alaska. This Contract of Carriage also incorporates the tariffs
       filed by Alaska in accordance with domestic and foreign government regulations. Unless otherwise prohibited
       by law, this Contract of Carriage constitutes the entire agreement between Alaska and the Passenger.

    B. This Contract of Carriage is subject to applicable laws, regulations, rules, and security directives imposed by
       governmental agencies, including, but not limited to, those imposed during or as a result of a national
       emergency, war, civil unrest or terrorist activities. In the event of a conflict between any of the terms and
       conditions contained herein and such government laws, regulations, rules, security directives and their
       corresponding effects on Alaska's operation, the latter shall prevail.

    C. The terms and conditions set forth herein are applicable to transportation of Passengers and Baggage provided
       by Alaska. See Rule 16 regarding application of these terms and conditions to Codeshare Partner services.

    D. International Carriage may be subject to rules relating to liability established by, and to all other provisions of,

the Warsaw Convention and/or Montreal Convention. Any provisions of these rules that are inconsistent with the provisions of the applicable Convention shall, to that extent, but only to that extent, be inapplicable to

A 1 International Carriage, except where the rules have been adopted in accordance with the terms of the IATA (International Air Transport Association) Intercarrier Agreement of October 31, 1995. Liability Rules are set forth below in Rules 8, 15 and 19.

E. Except as otherwise provided within specific fare rules, transportation is subject to this Contract of Carriage, rules, fares and charges in effect on the date on which the Ticket is issued. Rules, fares and charges quoted for ticketing are only guaranteed at the time of ticketing, unless otherwise specified in the fare rules.

    1. Where the Ticket has been purchased and issued before the effective date of an increase in the applicable fare or charges, the increase will not be collected, provided there is no change in origin, destination, Stopover point(s), flight(s) or dates shown on the original Ticket. These provisions apply whether an increase results from a change in fare level, a change in conditions governing the fare, or a cancellation of the fare itself.

F. Alaska is responsible only for transportation of Passengers and Baggage provided by Alaska, its regional partners or its Codeshare Partners. With respect to Codeshare Partner flights, different rules may apply to certain aspects of the operation of those flights. See Rule 16 regarding application of these Rules to Codeshare Partner services. When Alaska undertakes to issue a Ticket, check Baggage, or make any other arrangements for transportation over the lines of any other Carrier on an Interline basis (whether or not such transportation is part of a through service), Alaska will act only as agent for the other Carrier in these limited capacities, and will assume no responsibility for the acts or omissions of such other Carrier, including, but not limited to, providing flight status information, delays and other acts or omissions that arise from their flight operations.

G. No employee, representative, contractor or agent of Alaska has the authority to change, alter, modify, or waive any fare rules or any provision of this Contract of Carriage unless authorized in writing by a corporate officer of Alaska. Alaska's appointed agents, contractors and representatives are only authorized to sell Tickets for air transportation pursuant to approved fares, rules, and regulations of Alaska. Failure or delay on the part of either Alaska or its appointed agents, contractors or representatives to exercise any right or power herein shall not operate as a waiver thereof. This Rule supersedes any conflicting provision contained elsewhere in this Contract of Carriage.

H. Unless specifically stated otherwise herein or where any limitation would expressly violate any applicable law, Alaska shall not be liable for any consequential, compensatory, indirect, incidental or punitive damages arising out of or in connection with the performance of its obligations under this Contract of Carriage.

I. Alaska does not guarantee Carriage on any particular type or make of aircraft and reserves the right to provide Carriage on the aircraft or Carrier of its choice. Arrival and departure times shown in Alaska's schedules, timetables, or elsewhere are not guaranteed and may be changed without notice. Alaska does not guarantee provisions of any particular class or type of service on Codeshare Partners.

J. Fares apply for travel only between the points for which they are published. Tickets may not be issued at a fare published to and/or from a more distant point than the point being traveled, even when the issuance of such Tickets would produce a lower fare. When through or connecting Passengers enplane at an intermediate point between the origin and destination shown on their Tickets, Alaska may require evidence, such as a boarding pass, of use of a preceding flight for the portion of the Ticket from point of origin to intermediate point. Absent such evidence, Alaska may require additional fare collection from the Passenger for any difference between

the fare paid for the Ticket from origin to destination and the fare which would apply from the intermediate point to the destination.

K. Alaska will exercise reasonable efforts to ensure that all fares it publishes are accurate and available for sale, but Alaska reserves the right to correct any erroneously published fare that Alaska did not intend to offer for sale, including $0 fares, errant discount code and mileage redemption filings, and other unintended offerings.

L. Alaska's obligations hereunder extend only to the ticketed Passenger. There are no third party beneficiaries hereunder.

M. Except where provided otherwise by law, Alaska's Contract of Carriage, rules and tariffs are subject to change without notice, provided that no such change shall apply to Tickets issued prior to the effective date of such change. To the extent there is a conflict between this Contract of Carriage and information printed on a Ticket, this Contract of Carriage governs.

N. The invalidity of any provision herein by local law shall not affect the validity of any other provision, which shall remain in full force and effect.

O. If Alaska makes arrangements for a Passenger with any third party to provide any services other than Carriage by air, or issues a Ticket or voucher relating to transportation or services (other than Carriage by air) provided by a third party such as hotel reservations or car rental, Alaska acts only as Passenger's agent in doing so. The terms and conditions of the third party service provider will apply.

P. Alaska does not maintain, operate or provide ground transfer service between airports or between airports and town centers. Any such service is performed by independent operators who are not and shall not be deemed to be agents or contractors of Alaska. Anything done by an employee, agent, contractor or representative of Alaska in assisting the Passenger to make arrangements for such ground transfer service shall in no way make Alaska liable for the acts or omissions of such independent operator. In the case of scheduled overnight stops on through service via the same or a combination of Carriers named, ground transfer charges may be borne by the Carrier.

Q. Except as otherwise provided below, fare rule provisions, local or joint fares, including Arbitraries, contained in the On-line Tariff Database maintained by Airline Tariff Publishing Company on behalf of Alaska are considered to be part of this Contract of Carriage.

R. In the event that a Passenger does not comply with the terms and conditions in this Contract of Carriage, his/her Ticket shall be invalidated, and Alaska will have the right to: 1) cancel any remaining portion of the Passenger's itinerary; 2) refuse to allow the Passenger to board aircraft or check Baggage; and/or 3) confiscate the Passenger's Ticket.

S. The obligations of the carrier under the Air Passenger Protection Regulations (APPR) form part of the tariff and supersede any incompatible or inconsistent term and condition of carriage set out in the tariff to the extent of such inconsistency or incompatibility, but do not relieve the carrier from applying terms and conditions of carriage that are more favorable to the passenger than the obligations set out in the APPR.

T. No Class Action – Any case brought pursuant to this Contract of Carriage, Alaska's Tarmac Delay Plan, or Alaska's Customer Service Commitment and/or use of or dealings with Alaska's website must be brought in a party's individual capacity and not as a plaintiff or class member in any purported class or representative proceeding.

# Rule 4. Tickets





A. Except as otherwise provided in this Rule or required by the applicable local law of a foreign jurisdiction, any Ticket issued by Alaska on Alaska Ticket stock will be valid for transportation for one (1) year from the date on which transportation commences at the point of origin as designated on the original Ticket or, if no portion of the Ticket is used, one (1) year from the date of issuance of the original or reissued ticket, whichever is later. When an unused published fare Ticket is reissued, the new Ticket validity on the reissued ticket will be determined from the date the Ticket was reissued. Tickets that are nonrefundable as specified in the fare rule will be valid for transportation for one (1) year from the date of issuance of the original Ticket and will be subject to any and all applicable change fees. Any portion of a nonrefundable Ticket that is not applied to future travel within the applicable time period will be forfeited and will not be refunded or applied to future travel beyond the applicable time period. Tickets that are both nonrefundable and nonchangeable as specified in the fare rule, even if unused, have no residual value and cannot be applied to the purchase of future travel.

B. A Ticket will not be issued, and Alaska will not be obligated to carry any Passenger, until the Passenger has paid the applicable fare or has complied with credit arrangements established by Alaska. A Ticket will be valid only for flight(s) for which confirmed reservation(s) have been made. No person shall be entitled to transportation except upon presentation of a valid Ticket or proof of identification acceptable to Alaska to confirm that transportation has been purchased. Such Ticket shall entitle the Passenger to transportation subject to this Contract of Carriage and only between points of origin and destination and via the routing designated thereon. The Passenger must be in compliance with any other requirements of the Passenger's fare class. A Passenger holding an unused open-date Ticket or portion thereof for onward travel, or who wishes to change a ticketed reservation to another date, shall not be entitled to any preferential right with respect to the obtaining of reservations.

C. Flight coupons will be honored only in the order in which they were intended to be used, and only if all unused flight coupons and Passenger coupons are presented together.

D. A Ticket that has not been validated, or which has been altered, mutilated or improperly issued, shall not be valid. Tickets shall not be valid if reservations are cancelled pursuant to Rule 7 or cancelled by the Passenger or his/her representative.

E. The purchaser of the Ticket is considered to be the owner of the Ticket. If the purchaser cannot be determined, the Passenger whose name is on the Ticket is assumed to be the purchaser.

F. Tickets are not transferable. Alaska is not liable to the purchaser of a Ticket for honoring or refunding any Ticket when presented by a person other than the person identified as the Passenger on the Ticket. If a Ticket is used by an unauthorized person with or without the knowledge or consent of the person to whom the Ticket was issued, Alaska will not be liable for the loss, destruction, damage, or delay of such unauthorized person's Baggage or other personal property, or for the death or injury of such unauthorized person arising from or in connection with such unauthorized use. As used herein, "unauthorized person" means any person other than the person to whom the Ticket is issued.

G. Tickets may be purchased on credit, installment, or time payment plans lawfully in effect, subject always to Alaska's approval of credit.

H. In addition to the otherwise applicable fare, a per Ticket booking service fee will be collected for all Tickets

purchased through Alaska reservations or at airport locations. This booking service fee applies in addition to all applicable charge. Tickets are available for purchase without a service fee at alaskaair.com. For information about the amount of the booking service fee, please refer to our web site at www.alaskaair.com.

I. Any tax or other charge imposed by government authority and collectable from a Passenger will be included in or added to the published fares and charges.

J. A Passenger may exclusively occupy two adjacent seats on any Alaska flight (including flights operated by Horizon or SkyWest on behalf of Alaska Airlines), upon advance arrangement and payment of two applicable fares for the flight or flights on which two seats will be used and before travel on the first ticketed Segment, or if determined necessary by Alaska, and subject to space availability. The second seat will be purchased at the same fare paid for the first seat. A Ticket will be issued for each seat. Passengers who are unable to lower both armrests and/or who encroach upon any portion of the adjacent seat should book the number of seats needed prior to travel. Baggage allowance: Standard Checked Baggage charges and waivers apply for each Ticket purchased; standard Carry-on Baggage allowance applies per person, not per Ticket.

K. Alaska may mandate the issuance of an e-Ticket regardless of market, Carrier, form of payment, or customer type (including Mileage Plan and participating Carrier frequent flyer members).

L. Lost Tickets. *See* Rule 17.D.

M. Tickets Accepted. Alaska will accept only its own Tickets or those of its Codeshare Partners. Any Tickets issued in conjunction with travel on another Carrier will not be accepted unless required by government regulation or at Alaska's sole discretion.

N. If the Passenger is prevented from using a Ticket, or a portion of a Ticket, during the period of Ticket validity due to an Alaska flight cancellation or because Alaska is unable to provide space on a flight, Alaska will, without additional collection of fare, extend the Ticket validity period of such Passenger's Ticket until the first flight of Alaska on which space is available in the class of service for which the fare has been paid.

O. The date when payment is made by credit card, or the Ticket invoice date established when payment is made by other acceptable form of payment, will constitute the date a Ticket is "issued" for purposes of determining the Ticket validity period under this Rule.

P. Boarding Passes. Boarding passes may be obtained at alaskaair.com, through the Alaska mobile application, or at the airport from Alaska at: 1) e-Ticket check-in kiosks (where available); 2) skycap podiums (where available); or 3) Ticket counters. A boarding pass that has been altered, mutilated, or improperly issued shall not be valid and will not be accepted by Alaska. Boarding passes are nontransferable unless explicitly stated on the boarding pass. Alaska is not liable to the holder of a boarding pass for use of such a boarding pass when presented by a person other than the person to whom it was issued. If a boarding pass is used by a person other than the person to whom it was issued, Alaska shall not be liable for the loss, destruction, damage or delay of such unauthorized person's Baggage or other personal property or the death or injury of such unauthorized person arising from or in connection with such unauthorized use.

# Rule 5. Reservations

Ver esta regla en español

A. Alaska does not guarantee allocation of any particular space in the aircraft. Seat assignments, regardless of

class of service, are not guaranteed and are subject to change without notice. Alaska reserves the right to any reason, including from a seat for which an additional fee has been paid, and if a Passenger is improperly or erroneously upgraded to a different class of service. If a Passenger is removed from a seat for which a fee has been paid, and the Passenger is not re-accommodated in the same class of seat or a seat of equal or greater value, or if a Passenger is downgraded from a class of service and is not re-accommodated in a seat of an equal or greater class of service for which a fee has been paid, the Passenger may be eligible for a refund in accordance with Rule 17.

B. No person shall be entitled to transportation without a valid, confirmed reservation. No reservation shall be considered a confirmed reservation until payment in full has been received by Alaska. A reservation for space on a given flight is valid when the availability and allocation of such space is confirmed in Alaska's reservation system. Subject to payment or other satisfactory credit arrangements, a valid Ticket will be issued by Alaska or Alaska's authorized agent indicating such confirmed space once the Ticket is purchased. Unless an earlier advanced ticketing deadline is imposed by the applicable fare rule, the reservation must be paid for and ticketed at least sixty (60) minutes before posted departure time, otherwise Alaska may cancel reservations and seat assignments of Tickets not yet purchased. Exception: Where other rules, including fare rules and federal regulation, provide for the issuance, validation, purchase, or refund of a Ticket within specific time limits, these specific time limits will apply.

C. Alaska reserves the right to refuse Domestic Carriage or International Carriage to any person who has acquired a reservation in violation of applicable law or Alaska's Contract of Carriage, rules and regulations.

D. At the time of reservation, Alaska requires the full name (consisting of full first and last name) for each Passenger to be entered into the name field of the reservation. Exception: Only one name will be required for reservations for Passengers whose passport or other government-issued form of identification reflects only one name.

E. Because not all Passengers holding confirmed reservations actually use those reservations, Alaska may intentionally confirm a greater number of reservations for a flight than there are seats available in the aircraft. In that event, Alaska's obligation to the Passenger is governed by Rule 8 (Denied Boarding Compensation) and applicable law. A Passenger who obtains a Ticket that reflects confirmed space on a specific flight and date shall be regarded as having confirmed reserved space.

F. Alaska may limit the number of Passengers carried at any fare level and certain fares will not necessarily be available on all flights. The number of seats made available on a given flight will be determined by Alaska.

# Rule 6. Routing, Rerouting and Stopovers

Ver esta regla en español

A. Routing

    1. Each fare applies only to transportation via the routings specified in connection with that fare. Any local routing in connection with a fare applicable to transportation over the lines of any one Carrier between any two points shall be included in any routing in connection with:

        a. Any published joint fare which includes transportation over the lines of such Carrier between such points, unless expressly excluded from the joint fare routing or routings, or

b. Any through fare constructed by combining a local fare with a joint fare. In such instances, the local ~~~ ring of any one Carrier shall apply to its entire portion of the through routing, whether or not the Passenger travels via the point over which the fare is combined.

2. When more than one local fare applies for the portion of passage via a Carrier participating in a joint fare, the joint fare shall apply only via the routings specified in connection with the lowest local fare.

B. Rerouting

1. Alaska will reroute a Passenger at the Passenger's request upon presentation of the Ticket or portion thereof then held by the Passenger, but Alaska shall be required to reissue/reroute only between points on the original Ticket which it serves. Except as provided in Rule 8 (Failure to Operate on Schedule), tickets that are both nonrefundable and nonchangeable as specified in the fare rule are not eligible for rerouting and may not be applied to any travel other than as specified in the original ticket.

2. Endorsement for Purpose of Rerouting. Except as provided Rule 7 (Cancellation of Reservations and Prohibited Practices), Alaska will endorse the Ticket, or portion thereof, then held by the Passenger for the purpose of rerouting if the request is made at least three (3) hours prior to the scheduled departure of the flight on which the Passenger holds a confirmed reservation.

3. Fare Applicable to Rerouting or Change in Destination:

   a. Passengers may request that the routing and/or ultimate destination designated on his/her Ticket be changed in accordance with paragraph B.3.b of this Rule, provided that after transportation has commenced, a one-way Ticket will not be converted into a round-trip, Circle Trip, or open-jaw trip Ticket.

   b. Except as provided Rule 7 (Cancellation of Reservations and Prohibited Practices), the fare and charges applicable when rerouting or changing ultimate destination at the Passenger's request prior to arrival at the ultimate destination named in the original Ticket, shall be determined by reference to the fare rules that govern the Ticket. Any difference between the fare and charges so applicable and the fare and charges applicable to the original Ticket issued to the Passenger will be collected from or refunded to the Passenger, in accordance with the applicable fare rules. Note: The applicable fare and charges will be those in effect on the date the rerouting or change in ultimate destination is entered on the Passenger's Ticket.

C. Stopovers

1. U.S. and Canada Travel. A Stopover, as used herein, will occur when a Passenger arrives at an intermediate or junction transfer point and fails to depart from the intermediate or junction transfer point on:

   a. The first flight on which space is available; or

   b. The flight that will provide for the Passenger's earliest arrival at intermediate or junction transfer point(s) or destination point, via the Carrier and class of service shown on the Passenger's Ticket. Provided, however, that in no event will a Stopover occur when the Passenger departs from the intermediate or junction transfer point on a flight shown in Alaska's official general schedules and/or serving patterns as departing within four (4) hours after his/her arrival at such point.

2. Except as otherwise provided, Stopovers will be permitted only upon payment of the combination of applicable fares on transportation solely within the Continental United States and/or Canada.

3. For travel outside the U.S. and Canada, Stopovers will be permitted under the following conditions:

a. Stopovers must be arranged with Alaska in advance and specified on the Ticket.

Stopovers will be permitted at any point that can be included in an itinerary constructed either by the use of a mileage routing or as specified in the published routing, unless such Stopover is prohibited in Alaska rules or tariffs or governmental regulations.

c. Stopover provisions for special fares (applicable to all fares for which Stopovers other than at the point of turnaround are prohibited or restricted in number): when travel at a through fare is interrupted by surface travel, either at intermediate points or at the point of turnaround, the points of disembarkation and re-embarkation of the interrupted portion of travel will be considered together as one Stopover or the one point of turnaround.

d. Only one Stopover is permitted at any single point on the itinerary of a journey traveled at a one-way or half a round-trip fare. The origin and destination or point of turnaround, as the case may be, may not be included in such itinerary more than once, regardless as to whether or not a Stopover is made at such point.

4. Except as otherwise provided, Stopovers will be permitted free of charge at all intermediate points on routings applicable to fares between points in the U.S.A. on the one hand and points outside the U.S.A. on the other hand.

# Rule 7. Cancellation of Reservations and Prohibited Practices

Ver esta regla en español

A. Alaska reserves the right to cancel a reservation (whether or not confirmed) and seat assignment of any Passenger whenever necessary to comply with any governmental regulation or request for emergency transportation in connection with the national defense, or whenever necessary or advisable by reason of a Force Majeure Event.

B. Alaska reserves the right to cancel a reservation (whether or not confirmed) due to the Passenger's failure to comply with the rules set forth in this Contract of Carriage, including, but not limited to, the Passenger's failure to pay for the applicable Ticket under the conditions applicable to the fare for such travel.

C. Failure to occupy space. If a Passenger fails to occupy space which has been reserved for him/her on a flight and Alaska does not receive notice of cancellation of the reservation prior to the departure of the flight, or if Alaska or another Carrier cancels the reservation of any Passenger, Alaska may cancel all reservations (whether or not confirmed) and seat assignments held by such Passenger for continuing or return space. If a Passenger must change his/her itinerary, he/she must contact Alaska prior to a flight's departure to determine how this may affect the Ticket and remaining travel. When a passenger does not notify Alaska prior to a flight's departure that he/she is unable to travel on their confirmed flight, the passenger is considered a "No Show" passenger and all segments associated with the reservation are automatically canceled and all funds or miles used to purchase the ticket are forfeited, subject to the terms of Rule 17.

D. Duplicate, impossible/illogical, fraudulent, fictitious or abusive bookings and/or reservations, or bookings and/or reservations made by Passengers with no intention of being used, are prohibited and may be subject to cancellation. A duplicate or impossible/illogical booking includes, but is not limited to, bookings for the same Passenger on flights traveling on or about the same date between one or more of the same or nearby origin

and/or destination (such as SEALAX and SEAONT or SNASEA and ONTSEA), or bookings with Connections before the arrival of the inbound flight. Fraudulent, fictitious or abusive bookings are defined as any bookings made without having been requested by or on behalf of the named Passenger. Additionally, creating bookings to hold or block seats for the purpose of obtaining lower fares, Mileage Plan award inventory, or upgrades that may not otherwise be available, or to gain access to airport facilities, or to circumvent any of Alaska's fare rules or policies, is prohibited without prior authorization from Alaska.

E. Other Prohibited Practices

1. Use of flight coupons from two or more different Tickets issued at round-trip fares for the purpose of circumventing applicable tariff rules (such as advance purchase/minimum stay requirements), commonly referred to as "Back to Back Ticketing," is not permitted. Alaska and travel agents are prohibited from issuing Tickets under such circumstance when there is obvious intent to abuse and/or misuse restricted round-trip fares.

2. The purchase and use of round-trip Tickets for the purpose of one-way travel only, known as "Throwaway Ticketing," is prohibited by Alaska.

3. Fares apply for travel only between the points for which they are published. Tickets may not be purchased and used at fare(s) from an initial departure point on the Ticket which is before the Passenger's actual point of origin of travel or to a more distant point(s) than the Passenger's actual destination being traveled, even when the purchase and use of such Tickets would produce a lower fare. This practice is known as "Hidden Cities Ticketing" or "Beyond Point Ticketing" and is prohibited by Alaska. Note: For this instance, co-terminals are considered to be the same point.

4. Reissuing a nonrefundable Ticket and applying the value of the existing Ticket towards the creation of two or more new Tickets is prohibited by Alaska. A nonrefundable Ticket may only be reissued on a one-for-one basis. Any residual value to the existing Ticket may be issued as a Credit certificate if the applicable fare rules allow.

F. Alaska reserves the right to invalidate any Ticket(s) purchased or used in violation of this Contract of Carriage and Alaska's rules. Where a Ticket is invalidated as the result of the Passenger's non-compliance with any term or condition of sale or any fare rule (including prohibitions on Back to Back Ticketing, Throwaway Ticketing, Hidden Cities Ticketing or Beyond Point Ticketing), Alaska has the right in its sole discretion to take all actions permitted by law, including, but not limited to, the following: (a) cancel any remaining portion of the Passenger's itinerary, (b) confiscate unused flight coupons, (c) refuse to board the Passenger or carry the Passenger's Baggage, unless the difference between the fare paid and the fare for transportation used is collected prior to boarding, (d) refuse to refund an otherwise refundable Ticket, (e) assess the Passenger for the actual remaining value of the Ticket, which shall be no less than the difference between the fare actually paid and the lowest fare applicable to the Passenger's actual itinerary, (f) delete miles in the Passenger's frequent flyer account (Mileage Plan), revoke the Passenger's elite status, if any, in the Mileage Plan, terminate the Passenger's participation in the Mileage Plan, or take any other action permitted by the Mileage Plan "Conditions of Membership" (for additional information, see Alaska's website at https://www.alaskaair.com/content/mileage-plan/terms-and-conditions) and/or (g) take legal action with respect to the Passenger. Alaska is not liable in the event that one or more of the duplicate, impossible/illogical, fraudulent, fictitious or abusive reservations are canceled.

G. In the event a Ticket becomes the subject of a credit card chargeback based upon impropriety, a non-

sufficient funds check, a fraud or other form of compromised payment, the ticketed Passenger is liable for the _____ plus _____ dministrative fee. A ticketed Passenger assumes all risk of loss for any Ticket not purchased from Alaska or an Alaska authorized travel agent. Failure to pay ticketing costs and fees within sixty (60) days of notification may result in initiation of legal action or collection services. The ticketed Passenger shall be liable for all attorney and collection fees.

H. **Airport Check-In Time Limits.** Alaska reserves the right to cancel reservations (whether or not confirmed) and seat assignments, deny boarding and/or refuse the acceptance of Checked Baggage of any Passenger who fails to present himself/herself within the time limits preceding posted departure time of applicable flights as indicated in Section I of this Rule. Note: The time limits provided by Alaska in this Rule are minimum time requirements. Due to federal security screening measures in place at airports, Passenger processing time may differ from airport to airport. See Rule 15.C. It is the Passenger's responsibility to ascertain the departure airport's time requirements for security screening so that they comply with Alaska minimum check-in time limits.

I. Passengers must adhere to the following minimum times, which may be revised by Alaska from time to time:

   1. Unless an earlier advanced ticketing deadline is imposed by the applicable fare rule, Tickets purchased on www.alaskaair.com, Alaska's mobile website or Alaska's mobile app must be completed at least sixty (60) minutes prior to posted departure, otherwise Alaska may cancel reservations and seat assignments of Tickets not yet purchased; and

   2. Reservations and seat assignments may be canceled if Passenger fails to meet the check-in times noted in Rule 15.C, or fails to arrive for boarding at the gate at least 30 minutes prior to scheduled departure time.

   3. The time limits provided by Alaska in this Rule are minimum time requirements. Passenger and Baggage processing time requirements may differ from airport to airport and may be subject to change.

   4. Passengers must arrive at the airport sufficiently in advance of a flight departure time to permit completion of government requirements, security procedures and departure processing. Reservations and seat assignments may be canceled and departures will not be delayed for Passengers who are improperly documented, or have not completed all security processing, have not met Alaska's check-in requirements, or are otherwise not ready to travel by the posted departure time. It is the Passenger's responsibility to arrive at the airport with enough time to complete check-in, Baggage check, and security screening processes within these minimum time limits.

   5. Alaska will not be liable for any consequential, compensatory, or other damages when it cancels the reservation (whether or not confirmed) of any Passenger in accordance with this Rule, but if a reservation is cancelled pursuant to Paragraph A of this Rule, Rule 8 (Failure to Operate on Schedule) will apply. If a reservation is cancelled pursuant to other paragraphs of this Rule, Alaska will refund in accordance with Rule 17 (Refunds-Voluntary).

   6. Early Departure. Alaska reserves the right, in its sole discretion, to depart early when all Passengers who have met the requirements set forth in this Section I are onboard the aircraft.

# Rule 8. Liability for Delays, Cancellations, and Denied Boarding

Ver esta regla en español

A. Liability of Carrier: Except to the extent provided in Paragraph D of this Rule, Alaska shall not be liable for failing to operate any flight according to schedule or for changing the schedule of any flight, with or without notice to the Passenger. This exclusion from liability includes actual and Consequential Damages.

B. Options of Passengers: The provisions of this Rule apply only to Passengers who have a valid Ticket reflecting a confirmed reservation on a flight affected by a Schedule Irregularity.

C. Carrier Options for Schedule Irregularity. In the event Alaska cancels or fails to operate any flight according to Alaska's published schedule, or changes the schedule of any flight, Alaska will, at the request of a Passenger with a confirmed reservation and Ticket for such flight, take one of the following actions:

    1. For Local Passengers:

        a. Transport Passenger to his/her destination or next ticketed Stopover point on another Alaska flight on which space is available in the same or higher class of service than reflected on the Passenger's Ticket at no additional charge; or

        b. If acceptable to the Passenger, provide transportation to his/her destination or next ticketed Stopover point on another Carrier's flight in the same or higher class of service than reflected on the Passenger's Ticket at no additional charge; or

        c. Refund the unused portion of the Passenger's Ticket in accordance with Rule 17 (Involuntary Refunds).

    2. For Transit Passengers Connecting From an Alaska Flight:

        a. Transport Passenger to his/her destination or next ticketed Stopover point on another Alaska flight on which space is available in the same or higher class of service than reflected on the Passenger's Ticket at no additional charge; or

        b. If acceptable to the Passenger, provide transportation to his/her destination or next ticketed Stopover point on another Carrier's flight in the same or higher class of service than reflected on the Passenger Ticket at no additional charge; or

        c. If on the outbound leg, return Passenger to city of origin and refund the entire Ticket in the original form of payment. If on the return leg, refund unused portions of the Ticket in accordance with Rule 17.

    3. For Transit Passengers Connecting from Another Carrier's Flight:

        a. Transport Passenger to his/her destination or next ticketed Stopover point on another Alaska flight on which space is available in the same or higher class of service than reflected on the Passenger's Ticket at no additional charge; or

        b. If acceptable to the Passenger, provide transportation to his/her destination or next ticketed Stopover point on another Carrier's flight in the same or higher class of service than reflected on the Passenger Ticket at no additional charge; or

        c. If on the outbound leg, return Passenger to city of origin and refund the entire Ticket in the original form of payment. If on the return leg, refund unused portions of the Ticket in accordance with Rule 17.

    4. Alaska may, at its option and if acceptable to the Passenger, transport a Passenger affected by a Schedule Irregularity to his/her destination or next ticketed Stopover (or its co-terminal point specified in Rule 17) via surface transportation, or a combination of surface transportation, Alaska flights and other

Carriers' flights, at no additional charge.

*Alaska* ~~t to t~~ ~~xtent~~ provided in this Rule and subject to the Warsaw Convention and/or Montreal
A I R L I N Convention, where applicable, Alaska shall not be liable for any Schedule Irregularity.

D. Change in Schedule: Flight schedules are subject to change without notice, and the times shown on Alaska's
published schedules, Tickets, timetable and advertising are not guaranteed and form no part of this Contract of
Carriage. At times, without prior notice to Passengers, Alaska may need to substitute other aircraft and may
change, add, or omit intermediate stops. Alaska cannot guarantee that Passengers will make Connections to
other flights by Alaska or by other Carriers. In the event of flight Schedule Changes or service withdrawals,
Alaska will attempt to notify affected Passengers as early as possible. Alaska will promptly provide Passengers
the best available information regarding known delays, cancellations, misconnections and diversions, but
Alaska is not liable for any misstatements or other errors or omissions in connection with providing such
information. No employee, agent or representative of Alaska can bind Alaska legally by reason of any
statements relating to flight status or other information. When a ticketed, confirmed Passenger will be delayed
because of a change in Alaska's schedule as defined in Rule 1 (Schedule Change), Alaska will arrange to:

1. Transport the Passenger to his/her destination or next ticketed Stopover point on another Alaska flight
on which space is available in the same or higher class of service than reflected on the Passenger's
Ticket at no additional charge; or
2. Refund according to Rule 17. Exception 1: When an Alaska Schedule Change results in the cancellation of
all Alaska service between two cities, Alaska will reroute Passengers holding confirmed reservations on
Alaska between such cities over the lines of one or more other Carriers at no additional cost to the
Passenger. Exception 2: Change in schedule does not include Force Majeure Events.

E. Passengers Rerouted by Other Carriers: When Passengers are involuntarily rerouted on Alaska by other
Carriers, Alaska will have no obligation to accept another Carrier's Ticket which does not reflect a confirmed
reservation on Alaska, unless the issuing Carrier reissues the Ticket for any changes in routing. In the event
such Carrier is not available to do so, Alaska reserves the right to reroute the Passenger only over its own lines
between the points named on the original Ticket. Note: Notwithstanding the provisions of this paragraph,
Alaska will not accept Tickets issued on the Ticket stock of a Carrier that voluntarily or involuntarily has
become the subject of bankruptcy proceedings or that is in substantial default of its interline obligations
(hereinafter, a "Defaulting Carrier"), except under the following condition: Tickets issued or revalidated on the
Defaulting Carrier's stock prior to the date of filing of the bankruptcy petition or the date of default will be
accepted over the Segments where Alaska is shown as the Carrier, on a space-available basis.

F. Amenities/Services for Delayed Passengers: Alaska will furnish amenities to Passengers holding reservations
on a flight which is delayed more than three (3) hours, or canceled. The type of amenities given will be
dependent upon the length of delay and shall not exceed a period of twenty-four (24) hours from the time of
occurrence. Exception: Alaska cannot provide the amenities outlined in this section if air traffic control, a
weather situation, or another extraordinary circumstance beyond Alaska's control occurs at any city within the
affected Passenger's intended flight routing. Alaska will attempt to advise the affected Passenger of weather
problems before departure, but advises Passengers to check weather conditions along their route and plan
accordingly.

1. More Than Three (3) Hours: If Alaska has caused the Passenger's flight to be delayed more than three (3)
hours, Alaska's airport customer service agent will provide the Passenger with instructions to ensure that

Alaska's customer care team can promptly contact the Passenger via email or letter with an apology and to grant discount off a future Alaska Airlines flight.

2. Canceled: If the Passenger's flight is canceled, and the city where the cancellation occurs is 100 miles away from the Passenger's home, hotel accommodations may be provided. Accommodations include single or family rooms and round-trip ground transportation to an airport area hotel if such ground transportation is not furnished by the hotel. Alaska will provide at its option either one night's hotel accommodations, or, if no hotel accommodations are provided and upon the Passenger's request only, reimbursement for one night's hotel accommodations in the form of an electronic travel certificate that may be applied to future travel on Alaska up to a maximum amount determined by Alaska. Such accommodations will only be provided when a Passenger incurs a delay that is expected to exceed four hours between the hours of 10:00 p.m. to 6:00 a.m. local time. Where hotel accommodations have been offered but not accepted by a Passenger for whatever reason, Alaska is not liable to reimburse the Passenger for expenses relating to alternative hotel accommodations secured independently by the Passenger. Hotel accommodations will not be furnished to a Passenger whose trip is interrupted at a city which is his/her permanent domicile, origin point, or Stopover point or when such cancellation is due to circumstances outside Alaska's control, including due to Force Majeure Events. Alaska will provide ground transportation to the place of lodging via public conveyance if such ground transportation is not furnished by the hotel. Where ground transportation has been offered but not accepted by a Passenger for whatever reason, Alaska is not liable to reimburse the Passenger for expenses relating to alternative ground transportation secured by the Passenger.

3. The sole and exclusive remedies for a Passenger who has a claim under this Rule shall be those expressly provided for in this Contract of Carriage. The Passenger shall have no other claim against Alaska under law or equity for actual, compensatory, or punitive damages.

G. Notwithstanding the provisions of this Rule, Alaska will not be obligated to accept for any purposes under this Rule Passenger Tickets or related transportation documents issued by any Carrier which is in substantial default of its Interline obligations or that voluntarily or involuntarily has become the subject of bankruptcy proceedings (defined as (a "Defaulting Carrier"), except that Tickets issued by the Defaulting Carrier or its sales agent prior to the default will be accepted solely for transportation on Alaska, provided such Tickets were issued by the Defaulting Carrier in its capacity as Alaska's agent and specified transportation via Alaska. When Tickets are accepted, no adjustments in fare will be made which would require Alaska to refund money to the Passenger. Alaska will accept revenue Passengers of a Defaulting Carrier under the following conditions:

1. Acceptance for transportation will be on Alaska's route system only, between the points named in a given flight coupon of the Defaulting Carrier.

2. Transportation will be on a standby basis only and subject to the accommodation of all ticketed Passengers whether or not they hold confirmed reserved space.

3. Travel restrictions applicable to the traffic documents of the Defaulting Carrier shall apply.

4. Traffic documents of the Defaulting Carrier will be honored no later than twelve (12) months from the date validated.

5. No traffic document, or portion thereof, of the Defaulting Carrier will be refunded under any circumstance.

H. In the event of a strike or work stoppage that causes any cancellation or suspension of operations of any other

Carrier, the provisions of this Rule will not apply with respect to Passengers holding Tickets for transportation on that carrier.

A I R Alaska may, in the event of a Force Majeure Event, without notice cancel, terminate, divert, postpone, or delay any flight or the right of Carriage or reservation (whether or not confirmed) and determine if any departure or landing should be made, without any liability on the part of Alaska except to refund any unused portion of the Ticket in the original form of payment in accordance with involuntary refund rules.

I. Limitation of Liability. Except to the extent provided above in this Rule 8, Alaska shall not be liable for any failure or delay in operating any flight, with or without notice, for reasons of safety or when advisable, in its sole discretion, due to Force Majeure Events or any event not reasonably foreseen, anticipated or predicted by Alaska.

J. The provision of services in addition to those specifically set forth in this Rule to all or some Passengers shall not be construed as a waiver of Alaska's rights or an expansion of its obligations. Neither shall any delay on the part of Alaska in exercising or enforcing its rights under this Rule be construed as a waiver of such rights.

K. Rerouting Changes Requested by Passenger. For the terms and conditions applicable to rerouting changes requested by a Passenger, including those requested due to delays or cancellations, see Rule 6.

L. Denied Boarding Compensation

1. If Alaska is unable to provide previously confirmed space due to more Passengers holding confirmed reservations and Tickets than there are available seats on a flight, some Passengers may be denied boarding on Alaska's flights and may be entitled to compensation. This Rule explains Alaska's obligations and the Passenger's rights in the case of an Oversold Flight in accordance with regulations of the U.S. Department of Transportation ("DOT"). Alaska will take the actions specified in the provisions of this Rule.

2. Voluntary Denied Boarding and Request for Volunteers. If a flight is oversold (more Passengers hold confirmed reservations than there are seats available), no Passenger may be denied boarding against his or her will until Alaska's personnel first ask for volunteers who are willing to relinquish their confirmed reserved space voluntarily in exchange for compensation in an amount determined by Alaska (including, but not limited to, a check or an electronic travel certificate). The travel certificate will be valid only for Carriage on Alaska or one of our regional partners for one year from the date of issue and will have no refund value. If a Passenger is asked to volunteer, Alaska will not later deny boarding to that Passenger involuntarily unless the Passenger was informed at the time he/she was asked to volunteer that there was a possibility of being denied boarding involuntarily and of the amount of compensation to which he/she would have been entitled in that event. The request for volunteers and the selection of such persons to be denied space shall be in a manner determined solely by Alaska.

3. Boarding If a flight is oversold (more Passengers hold confirmed reservations than there are seats available) no one may be denied boarding against his/her will until Alaska personnel first ask for volunteers who will give up their reservations willingly, in exchange for a payment of Alaska's choosing. If there are not enough Passengers who volunteer to relinquish their confirmed reserved space, Alaska may deny boarding to other Passengers involuntarily in accordance with Alaska's boarding priorities. Passengers will be boarded in the following order until all available seats are occupied: (1) All Passengers holding confirmed seat assignments will be boarded; and (2) Passengers who are not holding confirmed seat assignments will be boarded in order of the time they check in (Note: Alaska's reservations system

records the time of check-in when seat requests cannot be immediately accommodated). Possible exceptions may be made in the case of Unaccompanied Minors, Qualified Individuals with a Disability, or any other Passenger, who in Alaska's opinion, may suffer severe hardship. Business commitments will not, of themselves, constitute a severe hardship. Accompanied children under 12 years of age will be included in the same category as their accompanying Adult Passenger.

4. Transportation for Passengers Denied Boarding: Alaska will transport Passengers denied boarding, whether voluntarily or involuntarily, without Stopover on its next flight on which space is available at no additional cost to the Passenger regardless of class of service, and if unable to provide onward transportation acceptable to the Passenger, at Alaska's sole discretion and the request of the Passenger, will transport the Passenger by other Carrier or combination of Carriers without Stopover on its (their) next flight(s) in the same class of service as the Passenger's original outbound flight(s), or if space is available on a flight(s) of a different class of service acceptable to the Passenger. Such flight(s) will be used without Stopover at no additional cost to the Passenger only if it (they) will provide an earlier arrival at the Passenger's destination, next Stopover point, or transfer point.

5. Compensation for Involuntary Denied Boarding Due to an Oversale: In addition to providing transportation as described in Paragraph 4 above, Passengers involuntarily denied boarding will be compensated for Alaska's failure to provide confirmed space in accordance with the provisions below.

6. In order to receive denied boarding compensation, the Passenger holding a Ticket for confirmed reserved space must have presented himself/herself for Carriage in accordance with this Contract of Carriage, and must have complied fully with Alaska's requirements as to ticketing, check-in, and boarding requirements within the time limits and at the location set out in Rule 15.C. In addition, the flight for which the Passenger holds confirmed reserved space must be unable to accommodate the Passenger and departs without him/her, except that the Passenger will not be eligible for compensation if: (i) the flight on which he/she holds confirmed reserved space is cancelled or is unable to accommodate him/her because of government requisition of space, operational or safety reasons, or substitution of aircraft type of lesser capacity and Alaska took all reasonable measures to avoid the substitution or it was impossible to take such measures; (ii) on a flight operated with an aircraft having 60 or fewer seats, the Passenger is denied boarding due to a safety-related weight/balance restriction that limits payload; (iii) the Passenger is offered accommodations in a section of the aircraft other than specified in their Ticket, at no extra charge (a Passenger seated in a section for which a lower fare is charged must be given an appropriate refund); (iv) Alaska is able to place the Passenger on another flight or flights that are planned to reach the Passenger's next Stopover or final destination within one hour of the planned arrival time of their original flight; or (v) the Passenger is an employee of Alaska or of another Carrier or other Passenger traveling without a confirmed reserved space. Note: Failure to comply with Alaska check-in time limits will result in the cancellation of the Passenger's reservation and will render him/her ineligible for denied boarding compensation.

7. Amount of Denied Boarding Compensation

**Domestic Transportation:** Passengers traveling between points within the United States (including U.S. Territories and possessions), subject to the exceptions noted in section L.6 of this Rule, who are denied boarding involuntarily from an Oversold Flight are entitled to:

1. No compensation if Alaska offers alternate transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's destination or first Stopover not later than one (1) hour after the planned arrival time of the Passenger's original flight; or

2. At least 200% of the fare to the Passenger's destination or first Stopover, or $775, whichever is lower, if Alaska offers alternate transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's destination or first Stopover more than one (1) hour but less than two (2) hours after the planned arrival time of the Passenger's original flight; or

3. At least 400% of the fare to the Passenger's destination or first Stopover, or $1,550, whichever is lower, if Alaska does not offer alternate transportation that, at the time the arrangement is made, is planned to arrive at the airport of the Passenger's destination or first Stopover more than two (2) hours after the planned arrival time of the Passenger's original flight.

| Length of Delay | Compensation Due |
|---|---|
| 0 to 1 hour arrival delay | No Compensation |
| 1 to 2 hour arrival delay | 200% of One-Way fare (no more than $775) |
| Over 2 hours arrival delay | 400% of One-Way fare (no more than $1550) |

**International Transportation:** Passengers traveling from the United States to a foreign point, subject to the exceptions noted in section L.6 of this Rule, who are denied boarding involuntarily from an Oversold Flight originating at a U.S. airport are entitled to:

a. No compensation if Alaska offers alternate transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's destination or first Stopover not later than one (1) hour after the planned arrival time of the Passenger's original flight; or

b. At least 200% of the fare to the Passenger's destination or first Stopover, or $775, whichever is lower, if Alaska offers alternate transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's destination or first Stopover more than one (1) hour but less than four (4) hours after the planned arrival time of the Passenger's original flight; or

c. At least 400% of the fare to the Passenger's destination or first Stopover, or $1,550, whichever is lower, if Alaska does not offer alternate transportation that, at the time the arrangement is made, is planned to arrive at the airport of the Passenger's destination or first Stopover more than four (4) hours after the planned arrival time of the Passenger's original flight.

| Length of Delay | Compensation Due |
|---|---|
| 0 to 1 hour arrival delay | No Compensation |
| 1 to 4 hour arrival delay | 200% of One-Way fare (no more than $775) |
| Over 4 hours arrival delay | 400% of One-Way fare (no more than $1550) |

**Transportation Originating in Canada:** Passengers traveling from Canada to a foreign point, including to the United States, subject to the exceptions noted in section L.6 of this Rule, who are denied boarding

involuntarily from an Oversold Flight originating at a Canadian airport are entitled to:

a. No compensation if Alaska offers alternate transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's destination or first Stopover not later than one (1) hour after the planned arrival time of the Passenger's original flight; or

b. A maximum payment of $400 CAD if Alaska offers alternate transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's destination or first Stopover more than one (1) hour but less than four (4) hours after the planned arrival time of the Passenger's original flight; or

c. A maximum payment of $800 CAD if Alaska offers alternate transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's destination or first Stopover more than four (4) hours after the planned arrival time of the Passenger's original flight.

**Transportation Originating from Points Outside the U.S.A. or Canada:** Where there is an Oversold Flight that originates outside the U.S.A. or Canada, no compensation will be provided except where required by local or international laws regulating Oversold Flights.

- If an offer of compensation is made by Alaska and accepted by the Passenger, such payment will constitute full compensation for all actual or anticipatory damages incurred or to be incurred as a result of the failure to provide confirmed reserved space. Passengers who are offered such compensation will not be provided with amenities and services offered under the provisions of Rule 8.

- Method of Payment. Except as provided below, Alaska will give each Passenger who qualifies for involuntary denied boarding compensation, except for those traveling from Canada, a payment by cash or check for the amount specified above, on the day and at the place the involuntary denied boarding occurs. However, if Alaska arranges alternate transportation for the Passenger's convenience that departs before the payment can be made, the payment shall be sent by mail or other means to the Passenger within 24 hours after the time the denied boarding occurs. Alaska may offer free or discounted air transportation in place of the cash payment due under this Rule, if the value of the air transportation offered is equal to or greater than the monetary compensation otherwise due and Alaska informs the Passenger of the amount and that the Passenger may decline the transportation benefit and receive monetary compensation. In that event, Alaska must disclose all material restrictions on the use of the free or discounted transportation before the Passenger decides whether to accept the transportation in lieu of a cash or check payment. The Passenger may insist on the cash/check payment or refuse all compensation and bring private legal action.

- Limitation of Liability for Denied Boarding. Acceptance of the compensation by the Passenger pursuant to the above provisions in this Rule constitutes full compensation for all actual or anticipatory damages incurred or to be incurred by the Passenger as a result of Alaska's failure to provide the Passenger with confirmed reserved space and relieves Alaska from any further liability to the Passenger caused by Alaska's failure to honor the confirmed reservation. If Alaska's offer of compensation pursuant to the above provisions is not accepted, Alaska's liability is limited to actual damages proved not to exceed $1550 USD per ticketed Passenger as a result of Alaska's failure to provide the Passenger with confirmed reserved space. Passenger will be responsible for providing documentation of all actual damages claimed. Alaska shall not be liable for any punitive, consequential or special damages arising out of or in connection with Alaska's failure to provide the Passenger with confirmed reserved space. However, the Passenger

may decline the payment and seek to recover damages in a court of law or in some other manner.

*Alaska.*
AIRLINES

Q

# Rule 9. Travel Documents—Responsibility of Passenger

Ver esta regla en español

A. Compliance with Regulations: The Passenger shall comply with all laws, regulations, orders, demands, or travel requirements of countries to be flown from, into, or over, and with all rules, regulations, and instructions of Alaska. Alaska shall not be liable for any aid, assistance or information provided by any agent or employee of Alaska to any Passenger in connection with obtaining necessary documents or complying with such laws, regulations, orders, demands, requirements, or instructions, whether given orally, in writing, or otherwise, or for the consequences to any Passenger resulting from his/her failure to obtain such documents or to comply with such laws, regulations, orders, demands, requirements, or instructions.

B. Each Passenger desiring transportation across any international boundary is responsible for obtaining and presenting all necessary travel documents, including documentation required for entry and exit from each country, which shall be in good condition, and for complying with the laws of each country flown from, through or into which he/she requests transportation. Alaska reserves the right to seek reimbursement from the Passenger for any loss, damage, or expense suffered or incurred by Alaska by reason of such Passenger's failure to do so. Where legally permitted, Alaska reserves the right to hold, photocopy or otherwise reproduce a travel document presented by any Passenger. Alaska also reserves the right to deny boarding to any Passenger whose necessary travel documents are not in good condition or which otherwise do not comply with laws of the specific country the Passenger is departing from, transiting through, or traveling to.

C. Subject to applicable laws and regulations, the Passenger must pay the applicable fare whenever Alaska, on government order, is required to return a Passenger to his/her point of origin or elsewhere due to the Passenger's inadmissibility into/or deportation from a country. The fare will be the applicable fare in effect at the time of the original Ticket's issuance. Any difference between the applicable fare and the fare paid will be collected from or refunded to the Passenger, as the case may be. Alaska will apply to the payment of such fares any funds paid by the Passenger for unused Carriage or any funds of the Passenger in possession of Alaska. The fare collected for Carriage to the point of refusal of entry or deportation will not be refunded by Alaska unless the law of such country requires that the fare be refunded.

D. Customs Inspection: If required, the Passenger must attend inspection of his/her Baggage, checked or unchecked, by customs or other government officials. Alaska accepts no responsibility toward the Passenger if the latter fails to observe this condition. If damage is caused to Alaska because of the Passenger's failure to observe this condition, the Passenger shall indemnify Alaska therefor.

E. Government Regulation: No liability shall be attached to Alaska if Alaska in good faith determines that what it understands to be applicable law, government regulation, demand, order or requirement, requires that it refuse and it does refuse to carry a Passenger.

F. This Rule and its limitations includes, but is not limited to, travel documents related to travel by minors. Some countries require special documents for minors traveling with only one parent to/from an international destination. This includes, but is not limited to, the Mexico Minor Letter of Consent, which is available on alaskaair.com. Parents/legal guardians of minors are responsible for compliance with all requirements and

procedures for minors traveling internationally, which may include, but may not be limited to, documentary evidence such as a notarized letter of relationship and permission for the Child's travel from the birth parent(s) or legal guardian(s) not present.

# Rule 10. Screening of Passengers and Baggage

Ver esta regla en español

Passengers and/or their Baggage are subject to security screening, including but not limited to, security profiling, physical pat-downs and inspections, x-ray screening, manual bag searches, questioning of Passengers, and use of electronic or other detectors or screening or security devices, in the sole discretion of the government, airport or Alaska, and with or without the Passenger's presence, consent or knowledge. Neither Alaska nor its employees or agents is liable for any damage, loss, delay (including refusal to transport), confiscation of property, injury or other harm relating to or arising out of security screening conducted by an agent of the airport or any local, state, or federal agency or a Passenger's failure to submit to or comply with such security screening.

# Rule 11. Refusal to Transport

Ver esta regla en español

Alaska may, in its sole discretion, refuse to transport, or may remove from an aircraft at any point, any Passenger in any circumstance not prohibited by law. Below is a non-exhaustive list of reasons and/or acts for which transport may be refused.

A. Breach of Contract of Carriage - Failure by Passenger to comply with the rules of this Contract of Carriage.
B. Whenever such action is necessary, with or without notice, for reasons of safety.
C. Force Majeure Event. Whenever required or, in Alaska's exclusive judgment, advisable due to a Force Majeure Event, whether actual, threatened or reported.
D. When Necessary to Comply with Government Directive, Request or Regulations. Passengers may be refused transport whenever necessary to comply with any government regulation, security directive, or to comply with any governmental request for emergency transportation in connection with the national defense.
E. Refusal of Passenger to permit the search of his/her person or property by Alaska or a government agency for explosives, hazardous materials, contraband, or a concealed, deadly or dangerous weapon or article.
F. Refusal of Passenger upon request to produce positive identification acceptable to Alaska or when presenting a Ticket to board, failure to provide identification that matches the name on the Ticket. Alaska shall have the right, but not be obliged, to require positive identification of persons purchasing Tickets and/or presenting a Ticket(s) for the purpose of boarding aircraft.
G. Failure to Pay - Whenever a Passenger has not paid the appropriate fare for a Ticket, Baggage, or applicable service charges for services required for travel, or produced satisfactory proof to Alaska that the Passenger is an authorized non-revenue Passenger or has engaged in a prohibited practice as specified in Rule 4.
H. Any Passenger traveling across any international boundary where:
    1. The travel documents of such Passenger are not in order and the Passenger has not obtained and

completed all documentation required for entry into and exit from each country, or has failed to comply with the law requirements or procedures of each country listed on the Passenger's itinerary. If for any reason, the Passenger's embarkation from, transit through, or entry into, any country from, through, or to which the Passenger desires transportation, would be unlawful.

I. Incompatible Medical Requirements. Alaska will refuse to transport Passengers requiring the following medical equipment or services, which either are not authorized or cannot be accommodated on Alaska's aircraft: medical device requiring electrical power or medical oxygen for use onboard the aircraft except Federal Aviation Administration ("FAA")-approved and Alaska-accepted Portable Oxygen Concentrators ("POCs"); incubators; or travel on a stretcher.

J. Comfort, Health and Safety. In the following categories where, in Alaska's sole judgment, refusal or removal may be necessary for the comfort, health and safety of Passengers or crew members, including but not limited to:

1. Passengers who refuse to obey Alaska's rules or policies.

2. Passengers who refuse to obey any federal regulations, security directives, or instructions given by crew members, station management or supervisory personnel.

3. Passengers whose conduct is or has been known to be disorderly, abusive, offensive, threatening, intimidating, violent, belligerent and/or irrational so as to be a hazard or potential hazard to Alaska employees, other Passenger(s), and/or him/herself (including verbal harassment related to race, color, gender, religion, national origin, disability, age, ethnicity or sexual orientation). Federal law, including but not limited to 49 U.S.C. Section 46503, protects Federal, airport, and air carrier employees who have security duties within an airport. Assault on such employees or interference with the performance of their duties is strictly prohibited.

4. Passengers who interfere or attempt to interfere with the duties of any member of the flight crew.

5. Passengers who, as a result of their conduct, cause a disturbance such that the captain or member of the cockpit crew must leave the cockpit in order to attend to the disturbance.

6. Passengers who are barefoot and older than two (2) years old or who have uncovered torsos (except the midriff, which may be uncovered) unless required due to disability.

7. Passengers who wear or display, and refuse to cover or stow, clothing or other items deemed to be lewd, profane obscene, or patently offensive.

8. Passengers who are unable to sit in a single seat with the seatbelt properly fastened, or are unable to put the seat's armrests down when seated, unless they comply with Rule 4.J.

9. Passengers who appear to be intoxicated or under the influence of drugs to a degree that the Passenger may endanger him/herself or any other Passengers or members of the crew (other than a Qualified Individual with a Disability whose appearance or involuntary behavior may make them appear to be intoxicated or under the influence of drugs).

10. Passengers who have an offensive odor (such as from a draining wound or improper hygiene), provided it is not the result of a disability.

11. Passengers who wear or have on or about their persons concealed or unconcealed deadly or dangerous weapons; provided, however, that Alaska will carry Passengers who meet the qualifications and conditions established under 49 C.F.R. Section 1544.219.

12. Prisoners (persons charged with or convicted of a crime) under escort of law enforcement personnel;

other persons in the custody of law enforcement personnel who are being transported while wearing handcuffs or other forms of restraint; persons who have resisted or may reasonably be believed to be capable of resisting escorts; or escorted persons who express to Alaska an objection to being transported on the flight.

13. Non-Smoking Policy. Passengers who are unwilling or unable to abide by Alaska's non-smoking rules and federal laws prohibiting smoking onboard the aircraft, as required under 49 U.S.C. Section 41706.

14. Passengers who have made a misrepresentation, which becomes evident upon arrival at the airport, and the misrepresentation renders the person unacceptable for Carriage.

15. Passengers who are incapable of completing a flight safely, without requiring extraordinary medical assistance during the flight, as well as Passengers who appear to have symptoms of or have a communicable or contagious disease, infection, or condition that could pose a direct threat as defined in 14 C.F.R. Section 382.3 to the health or safety of others on the flight, or who refuse a screening for such disease or condition. (Alaska requires a medical certificate for Passengers who wish to travel under such circumstances.)

16. Passengers who fail to travel with the required safety assistant(s), provide advance notice and/or comply with other safety requirements pursuant to Rule 12.

17. Passengers who do not qualify as acceptable Non-Ambulatory Passengers (see Rule 12).

18. Passengers who are mentally deranged or mentally incapacitated whose behavior may be hazardous to himself/herself, the crew, or other Passengers. However, Alaska will accept such patients if escorted and if the requesting mental health authority furnishes a medical certificate which states that the patient may be transported safely with an escort. The escort must accompany the escorted Passenger at all times; and

19. Unaccompanied Passengers who are both blind and deaf, unless such Passenger is able to communicate with representatives of Alaska by either physical, mechanical, electronic, or other means. Such Passenger must inform Alaska of the method of communication to be used.

20. Passengers whose animals threaten the safety or health of Passengers or crew members or cause delays or damage to aircraft or other Passengers.

K. Alaska is not liable for refusal to transport any Passenger or for removal of any Passenger in accordance with this Rule. The fare of any Passenger denied transportation or removed from Alaska's aircraft en route under the provisions of this Rule will be refunded in accordance with Rule 17 of this Contract of Carriage. The sole recourse of any Passenger refused Carriage or removed for any reason specified in this Rule shall be the recovery of the refund value of the unused portion of his/her Ticket as provided in Rule 17. Under no circumstances shall Alaska be liable to any Passenger for any type of special, incidental, or Consequential Damages.

L. Solicitation, Distribution and Commercial Filming. Passengers are prohibited from soliciting or distributing literature and/or other materials, or commercial filming, while on board Alaska's aircraft without the prior written consent of Alaska Airlines, Inc. Failure to comply with this provision may result in removal from the aircraft and refusal of future travel.

M. Alaska reserves the right in its sole judgment to refuse to transport, on a temporary or permanent basis, any Passenger who has been removed or refused transportation for any conduct described in this Rule.

N. Any Passenger who, by reason of engaging in any of the above activities in this Rule 11, causes Alaska any loss,

damage or expense of any kind, consents and acknowledges that he or she shall reimburse Alaska for any such loss or expense. In addition, the activities enumerated in this Section J shall constitute a material

A I R breach of contract, for which Alaska shall be excused from performing its obligations under this Contract of Carriage.

O. Smoking (including use of electronic simulated smoking materials and smokeless cigarettes) is not permitted on any flights operated by Alaska. Federal law also prohibits smoking in an airplane lavatory and tampering with, disabling, or destroying any smoke detector installed in any airplane lavatory. Federal law provides for a penalty of up to $2,000 for tampering with the smoke detector installed in the lavatory. Individuals are subject to FAA enforcement action and substantial monetary penalties for violation of this law and related regulations. By purchasing a Ticket or accepting transportation, the Passenger agrees to comply with Alaska's policy on smoking and use of other smokeless materials, as well as applicable federal law, and Alaska reserves the right to seek reimbursement from any Passenger whose failure to do so causes Alaska any loss, damage or expense.

# Rule 12. Special Services

Ver esta regla en español

A. Non-Ambulatory Persons who are unable to walk or move themselves or need the support of another person to walk or move, but who are otherwise capable of caring for themselves without assistance throughout a flight are considered Non-Ambulatory. Non-Ambulatory Passengers and persons with impairments or physical disabilities which would cause them to require special attention or assistance from Alaska's personnel will be accepted for transportation without an attendant subject to the following conditions:

1. The Passenger must be able to occupy a cabin seat in an upright position. An Orthotic Positioning Device (OPD) may be used if it does not impede any other Passenger's access to the aisle and the seatbelt can be secured around the person.
2. Alaska will provide or make arrangements to assist Passengers in boarding and deplaning.
3. Any expense for services not required to be provided without charge by Alaska under 14 C.F.R. Part 382 will be borne by the Passenger.
4. Two Non-Ambulatory Passengers will not be seated across the aisle from each other in the same seating row and a non-ambulatory Passenger will not be seated in an emergency exit row due to FAA safety requirements.
5. If a Passenger uses a wheelchair for convenience, the Passenger is not considered to be Non-Ambulatory.
6. A Child or Infant is not considered to be Non-Ambulatory merely because of his/her age.

B. Qualified Individuals with a Disability. Alaska requires a Passenger, including a Qualified Individual with a Disability, to provide up to forty-eight (48) hours' advance notice and check-in one (1) hour before the check-in time for the general public for flights if such Passenger requests to receive any of the following service accommodations:

1. Transportation of an electric wheelchair on an aircraft with fewer than 60 seats;
2. Provision by Alaska of hazardous materials packaging for a battery for a wheelchair or other Assistive Device that requires such packaging;

3. Accommodation of a group of ten (10) or more Qualified Individuals with a Disability who make reservations and travel as a group;

4. Provision of an on-board wheelchair on an aircraft with more than 60 seats that does not have an accessible lavatory;

5. Use of a ventilator, respirator, Continuous Positive Airway Pressure (CPAP) machine, or Passenger's own Portable Oxygen Concentrator (POC).

6. For information on transportation of a Service Animal, please refer to Rule 14 and www.alaskaair.com.

C. When a Travel Assistant is Required. If Alaska determines that an assistant is essential for safety, Alaska may require that a Passenger, including a Qualified Individual with a Disability, meeting any of the following criteria, travel with an assistant as a condition of being provided Domestic Carriage and/or International Carriage:

1. A Passenger who, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from Alaska personnel, including the safety briefing required by 14 C.F.R. Sections 121.571(a)(3), (a)(4), and 135.117(b);

2. A Passenger with a mobility impairment so severe that the Passenger is unable to physically assist in his or her own evacuation of the aircraft; or

3. A Passenger who has both severe hearing and severe vision impairments if the Passenger cannot establish some means of communication with Alaska personnel adequate to permit the transmission of the required safety briefing.

If Alaska determines that a Passenger meeting these criteria must travel with an assistant, contrary to the Passenger's self-assessment that he/she is capable of traveling independently, Alaska will not charge for the transportation of the assistant. For Passengers traveling to/from Canada, Alaska will accept a disabled Passenger's determination of his/her self-reliance, and Alaska will not provide a safety assistant.

Alaska flight attendants and other crew members cannot provide medical services to Passengers nor assist Passengers with actual eating or within the lavatory.

D. Passenger-Provided POCs. POCs approved by the FAA may be carried and used on board flights operated by Alaska, at no charge, in accordance with FAA requirements. Passengers utilizing POCs are required to provide Alaska a minimum forty-eight (48) hours advance notice and check-in one hour before the check-in time for the general public for Domestic Carriage and International Carriage and must also meet the following conditions:

1. FAA-approved and Alaska-accepted POCs may be used onboard an Alaska aircraft. Passengers are referred to alaskaair.com and 14 C.F.R. Part 121, SFAR No. 106 for details regarding Carriage of POCs and a list of POCs that are approved for use on aircraft;

2. Non-FAA-approved POC brands and models that do not contain compressed or liquid oxygen may be carried in the cabin if they meet Alaska's Carry-On Baggage size and weight requirements. Alternatively, they may be transported as Checked Baggage. Alaska may accept other brands and models for use on board in the future as they become approved by the FAA and Alaska.

3. Passengers must satisfy specific requirements prior to boarding the aircraft. The Passenger must:
   a. provide advance notice in the reservation record that he/she is planning to use a POC on board the flight;
   b. ensure that he/she has sufficient batteries to power the POC for the duration of his/her flight plus



three (3) additional hours to allow for unanticipated delays and any ground Connection time when a POC is planned to be used. (Aircraft in-seat electrical power is not available for Passenger use with POCs).

    c. ensure that all extra batteries are properly protected from short circuiting by either:

        1. having recessed battery terminals or;

        2. packing the batteries so that they do not contact metal objects including the terminals of other batteries.

4. Failure to meet the requirements will result in denied use of the POC during travel. Passengers planning on traveling with POCs are responsible for advising Alaska as soon as reservations are confirmed, regardless of whether the reservations were made through a travel agent, on the internet or directly with Alaska, in order to confirm specific requirements and to provide Alaska with required information.

5. When travelling on or connecting to or from any flight other than Alaska (including flights operated by Horizon or SkyWest on behalf of Alaska Airlines), the Passenger is responsible for notifying and making independent arrangements directly with the other Carrier.

6. POCs are Assistive Devices for Passengers with disabilities. As such, they do not count toward Carry-On Baggage or Checked Baggage limits, whether or not they are used on board. They must be able to fit underneath the seat or in an overhead storage compartment. A Passenger using a POC may not sit in an exit row or bulkhead seat.

7. Alaska is not liable for POC equipment failures, failure of the batteries that power the POC, or any other losses or damages alleged by the Passenger or any other person arising out of the use or possession of the POC, unless caused by the gross negligence or willful misconduct of Alaska.

# Rule 13. Acceptance of Children

Ver esta regla en español

A. Unaccompanied Minors: Alaska considers children ages 12 and under who are traveling without a parent, guardian, or other responsible Adult age 18 or older to be Unaccompanied Minors and subject to the policies described below. Children ages 13 years old through 17 years old are not subject to the policies and fees applicable to Unaccompanied Minors when traveling on Alaska unless they are connecting to another Carrier that uses different age thresholds to define Unaccompanied Minors. When two or more Unaccompanied Minors are traveling together, the most restrictive age requirement will apply.

    1. Children under the age of five (5) years will not be accepted under any conditions without an accompanying Adult Passenger on the same flight and in the same class of service. Alaska does not accept Infants in incubation.

    2. Children ages five (5), six (6), or seven (7) years old may travel as Unaccompanied Minors on Alaska (including flights operated by our regional carriers), but cannot be booked on flights involving transfers or Connections.

    3. Children ages eight (8) years old through twelve (12) years old may travel as Unaccompanied Minors on Alaska and may be booked on flights involving transfers or Connection only to Alaska (including flights operated by our regional partners), provided the Unaccompanied Minor holds a confirmed Ticket to a

point where he/she is to be met by their parent or responsible Adult upon deplaning.

*Alaska* Airlines reserves the right to limit the number of Unaccompanied Minors that may be transported on a Segment, whether for safety or administrative or other reasons.

B. Alaska offers Unaccompanied Minors the escorted services described below. Such escorted service is mandatory for Unaccompanied Minors ages five (5) to twelve (12) years of age and is optional for Unaccompanied Minors ages thirteen (13) to seventeen (17) years of age. Unaccompanied Minors must be brought to the departure airport by their parent, legal guardian or responsible Adult who must remain with their Unaccompanied Minor in the boarding area until the Unaccompanied Minor's flight has departed and is airborne and who must furnish Alaska with satisfactory evidence that the Unaccompanied Minor will be met by another parent or responsible Adult upon deplaning at his/her final destination. If the Unaccompanied Minor's itinerary involves a connecting flight, he/she must not be booked on the last connecting flight of the day to the destination, or a connecting flight departing between 2100 and 0500, unless it is the only flight of the day. The Unaccompanied Minor will not be accepted for transport if any flight on which the Unaccompanied Minor holds a reservation is expected to terminate short of or by-pass his/her destination or Connection point. Alaska reserves the right to require and charge the applicable service charge for Unaccompanied Minor service when an Unaccompanied Minor ages five (5) to twelve (12) years is traveling with a Passenger who is not at least eighteen (18) years old or parent or legal guardian.

C. Assisted Transfers

1. On-line Transfers: Alaska personnel will assist Unaccompanied Minors in connecting to/from other Alaska flights, including flights operated by regional partners, provided the scheduled period between ticketed flights is two hours or less. If the scheduled period between ticketed flights is more than two hours, the parent or legal guardian must pre-arrange to have the Unaccompanied Minor transferred by a responsible Adult.

2. Interline Transfer: Alaska will not transfer Unaccompanied Minors to/from flights on other Carriers, except for flights operated by our regional partners. The parent or legal guardian must pre-arrange to have the Unaccompanied Minor transferred by a responsible Adult for all other Carrier Connections.

D. A Guardian Contact Form provided by Alaska must be completed and signed by the parent or legal guardian of a Unaccompanied Minor under the age of 13, and must include the following information:

1. The name and phone number of the Adult who brings the Unaccompanied Minor to the origin airport; and

2. The name and phone number of the Adult who will meet the Unaccompanied Minor at each Stopover point and at the destination point. Note 1: Alaska has the right, but is not obligated, to require the parent, legal guardian, or responsible Adult meeting the Unaccompanied Minor at his/her transfer point or final destination to present valid government-issued photo identification and sign a release form designated by Alaska. Note 2: Alaska does not assume any financial or guardianship responsibilities for Unaccompanied Minors.

E. Infants' Fares and Unaccompanied Minor Service Fees.

1. One Infant not occupying a seat may travel with a parent, or an Adult fare-paying Passenger who is at least 18 years old on Alaska and/or its regional partners. Taxes and airport fees of up to USD/CAD 75 may apply for international carriage. Note: This Rule applies to fare only and not to any other special charges. Each additional Infant accompanied by the same Passenger who is traveling with the first Infant

will be charged the same fare as the fare for an Adult Passenger traveling in the same class of service. Infants for whom a seat at the applicable Adult fare has not been purchased may not occupy a seat. Our Codeshare Partners may have their own rules, fares and service fees applicable to Infant travel.

2. Unaccompanied Minors.

1. Service fees for Unaccompanied Minors for air transportation (a) operated by Alaska and/or its regional partners within the U.S. or between the U.S. and points outside Canada and (b) operated by Codeshare Partners may be found on our web site at www.alaskaair.com.

2. Fees for air transportation operated by Alaska and/or its regional partners between the U.S. and Canada. Children age 2-12 years old, whether accompanied or unaccompanied, are required to purchase a Ticket and will be charged the same fare as for an Adult Passenger in the same class of service. Such children are required to occupy a seat and use a separate seat belt. Infants reaching their second birthday after outbound flights will be required to purchase a Ticket and occupy a seat for continuing/return flights only.

| Ages | Unaccompanied Minor Service | Fees | Flight Restrictions | Gate Escort & Guardian Contacts |
|------|------------------------------|------|---------------------|----------------------------------|
| 5-7 | Required | $50 USD/CAD each way per child non-stop/direct flights | No departures between 9 pm and 5 am. No connections. | Required |
| 8-12 | Required | $50 USD/CAD each way per child non-stop/direct flights<br><br>$75 USD//CAD each way per child for connecting flights. | No departures between 9 pm and 5 am. | Required |
| 13-17 | Optional | $50 USD/CAD each way per child non-stop/direct flights;<br><br>$75 USD//CAD each way per child for connecting flights if service is requested. | No departures between 9 pm and 5 am. | Required when using the Unaccompanied Minor Service |

3. Unaccompanied Minor Service fees are waived for children who have attained MVP®, MVP® Gold, or Gold 75K Mileage Plan™ status. Escorted service fees for Unaccompanied Minors are

**Alaska.**
AIRLINES

subject to change at Alaska's discretion. The fare for Unaccompanied Minors ages five (5) to seventeen (17) includes the applicable Adult fare in addition to the escorted service fee assessed.

4. For the purpose of this Rule, escorted services means that Alaska will provide reasonable supervision for the Unaccompanied Minor from the time of boarding until the Unaccompanied Minor is met at the Stopover point or final destination.

5. Proof of Infant's, Child's, or Minor's age may be requested at time of purchase, check in, and/or boarding. Either government-issued photo identification or another identification document acceptable to Alaska bearing the birth date of the Infant, Child, or Minor who is traveling on a fare must be presented to Alaska.

6. The age limits referred to in this Rule shall be those in effect on the date of commencement of Carriage.

7. Children unable to sit upright with a seat belt fastened must be carried in an approved Infant/Child restraint device, except for Infants not occupying a seat as provided for in section E.1 of this Rule.

8. Unless unoccupied seats are available on a flight, Alaska requires a reservation and purchase of a Ticket for Carriage of a child restraint device onboard the aircraft to ensure that a child restraint device may be used during flight. Only federally-approved child restraint devices are permitted for use aboard Alaska's aircraft and must be clearly marked with the original NHTSA label. Federal regulations prohibit the use of child booster seats and harness-or-vest-type restraining devices, unless such devices have been specifically approved by the FAA. Child restraint devices must be used in unoccupied aircraft seats and cannot be held in an Adult's lap or used in an emergency exit row. Such devices must remain properly secured to an aircraft seat at all times unless stored as Carry-On Baggage. Child restraint devices will be considered as items of Carry-On Baggage counting toward the Adult Passenger's Carry-On Baggage allowance, unless the Child has been ticketed and a seat reserved for use of the child restraint device.

# Rule 14. Acceptance of Service Animals

Ver esta regla en español

To extent required by U.S. Department of Transportation regulations (14 C.F.R. Part 382), which can be accessed at https://www.transportation.gov/airconsumer/disability-issues-updated-version-of-Part-382 and other laws and regulations as applicable to the Passenger on his/her date(s) of travel, Alaska accepts for transportation, without charge, a Service Animal accompanying a Passenger who is a Qualified Individual with a Disability and who requires a Service Animal to assist him/her by doing work or performing tasks for the benefit of that Passenger. If you wish to travel with a Service Animal, you must review and comply with the requirements set forth at www.alaskaair.com. Where a flight is operated by a Codeshare Partner, the Codeshare Partner's Contract of Carriage governs with respect to the transport of Service Animals. Where we make arrangements for transportation over the lines of any other Carrier on an Interline basis (whether or not such transportation is part of a through service), the Interline Carrier's Contract of Carriage governs, including with respect to the transport of Service Animals.

1. The Passenger assumes full responsibility for the safety, health, well-being, and conduct of his/her Service

Animal, including the interaction of the Service Animal with other Passengers and crew members who may contact with the Service Animal while on board the aircraft.

2. Passengers with Service Animals will not be seated in emergency exit rows. Service Animals may not obstruct an aisle or other area that must remain unobstructed in order to facilitate an emergency evacuation.

3. Alaska accepts for transportation, without charge, a properly harnessed dog trained in law enforcement, explosive detection, drug search, and search and rescue, or other specific functions, when accompanied by its handler on official business as authorized by an appropriate federal, state, or local government agency. Such official duty status must be documented in writing to the satisfaction of Alaska. The dog will be permitted to accompany its handler into the cabin, but not to occupy a seat. A Passenger traveling with such a dog must present a letter of mission and a copy of the dog's certification. Alaska retains the right, at its sole discretion, to refuse to transport any Animal that exhibits aggressive behavior or any characteristics that appear to Alaska to be incompatible with air travel at the airport, in the boarding gate area, or onboard the aircraft.

4. Local laws and regulations at the Passenger's final or intermediate destination(s) may apply and impose certain requirements or restrictions on the transport of Service Animals. Qualified Individuals with a Disability assume full responsibility for compliance with all governmental laws, regulations and requirements, including, but not limited to, health certificates, permits, and vaccinations required by the country, state or territory from and/or to which the Service Animal is being transported. Alaska is not liable for any assistance or information provided by Alaska or any employee or agent of Alaska to any Qualified Individual with a Disability relating to compliance with such laws and regulations. Subject to applicable laws and regulations, a Qualified Individual with a Disability is solely responsible for any expenses incurred or any consequences resulting from his or her failure to comply with applicable laws and regulations. Alaska expressly reserves the right to seek reimbursement from a Qualified Individual with a Disability for any loss, damage, or expense suffered or incurred by Alaska resulting from such Qualified Individual with a Disability's failure to comply with applicable laws and regulations.

5. (A) For International Carriage, a health certificate and other documentation may be required for Service Animals depending on the Passenger's country of destination. It is the Passenger's responsibility to ensure compliance with all such requirements. Alaska will not be responsible for any costs incurred should the Passenger not have obtained his/her animal's required health and vaccination requirements or other documentation for his/her destination. Failure to ensure that all proper steps have been taken and documentation provided may result in the Passenger's animal being placed in quarantine on arrival. Any costs related to the care of the Passenger's animal in quarantine, issued fines, and any fee associated with returning the animal to its origin will be the Passenger's responsibility.

(B) Hawaii. Service Animals must meet the State of Hawaii entry requirements in order to accompany a Passenger with a disability to/from Hawaii without quarantine. The only Service Animal permitted into Hawaii is a service dog. In addition to Alaska's general Service Animal policies, the Hawaii Department of Agriculture requires the owners of service dogs to present appropriate health documentation. The only pets or other animals permitted into Hawaii is a cat or dog. Owners must follow the standard cat or dog pet entry requirements. Animals that do not fall into the State of Hawaii Department of Agriculture definitions of a guide or Service Animal must travel as a pet in cabin or animal in the cargo hold provided the animal meets the State of Hawaii pet entry requirements. Service Animals or other animals arriving without proper documentation may be quarantined for up to 120 days in Honolulu at the owner's expense. Alaska is not responsible for any

costs incurred should the Passenger arrive in Hawaii without the proper health documentation.



# Rule 15. Acceptance of Baggage

Ver esta regla en español

A. Application to both Domestic and International Carriage. Except where otherwise stated, all terms of this Rule 15 apply to Domestic Carriage and International Carriage.

B. General Conditions of Baggage Acceptance. Passengers may check Baggage for Carriage in the cargo compartment of the aircraft and/or may carry Baggage on board the aircraft subject to the provisions in this Rule. Alaska will accept for transportation as Baggage such personal property as is necessary or appropriate for the wear, use, comfort, or convenience of the Passenger for the purpose of their trip, subject to the following conditions:

1. All Baggage is subject to monitoring and inspection by Alaska and/or authorized government agencies with or without the Passenger's consent or knowledge; however, Alaska shall not be obligated to perform monitoring and inspection. Alaska may refuse to transport on any flight or may remove at any point Baggage that the Passenger refuses to submit for inspection.

2. Alaska may refuse to transport Baggage on any flight other than the one carrying the Passenger. Checked Baggage will generally be carried on the same aircraft as the Passenger unless such carriage is deemed impractical by Alaska, in which event Alaska will make arrangements to transport the Baggage on the next flight on which space is available. Alaska may also refuse to accept property (except for Assistive Devices) for transportation whose size, weight, contents, type of packaging or character renders it unsuitable for transportation on the particular aircraft which is to transport it; which cannot be accommodated without harming or annoying Passengers; or which is not suitably or adequately packaged to withstand ordinary handling.

3. Each piece of Checked Baggage tendered to Alaska must have a current identification tag or label with the Passenger's name, address, and telephone number. It is the Passenger's responsibility to attach proper identification to Baggage, and Alaska is not liable for a Passenger's failure to do so. It is also the Passenger's responsibility to claim the Checked Baggage at the Baggage claim area, and Alaska assumes no obligation to verify the identity of the owner of the Baggage at the destination airport.

4. Alaska will not accept Baggage that, because of its nature, contents, or characteristics (e.g., sharp objects, paint, corrosives, or other prohibited hazardous materials), might cause injury to Passengers or Alaska, damage to aircraft or other equipment, or damage to other Baggage.

5. Alaska will not accept Baggage that it determines cannot safely be carried in the Baggage compartment of the aircraft for any reason.

6. Alaska will not accept, store or hold Baggage from a Passenger on the day of travel at Alaska's airport Ticket counter or curbside check-in locations (where available) if tendered to Alaska earlier than four (4) hours in advance of flight departure time.

C. Checked and Carry-On Baggage. The suitability of Baggage, as to weight, size, contents, or character, and place of storage of Baggage to be carried in the Passenger compartment of the aircraft will be determined solely by Alaska. Alaska reserves the right to check a Passenger's Carry-on Baggage for any reason, including

if the Carry-on Baggage cannot be safely stowed. Alaska will check Baggage, acceptable under Alaska's rules, tendered by a Passenger holding a valid Ticket for transportation on Alaska, or over the lines of Alaska and one or more other Carriers, subject to payment of the applicable fee (see below) and the following conditions:

1. Minimum Times for Checked Baggage: Alaska may refuse to accept any article of Checked Baggage that has not been presented, checked in, and processed at least forty (40) minutes prior to scheduled departure time. Baggage checked in less than forty (40) minutes prior to a flight's scheduled departure time may be accepted and Alaska will make reasonable efforts, but cannot guarantee, to transport such Baggage on the Passenger's flight(s). Alaska will not assume responsibility for delivery charges if such Baggage arrives at the Passenger's destination on a subsequent flight. Baggage for International Carriage will not be accepted if presented to Alaska and processed with less than sixty (60) minutes prior to scheduled departure.

   Exception 1: The following cities must have Checked Baggage presented, checked in, and processed at least forty-five (45) minutes prior to departure.

   - Atlanta, GA
   - Denver, CO
   - Las Vegas, NV
   - Philadelphia, PA
   - Salt Lake City, UT

   Exception 2: Checked baggage for customers departing King Salmon and Dillingham must be presented and processed at least sixty (60) minutes prior to departure.

   Exception 3: The following cities must have Checked Baggage presented, checked in, and processed at least ninety (90) minutes prior to departure.

   - Guadalajara, Jalisco (Mexico)

   Additional passenger and baggage check-in requirements may apply on flights operated by Alaska's Codeshare Partners. These requirements may be found in the Codeshare Partners' contracts of carriage, which are available on those Carriers' websites.

   Note: The time limits provided by Alaska in this Rule are minimum time requirements. Due to federal security screening measures in place at airports, Passenger and Baggage processing time may differ from airport to airport.

2. Alaska will accept Checked Baggage up to four (4) hours prior to scheduled departure time. Exception: Ticket counters which open less than four (4) hours prior to departure will accept bags when the Ticket counter opens.

3. The Passenger's name, address, and telephone number must appear on the Baggage. Alaska will supply free Baggage identification labels.

4. Alaska will issue (for identification purposes only) a Baggage Claim Tag for each piece of Baggage so delivered and covered by the Baggage Check. All Checked Baggage must be properly packed in suitcases or similar containers in order to ensure safe Carriage with ordinary care in handling.

5. Baggage will not be checked:

a. To a point that is not on the Passenger's routing

b. Beyond the Passenger's next point of Stopover or, if there is no Stopover, beyond the final destination designated on the Ticket.

c. Beyond a point at which the Passenger wants to reclaim the Baggage or any portion thereof.

d. Beyond the point to which all applicable charges have been paid.

e. Beyond a point at which the Passenger is to transfer to a connecting flight, if that flight is scheduled to depart from an airport different from the one at which the Passenger is scheduled to arrive.

6. Live Animals will not be checked beyond a point of transfer to another Carrier, except on flights operated by one of our regional partners.

7. When Baggage is carried on board the aircraft, it must be stored under a seat or in an overhead compartment. The suitability of Baggage as to weight, size, contents, and character will be solely determined by Alaska.

D. Free Carry-On Baggage Allowance. Alaska will transport a fare-paying Passenger's Carry-On Baggage between points on its lines for which a valid Ticket is presented without charge, subject to the following:

1. Each ticketed Passenger is allowed one Carry-On Bag and one small personal item.

a. The Carry-On Bag dimensions must not exceed 9" in height by 14" in width by 22" in length.

b. Small personal items include items such as purses, briefcases, laptop computer cases, small musical instruments, small cameras, pet kennels and diaper bags.

c. To qualify as Carry-On Baggage or as a small personal item, a Passenger's small musical instrument must be able to be stowed safely in the overhead compartment in the aircraft cabin or under the Passenger's seat, in accordance with the requirements for Carriage of Carry-On Baggage established by the FAA, and there must be space for such stowage at the time the Passenger boards the aircraft. If a musical instrument is too large to stow safely in the overhead compartment in the aircraft cabin or under the Passenger's seat or such stowage space is unavailable at the time the Passenger boards the aircraft, the musical instrument must be carried onboard the aircraft as Cabin-Seat Baggage subject to the terms and conditions set forth in Section 15.K below or as Checked Baggage subject to the terms and conditions set forth in Sections 15.E, F and H below.

d. Carry-On Baggage and small personal items must be capable of being carried onboard the aircraft by one Passenger without additional assistance (except for a Qualified Individual with a Disability requiring assistance due to their disability) and must be capable of being stowed under a seat or in an overhead compartment.

2. Items exceeding the free allowance (see exceptions below) will be charged as indicated in Section 15.F and tagged for delivery to Baggage claim at the Passenger's destination.

3. All items brought onboard count toward the Carry-On Baggage and small personal item piece limit except the following:

a. Coats, hats, or umbrellas;

b. Reasonable amount of reading material;

c. Infant/Child safety seats, baby carrier backpack, strollers (based on space availability; space



guaranteed only with the purchase of a Ticket for the Infant);

Mobility Medical Assistive Devices, such as wheelchairs, canes, crutches, continuous positive airway pressure (CPAP) machines, POC, etc.;

e. Service Animals;

f. Food for immediate consumption; and

g. A pillow for personal use.

4. The following items count as the "one" free Carry-On Bag and may exceed the Carry-On Baggage dimensions as long as they can be safely accommodated in a proper stowage compartment in the cabin of the aircraft:

a. Human organs;

b. Art/Advertising portfolios;

c. Paintings;

d. Delicate scientific equipment;

e. Fishing poles; or

f. Duty Free Items.

5. Alaska reserves the right to further restrict the number of Carry-On Bags and small personal items carried onboard its flights.

E. Checked Baggage Charges. Baggage exceeding the free Carry-On Baggage allowance shall be checked and will be accepted for transportation (subject to aircraft load conditions) only upon payment of the following charges. Charges are assessed to the destination or first Stopover of twelve (12) hours or more. Checked Baggage charges must be paid again by Passengers who continue their journey and check bags after a Stopover of twelve (12) hours or more. If a piece of Checked Baggage falls into more than one charge category (e.g. Checked Baggage, overweight and/or oversize), only the greater of the charges shall apply. Due to limited aircraft size, limited cargo hold capacity and restricted gross take-off weights, excess, oversized and/or overweight Baggage presented or transferred at departure time without a prearranged reservation for space may travel on a space-available basis.

F. When Alaska Airlines' Baggage policy applies (see 15.R below), the applicable rules and fees can be found on www.alaskaair.com, provided that the following rules and fees are in effect for air transportation operated by Alaska and/or its regional partners between the U.S. and Canada:

1. Checked Baggage Charges

| Checked Baggage Piece | |
|---|---|
| 1st | $30 USD/CAD |
| 2nd | $40 USD/CAD |
| 3rd | $100 USD/CAD |
| 4th plus | $100 USD/CAD each |

**Exception 1:** Charges for MVP Gold 75k level Mileage Plan/**one**world Emerald members.



Exception 2: Charges for MVP and MVP Gold Level Mileage Plan/oneworld Ruby and Sapphire members, Club 49 members, and Passengers confirmed in first class at the time of check-in/Baggage acceptance.

### Checked Baggage Piece

| | |
|---|---|
| 1st | Free |
| 2nd | Free |
| 3rd | $100 USD/CAD each |
| 4th plus | $100 USD/CAD each |

Note: Club 49 Members must be traveling on a Ticket that contains at least one Alaskan city in the itinerary, and have their Alaska Airlines Mileage Plan number in the reservation to qualify for the Baggage exception.

Exception 3: Charges for active duty U.S. military Passengers or military recruit Passengers (with active duty U.S. military ID), and dependents of active duty U.S. military Passengers or military recruit Passengers (with active duty U.S. military ID and travel orders).

 **Checked Baggage Piece**



$100 USD/CAD each

**Exception 4:** Charges for MVP Gold 75k level Mileage Plan/oneworld Emerald members whose entire Ticket and itinerary are wholly within the state of Alaska.

**Exception 5:** Passengers whose entire Ticket and itinerary are wholly within the state of Alaska.

**Checked Baggage Piece**

| | |
|---|---|
| 1st | Free |
| 2nd | Free |
| 3rd | Free |
| 4th plus | $100 USD/CAD each |

**Exception 6:** Car seats, baby carrier backpacks, strollers, and Assistive Devices may be checked without incurring a Baggage service charge. Passengers departing Honolulu, Kona, Maui, and Lihue are allowed to check one box of pineapples without charge on domestic itineraries. The box must be inspected by the U.S. Department of Agriculture prior to check-in.

2. Overweight Charge - Checked Baggage (including Baggage accepted free of charge) may not exceed 50 pounds without incurring an overweight charge.
    a. For reservations ticketed on or before December 4, 2018, each piece over 50 pounds, the charge shall be $75.00 USD/CAD.
    b. For reservations ticketed on or after December 4, 2018 each piece over 50 pounds, the charge

shall be $100.00 USD/CAD.



Exception: Active duty U.S. military Passengers and military recruit Passengers and their dependents eligible for the U.S. military Baggage charge waiver may check bags which weigh 70 pounds or less without incurring an overweight fee. Bags weighing 71-100 pounds shall follow the standard overweight charge noted above.

3. Oversized Charge - Checked Baggage may not exceed 62 inches without incurring an oversize charge.
    a. For reservations ticketed on or before December 4, 2018 each piece over 62 inches in length, the charge shall be $75.00 USD/CAD.
    b. For reservations ticketed on or after December 5, 2018 each piece over 62 inches in length, the charge shall be $100.00 USD/CAD.

Exception: Active duty U.S. military Passengers and military recruit Passengers and their dependents eligible for the U.S. military Baggage charge waiver may check bags up to 115 linear inches without incurring an oversize charge.

Exception: Some sporting equipment may be accepted above the free standard weight or size dimensions without incurring overweight or oversize fees. Refer to the Sporting Equipment section below for additional information.

4. Excess, oversize and/or overweight Baggage may not be accepted on certain flights as solely determined by Alaska.
5. Alaska may, at its sole discretion, change, consider and make exceptions to its Baggage Allowance policy (e.g., to the number, size, weight, type, and/or applicable service charges) for certain Mileage Plan members, active duty U.S. military Passengers, and/or other Passengers depending on the fare class purchased or cities flown.

G. Conditions and Charges for Acceptance of Live Animals Other Than Service Animals Alaska will accept domesticated cats, dogs, ferrets, guinea pigs, hamsters, household birds, non-poisonous reptiles, potbellied pigs, rabbits, and tropical fish for transportation at Alaska's discretion, and subject to the conditions below:

1. Passengers seeking Carriage for a live animal other than a Service Animal must review and comply with Alaska's pet policy, available at https://www.alaskaair.com/content/travel-info/policies/pets-traveling-with-pets
2. Alaska reserves the right to refuse Carriage of animals in cabin or as cargo at any time.
3. Dogs and cats must comply with Alaska's minimum age limits for animal transport as set forth in Alaska's pet policy.
4. Alaska Airlines reserves the right to require a health certificate for animals being checked as Baggage. It is the Passenger's responsibility to ensure all animal entry requirements are met. Alaska Airlines will not be responsible for any costs incurred should the Passenger not meet their animal's health and vaccination requirements for their destination.
5. Muzzled, pregnant, injured or ill animals will not be accepted for Carriage.
6. Animals will be accepted for Carriage on Alaska flights or flights operated by Horizon or SkyWest on

behalf of Alaska Airlines. Passengers connecting to another Carrier must collect the animal from Alaska at the Connection city and recheck the animal with the other Carrier. If there is more than a 4-hour Connection for an animal in the cargo hold (AVIH), the animal must be short checked from point to point. Passengers have the option to check their animal point-to-point with a 2-hour Connection.

7. Advance arrangements must be made. Space must be reserved for animals in either the Passenger or cargo compartment. Animals without reserved space will be accepted, if space is available, only after the animals for whom space has been reserved have been accommodated. The pet fare listed in Section 14 below must be collected prior to flight, is nonrefundable, and may not be applied toward future travel if unused. Passengers traveling with an animal must check the animal in at the airport Ticket counter before proceeding to the departure gate.

8. The animals must be healthy, harmless, inoffensive, odorless, and require no attention during transit. If the pet becomes ill during the flight, oxygen or other first aid procedures will not be administered. In the event of an emergency, an oxygen mask will not be available for the pet. Alaska assumes no liability for the health or wellbeing of carry-on animals. Alaska retains the right, at its sole discretion, to refuse to transport any animal that exhibits aggressive behavior or any characteristics that appear to Alaska to be incompatible with air travel at the airport, in the boarding gate area, or onboard the aircraft. In the event the animal becomes offensive or causes a disturbance during transit, the animal may be removed, at the captain's discretion, at the first stop and placed on an alternative Carrier or carried as cargo by Alaska at the Passenger's expense.

9. The Animal must be confined in a cage or container subject to inspection and approval by Alaska before acceptance and in conformance with 9 C.F.R. or IATA live animal regulations.

10. Environmental conditions must pose no hazard to the safety or comfort of the animal.

11. The Passenger must make all arrangements and assume full responsibility for complying with all applicable laws, customs, and/or other governmental regulations, requirements, or restrictions of the country, state, or territory to which the animal is being transported, including furnishing a valid health and rabies vaccination certificate when required. Alaska will not be liable for loss or expense due to the Passenger's failure to comply with this provision, and Alaska will not be responsible if any pet is refused passage into or through any country, state, or territory.

12. Animals will be transported in either the Passenger or the belly cargo compartment. However, if transported in the Passenger compartment, animals will also be subject to the additional conditions and charges specified below. Alaska reserves the right to limit the number of cages or containers per flight.

   a. Carriage of animals is limited to one cage or container in the first class Passenger compartment and a maximum of five cages or containers in the coach compartment. Only one pet cage or container is allowed per Passenger. The cage or container may contain up to two animals of the same species. Unaccompanied Minors may not travel with an animal. Animals will be accepted on a first-come, first-served basis.

   b. The cage or container must be stored under the seat directly in front of the Passenger's seat at all times, and the animal must remain in the cage or container (including head and tail) while in the gate area, during boarding and deplaning, and on board the aircraft at all times. Passengers traveling with an animal will not be permitted to be seated in a row immediately behind a bulkhead with no forward under-seat stowage, or adjacent to an emergency exit. Maximum cage



or hard-sided container size is 17 in. by 11 in. by 7 1/2 in. Maximum soft-sided container size is 17 in. by 11 in. by 9.5 in. The cage or container must be leak-proof and well-ventilated, and the pet must be able to stand up and move around the cage or container with ease. Containers made totally of wire are not accepted. The cage or container must be small enough to fit under the seat in front of the Passenger and must remain stowed under the seat in front of the Passenger during the entire duration of the flight. Passengers are responsible for ensuring that the containers meet all governmental requirements for the safe and humane transportation of the animal being transported.

    c. The only animals permitted in the Passenger compartment are: domesticated cats and dogs.

    d. Brachycephalic (short-nosed) dogs and cats are subject to respiratory problems resulting from air travel, stress, and warmer temperatures. The following breeds of brachycephalic dogs and cats (or any mix thereof), are not accepted for transport as Checked Baggage:

Dogs: Boston Terrier, Boxer (All Breeds), Bull Dog (All Breeds), Bull Terrier, Brussels Griffon, Chow Chow, English Toy Spaniel, Japanese Spaniel/Japanese Chin, Mastiff (All Breeds), Pekingese, Pit Bull (All Breeds), Pug (All Breeds), Shih Tzu, Staffordshire Terrier.

Cats: Burmese, Exotic Shorthair, Himalayan, Persian

13. Certain unusual animals/reptiles pose unavoidable safety and/or public health concerns and Alaska will not accept dogs of the Pit Bull breed (unless Service Animal), snakes, other reptiles, ferrets, rodents and spiders as in-cabin Carry-On Baggage. Carriage of any other animals as in-cabin Carry-On Baggage will be at Alaska's discretion.

14. Alaska will not be liable for illness or injury to an animal or death of an animal due to illness or injury when the animal has been handled by Alaska with ordinary standards of safety and care or when Alaska has acted in the interests of the entire flight such as in an emergency or a Force Majeure Event.

15. Charge for Live Animal Transportation – All occupied pet cages or containers are subject to the applicable pet fare. For each live animal transported by Alaska or its regional partners, applicable pet fares may be found on our web site at www.alaskaair.com, provided that, for travel between the U.S. and Canada, the charge shall be as follows:

| Pet and Carrier Combined Weight | Pet in Cabin | Pet in Baggage |
| --- | --- | --- |
| Up to 150 lbs | $100.00 USD/CAD each way | $100.00 USD/CAD each way |
| 151 lbs or more | Contact Cargo for Pricing | Contact Cargo for Pricing |

For policies and information about live animal transportation (or pet fares) on flights operated by a Codeshare Partner, please visit the Codeshare Partner's website, including its contract of carriage.

16. The charges outlined are applicable for all Passengers, including those whose Checked Baggage charges are waived.

17. If the animal is not called for within 6 hours after flight arrival, the animal will be placed in a local kennel at the Passenger's expense. An animal that is unclaimed by its owner or its owner's agent for a period of more than ten (10) days after the scheduled Carriage has occurred or was to occur, shall be deemed

abandoned and may be turned over to a local animal shelter or pound or otherwise handled as Alaska may deem proper without any liability to Alaska. Any costs associated with reuniting an animal deemed abandoned with its owner or owner's agent shall be borne solely by the owner or owner's agent.

18. Hawaii Exceptions:

    a. Dogs and cats are the only animals accepted to/from Hawaii.

    b. Interline transfers are not permitted to Hawaii. Cats and dogs are only allowed to be transported to Honolulu Airport, unless a Passenger has a valid Neighbor Island Inspection permit for direct release at Kona, Lihue, and Kahului airports.

H. Conditions and Charges for Acceptance of Special Items. The following special items or types of items will be accepted as Baggage subject to the conditions shown. Charges are applicable from the point at which the item is accepted to the point to which the item is transported.

1. Animals, Live. *See* Paragraph G of this Rule.

2. Bassinets and Infant Carrying Seats: Bassinets are not accepted. Infant carrying seats approved by the U.S. DOT or comparable foreign agency are accepted free of charge. If the parent desires a confirmed seat for an Infant with carrying seat, a Ticket must be purchased. Use of the carrying seat onboard is on a space available basis and is contingent upon the adjacent seat being unoccupied.

3. Bicycles - see Sporting Equipment below.

4. Bowling - see Sporting Equipment below.

5. Firearms - Firearms and ammunition will be accepted as Checked Baggage only. See also Sporting Equipment below.

6. Fragile, Bulky or Perishable Items

    a. Upon request and subject to operational needs or space availability, a fragile and/or bulky item will be carried as Cabin-Seat Baggage subject to the provisions of Section 15.K below).

    b. Fragile and/or perishable items (for examples, see Paragraph d below) will be accepted as Checked Baggage in accordance with this Rule only if they are appropriately packaged in an original factory-sealed carton, cardboard mailing tube, or container or case designed for shipping such items or packed with protective internal material. Fragile, perishable or inappropriately packaged articles may be accepted from time-to-time. In such cases, Alaska is not responsible or liable for loss or damage of contents or delay in delivery resulting in damage or loss of the checked baggage where such loss or damage results solely from the inherent defect, quality or vice of the baggage or is due to fair wear and tear resulting from ordinary handling of baggage.

    c. Alaska is not liable for damage to a Passenger's Carry-On Baggage or other in-cabin property that contains fragile or perishable items when such damage is caused by the fragile or perishable items. Passengers are responsible for all damage caused by their property, whether such damage is to their own property or to someone else's property.

    d. The classes of items listed below are deemed to be fragile or perishable or otherwise unsuitable as Checked Baggage and are subject to the conditions of acceptance set forth in paragraph b above.

        1. Artistic items: Paintings; drawings; pictures; sculpture; plastics; plaster of paris molds and casts; antique items; ornamental or decorator items such as vases, figurines, trophies, display models, souvenirs, heirlooms, and other art objects, and curios.

        2. Chinaware/Ceramics/Pottery (see also glass) chinaware, pottery, ornamental and other



articles made of baked clay, earthenware, porcelain, ivory, marble, alabaster, or other similar material, including ceramics, pots, bowls, dishes, glasses, crockery, ornaments, and decorator and other items.

3. Dry ice. A maximum of 5.5 pounds (2.5 kilograms) of dry ice per Passenger will be accepted for carriage as Checked Baggage or Carry-On Baggage provided the Baggage is properly designed to permit the release of carbon dioxide, and the container is labeled, "DRY ICE" or "CARBON DIOXIDE SOLID." The packaging must also show the net weight and identify the perishable item being preserved by the dry ice. Each container cannot have more than the maximum allowed per customer. Multiple Passengers cannot pool their portions together, even within the same traveling party.

4. Electronic and Mechanical Items: Electrical and mechanical items for business or home use, including but not limited to computers and related components, tablets, software, cellular and smart phones, pagers, fax machines, photocopiers, scanners, calculators, typewriters, dictation equipment, sewing machines, water picks, coffee pots, toasters, televisions, radios (including citizen band), stereos, recorders, amplifiers, speakers, headphones, compact disc players, compact discs, video tapes, video games, video cartridges, records, audio tapes, and turntables.

5. Garment Bags: Garment bags (and contents thereof) that are made of paper or vinyl material designed for carrying and not for shipping and garment bags (and contents thereof) that contain articles other than garments.

6. Glass (see also chinaware/ceramics/pottery): Glassware, crystal, lamps, mirrors, bottles, and other glass containers and any liquids contained therein, telescopes, binoculars, barometers and eyeglasses and contact lenses that are not in their hard cases.

7. Household articles: Lamps, lamp shades, furniture and picture frames.

8. Liquids.

9. Liquor cartons: Alcoholic beverages in retail packaging may be checked as Baggage subject to the following conditions: (a) For alcoholic beverages less than 24 percent alcohol by volume (including most wines and beers) there are no restrictions on the amount that may be accepted in Checked Baggage or purchased after completing security screening at the checkpoint (Duty Free). If traveling internationally, alcoholic beverages may be subject to customs limits in the arrival country; (b) For alcoholic beverages between 24 and 70 percent alcohol by volume, there is a limit of 5 liters (1.3 gallons) per Passenger that may be accepted in Checked Baggage, or that may be purchased after completing security screening at the checkpoint (Duty Free). Packaging must be in receptacles smaller than 5 liters. Alcoholic beverages more than 70 percent alcohol by volume will not be accepted; (c) All alcoholic beverages must be packed to prevent leakage and damage to other Baggage. Alaska shall not be liable for breakage or spillage of alcoholic beverages. Normal Checked Baggage allowance limits, excess charges and Carry-On Baggage limits apply; (d) Up to 3 oz. (100ml) of an alcoholic beverage may be taken through the security checkpoint provided it is less than 70 percent alcohol by volume, in a container that is 3 oz. or smaller, and is carried in a plastic zip-top bag; (e) Alcohol transported on an airplane cannot be



consumed on board.

10. Musical Instruments and Equipment: Guitars, violins and other stringed instruments, organs, horns, percussion, wind and brass instruments, amplifiers or speakers in conjunction with electronic instruments may be carried as Checked Baggage or as Cabin-Seat Baggage (subject to the provisions in section 15.K below). As part of a Passenger's one piece of Carry-On Baggage plus one personal item allowance and subject to Alaska's Carry-On Baggage conditions specified in section 15.D above, a small musical instrument such as a violin or a guitar can be carried in lieu of Carry-On Baggage if it can be stowed safely in an overhead bin or under a Passenger seat and there is space for its stowage at the time the Passenger boards the aircraft. If the musical instrument appears too large or irregularly shaped to fit under the seat or in the overhead compartment, or, if at the time the Passenger boards the aircraft, there is no space to stow it, it will not be accepted for in-cabin stowage except as Cabin-Seat Baggage in accordance with Section 15K below. All musical instruments, whether as Carry-On Baggage or Checked Baggage, should be in a hard sided case, and stringed instruments should have the strings loosened to protect the neck from damage due to expansion and contraction which result from temperature variations. Checked instruments cannot exceed 165 pounds and 150 linear inches (or the applicable weight/size restriction for the aircraft) and will be included in determining the Baggage allowance, and when in excess (over 2 checked items), overweight or oversize, will be subject to the excess, oversize, and overweight Baggage charge. Except for certain International Carriage subject to the terms of the Montreal Convention or Warsaw Convention, whichever may apply, Alaska is not liable for damage to musical instruments or musical instrument cases.

11. Paper: Advertising displays, business documents, models, sketches, blueprints, maps, mechanical drawings, charts, historical documents and photographs.

12. Perishable Items: Floral and nursery stock such as flower, fruit, and vegetable plants, cut flowers and foliage, floral displays, and bulbs, foodstuffs (fresh and frozen) such as fruits, vegetables, meat, fish, cheese, poultry, bakery, dairy products, medicines, plants and foliage such as branches and blossoms of flowers, spices, fruits, and vegetables.

13. Photographic/Cinematographic and Precision Equipment: Cameras, disposable cameras, photoflash equipment, photometers, spectroscopes, phototubes or other devices using sensitive tubes or plates, projectors, lenses, film, flash bulbs, microscopes, oscilloscopes, sensitive medical instruments, prostheses (other than mobility aids); dental, orthodontic, and orthotic devices, watches, and clocks and other sensitive calibrated tools and equipment.

14. Recreational and Sporting Goods: Backpacks, sleeping bags, knapsacks, (and contents thereof) made of cloth, plastic, vinyl, or other easily torn material and those that have aluminum frames, outside pockets, straps, buckles, and other protruding parts, tennis racquets, bicycles, fishing rods, skis, snowboards, boogie boards, water-skis, windsurfing equipment, firearms, sculls, surfboards, scuba-diving gear.

15. Toys: Dolls, games, dollhouses, and models.



16. Miscellaneous: Attached Articles: articles that are retied, taped, wired, or strapped to the exterior of any piece of Checked Baggage, including luggage straps. Boxes/Sacks/Bags: boxes, sacks, and bags (and contents thereof) that do not have sufficient durability, a secure closure, or provide sufficient protection from damage to the container and its contents. Brittle Items. Over-packed Baggage. Uncrated/Unprotected/Unsuitable Items: Infant strollers, baby carrier backpack, car seats, umbrellas, bag carts, and other items whose shape, material, or characteristics render them susceptible to damage. Footlockers: Footlockers of thin fiberboard base construction, metal clad with edges metal trimmed.

17. Wet Ice: Alaska will not accept wet ice or items containing wet ice as Checked Baggage or Carry-On Baggage.

e. Release Advisory: Where Passengers elect to transport fragile items without appropriate packaging, Alaska will not be liable for damage to such items in Checked Baggage, where damage results solely from the unsuitability of such items as Checked Baggage and/or the inherent defect, quality or vice of the Checked Baggage, except for certain International Carriage of such fragile items subject to the terms of the Montreal Convention or Warsaw Convention, whichever may apply. Nor will Alaska be liable for spoilage or substantial loss of value or potency which results from delay in delivery of Checked Baggage when such spoilage results solely from the unsuitability of such items as Checked Baggage and/or the inherent defect, quality or vice of the Checked Baggage, except for certain International Carriage of such items subject to the terms of the Montreal Convention or Warsaw Convention, whichever may apply.

7. Other Checked Baggage Items - The items listed below will be accepted as Baggage by Alaska in accordance with the following specified provisions.

a. Government-approved Child/Infant seat - A government-approved Child/Infant seat that conforms to all applicable Federal Motor Vehicle standards and approved in accordance with 14 C.F.R. Section 121.311, including car seats approved for airline travel, will be accepted in addition to a Passenger's Baggage allowance. When checked as Baggage, all oversize and overweight charges will apply. First and second bag charges do not apply. A government-approved Child/Infant seat for use in the Passenger compartment is permitted only when an additional seat is reserved for the Infant, a Ticket is purchased, and the seat can be secured properly by a seat belt. The accompanying Adult Passenger is responsible for ensuring that the seat functions correctly, that the Infant does not exceed the seat's limitations, that the Infant is properly secured in the seat and that the seat is secured to the aircraft seat. Except for certain International Carriage subject to the terms of the Montreal Convention or Warsaw Convention, whichever may apply, Alaska is not liable for damage to Child/Infant seats when carried as Checked Baggage.

b. Strollers – Alaska accepts one collapsible stroller in addition to a Passenger's Baggage allowance. One non-collapsible stroller may be carried as Checked Baggage in lieu of one piece of Baggage (62 inches Maximum Outside Linear Dimensions). This item will be included in determining the Baggage allowance, and when in excess, overweight or oversize, such item will be subject to the excess Baggage charge. Except for certain International Carriage subject to the terms of the Montreal Convention or Warsaw Convention, whichever may apply, Alaska is not liable for damage to strollers when carried as Checked Baggage. Excess valuation may not be purchased

for strollers.

Wheelchairs - One wheelchair per Passenger will be accepted as Baggage by Alaska at no extra charge in addition to the Passenger's Baggage allowance. Excess and/or oversize/overweight Baggage charges pursuant to this Rule 15 may apply for checking in additional wheelchair(s) that are used for recreational purposes. In-cabin stowage of a wheelchair shall be in accordance with 14 C.F.R., Part 382, Subpart I. If no in-cabin storage space is available, the wheelchair will be carried in the cargo compartment of the aircraft. All types of wheelchairs will be accepted (collapsible, noncollapsible or electric-powered with wet or dry cell batteries). Alaska has the ultimate responsibility to confirm an electric-powered wheelchair has its cables disconnected and terminals protected against electrical shortages before carriage. For a wet cell battery-powered wheelchair, the Passenger must notify Alaska at least twenty-four (24) hours in advance, the Passenger must check in at least one (1) hour before the check-in time for the general public, and the battery must be disconnected and terminals protected against electrical shortages. Wheelchairs containing lithium ion batteries with a watt hour rating of 300 WH and above will not be accepted under any circumstances. Wheelchairs containing non-spillable batteries or lithium ion batteries with a watt hour rating of 300 WH or less may be carried on as Baggage or may be checked.

I. Restricted articles. Articles listed in the DOT Hazardous Materials Regulations (49 C.F.R. Parts 171-180) and/or IATA dangerous goods regulations and revisions and reissues thereof, will not be accepted for Carriage as Baggage except for dry ice and small arms ammunition (as specified in Paragraph J(12) of this Rule).

J. Sporting Equipment - Unless otherwise noted in this section, Alaska's standard checked Baggage Fees and Allowances shall apply. Items over 115 linear inches (length plus height plus width) shall not be accepted as checked baggage unless noted in this section. Items that are 100 lbs or greater shall not be accepted as Checked Baggage. When special items are carried over the lines of more than one Carrier, check with each Carrier for acceptance policies and rates. The sporting equipment listed below will be accepted as Baggage by Alaska in accordance with the following provisions and/or special item handling charges specified. Charges are based on a one-way trip and are applicable from the point at which the item is accepted to the point to which the item is transported. Where an item is not included in the Baggage Allowance, it will be subject to both the Excess Baggage Charge (but not Oversize/Overweight Baggage charges) and the service charges below. Other items listed below will be treated as Checked Baggage and included in the normal Checked Baggage allowance, or checked as excess Baggage. Except for certain International Carriage subject to the terms of the Montreal Convention or Warsaw Convention, whichever may apply, Alaska is not liable for damage to the items specified below when carried as Checked Baggage.

   1. Antlers: Antlers will only be accepted as Checked Baggage when they are properly packaged in an enclosed container acceptable to Alaska and meet normal size and weight restrictions. Antlers must be as free of residue as possible and the skull must be wrapped and tips protected. The Passenger must make all arrangements and assume full responsibility for complying with any applicable laws, customs, and/or other governmental regulations, requirements, or restrictions of the county, state territory, or country to and from which the antlers are being transported.

   2. Archery equipment: One piece of archery equipment consisting of a proper soft or hard archery case containing bows and arrows may be checked in lieu of one piece of Checked Baggage as long as the

bow and arrows are encased in a container acceptable to Alaska for withstanding normal Baggage handling without sustaining damage to the equipment. Checked archery pieces weighing 51 pounds or greater, or exceeding 62 linear inches may be checked without being assessed an oversize/overweight charge.

3. Bicycles: One item of bicycling equipment is defined as one bicycle, non-motorized, with single or tandem Alaska will only accept bicycles properly packed in a hard-sided bicycle box or container, with handlebars turned sideways, protruding pedals and accessories removed, and all sharp protrusions padded so as not to be damaged by or cause damage to other Baggage. Checked bicycles weighing 51 pounds or greater, or exceeding 62 linear inches, may be checked without being assessed an oversize/overweight charge.

4. Bowling equipment: One piece of bowling equipment consists of a proper soft or hard sided bowling ball case acceptable to Alaska, with no limit to the items inside the case. Pieces weighing 51 pounds or greater, or exceeding 62 linear inches, may be checked without being assessed an oversize/overweight charge.

5. Camping equipment: Tents, backpacks, knapsacks or sleeping bags acceptable as Baggage, must meet all normal Baggage restrictions. Camping equipment and fuel containers that once contained liquid fuel (i.e. camping stoves, portable heaters and flammable liquid lanterns) are allowed as long as the fuel system is completely dry with no fuel remaining in the tank or in any hoses or parts and no remaining fuel odor is evident. Any type of fuel is forbidden from transport in Checked Baggage in accordance with DOT Hazardous Materials Regulations. Fuel can be shipped as regulated dangerous goods through the cargo facility. Self-heating meals (i.e. MREs, flameless ration meals) are not permitted as Carry-On Baggage or Checked Baggage due to the risk of unintentional activation of the heating source. Passengers may transport these via air cargo only. Propane and empty propane tanks may only be shipped on all-cargo aircraft. No matches/lighters are permitted in Checked Baggage.

6. Fishing equipment: One piece of fishing equipment is defined as two rods, two reels, and one tackle box. Fishing poles that cannot be broken down adequately to be stowed on board in an overhead bin must be encased in a cylindrical fishing rod container acceptable to Alaska for withstanding normal Checked Baggage handling without sustaining damage to the rod and must be checked. Fishing equipment weighing 51 pounds or greater, or exceeding 62 linear inches, may be checked without being assessed an oversize/overweight charge.

7. Golfing equipment: One piece of golfing equipment consists of equipment in a proper soft or hard sided golf case acceptable to Alaska. There is no limit to the number of items inside the golf case. Golf equipment weighing 51 pounds or greater, or exceeding 62 linear inches, may be checked without being assessed an oversize/overweight charge.

8. Hockey/Lacrosse equipment: One piece of hockey/lacrosse equipment consists of hockey/lacrosse sticks not in a bag/box (multiple sticks must be taped/attached together) and miscellaneous hockey/lacrosse equipment in a bag/box (skates, pads, pucks, gloves, etc.). Sticks may be checked separately for no additional charge and may exceed 62 linear inches, but must not exceed 115 linear inches, without incurring an oversize charge. Hockey/Lacrosse equipment weighing 51 pounds or greater or exceeding 62 linear inches, may be checked without being assessed an oversize/overweight charge.

9. Kayaks: Kayaks will be accepted as Checked Baggage subject to the following restrictions: Kayaks are subject to standard overweight or oversize charges with maximum dimensions of 115 linear inches and maximum weight of 100 lbs. One set of kayak paddles may be included in this charge and must be securely taped to the kayak or boxed. Alaska does not provide paddle boxes at the counter. Only kayaks of polyethylene construction are acceptable to Alaska. Kayaks of glass construction are not accepted. Kayaks are not accepted on Alaska flights operated by Horizon or SkyWest on behalf of Alaska Airlines.

10. Pole vaulting equipment will be accepted on Alaska mainline flights only. It is not accepted on Alaska flights operated by Horizon or SkyWest on behalf of Alaska Airlines. One piece of pole vaulting equipment may contain up to two pole vaults. Such equipment does not require a case. Maximum dimensions of 6 in. x 6 in. x 17 ft. are allowed with 737 aircraft and 6" x 6" x 15' on Airbus Aircraft.

11. Scuba equipment: One piece of scuba equipment consists one scuba gear container. The scuba gear container is limited to one regulator, one tank harness, one pressure gauge, one mask, two fins, one snorkel, one knife, one spear gun, and one safety vest. On flights operated solely by Alaska, Horizon, or Skywest on behalf of Alaska, one scuba tank may be included as part of the scuba gear container and checked at no additional charge. The tank's regulator valve must be disconnected, and the tank must have an opening for visual inspection. Scuba tanks shall not be accepted on flights operated with Airbus Aircraft.

12. Shooting equipment (sporting firearms): Each individually checked firearm case is subject to standard Checked Baggage, overweight and/or oversize charges. There is no limit to the number of items contained in a rifle, shotgun or pistol case, up to 50 lbs, 62 linear inches maximum. Overweight or oversize items shall be subject to applicable charges.

Note: The term "firearm" describes any weapon that will or is designed to or may be readily converted to expel a projectile by the action of an explosive, or the frame or receiver of any such weapon. This includes: sporting rifles, shotguns, and handguns; handguns of authorized law enforcement officers while traveling on official duty; silencers/suppressors; starter pistols, compressed air or BB guns, and flare pistols; and antique firearms.

   a. Firearms must be unloaded and packed in (1) a manufacturer's crush-proof type container, manufactured specifically for the firearm or (2) a hard case acceptable to Alaska. Handguns checked as Baggage must be contained in a hard-sided, lockable case, or in a hard-sided container inside a soft-sided case acceptable to Alaska. Firearm containers must lock with a key or lock combination that remains in possession of the Passenger and must be locked by the Passenger in the presence of Alaska. No exceptions. Baggage containing firearms will be transported in an area, other than the cockpit, that is inaccessible to the Passenger.

   b. Baggage containing firearms will not knowingly be accepted for transportation at point of origin or at an online or interline connecting point unless a declaration, signed and dated on the day the Baggage is accepted for transportation, is placed inside the case containing the firearms, declaring that the firearms are not loaded.

   c. Ammunition up to 50 lbs. for domestic travel and up to 11 lbs. for international travel is permitted on Alaska mainline flights and Horizon flights operated on behalf of Alaska Airlines only. Passengers checking in or connecting to SkyWest flights operated on behalf of Alaska Airlines are limited to 11 lbs. of ammunition.



d. Ammunition must be securely packed in the original manufacturer's package or in a container designed for ammunition and of sufficient strength to protect it from accidental crushing or discharge (i.e. wood, fiber, plastic, or metal). The projectile must be no larger than 11/16" in diameter, the size of a dime. Ammunition may be checked with or separately from the firearm. It can only be accepted inside an ammunition clip if enclosed inside a suitcase, firearm case, etc. Ammunition purchased over the counter for rifles and pistols (.50 caliber or smaller, and 8, 10, 12, 16, 20, 28 and .410 shotgun shells) are acceptable as Baggage provided they are packaged properly. Dragon Breath shotgun shells are forbidden.

e. Firearms (all rifles), other than handguns, must be packed with the bolt (if included) removed when possible, and/or the action in an open position. Passengers picking up their rifle case(s) are required to present photo ID or claim checks at the Baggage claim or Ticket counter area.

f. Firearms and ammunition may not be checked to foreign destinations involving a Connection to another Carrier. Passengers need to reclaim their firearms(s) and ammunition at the final Alaska destination and check it directly with the other Carrier.

g. Firearms and ammunition may be checked for domestic travel involving a Connection to another Carrier other than Alaska subject to the acceptance policy of the other Carrier. The Passenger shall verify the specific policy of the other Carrier prior to checking these items.

h. Minors under 18 may not transport a firearm(s)/ammunition.

i. The Passenger must obtain prior to travel any necessary government permits, supporting documents, or notice of additional government requirements/restrictions to carry firearms to/from/via international points, including Canada and Mexico.

13. Skateboards: A maximum of one skateboard if not in a case will be considered one piece of Checked Baggage. If in a proper case, there is no limit to the number of items as long as, it does not exceed 50 lbs., 62 linear inches maximum.

14. Skiing Equipment: One piece of skiing equipment consists of one ski bag and one ski boot/helmet bag. Skiing equipment must be packaged in a proper soft or hard ski/snowboard/boot bag acceptable to Alaska. Ski equipment may exceed 62 inches without incurring an oversize charge. However, if additional items are packed with the ski/snowboard equipment, standard overweight fees may apply.

15. SurfboardsPaddleboards: One item of surfing or paddle equipment is defined as a surfboard or paddleboard case with up to two boards inside. On flights operated solely by 737 aircraft, the equipment may measure up to 115" (9 ft., 7 in.) in length alone. For flights operated by Horizon E175, Q400 or SkyWest ERJ 175 aircraft, the equipment may not exceed 115" in combined linear dimensions (height + length + width). The maximum single dimensions for E175 and Q400 aircraft is 8 feet.

16. Windsurfing equipment: Windsurfing equipment is not required to be in a case and consists of one windsurfing board and one mast, boom, and sail. On Airbus aircraft, the maximum mast length is 15 ft. On Alaska flights operated by Horizon E175, Q400 or Skywest ERJ 175 aircraft on behalf of Alaska Airlines, the maximum single dimension is 8 ft.

K. Cabin-Seat Baggage Charges. When a Passenger requests that item(s) of Baggage be carried in the Passenger cabin of the aircraft, and Alaska determines in its sole and absolute discretion that the item is acceptable as Cabin-Seat Baggage but is so fragile and/or bulky as to require the use of a seat, the Baggage must be carried aboard the aircraft by the Passenger and secured in the seat next to the Passenger's seat. Alaska will charge

100% of the applicable Adult fare. Alaska will not include the Cabin-Seat Baggage in determination of free Baggage allowance or excess Baggage charges. There are specific seating requirements when transporting Cabin-Seat Baggage. Alaska reservations can verify seating requirements for the flight. Note: For transportation to/from/between Alaska flights operated by Horizon or SkyWest on behalf of Alaska Airlines charges/Carriage restrictions of Cabin-Seat Baggage is to be consistent through to the destination using the highest applicable rate and the most restrictive rules for acceptance. The following provisions apply to Cabin-Seat Baggage:

1. Cabin-Seat Baggage is subject to inspection.
2. Such items must be able to withstand the rigors of flight and must be packaged or covered, as necessary, to prevent contents from escaping and to avoid possible injury to other Passengers. It is prohibited for either the instrument or the case to contain any object not otherwise permitted to be carried in an aircraft cabin by the rules contained in this Contract of Carriage, or any applicable law, regulation, rule, and/or security directive.
3. Cabin-Seat Baggage must be carried aboard the aircraft and strapped in a seat adjacent to the owner using the seatbelt securely fastened (eliminating the possibility of shifting).
4. The weight of the item (including any case or covering) is not to impose any load on the aircraft's seats or floor structure that exceeds the load limitations for these components, and cannot exceed 165 pounds, or the applicable weight restrictions for the aircraft.
5. No article secured to a seat may obstruct access to, or use of, any emergency or regular exit; block or protrude into any aisle or exit path; or obstruct any Passenger's view of the overhead fasten seatbelt and no smoking signs or any required exit sign or video monitor/screens.
6. No Cabin-Seat Baggage may be secured in an emergency exit seat.
7. A seat for ticketed Cabin-Seat Baggage must be reserved in advance and the applicable charges must be paid.
8. Cabin-Seat Baggage may not be accepted on some aircraft with weight/size restrictions.
9. Alaska personnel, including flight attendants and other crew members, cannot assist with the movement or placement of Cabin-Seat Baggage.

L. Liability – Baggage and Personal Property for International Carriage Governed by the Montreal Convention and the Warsaw Convention

For the purposes of International Carriage governed by the Montreal Convention or Warsaw Convention, whichever may apply, the liability rules set out in the Montreal Convention and Warsaw Convention are fully incorporated by reference herein and shall supersede and prevail over any provisions of this Contract of Carriage which may be inconsistent with those rules.

Destruction, Loss, or Delay of Baggage. Alaska's liability for damages sustained in the case of destruction or loss of, damage to, or delay of Checked Baggage and Unchecked Baggage governed by the Montreal Convention or Warsaw Convention, is provided in the following paragraphs:

1. Except as provided below, the liability of Alaska is limited to 1,288 Special Drawing Rights ("SDRs") for each Passenger in the case of destruction, loss, damage, or delay of Baggage, whether checked or unchecked, under the Montreal Convention or the Warsaw Convention, whichever may apply. Unless the Passenger proves otherwise: (a) all Baggage checked by a Passenger shall be considered to be the

property of that Passenger; (b) a particular piece of Baggage, checked or unchecked, shall not be considered to be the property of more than one Passenger; (c) Unchecked Baggage shall be considered to be the property of the Passenger in possession of the Baggage at the time of embarkation.

2. If a Passenger makes, at the time Checked Baggage is handed to Alaska, a special declaration of interest and has paid a supplementary sum, if applicable, Alaska will be liable for destruction, loss, damage, or delay of such Checked Baggage in an amount not exceeding the declared amount, unless Alaska proves that the declared amount is greater than the Passenger's actual interest in delivery at destination. The declared amount, and Alaska's liability, shall not exceed the total amount of declaration permissible under Alaska's regulations, inclusive of the limitation of paragraph L(1) hereof. In the case of transportation under the Warsaw Convention, no supplementary sum shall apply unless the declared amount exceeds 19 SDRs per kilogram of the total recorded weight of the Checked Baggage at the time the Baggage is handed to Alaska. Nevertheless, Alaska may impose charges for pieces of Baggage in excess of any free allowance Alaska may provide.

3. For purposes of determining liability with respect to lost, damaged or destroyed Baggage under the Warsaw Convention, the weight of each piece of such Baggage shall be deemed to be the maximum allowable weight for each piece of such Baggage under the applicable restrictions, unless the actual weight is stated on the Baggage Check.

4. In the event of delivery to the Passenger of part but not all of the Passenger's Checked Baggage, or in the event of damage to part but not all of such Baggage, the liability of Alaska with respect to the undelivered or damaged portion under the Warsaw Convention shall be reduced proportionately on the basis of weight, regardless of the value of any part of the Baggage or contents thereof.

5. Alaska is not liable for destruction, loss, damage, or delay of Baggage not in the charge of Alaska, including Baggage undergoing security inspections or measures not under the control and direction of Alaska.

6. Alaska is liable for damage sustained in case of destruction or loss of Checked Baggage upon condition only that the event which caused the destruction or loss took place on board the aircraft or during any period within which the Checked Baggage was in the charge of Alaska. However, Alaska is not liable if and to the extent that the damage resulted from the inherent defect, quality or vice of the Baggage. Further, Alaska's liability for the destruction, loss, damage or delay of Baggage is subject to the terms, limitations and defenses set forth in the Warsaw Convention and the Montreal Convention, whichever may apply, in addition to any limitation or defense recognized by a court with proper jurisdiction over a claim.

7. Alaska reserves all defenses and limitations available under the Montreal Convention and the Warsaw Convention, whichever may apply, to such claims including, but not limited to, the defense of Article 20 of the Warsaw Convention and Article 19 of the Montreal Convention, and the exoneration defenses of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention, except that Alaska shall not invoke Article 22(2) and (3) of the Warsaw Convention in a manner inconsistent with paragraph 1 hereof. The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22 (5) of the Montreal Convention, whichever may apply.

M. Notice of Irregularity and Filing of Claim: Except to/from Canada. An incident involving loss of, or damage to, or delay in the delivery of Baggage or personal property accepted into the custody of Alaska must be reported

in writing to an Alaska representative within twenty-four (24) hours. All claims for loss are subject to the rules in this Rule

NR Limitations of liability for Domestic Carriage: Maximum total liability of Alaska, if any, for substantiated damages in the event of loss, physical damage, or delay in the delivery of Checked Baggage, with the exception of wheelchairs, mobility aids, and Assistive Devices used by a Qualified Individual with a Disability, shall be limited to the proven amount of damage or loss, but in no event shall be greater than USD $3,800.00 per ticketed Passenger pursuant to 14 C.F.R. Section 254.4, unless the Passenger at time of check-in has declared the value of the Baggage to be in excess of USD $3,800.00 ("excess valuation") and has paid an additional charge for higher liability as provided below. This limitation shall also apply to Baggage or personal property for temporary storage at a city or airport Ticket office or elsewhere before or after the Passenger's trip. Alaska will compensate the Passenger for reasonable, documented damages incurred as a direct result of the loss, damage to, or substantial delay in the delivery of such Baggage, up to the limit of liability, or declared value, whichever is higher, provided the Passenger has exercised reasonable efforts and good judgment to minimize the amount of damage. Actual value for reimbursement of lost or damaged property shall be determined by the documented original purchase price less depreciation for prior usage. Passenger will be responsible for documenting and proving the actual value of the loss. For Baggage claims, reimbursement for any expenses will be based upon proof of claim acceptable to Alaska. When transportation is over the lines of Alaska and one or more Carriers with a limitation of liability other than USD $3,800.00 for each fare-paying Passenger and responsibility for the loss, damage or delay in delivery of Baggage cannot be determined, total liability of the combined Carriers will be the lowest maximum liability. Exception 1: Alaska's maximum liability for a lost, damaged or destroyed wheelchair or other Assistive Device, is the original, documented purchased price of the device. Exception 2: Liability limit on game meat: Alaska will be liable for loss, but not damage or spoilage of "game meat" as Checked Baggage. Game meat includes any type of meat that was obtained by the Passenger by means other than purchasing in a store, for example: fresh caught fish or meat obtained from a hunt. Liability will be based on a flat rate of $10.00 per pound up to maximum liability of USD $3,800 per ticketed Passenger.

1. Exclusions from Liability:

    a. Alaska does not assume liability for claims of missing or damaged items if a Passenger's Checked Baggage is not damaged, delayed, or lost.

    b. Minor damage to Baggage: When Alaska has exercised ordinary standard of care, it assumes no liability for incidental damage such as scuffs, dents, stains, punctures, marks, dirt, scratches, and cuts that result from normal wear and tear.

    c. Previously damaged items: Alaska assumes no responsibility and will not be liable for further damage to previously damaged items. Alaska may, but is not obligated to, conditionally accept previously damaged items.

    d. Damage to wheels/handles/pockets: Alaska shall not be liable for damage to protruding parts of Checked Baggage, including, but not limited to, wheels or feet, pockets, hanger hooks, pull handles, straps, zippers, locks, or telescoping handles that are attached to the exterior of Checked Baggage where such damage results from the inherent defect, quality or vice of the Checked Baggage. Furthermore, Alaska assumes no liability for defects in Baggage manufacture or for fair wear and tear resulting from ordinary handling of Checked Baggage. These exclusions apply



whether or not the Passenger is advised by the customer service agent.

Carry-On Baggage/unchecked property: Alaska will not be liable for damage, loss or theft of items taken on board an aircraft and remaining in the personal possession and care of the Passenger. Carry-On Baggage is the sole responsibility of the Passenger, and Alaska is liable only to the extent the damage resulted from its fault, or that of its contractors or agents. Assistance provided by flight crew members to properly store such items does not transfer liability to Alaska.

f. Unsuitable, valuable articles: The following items are judged to be unsuitable as contents of Checked Baggage. Except for certain International Carriage of such items subject to the terms of the Montreal Convention or Warsaw Convention, whichever may apply, Alaska assumes no liability for loss, theft, damage or delay in the delivery of:

1. cash, currency;
2. negotiable papers;
3. securities;
4. business or personal contracts, documents;
5. jewelry, watches;
6. cameras, videos and photographic equipment, camcorders, audio equipment, film, camera equipment, photographs;
7. electronic equipment/devices and personal electronic equipment/devices, including components thereof;
8. computers and related components;
9. binoculars, telescopes, optical devices including eyeglasses;
10. silverware, pottery, porcelain and china;
11. precious metals, stones or materials;
12. art objects, sculptures, paintings;
13. historical artifacts;
14. original manuscripts;
15. irreplaceable books, publications, collectibles (such as baseball cards);
16. antiques, heirlooms, collector's items, and artifacts;
17. keys;
18. sales samples and items intended for sale;
19. medications;
20. furs, including coats, gloves, hats; or
21. game trophies, antlers, and pelts.

Note: When transportation is via Alaska and one or more Carriers which exclude certain items in Checked Baggage from their liability, Alaska will not be liable for the excluded items, except for certain International Carriage of such items subject to the terms of the Montreal Convention or Warsaw Convention, whichever may apply.

g. Attached items: Alaska will not be liable for tents, sleeping bags, or similar articles which are strapped, taped, or tied to another piece of Baggage and may become separated as a result of normal handling during transportation.

h. Pets: Passengers presenting pets for checking as Baggage or Carriage in the Passenger cabin will



be responsible for compliance with all government regulations and restrictions, including furnishing valid health and vaccination certifications when required. Alaska will not be responsible for any expenses or loss that might result when any pet is refused passage into or through any country, state or territory.

　i. Unclaimed Baggage: Alaska will not be liable for Baggage not claimed within 30 minutes after Baggage has been made available for claiming in a public Baggage claim area.

　Note: TSA accepted locks are suggested, as TSA may need to physically inspect a piece of luggage. If a bag is locked, TSA may cut the lock off. Alaska is not liable for locks damaged or missing as a result of TSA inspection.

2. Declaration of Higher Value for Checked Baggage: When checking in for a flight and presenting Baggage to be checked for transportation, a Passenger may declare a value higher than the maximum amounts specified above, up to a maximum of USD $5,000.00 in which event Alaska's liability shall not exceed such higher declared value. The one-way charge for the declaration of higher value shall be USD $1.00 per USD $100.00 of additional declared value. Excluded items listed in Rule 15(N)(1) above are not acceptable for higher value declaration. When excess value is declared, the Passenger's Baggage and its contents may be inspected by Alaska. Such Baggage must be checked, and excess valuation coverage will apply only to the point to which it is checked by Alaska and claimed by the Passenger.

3. Excess value charges will be payable on a one-way basis at the point of origin for the entire journey to the final destination, provided that, if at a Stopover en route, a Passenger declares a higher excess value than that originally declared, additional value charges for the increased value from Stopover to the final destination will be due from the Passenger. Exception: Excess value charges will be due from the Passenger to Alaska only to the point to which the Baggage is checked, or to the point of transfer to another Carrier, if such point is before the point to which Baggage is checked.

4. Alaska has the discretion to not accept Baggage of any one Passenger having a declared value higher than $5,000 USD, unless special arrangements have been made in advance by the Passenger with Alaska.

5. Interline Variations on Liability: When personal property, including Baggage, is tendered for transportation via Alaska in conjunction with another Carrier having a different limit of liability and/or declared higher value, Alaska shall not be liable for any amount in excess of its limits as specified herein.

O. Time Limitations on Claims. For International Carriage, no action shall be maintained for any loss of, or damage to, or any delay in the delivery of, any property or Baggage, or on any other claim (except claims for personal injury or death), arising out of or in connection with transportation of, or failure to transport any Passenger or property or Baggage unless the claim is presented in writing to an office of Alaska or its agent, or in the case of interline transportation, to the Carrier alleged to be responsible therefore immediately after the discovery or at the latest, within seven (7) days from the date of receipt of Checked Baggage. In the case of delay, the complaint must be made at the latest within twenty-one (21) days from the date on which the Baggage has been returned; reimbursement will be based upon acceptable proof of claim. For Domestic Carriage, notice and proof of loss must be presented in writing to an office of Alaska within forty-five (45) days after the alleged occurrence of the events giving rise to the claim, and any legal action arising from those events must be initiated within two (2 years). Any written notification received within 45 days after which clearly indicates the nature of the claim is sufficient to meet the requirements for timely notice. Failure to give the above notice

shall not be a bar if the claimant can show good cause for his/her failure to bring the claim within 45 days. Regarding delivery, Alaska will pay delayed Checked Baggage delivery charges only so long as such Baggage was tendered to Alaska by the Passenger in accordance with the minimum check-in times set forth in Section 15.C Where timely tender is made, Alaska will make reasonable efforts, but cannot guarantee, to transport such Baggage on the Passenger's flight(s), and Alaska will not assume responsibility for delivery charges if such Baggage arrives at the Passenger's destination on a subsequent flight.

Q. The provisions of Tariff AS-1 NTA(A) No. 378 (Acceptance of Baggage - General) are wholly incorporated by reference in this Rule 15 and are applicable to transportation to/from Canada, provided, however, that for the purposes of International Carriage governed by the Montreal Convention, the liability rules set out in the Montreal Convention are fully incorporated herein and shall supersede and prevail over any provisions of this Contract of Carriage which may be inconsistent with those rules.

R. For International Carriage to/from Canada, the following rules apply:

   1. The provisions of this Rule 15 are applicable to travel to/from Canada where such travel is intraline (online) or Interline and Alaska's Baggage rules apply to an entire itinerary. To the extent that the liability rules of the Montreal Convention conflict with Rule 15, the Montreal Convention shall supersede Rule 15.

   2. For other interline itineraries issued on a single Ticket whose origin or ultimate ticketed destination is in Canada, Baggage rules will be selected as set forth below. For the purposes of interline Baggage acceptance:

      a. The Carrier whose designator code is identified on the first Segment of the Passenger's interline Ticket will be known as the Selecting Carrier.

      b. Any Carrier who is identified as providing Interline transportation to the Passenger by virtue of the Passenger's Ticket will be known as a Participating Carrier.

   3. Baggage Rule Determination by Selecting Carriers - Checked Baggage: The Selecting Carrier will:

      a. Select and apply its own Baggage rules to the entire interline itinerary.
         OR

      b. Select the Most Significant Carrier, as determined by IATA Resolution 302 and conditioned by the Canadian Transportation Agency, in order for that Carrier's Baggage rules, as established in its tariff, to apply to the entire Interline itinerary.

      The Carrier identified by means of (a) or (b) will be known as the Selected Carrier.

   4. Baggage Rule Determination by Selecting Carriers - Carry-On Baggage: Each operating Carrier's Carry-On Baggage allowances will apply to each flight Segment in an interline itinerary. Notwithstanding, the Carry-On Baggage charges that will apply to the entire Interline itinerary will be those of the Selected Carrier.

   5. Baggage Rule Application by Participating Carrier: Where Alaska is not the Selected Carrier on an interline itinerary but is a Participating Carrier that is providing transportation to the Passenger based on the Ticket issued, Alaska will apply the Baggage rules of the Selected Carrier throughout the interline itinerary.

   6. Disclosure of Baggage Rules.

      Summary Page at the end of an Online Purchase and E-Ticket Disclosure.

      a. For Baggage rules provisions related to a Passenger's first and second Checked Bag and the



Passenger's Carry-On Baggage (i.e., the Passenger's "standard" Baggage allowance), when Alaska sells or issues a Ticket for an interline itinerary, it will disclose to the Passenger on any summary page at the end of an online purchase and on the Passenger's itinerary/receipt and e-Ticket at the time of ticketing the Baggage information relevant to the Passenger itinerary as set out in paragraph (b) below. The disclosed information will reflect the Baggage rules of the Selected Carrier.

    b. Alaska will disclose the following information:

- Name of the Carrier whose Baggage rules apply;
- Passenger's free Baggage allowance and/or applicable fees;
- Size and weight limits of the Baggage, if applicable;
- Terms or conditions that would alter or impact a Passenger's standard Baggage allowances and charges (e.g. frequent flyer status, early check-in, pre-purchasing Baggage allowances with a particular credit card);
- Existence of any embargoes that may be applicable to the Passenger's itinerary; and,
- Application of Baggage allowances and charges (i.e., whether they are applied once per direction or if they are applicable at each Stopover point).

    c. Alaska will provide this information in text format on the Passenger's e-Ticket confirmation. Any fee information provided for Carry-On Baggage and the first and second Checked Bag will be expressed as specific charges.

7. Web site Disclosure. Alaska will disclose on its web site, in a convenient and prominent location, a complete and comprehensive summary of all of Alaska's own Baggage rules, including information concerning:

    a. The maximum weight and dimensions of Passenger Baggage, if applicable, both checked and unchecked;

    b. The number of Checked Baggage and Unchecked Baggage that can be transported and the applicable charges;

    c. Excess and oversized Baggage charges;

    d. Charges related to check in, collection and delivery of Checked Baggage;

    e. Acceptance and charges related to special items, e.g. surf boards, pets, bicycles, etc.;

    f. Baggage provisions related to prohibited or unacceptable items, including embargoes;

    g. Terms or conditions that would alter or impact the Baggage allowances and charges applicable to Passengers (e.g. frequent flyer status, early check in, pre-purchasing Baggage allowances with a particular credit card); and,

    h. Other rules governing treatment of Baggage at Stopover points, including Passengers subject to special Baggage allowances or charges, etc.

m

# Rule 16. Codeshare Services

Ver esta regla en español

A. Alaska has arrangements with other Codeshare Partners to enable Alaska to provide services to Passengers on flights operated by these other Codeshare Partners. Transportation provided by Alaska under an arrangement with a Codeshare Partner is designated by a flight number that includes Alaska's two-letter airline designator code, "AS".

B. The rules set forth in this Contract of Carriage with respect to ticketing, reservations, cancellations, fares, and refunds apply to services on flights operated by Codeshare Partners. However, each Codeshare Partner has established rules with respect to the operation of its own flights, which may differ from those set forth in this Contract of Carriage, including but not limited to rules governing:

- Check-in time limits;
- Unaccompanied minors;
- Carriage of animals(including Service Animals);
- Refusal to transport;
- Oxygen service;
- Irregular operations;
- Denied boarding compensation; and
- Carriage of musical instruments.

Each of the Codeshare Partner rules referenced above, which are found in the Codeshare Partner's contract of carriage, are incorporated by reference in this Contract of Carriage and apply to services provided on a flight operated by the Codeshare Partner. Those Codeshare Partner rules supersede any Alaska rule set forth in this Contract of Carriage that would otherwise apply. Notwithstanding the foregoing, the Baggage acceptance and liability provisions set forth in Rule 15 shall govern the acceptance of baggage and baggage liability of Alaska with respect to any transportation subject to this Contract of Carriage.

C. When a Codeshare Partner operates a flight on which Alaska's designator code "AS" appears, the Codeshare Partner's contingency plan for lengthy tarmac delays will apply to that flight.

# Rule 17. Refunds

Ver esta regla en español

A. General: If a ticketed reservation is cancelled prior to the ticketed departure time, refund by Alaska for an unused ticket or portion thereof will be made in accordance with the following conditions, except as otherwise provided in this rule:

1. The fare paid for unused travel by Passengers who purchase a fully refundable, unrestricted Ticket/Document, including taxes, security fees, and Passenger Facility Charges, may, for any reason, be refunded. Such refund must be requested within the Ticket's validity period. Refund will not be honored after the Ticket's validity date has expired. If the ticketed reservation is not changed or cancelled prior to the ticketed departure time, the value of the refundable ticket may be applied as travel credit toward the purchase of future travel on Alaska. Such travel credit must be requested within the ticket's validity period. Credit requests will not be honored after the ticket's validity period has expired.

2. Persons requesting a refund must surrender to Alaska all unused flight coupon(s) of the Ticket or

document.

Alaska will refuse a refund on a Ticket which has been presented to government officials of a country or AIRLINES Alaska as evidence of intention to depart therefrom unless the Passenger establishes to Alaska's satisfaction that he/she has permission to remain in the country or that he/she will depart from there by another Carrier or conveyance.

4. Alaska shall make all or any individual refunds in the country/currency of issuance. All Tickets purchased in Mexico will be treated as deferred refunds and will be forwarded to Alaska's Mexico-based accounting offices for processing. No refunds will be made at Alaska's Mexico-based regional sales offices.

5. Any tax or other charge that is imposed by a government authority and required to be collected from a Passenger will be in addition to the published fare. Such taxes and other government-imposed charges are refundable only if the purchased fare is itself refundable according to Alaska's fare rules.

6. Alaska shall make eligible refunds in the same form as the original payment. Refunds for Tickets purchased with a credit card shall be processed for crediting to the same credit card account no later than seven (7) business days from the date the refund request is received by Alaska. Refunds for Tickets purchased with cash will be issued by check no later than twenty (20) business days after the refund request is received by Alaska.

B. Currency: All refunds will be subject to government laws, rules, regulations, or orders of the country in which the Ticket was originally purchased and of the country in which the refund is being made. Refunds will be made subject to the following provisions:

1. Voluntary refunds of Tickets or documents purchased in currency other than U.S. dollars shall be made in the currency used for such purpose.

2. Voluntary refunds of Tickets or documents purchased in U.S. dollars may be made in U.S. dollars or local currency in any country provided such refund is not prohibited by local governmental exchange control regulations at point of refund.

3. Involuntary refunds of Tickets or documents shall be made in the currency used for such purchase, whenever possible. However, U.S. dollar refunds or refunds in the currency of the country where the involuntary refund is necessary may be made on request of the Passenger provided the refund in such currency is not prohibited by local governmental exchange control regulations.

4. Refunds will be made in the currency in which the fare was paid, or in lawful currency of the country of the Carrier making the refund or of the country where the refund is made or in the currency of the country in which the Ticket was purchased, in an amount equivalent to the amount due in the currency in which the fare or fares for the flight covered by the Ticket as originally issued was collected. Note: Despite the foregoing provisions, Alaska will reserve the right to refuse to make any refund authorized by this Contract of Carriage in a currency other than that used in the purchase of the Ticket to be refunded or at a place other than that at which payment for such Ticket was made.

C. Person to Whom Refund is Made: Except as provided below, Alaska will refund in accordance with this Rule only to the person named as the Passenger on the Ticket.

1. Exception 1: Tickets issued against a credit card or Universal Air Travel Plan (UATP) card or Government Transportation Request (GTR) honored by Alaska will be refunded only to the account of the person/subscriber to whom the form of payment was issued.

2. Exception 2: If, at the time of purchase, the purchaser designates on the Ticket or document another person or entity to whom a refund shall be made, the refund will be made to the person so designated. A refund made in accordance with this procedure to a person representing him/herself as the person so designated on the Ticket or document shall be deemed a valid refund, and Alaska will not be liable to the true Passenger for another refund.

3. Exception 3: If at the time of application for refund, evidence is submitted that a company purchased the Ticket or document on behalf of its employee, or the travel agent has made a refund to its client, such refund will be made directly to the employee's company or the travel agent.

D. Lost Tickets. When a Passenger loses his/her Ticket, or the unused portion thereof, Alaska, if it issued the Ticket, will refund the following amount:

1. If no portion of the Ticket has been used, an amount equal to the fare and charges paid.

2. If a portion of the Ticket has been used, and

    a. The Passenger has purchased a new Ticket covering the same transportation as that covered by the unused portion of the lost Ticket, an amount equal to the fare and charges paid for such new Ticket.

    b. The Passenger has not purchased a new Ticket covering the same transportation as that covered by the unused portion of the lost Ticket, an amount equal to the difference between the fare and charges paid and the fare and charges applicable to the transportation of the Passenger covered by the used portion of the Ticket.

E. Involuntary Refunds. The amount Alaska will refund upon surrender of the unused portion of the Passenger's Ticket, pursuant to Rule 11 (Refusal to Transport), Rule 13 (Acceptance of Children), or Rule 8 (Liability for Delays/Cancellations and Denied Boarding), will be:

1. If no portion of the Ticket has been used and no portion of the transportation has been provided: An amount equal to the fare and charges paid. Exception: Alaska shall not be obligated to refund any portion(s) of a fully unused Ticket which does not reflect a confirmed reservation on an Alaska flight involved in a schedule irregularity, unless such Ticket was issued by Alaska.

2. If a portion of the Ticket has been used or a portion of the transportation has been provided, the refund will be equal to the difference, if any, between the fare and charges paid for the ticket, and the fare and charges applicable to the used portion of the Ticket.

3. If alternative surface transportation is provided and is acceptable to the Passenger, no refund will be provided.

4. If fare is for transportation solely on substitute service flights involuntary refunds are deferred to the respective substitute service carrier's accounting office for computations.

F. Alaska will make no refund if transportation is provided from the point of Schedule Irregularity to the ticketed destination or Stopover airport, or a co-terminal as determined by Alaska. Examples of co-terminal airports include, but are not limited to:

1. Burbank/BUR, Long Beach/LGB, Los Angeles/LAX, Ontario/ONT, Orange County/SNA

2. Orange County/SNA, San Diego/SAN

3. Houston Bush/IAH, Houston Hobby/HOU

4. Palm Springs/PSP, Ontario/ONT

5. Oakland/OAK, San Francisco/SFO, San Jose/SJC

6. Washington-Reagan/DCA, Washington-Dulles/IAD, Baltimore/BWI

_Alaska_ rk/EV  New York/JFK, New York/LGA

A I R L I N E Seattle/SEA, Bellingham/BLI

9. Bellingham/BLI, Vancouver/YVR

10. Seattle/SEA, Everett Paine Field/PAE

G. **Time Limitation for Refund Requests:** Refunds will not apply for Tickets presented later than one (1) year from the date of issuance of the original Ticket.

H. **Voluntary Refunds.** When Rules 11 (Refusal to Transport), 13 (Acceptance of Children), or 8 ( Liability for Delays/Cancellations and Denied Boarding) are not applicable, the following rules apply to passenger requests only if (i) Alaska is named in the routing, (ii) the ticketed reservations is cancelled prior to the ticketed departure time, and (iii) the unused portion of the Alaska-issued ticket including the passenger receipt is surrendered. In such cases, Alaska will refund to the passenger on the following basis:

1. Any refund will be subject to fare rules of the Ticket purchased. A Credit certificate may be given for any Ticket that is nonrefundable according to its fare rules. Any tax or other charge that is imposed by a government authority and required to be collected from a Passenger is in addition to the published fare. Such taxes and charges are refundable only if the fare on which the tax or charge is assessed is itself refundable according to its fare rules.

2. If no portion of the Ticket has been used, the refund will be an amount equal to the fare, taxes, and charges paid.

3. If a portion of the Ticket has been used, the refund will be equal to the difference, if any, between the fare and charges paid for the Ticket, and the fare and charges applicable to the used portion of the Ticket.

4. Refunds will be made in accordance with section 2 or section 3 provided that the unused flight coupons are surrendered to Alaska within one (1) year of the Ticket issue date.

5. Alaska assumes no obligation to issue a voluntary refund unless such Ticket was issued on Alaska Ticket stock. The term "Alaska Ticket stock" means Tickets bearing the Alaska Carrier code (027) as the first three digits of the Ticket serial number.

Note: If a ticketed reservation is canceled prior to the ticketed departure time, any refund will be subject to fare rules of the original Ticket. A Credit certificate may be given for any Ticket that is nonrefundable according to its fare rules.

a. Application for Refund

1. Time limit: Application for refund of a lost Ticket must be made no later than one (1) month after the expiration date of the lost Ticket.

2. Application must be made on forms prescribed by Alaska for such refunds, and refunds will not be issued earlier than four (4) months after receipt of proof of loss.

b. Refund will be made only provided that the lost Ticket or lost portion thereof has not previously been honored for transportation or refunded to any person.

c. Alaska will make such refund only provided that the person to whom refund is made agrees, in such forms as Alaska may require, to indemnify Alaska for any loss or damage which it may sustain by reason of such refund.

d. A $50.00 USD/CAD per Ticket service charge shall be imposed for handling lost Ticket refund requests,

*Alaska* except that no service charge shall be imposed when transportation is paid for with a US Government
A I R L I N E S credit card. Exception: If a lost ticket is found and returned to Alaska within four (4) months from date of reported loss, the service charge will be waived.

I. Alaska reserves the right to refuse to make any refund in a currency other than that used in the purchase or at a place other than that at which payment was made.

J. Alaska will collect a service charge on any returned check of $25.00 USD/CAD, or the maximum permitted by applicable law, if less. This charge is nonrefundable and is not subject to any discount.

K. Nonrefundable Tickets as specified in the fare rules. The fare paid for unused travel by Passengers who purchase restricted, nonrefundable Tickets is not eligible for refunds. Taxes, security fees, and Passenger Facility Charges associated with a nonrefundable fare are also not eligible for refund except as required by applicable regulations. Exception: The fare paid for unused travel by Passengers who purchase restricted, nonrefundable Tickets, including taxes, security fees, and Passenger Facility Charges, may be applied as travel Credit toward the purchase of future travel on Alaska, when requested directly with Alaska prior to scheduled departure time.

L. Nonrefundable and nonchangeable Tickets as specified in the fare rules. The fare paid for unused travel by passengers who purchase restricted, nonrefundable and nonchangeable Tickets is not eligible for refunds or travel credit. Taxes, security fees, and Passenger Facility Charges associated with a nonrefundable fare are also not eligible for refund except as required by applicable regulations.

# Rule 18. Fares, Charges and Currency

Ver esta regla en español

A. Transportation is subject to the fares and charges in effect when the Ticket is purchased. The fare is guaranteed once a reservation is made and a Ticket is purchased. If a Ticket is purchased before an increase in the fare becomes effective, the Ticket shall be honored for transportation between the airports and at the fare for which it was purchased.

B. Changes to any portion of a Ticket initiated by the purchaser, Passenger, or his/her authorized agent after its original issue will be subject to the fares, fare rules, and charges in effect on the date the change is initiated. A change constitutes a change in flight number, origin, destination, intermediate points, flight date, class of service, or fare.

C. Statement of Fares and Charges. All fares and charges governed by this Contract of Carriage are stated as follows:

1. In United States dollars for transportation between the U.S.A. and Canada when travel commences in Canada. Amounts will be converted to Canadian dollars at the applicable banker's rate at time of purchase.

2. In United States dollars for transportation between the U.S.A. and Canada when travel to Canada commences in the U.S.A.

D. Payments for Tickets shall be:

1. In Canadian dollars at the Canadian dollar fare, or its equivalent in United States dollars converted to Canadian dollars at the banker's buying rate of exchange, when travel commences in Canada.

2. In United States dollars at the U.S. dollar fare, or its equivalent Canadian dollars converted to U.S. dollars at a bank's buying rate of exchange, when travel to Canada commences in the U.S.A.

A. E2 For the purpose of this Rule, the Banker's Buying Rate of Exchange means:

1. In Canada, the unit rate published in the *Toronto Globe and Mail* Friday edition each week, as the foreign exchange mid-market rate in Canadian funds. When a national holiday falls on a Friday, the rates quoted on the previous business day will be used. These rates will be applicable from Monday of the following week up to and including the following Sunday.

2. In the S.A., the rate published each Tuesday in the *Wall Street Journal* under the heading *Foreign Exchange*. This rate will be applicable from Wednesday of each week up to and including the Tuesday of the following week. When a national holiday falls on a Monday, foreign exchange rates do not appear in the Tuesday edition of the *Wall Street Journal*. In such exceptional cases, the previous week's rates are used through Wednesday instead of Tuesday, and the Wednesday edition of the *Wall Street Journal* will be used for the period Thursday through Tuesday of the following week.

3. In other countries, the rate at which, for the purpose of the transfer of funds through banking channels (i.e. other than transactions in bank notes, travelers checks, and similar banking instruments) a bank will purchase a given amount of foreign currency in exchange for one unit (or units) of the country in which the exchange transaction takes place.

F. Construction of Fares. When the fare between any two points is not specifically published via the desired routing, such fare shall be constructed by combining those fares, applicable via the desired routing from the Passenger's point of origin to point of destination, which produce the lowest fare for the class of service used; provided, however, that such fare will not exceed the lowest fare determined in accordance with paragraphs (1), (2), (3), and (4) of this Rule.

1. Circle Trip/Round-Trip Maximum - If the fare constructed for such routing exceeds the fare for a Circle Trip or round-trip constructed from the same point of origin which would include such routing, the Circle Trip or round-trip fare shall apply.

2. Interrupted Travel - If a fare constructed for a trip interrupted by travel other than via participating Carriers exceeds the applicable through fare for uninterrupted travel via the routing, the applicable through fare shall apply.

3. Maximum Fare - For travel via the same or different classes of service, a combination of fares of the same or different classes of service (see note below) shall not exceed the lowest of the allowed fares or combination of fares via the same Carrier(s) between and via the same point:

    a. A combination of fares via the class of service used for a portion of the transportation and fares for a higher class of service used for the remainder of the transportation; or

    b. A combination of fares via higher class of service; or

    c. A through published fare via a higher class of service. Exception: A through published fare via a higher class of service to or from a more distant point may not be used to construct a fare for an intermediate point(s) if there is a published fare for the same higher class of service to or from such intermediate point(s).

    NOTE: For the purpose of paragraphs (a), (b), and (c), fares are published in the following descending order of classes of service:



| Ticket Issue | On/before February 23, 2021 | February 24, 2021 - March 30, 2021 |
|---|---|---|
| Travel | On/before February 01, 2022 | On/before March 30, 2021 |

1. F Fare Types - Booking Code: F
2. P Fare Types - Booking Code: P
3. I Fare Types - Booking Code: I
4. Y Fare Types - Booking Code: Y
5. S Fare Types - Booking Code: S
6. B Fare Types - Booking Code: B
7. M Fare Types - Booking Code: M
8. H Fare Types - Booking Code: H
9. Q Fare Types - Booking Code: Q
10. L Fare Types - Booking Code: L
11. V Fare Types - Booking Code: V
12. K Fare Types - Booking Code: K
13. G Fare Types - Booking Code: G
14. T Fare Types - Booking Code: T
15. R Fare Types - Booking Code: R
16. X Fare Types - Booking Code: X

| Ticket Issue | On/after February 24, 2021 |
|---|---|
| Travel | On/after March 31, 2021 |

1. F Fare Types - Booking Code: F
2. A Fare Types - Booking Code: A
3. J Fare Types - Booking Code: J
4. C Fare Types - Booking Code: C
5. D Fare Types – Booking Code: D
6. I Fare Types - Booking Code: I
7. Y Fare Types - Booking Code: Y
8. B Fare Types - Booking Code: B
9. H Fare Types - Booking Code: H
10. K Fare Types - Booking Code: K
11. M Fare Types - Booking Code: M
12. L Fare Types - Booking Code: L



13. V Fare Types - Booking Code: V

14. S Fare Types - Booking Code: S

15. N Fare Types - Booking Code: N

16. Q Fare Types - Booking Code: Q

17. O Fare Types - Booking Code: O

18. G Fare Types -Booking Code: G

19. X Fare Types - Booking Code: X

    4. Construction of Fares for Combination of Jet and Propeller Transportation in the Same Class of Service: Where no through one-factor fare is published from point of origin to point of destination via the route or movement for a journey in one class of service, partly on jet aircraft and partly on propeller aircraft, the applicable fare for such transportation shall be constructed as follows: where a through one-factor fare for propeller aircraft is published from point of origin or destination via the route of movement for the class of service used, the applicable fare shall be such through one-factor fare, plus the difference between the fares for jet and propeller aircraft, for the class of service used, between the points where jet aircraft is used. For the purpose of applying paragraph (4) only, the classes of service are:

        1. When specifically published via the desired routing, the applicable round-trip fare specifically published by or on behalf of such Carrier(s).

        2. When not specifically published via the desired routing, the sum of the one-way Segments or the sum of the round-trip Segment fares if these are published.

G. Currency of Payment. Except as otherwise provided below, fares and charges are payable in any currency acceptable to Alaska. When payment is made in a currency other than the currency in which the fare is published, such payment will be made at the rate of exchange established for such purpose by Alaska, the current statement of which is available for inspection by the Passenger at Alaska's office where the Ticket is purchased. The provisions of this paragraph are subject to applicable exchange laws and government regulations.

    1. Payment of fares for travel originating in the U.S shall be in U.S. currency when payment is made in the USA for issuance of the Ticket or document.

    2. Payment of fares for travel originating at a point outside the U.S. destined to a point in the U.S. may be made in the currency of the country of origin or U.S. currency. When the fare in the currency of the country of origin is converted to U.S. currency at the local bankers' buying rate of exchange.

    3. In case of cancellation or rerouting which results in a partial refund of the original fare, the value of the unused portion of the Ticket shall be calculated in the currency of the country of transportation origination. Such amount may be refunded in the currency of the country of transportation origination or may be converted into the currency of the country of refund or reissuance at the local bankers' buying rate in effect at the time refund takes place. Note: Alaska will pay the refund in the same form (i.e., cash, check, credit card, etc.) that was used in purchasing the original transportation document. Alaska, in making the refund, will observe any refund restriction that may be published in the applicable rules governing the original transportation document.

    4. Where an additional collection is to be made as a result of the rerouting, the additional amount may be collected in the currency of the country of transportation origination or may be converted into the

currency of the country in which the rerouting takes place at the local bankers' buying rate in effect at the time of rerouting. Such amount shall not be greater than the fare published in the currency of the country of transportation origination for the transportation actually used and/or to be used.

5. "Bankers' Buying Rate" means the rate at which, for the purpose of the transfer of funds through banking channels (i.e., other than transactions in bank notes, travelers checks, and similar banking instruments), a bank will purchase a given amount of foreign currency in exchange for one unit (or units) of the national currency of the country in which the exchange transaction takes place.

Exception 1: In the U.S.A., the Bankers' Buying Rate means the rate published each Tuesday in the *Wall Street Journal* under the heading of "selling prices for bank transfers in the U.S. for payment abroad." This rate will be applicable from Wednesday of each week up to and including the Tuesday of the following week.

Exception 2: When a national holiday falls on Monday, foreign exchange rates do not appear in the Tuesday edition of the *Wall Street Journal*. In such exceptional cases, the previous week's rates are used through Wednesday instead of Tuesday, and the Wednesday edition of the *Wall Street Journal* will be used for the period Thursday through Tuesday.

Exception 3: In Canada, the Bankers' Buying Rate means the rate published each Saturday in the *Toronto Globe & Mail* under the heading *Foreign Exchange - Mid Market Rate in Canadian Funds*. This rate will be applicable from Monday of the following week up to and including the Sunday following after. When exceptional circumstances prevent the publication of exchange rates in the Saturday edition of the *Toronto Globe & Mail*, the currently applicable exchange rates will remain effective until two (2) days after superseding exchange rates are published. Such superseding rates will be effective through the first Sunday following their publication dates.

# Rule 19. Additional Liability Limitations for International Carriage

Ver esta regla en español

A. For purposes of International Carriage governed by the Montreal Convention or the Warsaw Convention, the liability rules set out in the Montreal Convention and the Warsaw Convention, whichever may apply, are fully incorporated by reference herein and shall supersede and prevail over any provisions of this Contract of Carriage which may be inconsistent with those rules.

B. Successive Carriers - Carriage to be performed under one Ticket or under a Ticket and any conjunction Ticket issued in connection therewith by several successive Carriers is regarded as a single operation.

C. Alaska shall avail itself of the limitations of liability provided in the Montreal Convention and the Warsaw Convention, whichever applies, for recoverable compensatory damages sustained in the case of death or bodily injury of a Passenger, as provided in the following paragraphs:

　　1. (a) Alaska shall not avail itself of any exoneration defense under the Montreal Convention or Warsaw Convention with respect to that portion of such claim for death or bodily injury of a Passenger which does not exceed 128,821 SDRs for each Passenger.

　　(b) Alaska shall not be liable for damages to the extent that they exceed 128,821 SDRs for each

Passenger if Alaska proves that: (i) such damage was not due to the negligence or other wrongful act or omission of Alaska or its contractors or agents; or (ii) such damage was solely due to the negligence or other wrongful act or omission of a third party.

(c) Alaska reserves all other defenses and limitations available under the Warsaw Convention or the Montreal Convention, whichever applies, to such claims, including, but not limited to, the exoneration defense of Article 20 of the Montreal Convention and Article 21 of the Warsaw Convention, except that Alaska shall not invoke Articles 20 and 22(I) of the Warsaw Convention in a manner inconsistent with paragraph 1 hereof.

(d) With respect to third parties, Alaska reserves all rights of recourse against any other person, including without limitation, rights of contribution and indemnity.

(e) Alaska agrees that, subject to applicable law, recoverable compensatory damages for such claims may be determined by reference to the laws of the domicile or permanent residence of the Passenger.

2. In cases of bodily injury or death, Alaska shall make an advance payment where Alaska determines it is necessary to meet the immediate economic needs of, and hardship suffered by, a Passenger as provided in the following paragraphs:

(a) Unless a dispute arises over the identity of the person to whom an advance payment shall be made, Alaska shall, without delay, make the advance payment to the Passenger in an amount or amounts determined by Alaska in its sole discretion. In the event of death of a Passenger, the amount of the advance payment shall not be less than 16,000 SDRs, which shall be paid to a representative of the Passenger's next of kin eligible to receive such advance payment as determined by Alaska in its sole discretion.

(b) Alaska shall make the advance payment as an advance against Alaska's liability under the Montreal Convention or the Warsaw Convention, whichever may apply. An advance payment shall not constitute recognition of liability. An advance payment shall be offset against, or deducted from the payment of, any settlement or judgment with respect to any claim for compensation on behalf of the Passenger.

(c) Alaska, in making an advance payment, does not waive any rights, defenses, or limitations available under the Montreal Convention or the Warsaw Convention, whichever may apply, to any claim, nor shall acceptance of an advance payment constitute a release of any claim, whatsoever, by any person.

(d) Alaska, in making an advance payment, preserves its right to seek contribution or indemnity from any other person for such payment, which shall not be deemed to be a voluntary contribution or contractual payment on the part of Alaska.

(e) Alaska may recover an advance payment from any person where it is proven that Alaska is not liable for any damage sustained by the Passenger, or where it is proven that the person was not entitled to receive the payment, or where and to the extent that it is proven that the person who received the advance payment caused, or contributed to, the damage.

D. Alaska shall not be liable for damage occasioned by the delay in the Carriage of Passengers by air, as provided in the following paragraphs:

1. Alaska shall not be liable if it proves that it and its contractors and agents took all measures that could reasonably be required to avoid the damage, or that it was impossible for it or them to take such measures.

2. Airport, air traffic control, security, and other facilities or personnel, whether public or private, not under the control and direction of Alaska are not contractors or agents of Alaska, and Alaska is not liable to the extent the delay is caused by these kinds of facilities or personnel and Alaska took all reasonable measures to avoid the delay.

3. Damages occasioned by delay are subject to the terms, limitations and defenses set forth in the Warsaw Convention and the Montreal Convention, whichever may apply, in addition to any limitation or defense recognized by a court with proper jurisdiction over a claim.

4. Alaska reserves all defenses and limitations available under the Warsaw Convention or the Montreal Convention, whichever may apply, to claims for damage occasioned by delay, including, but not limited to, the exoneration defense of Article 20 of the Montreal Convention and Article 21 of the Warsaw Convention. Under the Montreal Convention, the liability of Alaska for damage caused by delay is limited to 5,346 SDRs per Passenger. The limits of liability shall not apply in cases described in Article 22 (5) of the Montreal Convention or Article 25 of the Warsaw Convention, whichever may apply.

E. Time Limitations on Claims and Actions

1. For Baggage claims, see Rule 15.O.

2. Any right to damages against Alaska shall be extinguished unless an action is brought within two (2) years from the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the Carriage stopped. No claims for overcharge shall be valid and no action shall be maintained thereon more than one (1) year after date of sale of the Ticket.

F. Liability for Carriage Not Governed by the Montreal Convention or Warsaw Convention

For purposes of all other Carriage not governed by the Montreal Convention, Warsaw Convention or other applicable international law, the following liability limitations and other exclusions apply:

(a) Alaska shall not be liable for any death, injury, delay, loss or other damage of whatsoever nature (hereafter referred to collectively as "damage") arising out of or in connection with Carriage or other services performed by Alaska, unless such damage is proven to have been caused by the sole negligence or willful misconduct of Alaska and there has been no contributory negligence on the part of the Passenger.

(b) Alaska shall not be liable for any damage arising out of Alaska's compliance with any laws, government regulations, orders, rules, requirements or security directives or as a result of a Passenger's failure to comply with such laws, government regulations, orders, rules, requirements or security directives or as a result of Passenger's reliance on advice provided by Alaska regarding such laws, regulations, orders, rules, requirements or security directives.

(c) Alaska shall not be liable for any punitive, consequential or special damages arising out of or in connection with Carriage or other services performed by Alaska, whether or not Alaska had knowledge that such damage might be incurred.

(d) Any limitations or exclusions of liability of Alaska shall apply to and be for the benefit of Alaska's agents, employees, contractors and representatives acting within the scope of their employment and also to any

person whose aircraft is used by Alaska and its agents, employees or representatives acting within the scope of employment.

(e) Nothing herein shall be deemed to affect the rights and liability of Alaska with regard to any claims brought by, on behalf of, or in respect to any person who has willfully caused damage which resulted in death, wounding, or other bodily injury of a Passenger.

G. Overriding Law: In so far as any provision contained or referred to in the Ticket or in this Contract of Carriage may be contrary to a law, international treaty, government regulation, order or requirement which severally cannot be waived by agreement of the parties, such provisions shall remain applicable and be considered as part of the Contract of Carriage to the extent only that such provision is not contrary thereto. The invalidity of any provision shall not affect any other part.

H. Modification and Waiver: No agent, contractor, or representative of Alaska has authority to alter, modify, or waive any provisions of this Contract of Carriage.

I. Alaska's liability for damage, if any, shall be limited to damage occurring on its own flights.

J. Alaska's shall not be liable for the death or injury of a Passenger not occurring on its own operated flights.

© 2021 Alaska Airlines, Inc. All rights reserved.