Plaintiffs' Exhibit 1

# 10

# Rule 15: Amended and Supplemental Pleadings

---

### Key Concepts



- Amending pleadings once as a matter of course and thereafter obtaining permission
- Amending pleadings to add a cause of action after the statute of limitations for that cause of action has run
- Amending pleadings during or after the trial
- Supplementing pleadings

---

## Introduction



Rule 15 allows a party to amend its pleading after it has been filed with the court. In keeping with the flexibility of the federal rules, Rule 15 is generous. The policy is that by allowing the parties to "fix" their pleadings as they go along, the case will more readily be resolved on the merits. The parties will not waste precious time and resources squabbling over the mechanics of amending their pleadings. However, Rule 15's flexibility must also be balanced with fairness concerns for the opposing party.

The need to amend generally arises when a party has made an inadvertent omission or mistake in its pleading. In that case, if the party realizes its mistake fairly quickly, the amendment will generally be allowed under the rule. But, a party may also learn of new information and want to amend its pleading to add a new party or claim accordingly. Whether an amendment is allowed in that situation often turns on whether the statute of limitations for the underlying action has run. If it has, the rule requires more complex analysis to determine whether that amendment will "relate back" to the original date of filing.

• 429 •

## A. The Rule

Rule 15 has four main sections:

- The first section (15(a)) sets out when and how a party can amend its pleading before trial.

- The second section (15(b)) allows the parties to amend the pleadings during and after trial.

- The third section (15(c)) prescribes whether an amendment to add a new claim or party filed after the statute of limitations has run will "relate back" (or be deemed to have been filed on the same date as the original pleading).

> The **statute of limitations** is the amount of time in which a particular cause of action can be brought *(See* Chapter 1 for a detailed description).

- Finally, the fourth section (15(d)) explains when a party can add claims that arise out of an event that occurred after the original pleading was filed.

## B. Rule 15(a): Amendments Before Trial

Rule 15(a) addresses two issues:

- the one and only time a party can amend the complaint without the permission of either the court or the opposing party; and

- how a party can amend a pleading once it has already filed an amendment under Rule 15(a)(1) or if the time period for filing a Rule 15(a)(1) amendment has passed.

| THE RULE | Rule 15(a) |
|---|---|

### Amendments Before Trial

**(1)** ***Amending as a Matter of Course.*** A party may amend its pleading **once as a matter of course** within:

    **(A)** 21 days after serving it; or

> **(B)** if the pleading is one to which a responsive pleading is re-
> quired, 21 days after service of a responsive pleading or 21
> days after service of a motion under Rule 12(b), (e), or (f),
> whichever is earlier.
>
> **(2)** *Other Amendments.* **In all other cases**, a party may amend its
> pleading only with the **opposing party's written consent** or the
> **court's leave**. The court should freely give leave **when justice so
> requires**.

## EXPLANATION

### 1. Rule 15(a)(1): Amendments as a Matter of Course



A party wishing to amend its pleading without permission of the court or the opposing party has a limited time in which to do so. This is called amending as a "matter of course" or an amendment "as of right." There are three specific moments listed in Rule 15(a)(1) in which a party can amend its pleading as a matter or course. They are:

> (a) within 21 days of serving the plead-ing;
>
> (b) 21 days after a responsive pleading is served; or
>
> (c) 21 days after a Rule 12 motion is served.

> Remember Rule 7 (discussed in Chapter 7). It tells us what counts as a "pleading" and what counts as a "motion." It is important to understand that while there are three distinct "amendment moments," a party has the right to amend without permission only once. For example, if a party amends its pleading within 21 days of serving that pleading, it cannot use Rule 15(a)(1) to amend again. Instead, it must seek permission of the court or the opposing party under Rule 15(a)(2).

## EXAMPLES & ANALYSIS

**Example:** Paula filed her complaint against Devon on October 1. She alleged that he negligently ran over her toe with his scooter. Devon did not file an answer, but instead filed and served a Rule 12(b)(6) motion

to dismiss on October 11, arguing that Paula failed to state a claim upon which relief could be granted. In the meantime, ==Paula realized that she also wanted to state a claim against Devon's brother Dillon.== She alleges that right after Devon ran over her right toe, Dillon ran over her left one. She would like to file an amended complaint to add Dillon. The statute of limitations does not run for two more years.

**Analysis:** ==Paula has 21 days from the date she was served with Devon's 12(b)(6) motion to file her amended complaint under 15(a)(1). This means that she has to file the complaint adding Dillon as a party by November 1.== If she misses that deadline, she will not be able to file the amendment as a matter of course under Rule 15(a)(1).

## IN PRACTICE



If a plaintiff files an amended complaint under Rule 15(a)(1) while a motion to dismiss is pending, the court has discretion to "transfer" the motion to the new complaint (assuming the motion is still responsive to the amended complaint) or it can require the defendant to file a new motion (if, for example, resolving the motion in light of the new complaint would cause confusion or delay). Often, an amended complaint will be filed in response to issues raised in a pending motion. In that case, the defendant must assess whether its motion is still viable.

**Example:** Assume that Paula successfully amended her complaint before November 1 to add Dillon as party. Dillon filed his answer on November 15, but a few days later he realized that he mistakenly denied an allegation when he intended to admit it. He filed an amended answer on November 20. Is he allowed to do so without court permission or without Paula's consent?

**Analysis:** Yes. The answer is a pleading, so Rule 15(a)(1)(A) applies. Dillon has 21 days from serving his answer to amend. And, as a policy matter, this

makes sense. His mistake is ministerial and the sooner it is fixed, the better it is for all parties involved.

**Example:** Assume again that Paula successfully amended her complaint before November 1 to add Dillon as a party. After filing that amendment, Paula realized that she mistakenly listed the wrong street names when describing where the accident occurred. Can she amend her pleading without permission from the court or the opposing party in order to replace the wrong street names with the correct ones?

**Analysis:** No. Paula has already amended her complaint once as a matter of course under Rule 15(a)(1). Although her proposed amendment is fairly innocuous, she will have to seek permission to amend under Rule 15(a)(2).

## 2.  Rule 15(a)(2): Amendments by Party Consent or Court Approval

Like Rule 15(a)(1), Rule 15(a)(2) is a generous rule. Even when the amending party has already amended once under Rule 15(a)(1) (or missed the window to amend under the same), that party can still amend its pleading as long as the opposing party consents in writing or the court grants the party leave to amend.

With respect to the first option—obtaining written consent from the opposing party—the calculus is fairly straightforward. The attorney for the opposing party should generally agree to the amendment unless doing so would violate the duties owed to her client. In other words, most reasonable requests for written consent for an amendment will be given. The attorney for the opposing party will in all likelihood want to avoid a protracted battle before the judge over a potential amendment and will often just allow the amendment out of professional courtesy.

On appeal, the court's decision to grant or deny the request for an amendment is reviewed for abuse of discretion (*See* Chapter 19 for a discussion of standards of review). If the court fails to explain its ruling, that omission alone could qualify as an abuse of discretion.

However, if the opposing party will not consent, the amending party must ask for the court's approval. Such a request should be made by motion, with the proposed amendment attached.

The language of Rule 15(a)(2) states that the amendment should be freely allowed "when justice so requires." Most courts have interpreted this language to require them to allow an amendment unless one of the following justifies denial:

(a) undue delay;

(b) bad faith or dilatory motive by the moving party;

(c) repeated failure to cure deficiencies by previous amendments;

(d) undue prejudice to the opposing party; or

(e) futility.

*See Foman v. Davis*, 371 U.S. 178, 182 (1962) (providing this basic set of factors for denying an amendment).

## EXAMPLES & ANALYSIS

**Example:** Parachute Corp. filed a complaint against Drexel Corp. in a breach of contract claim two years ago. In the past two years, the parties have completed a significant amount of discovery. The parties are set to go to trial in a month, but Parachute Corp. has asked to amend its complaint to add an additional claim of tortious interference. Drexel Corp. refused to consent to the amendment, so Parachute Corp. has sought permission from the court. Should the court allow the amendment?

**Analysis:** It depends, but probably not. The court will likely find that amending a month before trial to add this additional claim would result in prejudice to Drexel Corp. The court will have to determine whether Drexel Corp. would have done anything differently over the past two years. In other words, would it have conducted different discovery had it known of the tortious interference claim? If not, then the court may not find prejudice. But, if so, then the court will likely deny the motion. The court will also have to consider whether the new claim added by the amendment would be futile. Or put a different way, the court will have to determine whether the tortious interference claim would survive a Rule 12(b)(6) motion to dismiss. If it would not, then the court could deny the amendment on the basis of futility.

Rule 15(a)(2) does not prescribe a deadline for requesting permission from the court to amend the pleading. But, the factors to be considered certainly

## Quick Summary



- Rule 15 is an excellent example of how the federal rules provide parties with the necessary flexibility to pursue their claims.

- When a party acts within a specified time frame, it is free to amend its pleading once as a matter of course under Rule 15(a)(1).

- Even if it misses this deadline or even if it has already filed an amendment, it can still generally amend under Rule 15(a)(2). Either the opposing party or the court, in its discretion, can allow the amendment under this provision. Assuming the amendment is not futile, and assuming the party is not engaging in gamesmanship, the amendment will generally be allowed.

- Under Rule 15(b), when an issue comes up in trial and the opposing party objects to allowing an amendment to the pleading, the court will allow the amendment if the opposing party would not suffer prejudice. Or, if the issue is litigated in trial and neither party has objected to it, the parties and the court will treat the issue as if it had been properly pled since the beginning.

- When the statute of limitations has run, the rule attempts to balance the need for flexibility under the federal rules with the policy of fairness and repose that underlies statutes of limitations.

- Finally, when facts arise after a complaint has been filed, a party may seek to supplement her pleading. The court has discretion as to whether that supplemental filing should be allowed.

## Test Your Knowledge



To assess your understanding of the material in this chapter, **click here** to take a quiz.

Plaintiffs' Exhibit 2

# AMENDED COMPLAINTS

Before filing an amended complaint, be sure to review FRCvP 15 which details when an amended complaint is permitted to be filed.

If an amended complaint is permitted to be filed as of right or pursuant to a scheduling order or other previously determined deadline, **follow these instructions to file the *Amended Complaint***:

1. Log in to ECF.
2. Select **CIVIL** on the blue menu bar.
3. From the **Complaints and Other Initiating Documents** menu, select *Amended Complaint* and click **[SUBMIT]**.
4. Select the plaintiff(s) filing the amended complaint.
   a. To select more than one filer, hold the **<Ctrl>** key down and click on each appropriate name until all are highlighted.
   b. If a new plaintiff is being added to the amended complaint, click **[New Filer]** and add the new party.
   c. **REMEMBER:**
      i. Party names are entered in **ALL CAPS**.
      ii. **SEARCH** first before adding a new party to the database.
      iii. **Change the role of the party to PLAINTIFF**.
      iv. **DO NOT** add an address for the party.
      v. Add party text, if applicable.
      vi. To review the tutorial and instructions on Entering Party Names, go to our website: http://www.dcd.uscourts.gov/attorney-civil-case-opening-information
   d. Continue to add as many new plaintiffs as needed.
   e. Once the appropriate filers have been selected, click **[Next]**.
   f. **Note:** If a party is no longer named as a plaintiff in the amended complaint, do not select it as one of the filers. The Clerk's Office will follow up and terminate that plaintiff from the case.
5. Select the defendant(s) named in the amended complaint.
   a. To select more than one defendant, hold the **<Ctrl>** key down and click on each appropriate name until all are highlighted.
   b. If a new defendant is being added to the amended complaint, click **[New Party]** and add the new party. Continue to add as many new defendants as needed.
   c. **REMEMBER:**
      i. Party names are entered in **ALL CAPS**.
      ii. **SEARCH** first before adding a new party to the database.
      iii. **Change the role of the party to DEFENDANT**.
      iv. **DO NOT** add an address for the party.
      v. Add party text, if applicable.
      vi. To review the tutorial and instructions on Entering Party Names, go to our website: http://www.dcd.uscourts.gov/attorney-civil-case-opening-information
   d. Once the appropriate defendants have been selected, click **[Next]**.
   e. **Note:** If a party is no longer named as a defendant in the amended complaint, do not select it. The Clerk's Office will follow up and terminate that defendant from the case.
6. **[Browse]** and add your PDF document(s) to the docket entry, including any summons to be issued; click **[SUBMIT]**.

7.  When asked, "*Does this Complaint include a Jury Demand?*," select *Yes* or *No* and click **[SUBMIT]**.
8.  Modify/add docket text, if applicable. You may choose *First*, *Second*, *Third*, etc., from the drop-down menu in the docket text to accurately reflect what you are filing.
9.  Submit the docket entry and receive the Notice of Electronic Filing (NEF).

If consent was obtained from the defendant(s) to file the amended complaint, **follow these instructions to file the *Consent to the Filing of an Amended Complaint* <u>BEFORE</u> filing the amended complaint**:

1.  Log in to ECF.
2.  Select **CIVIL** on the blue menu bar.
3.  From the **<u>Other Documents</u>** menu, select ***Consent to the filing of an Amended Complaint*** and click **[SUBMIT]**.
4.  **[Browse]** and add your PDF document(s) to the docket entry and click **[SUBMIT]**.
5.  Select the plaintiff(s) as the filer(s) of the notice of consent; click **[Next]**.
6.  Submit the docket entry and receive the NEF.
7.  File the amended complaint following the instructions in the previous section.

If leave of court is required to file an amended complaint, **follow these instructions for filing a *Motion to Amend*:**

1.  Log in to ECF.
2.  Select **CIVIL** on the blue menu bar.
3.  From the **<u>Motions</u>** menu, select *Amend/Correct* and click **[SUBMIT]**.
4.  Follow the prompts of the event, entering the case number and selecting the appropriate filer(s).
5.  Add your motion as the main document of the docket entry, then **attach your proposed amended complaint as an exhibit to the motion**.
6.  When asked *"Should the document you are filing link to another document in this case?,"* add a checkmark to the box on the left and click **[SUBMIT]**.
7.  Select the original complaint or a previous amended complaint as the document you want to amend and click **[SUBMIT]**.
8.  Continue through the event until you receive the NEF.
9.  Once the motion is granted, the Clerk's Office will follow up and docket the amended complaint as a new and separate docket entry.

Plaintiffs' Exhibit 3

law.cornell.edu

# Amended Complaint

1-2 minutes

---

An amended complaint is a written revision of the original complaint filed by a plaintiff or petitioner. Rule 15 of the federal rules of civil procedure allows the plaintiff to amend their complaint one time within 21 days of serving the original complaint or at any point before the defendant answers the complaint. In all other circumstances, the plaintiff must seek consent of the court or consent from the defendant to amend the original complaint. Rule 15 provides that the court should allow the plaintiff to amend the complaint when justice requires it. Once the defendant receives the amended complaint, they are given the opportunity to send a responsive pleading.

Plaintiffs may choose to amend a complaint for numerous reasons such as to include additional claims, correct facts, add additional parties to the suit, include additional requests for relief, or clear up inadequate claims.

[Last updated in June of 2021 by the Wex Definitions Team]

- wex
- THE LEGAL PROCESS
- civil procedure
- wex definitions

Plaintiffs' Exhibit 4

law.jrank.org

# Parties - Joinder Of Additional Parties

4-5 minutes

---

Usually a plaintiff decides when, where, and whom she or he wants to sue. In some cases a plaintiff may wish to join, or add, other parties after the start of the lawsuit. Proper parties and necessary or indispensable parties may be added while the action is pending.

A proper party is anyone who may be a party in the lawsuit. The JOINDER, or addition, of a proper party in a pending lawsuit is entirely permissible. The court may allow the joinder of an additional party, but the lawsuit does not have to be dismissed if it does not. In some states anyone who has an interest in the subject of the controversy is a proper party in the lawsuit. Some courts encourage joinder of everyone who could be affected by the decision.

Under modern rules of procedure in many states and the federal courts, joinder is not encouraged to the point where a lawsuit becomes unwieldy or cluttered with unrelated parties and claims. Generally, joinder is approved where the claims of the persons sought to be joined arose out of the same transaction or event as the claims of the existing parties, so that all the claims may be settled by answering the same **QUESTIONS OF LAW** or fact. The decision to join additional parties is within the discretion of the court. Courts are careful not to exclude parties with an interest in a lawsuit because a failure to join those parties might lead to a series of lawsuits with inconsistent verdicts. That could ultimately leave a deserving plaintiff without a remedy or force a defendant to pay a certain claim more than once.

Whether a person is potentially necessary or indispensable to an action depends on the character and extent of that person's interest in the subject of the lawsuit. It is fair and equitable to require any person who has an interest

that can be affected by the lawsuit to be joined as a party. A person whose interest may be affected by the outcome of the case is considered necessary, and such a person should be joined if possible. A person whose interest is sure to be affected by the outcome of the lawsuit is considered an indispensable party, and the case cannot proceed without this person. The case must be dismissed, for example, if a person cannot be joined because he or she is beyond the jurisdiction of the court. In deciding whether a person should be a party to a lawsuit, the courts carefully weigh the consequences of proceeding without the person and seek a remedy that will give relief to those who are actual parties without doing great harm to a necessary or indispensable party who is missing.

Federal courts abandoned this analysis and terminology relating to necessary and indispensable parties in 1966. The Federal Rules of Civil Procedure focus on factors affecting the overall balance of fairness to the parties and potential parties involved rather than on categories of parties. Once a federal court determines that someone absent from the proceedings has an interest that can be affected by the case, the court must order that person to be joined as a party if it is practical to do so. If not, the court must weigh the competing interests of the plaintiff who would like to keep the case in federal court, the defendant who might be exposed to multiple lawsuits on the same issue, and the absent person whose rights may be lost if he or she does not become a party. The court must also consider how best to avoid wasting judicial time and resources and whether the case before it is the most efficient way to resolve the controversy.

# COMMENT

---

## ILLIBERAL CONSTRUCTION OF PRO SE PLEADINGS

RORY K. SCHNEIDER[†]

INTRODUCTION ........................................................................................586
I.  PRO SE LITIGATION AND LIBERAL CONSTRUCTION ......................589
    A. *The Right to Proceed Pro Se* .............................................. 590
    B. *The Federal Pro Se Docket*.................................................. 591
        1.  Evidence of a Burgeoning Caseload ......................591
        2.  Reasons Litigants Represent Themselves...............593
        3.  Challenges Facing Pro Se Litigants .......................597
    C. *Liberal Construction*......................................................... 600
        1.  The Method by Which Courts Liberally
            Construe Pro Se Complaints .................................601
        2.  The Theory Behind Liberal Construction............604
II. PLAUSIBILITY AND PRO SE PLEADINGS ..........................................607
    A. Ashcroft v. Iqbal............................................................. 608
        1.  Background and Prior History ..............................608
        2.  The Supreme Court's Two-Pronged Approach.....609
    B. Iqbal*'s Impact on Pro Se Pleadings* .................................. 612
        1.  The Minimal Assurance Provided Pro Se
            Litigants by *Erickson v. Pardus*................................613
        2.  *Iqbal*'s Exceptional Hostility Toward Pro Se
            Complaints ............................................................617
        3.  Explanations for the Disproportionate
            Increase in Pro Se Dismissals.................................619

---

    [†]  Comments Editor, *University of Pennsylvania Law Review*, Volume 159.  J.D. Candidate, 2011, University of Pennsylvania Law School; B.A., 2008, The George Washington University.  In loving memory of Barbara Ledet, for whose unconditional support I will forever be grateful.

      a.  *Necessarily Conclusory Allegations*.................. 619
      b.  *Biased Plausibility* ...................................... 622
III.  REFASHIONING LIBERAL CONSTRUCTION IN A
    POST-PLAUSIBILITY ERA................................................................625
    A.  *Restraining Judicial Authority to Carve Complaints*.............. 625
    B.  *Making Inferences Transparent to Assist with*
       *Complaint Amendments*..................................................... 628
    C.  *Addressing Concerns Related to Neutrality,*
       *Caseload, and Abuse* ....................................................... 630
CONCLUSION..........................................................................................632

## INTRODUCTION

Both the right to proceed pro se and liberal pleading standards reflect the modern civil legal system's emphasis on protecting access to courts.[1] Self-representation has firm roots in the notion that all individuals, no matter their status or wealth, are entitled to air grievances for which they may be entitled to relief.[2] Access, then, must not be contingent upon retaining counsel, lest the entitlement become a mere privilege denied to certain segments of society. Similarly, because pleading is the gateway by which litigants access federal courts, the drafters of the Federal Rules of Civil Procedure purposefully eschewed strict sufficiency standards.[3] In their place, the drafters instituted a regime in which a complaint quite easily entitled its author to discovery in order to prevent dismissal of cases before litigants have had an adequate opportunity to demonstrate their merit.[4]

Far from just articulating a common systemic value, though, the right to prosecute one's own case without assistance of counsel in fact

---

[1] *See, e.g.*, Phillips v. Cnty. of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008) ("Few issues . . . are more significant than pleading standards, which are the key that opens access to courts."); Drew A. Swank, *In Defense of Rules and Roles: The Need to Curb Extreme Forms of Pro Se Assistance and Accommodation in Litigation*, 54 AM. U. L. REV. 1537, 1546 (2005) (noting that "[o]pen access to the courts for all citizens" is one of the principles upon which the right to prosecute one's own case is founded).

[2] *See* Swank, *supra* note 1, at 1546 (discussing the importance of self-representation to the fundamental precept of equality before the law).

[3] *See Proceedings of the Institute on Federal Rules* (1938) (statement of Edgar Tolman), *reprinted in* RULES OF CIVIL PROCEDURE FOR THE DISTRICT COURTS OF THE UNITED STATES 301-13 (William W. Dawson ed., 1938).

[4] *See* Mark Herrmann, James M. Beck & Stephen B. Burbank, Debate, *Plausible Denial: Should Congress Overrule* Twombly *and* Iqbal*?* 158 U. PA. L. REV. PENNUMBRA 141, 148 (2009), http://pennumbra.com/debates/pdfs/PlausibleDenial.pdf (Burbank, Rebuttal) (asserting that the drafters of the Federal Rules objected to a technical pleading regime because it would "too often cut[] off adjudication on the merits").

depends significantly upon liberal pleading standards.[5]  The ability to file a "short and plain statement of the claim"[6] mitigates the impact that the choice to proceed pro se has on litigants' access to discovery by reducing the number of technicalities and requirements the satisfaction of which demands legal expertise.  However, recognizing that transsubstantive pleading standards do not sufficiently account for the capability differential between represented and unrepresented litigants, the Supreme Court fashioned a rule of special solicitude for pro se pleadings.[7]  Accordingly, "*pro se* complaint[s], 'however inartfully pleaded,' [are] held to 'less stringent standards than formal pleadings drafted by lawyers.'"[8]

Notably, however, the Court granted such leniency, or "liberal construction," to pro se pleadings against the backdrop of *Conley v. Gibson*'s undemanding "no set of facts" standard.[9]  The Court's failure to explain how pro se pleadings are to be liberally construed[10] indicates its belief that the standard was already lenient enough to render a detailed

---

[5]  *Cf.* Charles E. Clark, *The New Federal Rules of Civil Procedure:  The Last Phase—Underlying Philosophy Embodied in Some of the Basic Provisions of the New Procedure*, 23 A.B.A. J. 976, 976-77 (1937) (commenting that liberal pleading rules were necessary to mitigate information asymmetries between plaintiffs and defendants that often led to premature dismissal of suits).  Notably, in no suits are such information asymmetries more apparent than those in which pro se litigants sue represented adversaries.  These types of suits comprise the vast majority in which pro se litigants appear.  *Cf.* Jonathan D. Rosenbloom, *Exploring Methods to Improve Management and Fairness in Pro Se Cases:  A Study of the Pro Se Docket in the Southern District of New York*, 30 FORDHAM URB. L.J. 305, 323 (showing that the majority of pro se cases involve unrepresented plaintiffs who sue governmental defendants).

[6]  FED. R. CIV. P. 8(a).

[7]  *See* Robert Bacharach & Lyn Entzeroth, *Judicial Advocacy in Pro Se Litigation:  A Return to Neutrality*, 42 IND. L. REV. 19, 22-26 (2009) (noting that courts created ways to ensure that meritorious pro se suits would not be dismissed simply because the litigants lacked legal knowledge and experience, one of which was liberal construction).

[8]  Estelle v. Gamble, 429 U.S. 97, 106 (1976) (quoting Haines v. Kerner, 404 U.S. 519, 520-21 (1972) (per curiam)).

[9]  *See* Conley v. Gibson, 355 U.S. 41, 45-46 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."), *abrogated by* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 561-63 (2007).  This standard epitomized the notice-pleading regime envisioned by the drafters of the Federal Rules, who emphasized discovery as the stage at which a claim's true merit would come to light, rather than pleading.  *See* Christopher M. Fairman, *The Myth of Notice Pleading*, 45 ARIZ. L. REV. 987, 990 (2003) ("With merits determination as the goal, the Federal Rules create a new procedural system that massively deemphasizes the role of pleadings.").

[10]  *See* Bacharach & Entzeroth, *supra* note 7, at 29-30 (asserting that because the Supreme Court never defined the "degree of relaxation" afforded pro se pleadings in comparison to the liberal notice pleading standard applicable to all litigants, lower courts adopted different iterations of the rule).

articulation of the practice unnecessary to prevent premature dismissal of meritorious cases. However, with *Bell Atlantic Corp. v. Twombly*[11] and *Ashcroft v. Iqbal*[12] retiring the "no set of facts" standard and ratifying the means by which lower courts dismissed more disfavored cases under *Conley*,[13] liberal construction as presently practiced is not—if it ever was—sufficient to protect pro se litigants' access to courts.

The new plausibility standard[14] with which courts now determine the adequacy of complaints disproportionately harms pro se litigants.[15] First, the Supreme Court's instruction that "conclusory" facts not be presumed true when determining a claim's plausibility[16] will affect those who (1) lack the resources to develop facts before discovery, (2) bring claims requiring them to plead information exclusively within the opposition's possession, or (3) rely on forms in drafting complaints. Pro se litigants typify the parties who demonstrate all three behaviors. Second, determining whether the remaining allegations permit a plausible inference of wrongdoing, as per the Supreme Court's instruction,[17] is a wildly subjective endeavor. Courts are likely—no doubt unintentionally—to draw inferences that disfavor pro se litigants because their "judicial common sense" judgments of what is plausible result from a

---

[11] 550 U.S. 544 (2007).

[12] 129 S. Ct. 1937 (2009).

[13] *See generally* Richard L. Marcus, *The Revival of Fact Pleading Under the Federal Rules of Civil Procedure*, 86 COLUM. L. REV. 433, 435-37 (1986) (explaining how the reemergence of fact pleading resulted from lower courts' refusals to accept conclusory allegations as sufficient under the Federal Rules in particular categories of suits).

[14] *See Twombly*, 550 U.S. at 570 (requiring a complaint to allege "enough facts to state a claim to relief that is plausible on its face").

[15] *See* Patricia W. Hatamyar, *The Tao of Pleading: Do* Twombly *and* Iqbal *Matter Empirically?*, 59 AM. U. L. REV. 553, 615 (2010) (observing a substantially greater increase in the rate of dismissal of pro se suits than represented suits post-*Iqbal*).

[16] *See Iqbal*, 129 S. Ct. at 1951 ("[T]he allegations are conclusory and not entitled to be assumed true."); Hatamyar, *supra* note 15, at 579 ("*Iqbal* invites judges to . . . eliminate from consideration all the complaint's conclusory allegations . . . ."). The parsing of a complaint into conclusory and nonconclusory factual allegations disregards the Federal Rules' express disavowal of fact pleading, along with their requirement that all facts be presumed true when determining the adequacy of a complaint. *See, e.g.*, Stephen B. Burbank, *Pleading and the Dilemmas of Modern American Procedure*, 93 JUDICATURE 109, 115 (2009) (noting that the drafters of the Federal Rules rejected fact pleading because of the impossibility of distinguishing between conclusions and facts); Hatamyar, *supra* note 15, at 563 (discussing courts' obligations to credit as true all factual allegations in a complaint).

[17] *See Iqbal*, 129 S. Ct. at 1950 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

drastically different set of background experiences and values.[18]  The admixture of these two steps portends serious trouble for pro se litigants, who, even before the plausibility standard, did not fare well despite the leeway afforded their complaints.[19]

Accordingly, this Comment reevaluates the effectiveness of liberal construction as a bulwark against premature dismissal of pro se complaints.  Part I discusses pro se litigation generally.  It documents the rise of the federal pro se docket, the reasons individuals choose to proceed pro se, and the unique challenges they face as a result of that choice.  Because courts established liberal construction in response to those challenges, Part I ends by considering how this leniency operates in practice.  Part II examines in detail the new plausibility standard articulated by the Supreme Court in *Iqbal*.  Particularly, it dissects the Court's two-pronged approach to demonstrate how each step is uniquely hostile to pro se litigants.  This hostility explains the disproportionate impact that the decision has had and will continue to have on their complaints.  Part III suggests a way to reinvigorate the leeway afforded pro se litigants and bring self-representation closer to epitomizing our system's goal of providing equal court access.  Specifically, Part III advocates for (1) limiting disregard of "conclusory" factual allegations in pro se pleadings and (2) increasing transparency with respect to the inferences drawn against pro se litigants.

## I. PRO SE LITIGATION AND LIBERAL CONSTRUCTION

To evaluate liberal construction effectively, it is vital to understand the origins and characteristics of pro se litigation generally.  Recounting the roots from which the right to proceed pro se developed and the current prevalence of pro se cases in federal court demonstrates the importance of maintaining formidable protections against early dismissal.  Moreover, dispelling common assumptions about why individuals proceed pro se shows that their rate of dismissal may be disproportionately greater than the rate at which they file unmeritorious claims.  Thus, liberal construction has earned a reevaluation to ensure that it properly accomplishes the goals for which it was originally established.

---

[18]  *Cf.* Burbank, *supra* note 16, at 118 (suggesting that reliance on "judicial experience and common sense," *Iqbal*, 129 S. Ct. at 1950, invites "cognitive illiberalism," a phenomenon that negatively affects classes of disfavored litigants).

[19]  *See* Hatamyar, *supra* note 15, at 615 (noting that, under *Conley*, courts dismissed sixty-seven percent of pro se cases).

## A. *The Right to Proceed Pro Se*

Like many elements of the American legal system, the ability to civilly prosecute one's own case has its origins in British common law.[20]  Historically, these ties were so strong, in fact, that "[t]he Founders believed that self-representation was a basic right of a free people."[21]  As such, our early legal regimes heavily guarded the ability to proceed pro se; their commitment demonstrates both egalitarian and democratic ideals.

First, a fundamental precept of American law is that financial status should neither determine access to courts nor substantially alter the outcomes of cases.[22]  Individuals who are unable to afford attorneys should not be denied a forum in which to air their grievances.[23]  To ensure that they are not, any party to a case has long been able to proceed without a lawyer.  Importantly, however, considerable "anti-lawyer sentiment" also firmly ingrained the right to self-representation into the American system.[24]  This sentiment emphasizes that self-representation safeguards were not solely intended to protect the poor's access to courts; they also empowered citizens of all types to have their own voices heard, rather than speaking exclusively through their lawyers.

The Sixth Amendment protects the constitutional right to represent oneself as a criminal defendant.[25]  By contrast, however, the

---

[20] *See* Nina Ingwer VanWormer, *Help at Your Fingertips:  A Twenty-First Century Response to the Pro Se Phenomenon*, 60 VAND. L. REV. 983, 987 (2007) (tracing the right to represent oneself in federal court to medieval England, and to the Magna Carta in particular).

[21] Faretta v. California, 422 U.S. 806, 830 n.39 (1975).

[22] *See* Drew A. Swank, *The Pro Se Phenomenon*, 19 BYU J. PUB. L. 373, 374-75 (2005) (noting that the "American legal ideal is that both the wealthy and the pauper could have access to the courts and could be treated equally with the resulting decisions being as fair as possible").

[23] *See id.* at 375 ("The development of pro se rights in the United States has been tied to the rights of indigents to have access to the courts.").

[24] *See, e.g.*, *Faretta*, 422 U.S. at 826-27 (discussing American colonists' fervent distrust of lawyers as responsible for their insistence on maintaining the right to proceed pro se); Jona Goldschmidt, *Cases and Materials on Pro Se Litigation and Related Issues*, THE PRO SE LAW CENTER (May 1–4, 1997), http://www.pro-selaw.org/cases.asp (providing references to research pertaining to the anti-lawyer sentiment from which the right to self-representation emerged).

[25] *See Faretta*, 422 U.S. at 819 ("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. . . . [T]he right to self-representation . . . is thus necessarily implied by the structure of the Amendment.").  So firm are the historical roots from which the right to defend oneself from criminal prosecution arose that in sixteenth- and seventeenth-century England, felony defendants were actually required, not just

Supreme Court has not deemed the right to proceed pro se as a civil litigant to be constitutionally guaranteed, despite its longstanding recognition in the Anglo-American legal tradition.[26]   Nevertheless, Congress codified the right to proceed pro se in federal civil suits by statute, even prior to the ratification of the Sixth Amendment.   The Judiciary Act of 1789, the right's earliest statutory expression, pronounced "[t]hat in all the courts of the United States, the parties may plead and manage their own causes *personally* or by the assistance of such counsel or attorneys at law as by the rules of the said courts respectively."[27]   And Congress has, up to the present, continually codified the statutory right to proceed pro se in the United States Code using substantially similar language.[28]

## B.  *The Federal Pro Se Docket*

### 1.  Evidence of a Burgeoning Caseload

Although pro se litigation has been welcomed since the country's founding, federal courts have recently experienced a staggering in-

---

entitled, to proceed without a lawyer, despite the earlier recognition of a right to counsel in misdemeanor prosecutions and civil cases.  *See id.* at 823 ("By common law of that time, it was not representation by counsel but self-representation that was the practice . . . .").  The tradition carried over into colonial America as well:  "[E]ven where counsel was permitted, the general practice continued to be self-representation [in criminal cases]."  *Id.* at 828.

[26]  *See* Swank, *supra* note 1, at 1547 ("Whatever right there is to proceed pro se in criminal cases . . . has not been extended by the Supreme Court to civil cases."); Van-Wormer, *supra* note 20, at 986-87 (noting that, although criminal defendants' right to refuse counsel is protected by the Sixth Amendment of the Constitution, the guarantee "does not extend to civil litigants").  Nonetheless, considerable debate has focused upon whether there is a constitutional right to self-representation in civil cases, despite its nonrecognition thus far by the Supreme Court.  *See, e.g.*, Lois Bloom & Helen Hershkoff, *Federal Courts, Magistrate Judges, and the Pro Se Plaintiff*, 16 NOTRE DAME J.L. ETHICS & PUB. POL'Y 475, 484-85 (2002) (suggesting that the right to self-representation is constitutionally guaranteed); Candice K. Lee, Note, *Access Denied:  Limitations on Pro Se Litigants' Access to Courts in the Eighth Circuit*, 36 U.C. DAVIS L. REV. 1261, 1265 (2003) (commenting that courts have split on whether civil litigants have a constitutional right to proceed self-representation).  Some states, though, have definitively afforded constitutional protection to civil litigants' right to self-representation.  *See, e.g.*, GA. CONST. art. I, § 1, para. XII ("No person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state."); MICH. CONST. art. I, § 13 ("A suitor in any court of this state has the right to prosecute or defend his suit, either in his own proper person or by an attorney.").

[27]  Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 92 (emphasis added).

[28]  *See* 28 U.S.C. § 1654 (2006) ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel . . . .").

crease in the proportion of pro se cases on their dockets.[29]  The trend is restricted neither to particular courts nor to certain types of suits.  Rather, it has taken hold in both district and appellate courts, in cases involving prisoners and nonprisoners, and in claims ranging from civil rights to social security.[30]

Presently, pro se litigants appear in approximately thirty-seven percent of all federal court cases.[31]  Specifically, in 2008, there were over 70,000 pro se cases in federal district court, as compared to approximately 200,000 represented cases.[32]  Unsurprisingly, prisoners account for a significant part of the federal pro se docket.  However, nonprisoners still appeared pro se in a significant number of district court cases in 2008—over 20,000, in fact.[33]  Thus, statistics belie the notion that the increase in pro se litigation can solely be attributed to prisoners' incessant filing of habeas corpus petitions and claims under 42 U.S.C. § 1983.[34]

---

[29] *See* Stephan Landsman, *The Growing Challenge of Pro Se Litigation*, 13 LEWIS & CLARK L. REV. 439, 440-41 (2009) (describing the "inexorably rising tide of pro se litigation" in American courts); *see also* VanWormer, *supra* note 20, at 988-91 (presenting data on the recent rise of pro se litigation in both state and federal courts).

[30] *See* Landsman, *supra* note 29, at 442 (asserting that, aside from civil rights claims, common claims pursued pro se also involved contract, labor, social security, and tort law).

[31] Swank, *supra* note 22, at 377 (citing Tiffany Buxton, *Foreign Solutions to the U.S. Pro Se Phenomenon*, 34 CASE W. RES. J. INT'L L. 103, 112 (2002)).

[32] *See* JAMES C. DUFF, ADMIN. OFFICE OF THE U.S. COURTS, JUDICIAL BUSINESS OF THE UNITED STATES COURTS:  2008 ANNUAL REPORT OF THE DIRECTOR 78 tbl.S-23 (2008) (reporting that 70,948 pro se cases were heard in district courts in the twelve months preceding September 30, 2008, compared to 196,309 non–pro se cases).

[33] *Id.*

[34] In fact, two relatively recent statutory developments, the Prison Litigation Reform Act of 1995 (PLRA), Pub. L. No. 104-134, 110 Stat. 1321 (codified as amended in scattered sections of 11, 18, 28, and 42 U.S.C.), and the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered sections of 8, 18, 22, 28 and 42 U.S.C.), have severely limited prisoners' ability to institute abusive litigation.  The PLRA, for example, requires prisoners to exhaust administrative remedies before filing civil actions and pay court filing fees in full, thereby reducing the portion of the pro se docket consisting of prisoner complaints.  *See* 28 U.S.C. § 1915(b)(1) (2006) (imposing full filing fees on prisoner litigants); 42 U.S.C. § 1997e(a) (2006) (codifying an administrative exhaustion requirement); Rosenbloom, *supra* note 5, at 322 (concluding that the sharp decrease in "[t]he number of inmate-filed cases . . . following the enactment of the PLRA" demonstrates the enactment's profound effect on pro se litigation).  Even more strictly, AEDPA forbids prisoners from reinstituting previously adjudicated habeas claims.  28 U.S.C. § 2244(b)(1).  It also prohibits successive habeas petitions containing claims not previously adjudicated absent approval from the relevant court of appeals and either (1) a basis in a new constitutional rule made retroactive on collateral review by the Supreme Court or (2) a showing that the factual predicate for the claim both could not

Moreover, the number of pro se appeals in federal court has similarly increased in recent years to comprise a significant portion of the federal appellate docket. For example, "nonprisoner pro se litigants consistently accounted for approximately thirteen to fourteen percent of all civil federal appeals filed annually between 1997 and 2004."[35] From 2007 to 2008, though, federal courts of appeals experienced an eight percent increase in the number of civil pro se appeals, resulting in almost 20,000 in total.[36] As a result, approximately sixty-two percent of all civil appeals are presently pursued pro se, with approximately 14.5 percent involving nonprisoner pro se parties.[37]

Clearly, then, pro se litigation shows no sign of subsiding. It will only continue to grow as part of the federal docket, warranting an evaluation of the reasons individuals choose to proceed pro se. Without understanding the underlying causes of the rising tide of pro se litigation, meaningful accommodations for self-represented litigants will continue to evade courts.

### 2. Reasons Litigants Represent Themselves

Demonstrating that the leniency granted to pro se pleadings is insufficient to protect meritorious claims from premature dismissal requires first dispelling the notion that pro se claims virtually always lack merit. If they did, courts would appropriately dismiss them at rates substantially higher than complaints submitted by counseled parties. But the well-documented reasons individuals choose to proceed pro se, which largely do not relate to the merits of their claims, undercut the veracity of that belief.[38] In fact, "scholars and pro se litigants

---

have been developed previously and provides clear and convincing evidence that a reasonable factfinder would not have found the defendant guilty. 28 U.S.C. § 2244(b)(2)–(3). Despite these influential developments in prisoner litigation, the pro se docket continues to grow.

[35] VanWormer, *supra* note 20, at 989.

[36] *See* DUFF, *supra* note 32, at 45 tbl.S-4 (indicating an 8.2 percent increase from 2007 to 2008 in civil pro se appeals).

[37] *See id.* (showing that of the 31,454 total civil appeals in 2008, 4595 involved nonprisoners acting pro se).

[38] This is not to deny that a lack of legal expertise often leads litigants to believe they have claims when they, in fact, do not. It does, however, suggest that perhaps the number of unmeritorious pro se filings is not as high as many assert, and perhaps not high enough to explain the grossly disproportionate rate at which they are dismissed. Indeed, the high rate of dismissal of pro se cases cuts against the certainty that pro se claims lack merit because, without any discovery, it is difficult to discern the likelihood that a claim would have been successful—precisely the reason that drafters of the Federal Rules instituted a weak pleading regime in the first place.

themselves have identified several rational, well-considered reasons for deciding to do so."[39]

The assumption that a vast majority of pro se suits lack merit is primarily based upon a conception of the legal market as an accurate filter for unmeritorious cases; good claims attract representation, while bad ones do not.[40]  Under this theory, "the fact that no lawyer is willing to take on an action for damages suggests that someone knowledgeable about the law has looked at the matter and concluded that the plaintiff is unlikely to prevail."[41]  However, this argument does not accurately capture the reasons that individuals forego representation, as it assumes that lawyers always accept "good" cases presented to them and that any litigant would accept representation if made available.[42]  Neither of these assumptions holds water.

First, the most prevalent reason individuals choose to prosecute their own cases is inability to afford counsel.[43]  Certainly, the use of contingent fees mitigates to some extent the impact that lack of re-

---

[39]  VanWormer, *supra* note 20, at 991.

[40]  *See, e.g.,* Merritt v. Faulkner, 823 F.2d 1150, 1155 (7th Cir. 1987) (per curiam) (Posner, J., concurring) (arguing against the appointment of counsel in a pro se suit for damages because the self-represented litigant could have hired an attorney on a contingent-fee basis, and concluding from his failure to do so that the claim lacked merit).  For a fuller critique of this argument, see generally Robin Paul Malloy, *Framing the Market:  Representations of Meaning and Value in Law, Markets, and Culture*, 51 BUFF. L. REV. 1 (2003).

[41]  Colleen McMahon, *The Law of Unintended Consequences:  Shockwaves in the Lower Courts After* Bell Atlantic Corp. v. Twombly, 41 SUFFOLK U. L. REV. 851, 867 (2008).

[42]  *See, e.g.,* Swank, *supra* note 22, at 378 ("[C]ommon belief is that all pro se civil litigants want counsel to represent them and that no person would choose to be pro se." (internal quotation marks omitted) (footnotes omitted)).  The assumption that anyone intending to prosecute a claim desires counsel reflects, in a more refined manner, the saying that "one who is his own lawyer has a fool for a client."  Faretta v. California, 422 U.S. 806, 852 (1975) (Blackmun, J., dissenting).  Yet the myriad reasons why individuals choose to proceed pro se in civil suits show that they may not be foolish for doing so and certainly cannot be blamed for the decision, as it often results from their insolvency.  *See* VanWormer, *supra* note 20, at 991-92 (rejecting the joke as inaccurate in light of why individuals represent themselves).  Indeed, even in the criminal context—where the stakes are higher—the saying's accuracy has been called into question by a study that demonstrates that, in fact, "pro se felony defendants in state courts are convicted at rates equivalent to or lower than the conviction rates of represented felony defendants."  Erica J. Hashimoto, *Defending the Right of Self-Representation:  An Empirical Look at the Pro Se Felony Defendant*, 85 N.C. L. REV. 423, 423 (2007).

[43]  *See* Paul D. Healey, *In Search of the Delicate Balance:  Legal and Ethical Questions in Assisting the* Pro Se *Patron*, 90 LAW LIBR. J. 129, 133 (1998) ("Ultimately, the predominant reason for self-representation may be simple economics.");  Swank, *supra* note 22, at 378 (asserting that a majority of the public attributes the increase in pro se appearances to the high cost of attorneys).

sources should have on acquiring counsel. However, contingent fees do not effectively assist many claims that pro se litigants pursue, such as those for injunctive relief against civil rights abuses.[44] Additionally, the contingent-fee structure still requires attorneys to front large sums of money to prosecute claims, which they will not do if the projected reward is too little (or nothing at all), despite a significant likelihood of success.[45] Furthermore, there may not exist an accessible legal market in which a litigant can shop her claims, either because of geographical remoteness[46] or incarceration.[47] Thus, proponents of the efficient-legal-market hypothesis ignore influential factors in lawyers' decisions regarding whether to represent prospective clients, which relate less to their claims' merit or likelihood of success and more to external factors.

Furthermore, a significant number of pro se litigants in fact have funds to retain counsel, demonstrating that there are other, noneco-

---

[44] *See* Rosenbloom, *supra* note 5, at 321, 326-27 (asserting that civil rights cases are most frequently pursued pro se and that approximately thirty percent of examined pro se cases sought a form of equitable relief). Although attorneys' fees would presumably be available if these types of suits are "successful," the Supreme Court has limited the ability of civil rights attorneys to receive attorneys' fees under 42 U.S.C. § 1988. *See, e.g.*, Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 598 (2001) (holding that attorneys cannot collect fees under the "catalyst theory," in which defendants voluntarily change their conduct in the way requested by plaintiffs); *see also generally* 42 U.S.C. § 1988 (2006). As a result, attorneys are nevertheless discouraged from pursuing such suits. *See* Catherine R. Albiston & Laura Beth Nielsen, *The Procedural Attack on Civil Rights: The Empirical Reality of* Buckhannon *for the Private Attorney General*, 54 UCLA L. REV. 1087, 1089-92 (2007) (arguing that the Court's holding in *Buckhannon* discourages civil rights claims).

[45] *See* Lee, *supra* note 26, at 1280-81 (doubting the market's capacity to provide representation when the expected profit is too insignificant to attract counsel); Swank, *supra* note 22, at 380 (noting that where little or no profit motive exists, as where a potential client is a defendant or has an unprofitable case, the market will not provide representation). In addition to not fully accounting for lawyers' calculus in accepting cases, the contingent-fee structure may cause parties to forego representation because the substantial portion of an award that goes to the attorney may prevent even successful plaintiffs from being made whole. If a party feels confident in the strength of her suit, then, she may choose to proceed without counsel in order to be more fully compensated for the injuries suffered.

[46] *See* PATRICIA A. GARCIA, LITIGANTS WITHOUT LAWYERS: COURTS AND LAWYERS MEETING THE CHALLENGES OF SELF-REPRESENTATION 8 (2002) (asserting that some litigants "point to problems finding a lawyer" as a reason why they did not obtain counsel); Frances H. Thompson, *Access to Justice in Idaho*, 29 FORDHAM URB. L.J. 1313, 1315 (2002) (asserting that in certain rural locations, even if an individual wishes to hire an attorney, she may not be able to find one).

[47] *See, e.g.*, McMahon, *supra* note 41, at 867 (excluding prisoners from the assertion that the legal market adequately determines meritorious cases because they have "virtually no opportunity to search for counsel").

nomic reasons for their decisions to proceed pro se.[48]  For example, pro se litigants have asserted that their distrust of lawyers or the legal system in general drove them to forego representation.[49]  Unlike these skeptical individuals, others who choose to prosecute claims without counsel seem to possess a more idealistic vision of our legal system.  They believe that courts will come to the "right" or "just" result regardless of their status as unrepresented litigants, a concept from which self-representation itself originated.[50]  There are numerous other factors, unrelated to merit, resulting in more litigants opting to not hire counsel, including increased literacy rates, a heightened sense of individualism, and the belief that litigation is simple enough to navigate on one's own.[51]  However, one remaining factor is particularly strong in demonstrating that many pro se suits do indeed have merit: consulted counsel often advise litigants to proceed unrepresented because they believe certain cases are easy enough for the litigants to pursue without assistance.[52]

Thus, we should not assume that most pro se suits have been reviewed by lawyers who deemed them unworthy.  Rather, many of the reasons individuals choose to act without assistance of counsel may

---

[48] *See, e.g.*, Bauer v. Comm'r, 97 F.3d 45, 49-50 (4th Cir. 1996) (acknowledging that a pro se litigant had the funds and ability to obtain counsel and was therefore not entitled to "preferential treatment"); Landsman, *supra* note 29, at 444-45 (emphasizing the presence among pro se litigants of "individuals who can afford counsel but choose not to hire a lawyer"); Swank, *supra* note 22, at 378 (citing a survey in which almost half of the pro se litigants "implied that they had the necessary funds to hire an attorney, but chose not to"); Spencer G. Park, Note, *Providing Equal Access to Equal Justice:  A Statistical Study of Non-Prisoner Pro Se Litigation in the United States District Court for the Northern District of California in San Francisco*, 48 HASTINGS L.J. 821, 831 (1997) ("[T]he overwhelming majority of pro se litigants, 72%, were not legally 'indigent' . . . .").

[49] *See* Jona Goldschmidt, *The Pro Se Litigant's Struggle for Access to Justice:  Meeting the Challenge of Bench and Bar Resistance*, 40 FAM. CT. REV. 36, 36 (2002) (discussing "antilawyer sentiment" as a reason for increased pro se litigation); Eric J.R. Nichols, Note, *Preserving* Pro Se *Representation in an Age of Rule 11 Sanctions*, 67 TEX. L. REV. 351, 380 (1988) (placing distrust of the legal system among the reasons why litigants choose to proceed pro se).  It seems, then, that the antilawyer sentiment partially responsible for solidifying self-representation as an element of the Anglo-American legal tradition has not dissipated, but rather continues to nurture its growth.

[50] *See* Swank, *supra* note 22, at 379 (presenting noneconomic reasons for which some litigants choose to represent themselves); *see also supra* Section I.A (discussing the foundations upon which the right to self-representation rests, including the notion that the retention of counsel should not substantially alter outcomes).

[51] *See* Swank, *supra* note 22, at 378-79 (listing factors that in recent years have contributed to the growing inclination toward pro se litigation).

[52] *See, e.g.*, Thompson, *supra* note 46, at 1316 (asserting that thirty-one percent of pro se litigants in Idaho consulted counsel, and many were advised not to obtain representation because "their case [wa]s simple enough for them to handle themselves").

be largely unrelated to the validity of their claims, calling into question the presumption of reduced merit that informally attaches to pro se complaints.

### 3. Challenges Facing Pro Se Litigants

If more pro se litigants have potentially valid grievances than commonly believed, there must be other factors, aside from frivolity, that explain the grossly disproportionate rate at which their claims are dismissed. These factors, consisting of the unique challenges faced by litigants proceeding pro se, manifest at the pleading stage of litigation to render their complaints more vulnerable to dismissal for failure to state a claim.[53]

First, there exists significant bias against pro se litigants in the court system: "Pro se litigants are regularly perceived in a negative manner; they are 'most often attacked for the judicial inefficiencies many judges, attorneys, and observers believe they create.'"[54] As a result, they are thought to be pests responsible for "clogging" up the court system.[55] However, the evidence largely disproves these assessments. Indeed, studies have shown that cases with only represented parties consumed more time than[56] and settled at essentially the same rate as their pro se counterparts.[57] Aside from a sense that their claims

---

[53] *See* Rosenbloom, *supra* note 5, at 308-09 (discussing the methods by which over-burdened courts summarily dispose of pro se cases).

[54] Swank, *supra* note 22, at 384 (quoting Buxton, *supra* note 31, at 114).

[55] *See* JONA GOLDSCHMIDT ET AL., MEETING THE CHALLENGE OF PRO SE LITIGATION: A REPORT AND GUIDEBOOK FOR JUDGES AND COURT MANAGERS 121 (1998) (quoting judges who expressed distaste for pro se litigants).

[56] Rosenbloom, *supra* note 5, at 358-59.

[57] *See, e.g.*, Buxton, *supra* note 31, at 145-46 (citing a study which found that civil pro se claims settled at a rate "virtually identical" to that of cases with represented parties); Rosenbloom, *supra* note 5, at 358-59 (noting that cases longest on the docket involved represented parties). The lighter burden that pro se suits impose upon courts in comparison to counseled suits reflects not only pro se litigants' unfamiliarity with available litigation tactics but also the less complex nature of the claims that pro se litigants pursue. Accordingly, pro se suits are particularly good candidates for the sort of limited, court-supervised discovery that many commentators and the *Iqbal* minority have suggested as more appropriate than stringent pleading requirements. *See* Ashcroft v. Iqbal, 129 S. Ct. 1937, 1961-62 (2009) (Breyer, J., dissenting) ("[A] trial court, responsible for managing a case, . . . can structure discovery . . . . Neither the briefs nor the Court's opinion provides convincing grounds for finding these alternative case-management tools inadequate . . . ." (citation omitted)); A. Benjamin Spencer, *Understanding Pleading Doctrine*, 108 MICH. L. REV. 1, 30 (2009) ("[A] better approach might be to permit judges to identify those cases where additional facts are needed to support the needed inference and reserve judgment on the motion to dismiss until after limited, focused discovery on that issue can occur."). The discovery costs would not be

Plaintiffs' Exhibit 6

# Managing Class Action Litigation:
# A Pocket Guide for Judges

Barbara J. Rothstein & Thomas E. Willging

Federal Judicial Center
2005

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to develop and conduct education programs for judicial branch employees. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

# Contents

Preface, v

Introduction, 1

I. Selection of counsel, 4

    A. Single-lawyer model, 4

    B. Private ordering, 4

    C. Selection by the judge, 5

    D. Empowered plaintiff model, 5

    E. Competitive bidding, 5

II. Timing and significance of class certification, 6

    A. Timing, 6

    B. Class certification, 6

    C. Defining the class, 7

    D. Multiple class actions, 7

III. Settlement review: risks and issues, 8

    A. Judge's role, 8

    B. Obtaining information about the settlement, 9

    C. Hot button indicators, 12

    D. Preliminary review of proposed settlement, 16

    E. Notice issues, 18

    F. Fairness hearing, 20

IV. Attorney fee issues, 22

    A. "Mega" cases, 22

    B. Monetary results achieved for class, 23

    C. Evaluating nonmonetary results, 23

    D. Role of government actors, 24

    E. Objectors, 24

    F. Methods of calculating fees, 24

V. Role of government actors, 25

VI. Coordination with state judges, 27

VII. Use of special masters and court-appointed experts, 28

Conclusion, 28

Bibliography, 29

**About the Federal Judicial Center, 30**

# Preface

This pocket guide is designed to help federal judges manage the increased number of class action cases expected as a result of the Class Action Fairness Act of 2005. The new legislation expresses congressional confidence in the abilities of federal judges to "assure fair and prompt recoveries for class members with legitimate claims" and to provide appropriate "consideration of interstate cases of national importance under diversity jurisdiction." CAFA, sec. 2(b).

The Act also calls on the judiciary to develop and implement "best practices" for ensuring that settlements are fair to class members and that class members are the primary beneficiaries of any settlement. This guide is part of a continuing effort of the federal judiciary to achieve those goals.

Amendments to Rule 23 that went into effect in December 2003 anticipated the statutory charge, as did the Center's publication of its *Manual for Complex Litigation, Fourth* in 2004. Those involved in producing the rules and manual, particularly Judge Lee H. Rosenthal (S.D. Tex.), deserve recognition for their efforts.

A note of appreciation should also go to Judge D. Brock Hornby (D. Me.) for his detailed suggestion and outline of topics which served as a catalyst and roadmap for this publication.

I hope you find this guide useful in meeting the challenges Congress has entrusted to us in managing class action litigation.

Barbara Jacobs Rothstein
Director, Federal Judicial Center

# Introduction

Class actions often attract a great deal of public attention.* Rulings by state and federal judges in class actions have become the subject of a highly polarized public debate. This debate has focused on perceived abuses of class action by the parties and their attorneys that have affected both defendants and class members. In the Class Action Fairness Act of 2005 (CAFA) (Pub. L. No. 109-2, 119 Stat. 4 (2005)), Congress responded to the debate by shifting many class actions to federal court and assigning new responsibilities to federal judges. This guide can assist you in discharging those responsibilities. The guide distills many of the most important practices for managing class actions found in the *Manual for Complex Litigation, Fourth* (MCL 4th) and provides cites to cases decided after publication of the MCL 4th to illustrate many points. For your convenience, cross-references to the MCL 4th are also provided in the guide.

CAFA begins with the finding that "class action lawsuits are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties . . . ." Such claims might otherwise evade legal enforcement. Class actions may also help regulators control conduct that threatens to harm various markets. Securities and other consumer class actions serve to enforce regulatory standards designed to control or deter fraudulent marketplace conduct that might otherwise escape regulation. Members of Congress and others who assert class actions' general utility also point, however, to abuses that threaten to undermine their usefulness. Critics single out cases in which the benefits accruing to the class as a whole and to the public seem minimal.

---

*The Federal Judicial Center has devoted considerable attention to class actions in educational programs for judges and has performed extensive empirical work for the Judicial Conference's Advisory Committee on Civil Rules. The Center's *Manual for Complex Litigation, Fourth* (MCL 4th) devotes hundreds of pages to the subject in a general chapter on class actions (chapter 21) and a chapter on attorney fees (chapter 14), and discussions of class actions in mass tort (section 22.7), securities (section 31.5), and employment discrimination (section 32.42) contexts. This guide highlights some of the practices endorsed in the manual and cross-references major provisions of the manual. Other resources, including an outline and videotape of a Federal Judicial Television Network program on the Class Action Fairness Act (Rothstein et al. (2005) in the Bibliography) are available on the Center's sites on the judiciary's intranet and Internet and through the Center's Information Services Office.

*Class Action Pocket Guide*

Class actions demand that judges play a unique role. There is no such thing as a simple class action. Every one has hidden hazards that can surface without warning. Your role includes anticipating the consequences of poorly equipped class representatives or attorneys, inadequate class settlement provisions, and overly generous fee stipulations. The high stakes of the litigation heighten your responsibility, and what's more, you cannot rely on adversaries to shape the issues that you must resolve in the class context. Indeed, you have to decide first which adversaries on the plaintiff side—class representatives and class counsel—can represent the class adequately and whom you should appoint to do so. And, once the adversaries agree on a settlement, you must decide—largely without any clash of views from class counsel, class representatives, or the defendant—whether that settlement is fair, reasonable, and adequate to satisfy the interests of the class as a whole. This guide attempts to clarify the standards that inform those decisions. It is designed to help you use accumulated judicial experience to determine when class representatives and counsel are "adequate" and whether a settlement's terms are "fair" to the class as a whole, "reasonable" in relation to the class's legitimate claims, and "adequate" to redress class members' actual losses.

Now that CAFA is on the books and Federal Rule of Civil Procedure 23 has been amended, you can expect to encounter the following class action responsibilities:

- applying CAFA's new federal jurisdiction rules, such as its $5 million amount in controversy for the class as a whole, minimum diversity of citizenship between class members and defendants, and complex set of rules regarding cases in which the primary defendants are local citizens (*see* Rothstein et al. (2005) in the Bibliography);
- ruling on remand motions;
- appointing counsel who have the professional skills, legal support staff, and financial resources needed to provide the class with adequate representation;
- managing discovery and pretrial motions practice with the object of separating meritorious claims from meritless ones while keeping expenses to a reasonable level and moving the case toward resolution;
- determining when and how to decide class certification motions;

- reviewing notice plans and notices to the class to ensure the best notice practicable;
- coordinating with state and federal judges the management of competing and overlapping class actions;
- evaluating the merits of proposed settlements to determine whether they are fair, reasonable, and adequate for class members; and
- assessing reasonable attorney fees for counsel for the class by ensuring that fee awards are commensurate with the value of the results to the class as a whole.

In Part I of this guide, we consider the matter of selecting counsel, and in Part II, we touch on the timing and significance of decisions about whether to certify a class. In Part III, we focus extensively on both procedural and substantive elements of reviewing a class settlement, generally the most important challenge you will face in managing class action litigation. Part IV concerns reviewing requests for attorney fees. In Part V, we discuss the role of government actors; in Part VI, coordination with state judges; and in Part VII, the use of special masters and court-appointed experts.

*Class Action Pocket Guide*

# I. Selection of Counsel

Attorneys representing classes are in a position to control the litigation process far more than attorneys representing individual clients. The class action device enhances the role of such lawyers by virtue of the fact that even the approved class representatives do not have legal control over the litigation. Your power to appoint counsel and approve or reject a class settlement may be the only checks and balances on the power of attorneys for the class.

There are at least five approaches to selection of counsel in class action litigation. Note that in multidistrict litigation (MDL), the transferee judge has the authority to appoint lead and liaison counsel regardless of whether class claims are involved. *See* MCL 4th § 10.22. Whatever approach you use, it is important to make clear to counsel at the outset the content and form of records you require to support applications for awards of fees and expenses or for a lodestar cross-check. *See* "Attorney Fee Issues," *infra* Part IV, and MCL 4th § 14.21. You may find it useful to instruct class counsel that all lawyers should submit fee and expense requests in a similar format—one that will be accessible by the court.

## A. Single-lawyer model

In the typical class action, the lawyer who filed the case will be the only logical choice for appointment as class counsel. That lawyer may have investigated the case independently or may have spoken with government regulators, investigative journalists, or other public information sources. In those cases, the task of selecting counsel consists of assuring yourself that the filing attorney satisfies Rule 23(g) standards, that is, has the requisite knowledge of the substantive law, class action legal experience, and financial and staff resources to represent the class adequately. That attorney, of course, must not have a conflict of interest with the class.

## B. Private ordering

In high-stakes, high-profile class action litigation, entrepreneurial plaintiff attorneys often compete to play the lead role. This competition may be heightened when the case piggybacks on a case investigated and perhaps litigated or prosecuted by a governmental entity. Nonetheless, substantial resources may be necessary to finance the expenses of the litigation. Most often, attorneys in such cases

attempt to resolve the competition by "private ordering," that is, by agreeing to divide the labor, expenses, and fees. To safeguard the interests of the class and to prevent unnecessary litigation and over-staffing, you may want to review those agreements (which will be subject to disclosure upon settlement in any event). MCL 4th § 21.272.

## C. Selection by the judge

In the absence of private ordering, you will have to select among competing counsel by reviewing submissions based on the factors identified in Rule 23(g)(1)(C). Rule 23(g)(2)(C) explicitly permits you to include in the order of appointment "provisions about the award of attorney fees or nontaxable costs." Few judges have unilaterally imposed strict limits on fees in the order of appointment. Consider, however, requesting that counsel submit ex parte or under seal a proposed budget for fees in the case. The budget would serve as an *ex ante* record of the projected time and expense the case might require; judicial review of a proposed fee award at the end of the case would still be necessary, but would most likely be easier.

## D. Empowered plaintiff model

As mentioned earlier, Rule 23(g) presents explicit criteria and a pro-cedure for appointing counsel to represent the class. For securities class actions, the Private Securities Litigation Reform Act (PSLRA) directs you to employ a special procedure for selecting an "empow-ered" lead plaintiff (presumptively one with sizable claims), who, in turn, has the right to select and retain class counsel, subject to your approval. *See In re Cendant Corp. Litigation,* 264 F.3d 201, 273–78 (3d Cir. 2001).

## E. Competitive bidding

In a very narrow set of cases, courts have used competitive bidding to select counsel. After an intensive study, a task force in the Third Circuit concluded that competitive bidding "should be an excep-tion to the rule that qualified counsel can be selected either by pri-vate ordering or by judicial selection of qualified counsel . . . ." *Third Circuit Task Force Report on Selection of Counsel,* 74 Temp. L. Rev. 689, 741 (2001). *See also* Hooper & Leary (2001) in the Bibliography.

# II. Timing and Significance of Class Certification

## A. Timing

Rule 23 once urged attorneys to file and judges to rule on class certification motions "as soon as practicable." Local rules sometimes defined "practicable" as requiring a motion to be filed within 90, 120, or 180 days of the filing of the action. As experience with Rule 23 evolved, however, judges began to rule on motions to dismiss and even motions for summary judgment before turning to class certification. That approach seems to have several advantages. You need not waste time dealing with increasingly complicated class certification issues in meritless cases. Also, should you need to decide whether a class settlement is reasonable, you can use knowledge gained through your rulings on pretrial motions. And the parties can use information from early rulings on the merits to assess their prospects of success and to bargain or act accordingly.

A 1996 Center study (Willging, Hooper & Niemic in the Bibliography) documented that district courts often ruled on merits motions before class certification. Experience had overtaken formal rules, and the rulemakers took notice. The 2003 amendments to Rule 23(c)(1) give you more flexibility by allowing you to consider class certification "at an early practicable time." Considering this change, you should feel free to ignore local rules calling for specific time limits; they appear to be inconsistent with the federal rules and, as such, obsolete. *See* MCL 4th § 21.133.

## B. Class certification

Not all cases filed as class actions settle. Likewise, not all cases filed as class actions end up being certified as class actions. The great majority are dismissed or withdrawn. The 1996 and 2005 FJC studies cited in the Bibliography found that from 20% to 40% of all cases filed as class actions were certified as such. Those certified class actions almost always settled (90% of the time in the 2005 study). The combination of rulings on the merits and on class certification gives the parties ample information for predicting the likelihood of a class recovery. This suggests that the most important actions you can take to promote settlement are to rule on dispositive motions and then, if necessary, rule on class certification.

If the parties decide to talk about settlement before any ruling

on class certification, they may urge you to certify a class for settlement purposes only—a *settlement class*—as opposed to certifying a *litigation class* for a possible trial. *See infra* section III.C.7; *see also* MCL 4th § 21.131–.132.

## C. Defining the class

Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled to notice in a Rule 23(b)(3) action. The definition must be precise, objective, and ascertainable. For example, the class may consist of those persons and companies that purchased specified products or securities from the defendants during a specified period, or it may consist of all persons who sought employment with or who were employed by the defendant during a fixed period. *See* MCL 4th § 21.222. Your certification order should specify those excluded from the class, such as residents of particular states, persons who have filed their own actions or are members of another class, and officers and directors of the defendants.

Consider also whether the class definition captures all individuals or entities necessary for the efficient and fair resolution of common questions of fact and law in a single proceeding. If the class definition fails to include a substantial number of persons with claims similar to those of the class members, it is questionable. A broader class definition or definition of a separate class might be more appropriate. If the class definition includes people with similar claims but divergent interests or positions, subclasses with separate class representatives and counsel might suffice. *See also* MCL 4th § 21.23.

*Issues classes* are classes certified for particular issues or elements of claims or defenses. Though controversial and subject to conflicting rules in different circuits, issues classes "may enable a court to achieve economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action." MCL 4th § 21.24. The test is whether the resolution of common issues advances the litigation as a whole, as opposed to leaving a large number of issues for case-by-case adjudication.

## D. Multiple class actions

Finally, consider class certification in the context of duplicative or overlapping class action litigation pending in other federal and state

courts. Be sure to "obtain complete information from the parties about other pending or terminated actions in federal or state courts relating to the claims presented." MCL 4th § 21.25. Communication and administrative coordination with other judges will often be necessary. Other things being equal, federal judges should exercise federal jurisdiction over classes of nationwide scope; actions limited to single states can be carved out of any national certification.

# III. Settlement Review: Risks and Issues

Reviewing proposed settlements and awarding fees are usually the most important and challenging assignments judges face in the class action arena. Unlike settlements in other types of litigation, class action settlements are not an unmitigated blessing for judges. Rule changes, precedent, recent legislation, and elemental fairness to class members direct you not to rubber-stamp negotiated settlements on the basis of a cursory review. Current rules, particularly the 2003 amendments to Rule 23, unambiguously place you in the position of safeguarding the interests of absent class members by scrutinizing settlements approved by class counsel. Be aware that the adversarial clashes usually end with the settlement. Indeed, most settlements preclude the parties and attorneys from opposing the settlement's provisions, especially the stipulations about attorney fees. Thus, you need to take independent steps to get the information you'll undoubtedly need to review a settlement agreement.

## A. Judge's role

The judge's assigned task of approving or disapproving a class settlement presents exceptional challenges. Some courts "have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class" and to impose "the high duty of care that the law requires of fiduciaries." *Reynolds v. Beneficial National Bank*, 288 F.3d 277, 280 (7th Cir. 2002).

Because the class itself typically lacks the motivation, knowledge, and resources to protect its own interests, you need to critically examine the class certification elements, the proposed settlement

Plaintiffs' Exhibit 7



UNITED STATES

*Margaret M Zwisler, Christopher S Yates, William R Sherman,
William H Rawson and William J Rinner, LATHAM & WATKINS LLP*

## OVERVIEW OF CLASS/COLLECTIVE ACTIONS AND CURRENT TRENDS

1. WHAT IS THE DEFINITION OF CLASS/COLLECTIVE ACTIONS IN YOUR JURISDICTION? ARE THEY POPULAR AND WHAT ARE THE CURRENT TRENDS?

**Definition of class/collective actions**

In the US, a class action is a form of representative litigation where some parties are absent from court.  In a traditional lawsuit, all parties to the suit, meaning all plaintiffs and defendants, are present in court and represent themselves. However, in a class action, at least one of the parties, plaintiff or defendant, is a group of people who are collectively represented by a member of that group. That member, known as the "named" plaintiff or defendant, is present in court and litigates the case on behalf of themselves and the absent members of its class.

**Use of class/collective actions**

The vast majority of class actions in the US are plaintiff class actions. In a plaintiff class action, one or more named plaintiffs sue one or more defendants on behalf of themselves and the absent plaintiffs.

Defendant class actions are possible but rare. There, plaintiffs sue a named defendant and other unnamed, absent defendants who the plaintiffs allege are similarly situated to the named defendant.  If both plaintiffs and defendants are organised into classes, the action is a bilateral class action. Class actions are most common where the plaintiffs allege that a large number of people have been injured by the same defendants in the same way. Instead of each injured person bringing his or her own separate lawsuit, the class action allows a court to resolve in a single proceeding the claims of all class members.  Class actions are generally available in all areas of law, as long as the legal and procedural requirements for bringing a class action are met (*see Question 3*).

**Current trends**

After many years of growth in the use of the class action device in both federal and state courts, the US Congress and US Supreme Court have both acted to attempt to limit class actions, and additional bills are pending before the US Congress that would impose further limitations.  In 2005, the US Congress passed the Class Action Fairness Act, 28 U.S.C. § 1332(d) (CAFA).  CAFA expands federal jurisdiction over class actions, to reduce

Supreme Court.  The individual states each maintain analogous state court systems of their own.

Since the passage of the Class Action Fairness Act, 28 U.S.C. § 1332(d) (CAFA), most class actions proceed in the federal courts. Under CAFA, the federal courts have jurisdiction over all class actions where:

- The amount in controversy exceeds US$5 million.
- "Any member of a class of plaintiffs is a citizen of a State different from any defendant" (*28 U.S.C. § 1332(d)(2)*).

That encompasses the vast majority of class actions.  However, a federal court can decline jurisdiction if "greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed"  (*28 U.S.C. § 1332(d)(3)*).

Class actions can also be resolved by arbitration, including where the parties expressly or implicitly contract to resolve disputes by arbitration.  And in certain circumstances businesses can prevent class action litigation by requiring that consumers agree to arbitration of individual claims (*see Question 23*).

**Different mechanisms**

In both the federal and state courts, the mechanism for bringing a class action lawsuit is simply filing a proposed, or "putative" class action, where the named plaintiff seeks to represent itself and all other similarly situated persons.  To proceed, the named plaintiffs must then establish that they satisfy the specific requirements to maintain a class action (*see Question 6*).

3.      ARE CLASS/COLLECTIVE ACTIONS PERMITTED/USED IN ALL AREAS OF LAW, OR ONLY IN SPECIFIC AREAS?

Class actions are generally permitted in all areas of law, including:

- Product liability.
- Environmental law.
- Anti-trust and competition law.
- Pension disputes.
- Civil rights.
- Securities.

These disputes typically involve alleged actions or activities that harm a large number of individuals or entities through the same underlying means (for example, by designing a defective product, by overcharging customers and consumers through price-fixing, or by making a false statement that affects the price of a security). Cases involving discrete actions that affect different individuals in different ways are generally less suitable for class treatment. But in the absence of an express statutory or contractual prohibition, class actions are available for any private right of action.

Some state and federal statutes and common law doctrines nevertheless limit certain disputes from being litigated on a class basis or restrict the type of individuals or entities that may be members of a class. For example, the Truth in Lending Act caps damages and does not permit class actions for rescission claims.  Certain states limit the type of claims that may be brought as class actions, or do not allow class actions at all.

UNITED STATES

**Other areas of law/policy**

Where a statutory right of action exists permitting private claims, classes may pursue remedies even if state or federal regulators bring a lawsuit for the same underlying actions.  As a result, class action lawsuits often proceed at the same time as civil and criminal enforcement actions, and unless limited by statute, a class may obtain monetary or injunctive relief in addition to any relief obtained by government enforcers.  As enforcers may have limited resources, many policymakers view class actions as an additional mechanism to deter wrongdoing.

## LIMITATION

4.     WHAT ARE THE KEY LIMITATION PERIODS FOR CLASS/COLLECTIVE ACTIONS?

Limitation periods are relevant in both class actions and traditional litigation, and many of the same rules apply.  Calculating the limitation period relevant to a particular class action therefore requires first considering both the substantive nature of the action and the court hearing the action. For example, the different states each have their own limitations periods for tort actions, ranging from about one to six years.  In addition, different causes of action have different rules regarding the kind of circumstances that justify "tolling", or suspending, the limitation period, such as fraudulent concealment by the defendant of its alleged conduct.

Other considerations relating to limitation periods are unique to class actions.  Principally, the filing of a class action generally suspends the limitation periods that would apply to the individual claims of all of the putative class members.  That is the case even if a putative class member is not even aware that the class action is pending.  That suspension ends if the court denies certification of the class, and the limitation periods applicable to individual claims begin to run again.

## STANDING AND PROCEDURAL FRAMEWORK FOR BRINGING AN ACTION

STANDING

5.     WHAT ARE THE RULES FOR BRINGING A CLAIM IN A CLASS/COLLECTIVE ACTION?

**Definition of class**

To bring a class action, the representative plaintiffs must define the class that they seek to represent. The class definition must be sufficiently precise so that the court can determine who is and is not in the class.  To that end, class definitions commonly focus on the defendant's alleged conduct and include geographic, temporal, or other objective parameters that permit the court to ascertain the members of the class (and thereby limit membership of the class).

global.practicallaw.com/**classactions-guide**

Until the court concludes that the class satisfies the requirements for a class action, a process that can take several years, the class is referred to as a "putative" or "potential" class and the members of the putative class are referred to as "putative" or "potential" class members.

### Potential claimant

To serve as a named plaintiff, a potential claimant must satisfy two fundamental requirements.  First, the putative plaintiff must be a member of the class that it seeks to represent.  Second, the putative plaintiff must itself have "standing" to assert its claim.

In the US, standing is generally required in all lawsuits, whether class action or individual.  The doctrine entails several specific considerations but, in essence, requires determining whether the litigant itself is entitled to have the court decide the merits of the dispute.  The answer will often depend on the plaintiff's relationship to the defendant's alleged conduct.  For example, a plaintiff will generally have standing where it alleges that it was harmed directly by the defendant.

However, the scope of standing to assert a claim varies depending on the claims at issue and the court hearing the claim.  For example, in the anti-trust context, under *Illinois Brick Co. v Illinois, 431 U.S. 720 (1977)*, an indirect purchaser of a good or service generally may not sue the seller for alleged damages in federal court.  However, the indirect purchaser may be able to sue the seller in state court, depending on whether and how the court applies the test for anti-trust standing as established in *Associated General Contractors of California v. California State Council of Carpenters, 459 U.S. 519 (1983)*.  That test focuses on the causal connection between the alleged violation and the asserted harm, and on the directness of the harm.  Regardless, in class actions, the named plaintiff's theory of harm, and therefore standing, must be generally the same as the class of persons that he or she seeks to represent.

### Claimants outside the jurisdiction

The representative plaintiff can bring claims that arise under federal law on behalf of absent plaintiffs residing in other states, so long as their claims and theories of harm are the same. In addition, the same federal court will typically hear any accompanying state law claims, brought on behalf of plaintiffs living in those specific states, so long as the requirements for federal jurisdiction are met.

### Professional claimants

Entities may have standing to assert claims that they acquire from others (*see Sprint Communications Co. v. APCC Services, Inc., 554 U.S. 269 (2008)*).  Additionally, although the US Supreme Court has not answered the question, such assignees may also serve as class representatives if the assignor satisfies the Rule 23 (of the Federal Rules of Civil Procedure) prerequisites.  If so, the assignees "stand in the shoes of the assignor before [the] court" as "assimilated members of the class" and therefore possess the same interests as other class members and assert a claim for the same injury allegedly suffered by the class (*see Cordes & Co. Fin. Servs., Inc. v A.G. Edwards & Sons, Inc., 502 F.3d 91, 99-103 (2d Cir. 2007); Faris v Longtop Fin. Tech. Ltd., 2011 WL 4597553 (S.D.N.Y. Oct. 4, 2011) and Amalgamated Transit Union Local v Laidlaw Transit Servs., Inc., 2009 WL 249888 (S.D. Cal. Feb. 2, 2009)*).

UNITED STATES

QUALIFICATION, JOINDER AND TEST CASES

6.    WHAT ARE THE KEY PROCEDURAL ELEMENTS FOR MAINTAINING A CASE AS A CLASS ACTION?

**Certification/qualification**

To maintain a class action, the representative plaintiff must first meet each of the four prerequisites of Federal Rule of Civil Procedure 23(a):

- The class must be so numerous that a joinder of all members is impracticable.
- There must be questions of law or fact common to the class.
- The claims or defences of the representatives must be typical of the claims or defences of the class.
- The representative parties must fairly and adequately protect the interest of the class.

Next, the representative plaintiff must also satisfy at least one of the following requirements imposed by Rule 23(b) of the Federal Rules of Civil Procedure:

- The prosecution of separate actions could potentially establish inconsistent standards of conduct or substantially impair other class members' ability to protect their interests.
- Final injunctive or declarative relief is appropriate because the party opposing the class acted on grounds generally applicable to the entire class.
- Common issues of law and fact predominate over individual issues and a class action is the superior mechanism for resolving the plaintiffs' claims.  In actions for monetary damages, the third issue is the most important factor in the decision regarding whether a class can proceed as a class action.

On the timetable described below (*see Question 7*), the court determines before trial whether named plaintiffs meet the requirements to maintain a class action. If so, the court "certifies" the class for trial, and the class action proceeds.  If plaintiffs do not meet the requirements, the court will not certify the class. Then, unless the representative plaintiffs attempt to amend their class claims, plaintiffs will be left to pursue their claims individually.

**Minimum/maximum number of claimants**

There is no absolute minimum or maximum number of claimants that may comprise a plaintiffs' class. Although the Rule 23(a) of the Federal Rules of Civil Procedure requirement of a number of plaintiffs in the class requires case-specific consideration, courts have held that classes of at least 25 plaintiffs are sufficient.

**Joining other claimants**

In the US, class actions are almost always initiated on an opt-out basis, as opposed to an opt-in basis. This means that all putative class members are assumed to be a part of a certified class unless and until class members opt out, or choose to leave, the class. Class members may opt out where they determine that their individual claims are large enough to justify suing separately, or for a variety of other reasons, but the opt-out rate in most cases is less than 2% of the class.

UNITED STATES

If the court certifies the class, the court will set specific deadlines for the representative plaintiffs to notify absent plaintiffs of the class, and for absent plaintiffs to decide whether to opt out.  The form and method of notice is subject to court approval.  Notice is usually either direct (for example, by mail) if that method is reasonably practicable, or by publication in various media.

**Test cases**

In the US, if the court certifies the class and the parties do not then settle, test cases, or "bellwether trials", are sometimes used to move the overall litigation towards a more prompt resolution. In these circumstances, the court selects a representative plaintiff's claim or claims from among the class, and that case proceeds to trial. The outcome, whether for plaintiffs or defendants, will likely inform how the parties proceed as to the remaining cases. Bellwether trials are particularly common in mass tort actions, where thousands of plaintiffs claim the same injury allegedly caused by the same defendant.

TIMETABLING

7.    WHAT IS THE USUAL PROCEDURAL TIMETABLE FOR A CASE?

A plaintiff seeking class treatment must assert in its complaint that it seeks to represent a class of persons or entities and must describe why the putative class meets the prerequisites of Rule 23 of the Federal Rules of Civil Procedure. Before any timetable is established, a defendant can seek dismissal of some or all the claims. If a class action survives a motion to dismiss (or if none is filed), a court will usually establish a timetable for discovery, motions and hearings on class certification, a deadline for filing any summary judgment motions, and trial.  Rule 23 states that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action".

Because a putative class plaintiff must demonstrate that the class meets each Rule 23 prerequisite through a preponderance of evidence, courts typically allow several months (or years) of discovery before a class certification motion is due.  If a class is certified, any ruling at summary judgment or trial will bind all members of that class who have not opted out.

EFFECT OF THE AREA OF LAW ON THE PROCEDURAL SYSTEM

8.    DOES THE APPLICABLE PROCEDURAL SYSTEM VARY DEPENDING ON THE RELEVANT AREA OF LAW IN WHICH THE CLASS/COLLECTIVE ACTION IS BROUGHT?

The applicable procedural system typically does not vary based on the area of law giving rise to the class or collective action claim (*see Question 3*). However, there are certain exceptions.

Plaintiffs can bring a "collective action" suit under the Fair Labor Standards Act, 29 U.S.C. § 216(b) (FLSA), to recover unpaid minimum wages, overtime compensation, and additional liquidated damages.

Although FLSA collective actions and Rule 23 (of the Federal Rules of Civil Procedure) class actions share many similarities, they have certain key differences (*see ABA Section*

**During litigation**

During class action litigation, discovery between plaintiffs and defendants is sometimes viewed as two parts:

• Pre-certification, in connection with the court's decision whether to certify the proposed class.

• Merits discovery, as to the parties' underlying claims.

Relatively soon after a class action commences, the court will often enter a discovery plan or schedule, setting out the timing, sequencing of, and rules for discovery. Because many issues often relate to both certification and the merits, courts now less commonly divide discovery of the two. Rather, full discovery will generally proceed. Class certification discovery might end before merits discovery but, in most instances, the court will not be able to determine whether certification is appropriate without extensive discovery, including both factual evidence and expert opinion. Certification discovery will focus on whether the proposed class meets the requirements of Rule 23(a) and Rule 23(b) of the Federal Rules of Civil Procedure.

Discovery during class actions, as in traditional litigation, is governed by the Federal Rules of Civil Procedure, rules of the local court, and the judge's individual rules and practices. Those rules will dictate the scope of discovery. Similarly, the court will commonly enter a protective order, agreed to by the parties, that limits the use and disclosure of materials obtained through discovery.

## 16.   ARE THERE SPECIAL CONSIDERATIONS FOR PRIVILEGE IN RELATION TO CLASS/ COLLECTIVE ACTIONS?

There is a well-established concept of privilege in the US, whereby otherwise relevant information is protected from discovery because it falls within a privilege. Most notable are the attorney-client privilege and attorney "work product" doctrine.

The attorney-client privilege protects from discovery confidential communications between the client and attorney, made for the purpose of seeking or conveying legal advice.

The attorney work product doctrine protects from discovery materials prepared by or for an attorney in anticipation of litigation. Federal Rule of Civil Procedure 26(b)(1) limits discovery to non-privileged matters, and Rule 26(b)(3) codifies the attorney work product doctrine. Similarly, Rule 26(b)(4) limits the extent to which parties may seek discovery of communications between a party's attorney and its expert witnesses.

Although the same core rules regarding privilege apply in class actions, class actions do pose some unique considerations. For example, some courts allow defendants and/ or defence counsel to contact absent putative class members before certification because, until certification, they are not represented by class counsel. Those communications would not be privileged. Also, individual named plaintiffs and individual defendants often have separate counsel. Communications among plaintiffs and their counsel and among defendants and their counsel are likely to remain privileged, particularly if the groups enter "common interest" or "joint defence" agreements.

UNITED STATES

## EVIDENCE

### 17.   WHAT IS THE PROCEDURE FOR FILING FACTUAL AND EXPERT WITNESS EVIDENCE IN CLASS/COLLECTIVE ACTIONS?

The Federal Rules of Evidence govern the admissibility of any evidence submitted in class action lawsuits. At the class certification stage, to certify a class, the plaintiffs must demonstrate by a preponderance of evidence that their case satisfies each applicable requirement of Rule 23. Courts typically require plaintiffs to submit admissible factual evidence such as documents, affidavits, and deposition testimony, and expert reports along with their motion for certification, and defendants can submit their own factual and expert evidence along with their opposition to the class certification motion.

In many instances, courts permit plaintiffs to submit rebuttal evidence and expert reports with their reply to a defendant's opposition. Even though Rule 23 does not require expert evidence at the class certification stage, as a practical matter, parties almost always submit expert reports regarding whether the proposed class meets the prerequisites for certification. Parties often file motions to exclude this expert testimony, and in resolving those motions, many courts apply the same Federal Rules of Evidence standard applicable to expert testimony offered at trial. Until recently, courts faced with conflicting expert reports at the class certification stage would often certify the class and postpone a close inquiry into empirical questions. However, as demonstrated by the Supreme Court's ruling in *Comcast Corp. v Behrend*, courts now rigorously scrutinise expert submissions at the class certification stage, and in some instances exclude or refuse to endorse unreliable expert testimony.

After certification proceedings, a case will proceed under the ordinary federal evidentiary and procedural rules.  Courts permit the parties to file additional factual and expert evidence at the summary judgment and trial stages. At summary judgment, to determine whether disputed issues of material fact exist between the parties, a court may only rely on evidence that would be admissible at trial.  Courts therefore commonly allow the parties to file motions to exclude opposing evidence submitted at this stage.  Before trial, courts often set a process for exchanging pre-trial evidence and filing motions to exclude.

## DEFENCE

### 18.   CAN ONE DEFENDANT APPLY TO JOIN OTHER POSSIBLE DEFENDANTS IN A CLASS/COLLECTIVE ACTION?

**Joining other defendants**

The Federal Rules of Civil Procedure liberally permit a joinder of other parties, and the rules for a joinder of defendants typically do not vary in the context of a class action suit.  Rule 19 allows a joinder of a party, including additional defendants, where "in that person's absence, the court cannot accord complete relief among existing parties", or if a non-party claims an interest in the litigation and disposing of the action in that non-party's absence would impair their interest or would leave an existing party subject to a

UNITED STATES

substantial risk of incurring multiple or inconsistent obligations. At the request of any party, a court may order the joinder of such a non-party as a defendant.

Rule 21 more generally provides that "[p]arties may be dropped or added by order of the court on motion of any party . . . at any stage of the action and on such terms as are just". If a defendant has a claim against a non-party who may be liable for all or part of a plaintiff's claim against that defendant, the defendant can serve a complaint on that non-party within 14 days of serving its original answer, or can file a motion for leave to serve the non-party if more than 14 days have passed since serving its original answer (*Fed. R. Civ. P. 14(a)*). The purpose of these rules is to ensure fairness and judicial efficiency in the resolution of all claims arising from the same underlying events or subject matter. As a practical matter, defendants do not join other defendants in certain class actions (such as anti-trust actions) because there is no right to contribution or indemnification among anti-trust defendants in the US.

**Rights of multiple defendants**

When there is more than one defendant in a class action and the interests of those defendants align, they may enter into joint defence agreements, in which each defendant agrees to share confidential information without waiver of attorney-client privilege, to further common goals in the litigation. Joint defence agreements typically require defendants not to use any other defendant's confidential information for any purpose separate from the litigation, and they outline the process for a defendant's withdrawal if any conflicts arise among defendants during the course of the litigation. Joint defence agreements often provide that a defendant who settles with the plaintiffs no longer has a community of interest with the remaining defendants and therefore must withdraw from the joint defence agreement.

In most instances, multiple defendants are represented by separate lawyers, although occasionally a law firm will represent more than one defendant where the unavailability of indemnification or contribution claims means that a conflict between defendants is unlikely. In addition, one firm will often represent affiliated defendants, such as parents and subsidiaries both named as defendants. Multiple defendants may jointly retain experts in a class action; indeed, a single expert commonly submits a report on behalf of all defendants at the class certification stage and on the merits where an analysis of certain elements of liability do not pose any conflicts among defendants.

---

## DAMAGES AND RELIEF

### 19.   WHAT IS THE MEASURE OF DAMAGES UNDER NATIONAL LAW IN THE FIELD OF CLASS/COLLECTIVE ACTIONS?

**Damages**

A class certified under Rule 23 of the Federal Rules of Civil Procedure can recover compensatory damages on behalf of its members if it demonstrates liability, as well as automatic treble damages for certain violations (such as violations of the anti-trust laws). Similarly, a certified class can obtain punitive damages where permitted by statute

UNITED STATES

or common law, but courts often reduce the amount of punitive damage awards under equitable doctrines and based on constitutional due process concerns.

Courts typically calculate and apportion damages based on a methodology submitted by plaintiffs' experts, but the calculation itself will often depend on the characteristics of each class member.  For example, in a securities class action, even if a court or jury finds a defendant liable for losses incurred from a reduction in a company's stock price, each class member's damages will depend on the amount of stock it purchased, and the circumstances of that purchase and sale. No explicit cap on damages exists under Rule 23, and defendants may be held liable for the actions of their co-defendants under ordinary principles of joint and several liability.

### Recovering damages

Under certain statutes for which a plaintiff may recover joint and several damages from a single defendant based on the actions of other defendants, the defendant that pays damages may bring a contribution claim against the remaining defendants. For example, under section 11 of the Securities and Exchange Act, multiple defendants may be held jointly and severally liable and have a right of contribution, but outside directors may only be held liable for proportionate liability as determined by a jury verdict (*15 U.S.C. § 77k(f)*). Other statutes, such as the anti-trust laws, make defendants jointly and severally liable, but prohibit a defendant from bringing a contribution or indemnification claim against another defendant.

### Interest on damages

The rules for calculating interest on damages vary based on the underlying state or federal law giving rise to a claim. Rule 23 does not contain any specific rules for calculating interest on damages.

---

## DECLARATORY RELIEF AND INTERIM AWARDS

### 20.   WHAT RULES APPLY TO DECLARATORY RELIEF AND INTERIM RELIEF IN CLASS/ COLLECTIVE ACTIONS?

### Declaratory relief

A class of individuals or entities may seek declaratory relief in a number of circumstances where the class also seeks injunctive relief or monetary damages. For example, a class may seek a ruling that a law is unconstitutional and should be invalidated, that a single tortfeasor acted negligently with respect to many affected parties, or that a provision of an insurance policy should be interpreted to require coverage of a particular claim. Certification of a class seeking declaratory relief is required before a court can make such an award binding class members other than the named plaintiffs. To obtain certification of a class seeking injunctive and declaratory relief, a plaintiff must demonstrate that the class it seeks to represent meets the four prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure (*see Question 6*), and that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or

<mark>corresponding declaratory relief is appropriate respecting the class as a whole</mark>" (*Fed. R. Civ. P. 23(b)(2)*). If a class seeks monetary damages in addition to declaratory relief, it must satisfy the additional requirements of Rule 23(b)(3), including predominance and superiority. That is, a class certified for purposes of obtaining declaratory relief under Rule 23(b)(2) alone may not also obtain monetary relief on the grounds that a declaratory ruling necessarily entitles the class to damages.

### Interim awards

Interim monetary awards are generally unavailable for class members before they have succeeded on their claims or obtained a settlement, but in limited circumstances, class counsel may apply for and obtain interim awards of costs and fees after they have prevailed or obtained recovery on at least some of the claims of the class. In several states such as Delaware, interim fee awards are not favoured for reasons of judicial economy, but for complex class actions involving multiple defendants, some of whom settle in the early stages of litigation, courts tend to allow such awards.

## SETTLEMENT

21.   WHAT RULES APPLY TO SETTLEMENT OF CLASS/COLLECTIVE ACTIONS?

### Settlement rules

In individual litigation, a court usually does not need to approve a settlement between the parties. In class actions, however, Rule 23(e)(1)(A) of the Federal Rules of Civil Procedure requires that the court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defences of a certified class. That is because settlement of class actions implicates numerous parties, including the class representatives, class counsel, absent class members, defendants, defence counsel, and possibly defendants' insurers. Although the court need not approve a pre-certification settlement of individual claims, the court can still inquire into the circumstances behind such a settlement, including to protect the interests of the absent class members.

To approve the settlement of a certified class, Rule 23(e)(1)(C) requires that the court conduct a hearing and find that the settlement is "fair, reasonable and adequate".  Courts commonly consider several factors:

- The nature of the claims and possible defences.
- Whether the proposed settlement was fairly and honestly negotiated.
- Whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt.
- Whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation.
- Whether the parties believe that the settlement is fair and reasonable.
- The defendant's financial viability.
- The number and objective merit of any objections received from the class members.
- The risks in establishing damages.

UNITED STATES

- The complexity, length, and expense of continued litigation.
- The stage of the proceedings.

Because strong policy considerations favour settlement, courts often presume that settlements negotiated at arm's length are fair and reasonable.

If a defendant seeks to settle with all the putative class members before class certification, the court must still apply the factors set out in Rule 23, and certify a class for settlement purposes. Following *Amchem Products v Windsor, 521 U.S. 591 (1997)*, the court must find that the settlement class meets all of the Rule 23 requirements except manageability at trial. Determining whether to certify a settlement class is often less onerous than whether to certify a contested class, if all defendants favour the settlement.

If the court preliminarily approves the settlement, under Rule 23(e)(1)(B), the court will then determine a schedule for notifying all absent class members who would be bound by the class, so that they can decide whether to opt out of the class. In addition to opting out, any class member may object to the terms of the proposed settlement.

**Separate settlements**

Where there is more than one defendant, individual defendants may, and often do, settle separately and at different points in the litigation with all class members. The effect of such a settlement is that the settling defendant is out of the litigation and the remaining defendants may be jointly and severally liable for the plaintiffs' full damages, including that proportion caused by the settling defendant. Usually, however, any judgment against the remaining defendants will be reduced by the amount of the prior settlements. In cases where treble damages are available, this reduction happens after the court triples the damages award.

Similarly, before certification, one or more defendants can seek to settle with some but not all of the named plaintiffs, sometimes in an attempt to undermine the putative class. The US Supreme Court is expected to decide this year in *Campbell-Ewald Co. v Gomez* whether a pre-certification settlement offer to pay a plaintiff's full claim of damages moots (voids) that plaintiff's case, on the basis that a plaintiff no longer has constitutional standing to pursue its case if it has received an offer to pay its alleged damages in full (*see Petition for Writ of Certiorari, Campbell-Ewald Co. v Gomez, No. 14-857 (filed Jan. 16, 2015 and granted May 18, 2015), http://sblog.s3.amazonews.com/wp-content/uploads/2015/02/2015-01-15-Campbell-Ewald-Cert-Petition-and-Appendix-1.pdf*). If the Court rules that such an offer does moot a plaintiff's case, these offers by defendants will likely become more common.

## APPEALS

22.   DO PARTIES HAVE A RIGHT TO APPEAL DECISIONS RELATING TO CLASS ACTIONS, SUCH AS A DECISION GRANTING OR DENYING CERTIFICATION OF A CLASS ACTION?

The final judgment rule in federal civil litigation generally prohibits appeals of interim or "interlocutory" decisions before the court enters a final judgment on all of a plaintiff's claims, but Rule 23 of the Federal Rules of Civil Procedure includes an exception to this general rule for class action suits. In particular, under 23(f), "[a] court of appeals may permit an appeal from an order granting or denying class action certification under this