Plaintiff's Exhibit 1

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

| | | |
|---|---|---|
| **LUCAS WALL** *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Case No. 6:21-cv-1008-PGB-DCI |
| | : | |
| v. | : | District Judge Paul Byron |
| | : | |
| **SOUTHWEST AIRLINES** *et al.*, | : | Magistrate Judge Daniel Irick |
| | : | |
| Defendants. | : | |

## <u>DECLARATION OF PLAINTIFF PETER MENAGE</u>

I, Peter Menage, declare as follows:

1. I am over the age of majority.

2. I could testify to the facts set out herein if called upon to do so.

3. I reside at 3255 N. Mars Ave., Palmer, AK 99645.

4. I make this declaration based on my personal knowledge and to explain the impact of Defendant Alaska Airlines' illegal discriminatory mask policy and its retaliation against me for suing it in this Court.

5. I board 16-20 flights per year for both work and personal travel.

6. Due to my medical issues, I can't tolerate wearing a face mask. Covering my nose and mouth prevents proper breathing including faintness, hyperventilation, anxiety, and more.

7. I have a medical mask exemption that was issued Dec. 18, 2020, by Dr. Packer of Wasilla, Alaska. Ex. 2.

8. I have flown approximately 19 times during the COVID-19 pandemic since it was declared by the World Health Organization in March 2020 and have been subject to Defendant Alaska Airlines' illegal mask mandate.

9. I have contacted Defendant Alaska Airlines on numerous occasions, including in person at the ticket counter and via e-mail presenting my medical mask exemption. On each occasion, I was informed that it would not be accepted or recognized by the airline.

10. On one occasion, upon presenting my exemption to Transportation Security Administration personnel at the security checkpoint, an Alaska Airlines representative intervened and threatened to ban me from the airport entirely – which I consider to be harassment, intimidation, and threat of false imprisonment.

11. On another occasion, Alaska's staff forbid me from consuming food or drinks for the duration of the flight even though this is allowed by the airline and the Federal Transportation Mask Mandate. I was harassed and threatened with being banned from the airline.

12. I work as an operator for Worley in the remote Arctic oilfields in and around Prudhoe Bay, Alaska. As is common for North Slope workers, I fly Alaska Airlines from Anchorage to Deadhorse (the airport serving the Prudhoe Bay

oilfields) every three weeks for work. I work three weeks straight, then re-
turn to Anchorage on Alaska Airlines.

13. Alaska Airlines is the only carrier flying from Anchorage to Deadhorse.

14. On Nov. 25, 2021, I boarded Alaska Flight 55 from Anchorage to Deadhorse
to come to work.

15. Once we reached cruising altitude and the flight attendants started serving
drinks, I got out my own food and beverage. I proceeded to eat and drink.

16. A flight attendant came and demanded I put a mask back on. I had food in
my hand and was chewing when she addressed me. After finishing chewing
my food, I told her I was eating. She demanded again that I put a mask on. I
repeated that I am eating. She persisted, demanding I don a mask while eat-
ing and drinking, which is virtually impossible. It is also not the company
policy or required by the FTMM. After a couple minutes of this, I gave her a
salute, put my food aside, and placed the mask back on (which is detrimental
to my health).

17. A short bit later, another flight attendant addressed me about masks. I ad-
vised her that the first attendant was banning me from eating. The crew said
something about a "yellow card" and how it could cost me my job. I couldn't
hear what else might have been said due to the noise of the aircraft and them
speaking through their masks.

18. I was handed a yellow card (Ex. 3), then left alone, and returned to watching
a movie with a mask on (harming my health).

19. I deboarded the aircraft at Deadhorse airport and removed my mask. Outside, someone grabbed me from behind. I spun around and a man was standing there. He flashed a badge, which I could not make out because it was quickly put away. I believe he works for Alaska Airlines. This man demanded to see my identification and asked what company I work for. I provided the information. I consider this incident to be battery.

20. A flight attendant was also present and asked if I knew the significance of a yellow card. I told her I did not. She then stated I was to be banned from Alaska Airlines for a minimum of 30 days. The man said I was banned from the airport terminal as well, pending further investigation.

21. I received a letter from Alaska Airlines on Nov. 25 in which the defendant falsely alleged "you were unwilling to properly wear a mask or face covering (over the mouth and nose) while onboard our aircraft, as required by Alaska Airlines policy and federal law." Ex. 4.

22. I never said I was unwilling to wear a mask. I was eating at the time. Also, I've presented my medical exemption to Alaska many times and been denied, a fact the letter fails to address.

23. There is no federal law requiring passengers wear masks. There is an illegal CDC order and unlawful TSA Health Directive, which are being challenged in many courts including this one. *See Wall v. Centers for Disease Control & Prevention*, No. 6:21-cv-975, and *Health Freedom Defense Fund v. Biden*, No. 8:21-cv-1693.

24.    The letter alleges "During your travel, you were informed about the importance of the policy and reminded that your continued noncompliance would result in suspension of further travel." This never happened.

25.    It further alleges "Because you refused to wear a face covering after multiple reminders, you will not be permitted to fly with us again, pending the outcome of an internal investigation." But I never refused to wear a face covering and was not given multiple reminders.

26.    I received another letter from Alaska on Dec. 1 informing me that "it is our policy, and federal law, that all our guests wear [masks] while at the airport and onboard, except when briefly engaged in eating or drinking. Masks otherwise need to cover the mouth and nose at all times (including while sleeping and in between bites/sips)." Ex. 5. Alaska has again committed fraudulent misrepresentation of the law, as Congress has never enacted any law requiring anybody to wear a mask while flying (or anywhere else).

27.    Alaska's Dec. 1 letter again fails to mention that I have a doctor's note exempting me from wearing a mask. It also doesn't note that I complied with the flight attendant's illegal request to stop eating and put my mask back on.

28.    Alaska's letter falsely asserts that its mask policy is "based on guidance of the CDC and other regulatory authorities, and supported by the best available medical evidence. It is a fact that wearing face coverings significantly reduces the transmission of the COVID-19 virus." These are lies. The scientific

consensus for decades is that masks to not stop the transmission of a respiratory virus such as COVID-19 but cause dozens of harms to human health. *See* 223 scientific studies, medical articles, and videos compiled at https://lucas.travel/masksarebad as well as hundreds of such documents introduced into evidence in this case. Doc. 62.

29.  Alaska's claim that "Reports we received detail willful non-compliance of our mask policy on your part" is also a lie. Clearly I am being targeted because I am suing the airline as no one else I know who was eating on Flight 55 was served a travel ban. I have spoken to other oilfield workers who were on the same flight. They told me they were not harassed while eating. It's a little too coincidental that I was maliciously singled out and aggressively harassed, being I was the only person on the plane who is suing Alaska Airlines for illegally discriminating against the disabled who can't wear masks.

30.  Alaska informed me in its Dec. 1 letter that "your travel suspension remains in place until face coverings are no longer required for travel."

31.  I believe Alaska's action banning me for eating aboard Flight 55 is retaliation for me suing the airline.

32.  My next booked flight is Dec. 9, 2021, on Alaska Airlines from Deadhorse to Anchorage.

33.  If this Court does not grant me a temporary restraining order stopping Alaska from banning me, I do not know by what means I will be able to get

home. I do not have a car in Deadhorse. Even if I did, the only ground transportation is a rough road called the Dalton Highway (also known as the North Slope Haul Road) that runs 414 miles to Alaska Route 2. From there, it's another 408 miles to my home in Palmer for a total of 822 miles.

34.     In good weather, the drive (if I were able to find a ride; there are no rental cars available in Prudhoe Bay) would take an estimated 17 hours, not counting stops for fuel, food, bathroom, and sleeping. However, the Dalton Highway is often impassible in winter.

35.     If this Court does not restrain Alaska Airlines from refusing to transport me, losing my job is a certainty. This would constitute irreparable harm for myself and my family.

36.     I e-mailed Alaska's lawyers twice (Nov. 30 and Dec. 3) in an effort to resolve this matter outside of court, but they failed to respond to me. Ex. 6.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on Dec. 5, 2021.

_____
Peter Menage, plaintiff

Plaintiff's Exhibit 2

**Face Mask Exemption Form**

Patient Name: _Peter Menage_   Date of Birth: ██████ _1983_

### FACE MASK EXEMPTION GUIDELINES

General Recommendations for Medical Exemptions from the CDC, 2020:

- Young children under age 2
- Anyone who has trouble breathing (e.g., presents risk of serious adverse effect due to underlying condition such as an acute exacerbation of COPD or Asthma)*
- Anyone who is unconscious, incapacitated or otherwise unable to remove the mask without assistance

*The above list is not all-inclusive, and other medical conditions may also prevent a patient from wearing a mask.*

Further Considerations:

- Mental health conditions: severe anxiety, PTSD or claustrophobia
- Autism (e.g., sensitive to touch and texture)
- Cognitive impairment
- Craniofacial deformity which prohibits mask fit
- Dermatologic condition: severe dermatitis related to mask wearing
- Consider other medical situations described by the patient on a case-by-case basis

*\*According to the American Lung Association (2020), many individuals with underlying chronic lung disease should be able to wear a non-N95 facial covering without affecting their oxygen or carbon dioxide levels.*

☒ The above-named individual **CANNOT** medically tolerate a face covering due to one of the medical condition listed above.

☐ The above-named individual does not have a medical condition that prevents them from wearing a face covering. This individual **CAN** wear a face covering.

☐ Additional comment: _____

Healthcare provider name: _____

Signature: _____

Date: _12 · 18 · 2020_

Urgent Care At Lake Lucille
185 E. Parks Hwy.
Wasilla, Alaska 99654
373-4200-Office
(907)373 4201-fax

Urgent Care At Lake Lucille
185 E Parks Hwy
Wasilla, Alaska 99654
(907) 373-4200 - Office
(907) 373-4201 - Fax

Plaintiff's Exhibit 3

# The safety of guests and employees is always our top priority, but we also need your cooperation to help keep each other safe.

This is why Alaska Airlines requires guests to wear a face mask or covering while on board, except when eating or drinking.

(Small children and guests with medical conditions may be exempt.)

Medical evidence—including studies by the CDC and University of Washington Infectious Disease Specialists—shows that wearing a mask significantly reduces the transmission of viruses like COVID-19 on board. By covering your face for the duration of the flight, you are helping fellow guests feel more comfortable about their travel experience and helping us maintain the healthiest possible onboard environment.

## This is your final notice to comply with our policy. Next, we will file a report, which could result in the suspension of future travel on Alaska Airlines.

Thank you for doing your part to keep those around you healthy and safe.

Plaintiff's Exhibit 4

Fwd: Reference#: 6929812

**From:** Customer.Care.Reply@alaskaair.com
**Date:** November 25, 2021 at 18:33:12 AKST
**To:** pmenage@gmail.com
**Subject: RE: Reference#: 6929812**



November 25, 2021

Dear Peter,

It has come to our attention that, while traveling with us, you were unwilling to properly wear a mask or face covering (over the mouth and nose) while onboard our aircraft, as required by Alaska Airlines policy and federal law.?
During your travel, you were informed about the importance of the policy and reminded that your continued noncompliance would result in suspension of further travel.

Because you refused to wear a face covering after multiple reminders, you will not be permitted to fly with us again, pending the outcome of an internal investigation.
Your suspension is effective immediately. We have cancelled any remaining portion of your itinerary (to include any connecting and return flights) and any future trips that you have booked, if applicable.?
You will receive a refund for any qualifying cancelled Alaska Airlines bookings but are otherwise responsible for your own travel arrangements from this point. You will not be reimbursed for any costs or damages associated with your travel suspension.

We expect to complete our investigation within 30 days, at which point you will be notified of the duration of your suspension. If you wish to share any related information for our consideration, please send it via a reply to this email for our consideration.??

We are committed to ensuring the safety of our guests and employees, which is why our mask policy is necessary at this?time and?hope you will consider flying Alaska when your travel suspension is complete.?
Sincerely,?
?
Alaska Airlines??
Corporate Security?

Reference#: 6929812

```
Plaintiff's Exhibit 5
```

Fwd: Reference#: 6929812

---

---

**From:** Customer.Care.Reply@alaskaair.com
**Date:** December 1, 2021 at 11:38:48 AKST
**To:** pmenage@gmail.com
**Subject: RE: Reference#: 6929812**



December 1, 2021

Dear Mr. Menage,

Thank you for reaching out regarding your travel suspension with us.

We certainly understand that wearing a face covering is inconvenient and uncomfortable for the majority of people. However, in the interest of safety during the COVID-19 pandemic, it is our policy, and federal law, that all our guests wear them while at the airport and onboard, except when briefly engaged in eating or drinking. Masks otherwise need to cover the mouth and nose at all times (including while sleeping and in between bites/sips).

This policy is consistent with that of other US airlines, based on guidance of the CDC and other regulatory authorities, and supported by the best available medical evidence.  It is a fact that wearing face coverings significantly reduces the transmission of the COVID-19 virus.

Reports we received detail willful non-compliance of our mask policy on your part. We truly appreciate your business, especially during these difficult times, but we are not willing to compromise the safety of our guests and employees.  As such, your travel suspension remains in place until face coverings are no longer required for travel.  We look forward to a time soon when the risks from COVID-19 are reduced further to a point where it is safe to modify or discontinue the mask policy, in alignment with federal law.

We appreciate your understanding.

Sincerely,

Alaska Airlines
Corporate Security

Reference#: 6929812

Plaintiff's Exhibit 6

Wall v. Southwest Airlines -- Emergency Motion to Enjoin Alaska Airlines from Banning Me

From:  Peter Menage (pmenage@googlemail.com)

To:      Maurice@torricellalaw.com

Date:   Tuesday, November 30, 2021, 03:57 PM EST

Dear counsel:

I am a plaintiff in Wall v. Southwest Airlines in the U.S. District Court in Orlando. Last week Alaska Airlines, which I fly on all the time for work in the Arctic oilfields of Alaska informed me I had been banned from the airline for not wearing a mask while eating, which is specifically an activity allowed under the Federal Transportation Mask Mandate and Alaska's own policies. I believe this is retaliation against me for suing the airline in federal court because several of my coworkers were on the same flight and also were eating without a mask on, yet none of them were banned.

I intend to file an emergency motion for temporary restraining order and preliminary injunction, likely tomorrow, to get a court order forcing Alaska Airlines to transport me. It is the only carrier offering nonstop flights from Deadhorse/Prudhoe Bay to Anchorage, near where I reside.

I ask you to call me immediately at 907-715-1205 so we can try to resolve this issue without needing the court's intervention.

*Respectfully,*
*Peter Menage*

*The information contained in this message is confidential, intended solely for the use of the individual or entity to whom it is addressed and may be protected by professional secrecy.*
*You should not copy, disclose or distribute this information for any purpose.*
*If you are not the intended recipient of this message or you receive this mail in error, you should refrain from making any use of the contents and from opening any attachment.*
*In that case, please notify the sender immediately and return the message to the sender, then, delete and destroy all copies.*
*This e-mail message has been swept by anti-virus systems for the presence of computer viruses.*
*In doing so, however, we cannot warrant that virus or other forms of data corruption may not be present and we do not take any responsibility in any occurrence.*

## Wall v. Southwest Airlines -- Emergency Motion to Enjoin Alaska Airlines from Banning Me

From:  Peter Menage (pmenage@googlemail.com)

To:     Roy.Goldberg@stinson.com

Date:  Tuesday, November 30, 2021, 03:55 PM EST

Dear counsel:

I am a plaintiff in Wall v. Southwest Airlines in the U.S. District Court in Orlando. Last week Alaska Airlines, which I fly on all the time for work in the Arctic oilfields of Alaska informed me I had been banned from the airline for not wearing a mask while eating, which is specifically an activity allowed under the Federal Transportation Mask Mandate and Alaska's own policies. I believe this is retaliation against me for suing the airline in federal court because several of my coworkers were on the same flight and also were eating without a mask on, yet none of them were banned.

I intend to file an emergency motion for temporary restraining order and preliminary injunction, likely tomorrow, to get a court order forcing Alaska Airlines to transport me. It is the only carrier offering nonstop flights from Deadhorse/Prudhoe Bay to Anchorage, near where I reside.

I ask you to call me immediately at 907-715-1205 so we can try to resolve this issue without needing the court's intervention.

*Respectfully,*
*Peter Menage*

*The information contained in this message is confidential, intended solely for the use of the individual or entity to whom it is addressed and may be protected by professional secrecy.*
*You should not copy, disclose or distribute this information for any purpose.*
*If you are not the intended recipient of this message or you receive this mail in error, you should refrain from making any use of the contents and from opening any attachment.*
*In that case, please notify the sender immediately and return the message to the sender, then, delete and destroy all copies.*
*This e-mail message has been swept by anti-virus systems for the presence of computer viruses.*
*In doing so, however, we cannot warrant that virus or other forms of data corruption may not be present and we do not take any responsibility in any occurrence.*

Wall v. Southwest Airlines -- Emergency Motion to Enjoin Alaska Airlines from Banning Me

From:  Peter Menage (pmenage@googlemail.com)

To:    Robert@torricellalaw.com

Date:  Tuesday, November 30, 2021, 03:56 PM EST

Dear counsel:

I am a plaintiff in Wall v. Southwest Airlines in the U.S. District Court in Orlando. Last week Alaska Airlines, which I fly on all the time for work in the Arctic oilfields of Alaska informed me I had been banned from the airline for not wearing a mask while eating, which is specifically an activity allowed under the Federal Transportation Mask Mandate and Alaska's own policies. I believe this is retaliation against me for suing the airline in federal court because several of my coworkers were on the same flight and also were eating without a mask on, yet none of them were banned.

I intend to file an emergency motion for temporary restraining order and preliminary injunction, likely tomorrow, to get a court order forcing Alaska Airlines to transport me. It is the only carrier offering nonstop flights from Deadhorse/Prudhoe Bay to Anchorage, near where I reside.

I ask you to call me immediately at 907-715-1205 so we can try to resolve this issue without needing the court's intervention.

*Respectfully,*
*Peter Menage*

*The information contained in this message is confidential, intended solely for the use of the individual or entity to whom it is addressed and may be protected by professional secrecy.*
*You should not copy, disclose or distribute this information for any purpose.*
*If you are not the intended recipient of this message or you receive this mail in error, you should refrain from making any use of the contents and from opening any attachment.*
*In that case, please notify the sender immediately and return the message to the sender, then, delete and destroy all copies.*
*This e-mail message has been swept by anti-virus systems for the presence of computer viruses.*
*In doing so, however, we cannot warrant that virus or other forms of data corruption may not be present and we do not take any responsibility in any occurrence.*

## Wall vs Southwest Airlines- Alaska Airlines TRO

From: Peter Menage (pmenage@googlemail.com)

To:    Maurice@torricellalaw.com; Roy.Goldberg@stinson.com; Robert@torricellalaw.com

Date:  Friday, December 3, 2021, 01:36 PM EST

Dear counsel:

As stated in my last email, I am a plaintiff in Wall v. Southwest Airlines in the U.S. District Court in Orlando. Last week Alaska Airlines, which I fly on in regular intervals for work in the arctic oilfields of Prudhoe Bay, Alaska, informed me I had been banned from the airline for not wearing a mask while eating, which is specifically an activity allowed under the Federal Transportation Mask Mandate and Alaska's own policies. I believe I was singled out and that this is in retaliation against me for suing the airline in federal court, because several of my coworkers were on the same flight and were able to eat and drink without harassment or being banned.

Consider this my final notice to you, before I file an emergency motion for temporary restraining order and preliminary injunction, to get a court order forcing Alaska Airlines to transport me, should this not be resolved immediately. It is the only carrier offering nonstop flights from Deadhorse/Prudhoe Bay to Anchorage, near where I reside.

I ask you to contact me immediately at this email address so we can try to resolve this issue without needing the court's intervention.

*Respectfully,*
*Peter Menage*

*The information contained in this message is confidential, intended solely for the use of the individual or entity to whom it is addressed and may be protected by professional secrecy.*
*You should not copy, disclose or distribute this information for any purpose.*
*If you are not the intended recipient of this message or you receive this mail in error, you should refrain from making any use of the contents and from opening any attachment.*
*In that case, please notify the sender immediately and return the message to the sender, then, delete and destroy all copies.*
*This e-mail message has been swept by anti-virus systems for the presence of computer viruses.*
*In doing so, however, we cannot warrant that virus or other forms of data corruption may not be present and we do not take any responsibility in any occurrence.*

Plaintiff's Exhibit 7

en.wikipedia.org

# Essential Air Service

*Contributors to Wikimedia projects*

38-48 minutes



Counties containing airports subsidized by Essential Air Service

**Essential Air Service** (**EAS**) is a U.S. government program enacted to guarantee that small communities in the United States, which had been served by certificated airlines prior to deregulation in 1978, maintained commercial service. Its aim is to maintain a minimal level of scheduled air service to these communities that otherwise would not be profitable.[1] The program is codified at 49 U.S.C. §§ 41731–41748.

The United States Department of Transportation (USDOT) subsidizes airlines to serve communities across the country that otherwise would not receive scheduled air service.[1] As of June 1, 2015, 159 communities in the US received EAS subsidies, of which 44 were in Alaska, two in Hawaii, and one in Puerto Rico.[2] The decision as to what degree of subsidized service a community requires is made based on identifying a specific hub for the community and from there determining the number of trips, seats, and type of aircraft that are necessary to serve that hub.[1]

These increases occurred despite numerous Congressional measures to contain program spending.[2] The George W. Bush Administration sought to reduce the cost of the program

to $50 million by stricter eligibility criteria and requiring the local governments of the areas served to contribute to the cost. [The Heritage Foundation](#) argued in 2014 that rural airports should receive no federal subsidies through the Essential Air Service program; rather, state and local governments that value the air services should support them.[3] The [Congressional Research Service](#) has reported in 2018 that since the early 2000s federal subsidies for the EAS have nearly tripled to almost $300 million per year.[2] By March 2021, the subsidies amounted to $339.19 million per year.[4][5]

[[edit](#)]



EAS subsidies have increased by more than 500% since 1997, not accounting for inflation.

Pursuant to the Department of Transportation and Related Agencies Appropriations Act of 2000, no community within the 48 contiguous states may receive a subsidy greater than $200 per passenger unless the community is more than 210 miles (340 km) from the nearest large or medium hub airport. Pursuant to the FAA Modernization and Reform Act of 2012, to be eligible for the program, a community in the contiguous 48 states must either maintain an average of 10 or more enplanements per service day or be located more than 175 miles (282 km) from the nearest large or medium hub airport. The criteria for 10 or more enplanements can be waived by the Secretary of Transportation, on an annual basis, if a community can demonstrate that it is due to a temporary decline.[6]

The Department of Transportation, pursuant to the Consolidated and Further Appropriations Act of 2015, is required to negotiate a local cost share with communities located less than 40 miles (64 km) from a small hub airport.[6]

## Controversy[[edit](#)]

Critics question the economic and environmental efficiency of the service.[7] According to a 2006 *New York Times* article on the program, the subsidy per passenger, averaged across the entire program excluding [Alaska](#), is approximately $74, and much higher on

| State | Community | Airport | Destinations | Air carrier | Aircraft / maximum seats | Annual subsidy |
|---|---|---|---|---|---|---|
| | | | | | | $3,305,353 (year 3) |
| | | | | | | $3,387,987 (year 4) |
| WI | Eau Claire | Chippewa Valley Regional Airport | Chicago-O'Hare (ORD) | SkyWest Airlines dba United Express | Bombardier CRJ200 / 50 | $2,363,769 |
| WI | Rhinelander | Rhinelander–Oneida County Airport | Minneapolis/Saint Paul (MSP) | SkyWest Airlines dba Delta Connection | Bombardier CRJ200 / 50 | $2,560,031 |
| WY | Cody | Yellowstone Regional Airport | Denver (DEN) | United dba United Express | Bombardier CRJ200 / 50 | $841,000 |
| WY | Laramie | Laramie Regional Airport | Denver (DEN) | SkyWest Airlines dba United Express | Bombardier CRJ200 / 50 | $2,215,702 |

**Alaska[edit]**

| Community | Airport | Destinations | Carrier | Aircraft | Annual subsidy | Docket |
|---|---|---|---|---|---|---|
| Adak | Adak Airport | Anchorage (ANC) | Alaska Airlines | Boeing 737-700 / 124 | $2,309,263 (year 1) $1,785,586 (year 2) | 2000-8556 |
| Akutan | Akutan Airport | Unalaska/Dutch Harbor (DUT) | Grant Aviation | Beechcraft King Air 200 / 9 or | $1,037,523 (year 1) | 2000-7068 |

| Community | Airport | Destinations | Carrier | Aircraft | Annual subsidy | Docket |
|-----------|---------|--------------|---------|----------|----------------|--------|
| Angoon | Angoon Seaplane Base | Juneau (JNU) | Kalinin Aviation dba Alaska Seaplanes | Cessna 208 Caravan / 9, Cessna 206 / 4, de Havilland Beaver / 6 | $280,999 (year 1) $335,904 (year 2) $356,446 (year 3) $377,397 (year 4) | 2006-25542 |
| Atka | Atka Airport | Unalaska/Dutch Harbor (DUT) | Grant Aviation | Beechcraft King Air 200 / 9 | $1,183,916 (year 1) $1,190,339 (year 2) | 1995-363 |
| Central | Central Airport | Fairbanks (FAI) Circle (CRC) | Warbelow's Air Ventures | Piper Navajo / 8 | $159,268 | 1998-3621 |
| Chisana | Chisana Airport | Tok (TKJ) | 40-Mile Air | Cessna 185 / 3 or Cessna 206 and 207 / 4 | $105,389 | 1998-4574 |
| Circle | Circle City Airport | Fairbanks (FAI) Central (CEM) | Warbelow's Air Ventures | Piper Navajo / 8 | $159,268 | 1998-3621 |
| Cordova | Merle K. (Mudhole) Smith Airport | Anchorage (ANC) Juneau (JNU) | Alaska Airlines | Boeing 737-700 | $3,480,868 (*passenger*) $48,250 (*freighter*) | 1998-4899 |
| Diomede | Diomede Heliport | Nome (OME) | Pathfinder Aviation | Bell 212 / 12 | $634,400 (year 1) | 2009-0260 |

| Community | Airport | Destinations | Carrier | Aircraft | Annual subsidy | Docket |
|---|---|---|---|---|---|---|
| | | | | | $643,916 (year 2) | |
| | | | | | $653,575 (year 3) | |
| Elfin Cove | Elfin Cove Seaplane Base | Juneau (JNU) | Kalinin Aviation dba Alaska Seaplanes | Cessna 208 Caravan / 9, Cessna 206 / 4, de Havilland Beaver / 6 | $121,118 (year 1) | 2002-11586 |
| | | | | | $114,916 (year 2) | |
| | | | | | $106,834 (year 3) | |
| | | | | | $95,638 (year 4) | |
| Excursion Inlet | Excursion Inlet Seaplane Base | Juneau (JNU) | Kalinin Aviation dba Alaska Seaplanes | Cessna 206 / 4 or Cessna 207 / 5 | $35,408 (year 1) | 2002-12014 |
| | | | | | $36,824 (year 2) | |
| | | | | | $38,297 (year 3) | |
| | | | | | $39,829 (year 4) | |
| Gulkana | Gulkana Airport | Anchorage (ANC) | Reeve Air Alaska | Piper Navajo / 7 | $256,686 | 1995-492 |
| Gustavus | Gustavus Airport | Juneau (JNU) - *Seasonal* | Alaska Airlines | Boeing 737-700 | $192,446 | 1998-4899 |
| Healy Lake | Healy Lake Airport | Fairbanks (FAI) | 40-Mile Air | Cessna 206 or 207 / 5 | $130,903 | 1998-3546 |

| Community | Airport | Destinations | Carrier | Aircraft | Annual subsidy | Docket |
|---|---|---|---|---|---|---|
| | | | | Havilland Beaver / 6 | (year 2)<br><br>$427,915 (year 3)<br><br>$439,719 (year 4)<br><br>$448,266 (year 5) | |
| Pelican | Pelican Seaplane Base | Juneau (JNU) | Kalinin Aviation dba Alaska Seaplanes | Cessna 208 Caravan / 9, Cessna 206 / 4, de Havilland Beaver / 6 | $296,412 (year 1)<br><br>$320,438 (year 2)<br><br>$339,292 (year 3)<br><br>$358,530 (year 4) | 2002-11586 |
| Petersburg | Petersburg James A. Johnson Airport | Juneau (JNU)<br><br>Ketchikan (KTN)<br><br>Seattle (SEA) - *Freighter* | Alaska Airlines | Boeing 737-700 | $2,116,128 (*passenger*)<br><br>$247,113 (*freighter*) | 1998-4899 |
| Port Alexander | Port Alexander Seaplane Base | Sitka (SIT) | Baranautica Air Service | Cessna 185 / 3 | $124,800 (initial rate)<br><br>$127,920 (year 1)<br><br>$131,118 (year 2)<br><br>$134,396 | 1999-6244 |

| Community | Airport | Destinations | Carrier | Aircraft | Annual subsidy | Docket |
|---|---|---|---|---|---|---|
| | | | | de Havilland Beaver / 6 | (year 3)<br><br>$172,427 (year 4) | |
| West Point | West Point Village Seaplane Base | Kodiak (ADQ) | Island Air Service | de Havilland Beaver / 6 | $38,408 | 2000-6945 |
| Wrangell | Wrangell Airport | Ketchikan (KTN)<br><br>Juneau (JNU)<br><br>Seattle (SEA) - *Freighter* | Alaska Airlines | Boeing 737-700 | $2,258,269 (*passenger*)<br><br>$259,895 (*freighter*) | 1998-4899 |
| Yakutat | Yakutat Airport | Anchorage (ANC)<br><br>Juneau (JNU) | Alaska Airlines | Boeing 737-700 | $2,072,858 (*passenger*)<br><br>$46,359 (*freighter*) | 1998-4899 |
| Zachar Bay | Zachar Bay Seaplane Base | Kodiak (ADQ) | Island Air Service | Cessna 206 / 5 *or*<br><br>de Havilland Beaver / 6 | $398,175 (year 1)<br><br>$413,297 (year 2)<br><br>$427,915 (year 3)<br><br>$439,719 (year 4)<br><br>$448,266 (year 5) | 2000-6945 |

## Communities formerly having subsidized EAS[edit]

Plaintiff's Exhibit 8

## UNITED STATES OF AMERICA
## DEPARTMENT OF TRANSPORTATION
## OFFICE OF THE SECRETARY
## OFFICE OF AVIATION ANALYSIS

## TITLE VI ASSURANCE
### (Implementing Title VI of the Civil Rights Act of 1964, as amended)

## ASSURANCE CONCERNING NONDISCRIMINATION ON THE BASIS OF DISABILITY IN FEDERALLY-ASSISTED PROGRAMS AND ACTIVITIES RECEIVING OR BENEFITING FROM FEDERAL FINANCIAL ASSISTANCE

### (Implementing the Rehabilitation Act of 1973, as amended, and the Air Carrier Access Act of 1986)

### 49 CFR Parts 21 and 27 and 14 CFR Parts 271, and 382

_____ (the Recipient) HEREBY AGREES THAT,
      (Name of Recipient)

      I.      As a condition to receiving any Federal financial assistance from the Department of Transportation, it will comply:  with Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000d--42 U.S.C. 2000d-4; all requirements imposed by or pursuant to:  Title 49, Code of Federal Regulations, Part 21, Nondiscrimination in Federally-Assisted Programs of the Department of Transportation--Effectuation of Title VI of the Civil Rights Act of 1964; and other pertinent directives so that no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity for which the Recipient receives Federal financial assistance from the Department of Transportation.  This assurance is required by Title 49, Code of Federal Regulations, section 21.7(a) and Title 14, Code of Federal Regulations, section 271.9(c).

      II.      As a condition to receiving any Federal financial assistance from the Department of Transportation, it will comply with:  section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. 794); the Air Carrier Access Act of 1986 (49 U.S.C. 1374(c)); and all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, Part 27, Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefitting from Federal Financial Assistance, Title 14, Code of Federal Regulations, Part 382, Nondiscrimination on the Basis of Handicap in Air Travel; and other pertinent directives

so that no otherwise qualified person with a disability, be excluded from participation in, be denied the benefits of, be discriminated against by reason of such handicap in the provision of air transportation, or otherwise be subjected to discrimination under any program for which the Recipient receives Federal financial assistance from the Department of Transportation.  This assurance is required by Title 49, Code of Federal Regulations, section 27.9 and Title 14, Code of Federal Regulations, sections 271.9(c) and 382.9.

III.    It will promptly take any meaures necessary to effectuate this agreement.  The Recipient further agrees that it shall take reasonable actions to guarantee that it, its contractors and subcontractors subject to the Department of Transportation regulations cited above, transferees, and successors in interest will comply with all requirements imposed or pursuant to the statutes and Department of Transportation regulations cited above, other pertinent directives, and the above assurances.

IV.    These assurances obligate the Recipient for the period during which Federal financial assistance is extended.  The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the statutes and Department of Transportation regulations cited above, other pertinent directives, and the above assurances.

V.    These assurances are given for the purpose of obtaining Federal subsidy under the Essential Air Service Program and are binding on the Recipient, contractors, subcontractors, transferees, successors in interest, and all other participants receiving Federal subsidy in the Essential Air Service Program.  The person or persons whose signatures appear below are authorized to sign this agreement on behalf of the Recipient.

VI.    In addition to these assurances, the Recipient agrees to file:  a summary of all complaints filed against it within the past year that allege violation(s) by the Recipient of Title VI of the Civil Rights Act of 1964, as amended, section 504 of the Rehabilitation Act of 1973, as amended, or the Air Carrier Access Act of 1986; or a statement that there have been no complaints filed against it.  The summary should include the date the complaint was filed, the nature of the complaint, the status or outcome of the complaint (i.e., whether it is still pending or how it was resolved).

_____          _____
Date                                     Legal Name of Recipient


                            By:    _____
                                    Signature of Authorized Official

Plaintiff's Exhibit 9

enotrans.org

# Airlines Close on $13 Billion in CARES Act Loans

9-11 minutes

---



- 
- [Article](#)
- [Week of September 28, 2020](#)
- Airlines Close on $13 Billion in CARES Act Loans

October 02, 2020  | Jeff Davis

The Treasury Department announced this week that seven passenger airlines had closed loans under the authority provided in the March 2020 CARES Act, totaling at least $13 billion out of the $25 billion in allowable loan authority.

Treasury is posting documents on its website for each loan within 72 hours of closing, so at present, we have details on five of the loans: for American, Alaska, Frontier, Hawaiian, and United. Loan details for JetBlue and SkyWest were not yet available as of this writing.

Because two of the four U.S. megacarriers (Delta and Southwest) elected to borrow from the private markets and not take advantage of the CARES program, more of the $25 billion will remain that can be divided amongst other applicants. Treasury says that, if this holds true, the $12.9 billion in loans closed to those five carriers will eventually grow to $18.1 billion.

Only $1.4 billion was drawn (disbursed) this week. Most carriers secured their loans with their frequent flier programs (which makes this AAdvantage member a bit uneasy), but Hawaiian put up some of its aircraft in addition to its loyalty program, and United put up its European and South American routes as well as some aircraft.

Whenever an airline makes a draw on its loan, it has to give Treasury warrants to purchase common stock equal to 10 percent of the loan disbursement.

Motion for TRO Ex. 9 Page 1

The CARES Act requires airlines receiving Treasury loans not to fire or furlough employees before September 30, 2020, but since that date has already passed, the loans have no direct bearing on the legal ability of airlines to reduce payroll.

|  | American | Alaska | Frontier | Hawaiian | United |
|---|---|---|---|---|---|
| Initial Loan | $5.477 billion | $1.301 billion | $574 million | $420 million | $5.170 billion |
| Max. Loan | $7.5 billion | $1.928 billion | $574 million | $622 million | $7.5 billion |
| Initial Draw | $550 million | $135 million | $150 million | $45 million | $520 million |
| Maturity Date | June 30, 2025 | Sept. 26, 2025 | Sept. 26, 2025 | June 30, 2024 | Sept. 26, 2025 |
| Rate | LIBOR + 3.5% | LIBOR + 2.5% | LIBOR + 2.5% | LIBOR + 2.5% | LIBOR + 3.0% |
| Secured by | Freq. Flyer Prog. | Freq. Flyer Prog. | Freq. Flyer Prog. | FFP, aircraft | Int'l routes, aircraft |
| Stock Warrants | 10% of loan draw | 10% of loan draw | 10% of loan draw | 10% of loan draw | 10% of loan draw |

**Related Articles**

**T&I Aviation Hearing Explores Air Rage Incidents**

Unruly passenger incidents are not new to aviation, but the rates of verbal disputes, threats, and sometimes physical altercations with...

**Biden Signs Sweeping Market Competition/Concentration Order**

On July 9, President Biden signed one of the widest-ranging executive orders of his Administration, EO 14036, "Promoting Competition in the...

**Modernizing Airports and Air Traffic Control Facilities Among Top Priorities in Aviation Infrastructure Funding**

The Subcommittee on Aviation Safety, Operations, and Innovation of the Senate Committee on Commerce, Science and Transportation held a...

Motion for TRO Ex. 9 Page 2

**Guest Op-Ed: Action and Reaction: The Belarus Gambit to Force Diversion of Ryanair Flight 4978**

Before the end of World War II, the United States government brought representatives of nations from around the world to Chicago to hammer...

**Op-Ed: Opening Up Global Air Travel—Safely**

One of the indelible effects of the COVID-19 outbreak is the dramatic decrease in air travel. Now that parts of the world are starting to...

**State of the Aviation Industry Hearing**

In a hearing on April 21, the Senate Subcommittee on Aviation, Safety, Operations, and Innovation assessed the state of the aviation...

**Airlines, public transit agencies say $1.9 trillion relief plan would prevent deep cuts, job losses**

Jeff Davis discusses industry survival measures while reviewing funding aspects of the latest coronavirus relief package.

**More Airline Aid Now Won't Move Without Resolution of Larger COVID Aid Bill**

This was an interesting week for the aviation news beat in Congress. The end result is that many U.S. airlines and contractors are...

**Additional Airline Payroll Support Promised But Not (Yet) Delivered**

U.S. airlines commenced plans to lay off over 30,000 employees yesterday, following the expiration of the no-layoffs clause accompanying...

**Airlines Close on $13 Billion in CARES Act Loans**

The Treasury Department announced this week that seven passenger airlines had closed loans under the authority provided in the March 2020...

**Plan for Contact Tracing Air Travelers Stalls**

Motion for TRO Ex. 9 Page 3

Last week, news outlets reported that the White House put the brakes on a plan by the Centers for Disease Control (CDC) to require airlines...

**Airports, Some Transit Agencies Slow to Spend COVID Relief Money**

New data from the federal government shows that not all airports and transit agencies needed the federal coronavirus aid provided by the...

Motion for TRO Ex. 9 Page 4

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

## FORM 8-K

**CURRENT REPORT PURSUANT**
**TO SECTION 13 OR 15(D) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

**April 29, 2021**
(Date of earliest event reported)

# ALASKA AIR GROUP, INC.

(Exact Name of Registrant as Specified in Its Charter)

**Delaware**
(State or Other Jurisdiction of Incorporation)

| | |
|---|---|
| **1-8957** | **91-1292054** |
| (Commission File Number) | (IRS Employer Identification No.) |

| | | | |
|---|---|---|---|
| **19300 International Boulevard** | **Seattle** | **Washington** | **98188** |
| (Address of Principal Executive Offices) | | | (Zip Code) |

**(206) 392-5040**
(Registrant's Telephone Number, Including Area Code)
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Ticker Symbol | Name of each exchange on which registered |
|---|---|---|
| Common stock, $0.01 par value | ALK | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR 230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR 240.12b-2).

☐ Emerging growth company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

This document is also available on our website at http://investor.alaskaair.com.

**ITEM 1.01  Entry into a Material Definitive Agreement**

<u>**Payroll Support Program**</u>

On April 29, 2021, Alaska Air Group, Inc. (Air Group) and its subsidiaries Alaska Airlines, Inc. (Alaska), Horizon Air Industries, Inc. (Horizon) and McGee Air Services, Inc. (McGee) finalized agreements with the U.S. Department of the Treasury (the Treasury) and accepted partial disbursement of funds through an extension of the Payroll Support Program of the American Rescue Plan Act of 2021 (PSP 3).

Under PSP 3 and the extension agreements entered into, Alaska and Horizon will receive a total of $571 million, and McGee will receive a total of $13 million, to be used exclusively toward continuing to pay employee salaries, wages and benefits. Alaska, Horizon and McGee received $292 million on April 29, 2021, with the remainder expected to be received sometime in May 2021. Of the funds received, $59 million takes the form of a senior term loan with a 10-year term, bearing an interest rate of 1% in years 1 - 5, and SOFR + 2% in years 6 -10. The loan is prepayable at par at any time. As additional taxpayer protection, Air Group granted the Treasury Department 88,395 warrants to purchase Air Group (ALK) common stock at a strike price of $66.39, based on the closing price on March 10, 2021. The warrants are non-voting, freely transferable, and may be settled as net shares or in cash at Alaska's option.

As a condition to receiving PSP 3 funds, Alaska, Horizon and McGee agreed to refrain from conducting involuntary furloughs or reducing employee rates of pay or benefits through September 30, 2021, and to limit executive compensation and severance through April 1, 2023. Air Group agreed to continue suspension of dividends and share repurchases until September 30, 2022.

**ITEM 2.03  Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant**

The information described under Item 1.01 above "Entry into a Material Definitive Agreement" is incorporated herein by reference.

**ITEM 8.01.  Other Items**

On April 29, 2021, Alaska and Horizon received an additional $80 million in funding from the extension of the Payroll Support Program made available under the Consolidated Appropriations Act, 2021. Funds received are to be used exclusively toward continuing to pay employee salaries, wages and benefits. Of this amount, approximately $23 million will take the form of a senior term loan with a 10-year term bearing an interest rate of 1% in years 1 - 5 and SOFR+ 2% in years 6 -10. As additional taxpayer protection, upon funding of the additional disbursement, Air Group granted the Treasury Department warrants to purchase 45,855 shares of Air Group (ALK) common stock at a strike price of $52.25, based on the closing price on December 24, 2020.

**Signatures**
Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

<u>ALASKA AIR GROUP, INC.</u>
Registrant

Date: May 3, 2021

<u>/s/ KYLE B. LEVINE</u>
Kyle B. Levine
Senior Vice President, Legal, General Counsel and Corporate Secretary

<u>/s/ CHRISTOPHER M. BERRY</u>
Christopher M. Berry
Vice President, Finance and Controller

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

**FORM 8-K**

**CURRENT REPORT PURSUANT**
**TO SECTION 13 OR 15(D) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

**April 29, 2021**
(Date of earliest event reported)

# ALASKA AIR GROUP, INC.

(Exact Name of Registrant as Specified in Its Charter)

**Delaware**
(State or Other Jurisdiction of Incorporation)

| **1-8957** | | **91-1292054** |
|---|---|---|
| (Commission File Number) | | (IRS Employer Identification No.) |

| **19300 International Boulevard** | **Seattle** | **Washington** | **98188** |
|---|---|---|---|
| (Address of Principal Executive Offices) | | | (Zip Code) |

**(206) 392-5040**
(Registrant's Telephone Number, Including Area Code)
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Ticker Symbol** | **Name of each exchange on which registered** |
|---|---|---|
| Common stock, $0.01 par value | ALK | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR 230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR 240.12b-2).

☐ Emerging growth company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

This document is also available on our website at http://investor.alaskaair.com.

**ITEM 1.01 Entry into a Material Definitive Agreement**

**Payroll Support Program**

On April 29, 2021, Alaska Air Group, Inc. (Air Group) and its subsidiaries Alaska Airlines, Inc. (Alaska), Horizon Air Industries, Inc. (Horizon) and McGee Air Services, Inc. (McGee) finalized agreements with the U.S. Department of the Treasury (the Treasury) and accepted partial disbursement of funds through an extension of the Payroll Support Program of the American Rescue Plan Act of 2021 (PSP 3).

Under PSP 3 and the extension agreements entered into, Alaska and Horizon will receive a total of $571 million, and McGee will receive a total of $13 million, to be used exclusively toward continuing to pay employee salaries, wages and benefits. Alaska, Horizon and McGee received $292 million on April 29, 2021, with the remainder expected to be received sometime in May 2021. Of the funds received, $59 million takes the form of a senior term loan with a 10-year term, bearing an interest rate of 1% in years 1 - 5, and SOFR + 2% in years 6 - 10. The loan is prepayable at par at any time. As additional taxpayer protection, Air Group granted the Treasury Department 88,395 warrants to purchase Air Group (ALK) common stock at a strike price of $66.39, based on the closing price on March 10, 2021. The warrants are non-voting, freely transferable, and may be settled as net shares or in cash at Alaska's option.

As a condition to receiving PSP 3 funds, Alaska, Horizon and McGee agreed to refrain from conducting involuntary furloughs or reducing employee rates of pay or benefits through September 30, 2021, and to limit executive compensation and severance through April 1, 2023. Air Group agreed to continue suspension of dividends and share repurchases until September 30, 2022.

**ITEM 2.03 Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant**

The information described under Item 1.01 above "Entry into a Material Definitive Agreement" is incorporated herein by reference.

**ITEM 8.01. Other Items**

On April 29, 2021, Alaska and Horizon received an additional $80 million in funding from the extension of the Payroll Support Program made available under the Consolidated Appropriations Act, 2021. Funds received are to be used exclusively toward continuing to pay employee salaries, wages and benefits. Of this amount, approximately $23 million will take the form of a senior term loan with a 10-year term bearing an interest rate of 1% in years 1 - 5 and SOFR+ 2% in years 6 -10. As additional taxpayer protection, upon funding of the additional disbursement, Air Group granted the Treasury Department warrants to purchase 45,855 shares of Air Group (ALK) common stock at a strike price of $52.25, based on the closing price on December 24, 2020.

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

ALASKA AIR GROUP, INC.
Registrant

Date: May 3, 2021

/s/ KYLE B. LEVINE
Kyle B. Levine
Senior Vice President, Legal, General Counsel and Corporate Secretary

/s/ CHRISTOPHER M. BERRY
Christopher M. Berry
Vice President, Finance and Controller



# Payroll Support Program Extension Agreement, dated January 15, 2021, between Alaska Airlines, Inc. and the United States Department of the Treasury

EX-10.19 7 ex1019payrollsupportagreem.htm EX-10.19 Document

**PAyroll support Program EXTENSION Agreement**

Motion for TRO Ex. 9 Page 9

| **Recipient:**   Alaska Airlines, Inc. | **PSP Participant Number:** PSA ###-###-#### |
| 19300 International Blvd. | **Employer Identification Number:** 92-0009235 |
| Seattle, WA 98199 | **DUNS Number:** _____ |

**☐dditional Recipients:** Horizon Air Industries, Inc.

**☐mount of Initial Payroll Support Payment**: $266,385,000 of the Prorated Award of $532,770,000.

The Department of the Treasury (Treasury) hereby provides Payroll Support (as defined herein) under Subtitle A of Title IV of Division N of the Consolidated Appropriations Act, 2021. The Signatory Entity named above, on behalf of itself and its Affiliates (as defined herein), agrees to comply with this Agreement and applicable Federal law as a condition of receiving Payroll Support. The Signatory Entity and its undersigned authorized representatives acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in connection with this Agreement may result in administrative remedies as well as civil and/or criminal penalties.

**The undersigned hereby agree to the attached Payroll Support Program Extension Agreement.**

| _____ | _____ |
| Department of the Treasury | Alaska Airlines, Inc. |
| Name: Steven Mnuchin | First Authorized Representative: Bradley D. Tilden |
| Title: Secretary | Title:    Chief Executive Officer |
| Date: | Date: |
| | |
| | _____ |
| | Alaska Airlines, Inc. |
| | Second Authorized Representative: Shane R. Tackett |
| | Title:    Exec. Vice President, Finance, and Chief    Financial Officer |
| | Date: |

OMB Approval No. 1505-0263

1

_____

Motion for TRO Ex. 9 Page 10

## PAYROLL SUPPORT PROGRAM EXTENSION AGREEMENT

### INTRODUCTION

Subtitle A of Title IV of Division N of the Consolidated Appropriations Act, 2021 (PSP Extension Law) directs the Department of the Treasury (Treasury) to provide Payroll Support (as defined herein) to passenger air carriers and certain contractors that must be exclusively used for the continuation of payment of Employee Salaries, Wages, and Benefits (as defined herein). The PSP Extension Law permits Treasury to provide Payroll Support in such form, and on such terms and conditions, as the Secretary of the Treasury determines appropriate, and requires certain assurances from the Recipient (as defined herein).

This Payroll Support Program Extension Agreement, including the application and all supporting documents submitted by the Recipient and the Payroll Support Program Extension Certification attached hereto (collectively, Agreement), memorializes the binding terms and conditions applicable to the Recipient.

### DEFINITIONS

As used in this Agreement, the following terms shall have the following respective meanings, unless the context clearly requires otherwise. In addition, this Agreement shall be construed in a manner consistent with any public guidance Treasury may from time to time issue regarding the implementation of the PSP Extension Law.

*Additional Payroll Support Payment* means any disbursement of Payroll Support occurring after the first disbursement of Payroll Support under this Agreement.

*Affiliate* means any Person that directly or indirectly controls, is controlled by, or is under common control with, the Recipient. For purposes of this definition, "control" of a Person shall mean having the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by ownership of voting equity, by contract, or otherwise.

*Benefits* means, without duplication of any amounts counted as Salary or Wages, pension expenses in respect of Employees, all expenses for accident, sickness, hospital, and death benefits to Employees, and the cost of insurance to provide such benefits; any Severance Pay or Other Benefits payable to Employees pursuant to a bona fide voluntary early retirement program or voluntary furlough; and any other similar expenses paid by the Recipient for the benefit of Employees, including any other fringe benefit expense described in lines 10 and 11 of Financial Reporting Schedule P-6, Form 41, as published by the Department of Transportation, but excluding any Federal, state, or local payroll taxes paid by the Recipient.

*Corporate Officer* means, with respect to the Recipient, its president; any vice president in charge of a principal business unit, division, or function (such as sales, administration or finance); any other officer who performs a policy-making function; or any other person who performs similar policy making functions for the Recipient. Executive officers of subsidiaries or

2

Motion for TRO Ex. 9 Page 11

parents of the Recipient may be deemed Corporate Officers of the Recipient if they perform such policy-making functions for the Recipient.

*Employee* means an individual who is employed by the Recipient and whose principal place of employment is in the United States (including its territories and possessions), including salaried, hourly, full-time, part-time, temporary, and leased employees, but excluding any individual who is a Corporate Officer or independent contractor.

*Involuntary Termination or Furlough* means the Recipient terminating the employment of one or more Employees or requiring one or more Employees to take a temporary suspension or unpaid leave for any reason, including a shut-down or slow-down of business; provided, however, that an Involuntary Termination or Furlough does not include a Permitted Termination or Furlough.

*Maximum Awardable Amount* means the amount determined by the Secretary with respect to the Recipient pursuant to section 403(a) of the PSP Extension Law.

*Payroll Support* means funds disbursed by the Secretary to the Recipient under this Agreement, including the first disbursement of Payroll Support and any Additional Payroll Support Payment.

*PSP Extension Law* means Subtitle A of Title IV of Division N of the Consolidated Appropriations Act, 2021.

*Permitted Termination or Furlough* means, with respect to an Employee, (1) a voluntary furlough, voluntary leave of absence, voluntary resignation, or voluntary retirement, (2) termination of employment resulting from such Employee's death or disability, or (3) the Recipient terminating the employment of such Employee for cause or placing such Employee on a temporary suspension or unpaid leave of absence for disciplinary reasons, in either case, as reasonably determined by the Recipient acting in good faith.

*Person* means any natural person, corporation, limited liability company, partnership, joint venture, trust, business association, governmental entity, or other entity.

*PSP1* means the Payroll Support Program established under Division A, Title IV, Subtitle B of the Coronavirus Aid, Relief, and Economic Security Act (Pub. L. No. 116-136).

*Recall* means the dispatch of a notice by the Recipient, via mail, courier, or electronic mail, to an Employee who was subject to an Involuntary Termination or Furlough notifying the Employee that (1) the Employee must, within a specified period of time that is not less than 14 days or such other period for recall as is specified in an existing collective bargaining agreement entered into before December 27, 2020, elect either (a) to return to employment or bypass return to employment, in accordance with an applicable collective bargaining agreement or, in the absence of a collective bargaining agreement, the Recipient's policy; or (b) to permanently separate from employment with the Recipient; and (2) failure to respond within such time period specified shall be considered an election under clause (1)(b) of this definition.

3

Motion for TRO Ex. 9 Page 12

*Recipient* means, collectively, the Signatory Entity; its Affiliates that are listed on the signature page hereto as Additional Recipients; and their respective heirs, executors, administrators, successors, and assigns.

*Returning Employee* means an Employee of the Recipient who was subject to an Involuntary Termination or Furlough and who has elected to return to employment pursuant to a Recall.

*Salary* means, without duplication of any amounts counted as Benefits, a predetermined regular payment, typically paid on a weekly or less frequent basis but which may be expressed as an hourly, weekly, annual or other rate, as well as cost-of-living differentials, vacation time, paid time off, sick leave, and overtime pay, paid by the Recipient to its Employees, but excluding any Federal, state, or local payroll taxes paid by the Recipient.

*Secretary* means the Secretary of the Treasury.

*Severance Pay or Other Benefits* means any severance payment or other similar benefits, including cash payments, health care benefits, perquisites, the enhancement or acceleration of the payment or vesting of any payment or benefit or any other in-kind benefit payable (whether in lump sum or over time, including after October 1, 2022) by the Recipient to a Corporate Officer or Employee in connection with any termination of such Corporate Officer's or Employee's employment (including, without limitation, resignation, severance, retirement, or constructive termination), which shall be determined and calculated in respect of any Employee or Corporate Officer of the Recipient in the manner prescribed in 17 CFR 229.402(j) (without regard to its limitation to the five most highly compensated executives and using the actual date of termination of employment rather than the last business day of the Recipient's last completed fiscal year as the trigger event).

*Signatory Entity* means the passenger air carrier or contractor that has entered into this Agreement.

*Taxpayer Protection Instruments* means warrants, options, preferred stock, debt securities, notes, or other financial instruments issued by the Recipient or an Affiliate to Treasury as compensation for the Payroll Support under this Agreement, if applicable.

*Total Compensation* means compensation including salary, wages, bonuses, awards of stock, and any other financial benefits provided by the Recipient or an Affiliate, as applicable, which shall be determined and calculated for the 2019 calendar year or any applicable 12-month period in respect of any Employee or Corporate Officer of the Recipient in the manner prescribed under paragraph e.5 of the award term in 2 CFR part 170, App. A, but excluding any Severance Pay or Other Benefits in connection with a termination of employment.

*Wage* means, without duplication of any amounts counted as Benefits, a payment, typically paid on an hourly, daily, or piecework basis, including cost-of-living differentials, vacation, paid time off, sick leave, and overtime pay, paid by the Recipient to its Employees, but excluding any Federal, state, or local payroll taxes paid by the Recipient.

4

Motion for TRO Ex. 9 Page 13

## PAYROLL SUPPORT PAYMENTS

1.  Upon the execution of this Agreement by Treasury and the Recipient, the Secretary shall approve the Recipient's application for Payroll Support.

2.  The Recipient may receive Payroll Support in multiple payments up to the Maximum Awardable Amount, and the amounts (individually and in the aggregate) and timing of such payments will be determined by the Secretary in his sole discretion. The Secretary may, in his sole discretion, increase or reduce the Maximum Awardable Amount (a) consistent with section 403(a) of the PSP Extension Law and (b) on a pro rata basis in order to address any shortfall in available funds, pursuant to section 403(c) of the PSP Extension Law.

3.  The Secretary may determine in his sole discretion that any Payroll Support shall be conditioned on, and subject to, compliance by the Recipient with all applicable requirements under PSP1 if the Recipient received financial assistance in PSP1, and such additional terms and conditions (including the receipt of, and any terms regarding, Taxpayer Protection Instruments) to which the parties may agree in writing.

## TERMS AND CONDITIONS

<u>Retaining and Paying Employees</u>

4.  The Recipient shall use the Payroll Support exclusively for the continuation of payment of Wages, Salaries, and Benefits to the Employees of the Recipient, including the payment of lost Wages, Salaries, and Benefits to Returning Employees.

    a.  *Furloughs and Layoffs*. The Recipient shall not conduct an Involuntary Termination or Furlough of any Employee between the date of this Agreement and March 31, 2021.

    b.  *Employee Salary, Wages, and Benefits*

        i.  *Salary and Wages*. Except in the case of a Permitted Termination or Furlough, the Recipient shall not, between the date of this Agreement and March 31, 2021, reduce, without the Employee's consent, (A) the pay rate of any Employee earning a Salary, or (B) the pay rate of any Employee earning Wages.

        ii.  *Benefits*. Except in the case of a Permitted Termination or Furlough, the Recipient shall not, between the date of this Agreement and March 31, 2021, reduce, without the Employee's consent, the Benefits of any Employee; provided, however, that for purposes of this paragraph, personnel expenses associated with the performance of work duties, including those described in line 10 of Financial Reporting Schedule P-6, Form 41, as published by the Department of Transportation, may be reduced to the extent the associated work duties are not performed.

5

Motion for TRO Ex. 9 Page 14

4.1. If the Recipient received financial assistance in PSP1, the Recipient shall:

    a.  Recall, not later than 72 hours after this Agreement has been executed by each party hereto, any Employees who were subject to an Involuntary Termination or Furlough between October 1, 2020, and the effective date of this Agreement, and enable each Returning Employee to return to employment within 30 days after making the election to do so;

    b.  compensate, not later than 30 days after a Returning Employee returns to employment, such Returning Employee for lost Salary, Wages, and Benefits (offset by any amounts received by the Returning Employee from the Recipient or an Affiliate as a result of such Returning Employee's Involuntary Termination or Furlough, including any Severance Pay or Other Benefits or furlough pay) between December 1, 2020, and the effective date of this Agreement; and

    c.  restore the rights and protections for any Returning Employees as if such Returning Employees had not been subject to an Involuntary Termination or Furlough.

4.2. If the Recipient did not receive financial assistance in PSP1, the Recipient shall:

    a.  Recall, not later than 72 hours after this Agreement has been executed by each party hereto, any Employees who were subject to an Involuntary Termination or Furlough between March 27, 2020, and the effective date of this Agreement, and enable each Returning Employee to return to employment within 30 days of making the election to do so;

    b.  compensate, not later than 30 days after a Returning Employee returns to employment, such Returning Employee for lost Salary, Wages, and Benefits (offset by any amounts received by the Returning Employee from the Recipient or an Affiliate as a result of such Returning Employee's Involuntary Termination or Furlough, including any Severance Pay or Other Benefits or furlough pay) between December 1, 2020, and the effective date of this Agreement; and

    c.  restore the rights and protections for any Returning Employees as if such Returning Employees had not been subject to an Involuntary Termination or Furlough.

<u>Dividends and Buybacks</u>

5.  Through March 31, 2022, neither the Recipient nor any Affiliate shall, in any transaction, purchase an equity security of the Recipient or of any direct or indirect parent company of the Recipient that, in either case, is listed on a national securities exchange.

6

Motion for TRO Ex. 9 Page 15

6.  Through March 31, 2022, the Recipient shall not pay dividends, or make any other capital distributions, with respect to the common stock (or equivalent equity interest) of the Recipient.

Limitations on Certain Compensation

7.  Beginning October 1, 2020, and ending October 1, 2022, the Recipient and its Affiliates shall not pay any of the Recipient's Corporate Officers or Employees whose Total Compensation exceeded $425,000 in calendar year 2019 (other than an Employee whose compensation is determined through an existing collective bargaining agreement entered into before December 27, 2020):

    a.  Total Compensation which exceeds, during any 12 consecutive months of such two-year period, the Total Compensation the Corporate Officer or Employee received in calendar year 2019; or

    b.  Severance Pay or Other Benefits in connection with a termination of employment with the Recipient which exceed twice the maximum Total Compensation received by such Corporate Officer or Employee in calendar year 2019.

8.  Beginning October 1, 2020, and ending October 1, 2022, the Recipient and its Affiliates shall not pay, during any 12 consecutive months of such two-year period, any of the Recipient's Corporate Officers or Employees whose Total Compensation exceeded $3,000,000 in calendar year 2019 Total Compensation in excess of the sum of:

    a.  $3,000,000; and

    b.  50 percent of the excess over $3,000,000 of the Total Compensation received by such Corporate Officer or Employee in calendar year 2019.

9.  For purposes of determining applicable amounts under paragraphs 7 and 8 with respect to any Corporate Officer or Employee who was employed by the Recipient or an Affiliate for less than all of calendar year 2019, the amount of Total Compensation in calendar year 2019 shall mean such Corporate Officer's or Employee's Total Compensation on an annualized basis.

Continuation of Service

10. If the Recipient is an air carrier, until March 1, 2022, the Recipient shall comply with any applicable requirement issued by the Secretary of Transportation under section 407) of the PSP Extension Law to maintain scheduled air transportation service to any point served by the Recipient before March 1, 2020.

Effective Date

11. This Agreement shall be effective as of the date of its execution by both parties.

7

Motion for TRO Ex. 9 Page 16

<u>Reporting and Auditing</u>

12. Until the calendar quarter that begins after the later of October 1, 2022, and the date on which no Taxpayer Protection Instrument is outstanding, not later than 45 days after the end of each of the first three calendar quarters of each calendar year and 90 days after the end of each calendar year, the Signatory Entity, on behalf of itself and each other Recipient, shall certify to Treasury that it is in compliance with the terms and conditions of this Agreement and provide a report containing the following:

   a.  the amount of Payroll Support funds expended during such quarter;

   b.  the Recipient's financial statements (audited by an independent certified public accountant, in the case of annual financial statements);

   c.  a copy of the Recipient's IRS Form 941 filed with respect to such quarter; and

   d.  a detailed summary describing, with respect to the Recipient, (a) any changes in Employee headcount during such quarter and the reasons therefor, including any Involuntary Termination or Furlough, (b) any changes in the amounts spent by the Recipient on Employee Wages, Salary, and Benefits during such quarter, and (c) any changes in Total Compensation for, and any Severance Pay or Other Benefits in connection with the termination of, Corporate Officers and Employees subject to limitation under this Agreement during such quarter; and the reasons for any such changes.

13. If the Recipient or any Affiliate, or any Corporate Officer of the Recipient or any Affiliate, becomes aware of facts, events, or circumstances that may materially affect the Recipient's compliance with the terms and conditions of this Agreement, the Recipient or Affiliate shall promptly provide Treasury with a written description of the events or circumstances and any action taken, or contemplated, to address the issue.

14. In the event the Recipient contemplates any action to commence a bankruptcy or insolvency proceeding in any jurisdiction, the Recipient shall promptly notify Treasury.

15. The Recipient shall:

   a.  Promptly provide to Treasury and the Treasury Inspector General a copy of any Department of Transportation Inspector General report, audit report, or report of any other oversight body, that is received by the Recipient relating to this Agreement.

   b.  Immediately notify Treasury and the Treasury Inspector General of any indication of fraud, waste, abuse, or potentially criminal activity pertaining to the Payroll Support.

   c.  Promptly provide Treasury with any information Treasury may request relating to compliance by the Recipient and its Affiliates with this Agreement.

8

Motion for TRO Ex. 9 Page 17

16. The Recipient and Affiliates will provide Treasury, the Treasury Inspector General, and such other entities as authorized by Treasury timely and unrestricted access to all documents, papers, or other records, including electronic records, of the Recipient related to the Payroll Support, to enable Treasury and the Treasury Inspector General to make audits, examinations, and otherwise evaluate the Recipient's compliance with the terms of this Agreement. This right also includes timely and reasonable access to the Recipient's and its Affiliates' personnel for the purpose of interview and discussion related to such documents. This right of access shall continue as long as records are required to be retained. In addition, the Recipient will provide timely reports as reasonably required by Treasury, the Treasury Inspector General, and such other entities as authorized by Treasury to comply with applicable law and to assess program effectiveness.

Recordkeeping and Internal Controls

17. If the Recipient is a debtor as defined under 11 U.S.C. § 101(13), the Payroll Support funds, any claim or account receivable arising under this Agreement, and any segregated account holding funds received under this Agreement shall not constitute or become property of the estate under 11 U.S.C. § 541.

18. The Recipient shall expend and account for Payroll Support funds in a manner sufficient to:

    a. Permit the preparation of accurate, current, and complete quarterly reports as required under this Agreement.

    b. Permit the tracing of funds to a level of expenditures adequate to establish that such funds have been used as required under this Agreement.

19. The Recipient shall establish and maintain effective internal controls over the Payroll Support; comply with all requirements related to the Payroll Support established under applicable Federal statutes and regulations; monitor compliance with Federal statutes, regulations, and the terms and conditions of this Agreement; and take prompt corrective actions in accordance with audit recommendations. The Recipient shall promptly remedy any identified instances of noncompliance with this Agreement.

20. The Recipient and Affiliates shall retain all records pertinent to the receipt of Payroll Support and compliance with the terms and conditions of this Agreement (including by suspending any automatic deletion functions for electronic records, including e-mails) for a period of three years following the period of performance. Such records shall include all information necessary to substantiate factual representations made in the Recipient's application for Payroll Support, including ledgers and sub-ledgers, and the Recipient's and Affiliates' compliance with this Agreement. While electronic storage of records (backed up as appropriate) is preferable, the Recipient and Affiliates may store records in hardcopy (paper) format. The term "records" includes all relevant financial and accounting records and all supporting documentation for the information reported on the Recipient's quarterly reports.

9

Motion for TRO Ex. 9 Page 18

21. If any litigation, claim, investigation, or audit relating to the Payroll Support is started before the expiration of the three-year period, the Recipient and Affiliates shall retain all records described in paragraph 20 until all such litigation, claims, investigations, or audit findings have been completely resolved and final judgment entered or final action taken.

Remedies

22. If Treasury believes that an instance of noncompliance by the Recipient or an Affiliate with (a) this Agreement, (b) sections 404 or 406 of the PSP Extension Law, or (c) the Internal Revenue Code of 1986 as it applies to the receipt of Payroll Support has occurred, Treasury may notify the Recipient in writing of its proposed determination of noncompliance, provide an explanation of the nature of the noncompliance, and specify a proposed remedy. Upon receipt of such notice, the Recipient shall, within seven days, accept Treasury's proposed remedy, propose an alternative remedy, or provide information and documentation contesting Treasury's proposed determination. Treasury shall consider any such submission by the Recipient and make a final written determination, which will state Treasury's findings regarding noncompliance and the remedy to be imposed.

23. If Treasury makes a final determination under paragraph 22 that an instance of noncompliance has occurred, Treasury may, in its sole discretion, withhold any Additional Payroll Support Payments; require the repayment of the amount of any previously disbursed Payroll Support, with appropriate interest; require additional reporting or monitoring; initiate suspension or debarment proceedings as authorized under 2 CFR Part 180; terminate this Agreement; or take any such other action as Treasury, in its sole discretion, deems appropriate.

24. Treasury may make a final determination regarding noncompliance without regard to paragraph 22 if Treasury determines, in its sole discretion, that such determination is necessary to protect a material interest of the Federal Government. In such event, Treasury shall notify the Recipient of the remedy that Treasury, in its sole discretion, shall impose, after which the Recipient may contest Treasury's final determination or propose an alternative remedy in writing to Treasury. Following the receipt of such a submission by the Recipient, Treasury may, in its sole discretion, maintain or alter its final determination.

25. Any final determination of noncompliance and any final determination to take any remedial action described herein shall not be subject to further review. To the extent permitted by law, the Recipient waives any right to judicial review of any such determinations and further agrees not to assert in any court any claim arising from or relating to any such determination or remedial action.

26. Instead of, or in addition to, the remedies listed above, Treasury may refer any noncompliance or any allegations of fraud, waste, or abuse to the Treasury Inspector General.

27. Treasury, in its sole discretion, may grant any request by the Recipient for termination of this Agreement, which such request shall be in writing and shall include the reasons for such

10

Motion for TRO Ex. 9 Page 19

termination, the proposed effective date of the termination, and the amount of any unused Payroll Support funds the Recipient requests to return to Treasury. Treasury may, in its sole discretion, determine the extent to which the requirements under this Agreement may cease to apply following any such termination.

28. If Treasury determines that any remaining portion of the Payroll Support will not accomplish the purpose of this Agreement, Treasury may terminate this Agreement in its entirety to the extent permitted by law.

<u>Debts</u>

29. Any Payroll Support in excess of the amount which Treasury determines, at any time, the Recipient is authorized to receive or retain under the terms of this Agreement constitutes a debt to the Federal Government.

30. Any debts determined to be owed by the Recipient to the Federal Government shall be paid promptly by the Recipient. A debt is delinquent if it has not been paid by the date specified in Treasury's initial written demand for payment, unless other satisfactory arrangements have been made. Interest, penalties, and administrative charges shall be charged on delinquent debts in accordance with 31 U.S.C. § 3717, 31 CFR 901.9, and paragraphs 31 and 32. Treasury will refer any debt that is more than 180 days delinquent to Treasury's Bureau of the Fiscal Service for debt collection services.

31. Penalties on any debts shall accrue at a rate of not more than 6 percent per year or such other higher rate as authorized by law.

32. Administrative charges relating to the costs of processing and handling a delinquent debt shall be determined by Treasury.

33. The Recipient shall not use funds from other federally sponsored programs to pay a debt to the government arising under this Agreement.

<u>Protections for Whistleblowers</u>

34. In addition to other applicable whistleblower protections, in accordance with 41 U.S.C. § 4712, the Recipient shall not discharge, demote, or otherwise discriminate against an Employee as a reprisal for disclosing information to a Person listed below that the Employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant:

    a. A Member of Congress or a representative of a committee of Congress;

    b. An Inspector General;

11

Motion for TRO Ex. 9 Page 20

   c.  The Government Accountability Office;

   d.  A Treasury employee responsible for contract or grant oversight or management;

   e.  An authorized official of the Department of Justice or other law enforcement agency;

   f.  A court or grand jury; or

   g.  A management official or other Employee of the Recipient who has the responsibility to investigate, discover, or address misconduct.

<u>Lobbying</u>

35. The Recipient shall comply with the provisions of 31 U.S.C. § 1352, as amended, and with the regulations at 31 CFR Part 21.

<u>Non-Discrimination</u>

36. The Recipient shall comply with, and hereby assures that it will comply with, all applicable Federal statutes and regulations relating to nondiscrimination including:

   a.  Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*), including Treasury's implementing regulations at 31 CFR Part 22;

   b.  Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794);

   c.  The Age Discrimination Act of 1975, as amended (42 U.S.C. §§ 6101–6107), including Treasury's implementing regulations at 31 CFR Part 23 and the general age discrimination regulations at 45 CFR Part 90; and

   d.  The Air Carrier Access Act of 1986 (49 U.S.C. § 41705).

<u>Additional Reporting</u>

37. Within seven days after the date of this Agreement, the Recipient shall register in SAM.gov, and thereafter maintain the currency of the information in SAM.gov until at least October 1, 2022. The Recipient shall review and update such information at least annually after the initial registration, and more frequently if required by changes in the Recipient's information. The Recipient agrees that this Agreement and information related thereto, including the Maximum Awardable Amount and any executive total compensation reported pursuant to paragraph 38, may be made available to the public through a U.S. Government website, including SAM.gov.

38. For purposes of paragraph 37, the Recipient shall report total compensation as defined in paragraph e.5 of the award term in 2 CFR part 170, App. A for each of the Recipient's five most highly compensated executives for the preceding completed fiscal year, if:

12

    a.   the total Payroll Support is $25,000 or more;

    b.   in the preceding fiscal year, the Recipient received:

        i.   80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance, as defined at 2 CFR 170.320 (and subawards); and

        ii.   $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance, as defined at 2 CFR 170.320 (and subawards); and

    c.   the public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. To determine if the public has access to the compensation information, the Recipient shall refer to U.S. Securities and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.

39. The Recipient shall report executive total compensation described in paragraph 38:

    a.   as part of its registration profile at https://www.sam.gov; and

    b.   within five business days after the end of each month following the month in which this Agreement becomes effective, and annually thereafter.

40. The Recipient agrees that, from time to time, it will, at its own expense, promptly upon reasonable request by Treasury, execute and deliver, or cause to be executed and delivered, or use its commercially reasonable efforts to procure, all instruments, documents and information, all in form and substance reasonably satisfactory to Treasury, to enable Treasury to ensure compliance with, or effect the purposes of, this Agreement, which may include, among other documents or information, (a) certain audited financial statements of the Recipient, (b) documentation regarding the Recipient's revenues derived from its business as a passenger air carrier or regarding the passenger air carriers for which the Recipient provides services as a contractor (as the case may be), and (c) the Recipient's most recent quarterly Federal tax returns. The Recipient agrees to provide Treasury with such documents or information promptly.

41. If the total value of the Recipient's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period before termination of this Agreement, then the Recipient shall make such reports as required by 2 CFR part 200, Appendix XII.

<u>Other</u>

13

42. The Recipient acknowledges that neither Treasury, nor any other actor, department, or agency of the Federal Government, shall condition the provision of Payroll Support on the Recipient's implementation of measures to enter into negotiations with the certified bargaining representative of a craft or class of employees of the Recipient under the Railway Labor Act (45 U.S.C. 151 *et seq.*) or the National Labor Relations Act (29 U.S.C. 151 *et seq.*), regarding pay or other terms and conditions of employment.

43. Notwithstanding any other provision of this Agreement, the Recipient has no right to, and shall not, transfer, pledge, mortgage, encumber, or otherwise assign this Agreement or any Payroll Support provided under this Agreement, or any interest therein, or any claim, account receivable, or funds arising thereunder or accounts holding Payroll Support, to any party, bank, trust company, or other Person without the express written approval of Treasury.

44. The Signatory Entity will cause its Affiliates to comply with all of their obligations under or relating to this Agreement.

45. Unless otherwise provided in guidance issued by Treasury or the Internal Revenue Service, the form of any Taxpayer Protection Instrument held by Treasury and any subsequent holder will be treated as such form for purposes of the Internal Revenue Code of 1986 (for example, a Taxpayer Protection Instrument in the form of a note will be treated as indebtedness for purposes of the Internal Revenue Code of 1986).

46. This Agreement may not be amended or modified except pursuant to an agreement in writing entered into by the Recipient and Treasury, except that Treasury may unilaterally amend this Agreement if required in order to comply with applicable Federal law or regulation.

47. Subject to applicable law, Treasury may, in its sole discretion, waive any term or condition under this Agreement imposing a requirement on the Recipient or any Affiliate.

48. This Agreement shall bind and inure to the benefit of the parties and their respective heirs, executors, administrators, successors, and assigns.

49. The Recipient represents and warrants to Treasury that this Agreement, and the issuance and delivery to Treasury of the Taxpayer Protection Instruments, if applicable, have been duly authorized by all requisite corporate and, if required, stockholder action, and will not result in the violation by the Recipient of any provision of law, statute, or regulation, or of the articles of incorporation or other constitutive documents or bylaws of the Recipient, or breach or constitute an event of default under any material contract to which the Recipient is a party.

50. The Recipient represents and warrants to Treasury that this Agreement has been duly executed and delivered by the Recipient and constitutes a legal, valid, and binding obligation of the Recipient enforceable against the Recipient in accordance with its terms.

51. This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute a single contract.

14

Motion for TRO Ex. 9 Page 23

52. The words "execution," "signed," "signature," and words of like import in any assignment shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. Notwithstanding anything herein to the contrary, delivery of an executed counterpart of a signature page of this Agreement by electronic means, or confirmation of the execution of this Agreement on behalf of a party by an email from an authorized signatory of such party, shall be effective as delivery of a manually executed counterpart of this Agreement.

53. The captions and paragraph headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

54. This Agreement is governed by and shall be construed in accordance with Federal law. Insofar as there may be no applicable Federal law, this Agreement shall be construed in accordance with the laws of the State of New York, without regard to any rule of conflicts of law (other than section 5-1401 of the New York General Obligations Law) that would result in the application of the substantive law of any jurisdiction other than the State of New York.

55. Nothing in this Agreement shall require any unlawful action or inaction by either party.

56. The requirement pertaining to trafficking in persons at 2 CFR 175.15(b) is incorporated herein and made applicable to the Recipient.

57. This Agreement, together with the attachments hereto, including the Payroll Support Program Extension Certification and any attached terms regarding Taxpayer Protection Instruments, constitute the entire agreement of the parties relating to the subject matter hereof and supersede any previous agreements and understandings, oral or written, relating to the subject matter hereof. There may exist other agreements between the parties as to other matters, which are not affected by this Agreement and are not included within this integration clause.

58. No failure by either party to insist upon the strict performance of any provision of this Agreement or to exercise any right or remedy hereunder, and no acceptance of full or partial Payroll Support (if applicable) or other performance by either party during the continuance of any such breach, shall constitute a waiver of any such breach of such provision.

## ATTACHMENT

Payroll Support Program Extension Certification of Corporate Officer of Recipient

Motion for TRO Ex. 9 Page 24

## PAYROLL SUPPORT PROGRAM EXTENSION

## CERTIFICATION OF CORPORATE OFFICER OF RECIPIENT

In connection with the Payroll Support Program Extension Agreement (Agreement) between Alaska Airlines, Inc. and the Department of the Treasury (Treasury) relating to Payroll Support being provided by Treasury to the Recipient under Subtitle A of Title IV of Division N of the Consolidated Appropriations Act, 2021, I hereby certify under penalty of perjury to the Treasury that all of the following are true and correct. Capitalized terms used but not defined herein have the meanings set forth in the Agreement.

(1)   I have the authority to make the following representations on behalf of myself and the Recipient. I understand that these representations will be relied upon as material in the decision by Treasury to provide Payroll Support to the Recipient.

(2) The information and certifications provided by the Recipient in an application for Payroll Support, and in any attachments or other information provided by the Recipient to Treasury related to the application, are true and correct and do not contain any materially false, fictitious, or fraudulent statement, nor any concealment or omission of any material fact.

(3) The Recipient has the legal authority to apply for the Payroll Support, and it has the institutional, managerial, and financial capability to comply with all obligations, terms, and conditions set forth in the Agreement and any attachment thereto.

(4) The Recipient and any Affiliate will give Treasury, Treasury's designee or the Treasury Office of Inspector General (as applicable) access to, and opportunity to examine, all documents, papers, or other records of the Recipient or Affiliate pertinent to the provision of Payroll Support made by Treasury based on the application, in order to make audits, examinations, excerpts, and transcripts.

(5) No Federal appropriated funds, including Payroll Support, have been paid or will be paid, by or on behalf of the Recipient, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(6) If the Payroll Support exceeds $100,000, the Recipient shall comply with the disclosure requirements in 31 CFR Part 21 regarding any amounts paid for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the Payroll Support.

Motion for TRO Ex. 9 Page 25

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution and also may subject me and the Recipient to civil penalties and/or administrative remedies for false claims or otherwise.

_____          _____

Corporate Officer of Signatory Entity                      Second Authorized Representative

Name:   Bradley D. Tilden                                           Name:   Shane R. Tackett

Title:   Chief Executive Officer                                   Title:   Executive Vice President, Finance
                                                                                     and Chief Financial Officer

Date:                                                                        Date:

Motion for TRO Ex. 9 Page 26

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

# FORM 8-K

### CURRENT REPORT PURSUANT
### TO SECTION 13 OR 15(D) OF THE
### SECURITIES EXCHANGE ACT OF 1934

**April 29, 2021**
(Date of earliest event reported)

# ALASKA AIR GROUP, INC.

(Exact Name of Registrant as Specified in Its Charter)

**Delaware**
(State or Other Jurisdiction of Incorporation)

| **1-8957** | **91-1292054** |
|---|---|
| (Commission File Number) | (IRS Employer Identification No.) |

| **19300 International Boulevard** | **Seattle** | **Washington** | **98188** |
|---|---|---|---|
| (Address of Principal Executive Offices) | | | (Zip Code) |

**(206) 392-5040**
(Registrant's Telephone Number, Including Area Code)
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Ticker Symbol** | **Name of each exchange on which registered** |
|---|---|---|
| Common stock, $0.01 par value | ALK | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR 230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR 240.12b-2).

☐ Emerging growth company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised

Motion for TRO, Ex. 9, Page 27

financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

This document is also available on our website at http://investor.alaskaair.com.

Motion for TRO Ex. 9 Page 28

**ITEM 1.01  Entry into a Material Definitive Agreement**

**Payroll Support Program**

On April 29, 2021, Alaska Air Group, Inc. (Air Group) and its subsidiaries Alaska Airlines, Inc. (Alaska), Horizon Air Industries, Inc. (Horizon) and McGee Air Services, Inc. (McGee) finalized agreements with the U.S. Department of the Treasury (the Treasury) and accepted partial disbursement of funds through an extension of the Payroll Support Program of the American Rescue Plan Act of 2021 (PSP 3).

Under PSP 3 and the extension agreements entered into, Alaska and Horizon will receive a total of $571 million, and McGee will receive a total of $13 million, to be used exclusively toward continuing to pay employee salaries, wages and benefits. Alaska, Horizon and McGee received $292 million on April 29, 2021, with the remainder expected to be received sometime in May 2021. Of the funds received, $59 million takes the form of a senior term loan with a 10-year term, bearing an interest rate of 1% in years 1 - 5, and SOFR + 2% in years 6 -10. The loan is prepayable at par at any time. As additional taxpayer protection, Air Group granted the Treasury Department 88,395 warrants to purchase Air Group (ALK) common stock at a strike price of $66.39, based on the closing price on March 10, 2021. The warrants are non-voting, freely transferable, and may be settled as net shares or in cash at Alaska's option.

As a condition to receiving PSP 3 funds, Alaska, Horizon and McGee agreed to refrain from conducting involuntary furloughs or reducing employee rates of pay or benefits through September 30, 2021, and to limit executive compensation and severance through April 1, 2023. Air Group agreed to continue suspension of dividends and share repurchases until September 30, 2022.

**ITEM 2.03  Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant**

The information described under Item 1.01 above "Entry into a Material Definitive Agreement" is incorporated herein by reference.

**ITEM 8.01.  Other Items**

On April 29, 2021, Alaska and Horizon received an additional $80 million in funding from the extension of the Payroll Support Program made available under the Consolidated Appropriations Act, 2021. Funds received are to be used exclusively toward continuing to pay employee salaries, wages and benefits. Of this amount, approximately $23 million will take the form of a senior term loan with a 10-year term bearing an interest rate of 1% in years 1 - 5 and SOFR+ 2% in years 6 -10. As additional taxpayer protection, upon funding of the additional disbursement, Air Group granted the Treasury Department warrants to purchase 45,855 shares of Air Group (ALK) common stock at a strike price of $52.25, based on the closing price on December 24, 2020.


**Signatures**
Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

ALASKA AIR GROUP, INC.
Registrant

Date: May 3, 2021

/s/ KYLE B. LEVINE
Kyle B. Levine
Senior Vice President, Legal, General Counsel and Corporate Secretary

/s/ CHRISTOPHER M. BERRY
Christopher M. Berry
Vice President, Finance and Controller

Motion for TRO Ex. 9 Page 29

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

# FORM 8-K

### CURRENT REPORT PURSUANT
### TO SECTION 13 OR 15(D) OF THE
### SECURITIES EXCHANGE ACT OF 1934

**January 15, 2021**
(Date of earliest event reported)

# ALASKA AIR GROUP, INC.

(Exact Name of Registrant as Specified in Its Charter)

**Delaware**
(State or Other Jurisdiction of Incorporation)

| **1-8957** | **91-1292054** |
|---|---|
| (Commission File Number) | (IRS Employer Identification No.) |

| **19300 International Boulevard**      **Seattle**      **Washington** | **98188** |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

**(206) 392-5040**
(Registrant's Telephone Number, Including Area Code)
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Ticker Symbol** | **Name of each exchange on which registered** |
|---|---|---|
| Common stock, $0.01 par value | ALK | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR 230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR 240.12b-2).

Motion for TRO Ex. 9 Page 30

☐ Emerging growth company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

This document is also available on our website at http://investor.alaskaair.com.

Motion for TRO Ex. 9 Page 31

## ITEM 1.01  Entry into a Material Definitive Agreement

### Payroll Support Program Extension

On January 15, 2021, Alaska Air Group, Inc. (Alaska) and its subsidiaries Alaska Airlines, Inc. and Horizon Air Industries, Inc. finalized agreements with the U.S. Department of the Treasury (the Treasury) and accepted partial disbursement of funds through an extension of the Payroll Support Program (PSP) of the Coronavirus Aid, Relief and Economic Security (CARES) Act, made available under the Consolidated Appropriations Act, 2021.

Under the PSP and the extension agreements entered into, Alaska Airlines and Horizon Air will receive a total of $533 million to be used exclusively toward continuing to pay employee salaries, wages and benefits. Alaska Airlines and Horizon Air received $266 million on January 15, 2021, with the remainder expected to be received sometime in February 2021. Of the funds received, $50 million takes the form of a senior term loan with a 10-year term, bearing an interest rate of 1% in years 1–5, and SOFR + 2% in years 6–10. The loan is prepayable at par at any time. As additional taxpayer protection required under the PSP, we granted the Treasury Department 95,532 warrants to purchase Alaska Air Group (ALK) common stock at a strike price of $52.25, based on the closing price on December 24, 2020. The warrants are non-voting, freely transferable, and may be settled as net shares or in cash at Alaska's option.

As a condition to receiving an extension of PSP funds, Alaska Airlines and Horizon Air agreed to refrain from conducting involuntary furloughs or reducing employee rates of pay or benefits through March 31, 2021, and to limit executive compensation through October 1, 2022. Alaska Air Group agreed to continue suspension of dividends and share repurchases until March 31, 2022.

### Treasury Loan Agreement

In the third quarter of 2020, the Company finalized a Loan and Guarantee Agreement (the Loan Agreement) with the Treasury to obtain up to $1.3 billion via a secured term loan facility. The Loan Agreement was subsequently increased by the Treasury in October 2020 to $1.9 billion. Upon execution of the Loan Agreement, the Company borrowed an initial amount of $135 million.

On January 15, 2021, the Company entered into a letter agreement further amending the Loan Agreement providing for an extension of the deadline pursuant to which the Company may, at its option, borrow additional amounts in subsequent borrowings, from March 26, 2021 to May 28, 2021.

## ITEM 2.03  Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant

The information described under Item 1.01 above "Entry into a Material Definitive Agreement" is incorporated herein by reference.

## ITEM 5.02 Departure of Directors or Certain Officers; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

On January 20, 2021, the Board of Directors of Alaska Air Group, Inc. (the "Company") appointed Daniel K. Elwell to the Company's and its airline subsidiaries' boards of directors, effective immediately. He was also appointed to the Audit and Innovation Committees of the Company's Board of Directors.

Mr. Elwell will participate in the current director compensation arrangements applicable to non-employee directors. Under the terms of those arrangements, Mr. Elwell received a prorated annual cash retainer of $21,990 for service on the Company's board for the period from his appointment until the Company's next annual meeting of stockholders. In addition, under the Company's 2016 Performance Incentive Plan, Mr. Elwell received a grant of Alaska Air Group, Inc. common shares, determined by dividing the grant value $29,320 by the closing price of the Company's common stock on January 20, 2021.
In connection with Mr. Elwell's appointment, the number of seats on the Company's and its airline subsidiaries' boards of directors was increased by actions of each board from 13 to 14.

## ITEM 7.01.  Regulation FD Disclosure

Motion for TRO Ex. 9 Page 32

On January 20, 2021, the Company issued a press release announcing the appointment of Daniel K. Elwell to the Company's board of directors. The press release is furnished as Exhibit 99.1.

---

Motion for TRO Ex. 9 Page 33

**ITEM 9.01  Financial Statements and Other Exhibits**

(d) Exhibits.

Exhibit 99.1          Alaska Air Group Press Release
104                      Cover Page Interactive Data File - embedded within the Inline XBRL Document

**Signatures**
Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

ALASKA AIR GROUP, INC.
Registrant

Date: January 21, 2021

/s/ KYLE B. LEVINE
Kyle B. Levine
Senior Vice President, Legal, General Counsel and Corporate Secretary

/s/ CHRISTOPHER M. BERRY
Christopher M. Berry
Vice President, Finance and Controller

Motion for TRO Ex. 9 Page 34



Jan. 21, 2021

**Contact:**
Media Relations
(206) 304-0008
newsroom@alaskaair.com

### Alaska Air Group board of directors appoints Daniel Elwell as newest member

SEATTLE — Alaska Air Group announced today the appointment of Daniel Elwell to the company's board of directors, effective immediately. Elwell will also join the boards of directors of the company's airline subsidiaries Alaska Airlines, Inc. and Horizon Air Industries, Inc.

Elwell served as Deputy and Acting Administrator of the Federal Aviation Administration from June 2017 to November 2020, where he was responsible for the safety and efficiency of the largest aerospace system in the world, which operates more than 50,000 flights a day. Elwell also had oversight of the FAA's multibillion-dollar NextGen air traffic control modernization program to accelerate the shift from ground-based radar to state-of-the-art satellite technology with operational, community and environmental benefits.

"We are thrilled to have someone with Dan's expertise and background in the airline and aviation industry join our board," said Brad Tilden, Alaska Air Group Chair and CEO. "He has been a pilot, public servant and innovator to advance aviation safety in our country – a value we hold dear. At a both critical and exciting time in our industry, Dan clearly understands the challenges and opportunities ahead, and we welcome his trusted perspective and ideas."

Elwell will have a seat on the board's audit and innovation committees. His appointment increases the number of independent directors from 11 to 12. The total board is comprised of 14 members, with the other two positions filled by Tilden and Alaska Airlines President Ben Minicucci.

Motion for TRO Ex. 9 Page 35

Prior to his appointment as Deputy and Acting Director of the FAA, Elwell was Senior Advisor on Aviation to former U.S. Secretary of Transportation Elaine L. Chao. Elwell also previously served at the FAA as the Assistant Administrator for Policy, Planning and Environment from 2006-2008. Earlier in his career, he served as a legislative fellow for the late Sen. Ted Stevens (R-Alaska).

From 2013-2015, as Senior Vice President for Safety, Security and Operations at Airlines for America (A4A), Elwell was responsible for leading the advancement of commercial aviation safety and security excellence for major U.S. air carriers. Prior to A4A, Elwell was Vice President of the Aerospace Industries Association (AIA) from 2008-2013 where he represented civil aerospace manufacturers and led policy development and advocacy for the civil aerospace manufacturing interests.

Elwell was a commercial pilot for 16 years with American Airlines, flying DC-10, MD-80, and Boeing 757 and 767 aircraft. While maintaining his proficiency as an MD-80 captain, he served as Managing Director for International and Government Affairs at American Airlines. Elwell earned his pilot wings at Williams Air Force Base in Arizona after graduating from the U.S. Air Force Academy with a Bachelor of Science degree in International Affairs. As a lieutenant colonel, he retired from military service as a Command Pilot with more than 6,000 hours combined civilian and military flight time in the U.S. Air Force and U.S. Air Force Reserve, including combat service during Operation Desert Storm.

**About Alaska Airlines**

Alaska Airlines and its regional partners serve more than 115 destinations across the United States and North America. The airline provides essential air service for our guests along with moving crucial cargo shipments, while emphasizing Next-Level Care. Alaska is known for low fares, award-winning customer service and sustainability efforts. Guests can earn and redeem miles on flights to more than 800 destinations worldwide with Alaska and its Global Partners. On March 31, 2021, Alaska will officially become a member of the **one**world global alliance. Learn more about Alaska at newsroom.alaskaair.com and blog.alaskaair.com. Alaska Airlines and Horizon Air are subsidiaries of Alaska Air Group (NYSE: ALK).

Motion for TRO Ex. 9 Page 36

bizjournals.com

# Alaska Air Group adds board director, reveals it's getting another $533M in federal aid

*Andrew McIntosh*

3 minutes

---

By Andrew McIntosh
 – Reporter, Puget Sound Business Journal

Jan 21, 2021, 6:03pm EST

Alaska Air Group Inc. said Thursday that Daniel Elwell, a longtime American Airlines pilot and former acting administrator of the Federal Aviation Administration, is joining its board of directors, effective immediately.

The carrier announced its new board member at the same time SeaTac-based Alaska revealed the company is receiving an additional $533 million from the federal government's Coronavirus Aid, Relief and Economic Security (CARES) Act.

Elwell also will join the boards of the airline group's operating subsidiaries, Alaska Airlines and Horizon Air Industries Inc.

Alaska Chairman and CEO Brad Tilden announced his new board recruit, saying the airline would benefit from having a person with Elwell's expertise and background in the airline and aviation industry join its board.

"He has been a pilot, public servant and innovator to advance aviation safety in our country — a value we hold dear. At a both critical and exciting time in our industry, Dan clearly understands the challenges and opportunities ahead, and we welcome his trusted perspective and ideas," Tilden said.

Daniel Elwell is joining the board of Alaska Air Group. He was deputy and acting administrator of the Federal Aviation Administration from June 2017 to November 2020.

Alaska Airlines

In a separate Securities and Exchange Commission filing, Alaska revealed it has received more help under the CARES Act Payroll Support Program, disclosing that Alaska Airlines and Horizon Air together are getting $533 million in new money "to be used exclusively

Motion for TRO Ex. 9 Page 37

toward continuing to pay employee salaries, wages and benefits."

Alaska Airlines and Horizon Air received $266 million on Jan. 15, with the rest of the cash expected in February.

In exchange for CARES Act payroll support funds, Alaska Airlines and Horizon Air said they agreed to:

- Not make new employee layoffs or reduce workers' pay or benefits through March 31, 2021.

- "Limit" executive compensation through Oct. 1 2022. (No further details about those limits were reported in the filing.)

- Continue suspensions on dividends and stock buybacks until March 31, 2022.

Motion for TRO Ex. 9 Page 38

adn.com

# Alaska Air Group reports $1.3 billion loss in 2020 but forecasts strong recovery this year

*Dominic Gates, The Seattle Times*

6-8 minutes



Alaska Airlines jets parked at gates at Seattle-Tacoma International Airport in Seattle. (AP Photo/Ted S. Warren, File)

SEATTLE -- As summer turned to fall last year, Alaska Air Group's struggle to cope with the COVID-19 air travel downturn seemed to have turned a corner — until November's wave of new coronavirus infections and business restrictions hit.

Before that, both the numbers of passengers carried and Alaska's forward ticket bookings "were at peaks for the pandemic period, and each month was improving from the last," said Ben Minicucci, Alaska's president.

Then, as state and local closures and travel warnings came into effect, "that trend stalled in the fourth quarter," said Minicucci, who will become CEO on March 1.

Motion for TRO Ex. 9 Page 39

Yet even as Minicucci discussed the faltering fourth quarter on a teleconference call after the company announced a $1.3 billion annual loss for 2020, he offered an optimistic case for a steadier recovery this year.

"While we had hoped the fourth-quarter results would be better, we are cautiously optimistic there will be a step change in demand once the vaccine has been broadly distributed," he said. "We do expect health patterns to improve in the next two months and that restrictions will begin to relax."

"We believe our customers are gearing up for travel in the spring and summer," Minicucci said.

He said daily bookings this month are up 20% compared to December.

He said Alaska plans to increase the number of flights and reach approximately 80% of its 2019 aircraft capacity levels by this summer, with an initial focus on building up routes from the Pacific Northwest and Alaska.

For now, he said, passenger traffic remains stuck at just over one-third of normal levels, with transcontinental flights the worst performers and demand for more lucrative business travel at 15% of normal.

Financial results released Tuesday by Alaska Air, parent company of Alaska Airlines and Horizon Air, show total revenue down 64% and a loss of $430 million in the final quarter.

Excluding the impact of government stimulus funds to support airlines, during the quarter Alaska spent $342 million more than it took in. That's burning through cash at an average rate of $3.7 million per day, down from $4.3 million per day in the previous quarter.

Alaska ended the year with $5.2 billion in liquidity, consisting of $3.3 billion in cash and the rest in available loans.

The fourth quarter results were worse than analyst forecasts, and Alaska shares closed down $1.07, or 2%, at $51.83.

**Government grants help out**

Brad Tilden, speaking on his final quarterly teleconference call before he steps down as Alaska Air CEO, praised the airline's resilience in face of the "deep and prolonged disruption."

He pointed out that even though revenue in 2020 was down $5.2 billion from the previous year, Alaska ended the year with adjusted net debt essentially unchanged from a year earlier at $1.7 billion.

That was achieved through aggressive cost-cutting. More than 10,600 employees took

Motion for TRO Ex. 9 Page 40

temporary leave in 2020, of whom 3,300 remained on leave last quarter.

And Alaska Airlines cut its fleet of 237 jets by taking 40 Airbus A320s permanently out of service.

Additional help came from the government's Coronavirus Aid, Relief, and Economic Security (CARES) Act, which provided Alaska a $753 million grant in 2020. The airline will get a further $400 million grant in the first three months of this year.

The CARES Act grant is part of an extension of payroll support that with additional loans totals $533 million. Alaska received $266 million of that amount on Jan. 15.

*max*

As a condition of the extension, the airline cannot lay off any more employees or cut pay or benefits through the end of March.

Alaska's chief financial officer, Shane Tackett, said the airline must take back "a few folks, mostly on the management side," who were let go in October.

Most of the furloughed frontline employees who work at airports and onboard planes are in the process of being recalled because of the planned capacity increase ahead.

Tilden said the company's strong cash position will allow the airline to survive the pandemic, and because the airline has a mostly domestic, low-fare business, it will recover faster than larger competitors with more exposure to international markets that are likely to take longer to come back.

The $1.3 billion loss in 2020, or $10.59 per share, compares with a profit of $769 million, or $6.19 per share, the previous year.

The $430 million loss in the final quarter, or $3.47 per share, compares with a profit of $181 million, or $1.46 per share, in the final three months of 2019 — the last quarter unaffected by the pandemic.

For comparison, Alaska's much larger rival, Delta Air Lines, announced earlier this month that last year it lost $12.4 billion, including $755 million in the fourth quarter.

**Still planning for growth**

As part of Alaska's recovery plan, Tilden has committed to renewing Alaska's fleet with the newly ungrounded Boeing 737 MAX, getting rid of its less efficient Airbus A320s.

Alaska has 68 MAXs on order and took delivery of the first one on Sunday. That airplane is due to begin passenger service March 1, and the airline will have 13 MAXs in its fleet by year end.

The total market value of those airplanes after standard industry discounts is about $630

Motion for TRO Ex. 9 Page 41

million, according to market pricing data from aircraft valuation firm Avitas. However, CFO Tackett said on the teleconference call that the airline will have to lay out only $150 million to $250 million to take them because it had already paid Boeing advance delivery payments for those and other MAXs that will cover the difference.

That low level of capital spending in the year ahead "was one of the important features of the revised deal with Boeing," he said.

On the same call, Nat Pieper, senior vice president of fleet, said Alaska is scheduled to take 30 more MAXs next year, 13 in 2023 and 12 in 2024, though with flexibility in the contracts to defer deliveries if the recovery takes longer than anticipated.

And if the recovery arrives as hoped, so that air travel is back to 2019 levels by 2023, he said Alaska has options to purchase a further 52 MAXs through 2026.

Motion for TRO Ex. 9 Page 42

[prnewswire.com](prnewswire.com)

# Alaska Air Group reports first quarter 2021 results

*Alaska Air Group*

28-35 minutes

SEATTLE, April 22, 2021 /PRNewswire/ --

***Financial Results:***

- Reported a net loss for the first quarter of 2021 under Generally Accepted Accounting Principles (GAAP) of $131 million, or $1.05 per share, compared to a net loss of $232 million, or $1.89 per share in the first quarter of 2020.

- Reported a net loss for the first quarter of 2021, excluding CARES Act Payroll Support Program (PSP) wage offsets, special items and mark-to-market fuel hedge accounting adjustments, of $436 million, or $3.51 per share, compared to an adjusted net loss of $102 million or $0.83 per share, in the first quarter of 2020.

- Decreased adjusted net debt to $1.6 billion at March 31, 2021 from $1.7 billion at December 31, 2020.

- Reported a debt-to-capitalization ratio, including short-term borrowings related to COVID-19, of 62%.

- Held $3.5 billion in unrestricted cash and marketable securities as of March 31, 2021, and available total liquidity of $5.3 billion.

- Generated $167 million in operating cash flow in the first quarter, inclusive of PSP funding, bolstered by improved advance bookings for increased demand for air travel.

***Operational Updates:***

- Welcomed Ben Minicucci as Air Group CEO and Constance von Muehlen as Alaska COO.

- Formally joined the **one**world alliance on March 31 as the 14th member airline. Entry into the alliance transforms Alaska into a global airline, provides guests a seamless travel experience and increases the value of our loyalty and corporate travel offerings.

- Finalized a previously announced amendment to the existing aircraft purchase agreement with Boeing to expand our total 737-9 MAX firm deliveries to 68 between 2021 and 2024,

Motion for TRO Ex. 9 Page 43

inclusive of 13 leased aircraft.

- Took delivery of four 737-9 MAX aircraft during the first quarter.

- Announced 12 new routes during the first quarter, aimed at offering our guests greater connectivity to and from West Coast destinations.

- Announced plans to open a new Alaska Lounge in Terminal 2 of San Francisco International Airport.

- Issued early recall notices to nearly 350 Alaska pilots on extended leaves to prepare for capacity growth.

***Liquidity Updates:***

- Received $546 million through a combination of grants and loans from the U.S. Treasury under an extension of the PSP, and anticipate a supplemental payment of $80 million in late April.

- Received notification from the U.S. Treasury that Alaska, Horizon and McGee are eligible to obtain an additional $584 million in incremental payroll support funding under a third round of the PSP.

- Extended maturity of the 364-day Senior Secured Term Loan previously due to expire in March 2021 to March 2022, and in conjunction funded an incremental $54 million.

***Sustainability Updates:***

- Published 2020 LIFT Sustainability Report including final data on our 2020 sustainability goals and Sustainable Accounting Standards Board disclosure, and shared new 2025 goals related to Environmental Social Governance.

- Announced specific commitments for diversity, equity, and inclusion to increase diverse leadership representation, cultivate an inclusive culture, and to continue supporting education.

- Set a course for net-zero carbon emissions by 2040, with 2025 milestone goals to be the most fuel-efficient U.S. airline, maintain carbon neutral growth, and cut ground service equipment climate emissions by 50%. As part of the net-zero commitment, joined The Climate Pledge alongside Amazon and other major businesses.

- Announced a memorandum of understanding with SkyNRG focused on increasing the supply and production of sustainable aviation fuel from municipal solid waste and other waste streams, especially in the western United States.

Alaska Air Group Inc. today reported a first quarter 2021 GAAP net loss of $131 million, or $1.05 per share, compared to a net loss of $232 million, or $1.89 per share in the first

Motion for TRO Ex. 9 Page 44

quarter of 2020. Excluding the impact of payroll support program wage offsets, special items and mark-to-market fuel hedge adjustments, the company reported an adjusted net loss of $436 million, or $3.51 per diluted share, compared to an adjusted net loss of $102 million, or $0.83 per diluted share in 2020.

"This has been a long road, and I want to thank the employees at Alaska and Horizon for providing great guest service and everything they've done to get through the last challenging year and help us achieve positive cash flow in March," said CEO Ben Minicucci. "We're a big company, but still small enough that each person's work makes a difference. We're now laser focused on a return to profitability and growth, with aggressive cost control, optimal productivity across all our work groups, and the operational and financial discipline that Alaska is known for."

The following table reconciles the company's reported GAAP net loss per share (EPS) for the three months ended March 31, 2021 and 2020 to adjusted amounts.

| | Three Months Ended March 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2021** | | | | **2020** | | |
| ***(in millions, except per-share amounts)*** | **Dollars** | | **EPS** | | **Dollars** | | **EPS** |
| GAAP net loss per share | $ **(131)** | | $ **(1.05)** | | $ (232) | | $ (1.89) |
| Payroll support program wage offset | **(411)** | | **(3.31)** | | — | | — |
| Mark-to-market fuel hedge adjustments | **(22)** | | **(0.18)** | | 9 | | 0.07 |
| Special items - impairment charges and other | **18** | | **0.14** | | 160 | | 1.30 |
| Special items - restructuring charges | **11** | | **0.09** | | — | | — |
| Special items - merger-related costs | **—** | | **—** | | 3 | | 0.03 |
| Income tax effect of reconciling items above | **99** | | **0.80** | | (42) | | (0.34) |
| Non-GAAP adjusted net loss per share | $ **(436)** | | $ **(3.51)** | | $ (102) | | $ (0.83) |

Statistical data, as well as a reconciliation of the reported non-GAAP financial measures, can be found in the accompanying tables. A glossary of financial terms can be found on the last page of this release.

Motion for TRO Ex. 9 Page 45

A conference call regarding the first quarter results will be streamed online at 8:30 a.m. PDT on April 22, 2021. It can be accessed at www.alaskaair.com/investors. For those unable to listen to the live broadcast, a replay will be available after the conclusion of the call.

References in this news release to "Air Group," "company," "we," "us" and "our" refer to Alaska Air Group, Inc. and its subsidiaries, unless otherwise specified. Alaska Airlines, Inc. and Horizon Air Industries, Inc. are referred to as "Alaska" and "Horizon," respectively, and together as our "airlines."

This news release may contain forward-looking statements subject to the safe harbor protection provided by Section 27A of the Securities Act of 1933, as amended, Section 21E of the Securities Exchange Act of 1934, as amended, and the Private Securities Litigation Reform Act of 1995. These statements relate to future events and involve known and unknown risks and uncertainties that may cause actual outcomes to be materially different from those indicated by any forward-looking statements.  For a comprehensive discussion of potential risk factors, see Item 1A of the Company's Annual Report on Form 10-K for the year ended December 31, 2020. Some of these risks include the risks associated with contagious illnesses and contagion, such as COVID-19, general economic conditions, increases in operating costs including fuel, competition, labor costs and relations, our indebtedness, inability to meet cost reduction goals, seasonal fluctuations in our financial results, an aircraft accident, and changes in laws and regulations. All of the forward-looking statements are qualified in their entirety by reference to the risk factors discussed therein. We operate in a continually changing business environment, and new risk factors emerge from time to time. Management cannot predict such new risk factors, nor can it assess the impact, if any, of such new risk factors on our business or events described in any forward-looking statements. We expressly disclaim any obligation to publicly update or revise any forward-looking statements after the date of this report to conform them to actual results. Over time, our actual results, performance or achievements will likely differ from the anticipated results, performance, or achievements that are expressed or implied by our forward-looking statements, and such differences might be significant and materially adverse.

Alaska Airlines and its regional partners serve more than 120 destinations across the United States and to Mexico, Canada and Costa Rica. The airline emphasizes Next-Level Care for its guests, along with providing low fares, award-winning customer service and sustainability efforts. On March 31, 2021, Alaska became the 14th member of oneworld. With the global alliance and Alaska Airlines' additional partners, guests can travel to more than 1,000 destinations on more than 20 airlines while earning and redeeming miles on flights to locations around the world. Learn more about Alaska at newsroom.alaskaair.com and blog.alaskaair.com. Alaska Airlines and Horizon Air are subsidiaries of Alaska Air

Motion for TRO Ex. 9 Page 46

Group (NYSE: ALK).

| CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (unaudited) | | | | | | |
|---|---|---|---|---|---|---|
| **Alaska Air Group, Inc.** | | | | | | |
| | **Three Months Ended March 31,** | | | | | |
| ***(in millions, except per-share amounts)*** | **2021** | | **2020** | | **Change** | |
| **Operating Revenues:** | | | | | | |
| Passenger revenue | **$** | **659** | $ | 1,481 | (56) | % |
| Mileage Plan other revenue | **94** | | 109 | | (14) | % |
| Cargo and other | **44** | | 46 | | (4) | % |
| **Total Operating Revenues** | **797** | | 1,636 | | (51) | % |
| **Operating Expenses:** | | | | | | |
| Wages and benefits | **493** | | 612 | | (19) | % |
| Payroll support program wage offset | **(411)** | | — | | NM | |
| Variable incentive pay | **33** | | 7 | | 371 | % |
| Aircraft fuel, including hedging gains and losses | **203** | | 384 | | (47) | % |
| Aircraft maintenance | **81** | | 115 | | (30) | % |
| Aircraft rent | **62** | | 81 | | (23) | % |
| Landing fees and other rentals | **129** | | 131 | | (2) | % |
| Contracted services | **51** | | 72 | | (29) | % |
| Selling expenses | **33** | | 55 | | (40) | % |

Motion for TRO Ex. 9 Page 47

| | | | | | |
|---|---|---|---|---|---|
| Depreciation and amortization | **97** | | 108 | (10) | % |
| Food and beverage service | **23** | | 49 | (53) | % |
| Third-party regional carrier expense | **30** | | 37 | (19) | % |
| Other | **105** | | 143 | (27) | % |
| Special items - impairment charges and other | **18** | | 160 | (89) | % |
| Special items - restructuring charges | **11** | | — | . NM | |
| Special items - merger-related costs | **—** | | 3 | (100) | % |
| **Total Operating Expenses** | **958** | | 1,957 | (51) | % |
| **Operating Loss** | **(161)** | | (321) | (50) | % |
| **Nonoperating Income (Expense):** | | | | | |
| Interest income | **7** | | 9 | (22) | % |
| Interest expense | **(32)** | | (13) | 146 | % |
| Interest capitalized | **3** | | 3 | — | % |
| Other - net | **10** | | 5 | 100 | % |
| **Total Nonoperating Income (Expense)** | **(12)** | | 4 | NM | |
| **Loss Before Income Tax** | **(173)** | | (317) | | |
| Income tax benefit | **(42)** | | (85) | | |
| **Net Loss** | **$ (131)** | | $ (232) | | |
| | | | | | |
| **Basic Loss Per Share:** | **$ (1.05)** | | $ (1.89) | | |
| **Diluted Loss Per Share:** | **$ (1.05)** | | $ (1.89) | | |

Motion for TRO Ex. 9 Page 48

| Shares Used for Computation: | | | | | | |
|---|---|---|---|---|---|---|
| Basic | **124.299** | | | 122.818 | | |
| Diluted | **124.299** | | | 122.818 | | |
| | | | | | | |
| Cash dividend declared per share: | $ | **—** | | $ | 0.375 | |

**CONDENSED CONSOLIDATED BALANCE SHEETS (unaudited)**

**Alaska Air Group, Inc.**

| *(in millions)* | March 31, 2021 | | December 31, 2020 | |
|---|---|---|---|---|
| Cash and cash equivalents | $ | **1,076** | $ | 1,370 |
| Marketable securities | **2,473** | | 1,976 | |
| Total cash and marketable securities | **3,549** | | 3,346 | |
| Other current assets | **735** | | 660 | |
| Current assets | **4,284** | | 4,006 | |
| Property and equipment - net | **6,144** | | 6,211 | |
| Operating lease assets | **1,423** | | 1,400 | |
| Goodwill | **1,943** | | 1,943 | |
| Intangible assets - net | **105** | | 107 | |
| Other assets | **363** | | 379 | |

Motion for TRO Ex. 9 Page 49

| | | | |
|---|---|---|---|
| **Total assets** | **14,262** | | 14,046 |
| | | | |
| Air traffic liability | **1,297** | | 1,073 |
| Current portion of long-term debt | **1,246** | | 1,138 |
| Current portion of operating lease liabilities | **271** | | 290 |
| Other current liabilities | **1,948** | | 1,792 |
| Current liabilities | **4,762** | | 4,293 |
| Long-term debt | **2,325** | | 2,357 |
| Long-term operating lease liabilities | **1,283** | | 1,268 |
| Other liabilities and credits | **3,017** | | 3,140 |
| Shareholders' equity | **2,875** | | 2,988 |
| **Total liabilities and shareholders' equity** | **$   14,262** | | $   14,046 |
| | | | |
| Debt-to-capitalization ratio, including operating leases | **62** | **%** | 61 | % |
| | | | |
| Number of common shares outstanding | **124.442** | | 124.218 |

| | | |
|---|---|---|
| **SUMMARY CASH FLOW (unaudited)** | | |
| **Alaska Air Group, Inc.** | | |
| | | |
| *(in millions)* | **March 31, 2021** | **March 31, 2020** |

Motion for TRO Ex. 9 Page 50

| | | | |
|---|---|---|---|
| **Cash Flows from Operating Activities:** | | | |
| Net loss | $ **(131)** | $ | (232) |
| Non-cash reconciling items | **137** | | 277 |
| Changes in working capital | **161** | | (12) |
| **Net cash provided by (used in) operating activities** | **167** | | 33 |
| | | | |
| **Cash Flows from Investing Activities:** | | | |
| Property and equipment additions | **(27)** | | (119) |
| Other investing activities | **(516)** | | (8) |
| **Net cash provided by (used in) investing activities** | **(543)** | | (127) |
| | | | |
| **Cash Flows from Financing Activities:** | **82** | | 684 |
| | | | |
| Net increase (decrease) in cash and cash equivalents | $ **(294)** | $ | 590 |
| Cash, cash equivalents, and restricted cash at beginning of year | **1,386** | | 232 |
| **Cash, cash equivalents, and restricted cash at end of the period** | $ **1,092** | $ | 822 |

| |
|---|
| **OPERATING STATISTICS SUMMARY (unaudited)** |
| **Alaska Air Group, Inc.** |

Motion for TRO Ex. 9 Page 51

|  | Three Months Ended March 31, | | |
|---|---|---|---|
|  | 2021 | 2020 | Change |
| **Consolidated Operating Statistics:**[a] |  |  |  |
| Revenue passengers (000) | **4,666** | 8,932 | (47.8)% |
| RPMs (000,000) "traffic" | **5,393** | 10,656 | (49.4)% |
| ASMs (000,000) "capacity" | **10,397** | 15,304 | (32.1)% |
| Load factor | **51.9%** | 69.6% | (17.7) pts |
| Yield | **12.22¢** | 13.90¢ | (12.1)% |
| RASM | **7.67¢** | 10.69¢ | (28.3)% |
| CASMex[b] | **10.93¢** | 9.22¢ | 18.5% |
| Economic fuel cost per gallon[b] | **$1.79** | $1.93 | (7.3)% |
| Fuel gallons (000,000) | **126** | 194 | (35.1)% |
| ASM's per gallon | **82.4** | 78.9 | 4.4% |
| Average number of full-time equivalent employees (FTE) | **17,140** | 22,473 | (23.7)% |
| **Mainline Operating Statistics:** |  |  |  |
| Revenue passengers (000) | **3,151** | 6,675 | (52.8)% |
| RPMs (000,000) "traffic" | **4,589** | 9,582 | (52.1)% |
| ASMs (000,000) "capacity" | **8,853** | 13,697 | (35.4)% |

Motion for TRO Ex. 9 Page 52

| | | | |
|---|---|---|---|
| Load factor | **51.8%** | 70.0% | (18.2) pts |
| Yield | **11.02¢** | 12.88¢ | (14.4)% |
| RASM | **7.11¢** | 10.05¢ | (29.3)% |
| CASMex[b] | **10.08¢** | 8.46¢ | 19.1% |
| Economic fuel cost per gallon[b] | **$1.77** | $1.92 | (7.8)% |
| Fuel gallons (000,000) | **98** | 163 | (39.9)% |
| ASM's per gallon | **90.3** | 84.0 | 7.5% |
| Average number of FTE's | **12,473** | 16,818 | (25.8)% |
| Aircraft utilization | **8.5** | 10.1 | (15.8)% |
| Average aircraft stage length | **1,303** | 1,306 | (0.2)% |
| Operating fleet[d] | **201** | 225 | (24) a/c |
| **Regional Operating Statistics:[c]** | | | |
| Revenue passengers (000) | **1,515** | 2,257 | (32.9)% |
| RPMs (000,000) "traffic" | **804** | 1,074 | (25.1)% |
| ASMs (000,000) "capacity" | **1,544** | 1,607 | (3.9)% |
| Load factor | **52.1%** | 66.8% | (14.7) pts |
| Yield | **19.04¢** | 23.04¢ | (17.4)% |
| RASM | **10.84¢** | 16.09¢ | (32.6)% |
| Operating fleet | **94** | 94 | — a/c |

| (a) | Except for FTEs, data includes information related to third-party regional capacity purchase flying arrangements. |
|-----|---|
| (b) | See a reconciliation of this non-GAAP measure and Note A for a discussion of potential importance of this measure to investors in the accompanying pages. |
| (c) | Data presented includes information related to flights operated by Horizon and third-party carriers. |
| (d) | Excludes all aircraft permanently removed from operating service. |

Given the unusual nature of 2020, we believe that some analysis of specific financial and operational results compared to 2019 provides meaningful insight. The table below includes comparative results from 2021 to 2019.

| FINANCIAL INFORMATION AND OPERATING STATISTICS - 2019 RESULTS (unaudited) | | | | | | |
|---|---|---|---|---|---|---|
| **Alaska Air Group, Inc.** | | | | | | |
| | | | | | | |
| | Three Months Ended March 31, | | | | | |
| | **2021** | | **2019** | | **Change** | |
| Passenger revenue | $ | **659** | $ | 1,716 | (62) | % |
| Mileage plan other revenue | **94** | | 110 | | (15) | % |
| Cargo and other | **44** | | 50 | | (12) | % |
| **Total operating revenues** | $ | **797** | $ | 1,876 | (58) | % |
| | | | | | | |
| Operating expense, excluding fuel and special items | $ | **1,137** | $ | 1,405 | (19) | % |
| Economic fuel | **203** | | 420 | | (52) | % |

Motion for TRO Ex. 9 Page 54

| | | | | | |
|---|---|---|---|---|---|
| Special items | **(382)** | | 26 | | NM |
| **Total operating expenses** | **$ 958** | | $ 1,851 | | (48) % |
| | | | | | |
| **Consolidated Operating Statistics[a]:** | | | | | |
| Revenue passengers (000) | **4,666** | | 10,417 | | (55) % |
| RPMs (000,000) "traffic" | **5,393** | | 12,449 | | (57) % |
| ASMs (000,000) "capacity" | **10,397** | | 15,508 | | (33) % |
| Load Factor | **51.9%** | | 80.3% | | (28.4) pts |
| Yield | **12.22¢** | | 13.78¢ | | (11) % |
| RASM | **7.67¢** | | 12.10¢ | | (37) % |
| CASMex | **10.93¢** | | 9.06¢ | | 21 % |
| FTEs | **17,140** | | 21,832 | | (21) % |

| | |
|---|---|
| (a) | 2019 comparative operating statistics have been recalculated using the information presented above, and as filed in our first quarter 2019 Form 10-Q |

**OPERATING SEGMENTS (unaudited)**

**Alaska Air Group, Inc.**

| | | | | |
|---|---|---|---|---|
| | **Three Months Ended March 31, 2021** | | | |
| *(in millions)* | **Mainline** | **Regional** | **Horizon** | **Consolidating & Other[a]** |
| **Operating Revenues** | | | | |

Motion for TRO Ex. 9 Page 55

| | Mainline | Regional | Horizon | Consolidating & Other(a) |
|---|---|---|---|---|
| Passenger revenues | $ 506 | $ 153 | $ — | $ — |
| CPA revenues | — | — | 104 | (104) |
| Mileage Plan other revenue | 80 | 14 | — | — |
| Cargo and other | 44 | — | — | — |
| **Total Operating Revenues** | 630 | 167 | 104 | (104) |
| **Operating Expenses** | | | | |
| Operating expenses, excluding fuel | 893 | 265 | 88 | (109) |
| Economic fuel | 174 | 52 | — | (1) |
| **Total Operating Expenses** | 1,067 | 317 | 88 | (110) |
| **Nonoperating Income (Expense)** | | | | |
| Interest income | 7 | — | — | — |
| Interest expense | (27) | — | (5) | — |
| Interest capitalized | 3 | — | — | — |
| Other - net | 10 | — | — | — |
| **Total Nonoperating Income (Expense)** | (7) | — | (5) | — |
| **Income (Loss) Before Income Tax** | $ (444) | $ (150) | $ 11 | $ 6 |

| | Three Months Ended March 31, 2020 | | | |
|---|---|---|---|---|
| *(in millions)* | **Mainline** | **Regional** | **Horizon** | **Consolidating & Other(a)** |

Motion for TRO Ex. 9 Page 56

| | | | | |
|---|---|---|---|---|
| **Operating Revenues** | | | | |
| Passenger revenues | $ 1,234 | $ 247 | $ — | $ — |
| CPA revenues | — | — | 105 | (105) |
| Mileage Plan other revenue | 98 | 11 | — | — |
| Cargo and other | 44 | — | — | 2 |
| **Total Operating Revenues** | 1,376 | 258 | 105 | (103) |
| **Operating Expenses** | | | | |
| Operating expenses, excluding fuel | 1,159 | 269 | 92 | (110) |
| Economic fuel | 313 | 62 | — | — |
| **Total Operating Expenses** | 1,472 | 331 | 92 | (110) |
| **Nonoperating Income (Expense)** | | | | |
| Interest income | 14 | — | — | (5) |
| Interest expense | (12) | — | (5) | 4 |
| Interest capitalized | 3 | — | — | — |
| Other - net | 6 | — | — | (1) |
| **Total Nonoperating Income (Expense)** | 11 | — | (5) | (2) |
| **Income (Loss) Before Income Tax** | $ (85) | $ (73) | $ 8 | $ 5 |

| | |
|---|---|
| (a) | Includes consolidating entries, Air Group parent company, McGee Air Services, and other immaterial business units. |
| (b) | The Air Group Adjusted column represents the financial information that is reviewed by management to assess performance of operations and determine |

Motion for TRO Ex. 9 Page 57

| | | | |
|---|---|---|---|
| | capital allocation and excludes certain charges. See Note A in the accompanying pages for further information. | | |
| (c) | Includes payroll support program wage offsets, special items and mark-to-market fuel hedge accounting adjustments. | | |

**GAAP TO NON-GAAP RECONCILIATIONS (unaudited)**

**Alaska Air Group, Inc.**

**CASM Excluding Fuel and Special Items Reconciliation**

| | Three Months Ended March 31, | | |
|---|---|---|---|
| | **2021** | | **2020** |
| **Consolidated:** | | | |
| CASM | **9.21** | ¢ | 12.79 | ¢ |
| *Less* the following components: | | | |
| Payroll support program wage offset (benefit) | **(3.95)** | | — |
| Aircraft fuel, including hedging gains and losses | **1.95** | | 2.51 |
| Special items - impairment charges and other[a] | **0.17** | | 1.04 |
| Special items - restructuring charges[b] | **0.11** | | — |
| Special items - merger-related costs | **—** | | 0.02 |
| **CASM excluding fuel and special items** | **10.93** | ¢ | 9.22 | ¢ |
| | | | |
| **Mainline:** | | | |

| | | | | | |
|---|---|---|---|---|---|
| CASM | **8.07** | ¢ | | 11.55 | ¢ |
| *Less* the following components: | | | | | |
| Payroll support program wage offset (benefit) | **(4.06)** | | | — | |
| Aircraft fuel, including hedging gains and losses | **1.72** | | | 2.35 | |
| Special items - impairment charges and other[a] | **0.20** | | | 0.72 | |
| Special items - restructuring charges[b] | **0.13** | | | — | |
| Special items - merger-related costs | — | | | 0.02 | |
| **CASM excluding fuel and special items** | **10.08** | ¢ | | 8.46 | ¢ |

| | |
|---|---|
| (a) | Special items - impairment charges and other in the three months ended March 31, 2021 are primarily comprised of costs associated with leased aircraft that have been retired and removed from the operating fleet but not yet returned to the lessor. |
| (b) | Special items - restructuring charges in the three months ended March 31, 2021 represent incremental cost for pilot incentive leaves as a result of delayed recalls from what was anticipated at December 31, 2020 due to training limitations and other factors. |

**Fuel Reconciliation**

| | Three Months Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | | **2020** | | |
| *(in millions, except for per-gallon amounts)* | **Dollars** | | **Cost/Gallon** | **Dollars** | | **Cost/Gal** |
| Raw or "into-plane" fuel cost | $ | 222 | $  1.77 | $  370 | $ | 1.91 |
| Losses on settled hedges | 3 | | 0.02 | 5 | | 0.02 |

Motion for TRO Ex. 9 Page 59

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Consolidated economic fuel expense** | **225** | | **1.79** | | | 375 | | 1.93 | |
| Mark-to-market fuel hedge adjustment | **(22)** | | **(0.18)** | | | 9 | | 0.05 | |
| GAAP fuel expense | $ | **203** | $ | **1.61** | | $ | 384 | $ | 1.98 |
| Fuel gallons | **126** | | | | | 194 | | | |

| **Debt-to-capitalization, adjusted for operating leases** | | | | |
|---|---|---|---|---|
| *(in millions)* | **March 31, 2021** | | **December 31, 2020** | |
| Long-term debt, net of current portion | $ | **2,325** | $ | 2,357 |
| Capitalized operating leases | **1,554** | | 1,558 | |
| COVID-19 related borrowings[a] | **788** | | 734 | |
| Adjusted debt, net of current portion of long-term debt | **4,667** | | 4,649 | |
| Shareholders' equity | **2,875** | | 2,988 | |
| **Total Invested Capital** | $ | **7,542** | $ | 7,637 |
| | | | | |
| Debt-to-capitalization ratio, including operating leases | **62** | **%** | 61 | **%** |

| | |
|---|---|
| (a) | To best reflect our leverage we included the short-term borrowings stemming from the COVID-19 pandemic which are classified as current liabilities in the consolidated balance sheets. |

**Adjusted net debt to earnings before interest, taxes, depreciation, amortization and special items**

| (in millions) | March 31, 2021 | | December 31, 2020 | |
|---|---|---|---|---|
| Current portion of long-term debt | $ | 1,246 | $ | 1,138 |
| Current portion of operating lease liabilities | 271 | | 290 | |
| Long-term debt, net of current portion | 2,325 | | 2,357 | |
| Long-term operating lease liabilities, net of current portion | 1,283 | | 1,268 | |
| **Total adjusted debt** | 5,125 | | 5,053 | |
| Less: Cash and marketable securities | (3,549) | | (3,346) | |
| **Adjusted net debt** | $ | 1,576 | $ | 1,707 |

| (in millions) | Twelve Months Ended March 31, 2021 | | Twelve Months Ended December 31, 2020 | |
|---|---|---|---|---|
| GAAP Operating Loss[a] | $ | (1,615) | $ | (1,775) |
| Adjusted for: | | | | |
| Payroll support program grant wage offset and special items | (474) | | 71 | |
| Mark-to-market fuel hedge adjustments | (39) | | (8) | |
| Depreciation and amortization | 409 | | 420 | |
| Aircraft rent | 280 | | 299 | |
| **EBITDAR** | $ | (1,439) | $ | (993) |

Motion for TRO Ex. 9 Page 61

| Adjusted net debt to EBITDAR | **(1.1x)** | **(1.7x)** |
| --- | --- | --- |

| | |
| --- | --- |
| (a) | Operating loss can be reconciled using the trailing twelve month operating income as filed quarterly with the SEC. |

**Note A:** Pursuant to Regulation G, we are providing reconciliations of reported non-GAAP financial measures to their most directly comparable financial measures reported on a GAAP basis. We believe that consideration of these non-GAAP financial measures may be important to investors for the following reasons:

- By eliminating fuel expense and certain special items (including the payroll support program wage offset, impairment and restructuring charges and merger-related costs) from our unit metrics, we believe that we have better visibility into the results of operations as we focus on cost-reduction initiatives emerging from the COVID-19 pandemic. Our industry is highly competitive and is characterized by high fixed costs, so even a small reduction in non-fuel operating costs can result in a significant improvement in operating results. In addition, we believe that all domestic carriers are similarly impacted by changes in jet fuel costs over the long run, so it is important for management (and thus investors) to understand the impact of (and trends in) company-specific cost drivers such as labor rates and productivity, airport costs, maintenance costs, etc., which are more controllable by management.

- Cost per ASM (CASM) excluding fuel and certain special items, such as the payroll support program wage offset, impairment and restructuring charges and merger-related costs, is one of the most important measures used by management and by the Air Group Board of Directors in assessing quarterly and annual cost performance.

- Adjusted income before income tax (and other items as specified in our plan documents) is an important metric for the employee incentive plan, which covers the majority of Air Group employees.

- CASM excluding fuel and certain special items is a measure commonly used by industry analysts, and we believe it is the basis by which they have historically compared our airline to others in the industry. The measure is also the subject of frequent questions from investors.

- Disclosure of the individual impact of certain noted items provides investors the ability to measure and monitor performance both with and without these special items. We believe that disclosing the impact of these items as noted above. Industry analysts and investors consistently measure our performance without these items for better comparability

Motion for TRO Ex. 9 Page 62

between periods and among other airlines.

- Although we disclose our passenger unit revenues, we do not (nor are we able to) evaluate unit revenues excluding the impact that changes in fuel costs have had on ticket prices. Fuel expense represents a large percentage of our total operating expenses. Fluctuations in fuel prices often drive changes in unit revenues in the mid-to-long term. Although we believe it is useful to evaluate non-fuel unit costs for the reasons noted above, we would caution readers of these financial statements not to place undue reliance on unit costs excluding fuel as a measure or predictor of future profitability because of the significant impact of fuel costs on our business.

**GLOSSARY OF TERMS**

**Adjusted net debt -** long-term debt, including current portion, plus capitalized operating leases, less cash and marketable securities

**Adjusted net debt to EBITDAR** - represents net adjusted debt divided by EBITDAR (trailing twelve months earnings before interest, taxes, depreciation, amortization, special items and rent)

**Aircraft Utilization** - block hours per day; this represents the average number of hours per day our aircraft are in transit

**Aircraft Stage Length** - represents the average miles flown per aircraft departure

**ASMs** - available seat miles, or "capacity"; represents total seats available across the fleet multiplied by the number of miles flown

**CASM** - operating costs per ASM, or "unit cost"; represents all operating expenses including fuel and special items

**CASMex** - operating costs excluding fuel and special items per ASM; this metric is used to help track progress toward reduction of non-fuel operating costs since fuel is largely out of our control

**Debt-to-capitalization ratio** - represents adjusted debt (long-term debt plus capitalized operating lease liabilities) divided by total equity plus adjusted debt

**Diluted Earnings per Share** - represents earnings per share (EPS) using fully diluted shares outstanding

**Diluted Shares** - represents the total number of shares that would be outstanding if all possible sources of conversion, such as stock options, were exercised

**Economic Fuel** - best estimate of the cash cost of fuel, net of the impact of our fuel-hedging program

Motion for TRO Ex. 9 Page 63

**Load Factor** - RPMs as a percentage of ASMs; represents the number of available seats that were filled with paying passengers

**Mainline** - represents flying Boeing 737, Airbus 320 and Airbus 321neo family jets and all associated revenues and costs

**Productivity** - number of revenue passengers per full-time equivalent employee

**RASM** - operating revenue per ASMs, or "unit revenue"; operating revenue includes all passenger revenue, freight & mail, Mileage Plan and other ancillary revenue; represents the average total revenue for flying one seat one mile

**Regional** - represents capacity purchased by Alaska from Horizon and SkyWest. In this segment, Regional records actual on-board passenger revenue, less costs such as fuel, distribution costs, and payments made to Horizon and SkyWest under the respective capacity purchased arrangement (CPAs). Additionally, Regional includes an allocation of corporate overhead such as IT, finance, other administrative costs incurred by Alaska and on behalf of Horizon.

**RPMs** - revenue passenger miles, or "traffic"; represents the number of seats that were filled with paying passengers; one passenger traveling one mile is one RPM

**Yield** - passenger revenue per RPM; represents the average revenue for flying one passenger one mile

SOURCE Alaska Air Group

**Related Links**

http://www.alaskaair.com

Motion for TRO Ex. 9 Page 64

geekwire.com

# Alaska Air signs on for payroll support as part of airlines' $25B coronavirus bailout

6-8 minutes



Alaska Airlines is among 10 passenger air carriers that plan to participate in the Treasury Department's coronavirus payroll aid program. (Alaska Airlines Photo)

Seattle-based Alaska Airlines and nine other air carriers plan to participate in a $25 billion payroll assistance program that's part of the coronavirus relief package signed into law last month, Treasury Secretary Steven Mnuchin said today.

"Conversations continue with other airlines regarding their potential participation," Mnuchin said in a statement.

Today's announcement comes after days of negotiations over the terms of the assistance program, with the Treasury Department seeking ownership stakes in at least some of the airlines that participate.

Another point of contention is the Trump administration's insistence that about 30 percent

of the money provided to the airlines would be in the form of a low-interest loan. Under the deals announced today, the loans would be repaid over 10 years.

If an airline's loan exceeds $100 million, the Treasury Department would be entitled to stock warrants worth 10 percent of the excess loan amount, The New York Times reported. Airlines that accept the money would also be required to refrain from major cuts in staffing or pay through September. Stock buybacks and dividend payouts would be prohibited until September 2021, and limits on executive pay would be in effect until late March 2022.

Alaska Airlines and its subsidiary, Horizon Air, will receive $992 million from the payroll support program, with $267 million of that sum in the form of a loan. The Treasury Department will have the right to buy 847,000 non-voting shares of Alaska Air Group at a price of $31.61 per share.

"We are grateful for and humbled by this support," Brad Tilden, Alaska Air Group's Chairman and CEO, said in a statement. "This aid will bring immediate and sorely needed liquidity to the airline industry and will enable all airlines – including Alaska – to continue serving our customers and to keep our people at work, while we adjust to an extraordinary reduction in demand.

United Airlines said it was still working out the details of its agreement with the Treasury Department. Allegiant Air said it's reviewing term sheets for federal assistance while it explores other financing alternatives.

As for the other airlines:

- Delta Air Lines will receive $5.4 billion from the payroll support program, including a loan of $1.6 billion, CEO Ed Bastian told employees in a memo. He said Delta will provide the government with warrants to acquire about 1 percent of Delta stock at $24.39 per share over five years.

- Southwest Airlines will be getting $3.2 billion in support, including a loan of almost $1 billion. The deal calls for the Treasury Department to receive warrants for about 2.6 million shares.

- JetBlue will receive $935.8 million in support, with $250.7 million in the form of a loan. The government will receive "a limited number of warrants," the airline said.

- American Airlines will receive $5.8 billion in support, including a loan of $1.7 billion. Details of the deal, including the stock warrants for the government, will be laid out in a regulatory filing, the airline said.

- Frontier Airlines, Hawaiian Airlines and SkyWest Airlines have also agreed to participate in the payroll support program, but details about their deals weren't immediately available.

Motion for TRO Ex. 9 Page 66

The $25 billion payroll assistance program was set up under the terms of the Coronavirus Aid, Relief and Economic Security Act, or CARES Act. The detailed terms of the aid were left up to the airlines and the Treasury Department to negotiate — and not everyone in Congress was thrilled about the results.

"Although I'm glad that the Treasury is finally cutting checks for airline employees, I'm disappointed the terms will require repayment for some of the payroll grants," Sen. Ed Markey, D-Mass., said in a tweet.

The CARES Act provides another $25 billion for loans to passenger airlines, as well as $8 billion in grants and loans to cargo carriers. Alaska Airlines and Horizon Air said they would seek $1.128 billion in loans from the Treasury Department through the loan program, and American Airlines said it would seek nearly $4.8 billion in loans.

Meanwhile, Boeing is still considering how it would take advantage of federal assistance. The Washington Post quoted an unnamed Boeing official as saying "we're trying to figure out what the process and the protocol will look like with Treasury, and what will be the best way to approach it."

Today Boeing reported the cancellation of 150 orders for 737 MAX planes during March, which outweighed the month's 31 new orders for wide-body passenger planes and military aircraft. Twenty planes were delivered during March, rounding out a first quarter with only 50 commercial jet deliveries.

Boeing said in a statement that the coronavirus outbreak is dealing a heavy blow to the aviation market.

"The airline industry is confronting the COVID-19 pandemic and the unprecedented impacts on air travel," the company said. "We are working closely with our customers, many of whom are facing significant financial pressures, to review their fleet plans and make adjustments where appropriate. At the same time, Boeing continues to adjust its order book to adapt to lower-than-planned 737 MAX production in the near term."

The worldwide fleet of 737 MAX planes is still grounded in the wake of two catastrophic plane crashes, and most of Boeing's airplane production workforce has been idled due to the outbreak. However, Boeing says about 2,500 employees will be called back to their work sites in the Puget Sound region and Moses Lake, Wash., to work on defense projects and 737 MAX maintenance.

**Update for 4:30 p.m. PT May 11:** United Airlines said it worked out a deal for $5 billion in assistance, including a $1.5 billion loan. Allegiant said it would receive $171.9 million in relief, including a $21 million loan. Spirit Airlines said it would receive up to $334.7 million through the payroll support program, including a Treasury loan of up to $70.4 million. All three deals involve stock warrants.

Motion for TRO Ex. 9 Page 67

newsminer.com

# Alaska Air suffers another big quarterly loss, but has stopped the cash bleed

*Dominic Gates, The Seattle Times*

7-9 minutes

---

The parent company of Alaska Airlines on Thursday reported a net loss of $131 million in the first quarter of 2021, though the red ink would have been much greater without government grants. Yet the financial results offered a ray of hope that an airline recovery is in sight.

New CEO Ben Minicucci said in a teleconference call with Wall Street analysts that March was the first month since the pandemic paralyzed air travel that Alaska Air Group took in more cash than it spent as people began to book summer air travel.

Minicucci said that while the quarterly financials still came in "far below normal levels," last month "marked an inflection point during this pandemic, and it appears that we have turned the corner."

Alaska's managing director of investor relations, Emily Halverson, said the company "went from burning approximately $4 million a day last quarter to cash generation of approximately $1 million a day in March."

Minicucci said that "as momentum in vaccines has picked up and travel restrictions have eased, there has been a strong return of leisure demand." Future bookings for early summer are now at roughly 80% of pre-Covid-19 levels.

"We plan to return to 100% no later than summer of 2022," he said.

Alaska's planes were on average 42% full in January, rising to 49% in February and 62% in March. The airline expects to get close to 70% full this month.

Advance ticket bookings stepped up in March to approximately 70% of 2019 levels. Chief Commercial Officer Andrew Harrison said on the call that average fares in summer for peak flights "are actually higher than 2019."

Minicucci forecast that Alaska will approach the break-even point between losses and profit in the second quarter "and we anticipate turning to profitability in Q3."

Motion for TRO Ex. 9 Page 68

Part of that optimism is based on the expectation that flights in and out of California, which represented about half of Alaska's traffic pre-Covid-19, will pick up briskly after the lockdown there eases. California currently aims to fully reopen businesses on June 15.

"California remains largely closed today," Minicucci said. "Seeing the state reopen will be a powerful near-term enabler for our path back."

Harrison conceded that "international travel is basically next to nothing," while air travel for business remains "severely depressed."

However, he added, a longtime issue that had handicapped Alaska in winning corporate accounts — the lack of a tight alliance with other airlines to offer full U.S. and international network coverage — is now resolved with its joining the oneworld alliance and its partnership with American Airlines.

He said surveys of corporate customers suggest that business travel "will ramp to about 50% of normal levels by the end of this year."

**Still in the red, but heading to black**

For now, the ink in the account books is still red.

The Covid-19 pandemic reduced revenue for the first quarter by 57.5% compared to last year while raising the cost of carrying each passenger by 18.5%.

The net loss of $131 million, or $1.05 per share, would have been much greater but for government Payroll Support Program funding of $411 million to cover wages.

In the first quarter of last year, the net loss was $232 million, or $1.89 per share. However, that was without any government support, the first installment of which was agreed upon only in April 2020.

The airline generated $167 million in operating cash flow in the first three months of 2021, including the PSP funding, bolstered by the improved advance bookings in March.

Without the government support, Alaska would have burned through $244 million during the quarter, averaging a cash burn of $2.7 million per day.

By slashing spending and capacity to get though the crisis, Alaska reduced the cash burn each quarter, from $5.5 million a day last summer down to $4.3 million per day and then $3.7 million per day in the previous two quarters.

In the months ahead, Minicucci said, "Our primary focus is on rebuilding our business to pre-Covid levels and returning to profitable growth."

In the second half of this year, management aims to start bringing down the airline's $1.6 billion in net debt.

Motion for TRO Ex. 9 Page 69

Minicucci said Alaska will adapt and accelerate its fleet capacity plans if it sees either a faster-than-expected recovery or competitive threats from other airlines.

**Other airlines burning cash, too**

Every airline in the world is struggling with the losses from the Covid-19 pandemic.

On Thursday, Southwest Airlines also reported its first-quarter numbers, and thanks to government support, it managed to eke out a net profit of $116 million — the first U.S. airline to do so in a year.

Without the $1.2 billion Southwest received from the extended Payroll Support Program, that would have been a $1 billion net loss.

Southwest's average cash burn excluding the government support averaged approximately $13 million per day in the quarter and came down to about $9 million per day in March.

American Airlines, also reporting Thursday, recorded a net loss of $1.3 billion, despite receiving $2.2 billion from the Payroll Support Program, and an average cash burn of $27 million per day.

Last week, Delta Air Lines reported a $1.5 billion loss in the quarter after a $1.2 billion benefit from the Payroll Support Program and an average cash burn of $11 million per day.

This week, United reported a $1.4 billion loss in the quarter after a $2.6 billion benefit from the Payroll Support Program and an average cash burn of $9 million per day.

So far this year, Alaska has received $546 million from the U.S. Treasury through a combination of grants and loans, and anticipates another payment of $80 million in late April.

The government will provide an additional $584 million in incremental payroll support funding under a third round of the PSP.

**Growing the fleet with Boeing's MAX**

Alaska is also looking to the airports it services for financial relief.

Chief Financial Officer Shane Tackett said that since airports received additional funding under the American Rescue Plan Act, the airline is asking them to use some of that money to offset airline costs.

Tackett specifically mentioned an issue at Seattle-Tacoma International Airport specifically, where he said the sunsetting of a lease provision that gave airlines a share of concession revenues will cost the airline $30 million.

However, Alaska already has relief on one typically high-cost item: It will have to pay very

Motion for TRO Ex. 9 Page 70

little cash for the dozen new Boeing jets it's taking this year.

Alaska took delivery of four 737-9 MAX aircraft in the quarter. Although those are currently grounded due to an electrical issue in the cockpit, Minicucci said he expects that problem to be resolved "in the next week or two."

Alaska will take eight more MAXs this year. Nat Pieper, Alaska's senior vice president of fleet, said the company will pay Boeing "very little, if any, cash" for these deliveries because of the advance payments already made on all the planes on order.

Next year, Alaska plans to bring an additional 31 MAX 9s into its fleet, which will require paying Boeing about $1.3 billion, or $42 million per jet, Pieper said.

CFO Tackett said Alaska over the next few years needs to replace 60 aircraft with MAXs to get back to its pre-COVID-19 fleet size of 235 mainline jets, and then will add 10 to 12 jets each year afterward to maintain planned growth.

aviationpros.com

# Alaska Air Suffers Another Big Quarterly Loss, but Has Stopped the Cash Bleed

*By Dominic Gates Source The Seattle Times (TNS)*

7-9 minutes

---

Apr. 22—The parent company of Alaska Airlines on Thursday reported a net loss of $131 million in the first quarter of 2021, though the red ink would have been much greater without government grants. Yet the financial results offered a ray of hope that an airline recovery is in sight.

New CEO Ben Minicucci said in a teleconference call with Wall Street analysts that March was the first month since the pandemic paralyzed air travel that Alaska Air Group took in more cash than it spent as people began to book summer air travel.

Minicucci said that while the quarterly financials still came in "far below normal levels," last month "marked an inflection point during this pandemic, and it appears that we have turned the corner."

Alaska's managing director of investor relations, Emily Halverson, said the company "went from burning approximately $4 million a day last quarter to cash generation of approximately $1 million a day in March."

Minicucci said that "as momentum in vaccines has picked up and travel restrictions have eased, there has been a strong return of leisure demand." Future bookings for early summer are now at roughly 80% of pre-COVID-19 levels.

"We plan to return to 100% no later than summer of 2022," he said.

Alaska's planes were on average 42% full in January, rising to 49% in February and 62% in March. The airline expects to get close to 70% full this month.

Advance ticket bookings stepped up in March to approximately 70% of 2019 levels. Chief Commercial Officer Andrew Harrison said on the call that average fares in summer for peak flights "are actually higher than 2019."

Minicucci forecast that Alaska will approach the break-even point between losses and profit in the second quarter "and we anticipate turning to profitability in Q3."

Motion for TRO Ex. 9 Page 72

Part of that optimism is based on the expectation that flights in and out of California, which represented about half of Alaska's traffic pre-COVID-19, will pick up briskly after the lockdown there eases. California currently aims to fully reopen businesses on June 15.

" California remains largely closed today," Minicucci said. "Seeing the state reopen will be a powerful near-term enabler for our path back."

Harrison conceded that "international travel is basically next to nothing," while air travel for business remains "severely depressed."

However, he added, a longtime issue that had handicapped Alaska in winning corporate accounts — the lack of a tight alliance with other airlines to offer full U.S. and international network coverage — is now resolved with its joining the oneworld alliance and its partnership with American Airlines.

He said surveys of corporate customers suggest that business travel "will ramp to about 50% of normal levels by the end of this year."

Still in the red, but heading to black

For now, the ink in the account books is still red.

The COVID-19 pandemic reduced revenue for the first quarter by 57.5% compared to last year while raising the cost of carrying each passenger by 18.5%.

The net loss of $131 million, or $1.05 per share, would have been much greater but for government Payroll Support Program funding of $411 million to cover wages.

In the first quarter of last year, the net loss was $232 million, or $1.89 per share. However, that was without any government support, the first installment of which was agreed upon only in April 2020.

The airline generated $167 million in operating cash flow in the first three months of 2021, including the PSP funding, bolstered by the improved advance bookings in March.

Without the government support, Alaska would have burned through $244 million during the quarter, averaging a cash burn of $2.7 million per day.

By slashing spending and capacity to get though the crisis, Alaska reduced the cash burn each quarter, from $5.5 million a day last summer down to $4.3 million per day and then $3.7 million per day in the previous two quarters.

In the months ahead, Minicucci said, "Our primary focus is on rebuilding our business to pre-COVID levels and returning to profitable growth."

In the second half of this year, management aims to start bringing down the airline's $1.6 billion in net debt.

Motion for TRO Ex. 9 Page 73

Minicucci said Alaska will adapt and accelerate its fleet capacity plans if it sees either a faster-than-expected recovery or competitive threats from other airlines.

Other airlines burning cash, too

Every airline in the world is struggling with the losses from the COVID-19 pandemic.

On Thursday, Southwest Airlines also reported its first-quarter numbers, and thanks to government support, it managed to eke out a net profit of $116 million — the first U.S. airline to do so in a year.

Without the $1.2 billion Southwest received from the extended Payroll Support Program, that would have been a $1 billion net loss.

Southwest's average cash burn excluding the government support averaged approximately $13 million per day in the quarter and came down to about $9 million per day in March.

American Airlines, also reporting Thursday, recorded a net loss of $1.3 billion, despite receiving $2.2 billion from the Payroll Support Program, and an average cash burn of $27 million per day.

Last week, Delta Air Lines reported a $1.5 billion loss in the quarter after a $1.2 billion benefit from the Payroll Support Program and an average cash burn of $11 million per day.

This week, United reported a $1.4 billion loss in the quarter after a $2.6 billion benefit from the Payroll Support Program and an average cash burn of $9 million per day.

So far this year, Alaska has received $546 million from the U.S. Treasury through a combination of grants and loans, and anticipates another payment of $80 million in late April.

The government will provide an additional $584 million in incremental payroll support funding under a third round of the PSP.

Growing the fleet with Boeing's MAX

Alaska is also looking to the airports it services for financial relief.

Chief Financial Officer Shane Tackett said that since airports received additional funding under the American Rescue Plan Act, the airline is asking them to use some of that money to offset airline costs.

Tackett specifically mentioned an issue at Seattle-Tacoma International Airport specifically, where he said the sunsetting of a lease provision that gave airlines a share of concession revenues will cost the airline $30 million.

However, Alaska already has relief on one typically high-cost item: It will have to pay very

Motion for TRO Ex. 9 Page 74

little cash for the dozen new Boeing jets it's taking this year.

Alaska took delivery of four 737-9 MAX aircraft in the quarter. Although those are currently grounded due to an electrical issue in the cockpit, Minicucci said he expects that problem to be resolved "in the next week or two."

Alaska will take eight more MAXs this year. Nat Pieper, Alaska's senior vice president of fleet, said the company will pay Boeing "very little, if any, cash" for these deliveries because of the advance payments already made on all the planes on order.

Next year, Alaska plans to bring an additional 31 MAX 9s into its fleet, which will require paying Boeing about $1.3 billion, or $42 million per jet, Pieper said.

CFO Tackett said Alaska over the next few years needs to replace 60 aircraft with MAXs to get back to its pre-COVID-19 fleet size of 235 mainline jets, and then will add 10 to 12 jets each year afterward to maintain planned growth.

___

(c)2021 The Seattle Times

Visit The Seattle Times at www.seattletimes.com

Distributed by Tribune Content Agency, LLC.

Motion for TRO Ex. 9 Page 75

marketwatch.com

# Alaska Air to receive $533 million as part of extension of payroll support loans

*Tomi Kilgore*

1 minute

---

Published: Jan. 21, 2021 at 6:26 a.m. ET

Alaska Air Group Inc. disclosed Thursday that it will receive $533 million after it reached agreement last week with the U.S. Treasury on an extension of the Payroll Support Program (PSP), which is part of the Coronavirus Aid, Relief and Economic Security (CARES) Act. Alaska Air said its subsidiary's, Alaska Airline and Horizon Air, received $266 million on Jan. 15 and expects to receive the remainder sometime in February. As part of the agreement, the air carrier granted the U.S. Treasury 95,532 warrants to buy Alaska Air common stock at a strike price of $52.25. In addition, Alaska Airlines and Horizon Air agreed to...

Motion for TRO Ex. 9 Page 76

king5.com

# Alaska Air to receive nearly $1 billion in coronavirus bailout

*Author: KING 5 Staff*

4 minutes

Alaska Airlines, along with the other five major U.S. carriers, will take part in the federal $25 billion airline rescue package. The money will cover employee pay.

SEATAC, Wash. — Locally based Alaska Air Group will receive $992 million of the $25 billion federal coronavirus aid package for the nation's airlines.

Alaska Air Group, which includes Alaska Airlines and Horizon Air, said that the money will go toward employee pay and benefits through September.

The $992 million is expected to cover about 70% of Alaska's budgeted costs through Sept. 30, and was based on similar costs reported by the airlines for the period of April through September 2019, according to a statement from Alaska Air.

Alaska Air Group Chairman and CEO Brad Tilden said in a statement the company was operating at "near-zero" revenue, but that flights continue at a reduced schedule for people who still need to travel and for cargo and deliveries.

Alaska will take part in the deal along with five other major U.S. carriers, Delta, American, United, Southwest and JetBlue, and four smaller carriers.

The airlines and the U.S. Department of Treasury agreed to a deal that gives the airlines 70% of the aid in cash and 30% in loans that must be repaid. The deal also allows the Treasury department the right to purchase shares of the companies.

For Alaska, this means that of the $992 million in funding, $267 million will be a loan, and Treasury will receive the right to buy 847,000 non-voting shares of the company at a price of $31.61 a share, according to the statement.

Additional conditions of the funding include no involuntary furloughs, limits to executive compensation and reasonable continuation of service, the company said.

Earlier this month, Alaska Airlines announced that it would cut its flight schedule in April and May by 80% from normal levels, citing reduced demand for travel due to the global

Motion for TRO Ex. 9 Page 77

coronavirus pandemic.

The company informed investors of the cut in a report to the U.S. Securities and Exchange Commission. The 80% cut in flights was deeper than the cuts the company had previously announced, and it was uncertain how much the flight scheduled could be restored in the future.

The area air travel industry has taken a massive hit by the coronavirus crisis, and other local organizations also received aid from separate parts of the $2 trillion CARES act package, which federal lawmakers passed in response to the national coronavirus crisis.

Sea-Tac Airport, Paine Field and Boeing Field will get $310 million in aid.

Traffic at Sea-Tac Airport has dwindled significantly, said airport Aviation Director Lance Lyttle told KING 5 this week.

"To give you an idea, this time of the year we typically have 54,000 people coming through our checkpoints, yesterday we had approximately 2,500 people," Lyttle said.

Also, the Boeing Company, which manufactures and designs many aircraft throughout the Seattle area, also reported losing hundreds of orders in the first quarter of 2020.

Motion for TRO Ex. 9 Page 78

newsroom.alaskaair.com

# Alaska Airlines and Horizon Air announce receipt of payroll support program funds under CARES Act

3-4 minutes

---

Alaska Airlines and Horizon Air announce receipt of payroll support program funds under CARES Act

SEATTLE, April 23, 2020 /PRNewswire/ -- Alaska Airlines and Horizon Air finalized agreements today with the U.S. Treasury Department and accepted full disbursement of funds through the Payroll Support Program (PSP) under the Coronavirus Aid, Relief and Economic Security (CARES) Act, subject to terms that were previously disclosed.



Alaska and Horizon have received $992 million in the form of a $725 million grant and $267 million loan, to be used exclusively toward continuing to pay employee salaries, wages and benefits. The funding will cover about 70% of budgeted payroll costs for both airlines through Sept. 30, 2020, and was based on similar costs reported by the airlines for the period of April through September 2019.

- 

Motion for TRO Ex. 9 Page 79



Alaska Airlines CARES Act Payroll Funds

"We're extremely grateful for the leadership of all federal government officials involved in enabling this direct support for aviation employees during this time of significantly suppressed demand and near-zero revenue," said Brad Tilden, Alaska Air Group's Chairman and CEO. "This support enables us to protect jobs and maintain critical transportation infrastructure while we work over the next few months to assess our business and make thoughtful decisions."

Of the $992 million in PSP funding, $267 million is in the form of a loan and must be repaid to the government within a 10-year term. Additionally, the Treasury Department has received warrants to buy 847,000 non-voting shares of Alaska Air Group common stock at a price of $31.61 a share, which was the closing price of the stock on April 9, 2020.

Under this program, Alaska and Horizon have agreed to additional conditions such as no involuntary furloughs and no reductions to rates of pay or benefits through Sept. 30, 2020; to continue suspension of dividends and share repurchases until Sept. 30, 2021; limits on executive compensation through March 24, 2022; and to maintain the minimum levels of air service as required under a Department of Transportation rule.

Alaska and Horizon have separately applied for $1.1 billion in federal loan funding through a separate program authorized under the CARES Act. Funds loaned to both airlines through this program will support short-term liquidity needs and must be paid back in full. If finalized, the term of the secured term loan agreement would be five years, and provide for the Treasury Department to receive warrants to buy additional non-voting shares of Alaska Air Group common stock amounting to 10% of the loan value at a price of $31.61 a share. Discussions with the Treasury Department on this loan are still ongoing.

Alaska Airlines ranked "Highest in Customer Satisfaction Among Traditional Carriers in North America" in the J.D. Power North America Airline Satisfaction Study for 12 consecutive years from 2008 to 2019. Learn about Alaska's award-winning service at newsroom.alaskaair.com and blog.alaskaair.com. Alaska Airlines and Horizon Air are subsidiaries of Alaska Air Group (NYSE: ALK).

SOURCE Alaska Air Group

Motion for TRO Ex. 9 Page 80

[simpleflying.com](simpleflying.com)

# Alaska Airlines Reveals A Profit Of $400 Million

*Luke Bodell*

4-5 minutes

Alaska Airlines has reported a net profit of almost $400 million for Q2 2021. With air travel picking up again, the airline was able to run a profit after making losses for the same period in 2020. However, excluding CARES Act Payroll Support Program (PSP) wage offsets and other adjustments, the airline in fact made an adjusted net loss of $38 million for the quarter.



Alaska's Q2 results reveal a net profit of almost $400 million. Photo: Vincenzo Pace | Simple Flying

## Alaska made a profit of $397 million for Q2

After a relatively impressive second quarter performance, Alaska has revealed a profit of $397 million for Q2 2021. The profit, calculated under Generally Accepted Accounting

Motion for TRO Ex. 9 Page 81

Principles (GAAP), is a significant improvement on Alaska's net losses of $214 million for Q2 2020. Total operating revenue was $1.52 billion for the quarter, a huge increase from $421 million in Q2 2020.

Ben Minicucci, CEO of Alaska Airlines, said,

*"As we put the worst of last year's downturn behind us, Alaska is back on the path to profitability."*

However, excluding PSP wage offsets and other accounting adjustments, the airline reported an adjusted net loss of $38 million. Over the second quarter, Alaska received $503 million in PSP support and a total of $914 million for Q1 and Q2. The airline's adjusted net losses for Q2 2020 were $439 million.

Alaska Airlines has benefited from the reopening of California. Photo: Vincenzo Pace | Simple Flying

The airline achieved a load factor of 77% over the second quarter, with its capacity down by 20% compared to 2019. This was slightly higher than Alaska had projected (74-76%), with new routes and looser travel restrictions helping the airline to keep its planes relatively full.

**Stay informed:** Sign up for our daily and weekly aviation news digests.

Motion for TRO Ex. 9 Page 82

## Debts, grants and operating cash flow

Alaska received a total of $664 million from the U.S. Treasury under an extension of the PSP through a mix of grants and loans. At the same time, the airline also paid back $570 million in debt.

This included a $135 million loan from the Treasury under the CARES Act and $363 million to two creditors. Alaska also revealed its debt-to-capitalization ratio was at 56%, down from 61% at the beginning of the year.

The airline is emerging from its most difficult year with optimism. Photo: Getty Images

The airline was able to bring in $840 million in operating cash flow in the second quarter. However, this figure includes $489 million of PSP funding. Excluding PSP funding, quarterly operating cash flows improved over $580 million from Q1 2021.

## Optimism for the rest of the year

After a horrible year for the aviation industry, Alaska is optimistic about the future. The airline is bolstering its fleet by exercising options for 13 Boeing 737-9 MAX and nine E175 (to be operated by Horizon Air), with deliveries expected from 2022 to 2024.

The airline has also added new connections to its network, including flights to Belize from Seattle and Los Angeles from November 2021. Additionally, seven new domestic routes '*aimed at providing our West Coast guests more options to sun-filled destinations*' have been announced.

Motion for TRO Ex. 9 Page 83

Alaska is exercising options to expand its fleet. Photo: Getty Images

CEO Minicucci added,

*"We are executing our plan, rebuilding our network, leveraging our capacity to meet growing demand, and delivering exceptional service and value to our guests. I'm incredibly proud and grateful for how hard our employees are working and how they show up for each other and our guests every day with focus on safety, operational excellence and care."*

**Do you think Alaska Airlines has plenty of reasons to be optimistic? Let us know what you think in the comments.**

Journalist - With 10 years of experience as a travel writer and aviation analyst, Luke has worked with industry-leaders including Skyscanner, KLM and HotelsCombined throughout his career. As a passionate traveler based across the Middle East and East Asia, Luke offers strong insights into the travel and aviation industry.

Motion for TRO Ex. 9 Page 84

January 15, 2021

Alaska Airlines, Inc.

19300 International Blvd.
Seattle, WA 98188

Re: Amendments to Loan and Guarantee Agreement

Reference is made to that certain Loan and Guarantee Agreement, dated as of September 28, 2020, and amended and restated pursuant to that certain Restatement Agreement, dated as of October 30, 2020] (the "Existing Loan and Guarantee Agreement", and as amended hereby and as may be further amended, supplemented and restated or otherwise modified from time to time, the "Loan and Guarantee Agreement"), among Alaska Airlines, Inc., a corporation organized under the laws of the State of Alaska (the "Borrower"), Alaska Air Group, Inc., a corporation organized under the laws of the State of Delaware (the "Parent"), the United States Department of the Treasury ("Treasury") and The Bank of New York Mellon as Administrative Agent and Collateral Agent.  Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Loan and Guarantee Agreement.

WHEREAS, Pursuant to Section 11.02 of the Loan and Guarantee Agreement, the Borrower has requested amendments to the Existing Loan and Guarantee Agreement as set forth herein; and

WHEREAS, Treasury, as the Initial Lender and constituting the Required Lenders, has agreed to amend the Existing Loan and Guarantee Agreement as set forth herein.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      Effective as of the date hereof, Section 1.01 of the Existing Loan and Guarantee Agreement is hereby amended by inserting the following definition, in alphabetical order:

""PSP2 Warrant Agreement" means that certain warrant agreement, dated as of January 15, 2021 between Parent and Treasury."

2.      Effective as of the date hereof, the definition of "Warrants" in Section 1.01 of the Existing Loan and Guarantee Agreement is hereby amended and restated in its entirety as follows:

""Warrants" means, collectively, those certain warrants issued to Treasury under the Warrant Agreement, the PSP Warrant Agreement or the PSP2 Warrant Agreement."

3.      Effective as of the date hereof, Section 2.07 of the Existing Loan and Guarantee Agreement is hereby amended by deleting the reference to "March 26, 2021" and replacing it with "May 28, 2021".

4.      This letter agreement shall be limited as written and nothing herein shall be deemed to constitute an amendment or waiver of any other term, provision or condition of the Loan and Guarantee Agreement or any of the other Loan Documents in any other instance than as expressly set forth herein or prejudice any right or remedy that any Lender, the Administrative Agent or the

Collateral Agent may now have or may in the future have under the Loan and Guarantee Agreement or any of the other Loan Documents.  For the avoidance of doubt, this letter agreement is hereby deemed to be a Loan Document under the Loan and Guarantee Agreement.  Except as herein provided, the Loan and Guarantee Agreement and the other Loan Documents shall remain unchanged and in full force and effect. This letter agreement shall not constitute a novation of the Loan and Guarantee Agreement or any other Loan Documents.

5.      The Agents assume no responsibility for, and shall be entitled to rely on, without any obligation to ascertain or investigate, the correctness of the recitals and statements contained herein. The Agents shall not be liable or responsible in any manner whatsoever for, or in respect of, the validity or sufficiency of the amendments contained in this letter agreement.

6.      Sections 11.06(b) (*Electronic Execution*), 11.09 (*Governing Law; Jurisdiction; Etc.*) and 11.10 (*Waiver of Jury Trial*) of the Loan and Guarantee Agreement shall apply mutatis mutandis to this letter agreement as if set out herein.

7.      This letter agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this letter agreement by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this letter agreement.

The Lenders party hereto hereby authorize and direct the Administrative Agent and the Collateral Agent to acknowledge this letter agreement.

[*Remainder of this page intentionally left blank.*]

IN WITNESS WHEREOF, the undersigned have caused this letter agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

ALASKA AIRLINES, INC.

By: _____

Name:  Nathaniel Pieper
Title:    Senior Vice President, Fleet, Finance
           and Alliances, and Treasurer

ALASKA AIR GROUP, INC.

By: _____

Name:  Nathaniel Pieper
Title:    Treasurer

[Signature Page to Letter Agreement – Alaska]

UNITED STATES DEPARTMENT OF THE
TREASURY, as the Initial Lender and a Lender

By: _____

    Name:  Brent McIntosh

    Title:   Under Secretary for International Affairs

[Signature Page to Letter Agreement – Alaska]

Acknowledged:

THE BANK OF NEW YORK MELLON, as Administrative Agent

By: _____
      Name:  Bret S. Derman
      Title:  Vice President

THE BANK OF NEW YORK MELLON, as Collateral Agent

By: _____
      Name:  Bret S. Derman
      Title:  Vice President

[Signature Page to Letter Agreement – Alaska]

*EXECUTION VERSION*

## RESTATEMENT AGREEMENT

RESTATEMENT AGREEMENT, dated as of October 30, 2020 (this "<u>Restatement Agreement</u>"), to that certain Loan and Guarantee Agreement, dated as of September 28, 2020 (the "<u>Existing Loan and Guarantee Agreement</u>", and as amended and restated by this Restatement Agreement, and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Loan and Guarantee Agreement</u>"), among ALASKA AIRLINES, INC., a corporation organized under the laws of the State of Alaska (the "<u>Borrower</u>"), ALASKA AIR GROUP, INC., a corporation organized under the laws of the State of Delaware (the "<u>Parent</u>"), the Guarantors party hereto from time to time, the UNITED STATES DEPARTMENT OF THE TREASURY ("<u>Treasury</u>"), as Initial Lender and THE BANK OF NEW YORK MELLON, as Administrative Agent and as Collateral Agent.  Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Loan and Guarantee Agreement.

## W I T N E S S E T H:

WHEREAS, the Parent, the Borrower, the Guarantors Treasury and the Agents are each party to the Existing Loan and Guarantee Agreement;

WHEREAS, the Borrower has requested that Treasury extend additional Commitments to the Borrower (the "<u>Additional Commitments</u>") as is permissible under the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136 (Mar. 27, 2020), as the same may be amended form time to time (the "<u>CARES Act</u>") to the Borrower, and Treasury is willing to do so on the terms and conditions set forth herein;

WHEREAS, pursuant to Section 4003(h)(1) of the CARES Act, for purposes of the Code, the Loans made pursuant to the Commitments (as increased by the Additional Commitments being provided hereby) shall be treated as indebtedness and as having been issued for their aggregate stated principal amount, and the interest payable pursuant to Section 2.09(a) of the Loan and Guarantee Agreement shall be treated as qualified stated interest;

WHEREAS, Loans made pursuant to the Commitments (as increased by the Additional Commitments being provided hereby) will be secured by Liens on the Collateral securing the existing Obligations, together with Liens on any Additional Collateral, subject to the distribution priorities set forth in the Loan and Guarantee Agreement;

WHEREAS, pursuant to Section 11.02 of the Loan and Guarantee Agreement, the Borrower has requested amendments to the Existing Loan and Guarantee Agreement as set forth in this Restatement Agreement; and

WHEREAS, Treasury has agreed to amend the Existing Loan and Guarantee Agreement as more particularly set forth in this Restatement Agreement.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**Section 1.** **Additional Commitments.** Treasury hereby agrees to provide Additional Commitments to the Borrower on the Restatement Effective Date on the terms set forth herein and in the Loan and Guarantee Agreement and the other Loan Documents, and subject to the conditions set forth below, in an aggregate principal amount, together with the Closing Date Commitment, not to exceed the amount of the Commitments as defined in the Loan and Guarantee Agreement (as amended hereby). The Additional Commitments shall be deemed to be "Commitments" under and as defined in the Loan and Guarantee Agreement (as amended hereby) for all purposes of the Loan and Guarantee Agreement and the other Loan Documents, and shall be secured by the applicable Liens granted to the Collateral Agent for the benefit of the Secured Parties and entitled to the benefits of the applicable Security Documents.

**Section 2.** **Amendments.** Effective as of the Restatement Effective Date, (a) the Existing Loan and Guarantee Agreement is hereby amended and restated, in its entirety, to be in the form attached as Annex A hereto and (b) all of the other Schedules and Exhibits to the Existing Loan and Guarantee Agreement remain in the forms attached to the Existing Loan and Guarantee Agreement.

**Section 3.** **Representations and Warranties.** The Credit Parties represent and warrant to the Administrative Agent, the Collateral Agent and the Lenders as of the Restatement Effective Date that:

(a) The execution, delivery and performance by each Credit Party of this Restatement Agreement and each other Loan Document to which it is party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of its Organizational Documents, (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any material Contractual Obligation to which each Credit Party is a party or affecting each Credit Party or the material properties of any Credit Party or (ii) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which any Credit Party or its property is subject or (c) violate any Law, except to the extent such violation could not reasonably be expected to have a Material Adverse Effect.

(b) No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, each Credit Party of this Restatement Agreement or any other Loan Document, except for (i) such approvals, consents, exemptions, authorizations, actions or notices that have been duly obtained, taken or made and in full force and effect and (ii) filings and consents contemplated by the Security Documents or Section 5.14 of the Loan and Guarantee Agreement.

(c) This Restatement Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Credit Party set forth on the signature pages to this Restatement Agreement. This Restatement Agreement constitutes, and each other Loan Document when so delivered will constitute, the legal, valid and binding obligation of each Credit Party hereto enforceable against such Credit Party in accordance with its terms, except as such enforceability may be limited by bankruptcy,

2

insolvency, reorganization, receivership, moratorium or other Laws affecting the creditors' rights generally and by general principles of equity.

(d) No Default exists under the Loan and Guarantee Agreement.

(e) All representations and warranties contained in the Loan and Guarantee Agreement and the other Loan Documents are true and correct in all material respects as of the date hereof, except to the extent that (A) such representations or warranties are qualified by a materiality standard, in which case they are true and correct in all respects, and (B) such representations or warranties expressly relate to an earlier date (in which case such representations and warranties are true and correct in all material respects as of such earlier date).

**Section 4.    Conditions Precedent to Effectiveness.** The effectiveness of this Restatement Agreement and the Additional Commitments provided hereby are subject to the satisfaction (or waiver in accordance with Section 11.02 of the Loan and Guarantee Agreement) of the following conditions (and, in the case of each document specified in this Section to be received by the Initial Lender (and the applicable Agent or Agents), such document shall be in form and substance satisfactory to the Initial Lender and/or the applicable Agent or Agents) (the date on which such conditions are satisfied or waived being the "Restatement Effective Date") when:

(a) Executed Counterparts.  The Initial Lender and the Agents shall have received from each Credit Party hereto a counterpart of this Restatement Agreement and an Amended and Restated Horizon Aircraft, Engine and Propeller Pledge and Security Agreement, substantially in the form attached hereto as Annex B (such amended and restated agreement, the "Amended and Restated Horizon Pledge and Security Agreement"), each signed on behalf of such Credit Party.  Notwithstanding anything herein to the contrary, delivery of an executed counterpart of a signature page of this Restatement Agreement or the Amended and Restated Horizon Pledge and Security Agreement by telecopy or other electronic means, or confirmation of the execution of this Restatement Agreement and the Amended and Restated Horizon Pledge and Security Agreement on behalf of a party by an email from an authorized signatory of such party shall be effective as delivery of a manually executed counterpart of this Restatement Agreement and the Amended and Restated Horizon Pledge and Security Agreement.

(b) Certificates.  The Initial Lender and any applicable Agent shall have received such customary certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of the Credit Parties as the Lenders may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with the Loan Documents;

(c) Organizational Documents.  The Initial Lender shall have received customary resolutions or evidence of corporate authorization, secretary's certificates and such other documents and certificates (including Organizational Documents and good standing certificates) as the Initial Lender may request relating to the organization, existence and good standing of each Credit Party and any other legal matters relating to the Credit Parties, the Loan Documents or the transactions contemplated thereby.

3

(d) <u>Opinion of Counsel to Credit Parties</u>.  The Initial Lender and the applicable Agent or Agents shall have received opinions of counsel (including opinions of counsel covering the creation and perfection, or the continuing creation and perfection, of the security interests on Collateral, consistent with the opinions delivered on the Closing Date, and including substantially similar opinions with respect to any Additional Collateral) to the Credit Parties that are acceptable to the Initial Lender, addressed to the Initial Lender and the applicable Agent or Agents and dated as of the Restatement Effective Date, in form and substance satisfactory to the Initial Lender and the applicable Agent (and the Parent hereby instructs such counsel to deliver such opinions to such Persons).

(e) <u>Expenses</u>.  The Borrower shall have paid all reasonable fees, expenses (including the reasonable fees and expenses of legal counsel) and other amounts due to the Initial Lender, the Administrative Agent and the Collateral Agent (to the extent that statements for such expenses shall have been delivered to the Borrower on or prior to the Restatement Effective Date); <u>provided</u> that such expenses payable by the Borrower may be offset against the proceeds of any Loans funded on the Restatement Effective Date.

(f) <u>Officer's Certificate</u>.  The Initial Lender shall have received a certificate executed by a Responsible Officer of the Parent and the Borrower confirming (i) that the representations and warranties contained in Section 3 of this Restatement Agreement are true and correct on and as of the Restatement Effective Date, (ii) that the information provided in the Loan Application Form submitted by the Borrower was true and correct on and as of the date of delivery thereof, (iii) the satisfaction of Sections 4(j) and (l) herein as of the Restatement Effective Date, (iv) the satisfaction of all other conditions precedent to the Restatement Effective Date described in this Section 4 and (v) that no Default or Event of Default exists or will result from the terms of this Restatement Agreement on the Restatement Effective Date.

(g) <u>Appraisals</u>.  The Initial Lender shall have received Appraisals of Additional Collateral satisfactory in form and substance and performed by an Eligible Appraiser dated as of a date no earlier than thirty (30) days prior to the Restatement Effective Date.

(h) <u>Consents and Authorizations</u>.  Each Credit Party shall have obtained all consents and authorizations from Governmental Authorities and all consents of other Persons (including shareholder approvals, if applicable) that are necessary or advisable in connection with this Restatement Agreement, any Loan Document, any of the transactions contemplated hereby or thereby or the continuing operations of the Credit Parties and each of the foregoing shall be in full force and effect and in form and substance satisfactory to the Initial Lender.

(i) <u>Lien Searches</u>.  The Initial Lender shall have received (i) UCC, Intellectual Property and other applicable lien searches, including tax and judgment liens searches, conducted in the jurisdictions and offices where such liens on material assets of the Credit Parties are required to be filed or recorded, in each case, as of the date that such lien searches were last conducted pursuant to the Loan and Guarantee Agreement and (ii) to the extent any Additional Collateral consists of (x) Aircraft and Engine Assets (as defined in the Pledge and Security Agreements), aircraft registry lien searches conducted with the FAA and the International Registry or (y) Spare Part Assets (as defined in the Pledge and Security Agreements), registry lien searches conducted with the FAA (with reference to each Designated

4

Spare Parts Location set forth on Schedule 2.1 of the Pledge and Security Agreements), in each case, reflecting the absence of Liens on the assets of the Credit Parties, other than Permitted Liens or Liens to be discharged on or prior to the Restatement Effective Date pursuant to documentation satisfactory to the Initial Lender.

(j) <u>Collateral Coverage Ratio</u>.  On the Restatement Effective Date (and after giving pro forma effect to any Borrowings on such date), the Collateral Coverage Ratio shall not be less than 2.0 to 1.0.

(k) <u>Solvency Certificate</u>.  The Initial Lender shall have received a certificate of the chief financial officer or treasurer (or other comparable officer) of the Parent certifying that the Borrower and its Subsidiaries (taken as a whole) are, and will be immediately after giving effect to the Restatement Agreement, Solvent.

(l) <u>No Material Adverse Effects</u>.  Since the Closing Date, (i) there has been no event or circumstance that, either individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect and (ii) none of the Credit Parties has made a Disposition (including any sale of Currency) of any assets of the type that would be included in the Collateral other than as would have been permitted under the Loan and Guarantee Agreement.

(m) <u>Audits</u>.  On the Restatement Effective Date, the opinion of the independent public accountants (after giving effect to any reissuance or revision of such opinion) on the most recent audited consolidated financial statements delivered by the Parent pursuant to Section 5.01(a) of the Loan and Guarantee Agreement shall not include a "going concern" qualification under GAAP as in effect on the date of this Restatement Agreement or, if there is a change in the relevant provisions of GAAP thereafter, any like qualification or exception under GAAP after giving effect to such change; and

(n) <u>Perfection Certificate</u>.  The Initial Lender and the Agents shall have received from each Credit Party hereto an amended and restated Perfection Certificate or supplement thereof, updated to include all Additional Collateral, signed on behalf of such Credit Party.  Notwithstanding anything herein to the contrary, delivery of an executed signature page of an amended and restated Perfection Certificate or supplement thereof by telecopy or other electronic means, or confirmation of the execution of an amended and restated Perfection Certificate or supplement thereof on behalf of a party by an email from an authorized signatory of such party shall be effective as delivery of a manually executed counterpart of an amended and restated Perfection Certificate or supplement thereof.

(o) <u>Perfection of Liens on Collateral</u>.  On or prior to the Restatement Effective Date, in connection with the execution of the Pledge and Security Agreements, the Perfection Requirement (as defined in the Pledge and Security Agreements) shall have been satisfied and all of the perfection steps thereunder shall have been completed, and copies or evidence, if available, of any relevant filings, recordings and other perfection documentation shall have been provided to the Initial Lender, the Administrative Agent and the Collateral Agent.

**Section 5.** <u>**Miscellaneous**</u>.

(a) <u>Fees</u>. The Borrower shall pay all fees required to be paid to the Administrative Agent, the Collateral Agent and the Lenders and all expenses (including fees and expenses of counsel) required to be paid to the Administrative Agent, Collateral Agent and the Lenders, in each case as required by and in accordance with the terms of the Loan and Guarantee Agreement, as they are due and payable in connection with this Restatement Agreement.

(b) <u>Continued Effectiveness</u>. Notwithstanding anything contained herein, the terms of this Restatement Agreement shall not constitute a novation or termination of the Existing Loan and Guarantee Agreement or any other Loan Documents and are not intended to and do not serve to effect a novation or termination of the obligations outstanding under the Existing Loan and Guarantee Agreement or instruments guaranteeing or securing the same, which instruments shall remain and continue in full force and effect.

(c) <u>Governing Law; Jurisdiction, Etc</u>. THIS RESTATEMENT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE FEDERAL LAW OF THE UNITED STATES IF AND TO THE EXTENT SUCH LAW IS APPLICABLE, AND OTHERWISE IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

(d) <u>**WAIVER OF JURY TRIAL**</u>. **TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH CREDIT PARTY AND EACH LENDER HEREBY UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY CIVIL LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

(e) <u>Entire Agreement</u>. This Restatement Agreement, the Loan and Guarantee Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. The Borrower and the Agents hereby designate this Restatement Agreement as a Loan Document.

(f) <u>Counterparts</u>. This Restatement Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Restatement Agreement by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(g) <u>Electronic Execution</u>. The words "execution," "signed," "signature," and words of like import in this Restatement Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the

New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h) <u>Successors and Assigns</u>. When this Restatement Agreement has been executed by the Parent, the Borrower, the Guarantors, the Agents and the Lenders party hereto, this Restatement Agreement shall thereafter be binding upon and inure to the benefit of the parties and their respective successors and assigns, in accordance with the terms of the Loan and Guarantee Agreement.

(i) <u>Severability</u>.  If any provision of this Restatement Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Restatement Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(j) <u>Headings</u>. The headings of this Restatement Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

(k) <u>Direction to Agents</u>. The Lenders party hereto hereby authorize and direct the Administrative Agent and the Collateral Agent to execute and deliver this Restatement Agreement.

(l) <u>Release by Credit Parties</u>. Each Credit Party hereto hereby acknowledges and agrees that it has no actual knowledge of any defenses or claims against any Lender, the Agents, any of their respective Affiliates or any of their respective officers, directors, employees, attorneys, representatives, predecessors, successors or assigns with respect to the Obligations, and that if such Credit Party now has, or ever did have, any defenses or claims with respect to the Obligations against any Lender, the Agents, any of the respective Affiliates or any of their respective officers, directors, employees, attorneys, representatives, predecessors, successors, or assigns, whether known or unknown, at law or in equity, from the beginning of the world through this date and through the time of effectiveness of this Restatement Agreement, all of them are hereby expressly **WAIVED**, and the Borrower hereby **RELEASES** each Lender, each Agent, their respective Affiliates and their respective officers, directors, employees, attorneys, representatives, predecessors, successors and assigns from any liability therefor.

(m) <u>No Liability of Agents</u>.  The Agents assume no responsibility for, and shall be entitled to rely on, without any obligation to ascertain or investigate, the correctness of the recitals and statements contained herein. The Agents shall not be liable or responsible in any manner whatsoever for, or in respect of, the validity or sufficiency of this Restatement Agreement.

**Section 6.**      <u>**Reaffirmation**</u>.

(a) Each Credit Party hereto hereby consents to the execution, delivery and performance of this Restatement Agreement and agrees that each reference to "the Loan and

Guarantee Agreement," "this Agreement," "hereunder," "hereof" or words of like import referring to the Loan and Guarantee Agreement in the Loan Documents shall, on and after the Restatement Effective Date, be deemed to be a reference to the Loan and Guarantee Agreement, as amended and restated by this Restatement Agreement.

(b) Each Credit Party hereto hereby reaffirms all of its respective obligations and liabilities under the Loan Documents to which it is a party, as such obligations and liabilities have been amended by this Restatement Agreement, and acknowledges and agrees that such obligations and liabilities remain in full force and effect.

(c) Each Credit Party hereto hereby irrevocably and unconditionally ratifies each Loan Document to which it is a party (as such Loan Documents are amended to and including the date hereof) and ratifies and reaffirms such Credit Party's guarantee and grant of liens and security interests under the Security Documents and confirms that the guarantees, liens and security interests granted thereunder continue to secure the Obligations, including, without limitation, any additional Obligations resulting from or incurred pursuant to the Loan and Guarantee Agreement.

**Section 7.      Post-Closing Matters**.

(a) Opinion of Crowe & Dunlevy.  The Initial Lender and the applicable Agent or Agents shall receive all opinions of Crowe & Dunlevy (including opinions covering the creation and perfection, or the continuing creation and perfection, of the security interests on Collateral, consistent with the opinions delivered by Crowe & Dunlevy on the Closing Date, and including substantially similar opinions with respect to any Additional Collateral), aviation counsel to the Credit Parties, that are acceptable to the Initial Lender, addressed to the Initial Lender and the applicable Agent or Agents and dated no later than two (2) Business Days after the Restatement Effective Date, in form and substance satisfactory to the Initial Lender and the applicable Agent (and the Parent hereby instructs Crowe & Dunlevy to deliver such opinions to such Persons).  Failure to comply with this Section 7(a) shall constitute a Default under the Loan and Guarantee Agreement.

[*Remainder of this page intentionally left blank.*]

8

IN WITNESS WHEREOF, the undersigned have caused this Restatement Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

ALASKA AIRLINES, INC., as Borrower

By:

Name: Nathaniel Pieper
Title: Senior Vice President Fleet,
Finance & Alliances, and Treasurer

ALASKA AIR GROUP, INC., as Parent and
    Guarantor

By: _____
    Name:  Nathaniel Pieper
    Title)  Treasurer

HORIZON AIR INDUSTRIES, INC., as
   Guarantor

By: _____
Name:  Nathaniel Pieper
Title:  Treasurer

UNITED STATES DEPARTMENT OF THE
TREASURY, as the Initial Lender and a Lender

By:

Name: Steven T. Mnuchin
Title: Secretary

[Signature Page to Restatement Agreement – Alaska Airlines]

THE BANK OF NEW YORK MELLON, as
Administrative Agent

By: _____

Name:  Bret S. Derman
Title:  Vice President

THE BANK OF NEW YORK MELLON, as
Collateral Agent

By: _____

Name:  Bret S. Derman
Title:
Vice President

[Signature Page to Restatement Agreement – Alaska]

Annex A

**<u>Form of Amended and Restated Loan and Guarantee Agreement</u>**

LOAN AND GUARANTEE AGREEMENT

dated as of

September 28, 2020,

and as amended and restated as of

October 30, 2020

among

ALASKA AIRLINES, INC., as Borrower,

the Guarantors party hereto from time to time,

THE UNITED STATES DEPARTMENT OF THE TREASURY,

and

THE BANK OF NEW YORK MELLON,

as Administrative Agent and Collateral Agent

TABLE OF CONTENTS

Page

ARTICLE I

DEFINITIONS

SECTION 1.01    Defined Terms ................................................................................................ 1
SECTION 1.02    Terms Generally ............................................................................................ 34
SECTION 1.03    Accounting Terms; Changes in GAAP .......................................................... 35
SECTION 1.04    Rates ............................................................................................................. 35
SECTION 1.05    Divisions ....................................................................................................... 35

ARTICLE II

COMMITMENTS AND BORROWINGS

SECTION 2.01    Commitments ................................................................................................ 35
SECTION 2.02    Loans and Borrowings .................................................................................. 35
SECTION 2.03    Borrowing Requests ..................................................................................... 36
SECTION 2.04    [Reserved] ..................................................................................................... 36
SECTION 2.05    [Reserved] ..................................................................................................... 36
SECTION 2.06    Prepayments .................................................................................................. 36
SECTION 2.07    Reduction and Termination of Commitments ............................................... 38
SECTION 2.08    Repayment of Loans ...................................................................................... 38
SECTION 2.09    Interest ........................................................................................................... 38
SECTION 2.10    Benchmark Replacement Setting ................................................................... 39
SECTION 2.11    Evidence of Debt ........................................................................................... 40
SECTION 2.12    Payments Generally ....................................................................................... 40
SECTION 2.13    Sharing of Payments ..................................................................................... 41
SECTION 2.14    Compensation for Losses .............................................................................. 42
SECTION 2.15    Increased Costs .............................................................................................. 42
SECTION 2.16    Taxes ............................................................................................................. 43
SECTION 2.17    [Reserved] ..................................................................................................... 46
SECTION 2.18    [Reserved] ..................................................................................................... 46
SECTION 2.19    Mitigation Obligations; Replacement of Lenders ........................................ 46

ARTICLE III

REPRESENTATIONS AND WARRANTIES

SECTION 3.01    Existence, Qualification and Power ............................................................... 47
SECTION 3.02    Authorization; No Contravention .................................................................. 48
SECTION 3.03    Governmental Authorization; Other Consents .............................................. 48
SECTION 3.04    Execution and Delivery; Binding Effect ....................................................... 48
SECTION 3.05    Financial Statements; No Material Adverse Change ..................................... 48
SECTION 3.06    Litigation ....................................................................................................... 48
SECTION 3.07    Contractual Obligations; No Default ............................................................. 48
SECTION 3.08    Property ......................................................................................................... 49
SECTION 3.09    Taxes ............................................................................................................. 49

i

SECTION 3.10    Disclosure ........................................................................................... 49
SECTION 3.11    Compliance with Laws ......................................................................... 49
SECTION 3.12    ERISA Compliance .............................................................................. 50
SECTION 3.13    Environmental Matters ........................................................................ 50
SECTION 3.14    Investment Company Act ..................................................................... 51
SECTION 3.15    Sanctions; Export Controls; Anti-Corruption; AML Laws ................. 51
SECTION 3.16    Solvency ............................................................................................... 51
SECTION 3.17    Subsidiaries ......................................................................................... 51
SECTION 3.18    Senior Indebtedness ............................................................................ 51
SECTION 3.19    Insurance Matters ................................................................................ 51
SECTION 3.20    Labor Matters ...................................................................................... 51
SECTION 3.21    Insolvency Proceedings ....................................................................... 52
SECTION 3.22    Margin Regulations ............................................................................. 52
SECTION 3.23    Liens .................................................................................................... 52
SECTION 3.24    Perfected Security Interests ................................................................ 52
SECTION 3.25    US Citizenship ..................................................................................... 52
SECTION 3.26    Air Carrier Status ................................................................................ 52
SECTION 3.27    Cybersecurity ....................................................................................... 52
SECTION 3.28    Loyalty Program Agreements .............................................................. 53

ARTICLE IV

CONDITIONS

SECTION 4.01    Closing Date and Initial Borrowing ..................................................... 53
SECTION 4.02    Each Borrowing .................................................................................... 55

ARTICLE V

AFFIRMATIVE COVENANTS

SECTION 5.01    Financial Statements ............................................................................ 56
SECTION 5.02    Certificates; Other Information ........................................................... 57
SECTION 5.03    Notices ................................................................................................. 59
SECTION 5.04    Preservation of Existence, Etc. ........................................................... 59
SECTION 5.05    Maintenance of Properties ................................................................... 59
SECTION 5.06    Maintenance of Insurance .................................................................... 60
SECTION 5.07    Payment of Obligations ....................................................................... 60
SECTION 5.08    Compliance with Laws ......................................................................... 60
SECTION 5.09    Environmental Matters ........................................................................ 60
SECTION 5.10    Books and Records ............................................................................... 60
SECTION 5.11    Inspection Rights ................................................................................. 60
SECTION 5.12    Sanctions; Export Controls; Anti-Corruption Laws and AML Laws ...... 61
SECTION 5.13    Guarantors; Additional Collateral ....................................................... 61
SECTION 5.14    Post-Closing Matters ........................................................................... 62
SECTION 5.15    Further Assurances ............................................................................... 62
SECTION 5.16    Delivery of Appraisals ......................................................................... 62
SECTION 5.17    Ratings ................................................................................................. 62
SECTION 5.18    Regulatory Matters .............................................................................. 62
SECTION 5.19    Loyalty Programs; Loyalty Program Agreements ............................... 63
SECTION 5.20    Collections; Accounts; Payments ........................................................ 63

ii

# ARTICLE VI

## NEGATIVE COVENANTS

SECTION 6.01    [Reserved] ................................................................................................ 64
SECTION 6.02    Liens ....................................................................................................... 64
SECTION 6.03    Fundamental Changes .............................................................................. 64
SECTION 6.04    Dispositions ............................................................................................ 65
SECTION 6.05    Restricted Payments ................................................................................ 66
SECTION 6.06    Investments ............................................................................................. 67
SECTION 6.07    Transactions with Affiliates ..................................................................... 69
SECTION 6.08    [Reserved] ............................................................................................... 69
SECTION 6.09    [Reserved] ............................................................................................... 69
SECTION 6.10    Changes in Nature of Business ................................................................ 69
SECTION 6.11    Sanctions; AML Laws ............................................................................. 69
SECTION 6.12    Amendments to Organizational Documents .............................................. 69
SECTION 6.13    [Reserved] ............................................................................................... 70
SECTION 6.14    Prepayments of Junior Indebtedness ........................................................ 70
SECTION 6.15    Lobbying ................................................................................................. 70
SECTION 6.16    Use of Proceeds ....................................................................................... 70
SECTION 6.17    Financial Covenants ................................................................................ 70

# ARTICLE VII

## EVENTS OF DEFAULT

SECTION 7.01    Events of Default ..................................................................................... 72
SECTION 7.02    Application of Payments .......................................................................... 75

# ARTICLE VIII

## AGENCY

SECTION 8.01    Appointment and Authority ...................................................................... 76
SECTION 8.02    Collateral Matters. .................................................................................. 76
SECTION 8.03    Removal or Resignation of Administrative Agent ..................................... 76
SECTION 8.04    Exculpatory Provisions ............................................................................ 77
SECTION 8.05    Reliance by Agent ................................................................................... 79
SECTION 8.06    Delegation of Duties ................................................................................ 79
SECTION 8.07    Non-Reliance on Agents and Other Lenders ............................................. 79
SECTION 8.08    Administrative Agent May File Proofs of Claim ....................................... 79

# ARTICLE IX

## GUARANTEE

SECTION 9.01    Guarantee of the Obligations ................................................................... 80
SECTION 9.02    Payment or Performance by a Guarantor ................................................. 80
SECTION 9.03    Liability of Guarantors Absolute ............................................................. 80
SECTION 9.04    Waivers by Guarantors ............................................................................ 82
SECTION 9.05    Guarantors' Rights of Subrogation, Contribution, etc. .............................. 82

Motion for TRO Ex. 9 Page 107

SECTION 9.06    Subordination ........................................................................................ 82
SECTION 9.07    Continuing Guarantee ........................................................................... 83
SECTION 9.08    Financial Condition of the Borrower ...................................................... 83
SECTION 9.09    Reinstatement ....................................................................................... 83
SECTION 9.10    Discharge of Guarantees ........................................................................ 83

ARTICLE X

CARES ACT REQUIREMENTS

SECTION 10.01    CARES Act Compliance ...................................................................... 83
SECTION 10.02    Dividends and Buybacks ..................................................................... 83
SECTION 10.03    Maintenance of Employment Levels ................................................... 84
SECTION 10.04    United States Business ......................................................................... 84
SECTION 10.05    Limitations on Certain Compensation ................................................ 84
SECTION 10.06    Continuation of Certain Air Service .................................................... 85
SECTION 10.07    Treasury Access .................................................................................. 85
SECTION 10.08    Additional Defined Terms ................................................................... 85

ARTICLE XI

MISCELLANEOUS

SECTION 11.01    Notices; Public Information................................................................. 86
SECTION 11.02    Waivers; Amendments ........................................................................ 88
SECTION 11.03    Expenses; Indemnity; Damage Waiver ............................................... 89
SECTION 11.04    Successors and Assigns ....................................................................... 91
SECTION 11.05    Survival................................................................................................ 93
SECTION 11.06    Counterparts; Integration; Effectiveness; Electronic Execution............ 94
SECTION 11.07    Severability.......................................................................................... 94
SECTION 11.08    Right of Setoff ..................................................................................... 94
SECTION 11.09    Governing Law; Jurisdiction; Etc........................................................ 95
SECTION 11.10    Waiver of Jury Trial ........................................................................... 95
SECTION 11.11    Headings.............................................................................................. 95
SECTION 11.12    Treatment of Certain Information; Confidentiality ............................. 95
SECTION 11.13    Money Laundering; Sanctions ............................................................ 96
SECTION 11.14    Interest Rate Limitation ...................................................................... 96
SECTION 11.15    Payments Set Aside ............................................................................ 96
SECTION 11.16    No Advisory or Fiduciary Responsibility............................................ 96
SECTION 11.17    Acknowledgement and Consent to Bail-In of EEA Financial Institutions............... 97

SCHEDULES

| | | |
|---|---|---|
| SCHEDULE 1.01(a) | - | Carrier Loyalty Programs |
| SCHEDULE 1.01(b) | - | Loyalty Program Agreements |
| SCHEDULE 1.01(c) | - | Loyalty Subscription Programs |
| SCHEDULE 3.05 | - | Financial Statements |
| SCHEDULE 3.17 | - | Subsidiaries |
| SCHEDULE 5.14 | - | Post-Closing Matters |
| SCHEDULE 6.05(i) | - | Restricted Payments |
| SCHEDULE 6.06 | - | Investments |
| SCHEDULE 6.07 | - | Affiliate Transactions |

EXHIBITS

| | | |
|---|---|---|
| EXHIBIT A | - | Assignment and Assumption |
| EXHIBIT B-1 | - | Form of U.S. Tax Compliance Certificate |
| EXHIBIT B-2 | - | Form of U.S. Tax Compliance Certificate |
| EXHIBIT B-3 | - | Form of U.S. Tax Compliance Certificate |
| EXHIBIT B-4 | - | Form of U.S. Tax Compliance Certificate |
| EXHIBIT C | - | Form of Note |
| EXHIBIT D | - | Form of Direct Agreement |
| EXHIBIT E | - | Form of Borrowing Request |

Motion for TRO Ex. 9 Page 109

1

LOAN AND GUARANTEE AGREEMENT dated as of September 28, 2020 (as amended and restated by the Restatement Agreement, this "Agreement"), among ALASKA AIRLINES, INC., a corporation organized under the laws of the State of Alaska (the "Borrower"), ALASKA AIR GROUP, INC., a corporation organized under the laws of the State of Delaware (the "Parent"), the Guarantors party hereto from time to time, the UNITED STATES DEPARTMENT OF THE TREASURY ("Treasury") and THE BANK OF NEW YORK MELLON as Administrative Agent and Collateral Agent.

WHEREAS, the Borrower has requested that the Initial Lender (as defined below) extend credit as is permissible under the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136 (Mar. 27, 2020), as the same may be amended form time to time (the "CARES Act") to the Borrower, and the Initial Lender is willing to do so on the terms and conditions set forth herein; and

WHEREAS, pursuant to Section 4003(h)(1) of the CARES Act, for purposes of the Code (as defined below) the Loans (as defined below) shall be treated as indebtedness and as having been issued for their aggregate stated principal amount, and the interest payable pursuant to Section 2.09(a) shall be treated as qualified stated interest.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01 Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABL Agreement" means that certain credit agreement dated as of March 31, 2010 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among the Borrower, the lenders party thereto and Wells Fargo Capital Finance, LLC as agent.

"Additional Collateral" shall mean (a) cash and Cash Equivalents pledged to the Collateral Agent for the benefit of the Secured Parties under the Security Documents (and subject to an account control agreement in form and substance satisfactory to the Appropriate Party), (b) airframes, aircraft, engines and Spare Parts, registered, habitually located, or located in a designated location, respectively, in the United States and that are eligible for the benefits of Section 1110 of the Bankruptcy Code, 11 U.S.C. § 1110 or otherwise acceptable to the Required Lenders (provided that any airframe must be less than 20 years old at the time of its designation as Additional Collateral), (c) Route Authorities for routes with at least one end point located in the United States and all Slots and Gate Leaseholds related from time to time thereto or otherwise acceptable to the Required Lenders, (d) real property, (e) ground support equipment, (f) flight simulators and (g) any other assets acceptable to the Required Lenders, and all of which assets shall (i) (other than Additional Collateral of the type described in clause (a)) be valued by a new Appraisal at the time the Parent designates such assets as Additional Collateral, (ii) as of any date of addition of such assets as Collateral, be subject, to the extent purported to be created by the applicable Security Document, to a perfected first priority Lien and/or mortgage (or comparable Lien), in favor of the Collateral Agent for the benefit of the Secured Parties and otherwise subject only to Permitted Liens (excluding those referred to in clause (4) of the definition of "Permitted Lien"), (iii) pledged to the Collateral Agent for the benefit of the Secured Parties pursuant to security agreement(s) or mortgage(s), as applicable, in a form satisfactory to the Appropriate Party and (iv) at the time of their designation as Additional Collateral, be accompanied by a legal opinion in form satisfactory to the Appropriate Party; provided that, in accordance with Section 8.06, the Collateral Agent may designate a sub-agent to accept the security interest in any Additional Collateral for the benefit of the Secured Parties; provided further that, with respect to Additional Collateral of the type

described in clauses (c), (d) and (g), the Borrower agrees to notify the Collateral Agent as promptly as practicable of any new categories of assets which are expected to be designated as Additional Collateral or any new jurisdictions in which any asset is to be secured or located; provided further that, with respect to Additional Collateral of the type described in clause (d), (e) or (f), (i) such assets are acceptable to the Required Lenders, (ii) the Borrower shall have delivered Appraisals acceptable in form and substance to the Required Lenders with respect to such assets, (iii) such assets are subject to a loan to value framework acceptable to the Required Lenders, (iv) such assets are pledged pursuant to documentation acceptable in form and substance to the Required Lenders and (v) the benefits of pledging such assets outweigh the associated cost, burden, difficulty or other consequences, as determined by the Required Lenders in their sole discretion.

"Adjusted LIBO Rate" means, as to any Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period divided by (b) one minus the Eurodollar Reserve Percentage.

"Administrative Account" means the account opened with the Administrative Agent in the name of the Initial Lender as notified to the Borrower and the Initial Lender, or such other account as the Administrative Agent shall advise the Borrower and each Lender from time to time.

"Administrative Agency Fee Letter" means any fee letter entered into between the Borrower, the Administrative Agent and the Collateral Agent, or with any successor administrative agent or collateral agent, in its capacity as administrative agent and in its capacity as collateral agent under any of the Loan Documents.

"Administrative Agent" means The Bank of New York Mellon, in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by or otherwise acceptable to the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means any Person that directly or indirectly controls, is controlled by, or is under common control with, any other Person.  For purposes of this definition, "control" of a Person shall mean having the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by ownership of voting equity, by contract, or otherwise.

"Agent Parties" has the meaning specified in Section 11.01(d)(ii).

"Agent Responsible Officer" means, when used with respect to an Agent, any vice president, assistant vice president, assistant treasurer or trust officer in the corporate trust and agency administration of the Agent or any other officer of the Agent customarily performing functions similar to those performed by any of the above-designated officers, and, in each case, who shall have direct responsibility for the administration of this Agreement and also means, with respect to a particular agency matter, any other officer to whom such matter is referred because of his or her knowledge of and familiarity with the particular subject.

"Agents" means any of the Administrative Agent and the Collateral Agent.

"Agreement" has the meaning specified in introductory paragraph hereof.

"Air Carrier" has the meaning such term has under Section 40102 of Title 49, United States Code.

"Alternate Base Rate" means, for any day, a rate per annum equal to the highest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 0.50% and (c) the Adjusted LIBO Rate for a one-month term in effect on such day (taking into account any LIBO Rate floor under the definition of "Adjusted LIBO Rate") plus 1.00%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or such Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or such Adjusted LIBO Rate, respectively.

"AML Laws" means (a) the USA Patriot Act of 2001 (Pub. L. No. 107-56), (b) the U.S. Money Laundering Control Act of 1986, as amended, (c) the Bank Secrecy Act, 31 U.S.C. sections 5301 et seq., (d) Laundering of Monetary Instruments, 18 U.S.C. section 1956, (e) Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, 18 U.S.C. section 1957, (f) the Financial Recordkeeping and Reporting of Currency and Foreign Transactions Regulations (Title 31 Part 103 of the US Code of Federal Regulations), or (g) any other applicable money laundering or financial recordkeeping Laws.

"Amortization Date" means the date that is four (4) years and six (6) months after the Closing Date (except that, if such date is not a Business Day, the Amortization Date shall be the preceding Business Day); provided that to the extent either (x) any Material Loyalty Program Agreement (other than Material Loyalty Program Agreements that have been replaced as permitted under this Agreement) or (y) Loyalty Program Agreements representing 90% of Loyalty Program Revenues (excluding revenues generated under any Loyalty Subscription Program) in the aggregate over the immediately preceding twelve (12) calendar month period then ended, in each case, expires prior to the date that is six (6) months after the date that is four (4) years and six (6) months after the Closing Date, the Amortization Date shall be the date that is six (6) months prior to the earliest such expiration date.

"Applicable Law" means, as to any Person, all applicable Laws binding upon such Person or to which such a Person is subject.

"Applicable Percentage" means, with respect to any Lender, the percentage of the total Outstanding Amount of Loans of all Lenders represented by the aggregate Outstanding Amount of Loans of such Lender at such time.

"Applicable Rate" means 2.50%.

"Appraisal" means any appraisal specifying a value in Dollars (and not a range of values), dated as of the delivery thereof, prepared by an Eligible Appraiser that certifies, at the time of determination, in reasonable detail the Appraised Value of Eligible Collateral; provided that any methodology, form of presentation and all assumptions must be acceptable to the Appropriate Party; provided further that the methodology, form of presentation and assumptions in the Appraisal delivered on the Closing Date pursuant to Section 4.01(i) shall be satisfactory for any subsequent Appraisal with respect to the same category and specific type of Eligible Collateral, except that, for the avoidance of doubt, if any Appraisal provided one Appraised Value for a combination of items of Eligible Collateral and any item is later removed from the combination, any subsequent Appraisal shall either provide the Appraised Value of each item separately or, in the case where the item removed from the combination of Eligible Collateral cannot be appraised individually, the Appraised Value of the remaining combination of Eligible Collateral shall be zero until the next Appraisal conducted after the removed item has been restored to such combination.

"Appraised Value" means, as of any date, (a) the specific value in Dollars (and not a range of values) of any property constituting Eligible Collateral (other than cash and Cash Equivalents) as

reflected in the most recent Appraisal, (b) with respect to any cash pledged or being pledged at such time as Collateral, 160% of the face amount and (c) with respect to any Cash Equivalents pledged or being pledged at such time as Collateral, 100% of the fair market value thereof as determined by the Parent in accordance with customary financial market practices determined no earlier than 45 days prior to such date; provided that (i) if no Appraisal relating to such Eligible Collateral has been delivered to the Collateral Agent prior to such date, the Appraised Value of such Eligible Collateral shall be deemed to be zero and (ii) in the case of any such property consisting of ground support equipment, the Appraised Value shall be deemed to be 50% of the value set forth in the most recent Appraisal.

"Appropriate Party" means (i) while the Initial Lender holds any Commitment or Loan, the Initial Lender and (ii) if the Initial Lender is no longer a Lender, the Administrative Agent (acting at the direction of the Required Lenders).

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.04), and accepted by the Administrative Agent, in substantially the form of Exhibit A or any other form approved by the Administrative Agent.

"Attributable Indebtedness" means, as of any date of determination, (a) in respect of any Capitalized Lease Obligations of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (d) of Section 2.10.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by an applicable Resolution Authority in respect of any liability of any Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing Law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Benchmark" means, initially, USD LIBO Rate; provided that if a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have occurred with respect to USD LIBO Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.10(a).

"Benchmark Replacement" means, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Required Lenders for the applicable Benchmark Replacement Date:

(1)   the sum of: (a) Term SOFR and (b) the related Benchmark Replacement Adjustment;

(2)   the sum of: (a) Daily Simple SOFR and (b) the related Benchmark Replacement Adjustment;

(3)   the sum of: (a) the alternate benchmark rate that has been selected by (y) so long as the Initial Lender is a Lender, the Initial Lender and (z) otherwise, the Required Lenders and the Borrower, in each case, as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for U.S. dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment;

provided that, in the case of clause (1), such Unadjusted Benchmark Replacement is displayed on a screen or other information service that publishes such rate from time to time as selected by the Required Lenders in their reasonable discretion and such screen is administratively acceptable as determined by the Administrative Agent in its reasonable discretion. If the Benchmark Replacement as determined pursuant to clause (1), (2) or (3) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents; provided further that any such Benchmark Replacement shall be administratively feasible as determined by the Administrative Agent in its reasonable discretion.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then- current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement:

(1)   for purposes of clauses (1) and (2) of the definition of "Benchmark Replacement," the first alternative set forth in the order below that can be determined by the Required Lenders:

(a)   the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Interest Period that has been selected or recommended by the Relevant Governmental Body for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for the applicable Corresponding Tenor;

(b)   the spread adjustment (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Interest Period that would apply to the fallback rate for a derivative transaction referencing the ISDA Definitions to be effective upon an index cessation event with respect to such Benchmark for the applicable Corresponding Tenor; and

(2)   for purposes of clause (3) of the definition of "Benchmark Replacement," the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by (y) so long as the Initial Lender is a Lender, the Initial Lender and (z) otherwise, the Required Lenders and the Borrower, in each case, for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement

Date or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. dollar- denominated syndicated credit facilities;

provided that, in the case of clause (1) above, such adjustment is displayed on a screen or other information service that publishes such Benchmark Replacement Adjustment from time to time as selected by the Required Lenders in their reasonable discretion and such screen is administratively acceptable as determined by the Administrative Agent in its reasonable discretion; provided that, any such Benchmark Replacement Adjustment shall be administratively feasible as determined by the Administrative Agent in its reasonable discretion.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent (after consultation with the Required Lenders) decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent (after consultation with the Required Lenders) decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent (after consultation with the Required Lenders) determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent (after consultation with the Required Lenders) decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).  The Required Lenders shall cooperate in good faith with the Administrative Agent so that the Administrative Agent may determine such Benchmark Replacement Conforming Changes.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(1) in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof);

(2) in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein; or

(3) in the case of an Early Opt-in Election, (y) so long as the Initial Lender is a Lender, the sixth (6th) Business Day after the date notice of such Early Opt-in Election is provided to the Administrative Agent and (z) otherwise, the sixth (6th) Business Day after the date notice of such Early Opt-in Election is provided to the Administrative Agent, so long as the Administrative Agent has not received, by 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, written notice of objection to such Early Opt-in Election from Lenders comprising the Required Lenders.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1)

or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1)   a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2)   a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3)   a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.10 and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.10.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Blocked Account" means a deposit account in the name of a Credit Party noted as a Blocked Account on Schedule 2.1 (as supplemented from time to time) of the Pledge and Security Agreements that is, or is otherwise required under the terms thereof to be, subject to an agreement, in form and substance satisfactory to the Appropriate Party, establishing Control (as defined in the Pledge and Security Agreements) of such account by the Collateral Agent, and any replacement account thereof.

"Borrower" has the meaning specified in introductory paragraph hereof.

"Borrower Materials" has the meaning specified in Section 11.01(e).

"Borrowing" means a borrowing of Loans.

"Borrowing Request" means a request for a Borrowing in substantially the form of Exhibit E or any other form approved by the Administrative Agent.

"Business Day" means any day on which Treasury and the Federal Reserve Bank of New York are both open for business that is not a Saturday, Sunday or other day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions in such state are authorized or required by Law to close; provided that, when used in connection with a Loan, the term "Business Day" means any such day that is also a day on which dealings in Dollar deposits are conducted by and between banks in the London interbank market.

"Capital Markets Offering" means any offering of "securities" (as defined under the Securities Act and, including, for the avoidance of doubt, any offering of pass-through certificates by any pass-through trust established by the Parent or any of its Subsidiaries) in (a) a public offering registered under the Securities Act, or (b) an offering not required to be registered under the Securities Act (including, without limitation, a private placement under Section 4(a)(2) of the Securities Act, an exempt offering pursuant to Rule 144A and/or Regulation S of the Securities Act and an offering of exempt securities).

"Capitalized Lease Obligations" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP; provided that all leases of such Person that are or would have been treated as operating leases for purposes of GAAP prior to the issuance of the ASU shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations for purposes of this Agreement (whether or not such operating lease obligations were in effect on such date) notwithstanding the fact that such obligations are required in accordance with the ASU (on a prospective or retroactive basis or otherwise) to be treated as capitalized lease obligations for other purposes.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP as in effect on the Closing Date, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP; provided, further, that all leases of such Person that are or would have been treated as operating leases for purposes of GAAP prior to the issuance of the ASU shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations for purposes of this Agreement (whether or not such operating lease obligations were in effect on such date) notwithstanding the fact that such obligations are required in accordance with the ASU (on a prospective or retroactive basis or otherwise) to be treated as capitalized lease obligations for other purposes.

"CARES Act" has the meaning specified in the preamble to this Agreement.

"Carrier Loyalty Programs" means the Loyalty Programs listed on Schedule 1.01(a) and any other Loyalty Program that is operated under a Trademark owned by any Credit Party, or that is

otherwise operated, owned or controlled, directly or indirectly by, or principally associated with, any Credit Party or any of its Affiliates, as such program may be in effect from time to time, in each case whether now existing or established, arising or acquired in the future and including any successor program of such program.  The term "Carrier Loyalty Program" shall include the provision, operation and promotion of such program.

"Cash Equivalents" means:

(a)  direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)  investments in commercial paper maturing within one year from the date of acquisition thereof and having, at such date of acquisition, a rating of at least A-2 from S&P or at least P-2 from Moody's;

(c)  investments in certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $250,000,000;

(d)  money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA and Aaa (or equivalent rating) by at least two Credit Rating Agencies and (iii) have portfolio assets of at least $5,000,000,000;

(e)  deposits available for withdrawal on demand with commercial banks organized in the United States having capital and surplus in excess of $100,000,000; and

(f)  other short-term liquid investments held by the Parent and the Subsidiaries as of the Closing Date in accordance with their normal investment policies and practices for cash management.

"CCR Certificate" has the meaning specified in Section 6.17(b).

"CCR Certificate Delivery Date" has the meaning specified in Section 6.17(b).

"CCR Reference Date" has the meaning specified in Section 6.17(b).

"CFC" means a controlled foreign corporation within the meaning of Section 957 of the Code.

"CFC Holdco" means any Domestic Subsidiary that has no material assets other than Equity Interests of one or more Foreign Subsidiaries that are CFCs.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee

on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means the occurrence of any of the following: (a) the sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Borrower and its Subsidiaries, or if the Borrower is a direct or indirect Subsidiary of the Parent, the Parent and its Subsidiaries, taken as a whole to any Person (including any "person" (as that term is used in Section 13(d)(3) of the Exchange Act)); (b) the consummation of any transaction (including, without limitation, any merger or consolidation), the result of which is that any Person (including any "person" (as defined above)) becomes the Beneficial Owner, directly or indirectly, of more than 50% of the Voting Stock of the Borrower or the Parent, as applicable, (measured by voting power rather than number of shares), other than (i) any such transaction where the Voting Stock of the Borrower or the Parent, as applicable, (measured by voting power rather than number of shares) outstanding immediately prior to such transaction constitutes or is converted into or exchanged for at least a majority of the outstanding shares of the Voting Stock of such Beneficial Owner (measured by voting power rather than number of shares), or (ii) the consummation of any merger or consolidation of the Borrower or the Parent, as applicable, with or into any Person (including any "person" (as defined above)) which owns or operates (directly or indirectly through a contractual arrangement) a Permitted Business (a "Permitted Person") or a Subsidiary of a Permitted Person, in each case, if immediately after such transaction no Person (including any "person" (as defined above)) is the Beneficial Owner, directly or indirectly, of more than 50% of the total Voting Stock of such Permitted Person (measured by voting power rather than number of shares); (c) if the Borrower is a direct or indirect Subsidiary of the Parent, the Parent ceasing to own, directly or indirectly, 100% of the Equity Interests of the Borrower; (d) the adoption of a plan relating to the liquidation or dissolution of the Borrower or the Parent or (e) the occurrence of a "change of control", "change in control" or similar event under any Material Indebtedness of the Borrower, the Parent or any parent entity of the foregoing.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied.

"Closing Date Commitment" means the commitment of the Initial Lender on the Closing Date to make Loans in the amount of $1,301,000,000, as such commitment may be reduced or terminated pursuant to Section 2.07.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" has the meaning assigned to such term in the Pledge and Security Agreements.

"Collateral Account" means any of the Collection Account, the Blocked Account, the Payment Account and the Collateral Proceeds Account.

"Collateral Agent" means The Bank of New York Mellon, in its capacity as collateral agent under any of the Loan Documents, or any successor collateral agent.

"Collateral Cash Flow" means the funds that are deposited into a Collateral Account pursuant to the Direct Agreements or directly by a Credit Party.

"Collateral Coverage Ratio" means, as of any date of determination, the ratio of (i) the Appraised Value of the Eligible Collateral as of the date of the Appraisal most recently delivered pursuant to Section 5.16 (or in the case of cash and Cash Equivalents, as of such date of determination) to (ii) the aggregate principal amount of all Loans and Commitments outstanding as of such date; provided that for the purposes of calculating clause (i) above, (x) no more than 25% of the Appraised Value of the Eligible

Collateral may correspond to ground support equipment and (y) any amounts held in the Blocked Account, Payment Account and Collateral Proceeds Account shall not be included; provided further that for the purposes of calculating clause (i) above, Loyalty Program Assets (other than any Loyalty Subscription Program) shall not be included unless (x) each Material Loyalty Program Agreement has and (y) Loyalty Program Agreements representing 90% of Loyalty Program Revenues (excluding revenues generated under any Loyalty Subscription Program) in the aggregate over the immediately preceding twelve (12) calendar month period then ended have, in each case, an expiration date that is at least six (6) months after the Maturity Date.

"Collateral Proceeds Account" means a deposit account in the name of the Borrower that is subject to an agreement in form and substance satisfactory to the Appropriate Party establishing Control (as defined in the Pledge and Security Agreements) of such account by the Collateral Agent.

"Collection Account" means that certain concentration account at Bank of America, N.A. in the name of a Credit Party, and any replacement account, which, in each case, must be a segregated deposit account and subject at all times to an account control agreement in form and substance satisfactory to the Appropriate Party.

"Commitment" means the commitment of the Initial Lender to make Loans in the amount of $1,928,000,000 (which, for the avoidance of doubt, is an increase of the Closing Date Commitment by $627,000,000, pursuant to that certain Restatement Agreement), as such commitment may be reduced or terminated pursuant to Section 2.07.

"Communications" has the meaning specified in Section 11.01(d)(ii).

"Competitor" means (i) any Person operating an Air Carrier or a commercial passenger air carrier business and (ii) any Affiliate of any Person described in clause (i) (other than any Affiliate of such Person as a result of common control by a Governmental Authority or instrumentality thereof and any Affiliate of such Person under common control with such Person which Affiliate is not actively involved in the management and/or operations of such Person).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Contingent Payment Event" means any indemnity, termination payment or liquidated damages under a Loyalty Program Agreement.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings analogous thereto.

"Convertible Indebtedness" means Indebtedness of the Parent that is convertible into common Equity Interests of the Parent (and cash in lieu of fractional shares) and/or cash (in an amount determined by reference to the price of such common Equity Interests).

"Corresponding Tenor" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Credit Parties" means the Borrower and the Guarantors.

"Credit Rating" means a rating as determined by a Credit Rating Agency of the Parent's non-credit-enhanced, senior unsecured long-term indebtedness.

"Credit Rating Agency" means a nationally recognized credit rating agency that evaluates the financial condition of issuers of debt instruments and then assigns a rating that reflects its assessment of the issuer's ability to make debt payments.

"Currency" means miles, points or other units that are a medium of exchange constituting a convertible, virtual and private currency that is tradable property and that can be sold or issued to Persons.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Required Lenders in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Required Lenders may establish another convention in its reasonable discretion, subject to the determination by the Administrative Agent of the administrative feasibility of such convention.

"Debt Service Amount" means, as of any DSCR Determination Date or any other date of determination, the sum of all accrued interest on the Loans and any other Indebtedness secured by Liens on the Collateral in respect of the most recently ended DSCR Test Period.

"Debt Service Coverage Ratio" means, as of any DSCR Determination Date or any other date of determination, the ratio of (a) the aggregate amount of Collateral Cash Flow received during the relevant DSCR Test Period that has been deposited into a Collateral Account (and for the avoidance of doubt, excluding any amounts on deposit in a Collateral Account in respect of prior periods) to (b) the Debt Service Amount for such DSCR Test Period; provided, however, that for (i) the first calendar quarter ending after the Closing Date, such ratio shall be calculated for the one calendar quarter ending on such date, (ii) the second calendar quarter ending after the Closing Date, such ratio shall be calculated for the two calendar quarters ending on such date and (iii) the third calendar quarter ending after the Closing Date, such ratio shall be calculated for the three calendar quarters ending on such date.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate (before as well as after judgment) equal to the applicable interest rate plus 2.00% per annum.

"Direct Agreements" means those certain Loyalty Partner Direct Agreements entered into by and among the applicable Credit Party, the Collateral Agent, the Initial Lender and the applicable counterparty to the Material Loyalty Program Agreements, substantially in the form of Exhibit D hereto.

"Disposition" or "Dispose" means the sale, transfer (including through a plan of division), license, lease or other disposition of any property by any Person (including (i) any sale and leaseback transaction, any issuance of Equity Interests by a Subsidiary of such Person, (ii) with respect to Intellectual Property, any covenant not to sue, release, abandonment, lapse, forfeiture, dedication to the public or other

similar disposition of Intellectual Property and (iii) with respect to any Personal Data, any deletion, de-identification, purging or other similar disposition of Personal Data), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"<u>Disqualified Equity Interest</u>" means any Equity Interest that, by its terms (or the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Equity Interests that are not Disqualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof, in whole or in part, (c) provides for scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Maturity Date; <u>provided</u> that if such Equity Interests are issued pursuant to a plan for the benefit of employees of the Parent or any Subsidiary or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Parent or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"<u>Dollar</u>" and "<u>$</u>" mean lawful money of the United States.

"<u>Domestic Subsidiary</u>" means any Subsidiary that is organized under the Laws of the United States of America, any state thereof, or the District of Columbia.

"<u>DOT</u>" means the U.S. Department of Transportation.

"<u>DSCR Determination Date</u>" means the fifth Business Day following the last day of each March, June, September and December (beginning with December 2020).

"<u>DSCR Test Period</u>" means, at any DSCR Determination Date or other date of determination, the period of twelve (12) calendar months ending on the last day of the calendar month ending immediately prior to such date.

"<u>DSCR Trigger Event</u>" has the meaning specified in Section 6.17(c)(ii).

"<u>Early Opt-in Election</u>" means, if the then-current Benchmark is USD LIBO Rate, the occurrence of:

(a)      (x) so long as the Initial Lender is a Lender, the Initial Lender and (y) otherwise, the Required Lenders, in each case notifying to the Administrative Agent that the Initial Lender or the Required Lenders have determined that at least five currently outstanding U.S. dollar-denominated syndicated credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such syndicated credit facilities are identified in such notice and are publicly available for review), and

(b)      (x) so long as the Initial Lender is a Lender, the election by the Initial Lender and (y) otherwise, the joint election by the Required Lenders and the Borrower to trigger a fallback from USD LIBO Rate and, in each case, the provision to the Administrative Agent and the other Lenders of written notice of such election.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Eligible Appraiser</u>" means (a) with respect to aircraft or engines: Morten Beyer & Agnew, International Bureau of Aviation, Ascend Worldwide Group, ICF International Inc., BK Associates, Inc., Aircraft Information Services Inc., AVITAS, Inc., PAC Appraisal Inc., Aviation Specialists Group, Aviation Asset Management Inc. or IBA Group Ltd., (b) with respect to slots, gates or routes: Morten Beyer & Agnew, ICF International Inc., PAC Appraisal Inc. or BK Associates, Inc., (c) with respect to parts, Morten Beyer & Agnew, ICF International Inc., Sage-Popovich, Inc., PAC Appraisal Inc., Aviation Asset Management Inc. or Alton Aviation Consultancy LLC, (d) with respect to any other type of property, Deloitte & Touche LLP, Andersen Tax LLC, BBC Aviation Enterprises Aviation Advisors Group, LLC, PricewaterhouseCoopers, CBRE Group Inc. and Jones Lang LaSalle Incorporated, and (e) any independent appraisal firm appointed by the Borrower and acceptable to the Appropriate Party.

"<u>Eligible Assignee</u>" means any Person that meets the requirements to be an assignee under Section 11.04(b)(iii), 11.04(b)(v) and 11.04(b)(vi) (subject to such consents, if any, as may be required under Section 11.04(b)(iii)); <u>provided</u> that no Competitor shall be an Eligible Assignee.

"<u>Eligible Collateral</u>" means, as of any date, all Collateral on which the Collateral Agent has, as of such date, to the extent purported to be created by the applicable Security Document, a valid and perfected first priority Lien and/or mortgage (or comparable Lien) for the benefit of the Secured Parties and which is otherwise subject only to Permitted Liens and satisfies the requirements set out in the Loan Documents for such type of Collateral.

"<u>Environmental Laws</u>" means any and all federal, state, local, and foreign statutes, Laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions, including all common law, relating to pollution or the protection of health, safety or the environment or the release of any materials into the environment, including those related to Hazardous Materials, air emissions, discharges to waste or public systems and health and safety matters.

"<u>Environmental Liability</u>" means any liability or obligation, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), directly or indirectly, resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment, disposal or permitting or arranging for the disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"<u>Equity Interests</u>" means, as to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such

Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination (other than Convertible Indebtedness or any other debt security that is convertible into or exchangeable for Equity Interests of such Person and the Warrants).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Credit Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code or Section 302 of ERISA).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the failure by any Credit Party or any ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules or the filing of an application for the waiver of the minimum funding standards under the Pension Funding Rules; (c) the incurrence by any Credit Party or any ERISA Affiliate of any liability pursuant to Section 4063 or 4064 of ERISA or a cessation of operations with respect to a Pension Plan within the meaning of Section 4062(e) of ERISA; (d) a complete or partial withdrawal by any Credit Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization or insolvent (within the meaning of Title IV of ERISA); (e) the filing of a notice of intent to terminate a Pension Plan under, or the treatment of a Pension Plan amendment as a termination under, Section 4041 of ERISA; (f) the institution by the PBGC of proceedings to terminate a Pension Plan; (g) any event or condition that constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (h) the determination that any Pension Plan is in at-risk status (within the meaning of Section 430 of the Code or Section 303 of ERISA) or that a Multiemployer Plan is in endangered or critical status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (i) the imposition or incurrence of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Credit Party or any ERISA Affiliate; (j) the engagement by any Credit Party or any ERISA Affiliate in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; (k) the imposition of a lien upon any Credit Party pursuant to Section 430(k) of the Code or Section 303(k) of ERISA; or (l) the making of an amendment to a Pension Plan that could result in the posting of bond or security under Section 436(f)(1) of the Code.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar Reserve Percentage" means, for any day during any Interest Period, the reserve percentage in effect on such day, whether or not applicable to any Lender, under regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, special, supplemental or other marginal reserve requirement) with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D). The Adjusted LIBO Rate for each outstanding Loan shall be adjusted automatically as of the effective date of any change in the Eurodollar Reserve Percentage.

"Event of Default" has the meaning specified in Article VII.

"Excluded Assets" has the meaning assigned to such term in the Pledge and Security Agreements.

"Excluded Subsidiary" means any Subsidiary of the Parent (other than the Borrower) that (i) is not wholly-owned, directly or indirectly, by the Parent, (ii) is a captive insurance company, (iii) is an Immaterial Subsidiary, (iv) is a Receivables Subsidiary or (v) is a Foreign Subsidiary or a CFC Holdco existing on the Closing Date; provided that, notwithstanding the foregoing, (1) a Subsidiary will not be an Excluded Subsidiary if it (x) owns assets of the type that would be included in the Collateral, (y) owns individually, or in the aggregate with other Subsidiaries (including any Subsidiary that would otherwise qualify as an Excluded Subsidiary), a majority of the Equity Interests of any Subsidiary that owns any assets of the type that would be included in the Collateral or is party to any agreements that constitute (or would constitute) Collateral or (z) guarantees Material Indebtedness of the Parent or any of its Subsidiaries (other than any acquired Subsidiary that guarantees assumed Indebtedness of a Person acquired pursuant to an acquisition permitted under this Agreement that is existing at the time of such acquisition or investment; provided that such Indebtedness was not created in contemplation of or in connection with such acquisition and the amount of such Indebtedness is not increased) and (2) Horizon Air Industries, Inc. shall not be an Excluded Subsidiary.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loans (other than pursuant to an assignment request by the Borrower under Section 2.19(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.16, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.16(g) and (d) any withholding Taxes imposed under FATCA.

"Export Control Laws" means any applicable export control Laws including the International Traffic in Arms Regulations (22 C.F.R. 120 et seq.) and the Export Administration Regulations (15 C.F.R. 730 et seq.).

"FAA" means the United States Federal Aviation Administration and any successor thereto.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" has the meaning specified in Section 3.15(b).

"Federal Funds Effective Rate" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate and (b) 0%.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States.

"Finance Entity" means any Person created or formed by or at the direction of the Parent or any of its Subsidiaries for the purpose of financing aircraft and aircraft related assets and related pre-delivery payment obligations of Parent or such Subsidiaries that; provided, that, such (i) Person holds no material assets other than the aircraft or aircraft related assets to be financed or assets pursuant to which related pre-delivery payment obligations arise, (ii) financing is in the ordinary course of business of the Parent and its Subsidiaries or otherwise customary for airlines based in the United States and (iii) Person holds no assets constituting, or otherwise intended to be included in, Collateral.

"Financial Officer" means, as to any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person.

"Fitch" means Fitch Ratings and any successor to its rating agency business.

"Floor" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to USD LIBO Rate.  As of the Closing Date, the Floor shall be 0%.

"Foreign Lender" means any Lender that is not a U.S. Person.

"Foreign Plan" means any employee pension benefit plan, program, policy, arrangement or agreement maintained or contributed to by the Parent or any Subsidiary with respect to employees employed outside the United States (other than any governmental arrangement).

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities.

"GAAP" means, subject to Section 1.03, United States generally accepted accounting principles as in effect from time to time; provided that if at any time any change in GAAP would affect the computation of any financial ratio or financial requirement, or compliance with any covenant, set forth in any Loan Document, the Required Lenders and the Borrower will negotiate in good faith to amend such ratio, requirement or covenant to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that until so amended, (a) such ratio, requirement or covenant will continue to be computed in accordance with GAAP prior to such change therein and (b) the Borrower will provide to the Administrative Agent and the Lenders reconciliation statements to the extent requested.

"Gate Leasehold" has the meaning assigned to such term in the Pledge and Security Agreements.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation

payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning specified in Section 9.01.

"Guarantor" means the Parent and each other Guarantor listed on the signature page to this Agreement and any other Person that Guarantees the Obligations under this Agreement and any other Loan Document.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes, and other substances or wastes of any nature regulated under or with respect to which liability or standards of conduct are imposed pursuant to any Environmental Law.

"Immaterial Subsidiaries" means one or more Subsidiaries, for which (a) the assets of all such Subsidiaries constitute, in the aggregate, no more than 7.50% of the total assets of the Parent and its Subsidiaries on a consolidated basis (determined as of the last day of the most recent fiscal quarter of Parent for which financial statements are available), and (b) the revenues of all such Subsidiaries account for, in the aggregate, no more than 7.50% of the total revenues of the Parent and its Subsidiaries on a consolidated basis for the four (4) fiscal quarter period ending on the last day of the most recent fiscal quarter of Parent for which financial statements are available; provided that (x) a Subsidiary will not be an Immaterial Subsidiary if it (i) directly or indirectly guarantees, or pledges any property or assets to secure, any Obligations, (ii) owns any assets of the type that are intended to be included in the Collateral or is party to any agreements that constitute (or would constitute) Collateral or (iii) owns a majority of the Equity Interests of any Subsidiary that owns any assets of the type that are intended to be included in the Collateral or is party to any agreements that constitute (or would constitute) Collateral, (y) the Borrower shall not be an Immaterial Subsidiary and (z) Horizon Air Industries, Inc. shall not be an Immaterial Subsidiary.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)        all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     all direct or contingent obligations of such Person arising under (i) letters of credit (including standby and commercial), bankers' acceptances and bank guaranties and (ii) surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)     net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all Attributable Indebtedness;

(g)     all obligations of such Person in respect of Disqualified Equity Interests; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of any Indebtedness of any Person for purposes of clause (e) that is expressly made non-recourse or limited-recourse (limited solely to the assets securing such Indebtedness) to such Person shall be deemed to be equal to the lesser of (i) the aggregate principal amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning specified in Section 11.03(b).

"Information" has the meaning specified in Section 11.12.

"Initial Lender" means Treasury or its designees (but, for the avoidance of doubt, excluding any assignee of the Loans).

"Intellectual Property" has the meaning assigned to such term in the Pledge and Security Agreements.

"Interest Payment Date" means the first Business Day following the 14th day of each March, June, September and December (beginning with September 15, 2021), and the Amortization Date and the Maturity Date.

"Interest Period" means, as to any Borrowing, (a) for the initial Interest Period, the period commencing on the date of such Borrowing and ending on the next succeeding Interest Payment Date and (b) for each Interest Period thereafter, the period commencing on the last day of the next preceding Interest Period and ending on the next succeeding Interest Payment Date.

20

"International Registry" has the meaning assigned to such term in the Pledge and Security Agreements.

"Interpolated Rate" means, at any time, the rate per annum determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between:  (a) the rate as displayed on the Bloomberg "LIBOR01" screen page (or any successor or replacement screen on such service; in each case the "Screen Rate") for the longest period (for which that Screen Rate is available) that is shorter than three (3) months and (b) the Screen Rate for the shortest period (for which that Screen Rate is available) that is equal to or exceeds three (3) months, in each case, at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs Indebtedness of the type referred to in clause (h) of the definition of "Indebtedness" in respect of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received in case by such Person with respect thereto.

"IP Licenses" has the meaning assigned to such term in the Pledge and Security Agreements.

"IRS" means the United States Internal Revenue Service.

"ISDA Definitions" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"IT Systems" has the meaning specified in Section 3.27.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lenders" means the Initial Lender and any other Person that shall have become party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"LIBO Rate" means, the greater of (a) the rate appearing on the Bloomberg "LIBOR01" screen page (or any successor or replacement screen on such service) at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity of three (3) months; provided that (i) if such rate is not available at such time for

any reason, then the "LIBO Rate" shall be the Interpolated Rate, and (ii) if the Interpolated Rate is not available (except as set forth in Section 2.10), the "LIBO Rate" shall be the LIBO Rate for the immediately preceding Interest Period, two (2) Business Days prior to the commencement of such Interest Period and (b) 0%.

"Lien" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, any option or other agreement to sell or give a security interest in an asset, or preference, priority, or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Liquidity" means the sum of (i) all unrestricted cash and Cash Equivalents of Parent and its Subsidiaries, (ii) cash or Cash Equivalents of the Parent and its Subsidiaries restricted in favor of the Obligations or in connection with the Payroll Support Program Agreement (other than any amounts held in the Blocked Account, Payment Account and Collateral Proceeds Account), (iii) the aggregate principal amount committed and available to be drawn by the Parent and its Subsidiaries (taking into account all borrowing base limitations or other restrictions) under all revolving credit facilities of the Parent and its Subsidiaries, (iv) any remaining aggregate principal amount committed and available to be drawn (taking into account any applicable restrictions) by the Parent and its Subsidiaries in respect of the Loans and (v) the scheduled net proceeds (after giving effect to any expected repayment of existing Indebtedness using such proceeds) of any Capital Markets Offering of the Parent or any of its Subsidiaries that has priced but has not yet closed (until the earliest of the closing thereof, the termination thereof without closing or the date that falls five (5) Business Days after the initial scheduled closing date thereof).

"Loan" means a loan made by a Lender to the Borrower pursuant to this Agreement.

"Loan Application Form" means the application form and any related materials submitted by the Borrower to the Initial Lender in connection with an application for the Loans under Division A, Title IV, Subtitle A of the CARES Act.

"Loan Documents" means, collectively, this Agreement, any Security Document, any promissory notes issued pursuant to Section 2.11(b) and any other documents entered into in connection herewith (including an Administrative Agency Fee Letter, if any).

"Loyalty Program" means (a) any frequent flyer program, co-branded card program or any other program (whether now existing or established, arising or acquired in the future) that grants members in such program or co-branded cardholders Currency based on such member's or co-branded cardholder's purchasing or other behavior and that entitles a member or co-branded cardholder to accrue, redeem or otherwise exploit such Currency for a benefit or reward, including flights, priority access, lounge or "club" access, discounts, upgrades (including in seat or class) or other goods or services or (b) any Loyalty Subscription Program.

"Loyalty Program Agreement" means each contract, agreement, transaction or other undertaking described on Schedule 1.01(b) and any other current or future contract, agreement, transaction or other undertaking between any Credit Party (or any of its Affiliates, as applicable) and a Loyalty Program Participant entered into connection with any Carrier Loyalty Program, including any card marketing agreement with respect to credit cards co-branded by a Credit Party and a Loyalty Program Participant and any card network agreement, and any amendment, supplement or modification thereto, but excluding all reciprocal passenger Currency accrual and redemption agreements with other Air Carriers.

"Loyalty Program Assets" has the meaning assigned to such term in the Pledge and Security Agreements.

"Loyalty Program Data" means all data (whether or not constituting Personal Data) Processed in connection with, or generated or produced in the course of the operation of, any Carrier Loyalty Program, but, with respect to Personal Data, solely to the extent Processed, generated or produced regarding Loyalty Program Members as Loyalty Program Members, including all such data consisting of (a) a list of all Loyalty Program Members and (b)data concerning each Loyalty Program Member as a member of any of the Carrier Loyalty Programs, including such Loyalty Program Member's (i) name, mailing address, email address, date of birth, gender and phone number and other identifiers, (ii) communication and promotion opt-ins and opt-outs, (iii) financial information and transaction histories, (iv) total miles and awards, (v) third-party engagement history and customer experience, (vi) accrual and redemption activity, (vii) member tier and status designations and member tier and status activity and qualifications, (viii) internet or network activity (including information regarding interaction with a website), (ix) profile preferences, (x) login information, (xi) Loyalty Program Member spend activity, (xii) geolocation data and (xiii) any inferences drawn or enrichments created from any of the foregoing.  Loyalty Program Data also includes any Proceeds relating to any of the foregoing (other than any such Proceeds to the extent arising from a Credit Party's non-Loyalty Program operations).  For the avoidance of doubt, the definition of "Loyalty Program Data" does not impose an obligation on any Credit Party to collect any data inconsistent with its past or current practices.

"Loyalty Program Intellectual Property" has the meaning assigned to such term in the Pledge and Security Agreements.

"Loyalty Program Member" means, as of any date, any individual who is an applicant or member of any Carrier Loyalty Program (or a legal guardian of such applicant or member).

"Loyalty Program Participant" means (a) a financial institution or other Person that is a party to any card agreement with a Credit Party or (b) any other Person (i) to which a Credit Party or any of its Affiliates sells, leases or otherwise transfers Currency in connection with any Carrier Loyalty Program, including partner airline, co-branded card, hotel and car rental partners, (ii) that provides goods, services or other consideration to Loyalty Program Members in exchange for, or redemption of, Currency or (iii) that, in connection with the provision of goods, services or other consideration by such Person to Loyalty Program Members or the use of the services of such Person by Loyalty Program Members, such Person offers Currency to such Loyalty Program Members or provides any Credit Party (or any Affiliate thereof) with sufficient information so that such Credit Party (or any Affiliate thereof) may post Currency to such Loyalty Program Members' accounts.

"Loyalty Program Revenue" means all payments received by, or otherwise required to be paid to, the Credit Parties (and their Affiliates), and all other amounts the Credit Parties are entitled to, under the Loyalty Program Agreements and any Loyalty Subscription Program.

"Loyalty Revenue Advance Transaction" means (i) any Pre-paid Currency Purchase or (ii) any other transaction between any Credit Party and a counterparty to a Loyalty Program Agreement providing for the advance of cash that is expected to be paid from or set off against future payments otherwise required to be made by the counterparty to such Credit Party.

"Loyalty Subscription Program" means any program (whether now existing or established, arising or acquired in the future) that grants members in such program access to discounted goods or services in exchange for a periodic cash payment.  The Loyalty Subscription Programs in existence as of the Closing Date are listed on Schedule 1.01(c) of this Agreement.

"Margin Stock" means margin stock within the meaning of Regulations T, U and X.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect on, the operations, business, properties, liabilities (actual or contingent), condition (financial or

otherwise) or prospects of the Parent and its Subsidiaries taken as a whole; or (b) a material adverse effect on (i) the ability of the Borrower or any Credit Party to perform its Obligations, (ii) the legality, validity, binding effect or enforceability against the Borrower or any Credit Party of any Loan Document to which it is a party or the validity, perfection and first priority of the Liens on the Collateral in favor of the Collateral Agent taken as a whole or with respect to a substantial portion of the Collateral, (iii) the rights, remedies and benefits available to, or conferred upon, the Lenders or the Agents under any Loan Documents, (iv) the ability of the Borrower or any Credit Party to perform its obligations under any Material Loyalty Program Agreement, (v) the legality, validity, binding effect or enforceability against the Borrower or any Credit Party of any Material Loyalty Program Agreement or (c) the business and operations of any Carrier Loyalty Program, in each case, taken as a whole; provided that the impacts of the COVID-19 disease outbreak will be disregarded for purposes of clauses (a)and (b)(vi) of this definition to the extent (i) publicly disclosed in any SEC filing of the Parent or otherwise provided to the Initial Lender prior to the Closing Date and (ii) the scope of such adverse effect is no greater than that which has been disclosed as of the Closing Date.

"Material Indebtedness" means Indebtedness of the Parent or any of its Subsidiaries (other than the Loans) outstanding under the same agreement in a principal amount exceeding $50,000,000.

"Material Loyalty Program Agreements" means (a) each Loyalty Program Agreement identified as a Material Loyalty Program Agreement as set forth on Schedule 1.01(b), as updated from time to time pursuant to the terms of the Pledge and Security Agreements and (b) any other Loyalty Program Agreements between a Credit Party and a Loyalty Program Participant such that, at all times, the Credit Parties have identified to Lender Loyalty Program Agreements then in full force and effect and generating not less than 90% of aggregate Loyalty Program Revenue (excluding revenues generated under any Loyalty Subscription Program).

"Material Modification" means any amendment or waiver of, or modification or supplement to, any term or condition of a Loyalty Program Agreement agreed to, executed or effected on or after the Closing Date, which:

(a)        extends, waives, delays or contractually or structurally subordinates one or more payments due to any Credit Party with respect to such Loyalty Program Agreement;

(b)        reduces the rate or amount of payments due to any Credit Party with respect to such Loyalty Program Agreement or reduces the frequency or timing of payments due to any Credit Party;

(c)        gives any Person other than Credit Parties party to such Loyalty Program Agreement additional or improved termination rights with respect to such Loyalty Program Agreement;

(d)        shortens the term of such Loyalty Program Agreement (other than in connection with the replacement of such Loyalty Program Agreement with another Loyalty Program Agreement on terms at least as favorable to the Lenders, as determined by the Appropriate Party in its reasonable discretion (or in the case of the Initial Lender, its sole discretion)) or expands or improves any counterparty's rights or remedies following a termination;

(e)        limits, or requires or results in the limitation of (x) the right or ability of any Credit Party, any of its Affiliates, any of its or their successors or assigns or the Collateral Agent to, or to authorized others to, use, exploit, share or transfer the Loyalty Program Intellectual Property or the IP Licenses included in the Collateral (other than third-party Intellectual Property that ceases to be required or useful for the conduct of any Carrier Loyalty Program as currently conducted and as currently contemplated to be conducted) or (y) the right or ability of any Credit Party, any of its Affiliates, any of its or their successors or assigns or the Collateral Agent to, or to authorized others to, Process any Loyalty Program Data, including such amendment, waiver, modification or supplement that removes or narrows, or requires or results in the removal or narrowing of any disclosure to individuals existing as of the date hereof regarding

the potential future transfer, sharing or disclosure of Loyalty Program Data, in each case other than pursuant to a change required under applicable Law; or

(f)        imposes new financial obligations on any Credit Party under such Loyalty Program Agreement, in each case, to the extent such amendment, waiver, modification or supplement would reasonably be expected to (1) be materially adverse to the Lenders or any Secured Party (as defined in the Pledge and Security Agreements) or (2)  result in a Material Adverse Effect; provided that any amendment to a Loyalty Program Agreement that (i) shortens the scheduled maturity or term thereof (other than changes that are permitted under (d) above), (ii) amends, modifies or otherwise changes the calculation or rate of fees, expenses, guarantee payments or termination payments due and owing thereunder, including changes to interchange rates, in each case as defined in the applicable Loyalty Program Agreement and any other term related to the calculation of fees related to the purchase of the applicable Currency, and in a manner materially reducing the amount owed to the Credit Parties, (iii) changes the contractual subordination of payments thereunder in a manner materially adverse to the Lenders, reduces the frequency of payments thereunder or permits payments due to the applicable Credit Parties to be deposited to an account other than the Collection Account, (iv) changes the amendment standards applicable to such Loyalty Program Agreement in a manner that would reasonably be expected to result in a Material Adverse Effect, (v) materially impairs the rights of the Collateral Agent or the Initial Lender to enforce or consent to amendments to any provisions of a Loyalty Program Agreement in accordance therewith, or (vi) constitutes an action set forth in clause (e) shall be deemed to result in a Material Adverse Effect and shall be considered a Material Modification.

"Material Subsidiary" means any Subsidiary that is not an Immaterial Subsidiary.

"Maturity Date" means the date that is five (5) years after the Closing Date (except that, if such date is not a Business Day, the Maturity Date shall be the preceding Business Day).

"Maximum Rate" has the meaning specified in Section 11.14.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Credit Party or any ERISA Affiliate makes or is obligated to make contributions, during the preceding five (5) plan years has made or been obligated to make contributions, or has any liability.

"Multiple Employer Plan" means a Plan with respect to which any Credit Party or any ERISA Affiliate is a contributing sponsor, and that has two (2) or more contributing sponsors at least two (2) of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Net Proceeds" means in connection with any Disposition, Recovery Event or Contingent Payment Event, the aggregate cash and Cash Equivalents received by the Parent or any of its Subsidiaries in respect of a Disposition of Collateral (including, without limitation, any cash or Cash Equivalents received in respect of or upon the Disposition of any non-cash consideration received in any such Disposition of Collateral) or Recovery Event or Contingent Payment Event, net of the direct costs and expenses relating to such Disposition and incurred by the Parent or a Subsidiary (including the sale or disposition of such non-cash consideration) or any such Recovery Event or Contingent Payment Event, including, without limitation, legal, accounting and investment banking fees, and sales commissions, and any relocation expenses incurred as a result of the Disposition, Recovery Event or Contingent Payment Event, taxes paid or reasonably estimated to be payable as a result of the Disposition, Recovery Event or

Contingent Payment Event, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all or all affected Lenders in accordance with the terms of Section 11.02 and (b) has been approved by the Required Lenders.

"Non-Loyalty Collateral Coverage Ratio" means, as of any date of determination, the ratio of (i) the Appraised Value of the Eligible Collateral as of the date of the Appraisal most recently delivered pursuant to Section 5.16 (or in the case of cash and Cash Equivalents, as of such date of determination) to (ii) the aggregate principal amount of all Loans and Commitments outstanding as of such date; provided that for the purposes of calculating clause (i) above, (x) no more than 25% of the Appraised Value of the Eligible Collateral may correspond to ground support equipment, (y) Loyalty Program Assets shall not be included and (z) any amounts held in the Blocked Account, Payment Account and Collateral Proceeds Account shall likewise not be included.

"Note" means the promissory note executed by the Borrower pursuant to Section 2.11(b).

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, each Credit Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or required to be performed, or to become due or to be performed, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Credit Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding. Without limiting the foregoing, the Obligations include (a) the obligation to pay principal, interest, charges, expenses, fees, indemnities and other amounts payable by the Borrower or any other Credit Party under any Loan Document, (b) the obligation of any Credit Party to reimburse any amount in respect of any of the foregoing that the Lenders, in each case in their sole discretion, may elect to pay or advance on behalf of any Credit Party and (c) the obligation of any Credit Party or any of its Subsidiaries to take any action or refrain from taking any action as required by the covenants and other provisions contained in this Agreement and any other Loan Document.

"Obligee Guarantor" has the meaning specified in Section 9.06.

"Organizational Documents" means (a) as to any corporation, the charter or certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) as to any limited liability company, the certificate or articles of formation or organization and operating or limited liability agreement and (c) as to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Loans or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery,

performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.19(b)).

"Outstanding Amount" means, with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date.

"Parent" has the meaning specified in introductory paragraph hereof.

"Participant" has the meaning specified in Section 11.04(d).

"Participant Register" has the meaning specified in Section 11.04(d).

"Payment Account" has the meaning specified in Section 5.20.

"Payment Event" means (a), the Debt Service Coverage Ratio with respect to any DSCR Determination Date is less than or equal to 1.50 to 1.00 (including if the Debt Service Coverage Ratio is less than or equal to 1.25 to 1.00), or (b) an Event of Default or Term Trigger Event has occurred.  A Payment Event shall be deemed continuing until (i) with respect to clause (a), the Debt Service Coverage Ratio is greater than 1.50 to 1.00 on a DSCR Determination Date or (ii) such Event of Default or Term Trigger Event shall no longer be continuing.

"Payroll Support Program Agreement" means that certain Payroll Support Program Agreement dated as of April 23, 2020, between the Borrower and Treasury.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Act" means the Pension Protection Act of 2006.

"Pension Funding Rules" means the rules of the Code and ERISA (as modified by the CARES Act) regarding minimum funding standards and minimum required contributions (including any installment payment thereof) to Pension Plans and Multiemployer Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any employee pension benefit plan (including a Multiple Employer Plan, but excluding a Multiemployer Plan) that is maintained or is contributed to by any Credit Party or any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"Perfection Requirement" has the meaning specified in the Pledge and Security Agreements.

"Permitted Bond Hedge Transaction" means any call or capped call option (or substantively equivalent derivative transaction) on the Parent's common Equity Interests purchased by the Parent in connection with the issuance of any Convertible Indebtedness; provided that the purchase price for such Permitted Bond Hedge Transaction does not exceed the net proceeds received by the Parent from the sale of such Convertible Indebtedness issued in connection with the Permitted Bond Hedge Transaction.

"Permitted Business" means any business that is the same as, or reasonably related, ancillary, supportive or complementary to, the business in which the Parent and its Subsidiaries are engaged on the date of this Agreement.

"Permitted Liens" means:

(1)     Liens created for the benefit of (or to secure the payment and performance of) the Obligations or any Guaranteed Obligations;

(2)     Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(3)     Liens imposed by law, including carriers', vendors', materialmen's, warehousemen's, landlord's, mechanics' repairmen's, employees' or other like Liens, in each case, incurred in the ordinary course of business;

(4)     Liens arising by operation of law in connection with judgments, attachments or awards which do not constitute an Event of Default hereunder;

(5)     (A) any overdrafts and related liabilities arising from treasury, netting, depository and cash management services or in connection with any automated clearing house transfers of funds, in each case as it relates to cash or Cash Equivalents, if any, and (B) Liens arising by operation of law or that are contractual rights of set-off in favor of the depository bank or securities intermediary in respect of any deposit or securities accounts pledged in favor of the Collateral Agent; provided that, such Liens shall be subordinated to the Liens securing the Obligations (other than the Liens relating to amounts owed in connection with the maintenance of such account);

(6)     [reserved];

(7)     [reserved];

(8)     to the extent applicable, salvage or similar rights of insurers, in each case as it relates to Collateral;

(9)     any licenses or sublicenses (x) granted on a non-exclusive basis to customers or service providers in the ordinary course of business or to business partners in the ordinary course of business in a manner and subject to terms consistent with past practice or (y) granted pursuant to any Loyalty Program Agreement in full force and effect as of the Closing Date, any successor agreement thereto or any new Loyalty Program Agreement, in each case that is included in the Collateral (provided that any such grant pursuant to such new or successor agreement is made in the ordinary course of business in a manner and subject to terms substantially similar with those of the predecessor Loyalty Program Agreement or with any Loyalty Program Agreement in full force and effect as of the Closing Date, as the case may be);

(10)    to the extent constituting Liens on Collateral, Dispositions permitted pursuant to Section 6.04(b), (d)(2), (e), (f) or (h); and

(11)    Liens expressly permitted by the Pledge and Security Agreements.

"Permitted Refinancing" means with respect to any Person, any refinancings, renewals, or extensions of any Indebtedness of such Person so long as: (a) such refinancings, renewals, or extensions do not result in an increase in the principal amount of the Indebtedness so refinanced, renewed, or extended,

other than by the amount of premiums paid thereon and the fees and expenses incurred in connection therewith and by the amount of unfunded commitments with respect thereto; (b) such refinancings, renewals, or extensions do not result in a shortening of the average weighted maturity (measured as of the refinancing, renewal, or extension) of the Indebtedness so refinanced, renewed, or extended, nor are they on terms or conditions that, taken as a whole, are or could reasonably be expected to be materially adverse to the interests of the Lenders; (c) if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, renewal, or extension must include subordination terms and conditions that are at least as favorable to the Lenders as those that were applicable to the refinanced, renewed, or extended Indebtedness; (d) the Indebtedness that is refinanced, renewed, or extended is not recourse to any Person that is liable on account of the Obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended and (e) to the extent the Indebtedness that is refinanced, renewed, or extended is unsecured, the Indebtedness resulting from such refinancing, renewal or extension must be unsecured.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Personal Data" means any information or data that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household, or any other data or information that constitutes personal data, personally identifiable information, personal information or a similar defined term under any Privacy Law or any policy of a Credit Party or any of its Affiliates relating to privacy or the Loyalty Program Data.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA, maintained for employees of the Parent or any Subsidiary, or any such plan to which the Parent or any Subsidiary is required to contribute on behalf of any of its employees or with respect to which any Credit Party has any liability.

"Platform" means Debt Domain, Intralinks, Syndtrak, DebtX or a substantially similar electronic transmission system.

"Pledge and Security Agreements" means (a) that certain Alaska Airlines Loyalty Program Pledge and Security Agreement, dated as of September 28, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), between the Borrower, as a Grantor (as defined therein) and the Collateral Agent; (b) that certain Alaska Airlines Aircraft and Engine Security Agreement, dated as of September 28, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), between the Borrower, as a Grantor (as defined therein) and the Collateral Agent; and (c) that certain Amended and Restated Horizon Aircraft, Engine and Propeller Pledge and Security Agreement, dated as of October 30, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), between Horizon Air Industries, Inc., as a Grantor (as defined therein) and the Collateral Agent. For the avoidance of doubt, the terms of the "Pledge and Security Agreements" shall include the terms of all Applicable Annexes (as defined in each Pledge and Security Agreement).

"Pre-paid Currency Purchases" means the sale, lease or other transfer by any Credit Party or any Subsidiary of a Credit Party of pre-paid Currency to a counterparty of a Loyalty Program Agreement.

"Prepayment Notice" means a notice by the Borrower to prepay Loans, which shall be in such form as the Appropriate Party may approve.

"Prime Rate" means the rate of interest per annum last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per

annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Required Lenders) or any similar release by the Federal Reserve Board (as determined by the Required Lenders).  Any change in the Prime Rate shall take effect at the opening of business on the day such change is publicly announced or quoted as being effective.

"Privacy Law" means all Applicable Laws worldwide relating to the Processing, privacy or security of Personal Data and all regulations issued thereunder, including, to the extent applicable, the EU General Data Protection Regulation (EU) 2016/679 (and all Laws implementing it), Section 5 of the Federal Trade Commission Act, the California Consumer Privacy Act, the Children's Online Privacy Protection Act, Title V, Subtitle A of the Gramm-Leach-Bliley Act, 15 U.S.C. 6801 et seq. (and the rules and regulations promulgated thereunder), state data breach notification Laws, state data security Laws, and any Law concerning requirements for website and mobile application privacy policies and practices, or any outbound communications (including e-mail marketing, telemarketing and text messaging), tracking and marketing.

"Proceeds" means "proceeds," as defined in Article 9 of the UCC.

"Processed", "Processing" or "Process", with respect to data (including Loyalty Program Data), means collected, accessed, recorded, acquired, stored, organized, altered, adapted, retrieved, disclosed, used, disposed, erased, disclosed, destructed, transferred or otherwise processed; in each case, whether or not by automated means.

"PSP Warrant Agreement" means that certain warrant agreement, dated as of April 23, 2020 between Parent and Treasury.

"Public Lender" has the meaning specified in Section 11.01(e).

"Receivables Subsidiary" means (x) a Wholly-Owned Subsidiary of the Parent formed for the purpose of and which engages in no activities other than in connection with the financing or securitization of accounts receivables (a) no portion of the Indebtedness or any other obligations (contingent or otherwise) of which (1) is guaranteed by the Parent by any Subsidiary of the Parent, and excluding any guarantees of obligations (other than the principal of, and interest on, Indebtedness) pursuant to Standard Securitization Undertakings, (2) is recourse to or obligates the Parent or any Subsidiary of the Parent in any way other than pursuant to Standard Securitization Undertakings or (3) subjects any property or asset of the Parent or any Subsidiary of the Parent (other than accounts receivable and related assets) or any property or asset of the type that is intended to be include in the Collateral, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings, (b) with which neither the Parent nor any Subsidiary of the Parent (other than another Receivables Subsidiary) has any material contract, agreement, arrangement or understanding (other than pursuant to the related financing of accounts receivable) other than on terms no less favorable to the Parent or such Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Parent and (c) with which neither the Parent nor any Subsidiary of the Parent has any obligation to maintain or preserve such Subsidiary's financial condition, other than a minimum capitalization in customary amounts, or to cause such Subsidiary to achieve certain levels of operating results or (y) any Subsidiary of a Receivables Subsidiary. For the avoidance of doubt, the Parent and any Subsidiary of the Parent may enter into Standard Securitization Undertakings for the benefit of a Receivables Subsidiary.

"Recipient" means (a) the Administrative Agent, (b) the Collateral Agent or (c) any Lender, as applicable.

"<u>Recovery Event</u>" means any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any Collateral or any Event of Loss (as defined in the Pledge and Security Agreements).

"<u>Reference Time</u>" with respect to any setting of the then-current Benchmark means (1) if such Benchmark is USD LIBO Rate, 11:00 a.m. (London time) on the day that is two London banking days preceding the date of such setting, and (2) if such Benchmark is not USD LIBO Rate, the time determined by the Required Lenders in their reasonable discretion, provided that such time is determined to be administratively feasible by the Administrative Agent.

"<u>Register</u>" has the meaning specified in Section 11.04(c).

"<u>Regulation D</u>" means Regulation D of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"<u>Regulation T</u>" means Regulation T of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"<u>Regulation U</u>" means Regulation U of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"<u>Regulation X</u>" means Regulation X of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"<u>Related Parties</u>" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"<u>Relevant Governmental Body</u>" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"<u>Reportable Event</u>" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30)-day notice period has been waived.

"<u>Required Filings</u>" shall have the meaning specified in the Pledge and Security Agreements.

"<u>Required Lenders</u>" means, at any time, Lenders having Loans representing more than 50% of the aggregate Outstanding Amount of Loans of all Lenders at such time.

"<u>Resolution Authority</u>" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Responsible Officer</u>" means (a) the chief executive officer, president, executive vice president or a Financial Officer of the Borrower or such Credit Party, as applicable, (b) solely for purposes of the delivery of incumbency certificates and certified Organizational Documents and resolutions pursuant to Section 4.01, any vice president, secretary or assistant secretary of the Borrower or such Credit Party and (c) solely for purposes of Borrowing Requests, prepayment notices and notices for Commitment terminations or reductions given pursuant to Article II, any other officer or employee of the Borrower so designated from time to time by one of the officers described in clause (a) in a notice to the Administrative Agent (together with evidence of the authority and capacity of each such Person to so act in form and substance satisfactory to the Administrative Agent). Any document delivered hereunder that is signed by

a Responsible Officer of the a Credit Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership or other action on the part of such Credit Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Credit Party.

"Restatement Agreement" means that certain Restatement Agreement, dated as of October 30, 2020, to this Agreement, between the Borrower, the Parent, the Guarantors party thereto from time to time, Treasury, the Adminstrative Agent and the Collateral Agent.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof).

"Route Authority" has the meaning assigned to such term in the Pledge and Security Agreements.

"S&P" means S&P Global Ratings, and any successor to its rating agency business.

"Sanctioned Country" has the meaning specified in Section 3.15(a).

"Sanctioned Person" has the meaning specified in Section 3.15(a).

"Sanctions" has the meaning specified in Section 3.15(a).

"Screen Rate" has the meaning specified in the definition of the term "Interpolated Rate".

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Obligations" has the meaning assigned to such term in the Pledge and Security Agreements.

"Secured Parties" has the meaning assigned to such term in the Pledge and Security Agreements.

"Securities Act" means the Securities Act of 1933, as amended.

"Security Document" means the Pledge and Security Agreements and any security or pledge agreement, mortgage, hypothecation or other agreement, instrument or document relating to collateral for the Loans (including any short form agreements, supplements, control agreements, collateral access agreements and registrations executed or made) that may exist at any time and from time to time, as amended from time to time.

"Slot" has the meaning assigned to such term in the Pledge and Security Agreements.

"SOFR" means, with respect to any Business Day, a rate per annum equal to the secured overnight financing rate for such Business Day published by the SOFR Administrator on the SOFR Administrator's Website at approximately 8:00 a.m. (New York City time) on the immediately succeeding Business Day.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"Solvent" means, as to any Person as of any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair saleable value of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature and (d) such Person is not engaged in a business or a transaction, and is not about to engage in a business or a transaction, for which such Person's property would constitute an unreasonably small capital.  The amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.  For the avoidance of doubt, a Person shall not fail to be Solvent on any date solely as a result of such person's audit having a "going concern" or like qualification, exception or explanatory paragraph or any qualification, exception or explanatory paragraph as to the scope of such audit solely due to the COVID-19 disease outbreak.

"Spare Parts" has the meaning assigned to such term in the Pledge and Security Agreements.

"Standard Securitization Undertakings" means all representations, warranties, covenants, indemnities, performance Guarantees and servicing obligations entered into by the Parent or any Subsidiary (other than a Receivables Subsidiary), which are customary in connection with any financing of accounts receivable.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, association or joint venture or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time owned or the management of which is controlled, directly, or indirectly through one or more intermediaries, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Parent.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, that are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, as to any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term SOFR" means, for the applicable Corresponding Tenor as of the applicable Reference Time, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Term Trigger Event" has the meaning specified in Section 2.06(b).

"Trade Date" means the date on which an assigning Lender enters into a binding agreement to sell and assign all or a portion of its rights and obligations under this Agreement to another Person.

"Trade Secrets" has the meaning assigned to such term in the Pledge and Security Agreements.

"Trademark" has the meaning assigned to such term in the Pledge and Security Agreements.

"Treasury" has the meaning specified in the preamble to this Agreement.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any Person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Uniform Commercial Code" and "UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

"United States" and "U.S." mean the United States of America.

"USD LIBO Rate" means the LIBO Rate for U.S. dollars.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 2.16(g).

"Voting Stock" of any specified Person as of any date means the equity interests of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"Warrant Agreement" means the warrant agreement, dated as of the date hereof between Parent and Treasury, pursuant to which Parent agrees to issue Warrants to Treasury upon each Borrowing.

"Warrants" means, collectively, those certain warrants issued to Treasury under the Warrant Agreement or the PSP Warrant Agreement.

"Wholly-Owned" means, as to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (a) director's qualifying shares and (b) shares issued to foreign nationals to the extent required by Applicable Law) are owned by such Person and/or by one or more Wholly-Owned Subsidiaries of such Person.

"Withholding Agent" means the Borrower and the Administrative Agent or other person making or transferring to any Lender any payment on behalf of the Borrower.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of such Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those power.

SECTION 1.02 Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." The word "or" is not exclusive. The word "year" shall refer (i) in the case of a leap year, to a year of three hundred sixty-six (366) days, and (ii) otherwise, to a year of three hundred sixty-five (365) days. Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.03  Accounting Terms; Changes in GAAP.

(a)        Accounting Terms. Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall be construed in conformity with GAAP.  Financial statements and other information required to be delivered by the Lenders pursuant to Sections 5.01(a) and 5.01(b) shall be prepared in accordance with GAAP as in effect at the time of such preparation. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Parent and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

(b)        Changes in GAAP.  If the Borrower notifies the Administrative Agent (who will forward such notification to the Lenders) that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn, the Required Lenders shall have notified the Borrower (with a copy to the Administrative Agent) of their objection to such amendment or such provision shall have been amended in accordance herewith.

SECTION 1.04 Rates.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the rates in the definition of "LIBO Rate" or with respect to any comparable or successor rate thereto.

SECTION 1.05 Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

ARTICLE II

COMMITMENTS AND BORROWINGS

SECTION 2.01 Commitments.  Subject to the terms and conditions set forth herein, the Initial Lender agrees to make the Loans to the Borrower in one or more installments on or after the Closing Date in an aggregate principal amount not to exceed the Initial Lender's Commitment.  Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.

SECTION 2.02 Loans and Borrowings.

(a)        Borrowings.  The Borrower shall request the initial Borrowing of the Loans on the Closing Date and may request one or more subsequent Borrowings of the Loans; provided that the Borrower shall request no more than three (3) total Borrowings.

(b)        Minimum Amounts.  Each Borrowing shall be in an aggregate amount of $135,000,000 or a larger multiple of $5,000,000; provided that, the final Borrowing may be in an amount equal to the aggregate remaining outstanding Commitment available to the Borrower under the terms and conditions of this Agreement.

(c)     Funding of Borrowings.  Each Lender shall make the amount of each Borrowing to be made by it hereunder available to the Administrative Agent by wire transfer of immediately available funds to the Administrative Account not later than 12:00 noon (New York City time) on the proposed date thereof. The Administrative Agent will make all such funds so received available to the Borrower in like funds, by wire transfer of such funds in accordance with the instructions provided in the applicable Borrowing Request; provided that if all such requested funds are not received by the Administrative Agent by 12:00 noon (New York City time) on the proposed date for such Borrowing, the Administrative Agent shall distribute such funds on the next succeeding Business Day.

SECTION 2.03 Borrowing Requests.

(a)     Notice by Borrower.  In order to request a Borrowing, the Borrower shall notify the Administrative Agent of such request in writing not later than 11:00 a.m. (New York City time) (i) with respect to the initial Borrowing under this Agreement, three (3) Business Days prior to the date of the requested Borrowing and (ii) for each subsequent Borrowing, five (5) Business Days before such Borrowing.  Each such notice shall be irrevocable and shall be in the form of a written Borrowing Request, appropriately completed and signed by a Responsible Officer of the Borrower.  The Administrative Agent shall promptly advise the applicable Lenders of any Borrowing Request given pursuant to this Section 2.03(a) (and the contents thereof), and of each Lender's portion of the requested Borrowing.

(b)     Content of Borrowing Requests.  Each Borrowing Request for a Borrowing pursuant to this Section shall specify the following information in compliance with Section 2.02:  (i) the aggregate amount of the requested Borrowing; (ii) the date of such Borrowing (which shall be a Business Day); and (iii) the location and number of the Borrower's account to which funds are to be disbursed.

SECTION 2.04 [Reserved].

SECTION 2.05 [Reserved].

SECTION 2.06 Prepayments.

(a)     Optional Prepayments.    The Borrower may, upon written notice to the Administrative Agent, at any time and from time to time prepay the Loans in whole or in part without premium or penalty, subject to the requirements of this Section.  Partial prepayments of the Loans shall be in a minimum aggregate principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof. Notwithstanding anything herein to the contrary, the Borrower may at any time elect to prepay the loans with funds contained in the Collateral Proceeds Account.

(b)     Mandatory Prepayments.

(i)     Dispositions of Collateral.  Within three (3) Business Days of the receipt by the Parent or any of its Subsidiaries of any Net Proceeds from a Disposition of Collateral not permitted by Section 6.04, the Borrower shall prepay the Loans in an amount equal to 100% of such Net Proceeds.

(ii)     Recovery Events.  Within three (3) Business Days of the receipt by the Parent or any of its Subsidiaries of any Net Proceeds from a Recovery Event in respect of Collateral, the Borrower shall prepay the Loans in an amount equal to 100% of such Net Proceeds; provided that with respect to Collateral consisting of airframes, aircraft, engines and Spare Parts, the Borrower may deposit such Net Proceeds into the Collateral Proceeds Account for such purpose and thereafter such Net Proceeds shall be applied (to the extent not otherwise applied pursuant to the immediately succeeding proviso) to prepay the Loans; provided further that (I) the Borrower may use such Net Proceeds to (A) replace the assets which are the subject of such Recovery Event

37

with assets that are of the same type of Collateral or (B) repair the assets which are the subject of such Recovery Event, in each case, within 270 days after such deposit is made, (II) all such Net Proceeds amount may, at the option of the Borrower at any time, be applied to repay the Loans, and (III) upon the occurrence of an Event of Default, the amount of any such deposit may be applied by the Administrative Agent to repay the Loans.

(iii)    <u>Certain Debt Issuances</u>.  Immediately upon receipt by the Parent or any of its Subsidiaries of any proceeds from the incurrence of any Indebtedness that is secured by Liens on the Collateral (other than Permitted Liens), the Borrower shall prepay the Loans in an amount equal to 100% of any such proceeds from any such Indebtedness.

(iv)    <u>Contingent Payment Events</u>.  Within three (3) Business Days of the receipt by the Parent or any of its Subsidiaries of any Net Proceeds from a Contingent Payment Event under a Loyalty Program Agreement, which Net Proceeds, together with the aggregate amount of Net Proceeds previously received from Contingent Payment Events, are in excess of $5,000,000, the Borrower shall prepay the Loans in an amount equal to 100% of such Net Proceeds.

(v)    <u>Loyalty Revenue Advance Transactions</u>.  Within three (3) Business Days of the receipt by the Parent or any of its Subsidiaries of any Net Proceeds from a Loyalty Revenue Advance Transaction, which Net Proceeds, together with the aggregate amount of Net Proceeds previously received from Loyalty Revenue Advance Transactions during the term of this Agreement, are in excess of an amount equal to the greater of (x) $10,000,000 and (y) 10% of the aggregate amount of Collateral Cash Flow received during the most recently ended DSCR Test Period that has been deposited into a Collateral Account, the Borrower shall prepay the Loans in an amount equal to 100% of such excess Net Proceeds.

(vi)    <u>Payment Events</u>.

(A)    The Loans shall be required to be repaid if the Debt Service Coverage Ratio with respect to any DSCR Determination Date is less than 1.50 to 1.00 or 1.25 to 1.00, as the case may be, as set forth in Section 6.17(c).

(B)    After the occurrence and during the continuation of an Event of Default, the Loans shall be repaid in an amount equal to 100% of all Loyalty Program Revenue received thereafter, and the Parent and the Subsidiaries shall ACH or wire transfer daily such Loyalty Program Revenue to the Payment Account  (from the Collection Account or otherwise) with all such amounts deposited into the Payment Account to be applied to the prepayment of any Loans then outstanding.

(C)    If at any time (x) any Material Loyalty Program Agreement has a remaining term of less than two (2) years (or, if the Lender ever provides Loans in a principal amount in excess of the Closing Date Commitment, thirty (30) calendar months) or (y) Loyalty Program Agreements representing 90% of Loyalty Program Revenues (excluding revenues generated under any Loyalty Subscription Program) in the aggregate over the immediately preceding twelve (12) calendar month period then ended have remaining terms of less than two (2) years (or, if the Lender ever provides Loans in a principal amount in excess of the Closing Date Commitment, thirty (30) calendar months) (a "<u>Term Trigger Event</u>") and such Term Trigger Event is continuing, then the Loans shall be repaid in an amount equal to 100% of all Loyalty Program Revenue received thereafter, and the Parent and the Subsidiaries shall ACH or wire transfer daily such Loyalty Program Revenue to the Payment Account  (from the Collection Account or otherwise) with all such amounts deposited into the Payment Account to be applied to the prepayment of any Loans

38

then outstanding; provided that this Section 2.06(b)(vi)(C) will not apply upon the satisfaction of the mandatory prepayment required by Section 2.06(b)(viii) below.

(vii)     Change of Control.  Immediately upon the occurrence of a Change of Control, the Borrower shall prepay the Loans in an amount equal to 100% of the aggregate outstanding principal amount of Loans.

(viii)     Amortization Date.  On the Amortization Date, the Borrower shall prepay the Loans in an aggregate principal amount (together with any accrued and unpaid interest thereon) such that the Non-Loyalty Collateral Coverage Ratio shall not be less than 2.00 to 1.00.

(c)     Notices.  Each such notice pursuant to this Section shall be in the form of a written Prepayment Notice, appropriately completed and signed by a Responsible Officer of the Borrower, and must be received by the Administrative Agent not later than 11:00 a.m. (New York City time) three (3) Business Days before the date of prepayment (which delivery may initially be by electronic communication including fax or email and shall be followed by an original authentic counterpart thereof).  Each Prepayment Notice shall specify the (x) the prepayment date and (y) the principal amount of the Loans or portion thereof to be prepaid.  Each Prepayment Notice shall be irrevocable.

(d)     Payments.  Any prepayment of the Loans pursuant to this Section 2.06 shall be accompanied by accrued interest on the principal amount prepaid as set forth in Section 2.09(c).

SECTION 2.07 Reduction and Termination of Commitments.   The Initial Lender's Commitment shall (x) automatically and permanently be reduced by the amount of any Borrowing of a Loan and (y) automatically and permanently terminate on March 26, 2021.  The Borrower may, upon not less than three (3) Business Days' notice to the Initial Lender and the Administrative Agent, terminate the Commitment or, from time to time, reduce the Commitment.  Any such reduction in the Commitment shall be in an amount equal to $1,000,000 or a whole multiple thereof, and shall permanently reduce the Commitment.

SECTION 2.08 Repayment of Loans. The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders the aggregate principal amount of all Loans outstanding on the Maturity Date.

SECTION 2.09 Interest.

(a)     Interest Rates.  Subject to paragraph (b) of this Section, the Loans shall bear interest at a rate per annum equal to the Adjusted LIBO Rate plus the Applicable Rate.

(b)     Default Interest.  If any amount payable by the Borrower under this Agreement or any other Loan Document (including principal of any Loan, interest, fees and other amount) is not paid when due, whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a rate per annum equal to the applicable Default Rate.  Upon the request of the Required Lenders, while any Event of Default exists, the Borrower shall pay interest on the principal amount of all Loans outstanding hereunder at a rate per annum equal to the applicable Default Rate.

(c)     Payment Dates.  Accrued interest on each Loan shall be payable in arrears on or before 12:00 noon (New York City time) on each Interest Payment Date applicable thereto and at such other times as may be specified herein; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan (including mandatory prepayments under Section 2.06(b)), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)     Interest Computation.  All interest hereunder shall be computed on the basis of a year of three hundred sixty (360) days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.10 Benchmark Replacement Setting.

(a)     Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, as notified by the Required Lenders to the Administrative Agent in writing, then (x) if a Benchmark Replacement is determined in accordance with clause (1) or (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (3) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders and the Administrative Agent by the Required Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document, so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(b)     Benchmark Replacement Conforming Changes. In connection with the implementation of a Benchmark Replacement, the Administrative Agent (after consultation with the Required Lenders) will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)     Notices; Standards for Decisions and Determinations. The Initial Lender or the Required Lenders, as the case may be, will promptly notify the Administrative Agent, which will then promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date, (ii) the implementation of any Benchmark Replacement, (iii) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (d) below and (iv) the commencement or conclusion of any Benchmark Unavailability Period. The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Benchmark Replacement Conforming Changes. Any determination, decision or election that may be made by any Lender (or group of Lenders) or the Administrative Agent, if applicable, pursuant to this Section 2.10 including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.10. Notwithstanding anything in this Agreement to the contrary, the Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, any determination made by it in connection with the adoption of Benchmark Replacement Conforming Changes or for the impact of such Benchmark Replacement Conforming Changes, nor for the failure to adopt any Benchmark Replacement Conforming Changes due to the failure of the Required Lenders to cooperate in good faith in connection with the determination of any Benchmark Replacement Conforming Changes.

(d)     <u>Unavailability of Tenor of Benchmark</u>. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR or USD LIBO Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the definition of "Interest Period" may be modified for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) used by the Administrative Agent or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the definition of "Interest Period" may be modified for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     <u>Benchmark Unavailability Period</u>. During any Benchmark Unavailability Period, all calculations of interest by reference to a LIBO Rate hereunder shall instead be made by reference to the Alternate Base Rate.

SECTION 2.11 <u>Evidence of Debt</u>.

(a)     <u>Maintenance of Records</u>.  The Administrative Agent shall maintain the Register in accordance with Section 11.04(c).  The entries made in the records maintained pursuant to this paragraph (a) shall be <u>prima facie</u> evidence absent manifest error of the existence and amounts of the obligations recorded therein.  Any failure of the Administrative Agent to maintain such records or make any entry therein or any error therein shall not in any manner affect the obligations of the Borrower under this Agreement and the other Loan Documents.

(b)     <u>Promissory Notes</u>.  The Borrower shall prepare, execute and deliver to such Lender a promissory note of the Borrower payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and a form attached as Exhibit C hereto, which shall evidence such Lender's Loan.

SECTION 2.12 <u>Payments Generally</u>.

(a)     <u>Payments by Borrower</u>.  All payments to be made by the Borrower hereunder and the other Loan Documents shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all such payments shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, to the Administrative Account in immediately available funds not later than 12:00 noon (New York City time) on the date specified herein.  All amounts received by a Lender or the Administrative Agent after such time on any date shall be deemed to have been received on the next succeeding Business Day and any applicable interest or fees shall continue to accrue.  The Administrative Agent will promptly distribute to each Lender its ratable share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's applicable lending office (or otherwise distribute such payment in like funds as received to the Person or Persons entitled thereto as provided herein).  If any payment to be made by the Borrower shall fall due on a day that is not a Business Day, payment shall be made on the next succeeding Business Day and such extension of time shall be reflected in computing interest or fees, as the case may be; <u>provided</u> that, if such next succeeding Business Day would fall after the Amortization Date or the Maturity Date, as applicable, payment shall be made on the immediately preceding Business Day.  Except as otherwise expressly provided herein, all payments hereunder or under any other Loan Document shall be made in Dollars.

(b)     Underline{Application of Insufficient Payments}.  Subject to Section 7.02, if at any time insufficient funds are received by and available to the Lenders or the Administrative Agent to pay fully all amounts of principal, interest, fees and other amounts then due hereunder, such funds shall be applied (i) first, to pay interest, fees and other amounts then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest, fees and other amounts then due to such parties, and (ii) second, to pay principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)     Presumptions by Administrative Agent.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, but shall not be obligated to, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. Notwithstanding the foregoing, the Administrative Agent is not required to make any payment to the Lenders until it is in possession of cleared funds from the Borrower.

(d)     Deductions by Administrative Agent.  If any Lender (other than the Initial Lender) shall fail to make any payment required to be made by it pursuant to Section 2.13 or 11.03(c), then the Administrative Agent may, in its discretion and notwithstanding any contrary provision hereof, (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender for the benefit of the Administrative Agent to satisfy such Lender's obligations to the Administrative Agent until all such unsatisfied obligations are fully paid or (ii) hold any such amounts in a segregated account as cash collateral for, and for application to, any future funding obligations of such Lender under any such Section, in the case of each of clauses (i) and (ii) above, in any order as determined by the Administrative Agent in its discretion.

(e)     Several Obligations of Lenders.  The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 11.03(c) are several and not joint.  The failure of any Lender to make any Loan or to make any such payment on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its payment under Section 11.03(c).

SECTION 2.13 Sharing of Payments.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided that:

(i)     if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this

42

Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this paragraph shall apply).

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

SECTION 2.14  Compensation for Losses.  In the event of (a) the payment of any principal of the Loans other than on the last day of an Interest Period (including as a result of an Event of Default), (b) the failure to borrow or prepay the Loans (or any portion thereof) on the date specified in any notice delivered pursuant hereto, or (c) the assignment of the Loans (or any portion thereof) other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.19(b), then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  Such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, for the date that would have been the applicable Interest Period), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the London interbank eurodollar market.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate promptly after receipt thereof.

SECTION 2.15  Increased Costs.

(a)     Increased Costs Generally.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the Adjusted LIBO Rate);

(ii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making or maintaining any Loan or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or other Recipient, the Borrower will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)      [Reserved].

(c)      <u>Certificates for Reimbursement</u>.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) of this Section and delivered to the Borrower, shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)      <u>Delay in Requests</u>.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 2.16 <u>Taxes</u>.

(a)      <u>Defined Terms</u>.  For purposes of this Section, the term "Applicable Law" includes FATCA.

(b)      <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.  Borrower acknowledges and agrees that, absent a Change in Law, Borrower is not required to withhold or deduct from any such payments to the Initial Lender on account of any U.S. federal withholding taxes or Taxes imposed pursuant to FATCA.

(c)      <u>Payment of Other Taxes by Borrower</u>.  The Borrower shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the Initial Lender, the Required Lenders or the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)      <u>Indemnification by Borrower</u>.  The Borrower shall indemnify each Recipient, within thirty (30) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent if such Lender is not the Initial Lender), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)      <u>Indemnification by the Lenders</u>.  Each Lender (other than the Initial Lender) shall severally indemnify the Administrative Agent, within thirty (30) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already

44

indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.04(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any such Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender (other than the Initial Lender) hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to such Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)     Evidence of Payments.  As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)     Status of Lenders.  (i) Any Lender (other than the Initial Lender) that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower (or, if such Lender is not the Initial Lender, the Administrative Agent) as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender (other than the Initial Lender), if reasonably requested by the Borrower (or the Administrative Agent), shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower (or the Administrative Agent) as will enable the Borrower (or the Administrative Agent) to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (g)(ii)(A), (ii)(B)and (ii)(D) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing,

(A)     any Lender (other than the Initial Lender) that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to

payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI (or any successor forms) and, in the case of an Agent, a withholding certificate that satisfies the requirements of Treasury Regulation Sections 1.1441-1(b)(2)(iv) and 1.1441-1(e)(3)(v) as applicable to a U.S. branch that has agreed to be treated as a U.S. Person for withholding tax purposes;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit B-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit B-2 or Exhibit B-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit B-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender (other than the Initial Lender) under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary

for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so. Notwithstanding anything to the contrary in this Agreement, the Initial Lender shall be entitled to the benefits of this Section 2.16 and all related provisions under this Agreement without regard to whether it provides any documentation described in Section 2.16(g).

(h)     Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     Survival. Each party's obligations under this Section shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.17 [Reserved].

SECTION 2.18 [Reserved].

SECTION 2.19 Mitigation Obligations; Replacement of Lenders.

(a)     Designation of a Different Lending Office. If any Lender requests compensation under Section 2.15, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.16, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.16, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)      Replacement of Lenders.  If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.16 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with paragraph (a) of this Section, or if any Lender is a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 11.04), all of its interests, rights (other than its existing rights to payments pursuant to Section 2.15 or Section 2.16) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i)      the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 11.04;

(ii)      such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 2.14) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)      in the case of any such assignment resulting from a claim for compensation under Section 2.15 or payments required to be made pursuant to Section 2.16, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)      such assignment does not conflict with Applicable Law; and

(v)      in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

The Credit Parties represent and warrant to the Administrative Agent, the Collateral Agent and the Lenders on the Closing Date and on the date of each Borrowing that:

SECTION 3.01 Existence, Qualification and Power.  Each of the Credit Parties and their respective Material Subsidiaries (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, except, in each case referred to in clause (a) (other than with respect to any Credit Party), (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

48

SECTION 3.02 <u>Authorization; No Contravention</u>.  The execution, delivery and performance by each Credit Party of each Loan Document to which it is party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of its Organizational Documents, (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any material Contractual Obligation to which each Credit Party is a party or affecting each Credit Party or the material properties of any Credit Party or (ii) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which any Credit Party or its property is subject or (c) violate any Law, except to the extent such violation could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.03 <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, each Credit Party of this Agreement or any other Loan Document, except for (i) such approvals, consents, exemptions, authorizations, actions or notices that have been duly obtained, taken or made and in full force and effect and (ii) filings and consents contemplated by the Security Documents or Section 5.14.

SECTION 3.04 <u>Execution and Delivery; Binding Effect</u>.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Credit Party.  This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of each Credit Party, enforceable against each Credit Party in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or other Laws affecting creditors' rights generally and by general principles of equity.

SECTION 3.05 <u>Financial Statements; No Material Adverse Change</u>.

(a)     <u>Financial Statements</u>.  The financial statements described in <u>Schedule 3.05</u> were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and fairly present in all material respects the financial condition of the Parent and its Subsidiaries as of the date thereof and their results of operations and cash flows for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

(b)     <u>No Material Adverse Change</u>.  Since the date of the most recent audited balance sheet included in the financial statements described in <u>Schedule 3.05</u>, there has been no event or circumstance that, either individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect.

SECTION 3.06 <u>Litigation</u>.  Except for those matters which have been publicly disclosed in any SEC filing of the Parent filed prior to the Closing Date, there are no actions, suits, proceedings, claims, disputes or investigations pending or, to the knowledge of any Credit Party, threatened, at Law, in equity, in arbitration or before any Governmental Authority, by or against any Credit Party or any of its Subsidiaries or against any of their properties or revenues that (a) either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect or (b) purport to affect or pertain to this Agreement or any other Loan Document or any of the transactions contemplated hereby.

SECTION 3.07 <u>Contractual Obligations; No Default</u>.  None of the Credit Parties and their respective Subsidiaries is in default under or with respect to any Contractual Obligation that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

49

SECTION 3.08 <u>Property</u>.

(a)     <u>Ownership of Properties and Collateral</u>.   Each of the Credit Parties and their respective Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title that, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Each Credit Party has good title to the Collateral owned by it, free and clear of all Liens other than Permitted Liens.

(b)     <u>Intellectual Property and Personal Data</u>.   Each of the Credit Parties and their respective Subsidiaries owns, licenses or possesses the valid and enforceable right to use all of the material Intellectual Property and data (including Personal Data) that is used in or necessary for the operation of each Carrier Loyalty Program.  The use of Loyalty Program Intellectual Property and the Loyalty Program Data by the Credit Parties and the conduct of the Carrier Loyalty Programs as currently conducted do not materially infringe upon, misappropriate, dilute or otherwise violate any Privacy Law nor any rights held by any other Person.  No claim or litigation regarding any of the foregoing, or challenging the ownership, validity or enforceability of any Loyalty Program Intellectual Property is pending or, to the knowledge of any of the Credit Parties, threatened that could reasonably be expected to be material to any of the Credit Parties, and to the knowledge of the Credit Parties, there is no basis for any such claim.

SECTION 3.09 <u>Taxes</u>.   The Credit Parties and their respective Subsidiaries have filed all federal, state and other tax returns and reports required to be filed, and have paid all federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except (a) Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are being maintained in accordance with GAAP or (b) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.10 <u>Disclosure</u>.   (a) The Credit Parties and their respective Subsidiaries have disclosed to the Administrative Agent, the Collateral Agent and the Lenders all agreements, instruments and corporate or other restrictions to which they are subject, and all other matters known to them, that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  The Loan Application Form, reports, financial statements, certificates and other written information (other than projected or pro forma financial information) furnished by or on behalf of the Credit Parties and their respective Subsidiaries to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished), taken as a whole, do not contain any material misstatement of fact or omit to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not misleading; <u>provided</u> that, with respect to projected or pro forma financial information, the Credit Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation and delivery (it being understood that such projected information may vary from actual results and that such variances may be material) and (b) as of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

SECTION 3.11 <u>Compliance with Laws</u>.   Each of the Credit Parties and their respective Subsidiaries is in compliance with the requirements of all Laws (including Environmental Laws and Privacy Laws) and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to so comply, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

50

SECTION 3.12 ERISA Compliance.

(a)     Except as could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, (i) each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws and (ii) each Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter, opinion letter or advisory letter from the IRS to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the IRS to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the IRS, and, to the knowledge of any Credit Party, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(b)     There are no pending or, to the knowledge of any Credit Party, threatened or contemplated claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that, either individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect.

(c)     No ERISA Event has occurred, and neither any Credit Party nor any ERISA Affiliate is aware of any fact, event or circumstance that, either individually or in the aggregate, could reasonably be expected to constitute or result in an ERISA Event  that, either individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect.

(d)     Except as would not reasonably be expected to have individually or in the aggregate, a Material Adverse Effect, the present value of all accrued benefits under each Pension Plan (based on those assumptions used to fund such Pension Plan) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Pension Plan allocable to such accrued benefits by a material amount.

(e)     To the extent applicable, each Foreign Plan has been maintained in compliance with its terms and with the requirements of any and all applicable requirements of Law and has been maintained, where required, in good standing with applicable regulatory authorities, except to the extent that the failure so to comply could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  Neither the Parent nor any Subsidiary has incurred any obligation in connection with the termination of or withdrawal from any Foreign Plan that, either individually or in the aggregate, would reasonably be expected to have individually or in the aggregate, a Material Adverse Effect.  Except as would not reasonably be expected to have individually or in the aggregate, a Material Adverse Effect, the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Plan that is funded, determined as of the end of the most recently ended fiscal year of the Parent or Subsidiary, as applicable, on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the property of such Foreign Plan by a material amount, and for each Foreign Plan that is not funded, the obligations of such Foreign Plan are properly accrued.

SECTION 3.13 Environmental Matters.  Except with respect to any matters that, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, none of the Credit Parties and their respective Subsidiaries (a) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (b) knows of any basis for any permit, license or other approval required under any Environmental Law to be revoked, canceled, limited, terminated, modified, appealed or otherwise challenged, (c) has or could reasonably be expected to become subject to any Environmental Liability, (d) has received notice of any claim, complaint, proceeding, investigation or inquiry with respect to any Environmental Liability (and no such claim, complaint, proceeding, investigation or inquiry is pending or, to the knowledge of the Parent, is

threatened or contemplated) or (e) knows of any facts, events or circumstances that could give rise to any basis for any Environmental Liability with respect thereto.

SECTION 3.14 <u>Investment Company Act</u>.  None of the Credit Parties is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.15 <u>Sanctions; Export Controls; Anti-Corruption; AML Laws</u>.

(a)     None of the Credit Parties and their respective Subsidiaries and no director, officer, or affiliate of the foregoing is a Person that is:  (i) the subject of any sanctions administered or enforced by the United States (including, but not limited to, those administered by the U.S. Department of the Treasury's Office of Foreign Assets Control, the U.S. Department of State, and the U.S. Department of Commerce's Bureau of Industry and Security) ("<u>Sanctions</u>"),  (ii) organized or resident in a country or territory that is the subject of country-wide or region-wide Sanctions (including, currently, Crimea, Cuba, Iran, North Korea, and Syria) (each a "<u>Sanctioned Country</u>") or located in a Sanctioned Country except to the extent authorized under Sanctions or (iii) a Person with whom dealings are restricted or prohibited by Sanctions as a result of a relationship of ownership or control with a Person listed in (i) or (ii) (each of (i), (ii) and (iii) is a "<u>Sanctioned Person</u>").

(b)     For the period beginning eight (8) years prior to the date hereof, each of the Credit Parties and their respective Subsidiaries and their respective directors, officers and employees and, to the knowledge of the Credit Parties, such respective affiliates, have been, in all material respects, in compliance with the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "<u>FCPA</u>") and any other applicable anti-bribery or anti-corruption laws and regulations (collectively with the FCPA, the "<u>Anticorruption Laws</u>") and all applicable Sanctions, Export Control Laws, and AML Laws.

SECTION 3.16 <u>Solvency</u>.  The Borrower and its Subsidiaries are Solvent on a consolidated basis after giving effect to the borrowing of the Loans.

SECTION 3.17   <u>Subsidiaries</u>.  <u>Schedule 3.17</u> sets forth the name of, and the ownership interests of the Parent and each of its Subsidiaries and indicates which of such Subsidiaries are Excluded Subsidiaries as of the date hereof.

SECTION 3.18   <u>Senior Indebtedness</u>.  The Loans, the Obligations and the Guaranteed Obligations constitute "senior indebtedness" (or any other similar or comparable term) under and as defined in the documentation governing any Indebtedness of the Credit Parties that is subordinated in right of payment to any other Indebtedness thereof.

SECTION 3.19   <u>Insurance Matters</u>.   The properties of the Credit Parties are insured pursuant to Section 5.06 hereof.  Each insurance policy required to be maintained by the Credit Parties pursuant to Section 5.06 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

SECTION 3.20   <u>Labor Matters</u>.  Except as would not reasonably be expected to have individually or in the aggregate, a Material Adverse Effect, (a) there are no strikes, lockouts, slowdowns or other material labor disputes against any Credit Party or any of its Subsidiary thereof pending or, to the knowledge of the Credit Parties, threatened, (b) the Credit Parties and their respective Subsidiaries have complied with all applicable federal, state, local and foreign Laws relating to the employment (or termination thereof), the hours worked by and payments made to employees of the Parent and its Subsidiaries comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters and (c) all payments due from the Credit Parties and their respective Subsidiaries, or for which any claim may be made against the Credit Parties and their respective Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance

with GAAP as a liability on the books of the Parent or such Subsidiary.  There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against the Credit Parties or their respective Subsidiaries pending or, to the knowledge of the Credit Parties, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of the Credit Parties and their respective Subsidiaries that would, individually or in the aggregate, be reasonably expected to result in a Material Adverse Effect.

SECTION 3.21 Insolvency Proceedings.  None of the Credit Parties has taken, and none of the Credit Parties is currently evaluating taking, any action to seek relief or commence proceedings under any Debtor Relief Law in any applicable jurisdiction.

SECTION 3.22 Margin Regulations.  The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no part of the proceeds of any Borrowing hereunder will be used to buy or carry any Margin Stock.  Following the application of the proceeds of each Borrowing, not more than 25% of the value of the assets (either of the Borrower only or of the Borrower and its Subsidiaries on a consolidated basis) will be Margin Stock.

SECTION 3.23 Liens.  There are no Liens of any nature whatsoever on any Collateral other than Liens permitted under Section 6.02 hereof.

SECTION 3.24 Perfected Security Interests.

(a)      As of the Closing Date (or such later date as permitted under Section 5.14) and as of the date of each Borrowing, the Security Documents, taken as a whole, are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable first priority security interest in all of the Collateral to the extent purported to be created thereby.

(b)      As of the Closing Date (or such later date as permitted under Section 5.15 and as of the date of each Borrowing, each Credit Party has or shall have satisfied the Perfection Requirement with respect to the Collateral.

SECTION 3.25 US Citizenship.  The Borrower is a "citizen of the United States" as defined in Section 40102(a)(15) of Title 49 and as that statutory provision has been interpreted by the DOT pursuant to its policies.

SECTION 3.26 Air Carrier Status.  The Borrower is an "air carrier" within the meaning of Section 40102 of Title 49, holds a certificate under Section 41102 of Title 49 and, during the time period from April 1, 2019 to September 30, 2019, derived more than 50% of its air transportation revenue from the transportation of passengers.  The Borrower holds an air carrier operating certificate issued pursuant to Chapter 447 of Title 49.  The Borrower possesses all necessary certificates, franchises, licenses, permits, rights, designations, authorizations, exemptions, concessions, frequencies and consents which relate to the operation of the routes flown by it and the conduct of its business and operations as currently conducted, except where failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.27 Cybersecurity.  Except as could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, the information technology assets, equipment, systems, networks, software, hardware, and the computers, websites, applications and databases used by or on behalf of the Credit Parties in connection with any of the Carrier Loyalty Programs (collectively, "IT Systems") (i) are adequate for the operation of the Carrier Loyalty Programs as currently conducted, and (ii) are free and clear of all bugs, errors, defects, Trojan horses, time bombs, malware and other corruptants.

Except as could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, (i) the Credit Parties have implemented and maintained commercially reasonable (taking into account the nature, scope and sensitivity of the information) policies, procedures, and safeguards designed to maintain and protect all Loyalty Program Data and confidential information (including Trade Secrets) included in the Collateral and the integrity, continuous operation, redundancy and security of all IT Systems and data and (ii) there have been no breaches, cyberattacks (including ransomware attacks) or unauthorized uses of or accesses to the IT Systems or any Loyalty Program Data, Trade Secrets or confidential information stored therein or processed thereby, except for those that have been fully remedied.

SECTION 3.28 <u>Loyalty Program Agreements</u>.  The Credit Parties have delivered or made available to the Initial Lender complete and correct copies of each of the Material Loyalty Program Agreements. Each of the Material Loyalty Program Agreements is in full force and effect and except as could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, none of the Credit Parties has knowledge of or has received notice of (i) any breach, (ii) change in law or (iii) force majeure event, in the case of (ii) and (iii) as defined under the applicable Material Loyalty Program Agreement, that would prevent such Credit Party and/or the applicable counterparty from performing its respective obligations under such Material Loyalty Program Agreement.

ARTICLE IV

CONDITIONS

SECTION 4.01 <u>Closing Date and Initial Borrowing</u>.  The effectiveness of this Agreement and the funding of the initial Borrowing hereunder are subject to the satisfaction (or waiver in accordance with Section 11.02) of the following conditions (and, in the case of each document specified in this Section to be received by the Initial Lender (and the applicable Agent or Agents), such document shall be in form and substance satisfactory to the Initial Lender and/or the applicable Agent or Agents):

(a)     <u>Executed Counterparts</u>.  The Initial Lender and the Agents shall have received from each party hereto a counterpart of this Agreement, any Security Documents to which it is a party and the Note, each signed on behalf of such party.  Notwithstanding anything herein to the contrary, delivery of an executed counterpart of a signature page of this Agreement or any Security Documents by telecopy or other electronic means, or confirmation of the execution of this Agreement on behalf of a party by an email from an authorized signatory of such party shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)     <u>Certificates</u>.  The Initial Lender and any applicable Agent shall have received such customary certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of the Credit Parties as the Lenders may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with the Loan Documents;

(c)     <u>Organizational Documents</u>.  The Initial Lender shall have received customary resolutions or evidence of corporate authorization, secretary's certificates and such other documents and certificates (including Organizational Documents and good standing certificates) as the Initial Lender may request relating to the organization, existence and good standing of each Credit Party and any other legal matters relating to the Credit Parties, the Loan Documents or the transactions contemplated thereby.

(d)     <u>Opinion of Counsel to Credit Parties</u>.  The Initial Lender and the applicable Agent or Agents shall have received all opinions of counsel (including any additional opinions of counsel as required under any Security Document) to the Credit Parties that is acceptable to the Initial Lender, addressed to the Initial Lender and the applicable Agent or Agents and dated the Closing

Date, in form and substance satisfactory to the Initial Lender and the applicable Agent (and the Parent hereby instructs such counsel to deliver such opinions to such Persons).

(e)     Beneficial Ownership Regulation Information.  At least five (5) days prior to the Closing Date, the Borrower shall deliver to the Initial Lender a Beneficial Ownership Certification.

(f)     Expenses.  The Borrower shall have paid all reasonable fees, expenses (including the fees and expenses of legal counsel) and other amounts due to the Initial Lender, the Administrative Agent and the Collateral Agent (to the extent that statements for such expenses shall have been delivered to the Borrower on or prior to the Closing Date); provided that such expenses payable by the Borrower may be offset against the proceeds of the Loans funded on the Closing Date.

(g)     Officer's Certificate.  The Initial Lender shall have received a certificate executed by a Responsible Officer of the Parent and the Borrower confirming (i) that the representations and warranties contained in Article III of this Agreement are true and correct on and as of the Closing Date, (ii) that the information provided in the Loan Application Form submitted by the Borrower was true and correct on and as of the date of delivery thereof, (iii) the satisfaction of such condition and (iv) that no Default or Event of Default exists or will result from the borrowing of the Loans on the Closing Date.

(h)     Other Documents.  The Initial Lender and the Agents shall have received such other documents as it may request.

(i)     Appraisals.  The Initial Lender shall have received Appraisals satisfactory in form and substance and performed by an Eligible Appraiser dated as of a date no earlier than thirty (30) days prior to the Closing Date.

(j)     Security Interests.  Each Credit Party shall have, and caused its Subsidiaries to, take any action and execute and deliver, or cause to be executed and delivered, any agreement, document or instrument required in order to create a valid, perfected first priority security interest in the Collateral in favor of the Collateral Agent for the benefit of the Secured Parties (including delivery of UCC financing statements in appropriate form for filing under the UCC and of the Intellectual Property security agreements included in the Required Filings and entering into control agreements).  Each Credit Party shall have satisfied, and caused its Subsidiaries to satisfy, the Perfection Requirement with respect to the Collateral. In addition, the Credit Parties shall have delivered a completed Perfection Certificate (as defined in the Pledge and Security Agreements).

(k)     Consents and Authorizations.  Each Credit Party shall have obtained all consents and authorizations from Governmental Authorities and all consents of other Persons (including shareholder approvals, if applicable) that are necessary or advisable in connection with this Agreement, any Loan Document, any of the transactions contemplated hereby or thereby or the continuing operations of the Credit Parties and each of the foregoing shall be in full force and effect and in form and substance satisfactory to the Initial Lender.

(l)     Lien Searches.  The Initial Lender shall have received (i) UCC, Intellectual Property and other lien searches conducted in the jurisdictions and offices where liens on material assets of the Credit Parties are required to be filed or recorded and (ii) to the extent Collateral consists of (x) Aircraft and Engine Assets (as defined in the Pledge and Security Agreements), aircraft registry lien searches conducted with the FAA and the International Registry, and (y) Spare Part Assets (as defined in the Pledge and Security Agreements), registry lien searches conducted with the FAA (with reference to each Designated Spare Parts Location set forth on Schedule 2.1 of the Pledge and Security Agreements), in each case, reflecting the absence of Liens on the assets of

the Credit Parties, other than Permitted Liens or Liens to be discharged on or prior to the Closing Date pursuant to documentation satisfactory to the Initial Lender.

(m)     Collateral Coverage Ratio.  On the Closing Date (and after giving pro forma effect to any Borrowings on such date), the Collateral Coverage Ratio shall not be less than 2.0 to 1.0.

(n)     Solvency Certificate.  The Initial Lender shall have received a certificate of the chief financial officer or treasurer (or other comparable officer) of the Parent certifying that the Borrower and its Subsidiaries (taken as a whole) are, and will be immediately after giving effect to any Loans borrowed on the Closing Date, Solvent.

(o)     Warrant Agreement.  Treasury and Parent shall have entered into the Warrant Agreement.

(p)     Loyalty Revenue Advance Transactions.  On the Closing Date, the aggregate outstanding balance of Loyalty Revenue Advance Transactions shall not exceed an aggregate amount equal to $15,000,000.

(q)     Control Agreements.  The Initial Lender and the Collateral Agent shall have received fully executed copies of account control agreements in form and substance satisfactory to the Initial Lender with respect to the Collateral Accounts.

(r)     [Reserved].

(s)     Loyalty Partner Direct Agreements.  The Initial Lender and the Collateral Agent shall have received duly executed Direct Agreements from the counterparties to each Material Loyalty Program Agreement in effect on the Closing Date substantially in the form of Exhibit D hereto.

(t)     ABL Agreement.  The Initial Lender shall have received satisfactory evidence that all Liens under the ABL Agreement encumbering any Loyalty Program Agreement, any other Loyalty Program Assets, any Collateral Account or any other property constituting Collateral for the Secured Obligations have been released and are no longer in effect.

(u)     Other Matters.  Since August 5, 2020, (i) there has been no event or circumstance that, either individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect and (ii) none of the Credit Parties has made a Disposition (including any sale of Currency) of any assets of the type that would be included in the Collateral had this Agreement been in effect at such time other than as would have been permitted under Section 6.04(b), (d), (e) or (h).

SECTION 4.02 Each Borrowing.  The funding by the Lenders of each Borrowing (including the Borrowing to be requested on the Closing Date) is additionally subject to the satisfaction of the following conditions:

(a)     the Administrative Agent shall have received a written Borrowing Request in accordance with the requirements of Section 2.03(a), with a copy to the Initial Lender (solely to the extent the Initial Lender is a Lender at the time of such Borrowing);

(b)     the representations and warranties of the Credit Parties set forth in this Agreement and in any other Loan Document shall be true and correct in all material respects (or, in the case of any such representation or warranty already qualified by materiality, in all respects) on and as of

the date of such Borrowing (or, in the case of any such representation or warranty expressly stated to have been made as of a specific date, as of such specific date);

(c)     no Default shall have occurred and be continuing or would result from such Borrowing or from the application of proceeds thereof;

(d)     on the date of the funding of such Borrowing (and after giving pro forma effect thereto and the pledge of any Additional Collateral), the Collateral Coverage Ratio shall not be less than 2.0 to 1.0 as evidenced by a certificate of a Responsible Officer of the Parent;

(e)     [reserved];

(f)     the Initial Lender shall have received satisfactory evidence that (x) each Material Loyalty Program Agreement has and (y) Loyalty Program Agreements representing 90% of Loyalty Program Revenues (excluding revenues generated under any Loyalty Subscription Program) in the aggregate over the immediately preceding twelve (12) calendar month period then ended have, in each case, an expiration date that is at least six (6) months after the Amortization Date (without giving effect to the proviso in the definition thereof);

(g)     on the date of such Borrowing, the opinion of the independent public accountants (after giving effect to any reissuance or revision of such opinion) on the most recent audited consolidated financial statements delivered by the Parent pursuant to Section 5.01(a) shall not include a "going concern" qualification under GAAP as in effect on the date of this Agreement or, if there is a change in the relevant provisions of GAAP thereafter, any like qualification or exception under GAAP after giving effect to such change; and

(h)     on or prior to the date of such Borrowing, each Credit Party shall have satisfied the Perfection Requirement with respect to the Collateral.

Each Borrowing Request by the Borrower hereunder and each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on and as of the date of the applicable Borrowing as to the matters specified in clauses (b) and (c) above in this Section.

ARTICLE V

AFFIRMATIVE COVENANTS

Until all the later of (i) the date on which all of the Obligations shall have been paid in full and (ii) such later date specified in this Agreement, the Credit Parties covenant and agree with the Lenders that:

SECTION 5.01 Financial Statements.  The Parent will furnish to the Administrative Agent and each Lender:

(a)     as soon as available, and in any event within ninety (90) days after the end of each fiscal year of the Parent (or, if earlier, five (5) days after the date required to be filed with the SEC) (commencing with the fiscal year ended prior to the Closing Date), a consolidated balance sheet of the Parent and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, audited and accompanied by a report and opinion of independent public accountants of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards (and shall not be subject to any "going concern" or like qualification (other than

a qualification solely resulting from (x) the impending maturity of any Indebtedness or (y) any prospective or actual default under any financial covenant), exception or explanatory paragraph or any qualification, exception or explanatory paragraph as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Parent and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b)      as soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Parent (or, if earlier, five (5) days after the date required to be filed with the SEC) (commencing with the first of such fiscal quarters ended prior to the Closing Date), a consolidated balance sheet of the Parent and its Subsidiaries as at the end of such fiscal quarter, the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal quarter and for the portion of the Parent's fiscal year then ended, in each case setting forth in comparative form, as applicable, the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, certified by a Financial Officer of the Parent as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Parent and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject only to normal year-end audit adjustments and the absence of notes;

(c)      for so long as the Initial Lender is the only Lender, as soon as available, but in any event no later than seventy-five (75) days after the beginning of each fiscal year of the Parent, (i) forecasts prepared by management of the Parent and a summary of material assumptions used to prepare such forecasts, in form satisfactory to the Initial Lender, including projected consolidated balance sheets and statements of income or operations and cash flows of the Parent and its Subsidiaries on a quarterly basis for such fiscal year and (ii) reasonably detailed calculations in a form satisfactory to the Appropriate Party of (A) all Loyalty Program Revenues and related cash flows for the immediately preceding fiscal year and (B) projected Loyalty Program Revenues for the next two fiscal years; and

(d)      solely at the request of the Appropriate Party (which shall be no more than quarterly), at a time mutually agreed with the Appropriate Party and the Parent, participate in a conference call for Lenders to discuss the financial condition and results of operations of the Parent and its Subsidiaries and any forecasts which have been delivered pursuant to this Section 5.01.

SECTION 5.02 Certificates; Other Information.      The Parent will deliver to the Administrative Agent and each Lender:

(a)      [reserved];

(b)      concurrently with the delivery of the financial statements referred to in Sections 5.01(a) and (b), a duly completed certificate signed by a Responsible Officer of the Parent certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto;

(c)      [reserved];

(d)      promptly after the furnishing thereof, copies of any notice of default or potential default or other material written notice received by the Parent or any Subsidiary from, or furnished by the Parent or any Subsidiary to, any holder of Material Indebtedness of the Parent or any Subsidiary;

(e)      promptly after receipt thereof by any Credit Party or any Subsidiary thereof, copies of each material notice or other material written correspondence received from the SEC (or

comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding material financial or other material operational results of any Credit Party or any Subsidiary thereof;

(f)      [reserved];

(g)      promptly following any request therefor, (i) such other information regarding the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of any Credit Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent, the Initial Lender or any other Lender (acting through the Administrative Agent) may from time to time request; or (ii) beneficial ownership information and documentation reasonably requested by the Administrative Agent or any Lender from time to time for purposes of ensuring compliance with Sanctions and AML Laws.  For purposes of determining whether or not a representation with respect to any indirect ownership is true or a covenant is being complied with under this Section, the Parent shall not be required to make any investigation into (i) the ownership of publicly traded stock or other publicly traded securities or (ii) the ownership of assets by a collective investment fund that holds assets for employee benefit plans or retirement arrangements;

(h)      concurrently with the delivery of the financial statements referred to in Sections 5.01(a) and (b), a duly completed certificate signed by a Responsible Officer of the Borrower certifying as to its compliance with Article X of this Agreement;

(i)      knowledge or notice of any event or circumstance that has had or is reasonably expected to (i) result in a material reduction or suspension of payments under any Material Loyalty Program Agreement or any Loyalty Subscription Program or (ii) have a material adverse effect on the ability of a Credit Party and/or any counterparty to a Material Loyalty Program Agreement to perform its material obligations thereunder;

(j)      certificates with reasonably detailed calculations of the Collateral Coverage Ratio on each CCR Certificate Delivery Date and the Debt Service Coverage Ratio on each DSCR Determination Date; and

(k)      no later than ten (10) Business Days following the last day of each March, June, September and December (commencing December 31, 2020), deliver a certificate of a Responsible Officer of the Parent (i) setting forth the name of each new Material Loyalty Program Agreement entered into as of such date and each of the parties thereto, (ii) certifying that all Loyalty Program Revenue for the immediately preceding calendar quarter were deposited, directly or indirectly, into the Collection Account or another Collateral Account (and at least 90% of all Loyalty Program Revenues (excluding revenues generated under any Loyalty Subscription Program) were deposited directly into a Collateral Account)  and (iii) setting forth in reasonable detail and in form satisfactory to the Appropriate Party (x) all Loyalty Program Revenues and related cash flows for the immediately preceding calendar quarter and (y) for so long as the Initial Lender is the only Lender, projected Loyalty Program Revenues for the current calendar quarter.

Documents required to be delivered pursuant to Section 5.01(a) or (b) or Section 5.02(c), (d) or (e) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and, if so delivered, shall be deemed to have been delivered on the date (i) on which such materials are publicly available as posted on the Electronic Data Gathering, Analysis and Retrieval system (EDGAR); or (ii) on which such documents are posted on the Parent's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that:  (A) upon written request by the Administrative Agent, the Parent shall deliver paper copies of such

documents to the Administrative Agent or any Lender upon its request to the Parent to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (B) the Parent shall notify the Administrative Agent and each Lender (by facsimile or electronic mail) of the posting of any such documents and provide to the Lenders by electronic mail electronic versions (i.e., soft copies) of such documents.  The Administrative Agent shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to above.

SECTION 5.03  <u>Notices</u>.  The Parent will promptly notify the Administrative Agent and each Lender of:

(a)  promptly after any Responsible Officer of Parent or any of its Subsidiaries obtains knowledge thereof, the occurrence of any Default;

(b)  the filing or commencement of any action, suit, investigation or proceeding by or before any arbitrator or Governmental Authority against or affecting the Parent or any Controlled Affiliate thereof, including pursuant to any applicable Environmental Laws, that could reasonably be expected to be adversely determined, and, if so determined, could reasonably be expected to have a Material Adverse Effect;

(c)  the occurrence of any ERISA Event that, either individually or together with any other ERISA Events, could reasonably be expected to have a Material Adverse Effect;

(d)  notice of any action arising under any Environmental Law or of any noncompliance by any Credit Party or any Subsidiary with any Environmental Law or any permit, approval, license or other authorization required thereunder that, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(e)  to the extent not publicly disclosed pursuant to an SEC filing of the Parent, any material change in accounting or financial reporting practices by the Parent, any Credit Party or any Subsidiary;

(f)  any change in the Credit Ratings from a Credit Rating Agency with negative implications, or the cessation by a Credit Rating Agency of, or its intent to cease, rating the Borrower's or the Parent's debt; and

(g)  any matter or development that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Responsible Officer of the Parent setting forth the details of the occurrence requiring such notice and stating what action the Parent has taken and proposes to take with respect thereto.

SECTION 5.04  <u>Preservation of Existence, Etc.</u>  Each Credit Party will, and will cause each of its Subsidiaries to, (a) preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 6.03 or 6.04; (b) take all reasonable action to maintain all rights, licenses, permits, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

SECTION 5.05  <u>Maintenance of Properties</u>.  Each Credit Party will, and will cause each of its Subsidiaries to, (a) maintain, preserve and protect all of its properties and equipment necessary in the

operation of its business in good working order and condition (ordinary wear and tear excepted) and (b) make all necessary repairs thereto and renewals and replacements thereof, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.06 <u>Maintenance of Insurance</u>.  Subject to any additional requirements under any Security Document, each Credit Party will maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as Parent and its Subsidiaries; <u>provided</u> that, insurance in respect of Collateral shall be maintained with such third party insurance companies except to the extent expressly permitted in the Pledge and Security Agreements) as are customarily carried under similar circumstances by such Persons.

SECTION 5.07 <u>Payment of Obligations</u>.  Each Credit Party will pay, discharge or otherwise satisfy as the same shall become due and payable, all of its obligations and liabilities, including Tax liabilities, except to the extent (a) the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Parent or such Credit Party or (b) the failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.08 <u>Compliance with Laws</u>.  Each Credit Party will, and will cause each of its Subsidiaries to, comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.09 <u>Environmental Matters</u>.  Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, each Credit Party will, and will cause each of its Subsidiaries to, (a) comply with all Environmental Laws, (b) obtain, maintain in full force and effect and comply with any permits, licenses or approvals required for the facilities or operations of the Parent or any of its Subsidiaries, and (c) conduct and complete any investigation, study, sampling or testing, and undertake any corrective, cleanup, removal, response, remedial or other action necessary to identify, report, remove and clean up all Hazardous Materials present or released at, on, in, under or from any of the facilities or real properties of the Parent or any of its Subsidiaries.

SECTION 5.10 <u>Books and Records</u>.  Each Credit Party will maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Parent or such Subsidiary, as the case may be.

SECTION 5.11 <u>Inspection Rights</u>.  Each Credit Party will, and,  to the extent relevant for inspections of Collateral will cause each of its Subsidiaries to, permit representatives, agents and independent contractors of the Administrative Agent, the Initial Lender and the Special Inspector General for Pandemic Recovery to visit and inspect any of its properties (including all Collateral), to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the reasonable expense of the Parent and at such reasonable times during normal business hours and as often as may be reasonably requested; <u>provided</u> that, other than with respect to such visits and inspections during the continuation of an Event of Default or by the Initial Lender or the Special Inspector General for Pandemic Recovery, (a) only the Administrative Agent (or its representatives, agents and independent contractors) at the direction of a Lender may exercise rights under this Section and (b) the Administrative Agent (or its representatives, agents and independent contractors) shall not exercise such rights more often than two (2) times during any calendar year; <u>provided</u>, <u>further</u>, that when an Event of Default exists the Administrative Agent, any Lender or the Special Inspector General for Pandemic Recovery (or any of their respective representatives, agents or

independent contractors) may do any of the foregoing under this Section at the expense of the Parent and at any time during normal business hours and without advance notice.

SECTION 5.12 <u>Sanctions; Export Controls; Anti-Corruption Laws and AML Laws</u>.  Each Credit Party and its Subsidiaries will remain in compliance in all material respects with applicable Sanctions, Export Control Laws, Anticorruption Laws, and AML Laws.  Until all Obligations have been paid in full, neither any Credit Party, any Subsidiary of a Credit Party, nor any director or officer of any Credit Party or any Subsidiary of a Credit Party shall become a Sanctioned Person or a Person that is organized or resident in a Sanctioned Country or located in a Sanctioned Country except to the extent authorized under Sanctions.

SECTION 5.13 <u>Guarantors; Additional Collateral</u>.

(a)    The Guarantors listed on the signature page to this Agreement hereby Guarantee the Guaranteed Obligations as set forth in Article IX.  If any Subsidiary (other than an Excluded Subsidiary) is formed or acquired after the Closing Date, if any Subsidiary ceases to be an Excluded Subsidiary or if required in connection with the addition of Additional Collateral, then the Parent will cause such Subsidiary, promptly (in any event, within thirty (30) days of such Subsidiary being formed or acquired or of such Subsidiary ceasing to be an Excluded Subsidiary), (i) to become a Guarantor of the Loans pursuant to joinder documentation reasonably acceptable to the Appropriate Party and on the terms and conditions set forth in Article IX, (ii) to become a party to each applicable Security Document and all other agreements, instruments or documents that create or purport to create and perfect a first priority Lien (subject to Permitted Liens) in favor of the Collateral Agent for the benefit of the Secured Parties in its assets that are of a type that are intended to be included in the Collateral (other than any Excluded Assets), subject to and in accordance with the terms, conditions and provisions of the Loan Documents, (iii) to satisfy the Perfection Requirement, (iv) to deliver a secretary's certificate of such Subsidiary, in form and substance reasonably acceptable to the Appropriate Party, with appropriate insertions and attachments, and (v) to deliver legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, satisfactory to the Appropriate Party.

(b)    If the Parent or any Subsidiary desires, or is required pursuant to the terms of this Agreement, to add Additional Collateral or, if any Subsidiary acquires any existing Collateral from a Grantor (as defined in the Pledge and Security Agreements) that it is required pursuant to the terms of this Agreement to maintain as Collateral, in each case, after the Closing Date, the Parent shall, in each case at its own expense, promptly (in any event, unless any other time period is specified in this Agreement or any other Loan Document, within thirty (30) days of the relevant date) (i) cause any such Subsidiary to become a Grantor (to the extent such Subsidiary is not already a Grantor) pursuant to joinder documentation acceptable to the Appropriate Party and on the terms and conditions set forth in the relevant Security Documents, (ii) cause any such Subsidiary to become a party to each applicable Security Document and all other agreements, instruments or documents that create or purport to create and perfect a first priority Lien (subject to Permitted Liens) in favor of the Collateral Agent for the benefit of the Secured Parties applicable to such Collateral, in form and substance satisfactory to the Appropriate Party (it being understood that in the case of any Additional Collateral of a type, or in a jurisdiction, that has not been theretofore included in the Collateral, such Additional Collateral may be subject to such additional terms and conditions as requested by the Appropriate Party), (iii) promptly execute and deliver (or cause such Subsidiary to execute and deliver) to the Collateral Agent such documents and take such actions to create, grant, establish, preserve and perfect the first priority Liens (subject to Permitted Liens) (including to obtain any release or termination of Liens not permitted under the definition of "Additional Collateral" in Section 1.01 or under Section 6.02 and to satisfy all Perfection Requirements, including the filing of UCC financing statements, filings with the FAA and registrations with the International Registry, as applicable) in favor of the Collateral Agent for the benefit of the Secured Parties on such assets of the Parent or such Subsidiary, as applicable, to secure the Obligations to the extent required under the applicable Security Documents or reasonably requested by the Appropriate Party, and to ensure that such Collateral shall be subject to no other Liens other than Permitted Liens and (iv) if requested by the Appropriate Party, deliver (or cause such

62

Subsidiary to deliver) legal opinions to the Collateral Agent, for the benefit of the Secured Parties, relating to the matters described above, which opinions shall be in form and substance, and from counsel, satisfactory to the Appropriate Party.

SECTION 5.14 Post-Closing Matters. As promptly as practicable, and in any event within the time periods after the Closing Date specified on Schedule 5.14 or such later date as the Initial Lender may agree to in writing in its sole discretion, the Parent shall deliver the documents or take the actions specified on Schedule 5.14 that would have been required to be delivered or taken on the Closing Date.

SECTION 5.15 Further Assurances. In each case subject to the terms, conditions and limitations in the Loan Documents, (a) each Credit Party shall remain in compliance with the Perfection Requirement with respect to all Collateral (including any assets, rights and properties that (x) become Collateral after the Closing Date and (y) any permitted replacement or substitute assets, rights and properties thereof (including any Additional Collateral) and (b) each Credit Party shall, promptly and at its expense, execute any and all further documents and instruments and take all further actions, that may be required or advisable under applicable law or that the Initial Lender, the Administrative Agent or the Collateral Agent may request, in order to create, grant, establish, preserve, protect, renew or perfect the validity, perfection or first priority of the Liens and security interests created or intended to be created by the Security Documents, in each case to the extent required under this Agreement or the Security Documents (including with respect to any additions to the Collateral (including any Additional Collateral) or replacements, substitutes or proceeds thereof or with respect to any other property or assets hereafter acquired by any Credit Party that are of a type that are intended to be included in the Collateral). Promptly following the entry by any Credit Party into any Material Loyalty Program Agreement after the Closing Date, the Parent will enter into and cause the counterparty to enter into a Direct Agreement substantially in the form of Exhibit D hereto.

SECTION 5.16 Delivery of Appraisals. The Parent shall (1) within ten (10) Business Days prior to the last Business Day of March and September of each year, beginning with March 31, 2021 and (2) promptly (but in any event within thirty (30) days) following request by the Administrative Agent (acting at the direction of the Required Lenders) if an Event of Default has occurred and is occurring, deliver to the Administrative Agent one or more Appraisals determining the Appraised Value of the Collateral. In addition, on the date upon which any Additional Collateral is pledged as Collateral to the Collateral Agent for the benefit of the Secured Parties to secure the Obligations, but only with respect to such Additional Collateral, the Parent shall deliver to the Administrative Agent one or more Appraisals determining the Appraised Value of such Additional Collateral.

SECTION 5.17 Ratings. At any time when the Initial Lender is a Lender, the Borrower shall, upon request by the Initial Lender, use its reasonable best efforts to obtain a public rating in respect of the Loans by any two of S&P, Moody's and Fitch in connection with any contemplated assignment of, or participation in, the Loans.

SECTION 5.18 Regulatory Matters.

(a)     US Citizenship. The Borrower will at all times maintain its status as a "citizen of the United States" as defined in Section 40102(a)(15) of Title 49 and as that statutory provision has been interpreted by the DOT pursuant to its policies.

(b)     Air Carrier Status. The Borrower will at all times maintain its status as an "air carrier" within the meaning of Section 40102 of Title 49 and holds a certificate under Section 41102 of Title 49. The Borrower will at all times possess an air carrier operating certificate issued pursuant to Chapter 447 of Title 49. The Borrower will at all times possess all necessary certificates, franchises, licenses, permits, rights, designations, authorizations, exemptions, concessions, frequencies and consents which relate to the operation of the routes flown by it and the conduct of its business and operations as

currently conducted, except where failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.19 <u>Loyalty Programs; Loyalty Program Agreements</u>.

(a)     <u>Loyalty Programs</u>.  The Parent will, and will cause each of its Subsidiaries to, take all actions necessary to maintain the existence, business and operations of the Carrier Loyalty Programs as in effect on the Closing Date or on terms at least as favorable to the Lenders, as determined by the Appropriate Party in its sole discretion, except as otherwise expressly permitted under this Agreement.

(b)     <u>Loyalty Program Agreements</u>.  The Parent will, and will cause each of its Subsidiaries to, take any action permitted under the Material Loyalty Program Agreements and applicable law that it, in its reasonable business judgment, determines is advisable, in order to diligently and promptly (i) enforce its rights and any remedies available to it under the Material Loyalty Program Agreements, (ii) perform its obligations under the Material Loyalty Program Agreements and (iii) use reasonable best efforts to cause the applicable counterparties to perform their obligations under the related Material Loyalty Program Agreements, including such counterparties' obligations to make payments to and indemnify the applicable Credit Parties in accordance with the terms thereof, in each case except as would not (1) be materially adverse to the Lenders or (2) reasonably be expected to result in a Material Adverse Effect.

SECTION 5.20 <u>Collections; Accounts; Payments</u>.

(a)     The Credit Parties shall (x) instruct and use their reasonable best efforts to cause counterparties to all Material Loyalty Program Agreements to direct payments of all Loyalty Program Revenue into the Collection Account and (y) cause sufficient counterparties to the Loyalty Program Agreements to direct payments of Loyalty Program Revenue into the Collection Account (in the case of Loyalty Program Revenue generated under any Material Loyalty Program Agreement, pursuant to a Direct Agreement) such that during any DSCR Test Period, at least 90% of Loyalty Program Revenue (excluding revenues generated under any Loyalty Subscription Program) for such period is deposited directly into the Collection Account.  Promptly following the entry by any Credit Party into any Material Loyalty Program Agreement after the Closing Date, the applicable Credit Party will enter into and cause the counterparty to enter into a Direct Agreement with respect to such Material Loyalty Program Agreement. To the extent the Parent, any Subsidiary or any of their respective Controlled Affiliates receives any payments of Loyalty Program Revenues to an account other than the Collection Account, such Person shall ACH or wire transfer as soon as practicable, but in any event within three (3) Business Days of receipt, any such amounts to the Collection Account.  All amounts in the Collection Account shall be conclusively presumed to be Collateral and proceeds of Collateral, and the Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the Collection Account.  No Credit Party shall revoke, or permit to be revoked, any payment direction included in any Direct Agreement other than in connection with a replacement Collection Account (which shall be at a depository institution satisfactory to the Appropriate Party).

(b)     Each account control agreement with respect to each Blocked Account shall require, after the occurrence and during the continuance of a Payment Event, the ACH or wire transfer no less frequently than once per Business Day (unless the Obligations are no longer outstanding), of all collected and available funds in such Blocked Account (net of such minimum balance, not to exceed $25,000, as may be required to be kept in the subject Blocked Account by the account bank), to an account in the name of the Borrower maintained by the Administrative Agent at The Bank of New York Mellon (the "<u>Payment Account</u>") or such other account as directed by the Administrative Agent. The Payment Accounts and the Blocked Accounts shall be non-interest bearing accounts. Funds on deposit in the Blocked Accounts and the Payment Accounts shall be uninvested.  All amounts in the Blocked Account shall be conclusively presumed to be Collateral and proceeds of Collateral, and the Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the Blocked Account.  The Borrower

64

may at any time elect to apply amounts on deposit in the Blocked Account to prepay the Loans, by requesting that the Collateral Agent instruct the account to withdraw such amounts for such prepayment.

(c)      The Payment Account shall at all times be under the sole dominion and control of the Collateral Agent and shall be subject to an account control agreement in form and substance satisfactory to the Appropriate Party. The Credit Parties hereby acknowledge and agree that (i) the Credit Parties have no right of withdrawal from the Payment Account, (ii) the funds on deposit in the Payment Account shall at all times be collateral security for all of the Obligations, and (iii) the funds on deposit in the Payment Account shall be applied to repay the Loans.  All amounts in the Payment Account shall be conclusively presumed to be Collateral and proceeds of Collateral, and the Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the Payment Account.  Upon payment in full of the Loans and all Obligations under this Agreement (other than contingent indemnification or reimbursement obligations not yet accrued and payable) and termination of the Commitments, any remaining amounts in the Payment Account will be released and transferred to a deposit account of the Credit Parties as the Borrower shall direct.

ARTICLE VI

NEGATIVE COVENANTS

Until all the later of (i) the date on which all of the Obligations shall have been paid in full and (ii) such later date specified in this Agreement, the Credit Parties covenant and agree with the Lenders that:

SECTION 6.01  [Reserved].

SECTION 6.02  Liens.  Parent will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien upon any property or assets constituting Collateral, whether now owned or hereafter acquired, except for Permitted Liens.

SECTION 6.03  Fundamental Changes.  Parent will not, and will not permit any of its Subsidiaries to, merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

(a)      any Subsidiary may merge with (i) the Borrower; provided that the Borrower shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries; provided that (x) when any Wholly-Owned Subsidiary is merging with another Subsidiary, a Wholly-Owned Subsidiary shall be the continuing or surviving Person and (y) when any Subsidiary that is a Credit Party is merging with another Subsidiary, then such other Subsidiary shall be a Credit Party;

(b)      any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Parent or to another Subsidiary; provided that (x) if the transferor in such a transaction is a Wholly-Owned Subsidiary, then the transferee shall either be the Parent or another Wholly-Owned Subsidiary and (y) if the transferor in such a transaction is a Credit Party, then the transferee shall be a Credit Party;

(c)      the Parent and its Subsidiaries may make Dispositions permitted by Section 6.04;

(d)      any Investment permitted by Section 6.06 may be structured as a merger, consolidation or amalgamation;

(e)     any Subsidiary may dissolve, liquidate or wind up its affairs if it owns no material assets, engages in no business and otherwise has no activities other than activities related to the maintenance of its existence and good standing; and

(f)     any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise), provided that such assets do not constitute all or substantially all of the consolidated assets of the Parent and its Subsidiaries.

SECTION 6.04  Dispositions.  Parent will not, and will not permit any of its Subsidiaries to, sell or otherwise make any Disposition of Collateral or enter into any agreement to make any sale or other Disposition of Collateral (in each case, including, without limitation by way of any sale or other Disposition of any Guarantor), except, subject to Article X and so long as no Default shall have occurred and be continuing at the time of any action described below, or would result therefrom:

(a)     the Disposition of Collateral expressly permitted under the applicable Security Documents;

(b)     any licenses or sublicenses (i) granted on a non-exclusive basis to customers or service providers in the ordinary course of business or to business partners in the ordinary course of business in a manner and subject to terms consistent with past practice or (ii) granted pursuant to any Loyalty Program Agreement in full force and effect as of the Closing Date, any successor agreement thereto or any new Loyalty Program Agreement, in each case that is included in the Collateral (provided that any such grant pursuant to such new or successor agreement is made in the ordinary course of business in a manner and subject to terms substantially similar with those of the predecessor Loyalty Program Agreement or with any Loyalty Program Agreement in full force and effect as of the Closing Date, as the case may be);

(c)     any abandonment, lapse, forfeiture or dedication to the public, in the ordinary course of business, of any Intellectual Property that, in the applicable Credit Party's reasonable good faith judgment, is no longer used and no longer useful in the business of the Borrower or its Subsidiaries;

(d)     any (1) deletion, de-identification or purge of any Personal Data that is required under applicable Privacy Laws, under any of the Credit Parties' public-facing privacy policies in full force and effect as of the Closing Date or in the ordinary course of business (including in connection with terminating inactive Carrier Loyalty Program accounts) pursuant to the applicable Credit Party's privacy and data retention policies in full force and effect as of the Closing Date consistent with past practice, (2) transfer of any Loyalty Program Data to services providers for their Processing of such data on behalf of any of the Credit Parties in the ordinary course of business, subject to a prohibition on deletion, de-identification and purging, except as permitted under clause (1) or (3) transfer of any Loyalty Program Data to a third party in the ordinary course of business to the extent such Credit Party also retains a copy of such Loyalty Program Data;

(e)     the sale, lease or other transfer any Currency under any Loyalty Program in accordance with any Loyalty Program Agreement as in existence on the Closing Date (or any (i) permitted successor agreement thereto or (ii) new Loyalty Program Agreement permitted under this Agreement, in each case that is included in the Collateral) or subsequently approved by the Appropriate Party;

(f)     Loyalty Revenue Advance Transactions (together with any Loyalty Revenue Advance Transactions outstanding on the Closing Date that remain outstanding) in an aggregate amount not to exceed an amount equal to the greater of (x) $15,000,000 and (y) 15% of the aggregate amount of Collateral Cash Flow received during the most recently ended DSCR Test Period that has been deposited into a Collateral Account;

66

(g)      to the extent constituting a Disposition of Collateral, the incurrence of Liens that are permitted to be incurred pursuant to Section 6.02;

(h)      to the extent constituting a Disposition of Collateral, (1) the sale or other transfer of Currency in the ordinary course of business under the terms of the Loyalty Program Agreements and (2) transfers of Currency to Loyalty Program Members in the ordinary course of business in accordance with program terms;

(i)      Dispositions of Collateral among the Credit Parties (including any Person that shall become a Credit Party simultaneous with such Disposition in the manner contemplated by Section 5.13); provided that:

(i)      such Collateral remains at all times subject to a Lien with the same priority and level of perfection as was the case immediately prior to such Disposition (and otherwise subject only to Permitted Liens) in favor of the Collateral Agent for the benefit of the Secured Parties following such Disposition;

(ii)      concurrently therewith, the Credit Parties shall execute any documents and take any actions reasonably required to create, grant, establish, preserve or perfect such Lien in accordance with the other provisions of this Agreement or the Security Documents;

(iii)      if requested by the Appropriate Party, concurrently therewith the Appropriate Party shall receive an opinion of counsel to the applicable Credit Party as to the validity and perfection of such Lien on the Collateral, in each case in form and substance satisfactory to the Appropriate Party; and

(iv)      concurrently with any Disposition of Collateral to any Person that shall become a Credit Party simultaneous with such Disposition in the manner contemplated by Section 5.13, such Person shall have complied with the requirements of Section 5.13;

(j)      any Disposition of property resulting from an event of loss with respect to any aircraft, airframe, engine, spare engine or Spare Parts if the Credit Party is replacing such aircraft, airframe, engine, spare engine or Spare Parts in accordance with the terms of the Loan Documents;

(k)      any Disposition of Collateral permitted by any of the Security Documents; and

(l)      Dispositions of cash or Cash Equivalents in exchange for other cash or Cash Equivalents constituting Collateral and having reasonably equivalent value therefor.

SECTION 6.05 Restricted Payments.   Parent will not, and will not permit any of its Subsidiaries to, declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except, that, subject to additional restrictions set forth in Article X, so long as no Default shall have occurred and be continuing at the time of any action described below or would result therefrom:

(a)      each Subsidiary may make Restricted Payments to the Parent and any other Person that owns an Equity Interest in such Subsidiary, ratably according to their respective holdings of such Equity Interests in respect of which such Restricted Payment is being made;

(b)      the Parent and each Subsidiary may declare and make dividend payments or other distributions payable solely in common Equity Interests of such Person;

(c)     the Parent and each Subsidiary may purchase, redeem or otherwise acquire Equity Interests issued by it with the proceeds received from the substantially concurrent issue of new common Equity Interests;

(d)     the Parent and each Subsidiary may pay withholding or similar taxes payable by any future, present or former employee, director or officer (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) in connection with any repurchases of Equity Interests or the exercise of stock options;

(e)     the repurchase of Equity Interests or other securities deemed to occur upon (A) the exercise of stock options, warrants or other securities convertible or exchangeable into Equity Interests or any other securities, to the extent such Equity Interests or other securities represent a portion of the exercise price of those stock options, warrants or other securities convertible or exchangeable into Equity Interests or any other securities or (B) the withholding of a portion of Equity Interests issued to employees and other participants under an equity compensation program of the Parent or its Subsidiaries to cover withholding tax obligations of such persons in respect of such issuance;

(f)     payments of cash, dividends, distributions, advances, common stock or other Restricted Payments by the Parent or any of its Subsidiaries to allow the payment of cash in lieu of the issuance of fractional shares upon (A) the exercise of options or warrants, (B) the conversion or exchange of capital stock of any such Person or (C) the conversion or exchange of Indebtedness or hybrid securities into capital stock of any such Person;

(g)     the Parent may make cash payments in connection with any conversion or exchange of Convertible Indebtedness in amount equal to the sum of (i) the principal amount of such Convertible Indebtedness and (ii) the proceeds of any payments received by the Parent or any of its Subsidiaries pursuant to the exercise, settlement or termination of any related Permitted Bond Hedge Transaction;

(h)     the Parent may make payments in connection with a Permitted Bond Hedge Transaction (i) by delivery of shares of the Parent's Equity Interests upon net share settlement thereof or (ii) by (A) set-off against the related Permitted Bond Hedge Transaction and (B) payment of an early termination amount thereof in common Equity Interests of the Parent upon any early termination thereof; and

(i)     Restricted Payments not to exceed the amount allowable pursuant to Schedule 6.05(i).

SECTION 6.06 Investments.  Parent will not, and will not permit any of its Subsidiaries to, make any Investments, except:

(a)     Investments held by the Parent or such Subsidiary in the form of cash or Cash Equivalents;

(b)     (i) Investments in Subsidiaries in existence on the Closing Date, (ii) other Investments in existence on the Closing Date and listed in Section I to Schedule 6.06 and (iii) other Investments described on Section II of Schedule 6.06, and, in each case, any refinancing, refunding, renewal or extension of any such Investment that does not increase the amount thereof;

(c)     advances to officers, directors and employees of the Parent and its Subsidiaries in an aggregate amount not exceeding, at any time outstanding, an amount that is customary and

consistent with past practice, for travel, entertainment, relocation and similar ordinary business purposes;

(d)      (x) Investments of the Parent in the Borrower or any other Credit Party, (y) Investments of any Subsidiary in the Parent or any other Credit Party and (z) Investments made between Subsidiaries that are not Credit Parties; provided that any such Investments made pursuant to this clause (d) in the form of intercompany indebtedness incurred by a Credit Party and owed to a Subsidiary that is not a Credit Party shall be subordinated to the Obligations and the Guaranteed Obligations on customary terms (it being understood and agreed that any Investments permitted under this clause (d) in the form of intercompany indebtedness that are not already subordinated on such terms as of the Closing Date shall not be required to be so subordinated until the date that is thirty (30) days after the Closing Date);

(e)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(f)      Investments consisting of the indorsement by the Parent or any Subsidiary of negotiable instruments payable to such Person for deposit or collection in the ordinary course of business;

(g)      to the extent constituting an Investment, transactions otherwise permitted by Sections 6.03 and 6.05;

(h)      any Investments received in compromise or resolution of (i) obligations of trade creditors or customers that were incurred in the ordinary course of business of Parent or any of its Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer or (ii) litigation, arbitration or other disputes;

(i)      Investments represented by obligations in respect of Swap Contracts that are not speculative in nature and that are entered into to hedge or mitigate risks to which the Parent or any of its Subsidiaries has (or will have) actual exposure (other than those in respect of the Equity Interests or Indebtedness of the Parent or any of its Subsidiaries);

(j)      accounts receivable arising in the ordinary course of business;

(k)      any guarantee of Indebtedness of Parent or any Subsidiary of Parent, other than any guarantee of Indebtedness secured by Liens that would not be permitted under Section 6.02;

(l)      Investments to the extent that payment for such Investment is made with the capital stock of the Parent;

(m)      Investments having an aggregate fair market value (measured on the date each such Investment was made and without giving effect to subsequent changes in value other than a reduction for all returns of principal in cash and capital dividends in cash), when taken together with all Investments made pursuant to this clause (n) that are at the time outstanding, not to exceed 30% of the total consolidated assets of the Parent and its Subsidiaries at the time of such Investment;

(n)      Permitted Bond Hedge Transactions to the extent constituting Investments; and

69

(o)     Investments in Finance Entities in the ordinary course of business of the Parent and its Subsidiaries or that are otherwise customary for airlines based in the United States.

SECTION 6.07 <u>Transactions with Affiliates</u>.  Parent will not, and will not permit any of its Subsidiaries to, enter into any transaction of any kind involving aggregate payments or consideration in excess of $50,000,000 with any Affiliate of the Parent, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Parent or such Subsidiary as would be obtainable by the Parent or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate, subject to delivery of (x) with respect to any transaction or series of related transactions involving aggregate consideration in excess of $100,000,000, a certificate of a Responsible Officer of the Parent certifying as to compliance with the foregoing and (y) with respect to any transaction or series of related transactions involving aggregate consideration in excess of $150,000,000, an opinion as to the fairness to the Parent or such Subsidiary of such transaction from a financial point of view issued by an accounting, appraisal or investment banking firm of national standing (<u>provided</u> that this clause (y) shall not apply to any transaction between or among the Parent or any of its Subsidiaries and any Finance Entities); <u>provided</u> that, subject to Article X, the foregoing restriction shall not apply to:

(a)     transactions between or among the Parent and any Wholly-Owned Subsidiaries,

(b)     Restricted Payments permitted by Section 6.05,

(c)     Investments permitted by Section 6.06(b), or (c) or (d),

(d)     transactions described in <u>Schedule 6.07</u>,

(e)     any employment agreement, confidentiality agreement, non-competition agreement, incentive plan, employee stock option agreement, long-term incentive plan, profit sharing plan, employee benefit plan, officer or director indemnification agreement or any similar arrangement entered into by the Parent or any of its Subsidiaries in the ordinary course of business and payments pursuant thereto, and

(f)     payment of fees, compensation, reimbursements of expenses (pursuant to indemnity arrangements or otherwise) and reasonable and customary indemnities provided to or on behalf of officers, directors, employees or consultants of the Parent or any of its Subsidiaries.

SECTION 6.08 [Reserved].

SECTION 6.09 [Reserved].

SECTION 6.10 <u>Changes in Nature of Business</u>.  Parent will not, and will not permit any of its Subsidiaries to, engage to any material extent in any business other than those businesses conducted by the Parent and its Subsidiaries on the date hereof or any business reasonably related or incidental thereto or representing a reasonable expansion thereof.

SECTION 6.11 <u>Sanctions; AML Laws</u>.  Parent will not, and will not permit any of its Subsidiaries to, directly or knowingly indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person to fund any activities or business of or with any Person in a manner that would result in a violation of Sanctions or AML Laws by any Person.

SECTION 6.12 <u>Amendments to Organizational Documents</u>.  Parent will not, and will not permit any of its Subsidiaries to amend, modify, or grant any waiver or release under or terminate in any

70

manner, any Organizational Documents in any manner materially adverse to, or which would impair the rights of, the Lenders.

SECTION 6.13 [Reserved].

SECTION 6.14 Prepayments of Junior Indebtedness.  Parent will not, and will not permit any of its Subsidiaries to, make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case prior to any scheduled repayment, sinking fund payment or maturity, any Indebtedness secured by junior Liens on the Collateral or that is subordinated in right of payment to the Obligations, in each case other than in connection with a Permitted Refinancing of such Indebtedness.

SECTION 6.15 Lobbying.  Parent will not, and will not permit any of its Subsidiaries to, directly, or to the Parent or such Subsidiary's knowledge, indirectly, use the proceeds of the Loans, or lend, contribute, or otherwise make available such proceeds to any other Person (i) for publicity or propaganda purposes designated to support or defeat legislation pending before the U.S. Congress or (ii) to fund any activities that would constitute "lobbying activities" as defined under 2 U.S.C. § 1602.  The Parent shall, and shall cause its subsidiaries to, comply with the provisions of 31 U.S.C. § 1352, as amended, and with the regulations at 31 CFR Part 21.

SECTION 6.16 Use of Proceeds.  Parent will not, and will not permit any of its Subsidiaries to, use the proceeds of the Loans for any purpose other than for general corporate purposes and operating expenses (including payroll, rent, utilities, materials and supplies, repair and maintenance, and scheduled interest payments on other Indebtedness incurred before February 15, 2020), in each case in compliance with all applicable law to the extent permitted by the CARES Act; provided however that the proceeds of the Loans shall not be used for any non-operating expenses (including capital expenses, delinquent taxes and payments of principal on other Indebtedness), unless the Parent can demonstrate, to the satisfaction of the Initial Lender, that payment of any such non-operating expense is necessary to optimize the continued operations of the Parent's business and does not merely constitute a transfer of risk from an existing creditor or investor to the Federal taxpayer.

SECTION 6.17 Financial Covenants.

(a)     Liquidity.  The Parent will not permit the aggregate amount of Liquidity at the close of any Business Day to be less than $500,000,000.

(b)     Collateral Coverage Ratio.

(i)     Within ten (10) Business Days after (x) the last day of March and September of each year (beginning with March 2021) or (y) any date on which an Appraisal is delivered pursuant to clause (2) of Section 5.16 (each such date in clauses (x) and (y), a "CCR Reference Date" and the tenth Business Day after a CCR Reference Date, a "CCR Certificate Delivery Date"), the Parent shall deliver to the Administrative Agent a certificate of a Responsible Officer of the Parent containing a calculation of the Collateral Coverage Ratio (a "CCR Certificate").

(ii)     If the Collateral Coverage Ratio with respect to any CCR Reference Date is less than 1.60 to 1.00, the Borrower shall, no later than ten (10) Business Days after the applicable CCR Certificate Delivery Date, (x) prepay any outstanding Loans such that following such prepayment, the Collateral Coverage Ratio with respect to such CCR Reference Date, recalculated by subtracting any such prepaid portion of the Loans, shall be no less than 1.60 to 1.00 and/or (y) designate Additional Collateral as additional Eligible Collateral and comply with Sections 5.13 and 5.15, collectively, in an amount such that following such designation, the Collateral Coverage

Ratio with respect to such CCR Reference Date, recalculated by adding such Additional Collateral, shall be no less than 1.60 to 1.00.

    (iii) At the Parent's request, the Lien on the Loyalty Program Assets under the Security Documents will be released, <u>provided</u>, in each case, that the following conditions are satisfied or waived: (a) no Event of Default shall have occurred and be continuing, (b) either (x) after giving effect to such release and to any Commitment reductions pursuant to Section 2.07, the Collateral Coverage Ratio is not less than 2.00 to 1.00 or (y) the Parent shall prepay or cause to be prepaid the Loans and/or shall designate Eligible Collateral as Additional Collateral and comply with Sections 5.13 and 5.15, collectively, in an amount necessary to cause the Collateral Coverage Ratio to not be less than 2.00 to 1.00, (c) the Parent shall deliver a certificate executed by a Responsible Officer demonstrating compliance with this Section 6.17(b)(iii) and (d) the Administrative Agent (acting at the direction of the Required Lenders) has given notice to the Parent of such release in accordance with this Section 6.17(b)(iii). Upon any release in accordance with the terms of this Section 6.17(b)(iii), the IP License Agreement, the Trademark Security Agreement, Annex 1 of the Pledge and Security Agreements and each Direct Agreement with a Loyalty Program Participant will terminate automatically, and the agents (acting at the direction of the Required Lenders) shall take all actions reasonably requested by the Parent to evidence such releases, notify the parties to the Direct Agreements, and file any reasonably required public notices of such releases (and the Lenders shall instruct the Agents accordingly).

    (A) Upon notice from the Administrative Agent (acting at the direction of the Required Lenders) to the Borrower that all the requirements set forth in Section 6.17(b)(iii) have been complied with and the Liens on all Loyalty Program Assets have been released in accordance therewith, then: (1) the Credit Parties shall not be subject to the provisions of this Agreement set forth under Sections 2.06(b)(iv), 2.06(b)(v), 2.06(b)(vi), 3.08, 3.27, 3.28, 5.02(i), 5.19 5.20 and 6.17(c) and the last sentence of Section 5.15, in each case to the extent such provision relates to the Loyalty Program Assets or any other Loyalty Terms (as defined below); (2) the requirement to deliver a certificate pursuant to Section 5.02(j) with calculations of the Debt Service Coverage Ratio on each DSCR Determination Date shall no longer apply; (3) the requirement to deliver a certificate pursuant to Section 5.02(k) for any period during which no Liens on Loyalty Program Assets were in effect shall no longer apply; (4) the restrictions on Loyalty Revenue Advance Transactions set forth under Sections 6.04(b), 6.04(d), 6.04(e), 6.04(f) and 6.04(h) shall no longer apply; (5) the Events of Default set forth under Sections 7.01(p), 7.01(q), 7.01(r) and 7.01(s) shall no longer apply; and (6) the language "(iii) with respect to any Personal Data, any deletion, de-identification, purging or other similar disposition of Personal Data" shall be deemed deleted from the definition of the terms "Disposition" and "Dispose". For purposes hereof, "Loyalty Terms" means Loyalty Program Data, Loyalty Program Intellectual Property, Loyalty Program Revenues, Loyalty Program Agreements, Material Loyalty Program Agreements, Loyalty Revenue Advance Transaction, Loyalty Subscription Program or any similar loyalty related term.

    (iv) At the Parent's request, the Lien on any Additional Collateral will be released, <u>provided</u>, in each case, that the following conditions are satisfied or waived: (a) no Event of Default shall have occurred and be continuing, (b) either (x) after giving effect to such release, the Collateral Coverage Ratio is not less than 2.00 to 1.00 (or in the case of a swap or exchange of existing Additional Collateral with new Additional Collateral, less than 1.60 to 1.00) or (y) the Parent shall prepay or cause to be prepaid the Loans and/or shall designate Eligible Collateral as Additional Collateral and comply with Sections 5.13 and 5.15, collectively, in an amount necessary to cause the Collateral Coverage Ratio to not be less than 2.00 to 1.00 (or in the case of a swap or exchange of existing Additional Collateral with new Additional Collateral, less than 1.60 to 1.00)

72

and (c) the Parent shall deliver a certificate executed by a Responsible Officer demonstrating compliance with this Section 6.17(b)(iv).

 (c)  <u>Debt Service Coverage Ratio</u>.

  (i)  On each DSCR Determination Date, the Parent shall deliver to the Administrative Agent a certificate of a Responsible Officer of the Parent (x) containing a calculation of the Debt Service Coverage Ratio and (ii) certifying that all Loyalty Program Revenue for such DSCR Test Period has been deposited, directly or indirectly, into the Collection Account or another Collateral Account (and at least 90% of all Loyalty Program Revenues (excluding revenues generated under any Loyalty Subscription Program) were deposited directly into a Collateral Account); and

  (ii)  if the Debt Service Coverage Ratio with respect to any DSCR Determination Date is less than 1.75 to 1.00 (a "<u>DSCR Trigger Event</u>"), then the Parent and the Subsidiaries shall cause an amount equal to at least 50% of all Loyalty Program Revenues received thereafter to be transferred (as such payments are received) from the Collection Account to a Blocked Account to be held for the benefit of the Lenders (which amounts on deposit in the Blocked Account may be used to prepay the Loans at the option of the Borrower, upon request to the Collateral Agent) until the first DSCR Determination Date on which the Debt Service Coverage Ratio is 1.75 to 1.00 or more, whereupon such amounts may be transferred from the Blocked Account to the Collection Account following a request to the Collateral Agent;

  (iii)  if the Debt Service Coverage Ratio with respect to any DSCR Determination Date is less than or equal to 1.50 to 1.00 but greater than 1.25 to 1.00, then (x) all amounts then deposited in the Blocked Account shall be applied to prepay the Loans and (y) the Parent and the Subsidiaries shall cause an amount equal to at least 50% of all Loyalty Program Revenues received thereafter to be transferred (as such payments are received) from the Collection Account to the Payment Account with all such amounts deposited into the Payment Account to be applied to the prepayment of any Loans then outstanding until the first DSCR Determination Date on which the Debt Service Coverage Ratio is greater than 1.50 to 1.00; and

  (iv)  if the Debt Service Coverage Ratio with respect to any DSCR Determination Date is less than or equal to 1.25 to 1.00, then (x) all amounts then deposited in the Blocked Account shall be applied to prepay the Loans and (y) the Parent and the Subsidiaries shall cause an amount equal to at least 75% of all Loyalty Program Revenues received thereafter to be transferred (as such payments are received) from the Collection Account to the Payment Account with all such amounts deposited into the Payment Account to be applied to the prepayment of any Loans then outstanding until the first DSCR Determination Date on which the Debt Service Coverage Ratio is greater than 1.25 to 1.00.

## ARTICLE VII

## EVENTS OF DEFAULT

 SECTION 7.01 <u>Events of Default</u>.  If any of the following events (each, an "<u>Event of Default</u>") shall occur:

  (a)  the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)      the Borrower shall fail to pay any interest on any Loan, or any fee or any other amount (other than an amount referred to in clause (a) of this Section) payable under this Agreement or under any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of two (2) or more Business Days;

(c)      any representation or warranty made or deemed made by or on behalf of any Credit Party, including those made prior to the Closing Date, in or in connection with this Agreement, the Loan Application Form or any other Loan Document or any amendment or modification hereof or thereof, or any waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement, the Loan Application Form or any other Loan Document or any amendment or modification hereof or thereof, or any waiver hereunder or thereunder, shall prove to have been incorrect in any material respect (or, in the case of any such representation or warranty under this Agreement, the Loan Application Form or any other Loan Document already qualified by materiality, such representation or warranty shall prove to have been incorrect) when made or deemed made;

(d)      any Credit Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.03(a), 5.04 (with respect to the Borrower's existence) or in Article VI or Article X;

(e)      any Credit Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified in clause (a), (b) or (d) of this Section) and such failure shall continue unremedied for a period of thirty (30) or more days after notice thereof by the Administrative Agent or the Initial Lender to the Parent;

(f)      (i) Any Credit Party or any Subsidiary thereof shall fail to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness (other than Indebtedness under this Agreement) and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument governing such Material Indebtedness; or (ii) any Credit Party or any Subsidiary thereof shall fail to observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event results in the holder or holders or beneficiary or beneficiaries of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) causing such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or causing an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that this clause (f)(ii) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer (or disposition of property as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness and such Indebtedness is repaid when required under the documents providing for such Indebtedness;

(g)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of any Credit Party or any Material Subsidiary thereof or its debts, or of a substantial part of its assets, under any Debtor Relief Law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Credit Party or any Material Subsidiary thereof or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for a period of sixty (60) or more days or an order or decree approving or ordering any of the foregoing shall be entered;

74

(h)     any Credit Party or any Material Subsidiary thereof shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Debtor Relief Law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (g) of this Section, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Parent or any of its Subsidiaries or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(i)     any Credit Party or any Material Subsidiary thereof shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(j)     there is entered against any Credit Party or any Material Subsidiary thereof (i) a final judgment or order for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $50,000,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied or failed to acknowledge coverage), or (ii) a non-monetary final judgment or order that, either individually or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect;

(k)     an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or could reasonably be expected to result in liability of any Credit Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC that, either individually or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect;

(l)     [reserved];

(m)     any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all Obligations, ceases to be in full force and effect; or any Credit Party or any other Person who is a party to any Loan Document contests in writing the validity or enforceability of any provision of any Loan Document; or any Credit Party denies in writing that it has any or further liability or obligation under any Loan Document, or purports in writing to revoke, terminate or rescind any Loan Document;

(n)     any Lien purported to be created under any Security Document shall cease to be, or shall be asserted in writing by any Credit Party not to be, a legal, valid and perfected Lien on any material portion of the Collateral (individually or in the aggregate), with the priority required by the applicable Security Documents, except (i) as a result of the sale or other Disposition of the applicable Collateral to a Person that is not a Credit Party in a transaction not prohibited under the Loan Documents or (ii) as a result of either Agent's failure to maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Security Documents or (iii) as a result of acts or omissions with respect to possessory collateral held by the Collateral Agent pursuant to this Agreement;

(o)     any Guarantee of any Obligations by any Credit Party under any Loan Document shall cease to be in full force in effect (other than in accordance with the terms of the Loan Documents);

(p)     a default or breach by any Credit Party of its material obligations under a Material Loyalty Program Agreement beyond any applicable notice and cure periods thereunder;

(q)     an exit from, or a termination or cancellation of, any Carrier Loyalty Program (and in the case of any Loyalty Subscription Program, such program as a whole by a Credit Party, and not any individual cancellation or termination by a consumer) in effect on the Closing Date or any Material Loyalty Program Agreement other than in connection with any replacement expressly permitted hereunder;

(r)     any material provision of any Material Loyalty Program Agreement, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all Obligations, ceases to be in full force and effect; or any Credit Party contests in writing the validity or enforceability of any provision of any Material Loyalty Program Agreement; or any Credit Party denies in writing that it has any or further liability or obligation under any Material Loyalty Program Agreement, or purports in writing to revoke, terminate or rescind any Material Loyalty Program Agreement; or

(s)     any Credit Party makes a Material Modification to a Material Loyalty Program Agreement without the prior written consent of the Required Lenders.

then, and in every such event (other than an event described in clause (g) or (h) of this Section), and at any time thereafter during the continuance of such event, the Initial Lender may, and the Administrative Agent may, and at the request of the Required Lenders or the Initial Lender shall, by notice to the Borrower, take any or all of the following actions, at the same or different times:

(i)     declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations of the Credit Parties accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower and the other Credit Parties; and

(ii)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents and Applicable Law;

provided that, in case of any event described in clause (g) or (h) of this Section, the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other Obligations accrued hereunder, shall automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Credit Parties.

SECTION 7.02 Application of Payments.  Notwithstanding anything herein to the contrary, following the occurrence and during the continuance of an Event of Default, and notice thereof to the Initial Lender and the Administrative Agent by the Borrower or the Required Lenders, all payments received on account of the Obligations shall be applied by the Administrative Agent as follows:

(i)     first, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees and disbursements and other charges of counsel payable under Section 11.03 and amounts payable under an Administrative Agency Fee Letter (if any)) payable to the Administrative Agent and the Collateral Agent in their respective capacities as such;

76

      (ii)    <u>second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees and disbursements and other charges of counsel payable under Section 11.03) arising under the Loan Documents, ratably among them in proportion to the respective amounts described in this clause (ii) payable to them;

      (iii)    <u>third</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause (iii) payable to them;

      (iv)    <u>fourth</u>, to payment of that portion of the Obligations constituting unpaid principal of the Loans ratably among the Lenders in proportion to the respective amounts described in this clause (iv) payable to them;

      (v)    <u>fifth</u>, to the payment in full of all other Obligations, in each case ratably among the Administrative Agent and the Lenders based upon the respective aggregate amounts of all such Obligations owing to them in accordance with the respective amounts thereof then due and payable; and

      (vi)    <u>finally</u>, the balance, if any, after all Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

ARTICLE VIII

AGENCY

SECTION 8.01 <u>Appointment and Authority</u>.  Each Lender hereby irrevocably appoints The Bank of New York Mellon to act on its behalf as the Administrative Agent and as the Collateral Agent hereunder and under the other Loan Documents and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental or related thereto; provided that notwithstanding anything in this Article VIII or this Agreement to the contrary, the terms and conditions of the relationship between the Initial Lender and the Agents shall be governed by a separate agreement  between the Initial Lender and the Agents.  The Borrower and the Guarantors acknowledge and agree that the Agents are Agents of the Lenders and not of the Borrower or the Guarantors.  In connection with an assignment of the Loans by the Initial Lender, upon the Administrative Agent's request, the Borrower and the Agents shall enter into an Administrative Agency Fee Letter.  The provisions of this Article are solely for the benefit of the Agents and the Lenders, and the Borrower shall not have rights as a third-party beneficiary of any of such provisions.  Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to (i) execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the other Loan Documents and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

SECTION 8.02 <u>Collateral Matters.</u>  Each of the Lenders hereby irrevocably appoints and authorizes the Collateral Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Credit Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto and to enter into and perform the other Loan Documents.

SECTION 8.03 <u>Removal or Resignation of Administrative Agent</u>.  While the Initial Lender is a Lender, the Administrative Agent may be removed or give notice of its resignation subject to any

conditions as separately agreed between the Initial Lender and the Administrative Agent.  Any such resignation as Administrative Agent pursuant to this Section 8.03 shall also constitute its resignation as the Collateral Agent; provided that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed. Upon such removal or receipt of any such notice of resignation, the Initial Lender shall have the right to appoint a successor. After the Initial Lender is no longer a Lender, either Agent may resign at any time by notifying the Lenders and the Borrower in writing, and either Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to the Borrower and such Agent and signed by the Required Lenders.  Upon any such resignation or removal, the Required Lenders shall have the right, with the consent of the Borrower (which consent shall not be required during the continuance of an Event of Default), to appoint a successor.  If no successor shall have been so appointed by the Required Lenders (with the consent of the Borrower (which consent shall not be required during the continuance of an Event of Default)) and shall have accepted such appointment within 30 days after (i) the retiring Agent gives notice of its resignation or (ii) the Required Lenders deliver removal instructions, then the retiring or removed Agent may, on behalf of the Lenders (with the consent of the Borrower (which consent shall not be required during the continuance of an Event of Default)), appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  If no successor Agent has been appointed pursuant to the immediately preceding sentence, such Agent's resignation or removal shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders (with the consent of the Borrower (which consent shall not be required during the continuance of an Event of Default)) appoint a successor Administrative Agent and/or Collateral Agent, as the case may be.  Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of its predecessor Agent, and its predecessor Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After an Agent's resignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

SECTION 8.04 Exculpatory Provisions.

(a)     The Agents shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents or as separately agreed between the Initial Lender and the Agents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing:

(i)     neither Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, except that The Bank of New York Mellon shall always have a fiduciary duty to Treasury while serving as its Agent in accordance with the provisions of the separate writing between The Bank of New York Mellon and Treasury;

(ii)     neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); and

(iii)     except as expressly set forth herein and in the other Loan Documents, neither Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Borrower or any of the Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent and/or Collateral Agent or any of its Affiliates in any capacity.

(b)      Neither Agent shall be required to expend or risk its own funds or otherwise incur liability in the performance of any of its duties hereunder or under any other Loan Document or in the exercise of any of its rights or powers. Notwithstanding anything in any Loan Document to the contrary, prior to taking any action under this Agreement or any other Loan Document, each Agent shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses in connection with taking such action. Neither Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Sections 7.01 and 11.02) or in the absence of its own gross negligence or willful misconduct as determined by the final non-appealable judgment of a court of competent jurisdiction. Notwithstanding the foregoing, no  action nor any omission to act, taken by either Agent at the direction of the Required Lenders (or such other number of percentage of Lenders as shall be expressly provided for herein or in the other Loan Documents) shall constitute gross negligence or willful misconduct. Neither Agent shall be deemed to have knowledge of any Default unless and until written notice thereof, conspicuously labeled as a "notice of default" and specifically describing such Default, is given to an Agent Responsible Officer by the Borrower or a Lender.

(c)      Neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

(d)      In no event shall either Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder or under any other Loan Document arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, epidemics, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services (it being understood that such Agent shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances).

(e)      Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it in good faith to be genuine and to have been signed or sent by the proper Person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not incur any liability for relying thereon. Delivery of reports, information and documents to an Agent is for informational purposes only and an Agent's receipt of the foregoing will not constitute actual or constructive knowledge or notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants hereunder. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in reliance on the advice of any such counsel, accountants or experts. Any funds held by an Agent shall, unless otherwise agreed in writing with the Borrower, be held uninvested in a non-interest bearing account.

(f)      Neither Agent shall have any obligation to calculate or confirm the calculation of any financial covenant contained herein.

(g)        Notwithstanding anything to the contrary in any Loan Document, neither Agent shall be responsible for the existence, genuineness or value of any of the Collateral; for filing any financing or continuation statements or recording any documents or instruments in any public office or otherwise perfecting or maintaining the perfection of any security interest in the Collateral (except, in the case of possessory Collateral, for the Collateral Agent maintaining possession of any such Collateral received by it in accordance with the terms of the Loan Documents); for the validity, perfection, priority or enforceability of the Liens in any of the Collateral; for the validity or sufficiency of the Collateral or any agreement or assignment contained therein; for the validity of the title of any grantor to the Collateral; for insuring the Collateral; or for the payment of taxes, charges or assessments on the Collateral.  The Collateral Agent agrees that it will check any possessory Collateral received by it against any itemized list in the Pledge and Security Agreements of Collateral to be delivered to it in accordance with the Pledge and Security Agreements.

SECTION 8.05 <u>Reliance by Agents</u>.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, opinion, consent, statement, instrument, document or other writing believed by it in good faith to be genuine and to have been signed or sent by the proper Person.  Each Agent may also rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not incur any liability for relying thereon.  Delivery of reports, information and documents to an Agent is for informational purposes only and an Agent's receipt of the foregoing will not constitute actual or constructive knowledge or notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants hereunder. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 8.06 <u>Delegation of Duties</u>.  Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents or attorneys appointed by it and will not be responsible for the misconduct or negligence of any agent appointed with due care.  Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties.

SECTION 8.07 <u>Non-Reliance on Agents and Other Lenders</u>.  Each Lender (other than the Initial Lender) acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender (other than the Initial Lender) also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

SECTION 8.08 <u>Administrative Agent May File Proofs of Claim</u>.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)        to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agents (including any claim for the reasonable compensation, expenses, disbursements and

advances of the Lenders and the Agents and their respective agents and counsel and all other amounts due the Lenders and the Agents under Section 11.03) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Agents under the Loan Documents.  Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

ARTICLE IX

GUARANTEE

SECTION 9.01 Guarantee of the Obligations.  Each Guarantor jointly and severally hereby irrevocably and unconditionally guarantees to the Secured Parties, the due and punctual payment in full and performance of all Obligations (or such lesser amount as agreed by the Required Lenders in their sole discretion with respect to Obligations owed to the Lenders) when the same shall become due or required to be performed, whether at stated maturity, by required prepayment, declaration, acceleration, performance, demand or otherwise (including amounts that would become and any performance that would have been required to be taken due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "Guaranteed Obligations").

SECTION 9.02 Payment or Performance by a Guarantor.  Each Guarantor hereby jointly and severally agrees, in furtherance of the foregoing and the other terms of this Article IX and not in limitation of any other right which the Secured Parties may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Borrower to pay or perform any of the Guaranteed Obligations when and as the same shall become due or required to be performed, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), such Guarantor will pay, or cause to be paid, in cash, or perform, or cause to be performed, to the Secured Parties an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed or required to be performed to the Secured Parties as aforesaid.

SECTION 9.03 Liability of Guarantors Absolute.  Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment and performance in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)     this Guarantee is a guarantee of payment and performance when due and not merely of collection;

(b)     either Agent and any of the other Secured Parties may enforce this Guarantee upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Borrower and the Secured Parties with respect to the existence of such Event of Default;

(c)     a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Borrower or any other Guarantors and whether or not Borrower or such Guarantors are joined in any such action or actions;

(d)     payment or performance by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any other Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid or performed;

(e)     the Required Lenders, upon such terms as they deem appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment or performance of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or subordinate the payment of the same to the payment of any other obligations; (iii) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment or performance of the Guaranteed Obligations, any other guarantees of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; and (iv) enforce its rights and remedies even though such action may operate to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Borrower or any security for the Guaranteed Obligations; and

(f)     this Guarantee and the obligations of each Guarantor hereunder shall be legal, valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment or performance in full of the Guaranteed Obligations), including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Guaranteed Obligations, any impossibility in the performance of any of the Guaranteed Obligations, or otherwise.  Without limiting the generality of the foregoing, except for the payment and performance in full of the Guaranteed Obligations and to the fullest extent permitted by Applicable Law, the obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by:  (i) any failure, delay or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy with respect to the Guaranteed Obligations, or with respect to any security for the payment and performance of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions hereof or any other Loan Document; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the Lender's consent to the change, reorganization or termination of the corporate structure or existence of the Borrower or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (v) the release of, or any impairment of or failure to perfect or continue perfection of or protect a security interest in, any collateral which secures any of the Guaranteed Obligations; (vi) any defenses, set-offs or counterclaims which the Borrower or any Guarantor may allege or assert against either Agent or the Lenders in respect of the Guaranteed Obligations, including failure of consideration, lack of authority, validity or enforceability, breach of warranty, payment, statute of frauds, statute of limitations, accord and

satisfaction and usury; (vii) any change in the corporate existence, structure or ownership of any Credit Party, or any insolvency, bankruptcy, reorganization, examinership or other similar proceeding affecting any Credit Party or its assets or any resulting release or discharge of any of the Guaranteed Obligations; (viii) the fact that any Person that, pursuant to the Loan Documents, was required to become a party hereto may not have executed or is not effectually bound by this Agreement, whether or not this fact is known to the Secured Parties; (ix) any action permitted or authorized hereunder; (x) any other circumstance, or any existence of or reliance on any representation by the Agents, any Secured Party or any other Person, that might otherwise constitute a defense to, or a legal or equitable discharge of, the Borrower, any Guarantor or any other guarantor or surety; and (xi) any other event or circumstance that might in any manner vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

SECTION 9.04 <u>Waivers by Guarantors</u>.  Each Guarantor hereby waives, for the benefit of the Lender:  (a) any right to require the Lender, as a condition of payment or performance by such Guarantor, to (i) proceed against Borrower, any Guarantor or any other Person; (ii) proceed against or exhaust any security in favor of the Lender; or (iii)  pursue any other remedy in the power of the Agents or Secured Parties whatsoever or (b) presentment to, demand for payment or performance from and protest to the Borrower or any Guarantor or notice of acceptance; and (c) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof. The Agents and the other Secured Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure or exercise any other right or remedy available to them against the Borrower or any other Credit Party without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Guaranteed Obligations have been paid in full.  To the fullest extent permitted by Applicable Law, each Credit Party waives any defense arising out of any such election even though such election operates, pursuant to Applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Credit Party against the Borrower or any other Credit Party, as the case may be, or any security.

SECTION 9.05 <u>Guarantors' Rights of Subrogation, Contribution, etc</u>.  Until the Guaranteed Obligations shall have been paid in full, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Borrower or any other Guarantor or any of its assets in connection with this Guarantee or the performance by such Guarantor of its obligations hereunder, including without limitation (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that the Agents or the Secured Parties now has or may hereafter have against the Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by the Agents or the Secured Parties.  In addition, until the Guaranteed Obligations shall have been paid in full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and paid in full, such amount shall be held in trust for the Secured Parties and shall forthwith be paid over to the Secured Parties to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

SECTION 9.06 <u>Subordination</u>.  Any Indebtedness of the Borrower or any Guarantor now or hereafter and all rights of indemnity, contribution or subrogation under Applicable Law or otherwise held by any Guarantor (the "<u>Obligee Guarantor</u>") are hereby subordinated in right of payment or performance to the Guaranteed Obligations until the Guaranteed Obligations is paid and performed in full. Any amount in respect of such indebtedness or rights collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Secured Parties and shall forthwith be paid over to the Secured Parties to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

SECTION 9.07 <u>Continuing Guarantee</u>.  This Guarantee is a continuing guarantee and shall remain in effect until all of the Guaranteed Obligations shall have been paid and performed in full.  Each Guarantor hereby irrevocably waives any right to revoke this Guarantee as to future transactions giving rise to any Guaranteed Obligations.

SECTION 9.08 <u>Financial Condition of the Borrower</u>.  The Loans may be made to the Borrower without notice to or authorization from any Guarantor regardless of the financial or other condition of the Borrower at the time of such grant.  Each Guarantor has adequate means to obtain information from the Borrower on a continuing basis concerning the financial condition of the Borrower and its ability to perform its obligations under the Loan Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.

SECTION 9.09 <u>Reinstatement</u>.   In the event that all or any portion of the Guaranteed Obligations are paid by the Borrower or any Guarantor, the obligations of any other Guarantor hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from the Secured Parties as a preference, fraudulent transfer or otherwise must be so recovered or returned, and any such payments and amounts which are so rescinded, recovered or returned shall constitute Guaranteed Obligations for all purposes hereunder.

SECTION 9.10 <u>Discharge of Guarantees</u>.  If, in compliance with the terms and provisions of the Loan Documents, (x) all of the Equity Interests of any Guarantor that is a Subsidiary of the Parent or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) to any Person (other than to the Parent or to any other Subsidiary of Parent), the Guarantee of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any beneficiary or any other Person effective as of the time of such asset sale or (y) a Guarantor becomes an Excluded Subsidiary (other than as a result of a Guarantor becoming a non-Wholly Owned Subsidiary), the Borrower may request the release of the Guarantee of such Guarantor, whereupon the Guarantee of such Guarantor shall be discharged and released.

ARTICLE X

CARES ACT REQUIREMENTS

Notwithstanding anything in this Agreement to the contrary, the Credit Parties, on behalf of themselves and their Affiliates, represent, warrant, and agree with the Lenders that:

SECTION 10.01 <u>CARES Act Compliance</u>.  Each Credit Party and its Subsidiaries are in compliance, and will at all times comply, with all applicable requirements under Title IV of the CARES Act, including any applicable requirements pertaining to the Borrower's eligibility to receive the Loans.  The Parent, the Borrower and their Subsidiaries will provide any information requested by the Initial Lender or Agents to assess the Borrower's compliance with applicable requirements under Title IV of the CARES Act, its obligations under this Article X or its eligibility to receive the Loans under the CARES Act.  The Borrower is not a "covered entity" as defined in Section 4019 of the CARES Act.

SECTION 10.02 <u>Dividends and Buybacks</u>.

(a)      Until the date that is twelve (12) months after the date on which the Loans are no longer outstanding, neither any Borrower Air Carrier nor any of its Affiliates (other than an Affiliate that is a natural person) shall, in any transaction, purchase an equity security of any Borrower Air Carrier or of any direct or indirect parent company of a Borrower Air Carrier or of any Subsidiary of the Parent that, in

each case, is listed on a national securities exchange, except to the extent required under a contractual obligation in effect as of the date of enactment of the CARES Act.

(b)     Until the date that is twelve (12) months after the date on which the Loans are no longer outstanding, no Borrower Air Carrier shall pay dividends, or make any other capital distributions, with respect to the common stock of any Borrower Air Carrier.

SECTION 10.03   Maintenance of Employment Levels.   Until September 30, 2020, each Borrower Air Carrier shall maintain its employment levels as of March 24, 2020, to the extent practicable, and in any case shall not reduce its employment levels by more than ten percent (10%) from the levels on March 24, 2020.

SECTION 10.04   United States Business.   Each Borrower Air Carrier is created or organized in the United States or under the laws of the United States and has significant operations in and a majority of its employees based in the United States.

SECTION 10.05   Limitations on Certain Compensation.

(a)     Beginning on the Closing Date, and ending on the date that is one (1) year after the date on which the Loans are no longer outstanding, each Borrower Air Carrier and its Affiliates shall not pay any of each Borrower Air Carrier's Corporate Officers or Employees whose Total Compensation exceeded $425,000 in calendar year 2019 or the Subsequent Reference Period (other than an Employee whose compensation is determined through an existing collective bargaining agreement entered into before March 1, 2020):

(i)     Total Compensation which exceeds, during any twelve (12) consecutive months of the period beginning on the Closing Date and ending on the date that is one (1) year after the date on which the Loans are no longer outstanding, the Total Compensation the Corporate Officer or Employee received in calendar year 2019 or the Subsequent Reference Period; or

(ii)     Severance Pay or Other Benefits in connection with a termination of employment with any Borrower Air Carrier which exceed twice the maximum Total Compensation received by such Corporate Officer or Employee in calendar year 2019 or the Subsequent Reference Period.

(b)     Beginning on the Closing Date, and ending on the date that is one (1) year after the date on which the Loans are no longer outstanding, each Borrower Air Carrier and its Affiliates shall not pay any of each Borrower Air Carrier's Corporate Officers or Employees whose Total Compensation exceeded $3,000,000 in calendar year 2019 or the Subsequent Reference Period, Total Compensation which exceeds, during any twelve (12) consecutive months of such period, in excess of the sum of:

(i)     $3,000,000; and

(ii)     Fifty percent (50%) of the excess over $3,000,000 of the Total Compensation received by such Corporate Officer or Employee in calendar year 2019 or the Subsequent Reference Period.

(c)     For purposes of determining applicable amounts under this Section with respect to any Corporate Officer or Employee who was employed by any Borrower Air Carrier or any of their Affiliates for less than all of calendar year 2019, the amount of Total Compensation in calendar year 2019 shall mean such Corporate Officer's or Employee's Total Compensation on an annualized basis.

SECTION 10.06   <u>Continuation of Certain Air Service</u>.   Until March 1, 2022, each Borrower Air Carrier shall comply with any applicable requirement issued by the Secretary of Transportation under section 4005 of the CARES Act to maintain scheduled air transportation service to any point served by any Borrower Air Carrier before March 1, 2020.   The Borrower acknowledges that neither Treasury, nor any other actor, department, or agency of the Federal Government, shall condition the issuance of any loan under this Loan Agreement on the Borrower's implementation of measures to enter into negotiations with the certified bargaining representative of a craft or class of employees of the Borrower Air Carrier under the Railway Labor Act (45 U.S.C. 151 et seq.) or the National Labor Relations Act (29 U.S.C. 151 et seq.), regarding pay or other terms and conditions of employment.

SECTION 10.07   <u>Treasury Access</u>.   Provide Treasury, the Treasury Inspector General, the Special Inspector General for Pandemic Recovery, and such other entities as authorized by Treasury timely and unrestricted access to all documents, papers, or other records, including electronic records, of the Borrower related to the Loans, to enable Treasury, the Treasury Inspector General, and the Special Inspector General for Pandemic Recovery to make audits, examinations, and otherwise evaluate the Borrower's compliance with the terms of this Agreement.   This right also includes timely and reasonable access to the Borrower's and its Affiliates' personnel for the purpose of interview and discussion related to such documents.

SECTION 10.08   <u>Additional Defined Terms</u>.   As used in this Article, the following terms have the meanings specified below:

"<u>Borrower Air Carrier</u>" means, collectively, the Borrower, its Affiliates that are Air Carriers, and their respective heirs, executors, administrators, successors, and assigns.   Notwithstanding anything to the contrary herein, for purposes of this Article X, an "Affiliate" of the Borrower shall not include any Person(s) that become affiliated with the Borrower solely by virtue of the consummation of a Change of Control transaction resulting in repayment of the Loans in full.

"<u>Corporate Officer</u>" means, with respect to any Borrower Air Carrier, its president; any vice president in charge of a principal business unit, division, or function (such as sales, administration or finance); any other officer who performs a policy-making function; or any other person who performs similar policy making functions for the Borrower Air Carrier.   Executive officers of subsidiaries or parents of any Borrower Air Carrier may be deemed Corporate Officers of the Borrower Air Carrier if they perform such policy-making functions for the Borrower Air Carrier.

"<u>Employee</u>" has the meaning given to the term in section 2 of the National Labor Relations Act (29 U.S.C. 152 and includes any individual employed by an employer subject to the Railway Labor Act (45 U.S.C. 151 et seq.), and for the avoidance of doubt includes all individuals who are employed by the Borrower Air Carrier who are not Corporate Officers.

"<u>Severance Pay or Other Benefits</u>" means any severance payment or other similar benefits, including cash payments, health care benefits, perquisites, the enhancement or acceleration of the payment or vesting of any payment or benefit or any other in-kind benefit payable (whether in lump sum or over time, including after March 24, 2022) by any Borrower Air Carrier or its Affiliates to a Corporate Officer or Employee in connection with any termination of such Corporate Officer's or Employee's employment (including, without limitation, resignation, severance, retirement, or constructive termination), which shall be determined and calculated in respect of any Employee or Corporate Officer of the Borrower Air Carrier in the manner prescribed in 17 CFR 229.402(j) (without regard to its limitation to the five (5) most highly compensated executives and using the actual date of termination of employment rather than the last business day of the Borrower Air Carrier's last completed fiscal year as the trigger event).

"<u>Subsequent Reference Period</u>" means (i) for a Corporate Officer or Employee whose employment with the Borrower Air Carrier or an Affiliate started during 2019 or later, the twelve (12)

month period starting from the end of the month in which the officer or employee commenced employment, if such officer's or employee's total compensation exceeds $425,000 (or $3,000,000) during such period and (ii) for a Corporate Officer or Employee whose Total Compensation first exceeds $425,000 during a 12-month period ending after 2019, the 12-month period starting from the end of the month in which the Corporate Officer's or Employee's Total Compensation first exceeded $425,000 (or $3,000,000).

"Total Compensation" means compensation including salary, wages, bonuses, awards of stock, and any other financial benefits provided by the Borrower Air Carrier or an Affiliate, as applicable, which shall be determined and calculated for the 2019 calendar year or any applicable twelve (12)-month period in respect of any Employee or Corporate Officer of the Borrower Air Carrier in the manner prescribed under paragraph e.5 of the award term in 2 CFR part 170, App. A, but excluding any Severance Pay or Other Benefits in connection with a termination of employment.

ARTICLE XI

MISCELLANEOUS

SECTION 11.01   Notices; Public Information.

(a)   Notices Generally.   Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing in English and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email as follows:

(i)   if to a Credit Party, to it at Alaska Air Group, Inc., 19300 International Blvd., Seattle, WA, 98188, Attention of  Nathaniel Pieper (Facsimile No. (206) 392-5290; Telephone No. (206) 392-5062; Email: nat.pieper@alaskaair.com);

(ii)   if to the Administrative Agent or the Collateral Agent, to The Bank of New York Mellon at 240 Greenwich Street, 7th Floor, New York, NY 10286, Attention of Joanna Shapiro,  Managing  Director  (Telephone  No.  212-815-4949;  Email: joanna.g.shapiro@bnymellon.com with a copy to UST.Cares.Program@bnymellon.com);

(iii)   if to Treasury, as the Initial Lender, to The Department of the Treasury of the United States at 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220, Attention of Assistant General Counsel (Banking and Finance) (Telephone No. 202-622-0283; Email: eric.froman@treasury.gov); and

(iv)   if to any other Lender, to it at its address (or facsimile number or email address) set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received.  Notices delivered through electronic communications, to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)   Electronic Communications.   Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail, FpML, and Internet or intranet websites) pursuant to procedures approved by the Lenders and reasonably acceptable to the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent, the Collateral Agent, the Parent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by

electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent, the Collateral Agent or a Lender otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)    Change of Address, etc.  Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

(d)    Platform.

(i)    The Borrower and the Lenders agree that the Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the other Lenders by posting the Communications on the Platform.

(ii)    The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Credit Parties, any Lender or any other Person or entity for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of communications through the Platform.  "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of the Credit Parties pursuant to any Loan Document or the transactions contemplated therein that is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through the Platform.

(e)    Public Information.  The Borrower hereby acknowledges that certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the materials and information provided by or on behalf of the Borrower hereunder and under the other Loan Documents (collectively, "Borrower Materials") that may be distributed to the Public Lenders and that (i) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC," which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of U.S. federal and state securities Laws (provided, however, that to the extent that such Borrower Materials constitute Information, they shall be subject to Section 11.12); (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (iv) the

88

Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information". Each Public Lender will designate one or more representatives that shall be permitted to receive information that is not designated as being available for Public Lenders. Notwithstanding the foregoing, financial statements and related documentation, in each case, provided pursuant to Section 5.01(a) or 5.01(b) shall be deemed to be marked "PUBLIC", unless the Parent notifies the Administrative Agent promptly that any such document contains material non-public information.

SECTION 11.02   Waivers; Amendments.

(a)    No Waiver; Remedies Cumulative; Enforcement.   No failure or delay by the Administrative Agent, the Collateral Agent or any Lender in exercising any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege, or any abandonment or discontinuance of steps to enforce such a right remedy, power or privilege, preclude any other or further exercise thereof or the exercise of any other right remedy, power or privilege. The rights, remedies, powers and privileges of the Administrative Agent, the Collateral Agent and the Lenders hereunder and under the Loan Documents are cumulative and are not exclusive of any rights, remedies, powers or privileges that any such Person would otherwise have.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Credit Parties shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, (i) so long as the Initial Lender is a Lender, either the Initial Lender or, at the Initial's Lender's option, the Administrative Agent in accordance with Section 7.01 for the benefit of all the Lenders and (ii) if the Initial Lender is no longer a Lender, the Required Lenders or the Administrative Agent (acting at the direction of the Required Lenders) in accordance with Section 7.01 for the benefit of all the Lenders; provided that the foregoing shall not prohibit (i) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacities as Administrative Agent and as Collateral Agent) hereunder and under the other Loan Documents, (ii) any Lender from exercising setoff rights in accordance with Section 11.08 (subject to the terms of Section 2.13) or (iii) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to a Credit Party under any Debtor Relief Law; provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (x) the Required Lenders shall have the rights otherwise provided to the Administrative Agent pursuant to Section 7.01 and (y) in addition to the matters set forth in clauses (ii) and (iii) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights or remedies available to it and as authorized by the Required Lenders.

(b)    Amendments, Etc.   Except as otherwise expressly set forth in this Agreement (including Section 2.10 and Section 8.01), no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower therefrom, shall be effective unless in writing executed by the Borrower and the Required Lenders, and acknowledged by the Administrative Agent, or by the Borrower and the Administrative Agent with the consent of the Required Lenders, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that no such amendment, waiver or consent shall:

(i)    extend or increase any Commitment of any Lender without the written consent of such Lender;

(ii)    reduce the principal of, or rate of interest specified herein on, any Loan, or any fees or other amounts payable hereunder or under any other Loan Document, without the written consent of each Lender directly and adversely affected thereby (provided that only the

consent of the Required Lenders shall be necessary (x) to amend the definition of "Default Rate" or to waive the obligation of the Borrower to pay interest at the Default Rate or (y) to amend any financial covenant (or any defined term directly or indirectly used therein), even if the effect of such amendment would be to reduce the rate of interest on any Loan or other Obligation or to reduce any fee payable hereunder);

(iii)     postpone any date scheduled for any payment of principal of, or interest on, any Loan, or any fees or other amounts payable hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, without the written consent of each Lender directly and adversely affected thereby;

(iv)     change Section 2.12(b) or Section 2.13 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender directly and adversely affected thereby;

(v)     waive any condition set forth in Section 4.01 without the written consent of the Initial Lender; or

(vi)     change any provision of this Section or the percentage in the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

provided, further, that no such amendment, waiver or consent shall amend, modify or otherwise affect the rights or duties hereunder or under any other Loan Document of either of the Agents, unless in writing executed by such Agent, in each case in addition to the Borrower and the Lenders required above.

In addition, notwithstanding anything in this Section to the contrary, (i) if the Borrower shall have identified an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then, upon the delivery of a certificate of a Responsible Officer of the Borrower to the Administrative Agent identifying such error and directing the Administrative Agent to execute an amendment to correct such error, the Administrative Agent and the Borrower shall be permitted to amend such provision, and, in each case, such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders to the Administrative Agent within ten (10) Business Days following receipt of notice thereof and (ii) that any Security Document may be amended, supplemented or otherwise modified with the consent of the applicable Grantor (as defined in the Pledge and Security Agreements) and the Administrative Agent to add assets (or categories of assets) to the Collateral covered by such Security Document, as contemplated by the definition of Additional Collateral, or to remove any assets or categories of assets (including after-acquired assets of that category) from the Collateral covered by such Security Document to the extent the release thereof is permitted by Section 6.17(b)(iii).

SECTION 11.03   Expenses; Indemnity; Damage Waiver.

(a)     Costs and Expenses.   The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Initial Lender, the Administrative Agent, the Collateral Agent and their Affiliates (including the reasonable fees, charges and disbursements of any counsel for the Initial Lender, the Administrative Agent or the Collateral Agent), and shall pay all fees and time charges and disbursements for attorneys who may be employees of the Administrative Agent or the Collateral Agent, in connection with the preparation, negotiation, execution, delivery and administration of this Agreement, the Loan Documents, any other agreements or documents executed in connection herewith or therewith or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by the

Administrative Agent, the Collateral Agent or any Lender (including the fees, charges and disbursements of any counsel for the Administrative Agent, the Collateral Agent or any Lender), and shall pay all fees and time charges for attorneys who may be employees of the Administrative Agent, the Collateral Agent or any Lender, in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the Loan Documents, any other agreements or documents executed in connection herewith or therewith, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) including its rights under this Section, or (B) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring, negotiations or enforcement in respect of this Agreement, the Loan Documents and other agreements or documents executed in connection herewith or therewith.

(b)     Indemnification by the Borrower.   The Borrower shall indemnify the Administrative Agent and Collateral Agent (and any sub-agents thereof) and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, obligations, penalties, fines, settlements, judgments, disbursements and related costs and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Parent) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Parent or any of its Subsidiaries, or any Environmental Liability related in any way to the Parent or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Parent, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee other than the Initial Lender, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.  This paragraph (b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     Reimbursement by Lenders.  To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under paragraph (a) or (b) of this Section to be paid by it to the Administrative Agent or Collateral Agent (or any sub-agents thereof) or any Related Party of any of the foregoing, each Lender (other than the Initial Lender) severally agrees to pay to the Administrative Agent or Collateral Agent (or any such sub-agents) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's Applicable Percentage at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or Collateral Agent (or any such sub-agents), or against any Related Party of any of the foregoing acting for the Administrative Agent or Collateral Agent (or any such sub-agents) in connection with such capacity.  The obligations of the Lenders under this paragraph (c) are subject to the provisions of Section 2.12(e).

(d)     Waiver of Consequential Damages, Etc.   To the fullest extent permitted by Applicable Law, no Credit Party shall assert, and each hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or

91

thereby, any Loan, or the use of the proceeds thereof.  No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)     Payments.  All amounts due under this Section shall be payable not later than five  (5) days after demand therefor; provided that the terms of this Section shall not apply to the Initial Lender.

(f)     Survival.  Each party's obligations under this Section shall survive the termination of the Loan Documents and payment of the obligations hereunder and the resignation or removal of the Administrative Agent or the Collateral Agent.

SECTION 11.04  Successors and Assigns.

(a)     Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any other attempted assignment or transfer by any party hereto shall be null and void), and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of paragraph (b) of this Section, (ii) by way of participation in accordance with the provisions of paragraph (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (e) of this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments by Lenders.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it); provided that any such assignment by any Lender (other than the Initial Lender) shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Loans at the time owing to it or contemporaneous assignments to and/or by related Approved Funds (determined after giving effect to such assignments) that equal at least the amount specified in paragraph (b)(i)(B) of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in paragraph (b)(i)(A) of this Section, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $5,000,000, unless each of the Administrative Agent and, so long as no Default or Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii)     Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans assigned.

(iii)     Required Consents.  No consent shall be required for any assignment by the Initial Lender.  The consent of the Borrower (such consent not to be unreasonably withheld, delayed or conditioned) shall be required for any assignment by any Lender other than the Initial Lender unless (x) a Default or Event of Default has occurred and is continuing at the time of such assignment, or (y) such assignment is to a Lender or an Affiliate of a Lender; provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof.

(iv)     Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)     No Assignment to Certain Persons.  No such assignment shall be made to the Borrower or any of the Borrower's Affiliates or Subsidiaries.

(vi)     No Assignment to Natural Persons.  No such assignment shall be made to a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person).

Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 11.03 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender other than the Initial Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section.

(c)     Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, the Collateral Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a Competitor, a natural person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person, or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a

"Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent, the Collateral Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 11.03(b) with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 11.02(b)(i) through (v) that affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.14, 2.15 and 2.16 (subject to the requirements and limitations therein, including the requirements under Section 2.16(g) (it being understood that the documentation required under Section 2.16(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Section 2.19 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Section 2.15 or 2.16, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.19(b) with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.13 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)      Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 11.05  Survival.  All covenants, agreements, representations and warranties made by any Credit Party herein and in any Loan Document or other documents delivered in connection herewith or therewith or pursuant hereto or thereto shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery hereof and thereof and the making of the Borrowings hereunder, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, the Collateral Agent or any Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any

94

other Obligation hereunder shall remain unpaid or unsatisfied and so long as the Commitments have not expired or been terminated.  The provisions of Sections 2.14, 2.15, 11.03, 11.15 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the payment in full of the Obligations, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

SECTION 11.06   Counterparts; Integration; Effectiveness; Electronic Execution.

(a)      Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)      Electronic Execution.  The words "execution," "signed," "signature," and words of like import in this Agreement and in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. Notwithstanding anything herein to the contrary, delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic means, or confirmation of the execution of this Agreement on behalf of a party by an email from an authorized signatory of such party shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 11.07   Severability.   If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 11.08   Right of Setoff.   If an Event of Default shall have occurred and be continuing, each Lender, and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held, and other obligations (in whatever currency) at any time owing, by such Lender or any such Affiliate, to or for the credit or the account of the Borrower against any and all of the due and unpaid Obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document to such Lender or its respective Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower may be contingent or unmatured or are owed to a branch office or Affiliate of such Lender different from the branch office or Affiliate holding such deposit or obligated on such indebtedness.  The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have.  Each Lender (other than the Initial Lender)

agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 11.09   Governing Law; Jurisdiction; Etc.

(a)      Governing Law.  This Agreement and the other Loan Documents will be governed by and construed in accordance with the federal law of the United States if and to the extent such law is applicable, and otherwise in accordance with the law of the State of New York applicable to contracts made and to be performed entirely within such State.

(b)      Jurisdiction and Venue.  Each of the Credit Parties and each Lender agrees (a) to submit to the exclusive jurisdiction and venue of the United States District Court for the District of Columbia for any civil action, suit or proceeding arising out of or relating to this Agreement, the Loan Documents, or the transactions contemplated hereby or thereby.

(c)      Service of Process.  Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 11.01.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by Applicable Law.

SECTION 11.10   Waiver of Jury Trial.  To the extent permitted by Applicable Law, each Credit Party and each Lender hereby unconditionally waives trial by jury in any civil legal action or proceeding relating to this Agreement, the Loan Documents or the transactions contemplated hereby or thereby.

SECTION 11.11   Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 11.12   Treatment of Certain Information; Confidentiality.  Each of the Agents and the Lenders (other than the Initial Lender) agree to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent required or request by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners); (c) to the extent required by Applicable Laws or by any subpoena or similar legal process; (d) to any other party hereto; (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (f) subject to an agreement containing provisions substantially the same as (or no less restrictive than) those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement, or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder; provided that, in each case under this clause (f)(ii), such actual or prospective party is not a Competitor; (g) on a confidential basis to (i) any rating agency in connection with rating the Borrower or its Subsidiaries or the Loans or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans; (h) with the consent of the Borrower or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, or (y) becomes available to either Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower who did not acquire such information as a result of a breach of this Section.

For purposes of this Section, "Information" means all information received from the Parent or any of its Subsidiaries relating to the Parent or any of its Subsidiaries or any of their respective businesses,

other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Parent or any of its Subsidiaries; provided that, in the case of information received from the Parent or any of its Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 11.13   Money Laundering; Sanctions.   The Borrower shall provide to the Administrative Agent, the Collateral Agent, and the Lenders information and documentation that the Lenders may reasonably request that identifies the Borrower and its Affiliates, which information may include the name and address of the Borrower and its Affiliates and other information regarding beneficial ownership of the Borrower and its Affiliates that will allow the Lenders to ensure compliance with Sanctions and the AML Laws.  For purposes of determining whether or not a representation with respect to any indirect ownership is true or a covenant is being complied with under this Section 11.13, the Borrower shall not be required to make any investigation into (i) the ownership of publicly traded stock or other publicly traded securities or (ii) the ownership of assets by a collective investment fund that holds assets for employee benefit plans or retirement arrangements.

SECTION 11.14   Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under Applicable Law (collectively, "charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with Applicable Law, the rate of interest payable in respect of such Loan hereunder, together with all charges payable in respect thereof, shall be limited to the Maximum Rate.  To the extent lawful, the interest and charges that would have been paid in respect of such Loan but were not paid as a result of the operation of this Section shall be cumulated and the interest and charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the amount collectible at the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate for each day to the date of repayment, shall have been received by such Lender.  Any amount collected by such Lender that exceeds the maximum amount collectible at the Maximum Rate shall be applied to the reduction of the principal balance of such Loan or refunded to the Borrower so that at no time shall the interest and charges paid or payable in respect of such Loan exceed the maximum amount collectible at the Maximum Rate.

SECTION 11.15   Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender (other than the Initial Lender) severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.

SECTION 11.16   No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (a) (i) no fiduciary, advisory or agency relationship between any Credit Party and any of their respective Subsidiaries and the Administrative Agent, the Collateral Agent

or any Lender is intended to be or has been created in respect of the transactions contemplated hereby or by the other Loan Documents, irrespective of whether the Administrative Agent, the Collateral Agent, or any Lender has advised or is advising any Credit Party or any of their respective Subsidiaries on other matters, (ii) the lending and other services regarding this Agreement provided by the Administrative Agent, the Collateral Agent and the Lenders are arm's-length commercial transactions between Credit Parties and their Affiliates, on the one hand, and the Administrative Agent, the Collateral Agent and the Lenders, on the other hand, (iii) the Credit Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent that they has deemed appropriate and (iv) the Credit Parties are capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; and (b) (i) the Administrative Agent, the Collateral Agent and the Lenders each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Credit Parties or any of their respective Affiliates, or any other Person; (ii) none of the Administrative Agent, the Collateral Agent and the Lenders has any obligation to the Credit Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Collateral Agent and the Lenders and their respective Affiliates may be engaged, in a broad range of transactions that involve interests that differ from those of the Credit Parties and their respective Affiliates, and none of the Administrative Agent, the Collateral Agent and the Lenders has any obligation to disclose any of such interests to the Credit Parties or any of their respective Affiliates. To the fullest extent permitted by Law, the Credit Parties hereby waive and release any claims that they may have against any of the Administrative Agent, the Collateral Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 11.17   <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the parties, each party hereto (including each Credit Party) acknowledges that any liability arising under a Loan Document of any Credit Party that is an Affected Financial Institution, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority, and agrees and consents to, and acknowledges and agrees to be bound by: (a) the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising under any Loan Documents which may be payable to it by any Credit Party that is an Affected Financial Institution; and (b) the effects of any Bail-In Action on any such liability, including (i) a reduction in full or in part or cancellation of any such liability, (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under any Loan Document, or (iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

[Signature pages follow.]

98

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

ALASKA AIRLINES, INC., as Borrower

By_____
   Name:
   Title:

99

ALASKA AIR GROUP, INC.,
  as Parent and Guarantor


By_____
    Name:
    Title:

100

HORIZON AIR INDUSTRIES, INC., as Guarantor

By_____
   Name:
   Title:

101

THE BANK OF NEW YORK MELLON,
   as Administrative Agent


By_____
   Name:
   Title:


THE BANK OF NEW YORK MELLON,
   as Collateral Agent


By_____
   Name:
   Title:

102

UNITED STATES DEPARTMENT OF THE
TREASURY, as the Initial Lender

By_____
   Name:
   Title:

Annex B

## <u>Form of Amended and Restated Horizon Pledge and Security Agreement</u>

EXECUTION VERSION

**AMENDED AND RESTATED HORIZON AIRCRAFT, ENGINE AND PROPELLER PLEDGE AND SECURITY AGREEMENT**

**dated as of October 30, 2020**

**between**

**EACH OF THE GRANTORS PARTY HERETO**

**and**

**THE BANK OF NEW YORK MELLON**

**as Collateral Agent**

# TABLE OF CONTENTS

Section 1.    DEFINITIONS ..................................................................................................... 1
  1.1    General Definitions. .......................................................................................... 1
  1.2    Definitions; Interpretation .............................................................................. 5

Section 2.    GRANT OF SECURITY INTERESTS. ..................................................... 5
  2.1    Grant of Security ............................................................................................. 5

Section 3.    SECURITY FOR OBLIGATIONS; GRANTORS REMAIN LIABLE. ............ 7
  3.1    Security for Obligations .................................................................................. 7
  3.2    Continuing Liability Under Collateral ........................................................... 7

Section 4.    REPRESENTATIONS AND WARRANTIES. ............................................ 7
  4.1    Generally. ......................................................................................................... 7

Section 5.    COVENANTS AND AGREEMENTS ......................................................... 9
  5.1    Affirmative Covenants. ................................................................................... 9
  5.2    Negative Covenants. ....................................................................................... 10

Section 6.    FURTHER ASSURANCES; ADDITIONAL GRANTORS. ....................... 10
  6.1    Further Assurances ......................................................................................... 10
  6.2    Additional Grantors ....................................................................................... 11

Section 7.    COLLATERAL AGENT APPOINTED PROXY ATTORNEY-IN-FACT ........ 11
  7.1    Power of Attorney .......................................................................................... 11
  7.2    No Duty on the Part of Collateral Agent or Secured Parties ........................ 13
  7.3    Standard of Care; Collateral Agent May Perform ......................................... 13

Section 8.    REMEDIES. ......................................................................................... 14
  8.1    Generally. ....................................................................................................... 14
  8.2    Application of Proceeds ................................................................................. 17
  8.3    Sales on Credit ............................................................................................... 17

Section 9.    CONTINUING SECURITY INTEREST; TRANSFER OF LOANS; Reinstatement. ...... 17
  9.1    Continuing Security Interest; Transfer of Loans .......................................... 17
  9.2    Reinstatement ................................................................................................. 18

Section 10.    MISCELLANEOUS. ............................................................................ 18
  10.1    Notices. ......................................................................................................... 18
  10.2    Waiver; Amendment. ................................................................................... 18
  10.3    Relation to Other Security Documents. ....................................................... 19
  10.4    Collateral Agent's Fees and Expenses. ........................................................ 19
  10.5    Survival of Agreement. ................................................................................. 19
  10.6    Counterparts; Effectiveness, Successors and Assigns. ................................ 19
  10.7    Severability. .................................................................................................. 20
  10.8    Governing Law; Jurisdiction, Etc. ................................................................ 20

Schedules

Schedule 1.1 (Excluded Intellectual Property)

Schedule 2.1 (Certain Listed Collateral)

Schedule 4.1 (General Information)

Exhibits

Exhibit A (Form of Pledge Supplement)

Exhibit B (Form of Perfection Certificate)

Annexes

Annex 1 (Loyalty Program Assets)

Annex 2 (Control Collateral)

Annex 3A (Propeller Assets)

Annex 3B (Aircraft and Engine Assets)

Annex 4 (Slots, Gates and Routes)

Annex 5 (Pledged Collateral)

Annex 6 (Spare Parts Assets)

ii

Motion for TRO Ex. 9 Page 215

This AMENDED AND RESTATED HORIZON AIRCRAFT, ENGINE AND PROPELLER PLEDGE AND SECURITY AGREEMENT, dated as of October 30, 2020 (together with the Annexes and Schedules, and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**"), between each Grantor, whether as an original signatory hereto or as an Additional Grantor, and The Bank of New York Mellon, as collateral agent for the Secured Parties (in such capacity as collateral agent, together with its successors and assigns, the "**Collateral Agent**").

## W I T N E S S E T H :

WHEREAS, each Grantor has entered into a Restatement Agreement (the "**Restatement Agreement**"), dated as the date hereof, to that certain Loan and Guarantee Agreement, dated as of September 28, 2020 (the "**Existing Loan and Guarantee Agreement**", and as restated by the Restatement Agreement, and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), between ALASKA AIRLINES, INC. (the "**Borrower**"), ALASKA AIR GROUP, INC. (the "**Parent**"), the Guarantors party thereto from time to time, the UNITED STATES DEPARTMENT OF THE TREASURY ("**Treasury**"), as Initial Lender, and THE BANK OF NEW YORK MELLON, as Administrative Agent and Collateral Agent;

WHEREAS, each Grantor had entered into that certain Horizon Aircraft and Engine Pledge and Security Agreement, dated as of September 28, 2020 and filed for recordation with the FAA Registry pursuant to and in accordance with the provisions of Section 44107 of the Transportation Code on September 28, 2020 at 8:17 A.M., C.D.T. but has not yet been recorded, between each Grantor and the Collateral Agent (the "**Existing Horizon Security Agreement**");

WHEREAS, the Borrower has requested, and Treasury has agreed to, extend additional Commitments to the Borrower as is permissible under the CARES Act to the Borrower;

WHEREAS, Loans made pursuant to the Commitments (as increased by the Additional Commitments being provided by the Restatement Agreement to the Existing Loan and Guarantee Agreement) will be secured by Liens on the Collateral securing the existing Obligations, together with Liens on any Additional Collateral, subject to the distribution priorities set forth in the Loan Agreement;

WHEREAS, in connection with the foregoing, each Grantor and the Collateral Agent on behalf of the Secured Parties wish to amend and restate the Existing Horizon Security Agreement to (i) add the Annex 3A to this Agreement covering any and all Propeller Assets as Additional Collateral and (ii) renumber the existing Annex 3 (Aircraft and Engine Assets) as Annex 3B (Aircraft and Engine Assets);

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## SECTION 1.   DEFINITIONS

### 1.1   General Definitions.

All capitalized terms used herein (including the preamble and recitals hereto) shall have the meanings assigned to such terms as set forth below or in any Applicable Annex, in the Loan Agreement, or if not defined therein, in the UCC.

"**Additional Grantor**" shall have the meaning assigned in <u>Section 6.2</u>.

1

"**Agreement**" shall have the meaning set forth in the preamble.

"**Aircraft Protocol**" means the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment adopted on November 16, 2001, at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States.

"**Annex Remedies Section**" shall mean, with respect to an Applicable Annex, the section in such Applicable Annex named "Defaults and Remedies".

"**Applicable Annex**" shall mean, with respect to any Collateral and any Grantor, (i) each of Annex 1 (Loyalty Program Assets), Annex 2 (Control Collateral), Annex 3A (Propellers), Annex 3B (Aircraft and Engine Assets), Annex 4 (Slots, Gates and Routes), Annex 5 (Pledged Collateral), and Annex 6 (Spare Parts Assets) that is applicable to such Collateral and such Grantor and any other Annexes incorporated by reference in such Annex and (ii) any other Annexes attached hereto.

"**Cape Town Convention**" shall mean the official English language text of the Convention on International Interests in Mobile Equipment, adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States.

"**Cape Town Treaty**" shall mean, collectively, (a) the Cape Town Convention, (b) the Aircraft Protocol, and (c) all rules and regulations (including the Regulations and Procedures for the International Registry) adopted pursuant thereto and all amendments, supplements and revisions thereto.

"**Collateral**" shall have the meaning assigned in Section 2.1.

"**Collateral Agent**" shall have the meaning set forth in the preamble.

"**Control**" shall mean the completion and satisfaction of those conditions and steps necessary for the secured party to have "control" when used with respect to any (i) Certificated Security, under UCC Section 8-106(a) or (b), as applicable, (ii) Securities Account, including any Financial Asset credited to such Securities Account and all related Security Entitlements, under UCC Section 8-106(d) and (iii) Deposit Account, under UCC Section 9-104(a).

"**Control Collateral**" shall mean Collateral consisting of the Deposit Accounts and Securities Accounts identified in Schedule 2.1.

"**Copyrights**" shall mean all United States and foreign (A) copyrights, whether registered or unregistered, whether in published or unpublished works of authorship, (B) copyright registrations or applications in any IP Filing Office, (C) copyright renewals or extensions and (D) rights corresponding, derived from or analogous to any of the foregoing.

"**Excluded Asset**" shall mean (i) any asset of a Grantor subject to a Permitted Lien, if, to the extent and only for so long as the grant of a Lien on such asset to secure the Secured Obligations is prohibited by, or requires additional action (that has not been taken) under, any agreement permitted under Section 6.02 of the Loan Agreement (unless the counterparty to such agreement is an Affiliate of any Grantor), (ii) any lease, license, contract, property right or agreement to which any Grantor is a party to the extent any such lease, license, contract, property right or agreement by its terms in effect on the date hereof or applicable Law, prohibits, or requires consent (unless such consent has been received or is of an Affiliate of any Grantor) to the granting of a Lien in the rights of such Grantor thereunder or which Lien would be invalid

WEIL:\97681611\4\13173.0005

or unenforceable upon any such grant, in each case in this <u>clause (ii)</u> except to the extent that the UCC or any other applicable Law provides that such grant of Lien is effective irrespective of any prohibitions to such grant (iii) any "intent-to-use" application for registration of a Trademark filed with the United States Patent and Trademark Office, pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. §1051, prior to the filing of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, but solely to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such "intent-to-use" application under applicable federal law, (iv) motor vehicles subject to certificates of title (other than to the extent a Lien thereon can be perfected by the filing of a financing statement under the UCC), (v) margin stock (within the meaning of Regulation U of the Board of Governors, as in effect from time to time), (vi) any Deposit Account or Securities Account that is used solely as a pension fund, escrow (including any escrow accounts for the benefit of customers), trust, or similar account, in each case, for the benefit of third parties and (vii) any Equity Interest of an Excluded Subsidiary; <u>provided</u>, <u>however</u>, that Excluded Assets shall not include any Material Loyalty Program Agreement, and licenses and property rights thereunder and, for the avoidance of doubt,  any other Loyalty Program Agreement as to which consent to the grant of the security interest hereunder has been obtained and provided further that Excluded Assets shall not include any Control Collateral or Proceeds, substitutions or replacements of any Excluded Assets referred to in <u>clauses (i)</u> through <u>(vii)</u> (unless such Proceeds, substitutions or replacements would independently constitute Excluded Assets referred to in <u>clauses (i)</u> through <u>(vii)</u>).

"**Grantor**" shall mean each of the signatories hereto (including any Additional Grantor) other than the Collateral Agent.

"**Loan Agreement**" shall have the meaning set forth in the recitals.

"**Insurance**" shall mean (i) all insurance policies covering any or all of the Collateral (regardless of whether the Collateral Agent is the loss payee thereof), (ii) any key man life insurance policies and (iii) in each case, all claims thereunder.

"**Intellectual Property**" shall mean all intellectual property rights or other similar proprietary rights, whether registered or unregistered, arising out of the laws of any jurisdiction throughout the world, including such rights in and to: (A) Copyrights, (B) Patents, (C) Trademarks, (D) Trade Secrets, (E) software, firmware and computer programs and applications, whether in source code, object code, human-readable or other form, including data files, algorithms, analytical models, computerized databases, plugins, subroutines, tools, application programming interfaces and libraries, and development documentation, programming tools, drawings, specifications and data, (F) designs and databases, (G) IP addresses and (H) all tangible embodiments and fixations thereof and documentation related thereto. "International Registry" shall mean the "International Registry" as defined in the Cape Town Treaty.

"**IP Filing Office**" means, as applicable, the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any jurisdiction.

"**Patents**" shall mean all United States and foreign issued patents (whether utility, design, or plant) and certificates of invention, and similar industrial property rights, and applications for any of the foregoing, including: (A) all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof, (B) all rights corresponding, derived from or analogous thereto throughout the world and (C) all inventions and improvements described or claimed therein.

WEIL:\97681611\4\13173.0005

"**Perfection Certificate**" shall mean a perfection certificate, executed and delivered by each of the Grantors, dated as of the date hereof, in substantially the form of Exhibit B attached hereto (as supplemented from time to time).

"**Perfection Requirement**" shall mean, at any time and with respect to any property, the requirement that:

(i)      each Grantor, at its sole cost and expense, shall have executed a grant of a security interest in such property in one or more applicable Security Documents (as specified in this Agreement) in favor of the Collateral Agent for the benefit of the Secured Parties;

(ii)      each Grantor, at its sole cost and expense, shall have prepared and duly and timely filed, registered, recorded or made, or shall have caused to be prepared and duly and timely filed, registered, recorded or made, the Required Filings in favor of the Collateral Agent for the benefit of the Secured Parties with respect to the security interest in such property;

(iii)      each Grantor shall have completed and satisfied, or shall have caused to be completed and satisfied, all conditions and steps constituting the Perfection Requirement under the terms of any Applicable Annex with respect to such property; and

(iv)      each Grantor shall have obtained all consents and approvals required to be obtained by it in connection with the execution and delivery of this Agreement and any other Security Documents to which it is a party, the performance of its obligations thereunder and the granting by it of the Liens hereunder and thereunder and delivered such consent or approval to the Collateral Agent.

"**Pledge Supplement**" shall mean any supplement to this Agreement in substantially the form of Exhibit A attached hereto.

"**Required Filing**" shall mean each (i) UCC financing statement (including any fixture filing, as applicable) in favor of the Collateral Agent for the benefit of the Secured Parties with respect to the Collateral (based upon the information provided to the Collateral Agent in the Perfection Certificate) and for filing in each governmental, municipal or other office specified in Schedule 5 to the Perfection Certificate and (ii) any Required Filing under each Applicable Annex in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Secured Obligations**" shall have the meaning assigned in Section 3.1.

"**Secured Parties**" shall mean the Lenders (including the Treasury as the Initial Lender), the Administrative Agent and the Collateral Agent.

"**Spare Parts**" shall mean all accessories, appurtenances, or parts of (A) an aircraft (except an engine or propeller), (B) an engine (except a propeller), (C) a propeller, or (D) an Appliance, that are to be installed at a later time in an aircraft, engine, propeller or Appliance (including "spare parts" (as defined in Section 40102 of Title 49)) including, in all cases, any replacements, substitutions or renewals therefor, and accessions thereto.

"**Title 14**" shall mean Title 14 of the United States Code, as amended from time to time.

"**Title 49**" shall mean Title 49 of the United States Code, as amended from time to time.

4

**"Trademarks"** shall mean all United States, and foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, trade dress, service marks, certification marks, collective marks, logos, social media identifiers, handles, other source or business identifiers, designs and general intangibles of a like nature, whether arising under a statute, common law, or the laws of any jurisdiction throughout the world, whether registered or unregistered, including: (A) all registrations, applications, extensions, renewals or other filings of any of the foregoing and (B) all of the goodwill of the business connected with the use of or symbolized by the foregoing.

**"Trade Secrets"** shall mean all trade secrets and all other confidential or proprietary information, data and know-how, whether arising under a statute, common law, or the Laws of any jurisdiction throughout the world, whether or not such trade secret has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating, or referring in any way to such trade secret.

**"Treasury"** shall have the meaning set forth in the recitals.

**"UCC"** shall mean the Uniform Commercial Code as in effect from time to time in the State of New York or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

### 1.2    Definitions; Interpretation

References to "Annexes," "Sections," "Exhibits" and "Schedules" shall be to Annexes, Sections, Exhibits and Schedules, as the case may be, of this Agreement unless otherwise specifically provided. References to "Schedules" shall be as supplemented from time to time.  References to this "Agreement" shall include all Annexes, Exhibits and Schedules hereto.  Section, Annex, Exhibit and Schedule headings and the Table of Contents in this Agreement are included herein for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  The word "or" is not exclusive.  If any conflict or inconsistency exists between this Agreement and the Loan Agreement, the Loan Agreement shall govern.  All references herein to provisions of the UCC shall include all successor provisions under any subsequent version or amendment to any Article of the UCC.

## SECTION 2.    GRANT OF SECURITY INTERESTS.

### 2.1    Grant of Security

(a)    As security for the payment and performance in full of all Secured Obligations, each Grantor hereby grants to the Collateral Agent for the benefit of the Secured Parties a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under the following personal property of such Grantor, in each case, whether now owned or existing or hereafter acquired, developed, created or arising and wherever located (all of which being hereinafter collectively referred to as the **"Collateral"**):

WEIL:\97681611\4\13173.0005

Motion for TRO Ex. 9 Page 220

(i)      all Loyalty Program Assets (including the Loyalty Program Assets described on <u>Schedule 2.1</u>);

(ii)     all Aircraft and Engine Assets described on <u>Schedule 2.1</u>;

(iii)    all Spare Parts Assets described on <u>Schedule 2.1</u>;

(iv)     all Propeller Assets described on <u>Schedule 2.1</u>;

(v)      all Route Authorities and (w) all FAA Route Slots, (x) all Foreign Route Slots, (y) all Domestic Gate Leaseholds and (z) all Foreign Gate Leaseholds, in the case of each of (w), (x), (y) and (z), held, acquired, used, allocated to or available for use by any Grantor in connection with any such Route Authority described on <u>Schedule 2.1</u>;

(vi)     Grantor's rights under any leasing, licensing and use agreements with respect to any of the foregoing Slots and Gate Leaseholds and under swap or similar agreements or arrangements with respect to any of the foregoing Slots;

(vii)    all General Intangibles that are owned by such Grantor related to the foregoing;

(viii)   the Deposit Accounts and Securities Accounts described on <u>Schedule 2.1</u> (which shall include the  Collateral Proceeds Account) and all cash deposited or held therein and financial assets credited thereto, as applicable;

(ix)     all Pledged Collateral described on <u>Schedule 2.1</u>;

(x)      all Documents (including the Documents described on <u>Schedule 2.1</u>) relating to assets described in the foregoing;

(xi)     all Accounts (including the Accounts described on <u>Schedule 2.1</u>) relating to assets described in the foregoing;

(xii)    to the extent not otherwise included above, all books and records and Supporting Obligations relating to any of the foregoing; and

(xiii)   to the extent not otherwise included above, all Proceeds (including all Proceeds (of any kind) received or to be received by the Grantors upon the transfer or other such disposition of any of the foregoing), products, accessions, rents and profits of or with respect to any of the foregoing.

(b)     Notwithstanding anything herein to the contrary, in no event shall the Collateral include, or the security interest granted under this <u>Section 2.1</u> attach to, any Excluded Asset.

(c)     Each Grantor shall file and make all Required Filings and also hereby authorizes the Collateral Agent to file or make all Required Filings, including any financing or continuation statements, and amendments thereto, in any jurisdictions and with any filing offices as the Collateral Agent may determine, in its sole discretion, are necessary or advisable to perfect the security interest granted to the

WEIL:\97681611\4\13173.0005

Motion for TRO Ex. 9 Page 221

Collateral Agent herein.  Such Required Filings may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as the Collateral Agent may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in all of the Collateral granted to the Collateral Agent herein. Each Grantor shall furnish to the Collateral Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Appropriate Party may request, all in such detail as the Appropriate Party may require.

(d)     If any Collateral (or any portion thereof) constitutes a type of asset covered by an Applicable Annex, the Applicable Annex for such type of asset shall apply and be deemed to have been incorporated in its entirety into this Agreement as if such Applicable Annex constituted a part of this Agreement.

## SECTION 3.     SECURITY FOR OBLIGATIONS; GRANTORS REMAIN LIABLE.

### 3.1     Security for Obligations

This Agreement secures, and the Collateral is collateral security for, the prompt and complete payment and performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under any Debtor Relief Law), of all Obligations and Guaranteed Obligations of the Borrower and each Grantor (collectively, the "**Secured Obligations**").

### 3.2     Continuing Liability Under Collateral

Notwithstanding anything herein to the contrary:

(a)     nothing contained herein is intended or shall be a delegation of duties to any Secured Party;

(b)     each Grantor shall remain liable under each agreement included in or relating to the Collateral and observe and perform all of the obligations undertaken by it thereunder all in accordance with and pursuant to the terms and provisions thereof, and neither the Collateral Agent nor any other Secured Party shall have any obligation or liability under any of such agreements by reason of or arising out of this Agreement or any other document related thereto nor shall the Collateral Agent nor any other Secured Party have any obligation to make any inquiry as to the nature or sufficiency of any payment received by it or have any obligation to take any action to collect or enforce any rights under any agreement included in or relating to the Collateral; and

(c)     the exercise by the Collateral Agent of any of its rights or remedies hereunder, any other Security Document or the Loan Agreement, shall not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral.

## SECTION 4.     REPRESENTATIONS AND WARRANTIES.

### 4.1     Generally.

Each Grantor hereby represents and warrants, on the Closing Date and on the date of each Borrowing (and, in the case of an Additional Grantor or Additional Collateral, on the date of such Grantor's execution and delivery of a Pledge Supplement, or the date such Additional Collateral becomes subject to the security interest created hereby, as applicable, provided that if Additional Collateral becomes subject to

the security interest created hereby without the execution and delivery of a Pledge Supplement, the following representations and warranties are repeated only with respect to such Additional Collateral):

(a)     It owns and has good and valid rights in all Collateral free and clear of any Lien except for Permitted Liens.

(b)     Subject to applicable Privacy Laws, it has the full corporate power, authority and right to pledge, sell, assign or transfer the Collateral pursuant to, and as provided in, this Agreement.

(c)     All information supplied by the Grantors with respect to Collateral, including Schedules 2.1 and 4.1, is true, correct and complete in all material respects; provided that the Grantors may, to the extent applicable, deliver to the Collateral Agent certified supplements to (or restated versions of) Schedules 2.1 and 4.1 and the Perfection Certificate in advance of any making of this representation.

(d)     The Perfection Certificate has been duly prepared, completed and executed and the information set forth therein is true, correct and complete.

(e)     This Agreement grants to the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable security interest in all of the Collateral and, upon the filing, recording or registration of the UCC financing statements and any Required Filing set forth in any Applicable Annex, the security interest granted hereunder constitute a perfected first priority security interest in all of the Collateral, subject to no Liens other than Permitted Liens.

(f)     The UCC financing statements and the Required Filing set forth in the Applicable Annexes are all the financing statements, filings, recordings and registrations that are necessary to publish notice of, protect the validity of and to establish a legal, valid and perfected first priority security interest in favor of the Collateral Agent for the benefit of the Secured Parties with respect to all Collateral, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration nor any other steps or actions is necessary in any such jurisdiction in connection with the grant, perfection or first priority status of the security interest of the Collateral Agent in any Collateral, except as provided (y) under applicable Law with respect to the filing of continuation statements and (z) expressly (by reference to this Section 4.1(f)) in any Applicable Annex.

(g)     Other than the financing statements, filings, recordings or registrations filed or to be filed in favor of the Collateral Agent for the benefit of the Secured Parties, no financing statement, filing, recordings, registrations or other document similar in effect under any applicable Law covering or purporting to cover any security interest in Collateral is on file or of record in any filing or recording office except for (x) financing statements for which proper termination statements have been properly filed and (y) financing statements filed in connection with Permitted Liens.

(h)     No authorization, approval, consent or other action by, and no notice to or filing with, any Person, Governmental Authority or regulatory body is required for either (A) the pledge or grant by any Grantor of the security interest purported to be created hereunder to be legal, valid and enforceable or (B) the exercise by the Collateral Agent of any rights or remedies with respect to any Collateral (whether specifically granted or created hereunder or created or provided for by applicable Law), except (w) such as have been obtained, (x) the filing of UCC financing statements and filing or recordation of any Required Filings set forth in any Applicable Annex, in each case, in favor of the Collateral Agent for the benefit of the Secured Parties,(y) any required continuation statements and (z) with respect to clause (B), to the extent expressly specified (by reference to this Section 4.1(h)) in any Applicable Annex.

WEIL:\97681611\4\13173.0005

## SECTION 5.   COVENANTS AND AGREEMENTS

### 5.1   Affirmative Covenants.

Each Grantor hereby covenants and agrees that:

(a)      It shall have satisfied the Perfection Requirement (i) with respect to the Collateral now owned or existing, on or prior to the Closing Date or, in the case of an Additional Grantor or Additional Collateral, on the date of execution and delivery of a Pledge Supplement, or the date such Additional Collateral becomes subject to the security interest created hereby, as applicable (except that the Perfection Requirement with respect to UCC financing statements and any FAA or International Registry filings may be satisfied by filing thereof by such Grantor on the Closing Date or such date of execution and delivery of a Pledge Supplement, or the date such Additional Collateral becomes subject to the security interest created hereby, as applicable, or, in each case, within one (1) Business Day thereafter) and (ii) with respect to any Collateral acquired or arising after the Closing Date requiring satisfaction of any Perfection Requirement that has not already been undertaken, as promptly as practicable after the date on which such Collateral was acquired or arose (in any event, unless any other timeframe is specifically provided, within thirty (30) days).

(b)      On the Closing Date and at any time at which an additional Perfection Requirement is required with respect to any Collateral of any Grantor, such Grantor shall deliver opinions of counsel that are acceptable to the Appropriate Party, addressed to the Secured Parties and dated the Closing Date or the date at which such Perfection Requirement is required, as applicable, in form and substance satisfactory to the Appropriate Party with respect to the validity and perfection of the Lien granted hereunder and under the other Security Documents in the applicable item(s) of Collateral, fulfillment of all Perfection Requirements, no governmental or third-party consents that have not been obtained, U.S. Bankruptcy Code Section 1110 treatment for any Aircraft and Engine Assets or Spare Parts, in each case, constituting Collateral, no contravention of agreements and such other matters relating to the Collateral as the Appropriate Party requests.

(c)      Concurrently with the Appraisals required to be delivered under Section 5.16 of the Loan Agreement, it shall provide to the Collateral Agent:

(i)      a certificate of a Responsible Officer of the applicable Grantor confirming that Schedules 2.1 and 4.1 (after giving effect to the supplements and restatements in clause (ii) below) with respect to Collateral remain true, correct and complete in all material respects; and

(ii)      to the extent applicable, supplements to (or restated versions of) Schedules 2.1 and 4.1 and the Perfection Certificate.

(d)      At the expense of such Grantor, it shall maintain the security interest created by this Agreement as a perfected first-priority security interest and shall defend such security interest against claims and demands of all Persons at any time claiming any interest therein and the priority of such security interest against any Lien (other than Permitted Liens).  Without limiting the foregoing, the applicable Grantor, at its sole cost and expense, will cause the Required Filings to be prepared and duly and timely filed and recorded.

(e)      It shall provide to the Collateral Agent statements and schedules (or supplements thereto) further identifying and describing in detail the assets and property of such Grantor constituting Collateral and such other reports therewith as the Appropriate Party may request from time to time.

WEIL:\97681611\4\13173.0005

Motion for TRO Ex. 9 Page 224

(f)     Concurrently with any supplementing or changing of the Schedules to this Agreement, it shall, at its expense, cause to be delivered to the Collateral Agent, at the request of the Appropriate Party, (i) an opinion of counsel, in form and substance satisfactory to the Appropriate Party, to the effect that all Perfection Requirements have been made, including that all Required Filings and any amendments or supplements thereto or continuation statements in respect thereof (except any continuation statements specified in such opinion of counsel that are to be filed more than six (6) months after the date thereof), have been filed or recorded in each office necessary to create and perfect the Liens of the Secured Parties and (ii) a certificate of a Responsible Officer as to any additional matters set forth in any Applicable Annex.

(g)     Grantor is an air carrier certificated under Section 44705 of Title 49, United States Code.

### 5.2     Negative Covenants.

Each Grantor hereby covenants and agrees that:

(a)     It shall not change the information provided in Schedule 2.1, Schedule 4.1 or the Perfection Certificate delivered to the Collateral Agent or the Lenders at any time unless (i) prior to such change or within the time period specified herein, it shall have satisfied all conditions and taken all actions, if not already satisfied and taken, necessary or advisable to maintain the continuous legality, validity, enforceability, perfection and the first priority (subject to Permitted Liens) of the Collateral Agent's security interest (for the benefit of the Secured Parties) in the Collateral (including making any and all filings under the UCC or any other applicable Law that are required to have a valid, legal, perfected first-priority (subject to Permitted Liens) security interest in the Collateral and satisfying any applicable Perfection Requirement, any other action required under any Applicable Annex and any other actions requested by the Collateral Agent or an Appropriate Party in connection therewith) and (ii) in connection with a change at any time to remove any Collateral identified at that time on Schedule 2.1, Schedule 4.1 or the Perfection Certificate, such change shall have been made in connection with a release or disposition permitted under, and made in accordance with, Section 6.17(b)(iii) of the Loan Agreement or otherwise in accordance with the applicable Loan Documents.

(b)     It shall not authorize the filing of any financing statements or other registrations, recordations or filings naming it as debtor covering all or any portion of the Collateral, except to cover security interests created hereunder or other Permitted Liens.

### SECTION 6.     FURTHER ASSURANCES; ADDITIONAL GRANTORS.

### 6.1     Further Assurances.

(a)     Each Grantor shall from time to time, at the sole expense of such Grantor, promptly execute and deliver, or cause to be executed and delivered, all further instruments and documents, and take or cause to be taken all further action, that may be necessary or advisable, or that the Appropriate Party or the Collateral Agent may request, in order to create or maintain the validity, perfection or priority of and protect any security interest granted hereby or to enable the Collateral Agent to obtain, preserve, exercise and enforce its rights and remedies hereunder with respect to any Collateral (including the satisfaction and completion of all conditions and steps constituting any applicable Perfection Requirement and any other steps required under any Applicable Annex). Without limiting the generality of the foregoing, each Grantor shall file or deliver to the Collateral Agent such Required Filings, or continuation statements or amendments thereto, and execute and deliver, or cause to be executed and delivered, such other agreements, instruments,

WEIL:\97681611\4\13173.0005

endorsements, powers of attorney or notices, as may be necessary or advisable, or as the Appropriate Party may request, in order to perfect and preserve the security interests granted or purported to be granted hereby.

(b)     Each Grantor shall provide any information on the Collateral that the Appropriate Party or the Collateral Agent may request in order to ensure the Collateral Agent's security interest in all of the Collateral is perfected and is first priority.

(c)     Notwithstanding anything herein to the contrary, with respect to pledges of, or grants of security interests in, assets acquired by a Grantor after the Closing Date or that cease to be an Excluded Asset and thereby become an item of Collateral after the Closing Date, unless any other timeframe is specifically provided, within thirty (30) days after the date of such acquisition (or after the date such assets cease to be Excluded Asset), the applicable Grantor shall satisfy the requirements of underline clause (a) above (including the satisfaction and completion of all conditions and steps constituting any applicable Perfection Requirement and any other action required under any Applicable Annex).

### 6.2     Additional Grantors; Additional Collateral

From time to time after the Closing Date, additional Persons may become parties hereto as additional Grantors (each, an "**Additional Grantor**") or assets eligible to be Additional Collateral may be added to the Collateral, in each case, by an Additional Grantor or applicable Grantor, as relevant, by executing a Pledge Supplement and, as applicable, satisfying the Perfection Requirements.  Upon delivery of such Pledge Supplement to the Collateral Agent, notice of which is hereby waived by the Grantors, each Additional Grantor shall be a Grantor and shall be as fully a party hereto as if such Additional Grantor were an original signatory hereto as a Grantor.  Each Grantor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Grantor hereunder, nor by any election of Collateral Agent (acting at the direction of the Required Lenders) not to cause any Subsidiary of the Parent or any Grantor to become an Additional Grantor hereunder.  This Agreement shall be fully effective as to any Grantor that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantor hereunder.

### SECTION 7.     COLLATERAL AGENT APPOINTED PROXY ATTORNEY-IN-FACT.

### 7.1     Power of Attorney

Each Grantor hereby irrevocably appoints the Collateral Agent (such appointment being coupled with an interest and terminable only upon the payment in full of the Secured Obligations (other than contingent indemnification or reimbursement obligations not yet accrued and payable) as such Grantor's proxy and attorney-in-fact) with full authority in the place and stead of such Grantor and in the name of such Grantor, the Collateral Agent or otherwise, from time to time in the Collateral Agent's discretion to take any action and to execute any instrument that the Appropriate Party may deem necessary or advisable to accomplish the purposes of this Agreement, all of which shall be at the Grantors' expense and constitute Secured Obligations, including, the following:

(a)     to prepare and file any UCC financing statements and any other Required Filing against such Grantor as debtor;

(b)     to prepare, sign and file any documents with the United States Patent and Trademark Office, the United States Copyright Office or any Governmental Authority in any jurisdiction that the Collateral Agent deems appropriate in connection with the perfection, protection, priority or enforcement of the security interest on the Collateral, and to remove any ineffective filings;

WEIL:\97681611\4\13173.0005

(c)     upon the occurrence and during the continuance of any Event of Default:

(i)     to take any actions set forth in any Applicable Annex;

(ii)    to do, at the Collateral Agent's option, at any time or from time to time, all acts and things that the Appropriate Party deems necessary or advisable to protect, preserve, perfect, establish the first priority of or realize upon the Collateral and the Collateral Agent's security interest therein in order to effect the intent of this Agreement, all as fully and effectively as such Grantor might do, including any access to pay or discharge Taxes or Liens levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by the Collateral Agent (acting at the direction of the Required Lenders), any such payments made by the Collateral Agent to become obligations of such Grantor to the Collateral Agent, due and payable immediately without demand;

(iii)   to exercise control in respect of any Deposit Account or Securities Account that is part of the Collateral, and issue instructions and entitlement orders to any bank or securities intermediary in respect thereof;

(iv)    to obtain and adjust insurance required to be maintained by such Grantor or paid to the Collateral Agent pursuant to the Loan Agreement;

(v)     to ask for, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or with respect to any of the Collateral;

(vi)    to receive, endorse and collect any drafts or other instruments, documents and chattel paper;

(vii)   to file any claims or take any action or institute any proceedings that the Required Lenders may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Collateral Agent with respect to any of the Collateral;

(viii)  to use information relating to the Collateral for purposes of Disposing or collecting the Collateral; provided that with respect to any information granted to a Grantor by a third party, the Collateral Agent shall comply with any of such Grantor's existing contractual obligations and restrictions that, in each case, such Grantor places the Collateral Agent on written notice of (in reasonable detail); and

(ix)    to Dispose, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, including to file any documents necessary or advisable to implement, effectuate or reflect the Disposition.

12

Motion for TRO Ex. 9 Page 227

None of the rights granted in this <u>Section 7.1</u> shall be construed as duties, and the Collateral Agent shall have no liability for omitting to take such actions.

**7.2**     **No Duty on the Part of Collateral Agent or Secured Parties.**

(a)     The powers conferred on the Collateral Agent hereunder are solely to protect the interests of the Secured Parties in the Collateral and shall not impose any duty upon the Collateral Agent or any Secured Party to exercise any such powers.  The Collateral Agent and the other Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.  The failure to act in the absence of any duty to so act shall not be deemed an act of gross negligence or willful misconduct.

(b)     The Collateral Agent has been appointed to act as Collateral Agent hereunder by the Lenders and, by their acceptance of the benefits hereof, the other Secured Parties. The Collateral Agent shall be obligated, and shall have the right hereunder, to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking any action (including any release or substitution of Collateral), solely in accordance with this Agreement and the Loan Agreement.

(c)     Notwithstanding any rights granted to the Collateral Agent hereunder to file or make filings to perfect the security interest granted to the Collateral Agent herein, the Collateral Agent shall not be responsible for the existence, genuineness or value of any of the Collateral; for filing any financing or continuation statements or recording any documents or instruments in any public office or otherwise perfecting or maintaining the perfection of any security interest in the Collateral (all of which shall be each Grantor's responsibility); for the validity, perfection, priority or enforceability of the Liens in any of the Collateral; for the validity or sufficiency of the Collateral or any agreement or assignment contained therein; for the validity of the title of any grantor to the Collateral; for insuring the Collateral; or for the payment of taxes, charges or assessments on the Collateral.

**7.3**     **Standard of Care; Collateral Agent May Perform.**

(a)     Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Collateral Agent shall have no duty as to any Collateral or any income therefrom or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

(b)     The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property.

(c)     The Collateral Agent shall not be liable or responsible for any loss or damage to any Collateral, or for any diminution in the value thereof, by reason of any act or omission of any sub-agent or bailee selected by the Collateral Agent in good faith, except to the extent that such liability arises from the Collateral Agent's gross negligence or willful misconduct.

(d)     Neither the Collateral Agent nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise Dispose of any Collateral upon the request of any Grantor or otherwise.

WEIL:\97681611\4\13173.0005

Motion for TRO Ex. 9 Page 228

(e) If any Grantor fails to perform any agreement contained herein, the Collateral Agent may itself (but shall have no obligation to) perform, or cause performance of, such agreement, and the expenses of the Collateral Agent incurred in connection therewith shall be payable by each Grantor in a manner consistent with Section 11.03 of the Loan Agreement.

(f) The Collateral Agent has been appointed by the Lenders under the Loan Agreement and has the benefit of the rights and protections set forth therein, including without limitation, that, notwithstanding any discretion given to it in any Loan Document, the Collateral Agent need not exercise discretion, but shall act as directed by the Required Lenders.

## SECTION 8. REMEDIES.

### 8.1 Generally.

(a) If any Event of Default shall have occurred and be continuing, the Collateral Agent may exercise (at the direction of the Required Lenders) with respect to the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it at law or in equity, all the rights and remedies that the Collateral Agent may have or that are afforded to a secured party under the UCC or any other applicable Law to collect, enforce or satisfy any Secured Obligations then owing, whether by acceleration or otherwise, and also may pursue any of the following separately, successively or simultaneously, subject to applicable Laws, including applicable Privacy Laws:

> (i) require any Grantor to, and each Grantor hereby agrees that it shall, at its expense and promptly upon request of the Appropriate Party or the Collateral Agent forthwith, (A) provide to the Appropriate Party or the Collateral Agent additional information concerning the Collateral and (B) assemble all or part of the Collateral as directed by the Appropriate Party or the Collateral Agent and make it available to the Collateral Agent at a place to be designated by the Collateral Agent;

> (ii) enter onto the property where any Collateral is located, if applicable and take possession thereof with or without judicial process (to the extent possession is not otherwise granted to the Collateral Agent by the applicable Grantors), with or without prior notice or demand for performance and without liability for trespass to enter any premises where any Collateral may be located for the purposes of taking possession of or removing any Collateral; <u>provided</u> that the Collateral Agent shall take commercially reasonable measures to protect the confidentiality of any Trade Secrets and other confidential information contained thereon;

> (iii) prior to the Disposition of the Collateral, store, process, repair or recondition the Collateral or otherwise prepare the Collateral for Disposition in any manner to the extent the Collateral Agent deems appropriate;

> (iv) give notice of exclusive control or any other instruction under any control agreement, collateral access agreement or other similar agreement and take any action provided therein with respect to the applicable Collateral;

> (v) seek the appointment of a receiver, keeper or any agent to take possession of the Collateral and enforce any of the Collateral Agent's remedies (for

14

Motion for TRO Ex. 9 Page 229

the benefit of the Collateral Agent and the Secured Parties) with respect to such appointment without prior notice or hearing as to such appointment;

(vi)　subject to compliance with the terms of Section 8.1(f), without notice except as specified below or under the UCC, sell, assign, lease, license (on an exclusive or non-exclusive basis), sublicense or otherwise Dispose of the Collateral or any part thereof in one or more parcels at public or private sale or on any securities exchange, at any of the Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as the Collateral Agent may deem appropriate (provided that such direct licenses or sublicenses survive even when the Event of Default no longer exists);

(vii)　require any applicable Grantor, and each applicable Grantor hereby agrees that it shall, in connection with any foreclosure, collection, sale or other enforcement of the Liens granted hereunder: (1) to cooperate with the Collateral Agent to obtain all regulatory licenses, consents and other governmental approvals necessary or advisable to conduct all aviation operations with respect to the Collateral, as applicable, (2) to continue to operate and manage the Collateral and maintain all applicable licenses until the Collateral Agent or its designee does so and (3) to cooperate with the transition of the operations to a new operator; and

(viii)　take any other actions specified in any Applicable Annex.

(b)　The Collateral Agent, the Administrative Agent or any other Secured Party may be the purchaser of any or all of the Collateral at any public or private (to the extent the portion of the Collateral being privately sold is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations) sale in accordance with the UCC, and the Collateral Agent, as collateral agent for and representative of the Secured Parties, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale made in accordance with the UCC, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by applicable Law) all rights of redemption, stay or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' notice to such Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Collateral Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Grantor agrees that it would not be commercially unreasonable for the Collateral Agent to Dispose of the Collateral or any portion thereof by using Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets. Each Grantor hereby waives any claims against the Collateral Agent arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if the Collateral Agent accepts the first offer received and does not offer such Collateral to more than one offeree. If the proceeds of any Disposition of the Collateral are insufficient to pay all the Secured Obligations, the Grantors shall be liable for the deficiency and the fees of any attorneys employed by the Collateral Agent to collect such deficiency.

15

Each Grantor further agrees that a breach of any of its covenants contained in this Section will cause irreparable injury to the Secured Parties, that the Secured Parties have no adequate remedy at law with respect to such breach and, as a consequence, that each and every covenant contained in this Section shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no default has occurred giving rise to the Secured Obligations becoming due and payable prior to their stated maturities.  Nothing in this Section shall in any way alter the rights of the Secured Parties hereunder.

(c)     The Collateral Agent may sell the Collateral without giving any warranties as to the Collateral.  The Collateral Agent may specifically disclaim or modify any warranties of title or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(d)     To the maximum extent permitted by the applicable Law, each Grantor absolutely and irrevocably waives (which waiver may not be withdrawn without the written consent of the Collateral Agent acting at the direction of the Required Lenders):

(i)     all claims, damages, and demands against the Collateral Agent or any other Secured Party arising out of the repossession, retention or Disposition of the Collateral (after the occurrence of and during the continuance of an Event of Default), except such as arise out of the gross negligence or willful misconduct of the Collateral Agent or such Secured Party as finally determined by a court of competent jurisdiction; and

(ii)    the benefit and advantage of, and covenants not to assert against the Collateral Agent or any other Secured Party, any valuation, stay, appraisal, extension, moratorium, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Collateral (after the occurrence of and during the continuance of an Event of Default), made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Agreement, or otherwise.

(e)     The Collateral Agent shall have no obligation to marshal any of the Collateral.

(f)     Each Grantor hereby grants each Secured Party a non-exclusive, irrevocable, worldwide, transferable license (or sublicense) to use, license, sublicense and otherwise exercise such Grantor's rights in or to any Intellectual Property and any data (in each case, (i) whether or not included in the Collateral, (ii) subject to applicable Laws, including applicable Privacy Laws and (iii) to the extent not in conflict with such Grantor's contractual obligations (not otherwise overridden by the UCC or applicable Law) that exist as of the Closing Date with third parties), without payment of royalty or other compensation to such Grantor, solely to enable the Collateral Agent to exercise its rights and remedies under Section 8 of this Agreement and under the Annex Remedies Section of any Applicable Annex after the occurrence, and solely during the continuance, of an Event of Default.  For the avoidance of doubt, the license granted pursuant to this Section 8.1(f) may be exercised by the Collateral Agent solely during the continuance of an Event of Default. This license is in addition to the Secured Parties' other rights with respect to the Collateral and is subject to the following:

(i)     to the extent that this license is a sublicense of such Grantor's rights as a licensee under any license, this license is subject to any limitations in the primary license;

(ii)     without limiting the foregoing, this license does not include Intellectual Property if the primary license for such Intellectual Property by its terms or as a matter of law prohibits sublicenses, requires the licensor's consent or entails additional consideration;

(iii)     for licensed Trademarks, this license is subject to such Grantor's standards of quality control and inspection, as necessary to avoid the risk of invalidation of the Trademarks;

(iv)     the Collateral Agent shall take commercially reasonable measures to protect the confidentiality of any Trade Secrets and other confidential information licensed pursuant to this Section 8.1(f); and

(v)     the termination or expiration of the license granted pursuant to this Section 8.1(f) shall not terminate the rights of the sublicensees of any sublicenses granted by the Collateral Agent or its assignee in connection with and in accordance with this Section 8.1(f).

(g)     Solely to the extent required to exploit or exercise the license rights granted in Section 8.1(f) and solely to the extent not already in the possession of the Collateral Agent, each Grantor shall provide to the Collateral Agent any Intellectual Property and data, including any embodiments thereof, licensed pursuant to Section 8.1(f) that are in the possession or control of such Grantor, and shall not interfere with the rights provided in Section 8.1(f) to such Intellectual Property (including such embodiments) including any right to obtain such Intellectual Property (or such embodiments) from another entity, in each case subject to applicable Laws, including applicable Privacy Laws.

### 8.2    Application of Proceeds

Upon the occurrence of an Event of Default, all proceeds received by the Collateral Agent with respect to any sale, any collection from, or other realization upon all or any part of the Collateral shall be applied in full or in part by the Collateral Agent against the Secured Obligations in accordance with Section 7.02 of the Loan Agreement.

### 8.3    Sales on Credit

If the Collateral Agent sells any of the Collateral upon credit, the Collateral Agent may retain such Collateral until the sale price is paid by the purchaser thereof, and the Grantors will be credited only with payments actually made by the purchaser and received by the Collateral Agent and applied to indebtedness of such purchaser.  In the event such purchaser fails to pay for the Collateral, neither the Collateral Agent nor any other Secured Party shall incur any liability, and such Collateral may be sold again upon like notice, and the Collateral Agent may resell the Collateral and Grantor shall be credited with proceeds of the sale.

### SECTION 9.  CONTINUING    SECURITY    INTEREST;    TRANSFER    OF    LOANS; REINSTATEMENT.

### 9.1    Continuing Security Interest; Transfer of Loans

This Agreement shall create a continuing security interest in all of the Collateral and shall remain in full force and effect until the payment in full of all Secured Obligations (other than contingent indemnification or reimbursement obligations not yet accrued and payable) and the Lender no longer having a commitment to make any Loan to the Borrower, be binding upon each Grantor, its successors and assigns,

Motion for TRO Ex. 9 Page 232

and inure, together with the rights and remedies of the Collateral Agent hereunder, to the benefit of the Collateral Agent and its successors, transferees and assigns.  Without limiting the generality of the foregoing, but subject to the terms of the Loan Agreement, the Lender may assign or otherwise transfer any Loans held by it to any other Person, and such other Person shall thereupon become vested with all the benefits with respect thereto granted to the Lender herein or otherwise.  Upon the payment in full of all Secured Obligations (other than contingent indemnification or reimbursement obligations not yet accrued and payable) and the Lender no longer has a commitment to make any loan to the Borrower, the security interest granted hereby shall automatically terminate hereunder and of record and all rights to the Collateral shall revert to Grantors.  Upon any Disposition of property expressly permitted by the Loan Agreement, the security interest granted herein shall be deemed to be automatically released and such property shall automatically revert to the applicable Grantor with no further action on the part of any Person.  Upon any such termination or Disposition or any release of Collateral pursuant to the provisions of any Applicable Annex or otherwise expressly permitted by the Loan Agreement, the Collateral Agent shall, at the Grantors' expense, execute and deliver or otherwise authorize the filing of such documents as Grantors shall reasonably request (including financing statement amendments to evidence such release) and return to the applicable Grantors any corresponding possessory Collateral held by the Collateral Agent.  Releases of the Collateral may also be made in accordance with the express terms of any Applicable Annexes.

### 9.2    Reinstatement

This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against the Parent, any Grantor or any Affiliates thereof for liquidation or reorganization, should the Borrower or any Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of the Borrower's or such Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Secured Obligations, or any part thereof, is, pursuant to Applicable Law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

## SECTION 10.  MISCELLANEOUS.

### 10.1    Notices.

All notices and other communications provided hereunder shall be given in a manner consistent with Section 11.01 of the Loan Agreement (i) if to any Grantor, as it applies to a Credit Party and (ii) if to the Collateral Agent, as it applies to the Collateral Agent.

### 10.2    Waiver; Amendment.

(a)    No failure or delay by the Collateral Agent in exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege, or any abandonment or discontinuance of steps to enforce such a right remedy, power or privilege, preclude any other or further exercise thereof or the exercise of any other right remedy, power or privilege.  The rights, remedies, powers and privileges of the Collateral Agent hereunder are cumulative and are not exclusive of any rights, remedies, powers or privileges that any such Person would otherwise have.

Motion for TRO Ex. 9 Page 233

(b)     Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Grantors with respect to which such waiver, amendment or modification is to apply.   This Agreement shall be construed as a separate agreement with respect to each Grantor and may be amended, modified, supplemented, waived or released with respect to any Grantor without the approval of any other Grantor and without affecting the obligations of any other Grantor hereunder.

### 10.3     Relation to Other Security Documents.

The provisions of this Agreement supplement the provisions of any Security Document or any other mortgage granted by any Grantor, which secure the payment or performance of any of the Secured Obligations.  Nothing contained in any such Security Document or mortgage shall derogate from any of the rights or remedies of the Secured Parties hereunder.  In all other conflicts between this Agreement and any other Security Document, this Agreement shall govern.

### 10.4     Collateral Agent's Fees and Expenses.

(a)     The Grantors jointly and severally agree to reimburse the Collateral Agent for its fees and expenses incurred hereunder as provided in Section 11.03 of the Loan Agreement; provided that, each reference therein to the "Borrower" shall be deemed to include a reference to the Grantors.

(b)     Any such amounts payable as provided hereunder shall be additional Secured Obligations secured hereby and by the other Security Documents.

### 10.5     Survival of Agreement.

All covenants, agreements, representations and warranties made by any Grantor herein and in any Loan Document or other documents delivered in connection herewith or therewith or pursuant hereto or thereto shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery hereof and thereof and the making of the Loan hereunder, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Secured Parties may have had notice or knowledge of any Default at the time of the Loan, and shall continue in full force and effect as long as any Loan or any other Secured Obligation hereunder shall remain unpaid or unsatisfied. The provisions of this Section 10 shall survive and remain in full force and effect regardless of the termination of this Agreement or any other Loan Document, the consummation of the transactions contemplated hereby or thereby, the repayment of any of the Secured Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document or any investigation made by or on behalf of the Collateral Agent or any other Secured Party.

### 10.6     Counterparts; Effectiveness, Successors and Assigns.

(a)     This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Collateral Agent and when the Collateral Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

19

(b)     The words "execution," "signed," "signature," and words of like import shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.  Notwithstanding anything herein to the contrary, delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic means, or confirmation of the execution of this Agreement on behalf of a party by an email from an authorized signatory of such party shall be effective as delivery of a manually executed counterpart of this Agreement.

### 10.7     Severability.

If any provision of this Agreement is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

### 10.8     Governing Law; Jurisdiction, Etc.

(a)     This Agreement will be governed by and construed in accordance with the law of the State of New York.

(b)     Each of the parties hereto agrees to submit to the exclusive jurisdiction and venue of the United States District Court for the District of Columbia for any civil action, suit or proceeding arising out of or relating to this Agreement, the Loan Documents, or the transactions contemplated hereby or thereby.

(c)     To the extent permitted by Applicable Law, each parties hereto hereby unconditionally waives trial by jury in any civil legal action or proceeding relating to this Agreement or the transactions contemplated hereby.

(d)     The Collateral Agent hereby notifies the Borrower and the Lenders that pursuant to the requirements of The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, it is required to obtain, verify and record information that identifies the Borrower and the Lenders, which information includes the name and address of the Borrower and the Lenders and other information that will allow the Collateral Agent to identify the Borrower and the Lenders, in accordance with The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

*[Signature Pages Follow]*

WEIL:\97681611\4\13173.0005

IN WITNESS WHEREOF, each Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**HORIZON AIR INDUSTRIES, INC.**, as Grantor

By: _____
       Name: Nathaniel Pieper
       Title: Treasurer

**THE BANK OF NEW YORK MELLON,**
as Collateral Agent

By: _____
       Name:
       Title:

IN WITNESS WHEREOF, each Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**HORIZON AIR INDUSTRIES, INC.**, as Grantor

By: _____
    Name: Nathaniel Pieper
    Title: Treasurer

**THE BANK OF NEW YORK MELLON,**
as Collateral Agent

By: _____
    *Bret S. Derman*
    3C7DEE3E706C4B5...
    Name:
    Title:

Schedule 1.1 (Excluded Intellectual Property)
to Agreement

## **EXCLUDED INTELLECTUAL PROPERTY (IF ANY)**

None.

WEIL:\97681611\4\13173.0005

Motion for TRO Ex. 9 Page 238

Schedule 2.1 (Certain Listed Collateral)
to Agreement

**CERTAIN LISTED COLLATERAL**

a. Aircraft

Embraer S.A. aircraft more specifically described below:

|  | Aircraft Model | Aircraft Generic Model | Airframe Serial No. | U.S. Registration No. |
|---|---|---|---|---|
| 1. | ERJ 170-200 LR | ERJ 170-200 | 17000769 | N646QX |
| 2. | ERJ 170-200 LR | ERJ 170-200 | 17000773 | N647QX |
| 3. | ERJ 170-200 LR | ERJ 170-200 | 17000789 | N648QX |
| 4. | ERJ 170-200 LR | ERJ 170-200 | 17000794 | N649QX |
| 5. | ERJ 170-200 LR | ERJ 170-200 | 17000809 | N650QX |
| 6. | ERJ 170-200 LR | ERJ 170-200 | 17000812 | N651QX |

Bombardier Inc. aircraft more specifically described below:

|  | Aircraft Model | Aircraft Generic Model | Airframe Serial No. | U.S. Registration No. |
|---|---|---|---|---|
| 1. | DHC-8-402 | DASH 8-Q400 | 4149 | N421QX |
| 2. | DHC-8-402 | DASH 8-Q400 | 4150 | N422QX |
| 3. | DHC-8-402 | DASH 8-Q400 | 4154 | N426QX |
| 4. | DHC-8-402 | DASH 8-Q400 | 4156 | N427QX |
| 5. | DHC-8-402 | DASH 8-Q400 | 4163 | N430QX |
| 6. | DHC-8-402 | DASH 8-Q400 | 4166 | N432QX |
| 7. | DHC-8-402 | DASH 8-Q400 | 4240 | N437QX |
| 8. | DHC-8-402 | DASH 8-Q400 | 4246 | N439QX |
| 9. | DHC-8-402 | DASH 8-Q400 | 4243 | N438QX |
| 10. | DHC-8-402 | DASH 8-Q400 | 4347 | N440QX |
| 11. | DHC-8-402 | DASH 8-Q400 | 4348 | N441QX |
| 12. | DHC-8-402 | DASH 8-Q400 | 4353 | N443QX |
| 13. | DHC-8-402 | DASH 8-Q400 | 4352 | N442QX |
| 14. | DHC-8-402 | DASH 8-Q400 | 4358 | N445QX |
| 15. | DHC-8-402 | DASH 8-Q400 | 4363 | N446QX |
| 16. | DHC-8-402 | DASH 8-Q400 | 4364 | N447QX |
| 17. | DHC-8-402 | DASH 8-Q400 | 4355 | N444QX |
| 18. | DHC-8-402 | DASH 8-Q400 | 4409 | N448QX |
| 19. | DHC-8-402 | DASH 8-Q400 | 4489 | N453QX |
| 20. | DHC-8-4-2 | DASH 8-Q400 | 4227 | N434MK |

WEIL:\97681611\4\13173.0005

| 21. | DHC-8-402 | DASH 8-Q400 | 4236 | N436QX |

b. Engines

General Electric engines as more specifically described below:

|  | Engine Model | Engine Generic Model | Engine Serial No. |
|---|---|---|---|
| 1. | CF34-8E5 | CF34-8E | 902879 |
| 2. | CF34-8E5 | CF34-8E | 902880 |
| 3. | CF34-8E5 | CF34-8E | 902888 |
| 4. | CF34-8E5 | CF34-8E | 902889 |
| 5. | CF34-8E5 | CF34-8E | 902924 |
| 6. | CF34-8E5 | CF34-8E | 902925 |
| 7. | CF34-8E5 | CF34-8E | 902850 |
| 8. | CF34-8E5 | CF34-8E | 902937 |
| 9. | CF34-8E5 | CF34-8E | 902973 |
| 10. | CF34-8E5 | CF34-8E | 902974 |
| 11. | CF34-8E5 | CF34-8E | 902978 |
| 12. | CF34-8E5 | CF34-8E | 902979 |
| 13. | CF34-8E5 | CF34-8E | 902599 |
| 14. | CF34-8E5 | CF34-8E | 902836 |
| 15. | CF34-8E5 | CF34-8E | 902933 |

Pratt & Whitney Canada engines as more specifically described below:

|  | Engine Model | Engine Generic Model | Engine Serial No. |
|---|---|---|---|
| 1. | PW150A | PW150 SERIES | PCEFA0116 |
| 2. | PW150A | PW150 SERIES | PCEFA0133 |
| 3. | PW150A | PW150 SERIES | PCEFA0374 |
| 4. | PW150A | PW150 SERIES | PCEFA0343 |
| 5. | PW150A | PW150 SERIES | PCEFA0084 |
| 6. | PW150A | PW150 SERIES | PCEFA0103 |
| 7. | PW150A | PW150 SERIES | PCEFA0346 |
| 8. | PW150A | PW150 SERIES | PCEFA0354 |
| 9. | PW150A | PW150 SERIES | PCEFA0355 |
| 10. | PW150A | PW150 SERIES | PCEFA0351 |
| 11. | PW150A | PW150 SERIES | PCEFA0353 |
| 12. | PW150A | PW150 SERIES | PCEFA0371 |
| 13. | PW150A | PW150 SERIES | PCEFA0192 |
| 14. | PW150A | PW150 SERIES | PCEFA0377 |
| 15. | PW150A | PW150 SERIES | PCEFA0378 |
| 16. | PW150A | PW150 SERIES | PCEFA0536 |
| 17. | PW150A | PW150 SERIES | PCEFA0537 |

| 18. | PW150A | PW150 SERIES | PCEFA0551 |
| 19. | PW150A | PW150 SERIES | PCEFA0312 |
| 20. | PW150A | PW150 SERIES | PCEFA0541 |
| 21. | PW150A | PW150 SERIES | PCEFA0340 |
| 22. | PW150A | PW150 SERIES | PCEFA0763 |
| 23. | PW150A | PW150 SERIES | PCEFA0184 |
| 24. | PW150A | PW150 SERIES | PCEFA0118 |
| 25. | PW150A | PW150 SERIES | PCEFA0792 |
| 26. | PW150A | PW150 SERIES | PCEFA0365 |
| 27. | PW150A | PW150 SERIES | PCEFA0778 |
| 28. | PW150A | PW150 SERIES | PCEFA0776 |
| 29. | PW150A | PW150 SERIES | PCEFA0769 |
| 30. | PW150A | PW150 SERIES | PCEFA0785 |
| 31. | PW150A | PW150 SERIES | PCEFA0786 |
| 32. | PW150A | PW150 SERIES | PCEFA0366 |
| 33. | PW150A | PW150 SERIES | PCEFA0800 |
| 34. | PW150A | PW150 SERIES | PCEFA0470 |
| 35. | PW150A | PW150 SERIES | PCEFA0803 |
| 36. | PW150A | PW150 SERIES | PCEFA0903 |
| 37. | PW150A | PW150 SERIES | PCEFA0904 |
| 38. | PW150A | PW150 SERIES | PCEFA0902 |
| 39. | PW150A | PW150 SERIES | PCEFA0373 |
| 40. | PW150A | PW150 SERIES | PCEFA1090 |
| 41. | PW150A | PW150 SERIES | PCEFA1094 |
| 42. | PW150A | PW150 SERIES | PCEFA0507 |
| 43. | PW150A | PW150 SERIES | PCEFA0552 |
| 44. | PW150A | PW150 SERIES | PCEFA0526 |
| 45. | PW150A | PW150 SERIES | PCEFA0529 |
| 46. | PW150A | PW150 SERIES | PCEFA0110 |
| 47. | PW150A | PW150 SERIES | PCEFA0174 |
| 48. | PW150A | PW150 SERIES | PCEFA0367 |
| 49. | PW150A | PW150 SERIES | PCEFA1077 |
| 50. | PW150A | PW150 SERIES | PCEFA1342 |

Each of the above described Engines is of 550 or more "rated take-off horsepower" or the equivalent of such horsepower.

c. Propellers

Dowty Aerospace model R408/6-123-F/17 propellers with the manufacturer's serial numbers described below:

| Propeller Serial No. | |
|---|---|
| 1. | DAP0334 |

| | |
|---|---|
| 2. | DAP0193 |
| 3. | DAP0094 |
| 4. | DAP0362 |
| 5. | DAP0366 |
| 6. | DAP0117 |
| 7. | DAP0711 |
| 8. | DAP0141 |
| 9. | DAP0042 |
| 10. | DAP0142 |
| 11. | DAP0349 |
| 12. | DAP0076 |
| 13. | DAP0247 |
| 14. | DAP0470 |
| 15. | DAP0181 |
| 16. | DAP0327 |
| 17. | DAP0192 |
| 18. | DAP0849 |
| 19. | DAP0237 |
| 20. | DAP0329 |
| 21. | DAP0337 |
| 22. | DAP0332 |
| 23. | DAP0341 |
| 24. | DAP0085 |
| 25. | DAP0857 |
| 26. | DAP0346 |
| 27. | DAP0326 |
| 28. | DAP0365 |
| 29. | DAP0372 |
| 30. | DAP0112 |
| 31. | DAP0359 |
| 32. | DAP0793 |
| 33. | DAP0363 |
| 34. | DAP0792 |
| 35. | DAP0115 |
| 36. | DAP0364 |
| 37. | DAP0899 |
| 38. | DAP0904 |
| 39. | DAP0507 |
| 40. | DAP0511 |
| 41. | DAP0532 |
| 42. | DAP0535 |

Each Propeller is capable of absorbing 750 or more "rated take-off shaft horsepower".

WEIL:\97681611\4\13173.0005

d. Loyalty Program Assets  – None[1]

e. Spare Parts Assets  – None[2]

f.  Slots, Gates and Routes  – None[3]

---

[1] If any collateral of this type is pledged or added to this Schedule after the closing date, then the UCC-1 financing statement collateral description may need to be amended to reflect this additional asset(s).

[2] If any collateral of this type is pledged or added to this Schedule after the closing date, then the UCC-1 financing statement collateral description may need to be amended to reflect this additional asset(s).

[3] If any collateral of this type is pledged or added to this Schedule after the closing date, then the UCC-1 financing statement collateral description may need to be amended to reflect this additional asset(s).

Schedule 2.1 - 5

Schedule 4.1 (General Information)
to Agreement

**GENERAL INFORMATION**

| No. | Legal Name | Entity Type | Jurisdiction of Organization | Address of Chief Executive Office/Principal Place of Business | Federal Taxpayer Identification Number or Organizational Identification Number |
|---|---|---|---|---|---|
| 1. | Horizon Air Industries, Inc. | Corporation | Washington | 19300 International Blvd. Seattle, WA 98188 | 91-1201373 |

Motion for TRO Ex. 9 Page 244

**[FORM OF] PLEDGE SUPPLEMENT**

This **PLEDGE SUPPLEMENT**, dated [●], is executed and delivered by the undersigned (a **"Grantor"**) pursuant to the Amended and Restated Horizon Aircraft, Engine and Propeller Pledge and Security Agreement, dated as of October 30, 2020 (as it may be from time to time amended, restated, modified or supplemented, the "**Security Agreement**"), among the Grantors and The Bank of New York Mellon, as Collateral Agent.  Capitalized terms used herein not otherwise defined herein shall have the meanings ascribed thereto in the Security Agreement.

By executing and delivering this Pledge Supplement, the Grantor hereby confirms the grant to the Collateral Agent set forth in the Security Agreement of, and does hereby grant to the Collateral Agent, a security interest in all of such Grantor's right, title and interest in, to and under all Collateral pledged by it to secure the Secured Obligations, in each case whether now or hereafter existing or in which such Grantor now has or hereafter acquires an interest and wherever the same may be located.  If the Grantor is not an existing Grantor under the Security Agreement, such Grantor hereby becomes a party to the Security Agreement as an Additional Grantor and a Grantor under the Security Agreement, in each case with the same force and effect as if originally named therein as a Grantor under the Security Agreement and subject to all Annexes applicable to the Collateral being pledged by it (which for the avoidance of doubt are hereby incorporated by reference).  If the Grantor is an existing Grantor under the Security Agreement and is providing, as Additional Collateral thereunder, the items specified in the attached Schedule hereto, such Additional Collateral is subject to the Security Agreement with the same force and effect as if originally a part thereof and to all Annexes applicable to such Additional Collateral (which for the avoidance of doubt are hereby incorporated by reference).

The Grantor represents and warrants that each of the representations and warranties contained in Section 4 of the Security Agreement and all Applicable Annexes are true, correct and complete on and as of the date hereof (after giving effect to this Pledge Supplement) and agrees that the Schedule attached hereto shall supplement the equivalent schedules of the Security Agreement and the Perfection Certificate. The Grantor hereby additionally represents and warrants that the Grantor has taken the perfection actions with respect to the Collateral specified in the Security Agreement and all Applicable Annexes, including the Perfection Requirement.

This Pledge Supplement will be governed by and construed in accordance with the law of the State of New York.

**IN WITNESS WHEREOF**, the Grantor has caused this Pledge Supplement to be duly executed and delivered by its duly authorized officer as of the date hereof.

**[NAME OF GRANTOR]**

By:_____
    Name:
    Title:

[FORM OF] SCHEDULE TO PLEDGE SUPPLEMENT

[FORM OF] SUPPLEMENT TO SCHEDULES
TO AGREEMENT

i.   <u>Loyalty Program Assets (certain non-Loyalty Program Agreement components):</u>

    a.   Loyalty Program Agreements (please denote any Loyalty Program Agreement which is a Material Loyalty Program Agreement with a ‡ and include the expiration date for each Material Loyalty Program Agreement)

    b.   Trademark Registration

| No. | Mark | Registration Number | Registration Date | Jurisdiction | Owner |
|-----|------|---------------------|-------------------|--------------|-------|
| 1.  | [●]  | [●]                 | [●]               | [●]          | [●]   |

    c.   Trademark Application

| No. | Mark | Application Number | Filing Date | Jurisdiction | Owner |
|-----|------|--------------------|-------------|--------------|-------|
| 1.  | [●]  | [●]                | [●]         | [●]          | [●]   |

    d.   Issued Patents

| No. | Title | Patent Number | Date Issued | Jurisdiction | Owner |
|-----|-------|---------------|-------------|--------------|-------|
| 1.  | [●]   | [●]           | [●]         | [●]          | [●]   |

    e.   Patent Applications

| No. | Title | Application Number | Filing Date | Jurisdiction | Owner |
|-----|-------|--------------------|-------------|--------------|-------|
| 1.  | [●]   | [●]                | [●]         | [●]          | [●]   |

    f.   Copyright Registration

| No. | Title | Registration Number | Registration Date | Jurisdiction | Owner |
|-----|-------|---------------------|-------------------|--------------|-------|
| 1.  | [●]   | [●]                 | [●]               | [●]          | [●]   |

    g.   Copyright Applications

---

‡ Denotes a Material Loyalty Program Agreement.

Schedule to Pledge Supplement - 1

Motion for TRO Ex. 9 Page 246

| No. | Title | Registration Number | Registration Date | Owner |
|---|---|---|---|---|
| **1.** | [●] | [●] | [●] | [●] |

    h.      Exclusive Copyright Licenses

    i.       Internet Domain Names

| No. | Domain Name | Owner |
|---|---|---|
| **1.** | [●] | [●] |

    j.      Material Unregistered Trademarks

    k.      IP Licenses

_____

(i)    Aircraft and Engine Assets:

    a.      Airframes

| No. | U.S. Registration No. | Airframe Manufacturer | Airframe Model | Airframe Serial No. |
|---|---|---|---|---|
| 1. | [●] | [●] | [●] | [●] |

    b.      Engines

| No. | Manufacturer | Model | Generic Manufacturer and Model | Manufacturer's Serial No. |
|---|---|---|---|---|
| 1. | [●] | [●] | [●] | [●] |

    c.      Insurance

_____

(i)    Spare Parts Assets:

    a.      Spare Parts

| No. | Grantor | Type of Spare Part | Manufacturer Part Number | Designated Spare Parts Location (and address) |
|---|---|---|---|---|
| 1. | [●] | [●] | [●] | [●] |

    b.      Insurance

Schedule to Pledge Supplement - 2

---

(i)  <u>SGR Assets:</u>

a.  Route Authorities

b.  Scheduled Service

| No. | Domestic Airport | Foreign Airport |
|-----|------------------|-----------------|
| 1.  | [●]              | [●]             |

c.  Slots

d.  Copies of Routes Certificates and Orders

---

<u>COMPLETE FOR ALL COLLATERAL PACKAGES</u>:

(ii)  <u>Control Collateral</u>

a.  Deposit Accounts

| No. | Grantor | Name of Account Bank | Account Number | Type of Account |
|-----|---------|----------------------|----------------|-----------------|
| 1.  | Horizon Air Industries, Inc. | Bank of America, N.A | 138110458058 | Collateral Proceeds Account |

b.  Securities Accounts*†

| No. | Grantor | Name of Securities Intermediary | Account Number | Account Name |
|-----|---------|--------------------------------|----------------|--------------|
| 1.  | [●]     | [●]                            | [●]            | [●]          |

(iii)  <u>Pledged Collateral</u>

a.  Pledged Debt

| No. | Grantor | Issuer | Original Principal Amount | Outstanding Principal Balance | Issue Date | Maturity Date |
|-----|---------|--------|---------------------------|-------------------------------|------------|---------------|
| 1.  | [●]     | [●]    | [●]                       | [●]                           | [●]        | [●]           |

b.  Pledged Equity Interests

---

* Denotes a Blocked Account.

† Denotes a Collection Account.

Schedule to Pledge Supplement - 3

Motion for TRO Ex. 9 Page 248

| No. | Grantor | Issuer | Type of issuer | If Stock, Class of Stock | Certifica ted (Y/N) | Certifi cate No. | Par Value | No. of Share s or Intere sts | % of Outstand ing Equity Interest of the issuer |
|---|---|---|---|---|---|---|---|---|---|
| 1. | [●] | [●] | [●] | [●] | [●] | [●] | [●] | [●] | [●] |

Schedule 4.1 – General Information

| No. | Legal Name | Entity Type | Jurisdiction of Organization | Address of Chief Executive Office/Principal Place of Business | Federal Taxpayer Identification Number or Organizational Identification Number |
|---|---|---|---|---|---|
| 1. | [●] | [●] | [●] | [●] | [●] |

Schedule to Pledge Supplement - 4

Exhibit B
to Agreement

**Form of Perfection Certificate**

[*Intentionally Omitted from the FAA Filing Counterpart as the Parties Deem it to Contain Confidential Information*]

Exhibit B - 1

Each Grantor and the Collateral Agent hereby agree that (i) the terms of this Annex shall apply with respect to Collateral consisting of Loyalty Program Assets and Grantors of such Collateral and (ii) the terms of Annexes 2 (for Control Collateral) and 5 (for Pledged Collateral) (each, an "**Incorporated Annex**", and collectively, the "**Incorporated Annexes**") shall apply to the Collateral consisting of assets noted in the parenthetical for such Annex and the Grantors of such Collateral.

1. **Perfection Requirement**.  The following requirements shall be included in the definition of "Perfection Requirement" and shall constitute an additional "Perfection Requirement":

   (a)   Notwithstanding anything to the contrary herein or in the Loan Agreement, in no event shall any Grantor be required to make any Intellectual Property filing in a jurisdiction other than the United States (or any state thereof) to perfect the Secured Parties' security interest in the Loyalty Program Intellectual Property.

   (b)   Notwithstanding anything to the contrary herein or in the Loan Agreement, in no event shall any Grantor be required to make any Required Filings for any Loyalty Program Assets set forth in Section 7(a)(ix)(H) of this Annex other than the filing of UCC financing statements (including any fixture filing, as applicable) in each governmental, municipal or other office specified in Schedules 2(a) and 2(b) to the Perfection Certificate.

2. **Required Filings**.  Each of the following financing statement, filing, recording or other document shall be included in the definition of Required Filing and shall constitute an additional "Required Filing":

   (a)   A copy (or short-form memorialization) of all exclusive licenses (i) granted to any Grantor under any registered or applied-for United States Copyrights and (ii) included in the Collateral, for filing with the United States Copyright Office in favor of Grantor;

   (b)   With respect to each Grantor's United States registered and applied-for Copyrights and any exclusive IP License granted to any Grantor under any registered or applied-for United States Copyrights, in each case, included in the Collateral, a Copyright security agreement substantially in the form attached hereto as Exhibit 1, for filing with the United States Copyright Office;

   (c)   With respect to such Grantor's issued and applied-for United States Patents included in the Collateral, a Patent Security Agreement substantially in the form attached hereto as Exhibit 2, for filing with the United States Patent and Trademark Office; and

   (d)   With respect to such Grantor's registered and applied-for United States Trademarks included in the Collateral, a Trademark Security Agreement in the form attached hereto as Exhibit 3, for filing with the United States Patent and Trademark Office.

3. **Representations and Warranties**.  Each Grantor (as applicable) hereby represents and warrants, on the Closing Date and on the date of each Borrowing (or, in the case of an Additional Grantor or Additional Collateral, on the date of such Grantor's execution and delivery of a Pledge Supplement, or the date such Additional Collateral becomes subject to the security interest created hereby, as applicable) as set forth below:

*Relevant IP & Data Representations*

(a)     The Loyalty Program Intellectual Property, the Loyalty Program Data and the IP Licenses included in the Collateral are fully transferable and alienable by such Grantor without restriction and without payment of any kind to any Person (other than, with respect to the Loyalty Program Intellectual Property, the fees and costs necessary to record such transfers with an IP Filing Office, as applicable and other than off-the-shelf inbound third-party computer software IP Licenses).

*Relevant Data Representations*

(b)     Except as set forth on Schedule 3(b), such Grantor is, and at all times has been, in compliance in all material respects with (i) all Privacy Laws, (ii) its and its Affiliates' internal and public-facing privacy policies, notices and statements and (iii) its contractual commitments and obligations, in each case in connection with the Loyalty Program Data. Such public-facing policies are accurate, not misleading and consistent with the actual practices of such Grantor.

(c)     The consummation of the transactions contemplated by this Agreement, the Loan Agreement and the other Security Documents will not cause any Grantor to be in material violation or breach of any internal or public-facing privacy policy, notice or statement of such Grantor, any Privacy Law or any Loyalty Program Agreement.

(d)     Except as set forth on Schedule 3(d), none of such Grantor's current or previous privacy policies, notices or statements include or included any restrictions on, or fail or failed to include any disclosures to permit, the potential transfer, sharing and disclosure of Loyalty Program Data to an unaffiliated third party in connection with a bankruptcy or in connection with an asset sale.

(e)     Except as set forth on Schedule 3(e), to such Grantor's knowledge, no notice of enforcement or investigation, or prohibition, warning or audit requests have been served in relation to the Processing by or on behalf of any Grantor or its Affiliates of any Loyalty Program Data and no fact or circumstance exists which would reasonably be expected to give rise to an such notice, warning or audit request. No judgment, decree, ruling, writ, award, injunction or order of any Governmental Authority is pending, threatened or active against any Grantor, its Affiliates or any of its or their service providers relating to the Processing of Loyalty Program Data.

*Relevant IP Representations*

(f)     Schedule 2.1 hereto sets forth a true and accurate list of (i) all United States and foreign registrations of, issuances of and applications for Patents, Trademarks (including Internet domain names) and Copyrights, in each case owned by a Grantor and included in the Collateral, (ii) all exclusive IP Licenses included in the Collateral granted to any Grantor under any Copyrights registered with or applied for at the United States Copyright Office, (iii) all United States and foreign Trademarks that are material to any Carrier Loyalty Program that are not registered or applied for in any IP Filing Office and (iv) all proprietary software that is material to the Carrier Loyalty Program whether registered or unregistered. Each item of Intellectual Property listed on Schedule 2.1 is valid and enforceable.

(g)     It is the record owner of all of its Intellectual Property listed on Schedule 2.1, and there are no gaps or inaccuracies in the chain of title of such Intellectual Property. It has the full power, right and authority to grant the licenses set forth in the IP License Agreement, and the licenses granted thereunder do not and the rights granted to Treasury thereunder if

Annex 1 - 2

exercised by the Treasury would not conflict with or breach any prior agreements or understandings entered into between such Grantor and any third party.

(h)    It has sole and exclusive rights to sue third parties for the infringement, misappropriation or other violation of its Loyalty Program Intellectual Property and Licensed Trademarks and to collect royalties, revenues, income, damages or other payments arising therefrom.

(i)    Schedule 2.1 is a true and complete list of all IP Licenses included in the Collateral that (i) involve payments in excess of $1 million per year, (ii) contain a grant of exclusivity or (iii) are otherwise material.

(j)    To such Grantor's knowledge, no Person is materially infringing, diluting, misappropriating or otherwise violating any Grantors' Loyalty Program Intellectual Property or Licensed Trademarks, and such Grantor has not made any such claim that has not been resolved.

(k)    No holding, decision, judgment, order, or other final determination has been rendered by any Governmental Authority that would materially limit, cancel or question the validity or enforceability of, or such Grantor's right, title or interest in, any material Loyalty Program Intellectual Property or any of the Licensed Trademarks.

(l)    It uses standards of quality sufficient to protect the validity and enforceability of the Loyalty Program Trademarks in all products marketed and sold, and in the performance of services provided, under the Loyalty Program Trademarks.  To the extent applicable, such Grantor has taken all reasonable actions necessary to ensure that all licensees of such Grantor's Loyalty Program Trademarks adhere to such Grantor's established standards of quality for the goods and services provided by the licensee using such licensed Loyalty Program Trademarks.

*Loyalty Program Agreement Representations*

(m)    Schedule 2.1 to this Agreement sets forth all Loyalty Program Agreements (including Material Loyalty Program Agreements and the expiration date for each Material Loyalty Program Agreement) that constitute Collateral and all Collateral Accounts.

(n)    [Reserved.]

(o)    With respect to each Material Loyalty Program Agreement:

(i)    [Reserved.];

(ii)    to the knowledge of the Grantors, no default by any party thereto exists and no party thereto is delinquent in payment of any other amounts required to be paid thereunder that (x) would be materially adverse to any Secured Party or (y) would, or would be reasonably expected to, result in a Material Adverse Effect;

(iii)    [Reserved.];

(iv)    except as disclosed to the Collateral Agent, such Loyalty Program Agreement permits such Grantor to grant a security interest in such Grantor's rights therein granted to the Collateral Agent and permits the Collateral Agent's exercise of its rights and remedies as secured party, including its rights of Disposition; and

Annex 1 - 3

(v)     the Collateral includes substantially all of the Loyalty Program Revenue.

*Other Collateral Representations*

(p)     [Reserved.]

(q)     The Collateral to which the Collateral Agent has been granted a security interest hereunder together with the rights the Collateral Agent has been granted under the Loan Documents (including Section 6 of this Annex) and the IP License Agreement constitute all the assets, properties and rights (other than off-the-shelf third-party computer software that is generally available and Equipment) reasonably necessary for the operation of the Carrier Loyalty Programs as currently conducted in all material respects.

2.   **Covenants**. Each Grantor (as applicable) hereby covenants and agrees as set forth below:

(a)     [Reserved].

*Affirmative Covenants - Data*

(b)     It will take all reasonable action requested by the Appropriate Party or any of its or their successors or assigns for purposes of complying with applicable Privacy Laws, including in issuing notices, opt-outs and similar communications to data subjects, including to Loyalty Program Members, to allow the full use and transfer of Loyalty Program Data, including full use by and transfer to an unaffiliated third party, in the Event of a Default.

(c)     Within sixty (60) days of the Closing Date, the Loyalty Program Data shall be physically segregated, compiled, hosted and maintained on a database that is separated and segregated from each of Grantor's databases that store data not included in the Loyalty Program Data, and each of the applicable Grantors shall provide the Collateral Agent with a signed certification certifying that the requirements of this <u>Section 4(c)</u> have been satisfied, provided that if there is any Loyalty Program Data with respect to which there is concurrently, (i) with respect to any Loyalty Program Data collected on or prior to the Closing Date, (x) at least one copy stored in connection with Grantor's Carrier Loyalty Program immediately prior to the Closing Date and (y) at least one copy stored in connection with Grantor's non-Loyalty Program operations immediately prior to the Closing Date as a result of such Grantor's collection or usage of such data in connection with such Grantor's non-Loyalty Program operations, or (ii) with respect to any Loyalty Program Data collected following the Closing Date, (x) at least one copy stored in connection with Grantor's Carrier Loyalty Program and (y) at least one copy stored in connection with Grantor's non-Loyalty Program operations as a result of such Grantor's collection or usage of such data in connection with such Grantor's non-Loyalty Program operations (such copies in clauses (i)(y) and (ii)(y), the "**Non-Loyalty Copies**"), this <u>Section 4(c)</u> shall not apply to the Non-Loyalty Copies.

(d)     It will maintain and be in compliance with commercially reasonable disaster recovery, backup and security plans and procedures, and have taken reasonable steps to test such plans and procedures on no less than an annual basis and to ensure that all employees and any other Persons acting on behalf of such Grantor or any of its Affiliates in connection with the Processing of the Loyalty Program Data are aware of and adhere to such plans and procedures.

Annex 1 - 4

(e)      It shall maintain in effect and implement commercially reasonable privacy and data security policies and procedures and administrative, physical and technical safeguards, and shall comply in all material respects with (i) all applicable Privacy Laws, (ii) its internal and public-facing privacy policies, notices and statements and (iii) its contractual commitments and obligations, in each case in connection with Loyalty Program Data.

(f)      It shall (i) promptly notify the Appropriate Party and the Collateral Agent, in accordance with Section 10.1 of this Agreement, providing such details as the Appropriate Party or the Collateral Agent may require, of (x) the institution of any enforcement or investigation, or prohibition, warning or audit request that has been served, or judgment, decree, ruling, writ, award, injunction or order of any Governmental Authority pending, threatened or active against any Grantor, its Affiliates or any of its or, to such Grantor's knowledge, their service providers, related to the Processing of any Loyalty Program Data or (y) any material breaches, cyberattacks (including ransomware attacks), violations or unauthorized uses of or accesses to the IT Systems or any Loyalty Program Data, Trade Secrets or confidential information stored therein or processed thereby and (ii) take all commercially reasonable steps to (x) defend its rights in the Loyalty Program Data in any such enforcement, investigation, audit or other proceeding and (y) as promptly as practicable, fully remediate any such breaches, attacks, violations or unauthorized uses or accesses and, to the extent required under applicable Law, including applicable Privacy Laws, notify the applicable data subjects thereof.

(g)      It shall maintain and, to the extent not already in its possession, obtain cyber liability insurance covering breaches to or compromises of third party components of the Loyalty Program Data and shall ensure that at all times the Collateral Agent, for the benefit of the Secured Parties, shall be named as an additional insured and lender loss payee under such cyber insurance, in each case to the fullest extent permitted under such insurance policy and by the applicable insurance provider, with respect to any Loyalty Program Data. Notwithstanding anything herein or in any other Loan Document to the contrary, the applicable Grantor shall be permitted to obtain first-party coverage for cyber liability insurance through its in-house captive insurance team to the extent that obtaining such first-party coverage through a third-party insurance provider is commercially unviable.

(h)      Notwithstanding anything to the contrary herein or in the other Loan Documents, any reference to "Loyalty Program Data" in this Annex (including in Section 3(q)(F)) will not include Non-Loyalty Copies.

*Affirmative Covenants – Intellectual Property*

(i)      To the extent not already registered or issued or the subject of a pending application (for the avoidance of doubt, including to the extent not already registered or the subject of a pending application in a material class of goods and services), each Grantor will take commercially reasonable efforts to promptly register all material Trademarks (other than the "MILEAGE PLAN" Trademark) included in the Collateral or in the Licensed Trademarks with the applicable IP Filing Office, including those set forth on Schedule 4(i). It shall promptly (i) file (A) a "Statement of Use" with the United States Patent and Trademark Office pursuant to Section 1(d) of the Lanham Act or (B) an "Amendment to Allege Use" whereby such intent-to-use trademark application is converted to a "use in commerce" application pursuant to Section 1(c) of the Lanham Act, in each case of (A) and (B) against all Loyalty Program Trademarks or Licensed Trademarks to the extent such Trademarks have been used in commerce by Grantor or any of its Affiliates and (ii) take

Annex 1 - 5

all other actions necessary to facilitate the acceptance of such "Statement of Use" or "Amendment to Allege Use" by the United States Patent and Trademark Office.

(j)     It shall (i) promptly notify in the manner set forth in Section 10.1 of this Agreement the Appropriate Party and the Collateral Agent, providing such details as the Appropriate Party or the Collateral Agent may require, of the institution of any material proceeding before a Governmental Authority regarding the validity or enforceability of, or such Grantor's right to register, own or use, any Loyalty Program Intellectual Property or any Licensed Trademarks, and of any adverse determination on the merits in any such proceeding (in each case, other than "office actions" by IP Filing Office examiners in the ordinary course of prosecution of applications), (ii) take all reasonable steps to defend its rights in the Loyalty Program Intellectual Property (other than any Loyalty Program Intellectual Property that is, and immediately prior to the institution of such proceeding was, no longer used and no longer useful in the business of any Grantor or its Subsidiaries) or the Licensed Trademarks, as applicable, in such proceedings and other interference, reexamination, opposition, cancellation, infringement, dilution, misappropriation and other proceedings and (iii) take all reasonable steps to protect the security, integrity and confidentiality of all Trade Secrets and any other confidential or proprietary information or data included in the Collateral.

(k)     It shall defend all material challenges to the validity and enforceability of, and its title to and ownership of, any Loyalty Program Intellectual Property (other than any Loyalty Program Intellectual Property that is, and immediately prior to the initiation of such challenge was, no longer used and no longer useful in the business of any Grantor or its Subsidiaries)and any Licensed Trademarks, and in the event that any Loyalty Program Intellectual Property or, subject to the IP License Agreement, any Licensed Trademarks is materially infringed, misappropriated, diluted or otherwise violated by a third party, promptly take all reasonable actions, as permitted by applicable Law, to stop such infringement, misappropriation, dilution or other violation and protect its rights in such Intellectual Property, including any initiation of a suit for injunctive relief, and to recover damages; for the avoidance of doubt, the Collateral Agent hereby permits Grantors to take the actions set forth in this Section 4(k) of this Annex prior to an Event of Default notwithstanding the IP License Agreement.

(l)     It will maintain the standards of quality of all products marketed or sold, and in the performance of services provided, under the Loyalty Program Trademarks, at a level at least as high as on the date hereof and will take all reasonable actions necessary to ensure that all licensees of its Loyalty Program Trademarks adhere to such Grantor's then-established standards of quality for the services provided by the licensee using such licensed Trademarks.

(m)     Within sixty (60) days of the Closing Date, a copy of all software code (in both object code and source code form) included in the Loyalty Program Intellectual Property, and all associated documentation, in each case (i) owned by any Grantor or any of its Affiliates or (ii) in any Grantor's or any of its Affiliates' possession or control, shall be stored in physically separated and segregated media from any of Grantors' other software code not included in the Loyalty Program Intellectual Property, and each of the applicable Grantors shall provide the Collateral Agent with a signed certification certifying that the requirements of this Section 4(m) have been satisfied.  For the avoidance of doubt, additional copies of such software code and associated documentation can concurrently remain stored in their current locations.

Annex 1 - 6

(n)     For the avoidance of doubt, <u>Section 6.1(c)</u> of this Agreement shall apply to any and all "intent-to-use" Loyalty Program Trademark applications included in the Excluded Assets with respect to which any Grantor files with the United States Patent and Trademark Office a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act.

*Affirmative Covenants - Other*

(o)     It shall notify the Collateral Agent of any Loyalty Program Agreement entered into after the Closing Date, together with copies if such agreement constitutes a Material Loyalty Program Agreement, (x) immediately after the execution thereof (in the case of a Material Loyalty Program Agreement), at which time Schedule 1.01(b) of the Loan Agreement will be deemed updated to include such agreement designated as a Material Loyalty Program Agreement, or (y) within ten (10) Business Days thereof (in the case of any Loyalty Program Agreement that is not a Material Loyalty Program Agreement).

(p)     It shall honor Currency according to the Loyalty Program Rules, except to the extent that would not, or would not be reasonably expected to, cause a Material Adverse Effect.

(q)     It shall promptly give notice to the Appropriate Party and the Collateral Agent (it being understood that such requirement will constitute a notice required under Section 5.03 of the Loan Agreement) of (i) a default or breach by any Grantor or counterparty to a Material Loyalty Program Agreement of its material obligations under such agreement and (ii) knowledge or notice of any event or circumstance that would, or would reasonably be expected to, reduce or offset the rate or amount of payments due to any Grantor under any Material Loyalty Program Agreement, including an explanation of impact of such event or circumstance on such Grantor's portion of the Loyalty Program Revenue in form and substance reasonably satisfactory to the Collateral Agent.

(r)     Concurrently with the Appraisals required to be delivered under Section 5.16 of the Loan Agreement, it shall additionally identify any material change to the terms of the Loyalty Program Agreements since the date of delivering the latest Appraisal and, to the extent such changes affect any Loyalty Program Agreements that constitute Material Loyalty Program Agreements, provide to the Collateral Agent copies of such change (including the relevant amendment, supplement, restatement or other modification).

(s)     [Reserved.]

*Negative Covenants - Data*

(t)     Except to the extent required by applicable Law, it will not modify, publish, provide or deliver any privacy policies, notices or statements in a manner that impairs (as compared with the last updated policies, notices or statements, as applicable, existing as of the date hereof) the right or ability of any Grantor, any of its Affiliates, any of its or their successors or assigns or the Collateral Agent to Process any Loyalty Program Data substantially in the manner Processed as of the Closing Date or removes or narrows any disclosure existing as of the date hereof regarding the potential future transfer, sharing or disclosure of Loyalty Program Data.

*Negative Covenants – Data & Intellectual Property*

Annex 1 - 7

(u)     It will not enter into any agreement (i) with respect to the Loyalty Program Data, Loyalty Program Intellectual Property or outbound IP Licenses included in the Collateral, after the Closing Date, that prohibits the assignment of, grant of a security interest in, or license of any such Collateral (other than to Treasury or the Collateral Agent) or (ii) that conflicts with or breaches any of the terms of the IP License Agreement or that would conflict with or breach the rights granted to Treasury thereunder if exercised by Treasury.

(v)     It will not take any action or omit to take any action (other than such Grantor's actions or omissions of action that are in the ordinary course of business and consistent with past practice) that could reasonably be expected to have a material negative effect on the Loyalty Program Data, the Loyalty Program Intellectual Property or the IP Licenses included in the Collateral (other than any Loyalty Program Intellectual Property that is no longer used and no longer useful), including diminishing, diluting, tarnishing, invalidating or rendering unenforceable Loyalty Program Trademarks, or otherwise materially impairing or harming the value or reputation thereof or the goodwill associated therewith.

*Negative Covenants - Other*

(w)     No Grantor nor any of its Affiliates shall create, establish, operate or otherwise permit to exist any other Loyalty Program or Loyalty Subscription Program unless (i) substantially all Loyalty Program Assets (including all income and revenue, Intellectual Property, data (including Personal Data) and third-party contracts and intercompany agreements, related to such other Loyalty Program) are Collateral (to the extent not already constituting Collateral pursuant to Section 2.1) and (ii) the Perfection Requirements with respect to such Collateral are satisfied (A) immediately (in the case of a Material Loyalty Program Agreement and related Loyalty Program Assets (other than Loyalty Program Intellectual Property)), (B) as promptly as practicable and in any event within thirty (30) days (in the case of the Loyalty Program Intellectual Property related to a Material Loyalty Program Agreement) or (C) within thirty (30) days (in the case of any Loyalty Program Agreement that is not a Material Loyalty Program Agreement and related Loyalty Program Assets), upon the creation, establishment or existence thereof, in the same manner and to the same extent as other Loyalty Program Assets constituting Collateral, on a first-priority basis (in each case, subject only to Permitted Liens); <u>provided</u> that (x) for purposes of this Section 4(w), the definition "Carrier Loyalty Program" included in the definition of "Loyalty Program Assets" shall refer to such new Loyalty Program or Loyalty Subscription Program and the definition of "Grantor" included in the definition of "Loyalty Program Assets" shall refer to Grantor or any of its Affiliates and (y) any Trademarks under which such new Loyalty Program or Loyalty Subscription Program are primarily operated shall be deemed to be removed from Schedule 1.1.

(x)     [Reserved.]

(y)     It shall not substantially reduce, or permit any of its Subsidiaries to reduce, the Carrier Loyalty Programs business as of the Closing Date.

3.  **Defaults and Remedies.**  Without limiting the generality of Section 8.1 of this Agreement and in addition to any rights and remedies that the Collateral Agent may have under the Loan Documents and the applicable Law:

(a)     If any Event of Default shall have occurred and be continuing, the Collateral Agent (acting at the direction of the Required Lenders) may, and each Grantor hereby irrevocably appoints the Collateral Agent (such appointment being coupled with an interest and

Annex 1 - 8

terminable only upon the payment in full of the Secured Obligations as such Grantor's proxy and attorney-in-fact) with full authority in the place and stead of such Grantor and in the name of such Grantor, to:

(i)      Subject to applicable Privacy Laws and consistent with Grantor's public-facing privacy policies in effect at the time of issuance, issue and circulate notices, opt-outs and similar communications to data subjects, including Loyalty Program Members, to allow the full use and transfer of Loyalty Program Data in the Event of a Default, including full use by and transfer to an unaffiliated third-party purchaser;

(ii)     bring suit or otherwise commence any action or proceeding in the name of any Grantor, as directed by the Required Lenders to the Collateral Agent, to enforce any Loyalty Program Intellectual Property, in which event such Grantor shall, at the request of the Appropriate Party or the Collateral Agent, do any and all lawful acts and execute any and all documents required by the Appropriate Party or the Collateral Agent in aid of such enforcement and such Grantor shall promptly, upon demand, reimburse and indemnify the Appropriate Party and the Collateral Agent in connection with the exercise of its rights under this Section 5 or Section 8 of this Agreement, and, to the extent that the Appropriate Party or the Collateral Agent shall elect not to bring suit to enforce any Loyalty Program Intellectual Property as provided in this Section 5 or Section 8 of this Agreement, each Grantor agrees to use all commercially reasonable measures, whether by action, suit, proceeding or otherwise, to prevent the infringement, misappropriation, dilution or other violation of any of such Grantor's rights in the Loyalty Program Intellectual Property by others and for that purpose agrees to diligently maintain any action, suit or proceeding against any Person so infringing as shall be necessary to prevent such infringement, misappropriation, dilution or violation;

(iii)    notify, or require each Grantor to notify, any obligors with respect to amounts due or to become due to such Grantor in respect of the Loyalty Program Intellectual Property or the IP Licenses included in the Collateral, of the existence of the security interest created herein, to direct such obligors to make payment of all such amounts directly to the Collateral Agent, and, upon such notification and at the expense of such Grantor, to enforce collection of any such amounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done;

(iv)    take any actions that the Appropriate Party deems appropriate to maintain the applicable Grantor's standards of quality, as referenced in Section 3(l) of this Annex, for products marketed or sold, or in the performance of services provided, under the Loyalty Program Trademarks; and

(v)     institute, defend or settle legal proceedings to collect on or enforce the applicable Grantor's rights and remedies against third parties, including account debtors, licensors, licensees, sublicensors, sublicensees and other parties to IP Licenses, under or on account of any Loyalty Program Intellectual Property or IP License included in the Collateral, without becoming a party to or incurring any liability under any IP License.

(b)     In connection with the Collateral Agent's exercise of its rights and remedies under of this Section 5 or Section 8 of this Agreement, each Grantor will, at the Collateral Agent's or

Annex 1 - 9

the Appropriate Party's request and to the extent within such Grantor's power and authority and subject to Grantor's existing third-party contractual restrictions, give the Collateral Agent or the Appropriate Party access to:

(i)     all software, technology, networks, systems, databases, information technology environments and other tangible assets used for the management of the Collateral or any Intellectual Property licensed under Section 8(e) of this Agreement or under the IP License Agreement, and access to and possession of all media and files in which any of such Collateral or Intellectual Property may be recorded or stored;

(ii)    such Grantor's know-how and expertise regarding the Collateral or the manufacture, sale, distribution or provision of any goods or services in connection with any Carrier Loyalty Program; and

(iii)   such Grantor's personnel responsible for either of the foregoing matters.

(c)     The Collateral Agent shall take commercially reasonable measures to protect the confidentiality of any Trade Secrets and other confidential information accessed pursuant to Section 5(b) of this Annex.

4.  **Provision of Services.**

(i)     Until the time of an Event of Default and following an Event of Default, each Grantor shall, and shall cause its Affiliates to, provide to the Collateral Agent, at such Grantor's cost and expense, any (i) services and (ii) access to any technology, networks, systems, databases or other tangible assets, in the case of (i) or (ii), that are required for, the operation of any Carrier Loyalty Program as such Carrier Loyalty Program was operated prior to the occurrence of such Event of Default, solely to enable the Collateral Agent to exercise its rights and remedies under Section 8 of this Agreement and Section 5 of this Annex after the occurrence, and solely during the continuance, of an Event of Default; provided that (x) with respect to any such services or assets which, at the time of the Collateral Agent's exercise of the right described in this paragraph, were provided to such Grantor by any third party and with respect to which the consent of such third party is necessary for such third party or such Grantor to provide such services or access to the Collateral Agent, such Grantor shall use its commercially reasonable efforts to obtain the consent of such third party to provide such services to the Collateral Agent and (y) this Section 6(i) of Annex 1 is exercisable solely upon and during the continuance of an Event of Default.

(ii)    Each Grantor shall work together, and cause its Affiliates, as applicable, to work together in good faith with any assignee of any Collateral and any applicable third-party service providers to provide the services and access set forth in clause (i) and Section 5(b) above to such assignee on commercially reasonable terms until such assignee is able to secure an adequate replacement or substitute for such services or access from a third party and such Grantor shall continue to provide such services and access to such assignee, on an actual cost basis, for the duration of a reasonable negotiation period.

5.  **Closing Deliverables**.  On the Closing Date, (a) the Grantors shall deliver to the Treasury and the Collateral Agent counterparts of the IP License Agreement duly executed by each of the applicable

WEIL:\97681611\4\13173.0005

Grantors and (b) the Treasury shall deliver to a Grantor a counterpart of the IP License Agreement duly executed by the Treasury.

6. **Miscellaneous**.  Each Grantor and the Collateral Agent agree that:

   (a)    The terms of this Annex shall be deemed incorporated into and part of this Agreement.

   (b)    The terms of this Annex cumulative in nature and shall not limit the applicability or scope of the other terms of this Agreement.

7. **Terms**.

   (a)    The following capitalized terms used in this Agreement shall have the following meanings:

        (i)    **"Collateral Support"** shall mean all property (real or personal) assigned or securing any Collateral and shall include any agreement granting a Lien in such real or personal property.

        (ii)    [Reserved].

        (iii)    [Reserved].

        (iv)    [Reserved].

        (v)    **"IP License Agreement"** shall mean that certain perpetual, transferable, worldwide, royalty-free Intellectual Property license agreement, dated as of the date hereof, by and among each of the Grantors that owns Loyalty Program Intellectual Property, on the one hand, and Treasury, on the other hand.

        (vi)    **"IP Licenses"** shall mean any and all agreements, whether or not styled as a "license," that (A) grant a Person an exclusive or non-exclusive license or other right to use or exercise any Intellectual Property, (B) that obligate a Person to refrain from using or enforcing any Intellectual Property, including settlements, co-existence agreements, consents-to-use, non-assertion agreements and covenants not to sue and (C) any option or right of first refusal or first offer on any of the foregoing in clauses (A) or (B).

        (vii)    **"IP-Related Rights"** shall mean, (A) with respect to any Loyalty Program Intellectual Property or IP Licenses included in the Collateral, any Proceeds thereof, and (B) with respect to any Loyalty Program Intellectual Property, Loyalty Program Data or IP Licenses included in the Collateral, (1) all rights to royalties, revenues, income, payments, claims, damages and proceeds of suit and other payments arising therefrom and (2) all other accrued and unaccrued causes of action (whether in contract, tort or otherwise) or rights to claim, sue or collect damages for or enjoin or obtain other legal or equitable relief for, an infringement, misuse, misappropriation, dilution, violation, unfair competition, injury to goodwill or other impairment (whether past, present or future) thereof, including expired items.

        (viii)    **"Licensed Trademarks"** shall mean the Carrier Licensed Trademarks as defined in the IP License Agreement.

Annex 1 - 11

(ix)    **"Loyalty Program Assets"** shall mean each Grantor's right, title and interest in, to and under the following, in each case, whether now owned or existing or hereafter acquired, developed, created or arising:

(A)    [Reserved];

(B)    the Loyalty Program Agreements, including all Loyalty Program Revenues and all:

      a.   Accounts;

      b.   Instruments; and

      c.   Receivables and Receivable Records

in each case, representing such Grantor's rights and claims arising under or in connection with any Carrier Loyalty Program (including the Loyalty Program Agreements) and the Loyalty Program Revenues;

(C)    All Trademarks used or held for use in a material respect in connection with any Carrier Loyalty Program and owned by a Grantor or any of its Affiliates (other than the items set forth on Schedule 1.1, the Licensed Trademarks and the Transitional Trademarks (as defined in the IP License Agreement)), and all Trademarks set forth on Schedule 2.1, in each case and any successor or replacement Trademarks thereto;

(D)    All:

      a.   Intellectual Property (other than Trademarks);

      b.   General Intangibles (other than Intellectual Property);

      c.   IT Systems; and

      d.   Equipment;

in each case, (i) owned by a Grantor or any of its Affiliates (A) exclusively used or held for use in connection with any Carrier Loyalty Program or (B) primarily used in, and required to operate, any Carrier Loyalty Program (which, for the avoidance of doubt, shall not include any aircraft, airframe, engines, Spare Parts or SGR Assets unless otherwise specified on Schedule 2.1 or in any Pledge Supplement), or (ii) as set forth on Schedule 2.1;

(E)    All IP Licenses (x) set forth on Schedule 7(a)(ix)(E)(x), (y) exclusively used or held for use in connection with any Carrier Loyalty Program (other than such Grantor's rights under the IP License Agreement) or (z) granted by a Grantor to a third party under any Loyalty Program Intellectual Property (other than non-exclusive trademark licenses, non-disclosure agreements and similar agreements entered into in the ordinary course of business, in each case that do not provide for the payment of royalties for the use of such Loyalty Program Intellectual Property), in each case other than all reciprocal passenger Currency accrual and redemption agreements with other Air Carriers and any IP License set forth on Schedule 7(a)(ix)(E)(y);

Annex 1 - 12

(F)      All Loyalty Program Data;

(G)      All IP-Related Rights;

(H)      Any other assets or property (i) exclusively used or held for use in connection with any Carrier Loyalty Program or (ii) primarily used in, and required to operate, any Carrier Loyalty Program (which, for the avoidance of doubt, shall not include any Intellectual Property, IT Systems, aircraft, airframe, engines, Spare Parts or SGR Assets unless otherwise specified in this <u>Section 7(a)(ix)</u>, <u>Schedule 2.1</u> or in any Pledge Supplement); and

(I)      All books, records, information and data with respect to any of the foregoing, and all tangible embodiments and fixations thereof (including all databases, files and media in which any of the foregoing is recorded or stored).

(x)      **"Loyalty Program Intellectual Property"** shall mean the Intellectual Property included in the Loyalty Program Assets.

(xi)     **"Loyalty Program Rules"** shall mean the rules, policies and procedures that govern the applicable Carrier Loyalty Program.

(xii)    **"Loyalty Program Trademarks"** shall mean the Trademarks included in the Loyalty Program Assets.

(xiii)   [Reserved].

(xiv)    **"Receivables"** shall mean all rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise Disposed of, or services rendered or to be rendered, including, but not limited to, all such rights constituting or evidenced by any Account, Chattel Paper, Instrument or General Intangible, together with all of Grantor's rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Receivables Records.

(xv)     **"Receivables Records"** shall mean all original copies of all documents, instruments or other writings or electronic records or other Records evidencing the Receivable, relating thereto or obtained or maintained in connection therewith.

(xvi)    [Reserved].

(xvii)   [Reserved].

(b)      For the avoidance of doubt, each of the following terms shall have the meaning ascribed to such term in the Loan Agreement: (i) Carrier Loyalty Program; (ii) Currency; (iii) Loyalty Program; (iv) Loyalty Program Agreement; (v) Loyalty Program Data; (vi) Loyalty Program Member; (vii) Loyalty Program Participant; (ix) Loyalty Program Revenue; (x) Material Loyalty Program Agreement; and (xi) IT Systems.

WEIL:\97681611\4\13173.0005

Schedule 7(a)(ix)(E) to <u>Annex 1 (Loyalty Program Assets)</u>

**Schedule 7(a)(ix)(E)(x)**

None.[4]

**Schedule 7(a)(ix)(E)(y)**

None.[5]

---

[4] If any collateral of this type is pledged or added to this Schedule after the closing date, then the UCC-1 financing statement collateral description may need to be amended to reflect this additional asset(s).

[5] If any collateral of this type is pledged or added to this Schedule after the closing date, then the UCC-1 financing statement collateral description may need to be amended to reflect this additional asset(s).

EXHIBIT 1 to <u>Annex 1 (Loyalty Program Assets)</u>

**FORM OF IP SECURITY AGREEMENT—COPYRIGHTS**

**COPYRIGHT SECURITY AGREEMENT**

COPYRIGHT SECURITY AGREEMENT, dated as of [●], made by and between [●] ("***Grantor***") and THE BANK OF NEW YORK MELLON (the "***Collateral Agent***").

WHEREAS, the Initial Lender has agreed to make Loans to the Grantor under that certain Loan and Guarantee Agreement, dated as of September 28, 2020 (as amended by that certain Restatement Agreement, dated as of October 30, 2020, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Loan Agreement***") by and among ALASKA AIRLINES, INC., as Borrower, the Guarantors party thereto, the Collateral Agent, the Administrative Agent named therein and the United States Department of the Treasury, as Lender;

WHEREAS, the Collateral Agent entered into that certain Amended and Restated Horizon Aircraft, Engine and Propeller Pledge and Security Agreement dated as of as of October 30, 2020, by and among Grantor, the grantors party thereto and the Collateral Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Security Agreement***").

WHEREAS, pursuant to the Security Agreement, the Grantor granted a security interest to the Collateral Agent in the Copyright Collateral (as defined below) and is required to execute and deliver this Copyright Security Agreement.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, Grantor and the Collateral Agent hereby agree as follows:

**1.  Defined Terms**

All capitalized terms used in this Copyright Security Agreement and not otherwise defined herein will have the meanings assigned to them in the Security Agreement or Loan Agreement, as applicable.

**2.  Supplement to Security Agreement**

This Copyright Security Agreement has been entered into in conjunction with the security interest granted to the Collateral Agent under the Security Agreement, and Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the security interest in Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein. The terms of this Copyright Security Agreement are supplemental to and not in replacement of the terms of the Security Agreement, and the rights and remedies of the Collateral Agent with respect to the security interests granted herein are without prejudice to, but in addition to, those set forth in the Security Agreement. If there is any conflict between this Copyright Security Agreement and the Security Agreement, the Security Agreement will govern.

**3.  Security Interest and Collateral**

Grantor hereby grants to the Collateral Agent a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under the following, in each case whether now owned or

existing or hereafter acquired, developed, created or arising and wherever located (collectively, the "*Copyright Collateral*"):

    a.    any United States or foreign: (i) copyrights, whether registered or unregistered, whether in published or unpublished works of authorship; (ii) copyright registrations or applications in any IP Filing Office; (iii) copyright renewals or extensions; and (iv) rights corresponding, derived from or analogous to the foregoing, in each case included in the Collateral, including any copyright listed in Schedule 1 attached hereto (as such schedule may be amended or supplemented from time to time) (collectively "*Copyrights*");

    b.    any agreements, whether or not styled as a "license," that grant to Grantor an exclusive license to use or exercise rights in any registered or applied-for Copyright, included in the Collateral, including any agreement listed in Schedule 1 attached hereto (as such schedule may be amended or supplemented from time to time) (collectively, "*Copyright Licenses*"); and

    c.    for any Copyright or Copyright License, any (i) Proceeds and rights to royalties, revenues, income, payments, claims, damages and proceeds of suit and other payments arising therefrom; and (ii) all other accrued and unaccrued causes of action (whether in contract, tort or otherwise) or rights to claim, sue or collect damages for or enjoin or obtain other legal or equitable relief for, an infringement, misuse, violation, unfair competition or other impairment (whether past, present or future) thereof, including expired items.

For the avoidance of doubt, this Copyright Security Agreement is not to be construed as an assignment of any Copyright Collateral.

**4.   Recordation**

Grantor hereby authorizes the Register of Copyrights and any other government officials to record and register, and Grantor hereby agrees to file at the United States Copyright Office, this Copyright Security Agreement upon request by the Collateral Agent, and Grantor hereby agrees to furnish to the Collateral Agent evidence of such recordation and registration.

**5.   Termination**

When all Secured Obligations have been completely and indefeasibly paid and performed in full and the Lender no longer has a commitment to make any Loan to the Borrower, this Copyright Security Agreement will terminate.

**6.   Governing law**

This Copyright Security Agreement shall be governed by, and construed in accordance with, the law of the State of New York.

**7.   Counterparts; Electronic communications**

This Copyright Security Agreement may be executed (including through electronic signatures) in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Notices and other communications may be delivered electronically (including by e-mail) and will be effective upon receipt, except that any record required to be signed, executed or

WEIL:\97681611\4\13173.0005

authenticated will only be effective when authenticated and delivered by electronic imaging means (e.g., .pdf or .tiff).

**[Remainder of page left intentionally blank]**

Annex 1 - 17

IN WITNESS WHEREOF, [each][the] Grantor and the Collateral Agent have caused this Copyright Security Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

[GRANTOR], as Grantor


By: _____
[NAME]
[TITLE]

THE BANK OF NEW YORK MELLON, as Collateral Agent

By: _____
[NAME]
[TITLE]

Annex 1 - 18

Motion for TRO Ex. 9 Page 268

**SCHEDULE 1**
**TO COPYRIGHT SECURITY AGREEMENT**

REGISTERED COPYRIGHTS

| NO. | TITLE OF WORK | REGISTRATION NUMBER | REGISTRATION DATE | GRANTOR |
|-----|---------------|---------------------|-------------------|---------|
| 1.  |               |                     |                   |         |

COPYRIGHT APPLICATIONS

| NO. | TITLE OF WORK | APPLICATION DATE | GRANTOR |
|-----|---------------|------------------|---------|
| 1.  |               |                  |         |

EXCLUSIVE COPYRIGHT IP LICENSES

| NO. | TITLE OF WORK | REGISTRATION NUMBER | REGISTRATION DATE | GRANTOR |
|-----|---------------|---------------------|-------------------|---------|
| 1.  |               |                     |                   |         |

Annex 1 - 19

Motion for TRO Ex. 9 Page 269

EXHIBIT 2 to <u>Annex 1 (Loyalty Program Assets)</u>

**FORM OF IP SECURITY AGREEMENT—PATENTS**

**PATENT SECURITY AGREEMENT**

PATENT SECURITY AGREEMENT, dated as of [●], made by and between [●] ("***Grantor***") and [●] (the "***Collateral Agent***").

WHEREAS, the Initial Lender has agreed to make Loans to the Grantor under that certain Loan and Guarantee Agreement, dated as of September 28, 2020 (as amended by that certain Restatement Agreement, dated as of October 30, 2020, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Loan Agreement***") by and among ALASKA AIRLINES, INC., as Borrower, the Guarantors party thereto, the Collateral Agent, the Administrative Agent named therein and the United States Department of the Treasury, as Lender;

WHEREAS, the Collateral Agent entered into that certain Amended and Restated Horizon Aircraft, Engine and Propeller Pledge and Security Agreement dated as of as of October 30, 2020, by and among Grantor, the grantors party thereto and the Collateral Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Security Agreement***").

WHEREAS, pursuant to the Security Agreement, the Grantor granted a security interest to the Collateral Agent in the Patent Collateral (as defined below) and is required to execute and deliver this Patent Security Agreement.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, Grantor and the Collateral Agent hereby agree as follows:

    **1.**   **Defined Terms**

All capitalized terms used in this Patent Security Agreement and not otherwise defined herein will have the meanings assigned to them in the Security Agreement or Loan Agreement, as applicable.

    **2.**   **Supplement to Security Agreement**

This Patent Security Agreement has been entered into in conjunction with the security interest granted to the Collateral Agent under the Security Agreement, and Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the security interest in Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein. The terms of this Patent Security Agreement are supplemental to and not in replacement of the terms of the Security Agreement, and the rights and remedies of the Collateral Agent with respect to the security interests granted herein are without prejudice to, but in addition to, those set forth in the Security Agreement. If there is any conflict between this Patent Security Agreement and the Security Agreement, the Security Agreement will govern.

    **3.**   **Security Interest and Collateral**

Grantor hereby grants the Collateral Agent a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under the following, in each case whether now owned or existing or hereafter acquired, developed, created or arising and wherever located (collectively, the "***Patent Collateral***"):

Annex 1 - 20

a.    Any United States and foreign issued patents (whether utility, design, or plant) and certificates of invention, and similar industrial property rights, and applications for any of the foregoing, in each case included in the Collateral,  including: (i) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof, (ii) all rights corresponding, derived from or analogous thereto throughout the world and (iii) all inventions and improvements described or claimed therein, including any patent listed in Schedule 1 attached hereto (as such schedule may be amended or supplemented from time to time) (collectively, "***Patents***"); and

b.    for any Patent, any (i) Proceeds therefrom and all rights to royalties, revenue, income, payments, claims, damages, and proceeds of suit and other payments arising therefrom; and (ii) all other accrued and unaccrued causes of action (whether in contract, tort or otherwise) or rights to claim, sue or collect damages for or enjoin or obtain other legal or equitable relief for, an infringement, misuse, violation, unfair competition or other impairment (whether past, present or future) thereof, including expired items.

For the avoidance of doubt, this Patent Security Agreement is not to be construed as an assignment of any Patent Collateral.

### 4.   Recordation

Grantor hereby authorizes the Commissioner for Patents and any other government officials to record and register, and Grantor hereby agrees to file at the United States Patent and Trademark Office, this Patent Security Agreement upon request by the Collateral Agent, and Grantor hereby agrees to furnish to the Collateral Agent evidence of such recordation and registration.

### 5.   Termination

When all Secured Obligations have been completely and indefeasibly paid and performed in full and the Lender no longer has a commitment to make any Loan to the Borrower, this Patent Security Agreement will terminate.

### 6.   Governing law

This Patent Security Agreement shall be governed by, and construed in accordance with, the law of the State of New York.

### 7.   Counterparts; Electronic communications

This Patent Security Agreement may be executed (including through electronic signatures) in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Notices and other communications may be delivered electronically (including by e-mail) and will be effective upon receipt, except that any record required to be signed, executed or authenticated will only be effective when authenticated and delivered by electronic imaging means (e.g., .pdf or .tiff).

**[Remainder of page left intentionally blank]**

Annex 1 - 21

IN WITNESS WHEREOF, [each][the] Grantor and the Collateral Agent have caused this Patent Security Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

[GRANTOR], as Grantor

By: _____
[NAME]
[TITLE]

THE BANK OF NEW YORK MELLON, as Collateral Agent

By: _____
[NAME]
[TITLE]

WEIL:\97681611\4\13173.0005

**SCHEDULE 1**

**TO PATENT SECURITY AGREEMENT**

ISSUED PATENTS

| NO. | PATENT NUMBER | DATE ISSUED | TITLE | GRANTOR |
|-----|--------------|-------------|-------|---------|
| 1. |  |  |  |  |

PATENT APPLICATIONS

| NO. | APPLICATION NUMBER | FILING DATE | TITLE | GRANTOR |
|-----|-------------------|-------------|-------|---------|
| 1. |  |  |  |  |

Annex 1 - 23

EXHIBIT 3 to Annex 1 (Loyalty Program Assets)

**FORM OF IP SECURITY AGREEMENT—TRADEMARKS**

**TRADEMARK SECURITY AGREEMENT**

TRADEMARK SECURITY AGREEMENT, dated as of [●], made by and between [●] ("*Grantor*") and [●] (the "*Collateral Agent*").

WHEREAS, the Initial Lender has agreed to make Loans to the Grantor under that certain Loan and Guarantee Agreement, dated as of September 28, 2020 (as amended by that certain Restatement Agreement, dated as of October 30, 2020, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Loan Agreement*") by and among ALASKA AIRLINES, INC., as Borrower, the Guarantors party thereto, the Collateral Agent, the Administrative Agent named therein and the United States Department of the Treasury, as Lender;

WHEREAS, the Collateral Agent entered into that certain Amended and Restated Horizon Aircraft, Engine and Propeller Pledge and Security Agreement dated as of as of October 30, 2020, by and among Grantor, the grantors party thereto and the Collateral Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Security Agreement*").

WHEREAS, pursuant to the Security Agreement, the Grantor granted a security interest to the Collateral Agent in the Trademark Collateral (as defined below) and is required to execute and deliver this Trademark Security Agreement.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, Grantor and the Collateral Agent hereby agree as follows:

   1. **Defined Terms**

All capitalized terms used in this Trademark Security Agreement and not otherwise defined herein will have the meanings assigned to them in the Security Agreement or Loan Agreement, as applicable.

   2. **Supplement to Security Agreement**

This Trademark Security Agreement has been entered into in conjunction with the security interest granted to the Collateral Agent under the Security Agreement, and Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the security interest in Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein. The terms of this Trademark Security Agreement are supplemental to and not in replacement of the terms of the Security Agreement, and the rights and remedies of the Collateral Agent with respect to the security interests granted herein are without prejudice to, but in addition to, those set forth in the Security Agreement. If there is any conflict between this Trademark Security Agreement and the Security Agreement, the Security Agreement will govern.

   3. **Security Interest and Collateral**

Grantor hereby grants the Collateral Agent a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under the following, in each case whether now owned or existing or hereafter acquired, developed, created or arising and wherever located (collectively, the "*Trademark Collateral*"):

a.   all United States and foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, trade dress, service marks, certification marks, collective marks, logos, social media identifiers, handles, other source or business identifiers, designs and general intangibles of a like nature, whether arising under a statute, common law, or the laws of any jurisdiction throughout the world, whether registered or unregistered, in each case included in the Collateral, including (i) all registrations, applications, extensions, renewals or other filings of any of the foregoing and (ii) all of the goodwill of the business connected with the use of and symbolized by the foregoing, including any trademark listed in Schedule 1 attached hereto (as such schedule may be amended or supplemented from time to time), in each case and any successor or replacement trademarks thereto, (collectively, "**_Trademarks_**"); and

b.   for any Trademark, any (i) Proceeds therefrom and rights to royalties, revenues, income, payments, claims, damages and proceeds of suit and other payments arising therefrom; and (ii) all other accrued and unaccrued causes of action (whether in contract, tort or otherwise) or rights to claim, sue or collect damages for or enjoin or obtain other legal or equitable relief for, an infringement, misuse, dilution, violation, unfair competition, injury to goodwill or other impairment (whether past, present or future) thereof, including expired items.

Notwithstanding the foregoing, the Trademark Collateral shall not include any "intent-to-use" application for registration of a Trademark filed with the USPTO pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, but solely to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such "intent-to-use" application under applicable federal law. For the avoidance of doubt, this Trademark Security Agreement is not to be construed as an assignment of any Trademark Collateral.

## 4.   Recordation

Grantor hereby authorizes the Commissioner for Trademarks and any other government officials to record and register, and Grantor hereby agrees to file at the United States Patent and Trademark Office, this Trademark Security Agreement upon request by the Collateral Agent, and Grantor hereby agrees to furnish to the Collateral Agent evidence of such recordation and registration.

## 5.   Termination

When all Secured Obligations have been completely and indefeasibly paid and performed in full and the Lender no longer has a commitment to make any Loan to the Borrower, this Trademark Security Agreement will terminate.

## 6.   Governing law

This Trademark Security Agreement shall be governed by, and construed in accordance with, the law of the State of New York.

## 7.   Counterparts; Electronic communications

This Trademark Security Agreement may be executed (including through electronic signatures) in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed

Annex 1 - 25

and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Notices and other communications may be delivered electronically (including by e-mail) and will be effective upon receipt, except that any record required to be signed, executed or authenticated will only be effective when authenticated and delivered by electronic imaging means (e.g., .pdf or .tiff).

**[Remainder of page left intentionally blank]**

Annex 1 - 26

Motion for TRO Ex. 9 Page 276

IN WITNESS WHEREOF, [each][the] Grantor and the Collateral Agent have caused this Trademark Security Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

[GRANTOR], as Grantor

By: _____

[NAME]

[TITLE]

THE BANK OF NEW YORK MELLON, as Collateral Agent

By: _____

[NAME]

[TITLE]

WEIL:\97681611\4\13173.0005

**SCHEDULE 1**

**TO TRADEMARK SECURITY AGREEMENT**

REGISTERED TRADEMARKS

| N<small>O.</small> | M<small>ARK</small> | R<small>EGISTRATION</small> N<small>UMBER</small> | R<small>EGISTRATION</small> D<small>ATE</small> | G<small>RANTOR</small> |
|---|---|---|---|---|
| 1. | | | | |

TRADEMARK APPLICATIONS

| N<small>O.</small> | M<small>ARK</small> | A<small>PPLICATION</small> N<small>UMBER</small> | F<small>ILING</small> D<small>ATE</small> | G<small>RANTOR</small> |
|---|---|---|---|---|
| 1. | | | | |

Annex 1 - 28

Motion for TRO Ex. 9 Page 278

Annex 2 (Control Collateral)

Each Grantor and the Collateral Agent hereby agree that the terms of this Annex shall apply with respect to Collateral consisting of Deposit Accounts and Securities Accounts (including the Collateral Proceeds Account).

1. **Perfection Requirement.**  The following requirements shall be included in the definition of "Perfection Requirement" and shall constitute an additional "Perfection Requirement" with respect to Collateral consisting of:

   (a)   A Deposit Account, each applicable Grantor shall, on or prior to the Closing Date or on the date of the establishment of a Deposit Account constituting Collateral, execute and deliver a control agreement with respect to such Collateral in form and substance satisfactory to the Appropriate Party and agreed to by the relevant depositary institution such that, upon the effectiveness of such control agreement, the Collateral Agent has Control over such Collateral.  Without limiting the generality of the foregoing, such control agreement shall require such depositary institution to comply with the Collateral Agent's instructions with respect to Disposition of funds held in such Deposit Account without further instruction or consent by any other Person; provided, that the Collateral Agent agrees with respect to the Collection Account not to give any such instructions unless an Event of Default has occurred and is continuing.

   (b)   A Securities Account (including any Security Entitlement with respect thereto), each applicable Grantor shall, on or prior to the Closing Date or on the date of the establishment of a Securities Account constituting Collateral, execute and deliver a control agreement with respect to such Collateral in form and substance satisfactory to the Appropriate Party and agreed to by the relevant securities intermediary such that, upon the effectiveness of such control agreement, the Collateral Agent has Control over such Collateral.  Without limiting the generality of the foregoing, such control agreement shall require such securities intermediary to comply with the Collateral Agent's entitlement orders with respect to such Securities Account without further consent by any other Person.

   (c)   A Collateral Proceeds Account, each applicable Grantor shall, on or prior to the Closing Date and, for any Collateral Proceeds Account established after the Closing Date, on the date of the establishment of such Collateral Proceeds Account, in addition to the above requirements, cause to be included in the applicable control agreement such further provisions required or advisable to implement the provisions of the Loan Agreement applicable to such Collateral Proceeds Account, all in form and substance satisfactory to the Appropriate Party.

2. **Representations and Warranties**.  Each Grantor (as applicable) hereby additionally represents and warrants, on the Closing Date and on the date of each Borrowing (or, in the case of an Additional Grantor or Additional Collateral, on the date of such Grantor's execution and delivery of a Pledge Supplement, or the date such Additional Collateral becomes subject to the security interest created hereby, as applicable):

   (a)   Schedule 2.1 to this Agreement sets forth Deposit Accounts and Securities Accounts constituting Collateral (including the Collateral Proceeds Account).  Each Grantor is the sole account holder thereof, as applicable.

   (b)   It has not consented to, and is not otherwise aware of, any Person having Control over, or any other interest in, any Deposit Account and Securities Accounts (including any Security

Annex 2 - 1

Entitlement in respect thereof) constituting Collateral or any property deposited therein or credited thereto.

(c)     Upon satisfaction and completion of the Perfection Requirements under this Annex, the Collateral Agent will (i) have Control over all Deposit Accounts and Securities Accounts (including any Security Entitlement in respect thereof) constituting Collateral and (ii) obtain a legal, valid and perfected first-priority security interest upon and in all Deposit Accounts and Securities Accounts (including any Security Entitlement in respect thereof) constituting Collateral, subject to no Lien (other than Permitted Liens).

3.   **Covenants**.  Each Grantor (as applicable) hereby agrees and covenants that:

(a)     It shall not grant Control of any Collateral to any Person other than the Secured Parties or any depositary bank or securities intermediary of any Deposit Account or Securities Account constituting Collateral, respectively.

(b)     Each Grantor of Collateral consisting of a Collateral Proceeds Account agrees to comply with the provisions of the Loan Agreement applicable to such Collateral Proceeds Account.

4.   **Defaults and Remedies**.  If any Event of Default shall have occurred and be continuing, without limiting the generality of Section 8.1 of this Agreement and in addition to any rights and remedies that the Collateral Agent may have under the Loan Documents and the applicable Law, the Collateral Agent may:

(a)     give a notice of exclusive control or any other instruction under any control agreement and take any action provided therein with respect to Collateral consisting of Deposit Accounts or Securities Accounts, including any Collateral Proceeds Account;

(b)     instruct the relevant depositary institution or securities intermediary to pay the balance of or credited to such Deposit Account or Securities Account, including any Collateral Proceeds Account; and

(c)     apply funds held in or credited to Collateral consisting of Deposit Accounts and Securities Accounts, including any Collateral Proceeds Account, to the Secured Obligations as set forth in Section 7.02 of the Loan Agreement.

5.   **Miscellaneous**.  Each Grantor and the Collateral Agent agree that:

(a)     The terms of this Annex shall be deemed incorporated into and part of this Agreement.

(b)     The terms of this Annex are cumulative in nature and shall not limit the applicability or scope of the other terms of this Agreement.

Annex 2 - 2

Annex 3A (Propeller Assets)

Each Grantor and the Collateral Agent hereby agree that the terms of this Annex shall apply with respect to Collateral consisting of Propellers.

1. **Perfection Requirement**.  The following requirements shall be included in the definition of "Perfection Requirement" and shall constitute an additional "Perfection Requirement" with respect to Collateral consisting of Propellers:

   The applicable Grantor, at its sole cost and expense, shall on the date of execution of any Mortgage Supplement or a Pledge Supplement:

   (i) execute and deliver, or cause to be executed and delivered, the Mortgage Supplements in form and substance satisfactory to the Appropriate Party; and

   (ii) duly prepare and file, or cause to be duly prepared and filed, the FAA Filed Documents for recordation with the FAA in accordance with Title 49 and the regulations thereunder.

2. **Required Filings**.  The filing of an FAA Filed Document with respect to Propellers with the FAA shall be included in the definition of "Required Filing" and shall constitute an additional "Required Filing" with respect to Collateral consisting of Propellers:

3. **Representations and Warranties**.  Each Grantor (as applicable) represents and warrants on the date of each Borrowing (or, in the case of an Additional Grantor or Additional Collateral, including any Additional Propeller, on the date of such Grantor's execution and delivery of a Mortgage Supplement or a Pledge Supplement, or the date such Additional Collateral becomes subject to the security interest created hereby, as applicable):

   (a) <u>Schedule 2.1</u> sets forth all Propeller Assets constituting Collateral and that such Grantor is the owner of the Propellers listed in Schedule 2.1.

   (b) <u>Necessary Filings</u>.  Upon (x) the filing of UCC financing statements (and continuation statements at periodic intervals) with respect to the security and other interests created hereby under the UCC as in effect in any applicable jurisdiction and (y) the recording and the filing of each Mortgage or Mortgage Supplement in the office of the FAA pursuant to Title 49, in each case, with respect to each Propeller constituting Collateral, (i) all filings, registrations and recordings necessary in the United States to create, preserve, protect and perfect the security interest granted by the Grantors to the Collateral Agent hereby in respect of the Collateral have been accomplished or, as to Collateral to become subject to the security interest of this Agreement after the date hereof, will be so filed, registered and recorded simultaneously with such Collateral being subject to the Lien of this Agreement and (ii) the security interest granted to the Collateral Agent pursuant to this Agreement in and to the Collateral will constitute a perfected security interest therein prior to the rights of all other Persons therein, but subject to no other Liens (other than Permitted Liens), and is entitled to all the rights, priorities and benefits afforded by Title 49 and any other applicable Law to perfected security interests or Liens.

   (c) <u>Other Filings or Registrations</u>. There is no registration covering or purporting to cover any interest of any kind in Propellers constituting Collateral (other than Permitted Liens).

Annex 3A - 1

(d)     All Propellers constituting Collateral have been first placed in service after October 22, 1994.

(e)     All Propellers constituting Collateral have been duly certified by the FAA as to type and airworthiness.

(f)     All Propellers are habitually located in the United States.

4.   **Covenants**. Each Grantor (as applicable) covenants and agrees that:

8.      *Filings and Registrations*

(a)     Such Grantor (as applicable) will take, or cause to be taken, at such Grantor's cost and expense, such action with respect to the recording, filing, re-recording and refiling of each Mortgage or Mortgage Supplement in the office of the FAA, pursuant to Title 49, and such other documents in such other places as may be required or desirable under any applicable Law, and any other instruments as are necessary or desirable by the Appropriate Party or the Collateral Agent, to maintain the existence, perfection, priority and preservation of the Lien created by this Agreement, the related Mortgages and the related Mortgage Supplement(s) of the Collateral Agent in the Propeller Assets constituting Collateral. The Grantors will furnish to the Collateral Agent timely notice of the necessity or desirability of such action, together with, if requested by the Collateral Agent, such instruments, in execution form, and such other information as may be required to enable the Collateral Agent to take such action or otherwise requested by the Appropriate Party.

9.      *Possession, Operation and Use, Maintenance, Registration and Markings.*

(a)     <u>General</u>. Except as otherwise expressly provided herein, it shall be entitled to operate, use, locate, employ or otherwise utilize or not utilize any Propeller in any lawful manner or place in accordance with such Grantor's business judgment.

(b)     <u>Possession</u>.  It shall not lease or otherwise in any manner deliver, transfer or relinquish possession of any Propeller, or install any Propeller, or permit any Propeller to be installed, on any engine other than an Engine, in each case, to the extent constituting Collateral; except that the applicable Grantor may, so long as no Event of Default has occurred:

(i)     Deliver possession of any Propeller constituting Collateral (x) to the Manufacturer thereof or to any third-party maintenance provider for testing service, repair, maintenance or overhaul work on such Propeller, or, to the extent required or permitted by <u>Section 3(c)</u> of this Annex, for alterations or modifications in or additions to such Propeller or (y) to any Person for the purpose of transport to a Person referred to in the preceding clause (x); <u>provided</u> that such Grantor covenants to promptly pay when due any payment obligation resulting in a mechanic's or other Lien related to such testing service, repair, maintenance, overhaul, alternation, modification, addition or transport;

(ii)    Transfer possession of the Propeller constituting Collateral to the U.S. Government, in which event such Grantor shall promptly notify the Appropriate Party of any such transfer of possession and, in the case of any transfer pursuant to CRAF, in such notification shall identify by name, address and telephone numbers the Contracting Office Representative or Representatives for the Military Airlift

Annex 3A - 2

Command of the United States Air Force to whom notices must be given and to whom requests or claims must be made to the extent applicable under CRAF; and

(iii)     Install a Propeller on an engine owned (including any Engine) or leased by such Grantor; provided that upon such installation, such Grantor shall be deemed to covenant to the Collateral Agent for the benefit of the Secured Parties that such installation shall not result in any material impairment (as compared to if such Propeller had not so been installed) of the Collateral Agent's rights and remedies in respect of such Propeller and access in connection therewith and to comply with the Appropriate Party's requests in furtherance of the exercise of such rights and remedies (including access). With respect to this clause (b)(iii), (A) the Collateral Agent hereby agrees on behalf of the Secured Parties, and for the benefit of each lessor, conditional seller, indenture trustee or secured party of any engine leased to, or owned by, the applicable Grantor subject to a lease, conditional sale, trust indenture or other security agreement that the Collateral Agent, on behalf of the Secured Parties, will not acquire or claim, as against such lessor, conditional seller, indenture trustee or secured party, any right, title or interest in such engine as the result of any Propeller being installed on such engine at any time while such engine is subject to such lease, conditional sale, trust indenture or other security agreement and (B) such Grantor shall cause any lessor, conditional seller, indenture trustee or secured party of any engine leased to, or owned by, the applicable Grantor subject to any lease, conditional sale, trust indenture or other security agreement to acknowledge that it will not acquire or claim, as against the Collateral Agent or any other Secured Parties, any right, title or interest in a Propeller as the result of such Propeller being installed on such engine at any time which such engine is subject to such lease, conditional sale, trust indenture or other security agreement.

(c)     Operation and Use. It shall not operate, use or locate such Propeller, or allow such Propeller to be operated, used or located, (i) in any area excluded from coverage by any insurance required by any Loan Document, except in the case of a requisition by the U.S. Government where the Grantors obtain indemnity in lieu of such insurance from the U.S. Government, or insurance from the U.S. Government, against substantially the same risks and for at least the amounts of insurance required by any Loan Document covering such area, or (ii) in any recognized area of hostilities unless covered in accordance with this Annex by war risk insurance, or in either case unless the Propeller is only temporarily operated, used or located in such area as a result of an emergency, equipment malfunction, navigational error, hijacking, weather condition or other similar unforeseen circumstance, so long as such Grantor diligently and in good faith proceeds to remove such Propeller from such area. No Grantor shall permit such Propeller to be used, operated, maintained, serviced, repaired or overhauled (x) in violation of any applicable Law or (y) in violation of any airworthiness certificate, license or registration of any Governmental Authority relating to such Propeller, except to the extent the validity or application of any such law or requirement relating to any such certificate, license or registration is being contested in good faith by such Grantor in any reasonable manner which does not involve any material risk of the sale, forfeiture or loss of such Propeller, any material risk of criminal liability or material civil penalty against the Collateral Agent or any Secured Party or impair the Appropriate Party's security interest in such Propeller.

(d)     Maintenance and Repair. It shall cause all Propeller Assets to be maintained, serviced, repaired and overhauled in accordance with maintenance standards required by or substantially equivalent to those required by the FAA so as to keep such Propeller Assets

Annex 3A - 3

in such operating condition as may be necessary to enable the applicable airworthiness certification of such Propeller, or, in the case of any Propeller that is installed on an Engine, the applicable Engine to be maintained under the regulations of the FAA.  Each Grantor further agrees that each Propeller constituting Collateral will be maintained, used, serviced, repaired, overhauled or inspected in compliance with applicable Laws with respect to the maintenance of the Propellers and in compliance with each applicable airworthiness certificate, license and registration relating to such Propeller issued by the applicable Aviation Authority.

10.    <em>Replacement of Parts, Alterations, Modification and Additions.</em>

(a)    <u>Replacement of Parts</u>. Except as otherwise provided herein, so long as the security interest created herein has not been released in accordance with the Loan Agreement, each applicable Grantor, at its own cost and expense, will, at its own cost and expense, promptly replace (or cause to be replaced) all Parts which may from time to time be incorporated or installed in or attached to such Propeller and which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use for any reason whatsoever. In addition, each Grantor may, at its own cost and expense, remove in the ordinary course of maintenance, service, repair, overhaul or testing any Parts, whether or not worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use; <u>provided</u>, <u>however</u>, that such Grantor, except as otherwise provided herein, at its own cost and expense, will, promptly replace such Parts.  All replacement parts shall be free and clear of all Liens, except Permitted Liens and shall be in as good an operating condition and have a value and utility not less than the value and utility of the Parts replaced (assuming such replaced Parts were in the condition required hereunder).

(b)    <u>Parts Subject to Lien</u>. Except as otherwise provided herein, any Part at any time removed from a Propeller shall remain subject to the security interest created in this Mortgage, no matter where located, until such time as such Part shall be replaced by a part that has been incorporated or installed in or attached to such Propeller and that meets the requirements for replacement parts specified above. Immediately upon any replacement part becoming incorporated or installed in or attached to such Propeller as provided in this Annex, without further act, (i) the replaced Part shall thereupon be free and clear of all rights of the Collateral Agent and shall no longer be deemed a Part hereunder and (ii) such replacement part shall become subject to this Agreement and be deemed part of such Propeller, as the case may be, for all purposes hereof to the same extent as the Parts originally incorporated or installed in or attached to such Propeller.

(c)    <u>Alterations, Modifications and Additions</u>.  It shall make alterations and modifications in and additions to each Propeller as may be required to be made from time to time to meet the applicable standards of the FAA, to the extent made mandatory in respect of such Propeller (a "**Mandatory Alteration**"); provided, however, that each Grantor may, in good faith and by appropriate procedure, contest the validity or application of any law, rule, regulation or order in any reasonable manner which does not materially adversely affect the Appropriate Party's interest in such Propeller and does not involve any material risk of sale, forfeiture or loss of such Propeller or the interest of the Appropriate Party therein, or any material risk of material civil penalty or any material risk of criminal liability being imposed on the Collateral Agent or any Secured Party.  In addition, each Grantor, at its own expense, may from time to time make such alterations and modifications in and additions to any Propeller (each an "**Optional Alteration**") as such Grantor may deem

Annex 3A - 4

desirable in the proper conduct of its business including the removal of Parts which such Grantor deems are obsolete or no longer suitable or appropriate for use in such Propeller ("**Obsolete Parts**"); provided, however, that no such Optional Alteration to a Propeller shall (i) materially diminish the fair market value, utility or remaining useful life of such Propeller below its fair market value, utility or remaining useful life immediately prior to such Optional Modification (assuming such Propeller was in the condition required by this Agreement immediately prior to such Optional Modification) or (ii) cause such Propeller to cease to have the applicable standard certificate of airworthiness. All Parts incorporated or installed in or attached to any Propeller as the result of any alteration, modification or addition effected by each applicable Grantor shall be free and clear of any Liens except Permitted Liens and become subject to the Lien of this Agreement; provided that such Grantor may, at any time so long as any Propeller is subject to the Lien of this Agreement, remove any Part (such Part being referred to herein as a "**Removable Part**") from such Propeller if (i) such Part is in addition to, and not in replacement of or in substitution for, any Part originally incorporated or installed in or attached to such Propeller at the time of original delivery thereof by the Manufacturer or any Part in replacement of, or in substitution for, any such original Part, (ii) such Part is not required to be incorporated or installed in or attached or added to such Propeller pursuant to the terms of this Annex and (iii) such Part can be removed from such Propeller without materially diminishing the fair market value, utility or remaining useful life which such Propeller would have had at the time of removal had such removal not been effected by such Grantor, assuming such Propeller was otherwise maintained in the condition required by this Agreement and such Removable Part had not been incorporated or installed in or attached to such Propeller. Upon the removal by any applicable Grantor of any such Removable Part or Obsolete Part as above provided, (A) title thereto shall, without further act, be free and clear of all rights of the Collateral Agent and (B) such Removable Part or Obsolete Part shall no longer be deemed a Part hereunder.

11.   *Loss, Destruction or Requisitions: Addition of Propellers.*

(a)   Event of Loss.  Upon the occurrence of an Event of Loss with respect to a Propeller:

(i)   each applicable Grantor shall promptly upon obtaining knowledge of such Event of Loss (and in any event within fifteen (15) Business Days after such occurrence) give the Collateral Agent written notice of such Event of Loss.

(ii)   prior to the occurrence of a Recovery Event with respect to such Propeller, each applicable Grantor shall have the right to replace and substitute such Propeller in accordance with Section 4(d) of this Annex.

(iii)   each Grantor shall comply with the applicable requirements of Section 2.06(b)(ii) of the Loan Agreement with respect to any Recovery Event relating to such Event of Loss, and upon such compliance, the Propeller suffering such Event of Loss shall be released from the Lien of this Agreement.

(b)   Requisition for Use. In the event of a requisition for use by any Governmental Authority or a CRAF activation of a Propeller or a propeller installed on an Engine while such Engine is subject to Liens of this Agreement, each applicable Grantor shall promptly notify the Collateral Agent of such requisition or activation and all of such Grantor's obligations under this Agreement and the Loan Agreement shall continue to the same extent as if such requisition or activation had not occurred and shall not be reduced or delayed by such requisition or activation. So long as no Event of Default shall have occurred and be

continuing, any payments received by the Collateral Agent or any Grantor from such Governmental Authority with respect to such requisition of use or activation may be paid over to, or retained by, such Grantor and shall not be required to be paid over to the Collateral Agent to hold as Collateral.

(c)    <u>Conditions to Addition of a Propeller</u>.  When any Grantor (including any Additional Grantor) is granting a security interest to the Collateral Agent for the benefit of the Secured Parties in an additional Propeller (an "**Additional Propeller**") pursuant to the requirements under the Loan Documents, such Grantor shall, at such Grantor's sole cost and expense, fulfill the following conditions:

(i)    an executed counterpart of a Mortgage Supplement or a Pledge Supplement covering such Additional Propeller;

(ii)    an executed counterpart of a Mortgage Supplement (in form and substance satisfactory to the Appropriate Party) covering such Additional Propeller, which shall have been duly filed for recordation pursuant to the Act or such other applicable Law or as required under the terms of this Agreement;

(iii)    each applicable Grantor shall have furnished to the Collateral Agent such evidence of compliance with the insurance provisions of this Annex with respect to such Additional Propeller;

(iv)    such Grantor shall have furnished to the Collateral Agent and the Appropriate Party, at the expense of such Grantor, (A) an opinion of counsel reasonably satisfactory to the Appropriate Party and addressed to the Secured Parties, to the effect that this Agreement creates a valid security interest in such Grantor's interest in the Additional Propeller and a UCC filing has been filed with respect thereto resulting in a perfected security interest to the extent the UCC is applicable, (B) an opinion of the Grantor's in-house counsel, reasonably satisfactory to the Appropriate Party and addressed to the Secured Parties, to the effect that the Secured Parties will have the benefits of Section 1110 of the U.S. Bankruptcy Code with respect to the Additional Propeller, and (C) an opinion of such Grantor's aviation law counsel reasonably satisfactory and addressed to the Appropriate Party as to the due filing for recordation of the Mortgage Supplement with respect to such Additional Propeller under the Act or any other applicable Law, and the perfection and first priority (other than with respect to any Permitted Lien) of the security interest in the Additional Propeller granted to the Appropriate Party hereunder.

(v)    the Grantors shall have delivered an Appraisal of such Additional Propeller to the Appropriate Party and, if such Additional Propeller were delivered to such grantor by the manufacturers within ninety (90) days prior to the date such Additional Propeller is added as Collateral, in an officer's certificate attesting to the foregoing; and

(vi)    the Grantors shall have taken such other actions and furnished such other certificates and documents as the Appropriate Party may require in order to assure that the Additional Propeller is duly and properly subjected to the Lien of this Agreement.

(d)    <u>Substitution of Propellers</u>.

Annex 3A - 6

(i)     Each Grantor shall have the right at its option at any time, on at least five (5) days' prior notice to the Collateral Agent and the Appropriate Party, at such Grantor's sole cost and expense, to substitute an Additional Propeller to replace any Propeller (such replaced Propeller, the "**Replaced Propeller**") (including, if so elected by such Grantor, in satisfaction of any applicable obligations in relation to an Event of Loss with respect to such Propeller prior to the occurrence of a related Recovery Event) in accordance with the requirements of Section 6.17(b)(iii) of the Loan Agreement and Section 4(d) of this Annex. Such Additional Propeller shall be a Propeller manufactured by the Manufacturer of the Replaced Propeller that is the same model as the Replaced Propeller, or an improved model, and that has a value and utility (without regard to hours and cycles remaining until overhaul) at least equal to the Replaced Propeller (assuming that such Propeller had been maintained in accordance with this Agreement (and, as applicable, had not suffered such Event of Loss), which value and utility shall be established by an Appraisal delivered pursuant to the terms of this Agreement; provided, that, until an Appraisal is obtained for such Additional Propeller, it shall be deemed to have the same Appraised Value of zero).

(ii)    Each Grantor's right to make a substitution hereunder shall be subject to the delivery of (A) a written request from the applicable Grantor, requesting release of the Replaced Propeller from Collateral and specifically describing such Propeller and (B) a certificate of a Responsible Officer of such Grantor providing:

   1.   a description of the Replaced Propeller which shall be identified by Manufacturer, model, and Propeller's serial number;

   2.   a description of the Additional Propeller (including the Manufacturer, model, and Propeller's serial number) to be received as consideration for the Replaced Propeller;

   3.   that on the date of the Mortgage Supplement relating to the Additional Propeller, such Grantor will be the legal owner of such Additional Propeller free and clear of all Liens (other than the Lien under this Agreement and Permitted Liens), and that such Additional Propeller has been duly registered in the name of such Grantor and that such Grantor has the full right and authority to use such Additional Propeller;

   4.   that the insurance required by this Agreement is in full force and effect with respect to such Additional Propeller and all premiums then due thereon have been paid in full;

   5.   that no Event of Default has occurred and is continuing or would result from the making and granting of the request for release and the addition of such Additional Propeller; and

   6.   that the conditions set forth in Section 6.17(b)(iii) of the Loan Agreement and Section 4(d) of this Annex have been satisfied after giving effect to such substitution (it being understood and agreed, for the avoidance of doubt, that any reference in Section 6.17(b)(iii) of the Loan Agreement to existing Additional Collateral shall include such Replaced Propeller).

Annex 3A - 7

(iii)  Immediately upon the satisfaction of conditions set forth in this <u>Section 4(d)</u> of this Annex and without further act, (A) the Replaced Propeller shall thereupon be released from and be free and clear of the Lien of this Agreement and shall no longer be deemed Collateral and (B) such Additional Propeller shall become subject to this Agreement as a Propeller and as Collateral.

12.  *Insurance.*

(a)  Each applicable Grantor shall furnish to the Collateral Agent such evidence of compliance with the insurance provisions of this Annex with respect to Propellers constituting Collateral.

(b)  Each Grantor shall ensure that at all times the Collateral Agent, for the benefit of the Secured Parties, shall be named as an additional insured and lender loss payee with respect to the insurance policies referenced in <u>Appendix I</u> with respect to any Propeller Assets constituting Collateral and take any other steps required under this Annex.

(c)  <u>Obligation to Insure</u>. Each Grantor (as applicable) shall comply with, or cause to be complied with, each of the provisions of <u>Appendix I</u> to this Annex, which provisions are hereby incorporated by this reference as if set forth in full herein.

(d)  <u>Insurance for Own Account</u>. Nothing in this Annex shall limit or prohibit (i) any Grantor's from maintaining the policies of insurance required under <u>Appendix I</u> of this Annex with higher coverage than those specified in <u>Appendix I</u>, or (ii) the Collateral Agent or any other Additional Insured from obtaining, upon the occurrence of an Event of Default, at the Grantors' expense, insurance for its own account (and any proceeds payable under such separate insurance shall be payable as provided in the policy relating thereto); <u>provided</u>, <u>however</u>, that no insurance may be obtained or maintained that would limit or otherwise adversely affect the coverage of any insurance required to be obtained or maintained by any Grantor pursuant to this Annex and <u>Appendix I</u> of this Annex.

(e)  <u>Application of Insurance Proceeds</u>. As between each applicable Grantor and the Collateral Agent, all insurance proceeds received as a result of the occurrence of an Event of Loss with respect to any Propeller constituting Collateral at the time of such receipt shall be applied in accordance with Section 2.06(b) of the Loan Agreement.

5.  **Defaults and Remedies**.  If any Event of Default shall have occurred and be continuing, without limiting the generality of <u>Section 8.1</u> of this Agreement, the Collateral Agent may exercise all of the rights and remedies of a secured party under the UCC and the Cape Town Treaty.

6.  **Release of Collateral**.  Each Grantor and the Collateral Agent agree that upon satisfaction and completion, as determined by the Appropriate Party, of the conditions for release of any Propeller Assets constituting Collateral from the Lien granted hereby in accordance with to <u>Section 6.17(b)(iii)</u> of the Loan Agreement such Replaced Propeller, as the case may be, shall be released from the Lien granted under this Agreement, and the Collateral Agent will thereupon execute and deliver to the applicable Grantor, at such Grantor's sole expense, all appropriate UCC termination statements and other documents that such Grantor shall reasonably request to evidence such release in such released Propeller Assets or Replaced Propeller.  The Collateral Agent shall have no liability whatsoever to any Secured Party as a result of its execution of any such documentation with respect to any such release.  The release of a Propeller from the Lien of this Agreement shall have effect without further action of releasing all other Collateral, including the related Propeller Documents relating to such released Propeller.

Annex 3A - 8

7. **Miscellaneous**. Each Grantor and the Collateral Agent agree that:

(a)   The terms of this Annex shall be deemed incorporated into and part of this Agreement.

(b)   The terms of this Annex are cumulative in nature and shall not limit the applicability or scope of the other terms of this Agreement.

(c)   It is the intention of the parties that the Appropriate Party shall be entitled to the benefits of Section 1110 with respect to the right to take possession of the Propellers as provided herein in the event of a case under Chapter 11 of the Bankruptcy Code in which the Grantors are debtors, and in any instance where more than one construction is possible of the terms and conditions hereof or any other pertinent Loan Document, each such party agrees that a construction which would preserve such benefits shall control over any construction which would not preserve such benefits.

(d)   The applicable Grantor shall deliver to the Collateral Agent a certificate from a Responsible Officer of such Grantor, dated as of the date of the Mortgage Supplement or the Pledge Supplement, which shall contain representations that such Grantor has exclusive title in all Propeller Assets constituting Collateral.

8. **Terms**. The following capitalized terms used in this Annex shall have the following meanings:

(a)   "**Additional Insureds**" is defined in <u>Appendix I</u> to this Annex.

(b)   "**Aircraft Protocol**" means the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment adopted on November 16, 2001, at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States.

(c)   "**Aviation Authority**" means, in the case of any Propeller, the FAA or, if such Propeller is permitted to be, and is, registered with any other Governmental Authority, such other Governmental Authority.

(d)   "**Cape Town Convention**" shall mean the official English language text of the Convention on International Interests in Mobile Equipment, adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States.

(e)   "**Cape Town Treaty**" shall mean, collectively, (a) the Cape Town Convention, (b) the Aircraft Protocol, and (c) all rules and regulations (including the Regulations and Procedures for the International Registry) adopted pursuant thereto and all amendments, supplements and revisions thereto.

(f)   "**CRAF**" means the Civil Reserve Air Fleet Program established pursuant to 10 U.S.C. Section 9511-13 or any similar substitute program.

(g)   "**Engine**" means (a) each of the engines identified by Manufacturer, model and Manufacturer's serial number in Schedule 2.1 or in the initial Mortgage Supplement or any subsequent Mortgage Supplement or any subsequent Pledge Supplement, in each case, executed and delivered by any Grantor and whether or not from time to time installed on an Airframe or installed on any other airframe, and (b) any and all Parts incorporated or

Annex 3A - 9

installed in or attached or appurtenant to such engine, and any and all Parts removed from such engine, unless the Lien created hereunder shall not apply to such Parts in accordance with Section 3 of this Annex, but excluding any such engine that has subsequently been released from the Lien in accordance with the terms of this Agreement.

(h)    "**Event of Loss**" means with respect to any Propeller, any of the following circumstances, conditions or events with respect to such property, for any reason whatsoever:

    (i)    the destruction of such property, damage to such property beyond economic repair or rendition of such property permanently unfit for normal use by the applicable Grantor;

    (ii)    the actual or constructive total loss of such property or any damage to such property, or requisition of title or use of such property, which results in an insurance settlement with respect to such property on the basis of a total loss or constructive or compromised total loss;

    (iii)    any theft, hijacking or disappearance of such property for a period of one hundred and eighty (180) consecutive days or more; or

    (iv)    any seizure, condemnation, confiscation, taking or requisition (including loss of title) of such property by any Governmental Authority or purported Governmental Authority for a period exceeding one hundred and eighty (180) consecutive days

(i)    "**FAA Filed Document**" shall mean the Mortgage or Mortgage Supplement executed by a Grantor.

(j)    "**Mandatory Alteration**" shall have the meaning given in this Annex.

(k)    "**Manufacturer**" shall mean, with respect to any Propeller, the manufacturer thereof.

(l)    "**Mortgage**" shall mean an FAA Mortgage, with appropriate modifications to reflect the purpose for which it is being used in form and substance satisfactory to the Appropriate Party.

(m)    "**Mortgage Supplement**" shall mean an FAA Mortgage, substantially in the form of Exhibit A to this Annex, with appropriate modifications to reflect the purpose for which it is being used in form and substance satisfactory to the Appropriate Party.

(n)    "**Obsolete Part**" shall have the meaning given in Section 3(c) of this Annex.

(o)    "**Optional Alteration**" shall have the meaning given in Section 3(c) of this Annex.

(p)    "**Parts**" means all appliances, parts, components, instruments, appurtenances, accessories, furnishings, seats and other equipment of whatever nature, that may from time to time be installed or incorporated in or attached or appurtenant to any Propeller or removed therefrom unless the Lien created under this Agreement shall not be applicable to such Parts in accordance with Section 3 of this Annex.

(q)    "**Propeller(s)**" means (i) each of the propellers listed in Schedule 2.1 or in the initial Mortgage Supplement or any subsequent Mortgage Supplement or any subsequent Pledge Supplement, in each case, executed and delivered by any Grantor, whether or not from time to time installed on any Engine or any other engine, and (ii) any replacement propeller

WEIL:\97681611\4\13173.0005

which may from time to time be substituted for any Propeller pursuant to the terms hereof; and (iii) in each case, any and all related Parts.

(r)     "**Propeller Assets**" shall mean:

(i)     Each Propeller as the same is now and will hereafter be constituted, together with (a) all Parts of whatever nature, which are from time to time included within the definition of "Propeller", including all substitutions, renewals and replacements of and additions, improvements, accessions and accumulations to the Propellers (other than additions, improvements, accessions and accumulations which constitute appliances, parts, instruments, appurtenances, accessories, furnishings or other equipment excluded from the definition of Parts) and (b) all Propeller Documents owned by, or in the possession of, the applicable Grantor;

(ii)     Any continuing rights of any Grantor in respect of any warranty, indemnity or agreement, express or implied, as to title, materials, workmanship, design or patent infringement with respect to such Propellers (reserving in each case to the Grantors, however, all of the Grantors' other rights and interest in and to such warranty, indemnity or agreement) together in each case under this clause with all rights, powers, privileges, options and other benefits of such Grantor thereunder (subject to such reservations) with respect to such Propellers, including the right to make all waivers and agreements, to give and receive all notices and other instruments or communications, to take such action upon the occurrence of a default thereunder, including the commencement, conduct and consummation of legal, administrative or other proceedings, as shall be permitted thereby or by law, and to do any and all other things which such Grantor is or may be entitled to do thereunder (subject to such reservations);

(iii)     All General Intangibles which are owned by such Grantor (including the General Intangibles described on Schedule 2.1) relating to Propeller Assets described in the foregoing; and

(iv)     All Insurance with respect to any of the foregoing.

(s)     "**Propeller Documents**" means, with respect to any Propeller, all technical data, manuals and log books, and all inspection, modification and overhaul records and other service, repair, maintenance and technical records that are required by the FAA (or the relevant Aviation Authority), to be maintained with respect to such Propeller, and such term shall include all additions, renewals, revisions and replacements of any such materials from time to time made, or required to be made, by the FAA (or other Aviation Authority) regulations, and in each case in whatever form and by whatever means or medium (including any microfiche, microfilm, paper or computer disk) such materials may be maintained or retained by or on behalf of the applicable Grantor.

Annex 3A - 11

Appendix I to Annex 3A

## APPENDIX I

## INSURANCE

A.  Liability Insurance.

1.  Except as provided in Section A.2 below, the applicable Grantor will carry at all times, at no expense to the Collateral Agent or any Secured Party, commercial airline legal liability insurance (including any passenger liability, property damage, baggage liability, cargo and mail liability, hangarkeeper's liability and contractual liability insurance) with respect to each Propeller (including, as applicable, in respect of an Engine on which a Propeller is then installed) which is (i) in an amount not less than the amount of commercial airline legal liability insurance from time to time applicable to propellers owned or leased and operated by the applicable Grantor of the same type and operating on similar routes as such Propeller and (ii) of the type and covering the same risks as from time to time applicable to propellers operated by the applicable Grantor of the same type as such Propeller; and (iii) maintained in effect with insurers of nationally or internationally recognized responsibility (such insurers being referred to herein as "Approved Insurers").

2.  During any period that a Propeller is on the ground and not in operation, the applicable Grantor may carry, in lieu of the insurance required by Section A.1 above, insurance otherwise conforming with the provisions of said Section A.1 except that (i) the amounts of coverage shall not be required to exceed the amounts of liability and property damage insurance from time to time applicable to propeller owned or operated by the applicable Grantor of the same type as such Propeller which is on the ground and not in operation and (ii) the scope of the risks covered and the type of insurance shall be the same as from time to time shall be applicable to propellers owned or operated by the applicable Grantor of the same type which are on the ground and not in operation by the applicable Grantor on the ground, not in operation, and stored or hangared.

B.  Hull Insurance.

1.  Except as provided in Section B.2 below, the applicable Grantor will carry, at no expense to the Collateral Agent or any Secured Party, with Approved Insurers "all-risk" aircraft hull insurance covering the Propellers (including when the Propeller is not installed on any engine) which is of the type as from time to time applicable to propellers owned by the applicable Grantor of the same type as such Propeller for an amount denominated in United States Dollars not less than, for each Propeller, 100% of the Appraised Value (which, as applicable based on the relevant Appraisal, may at the applicable Grantor's option be a combined value for an aircraft comprised of its airframe, its associated Engines, and its associated Propellers or separate such values for any airframe, Engine or Propeller) as set forth in the most recent Appraisal delivered pursuant to the Loan Agreement before the date (or renewal date) of the applicable insurance policies (the "Agreed Value"), or, prior to the delivery of the initial Appraisal covering such Propeller, the applicable "Agreed Value" set forth in the initial insurance certificate delivered with respect thereto, but in no event, in all cases, less than applicable replacement value (as reasonably determined by the applicable Grantor and its insurers); and in each case such insurance shall include all-risk property damage insurance covering Propellers temporarily removed from an Engine and Parts while temporarily removed from any Engine, in each case and not replaced by similar components for not less than the replacement value thereof which are of the type as from time to time applicable to components owned by the applicable Grantor of the same type

Annex 3A - 12

Motion for TRO Ex. 9 Page 292

as such Propeller and Parts for an amount denominated in United States Dollars (which replacement value shall, for a Propeller with a separate Agreed Value pursuant to the foregoing, be not less than such Agreed Value).

All losses will be adjusted by the applicable Grantor with the insurers; provided, however, that during a period when an Event of Default shall have occurred and be continuing, the applicable Grantor shall not agree to any such adjustment without the consent of the Appropriate Party.

Any policies of insurance carried in accordance with this Section B.1 or Section C covering any Propeller and any policies taken out in substitution or replacement for any such policies shall provide that insurance proceeds under such policies shall be payable directly to the Collateral Agent for prompt deposit into a Collateral Proceeds Account if such insurance proceeds are in respect of an Event of Loss.  The Collateral Agent shall be entitled to notify an insurer that such insurance proceeds shall be paid directly to the Collateral Agent as provided in the immediately preceding sentence.

For the avoidance of doubt, this Section B.1 shall not prohibit standard deductibles or industry standard self-insured retentions for hull insurance carried by the applicable Grantor.

2.  During any period that a Propeller is on the ground and not in operation, the applicable Grantor may carry, in lieu of the insurance required by Section B.1 above, insurance otherwise conforming with the provisions of said Section B.1 except that the scope of the risks and the type of insurance shall be the same as from time to time applicable to propeller owned by the applicable Grantor of the same type as such Propeller similarly on the ground and not in operation, provided that the applicable Grantor shall maintain insurance against risk of loss or damage to such Propeller in an amount at least equal to the Agreed Value for such Propeller during such period that it is on the ground and not in operation.

C.  War-Risk, Hijacking and Allied Perils Insurance.

If the applicable Grantor shall at any time operate or propose to operate the Propeller (i) in any area of recognized hostilities or (ii) on international routes and war-risk, hijacking or allied perils insurance is maintained by the applicable Grantor with respect to other aircraft owned or operated by the applicable Grantor on such routes or in such areas, the applicable Grantor shall maintain war-risk, hijacking and related perils insurance of substantially the same type carried by major United States commercial air carriers operating the same or comparable models of aircraft on similar routes or in such areas and in no event in an amount less than the Agreed Value.

D.  General Provisions.

Any policies of insurance carried in accordance with Sections A, B and C, including any policies taken out in substitution or replacement for such policies:

in the case of Section A, shall name the Collateral Agent and each other Secured Party (collectively, the "Additional Insureds"), as an additional insured, as its interests may appear;

shall apply worldwide subject to standard territorial restrictions or limitations applicable in the Lloyd's of London Insurance Market at the time the policy is issued (except only in the case of war, hijacking and related perils insurance required under Section C, which shall apply to the fullest extent available in the international insurance market);

shall provide that, in respect of the coverage of the Additional Insureds in such policies, the insurance shall not be invalidated by any act or omission (including misrepresentation and

Annex 3A - 13

nondisclosure) by the applicable Grantor which results in a breach of any term, condition or warranty of the polices, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission. However, the coverage afforded the Additional Insured will not apply in the event of exhaustion of policy limits or to losses or claims arising from perils specifically excluded from coverage under the policies;

shall provide that, if the insurers cancel such insurance for any reason whatsoever, or if any material change is made in the insurance policies by insurers which adversely affects the interest of any of the Additional Insureds, such cancellation or change shall not be effective as to the Additional Insureds for thirty (30) days (seven (7) days in the case of war risk, hijacking and allied perils insurance and ten (10) days in the case of nonpayment of premium) after receipt by the Additional Insureds of written notice by such insurers of such cancellation or change, <u>provided</u> that, if any notice period specified above is not reasonably obtainable, such policies shall provide for as long a period of prior notice as shall then be reasonably obtainable;

shall waive any rights of setoff (including for unpaid premiums), recoupment, counterclaim or other deduction, whether by attachment or otherwise, against each Additional Insured;

shall waive any right of subrogation against any Additional Insured;

shall be primary without right of contribution from any other insurance that may be available to any Additional Insured;

shall provide that all of the liability insurance provisions thereof, except the limits of liability, shall operate in all respects as if a separate policy had been issued covering each party insured thereunder;

shall provide that none of the Additional Insureds shall be liable for any insurance premium; and

shall contain a 50/50 Clause per Lloyd's Aviation Underwriters' Association Standard Policy Form AVS 103 or U.S. market equivalent.

E. <u>Reports and Certificates; Other Information.</u>

On the date of delivery of any Mortgage Supplement or Pledge Supplement with respect to each Propeller constituting Collateral, and on or prior to each renewal date of the insurance policies required hereunder, the applicable Grantor will furnish or cause to be furnished to the Collateral Agent insurance certificates describing in reasonable detail the commercial insurance maintained by the applicable Grantor hereunder and a report, signed by the applicable Grantor's regularly retained independent insurance broker (the "<u>Insurance Broker</u>"), stating the opinion of such Insurance Broker that (a) all premiums in connection with the commercial insurance then due have been paid and (b) such insurance complies with the terms of this <u>Appendix I</u>. To the extent such agreement is reasonably obtainable the applicable Grantor will also cause the Insurance Broker to agree to advise the Secured Parties in writing of any default in the payment of any premium and of any other act or omission on the part of the applicable Grantor of which it has knowledge and which might invalidate or render unenforceable, in whole or in part, any commercial insurance on such Propeller or cause the cancellation or termination of such insurance, and to advise the Secured Parties in writing at least thirty (30) days (seven (7) days in the case of war-risk and allied perils coverage and ten (10) days in the case of nonpayment of premium, or such shorter period as may be available in the international insurance market, as the case may be) prior to the cancellation or material adverse change of any commercial insurance maintained pursuant to this <u>Appendix I</u>.

F. <u>Right to Pay Premiums.</u>

The Additional Insureds shall have the rights but not the obligations of an additional named insured. None of the Collateral Agent or the other Additional Insureds shall have any obligation to pay any premium, commission, assessment or call due on any such insurance (including reinsurance). Notwithstanding the foregoing, in the event of cancellation of any insurance due to the nonpayment of premiums, the Collateral Agent shall have the option, as directed by the Required Lenders, to pay any such premium in respect of

WEIL:\97681611\4\13173.0005

the Propeller that is due in respect of the coverage pursuant to this Agreement and to maintain such coverage, as the Collateral Agent or the Appropriate Party may require, until the scheduled expiry date of such insurance and, in such event, the applicable Grantor shall, upon demand, reimburse the Collateral Agent or any Lender for amounts so paid by it, together with interest therein at the Default Rate from the date of payment.

      G.  <u>Salvage Rights; Other</u>.

All salvage rights to each Propeller shall remain with the applicable Grantor's insurers at all times, and any insurance policies of the Collateral Agent insuring any Propeller shall provide for a release to the applicable Grantor of any and all salvage rights in and to any Propeller.

Annex 3A - 15

**[FORM OF MORTGAGE SUPPLEMENT]**

**FAA MORTGAGE**

THIS FAA MORTGAGE dated _____ (herein, this "FAA <u>Mortgage</u>") made by [_____], a [_____] (together with its permitted successors and assigns, the "<u>Grantor</u>"), in favor of The Bank of New York Mellon, as the Collateral Agent (together with its successors and permitted assigns, the "<u>Collateral Agent</u>").

**W I T N E S S E T H :**

WHEREAS, the Amended and Restated Horizon Aircraft, Engine and Propeller Pledge and Security Agreement, dated as of October 30, 2020 and filed for recordation with the FAA Registry pursuant to and in accordance with the provisions of Section 44107 of the Transportation Code on September 28, 2020 at 8:17 A.M., C.D.T. (herein called the "<u>PSA</u>"; capitalized terms used herein but not defined shall have the meaning ascribed to them in the PSA), between the Grantors and the Collateral Agent, provides for the execution and delivery of this FAA Mortgage substantially in the form hereof, which shall particularly describe certain collateral, and shall specifically mortgage the same to the Collateral Agent;

WHEREAS, the PSA was entered into between the Grantors and the Collateral Agent in order to secure the Secured Obligations; and

WHEREAS, the Grantors wish to supplement the PSA and to subject the Aircraft and Engine Assets described in <u>Exhibit A</u> hereto to the security interest created by the PSA by execution and delivery of this FAA Mortgage, and by reference herein to the terms of the PSA which are hereby made a part hereof, and this FAA Mortgage is being filed for recordation on the date hereof with the FAA pursuant to Title 49 by the FAA at Oklahoma City, Oklahoma;

NOW, THEREFORE, THIS FAA MORTGAGE , in order to secure the prompt payment and performance of the Secured Obligations from time to time outstanding and to secure the performance and observance by the Grantor[s] and each of the other Credit Parties of all the agreements, covenants and provisions contained in the Loan Documents for the benefit of the Secured Parties, the Grantor[s] has/have mortgaged, assigned, pledged, hypothecated, transferred, conveyed and granted, and does hereby mortgage, assign, pledge, hypothecate, transfer, convey and grant, unto the Collateral Agent, for the security and benefit of the Secured Parties, a continuing first priority security interest in all right, title and interest of the Grantors in, to and under the following described property:

1. The Propellers as further described on <u>Exhibit A</u> hereto, in each case together with any and all Parts of whatever nature, which are from time to time included within the definitions of "Propeller", including all substitutions, renewals and replacements of and additions, improvements, accessions and accumulations to each such Propeller (other than additions, improvements, accessions and accumulations which constitute appliances, parts, instruments, appurtenances, accessories, furnishings or other equipment excluded from the definition of Parts) and all Propeller Documents relating to each such Propeller.

TO HAVE AND TO HOLD all and singular the aforesaid property unto the Collateral Agent, its successors and assigns, for the uses and purposes and subject to the terms and provisions set forth in the PSA.

This FAA Mortgage shall be governed by, and construed in accordance with, the law of the State of New York.

This FAA Mortgage shall be construed in every way in accordance to the terms of the PSA and as a part thereof, and the PSA is hereby incorporated by reference herein and is hereby ratified, approved and confirmed.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Grantor[s] has/have caused this FAA Mortgage to be duly executed by one of its officers, thereunto duly authorized, on the day and year first above written.

[_____]

By: _____
    Name:
    Title:

Annex 3A - 18

Motion for TRO Ex. 9 Page 298

EXHIBIT A
TO
FAA MORTGAGE

THE PROPELLERS:

| No. | Propeller Model | Propeller Serial No. |
|-----|-----------------|----------------------|
| 1. | [●] | [●] |

Each of the above listed Propellers is capable of absorbing 750 or more "rated take-off shaft horsepower."

Annex 3A - 19

<u>Exhibit B to Annex 3A</u>

### FORM OF OFFICER'S CERTIFICATE

[●], 202[●]

Reference is made to that certain Amended and Restated Horizon Aircraft, Engine and Propellers Pledge and Security Agreement, dated as of the date hereof (the "<u>Agreement</u>"), between Horizon Air Industries, Inc., a Washington corporation (the "<u>Company</u>"), as the Grantor, and The Bank of New York Mellon, as Collateral Agent.  Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Agreement.

The undersigned is a duly authorized Responsible Officer of the Company and I hereby certify, solely in my capacity as a Responsible Officer of the Company, and not in my individual capacity, on the date hereof that:

1.  The Company is an "air carrier" within the meaning of Section 40102 of Title 49 and holds a certificate under Section 40102 of Title 49;

2.  The Company has exclusive title in all Aircraft and Engine Assets and Propeller Assets listed in <u>Schedule I</u> attached hereto.

3.  The information supplied by the Company with respect to the Aircraft and Engine Assets and the Propeller Assets included in <u>Schedule I</u> and corresponding information in <u>Schedule 2.1</u> to the Agreement is true, correct and complete on and as of the date hereof.

4.  Each Aircraft or Airframe listed on <u>Schedule I</u> has been duly registered in the name of the applicable Company under Chapter 441 of the Transportation Code.  An airworthiness certificate has been duly issued under Chapter 447 of the Transportation Code with respect to each Aircraft and Airframe listed on <u>Schedule I</u>.  Each of the Aircraft and Airframes listed on <u>Schedule I</u> corresponds to an Aircraft or Airframe specified in <u>Schedule 2.1</u> to the Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Motion for TRO Ex. 9 Page 300

The undersigned hereby certifies, in his or her capacity as a Responsible Officer of the Company and not in his or her individual capacity, each and every matter contained herein to be true and correct as of the date first written above.

**[●]**

By:  _____
Name:
Title:

WEIL:\97681611\4\13173.0005

## Schedule I

1.  Aircraft/Airframes

[●] aircraft more specifically described below:

|   | Aircraft Model | Aircraft Generic Model | Airframe Serial No. | U.S. Registration No. |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |

2.  Engines

[●] engines as more specifically described below:

|   | Engine Model | Engine Generic Model | Engine Serial No. |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |

Each of the above described Engines is of 550 or more "rated take-off horsepower" or the equivalent of such horsepower.

3.  Propellers

[●] propellers as more specifically described below:

|   | Propeller Model | Propeller Serial No. | Propeller Location |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |

Each Propeller is capable of absorbing 750 or more "rated take-off shaft horsepower".

WEIL:\97681611\4\13173.0005

Motion for TRO Ex. 9 Page 302

Annex 3B (Aircraft and Engine Assets)

Each Grantor and the Collateral Agent hereby agree that the terms of this Annex shall apply with respect to Collateral consisting of Aircraft and Engine Assets.

1. **Perfection Requirement**.  The following requirements shall be included in the definition of "Perfection Requirement" and shall constitute an additional "Perfection Requirement" with respect to Collateral consisting of Aircraft and Engine Assets:

   (a)   The applicable Grantor, at its sole cost and expense, shall on or within one (1) Business Day after the Closing Date or the date of execution of any Pledge Supplement:

   (i)   execute and deliver, or cause to be executed and delivered, the Mortgage Supplements in form and substance satisfactory to the Appropriate Party;

   (ii)   duly prepare and file, or cause to be duly prepared and filed, the FAA Filed Documents for recordation with the FAA in accordance with Title 49 and the regulations thereunder; and

   (iii)   duly prepare and make, or cause to be duly prepared and made, all registrations of the International Interests with respect to such Collateral in the International Registry.

   (b)   The applicable Grantor, at is sole cost and expense, will on or within a commercially reasonable time after the Closing Date or the date of execution of any Pledge Supplement, as applicable, cause to be affixed to, and maintained in, the cockpit of all Airframes constituting Collateral and on all Engines constituting Collateral, in a clearly visible location, a placard of a reasonable size and shape bearing the legend: "Subject to a security interest in favor of The Bank of New York Mellon, as Collateral Agent for the benefit of the Secured Parties."

2. **Required Filings**.  Each of the following filings, recordings or other documents shall be included in the definition of "Required Filing" and shall constitute an additional "Required Filing" with respect to Collateral consisting of Aircraft and Engine Assets:

   (a)   Filing of an FAA Filed Document with respect to such Collateral with the FAA; and

   (b)   Registration of each International Interest with respect to such Collateral in the International Registry.

3. **Representations and Warranties**.  Each Grantor (as applicable) represents and warrants, on the Closing Date and on the date of each Borrowing (or, in the case of an Additional Grantor or Additional Collateral, including any Additional Airframe or Additional Engine, on the date of such Grantor's execution and delivery of a Pledge Supplement, or the date such Additional Collateral becomes subject to the security interest created hereby, as applicable):

   (a)   <u>Schedule 2.1</u> sets forth all Aircraft and Engine Assets constituting Collateral.  Each Grantor that is listed as owner in Schedule 2.1 is the registered owner as shown in FAA records, and the registration of each Airframe constituting Collateral has not expired.

   (b)   <u>Necessary Filings</u>.  Upon (x) the filing of UCC financing statements (and continuation statements at periodic intervals) with respect to the security and other interests created

Annex 3B - 1

hereby under the UCC as in effect in any applicable jurisdiction, (y) the recording and the filing of each Mortgage Supplement in the office of the FAA pursuant to Title 49 and (z) the registration of each International Interest in the International Registry, in each case, with respect to each Airframe and Engine constituting Collateral, (i) all filings, registrations and recordings necessary in the United States or in the International Registry to create, preserve, protect and perfect the security interest granted by the Grantors to the Collateral Agent hereby in respect of the Collateral have been accomplished or, as to Collateral to become subject to the security interest of this Agreement after the date hereof, will be so filed, registered and recorded simultaneously with such Collateral being subject to the Lien of this Agreement and (ii) the security interest granted to the Collateral Agent pursuant to this Agreement in and to the Collateral will constitute a perfected security interest therein prior to the rights of all other Persons therein, but subject to no other Liens (other than Permitted Liens), and is entitled to all the rights, priorities and benefits afforded by Title 49, the Cape Town Treaty, and any other applicable Law to perfected security interests or Liens.

(c)     <u>Other Filings or Registrations</u>.  There is no registration covering or purporting to cover any interest of any kind in Airframes and Engines constituting Collateral (other than Permitted Liens), and there are no International Interests registered on the International Registry in respect of such.  Each Grantor will not execute or authorize or permit to be filed in any public office any registration covering International Interests on the International Registry (other than the Lien created under this Agreement and the related Mortgage Supplement(s)) relating to such Collateral or location.

(d)     All Engines constituting Collateral have been first placed in service after October 22, 1994.

(e)     All Airframes constituting Collateral are equal to or less than 20 years old on the date that the relevant Airframes are first pledged as Collateral.

(f)     All Airframes constituting Collateral have been duly certified by the FAA as to type and airworthiness.

(g)     All Engines constituting Collateral have been duly certified by the FAA as to type.

(h)     All Airframes are registered and all Engines are habitually located, as applicable, in the United States.

4.   **Covenants**. Each Grantor (as applicable) covenants and agrees that:

*Filings and Registrations*

(a)     Such Grantor (as applicable) will take, or cause to be taken, at such Grantor's cost and expense, such action with respect to the recording, filing, re-recording and refiling of each Mortgage Supplement in the office of the FAA, pursuant to Title 49, and such other documents in such other places as may be required or desirable under any applicable Law, and any other instruments, or registrations on the International Registry, as are necessary or desirable by the Appropriate Party or the Collateral Agent, to maintain the existence, perfection, priority and preservation of the Lien created by this Agreement, the related Mortgage Supplement(s) and the International Interests of the Collateral Agent in the Aircraft and Engines Assets constituting Collateral.  The Grantors will furnish to the Collateral Agent timely notice of the necessity or desirability of such action, together with, if requested by the Collateral Agent, such instruments, in execution form, and such other

Annex 3B - 2

information as may be required to enable the Collateral Agent to take such action or otherwise requested by the Appropriate Party.

*Possession, Operation and Use, Maintenance, Registration and Markings.*

(b)     <u>General</u>. Except as otherwise expressly provided herein, it shall be entitled to operate, use, locate, employ or otherwise utilize or not utilize any Airframe, Engine or Part in any lawful manner or place in accordance with such Grantor's business judgment.

(c)     <u>Possession</u>.  It shall not lease or otherwise in any manner deliver, transfer or relinquish possession of any Airframe or Engine, or install any Engine, or permit any Engine to be installed, on any airframe other than an Airframe, in each case, to the extent constituting Collateral; except that the applicable Grantor may, so long as no Event of Default has occurred:

(i)     Deliver possession of any Airframe, Engine or Part constituting Collateral (x) to the Manufacturer thereof or to any third-party maintenance provider for testing service, repair, maintenance or overhaul work on such Airframe, Engine or Part, or, to the extent required or permitted by <u>Section 4(k)</u> of this Annex, for alterations or modifications in or additions to such Airframe or Engine or (y) to any Person for the purpose of transport to a Person referred to in the preceding clause (x); <u>provided</u> that such Grantor covenants to promptly pay when due any payment obligation resulting in a mechanic's or other Lien related to such testing service, repair, maintenance, overhaul, alternation, modification, addition or transport;

(ii)     Transfer possession of the Aircraft, Airframe or any Engine constituting Collateral to the U.S. Government, in which event such Grantor shall promptly notify the Appropriate Party of any such transfer of possession and, in the case of any transfer pursuant to CRAF, in such notification shall identify by name, address and telephone numbers the Contracting Office Representative or Representatives for the Military Airlift Command of the United States Air Force to whom notices must be given and to whom requests or claims must be made to the extent applicable under CRAF; and

(iii)     Install an Engine on an airframe owned (including any Airframe) or leased by such Grantor; <u>provided</u> that upon such installation, such Grantor shall be deemed to covenant to the Collateral Agent for the benefit of the Secured Parties that such installation shall not result in any material impairment (as compared to if such Engine had not so been installed) of the Collateral Agent's rights and remedies in respect of such Engine and access in connection therewith and to comply with the Appropriate Party's requests in furtherance of the exercise of such rights and remedies (including access).  With respect to this clause (c)(iii), (A) the Collateral Agent hereby agrees on behalf of the Secured Parties, and for the benefit of each lessor, conditional seller, indenture trustee or secured party of any airframe leased to, or owned by, the applicable Grantor subject to a lease, conditional sale, trust indenture or other security agreement that the Collateral Agent, on behalf of the Secured Parties, will not acquire or claim, as against such lessor, conditional seller, indenture trustee or secured party, any right, title or interest in such airframe as the result of any Engine being installed on such airframe at any time while such airframe is subject to such lease, conditional sale, trust indenture or other security agreement and (B) such Grantor shall cause any lessor, conditional seller, indenture trustee or secured party of any airframe leased to, or owned by, the

Annex 3B - 3

applicable Grantor subject to any lease, conditional sale, trust indenture or other security agreement to acknowledge that it will not acquire or claim, as against the Collateral Agent or any other Secured Parties, any right, title or interest in an Engine as the result of such Engine being installed on such airframe at any time which such airframe is subject to such lease, conditional sale, trust indenture or other security agreement.

(d)     <u>Operation and Use</u>. It shall not operate, use or locate such Airframe or Engine, or allow such Airframe or Engine to be operated, used or located, (i) in any area excluded from coverage by any insurance required by any Loan Document, except in the case of a requisition by the U.S. Government where the Grantors obtain indemnity in lieu of such insurance from the U.S. Government, or insurance from the U.S. Government, against substantially the same risks and for at least the amounts of insurance required by any Loan Document covering such area, or (ii) in any recognized area of hostilities unless covered in accordance with this Annex by war risk insurance, or in either case unless the Airframe or Engine is only temporarily operated, used or located in such area as a result of an emergency, equipment malfunction, navigational error, hijacking, weather condition or other similar unforeseen circumstance, so long as such Grantor diligently and in good faith proceeds to remove such Airframe or Engine from such area. No Grantor shall permit such Airframe or Engine to be used, operated, maintained, serviced, repaired or overhauled (x) in violation of any applicable Law or (y) in violation of any airworthiness certificate, license or registration of any Governmental Authority relating to such Airframe or Engine, except to the extent the validity or application of any such law or requirement relating to any such certificate, license or registration is being contested in good faith by such Grantor in any reasonable manner which does not involve any material risk of the sale, forfeiture or loss of such Airframe or Engine, any material risk of criminal liability or material civil penalty against the Collateral Agent or any Secured Party or impair the Appropriate Party's security interest in such Airframe or Engine.

(e)     <u>Maintenance and Repair</u>. It shall cause all Aircraft and Engine Assets to be maintained, serviced, repaired and overhauled in accordance with maintenance standards required by or substantially equivalent to those required by the FAA so as to keep such Aircraft and Engine Assets in such operating condition as may be necessary to enable the applicable airworthiness certification of such Airframe or, in the case of any Engine that is installed on an Aircraft, the applicable Aircraft to be maintained under the regulations of the FAA. Each Grantor further agrees that each Airframe or Engine constituting Collateral will be maintained, used, serviced, repaired, overhauled or inspected in compliance with applicable Laws with respect to the maintenance of the Airframes and Engines and in compliance with each applicable airworthiness certificate, license and registration relating to such Airframe or Engine issued by the applicable Aviation Authority.

(f)     <u>Registration</u>. It shall cause each Airframe to remain duly registered in its name under Title 49, except as otherwise expressly permitted under any Loan Document.

(g)     <u>Markings</u>. The placards described under "Perfection Requirement" in this Annex may be removed temporarily, if necessary, in the course of maintenance of the Airframes and Engines. If any such placard is damaged or becomes illegible, the applicable Grantor shall promptly replace it with a placard complying with the requirements of this Annex. If the Collateral Agent is replaced or its name is changed, such Grantor shall replace such placards with new placards reflecting the correct name of the Collateral Agent promptly

Annex 3B - 4

after such Grantor receives notice of such replacement or change (in any event within fifteen (15) days).

*Replacement of Parts, Alterations, Modification and Additions.*

(h)     Replacement of Parts. Except as otherwise provided herein, so long as the security interest created herein has not been released in accordance with the Loan Agreement, each applicable Grantor, at its own cost and expense, will, at its own cost and expense, promptly replace (or cause to be replaced) all Parts which may from time to time be incorporated or installed in or attached to such Airframe or Engine and which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use for any reason whatsoever. In addition, each Grantor may, at its own cost and expense, remove in the ordinary course of maintenance, service, repair, overhaul or testing any Parts, whether or not worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use; provided, however, that such Grantor, except as otherwise provided herein, at its own cost and expense, will, promptly replace such Parts.  All replacement parts shall be free and clear of all Liens, except Permitted Liens and shall be in as good an operating condition and have a value and utility not less than the value and utility of the Parts replaced (assuming such replaced Parts were in the condition required hereunder).

(i)     Parts Subject to Lien. Except as otherwise provided herein, any Part at any time removed from an Airframe or Engine shall remain subject to the security interest created in this Agreement, no matter where located, until such time as such Part shall be replaced by a part that has been incorporated or installed in or attached to such Airframe or Engine and that meets the requirements for replacement parts specified above. Immediately upon any replacement part becoming incorporated or installed in or attached to such Airframe or Engine as provided in this Annex, without further act, (i) the replaced Part shall thereupon be free and clear of all rights of the Collateral Agent and shall no longer be deemed a Part hereunder and (ii) such replacement part shall become subject to this Agreement and be deemed part of such Airframe or Engine, as the case may be, for all purposes hereof to the same extent as the Parts originally incorporated or installed in or attached to such Airframe or Engine.

(j)     [Reserved.]

(k)     Alterations, Modifications and Additions.  It shall make alterations and modifications in and additions to each Airframe and Engine as may be required to be made from time to time to meet the applicable standards of the FAA, to the extent made mandatory in respect of such Airframe or Engine (a "**Mandatory Alteration**"); provided, however, that each Grantor may, in good faith and by appropriate procedure, contest the validity or application of any law, rule, regulation or order in any reasonable manner which does not materially adversely affect the Appropriate Party's interest in such Airframe or Engine and does not involve any material risk of sale, forfeiture or loss of such Airframe or Engine or the interest of the Appropriate Party therein, or any material risk of material civil penalty or any material risk of criminal liability being imposed on the Collateral Agent or any Secured Party.  In addition, each Grantor, at its own expense, may from time to time make such alterations and modifications in and additions to any Airframe or Engine (each an "**Optional Alteration**") as such Grantor may deem desirable in the proper conduct of its business including the removal of Parts which such Grantor deems are obsolete or no longer suitable or appropriate for use in such Airframe or Engine ("**Obsolete Parts**");

provided, however, that no such Optional Alteration to an Airframe or Engine shall (i) materially diminish the fair market value, utility or remaining useful life of such Airframe or Engine below its fair market value, utility or remaining useful life immediately prior to such Optional Alteration (assuming such Airframe or Engine was in the condition required by this Agreement immediately prior to such Optional Alteration) or (ii) cause such Airframe to cease to have the applicable standard certificate of airworthiness. All Parts incorporated or installed in or attached to any Airframe or Engine as the result of any alteration, modification or addition effected by each applicable Grantor shall be free and clear of any Liens except Permitted Liens and become subject to the Lien of this Agreement; provided that such Grantor may, at any time so long as any Airframe or Engine is subject to the Lien of this Agreement, remove any Part (such Part being referred to herein as a "**Removable Part**") from such Airframe or Engine if (i) such Part is in addition to, and not in replacement of or in substitution for, any Part originally incorporated or installed in or attached to such Airframe or Engine at the time of original delivery thereof by the Manufacturer or any Part in replacement of, or in substitution for, any such original Part, (ii) such Part is not required to be incorporated or installed in or attached or added to such Airframe or Engine pursuant to the terms of this Annex and (iii) such Part can be removed from such Airframe or Engine without materially diminishing the fair market value, utility or remaining useful life which such Airframe or Engine would have had at the time of removal had such removal not been effected by such Grantor, assuming such Airframe or Engine was otherwise maintained in the condition required by this Agreement and such Removable Part had not been incorporated or installed in or attached to such Airframe or Engine. Upon the removal by any applicable Grantor of any such Removable Part or Obsolete Part as above provided, (A) title thereto shall, without further act, be free and clear of all rights of the Collateral Agent and (B) such Removable Part or Obsolete Part shall no longer be deemed a Part hereunder.

*Loss, Destruction or Requisitions: Addition of Airframes and Engines.*

(l)    Event of Loss.  Upon the occurrence of an Event of Loss with respect to an Airframe or an Engine:

    (i)    each applicable Grantor shall promptly upon obtaining knowledge of such Event of Loss (and in any event within fifteen (15) Business Days after such occurrence) give the Collateral Agent written notice of such Event of Loss.

    (ii)    prior to the occurrence of a Recovery Event with respect to such Airframe or Engine, each applicable Grantor shall have the right to replace and substitute such Airframe or Engine in accordance with Sections 4(p) and 4(q) of this Annex, as applicable.

    (iii)    each Grantor shall comply with the applicable requirements of Section 2.06(b)(ii) of the Loan Agreement with respect to any Recovery Event relating to such Event of Loss, and upon such compliance, the Airframe or Engine suffering such Event of Loss shall be released from the Lien of this Agreement.

(m)    Requisition for Use. In the event of a requisition for use by any Governmental Authority or a CRAF activation of an Airframe, Engine (whether or not installed on an Airframe), or engine installed on such Airframe while such Airframe is subject to the Lien of this Agreement, each applicable Grantor shall promptly notify the Collateral Agent of such requisition or activation and all of such Grantor's obligations under this Agreement and the Loan Agreement shall continue to the same extent as if such requisition or activation

WEIL:\97681611\4\13173.0005

had not occurred and shall not be reduced or delayed by such requisition or activation. So long as no Event of Default shall have occurred and be continuing, any payments received by the Collateral Agent or any Grantor from such Governmental Authority with respect to such requisition of use or activation may be paid over to, or retained by, such Grantor and shall not be required to be paid over to the Collateral Agent to hold as Collateral.

(n)    <u>Conditions to Addition of Airframe</u>.  When any Grantor (including any Additional Grantor) is granting a security interest to the Collateral Agent for the benefit of the Secured Parties in an additional Airframe (an "**Additional Airframe**") pursuant to the requirements under the Loan Documents, such Grantor shall, at such Grantor's sole cost and expense, fulfill the following conditions:

(i)    an executed counterpart of a Pledge Supplement covering such Additional Airframe;

(ii)    an executed counterpart of a Mortgage Supplement (in form and substance satisfactory to the Appropriate Party) covering such Additional Airframe, which shall have been duly filed for recordation pursuant to the Act or such other applicable Law or as required under the terms of this Agreement;

(iii)    each applicable Grantor shall have furnished to the Collateral Agent such evidence of compliance with the insurance provisions of this Annex with respect to such Additional Airframe;

(iv)    (A) the Additional Airframe shall have been duly certified by the FAA as to type and airworthiness, (B) application for registration of the Additional Airframe in accordance with the terms of this Annex shall have been duly made with and granted by the FAA and each applicable Grantor shall own and have the authority to operate the Additional Airframe and (C) each applicable Grantor shall have caused the sale of such Additional Airframe to the such Grantor (if occurring after February 28, 2006) and the International Interest granted under the Mortgage Supplement in favor of the Collateral Agent for the benefit of the Secured Parties with respect to such Additional Airframe, each to be registered on the International Registry as a sale or an International Interest, respectively;

(v)    the Collateral Agent and the Appropriate Party, at the expense of the Grantors, shall have received (A) an opinion of counsel, reasonably satisfactory to the Appropriate Party and addressed to the Secured Parties, to the effect that this Agreement creates a valid security interest in each applicable Grantor's interest in the Additional Airframe, the Secured Parties will be entitled to the benefits of Section 1110 of the U.S. Bankruptcy Code with respect to the Additional Airframe and a UCC filing has been filed with respect thereto resulting in a perfected security interest to the extent the UCC is applicable and (B) an opinion of such Grantor's aviation law counsel reasonably satisfactory to and addressed to the Appropriate Party as to the due registration of any such Additional Airframe and the due filing for recordation of the Mortgage Supplement with respect to such Additional Airframe under the Act and any other applicable Law, and the perfection and first priority (other than with respect to any Liens permitted under the Loan Agreement) of the security interest in the Additional Airframe, granted to the Appropriate Party hereunder and the registration with the International Registry of the sale of such Additional Airframe, to such Grantor (if occurring after

Annex 3B - 7

February 28, 2006) and the International Interest granted under the Mortgage Supplement with respect to such Additional Airframe;

(vi)    the Grantors shall have delivered an Appraisal of such Additional Airframe to the Appropriate Party and, if such Additional Airframes were delivered to such grantor by the manufacturers within ninety (90) days prior to the date such Additional Airframe is added as Collateral, in an officer's certificate attesting to the foregoing; and

(vii)    the Grantors shall have taken such other actions and furnished such other certificates and documents as the Appropriate Party may require in order to assure that the Additional Airframe is duly and properly subjected to the Lien of this Agreement.

(o)    <u>Conditions to Addition of Engine</u>. When any Grantor (including any Additional Grantor) is granting a security interest to the Collateral Agent for the benefit of the Secured Parties in an additional Engine (an "**Additional Engine**") pursuant to the requirements under the Loan Documents, such Grantor shall, at such Grantor's sole cost and expense, fulfill the following conditions:

(i)    an executed counterpart of a Pledge Supplement covering such Additional Engine;

(ii)    an executed counterpart of a Mortgage Supplement covering the Additional Engine, which shall have been duly filed for recordation pursuant to the Act;

(iii)    such Grantor shall have furnished to the Appropriate Party such evidence of compliance with the insurance provisions of this Agreement with respect to such Additional Engine;

(iv)    such Grantor shall have furnished to the Collateral Agent and the Appropriate Party an opinion of counsel from counsel satisfactory to the Appropriate Party to the effect that (A) this Agreement creates a valid security interest in such Grantor's interest in the Additional Engine and (B) the Secured Parties will have the benefits of Section 1110 of the U.S. Bankruptcy Code with respect to the Additional Engine, and a UCC filing has been filed with respect thereto resulting in a perfected security interest to the extent the UCC is applicable;

(v)    such Grantor shall have furnished to the Appropriate Party an opinion of such Grantor's aviation law counsel satisfactory to the Appropriate Party as to the due filing for recordation of the Mortgage Supplement with respect to such Additional Engine under the Act or any other applicable Law, and the perfection and first priority (other than with respect to any Permitted Lien) of the security interest in the Additional Engine granted to the Appropriate Party hereunder, and the registration with the International Registry of the sale to the Grantors of such Additional Engine (if occurring after February 28, 2006) and the International Interest granted under such Mortgage Supplement with respect to such Additional Engine;

(vi)    such Grantor shall have caused the sale of such Additional Engine to such Grantor (if occurring after February 28, 2006) and the International Interest granted under such Mortgage Supplement in favor of the Appropriate Party with respect to such

Annex 3B - 8

Additional Engine each to be registered on the International Registry as a sale or an International Interest, respectively;

(vii)   such Grantor shall have delivered an Appraisal of such Additional Engine to the Appropriate Party and, if such Additional Engine were delivered new to such Grantor by the manufacturers within ninety (90) days prior to the date such Additional Engine is added as Collateral, in an officer's certificate attesting to the foregoing; and

(viii)   such Grantor shall have taken such other actions and furnished such other certificates and documents as the Appropriate Party may require in order to assure that the Additional Engine is duly and properly subjected to the Lien of this Agreement.

Promptly after the recordation of the Mortgage Supplement or other requisite documents or instruments covering such Additional Engine, if any, pursuant to the Act, the Grantors shall cause to be delivered to the Appropriate Party an opinion of counsel, satisfactory in form and substance to the Appropriate Party, as to the due recordation of the Mortgage Supplement or other requisite documents or instruments covering such Additional Engine and the perfection and first priority (other than with respect to any Liens permitted under the Loan Agreement) of the security interest in such Additional Engine granted to the Appropriate Party hereunder.

(p)   <u>Substitution of Airframes</u>.

(i)   Each Grantor shall have the right at its option at any time, on at least five (5) days' prior notice to the Collateral Agent and the Appropriate Party, at such Grantor's sole cost and expense, to substitute an Additional Airframe to replace any Airframe (such replaced Airframe, the "**Replaced Airframe**") (including, if so elected by such Grantor, in satisfaction of any applicable obligations in relation to an Event of Loss with respect to such Airframe prior to the occurrence of a related Recovery Event) in accordance with the requirements of Section 6.17(b)(iii) of the Loan Agreement and <u>Section 4(n)</u> of this Annex. Such Additional Airframe shall be an airframe manufactured by the Manufacturer of the Replaced Airframe that is the same model as the Replaced Airframe, or an improved model, and that has a value and utility (without regard to hours and cycles remaining until overhaul) at least equal to the Replaced Airframe (assuming that such Airframe had been maintained in accordance with this Agreement (and, as applicable, had not suffered such Event of Loss), which value and utility shall be established by an Appraisal delivered pursuant to the terms of this Agreement; <u>provided</u>, that, until an Appraisal is obtained for such Additional Airframe, it shall be deemed to have the same Appraised Value of zero).

(ii)   Each Grantor's right to make a substitution hereunder shall be subject to the delivery of (A) a written request from the applicable Grantor, requesting release of the Replaced Airframe from Collateral and specifically describing such Airframe and (B) a certificate of a Responsible Officer of such Grantor providing:

1.   a description of the Replaced Airframe which shall be identified by Manufacturer, model, FAA registration number and Manufacturer's serial number;

Annex 3B - 9

2.  a description of the Additional Airframe (including the Manufacturer, model, FAA registration number and manufacturer's serial number) to be received as consideration for the Replaced Airframe;

3.  that on the date of the Mortgage Supplement relating to the Additional Airframe, such Grantor will be the legal owner of such Additional Airframe free and clear of all Liens (other than the Lien under this Agreement and Permitted Liens), and that such Additional Airframe has been duly registered in the name of such Grantor under Chapter 441 of the Transportation Code and that an airworthiness certificate has been duly issued under Chapter 447 of the Transportation Code with respect to such Additional Airframe, and that such registration and certificate is in full force and effect, and that such Grantor has the full right and authority to use such Additional Airframe;

4.  that the insurance required by this Agreement is in full force and effect with respect to such Additional Airframe and all premiums then due thereon have been paid in full;

5.  that no Event of Default has occurred and is continuing or would result from the making and granting of the request for release and the addition of such Additional Airframe; and

6.  that the conditions set forth in Section 6.17(b)(iii) of the Loan Agreement and <u>Section 4(n)</u> of this Annex have been satisfied after giving effect to such substitution (it being understood and agreed, for the avoidance of doubt, that any reference in Section 6.17(b)(iii) of the Loan Agreement to existing Additional Collateral shall include such Replaced Airframe).

(iii)   Immediately upon the satisfaction of conditions set forth in this <u>Section 4(p)</u> of this Annex and without further act, (A) the Replaced Airframe shall thereupon be released from and be free and clear of the Lien of this Agreement and shall no longer be deemed Collateral and (B) such Additional Airframe shall become subject to this Agreement as an Airframe and as Collateral.

(q)   <u>Substitution of Engines</u>.

(i)   Each Grantor shall have the right at its option at any time, on at least five (5) days' prior notice to the Collateral Agent and the Appropriate Party, at such Grantor's sole cost and expense, to substitute an Additional Engine to replace any Engine (such replaced Engine, the "**Replaced Engine**") (including, if so elected by such Grantor, in satisfaction of any applicable obligations in relation to an Event of Loss with respect to such Engine) in accordance with the requirements of Section 6.17(b)(iii) of the Loan Agreement and <u>Section 4(o)</u> of this Annex. Such Additional Engine shall be an engine manufactured by the Manufacturer of the Replaced Engine that is the same model as the Replaced Engine, or an improved model, and that has a value and utility (without regard to hours and cycles remaining until overhaul) at least equal to the Replaced Engine (assuming that the Replaced Engine had been maintained in accordance with this Agreement (and, as applicable, had not suffered such Event of Loss), which value and utility shall be established by an Appraisal delivered pursuant to the terms of this Agreement;

WEIL:\97681611\4\13173.0005

provided, that, until an Appraisal is obtained for such Additional Engine, it shall be deemed to have the same Appraised Value of zero).

(ii)     Each Grantor's right to make a substitution hereunder shall be subject to the delivery of (A) a written request from the applicable Grantor, requesting release of the Replaced Engine from Collateral and specifically describing the Replaced Engine and (B) a certificate of a Responsible Officer of such Grantor providing:

1.  a description of the Replaced Engine which shall be identified by Manufacturer's name and serial number;

2.  a description of the Additional Engine (including the Manufacturer's name and serial number) to be received as consideration for the Replaced Engine;

3.  that on the date of the Mortgage Supplement relating to the Additional Engine, such Grantor will be the legal owner of such Additional Engine free and clear of all Liens (other than the Lien under this Agreement and Permitted Liens);

4.  that the insurance required by this Agreement is in full force and effect with respect to such Additional Engine and all premiums then due thereon have been paid in full;

5.  that no Event of Default has occurred and is continuing or would result from the making and granting of the request for release and the addition of such Additional Engine; and

6.  that the conditions set forth in Section 6.17(b)(iii) of the Loan Agreement and Section 4(o) of this Annex have been satisfied after giving effect to such substitution (it being understood and agreed, for the avoidance of doubt, that any reference in Section 6.17(b)(iii) of the Loan Agreement to existing Additional Collateral shall include such Replaced Engine).

(iii)     Immediately upon the satisfaction of conditions set forth in this Section 4(q) of this Annex and without further act, (A) the Replaced Engine shall thereupon be released from and be free and clear of the Lien of this Agreement and shall no longer be deemed Collateral and (B) such Additional Engine shall become subject to this Agreement as an Engine and as Collateral.

*Insurance.*

(r)     Each applicable Grantor shall furnish to the Collateral Agent such evidence of compliance with the insurance provisions of this Annex with respect to Airframe and Engines constituting Collateral.

(s)     Each Grantor shall ensure that at all times the Collateral Agent, for the benefit of the Secured Parties, shall be named as an additional insured and lender loss payee with respect to the insurance policies referenced in Appendix I with respect to any Aircraft and Engine Assets constituting Collateral and take any other steps required under this Annex.

Annex 3B - 11

(t)     Obligation to Insure. Each Grantor (as applicable) shall comply with, or cause to be complied with, each of the provisions of Appendix I to this Annex, which provisions are hereby incorporated by this reference as if set forth in full herein.

(u)     Insurance for Own Account. Nothing in this Annex shall limit or prohibit (i) any Grantor's from maintaining the policies of insurance required under Appendix I of this Annex with higher coverage than those specified in Appendix I, or (ii) the Collateral Agent or any other Additional Insured from obtaining, upon the occurrence of an Event of Default, at the Grantors' expense, insurance for its own account (and any proceeds payable under such separate insurance shall be payable as provided in the policy relating thereto); provided, however, that no insurance may be obtained or maintained that would limit or otherwise adversely affect the coverage of any insurance required to be obtained or maintained by any Grantor pursuant to this Annex and Appendix I of this Annex.

(v)     Application of Insurance Proceeds. As between each applicable Grantor and the Collateral Agent, all insurance proceeds received as a result of the occurrence of an Event of Loss with respect to any Airframe or Engine constituting Collateral at the time of such receipt shall be applied in accordance with Section 2.06(b) of the Loan Agreement.

5.  **Defaults and Remedies**.  If any Event of Default shall have occurred and be continuing, without limiting the generality of Section 8.1 of this Agreement, the Collateral Agent may:

(a)     Exercise all of the rights and remedies of a secured party under the UCC and the Cape Town Treaty.

6.  **Release of Collateral**.  Each Grantor and the Collateral Agent agree that

(a)     Upon satisfaction and completion, as determined by the Appropriate Party, of the conditions for release of any Aircraft and Engine Assets constituting Collateral from the Lien granted hereby in accordance with to Section 6.17(b)(iii) of the Loan Agreement such Replaced Airframe or Replaced Engine, as the case may be, shall be released from the Lien granted under this Agreement, and the Collateral Agent will thereupon execute and deliver to the applicable Grantor, at such Grantor's sole expense, all appropriate UCC termination statements and other documents that such Grantor shall reasonably request to evidence such release and shall take necessary action to permit such Grantor to register with the International Registry the discharge of the International Interest created by this Agreement in such released Aircraft and Engine Assets, Replaced Airframe or Replaced Engine. The Collateral Agent shall have no liability whatsoever to any Secured Party as a result of its execution of any such documentation with respect to any such release. The release of an Airframe or Engine from the Lien of this Agreement shall have effect without further action of releasing all other Collateral, including the related Airframe Documents and Engine Documents, respectively, relating to such released Airframe or Engine.

7.  **Miscellaneous**.  Each Grantor and the Collateral Agent agree that:

(a)     The terms of this Annex shall be deemed incorporated into and part of this Agreement.

(b)     The terms of this Annex are cumulative in nature and shall not limit the applicability or scope of the other terms of this Agreement.

(c)     It is the intention of the parties that the Appropriate Party shall be entitled to the benefits of Section 1110 with respect to the right to take possession of the Airframes and Engines

WEIL:\97681611\4\13173.0005

as provided herein in the event of a case under Chapter 11 of the Bankruptcy Code in which the Grantors are debtor, and in any instance where more than one construction is possible of the terms and conditions hereof or any other pertinent Loan Document, each such party agrees that a construction which would preserve such benefits shall control over any construction which would not preserve such benefits.

(d)     The applicable Grantor shall deliver to the Collateral Agent a certificate from a Responsible Officer of such Grantor in the form set forth in Exhibit B hereto, dated as of the Closing Date (and, in the case of such Grantor's execution and delivery of a Mortgage Supplement or Pledge Supplement, the date thereof) which shall contain representations that such Grantor (i) is an "air carrier" within the meaning of Section 40102 of Title 49 and holds a certificate under Section 40102 of Title 49, (ii) has exclusive title in all Aircraft and Engine Assets constituting Collateral, and (iii) each Airframe constituting Collateral has been duly registered in the name of the Grantors under Chapter 441 of the Transportation Code and an airworthiness certificate has been duly issued under Chapter 447 of the Transportation Code with respect to each Airframe constituting Collateral.

8.   **Terms**.  The following capitalized terms used in this Annex shall have the following meanings:

(a)     "**Additional Insureds**" is defined in <u>Appendix I</u> to this Annex.

(b)     "**Aircraft**" shall mean, in the case of any Engine, the Airframe or airframe on which such Engine is then installed (if any).

(c)     "**Aircraft and Engine Assets**" shall mean:

(i)     Each Airframe as the same is now and will hereafter be constituted, together with (a) all Parts of whatever nature, which are from time to time included within the definition of "Airframe", including all substitutions, renewals and replacements of and additions, improvements, accessions and accumulations to the Airframes (other than additions, improvements, accessions and accumulations which constitute appliances, parts, instruments, appurtenances, accessories, furnishings or other equipment excluded from the definition of Parts) and (b) all Airframe Documents owned by, or in the possession of, the applicable Grantor;

(ii)    Each Engine as the same is now and will hereafter be constituted, and whether or not any such Engine shall be installed on or attached to an Airframe or any other airframe, together with (a) all Parts of whatever nature, which are from time to time included within the definition of "Engines", including all substitutions, renewals and replacements of and additions, improvements, accessions and accumulations to the Engines (other than additions, improvements, accessions and accumulations which constitute appliances, parts, instruments, appurtenances, accessories, furnishings or other equipment excluded from the definition of Parts) and (b) all Engine Documents owned by, or in the possession of, the applicable Grantor;

(iii)   Any continuing rights of any Grantor in respect of any warranty, indemnity or agreement, express or implied, as to title, materials, workmanship, design or patent infringement with respect to such Airframes or Engines (reserving in each case to the Grantors, however, all of the Grantors' other rights and interest in and to such warranty, indemnity or agreement) together in each case under this clause with all rights, powers, privileges, options and other benefits of such Grantor thereunder

Annex 3B - 13

(subject to such reservations) with respect to such Airframes or Engines, including the right to make all waivers and agreements, to give and receive all notices and other instruments or communications, to take such action upon the occurrence of a default thereunder, including the commencement, conduct and consummation of legal, administrative or other proceedings, as shall be permitted thereby or by law, and to do any and all other things which such Grantor is or may be entitled to do thereunder (subject to such reservations);

(iv)    All General Intangibles which are owned by such Grantor (including the General Intangibles described on <u>Schedule 2.1</u>) relating to Aircraft and Engine Assets described in the foregoing; and

(v)    All Insurance with respect to any of the foregoing.

(d)    [Reserved].

(e)    "**Airframe**" means (a) each airframe that is identified by Manufacturer model, United States registration number and Manufacturer's serial number in <u>Schedule 2.1</u> or in the initial Mortgage Supplement or any subsequent Mortgage Supplement or any subsequent Pledge Supplement, in each case, executed and delivered by any Grantor and (b) any and all Parts incorporated or installed in or attached or appurtenant to such airframe, and any and all Parts removed from such airframe, unless the Lien of this Agreement shall not be applicable to such Parts in accordance with <u>Section 4</u> of this Annex, but excluding any such airframe that has subsequently been released from the Lien of this Agreement pursuant to the Loan Agreement.

(f)    "**Airframe Documents**" means, with respect to any Airframe, all technical data, manuals and log books, and all inspection, modification and overhaul records and other service, repair, maintenance and technical records that are required by the FAA (or the relevant Aviation Authority), to be maintained with respect to such Airframe, and such term shall include all additions, renewals, revisions and replacements of any such materials from time to time made, or required to be made, by the FAA (or other Aviation Authority) regulations, and in each case in whatever form and by whatever means or medium (including any microfiche, microfilm, paper or computer disk) such materials may be maintained or retained by or on behalf of the applicable Grantor; <u>provided</u> that such term shall not include manuals and data relating to aircraft generally of the same fleet type as the Airframe as opposed to the Airframe specifically.

(g)    "**Aviation Authority**" means, in the case of any Aircraft or Airframe, the FAA or, if such Aircraft or Airframe is permitted to be, and is, registered with any other Governmental Authority, such other Governmental Authority.

(h)    [Reserved].

(i)    [Reserved].

(j)    "**CRAF**" means the Civil Reserve Air Fleet Program established pursuant to 10 U.S.C. Section 9511-13 or any similar substitute program.

(k)    "**Engine**" means (a) each of the engines identified by Manufacturer, model and Manufacturer's serial number in <u>Schedule 2.1</u> or in the initial Mortgage Supplement or any subsequent Mortgage Supplement or any subsequent Pledge Supplement, in each case,

Annex 3B - 14

executed and delivered by any Grantor and whether or not from time to time installed on an Airframe or installed on any other airframe, and (b) any and all Parts incorporated or installed in or attached or appurtenant to such engine, and any and all Parts removed from such engine, unless the Lien created hereunder shall not apply to such Parts in accordance with <u>Section 4</u> of this Annex, but excluding any such engine that has subsequently been released from the Lien in accordance with the terms of this Agreement.

(l)      "**Engine Documents**" means, with respect to any Engine, all technical data, manuals and log books, and all inspection, modification and overhaul records and other service, repair, maintenance and technical records that are required by the FAA (or the relevant Aviation Authority), to be maintained with respect to such Engine, and such term shall include all additions, renewals, revisions and replacements of any such materials from time to time made, or required to be made, by the FAA (or other Aviation Authority) regulations, and in each case in whatever form and by whatever means or medium (including any microfiche, microfilm, paper or computer disk) such materials may be maintained or retained by or on behalf of any Grantor; <u>provided</u> that such term shall not include manuals and data relating to engines generally of the same type as the Engine as opposed to the Engine specifically.

(m)     "**Event of Loss**" means with respect to any Airframe or Engine, any of the following circumstances, conditions or events with respect to such property, for any reason whatsoever:

      (i)     the destruction of such property, damage to such property beyond economic repair or rendition of such property permanently unfit for normal use by the applicable Grantor;

      (ii)    the actual or constructive total loss of such property or any damage to such property, or requisition of title or use of such property, which results in an insurance settlement with respect to such property on the basis of a total loss or constructive or compromised total loss;

      (iii)   any theft, hijacking or disappearance of such property for a period of one hundred and eighty (180) consecutive days or more; or

      (iv)   any seizure, condemnation, confiscation, taking or requisition (including loss of title) of such property by any Governmental Authority or purported Governmental Authority for a period exceeding one hundred and eighty (180) consecutive days.

(n)     "**FAA Filed Document**" shall mean the Mortgage Supplement executed by a Grantor.

(o)     "**International Interest**" shall mean an "international interest" as defined in the Cape Town Treaty.

(p)     [Reserved].

(q)     "**Mandatory Alteration**" shall have the meaning given in this Annex.

(r)     "**Manufacturer**" shall mean, with respect to any Airframe, Engine or Part, the manufacturer thereof.

Annex 3B - 15

(s)  "**Mortgage Supplement**" shall mean an FAA Mortgage, substantially in the form of <u>Exhibit A</u> to this Annex, with appropriate modifications to reflect the purpose for which it is being used in form and substance satisfactory to the Appropriate Party.

(t)  "**Obsolete Part**" shall have the meaning given in <u>Section 4(j)</u> of this Annex.

(u)  "**Optional Alteration**" shall have the meaning given in <u>Section 4(j)</u> of this Annex.

(v)  "**Parts**" means all appliances, parts, components, instruments, appurtenances, accessories, furnishings, seats and other equipment of whatever nature (other than Engines or engines), that may from time to time be installed or incorporated in or attached or appurtenant to any Airframe or any Engine or removed therefrom unless the Lien created under this Agreement shall not be applicable to such Parts in accordance with <u>Section 4</u> of this Annex.

WEIL:\97681611\4\13173.0005

## APPENDIX I

## INSURANCE

A.  <u>Liability Insurance</u>.

1.  Except as provided in <u>Section A.2</u> below, the applicable Grantor will carry at all times, at no expense to the Collateral Agent or any Secured Party, commercial airline legal liability insurance (including any passenger liability, property damage, baggage liability, cargo and mail liability, hangarkeeper's liability and contractual liability insurance) with respect to each Airframe and Engine (including, as applicable, in respect of an applicable Aircraft or airframe on which an Engine is then installed) which is (i) in an amount not less than the amount of commercial airline legal liability insurance from time to time applicable to aircraft (and airframes and engines) owned or leased and operated by the applicable Grantor of the same type and operating on similar routes as such aircraft, airframe or engine and (ii) of the type and covering the same risks as from time to time applicable to aircraft operated by the applicable Grantor of the same type as such Aircraft, airframe or engine; and (iii) maintained in effect with insurers of nationally or internationally recognized responsibility (such insurers being referred to herein as "<u>Approved Insurers</u>").

2.  During any period that an Aircraft, Airframe or Engine is on the ground and not in operation, the applicable Grantor may carry, in lieu of the insurance required by <u>Section A.1</u> above, insurance otherwise conforming with the provisions of said <u>Section A.1</u> except that (i) the amounts of coverage shall not be required to exceed the amounts of liability and property damage insurance from time to time applicable to aircraft owned or operated by the applicable Grantor of the same type as such Aircraft, Airframe or Engine which is on the ground and not in operation and (ii) the scope of the risks covered and the type of insurance shall be the same as from time to time shall be applicable to aircraft, airframes or engines, as applicable, owned or operated by the applicable Grantor of the same type which are on the ground and not in operation by the applicable Grantor on the ground, not in operation, and stored or hangared.

B.  <u>Hull Insurance</u>.

1.  Except as provided in <u>Section B.2</u> below, the applicable Grantor will carry, at no expense to the Collateral Agent or any Secured Party, with Approved Insurers "all-risk" aircraft hull insurance covering the Airframes and Engines (including when the Engine is not installed on any airframe) which is of the type as from time to time applicable to airframes and engines owned by the applicable Grantor of the same type as such Airframe or Engine for an amount denominated in United States Dollars not less than, for each Aircraft, Airframe or Engine, 100% of the Appraised Value (which, as applicable based on the relevant Appraisal, may at the applicable Grantor's option be a combined value for an Aircraft comprised of its Airframe and associated Engines, or separate such values for any Airframe or Engine) as set forth in the most recent Appraisal delivered pursuant to the Loan Agreement before the date (or renewal date) of the applicable insurance policies (the "<u>Agreed Value</u>"), or, prior to the delivery of the initial Appraisal covering such Aircraft, Airframe or Engine, the applicable "Agreed Value" set forth in the initial insurance certificate delivered with respect thereto, but in no event, in all cases, less than applicable replacement value (as reasonably determined by the applicable Grantor and its insurers); and in each case such insurance shall include all-risk property damage insurance covering Engines temporarily removed from an Aircraft and Parts while temporarily removed from

any Airframe or Engine, in each case and not replaced by similar components for not less than the replacement value thereof which are of the type as from time to time applicable to components owned by the applicable Grantor of the same type as such Engine and Parts for an amount denominated in United States Dollars (which replacement value shall, for an Engine with a separate Agreed Value pursuant to the foregoing, be not less than such Agreed Value).

All losses will be adjusted by the applicable Grantor with the insurers; provided, however, that during a period when an Event of Default shall have occurred and be continuing, the applicable Grantor shall not agree to any such adjustment without the consent of the Appropriate Party.

Any policies of insurance carried in accordance with this Section B.1 or Section C covering any Aircraft, Airframe or Engine and any policies taken out in substitution or replacement for any such policies shall provide that insurance proceeds under such policies shall be payable directly to the Collateral Agent for prompt deposit into a Collateral Proceeds Account if such insurance proceeds are in respect of an Event of Loss. The Collateral Agent shall be entitled to notify an insurer that such insurance proceeds shall be paid directly to the Collateral Agent as provided in the immediately preceding sentence.

For the avoidance of doubt, this Section B.1 shall not prohibit standard deductibles or industry standard self-insured retentions for hull insurance carried by the applicable Grantor.

2.  During any period that an Aircraft, Airframe or Engine is on the ground and not in operation, the applicable Grantor may carry, in lieu of the insurance required by Section B.1 above, insurance otherwise conforming with the provisions of said Section B.1 except that the scope of the risks and the type of insurance shall be the same as from time to time applicable to aircraft owned by the applicable Grantor of the same type as such Aircraft, Airframe or Engine similarly on the ground and not in operation, provided that the applicable Grantor shall maintain insurance against risk of loss or damage to such Aircraft, Airframe or Engine in an amount at least equal to the Agreed Value for such Aircraft, Airframe or Engine during such period that it is on the ground and not in operation.

C.  War-Risk, Hijacking and Allied Perils Insurance.

If the applicable Grantor shall at any time operate or propose to operate the Aircraft, Airframe or any Engine (i) in any area of recognized hostilities or (ii) on international routes and war-risk, hijacking or allied perils insurance is maintained by the applicable Grantor with respect to other aircraft owned or operated by the applicable Grantor on such routes or in such areas, the applicable Grantor shall maintain war-risk, hijacking and related perils insurance of substantially the same type carried by major United States commercial air carriers operating the same or comparable models of aircraft on similar routes or in such areas and in no event in an amount less than the Agreed Value.

D.  General Provisions.

Any policies of insurance carried in accordance with Sections A, B and C, including any policies taken out in substitution or replacement for such policies:

in the case of Section A, shall name the Collateral Agent and each other Secured Party (collectively, the "Additional Insureds"), as an additional insured, as its interests may appear;

shall apply worldwide subject to standard territorial restrictions or limitations applicable in the Lloyd's of London Insurance Market at the time the policy is issued (except only in the case of war,

WEIL:\97681611\4\13173.0005

hijacking and related perils insurance required under Section C, which shall apply to the fullest extent available in the international insurance market);

shall provide that, in respect of the coverage of the Additional Insureds in such policies, the insurance shall not be invalidated by any act or omission (including misrepresentation and nondisclosure) by the applicable Grantor which results in a breach of any term, condition or warranty of the polices, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission. However, the coverage afforded the Additional Insured will not apply in the event of exhaustion of policy limits or to losses or claims arising from perils specifically excluded from coverage under the policies;

shall provide that, if the insurers cancel such insurance for any reason whatsoever, or if any material change is made in the insurance policies by insurers which adversely affects the interest of any of the Additional Insureds, such cancellation or change shall not be effective as to the Additional Insureds for thirty (30) days (seven (7) days in the case of war risk, hijacking and allied perils insurance and ten (10) days in the case of nonpayment of premium) after receipt by the Additional Insureds of written notice by such insurers of such cancellation or change, provided that, if any notice period specified above is not reasonably obtainable, such policies shall provide for as long a period of prior notice as shall then be reasonably obtainable;

shall waive any rights of setoff (including for unpaid premiums), recoupment, counterclaim or other deduction, whether by attachment or otherwise, against each Additional Insured;

shall waive any right of subrogation against any Additional Insured;

shall be primary without right of contribution from any other insurance that may be available to any Additional Insured;

shall provide that all of the liability insurance provisions thereof, except the limits of liability, shall operate in all respects as if a separate policy had been issued covering each party insured thereunder;

shall provide that none of the Additional Insureds shall be liable for any insurance premium; and

shall contain a 50/50 Clause per Lloyd's Aviation Underwriters' Association Standard Policy Form AVS 103 or U.S. market equivalent.

E.   Reports and Certificates; Other Information.

On or prior to the Closing Date or on the date of delivery of any Pledge Supplement with respect to each Airframe and Engine constituting Collateral, and on or prior to each renewal date of the insurance policies required hereunder, the applicable Grantor will furnish or cause to be furnished to the Collateral Agent insurance certificates describing in reasonable detail the commercial insurance maintained by the applicable Grantor hereunder and a report, signed by the applicable Grantor's regularly retained independent insurance broker (the "Insurance Broker"), stating the opinion of such Insurance Broker that (a) all premiums in connection with the commercial insurance then due have been paid and (b) such insurance complies with the terms of this Appendix I. To the extent such agreement is reasonably obtainable the applicable Grantor will also cause the Insurance Broker to agree to advise the Secured Parties in writing of any default in the payment of any premium and of any other act or omission on the part of the applicable Grantor of which it has knowledge and which might invalidate or render unenforceable, in whole or in part, any commercial insurance on such Airframe or Engine or cause the cancellation or termination of such insurance, and to advise the Secured Parties in writing at least thirty (30) days (seven (7) days in the case of war-risk and allied perils coverage and ten (10) days in the case of nonpayment of premium, or such shorter period as may be available in the international insurance market, as the case may be) prior to the cancellation or material adverse change of any commercial insurance maintained pursuant to this Appendix I.

F.   Right to Pay Premiums.

Annex 3B - 19

The Additional Insureds shall have the rights but not the obligations of an additional named insured. None of the Collateral Agent or the other Additional Insureds shall have any obligation to pay any premium, commission, assessment or call due on any such insurance (including reinsurance). Notwithstanding the foregoing, in the event of cancellation of any insurance due to the nonpayment of premiums, the Collateral Agent shall have the option, as directed by the Required Lenders, to pay any such premium in respect of the Aircraft that is due in respect of the coverage pursuant to this Agreement and to maintain such coverage, as the Collateral Agent or the Appropriate Party may require, until the scheduled expiry date of such insurance and, in such event, the applicable Grantor shall, upon demand, reimburse the Collateral Agent or any Lender for amounts so paid by it, together with interest therein at the Default Rate from the date of payment.

      G. <u>Salvage Rights; Other</u>.

All salvage rights to each Airframe and Engine shall remain with the applicable Grantor's insurers at all times, and any insurance policies of the Collateral Agent insuring any Airframe or Engine shall provide for a release to the applicable Grantor of any and all salvage rights in and to any Airframe and Engine.

Annex 3B - 20

**[FORM OF MORTGAGE SUPPLEMENT]**

**FAA MORTGAGE**

THIS FAA MORTGAGE dated _____ (herein, this "FAA <u>Mortgage</u>") made by [_____], a [_____] (together with its permitted successors and assigns, the "<u>Grantor</u>"), in favor of The Bank of New York Mellon, as the Collateral Agent (together with its successors and permitted assigns, the "<u>Collateral Agent</u>").

**W I T N E S S E T H:**

WHEREAS, the Amended and Restated Horizon Aircraft, Engine and Propeller Pledge and Security Agreement, dated as of October 30, 2020 and filed for recordation with the FAA Registry pursuant to and in accordance with the provisions of Section 44107 of the Transportation Code on September 28, 2020 at 8:17 A.M., C.D.T. (herein called the "<u>PSA</u>"; capitalized terms used herein but not defined shall have the meaning ascribed to them in the PSA), between the Grantors and the Collateral Agent, provides for the execution and delivery of this FAA Mortgage substantially in the form hereof, which shall particularly describe certain collateral, and shall specifically mortgage the same to the Collateral Agent;

WHEREAS, the PSA was entered into between the Grantors and the Collateral Agent in order to secure the Secured Obligations; and

WHEREAS, the Grantors wish to supplement the PSA and to subject the Aircraft and Engine Assets described in <u>Exhibit A</u> hereto to the security interest created by the PSA by execution and delivery of this FAA Mortgage, and by reference herein to the terms of the PSA which are hereby made a part hereof, and this FAA Mortgage is being filed for recordation on the date hereof with the FAA pursuant to Title 49 by the FAA at Oklahoma City, Oklahoma;

NOW, THEREFORE, THIS FAA MORTGAGE , in order to secure the prompt payment and performance of the Secured Obligations from time to time outstanding and to secure the performance and observance by the Grantors and each of the other Credit Parties of all the agreements, covenants and provisions contained in the Loan Documents for the benefit of the Secured Parties, the Grantor[s] has/have mortgaged, assigned, pledged, hypothecated, transferred, conveyed and granted, and does hereby mortgage, assign, pledge, hypothecate, transfer, convey and grant, unto the Collateral Agent, for the security and benefit of the Secured Parties, a continuing first priority security interest in all right, title and interest of the Grantor[s] in, to and under the following described property:

2. [The Airframes as further described on <u>Exhibit A</u> hereto, in each case together with any and all Parts of whatever nature, which are from time to time included within the definitions of "Airframe", including all substitutions, renewals and replacements of and additions, improvements, accessions and accumulations to each such Airframe (other than additions, improvements, accessions and accumulations which constitute appliances, parts, instruments, appurtenances, accessories, furnishings or other equipment excluded from the definition of Parts) and all Airframe Documents relating to each such Airframe; and

3. The Engines as further described on <u>Exhibit A</u> hereto, in each case together with any and all Parts of whatever nature, which are from time to time included within the definition of "Engines",

including all substitutions, renewals and replacements of and additions, improvements, accessions and accumulations to each such Engine (other than additions, improvements, accessions and accumulations which constitute appliances, parts, instruments, appurtenances, accessories, furnishings or other equipment excluded from the definition of Parts) and all Engine Documents relating to each such Engine.][6]

TO HAVE AND TO HOLD all and singular the aforesaid property unto the Collateral Agent, its successors and assigns, for the uses and purposes and subject to the terms and provisions set forth in the PSA.

This FAA Mortgage shall be governed by, and construed in accordance with, the law of the State of New York.

This FAA Mortgage shall be construed in every way in accordance to the terms of the PSA and as a part thereof, and the PSA is hereby incorporated by reference herein and is hereby ratified, approved and confirmed.

[remainder of page intentionally left blank]

---

[6] Note to Form: Revise as appropriate to reflect what is listed on Exhibit A.

Annex 3B-22

IN WITNESS WHEREOF, the Grantor[s] has/have caused this FAA Mortgage to be duly executed by one of its officers, thereunto duly authorized, on the day and year first above written.

[_____]

By: _____
     Name:
     Title:

EXHIBIT A
TO
FAA MORTGAGE

THE AIRFRAMES:

| No. | Owner | U.S. Registration No. | Airframe Manufacturer | Airframe Model | Airframe Serial No. |
|---|---|---|---|---|---|
| 1. | [●] | [●] | [●] | [●] | [●] |

THE ENGINES:

| No. | Manufacturer | Model | Generic Manufacturer and Model | Manufacturer's Serial No. |
|---|---|---|---|---|
| 1. | [●] | [●] | [●] | [●] |

(Each of which Engines having at least 550 rated takeoff horsepower or the equivalent thereof).

WEIL:\97681611\4\13173.0005

Motion for TRO Ex. 9 Page 326

<u>Exhibit B to Annex 3B</u>

## FORM OF OFFICER'S CERTIFICATE

[●], 202[●]

Reference is made to that certain Amended and Restated Horizon Aircraft, Engine and Propellers Pledge and Security Agreement, dated as of the date hereof (the "<u>Agreement</u>"), between Horizon Air Industries, Inc., a Washington corporation (the "<u>Company</u>"), as the Grantor, and The Bank of New York Mellon, as Collateral Agent.  Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Agreement.

The undersigned is a duly authorized Responsible Officer of the Company and I hereby certify, solely in my capacity as a Responsible Officer of the Company, and not in my individual capacity, on the date hereof that:

1.  The Company is an "air carrier" within the meaning of Section 40102 of Title 49 and holds a certificate under Section 40102 of Title 49;

2.  The Company has exclusive title in all Aircraft and Engine Assets and Propeller Assets listed in <u>Schedule I</u> attached hereto.

3.  The information supplied by the Company with respect to the Aircraft and Engine Assets and the Propeller Assets included in <u>Schedule I</u> and corresponding information in <u>Schedule 2.1</u> to the Agreement is true, correct and complete on and as of the date hereof.

4.  Each Aircraft or Airframe listed on <u>Schedule I</u> has been duly registered in the name of the applicable Company under Chapter 441 of the Transportation Code.  An airworthiness certificate has been duly issued under Chapter 447 of the Transportation Code with respect to each Aircraft and Airframe listed on <u>Schedule I</u>.  Each of the Aircraft and Airframes listed on <u>Schedule I</u> corresponds to an Aircraft or Airframe specified in <u>Schedule 2.1</u> to the Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Motion for TRO Ex. 9 Page 327

The undersigned hereby certifies, in his or her capacity as a Responsible Officer of the Company and not in his or her individual capacity, each and every matter contained herein to be true and correct as of the date first written above.

**[●]**


By:    _____
Name:
Title:

**Schedule I**

4.   Aircraft/Airframes

[●] aircraft more specifically described below:

|  | Aircraft Model | Aircraft Generic Model | Airframe Serial No. | U.S. Registration No. |
|---|---|---|---|---|
| 1. |  |  |  |  |
| 2. |  |  |  |  |
| 3. |  |  |  |  |
| 4. |  |  |  |  |
| 5. |  |  |  |  |
| 6. |  |  |  |  |
| 7. |  |  |  |  |

5.   Engines

[●] engines as more specifically described below:

|  | Engine Model | Engine Generic Model | Engine Serial No. |
|---|---|---|---|
| 1. |  |  |  |
| 2. |  |  |  |
| 3. |  |  |  |
| 4. |  |  |  |
| 5. |  |  |  |
| 6. |  |  |  |
| 7. |  |  |  |

Each of the above described Engines is of 550 or more "rated take-off horsepower" or the equivalent of such horsepower.

6.   Propellers

[●] propellers as more specifically described below:

|  | Propeller Model | Propeller Serial No. | Propeller Location |
|---|---|---|---|
| 1. |  |  |  |
| 2. |  |  |  |
| 3. |  |  |  |
| 4. |  |  |  |
| 5. |  |  |  |
| 6. |  |  |  |
| 7. |  |  |  |

Each Propeller is capable of absorbing 750 or more "rated take-off shaft horsepower".

Annex 4 (Slots, Gates and Routes)

Each Grantor and the Collateral Agent hereby agree that the terms of this Annex shall apply with respect to Collateral consisting of SGR Assets and the Grantors of such Collateral.

1. **Perfection Requirement**.  The following requirements shall be included in the definition of "Perfection Requirement" and shall constitute an additional "Perfection Requirement":

    (a)    [Reserved].

2. **Required Filings**.  Each of the following financing statement, filing, recording or other document shall be included in the definition of "Required Filing" and shall constitute an additional "Required Filing":

    (a)    UCC financing statements for any SGR Assets constituting Collateral in such filing offices as the Appropriate Party deems advisable to perfect or protect the security interest set forth therein.

3. **Representations and Warranties**.  Each Grantor (as applicable) hereby represents and warrants, on the Closing Date and on the date of each Borrowing (or, in the case of an Additional Grantor or Additional Collateral, on the date of such Grantor's execution and delivery of a Pledge Supplement, or the date such Additional Collateral becomes subject to the security interest created hereby, as applicable):

    (a)    Schedule 2.1 sets forth (i) all Route Authorities that constitute Collateral, including the departing airport and the arriving airport for each such Route Authority, (ii) a true, correct and complete list of the Slots as of the date hereof (assuming full operation of the Route Authorities) and (iii) a copy of each certificate or order issued by the United States Department of Transportation (and any successor thereto) representing all Route Authorities constituting Collateral as of the date hereof.

    (b)    There are no filings, registrations or recordings under Title 49 necessary to create, preserve, protect or perfect the security interests granted by such Grantor to the Collateral Agent for the benefit of the Secured Parties in respect of the SGR Assets constituting Collateral.

    (c)    The Grantors hold their Pledged Gate Leaseholds being used for operation of the Scheduled Services pursuant to authority granted by the applicable Airport Authority or Foreign Aviation Authority, and there exists no material violation of the regulations, terms, conditions or limitations of the relevant Airport Authority or Foreign Aviation Authority applicable to any Pledged Gate Leasehold or any provision of law applicable to the Pledged Gate Leasehold that gives any applicable Airport Authority or Foreign Aviation Authority the right to terminate, cancel, withdraw or modify the rights of the Grantors in any such Pledged Gate Leasehold.

    (d)    Except for matters that would not reasonably be expected to result in a Material Adverse Effect or a Collateral Material Adverse Effect, no consent of any other party, and no consent, authorization, approval, or other action by, and (except in connection with the perfection of the Lien created in the SGR Assets) no notice to or filing with, any Governmental Authority or other Person is required either (x) for the pledge by the Grantors of the SGR Assets constituting Collateral pursuant to this Agreement or for the execution, delivery or performance of this Agreement or (y) for the exercise by the Collateral Agent of its rights and remedies in respect of the SGR Assets constituting

Annex 4 - 1

Motion for TRO Ex. 9 Page 330

Collateral; provided, however, that (A) the transfer of (other than the grant or pledge of a security interest in) the Route Authorities is subject to the consent of the DOT pursuant to Section 41105 of Title 49 and is subject to Presidential review pursuant to Section 41307 of Title 49, (B) the FAA Route Slots, if any, may not be transferred (other than the lease or trade of, or the grant or pledge of a security interest in, such FAA Route Slots), (C) the transfer of Gate Leaseholds may be subject to the foregoing actions by Governmental Authorities, Foreign Aviation Authorities or Airport Authorities, aviation authorities, air carriers or other lessors and (D) the transfer of Foreign Route Slots may be subject to approval by the applicable Foreign Aviation Authority or Airport Authorities. Section 4.1(f) and 4.1(h) of this Agreement shall be subject to, and deemed qualified by, the foregoing.

(e)     <u>Pledged Slots</u>.  Except for matters that would not reasonably be expected to result in a Material Adverse Effect or a Collateral Material Adverse Effect, and taking into account any waivers or other relief granted to the applicable Grantor by the applicable authorities, each Grantor holds its respective Pledged Slots pursuant to authority granted by the applicable Governmental Authorities and Foreign Aviation Authorities, and there exists no material violation by such Grantor of the terms, conditions or limitations of any rule, regulation or order of the applicable Governmental Authorities or Foreign Aviation Authorities regarding such Pledged Slots or any provisions of law applicable to such Pledged Slots that gives any applicable Governmental Authority or Foreign Aviation Authority the right to modify in any material respect, terminate, cancel or withdraw the rights of such Grantor in any such Pledged Slots to the extent such Governmental Authority or Foreign Aviation Authority would not have such right in the absence of such violation.

(f)     <u>Pledged Route Authorities</u>.  Each Grantor holds or co-holds the requisite authority to operate over such Grantor's Pledged Route Authorities pursuant to Title 49 and all rules and regulations promulgated thereunder, subject only to the regulations of the DOT, the FAA and the applicable Foreign Aviation Authorities and applicable treaties and bilateral and multilateral air transportation agreements, and there exists no material violation by such Grantor of any certificate or order issued by the DOT authorizing such Grantor to operate over such Pledged Route Authorities, the rules and regulations of any applicable Foreign Aviation Authority with respect to such Pledged Route Authorities or the provisions of Title 49 and rules and regulations promulgated thereunder applicable to such Pledged Route Authorities that gives the FAA, DOT or any applicable Foreign Aviation Authority the right to modify in any material respect, terminate, cancel or withdraw the rights of such Grantor in any such Pledged Route Authorities.

4.   **Covenants**. Each Grantor (as applicable) covenants and agrees that:

(a)     It shall promptly notify the Collateral Agent (which notice shall constitute notice required under Section 5.03 of the Loan Agreement) notice or knowledge of any violation of any applicable Laws or agreements with respect to the SGR Assets constituting Collateral or such Grantor's use thereof that could result in, or could reasonably be expected to result in, a Material Adverse Effect or a Collateral Material Adverse Effect.

(b)     [Reserved].

(c)     [Reserved].

(d)     It will at all times (i) possess and maintain all certificates, exemptions, licenses, permits, designations, authorizations, frequencies and consents required by the FAA, the DOT or

Annex 4 - 2

any applicable Foreign Aviation Authority or Airport Authority or any other Governmental Authority that are material to the operation of the Pledged Route Authorities and Pledged Slots operated by it, and to the conduct of its business and operations as currently conducted, in each case, to the extent necessary for the Grantors' operation of the Scheduled Services, (ii) maintain Pledged Gate Leaseholds sufficient to ensure its ability to operate the Scheduled Services and to preserve its right in and to its Pledged Slots, (iii) utilize its Pledged Slots in a manner consistent with applicable regulations, rules, foreign law and contracts in order to preserve its right to hold and use its Pledged Slots, taking into account any waivers or other relief granted to it by the FAA, the DOT, any Foreign Aviation Authority or any Airport Authority, (iv) cause to be done all things reasonably necessary to preserve and keep in full force and effect its rights in and to its Pledged Slots, including, without limitation, satisfying any applicable Use or Lose Rule, taking into account any waivers or other relief granted to it by the FAA, the DOT, any Foreign Aviation Authority or any Airport Authority, (v) utilize its Pledged Route Authorities in a manner consistent with Title 49, applicable foreign law, the applicable rules and regulations of the FAA, the DOT and any applicable Foreign Aviation Authorities, and any applicable treaty in order to preserve its rights to operate the Scheduled Services and (vi) cause to be done all things reasonably necessary to preserve and keep in full force and effect its authority to operate the Scheduled Services, except in each case, to the extent that any failure to do so would not reasonably be expected to result in a Material Adverse Effect or a Collateral Material Adverse Effect.  Without in any way limiting the foregoing, each Grantor will promptly take all such steps as may be necessary to obtain renewal of its Pledged Route Authorities from the DOT and any applicable Foreign Aviation Authorities, in each case to the extent necessary to operate the Scheduled Services, within a reasonable time prior to the expiration of such authority (as prescribed by law or regulation, if any), and promptly notify the Appropriate Party if it has been informed that such authority will not be renewed, except to the extent that any failure to take such steps would not reasonably be expected to result in a Material Adverse Effect or a Collateral Material Adverse Effect.  Each Grantor will pay any applicable filing fees and other expenses related to the submission of applications, renewal requests, and other filings as may be reasonably necessary to maintain or obtain its rights in its Pledged Route Authorities and have access to its Pledged Gate Leaseholds in each case to the extent necessary to operate the Scheduled Services.

(e)     It will not Dispose of any SGR Assets constituting Collateral except for:

    i.     Dispositions permitted by Section 6.04(b) or (c) of the Loan Agreement;

    ii.    exchanges of Slots in the ordinary course of business that in Grantor's reasonable judgment are of reasonably equivalent value (so long as the Slots received in such exchange are concurrently pledged under this Agreement and constitute Eligible Collateral, and such exchange would not result in a Material Adverse Effect or a Collateral Material Adverse Effect);

    iii.   the termination of leases or subleases or airport use or license agreements in the ordinary course of business to the extent such terminations do not have a Material Adverse Effect or a Collateral Material Adverse Effect;

    iv.    abandonment or return of Slots and Gate Leaseholds (A) required by the DOT, the FAA, Airport Authorities, Foreign Aviation Authorities or other Governmental Authority or (B) in the ordinary course of business consistent with past practices

Annex 4 - 3

and does not materially and adversely affect the business of the Parent and its Restricted Subsidiaries, taken as a whole and, in each case, which would not reasonably be expected to result in a Material Adverse Effect or a Collateral Material Adverse Effect; and

    v.    any leasing, licensing and use agreements with respect to assets and properties that constitute Slots or Gate Leaseholds in the ordinary course of business and swap agreements or similar arrangements with respect to Slots in the ordinary course of business and, in each case, which leasing, licensing and use agreement or swap agreement or similar agreement (A)(i)(x) has a term of one year or less, or does not extend beyond two comparable IATA traffic seasons (and contains no option to extend beyond either of such periods), or (y) if longer (including any option period), is expressly subject and subordinate to the rights (including remedies) of the Collateral Agent under this Agreement on terms reasonably satisfactory to the Collateral Agent (acting at the direction of the Appropriate Party), or (ii) is for purposes of operations by another airline operating under a brand associated with the applicable Grantor or otherwise operating routes at such Grantor's direction under a code share agreement, capacity purchase agreement, pro-rate agreement or similar arrangement between such airline and such Grantor, and (B) in each case, would not reasonably be expected to result in a Material Adverse Effect or a Collateral Material Adverse Effect; provided that, at any time, the aggregate of the most recently Appraised Value of such Slots and Gate Leaseholds subject to any leasing, licensing and use agreements at such time and of such Slots subject to any swap agreements or similar arrangements at such time, in each case permitted under clause (A)(i)(y) above, is no greater than the lesser of (x) $[•] or (y) [•]% of the most recently Appraised Value of the Collateral consisting of SGR Assets; and provided further that the applicable Grantor's rights under any such leasing, licensing, use, swap or similar agreement or arrangement shall constitute Collateral hereunder (but no representations or covenants shall apply in respect thereof).

(f)    Upon the request of the Collateral Agent (acting at the direction of the Appropriate Party), it shall use commercially reasonable efforts to deliver, in respect of each of the FAA Slots, undated slot transfer documents in form and substance reasonably satisfactory to the Collateral Agent (acting at the direction of the Appropriate Party) (considering any requirements by the DOT, the FAA and/or Airport Authority), executed in blank to be held in escrow by the Collateral Agent.

## 5.    Defaults and Remedies.

(a)    If any Event of Default shall have occurred and be continuing, without limiting the generality of Section 8.1 of this Agreement, the Collateral Agent may:

    i.    declare the entire right, title and interest of any Grantor in, to and under the SGR Assets constituting Collateral vested in the Collateral Agent, in which event such right, title and interest shall immediately vest in the Collateral Agent. Such Grantor agrees to execute and deliver such deeds of conveyance, assignments and other documents or instruments (including any notices or applications to the DOT, the FAA, applicable Foreign Aviation Authorities, Governmental Authorities or Airport Authorities having jurisdiction over any such SGR Assets constituting Collateral or the use thereof) necessary or advisable to effectuate the transfer of such SGR Assets constituting Collateral (and as requested by the Appropriate Party or the Collateral Agent), together

Annex 4 - 4

with copies of the certificates or orders issued by the DOT and the Foreign Aviation Authorities representing the same and any other rights of such Grantor with respect thereto, to any designee or designees selected by the Collateral Agent and approved by all necessary Governmental Authorities, Foreign Aviation Authorities and Airport Authorities (provided that if any of the foregoing is not permitted under the Law or by the DOT or applicable Governmental Authority, Foreign Aviation Authority or Airport Authority, the Collateral Agent for the benefit of the Secured Parties shall nevertheless continue to have all of such Grantor's right, title and interest in, to and under all of the Proceeds (of any kind) received or to be received by such Grantor upon the use, transfer or other disposition of such SGR Assets constituting Collateral); it being understood that each Grantor's obligation to deliver such SGR Assets constituting Collateral and such documents and instruments with respect thereto, subject to the aforesaid limitations, is of the essence of this Agreement;

ii.     require any Grantor, and each Grantor hereby agrees and covenants to, upon the occurrence and during the continuance of an Event of Default, use its reasonable best efforts to obtain all approvals and consents that would be required to transfer or assign all SGR Assets constituting Collateral as the Collateral Agent, acting on behalf of the Secured Parties, may designate; and

iii.    use the blank, undated, signed Slot transfer documents held in escrow (in form and substance reasonably satisfactory to the Collateral Agent (acting at the direction of the Appropriate Party) (considering any requirements by the DOT, the FAA and/or Airport Authority)) from time to time as a means to effectuate a transfer as contemplated herein.

(b)     Notwithstanding any other provision of this Agreement, subject to Section 5(a) of this Annex 4, if any Transfer Restriction applies to the transfer or assignment of (but not the creation of a security interest in) any of the right, title or interest referred to SGR Assets constituting Collateral, any provision of this Agreement permitting the Collateral Agent to cause the Grantors to transfer or assign to it or any other person any of the Grantors' right, title or interest in any such SGR Assets constituting Collateral (and any right the Collateral Agent may have under applicable law to do so by virtue of the security interest granted to it under this Agreement) shall be subject to such Transfer Restriction.

6.     **Release of Collateral**.  Each Grantor and the Collateral Agent agree that:

(a)     For the avoidance of doubt, (i) if any Slot ceases to be included in the SGR Assets constituting Collateral because it ceases to be actually utilized in connection with the Scheduled Services or any Foreign Gate Leasehold ceases to be included in the SGR Assets constituting Collateral because it ceases to be used for servicing the Scheduled Services relating to the airport at which such Foreign Gate Leasehold is located, such Slot or Foreign Gate Leasehold shall be automatically released from the Lien of this Agreement and (ii) subject to Section 5(b) of this Annex, if any FAA Slot or Foreign Slot now held or hereafter acquired by any Grantor becomes an FAA Route Slot or a Foreign Route Slot, respectively, or any right, title, privilege, interest and authority now held or hereafter acquired by such Grantor in connection with the right to use or occupy space in an airport terminal becomes a Foreign Gate Leasehold, such FAA Slot, Foreign Slot or right, title, privilege, interest and authority shall be automatically subject to the Lien of this Security Agreement.

Annex 4 - 5

(b)     Upon satisfaction and completion, as determined by the Appropriate Party, of the conditions for release of any SGR Assets constituting Collateral from the Lien granted hereby in accordance with Section 6.17(b)(iii) of the Loan Agreement, such SGR Assets shall be released from the Lien granted under this Agreement, and the Collateral Agent will thereupon execute and deliver to the applicable Grantor, at such Grantor's sole expense, all appropriate UCC termination statements and other documents that such Grantor shall reasonably request to evidence such release. The Collateral Agent shall have no liability whatsoever to any Secured Party as a result of its execution of any such documentation with respect to any such release.

(c)     In connection with any release of any SGR Assets constituting Collateral pursuant to this Section 6, the Collateral Agent will execute and deliver to the applicable Grantor, at such Grantor's sole expense, all appropriate UCC termination statements and other documents that such Grantor shall reasonably request to evidence such release.  The Collateral Agent shall have no liability whatsoever to any Secured Party as a result of any release of SGR Assets constituting Collateral by it as permitted by this Section 6.

7.   **Miscellaneous**.  Each Grantor and the Collateral Agent agree that:

(a)     The terms of this Annex shall be deemed incorporated into and part of this Agreement.

(b)     The terms of this Annex are cumulative in nature and shall not limit the applicability or scope of the other terms of this Agreement.

(c)     It is understood and agreed that, notwithstanding anything to the contrary in this Agreement (including Section 5.2(a)), Schedule 2.1(c) (Slots) is intended to be descriptive of the Slots listed on such Schedule as of the date hereof and shall not be construed as limiting in any way the SGR Assets constituting Collateral subject to this Agreement, except as may otherwise be expressly set forth herein.

(d)     Any amendment or modification of the Scheduled Services in Schedule 2.1 identified as of a certain date shall be in form and content similar to the information provided for such Collateral in Schedule 2.1 on the Closing Date.

8.   **Terms**.  The following capitalized terms used in this Annex shall have the following meanings:

(a)     "**Airport Authority**" means any city or any public or private board or other body or organization chartered or otherwise established for the purpose of administering, operating or managing an airport or related facilities.

(b)     "**Collateral Material Adverse Effect**" means a material adverse effect on the Appraised Value (as defined in the Loan Agreement) of the Collateral consisting of SGR Assets, taken as a whole.

(c)     "**Domestic Airport**" means any international airport located in the United States.

(d)     "**Domestic Gate Leasehold**" means, at any time of determination, all of the right, title, privilege, interest and authority of a Grantor to use or occupy space in an airport terminal at any Domestic Airport, in each case, to the extent necessary at the relevant time of determination for servicing the scheduled air carrier service authorized by a Route Authority relating to such airport.

Annex 4 - 6

Motion for TRO Ex. 9 Page 335

(e)    "**Excluded Asset**" means, solely for purposes of this Annex and any SGR Assets constituting Collateral, in lieu of the same term in the Agreement, (i) any asset of a Grantor, if, to the extent and only for so long as the grant of a Lien on such asset to secure the Secured Obligations is prohibited or otherwise restricted by, or requires additional action or consent (that has not been taken or obtained) under, any agreement (unless the counterparty of such agreement is an Affiliate of any Grantor) or applicable Law, or entitles any Governmental Authority or third party to terminate or suspend any right, title or interest in any such asset (or the Grantors' interest in any agreement or license related thereto) in each case in this clause (i) except (A) to the extent that the UCC or any other applicable Law provides that such grant of Lien is effective irrespective of any prohibitions to such grant or (B) so long as any such agreement was not entered into for the purpose of prohibiting or restricting such grant of Lien and (ii) any lease, license, contract, property right or agreement to which any Grantor is a party to the extent any such lease, license, contract, property right or agreement by its terms or applicable Law, prohibits, or requires consent (unless such consent has been received or is of an Affiliate of any Grantor) to the granting of a Lien in the rights of such Grantor thereunder or which Lien would be invalid or unenforceable upon any such grant, in each case in this clause (ii) except (A) to the extent that the UCC or any other applicable Law provides that such grant of Lien is effective irrespective of any prohibitions to such grant of Lien or (B) so long as any such lease, license, contract, property right or agreement was not entered into for the purpose of prohibiting or restricting such grant of Lien; provided, however, that clauses (i) and (ii) shall not apply to the pledge of any Route Authorities or FAA Slots and provided further that Excluded Assets shall not include any Control Collateral or Proceeds, substitutions or replacements of any Excluded Assets referred to in clauses (i) through (ii) (unless such Proceeds, substitutions or replacements would independently constitute Excluded Assets referred to in clauses (i) through (ii)).

(f)    "**FAA Route Slot**" means, at any time of determination, any FAA Slot of such Grantor at any Domestic Airport, in each case (i) to the extent such FAA Slot is actually being utilized at the relevant time of determination in connection a Scheduled Service and (ii) excluding any Temporary Slot.

(g)    "**FAA Slot**" means, at any time of determination, the right and operational authority to conduct an Instrument Flight Rule (as defined in Title 14) scheduled landing or take-off operation at a specific time or during a specific time period at such Domestic Airport, including, without limitation, slots, arrival authorizations and operating authorizations, whether pursuant to FAA or DOT regulations or orders pursuant to Title 14, Title 49 or other federal statutes or regulations now or hereinafter in effect.

(h)    "**Foreign Airport**" means each international airport not located in the United States that is an origin and/or destination point with respect to any Scheduled Service.

(i)    "**Foreign Aviation Authority**" means any non-U.S. governmental, quasi-governmental, regulatory or other agency, public corporation or private entity that exercises jurisdiction over the issuance or authorization (i) to serve any non-U.S. point on any Scheduled Service that any Grantor is serving at any time and/or to conduct operations related to any Scheduled Service and Gate Leaseholds at any time and/or (ii) to hold and operate any Foreign Route Slots at any time.

(j)    "**Foreign Gate Leasehold**" means all of the right, title, privilege, interest and authority, now held or hereafter acquired, of the Grantors in connection with the right to use or occupy

space at an airport terminal at any Foreign Airport but in each case excluding any Foreign Gate Leasehold of Grantor that, at such time, is held, acquired, used, allocated to or available for use by another air carrier pursuant to an agreement (including any loan agreement, lease agreement, or other gate leasehold use arrangement).

(k) "**Foreign Route Slot**" means, at any time of determination, any Foreign Slot of a Grantor at any Foreign Airport, but in each case excluding (i) any Temporary Slot and (ii) any Foreign Slot of Grantor that, at such time, is held, acquired, used, allocated to or available for use by another air carrier pursuant to an agreement (including any loan agreement, lease agreement, slot exchange agreement or a slot release agreement).

(l) "**Foreign Slot**" means, at any time of determination, in the case of airports outside the United States, the right and operational authority to conduct one landing or take-off operation at a specific time or during a specific time period at such airport.

(m) "**Gate Leasehold**" means each Domestic Gate Leasehold and each Foreign Gate Leasehold, or any of the foregoing.

(n) "**Governmental Authority**" has the meaning set forth in the Loan Agreement, except that for purposes of this Annex, Governmental Authority shall not include any Person in its capacity as an Airport Authority.

(o) "**IATA**" means the International Air Transport Association and any successor thereto.

(p) "**Material Adverse Effect**" shall have the meaning given in Section 1.01 of the Loan Agreement except that, in the case of SGR Assets, clause (b)(ii) of Material Adverse Effect shall refer to "the legality, validity, binding effect or enforceability against the Borrower or any Credit Party of any Loan Document to which it is a party or the validity, perfection and first priority of the Liens on the Collateral in favor of the Collateral Agent taken as a whole or with respect to a material portion of the Collateral".

(q) "**Pledged Gate Leaseholds**" means, as of any date, the Gate Leaseholds included in the Collateral as of such date.

(r) "**Pledged Route Authorities**" means, as of any date, the Route Authorities included in the Collateral as of such date.

(s) "**Pledged Slots**" means, as of any date, the Slots included in the Collateral as of such date.

(t) "**Route Authorities**" means, at any time of determination, any route authority whether currently in effect or hereafter granted to each Grantor to operate Scheduled Services between the points identified in <u>Schedule 2.1</u> to this Agreement (as such Schedule may be amended or modified from time to time pursuant to this Agreement), including applicable frequencies, notices, approvals, orders, exemptions and certificate authorities issued to such Grantor from time to time, in each case whether or not utilized by the Grantors.

(u) "**Scheduled Services**" means, at any time of determination, (i) each non-stop scheduled air carrier service between any Domestic Airport listed on Schedule 2.1 and any Foreign Airport listed on Schedule 2.1 of this Agreement (as such Schedule may be amended, or modified from time to time pursuant to this Agreement) (x) being operated by a Grantor or (y) available for operation by a Grantor (to the extent, with respect to clause (y), included in the then most recent Appraisal delivered under the Loan Agreement) and (ii) any other

Annex 4 - 8

non-stop scheduled air carrier service (x) being operated by a Grantor at such time or (y) available for operation by a Grantor (to the extent, with respect to clause (y), included in the then most recent Appraisal delivered under the Loan Agreement) that has been designated as an additional "Scheduled Service" pursuant to any Pledge Supplement, and "Scheduled Service" shall mean any of such Scheduled Services as the context requires.

(v)    "**SGR Assets**" shall consist of:

    i.    Gate Leaseholds;

    ii.    Route Authorities;

    iii.    Slots;

    iv.    Grantor's rights under any leasing, licensing and use agreements with respect to any of the foregoing Slots and Gate Leaseholds and under swap or similar agreements or arrangements with respect to any of the foregoing Slots; and

    v.    All General Intangibles which are owned by such Grantor (including the General Intangibles described on Schedule 2.1) relating to the SGR Assets.

(w)    "**Slot**" means each FAA Route Slot and each Foreign Route Slot, or any of the foregoing.

(x)    "**Temporary Slot**" means, a Slot that was obtained by any Grantor from another air carrier pursuant to an agreement (including any loan agreement, lease agreement, slot exchange agreement, a slot release agreement or other use arrangement) and is held by such Grantor on a temporary basis.

(y)    "**Title 49**" means Title 49 of the United States Code, which, among other things, recodified and replaced the U.S. Federal Aviation Act of 1958, and the rules and regulations promulgated pursuant thereto, as amended from time to time or any subsequent legislation that amends, supplements or supersedes such provisions.

(z)    "**Transfer Restriction**" means any restriction or consent requirement relating to the transfer or assignment by a Grantor of any right, title or interest in (but not the creation of a security interest in) any type of property or any claim, right or benefit arising thereunder or resulting therefrom, if an attempted transfer or assignment thereof without the consent of any third party would (i) constitute a violation of the terms under which the Grantors were granted such right, title or interest (or the Grantors' interest in any agreement or license related thereto), (ii) entitle any Governmental Authority or third party to terminate or suspend any such right, title or interest (or the Grantors' interest in any agreement or license related thereto), or (iii) violate any applicable Law, rule or regulation, except, in any case, to the extent such "Transfer Restriction" shall be rendered ineffective (both to the extent that it (x) prohibits, restricts or requires consent and (y) gives rise to a default, breach, right of recoupment, claim, defense, termination, right of termination or remedy) by virtue of any applicable law, including Sections 9-406, 9-407, 9-408 or 9-409 of the UCC as in effect, from time to time, in the State of New York, to the extent applicable (or any corresponding sections of the UCC in a jurisdiction other than the State of New York to the extent applicable).

(aa)     "**Use or Lose Rule**" means, with respect to Slots, any applicable utilization requirements issued by the FAA, other Governmental Authorities, any Foreign Aviation Authorities or any Airport Authorities.

Annex 4 - 10

Annex 5 (Pledged Collateral)

Each Grantor and the Collateral Agent hereby agree that the terms of this Annex shall apply with respect to Collateral consisting of Pledged Collateral.

1.  **Perfection Requirement**.  The following requirements shall be included in the definition of "Perfection Requirement" and shall constitute an additional "Perfection Requirement" with respect to Collateral consisting of:

    (a)  Certificated Securities, each applicable Grantor shall, on or prior to the Closing Date and immediately upon the issuance thereof after the Closing Date, deliver or cause to be delivered to the Collateral Agent, for it to hold in its possession, the Security Certificates evidencing such Certificated Securities duly indorsed by an effective indorsement (within the meaning of Section 8-107 of the UCC) or accompanied by undated share transfer powers or other instruments of transfer duly endorsed by such an effective endorsement, in each case, to the Collateral Agent or in blank.  In addition, each Grantor shall cause any certificates evidencing any Pledged Equity Interests to be similarly delivered to the Collateral Agent, for it to hold in its possession, regardless of whether such Pledged Equity Interests constitute Certificated Securities.  Each delivery after the Closing Date pursuant to the requirement under this clause (a) shall be accompanied by a schedule describing the Certificated Securities and Pledged Equity Interests so delivered, which schedule shall supplement Schedule 2.1; provided that failure to provide any such schedule or any error therein shall not affect the validity of the pledge of any Certificated Securities or Pledged Equity Interests.

    (b)  Instruments constituting Pledged Debt, each applicable Grantor shall on or prior to the Closing Date and immediately upon the issuance thereof after the Closing Date, deliver to the Collateral Agent, for it to hold in its possession, all such Instruments duly indorsed or accompanied by an undated transfer powers or other instruments of transfer duly endorsed by such an effective endorsement, in each case, to the Collateral Agent or in blank.  Each delivery after the Closing Date pursuant to the requirement under this clause (b) shall be accompanied by a schedule describing the Instruments so delivered, which schedule shall supplement Schedule 2.1; provided that failure to provide any such schedule or any error therein shall not affect the validity of the pledge of any such Instruments.

2.  **Representations and Warranties**.  Each Grantor (as applicable) represents and warrants, on the Closing Date and on the date of each Borrowing (or, in the case of an Additional Grantor or Additional Collateral, on the date of such Grantor's execution and delivery of a Pledge Supplement, or the date such Additional Collateral becomes subject to the security interest created hereby, as applicable):

    (a)  Schedule 2.1 sets forth all Pledged Collateral that constitutes Collateral.

    (b)  All Pledged Equity Interests and Pledged Debt issued by the Parent, the Borrower, a Grantor (or, in each case, a Subsidiary thereof), (A) have been duly and validly authorized, (B) are fully paid and nonassessable and (C) are legal, valid and binding obligations of the issuers thereof.

    (c)  (i) The Pledged Collateral is and will continue to be freely transferable and assignable and (ii) there are and will be no outstanding warrants, options or other rights to purchase, or

Annex 5 - 1

shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any Pledged Equity Interests.

(d)     Upon satisfaction and completion of all conditions and steps that constitute Perfection Requirement in this Agreement and this Annex, the Collateral Agent will obtain a legal, valid and perfected first-priority security interest upon and in such all Pledged Collateral subject to no Lien (other than the Liens created hereunder and other Permitted Liens).

(e)     Unless otherwise specified in <u>Schedule 2.1</u> of this Agreement, any Pledged Equity Interests consisting of an interest in a limited liability company, a partnership or limited partnership are not represented by a certificate and are not a "security" within the meaning of the UCC.

3.   **Covenants**. Each Grantor (as applicable) covenants and agrees that:

(a)     In the event such Grantor receives any dividends, interest or distributions on any Pledged Collateral upon the merger, consolidation, liquidation or dissolution of any issuer or obligor thereof, then (a) such dividends, interest or distributions and securities or other property shall be included in the definition of Collateral without further action and (b) such Grantor shall immediately take all steps, if any, necessary or advisable to ensure the validity, perfection, priority and, if applicable, Control of the Collateral Agent over such Pledged Collateral and pending any such action, such Grantor shall be deemed to hold such dividends, interest, distributions, securities or other property in trust for the benefit of the Collateral Agent and shall segregate such dividends, distributions, Securities or other property from all other property of such Grantor. Notwithstanding the immediately foregoing sentence, without limiting the restrictions and limitations contained in Section 6.05 of the Loan Agreement, all cash dividends, interest or distributions on any Pledged Collateral may be retained and used by the applicable Grantor so long as no Event of Default shall have occurred and be continuing.

(b)     The Pledged Equity Interests consisting of an interest in a limited liability company, a partnership or limited partnership shall not be represented by a certificate, and no Grantor shall elect to treat any such Pledged Equity Interests as a "security" within the meaning of the UCC other than to the extent any Pledged Equity Interests were represented by a certificate as of the Closing Date.

(c)     So long as no Event of Default shall have occurred and be continuing, except as otherwise provided in this Agreement or other Loan Documents, each Grantor shall be entitled to exercise or refrain from exercising any and all voting and other consensual rights pertaining to the Pledged Collateral or any part thereof for any purpose not inconsistent with the terms of the Loan Agreement, this Agreement or any other Loan Documents; provided, no Grantor shall exercise or refrain from exercising such voting and powers in any manner that (y) would reasonably be expected to materially and adversely affect the rights and remedies of the Collateral Agent with respect to the Pledged Collateral or (z) would result in, or would reasonably be expected to result in, a Material Adverse Effect.

(d)     If, after the Closing Date, any Grantor forms or acquires a Subsidiary that is a party to a contract, agreement, transaction or other undertaking constituting a Material Loyalty Program Agreement or Loyalty Program Agreement, then such Grantor will, as promptly as practicable and, in any event, within one (1) Business Day (in the case of a Material Loyalty Program Agreement) and ten (10) Business Days (in the case of a Loyalty Program Agreement) after such Subsidiary is formed or acquired, notify that Appropriate Party thereof and, at the request of the Appropriate Party, pledge, in favor of the Appropriate

Annex 5 - 2

Party, all such Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Grantor.

4. **Defaults and Remedies.**  Without limiting the generality of <u>Section 8.1</u> of this Agreement and in addition to any rights and remedies that the Collateral Agent may have under the Loan Documents and the applicable Law:

(a)     Each Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Pledged Collateral conducted without prior registration or qualification of such Pledged Collateral under the Securities Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Pledged Collateral for their own account, for investment and not with a view to the distribution or resale thereof.  Each Grantor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the Securities Act) and, notwithstanding such circumstances, each Grantor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Collateral Agent shall have no obligation to engage in public sales and no obligation to delay the sale of any Pledged Collateral for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.  If the Collateral Agent determines to exercise its right to sell any or all of the Pledged Collateral, upon written request, each Grantor shall and shall cause each issuer of the Pledged Collateral to be sold hereunder from time to time to furnish to the Collateral Agent all such information as the Collateral Agent may request in order to determine the number and nature of interest, shares or other instruments included in the Pledged Collateral which may be sold by the Collateral Agent in exempt transactions under the Securities Act and the rules and regulations of the Securities and Exchange Commission thereunder, as the same are from time to time in effect.

(b)     Each Grantor hereby authorizes and instructs each issuer of any Pledged Collateral that constitute Collateral to (i) comply with any instruction received by it from the Collateral Agent that (x) states that an Event of Default (or another applicable similar trigger event) has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from any other Person, and each Grantor agrees that each issuer shall be fully protected in so complying, and (ii) upon the occurrence and continuance of any Event of Default, unless otherwise expressly permitted hereby, pay any dividends or other payments with respect to the Pledged Collateral directly to the Collateral Agent.

(c)     If an Event of Default has occurred and is continuing:

(i)     at the direction of the Collateral Agent (acting at the direction of the Required Lenders), all rights of each Grantor to exercise or refrain from exercising the voting and other consensual rights which it would otherwise be entitled to exercise pursuant hereto shall cease and all such rights shall thereupon become vested in the Collateral Agent, which shall thereupon have the sole and exclusive right to exercise such voting and other consensual rights.

Annex 5 - 3

(ii)     all rights of any Grantor to dividends, interest, principal or other distributions that such Grantor is authorized to receive as otherwise which it would otherwise be entitled to exercise pursuant hereto shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions.  All dividends, interest, principal or other distributions received by any Grantor contrary to this provision shall be held in trust for the benefit of, or for and on behalf of, the Collateral Agent and the other Secured Parties, shall be segregated from other property or funds of such Grantor and shall be forthwith delivered to the Collateral Agent upon demand in the same form as so received (with any necessary endorsements, stock or note powers or other instruments of transfer).  Any and all money and other property paid over to or received by the Collateral Agent pursuant to this provision shall be retained by the Collateral Agent in an account in the name of the relevant Grantor to be established by the Collateral Agent and held as security for the payment and performance of the Secured Obligations and shall be applied in accordance with the provisions of Section 7.02 of the Loan Agreement.

(iii)    each Grantor will promptly give to the Collateral Agent copies of any notices or other communications received by it with respect to Pledged Collateral registered in the name of such Grantor.

(iv)     the Collateral Agent may (and to the extent that action by it is required, the relevant Grantor, if directed to do so by the Collateral Agent, will as promptly as practicable) cause each of the Pledged Collateral (or any portion thereof specified in such direction) to be transferred of record into the name of the Collateral Agent or its nominee, for the benefit of the Secured Parties.

(v)      the Collateral Agent may exercise all other rights, powers, privileges and remedies to which a holder of the Pledged Equity Interests would be entitled (including, with respect to the Pledged Equity Interests, giving or withholding written consents of members, calling special meetings of members and voting at such meetings).

(vi)     each Grantor agrees to use its best efforts to do or cause to be done all such other acts as may be necessary to make such sale or sales of all or any portion of the Pledged Equity Interests pursuant to this Agreement valid and binding and in compliance with any and all other applicable Law.  Each Grantor further agrees that a breach of any of the covenants contained in this Section of this Annex will cause irreparable injury to the Collateral Agent and the Secured Parties, that the Collateral Agent and the Secured Parties have no adequate remedy at law with respect to such breach and, as a consequence, that each and every covenant contained in this Annex shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Loan Agreement and is continuing.

(vii)    the Collateral Agent may complete any stock, bond or other power, to receive, endorse and collect all instruments made payable to any Grantor representing any dividend or other distribution with respect to the Pledged Equity Interests or any part thereof and to give full discharge for the same.

5.   **Miscellaneous**.  Each Grantor and the Collateral Agent agree that:

Annex 5 - 4

(a)     The terms of this Annex shall be deemed incorporated into and part of this Agreement.

(b)     The terms of this Annex are cumulative in nature and shall not limit the applicability or scope of the other terms of this Agreement.

(c)     Upon satisfaction and completion, as determined by the Appropriate Party, of the conditions for release of any Pledged Collateral from the Lien granted hereby in accordance with Section 6.17(b)(iii) of the Loan Agreement, such Pledged Collateral shall be released from the Lien granted under this Agreement, and the Collateral Agent will thereupon execute and deliver to the applicable Grantor, at such Grantor's sole expense, all appropriate UCC termination statements and other documents that such Grantor shall reasonably request to evidence such release.  The Collateral Agent shall have no liability whatsoever to any Secured Party as a result of its execution of any such documentation with respect to any such release.

6.  **Terms**.  The following capitalized terms used in this Annex shall have the following meanings:

(a)     "**Pledged Collateral**" shall mean (i) Pledged Debt, (ii) Pledged Equity Interests, (iii) all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed with respect to, in exchange for or upon the conversion of, and all other Proceeds received with respect to, the securities and instruments referred to in clauses (i) and (ii) above; (iv) all rights and privileges of such Grantor with respect to the securities, instruments and other property referred to in clauses (i), (ii) and (iii) above; and (v) all Proceeds of any and all of the foregoing.

(b)     "**Pledged Debt**" shall mean all Indebtedness owed to any Grantor issued by the obligors named therein, the promissory notes and any other instruments evidencing such Indebtedness, and all interest, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed with respect to or in exchange for any or all of such Indebtedness, listed opposite the name of such Grantor on Schedule 2.1.

(c)     "**Pledged Equity Interests**" shall mean (i) Equity Interests set forth opposite the name of such Grantor on Schedule 2.1, (ii) all rights, privileges, authorities, and powers of such Grantor as an owner or holder of such Equity Interests, including all economic rights, all control rights, authority, and powers, all status rights of such Grantor as a member, shareholder, or other owner (as applicable), and all rights and interests, if any, to participate in the management of each applicable issuer, (iii) all of such Grantor's options and other rights and interests, contractual or otherwise, with respect to the Pledged Equity Interests, (iv) all of the certificates, if any, evidencing or representing the Pledged Equity Interests and (v) all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed with respect to or in exchange for any or all of any of the foregoing.

Annex 5 - 5

Annex 6 (Spare Parts Assets)

Each Grantor and the Collateral Agent hereby agree that the terms of this Annex shall apply with respect to Collateral consisting of Spare Parts Assets.

1.  **Perfection Requirement**.  The following requirements shall be included in the definition of "Perfection Requirement" and shall constitute an additional "Perfection Requirement" with respect to Collateral consisting of Spare Parts Assets:

    (a)   The applicable Grantor, at its sole cost and expense, will cause the FAA Filed Documents to be prepared and duly and timely filed and recorded, or filed for recordation with the FAA to the extent permitted or required under Title 49.

    (b)   The applicable Grantor, at its sole cost and expenses, shall:

        (i)   Execute and deliver, or cause to be executed and delivered, the Mortgage Location Supplements in form and substance  satisfactory to the Appropriate Party.

        (ii)  Duly prepare and file, or cause to be duly prepared and filed, the FAA Filed Documents for recordation with the FAA in accordance with Title 49 and the regulations thereunder.

2.  **Required Filings**.  Each of the following financing statement, filing, recording or other document shall be included in the definition of "Required Filing" and shall constitute an additional "Required Filing":

    (a)   Each FAA Filed Document.

3.  **Representations and Warranties**.  Each Grantor represents and warrants, on the Closing Date and on the date of each Borrowing (or, in the case of an Additional Grantor or Additional Collateral, on the date of such Grantor's execution and delivery of a Pledge Supplement, or the date such Additional Collateral becomes subject to the security interest created hereby, as applicable):

    (a)   Schedule 2.1 sets forth all Spare Parts Assets that constitute Collateral and information with respect thereto, including the Designated Spare Parts Location for all such Spare Parts Assets.

    (b)   Upon satisfaction and completion of the Perfection Requirements under this Annex, the Collateral Agent for the benefit of the Secured Parties will obtain a legal, valid and perfected first-priority security interest upon and in all Collateral consisting of Spare Parts Assets, subject to no Lien (other than the Lien created hereunder and other Permitted Liens) and will be entitled to all the rights, priorities and benefits afforded by Title 49 and other applicable Laws to perfected security interests or Liens.

    (c)   All Spare Parts Assets constituting Collateral have been first placed in service after October 22, 1994.

    (d)   There is no registration or filing covering or purporting to cover any interest of any kind in the Spare Parts Assets (other than Permitted Liens).

    (e)   All Spare Parts Assets constituting Collateral are located at a Designated Spare Parts Location in the United States.

WEIL:\97681611\4\13173.0005

Motion for TRO Ex. 9 Page 345

(f)     The applicable Grantor, in compliance with 14 C.F.R. 49.53(a)(1) and (2), certifies that it is an air carrier, certificated by the FAA under 49 U.S.C. 44705, and that the Spare Parts Assets constituting Collateral are maintained by or on behalf of such Grantor at the Designated Spare Parts Locations.

(g)     Each Designated Spare Parts Location shall be either owned or leased by the Grantors.

4.   **Covenants**. Each Grantor (as applicable) covenants and agrees that:

(a)     It shall not execute or authorize or permit to be filed in any public office any filing (other than with respect to Liens hereunder or other Permitted Liens) relating to any Spare Parts Assets or the location thereof.

(b)     <u>Tracking System</u>.  It shall maintain the Tracking System in a manner sufficient to monitor the Spare Parts Assets and its perpetual inventory procedures for Spare Parts Assets that provide a continuous internal audit of Spare Parts Assets.  Notwithstanding the limitations herein, the Collateral Agent and the Appropriate Party, or their respective agents (as designated by the Lenders) shall be entitled to access and inspect the Tracking System to monitor the types, quantities and locations of any Spare Parts Assets and to ensure the Grantors' compliance with the terms hereof in a manner consistent with Section 5.11 of the Loan Agreement.  If requested by the Appropriate Party or the Collateral Agent, the applicable Grantor will obtain a written acknowledgment of the Collateral Agent's, the Appropriate Party's and their respective agents' access and inspection rights hereunder from any third party that owns or operates the Tracking System.

(c)     <u>Designated Spare Parts Locations</u>.

(i)     For so long as any Spare Parts Assets constitute Collateral hereunder, the applicable Grantor shall remain certified as an air carrier, certificated by the FAA under 49 U.S.C. 44705.  Except in connection with any utilization or Disposition thereof that is permitted hereunder or under the Loan Agreement, the Spare Parts Assets constituting Collateral shall be maintained by or on behalf of such Grantor at one or more of the Designated Spare Parts Locations, and the nature of such Grantor's interest in and to each such location (e.g., owner, leasehold, tenant) is and shall remain as described to the Collateral Agent pursuant to this Agreement.

(ii)    Each Grantor will promptly notify (in any event, within fifteen (15) days thereof) the Collateral Agent if any of the representations, warranties or agreements contained in the preceding sentence become inaccurate in any respect with respect to any of the Spare Parts Assets or the interest of the applicable Grantor therein.

(iii)   If any Grantor acquires at any time after the Closing Date a location at which such Grantor keeps Spare Parts of a type or model which, if located at a Designated Spare Parts Location would be subject to a Lien by this Agreement, then such Grantor shall promptly (and in any event within 5 days) furnish to the Collateral Agent, at such Grantor's sole expense, the documents listed in Section 4(c)(iv)(A)-(C).

(iv)    If any Grantor desires at any time after the Closing Date to add a Designated Spare Parts Location, such Grantor shall promptly furnish the following to the Collateral Agent, at Grantors' sole expense:

WEIL:\97681611\4\13173.0005

(A) not less than fifteen (15) days prior to the utilization of such new Designated Spare Parts Location, a Mortgage Location Supplement duly executed by the applicable Grantor, identifying each location that is to become a Designated Spare Parts Location and specifically subjecting the applicable Spare Parts Assets at such location to the Lien of this Agreement;

(B) not less than five (5) days prior to the utilization of such new Designated Spare Parts Location, an opinion of counsel, dated the date of execution of said Mortgage Location Supplement, in form and substance satisfactory to the Appropriate Party, addressed to the Secured Parties, stating that said Mortgage Location Supplement has been duly filed for recording in accordance with the provisions of Title 49, and either: (a) no other filing or recording is required in any other place within the United States in order to perfect the Lien of this Mortgage on the Spare Parts Assets held at the Designated Spare Parts Locations specified in such Mortgage Location Supplement under the laws of the United States, or (b) if any such other filing or recording shall be required that said filing or recording has been accomplished in such other manner and places, which shall be specified in such opinion of counsel, as are necessary to perfect the Lien of this Mortgage with respect to such Spare Parts Assets; and

(C) not less than five (5) days prior to the utilization of such new Designated Spare Parts Location, a certificate of the Responsible Officer stating that in the opinion of the Responsible Officer executing the certificate, all conditions precedent provided for in this Mortgage relating to the subjection of such property to the Lien of this Mortgage have been complied with.

(d) <u>Maintenance.</u>  At its own cost and expense, it:

(i) shall maintain, or cause to be maintained, at all times the Spare Parts Assets in accordance with all applicable Laws, including making any modifications, alterations, replacements and additions necessary therefor, and shall utilize, or cause to be utilized, the same manner and standard of maintenance with respect to each model of Spare Parts or Appliance included in the Collateral as is utilized for such model of Spare Parts or Appliance owned by such Grantor and not included in the Collateral;

(ii) shall maintain, or cause to be maintained, all records, logs and other materials required by the FAA or under Title 49 to be maintained in respect of the Spare Parts Assets and shall not modify its record retention procedures in respect of the Spare Parts Assets unless such modification is consistent with such Grantor's FAA approved maintenance program;

(iii) shall maintain, or cause to be maintained, all Spare Parts Documents in respect of the Spare Parts Assets in the English language;

(iv) shall maintain, or cause to be maintained on a timely basis, the Spare Parts Assets in good working order (other than during periods of maintenance, repair, inspection and testing) and condition and shall perform all maintenance thereon

necessary for that purpose, excluding (x) Spare Parts Assets that have become worn out or unfit for use, beyond economic repair or become obsolete or scrap, (y) Spare Parts Assets and quick change engine kits that are not required for such Grantor's normal operations and (z) Expendables that have been consumed or used in the such Grantor's operations; and

(v)      notwithstanding anything herein to the contrary, all Rotables and Repairables constituting Collateral and, to the extent customary, Expendables constituting Collateral, located at Designated Spare Parts Locations other than as excluded under clause (x), (y) or (z) above of <u>clause (iv)</u> above, shall have a current and valid serviceable tag and shall be in compliance with such tag, in each case in compliance with applicable FAA regulations.

(e)      <u>Possession</u>.  No Grantor may (A) Dispose of or relinquish possession of any Spare Parts Asset to anyone <u>except</u> that the applicable Grantors shall have the right, (w) to Dispose to the extent permitted under Section 6.04 of the Loan Agreement and in the ordinary course of business, (x) to transfer possession of any Spare Parts Asset in the ordinary course of business to the manufacturer thereof or any other organization for testing, overhaul, repairs, maintenance, alterations or modifications (to the extent required or permitted by the terms hereof) or to any Person for the purpose of transport to any of the foregoing; <u>provided</u> that such Grantor covenants to promptly pay when due any payment obligation resulting in a mechanic's or other Lien related to such testing service, repair, maintenance, overhaul, alternation, modification, or transport, (y) to subject any Spare Parts Asset to a maintenance servicing agreement arrangement entered into and operated in the ordinary course of business or (z) to transfer in the ordinary course of business any Spare Parts Asset between any Designated Spare Parts Locations; provided, however, that if the applicable Grantor's title to any such Spare Parts Asset shall be divested under any situation described in clauses (x) through (z) above, such divestiture shall be deemed to be a Disposition with respect to such Spare Parts Asset subject to the provisions of Section 2.06(b) of the Loan Agreement or (B) commingle at any location its Spare Parts Assets that constitute Collateral with (i) other Spare Parts of the applicable Grantor not constituting Collateral or (ii) the Spare Parts of another Affiliate if such other Affiliate has pledged Spare Parts which are not Collateral to secure any other Indebtedness or obligations, unless (x) the ownership of each such commingled Spare Parts can be definitely determined at all times by reference to the applicable Grantor's or Affiliate's Spare Parts tracking number and system, as applicable, or (y) the Spare Parts of such Grantor or Affiliate are not of a type or category of spare parts that corresponds to a type of category of Spare Parts Assets that is included in the Collateral; provided that Spare Parts that are segregated on a separate aisle, shelf or in a separate storage bin or other storage unit or area shall not be considered as having been commingled even though such Spare Parts are present at the same location so long as the applicable Grantor install signs in or on each such aisle, shelf, bin or other storage unit or area containing Collateral bearing the inscription: "Property of [GRANTOR], Mortgaged to THE BANK OF NEW YORK MELLON as Collateral Agent for the benefit of the Secured Parties" (such sign to be replaced if there is a successor Collateral Agent).

(f)      <u>Use; Modifications</u>.

(i)      <u>Use</u>.  At its own cost and expense, without the necessity of any release from or consent by the Collateral Agent, it may: (1) incorporate in, install on, attach or make appurtenant to, or use in, any aircraft, engine, or spare part in its fleet (whether or not subject to any Lien and whether or not operated by such Grantor)

the Spare Parts Assets constituting Collateral and, as a result thereof, if such Spare Parts Assets are incorporated in, installed in, attached or made appurtenant to an airframe, engine or spare engine, such Spare Parts Asset shall thereupon be free from the Lien of this Mortgage; provided that, except as provided for in Sections 4(e)(A)(x) and 4(f)(i)(2) of this Annex, if the Spare Part incorporated in, installed on, attached or made appurtenant to, or used in, any aircraft, engine, or spare part in its fleet is used to replace a part that would otherwise be covered by a Lien of this Mortgage if it were located at a Designated Spare Parts Location, then the applicable Grantor shall return that part to a Designated Spare Parts Location and (2) dismantle any Spare Parts Asset that has become worn out or obsolete or unfit for use, and to scrap, sell or Dispose of any such Spare Parts Asset or any salvage resulting from such dismantling, in which case such Spare Parts Asset shall thereupon be free from the Lien of this Agreement.

(g)     Insurance.

(i)     Each Grantor shall ensure that at all times the Collateral Agent, for the benefit of the Secured Parties, shall be named as an additional insured and lender loss payee with respect to any Spare Parts Assets constituting Collateral and take any other steps required under this Annex.

(ii)    Obligation to Insure. Each Grantor (as applicable) shall comply with, or cause to be complied with, each of the provisions of Appendix I to this Annex, which provisions are hereby incorporated by this reference as if set forth in full herein.

(iii)   Insurance for Own Account. Nothing in this Annex shall limit or prohibit (i) any Grantor from maintaining the policies of insurance required under Appendix I of this Annex with higher coverage than those specified in Appendix I, or (ii) the Collateral Agent (without a duty to do so) or any other Additional Insured from obtaining insurance, upon the occurrence of an Event of Default, at the applicable Grantor's expense, for its own account (and any proceeds payable under such separate insurance shall be payable as provided in the policy relating thereto); provided, however, that no insurance may be obtained or maintained that would limit or otherwise adversely affect the coverage of any insurance required to be obtained or maintained by any Grantor pursuant to this Annex and Appendix I of this Annex.

(iv)    Application of Insurance Proceeds. As between each applicable Grantor and the Collateral Agent, all insurance proceeds received as a result of the occurrence of an Event of Loss with respect to any Spare Parts Asset constituting Collateral at the time of such receipt shall be applied in accordance with Section 2.06(b) of the Loan Agreement.

(h)     Inspection.

(i)     The Appropriate Party and the Collateral Agent, or their respective authorized representatives, as designated by the Lenders may exercise inspection rights with respect Aircraft and Engine Assets constituting Collateral to the fullest extent permitted under Section 5.11 of the Loan Agreement.

WEIL:\97681611\4\13173.0005

(ii)     With respect to such rights of inspection, the Secured Parties shall not have any duty or liability to make, or any duty or liability by reason of not making, any such visit, inspection or survey.

(i)     <u>Data Reports</u>.  After the occurrence and during the continuance of an Event of Default and as may be requested by the Collateral Agent or the Appropriate Party from time to time, the applicable Grantor shall furnish the Collateral Agent and the Appropriate Party with a Data Report.

5.   **Release of Collateral**.  Each Grantor and the Collateral Agent agree that:

(a)     Upon satisfaction and completion, as determined by the Appropriate Party, of the conditions for release of any Spare Parts Assets constituting Collateral from the Lien granted hereby in accordance with <u>Section 6.17(b)(iii)</u> of the Loan Agreement, such Spare Parts Assets shall be released from the Lien granted under this Agreement, and the Collateral Agent will thereupon execute and deliver to the applicable Grantor, at such Grantor's sole expense, all appropriate UCC termination statements and other documents that such Grantor shall reasonably request to evidence such release.  The Collateral Agent shall have no liability whatsoever to any Secured Party as a result of its execution of any such documentation with respect to any such release.

6.   **Miscellaneous**.  Each Grantor and the Collateral Agent agree that:

(a)     The terms of this Annex shall be deemed incorporated into and part of this Agreement.

(b)     The terms of this Annex are cumulative in nature and shall not limit the applicability or scope of the other terms of this Agreement.

7.   **Terms**.

(a)     The following capitalized terms used in this Annex shall have the following meanings:

(i)     "**Additional Insureds**" is defined in <u>Appendix I</u> to this Annex.

(ii)     "**Aircraft**" shall mean any contrivance invented, used, or designed to navigate, or fly in, the air.

(iii)     "**Appliance**" shall mean any instrument, equipment, apparatus, part, appurtenance, or accessory used, capable of being used, or intended to be used, in operating or controlling aircraft in flight, including a parachute, communication equipment, and another mechanism installed in or attached to aircraft during flight, and not a part of an aircraft, engine, or propeller (including "appliances" (as defined in Section 40102 of Title 49)).

(iv)     "**Data Report**" means information and data relating to the Spare Part Assets supplied by the Grantors to the Collateral Agent and the Appropriate Party and substantially in the form of <u>Exhibit B</u> to this Annex.

(v)     "**Designated Spare Parts Locations**" shall mean the locations designated from time to time by the Grantors at which the Spare Parts Assets may be maintained by or on behalf of the Grantors, which shall be the locations set forth on <u>Schedule 2.1</u> to this Agreement.

(vi)     "**Engine**" shall mean an engine used, or intended to be used, to propel an Aircraft, including a part, appurtenance, and accessory of the Engine, except a propeller.

(vii)    "**Event of Loss**" means, with respect to any Spare Parts Asset, any of the following circumstances, conditions or events with respect to such property, for any reason whatsoever:

    (A)     the destruction of such property, damage to such property beyond economic repair or rendition of such property permanently unfit for normal use by the Grantors (other than the use of Expendables in Grantor's operations);

    (B)     the actual or constructive total loss of such property or any damage to such property, or requisition of title or use of such property, which results in an insurance settlement with respect to such property on the basis of a total loss or constructive or compromised total loss;

    (C)     any theft, hijacking or disappearance of such property for a period of one hundred and eighty (180) consecutive days or more; or

    (D)     any seizure, condemnation, confiscation, taking or requisition (including loss of title) of such property by any Governmental Authority or purported Governmental Authority (other than a requisition of use by the U.S. Government) for a period exceeding one hundred and eighty (180) consecutive days.

(viii)   "**Expendables**" shall mean Spare Parts, other than Rotables and Repairables.

(ix)     "**FAA Filed Document**" shall mean the Mortgage Location Supplement executed by a Grantor.

(x)      "**Mortgage**" shall mean this Pledge and Security Agreement.

(xi)     "**Mortgage Location Supplement**" means a Mortgage Location Supplement, substantially in the form of <u>Exhibit A</u> to this Annex, with appropriate modifications to reflect the purpose for which it is being used.

(xii)    "**Repairable**" shall mean any Spare Part that wears over time and can be commonly restored to a serviceable condition until the expected point of being beyond economic repair, excluding any such Spare Parts that qualifies as, and is designated by any Grantor to be, a Rotable.

(xiii)   "**Rotable**" means any Spare Part that wears over time and can be repeatedly restored to a serviceable condition over a period approximating the life of the flight equipment to which it relates, excluding any such Spare Parts that qualifies as, and is designated by any Grantor to be, a Repairable.

(xiv)    "**Spare Parts**" shall mean all accessories, appurtenances, or parts of (A) an aircraft (except an engine or propeller), (B) an engine (except a propeller), (C) a propeller, or (D) an Appliance, that are to be installed at a later time in an aircraft, engine, propeller or Appliance (including "spare parts" (as defined in Section 40102 of

Title 49)) including, in all cases, any replacements, substitutions or renewals therefor, and accessions thereto.

(xv) "**Spare Parts Assets**" shall mean:

    (A) All Spare Parts of the Grantors (including Expendables, Repairables and Rotables (and all substitutions or replacements of any of the foregoing)), including without limitation, all such Spare Parts from time to time located at a Designated Spare Parts Location described on <u>Schedule 2.1</u>;

    (B) Any continuing rights of any Grantor in respect of any warranty, indemnity or agreement, express or implied, as to title, materials, workmanship, design or patent infringement with respect to such Spare Parts (reserving in each case to the Grantors, however, all of the Grantors' other rights and interest in and to such warranty, indemnity or agreement) together in each case under this clause with all rights, powers, privileges, options and other benefits of such Grantor thereunder (subject to such reservations) with respect to such Spare Parts, including the right to make all waivers and agreements, to give and receive all notices and other instruments or communications, to take such action upon the occurrence of a default thereunder, including the commencement, conduct and consummation of legal, administrative or other proceedings, as shall be permitted thereby or by law, and to do any and all other things which such Grantor is or may be entitled to do thereunder (subject to such reservations);

    (C) All Appliances with respect to the foregoing;

    (D) All General Intangibles which are owned by such Grantor (including the General Intangibles described on <u>Schedule 2.1</u>) relating to Spare Parts Assets described in the foregoing; and

    (E) All Insurance with respect to the foregoing.

(xvi) "**Spare Parts Documents**" means all repair, maintenance and inventory records, logs, manuals and all other documents and materials similar thereto (including any such records, logs, manuals, documents and materials that are computer print-outs) at any time maintained, created or used by the applicable Grantor, and all records, logs, documents and other materials required at any time to be maintained by the applicable Grantor pursuant to the FAA or under Title 49, in each case with respect to any of the Spare Parts Assets.

(xvii) "**Tracking System**" shall mean Grantor's centralized computer system for monitoring and tracking the location, condition and status of its Spare Parts Assets, and any and all improvements, upgrades or replacement systems.

Annex 6 - 8

**APPENDIX I**

**INSURANCE**

A.   Liability Insurance.

Each Grantor (as applicable) will carry or cause to be carried at all times, at no expense to the Collateral Agent or any Secured Party, comprehensive airline liability insurance with respect to the Spare Parts Assets, which is (i) of an amount and scope as may be customarily maintained by such Grantor for equipment similar to the Spare Parts Assets and (ii) maintained in effect with insurers of nationally or internationally recognized responsibility (such insurers being referred to herein as "**Approved Insurers**").

B.   Hull (Spares) Insurance.

Each Grantor (as applicable) will carry or cause to be carried at all times, at no expense to any additional insured/loss payee, with Approved Insurers comprehensive airline hull insurance (including spares coverage) covering physical damage to the Spare Parts Assets providing for the reimbursement of the actual expenditure incurred in repairing or replacing any damaged or destroyed Spare Parts Asset or, if not repaired or replaced, for the payment of the amount it would cost to repair or replace such Spare Parts Asset, on the date of loss, with proper deduction for obsolescence and physical depreciation.

Any policies of insurance carried in accordance with this Section B covering the Spare Parts Assets and any policies taken out in substitution or replacement for any such policies shall provide that insurance proceeds under such policies shall be payable directly to the Collateral Agent for prompt deposit into a Collateral Proceeds Account in a manner consistent with Section 2.06(b)(ii) of the Loan Agreement as it applies to a Recovery Event.

All losses will be adjusted by the applicable Grantor with the insurers; provided, however, that during a period when an Event of Default shall have occurred and be continuing, no Grantor shall agree to any such adjustment without the written consent of the Collateral Agent (acting at the direction of the Required Lenders).

C.   Reports and Certificates; Other Information.

On or prior to the Closing Date, and on or prior to each renewal date of the insurance policies required hereunder, each applicable Grantor will furnish or cause to be furnished to the Collateral Agent insurance certificates describing in reasonable detail the commercial insurance maintained by the applicable Grantors hereunder, together with endorsements satisfactory to the Collateral Agent and the Appropriate Party designating the Secured Parties as loss payees and additional insureds with respect to the Spare Parts Assets constituting Collateral. To the extent such agreement is reasonably obtainable, the applicable Grantors will also cause the Insurance Broker to agree to advise the Secured Parties in writing of any default in the payment of any premium and of any other act or omission on the part of the applicable Grantors of which it has knowledge and which might invalidate or render unenforceable, in whole or in part, any commercial insurance on such Spare Parts Assets or cause the cancellation or termination of such insurance, and to advise the Secured Parties in writing at least thirty (30) days (ten (10) days in the case of nonpayment of premium, or such shorter period as may be available in the international insurance market, as the case

may be) prior to the cancellation or material adverse change of any commercial insurance maintained pursuant to this <u>Appendix I</u>.

    D.   <u>Right to Pay Premiums</u>.

        The additional insureds/loss payees shall have the rights but not the obligations of an additional named insured. None of the Collateral Agent or the other additional insureds/loss payees shall have any obligation to pay any premium, commission, assessment or call due on any such insurance (including reinsurance). Notwithstanding the foregoing, in the event of cancellation of any insurance due to the nonpayment of premiums, the Collateral Agent may, at the direction of the Required Lenders, to pay any such premium in respect of the Spare Parts Assets that is due in respect of the coverage pursuant to this Agreement and to maintain such coverage, as the Secured Parties may require, until the scheduled expiry date of such insurance and, in such event, the applicable Grantor shall, upon demand, reimburse the Collateral Agent for amounts so paid by it, together with interest therein at the Default Rate from the date of payment.

    E.   <u>Salvage Rights; Other</u>.

        All salvage rights to Spare Parts Assets shall remain with the applicable Grantor's insurers at all times, and any insurance policies of the Collateral Agent insuring Spare Parts Assets shall provide for a release to the applicable Grantor of any and all salvage rights in and to any Spare Parts Assets.

## [FORM OF MORTGAGE LOCATION SUPPLEMENT]

THIS MORTGAGE LOCATION SUPPLEMENT NO. [•], dated [●] (herein, this "Mortgage Location Supplement") made by [NAME(S) OF GRANTOR(S)], [a] [●] (together with its permitted successors and assigns, the "Grantor"), in favor of THE BANK OF NEW YORK MELLON, as the Collateral Agent (together with its successors and assigns, the "Collateral Agent") for the benefit of the Secured Parties.

### W I T N E S S E T H :

WHEREAS, the Amended and Restated Horizon Aircraft, Engine and Propeller Pledge and Security Agreement, dated as of October 30, 2020 (as amended, supplement, restated or otherwise modified from time to time, the "PSA"; capitalized terms used herein but not defined shall have the meaning ascribed to them in the PSA), between the Grantors (as defined in the PSA) party thereto from time to time and the Collateral Agent, provides for the execution and delivery of supplements thereto substantially in the form hereof;

WHEREAS, the Grantor[s] has/have previously designated the locations at which the Spare Parts Assets may be maintained by or on behalf of the Grantors in the PSA [and in Mortgage Location Supplement No. [●]];[7]

WHEREAS,[8] the Mortgage [and the Mortgage Location Supplements] has [have] been duly recorded with the FAA, pursuant to Title 49 on the following date as a document or conveyance bearing the following number:

|  | [DATE OF RECORDING] | [DOCUMENT OR CONVEYANCE NO.][9] |
|---|---|---|
| [Mortgage] |  |  |

WHEREAS, the Grantor[s] hereby confirm[s] that it is a certificated U.S. air carrier under Sections 41102 and 44705 of Title 49 of the United States Code, and the Spare Parts described in this Mortgage Location Supplement are maintained by it or on its behalf at the applicable Designated Spare Parts Locations described herein;

WHEREAS, the Grantor[s], as provided in the PSA, is/are hereby executing and delivering to the Collateral Agent this Mortgage Location Supplement for the purposes of adding locations at which the Spare Parts Assets may be maintained by or on behalf of the Grantor[s]; and

WHEREAS, all things necessary to make this Mortgage Location Supplement the valid, binding and legal obligation of the Grantors, including all proper corporate action on the part of the Grantors, have been done and performed and have happened;

---

[7] Note to Form: Bracketed language not to be included in the initial Mortgage Location Supplement.

[8] Note to Form: This recital is not to be included in the initial Mortgage Location Supplement.

[9] Note to Form: Table not to be included in the initial Mortgage Location Supplement.

WEIL:\97681611\4\13173.0005

NOW, THEREFORE, in order to secure the prompt payment and performance of the Secured Obligations from time to time outstanding and to secure the performance and observance by the Grantor[s] and each of the other Credit Parties of all the agreements and provisions contained in the Loan Documents (as such term is defined in the PSA for the benefit of the Secured Parties, the Grantor[s] has/have mortgaged, assigned, pledged, hypothecated, transferred, conveyed and granted, and does hereby mortgage, assign, pledge, hypothecate, transfer, convey and grant, unto the Collateral Agent, for the benefit and security of the Secured Parties, a continuing first priority security interest in, and mortgage lien on, the property comprising all its right, title and interest in and to the Spare Parts Assets at the Designated Spare Parts Location(s) described on Schedule 1 hereto and the Designated Spare Parts Locations listed on Schedule 1 hereto shall be deemed to amend and supplement Schedule 2.1 to the PSA;

To have and to hold all and singular the aforesaid property unto the Collateral Agent, its successors and assigns, for the benefit and security of the Secured Parties and for the uses and purposes and subject to the terms and provisions set forth in the PSA.

This Mortgage Location Supplement shall be construed in every way in accordance to the terms of the PSA and as a part thereof, and the PSA is hereby incorporated by reference herein and is hereby ratified, approved and confirmed.

This Mortgage Location Supplement will be governed by and construed in accordance with the law of the State of New York.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Grantor[s] has/have caused this Mortgage Location Supplement to be duly executed by one of its officers, thereunto duly authorized, on the day and year first above written.

**HORIZON AIR INDUSTRIES, INC.**, as Grantor

By:_____
    Name:
    Title:

WEIL:\97681611\4\13173.0005

Motion for TRO Ex. 9 Page 357

<u>Schedule 1</u>

**DESIGNATED SPARE PARTS LOCATIONS**

[●]

Exhibit A to Annex 6 - 4

<u>Exhibit B to Annex 6</u>

[Address to Appropriate Party]

_____, 20__

**Data Report For Spare Parts Assets**

Ladies and Gentlemen:

We refer to the Amended and Restated Horizon Aircraft, Engine and Propeller Pledge and Security Agreement, dated as of October 30, 2020 (as amended, supplement, restated or otherwise modified from time to time, the "**Security Agreement**"), between each Grantor, whether as an original signatory thereto or as an Additional Grantor, and The Bank of New York Mellon, as collateral agent for the Secured Parties (in such capacity as collateral agent, together with its successors and assigns, the "**Collateral Agent**"). Terms defined in the Security Agreement and used herein have such respective defined meanings.  The Grantor[s] hereby certifies/certify that:

Attached hereto as Exhibit 1 is a report that correctly sets forth the following information as of the date hereof with respect to each Pledged Spare Part:

1. Manufacturer's part number;

2. part description;

3. related aircraft model(s) in summary form;

4. classification as Rotable or Expendable or Repairable;

5. quantity on hand;

6. Designated Spare Parts Location;

7. each Spare Parts Asset out for repair; and

8. each Spare Parts Asset in transit.

Very truly yours,

[GRANTOR]

By:_____
   Name:
   Title:
   Date:

WEIL:\97681611\4\13173.0005

Motion for TRO Ex. 9 Page 359

**Transaction Summary**

The U.S. Department of the Treasury agreed to make a loan of up to $1.928 billion to Alaska Airlines, Inc. (the Company). Treasury originally agreed to make a loan of up to $1.301 billion to Company, and on October 30, 2020, Treasury increased the maximum loan amount to $1.928 billion. The Company is a wholly owned subsidiary of Alaska Air Group, Inc., and one of the largest domestic airlines in the United States. The Company had approximately 22,000 U.S. employees in March 2020 and carried more than 46 million passengers in 2019.

Treasury made the loan pursuant to section 4003(b)(1) of the Coronavirus Aid, Relief, and Economic Security (CARES) Act. The loan is secured by the Company's Mileage Plan loyalty program, certain aircraft, and engines. The loan has an interest rate equal to LIBOR plus 2.5% and matures on September 26, 2025. The Company elected to draw $135 million at close and may draw the remaining loan funds in multiple draws through May 28, 2021. The loan proceeds will be used to provide liquidity to continue the Company's operations. The transaction agreement includes covenants by the Company to comply with certain restrictions on employee compensation, stock repurchases, dividends, and reductions in employment levels, as required by the CARES Act. Treasury will receive warrants to purchase common stock equal to 10% of the total loan amount drawn.

Plaintiff's Exhibit 10

**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| **LUCAS WALL et al.,** | : |
| Plaintiffs, | :<br>:   Case No. 6:21-cv-1008-PGB-DCI |
| v. | :<br>:   District Judge Paul Byron |
| **SOUTHWEST AIRLINES et al.,** | :<br>:   Magistrate Judge Daniel Irick |
| Defendants. | :<br>: |

## DECLARATION OF Joseph D. Fine

I, Joseph D. Fine declare as follows:

1. I am over the age of majority.

2. I could testify to the facts set out herein if called upon to do so.

3. I reside at 6701 E. Homebuilt Cir. Wasilla Ak 99654

4. I make this declaration based on my personal knowledge of Peter Menage, who works for me, and my travels on Alaska Airlines during the COVID-19 pandemic.

5. I have flown approximately 18 times on Alaska Airlines during the pandemic since it was declared by the World Health Organization in March 2020 and have been subject to Alaska's illegal mask mandate.

6. I work as a Specialty Division Foremen for Worley in the remote Arctic oil-fields in and around Prudhoe Bay, Alaska. As is common for North Slope

1

workers, I fly Alaska Airlines from Anchorage to Deadhorse (the airport serving the Prudhoe Bay oilfields) every three weeks for work. I work three weeks straight, then return to Anchorage on Alaska Airlines.

7.  Alaska Airlines is the only carrier flying from Anchorage to Deadhorse.

8.  Mr. Menage is a work colleague.

9.  Flying Alaska Airline to and from the North Slope oilfields is the only practical way for Mr. Menage and others who work here to get our jobs. If Alaska Airlines is allowed to unlawfully ban Mr. Menage from flying, he would almost certainly be suspended or terminated because he would not have a reliable means of getting to and from work.

10. During my numerous flights on Alaska since its illegal mask mandate has been in place for the past 1½ years, it is common for passengers to take off their face coverings while eating and drinking. I have never observed a flight attendant telling a passenger he or she may not eat or drink.

11. I believe Mr. Menage is being retaliated against for suing Alaska Airlines for discrimination.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on Dec. 4, 2021.


Joseph D. Fine

2

Plaintiff's Exhibit 11

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

| | | |
|---|---|---|
| **LUCAS WALL** *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Case No. 6:21-cv-1008-PGB-DCI |
| | : | |
| v. | : | District Judge Paul Byron |
| | : | |
| **SOUTHWEST AIRLINES** *et al.*, | : | Magistrate Judge Daniel Irick |
| | : | |
| Defendants. | : | |

## DECLARATION OF JULIE GLEASON

I, Julie Gleason, declare as follows:

1. I am over the age of majority.

2. I could testify to the facts set out herein if called upon to do so.

3. I reside at 320 Woodhurst Pl., Coppell, TX 75019.

4. I make this declaration based on my personal knowledge of Peter Menage, who works with me, and my travels on Alaska Airlines during the COVID-19 pandemic.

5. I have flown approximately 50 times on Alaska Airlines during the pandemic since it was declared by the World Health Organization in March 2020 and have been subject to Alaska's illegal mask mandate.

6. I work as an Administrative Assistant for ESS Support Services Worldwide in the remote Arctic oilfields in and around Prudhoe Bay, Alaska. As is common for North Slope workers, I fly Alaska Airlines from Anchorage to Deadhorse (the airport serving the Prudhoe Bay oilfields) every three weeks for work. I work three weeks straight, then return to Anchorage on Alaska Airlines and then onto Dallas, Texas, via Alaska Airlines.

7. Alaska Airlines is the only carrier flying from Anchorage to Deadhorse.

8. Mr. Menage is a work colleague.

9. Flying Alaska Airlines to and from the North Slope oilfields is the only practical way for Mr. Menage and others who work here to get to our jobs. If Alaska Airlines is allowed to unlawfully ban Mr. Menage from flying, he would almost certainly be suspended or terminated because he would not have a reliable means of getting to and from work.

10. During my numerous flights on Alaska since its illegal mask mandate has been in place for the past 1½ years, it is common for passengers to take off their face coverings while eating and drinking. I have never observed a flight attendant telling a passenger he or she may not eat or drink.

11. I believe Mr. Menage is being retaliated against for suing Alaska Airlines for discrimination.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on Dec. 4, 2021.

*Julie Gleason*

_____

Julie Gleason

Plaintiff's Exhibit 12



**Transportation
Security
Administration**

U.S. Department of Homeland Security
Transportation Security Administration
6595 Springfield Center Drive
Springfield, Virginia 20598

# SECURITY DIRECTIVE

| | |
|---|---|
| <u>NUMBER</u> | SD 1544-21-02**B** |
| <u>SUBJECT</u> | Security Measures – Mask Requirements |
| <u>EFFECTIVE DATE</u> | September 14, 2021 |
| <u>EXPIRATION DATE</u> | **January 18, 2022** |
| <u>CANCELS AND SUPERSEDES</u> | SD 1544-21-02**A** |
| <u>APPLICABILITY</u> | Aircraft operators regulated under 49 CFR 1544.101 |
| <u>AUTHORITY</u> | 49 U.S.C. 114, 44902, and 44903; 49 CFR 1544.305 |
| <u>LOCATION(S)</u> | All Locations |

<u>PURPOSE AND GENERAL INFORMATION</u>

Due to the ongoing COVID-19 pandemic and to reduce the spread of the virus, the President issued an Executive Order, *Promoting COVID-19 Safety in Domestic and International Travel*, on January 21, 2021, requiring masks to be worn in and on airports, on commercial aircraft, and in various modes of surface transportation.[1]  On January 27, 2021, the Acting Secretary of Homeland Security determined a national emergency existed[2] requiring the Transportation Security Administration (TSA) to issue this Security Directive (SD) to implement the Executive Order and enforce the related Order[3] issued by the Centers for Disease Control and Prevention (CDC), pursuant to the authority of 49 U.S.C. sections 114, 44902, and 44903.  Consistent with these mandates and TSA's authority, TSA is issuing this SD requiring masks to be worn to mitigate the spread of COVID-19 during air travel.  The requirements in this SD must be applied to all persons onboard a commercial aircraft operated by a U.S. aircraft operator, including

---

[1] 86 FR 7205 (published Jan. 26, 2021).

[2] Acting Secretary David P. Pekoske, Determination of a National Emergency Requiring Actions to Protect the Safety of Americans Using and Employed by the Transportation System (Jan. 27, 2021), *available at* https://www.dhs.gov/publication/determination-national-emergency-requiring-actions-protect-safety-americans-using-and (accessed Feb. 22, 2021).  The Acting Secretary's determination directs TSA to take actions consistent with its statutory authorities "to implement the Executive Order to promote safety in and secure the transportation system."  In particular, the determination directs TSA to support "the CDC in the enforcement of any orders or other requirements necessary to protect the transportation system, including passengers and employees, from COVID-19 and to mitigate the spread of COVID-19 through the transportation system."

[3] *See* Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations (CFR) §§ 70.2, 71.31(B), 71.32(B); Requirement for Persons to Wear Masks While on Conveyances and at Stations, Ports, or Similar Transportation Hubs (January 29, 2021)

passengers and crewmembers, including those already vaccinated.  TSA developed these requirements in consultation with the Federal Aviation Administration and CDC.

DEFINITIONS

For the purposes of this SD, the following definitions apply:

*Conveyance* has the same definition as under 42 CFR 70.1, meaning "an aircraft, train, road vehicle, vessel…or other means of transport, including military."

*Mask* means a material covering the nose and mouth of the wearer, excluding face shields.[4]

ACTIONS REQUIRED

A. The aircraft operator must provide passengers with prominent and adequate notice of the mask requirements to facilitate awareness and compliance. [5]  At a minimum, this notice must inform passengers, at or before check-in and as a pre-flight announcement, of the following:

1. Federal law requires each person to wear a mask at all times throughout the flight, including during boarding and deplaning.

2. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties under federal law.

3. If wearing oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation, masks should be removed to accommodate oxygen masks.

B. The aircraft operator must not board any person who is not wearing a mask, except as described in Sections D., E., and F.

C. The aircraft operator must ensure that direct employees and authorized representatives wear a mask at all times while on an aircraft or in an airport location under the control of the aircraft operator, except as described in Sections D., E., and F.

D. The requirement to wear a mask does not apply under the following circumstances:

1. When necessary to temporarily remove the mask for identity verification purposes.

---

[4] A properly worn mask completely covers the nose and mouth of the wearer.  A mask should be secured to the head, including with ties or ear loops.  A mask should fit snugly but comfortably against the side of the face.  Masks do not include face shields.  Masks can be either manufactured or homemade and should be a solid piece of material without slits, exhalation valves, or punctures.  Medical masks and N-95 respirators fulfill the requirements of this SD.  CDC guidance for attributes of acceptable masks in the context of this SD is available at https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html.
[5] Notice may include, if feasible, advance notifications on digital platforms, such as on apps, websites, or email; posted signage in multiple languages with illustrations; printing the requirement on boarding passes; or other methods as appropriate.

2.  While eating, drinking, or taking oral medications for brief periods.[6]  Prolonged periods of mask removal are not permitted for eating or drinking; the mask must be worn between bites and sips.

3.  While communicating with a person who is deaf or hard of hearing, when the ability to see the mouth is essential for communication.

4.  If wearing oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation.

5.  If unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to remove the mask without assistance, or otherwise unable to remove the mask without assistance.[7]

E.  The following conveyances are exempted from this SD:

1.  Persons in private conveyances operated solely for personal, non-commercial use.

2.  A driver, when operating a commercial motor vehicle as this term is defined in 49 CFR 390.5, if the driver is the sole occupant of the vehicle.

F.  This SD exempts the following categories of persons from wearing masks:[8]

1.  Children under the age of 2.

2.  People with disabilities who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.).[9]

---

[6] The CDC has stated that brief periods of close contact without a face mask should not exceed 15 minutes.  *See* https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html

[7] Persons who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask.  Persons who are vomiting should remove the mask until vomiting ceases.  Persons with acute illness may remove the mask if it interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask.

[8] Aircraft operators may impose requirements, or conditions of carriage, on persons requesting an exemption from the requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the aircraft operator, as well as require evidence that the person does not have COVID-19 such as a negative result from a SAR-CoV-2 viral test or documentation of recovery from COVID-19. CDC definitions for SAR-CoV-2 viral test and documentation of recovery are available in Frequently Asked Questions at:  https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html.  Aircraft operators may also impose additional protective measures that improve the ability of a person eligible for exemption to maintain social distance (separation from others by 6 feet), such as scheduling travel at less crowded times or on less crowded conveyances, or seating or otherwise situating the individual in a less crowded section of the conveyance or airport.  Aircraft operators may further require that persons seeking exemption from the requirement to wear a mask request an accommodation in advance.

[9] This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability; who, e.g., do not understand how to remove their mask due to cognitive impairment, cannot remove a mask on their own due to dexterity/mobility impairments, or cannot communicate promptly to ask someone else to

    3.  People for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

G.  If a passenger refuses to comply with an instruction given by a crew member with respect to wearing a mask, the aircraft operator must:

    1.  Make best efforts to disembark the person who refuses to comply as soon as practicable; and

    2.  Follow incident reporting procedures in accordance with its TSA-approved standard security program and provide the following information, if available:

        a. Date and flight number;

        b. Passenger's full name and contact information;

        c. Passenger's seat number on the flight;

        d. Name and contact information for any crew members involved in the incident; and

        e. The circumstances related to the refusal to comply.

PREEMPTION

The requirements in this SD do not preempt any State, local, Tribal, or territorial rule, regulation, order, or standard necessary to eliminate or reduce a local safety hazard, which includes public health measures that are the same or more protective of public health than those required in this SD, if that provision is not incompatible with this SD.

ACKNOWLEDGMENT OF RECEIPT

The aircraft operator must immediately provide written confirmation of receipt of this SD to its Principal Security Inspector (PSI) or International Industry Representative (IIR), as appropriate.

DISSEMINATION REQUIRED

The aircraft operator must immediately pass the information and measures set forth in this SD to any personnel having responsibilities in implementing the provisions of this directive. The aircraft operator may share this SD with anyone subject to the provisions of this directive to include but not limited to: federal, state, and local government personnel; authorized representatives; catering personnel; vendors; airline club staff; contractors; etc.

---

remove their mask due to speech impairments or language disorders, or cannot wear a mask because doing so would impede the function of assistive devises/technology. It is not meant to cover persons for whom mask-wearing may only be difficult. The CDC issued additional guidance on disability exemptions on March 23, 2021, which is available at https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html.

APPROVAL OF ALTERNATIVE MEASURES

In accordance with 49 CFR 1544.305(d), the aircraft operator must immediately notify its PSI or IIR, as appropriate, if unable to implement any of the measures in this SD, or in any TSA-approved alternative measure.  The aircraft operator may submit proposed alternative measures and the basis for submitting those measures to its PSI or IIR.

David P. Pekoske
Administrator