§ 706. Because the Court agrees with Plaintiffs that the Mandate exceeds the CDC's statutory authority, it does not reach Plaintiffs' alternative non-delegation claim.

## B. The Mask Mandate Improperly Invoked the Good Cause Exception to Notice and Comment Rulemaking

The APA requires that agencies provide an opportunity for the public to review and comment upon a new rule before it becomes legally binding. *See* 5 U.S.C. § 553(b). The agency must publish a notice in the Federal Register that includes "reference to the legal authority under which the rule is proposed," and "either the terms or substance of the proposed rule or a description of the subjects and issues involved." § 553(b)(2). Following publication, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." § 553(c). This comment period must be at least thirty days. *See* § 553(d). Finally, the "agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

This process is known as "notice and comment." It "permits interested parties to criticize projected agency action before that action is embedded in a final rule and allows the agency to benefit from the parties' suggestions." *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 580 (D.C. Cir. 1981) (per curiam). It also "attempts to provide a 'surrogate political process'" to constrain the exercise of legislative power that Congress has delegated to an otherwise "undemocratic and unaccountable rulemaking process." *Dep't of*

*Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1929 n.13 (2020) (Thomas, J., concurring in the judgment in part and dissenting in part).

The CDC did not allow for public participation through notice and comment before issuing the Mask Mandate. Accordingly, promulgation of the Mandate violated the APA unless an exception to the ordinary rulemaking procedure applies. Despite its importance, the APA provides narrow exceptions to notice and comment. Two of those exceptions are relevant here. The first is when an agency action is not a rule. The second is when the agency properly invokes good cause to forego notice and comment.

### 1. The Mask Mandate Improperly Invoked the Order and Interpretative Rule Exceptions to Notice and Comment

The APA's notice-and-comment procedures apply only to agency rulemaking, *see* 5 U.S.C. § 553(b), which is the process of making a rule "of general or particular applicability and future effect," § 551(4)–(5). It does not apply to case-by-case "adjudication," which results in an "order." § 551(6)–(7); *see Neustar, Inc. v. FCC*, 857 F.3d 886, 893–96 (D.C. Cir. 2017) (Sentelle, J.) (explaining the distinction between rules and orders). Nor does it apply to an agency's "interpretative rules" or "general statements of policy," § 553(b), neither of which are binding on the public. *See Perez*, 575 U.S. at 103 (reciting "the longstanding recognition that interpretive rules do not have the force and effect of law").

Although the Mask Mandate itself claims that it is not a rule within the meaning of the APA, *see* 86 Fed. Reg. at 8030, the government abandoned that untenable position on review. The Mask Mandate is a generally applicable standard "governing conduct and rights." *See Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 620 (D.C. Cir. 1980) (Bazelon, J.). Thus, it is "clearly [a] rule[] subject to the notice and comment procedures required by the APA." *Id.* Accordingly, the sole question is whether the CDC had "good cause."

### 2.   The Mask Mandate Improperly Invoked the Good Cause Exception to Notice and Comment Rulemaking

Notice and comment does not apply "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The Mandate invoked this exception to forego notice and comment. So, the Court must determine whether a thirty-day notice-and-comment period was "impracticable, unnecessary, or contrary to the public interest." *Id.*

This exception "is to be 'narrowly construed and only reluctantly countenanced.'" *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (Brown, J.) (quoting *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (Randolph, J.)); *accord United States v. Dean*, 604 F.3d 1275, 1279 (11th Cir. 2010). It applies only "in

emergency situations" or "where delay could result in serious harm." *Dean*, 604 F.3d at

1281 (quoting *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)).

The "onus is on the [agency] to establish" this finding. *Action on Smoking &*

*Health v. Civ. Aeronautics Bd.*, 713 F.2d 795, 801 n.6 (D.C. Cir. 1983) (per curiam); *see*

*U.S. Steel Corp. v. U.S. EPA*, 595 F.2d 207, 213–14 (5th Cir. 1979) (concluding that the

agency "failed to show strong enough reasons to invoke" the good cause exception); *accord*

*Missouri*, 142 S. Ct. at 660 (Alito, J., dissenting) (explaining that the agency has the

"affirmative burden to show it has good cause"). Specifically, the APA requires that an

agency invoking good cause "incorporate[ its] finding and a brief statement of reasons" why

it believes notice and comment is "impracticable" or "contrary to the public interest."

§ 553(b)(B). Courts do not defer to the agency's conclusion on good cause. *See Mack*

*Trucks*, 682 F.3d at 93. The Court's review of the CDC's determination that good cause

exists "is limited to 'the grounds that the agency invoked when it took the action.'" *Regents*

*of the Univ. of Cal.*, 140 S. Ct. at 1907. The Court "may not supply a reasoned basis for

the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted).

The Mandate asserted that "there [was] good cause to dispense with prior public

notice and comment" because—given "the public health emergency caused by COVID-

19[—]it would be impracticable and contrary to the public's health, and by extension the

public's interest, to delay the issuance and effective date of this Order." 86 Fed. Reg. at

8030. This statement, without more, is insufficient to establish good cause to dispense with

notice and comment.

The Mandate's explanation—a single conclusory sentence—does not carry its

burden to "show strong enough reason to invoke the [good cause] exception." *U.S. Steel*

*Corp.*, 595 F.2d at 214. "A mere recitation that good cause exists . . . does not amount to

good cause." *Zhang v. Slattery*, 55 F.3d 732, 746 (2d Cir. 1995), *superseded on other*

*grounds by statute*, 8 U.S.C. § 1101(a)(42); *Action on Smoking*, 713 F.2d at 800

(explaining that "[b]ald assertions" are insufficient to show good cause). Nor does it allow

the Court to "ensur[e] that [the CDC] engaged in reasoned decisionmaking." *In re*

*Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1263 (11th Cir. 2020) (quoting

*Judulang v. Holder*, 565 U.S. 42, 53 (2011)) (explaining that courts may not simply "rubber

stamp" agency action).

The only reason the Mandate cites is "the public health emergency caused by

COVID-19." 86 Fed. Reg. at 8030. That is "certainly support [for] the promulgation" of

the Mandate, "[b]ut good cause to suspend notice and comment must be supported by

more than the bare need [for the] regulations." *Marshall*, 628 F.2d at 621. And COVID-

19 itself does not *always*" justify an agency bypassing notice and comment. *Florida v. Dep't*

*of Health & Hum. Servs.*, 19 F.4th 1271, 1290 (11th Cir. 2021). Instead, the agency must

"identif[y] specific reasons why . . . [there was] good cause for dispensing with the usual notice-and-comment requirements" in the particular "environment" the agency intended to regulate. *Id.* The Mandate does not do that.

Nor does the Mandate explain why a delay for public comment was contrary to the public's interest. Of course, delay—at least thirty days, *see* § 553(d)—is inherent in public comment. But the APA presupposes that participation from the regulated public produces benefits that outweigh the costs, at least in the ordinary course. *See Nat. Res. Def. Council v. NHTSA*, 894 F.3d 95, 114 (2d Cir. 2018) ("When, as here, the agency argues that its action is in the 'public interest,' a court will only agree 'in the rare circumstances when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest." (quoting *Mack Trucks*, 682 F.3d at 95)). Besides its brief reference to the pandemic, the Mandate makes no effort to explain its reasoning that there was an exceptional circumstance at the time it implemented the rule.

The Mandate's terse conclusion contrasts markedly with another regulation that addressed the COVID-19 pandemic and invoked good cause to forgo notice and comment. When the Centers for Medicare and Medicaid Services (CMS) mandated that the staff of healthcare facilities receiving Medicare or Medicaid funding be vaccinated against COVID-19, it provided almost four pages of reasoning (with forty footnotes of supporting sources) on why there was good cause to forego notice and comment. *See* Medicare and

36

Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61555, 61583–86 (Nov. 5, 2021). CMS "identified specific reasons" to dispense with notice and comment that it supported with "detailed explanation" on "the urgency presented by the ongoing pandemic, the outbreaks associated with the Delta variant, and the oncoming influenza season." *Dep't of Health & Hum. Servs.*, 19 F.4th at 1289–90. CMS also provided an estimated cost in human lives from a delay in issuing the vaccine mandate. *Id.* The Supreme Court concluded that this extensive reasoning properly invoked the good cause exception. *See Missouri*, 142 S. Ct. at 653–54. *But see id.* at 659–60 (Alito, J., dissenting) (reasoning for four Justices that even this explanation of good cause was insufficient). Unlike the CMS rule, the Mask Mandate mustered a single conclusory sentence to support its invocation of good cause.

The Mandate fares no better when compared to non-COVID-19-related regulations that invoked good cause. Courts have found longer and more detailed assertions of good cause deficient. *See, e.g.*, *Mack Trucks*, 682 F.3d at 93–96 (concluding that the EPA lacked good cause despite the rule's four reasons to dispense with notice and comment and eight paragraphs of explanation (citing Nonconformance Penalties for On-Highway Heavy Heavy-Duty Diesel Engines, 77 Fed. Reg. 4678, 4680 (Jan. 31, 2012))). And short or conclusory claims of good cause often fail. *See, e.g.*, *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706–07 (D.C. Cir. 2014) (concluding that an FCC interim order's one

paragraph of explanation on why delay for notice and comment would cause "fiscal peril" was "simply too scant" because it did not include any factual findings); *Nat'l Venture Cap. Ass'n v. Duke*, 291 F. Supp. 3d 5, 17–19 (D.D.C. 2017) (concluding that DHS's three paragraphs of explanation on good cause did "not pass muster" (citing International Entrepreneur Rule: Delay of Effective Date, 82 Fed. Reg. 31887, 31888 (July 11, 2017))). The regulations that succeed often contain detailed and careful explanations of the agency's reasoning. *See Dean*, 604 F.3d at 1277 (concluding that the Attorney General's multiple reasons for issuing a rule without notice and comment were sufficient (citing Office of the Attorney General; Applicability of the Sex Offender Registration and Notification Act, 72 Fed. Reg. 8894, 8896–97 (Feb. 28, 2007))).

The CDC's failure to explain its reasoning is particularly problematic here. At the time when the CDC issued the Mandate, the COVID-19 pandemic had been ongoing for almost a year and COVID-19 case numbers were decreasing. (Doc. 48-1 at 2.) This timing undercuts the CDC's suggestion that its action was so urgent that a thirty-day comment period was contrary to the public interest. So too, the CDC's delay in issuing the Mandate further undercuts its position. The CDC issued the mandate in February 2021, almost two weeks after the President called for a mandate, eleven months after the President had declared COVID-19 a national emergency, and almost thirteen months since the Secretary of Health and Human Services had declared a public health emergency. This history

suggests that the CDC itself did not find the passage of time particularly serious. *See Nat. Res. Def. Council*, 894 F.3d at 114–15 (explaining that agency delay makes "good cause" more difficult to find). Nor did the CDC explain its reason for the delay. *Cf. Dep't of Health & Hum. Servs.*, 19 F.4th at 1290 & n.2 (suggesting that delay undermines a good-cause finding but crediting the agency's explanation for its delay).

To be sure, the CDC needed time to deliberate on its proposed rule. Ordinarily, some of that deliberation occurs during the thirty-day notice-and-comment period. *See* § 553(d) (requiring at least thirty days). Instead, the CDC here spent approximately two weeks considering and drafting the Mask Mandate after the President called for it. Since an agency need publish only "a description of the subjects and issues involved," § 553(b)(3), not a complete rule, the CDC and the public's deliberation process could have partially overlapped. So, providing for notice and comment may have added only another two weeks. Or the CDC could have issued the Mask Mandate as a binding, interim rule and allowed immediate notice and comment on a final version. *See, e.g.*, *Dep't of Health & Hum. Servs.*, 19 F.4th at 1277 (explaining that HHS's "interim rule went into effect immediately" and provided a subsequent opportunity to comment).

Of course, the CDC "was not required to do any of this or to 'consider all policy alternatives in reaching [its] decision.'" *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1914–15 (quotation omitted). But the availability of these alternatives undermines its

39

conclusion that it had good cause to forego notice and comment due to the dangers of delay. *See Mid-Tex Elec. Coop., Inc. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987) (Ginsburg, J.) (describing the "interim status of the challenged rule [as] a significant factor" in whether the agency had good cause). Even more so since the Mandate does not address why these commonsense approaches—which may have required minimal or no additional delay and certainly would have "allowed interested persons an opportunity to submit their views"—were infeasible or contrary to the public interest. *Kollett v. Harris*, 619 F.2d 134, 145 (1st Cir. 1980).

Finally, the Mandate's failure to explain is especially troubling because the benefits of public comment were at their zenith. First, the Mandate governs the conduct of private individuals in their daily lives. Section 553(b) ordinarily provides them the opportunity "to participate in the formulation of the rules by which they are to be regulated." *See Am. Fed'n of Gov't Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981). And the "more expansive the regulatory reach of [agency] rules, of course, the greater the necessity for public comment." *Id.*

Second, the public has a heightened interest in participating in a regulation that would constrain their choices and actions via threats of civil and criminal penalties. *See United States v. Gavrilovic*, 551 F.2d 1099, 1105 (8th Cir. 1977) ("When the consequence of agency rule making is to make previously lawful conduct unlawful and to impose criminal

sanctions, the balance of these competing policies imposes a heavy burden upon the agency to show public necessity."). Though the CDC did not "intend to rely primarily on" them, it "reserve[d] the right to enforce [the Mandate] through criminal penalties." 86 Fed. Reg. at 8030 n.33. Federal statutes provide that an individual who violates or "disregard[s]" regulations issued under § 264 may be fined a thousand dollars, imprisoned for up to a year, or fined and imprisoned. 42 U.S.C. § 271(a). Federal regulations similarly provide for a potential year of imprisonment for violators, but more "strongly encourage[] . . . widespread voluntary compliance," 86 Fed. Reg. at 8030 n.33, by providing for fines of up to $100,000 if the violation does not cause a death and up to $250,000 if it does result in a death. *See* 42 C.F.R. §§ 70.18, 71.2.

Applying these provisions, DHS protocols provide for a $500–$1,000 fine for first-time offenders and $1,000–$3,000 for repeat offenders. *See DHS to Increase Civil Penalties for Violations of the Federal Face Mask Requirement*, U.S. DEP'T OF HOMELAND SEC. (Sept. 9, 2021), https://www.dhs.gov/news/2021/09/09/dhs-increase-civil-penalties-violations-federal-face-mask-requirement. DHS also clarifies that these penalties are separate from any civil penalties that the FAA may impose for "unruly and unsafe behavior." *Id.*; *see also FAA Proposes Fines*, FED. AVIATION ADMIN. (May 24, 2021), https://www.faa.gov/newsroom/faa-proposes-fines-against-5-passengers-allegedly -interfering-flight-attendants (noting that 1,900 of the 2,500 reports of unruly passenger

behavior between January 1, 2021, and May 24, 2021, involved "passengers refusing to comply with the federal facemask mandate").

And finally, "[e]specially in the context of health risks, notice and comment procedures assure the dialogue necessary to the creation of reasonable rules." *Marshall*, 628 F.2d at 621 (describing novel public health measures as "exactly the kind of standard[s] which especially need[] the utmost care in [their] development and exposure to public and expert criticism").

Despite the public interests involved, the availability of alternatives, and the timing, the Mandate makes no effort to "show the impracticability of affording notice and comment," *U.S. Steel Corp.*, 595 F.2d at 213, or that doing so was contrary to the public interest. Nor is the Mandate's invocation of good cause sufficient for the Court to find that the CDC engaged in reasoned decisionmaking when it found good cause.

The government resists this conclusion, arguing that the CDC made a "common-sense finding" based on the record that delaying the Mandate would do real harm because it would lead to increased COVID-19 transmission. (Doc. 45 at 40.) Perhaps so. But, as explained above, the CDC failed to articulate that reasoning or connect its finding—if it did so find—to the record. *See Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1380 (Fed. Cir. 2017) ("[Courts] are limited to examining the reasons [the agency] cited

in [the rule] to justify its invocation of good cause."). The Court may not offer those findings for the agency.

The Court accepts the CDC's policy determination that requiring masks will limit COVID-19 transmission and will thus decrease the serious illnesses and death that COVID-19 occasions. But that finding by itself is not sufficient to establish good cause. "If the existence of a communicable disease alone permitted CDC to find 'good cause,' [then] CDC would seldom, if ever, need to comply with [notice and comment]." *Becerra*, 544 F. Supp. 3d at 1296–97; *cf. U.S. Steel Corp.*, 595 F.2d at 215 ("Were we to allow the [agency] to prevail on this point we would make the provisions of § 553 virtually unenforceable."). And the COVID-19 pandemic does not "*always* . . . justify an agency's bypassing the notice-and-comment process." *Dep't of Health & Hum. Servs.*, 19 F.4th at 1290. Far from it. Instead, the agency must—at the very least—"identif[y] specific reasons why in the environment of [the regulation] the ongoing pandemic constituted good cause." *Id.* The Mandate does not do that.

### 3.  The Mask Mandate's Failure to Provide Notice and Comment Was Not Harmless Error

When courts review agency action, they apply "the rule of prejudicial error." 5 U.S.C. § 706. In other words, a court should not "set aside" an agency action unless an administrative error was harmful. *Id.* But that rule applies only "when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the

substance of the decision reached." *U.S. Steel Corp.*, 595 F.2d at 215 (quotation omitted). And an agency's "complete failure" to comply with administrative procedures requires only "a minimal showing of prejudice" to defeat a claim of harmless error. *Mid Continent Nail*, 846 F.3d at 1384.

Since the CDC's failure to use notice and comment here "plainly affected the procedure used, [the Court] cannot assume that there was no prejudice" to Plaintiffs. *U.S. Steel Corp.*, 595 F.2d at 215 (reasoning that failure to provide pre-promulgation notice and comment was prejudicial despite a post-promulgation opportunity for comment). Indeed, "the entire premise of notice-and-comment requirements is that an agency's decisionmaking may be affected by concerns aired by interested parties." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020).

As a result, "an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002); *see also U.S. Steel Corp.*, 595 F.2d at 215 ("Absence of such prejudice must be clear for harmless error to be applicable."). Plaintiffs provide at least a "minimal showing" that they were prejudiced by the lack of notice and comment. *Mid Continent Nail*, 846 F.3d at 1384. Specifically, they contest the studies and resources that the CDC relied upon and point to other resources that the CDC did not consider. (Doc. 48 at 44, 48–49.) Plaintiffs Pope and Daza,

44

as individuals who are at risk of anxiety or panic attacks while wearing masks, were well-positioned to contest the scope of the Mandate's medical exception. (Doc. 48-2; Doc. 48-3.) And, of course, Plaintiffs could have challenged the CDC's legal basis for regulating private conduct under the threat of criminal penalties through § 264(a). Thus, Plaintiffs "have presented enough to show that on remand they can mount a credible challenge to the [Mandate] and were thus prejudiced by the absence of an opportunity to do so before" the Mandate was issued. *Util. Solid Waste Activities Grp.*, 236 F.3d at 755.

The government disagrees, asserting that the error was harmless. It "presume[es]" that Plaintiffs' comments would have "focused primarily" on "dubious assertions" that would not have changed the CDC's mind. (Doc. 45 at 42.) But the Court does not dole out indulgences for bypassing notice and comment merely because an agency has its mind made up. *Cf. Action on Smoking*, 713 F.2d at 800 ("Bald assertions that the agency does not believe comments would be useful cannot create good cause to forgo notice and comment procedures.").

The government's blithe dismissal aside, the Court may not so lightly conclude that public input would have been inconsequential in a rule directly regulating individual conduct. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014) (Silberman, J.) ("[Courts] have not been hospitable to government claims of harmless error in cases in which the government violated § 553 of the APA by failing to provide notice.").

45

"Section 553 is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas." *U.S. Steel Corp.*, 595 F.2d at 214. The CDC's decision denied Plaintiffs (and the public) that opportunity to affect the outcome.

But more than outcomes are at stake. Process matters too. Notice and comment requirements "are not mere procedural niceties." *Dep't of Health & Hum. Servs.*, 19 F.4th at 1304 (Lagoa, J., dissenting). The "essential purpose" of notice and comment is "to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980) (Bazelon, J.). The government's response obscures that. And its behavior denied it. Even aside from Plaintiffs' showing, that alone is prejudicial error.

Since the CDC issued the Mask Mandate "without observance of procedure required by law," the Court must "hold [it] unlawful and set [it] aside." 5 U.S.C. § 706(2); *see Wheeler*, 955 F.3d at 85 (explaining that failure to provide notice and comment "is a fundamental flaw that normally requires vacatur of the rule" (quotation omitted)).

### C. The Mask Mandate is Arbitrary and Capricious Because the CDC Failed to Adequately Explain its Reasoning

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). "It requires agencies engage in 'reasoned decisionmaking.'" *Regents*

46

*of the Univ. of Cal.*, 140 S. Ct. at 1905 (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). When they fail to do so, courts must "set aside" their actions as "arbitrary" or "capricious." 5 U.S.C. § 706(2).

Plaintiffs raise three arguments on why the Mask Mandate was arbitrary and capricious. First, Plaintiffs argue that the Mandate failed to comply with 42 C.F.R. § 70.2. Second, that the Mandate was substantively unreasonable. And third, that the Mandate failed to adequately explain the CDC's reasoning. (Doc. 48 at 48–49; Doc. 51 at 13–15.) Because the Court agrees with Plaintiffs that the CDC failed to adequately explain its reasoning, the Court need not address whether the substantive decisions embodied in the Mandate were themselves arbitrary or capricious or whether the Mandate violated 42 C.F.R. § 70.2.

The APA's arbitrary and capricious review is "narrow." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quotation omitted). The Court may not "substitute its judgment for that of the agency." *Id.* (quotation omitted). Instead, the Court is limited to ensuring that "an agency's exercise of discretion [was] both reasonable and reasonably explained." *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 937 (D.C. Cir. 2017) (Kavanaugh, J.).

An agency decision is reasonably explained when the agency demonstrates that it engaged in "reasoned decisionmaking." *Michigan*, 576 U.S. at 750. To do so, "the agency

must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). The articulated rationale must also be adequate to explain all major aspects of the decision. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1907, 1910–12. While courts "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," they "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quotations omitted).

Although a closer question than the failure to properly invoke the good cause exception, the Mask Mandate fails this reasoned-explanation standard. Beyond the primary decision to impose a mask requirement, the Mask Mandate provides little or no explanation for the CDC's choices. Specifically, the CDC omits explanation for rejecting alternatives and for its system of exceptions. And there are many, such that the overall efficiency of masking on airplanes or other conveyances could reasonably be questioned.

The Mandate does not address alternative (or supplementary) requirements to masking, such as testing, temperature checks, or occupancy limits in transit hubs and conveyances. It also does not explain why all masks—homemade and medical-grade—are sufficient. Nor does it require "social distancing [or] frequent handwashing," despite finding these effective strategies for reducing COVID-19 transmission. 86 Fed. Reg. at

48

8026. Of course, the CDC did not need to explore "every alternative device and thought conceivable by the mind of man." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978). But an agency "must consider and explain its rejection of 'reasonably obvious'" or "significant and viable" alternatives. *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (quotations omitted).

Even if these alternatives were not so obvious that the CDC had to explain its decision to reject them, the Mandate fails to explain other significant choices. For example, the Mandate relies on studies explaining that "universal masking" reduces transmission of COVID-19 at the community level. 86 Fed. Reg. at 8028. But the Mandate does not require universal masking. It exempts individuals who are "eating, drinking, or taking medication" and a person who is "experiencing difficulty breathing" or who is "feeling winded." 86 Fed. Reg. at 8027 & n.7. It also excludes individuals who cannot wear a mask due to an ADA-recognized disability and all children under two years old. *See* 86 Fed. Reg. at 8027–28 (providing other unexplained exceptions). The Mandate makes no effort to explain why its purposes—prevention of transmission and serious illness—allow for such exceptions. Nor why a two-year-old is less likely to transmit COVID-19 than a sixty-two-year-old. The CDC does not "articulate a satisfactory explanation"—or any explanation at all—"for its action" and fails to include a "rational connection between the facts found and

49

the choices made." *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quotation omitted). Instead, it simply announces the exceptions.

The government disagrees, asserting that the CDC is entitled to strong deference on the scientific, medical, and policy issues underlying the Mask Mandate. True enough. Agency decisions on such "line-drawing" questions as whether a newborn or a three-year-old child must wear a mask are entitled to considerable deference. *See Nat'l Shooting Sports Found.*, 716 F.3d at 214. So too, that "wide discretion" applies to the CDC's decision to limit medical exceptions to the ADA's definition of disability. *Id.* (quotation omitted). But while the CDC is not required to "identify the optimal threshold," it *is* "required to identify the standard and explain its relationship to the underlying regulatory concerns." *Id.* (quotation omitted).

The same deference-and-explanation formula applies to agency decisions involving scientific uncertainty. When "an agency is obliged to make policy judgments" based on limited data, courts grant substantial deference to agency judgments. *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1221 (D.C. Cir. 1999) (quotation omitted). But courts must still ensure that the agency states its "policy judgment[]" and "go[es] on to identify the considerations it found persuasive" in reaching that judgment. *Id.* (quotation omitted). The CDC did not do that here.

50

In the same way, agencies "are permitted to rely on their experience in the regulated field" in crafting rules, but only "so long as they explain what their experience is and how that experience informs the agency's conclusion." *Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1322 (11th Cir. 2021). If the CDC relied on its experience in deciding, for example, that an exception for two-year-olds was an acceptable compromise while an extension to three-year-olds would not be, the CDC did not say so. *See id.* (explaining that agencies may rely on their experience unless "the agency fails to actually explain what that experience was and how that experience supports the promulgated regulation").

In sum, irrespective of whether the CDC made a good or accurate decision, it needed to explain why it acted as it did. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1907 (noting that agency decisions must be "adequately explained"). Since the CDC did not explain its decision to compromise the effectiveness of its Mandate by including exceptions or its decision to limit those exceptions, the Court cannot conclude that the CDC "articulated a 'rational connection between the facts found and the choices made.'" *Jifry*, 370 F.3d at 1180 (quotation omitted). And so, the decision is arbitrary and capricious and due to be "set aside" and remanded to the agency. *See* 5 U.S.C. § 706; *Regents of the Univ. of Cal.*, 140 S. Ct. at 1916 (describing remand as the appropriate remedy); *accord Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136,

1151 (D.C. Cir. 2005) (noting that remand with vacatur is "normally warrant[ed]" for inadequately supported agency actions).

The government disagrees, asserting that the CDC must have considered the question of medical exceptions and the age cut-off because it granted some exceptions. (Doc. 45 at 37–38.) This argument understates the agency's burden.

The agency must consider the essential aspects of the problem and act reasonably, as the government claims that the CDC did. That is necessary, but not sufficient alone. It must also explain its decision with enough particularity that a reviewing court can determine that it used its discretion appropriately. The CDC did not do that. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1913 ("The fact that there may be a valid reason . . . does not establish that [the agency] considered [it] . . . ."). It didn't even try to explain. And the Court may only consider "the grounds that the agency invoked when it took the action." *Michigan*, 576 U.S. at 758; *see Regents of the Univ. of Cal.*, 140 S. Ct. at 1909–10 ("An agency must defend its actions based on the reasons it gave when it acted."). The government may not supply "'post hoc' rationalizations." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). So too, the "reviewing court should not attempt itself to make up for . . . deficiencies" in the agency's explanation of its rule and "may not supply a

reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quotation omitted).

Without a contemporaneous explanation, the Court cannot conclude that the CDC "reasonably considered the relevant issues and reasonably explained the decision." *FEC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Nor can the Court "ensure that [the CDC] engaged in reasoned decisionmaking." *Nat'l Mining Ass'n*, 985 F.3d at 1321. Accordingly, the Mandate is due to be set aside as arbitrary and capricious and "remand[ed] to [the CDC]." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1916.

### D. The Mask Mandate is Vacated for Violating the APA

As explained above, the Mask Mandate exceeds the CDC's statutory authority and violates the APA. Plaintiffs ask the Court to declare it unlawful and set it aside. (Doc. 51 at 16.) This remedy mirrors the relief they sought in their Amended Complaint. (Doc. 39 at 29.) The government argues that Plaintiffs' relief is limited to a declaratory judgment and, even if other relief is awarded, it should be limited to non-enforcement of the Mask Mandate against Plaintiffs. (Doc. 50 at 25.)

The APA requires that courts "hold unlawful and set aside agency action" that violates the APA or exceeds the agency's authority. 5 U.S.C. § 706. Courts have long interpreted this provision as authorizing vacatur. Indeed, "vacatur . . . is the ordinary APA remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271,

1290 (11th Cir. 2015) (quotation omitted); *accord Allina Health Servs.*, 746 F.3d at 1110 (describing vacatur as "the normal remedy" for an APA violation); *Advocs. for Highway & Auto Safety*, 429 F.3d at 1151 ("[U]nsupported agency action normally warrants vacatur . . . ."). Some judges even reason that the APA mandates vacatur and permits of no other, lesser remedy. *See Checkosky v. SEC*, 23 F.3d 452, 492 (D.C. Cir. 1994) (Randolph, J., separate opinion) ("[O]ur decisions uniformly—and quite firmly—hold that § 706[] requires us to vacate . . . ."); *accord Milk Train, Inc. v. Veneman*, 310 F.3d 747, 757 (D.C. Cir. 2002) (Sentelle, J., dissenting) (explaining that remand to the agency without vacatur violates the APA). And vacatur ordinarily applies to the rule generally, not to just the plaintiffs in a suit. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989))); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2351 n.8 (2020) (explaining that, when "a provision [of law] is declared invalid[,]" the invalid provision "cannot be lawfully enforced against others"—not just "against the plaintiff").

Additionally, the recognized exceptions to vacatur for APA violations do not apply here. In deciding whether to award less-than-vacatur relief, courts frequently consider

(1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and (2) "the disruptive consequences of an interim change that may itself be changed." *Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993); *see also Black Warrior Riverkeeper*, 781 F.3d at 1290 (relying on this test). Here, the CDC cannot correct the serious deficiencies on remand nor is the Mask Mandate a rule necessitating a significant administrative winddown period. And, of course, the government never asked for remand to the CDC without vacatur.

While the Court recognizes the criticism about nationwide injunctive relief and admittedly shares some of the skepticism about it, *see Health Freedom Def. Fund, Inc. v. Biden*, __ F. Supp. 3d __, 2021 WL 5416688, at *5 & n.4 (M.D. Fla. 2021) (Mizelle, J.), the weight of authority and judicial practice instructs that vacatur is an appropriate remedy for an APA violation. *See, e.g., Black Warrior Riverkeeper*, 781 F.3d at 1290; *Alabama v. CMS*, 674 F.3d 1241, 1244 (11th Cir. 2012) (per curiam) (affirming the vacatur of an agency rule that violated the APA's notice-and-comment requirements); *Nat'l Mining Ass'n v. Sec'y of Lab.*, 153 F.3d 1264, 1269 (11th Cir. 1998) (vacating an agency rule for failing to comply with statutory requirements). The government, aside from a single sentence in its response, (Doc. 50 at 25), does not brief the propriety of vacatur. Nor does it address whether an injunction, which is often entered in a preliminary posture, and

vacatur, which follows final judgment, are comparable.[4] *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010) (describing complete vacatur as a "less drastic remedy" than an injunction); *CMS*, 674 F.3d at 1244–45 (discussing vacatur and an injunction as separate remedies); *see also O.A.*, 404 F. Supp. 3d at 118 ("As a result, vacatur—*i.e.*, nullification—of the Interim Final Rule obviates any need for the issuance of an injunction.").

There is another, independent reason supporting vacatur: Such relief is necessary to grant complete relief to Plaintiffs. Whatever doubts surround nationwide injunctive relief in general, there is no doubt that an Article III court "may administer complete relief between the parties, even [if] this involves the determination of legal rights which otherwise would not be within the range of its authority." *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2427 (2018) (Thomas, J., concurring) (explaining that historic equity permitted relief to benefit third parties if it

---

[4] The government contends that Plaintiffs are estopped from seeking an injunction because they earlier represented to the Court that they were seeking a declaratory judgment and that the Court relied upon that representation in denying the government's motion to transfer. (Doc. 50 at 25.) This argument is misplaced. First, the Plaintiffs never sought an injunction in this case, preliminary or otherwise. Second, in denying the government's motion to transfer, the Court relied on numerous differences between this case and the pro se-prosecuted case pending in a different division within the Middle District of Florida, only one of which highlighted that the plaintiff there had sought a temporary restraining order, a preliminary injunction, and a permanent injunction while Plaintiffs here did not. (Doc. 35 at 8.) Third, after denying the government's motion to transfer, Plaintiffs filed an Amended Complaint in this case, realleging the relief of a declaratory judgment and to set the Mandate aside. (Doc. 39 at 29.) The Court does not see how—even assuming an injunction and vacatur are identical relief—Plaintiffs are estopped when they sought this very relief in the Amended Complaint and never took any subsequent action that could be deemed a waiver or forfeiture of that kind of relief.

was "merely a consequence of providing relief to the plaintiff"). Stated simply, incidental

benefit to non-parties does not deprive Article III courts of exercising their "historic power

of equity to provide complete relief" to the plaintiffs before it. *Mitchell v. Robert DeMario*

*Jewelry, Inc.*, 361 U.S. 288, 292 (1960).

And awarding complete relief here requires vacatur. The difficulty of distinguishing

the named Plaintiffs from millions of other travelers—both for government actors and the

myriad of private companies, individuals, and local governments bound to enforce the

Mandate with "best efforts"—almost ensures that a limited remedy would be no remedy at

all. How is the ride-sharing driver, flight attendant, or bus driver to know someone is a

Plaintiff to this lawsuit with permission to enter mask-free? The identification problem is

compounded further for the geographically dispersed members of Health Freedom

Defense Fund.[5] *See Dep't of Health & Hum. Servs.*, 19 F.4th at 1282 (explaining that

"universal relief may be justified where the plaintiffs are dispersed throughout the United

States"). There seems to be no adequate assurances that the government can provide that

its agents or an unwitting "enforcer" will not violate this Court's order and deprive Plaintiffs

of their relief. Thus, complete vacatur—in addition to being the "ordinary APA remedy,"

---

[5] The Court takes judicial notice of the fact that Health Freedom Defense Fund has members throughout the country. *See Health Freedom Def. Fund, Inc. v. Roark*, No. 1:21-cv-406 (D. Idaho Oct. 15, 2021) (challenging an Idaho school mask mandate and alleging that members of the Fund reside in Idaho); *Health Freedom Def. Fund, Inc. v. Reilly*, 2:21-cv-8688 (C.D. Cal. Nov. 3, 2021) (challenging Los Angeles school district's staff vaccine mandate and alleging that members of the Fund reside in California).

*Black Warrior Riverkeeper*, 781 F.3d at 1290 (quotation omitted)—is necessary to remedy Plaintiffs' injury.

## IV.   CONCLUSION

"It is indisputable that the public has a strong interest in combating the spread of [COVID-19]." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2490. In pursuit of that end, the CDC issued the Mask Mandate. But the Mandate exceeded the CDC's statutory authority, improperly invoked the good cause exception to notice and comment rulemaking, and failed to adequately explain its decisions. Because "our system does not permit agencies to act unlawfully even in pursuit of desirable ends," *id.*, the Court declares unlawful and vacates the Mask Mandate.

Accordingly, the following is **ORDERED**:

1.   Plaintiffs' Motion for Summary Judgment (Doc. 48) is **GRANTED** on Counts I, II, and III. Defendants' Motion for Summary Judgment (Doc. 45) is **DENIED**.

2.   The Court **DECLARES UNLAWFUL** and **VACATES** the Mask Mandate, remanding it to the CDC for further proceedings consistent with this order.

3.   The Court directs the Clerk to **TERMINATE** President Joseph R. Biden, Jr., as a Defendant to this action, to **ENTER** final judgment in favor of Plaintiffs as prescribed in this order, and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on April 18, 2022.

*Kathryn Kimball Mizelle*

Kathryn Kimball Mizelle
United States District Judge

59